Case Nos. 11-3684, 11-3685

# United States Court of Appeals

*for the*

# Third Circuit

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock;
RICHARD GROGG and FRANK EDGETT, by and through their next friend
Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl
Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on
behalf of themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA and SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA.

CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin
Springstead; MARIA MEO, by and through her mother and guardian Grace Meo;
DANIEL BASTEK, by and through his father and guardian, John Bastek;
MICHAEL STORM, through his guardian, Polly Spare; BETH ANN LAMBO,
by and through her father and guardian, Joseph Lambo; RICHARD KOHLER, by
and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and
through her father and guardian Thomas Kashatus; and WILSON SHEPPARD,
by and through his brother and next friend, Alfred Sheppard,
Appellants in No. 11-3684,

DIANE SOLANO, by and through her brother and guardian, Carl A. Solano,
Appellant in No. 11-3685.

_____

ON APPEAL FROM THE ORDER DATED SEPTEMBER 2, 2011, BY THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA,
CIVIL ACTION NO. 09-01182

## CONSOLIDATED JOINT BRIEF FOR APPELLANTS
## AND APPENDIX VOLUME I (Pages JA1-JA39)

BENJAMIN J. HOFFART
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorney for Appellants in No. 11-3684*

CARL A. SOLANO
SCHNADER HARRISON SEGAL
  & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorney for Appellant in No. 11-3685*

# TABLE OF CONTENTS

*Page*

STATEMENT OF JURISDICTION...................................................................1

STATEMENT OF ISSUES ...............................................................................1

STATEMENT OF RELATED CASES ...............................................................2

STATEMENT OF THE CASE............................................................................2

    PRELIMINARY STATEMENT ........................................................................2

    PROCEDURAL HISTORY ..............................................................................3

STATEMENT OF FACTS ..............................................................................10

SUMMARY OF ARGUMENT .......................................................................27

ARGUMENT ..................................................................................................29

I.    THE DISTRICT COURT ERRED IN CERTIFYING AN IMPROPER CLASS UNDER RULE 23(b)(2) OF THE RULES OF CIVIL PROCEDURE ......................................29

    A.    The Class Defined by Plaintiffs Is Too Indefinite .............................30

    B.    The Class Depends on an Opt-Out Provision Not Permitted Under Rule 23(b)(2) ......................................................................................36

    C.    The Class Is Not Cohesive ................................................................40

    D.    The Named Plaintiffs' Claims Are Not Typical of Those of All Other Class Members and Those Plaintiffs Are Not Adequate Representatives of the Class.............................................................45

    E.    The Class Certification Did Not Comply with the Procedural Requirements of Rule 23 ........................................................................48

    F.    Because the Certification Was Improper, the Certification Order Should Be Vacated .............................................................................48

II.    THE DISTRICT COURT ERRED IN FAILING FULLY TO CONSIDER
       APPELLANTS' OBJECTIONS TO THE SETTLEMENT ............................................49

       A.    Appellants Are Class Members with Full Standing as Parties in
             Both the District Court and This Court ...............................................50

       B.    If Appellants Were Not Class Members, the District Court Should
             Have Permitted Them To Intervene So They Would Have Stand-
             ing To Object .....................................................................................53

III.   THE DISTRICT COURT ABUSED ITS DISCRETION AND BREACHED ITS
       FIDUCIARY DUTY TO CLASS MEMBERS WHEN IT APPROVED THE
       SETTLEMENT AS FAIR .....................................................................................54

       A.    The Settlement Compels Removal to Community Facilities of
             Residents Who Need Comprehensive Care and Have Not Ex-
             pressed a Desire To Be Moved ...........................................................55

       B.    The Settlement Procedures Are Infected by Bias ...............................60

       C.    The Settlement Fails To Provide Protections for State Center Res-
             idents Who Make Improvident Decisions To Relocate to Commu-
             nity Facilities .....................................................................................62

       D.    The Settlement Fails To Provide Protections for State Center Res-
             idents Who Do Not Wish To Be Relocated .........................................64

CONCLUSION ...................................................................................................69

# TABLE OF AUTHORITIES

*Page*

### Cases

*Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa., Jan. 30, 2006) & 2009 U.S. Dist. LEXIS 1540 (W.D. Pa., Jan. 12, 2009) ......................................11

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...........................................41

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998)*, cert. denied*, 526 U.S. 1114 (1999).....................................................................................40, 42

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) .............................................38

*Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684 (D. Minn. 1994)...............54

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004).....................................................31

*Devlin v. Scardelletti,* 536 U.S. 1 (2002)...........................................................38, 52

*Gardner v. Parson*, 874 F.2d 131 (3d Cir. 1989) .....................................................39

*Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006)..................................53

*Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011).......................................40

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ....................................................25, 30

*Grimes v. Vitalink Comm. Corp.*, 17 F.3d 1553 (3d Cir. 1994) ..............................52

*Harris v. Pernsley*, 820 F.2d 592 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987)...............................................................................................................49, 53

*Indus. Maritime Carriers (Bahama), Inc. v. Miller*, 399 Fed. Appx. 704 (3d Cir. 2010) ......................................................................................................60

*In re Bear*, 44 Pa. D.&C. 4th 225 (C.P. Dauphin 1999).........................................59

*In re Community Bank of N. Va.& Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3d Cir. 2005) ...............................................54

*In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001) ...................59

*In re General Motors Corp. Pick-Up Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, *cert. denied*, 516 U.S. 824 (1995)............................................................50, 54, 60

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)..... 29, 31-32, 40-41, 48

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) .........................30

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315 (3d Cir. 2001) ............................................................................................................55, 66

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010) ..................... 54-55

*In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).....................................30, 45

*In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 278 F.3d 175 (3d Cir. 2002) ...................................................................................................49

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009) ..............45

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .....................30

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981)....................................37

*Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007) .................................67

    Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx?submit =showbr&shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006) ........................67

*Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. LEXIS 34122 (N.D. Ill., Apr. 7, 2010) ........................................................................................................ 66-67

*Marino v. Ortiz*, 484 U.S. 301 (1988)....................................................................53

*McReynolds v. Richards-Cantave*, 588 F.3d 790 (2d Cir. 2009)............................52

*Neal ex re. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) .........................................40

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ..............................................................................................................49

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)..................................*passim*

*Tennessee Ass'n of Health Maintenance Orgs. v. Grier*, 262 F.3d 559 (6th Cir. 2001) ..............................................................................................................54

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 2001 U.S. Dist. LEXIS 13115, (S.D. Ind., Aug. 28, 2001), *aff'd*, 309 F.3d 978 (7th Cir. 2002) ......................54

*Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179 (3d Cir. 2006) ...........................48

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...................................37, 44

### *Statutes*

Americans with Disabilities Act, Tit. II, 42 U.S.C. § 13132....................................3

Developmental Disabilities Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 15042..............................................................................................48

Judicial Code

    28 U.S.C. § 1291...................................................................................................1

    28 U.S.C. § 1331...................................................................................................1

    28 U.S.C. § 1334...................................................................................................1

Mental Health and Intellectual Disability Act, 50 Pa. Stat. Ann. §§ 410 *et seq.* ....63

Rehabilitation Act § 504, 29 U.S.C. § 794 ..............................................................3

### *Court Rules*

Federal Rules of Civil Procedure

    Rule 17(c)(2)..............................................................................................39, 59

    Rule 23(a)(2)....................................................................................................44

    Rule 23(a)(3)....................................................................................................45

    Rule 23(a)(4)....................................................................................................45

    Rule 23(b)(2)...................................................................................5, 36-38, 40

    Rule 23(b)(3)....................................................................................................40

    Rule 23(c)(1)....................................................................................................48

Rule 23(e)(2) ...............................................................................55, 60

### Other Authorities

J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com/regionstate/20000416western4 .asp* (Apr. 16, 2000) ..........................................................................11

Am. Psych. Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DIS-ORDERS (4th ed., Text rev., 2000) ...............................................13, 15

ID/A Coalition, "Parents Warn That Cuts Will Hurt People with Disabilities," *http://www.par.net/portals/0/Mailman/Press2011.1213IDACoalitionrelease onHearing.pdf* (Dec. 13, 2011) ........................................................35

Walsh, *et al.*, "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research," 41 MENTAL RETARDA-TION 103, 116 (2003) .................................................................34, 44

7A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 1760 (2005) ............................................................................. 30-31

_____

All Internet materials are as accessed on December 16, 2011. Hard copies are available on request.

vi

## STATEMENT OF JURISDICTION

This action under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act, was within the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1343. The court's September 2, 2011 order approved the parties' settlement and dismissed the case. JA5. Appellants appealed on September 29, 2011. JA1, 3. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Did the district court err in certifying a class consisting of all Pennsylvania State Center residents who could reside in the community with "appropriate services and supports" and "do not or would not oppose community placement"?

PRESERVED AT: Objections, JA961-77,1027-42.

2. Did the district court err in failing to consider the Appellants' objections as those of class members or parties?

PRESERVED AT: Objections, JA959-60, 1025-27; motions for limited intervention, JA1000-12, 1062-66; *see* JA33-35 (order denying intervention).

3. Did the district court err in overruling those objections and approving the parties' class action settlement as fair?

PRESERVED AT: Objections, JA948-49, 1013-61; *see* JA5-6 (order).

## STATEMENT OF RELATED CASES

This case was before this Court at No. 10-1908, on an appeal by the present appellants in No. 11-3684 from an order denying intervention. This Court affirmed by a non-precedential opinion. 432 Fed. Appx. 94 (2011), *aff'g* 267 F.R.D. 456 (M.D. Pa. 2010). There are no other related proceedings.

## STATEMENT OF THE CASE

### PRELIMINARY STATEMENT

Appellants are among over 1,000 residents of Pennsylvania's intermediate care facilities for the mentally retarded ("ICFs/MR," or "State Centers"). Under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), states have an obligation to maintain such institutional facilities for those best suited to receive care in them. *See* 527 U.S. at 587-602. States also are obligated to enable relocation to "community" facilities for those who are able to live in them and choose to move there. *See id.*

This controversy arises from the competing interests of those who wish to live in community facilities, those who do not, and those whose wishes cannot be known. The named plaintiffs seek to relocate to community facilities, and no one in this litigation opposes that. But the district court certified a class consisting of ***all*** State Center residents, including those whose mental disabilities (and lack of guardians or others to speak on their behalf) make them unable to understand this question

2

or communicate what they want.  And it then approved a class action settlement that, by deliberately mischaracterizing such residents' inability to state their wishes as apathy about where they live, requires removal of those residents from the State Centers — even though the court's opinion ("Op.") expressed "serious doubts" about this result, questioned its "wisdom," and acknowledged "fears [about it that] . . . are heartfelt and entirely real."  JA21-22, *reported at* 2011 U.S. Dist. LEXIS 99044, at *20.  The court also approved unfair settlement terms that may force all Center residents to relocate in the future because of changes the settlement may cause to the Centers.  These results call for appellate review of both the class certification and the settlement's approval.

PROCEDURAL HISTORY

**The lawsuit.**  In 2009, five State Center residents — Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, and Anthony Beard (all by and through "next friends") — sued Pennsylvania's Department of Public Welfare ("DPW") for alleged violations of Title II of the ADA, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, because, they claimed, the Commonwealth did not take sufficient measures to enable them to move from the State Centers to "community" facilities.  They filed their action as a class action on behalf of all 1,272 residents of the Commonwealth's five State Centers.  JA79-80 (Am. Compl.).  The case was heard by Judge John E. Jones, III.

3

The amended complaint alleged that because the State Centers imposed "unnecessary segregation and institutionalization," the five plaintiffs wanted to move to "community" facilities. JA75-76. Plaintiffs claimed they "can live in the community" if they are provided "with appropriate services and supports," but that DPW failed to expend resources to relocate them because it gave higher priority to finding facilities for the thousands of individuals who receive no care at all. JA81-85, 90-91, 93-96.

Expanding their case beyond just themselves, plaintiffs alleged that "State-operated ICFs/MR are not the most integrated settings appropriate to the needs of *any* individual resident of those facilities." JA91 (emphasis added). They declared: "*All* persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings." JA91 (emphasis added). They claimed it would be cheaper for the Commonwealth to care for all State Center residents in the "community." JA76, 90, 95. They alleged that "[m]any" State Center residents and their families "are not opposed to discharge to the community" — an allegation that, as explained below, carefully avoided claiming that those residents or families actually *want* relocation — and alleged that those who opposed relocation were misinformed. JA92. Plaintiffs sought declaratory and injunctive relief on behalf of themselves and a class consisting of all State Center residents. JA79-80, 97-101.

Many of these allegations are contrary to the facts, but defendants did not contest them.  Indeed, they contested little during the course of this case.  After unsuccessfully moving to dismiss on the ground that plaintiffs merely were seeking to "jump the queue" and obtain higher placement on a community-care waiting list, JA171 (order denying motion), defendants filed an answer admitting, in particular, that "[a]ll persons" in the State Centers "with appropriate supports and services, could live in more integrated settings."  JA91, 185.

*Class certification.*  On August 31, 2009 (before defendants filed any substantive response to the amended complaint), plaintiffs moved to certify a mandatory, non-opt-out class under Rule 23(b)(2) of the Rules of Civil Procedure, with themselves as class representatives.  The class would be defined as:

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports;  and (3) do not or would not oppose community placement.

JA103-04.  Plaintiffs presented no evidence in support of their motion, except for a declaration discussing their counsel's qualifications.  *See* JA107.  In a brief supporting the motion, plaintiffs claimed that the class would consist of all 1,272 State Center residents and that plaintiffs were typical of all class members because everyone would seek the same type of relief.  JA 155, 158-60.  Plaintiffs did not discuss what "services and supports" would be "appropriate" to enable all 1,272 class members to reside in

5

community facilities, or the feasibility of providing them. Nor did they present evidence regarding how many residents "do not or would not oppose community placement" or how that would be determined. Their motion contained no discussion of whether individualized issues would deprive the class of the cohesion necessary for certification.

Despite these issues, defendants did not oppose the motion or file any response. Nor did the court hold a hearing to determine whether a class should be certified. Instead, on September 2, 2009 (two days after the motion was filed), the court granted the motion by entering an order (containing findings) that was substantially identical to the form submitted by plaintiffs, except that it added a paragraph about qualifications of class counsel. JA36.

***Denial of intervention.*** On November 10, 2009, nine residents of the State Centers, by and through their guardians or "next friends," moved to intervene in this action. They included all eight of the present appellants in No. 11-3684 in this Court — Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, and Wilson Sheppard (the ninth proposed intervenor died while this action was pending). They opposed the relief plaintiffs sought for the class, and, in view of the feeble defense mounted by defendants, sought to protect the interests of those opposed to relocation to community facilities and to present evidence in their support. JA166.

The district court denied intervention.  JA189, *reported at* 267 F.R.D. 456.  It held that the proposed intervenors did not have a significant risk that a protectable interest would be impaired by the action because the certified class includes only those who "do not or would not oppose community placement," thus enabling opponents to opt out of any decree.  JA200-01 (*id.* at 462-63).  The court also held that, under *Olmstead*, the Commonwealth could not deprive those wishing to reside in the State Centers of their right to do so.  JA200-01 (*id.* at 462 n.6).  And the court said the putative intervenors' interests were adequately protected by DPW.  JA205 (*id.* at 463-64).  In a non-precedential decision, this Court affirmed, holding that the district court's decision was not an abuse of discretion.  JA436 (432 Fed. Appx. 94).

    ***Summary judgment on liability.***  Following limited discovery, the parties filed cross-motions for summary judgment.  The district court granted the plaintiffs' motion.  JA410, *reported at* 768 F. Supp. 2d 747.

    Again, DPW mounted little defense.  Its response to plaintiffs' motion included numerous "admissions" supporting plaintiffs' theory of the case, which the district court then accepted as true.  *See*, *e.g.*, JA414-16 (768 F. Supp. 2d at 750).  Its defense relied mainly on its last-minute adoption of what it called an "*Olmstead* plan" to provide future relocations to community facilities, but the court rejected DPW's plan because it lacked "concrete benchmarks for deinstitutionalization."  JA428-32 (*id.* at 751-56).  Since this sole defense failed, the court directed entry of summary judgment

7

on liability and scheduled future proceedings to formulate an injunction. JA432-33 (*id.* at 757).

*Settlement.* Defendants engaged in no further efforts to defend the case (or to appeal). Instead, on May 19, 2011, they entered into a settlement with plaintiffs under which all State Center residents (whether part of the defined class or not) would be screened for placement on a "Planning List" that would name candidates for removal of up to 400 individuals from the State Centers by 2016. JA466 (Set. Ag.). Plaintiffs moved for preliminary approval of the settlement on May 26, 2011, JA447, and the court granted the motion the next day. JA485.

In response to a court-ordered notice of the settlement that was sent to all State Center residents, guardians, and family members, JA487-88 (order ¶¶ 3-4, 7), the court received 102 objections, 60 of which were from guardians (most of whom also are family members). JA1091, 1093 (Meek Decl.). *See* JA489-947 (copies of all objections). Appellants in these two appeals are nine of those objectors — the eight residents who had unsuccessfully moved to intervene, plus (in No. 11-3685) Diane Solano, a resident of the White Haven State Center who objected by and through her guardian.[1] The objections raised issues about specific terms of the settlement and also challenged the propriety of the class certification. *See* JA 489-947, 948, 1013.

---

1.    Other objectors are participating in this appeal as members of VOR, an advocacy organization for the mentally disabled that is filing an *amicus* brief on their behalf.

The court scheduled an August 22, 2011 hearing on whether to approve the settlement, and Appellants moved to intervene for the limited purpose of presenting their objections at that hearing. JA1000, 1062. On August 16, 2011, the court denied those motions and ordered that it would "take testimony and fact evidence presented only by the parties." JA34. The court did permit Appellants to question the parties' witnesses, however, *id.*, and, two business days before the hearing, ordered the parties to tell Appellants who those witnesses would be. JA1337-38. The court said it would "fully consider all written objections as filed," making them "a part of the record" without receipt of further evidence. JA1337.

At the hearing, the parties presented testimony by DPW's director for ICF/MR programs, Pamela Kuhno, and the acting director of its bureau of supports, Patricia McCool, as well as by Colleen Sassaman, an employee of the Disability Rights Network ("DRN," plaintiffs' counsel) who works as a "facility advocate" at the Selinsgrove State Center. JA1353-1438. The court then permitted argument by Appellants and heard statements from some of the other objectors in attendance. JA1440-43, 1445-54, 1457-74, 1491-94. The following week, on September 2, 2011, the court approved the settlement without modification, although, as discussed below, it expressed "serious doubts" about it. JA21 (Op. at 15).

These appeals were filed on September 29, 2011. JA1, 3. On November 8, 2011, after being informed by DPW that the residents it would relocate during

9

the 2011-12 fiscal year included some who, as explained below, are incapable of understanding what is happening to them and have no one to speak on their behalf, Appellants moved to stay the September 2, 2011, order, insofar as it applied to those residents. JA1505  The court has not yet acted on that motion.

## STATEMENT OF FACTS

Many of the facts relevant to these appeals are undeveloped. No material evidence was introduced at the time of class certification; the anemic defense asserted on summary judgment called for a limited factual record; only proponents of the settlement were permitted to present evidence at the settlement hearing; and intervention to permit development of a more complete record was denied. Nevertheless, the record that exists discloses the following:

***The State Centers.*** There are five State Centers, located in Ebensburg, Hamburg, Polk, Selinsgrove, and White Haven. Each provides comprehensive services to mentally disabled residents in "single or multiple buildings on campus-like sites accommodating more than eight persons." JA141 (Pa. budget description). The Centers take advantage of their proximity to nearby population centers, and their residents frequently attend such local events and activities as sports contests, church services, and local fairs. JA514, 774, 825; 1493 (Gordon, Potera, Sen. White Obj. Ltrs.; Sen. White testimony).

In recent decades, DPW has been reducing the number of State Centers, often against the wishes of Center residents and their families. JA834-835 (VOR Obj. Ltr.). *See generally Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa., Jan. 30, 2006) & 2009 U.S. Dist. LEXIS 1540 (W.D. Pa., Jan. 12, 2009) (closing of Altoona Center against residents' wishes); J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com/regionstate /20000416western4.asp* (Apr. 16, 2000) (reporting closure of Western Center while "several dozen parents stood helplessly behind police barricades . . . as their mentally retarded children who had lived there for decades were driven away"). DPW says budget constraints have prevented it from closing more Centers. *See* JA367-68 (Defs.' Ans. to Pl. Sum. J. Stmt. ¶¶ 103-05). Those budget constraints continue; as of June 2011, the Commonwealth's projected budget deficit was nearly $4 billion. JA966 (Solano Obj.); *see* JA826 (Sen. White Ltr.).

**The State Centers' residents.** When this case was filed, there were 1,272 State Center residents. JA141 (Pa. budget). The population has been declining as aging residents die. JA299 (Pl. Sum. J. Stmt. & Defs.' Ans. ¶ 21). By the time of the settlement, it had dropped to between 1,150 and 1,207. JA999 (Solano Ex. A); JA1368 (Kuhno testimony). DPW permits no new admissions that would offset this decline. *See* JA1437 (McCool testimony).

11

Many State Center residents have lived there for several decades — often 40 years or longer. *See, e.g.*, JA505, 507, 517, 519, 955 (Garramone, Reider, Attanasio, Beston  Ltrs.; Solano Obj.).  As a result, they consider the State Centers their home.  JA519, 581, 612 (Beston, Utt, M. Kashatus Ltrs.).  Many residents have become closely attached to staff members and fellow residents, considering them their family and community.  Some call staff members by their first names, or, even, "Mommy."  JA634, 647, 684 (O'Donnell, Grebski, Brice Ltrs.).  Some look to other residents for support.  JA845, 943 (Lotzi, Boring Ltrs.).  Solano's Individual Support Plan says that she recognizes friends and staff and demonstrates enjoyment being with them by her facial expressions.  JA1462 (Solano statement).  According to their family and guardians, many residents would be "devastated" to leave the Centers and would be "traumatized" if forced to do so.  JA531, 574, 623, 700, 794, 819, 845 (Brown, Spare, Thomas Kashatus, Wright, Herring, Crawford, Lotzi Ltrs.).

As the residents have aged, so too have their closest family members.  The court received objection letters from parents — some in their 80s and 90s — describing how placing their children in the State Centers was the hardest decision of their lives and expressing horror that this lawsuit now threatens to remove those children, just as their parents have become too old to fight back.  *See, e.g.*, JA698, 922 (Chang, Musacchio Ltrs.).  Many residents' parents are deceased and many of their families are dispersed, leaving them with no close relatives involved in their care.

And while some relatives have been appointed as the residents' legal guardians, ***82% of the residents*** have ***no guardians*** to protect their interests**.** JA280 (DRN Info. Rpt.). *See also* JA1384, 1398 (Kuhno testimony). At no point during the litigation did the district court appoint guardians ad litem for these residents.

All of the State Center residents have intellectual disabilities. JA999 (Solano Obj., Ex. A). Most are diagnosed as having "mental retardation" (subnormal intellectual functioning, accompanied by significant adaptive limitations).[2] This condition has several degrees of severity, the most extreme being "profound mental retardation" (diagnostic code 318.2), in which the person's intelligence quotient is below 20 or 25. *See* Am. Psych. Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 41-42 (4th ed., Text rev., 2000) ("DSM-IV-TR"). As DPW has closed State Centers around the Commonwealth, it has moved residents having less severe degrees of disability to other types of facilities. As a result, ***more than three-fourths*** of all remaining State Center residents are ***diagnosed as having profound mental retardation.*** JA999; 1383 (Solano Obj., Ex. A; Kuhno testimony); *see* JA304, 365 (Pl. Sum. J. Stmt. & Defs.' Ans. ¶ 47).

---

2.  The mental health community has worked in recent years to change terminology from "mental retardation" to terms like "intellectually disabled," but the formal diagnosis remains unchanged. The former term is used throughout this record and, therefore, in this brief.

The objectors' submissions describe such residents' conditions. For example, Appellant Solano has a mental age at or below one year. She is incapable of caring for herself and must rely on others for all daily needs, including food, clothing, bathing, and toilet activities. She can understand only the simplest directions, usually in connection with a routine developed over time, and therefore cannot be provided with advance care or safety instructions. She has no comprehension of everyday dangers. She is non-verbal, and her wants or needs must be anticipated by others. And because she is quiet and passive, she could easily be misplaced. She thus needs 24-hour care, seven days per week. JA955 (Solano Obj.). Many objectors' letters described similar residents. Among the other Appellants, Kashatus has a developmental state of three months, JA623; Lambo has a diagnosed mental age of 18 months, JA 570; and Storm has a mental age of two months, JA573. *See also* JA617, 922 (Perry, Musacchio Ltrs.).

Individual Support Plans prepared for these residents by DPW's professional staff confirm the residents' limited abilities, and, in particular, their inability to comprehend issues like whether they should be moved from a State Center to a "community" facility. Solano's ISP states, for example: "Diane's functioning level does not appear to support the idea she can comprehend these matters. Therefore, it is highly unlikely she has any interest or awareness of community-based placement options." JA969 (Solano Obj.). Inability to comprehend a choice between State Center

14

and community care options is common among State Center residents.  *See* JA581,

628, 770, 891, 922, 937 (Utt, Centi, Lightner, Vodzak, Musacchio, Lloyd Ltrs.).

The profound disabilities of three-fourths of the residents, coupled with

the fact that 82% of them lack guardians and many have no involved family members,

define a highly vulnerable subgroup of the State Centers' population.  They cannot

look out for themselves and have no one to do that for them.  As discussed below, the

settlement takes advantage of these residents' vulnerability by forcing their removal

without any objective indication of the residents' desires.

Many State Center residents have other disabilities as well.  Profoundly

retarded individuals are especially likely to have physical or other mental conditions

that require special care.  *See* DSM-IV-TR at 44.  For example, Solano's disabilities

stem from Down's Syndrome, and, like other aging Down's victims, she has early

stages of dementia (Alzheimer's disease), along with a broad range of physical ail-

ments.  JA955 (Solano Obj.).  Those residents whose disabilities are less than "pro-

found" also have significant mental and physical illnesses.  For example, Appellants

Springstead and Bastek have "moderate" mental retardation, but also have bipolar dis-

order and other debilitating illnesses (for Springstead, mood disorder with psychotic

features and intermittent explosive disorder;  for Bastek, pervasive developmental dis-

order and a history of acute mania cycles).  JA856, 585.  Appellant Lambo has disrup-

tive behavioral disorder, autism, and a history of escalating epileptic seizures;  Kohler

is deaf and blind; Kashatus is restricted to a wheelchair; and Storm is dependent on a tracheotomy and feeding tubes. JA570, 574, 612, 787. Appellants Solano, Kashatus, and Sheppard are non-verbal, JA954, 623, 525, as are 59% of all the State Center residents (712 out of 1,207). JA999 (Solano Obj., Ex. A).

The objection letters demonstrate that these ailments are far from unique. *See*, *e.g.*, JA617, 927 (Perry, Demers). Indeed, nearly half of all residents are unable to walk; 56% have seizure disorders, 27% have cerebral palsy, 26% have autism, 23% are visually impaired, and 16% require an enteral feeding tube for nutrition. JA999 (Solano Obj., Ex. A). The residents' physical and mental conditions necessarily would demand varied "services and supports" to accommodate any relocation to a facility outside a State Center. JA1375 (Kuhno testimony).

The special needs of State Center residents is evidenced by the fact that, on average, it costs more than twice as much to care for them than for mentally disabled persons in community facilities. *See* JA299-300, 302, 364-65 (Pl. Sum. J. Stmt. & Defs.' Ans. ¶¶ 24, 40). Although some community residents have disabilities like those of State Center residents, JA1420-21 (McCool testimony), there is no evidence that there are such disabilities among similar numbers of those individuals.

Because of the residents' special needs, most of their guardians and family members have concluded that removal from the State Centers would affirmatively harm them. *See*, *e.g.*, JA592, 621, 672, 738 (Meo, McKinley, Crytzer, Sheetz Ltrs.).

When 1,223 families were asked whether they would want their loved ones moved out of the Centers, 985 of the 1,013 who responded *(97.24%)* answered No, and of 307 residents who were able to respond, 271 *(88.27%)* answered No.  JA280 (DRN Info. Rpt.).  In fact, DPW's professional staff have concluded in some residents' "Community Placement Plans" that if the resident no longer is able to reside in a State Center, then the resident should be relocated only to another ICF/MR.  *See* JA570, 752, 965 (Lambo, Milliron, Solano Objs.).  *See also* JA677 (Nichol Ltr. re need to say in ICF).

*Residents' rights under* **Olmstead.**  Residents' rights under the ADA are framed by the Supreme Court's decision in *Olmstead.*  That was an action (***not*** a class action) brought on behalf of two "mentally retarded" women who had been confined for treatment in the psychiatric unit of a Georgia hospital and sought to be moved to community facilities.  The Court held that a state must provide such individuals with community-based treatment if such placement is appropriate, the individual does not oppose it, and the state can reasonably accommodate it while also serving the others in need of its resources.  527 U.S. at 607.

The Supreme Court made clear (and the parties do not dispute) that mentally incapacitated individuals have a right to remain under institutional care and may not be deprived of that right.  *See* 527 U.S. at 583.  As the lead opinion by Justice Ginsberg stated, "the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk," "condone[] termination of institu-

tional settings for persons unable to handle or benefit from community settings," or "require[] that community-based treatment be imposed on patients who do not desire it." *Id.* at 601-02, 604. Justice Kennedy's concurrence cautioned that "[i]t may be . . . that those who remain institutionalized are indeed the most severe cases," and care must be taken to assure that inappropriate removal of individuals to community facilities not do more harm than good. *Id.* at 609-10. He added, "It would be unreasonable, it would be a tragic event, then, were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id.* at 610.[3] Justice Ginsberg agreed, observing that it is not "the ADA's mission to drive States to move institutionalized patients into an inappropriate setting," since, for some individuals, "no placement outside the institution may ever be appropriate." *Id.* at 605.

  ***The five named plaintiffs.*** Plaintiffs are residents of three of the five State Centers — Ebensburg (Benjamin and Beard), Polk (Baldwin), and Selinsgrove (Grogg and Edgett). JA81-87 (Am. Compl.). Unlike most State Center residents, none of the plaintiffs is alleged to be profoundly retarded. Indeed, plaintiff Grogg is

---

3. Justice Kennedy cautioned against pressuring States "into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition," and placing "state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts." 527 U.S. at 610.

alleged to be "extremely independent and sociable" and to have the ability to hold a job, be involved in his church, and manage his own money. JA82. Edgett also is alleged to be "social, engaging, and independent," and Baldwin is described as "generally very independent." JA83-84. Each plaintiff wants or does not oppose community relocation, and each has a living relative who is participating in the decision to seek such relief. JA77-79.

*The settlement.* The settlement provides that State Center residents are to be removed from the Centers to "community" facilities; 50 removals are to take place during the fiscal year that ends June 30, 2012; and staggered numbers are to follow annually thereafter. JA474-75 (¶ V.1.). It aims for at least 400 removals. *See id.* DPW commits to make funding for them "one of its top budget priorities," and agrees that, "to the extent feasible [it] will shift funds from the carry-forward budget for state ICFs/MR" to the program funding community placements. JA475-76 (V.2.).

To determine which residents will be removed from the Centers, DPW agreed to create a "Planning List" that would identify all State Center residents "not opposed to discharge to community placement." JA470 (¶ III.1.). The key words are "not opposed." Under the agreement, if a resident or the resident's guardian or "involved family members" (those identified in State Center records as the resident's substitute decision-makers) explicitly "express opposition to considering community

placement," the resident will not be placed on the list.  JA470-71 (¶ III.2.b.).   Any

other response, however, gets the resident listed — including no response at all.

Here is what the parties agreed to:  DPW personnel, along with a "Facili-

ty Advocate" employed by plaintiffs' counsel, would have "discussions" with all State

Center residents and, usually separately, with their guardians and involved family

members. JA470-71; JA1359 (¶ III.2.a.; Kuhno testimony).  They would ask the resi-

dents questions on an "Assessment Protocol" form, including, "Do you want to live in

the community?" and "Do you want to live closer to your family?," and check off an-

swers of "Yes," "No," or "No preference."  JA1499.  They would ask guardians and

family members similar questions, or check on the form if the resident has "No family

or guardian."  JA1500-01.  For residents unable to communicate verbally or with as-

sistive technology, answers would be inferred from gestures, eye movement, sounds,

or "behaviors."  JA1500.  For residents who seem confused, some questioners have

explained to residents that moving to the "community" means moving to "where they

take vacations."  JA1407, 1413 (Sassaman testimony).  At least one questioner has

expressed opinions to try to influence respondents to select "community" care.

JA1449 (Objector Meyers' testimony).

A key element of this process is the "No preference" check box on the

protocol form.  The protocol instructs:

20

> If the person does not provide input in any manner that can be discerned in response to the questions in this section, ***indicate that they have no preference*** regarding living in the community . . . .

JA1497 (emphasis added).  This means that any resident whose disability is so severe that he or she cannot comprehend what is being asked — and, accordingly, cannot express opposition — is identified as having "no preference" (that is, as being indifferent) to being moved out of a State Center.  JA1498.  The procedure makes no exceptions, even if the resident has lived in the State Center for many decades, might consider it "home," shows a close affinity for staff members or others there, or has a Community Placement Plan prepared by professional staff that says the person requires residence in an ICF/MR.  Of course, residents who have guardians or designated family members to speak for them and express opposition will be spared the trauma of being moved from their homes, friends, and familiar care givers.  But there is no such safety net for those who have no guardians or "involved family."  The Assessment Protocol explicitly directs that a resident who "has no preference and has no involved family/guardian" is in a category of those who "***will*** be placed on the State ICF/MR Planning List."  JA1498 (emphasis added).

         In some cases, knowledge that a guardian or family member has opposed relocation is purposely bypassed.  First, if such a person died without appointment of a substitute, that person's wishes no longer are considered, and the resident will be placed on the Planning List despite the family's recorded desires.  JA1379-80 (Kuhno

testimony); *see* JA231-33 (Casey Dep.).  Second, if efforts to reach the guardian or family member to have the "discussion" mandated by the settlement are unsuccessful, that person is deemed to have "no preference" — even if recorded otherwise in the past.  JA1498, 1504 (Protocol).

At the time of the settlement approval hearing, DPW personnel already had conducted many of the resident "discussions" and had identified about 100 residents who could not respond and had no guardians or family to speak for them;  plaintiffs' counsel estimated that when the list was completed that number would be about 125.  JA1359-70 (Kuhno testimony); JA1483 (Meek statement).  Ultimately, 238 residents ended up on the Planning List.  DPW has not disclosed how many of them are profoundly retarded and without guardians or involved family, but it included four such residents among those to be relocated by June 30, 2012.  JA1540-41 (Leisch E-mail).  DPW has not disclosed how many residents were placed on the Planning List because it was unable to reach their guardians or family members.

Since most State Center residents are opposed to relocation, JA1371 (Kuhno testimony), the settlement contains provisions designed to reduce such opposition and thereby lengthen the Planning List.  It requires DPW to establish an eight-member "Community Partnership Steering Committee" that is to develop a program to "educate" residents, guardians, and families about supposed benefits of community placement.  JA472 (¶ IV.1.).  The eight members include representatives of plaintiffs'

counsel, a provider of "community" services, and a representative of the entities that contract with DPW to administer the community system, along with a State Center resident and family member, a community resident and family member, and someone from DPW's Office of Developmental Programs. *Id.* The curriculum is to focus on "opportunities to participate in community life," and, unless savvy residents or guardians ask the right questions, there is no plan to provide information that might lead anyone to elect not to opt for removal. *See* JA1390-96 (Kuhno testimony).

The agreement requires that the "discussions" to determine additions to the Planning List occur annually and include all residents, regardless of whether they are class members. JA470, 1378 (¶ III.2.; Kuhno testimony). Accordingly, no resident can opt out of the process the settlement establishes.

Under the agreement, all persons placed on the Planning List are to be offered community placements in which only four or fewer persons reside. JA476 (¶ V.4.). DPW is to develop individual support plans "that specify community placements"; there is no mention of existing plans prepared by DPW's professional personnel that called for ICF/MR placements. JA476 (¶ V.3.). Because sufficient community facilities presently are not available, DPW admits it will have to develop them. JA1376-77, 1425 (Kuhno and McCool testimony). The settlement does not specify how much say residents, guardians, and family members will have in selecting specific community facilities. Once relocated, the resident will have a trial period to be-

come acclimated. Thereafter, if the "community" facility does not work out, the resident will ***not*** be permitted to return to the State Center unless he or she secures a court order mandating a return. JA1434-35, 1437 (McCool testimony). Removal thus will be a one-way ticket out of the State Centers, with no opportunity for a change of mind about community residence. The settlement makes no provision to tell this to residents, guardians, and families.

    ***The objections and the Appellants.*** The bulk of the objections were filed by guardians and family members. They expressed a desire for their loved ones to remain in the State Centers because they believe the Centers provide better care than "community" facilities and are better able to provide for the residents' safety. Many explained that their views were influenced by research and past negative personal experiences with "community" facilities. *E.g.*, JA570, 634, 647, 653, 687, 801, 807, 814, 877,899, 918, 943 (Lambo, O'Donnell, Grebski, Sabo, Fernan, Daugherty, Casadonte, Krafft, Wolfe, Brill, Fischer, Boring Ltrs.). *See also* JA828 (VOR letter discussing abuse concerns); JA774 (Potera Ltr.). Others explained that no adequate community facilities were available for their loved ones. *E.g.*, JA574, 585, 856, 860 (Spare, Bastek, Springstead, Toperzer). The objectors voiced fears that the settlement improperly would force depopulation of the Centers, threaten their financial viability, and possibly cause their closure. *See, e.g.*, JA574, 585, 634, 647 (Spare, Bastek, O'Donnell, Grebski Ltrs.). Letters from local legislators echoed those concerns. *See*

24

JA826, 836, 1504.1-1504.2 (Sens. White, Vogel; Reps. Toohil, Sainato); JA1473 (reference to Sen. Baker letter missing from docket).

The nine Appellants' objections expressed views similar to these. *See* JA525, 570, 574, 585, 592, 623, 856, 948, 1013. Their authors, most of whom are guardians, added, however, that, as fiduciaries for their wards, they recognize that their present opposition to relocation would have to change if, for example, conditions in the State Centers deteriorate because funding is reallocated or the quality of care there suffers. *See*, *e.g.* JA856, 948 (Springstead, Solano). They agreed that they "would not oppose community placement" in such situations, and they thus were part of the certified class, even though they objected to the class certification. *See, e.g.*, JA958 (Solano); JA1025-26 (Springstead Supp. Obj.). Appellants also objected to specific terms of the settlement and the procedures it established, including a bias in favor of relocation and the inability of relocated residents to return to the State Centers if the community facilities failed to serve their needs. *See*, *e.g.*, JA986 (Solano).

***The trial court's approval of the settlement.*** In his opinion approving the settlement, Judge Jones concluded that the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), were met. JA15-22 (Op. at *11-*20). He said "the reaction of the class appears almost entirely favorable," with only one objection by a resident. JA17 (*id.* at *14). Without explanation, he said the other objections did not "truly demonstrate the balance of the class's own reaction" to the settlement and called the

objectors "non-class members," apparently because they "oppose any discharge at all." *Id.* He also said the objections "miss the mark" because they were based on "misguided fears" that the settlement "will force ICF/MR residents into community placements against their wishes." JA17 (*id.* at *14 n.3). Later, however, the court said the objections "were not only numerous, but some were also cogently expressed and many were at times quite eloquent and even poignant." JA31 (*id.* at *31-*32).

In the middle of his opinion, Judge Jones also stated:

> To our admittedly untrained eye, it appears as though the assessment protocol that has been developed to effectuate the Proposed Settlement Agreement may imply an unintended bias towards community placement. Reviewing the questionnaire to be utilized causes us to entertain serious doubts as to whether it is the proper tool for gauging whether the profoundly disabled, and especially those with no guardian to speak for them, are opposed to community placement. Indeed, we wonder about the wisdom of defaulting such individuals into a no preference category without greater analysis. And we have no doubt that the stated fears of many objectors . . . are heartfelt and entirely real. We urge those responsible for implementing the policy to consider these concerns, and if necessary revise the protocols in question.

JA21-22 (*id.* at *20-*21). Despite these expressed "doubts," the court ordered no changes to any parts of the settlement, and the parties have made no revisions. Judge Jones opined that no remedy would be perfect, and he advised objectors to resort to politics if they believe the State Centers are threatened, adding that he was "certainly not effectuating a closing of any of the Commonwealth's ICF/MRs." JA22, 31 (*id.* at *21, *32-*33).

26

# SUMMARY OF ARGUMENT

1.  The district court erred in certifying a Rule 23(b)(2) class consisting of State Center residents who "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement." That definition is too amorphous to form a true class, since it depends on undefined assessments of what is "appropriate" and subjective decisions about community placement that some residents are incapable of making and that will change with differing circumstances. The last clause of the definition purports to create an illusory opt-out clause for class members that is not authorized by the rule. The class is not cohesive, since each of its elements turn on individualized evidence, and it does not meet the Rule's requirements for commonality, typicality, or adequacy of representation because the five named plaintiffs differ from the majority of class members in material ways and seek injunctive relief at odds with what most class members want. The court never held a class certification hearing and did not comply with the rules for class certification. The certification thus was an abuse of discretion and should be vacated.

2.  The district court erred in failing to recognize Appellants as members of the class whose objections to the class settlement should have been considered and sustained. The settlement directly affects Appellants by putting in place provisions that require annual assessments of them and will govern any removal of them to

community facilities in the future. Appellants consistently have acknowledged that they are class members, and their objections to the class settlement did not change their status. Alternatively, the court abused its discretion in not permitting Appellants to intervene for the limited purpose of having their objections fully considered.

3. The court erred in approving the class settlement despite Appellants' objections. The settlement is grossly unfair to "profoundly retarded" residents who lack guardians or family members to look after their interests because it treats them as being indifferent to whether they should be relocated, even though they cannot understand the issue. It then automatically slots them for removal from their homes of many decades because of their inability to protest. It is biased in favor of removal, both in the procedures it prescribes for deciding who will be removed and in the information it provides for making that decision. The settlement also fails to protect residents from improvident relocation decisions by foreclosing any opportunity to return to State Centers if a community facility proves inappropriate. And it unfairly prejudices State Center residents who desire to remain in the Centers by improperly arranging for the Centers' depopulation and transfer of the Centers' funding. By approving the settlement, the court breached its fiduciary duty to unnamed class members and abused its discretion.

# ARGUMENT

## I.    THE DISTRICT COURT ERRED IN CERTIFYING AN IMPROPER CLASS UNDER RULE 23(b)(2) OF THE RULES OF CIVIL PROCEDURE.

STANDARD OF REVIEW:  This Court "review[s] a class certification order for abuse of discretion."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008).  A decision whether to certify a class must be based on "findings by the court," made by a preponderance of the evidence, "that each requirement of Rule 23 is met."  *Id.* at 307.

The district court's initial error pervaded the rest of the case.  Without evidence or investigation, the court granted plaintiffs' unopposed motion to certify a Rule 23(b)(2) class consisting of all present or future State Center residents who "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement."  JA36.  The court's order adopted as its own the findings proposed by plaintiffs, without material modification.  Its decision bypassed this Court's teachings in *Peroxide* about how to certify a class, and, as a result, certified a class that was improperly defined, lacked cohesion, and effectively was at war with itself.  Because the class certification enabled plaintiffs and DPW to impose class settlement terms on all State Center residents that unfairly would jeopardize and infringe upon their rights to remain in the Centers, the objectors to the settlement raised its impropriety as a threshold objection to the settlement itself.  *See*,

*e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009) (objector to a class settlement may object on ground that the class should not have been certified); *In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).  But the district court did not address the objection.[4]

This case should not have been certified as a class action because it does not meet the requirements of Rule 23.

## A.    The Class Defined by Plaintiffs Is Too Indefinite.

The class proposed by plaintiffs and defined by the court was not a proper class.  As a leading treatise explains:

> [T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. . . .  The class definition also cannot be too amorphous.

---

4.    A district court reviewing a class settlement should consider the class certification issue separately from the fairness of the settlement itself, *Prudential*, 148 F.3d at 308, although issues relating to the propriety of the certification may be considered in connection with an analysis of the settlement's fairness.  *See id.* at 323-24 & n.73 (listing class certification issues among appropriate class settlement factors for consideration).  In *Girsh*, 521 F.2d at 157, this Court identified the risk of maintaining class certification as a factor favoring approval of a settlement, but the pertinent risk in that inquiry is that a ***properly certified*** class may be decertified if it becomes unmanageable for trial.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004); *Prudential*, 148 F.3d at 321.  *Girsh* does not approve settlement of a class that was not eligible for certification under Rule 23.

> Thus, for example, a class defined with reference to the state of mind of
> its members will not be allowed to proceed under Rule 23.

7A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 3D § 1760

(2005) (footnotes citing cases omitted). Here, apart from requiring that class members

be State Center residents, the class is far from definite.

First, it includes only residents who "could reside in the community with

*appropriate* services and supports." There is no definition of what is "appropriate" or

how that is to be determined, and, as discussed below, those questions raise a host of

individualized issues for each resident. In the trial court, however, the parties ren-

dered this requirement meaningless because they *told the court that every resident*

*meets it*. JA91, 185 (Am. Compl. & Defs.' Ans. ¶ 65) Actual evidence, including

evaluations by DPW's professionals in residents' individual support plans, *e.g.*, JA965

(Solano Obj.), would have shown that all residents are *not* able to live in "community"

facilities, and this part of the class definition thus is a mere contrivance. It was not

exposed because the court held no hearing and took no evidence.

The remaining part of the class definition — that the residents "do not or

would not oppose community placement" — was grossly improper. This Court has

explicitly held that a class may not be defined by reference to the state of mind of its

members, since such a definition lacks common objective criteria. *Chiang v. Vene-*

*man*, 385 F.3d 256, 271-72 (3d Cir. 2004), *overruled on other grounds by Peroxide*,

31

552 F.3d at 318 n.18.  Yet, this element of the definition is entirely subjective, making the class certification invalid.  The definitional element has serious implications that are underscored when considered in light of the residents who would be asked to subjectively decide whether they "would not oppose community placement."

**Profoundly disabled residents.**  Many State Center residents are so severely disabled that they simply cannot make this decision.  For example, the "Community Placement Plan" drafted by DPW's professionals for appellant Solano states that she cannot comprehend this issue and therefore is unlikely to have "any interest or awareness of community-based placement options."  JA969.  Solano, whose mental age is less than one, is not unique.  ***Three-fourths*** of all State Center residents are diagnosed with "profound mental retardation," a disability so great that they simply cannot know whether they do or would oppose being moved out of the Centers because they cannot understand what that means.  Asking them to state a preference on this issue is fatuous.  And while some of these residents have guardians or other designated decision-makers who can make such decisions for them, ***82% of all State Center residents have no guardians***, and many have no involved family members.  And so they are at the mercy of outsiders.

This case takes advantage of that void.  Because there was no class certification hearing, no one discussed this issue until it was time to identify class members who would be relocated pursuant to the parties' settlement.  Then, the parties re-

32

sorted to another contrivance. Unable to prove profoundly disabled residents' desires, the parties declared that if they "discussed" relocation with these residents and the residents remained silent (which, of course, they would do if they were nonverbal and incapable of understanding), residents would be ***conclusively presumed*** to "not oppose" removal to the community. In the words of the protocol governing these "discussions": "If the person does not provide input in any manner that can be discerned in response to the questions in this section, ***indicate that they have no preference*** regarding living in the community." JA1497. So, any residents who did not (because they could not) say they "opposed community placement" were deemed in the class and targeted for removal from their homes. The abject unfairness — and (as discussed below) harm — this scheme works on these innocent residents exposes the utter bankruptcy of the class definition employed by plaintiffs and the court.

**Other residents.** For those residents who *are* capable of understanding this element of the class definition or have guardians or family members who can address it, asking whether they "do not or would not oppose" relocation still is an improper way to define class membership. The question requires difficult and sophisticated decision-making that may change with changed circumstances.

Many residents have lived for decades in the State Centers ("home"), where they have received superior care in an atmosphere that is safe from outside

harm. These significant historical facts must be balanced against theoretical benefits of relocating to "community" care. As one commentator has summarized —

> [P]ositive outcomes reported in the literature associated with deinstitutionalization and community-based services include increased choice, behavioral improvement, improved social interaction of certain segments of the population, integration in rural settings, and inclusion in various day-to-day activities. However, such positive findings need to be considered in relation to findings of increased mortality in community settings, problems in vocational services and employment, and problems of Individual Habilitation Plan objectives and behavioral technology. Recent work has also highlighted problems in access, utilization, and quality in community-based health care and personal care for people with mental retardation and developmental disabilities, [along with] higher rates of verbal abuse and relatively greater exposure to crime among individuals who lived in dispersed community settings.

Walsh, *et al.*, "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research," 41 MENTAL RETARDATION 103, 116 (2003).[5] This commentary concluded that "as institutions increasingly provide services to people with severe and profound cognitive deficits, complex needs, challenging behaviors, and diminishing skills, concerns about quality of *care* may outweigh those of satisfaction," while "[i]n community settings . . . with a more heterogeneous and able population, it may be that quality of life, satisfaction, and interest in self-determination takes on more importance." *Id.* (emphasis in original).

---

5.    Appellants are informed that the documented history of increased risks in community facilities will be discussed in the *amicus* briefs.

The Supreme Court recognized this tension in *Olmstead* when it held that a disabled resident may move elsewhere if he or she desires, but that such relocation is neither mandated nor universally preferable. As Justice Ginsberg stated, "the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk," since, for some individuals, "no placement outside the institution may ever be appropriate." 527 U.S. at 604-05.

The difficulty of making this decision is enhanced by the fact that each option is subject to changing conditions. Though care in the State Centers presently is excellent, that could change if Center populations decrease and the Commonwealth devotes less resources to them. Similarly, account must be taken of the Commonwealth's recent reduction of funding for community services, which community advocates claim will force providers "to drastically cut the quality of the care they provide" and result in "putting lives at risk." *See* ID/A Coalition, "Parents Warn That Cuts Will Hurt People with Disabilities" *http://www.par.net/portals/0/Mailman/Press2011.1213IDACoalitionreleaseonHearing.pdf* (Dec. 13, 2011) (summarizing testimony at December 2011 Pennsylvania legislative hearing).

Faced with these competing factors, many residents and guardians, when asked whether they "oppose" removal to the community, have said that "it depends." Appellants' guardians, for example, have made clear that their present preference is for their residents to remain in the State Centers, but have acknowledged that, as fidu-

ciaries, they cannot unequivocally say they "would not oppose" relocation in the future if, for example, conditions in the State Centers change in a way that makes the institutional facilities less attractive than community alternatives. For that reason, Appellants reluctantly have remained as class members, even though they currently oppose removal. *See* JA958 (Solano Obj.); JA1025-26 (Springstead Supp. Obj.).

The elastic class definition deliberately takes advantage of this dilemma by basing class membership not just on a present desire to relocate, but on whether someone "would" oppose relocating at some unspecified time in the future. *Cf.* JA1489-90 (DPW explanation that "people are allowed to change their minds"). Since few could unalterably foreclose that possibility, the elastic definition encompasses virtually everyone. As such, it is so amorphous as to be improper.

## B. The Class Depends on an Opt-Out Provision Not Permitted Under Rule 23(b)(2).

Rule 23(b)(2) provides for a mandatory class, without opt-outs, of similarly situated plaintiffs seeking injunctive or declaratory relief. But by making class membership depend on whether a resident "do[es] not or would not oppose community placement," the class definition seems to permit residents who otherwise would be members of the class to opt out of it. While some residents might welcome this opportunity, Rule 23(b)(2) does not provide for it, and both the Supreme Court and this Court have held that participation in a class under Rule 23(b)(2) is mandatory. *See*

36

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558-59 (2011); *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393-95 (3d Cir. 1981).  Appellants know of no authority permitting circumvention of these precedents by making the opt-out provision part of the class definition.  The class thus is invalid because this element of its definition cannot be effective.

Plaintiffs have claimed they defined the class this way so they could pre-serve class members' rights under *Olmstead* to choose to remain in State Centers.  If that were true, then plaintiffs were misguided.  Rule 23(b)(2) applies to actions under *Olmstead*, and nothing in *Olmstead* (which said nothing about class actions) authoriz-es this definition.  If plaintiffs wanted to protect all residents' *Olmstead* rights, they could have sought relief on behalf of ***all*** residents who seek to vindicate their right to live in the type of facility they choose — including ***both*** those who want (and are able) to move to the community, ***and*** those who do not — since *Olmstead* recognized a right to both institutional and non-institutional care.  A case seeking enforcement of all choices would require no opt-outs, since any injunction would democratically de-mand enforcement of all *Olmstead* options — not just the community relocation op-tion that plaintiffs advocate and other class members oppose.

Plaintiffs did not define their class so inclusively because they did not want to advance the rights of residents who want to stay in the State Centers.  Indeed, under the class they created, a resident can try to preserve that right only by affirma-

tively declaring opposition to removal — something that profoundly retarded residents who lack guardians cannot do. The settlement definition thus exposes plaintiffs' action as one to force relocation, not to enforce free choice.

Indeed, throughout the trial court proceedings, plaintiffs sought to use the class definition not to shield residents opposing removal, but to shield themselves from those residents. They characterized any assertion by residents of their right to remain in the State Centers as a ground for exclusion from the class, and they insisted that such exclusion deprived those residents of any ability to be heard or to object to the terms of the final settlement. *See*, *e.g.*, JA199 (267 F.R.D. at 462, n.5). Though ambiguous, the trial court's opinion approving the settlement appears to have adopted this view, treating an objection from the settlement as an exclusion from the class. *See* Part II.A., *infra*. The settlement thus was not a protection of residents' rights, but instead was a means of insulating the litigation tactics of plaintiffs (and DPW) from attack by any residents who disagreed with them. Rule 23(b)(2) does not permit manipulation of class procedures in that way. In a normal Rule 23(b)(2) class without opt-outs, all class members would have an unquestionable right to object and be heard. *See Devlin v. Scardelletti,* 536 U.S. 1, 7-10 (2002); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1307-10 (3d Cir. 1993). Plaintiffs and the trial court could not create a Rule 23(b)(2) class with purported opt-outs just to foreclose that right.

In the end, the opt-out provision also is invalid because it provided no effective opt-out right at all. For residents lacking guardians who are intellectually incapable of understanding an opt-out decision, the theoretical opt-out right was meaningless, since those residents could not exercise it. Despite the mandate of Civil Rule 17(c)(2) that the court "must" appoint a guardian ad litem to protect an unrepresented incompetent person, no guardian ad litem was appointed to assist with this decision.[6]

For residents capable of making the decision, the supposed opt-right was no more effective. First, those residents, including Appellants, could not irrevocably opt out because they could not conscientiously say they "would oppose community placement" if conditions change in the future. Second, and more important, the class settlement actually binds not only those seeking relocation, but opponents too. Under it, *all* State Center residents, whatever their preference, must undergo annual interrogation by DPW as it recompiles the relocation Planning List each year. JA470 (¶ III.2). There is no way to opt out of the screening, and if the guardian of a profoundly disabled resident who opposed relocation during the first year's interrogation dies or cannot be contacted in the second year, that resident suddenly can be placed on the Planning List for removal — prior opt out declarations notwithstanding. *See* JA1379-

---

6.    Since the question was whether to be part of the class, plaintiffs' counsel could not serve in that role. *Gardner v. Parson*, 874 F.2d 131, 137-41 (3d Cir. 1989) (need to appoint guardian ad litem when others claiming that role have conflict of interest).

80, 1497-98, 1504 (Kuhno testimony; Protocol).  Any refusal is effective only until the next year's screening, since the class settlement functions to assure that a refusal is never the final word.

Thus, the purported opt-clause is just another contrivance.  Though purportedly designed to protect residents opposing removal, it provides them no protection, and merely protects plaintiffs from their opposition.  A class defined by that clause thus is invalid.

### C.    The Class Is Not Cohesive.

This Court has emphasized that a Rule 23(b)(2) class must be cohesive and its members must share a predominance of common issues that exceeds even that required under Rule 23(b)(3).  *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 262, 264 n.12 (3d Cir. 2011); *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).  The relief sought in the action must benefit the entire class.  *Neal ex re. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).

It was plaintiffs' burden to prove cohesiveness of the class.  *Peroxide*, 552 F.3d at 307, 320-21.  But they didn't even try;  their class certification motion and brief made no mention of cohesiveness or predominance, and defendants never raised that (or any other) issue in opposition.  In this setting, the district court was required to give "rigorous consideration of all the evidence" and to "make a definitive determina-

tion that the requirements of Rule 23 have been met." *Id.* at 320-21. Defendants' lack of opposition did not obviate this obligation, which protects unnamed class members from being bound by a mandatory class order that should not have been entered. As the Supreme Court warned in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), courts must give "undiluted, even heightened, attention" to issues of commonality and predominance in the settlement context because those inquires are designed "to protect absentees by blocking unwarranted or overbroad class definitions." Nevertheless, the trial court did not hold a certification hearing, and certified the class by a mere *pro forma* order. That was error.

Both critical elements of the class definition — that residents "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement" — defined a class without cohesion.[7] Clearly, whether each resident "do[es] not" or "would not" oppose relocation is an individualized question dependant on each individual's personal choice, and there will be different answers for each class member, making cohesiveness and predominance of

---

7.   Although these requirements mirror elements of plaintiffs' cause of action under *Olmstead*, *see* 527 U.S. at 606, that does not make them appropriate definers of a class. *Olmstead* was not a class action. Ironically, the trial court granted summary judgment largely because "the definition of the class itself satisfies the first two elements articulated in *Olmstead*," JA425 (768 F. Supp. 2d at 754), even though the class elements themselves never were proven, and, as discussed in the text, actual evidence would have *dis*proven them.

common issues impossible. Similar individualized issues pervade the question wheth-er a resident can reside in the community with "appropriate" services and supports.

When the class was certified, there were alleged to be 1,272 State Center residents. The class definition requires determination of which of them would be ca-pable of living in the community, which, in turn, requires individualized analyses of just what "appropriate services and supports" each individual needs to do so and whether it is feasible for the Commonwealth to provide them. These individualized questions dwarf any supposed common issues in this case. *Cf. Barnes*, 161 F.3d at 146 (denying class certification because each class member would have individualized medical monitoring needs). The parties facile declaration that all class members can live in the community with sufficient services and supports did not resolve the prob-lem because they provided no evidentiary support for the declaration and because the facts would show it is not true.

State Center residents have a range of abilities and needs. Some needs may be relatively minor, such as transportation to a job. But for the majority of resi-dents who have profound intellectual and developmental disabilities, the needs are substantial. Profoundly disabled residents must have 24-hour care seven days per week, and a failure to provide this care would be catastrophic. These residents are in-capable of caring for themselves and are unable to learn how to do so. Many are pas-sive, unable to comprehend dangers, and incapable of complying with safety instruc-

tions. They have significant medical and psychosocial needs, require provision of daily hygiene and personal care, and depend on quick responsiveness to emergencies. For these reasons, an unknown number of residents have "community placement plans" prepared by DPW's professional staff that say that if they are moved out of the State Centers, they must be relocated to another ICF/MR, thus belying the parties' representations to the trial court that all State Center residents can reside in "community" facilities. *See* JA965 (Solano).

While the Commonwealth can provide 24-hour care cost-effectively in the State Centers to multiple residents who have such needs, the settlement agreement provides that the community facilities to which residents would be relocated are each to have no more than four residents. JA476 (Protocol). DPW has acknowledged that an adequate number of such facilities does not now exist, and they will have to be created. JA1375 (Kuhno testimony). The feasibility of doing so for each resident who must be relocated is itself an individualized question. As each resident's level of needs increases, so will the expense. And while DPW says it has funds to finance 50 relocations in Fiscal 2011-12, its pending budget deficit makes its ability to do so in the future uncertain.[8]

---

8.    Plaintiffs have sought to downplay this problem by arguing that the cost of community facilities for the developmentally disabled historically has been far below that of State Centers, but that historical distinction proves the point. The reason for the difference is that those who have been removed to the communi-

*...Continued*

For purposes of Rule 23(a)(2), a "common question" must be capable of generating "common answers" that will lead to resolution of the case. *Wal-Mart*, 131 S. Ct. at 2551 (quotation omitted). But this part of the class definition can generate no commonality at all because its predicate condition — that the class members will be provided with "appropriate services and supports" — will produce differing answers that depend on what supports are available. Plaintiffs' effort to avoid this deficiency by merely referring to "appropriate services and supports" without further definition or explanation merely substituted a generality for the rigorous examination that class certification requires. As the Supreme Court emphasized in *Wal-Mart*, generalized common issues are "not sufficient to obtain class certification" because the individualized differences that lie beneath the surface make those questions incapable of class-wide resolution. *See id.* Whether a class member can obtain relief depends on just what services and supports are "appropriate" ***for that individual***, whether ***those*** services ***actually*** can be provided in the community with the resources that are available, and whether defendants have violated the class member's rights by failing to provide for community placement in light of the ***actual*** availability of those services and sup-

---

*Continued from previous page*

ty before now generally have been less disabled and needed less expensive supports and services than the far more seriously disabled residents who remain in the State Centers. *See generally* Walsh, 41 MENTAL RETARDATION at 105, 117-18 (discussing differences in cost comparisons).

ports.  Because those questions will produce different answers for each class member,

a class should not have been certified.

### D.    The Named Plaintiffs' Claims Are Not Typical of Those of All Other Class Members and Those Plaintiffs Are Not Adequate Representatives of the Class.

Rule 23(a) requires that parties seeking class certification prove that their

claims are "typical of the claims . . . of the class" and that they "will fairly and ade-

quately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3), (4).  These re-

quirements are interrelated.  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d

585, 602 (3d Cir. 2009).  They require that the named plaintiffs' claims be sufficiently

similar in factual circumstances to those of the rest of the class so that the plaintiffs'

representation will be fair to those other class members.  *Id.* at 597-98;  *see Neal*, 43

F.3d at 59 ("the interests of the class members [must be] so like those of the individual

representatives that injustice will not result from their being bound by such judg-

ment"); *Prudential*, 148 F.3d at 311 (Rule 23(a)(3) "is designed to align the interests

of the class and the class representatives so that the latter will work to benefit the *en-*

*tire class* through the pursuit of their own goals" (emphasis added)).

Plaintiffs are residents of three of the five State Centers — Polk, Ebens-

burg, and Selinsgrove.  The record contains meager information about each plaintiff,

but none is alleged to be profoundly retarded.  Most are said to be "independent."

Each allegedly wants (or does not oppose) community relocation, and each has a living relative who is participating in the decision to seek such relief.

Plaintiffs presented no evidence that they are typical of the other State Center residents, and the record shows they are different from many class members in ways that are significant to the issues in the case. They differ in degree of intellectual disability and, therefore, in the types of services and supports they would require to live in the community. None is alleged to need 24-hour care. They thus bear no resemblance to the many "profoundly retarded" class members whose support needs are much more difficult to fulfill. Since plaintiffs are capable of choosing whether they want to be moved and have designated decision-makers to assist them, they are far different from those vulnerable residents who are unable to understand or exercise their options.

Another important difference is that none of the plaintiffs reside in the State Centers in Hamburg or White Haven.[9] A premise of plaintiffs' case is that residents should be moved out of all the State Centers because the Centers are located in rural communities isolated from community population centers. *See* JA245 (Defs. Resp. to Pl. Request for Admissions); JA305, 365 (Pl. Sum. J. Stmt. & Defs.' Ans. ¶ 52); JA416 (768 F. Supp. 2d at 750). But there is no evidence of that, and no evi-

---

9.    Although the original complaint included a White Haven resident, Wilson Sheppard, as a plaintiff, Sheppard withdrew as a plaintiff after learning more about the case, and he now is one of the Appellants.

dence that all State Centers are so fungible that this purported concern applies to the two Centers where plaintiffs do not reside. Those two Centers are located near some of Pennsylvania's major population areas (Hamburg is within 30 miles of Allentown, Bethlehem, and Reading; White Haven is within 30 miles of Scranton, Wilkes-Barre, and Hazelton), and there is evidence that they provide their residents with multiple opportunities to participate in events in those communities. JA514, 774, 825; 1493 (Gordon, Potera, Sen. White Ltrs.; Sen. White testimony).

Finally, and most fundamentally, the named plaintiffs have interests different from those of other class members regarding appropriate relief. Because of their purported abilities to care for themselves, the named plaintiffs do not share the needs of other class members for comprehensive care in intermediate care facilities, and, indeed, seek relief limited to "discharge" from the ICFs. Other class members need ICF support, however, and want to maintain receipt of it. Each of these groups would benefit from different forms of relief, but plaintiffs seek only a single type — discharge — which is of no benefit to the others. Plaintiffs' request for only one form of relief places these two groups in conflict, since the settlement would remove residents from the State Centers and require a reallocation of funding that would harm the residents who wish to remain. This conflict makes the named plaintiffs inadequate representatives of these other class members.

47

**E.    The Class Certification Did Not Comply with the Procedural Requirements of Rule 23.**

The procedural deficiencies underlying the class certification order have already been discussed.  Most fundamentally, there was no hearing, as required by *Peroxide*, 552 F.3d at 307.  In addition, the class certification order, JA36, failed to comply with the requirements of Rule 23(c)(1)(B) that the order "define the class and the class claims, issues, and defenses."  *See Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187-88 (3d Cir. 2006).

**F.    Because the Certification Was Improper, the Certification Order Should Be Vacated.**

For all of the foregoing reasons, this Court should vacate the class certification order.  Plaintiffs have objected to this course because, they say, it will prevent State Center residents who need relief from obtaining it, but that is not true.  As already discussed, there may be other ways to frame a class that comply with Rule 23.  And even if no class action can be formed, there is no reason why ADA claims like those here may not be brought by the individuals affected in joint or individual suits, just as was done in *Olmstead*.  The advocacy organization that represents plaintiffs, DRN, exists and is federally funded to bring actions on behalf of disabled residents like the five plaintiffs in this case and any others desiring similar relief.  *See* Developmental Disabilities Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 15042.  Since it appears that less than half of the 238 residents slated to be relocated

48

under the settlement actually requested such relief, the number of claims would not be unreasonably high.

In any event, this Court is not free to rewrite class action law merely to make it easier for some plaintiffs to recover. *See Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001). The class could not be certified under Rule 23. Accordingly, the certification cannot stand.

## II.    THE DISTRICT COURT ERRED IN FAILING FULLY TO CONSIDER APPELLANTS' OBJECTIONS TO THE SETTLEMENT.

SCOPE OF REVIEW: Whether Appellants were class members who had a right to have their objections fully considered is a question of law as to which this Court exercises plenary review. *See In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 180 (3d Cir. 2002). Whether the court should have allowed limited intervention as an alternative is reviewed for abuse of discretion. *Harris v. Pernsley*, 820 F.2d 592, 597 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987).

Appellants were among more than 100 residents, guardians, and family members who filed objections to the settlement. In view of the mental disabilities (and inability to object) of many residents, this number was substantial. Moreover, 60 of the objectors were guardians; that is 27% of all guardians of State Center residents. JA280 (Pl. Sum. J. Ex. 13, tallying 219 guardians as of 2009). The number is espe-

49

cially impressive because many of the guardians and family members who took the time and effort to object are elderly and in poor health.   *See*, *e.g.*, JA519, 546, 592, 698 (Beston, Pugh, Meo, Chang Ltrs.).  While a court should be "cautious about inferring support from a small number of objectors to a sophisticated settlement," the filing of substantial objections opposing a settlement is a significant signal of its unfairness. *In re General Motors Corp. Pick-Up Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (1995).

But while Judge Jones acknowledged that the objections to the settlement were "numerous," JA31 (Op. at *31), he inconsistently deemed the reaction of the class "almost entirely favorable."  JA17 (Op. at *14).  More important, he failed even to discuss most of the substantive objections made by Appellants, essentially treating them as non-existent.  The reason, apparently, is that Judge Jones dismissed the objections as being "from non-class members" because he accepted plaintiffs' argument that any objector who did not favor removal to the community was excluded from the class.  *See* JA17, 19 (*id.* at *14, *17 n.4).  With respect to Appellants, that was error.

## A.    Appellants Are Class Members with Full Standing as Parties in Both the District Court and This Court.

If there is a valid certified class, Appellants are within it.  No proceeding was held in the district court to determine if any resident was excluded from the class,

and Appellants have not excluded themselves.  As discussed above, the purported opt-out provision of the class definition could not and did not have that effect.

Plaintiffs apparently contend that eight of the present Appellants excluded themselves from the class when they sought to intervene to oppose the relief sought by plaintiffs.  But in fact those proposed intervenors consistently insisted to the trial court that they were members of the class.  *See* JA191 (267 F.R.D. at 459).  In denying intervention, the court accepted plaintiffs' argument that opponents of removal had no stake in the case that would justify intervention because, as "non-class members," they would be "insulate[d]" from any class settlement, JA199-200 (*id.* at 462 & n.5), and this Court's non-precedential affirmance adopted that same view.  *See* JA443-44 (432 Fed. Appx. at 98 & n.3).  But even this Court's opinion recognized that the class definition left the opponents free to change their minds, and, thus, their class status.  *See* JA443 (*id.*).  Indeed, that is just what the elastic "do not or would not oppose" element of the class definition was designed to do.

As discussed, the opt-out provision of the class definition was a contrivance that provided more protection to plaintiffs than to those purportedly "insulated" from their actions.  After the intervention decisions, the parties settled, and, contrary to the assumptions in the intervention decisions, they agreed to provisions that bind ***all*** residents, including opponents, in a process that subjects them to annual screening for relocation and risks trapping residents whose guardians or family members are not

available each year to protect them. The settlement establishes binding procedures and protocols that will govern any residents who ultimately determine that, against their initial wishes, they must agree to consider relocation after all. All residents thus remain part of the class.

Appellants' objections to the settlement did not change their class status. Though the district court treated the objections as opt-outs from the class, the class settlement notice did not say objections would be treated as opt-outs. *See* JA481 (Notice). To the contrary, it is well established that an objection is ***not*** an opt-out. *See Devlin*, 536 U.S. at 10-11; *McReynolds v. Richards-Cantave*, 588 F.3d 790, 800 (2d Cir. 2009); *Grimes v. Vitalink Comm. Corp.*, 17 F.3d 1553, 1560-61 (3d Cir. 1994).

Rather than excluding themselves from the class, Appellants' objections to the settlement explicitly acknowledged their class status. The settlement had significantly changed the complexion of the case. The understanding at the time of the intervention decisions was that the case would deal with relocation of residents who "affirmatively expressed their desire to be discharged." JA440 (2011 U.S. App. LEXIS 7124, at *4). But the settlement revealed for the first time that the parties would relocate profoundly retarded residents who could not affirmatively express their desires. It provided that as many as 400 residents — one-third of the entire population of the State Centers — would be moved, and that state funds would be diverted from the State Centers to "community" programs. Recognizing that the quality of care in the

State Centers could deteriorate as a result of these provisions, Appellants explicitly declined to say that they always "would oppose" community relocation in the future, explaining that changed conditions in the Centers resulting from the settlement might require them to reconsider that option. *See* JA958 (Solano); JA1025-26 (Springstead Supp. Obj.). They thus affirmatively stated that they are class members. The district court had no basis to disregard that statement, which Appellants reiterated during the class fairness hearing. JA1468. Appellants thus remain members of the class.

**B.    If Appellants Were Not Class Members, the District Court Should Have Permitted Them To Intervene So They Would Have Standing To Object.**

Anticipating that plaintiffs would contest their standing, Appellants moved to intervene for the limited purpose of presenting their objections to the settlement, but the court denied that motion. If the court did not view Appellants as class members, then it abused its discretion in denying their limited intervention motion.

In *Harris*, 820 F.2d at 603, this Court advised that even if an individual is not entitled to intervene for all purposes, it is appropriate to permit his or her limited intervention to object to a class settlement. Such intervention protects an individual's right to be heard. *See Marino v. Ortiz*, 484 U.S. 301 (1988); *Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006).

Appellants' petition was timely because it was made within the time set forth in the class settlement notice. *In re Community Bank of N. Va.& Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 314-15 (3d Cir. 2005). It should have been granted because Appellants had an interest in the terms of the settlement that would be adversely affected if they were not permitted to participate. That interest included the need to be sure that the procedures governing relocation, which would apply to Appellants if they decided to move, were appropriate. Neither plaintiffs nor DPW represented those interests. For these reasons, the district court should have exercised its discretion to permit limited intervention. *See*, *e.g.*, *Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 2001 U.S. Dist. LEXIS 13115, at *47-*49 (S.D. Ind., Aug. 28, 2001), *aff'd*, 309 F.3d 978 (7th Cir. 2002); *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 688-91 (D. Minn. 1994); *see also Tennessee Ass'n of Health Maintenance Orgs. v. Grier*, 262 F.3d 559 (6th Cir. 2001).

## III. THE DISTRICT COURT ABUSED ITS DISCRETION AND BREACHED ITS FIDUCIARY DUTY TO CLASS MEMBERS WHEN IT APPROVED THE SETTLEMENT AS FAIR.

SCOPE OF REVIEW: Whether the district court should have approved the class settlement is reviewed for abuse of discretion. *General Motors*, 55 F.3d at 804-19.

In deciding whether to approve a class settlement, a district court "acts as a fiduciary, guarding the claims and rights of the absent class members." *In re Pet*

54

*Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) (citing cases); *see In re Or-thopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 321 (3d Cir. 2001). Its task is to determine whether the settlement as a whole is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). There were many signs here of the settlement's unfairness. Much of the case was uncontested, including the improper class certification, much of the merits, and even the $430,000 counsel fee paid to plaintiffs (which the district court approved although it gave the Court "pause," JA22-30 (Op. at *23-*30)). In the end, the parties entered into an agreement designed to move as many residents out of the State Centers as they could. The district court failed properly to perform its task of evaluating this deal and its effect on unnamed members of the class. Even though the court recognized the settlement's improprieties and voiced concerns about them, it approved the settlement anyway, without requiring changes that would protect inno-cent residents. That was error.

### A.    The Settlement Compels Removal to Community Facilities of Resi-dents Who Need Comprehensive Care and Have Not Expressed a Desire To Be Moved.

The most egregious aspect of the settlement is the way it treats the most vulnerable members of the class — those who are so profoundly disabled that they are incapable of making decisions for themselves and who have no guardians or family members to speak on their behalf. Under *Olmstead*, residence is a matter of choice. The record shows that many residents view State Centers as their homes, are content

to live there, and view the staff and other residents as their family and community, but the settlement pays no heed to these circumstances in determining residents' choices. Instead, it employs a Kafkaesque protocol under which "profoundly retarded" residents incapable of comprehension are engaged in "discussions" during which they are asked to decide if they want to move to "community" facilities and, when they cannot respond, are declared to have "no preference" regarding the result.  JA1500 (Protocol).  Their supposed indifference is then recast to mean that they do not oppose being moved out of their homes, even if they have lived there for decades.

The parties claim their settlement advances residents' rights, but these provisions trample them.  A central tenet of *Olmstead* is that residents have a right to remain in institutional facilities unless they choose to move elsewhere.  But none of these residents have expressed a choice to move, and most cannot understand what such a choice means.  No evidence suggests that if they could make a choice, they would choose to move, and in the absence of such evidence it is unreasonable to infer such a preference.  Perversely, the settlement turns *Olmstead* on its head by providing that State Center residents must explicitly and repeatedly affirm their desire to stay in the Centers in order to be able to stay there — even if a very reason they are institutionalized is that they have disabilities so severe that they are incapable of making such affirmations.  Under the settlement, the consequence of residents' inability to affirm their desires is eviction from their homes.  These provisions do nothing to protect

these residents' rights; to the contrary, they take advantage of the residents' disabilities to depopulate the State Centers.

The available evidence shows that this gambit has worked all too well. It appears more than half of the 238 residents placed on the relocation "Planning List" are there because they were incapable of declaring opposition and have no guardians or family members to speak for them. DPW plans to begin moving some of these most vulnerable residents out of the State Centers by the end of the current fiscal year.

While residents who now have guardians (including Appellants) are not in this group, each will become part of it if his or her guardian or family member dies without an appointed successor, leaving the resident unprotected. DPW has made clear that it will give no consideration to opposition by guardians or family members who die before the next annual review. Indeed, under the protocol, Appellants can be placed on the relocation list merely because DPW is unable to contact a guardian when it performs its annual update. For these reasons, *all* residents of the Centers, including Appellants, have a strong interest in having this part of the settlement overturned.

Plaintiffs' advocates have claimed they desire to get residents out of the State Centers because they think community homes would be better for them. But nothing in the settlement requires any showing of such a benefit as a condition to "discharge" of any resident, even though benefit is one of *Olmstead*'s requirements

for discharge. *See* 527 U.S. at 601-02, 605 (nothing in federal law "condones termination of institutional settings for persons unable to handle or benefit from community settings"). The record contains no evidence that these "profoundly retarded" residents will derive any meaningful benefit from being relocated, and the statements by DPW's professional staff that some residents need placement in other ICFs/MR (not four-person community homes) if they are moved out of State Centers suggest otherwise.[10] *Cf. id.* at 605 (Justice Ginsberg's observation that for some individuals, "no placement outside the institution may ever be appropriate"). Nothing in the settlement acknowledges these professional determinations.

While there is no evidence that these residents would benefit from relocation, there *is* evidence that they would be harmed. Relocation will wrench them out of the only homes they have ever known as adults and place them in unfamiliar surroundings where they no longer will be in the care of familiar staff. The objection letters document the trauma this would cause to many residents. Due to their profound intellectual impairments, they will not understand what has been done to them or why. This fact is likely to enhance their trauma and may irreparably aggravate psychological injuries. The Pennsylvania courts have recognized these concerns and State Cen-

---

10.   The record does not disclose how many residents have such statements in their files. There is evidence that in years past, some DPW personnel mischaracterized residents' abilities in an effort to make them appear more appropriate for community placements than they were. *See* JA984-85 (Solano Obj.).

ter residents' rights to be protected from them. *See*, *e.g.*, *In re Easly*, 46 Pa. D.&C.

4th 374, 406-07, 413-14 (C.P. Venango 2000), *aff'd*, 771 A.2d 844, 863 (Pa. Cmwlth.)

(en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001). As the court stated in *In*

*re Bear*, 44 Pa. D.&C. 4th 225, 260 (C.P. Dauphin 1999):

> This court asks what would it do to the quality of life of a profoundly re-
> tarded man, physically disabled as well, to remove him from his home of
> 44 years, from what little joys of life he has living in the comfort of his
> surroundings, cared for by people who know and love him and provide
> for his every need? Surely, justice demands we allow him the dignity
> not to disrupt and uproot him from this.

These considerations make the settlement grossly unfair and unreasona-

ble. Indeed, the only thing more startling than its unfairness is the district court's or-

der approving it. The court was fully aware of what was at stake, and even expressed

its concern. Recognizing the settlement protocol's "bias toward community place-

ment," the court stated "serious doubts as to whether it is the proper tool for gauging

whether the profoundly disabled, and especially those with no guardian to speak for

them, are opposed to community placement," and it questioned "the wisdom of de-

faulting such individuals into a no preference category without greater analysis."

JA21 (Op. at *20-*21). But having stated these concerns, the court did nothing about

them, other than to say that "[n]o remedy . . . will be perfect" and to make an un-

heeded plea that the parties consider revising the protocol. JA22 (*id.*). It did not even

supply the missing guardians by appointing guardians ad litem under Rule 17(c)(2).

The court's approval of the settlement without modification, despite its stated concerns, was an abdication of its fiduciary responsibilities. A fiduciary has an obligation to prevent harm to those in its care. *See Indus. Maritime Carriers (Bahama), Inc. v. Miller*, 399 Fed. Appx. 704, 710 (3d Cir. 2010) (fiduciary's "'duty to exercise reasonable skill and care' on behalf of the person to whose benefit the fiduciary acts"). Under Rule 23(e), a district court must exercise that duty by declining to approve an unfair settlement. Where, as here, the court recognizes that a settlement needs revision, its approval of the unrevised settlement is an abuse of discretion calling for reversal. *See*, *e.g.*, *General Motors*, 55 F.3d at 804-19. The district court's explanation that this settlement was necessary to vindicate plaintiffs' rights, JA31-32 (Op. at *32), was simply wrong; the parties could have agreed to provide relief to the named plaintiffs and to anyone else with a stated desire to move without forcing removal of those stating no similar preference. Once the court recognized that the settlement's provisions were inappropriate, it had an obligation to say No.

## B.    The Settlement Procedures Are Infected by Bias.

The "bias" that the district court recognized in its opinion, JA21 (Op. at *20), is not limited to the protocol used to create the Planning List, but pervades the entire settlement. To begin with, the "discussions" with residents and guardians to determine who goes on the List are held with employees of plaintiffs' counsel ("facility advocates"), who participate in the process with DPW personnel. JA1497 (Protocol);

JA469, 471 (Set. Ag. ¶¶II.10, ¶III.2.c).  There is no reason why plaintiffs' counsel should take part in this process, other than to try to encourage their desired result. There was testimony at the settlement hearing that questioners have in fact tried to do so.  JA1449 (Meyers).  For example, to enhance the chances of getting the desired answer, questioners sometimes compare community living to "vacation."  JA1407, 1413 (Sassaman testimony).

The questions specified in the protocol used to guide the questioning already set this stage, comparing assent to relocation, for example, to a desire "to live closer to your family."  *See* JA1499.  That question is especially cruel for those residents who may remember bygone family settings of their childhoods, but whose family members today are deceased, divorced, or dispersed.  And  it is misleading for those who already live close to families residing in population centers near the State Centers.

Similarly, the Agreement's provisions for "education" of class members about placement options are designed to provide one-sided information that would induce selection of community options, rather than balanced information needed for unbiased decision-making.  The program is to be run by a "Community Partnership Steering Committee" (the name itself suggests a purpose to steer residents toward a community option) that is stacked with relocation advocates.  The curriculum is to focus on community placement and "opportunities to participate in community life."

61

JA472 (Set. Ag. ¶ IV.1.).  Information about abuse and security concerns in community homes and about what DPW claims has been enhanced care in ICFs/MR in recent years will not be provided unless a resident or guardian asks the correct question. JA1391-96 (Kuhno testimony).  In making this critical choice about their lives, residents need *neutral* information, not one-sided propaganda, but nothing in the settlement suggests they will get it.  Nevertheless, even though the district court noted indications of bias, it did nothing about them.  That, again, was an abuse of its discretion.

C.    **The Settlement Fails To Provide Protections for State Center Residents Who Make Improvident Decisions To Relocate to Community Facilities.**

The settlement is based on an unfounded presumption that all residents can be relocated with appropriate services and supports, but acknowledges that plans will have to be developed for each resident to determine what services and supports are "appropriate" and how to provide them.  The parties also acknowledge that sufficient community facilities do not currently exist and will have to be created. JA1425,1432-33 (McCool testimony).  Common sense says that in this uncharted territory, errors are likely, and some residents may be moved to community facilities improvidently and need to be returned to State Centers if the new facilities do not provide suitable care.  But once relocation takes place and a "trial period" has ended, the settlement forecloses that possibility.  Rather, if it turns out that community facilities are not providing these individuals with the care and services they require, the resident

will **not be permitted** to return to the Centers that had been providing them care before they were removed, unless the resident goes to court to obtain an order demanding return. JA1435-35 (McCool testimony). Nothing in the law governing placement of these residents, the Mental Health and Intellectual Disability Act, 50 Pa. Stat. Ann. §§ 410 *et seq.*, requires a court order before an individual under state care can be returned to an ICF/MR, but DPW insists that it must enforce this "policy" under the settlement anyway. By doing so, DPW will assure that once the State Centers are depopulated, they will stay that way, even if an improvidently relocated resident needs to return there for services. This policy is unreasonable and deprives residents of their right to institutional care under *Olmstead*.

In fact, the settlement makes no provision for oversight to determine if a relocation has been improvident. Although it contains detailed provisions for status reports on such things as progress in depopulating the State Centers, diversion of funding from the Centers to community programs, and reinstitutionalization of the residents because of commitments to psychiatric hospitals or incarceration, it says nothing about reports showing whether relocated residents are being provided with proper care or have been victims of the abuse, neglect, or criminal victimization that historically have occurred in community settings. *See* JA478 (¶ VI.2.). The district court was asked to order correction of this glaring omission, but it made no mention of this objection and approved the settlement without it. That was error.

**D.     The Settlement Fails To Provide Protections for State Center Residents Who Do Not Wish To Be Relocated.**

By moving as many residents out of the State Centers as possible, the settlement will depopulate them and may cause a reduction in their funding and, ultimately, one or more of their closures.  Though plaintiffs have denied that their objective is closures, their litigation documents discuss this prospect favorably.  *See* JA323-24, 368 (Pl. Sum. J. Stmt. & Defs.' Ans. ¶¶ 123-27)  Indeed, the settlement itself provides for funds to be shifted away from the Centers, a provision consistent with this objective.  JA476 (¶ V.2.c.).

Of course, if any resident wishes to move to the community and is capable of doing so, no other residents, including Appellants, have a right to complain.  But the settlement seeks to depopulate the State Centers by means that are ***improper*** and ***unfair*** to all residents, including the profoundly retarded residents deemed to be indifferent because they cannot express what they desire, the improvidently relocated residents forbidden to return, and those residents induced to move as the result of a biased system.  By using these improper means to reduce the Centers' populations and impair their financial strength, the settlement infringes on the rights of those State Center residents who wish to remain by imperiling the Centers' viability.  Even if the Centers do not close, reduced financing resulting from the settlement may lead to a reduced quality of ICF/MR care.  If that happens, those who have preferred to remain

in the Centers may be compelled to move to community facilities after all. This too infringes residents' *Olmstead* rights.

The district court held that these rights are not implicated here because the settlement does not directly provide for any State Center to close. JA17, 22 (Op. at *21, *32-*33). The court failed to discuss the likelihood of closures as an indirect result of the settlement. The use of contrivances to remove hundreds of residents from the Centers and the settlement's provisions for reallocation of funds together make closures a real likelihood, not just speculation. This likelihood has been certified by those most in a position to know — the hundreds of objectors who observe the every-day workings of the Centers where their loved ones are cared for and the legislators who wrote to Judge Jones to echo their concerns. The court should have taken these concerns into account.

Plaintiffs contend that residents wishing to remain in the Centers have no right to have this interest heard here because their expressions of similar concerns were rejected when this Court affirmed the district court's decision denying intervention. That is incorrect. Nothing in this Court's decision — which was based on intervention law, not class settlement law — precluded consideration of relocation opponents' interests when assessing the settlement's fairness. The settlement had not been negotiated at the time of this Court's decision, and its terms, such as the required transfer of funds from the State Centers, were not known. The Court believed that the

only class members who would be placed on a planning list would be those who "affirmatively expressed their desire to be discharged to the community," JA440 (432 Fed. Appx. at 96), not those who simply remained silent when asked. The facts have changed since this Court's decision, and the applicable legal standards are different as well. Intervention aside, the district court's obligations as a "fiduciary" for all class members required it to consider all class members' interests in assessing the proposed settlement. *See Orthopedic Bone Screw*, 246 F.3d at 321. But it failed to do so.

All *Olmstead* issues are interrelated, and plaintiffs cannot wall off just one form of relief and claim no effect on the rest. Their suit requires residents to make critical decisions about whether to stay in the State Centers or to move out, and that choice necessarily requires a comparison of the risks and benefits of each option. Those risks and benefits will depend in part on the resources available, and those resources depend in part on the settlement's terms. That is why the third part of plaintiffs' class definition asks whether residents "would not oppose community placement" in the future, thus inviting them to acknowledge possible situations in which they might not object, depending on all of the circumstances at the time.

This interrelationship of issues under *Olmstead* was recognized in *Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. LEXIS 34122 (N.D. Ill., Apr. 7, 2010). In *Ligas*, as here, the plaintiffs brought a class action for relocation of institutionalized residents and included an opt-out clause that, they said, insulated residents wishing to

remain institutionalized from any decree.  As here, some residents sought to intervene to oppose the requested relief, the district court denied intervention, and that decision was affirmed.  *See Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774-75 (7th Cir. 2007).  However, after the Seventh Circuit expressed doubt about the opt-out provision's validity (because it required individualized inquiries into class members' states of mind),[11] the parties removed the opt-out provision as part of a class settlement.  At a hearing on approval of that settlement at which it received 2,500 objections, the court denied approval and decertified the class.  *See* JA170.1 (*Ligas* minute order).

The plaintiffs in *Ligas* then proposed a new class definition and a new settlement, and again those opposing relocation moved to intervene.  This time, the court ***granted*** the intervention motion, agreeing that the intervenors had an interest under *Olmstead* in assuring that their needs of institutional residence "be considered in determining the State's obligation to provide the 'community-based' services" at issue.  2010 U.S. Dist. LEXIS 34122, at *11.  The court observed that the Court in *Olmstead* was "very much aware of competing claims on limited State resources" and required those resources to be taken into account along with "the needs of others with mental disabilities."  *Id.* at *13-*14, *quoting (second quote)* 527 U.S. at 607.  Therefore, it held, "the Proposed Intervenors have a right under *Olmstead* to have their

---

11.    *See* Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx?submit
=showbr&shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006).  *See also* 478
F.3d at 775 (questioning, but not ruling on, propriety of class definition).

needs considered" in assessing the proposed settlement. *Id.* at *14 (emphasis added). Otherwise, their future rights would be "significantly impaired." *Id.* at *16-*17. Since the State planned to reduce institutional capacity upon approval of a settlement relocating residents to "community" facilities, the litigation implicated the intervenors' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement" — what the court collectively called an interest "in the equitable distribution of State resources among individuals with mental disabilities." *Id.* at *18-*20.

The same is true here. As in *Ligas*, this litigation implicates all class members' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement." All class members, including those who presently may not favor relocation, therefore have a right to have their interests taken into account.

To protect all class members' rights under *Olmstead*, the court should have insisted that there be no impairment of care at the Centers. It should have refused to approve any settlement that failed to include assurances that DPW will continue to abide by its obligation under *Olmstead* to continue to provide quality institutional care and, in doing so, will continue to operate the State Centers and provide them with sufficient resources to permit them to provide the same high-quality care that they provide today. It also should have refused to approve the provision of the

settlement calling for funds to be shifted from ICFs/MR to community programs and required instead that the Commonwealth provide continued adequate funding to ***both*** institutional and community programs.  Its failure to do so was an abuse of discretion.

## <u>CONCLUSION</u>

The Court should vacate the orders certifying the class and approving the class settlement.  Upon doing so, the Court should remand with a direction that the district court proceed to adjudicate only the claims of the five named plaintiffs.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano, I.D. No. 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000

/s/ *Benjamin J. Hoffart*

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

*Attorneys for Appellants*

Dated:  December 19, 2011.

# <u>CERTIFICATIONS</u>

BENJAMIN HOFFART and CARL A. SOLANO certify:

*Bar membership*.  We are members in good standing of the Bar of this Court.

*Type volume*.  This brief contains 16,829 words, as counted by Schnader Harrison Segal & Lewis LLP's Microsoft Office Word 2007 word-processing software, and is within the word limit allowed by this Court's order dated December 12, 2011.

*Electronic filing*.  The electronic version of this brief was prepared in portable document format (*.pdf*) and is identical to the paper version of this brief.  A virus scan was run on the electronic version of this brief and no virus was detected.

*Service*.  On December 19, 2011, we served this brief and the appendix to the brief electronically on the following counsel, all of whom are Filing Users under Rule 113.2 of this Court, by the Notice of Docket Activity generated when the brief and appendix were filed electronically in these appeals:

Robert W. Meek, Esquire
DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
1315 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19107-4705
*Attorney for Plaintiff-Appellees*

Doris M. Leisch, Esquire
OFFICE OF GENERAL COUNSEL
PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE
Third Floor West, Health & Welfare Building
Harrisburg, Pennsylvania 17120
      *Attorney for Defendants.*


/s/ *Benjamin J. Hoffart*
Benjamin J. Hoffart

/s/ *Carl A. Solano*
Carl A. Solano

Dated:  December 19, 2011.

# JOINT APPENDIX
## TABLE OF CONTENTS

### <u>Volume I</u>

1. Springstead Objectors' Notice of Appeal, dated September 30, 2011 ....... JA1

2. Diane Solano's Notice of Appeal, dated September 30, 2011 ................... JA3

3. Order of the Honorable John E. Jones III, Approving Class
   Settlement dated September 2, 2011 ......................................................... JA5

4. Memorandum of the Honorable John E. Jones III, dated
   September 2, 2011 ...................................................................................... JA7

5. Order of the Honorable John E. Jones III, Denying Appellant Solano
   and Appellants Springstead Objectors Alternative Motions to
   Intervene, dated August 16, 2011 ............................................................ JA33

6. Order of the Honorable John E. Jones III, Granting Motion for Class
   Certification, dated September 2, 2009 ................................................... JA36

### <u>Volume II</u>

7. District Court Docket Entries ................................................................. JA40

8. Plaintiff's Amended Complaint for Declaratory and Injunctive
   Relief, dated July 14, 2009 ..................................................................... JA75

9. Plaintiff's Unopposed Motion for Class Certification, dated
   August 31, 2009 ...................................................................................... JA103

    a. Exhibit A – Certificate of Concurrence ........................................ JA105

    b. Exhibit B – Declaration of Robert W. Meek ................................ JA107

    c. Exhibit D – Governor's Executive Budget 2009-10 (excerpts)... JA141

10. Plaintiffs' Brief in Support of Unopposed Motion for Class
    Certification ........................................................................................... JA145

11. Defendants' Motion to Dismiss Amended Complaint, dated
    September 24, 2009 ................................................................................ JA165

12. Springstead Intervenors' Motion to Intervene, dated November 10, 2009 ................................................................................................. JA166

    a. Exhibit B to Springstead Intervenors' Brief in Support of Proposed Motion- Ligas v. Maram, 1:05-cv-04331 (N.D. Ill. Jul. 7, 2009) (minute order) ....................................... JA170.1

13. Order Denying Defendants' Motion to Dismiss Amended Complaint, dated January 25, 2010 ......................................................... JA171

14. Defendants' Answer to Amended Complaint, dated February 24, 2010 ................................................................................................. JA180

15. Memorandum and Order Denying Springstead Intervenors' Motion to Intervene, dated March 10, 2010 ......................................................... JA189

16. Plaintiffs' Motion for Summary Judgment, dated June 23, 2010 .......... JA211

    a. Exhibit 4 – Deposition of Kevin Casey (excerpts) ...................... JA213

    b. Exhibit 5 – Defendants' Response to Plaintiffs' First Request for Admissions ................................................................... JA243

    c. Exhibit 8 – Governor's Executive Budget FY 2010-2011 (excerpts) ......................................................................... JA259

    d. Exhibit 9 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Franklin Benjamin ....... JA265

    e. Exhibit 11 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Anthony Beard ............. JA271

    f. Exhibit 12 – Deposition of Fred Lokuta (excerpts) ..................... JA276

    g. Exhibit 13 – ODP Summary Chart re Opposition to Discharge ......................................................................... JA280

    h. Exhibit 17 – ODP Chart re Deaths/Discharges at State ICFs/MR .......................................................................... JA281

17. Plaintiffs' Proposed Summary Judgment Order (Exhibit 1 to Brief in Support, dated June 23, 2010) ................................................................. JA282

18. Plaintiffs' Statement of Undisputed Facts in Support of Motion for Summary Judgment ................................................................. JA294

19. Defendants' Motion for Summary Judgment, dated June 29, 2010 ....... JA328

    a.  Exhibit 1 – Declaration of Kevin Casey ..................................... JA330

    b.  Exhibit 2 – Deposition of Marti McIntire (excerpts) .................. JA338

    c.  Exhibit 3 – Deposition of Joseph O'Church (excerpts) ............... JA347

    d.  Exhibit 4 – The Plan, Supporting People Who Currently Reside in State Centers Who Want to Move to the Community ................................................................................. JA349

20. Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ................................................................. JA354

21. Defendants' Response to Plaintiff's Statement of Undisputed Facts (Ex. 1 to Defendants' Brief in Opposition, dated July 14, 2010) ........... JA364

22. Plaintiffs' Answer to Defendants' Statement of Undisputed Facts ........ JA370

23. Springstead Intervenors' Motion to Stay Formal Proceedings, dated November 19, 2010 ................................................................. JA400

24. Order Denying Springstead Intervenors' Motion to Stay Formal Proceedings, dated December 16, 2010 ................................................. JA403

25. Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment, dated January 27, 2011 ................................................................. JA410

26. Mandate of United States Court of Appeals, dated April 27, 2011 ....... JA434

    a.  Third Circuit Opinion denying Springstead Intervenors' appeal of March 10, 2010 Order, dated April 5, 2011 ................. JA436

27. Plaintiffs' Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement and for Approval of Class Notice, dated May 26, 2011 ................................................................. JA447

    b.  Exhibit 1 – Declaration of Robert W. Meek ................................ JA462

c.  Exhibit 2 – Settlement Agreement ............................................... JA466

d.  Exhibit 3 – Notice of Class Action Proposed Settlement and
Hearing ....................................................................................... JA481

28. Order Granting Plaintiffs' Unopposed Motion for Preliminary
Approval of the Proposed Class Action Settlement and for Approval
of Class Notice, dated May 27, 2011 ....................................................... JA485

29. Objection Letters re Notice of Class Action (in order of docket
entry- an alphabetical list of Objections received by the district court
is provided at pages xii-xv of this Index)

• Letter from Mr. and Mrs. Vincent Drago ......................................... JA489

• Letter from W.J. Parmley ................................................................. JA496

• Letter from Karen K. Blew ............................................................... JA499

• Letter from Jacob Kodnovich .......................................................... JA501

• Letter from Bob Sheetz ..................................................................... JA503

• Letter from Marion Kelly o/b/o Patrick Garramone ........................ JA505

• Letter from Helen Reider .................................................................. JA507

• Letter from Roy Reider ..................................................................... JA510

• Letter from Rev. AM Gordon and Minerva Gordon ........................ JA514

• Letter from Marion and Carment Attanasio, Jr. ............................... JA517

• Letter from Francis J. Beston ............................................................ JA519

• Letter from Cecelia Hopkins ............................................................. JA522

• Letter from Alfred R. Sheppard ........................................................ JA525

• Letter from Norma Ferguson ............................................................. JA528

• Letter from Cheryl O. Brown ............................................................ JA531

- Letter from Mary Gough ................................................................... JA533

- Letter from Arthur and Joyce Ciullo ................................................ JA537

- Letter from Doris Kalan ................................................................... JA541

- Letter from Nancy Slick ................................................................... JA544

- Letter from Elizabeth Pugh .............................................................. JA546

- Letter from Catherine T. Dymacek ................................................. JA549

- Letter from Lawrence County Association for Retarded Citizens.... JA552

- Letter from Norman Moses, Executive Director of Lawrence County Association for Retarded Citizens ......................................... JA554

- Letter from Joseph Lambo................................................................ JA564

- Letter from James B. Lambo ............................................................ JA570

- Letter from Polly Spare ................................................................... JA574

- Letter from Florence Plenn.............................................................. JA578

- Letter from Dale and Darcene Utt.................................................... JA581

- Letter from John Bastek .................................................................. JA585

- Letter from Grace Meo..................................................................... JA592

- Letter from Amelia and Jerry Hake................................................. JA596

- Letter from Kay Wagner ................................................................. JA600

- Letter from Gary and Mary Wills.................................................... JA602

- Letter from Kimberly Gordon ......................................................... JA605

- Letter from Dixie Henry.................................................................. JA608

- Letter from Clara Palmer................................................................. JA610

- Letter from Mary Kashatus ................................................................. JA612

- Letter from John Hoops, Jr. ............................................................... JA614

- Letter from Suzanne Perry .................................................................. JA617

- Letter from Wilson McKinley ............................................................. JA621

- Letter from Thomas Kashatus ............................................................ JA623

- Letter from Margaret Kashatus ......................................................... JA626

- Letter from August and Winnifred Centi .......................................... JA628

- Letter from Ruth Jarrett ..................................................................... JA631

- Letter from Patricia O'Donnell .......................................................... JA634

- Letter from Margaret Tierney ............................................................ JA638

- Letter from William Hudock .............................................................. JA641

- Letter from Carole Henry ................................................................... JA643

- Letter from Wes Grebski .................................................................... JA647

- Letter from Marian L. Lentz .............................................................. JA650

- Letter from Barbara and Donald Sabo ............................................... JA653

- Letter from Albert Knight .................................................................. JA659

- Letter from Kenneth Myers ................................................................ JA661

- Letter from Kathleen McKeaney ....................................................... JA664

- Letter from Jeremy Kashatus and Family ......................................... JA668

- Letter from Karen S. Crytzer ............................................................. JA672

- Letter from Ellen Lube ....................................................................... JA675

- Letter from Ruth Nichol ................................................................... JA677

- Letter from Deborah and Gerard Hey ............................................. JA681

- Letter from Sharon and Elmer Brice, Jr. ........................................ JA684

- Letter from Mary B. Fernan ............................................................ JA687

- Letter from Robert and Beverly Gill ............................................... JA690

- Letter from Adelaide Hardy ............................................................ JA696

- Letter from Lily Chang .................................................................... JA698

- Letter from Joan Wright .................................................................. JA700

- Letter from Bertin W. Springstead .................................................. JA703

- Letter from Dolores Drews .............................................................. JA707

- Letter from Frederick Drews ........................................................... JA710

- Letter from Nancy Murray ............................................................... JA713

- Letter from Mark Drews .................................................................. JA716

- Letter from Megan Irwin ................................................................. JA720

- Letter from Mr. and Mrs. John Potochnick ..................................... JA723

- Letter from Carol McDonald ........................................................... JA725

- Letter from James Margolis ............................................................. JA729

- Letter from Charles McCormick ...................................................... JA731

- Letter from Eloise Moore ................................................................ JA733

- Letter from Clarence and Gail Ropp ............................................... JA735

- Letter from Trudy Sheetz ................................................................ JA738

- Letter from Geraldine Wetzel ........................................................... JA743

- Letter from J. Keffer ...................................................................... JA745

- Letter from David Kalan ................................................................. JA747

- Letter from Richard and Jane Ruth .................................................. JA750

- Letter from Jean Milliron ............................................................... JA752

- Letter from Sen. Mary Jo White ...................................................... JA757

- Letter from Harold McConnell III .................................................... JA760

- Letter from Mary Schneider ............................................................ JA763

- Letter from Betty Lightner .............................................................. JA770

- Letter from Joseph Potera ............................................................... JA774

- Letter from Ann Marie Walsh .......................................................... JA778

- Letter from Barbara Ann Fritz ......................................................... JA781

- Letter from Rose Schafer ................................................................ JA784

- Letter from Tommy Kashatus .......................................................... JA787

- Letter from Debra Kleinen .............................................................. JA790

- Letter from Debra Herring .............................................................. JA794

- Letter from Daniel Kleinen ............................................................. JA798

- Letter from William and Beverly Daugherty ..................................... JA801

- Letter from Kathy Casadonte .......................................................... JA807

- Letter from Kimberley Gauronski ..................................................... JA811

- Letter from Larry and Sandra Krafft ................................................ JA814

- Letter from Jennifer Crawford........................................................JA819
- Letter from Sen. Mary Jo White...................................................JA825
- Letter from Nathan P. Heller and Lesli C. Esposito.......................JA828
- Letter from Tarah Toohil...............................................................JA836
- Letter from the Staff and Students of Keystone Job Corps..............JA839
- Letter from Rickey Shaffer ...........................................................JA840
- Letter from Francis Marion ...........................................................JA843
- Letter from Linda Lotzi.................................................................JA845
- Letter from Bertin Springstead......................................................JA856
- Letter from William Toperzer ........................................................JA860
- Letter from Amy Schwartz, Jerry Hake and Sara Greth .................JA868
- Letter from Martha Ilift ................................................................JA872
- Letter from David Parry ................................................................JA874
- Letter from Paula Wolfe................................................................JA877
- Letter from Henry Sitko ................................................................JA880
- Letter from Beatrice Sitko .............................................................JA883
- Letter from Gerard Dunne .............................................................JA885
- Letter from David Read..................................................................JA887
- Letter from Ann Marie Vodzak......................................................JA891
- Letter from Evelyn Crawford .........................................................JA896
- Letter from William Brill ..............................................................JA899

- Letter from James and Lucille Causer ............................................... JA903

- Letter from Emil and Elizabeth Gnall ............................................... JA907

- Letter from Barry and Anna Johns .................................................... JA912

- Letter from Regina Splane ............................................................... JA914

- Letter from Annette and Ronald Fischer ........................................... JA918

- Letter from Shirley Musacchio ......................................................... JA922

- Letter from Carin Doddroe .............................................................. JA925

- Letter from Timothy Demers ........................................................... JA927

- Letter from Rickey Shaffer .............................................................. JA934

- Letter from Carl Lloyd .................................................................... JA937

- Letter from Samuel Boring ............................................................. JA943

30. Diane Solano Objections to Class Action Settlement, dated
July 28, 2011 ................................................................................ JA948

    a.  Exhibit A – E-mail Exchange Between Fred Lokuta,
Superintendent of White Haven Center, and Tom Kashatus,
President of White Haven Center Relatives and Friends
Association ................................................................................ JA999

31. Diane Solano Motion to Intervene, dated July 28, 2011 ..................... JA1000

32. Springstead Objectors' Supplemental Objections to Class Action
Settlement, dated August 1, 2011 ...................................................... JA1013

    a.  Declaration of Benjamin J. Hoffart ........................................... JA1053

    b.  Exhibit A – ICF/MR Resident Demographics ........................... JA1055

    c.  Exhibit B – Collected ICF/MR Center Demographics for
Ebensburg, Hamburg, Polk, Selinsgrove, and White Haven
Centers ...................................................................................... JA1056

33. Springstead Objectors' Motion to Intervene, dated August 2, 2011 .... JA1062

34. Statement of Support by the United States, dated August 2, 2011[*] ..... JA1067

35. Plaintiff's Unopposed Motion For Final Approval of the Proposed Class Action Settlement Agreement, dated August 8, 2011 ................ JA1085

    a.  Exhibit A – Declaration of Robert W. Meek ............................ JA1087

    b.  Exhibit B – Settlement Agreement............................................ JA1099

36. Exhibit A to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Brief for Appellants, 3d Cir. Case No. 10-1908)[*] ...................................................................................... JA1114

37. Exhibit B to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Reply Brief for Appellants, 3d Cir. Case No. 10-1908) [*] ............................................................................. JA1156

38. Exhibit C to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Solano's *Amicus* Brief, 3d Cir. Case No. 10-1908)[*] ................................................................................. JA1183

39. Exhibit D to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Solano's Brief Providing Information Sought at Oral Argument, 3d Cir. Case No. 10-1908)[*] ... JA1215

40. Exhibit E to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Plaintiffs-Appellees' Brief, incl. attach 1, 3d Cir. Case No. 10-1908)[*] .................................................... JA1223

41. Exhibit G to Plaintiffs Brief in Opposition to Solano and Springstead Objectors' Motions to Intervene (Plaintiffs-Appellees' Response in Opposition to Solano's Motion to File Post-Argument Brief, 3d Cir. Case No. 10-1908)[*] ............................................................................ JA1289

42. Transcript of Argument before Third Circuit, 3d Cir. Case No. 10-1908 ....................................................................................................... JA1299

43. Joint Motion For Hearing, dated August 15, 2011 ............................... JA1331

---

[*] Document requested by Plaintiffs' counsel, Appellants object to the inclusion of this document pursuant to Fed. R. App. P. 30(a)(2) and L.A.R. 30.3 (a).

44.Order Regarding Fairness Hearing, dated August 18, 2011.................JA1336

45.Transcript of August 22, 2011 Fairness Hearing..................................JA1339

46.Exhibit Introduced at August 22, 2011 Hearing:

    a.  Exhibit 1 – Assessment Protocol................................................JA1497

    b.  Court Exhibit 1 – Objection Letter from Sen. Elder Vogel .... JA1504.1

    c.  Court Exhibit 2 – Objection Letter from Rep. Chris Sainato  JA1504.2

47.Appellants Motion to Stay, dated November 8, 2011 ..........................JA1505

    a.  Exhibit A – Declaration of Carl Solano .....................................JA1522

    b.  Exhibit B – E-mail Correspondence between D. Leisch and C.
      Solano ......................................................................................JA1536

## ALPHABETICAL LIST OF OBJECTIONS RECEIVED
## BY THE DISTRICT COURT

*The copies of the objection letters in the Appendix are included in the order in which they were filed. This alphabetized list is provided for convenience.*

Marion and Carment Attanasio, Jr. ..................................................JA517

John Bastek  ........................................................................JA585, 1013

Francis J. Beston ...........................................................................JA519

Karen K. Blew..............................................................................JA499

Samuel Boring...............................................................................JA943

Sharon and Elmer Brice, Jr. ............................................................JA684

William Brill ................................................................................JA899

Cheryl O. Brown ...........................................................................JA531

Kathy Casadonte ...........................................................................JA807

James and Lucille Causer................................................................JA903

August and Winnifred Centi ...........................................................JA628

Lily Chang...................................................................................JA698

Arthur and Joyce Ciullo .................................................................JA537

Evelyn Crawford...........................................................................JA896

Jennifer Crawford .........................................................................JA819

Karen S. Crytzer...........................................................................JA672

William and Beverly Daugherty .......................................................JA801

Timothy Demers ................................................................... JA927
Carin Doddroe ..................................................................... JA925
Mr. and Mrs. Vincent Drago ................................................ JA489
Dolores Drews ..................................................................... JA707
Frederick Drews ................................................................... JA710
Mark Drews ......................................................................... JA716
Gerard Dunne ...................................................................... JA885
Catherine T. Dymacek ......................................................... JA549
Norma Ferguson ................................................................... JA528
Mary B. Fernan ................................................................... JA687
Annette and Ronald Fischer ................................................ JA918
Barbara Ann Fritz ................................................................ JA781
Sara Fuller .......................................................................... JA1013
Marion Kelly o/b/o Patrick Garramone ............................. JA505
Kimberley Gauronski ........................................................... JA811
Robert and Beverly Gill ....................................................... JA690
Emil and Elizabeth Gnall ..................................................... JA907
Rev. AM Gordon and Minerva Gordon ............................... JA514
Kimberly Gordon ................................................................. JA605
Mary Gough ........................................................................ JA533
Wes Grebski ........................................................................ JA647
Amelia and Jerry Hake ......................................................... JA596
Adelaide Hardy ................................................................... JA696
Carole Henry ....................................................................... JA643
Dixie Henry ......................................................................... JA608
Nathan P. Heller and Lesli C. Esposito .............................. JA828
Debra Herring ...................................................................... JA794
Deborah and Gerard Hey ..................................................... JA681
John Hoops, Jr. .................................................................... JA614
Cecelia Hopkins .................................................................. JA522
William Hudock ................................................................... JA641
Martha Ilift ......................................................................... JA872
Megan Irwin ........................................................................ JA720
Ruth Jarrett ......................................................................... JA631
Barry and Anna Johns .......................................................... JA912
David Kalan ......................................................................... JA747
Doris Kalan .......................................................................... JA541
Jeremy Kashatus and Family ............................................... JA668
Margaret Kashatus ............................................................... JA626
Mary Kashatus ..................................................................... JA612

Thomas Kashatus ..................................................................JA623, 1013
Tommy Kashatus ...........................................................................JA787
J. Keffer .........................................................................................JA745
Staff and Students of Keystone Job Corps.....................................JA839
Daniel Kleinen ...............................................................................JA798
Debra Kleinen ................................................................................JA790
Albert Knight .................................................................................JA659
Jacob Kodnovich............................................................................JA501
Larry and Sandra Krafft .................................................................JA814
James B. Lambo ............................................................................JA570
Joseph Lambo ..........................................................................JA564, 1013
Lawrence County Association for Retarded Citizens.....................JA552
Marian L. Lentz .............................................................................JA650
Betty Lightner ...............................................................................JA770
Carl Lloyd ......................................................................................JA937
Linda Lotzi ....................................................................................JA845
Ellen Lube .....................................................................................JA675
James Margolis ..............................................................................JA729
Francis Marion ..............................................................................JA843
Harold McConnell III....................................................................JA760
Charles McCormick .......................................................................JA731
Carol McDonald ............................................................................JA725
Kathleen McKeaney.......................................................................JA664
Wilson McKinley ..........................................................................JA621
Grace Meo..............................................................................JA592, 1013
Jean Milliron .................................................................................JA752
Eloise Moore .................................................................................JA733
Norman Moses, Executive Director of Lawrence County Association for
    Retarded Citizens ....................................................................JA554
Nancy Murray ...............................................................................JA713
Shirley Musacchio..........................................................................JA922
Kenneth Myers ..............................................................................JA661
Ruth Nichol ...................................................................................JA677
Patricia O'Donnell .........................................................................JA634
Clara Palmer ..................................................................................JA610
W.J. Parmley ..................................................................................JA496
David Parry ....................................................................................JA874
Suzanne Perry ...............................................................................JA617
Florence Plenn................................................................................JA578
Joseph Potera.................................................................................JA774

Mr. and Mrs. John Potochnick .................................................................. JA723
Elizabeth Pugh ........................................................................................ JA546
David Read .............................................................................................. JA887
Helen Reider ........................................................................................... JA507
Roy Reider .............................................................................................. JA510
Clarence and Gail Ropp ......................................................................... JA735
Richard and Jane Ruth ........................................................................... JA750
Barbara and Donald Sabo ...................................................................... JA653
Rep. Chris Sainato .............................................................................. JA1504.2
Rose Schafer ........................................................................................... JA784
Mary Schneider ...................................................................................... JA763
Amy Schwartz, Jerry Hake and Sara Greth ........................................... JA868
Rickey Shaffer ............................................................................... JA840, 934
Bob Sheetz .............................................................................................. JA503
Trudy Sheetz .......................................................................................... JA738
Alfred R. Sheppard ........................................................................ JA525, 1013
Beatrice Sitko ......................................................................................... JA883
Henry Sitko ............................................................................................ JA880
Nancy Slick ............................................................................................ JA544
Carl Solano ............................................................................................. JA948
Polly Spare ..................................................................................... JA574, 1013
Regina Splane ......................................................................................... JA914
Bertin W. Springstead .......................................................... JA703, 856, 1013
Margaret Tierney .................................................................................... JA638
Rep. Tarah Toohil ................................................................................... JA836
William Toperzer .................................................................................... JA860
Dale and Darcene Utt ............................................................................. JA581
Ann Marie Vodzak .................................................................................. JA891
Sen. Elder Vogel ................................................................................. JA1504.1
Kay Wagner ............................................................................................ JA600
Ann Marie Walsh .................................................................................... JA778
Geraldine Wetzel .................................................................................... JA743
Sen. Mary Jo White ........................................................................ JA757, 825
Gary and Mary Wills .............................................................................. JA602
Paula Wolfe ............................................................................................. JA877
Joan Wright ............................................................................................ JA700

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
------------------------------------------------------------x
```
FRANKLIN BENJAMIN, *et al.,* on behalf of          :
themselves and all others similarly situated,        :
                                                     :
          *Plaintiffs,*          :
                                                     :        No. 09-cv-01182
    v.                                             :        (Jones, U.S.D.J.)
                                                     :
DEPARTMENT OF PUBLIC WELFARE OF       :        (Am. Complaint
THE COMMONWEALTH OF                        :        Filed 7/14/09)
PENNSYLVANIA, *et al.,*                           :
                                                     :
          *Defendants.*          :
```
------------------------------------------------------------x
```

## NOTICE OF APPEAL

Notice is hereby given that Craig Springstead, by and through his father and guardian, Bertin Springstead, Maria Meo, by and through her mother and guardian, Grace Meo, Daniel Bastek, by and through his father and guardian, John Bastek, Michael Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by and through her father and guardian, Joseph Lambo, Richard Kohler, by and through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend, Alfred Sheppard (collectively, the "Springstead Objectors"), as members of the class certified by the District Court and as Objectors to the class action settlement in this action, hereby appeal to the United

JA1

States Court of Appeals for the Third Circuit from the September 2, 2011 Order

approving the class action settlement and from the August 16, 2011 Order denying,

in part, the Springstead Objectors' motion to intervene in this action.


Dated:  Philadelphia, Pennsylvania                    Respectfully submitted,
September 29, 2011


**VAIRA & RILEY, P.C.**

By:___/s/ John E. Riley_____
John E. Riley (PA ID# 22504)
William J. Murray, Jr. (PA ID# 73917)
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania  19103
T: (215) 789-9405
F: (215) 751-9420



**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace
Meo, Daniel Bastek, Michael Storm,
Beth Ann Lambo, Richard Kohler,
Maria Kashatus, and Wilson Sheppard*

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
----------------------------------------------------------x
```
**FRANKLIN BENJAMIN**, *et al.*, on behalf of    :
themselves and all others similarly situated,    :
   :
           *Plaintiffs,*    :
   :    **No. 09-cv-01182**
      v.    :    (Jones, U.S.D.J.)
   :
**DEPARTMENT OF PUBLIC WELFARE OF**    :    (Am. Complaint
**THE COMMONWEALTH OF**    :    Filed 7/14/09)
**PENNSYLVANIA**, *et al.*,    :
   :
          *Defendants.*    :
```
----------------------------------------------------------x
```

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN THAT:

Diane Solano, by and through her brother and guardian Carl A. Solano, as a member of the class certified by the District Court and as an Objector to the Class Action Settlement in this action, hereby appeals to the United States Court of Appeals for the Third Circuit from the September 2, 2011 order approving the class action settlement; the August 16, 2011 order partially denying the relief

JA3

requested in her motion to intervene; and all other orders and judgments leading to

and including the final order in this action.

Respectfully submitted,

/s/ *Carl A. Solano*
Carl A. Solano (I.D. No. 23986)
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
215-751-2202
215-972-7363 (fax)

*Attorney for Diane Solano*

Dated:  September 29, 2011.

2

JA4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
|  | : |  |
|  | : |  |
| Plaintiffs | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : |  |
| COMMONWEALTH OF | : |  |
| PENNSYLVANIA and GARY | : |  |
| ALEXANDER, in his official capacity | : |  |
| as Secretary of Public Welfare of the | : |  |
| Commonwealth of Pennsylvania | : |  |
|  | : |  |
| Defendants. | : |  |

## ORDER

### September 2, 2011

In accordance with the Memorandum entered on this date, it is hereby **ORDERED** as follows:

1.  The Court **FINDS** that the Settlement Agreement is fair, reasonable, and adequate;

2.  Plaintiffs' Unopposed Motion for Final Approval of the Proposed Class Action Settlement Agreement (Doc. 260) is **GRANTED**;

3.  The Settlement Agreement is **APPROVED**;

4.  Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs (Doc. 262) is **GRANTED**;

5.  Defendants' will pay Plaintiffs' counsel the sum of $432,500 for

attorneys' fees, litigation expenses, and costs incurred;

6.      This action is hereby **DISMISSED** and the Clerk is directed to **CLOSE** this case; and

7.      The Court expressly retains jurisdiction as set forth in the Settlement Agreement, in order to enter any further orders that may be necessary or appropriate in administering or implementing the terms and provisions of the settlement agreement.

<u>/s/ John E. Jones III</u>
John E. Jones III
United States District Judge

2

JA6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, *et. al.*,          :          1:09-cv-1182
                                       :
                                       :
          Plaintiffs                   :
                                       :
     v.                                :
                                       :
DEPARTMENT OF PUBLIC ,                 :          Hon. John E. Jones III
WELFARE OF THE                         :
COMMONWEALTH OF                        :
PENNSYLVANIA and GARY                  :
ALEXANDER, in his official capacity    :
as Secretary of Public Welfare of the  :
Commonwealth of Pennsylvania           :
                                       :
          Defendants.                  :

## <u>MEMORANDUM</u>

## September 2, 2011

## I.      INTRODUCTION

Plaintiffs, a class of individuals with intellectual disabilities (formerly known as mental retardation) who are institutionalized in state intermediate care facilities for persons with mental retardation ("ICF/MRs") initiated this litigation in June 2009.  Plaintiffs alleged that they were appropriate for, and not opposed to, community-based services, and that Department of Public Welfare and the Secretary of Public Welfare (collectively, "Defendants" or "DPW") violated Title

1

II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131-12134, and

Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, by failing to

provide those services to institutionalized individuals.  Plaintiffs sought both

declaratory and injunctive relief.  On January 27, 2011, the Court resolved cross

Motions for Summary Judgment in Plaintiffs' favor, finding that Defendants were

violating the integration mandates of the ADA and RA by relegating

institutionalized individuals to a class of persons who receive community

placements only after another class, those who are not institutionalized, was fully

served.  (*See* Doc. 88.)  Because of the exhaustive detail that would be required in

any resulting injunctive relief ruling, and mindful that the parties were in a better

position to come to closure on an acceptable policy, we encouraged the parties to

mediate in aid of seeking a final resolution.  The parties thereafter reached a

settlement with the commendable assistance of U.S. Magistrate Judge Martin C.

Carlson, and, thus, before the Court is Plaintiffs' Unopposed Motion for Final

Approval of the Proposed Class Action Settlement Agreement (Doc. 260) and

Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs

(Doc. 262).  For the reasons that follow, the Court will approve the proposed

settlement and award the requested fees.

## II.    BACKGROUND

2

### A.    Procedural History

As aforementioned, the Plaintiffs initiated the action on June 22, 2009.

Pursuant to an unopposed motion predicated upon Federal Rule of Civil Procedure

23(b)(2), we thereafter certified the following class:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for persons
> with mental retardation; (2) could reside in the community with
> appropriate services and supports; and (3) do not or would not oppose
> community placement.

(Doc. 17.)  Defendants subsequently filed a Motion to Dismiss (Doc. 20) that the

Court denied by our Order of January 25, 2010.  (Doc. 38.)

While the Motion to Dismiss was pending, a group of individuals filed a

Motion to Intervene in the litigation.  (Doc. 27.)  These individuals, referred to

throughout this litigation as the "Springstead Intervenors", alleged that, although

they were opposed to community-based services and support, they were

nonetheless *de facto* members of the certified class.  The Springstead Intervenors

alleged that the resolution of the class action in Plaintiffs' favor would limit the

Springstead Intervenors' rights to choose ICF/MR care.  We denied the Motion to

Intervene on March 10, 2010, finding that the Springstead Intervenors were

explicitly excluded from the class by virtue of their opposition to community-based

care.  (Doc. 41.)  The Springstead Intervenors appealed that decision, and the

3

United States Court of Appeals for the Third Circuit affirmed our denial in April

2011.  *See Benjamin v. Dep't of Pub. Welfare*, 2011 WL 1243683 (3d Cir. 2011)

(unpublished opinion).

The parties completed extensive discovery and filed cross-Motions for

Summary Judgment.  (Docs. 48, 51.)  In January 2011 we issued a Memorandum

and Order that denied Defendants' Motion for Summary Judgment, granted

Plaintiffs' Motion for Summary Judgment, and declared that DPW violated the

integration mandates of the ADA and RA.  (Doc. 88.)  As noted, because at that

juncture the Court was reluctant to draft such extensive injunctive relief as would

be required, and in effect construct a policy that was better left for the parties to

develop in the first instance, we encouraged the parties to attempt to resolve the

remedy amicably.

Again, and as noted, we referred the parties to mediation with Magistrate

Judge Martin Carlson in February 2011.  The parties met twice with Judge Carlson

and continued arms-length negotiations on their own.   The parties eventually

finalized the Proposed Settlement Agreement, and we granted preliminary approval

of said Agreement on May 27, 2011.  (Doc. 106.)  Notice was either hand-

delivered to nearly all ICF/MR residents or mailed to involved family and

guardians of residents by June 24, 2011, and interested persons had the opportunity

4

to object to the Settlement by August 2, 2011.  The Court received numerous

objections, discussed in more detail below, and conducted a fairness hearing in

accordance with Federal Rule of Civil Procedure 23(e) on August 22, 2011.

**B.    The Proposed Settlement and Attorneys' Fees**

Plaintiffs appropriately summarize the salient terms of the Proposed

Settlement in their Brief in Support of the Motion for Final Approval (Doc. 261),

and we shall highlight the significant points herein.

As articulated in the Agreement and expanded upon during the testimony at

the fairness hearing, DPW is in the process of creating, and will continue to create,

a Planning List that includes all state ICF/MR residents who are not opposed to

discharge – this includes those who wish to be discharged and those who assert no

preference.  To evaluate who is not opposed to discharge, DPW's Office of

Developmental Programs ("ODP") and others will assess residents', guardians',

and involved family members' opposition to discharge utilizing the ICF/MR

Community Planning List Assessment Protocol (the "Assessment Protocol") that

was introduced in the hearing as Exhibit 1.  The assessment is intended to be an

individualized evaluation, and residents who do not indicate opposition to

community placements will be placed on the planning list unless their guardians

JA11

oppose.[1]  DPW will perform this assessment every year in conjunction with the

residents' IEPs.

Related to the assessments that will be performed to develop the Planning

List, DPW will create a committee to develop a training program to educate

residents and their families about community placements.  This committee will

distribute literature regarding the community placements and will offer visitations

to some of the placements.

Thereafter, DPW will develop and implement an Integration Plan to provide

community placements in the following order: (1) at least 50 persons on the

Planning List in Fiscal Year 2011-2012; (2) at least 75 persons on the Planning

List in FY 2012-13; (3) at least 100 persons on the Planning List in each FY 2013-

2014 and 2014-2015; and (4) at least 75 persons on the Planning List in FY 2015-

16 and every FY thereafter until all persons on the Planning List have been

discharged.  Throughout the course of the implementation of the Settlement

Agreement, DPW will provide to Plaintiffs regular status reports, and the Court

will retain continuing jurisdiction over the case for purposes of enforcement of the

Settlement Agreement.

---

[1]A substitute decision-maker can likewise oppose community placement for an individual who expresses no preference; thus preventing their inclusion on a waiting list.  A substitute decision-maker cannot, however, override the decision and prevent inclusion on the list if the resident affirmatively indicates a preference for community placement.

6

JA12

The Court received letters of opposition to the Settlement Agreement from at least one (1) state ICF/MR resident and from the families or guardians of approximately 101 other state ICF/MR residents.  We likewise received letters of objection from several Commonwealth lawmakers as well as others who will not be directly impacted by the litigation, and several letters of support from state ICF/MR residents and others.  Most of the articulated objections clearly stem from two apparent fears: that some state ICF/MR residents will be unable to voice their opposition to community placements and will be wrongly placed in the community and that, ultimately, the Settlement Agreement will result in the closure of all state ICF/MRs because of a decrease in the resident population.  Several objectors likewise objected to any award of fees to counsel for Plaintiffs or to the measure of any fees awarded.

Plaintiffs also filed an unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs.  (Doc. 262.)  Plaintiffs seek a total award of $432,500; an amount that is, according to Plaintiffs, only 86.6 percent of their actual fees, litigation expenses, and costs incurred through June 30, 2011.  Defendants do not oppose the Motion for Attorneys' Fees and Costs.

## III.   DISCUSSION

### A.    The Proposed Settlement Agreement

JA13

Rule 23(e) provides, in pertinent part:

The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval.  The following procedures apply to a proposed settlement. . .
(1)    The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
(2)    If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
(3)    The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
. . .
(5)    Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

F.R.C.P. 23(e).  As noted above, the class was properly certified in September 2009, so the Court need not make a certification determination as it would with a settlement class.  Because the Court directed reasonable notice and allowed for objections, the only requisite, but clearly important, step remaining is a determination that the proposal is fair, reasonable, and adequate.

As the Third Circuit has often stressed, when considering a class settlement the district court must "act[] as a fiduciary, guarding the claims and rights of the absent class members."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010).   A "presumption of fairness" applies in a class action settlement if a court finds that the negotiations were conducted at arm's length, that there was sufficient

8

discovery, that the proponents of settlement are experienced, and that only a small percentage of class members object. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).   Here, the presumption of fairness attaches to the Proposed Settlement Agreement.  First, and as referenced above, the parties did conduct extensive arms-length negotiations between themselves and with the guidance of Magistrate Judge Carlson.  Second, because the settlement was reached after the Court entered summary judgment in Plaintiffs' favor, extensive discovery – including expert discovery – had already occurred, and the Court and the parties are all well-acquainted with the factual basis for the salient assertions made by Plaintiffs.  Third, it is beyond peradventure that Plaintiffs' and Defendants' counsel are seasoned litigators with decades of combined experience in the subject matter at bar.  Finally, the number of objectors are a small fraction of the total population of the state ICF/MRs, and an infinitely smaller fraction of those who meet the strict definition of the class.

### 1.    The *Girsh* Factors

In *Girsh v. Jepson*, the Third Circuit articulated nine factors for courts to further consider when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of

maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).  The Third Circuit later identified other factors that are useful to consider, including whether any provisions for attorneys' fees are reasonable.  A court *must* make findings as to each of the nine *Girsh* factors before approving a settlement under Rule 23(e).  *See Pet Foods*, 629 F.3d at 351.  For the reasons articulated below, we find that the Proposed Settlement Agreement is fair, adequate, and reasonable and we shall adopt it.

The first factor – the complexity, expense, and likely duration of the litigation weighs in favor of approving the Settlement Agreement.  Though the litigation is in its latter stages, it would take an extensive hearing, further submissions, and large amounts of the Court's time to develop any sort of injunctive remedy.  Not only will the Court expend considerable resources, the parties will incur even greater fees and costs, and those Plaintiffs who wish to live in the community and who have been denied the opportunity to do so would remain institutionalized without recourse for DPW's clear violations as previously determined by us.

"In an effort to measure the class's own reaction to the settlement's terms

10

directly, courts look to the number and voiceferousness of the objectors." *General Motors Pick-Up Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (1995) ("*GM*"). Thus, when considering the second *Girsh* factor, the reaction of the class appears almost entirely favorable.  Notably, only one state ICF/MR resident voiced an opposition to the Proposed Settlement Agreement, and it appears that the entirety of his objection was that he wished to continue to live at the Selinsgrove Center. (Doc. 115.)  Accordingly, neither this one individual's objection nor the remaining objections from non-class members truly demonstrate the balance of the class's own reaction to the Proposed Settlement Agreement's terms.  Indeed, the non-class members oppose any discharge at all.[2]  Therefore, this factor weighs in favor of approving the Proposed Settlement Agreement.[3]

The stage of the proceedings and the amount of discovery completed weighs in favor of approval of the Proposed Settlement Agreement.  The parties must have

---

[2]We understand that all state ICF/MR residents are affected in some way by the Proposed Settlement Agreement because all residents will be subject to evaluation, but any effect on those who wish not to be discharged is negligible compared to the effect that a wholesale denial of the Settlement Agreement will have on those who do not oppose discharge.

[3]Assuming *arguendo* that the record objections by non-class members were cognizable and demonstrative of the reaction of the actual class members, we nonetheless believe that the objections miss the mark.  The objections voice misguided fears that the intended or inevitable consequences of the Proposed Settlement Agreement are that DPW will force ICF/MR residents into community placements against their wishes, and that all state ICF/MRs will close.  We do not believe the former to be the case, and find the latter to be pure speculation that is beyond the scope of our fairness evaluation.

an "adequate appreciation of the merits of the case before negotiating." *Id.* at 813.

To ensure the parties have that appreciation of the merits and the respective

consequences of the litigation, it is important to evaluate both the amount and type

of discovery conducted.  As mentioned before, the parties completed extensive

discovery, including expert discovery, for an extensive period before the Proposed

Settlement Agreement was submitted for approval by the Court.  Indeed, the

extensive discovery conducted was sufficient to support cross motions for summary

judgment and *actual* judgment.  Further, our decision on the merits clearly supports

the inference that the parties adequately appreciated the merits of their respective

positions.

The fourth factor, the risks of establishing liability, is not in play relative to

our analysis.  There are essentially no risks attendant here because the liability of

DPW was previously established by the Court's January 27, 2011 Order granting

Plaintiffs' Motion for Summary Judgment.

The fifth factor, which involves the risks of establishing damages, or, more

relevant to our case, securing the requested relief, weighs in favor of allowing

settlement.  Although the Court found for Plaintiffs on the issue of liability, the

nature of the relief or precise contours of any injunction that would be crafted by

the Court are far from certain.  Indeed, it is our reluctance to impose a judge-made

JA18

policy on Defendants which triggered the mediation that ultimately brought this proposed settlement before us for approval.

The sixth factor – the risks of maintaining the class – calls for the Court to weigh the possibility that a class would be decertified prior to trial.  The risk of decertification at this stage, after resolution of the cross-motions for summary judgment, is quite negligible.[4]  Therefore, this factor does not weigh in favor of the Proposed Settlement Agreement in any significant way.

The seventh factor, Defendants' ability to withstand a greater judgment, weighs in favor of settlement because, by any estimation, DPW is subject to significant budgetary constraints as recognized by the Court and the parties throughout this case.  The terms of the Proposed Settlement Agreement require DPW to develop and implement phased-in community placements.  While these may ultimately result in future cost reduction, they will undoubtedly require upfront

---

[4]On August 25, 2011, Carl A. Solano, Esq., who objected on behalf of his sister, Diane Solano, and presented argument at the hearing, submitted a letter and supplemental authority. (Doc. 279.)  Specifically, Mr. Solano submitted the Third Circuit's August 25, 2011 Opinion in *Gates v. Rohm and Haas, Co.*, No. 10-2108, in which the Third Circuit held that it would be improper to certify a class if the requirement of cohesiveness was not satisfied.  Presumably, Mr. Solano is suggesting that the Court should *sua sponte* reevaluate its certification decision because of the objections to the Proposed Settlement Agreement.  We note, again, that those who oppose the Proposed Settlement Agreement are those who oppose community placement and the certified class includes those who do not, or would not oppose community placement.  Thus, although the rights of those who are non-class members must be vigilantly protected, their objections do not destroy the cohesiveness of the class members.  We thus find *Gates* inapt as it relates to the task at hand.

JA19

costs.  Any relief designed by this Court – a body certainly far less well-versed in

the intricacies and necessities of planning for community integration than the

parties – will almost necessarily result in much greater costs and budgetary burdens

on DPW and the Commonwealth.

Finally, the range of reasonableness in light of the best possible recovery by

Plaintiffs and the attendant risks of litigation weighs in favor of settlement.  As

Plaintiffs aptly note, "[a]ssessing the value of a settlement and the 'best possible

recovery' is particularly difficult in a case seeking injunctive, rather than monetary

relief."  (Doc. 261 p. 20.)  The Proposed Settlement Agreement confers upon

Plaintiffs the benefits they sought – the opportunity to have a reasonable prospect of

discharge from institutionalization.  The Proposed Settlement Agreement develops a

reasoned plan to ensure Plaintiffs receive the relief they sought through a process

that is rationally measured in scope, duration, and cost.  Rejection of the settlement

will only result in further delay in implementing relief for the Plaintiffs. As we

would then have to return to the proverbial "drawing board", the Court would be

tasked to conduct a hearing on remedies in light of the violations, compelled to

spend a considerable amount of time deciding the precise relief, and thereafter the

parties would presumably spend a substantial amount of time preparing for or

conducting the discharge of proper Plaintiffs.  Forcing upon the parties an

14

injunction and resulting policy to which they did not agree via arms-length

negotiation could also presumably result in further litigation to ensure its

enforcement, draining the resources of the Plaintiffs, the Commonwealth, and this

Court.  Perhaps most importantly, the sooner the Proposed Settlement Agreement

can be implemented, the faster Plaintiffs can benefit from its mandate and achieve

real consideration for appropriate community placements.

### 2.    Conclusion

Thus, the ultimate balance of the *Girsh* factors weigh in favor of approval of

the Proposed Settlement Agreement, and we find that it is fair, adequate, and

reasonable.  Although we give our approval to Proposed Settlement Agreement and

its terms, we advise the parties to implement the settlement with caution.  To our

admittedly untrained eye, it appears as though the assessment protocol that has been

developed to effectuate the Proposed Settlement Agreement may imply an

unintended bias towards community placement.  Reviewing the questionnaire to be

utilized causes us to entertain serious doubts as to whether it is the proper tool for

gauging whether the profoundly disabled, and especially those with no guardian to

speak for them, are opposed to community placement.  Indeed, we wonder about the

wisdom of defaulting such individuals into a no preference category without greater

analysis.  And we have no doubt that the stated fears of many objectors, including

those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real.  We urge those responsible for implementing the policy to consider these concerns, and if necessary revise the protocols in question. As to the other oft-articulated objection, that this settlement is simply a stalking-horse for DPW's plan to close all ICF/MRs, we reiterate that this issue is not before us today, nor is it a facet of the settlement.  To the extent that any Objectors believe that there is an overarching policy to close ICF/MRs by DPW, their recourse lies not with this Court, but through their elected representatives and those who make policy within DPW.  At the end of the day, the Settlement we are approving is the necessary result of violations of class members' legal rights by Defendants.  We are thus duty-bound to place our imprimatur on a reasonable resolution that remedies those violations.  No remedy in a world such as this, where family members must make wrenching decisions regarding loved ones who are in many cases profoundly impaired, will be perfect.  However, the settlement presented to us is worthy of our approval for all of the reasons aforestated.

### B.    Attorneys' Fees and Costs

When evaluating an award of attorney's fees, in most instances courts apply the "American Rule".  This bedrock principle requires that each litigant pays his or her own costs or attorneys fees, unless a statute or contract provides otherwise.

JA22

Often, statutory fee-shifting provisions will deviate from the American Rule and permit a court to award attorney's fees to a "prevailing party." The fee-shifting statutes at issue *sub judice*, 42 U.S.C. § 12205 under the ADA and 29 U.S.C. § 794a(b), authorize the payment of reasonable attorneys' fees and costs to a prevailing party who has filed suit under these acts. It is within the Court's discretion to award fees to a prevailing party, although "it is well established that a prevailing party should recover an award of attorney's fees absent special circumstances." *Truesdell v. Philadelphia Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002) (reviewing and reversing a denial of attorney's fees under 42 U.S.C. § 1988). Because a plaintiff may be a "prevailing party" for attorney's fees purpose "if they succeed on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit", *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the Court has no doubt that Plaintiffs *sub judice* are the "prevailing party" in this litigation because they already fully succeeded on the merits prior to this proceeding to approve a final settlement. Therefore, we shall evaluate whether the requested fees and costs in the amount of $432,500 are reasonable.

### 1.    Calculating the Lodestar

Plaintiffs assert they incurred total attorneys' fees in the amount of $430,715 and, as mentioned, are requesting an award of a portion of that amount. "In general,

17

JA23

a reasonable fee is one which is adequate to attract competent counsel, but which

does not produce windfalls to the attorneys." *Pub. Interest Research Grp. v.*

*Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (internal quotation omitted).  A court

typically calculates the appropriate award by determining a lodestar.  The lodestar is

calculated by determining the product of an appropriate hourly rate and a reasonable

number of hours expended.  The party seeking fees has the burden of producing

"sufficient evidence of what constitutes a reasonable market rate for the essential

character and complexity of the legal services rendered. . . ."  *Knight v. Drye*, 2009

U.S. Dist. LEXIS 82369 (M.D. Pa. Sept. 10, 2009) (quoting *McCutcheon v.*

*America's Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 1990)).  Once the prevailing

party's burden has been met, the opposing party bears the burden of producing

sufficient evidence to challenge that amount.  *McCutcheon*, 560 F.3d at 150.  If the

opposing party does not challenge the amount, or does not provide sufficient

evidence to challenge the amount, the district court need not make an independent

lodestar determination, though the calculation of fees nonetheless is within the

court's discretion.  *Id.*  Notably, Defendants do not oppose the Motion for Fees and

Costs and thus do no challenge the reasonableness of the amount petitioned.

Indeed, this amount was the result of extensive negotiations as stated by counsel at

the fairness hearing.  However, in an abundance of caution we will briefly articulate

18

our independent lodestar determination.

### a.    Reasonable Hourly Rate

A reasonable hourly rate is typically based on the prevailing rates in the relevant community, and "[t]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services. . . ." *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). "Thus determination of the market rate first requires determination of the relevant market." *Windall*, 51 F.3d at 1186. In determining the reasonable hourly rate, courts can start by considering "the attorney's usual billing rate, but this is not dispositive." *Maldonado*, 256 F.3d at 185 (quoting *Windall*, 51 F.3d at 1185). As previously mentioned, the prevailing party bears the burden of establishing "by way of satisfactory evidence in addition to the attorney's own affidavits that the requested hourly rates meet [the above-mentioned] standard." *Id.* (quoting *Washington v. Philadelphia Cty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)) (internal quotation omitted).

Applying the lodestar, Plaintiffs assert the following respective hourly rates charged and hours expended by each attorney from Disability Rights Network:

| Attorney | Hours | Rate | Lodestar |
|----------|-------|------|----------|
| Robert W. Meek | 467.8 | $475 | $222,205.00 |
| Mark J. Murphy | 69.0 | $450 | $31,050.00 |
| Robin Resnick | 443.65 | $400 | $177,460.00 |

19

JA25

In considering the expertise and skill of each respective attorney, as well as the relevant market rate, we find that the rates claimed are not excessive.  As attorneys Meek, Murphy, and Resnick have demonstrated in their submissions, they have practiced law for approximately 33, 28, and 25 years, respectively.  Most of those years were with the Disability Rights Network, or its predecessor, the Disabilities Law Project.  (*See* Doc. 262, Exhibits E-G.)  All counsel have extensive demonstrated experience in the subject matter of this litigation – disabilities law – and have participated in the seminal cases upon which we relied in deciding this action under the ADA's integration mandate.  *See, e.g., Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151 (3d Cir. 2005); *Frederick L. v. Dep't of Pub. Welfare*, 402 F.3d 374 (3d Cir. 2004).

With respect to the prevailing market rate, the Third Circuit has previously noted:

> In establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in this forum.  The Task Force [appointed by the Third Circuit] reviewed the current practices of the various circuits and concluded that the best rule is the "forum rate" rule.  Hence an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged.  Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case.

20

JA26

*Windall*, 51 F.3d at 1186 (quoting Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 260-62 (1986)).  Thus, the typical measure of a market rate is based upon the forum of the litigation, unless Plaintiffs can demonstrate that they "required the particular expertise of counsel from another vicinage, or that local counsel were unwilling to take on the litigation."  *Interfaith Cmty. Org. v. Honey-well Intn'l, Inc.*, 426 F.3d 694, 699 (3d Cir. 2005).

Candidly, the rates requested by Mr. Meek, Mr. Murphy, and Ms. Resnick ($475, $450, and $400, respectively), give the Court some pause at first blush when comparing those rates to the prevailing market rates in the Middle District.  Mr. Meek declares in his Affidavit (Doc. 262, Exhibit A), and we have no reason to doubt, that these rates are entirely consistent in the Philadelphia legal community.  Although the rates are not commensurate with the local market rates, three considerations inform our decision that the rates requested are ultimately reasonable.  First, this complex litigation required a very high level of expertise by counsel.  As Mr. Meek avers, the litigation "required knowledge of operation and funding of Pennsylvania's mental retardation service system, the Medical Assistance system, and the legal issues under the ADA and the RA."  (Doc. 262-1 p. 5.)  The learned counsel at DRN quite clearly has this expertise.  Second, it is doubtful that local counsel would have been willing or able to take on a class action

lawsuit that required as much time and up-front costs with no monetary award even prayed for. Finally, equally importantly, and as noted, this Motion is uncontested and the product of Defendants' searching examination of Plaintiffs' counsels' charges. Therefore, the rates therein are not only uncontested, but have been thoroughly vetted as well. For these reasons, we find the hourly rates represented therein to be reasonable.

### b. Reasonable Hours Expended

In addition to determining a reasonable hourly rate, a court is charged with calculating the hours that are reasonably expended by the prevailing party. "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellarciprete*, 802 F.2d 1177, 1183 (3d Cir. 1990). As such, a party should not be responsible for those hours that are not reasonable or are excessive under the circumstances. Counsel for Plaintiffs collectively spent 980.45 hours on this litigation. In reviewing the time sheets attached to the Motion (Docs. 262, Exhibits B-E) and considering the length and development of this vigorously-contested litigation,[5] we find that there were no excessive expenditures of time.

---

[5]The hours claimed include, *inter alia*, time spent in pre-complaint investigation, drafting the Complaint, researching and drafting the Motion for Class Certification, responding to the Motion to Dismiss, Motion to Intervene, conducting and responding to discovery, pursuing the Motion for Summary Judgment. Review of the time-sheets likewise demonstrates that counsel consistently strived to avoid duplication of efforts.

### c.    Other Considerations

The amount reached by employing this framework and calculating the lodestar is typically "presumptively reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005).  Nonetheless, after calculating the lodestar, a district court's discretion then comes into play and the court may then increase or decrease the total award based upon other factors such as the relative success of the prevailing party.  *See In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009).

We do not find it prudent to disturb the amount requested by Plaintiffs.  As we have emphasized, the amount of fees requested is a portion of a bargained-for settlement that the Court encouraged the parties to reach.  Furthermore, the total fees requested by Plaintiffs are in fact less than Plaintiffs' lodestar.[6]  Finally, and very significantly in our view, Plaintiffs are not requesting compensation for fees incurred after June 30, 2011.   Therefore, we find the amount requested to be reasonable and shall approve and award the total amount of fees requested  by Plaintiffs.

### 2.    Costs

---

[6]The portion of the total amount requested in the Motion for Fees and Costs attributable to attorney's fees is $363,677.74, and the remainder is attributable to litigation costs incurred by Plaintiffs' counsel.  The total amount of fees actually accumulated by Mr. Meek, Mr. Murphy, and Ms. Resnick was $430,715.00.

JA29

As noted, in addition to the attorney's fees, the $432,500.00 requested also includes $68,822.26 in costs. The litigation expenditures are itemized by Plaintiffs as follows:

| Expenses | Amount |
| --- | --- |
| Filing Fee | $350.00 |
| Depositions | $6,074.95 |
| Expert Witnesses | $58,883.75 |
| Defendants' Expert Deposition Fee | $1,943.00 |
| Postage | $9.94 |
| Travel | $435.35 |
| Photocopying | $1,125.27 |

Once again, we find that these costs are entirely reasonable considering the length and complexity of the underlying litigation, and will approve the same.

### 3.    Conclusion

Plaintiffs and Defendants engaged in arms-length negotiations with respect to the final relief in this litigation. Plaintiffs agreed to request an award of fees and costs in an amount that was measurably less than what was actually incurred. Defendants have agreed to pay that amount. After calculating the lodestar and considering the complexity of the litigation, the Court can divine no reason to disturb this bargained-for agreement. Therefore, we find that an award of $432,500 to Plaintiffs for fees and costs as the prevailing party in this litigation is reasonable.

## IV.    CONCLUSION

JA30

To reiterate, we are placing our imprimatur on this settlement only after much consideration and deliberation.  The objections we received were not only numerous, but some were also cogently expressed and many were at times quite eloquent and even poignant.  The depth of emotion expressed in these objections could easily lead us to neglect the real task at hand, which is to consider the proposed remedy in light of the violations of Plaintiffs' rights.  Our foremost duty, however, is to consider the present posture of those individuals who brought this litigation to vindicate their legal rights.  As we have previously found, DPW has consistently marginalized Plaintiffs and relegated them to a class of persons who received integrated services only after every other person who was not in that class was served.  Plaintiffs are thus entitled to the remedies as agreed to by the parties.  This Settlement Agreement seeks to discontinue practices that have systematically violated Plaintiffs' rights, and we thus find that it is a fair, adequate, and reasonable way to achieve that end, although admittedly imperfect.

In closing however, we note the following for the benefit of the non-class Objectors and for those rightfully concerned citizens and elected officials who have voiced opposition: we are not approving this Settlement Agreement to force individuals who do not wish to live in the community out of the ICF/MRs, and we are certainly not effectuating a closing any of the Commonwealth's ICF/MRs.

JA31

Rather, we are approving the Settlement Agreement to ensure that the integration

mandates of the ADA and related laws are implemented and followed.

Accordingly, we shall grant Plaintiffs' Unopposed Motion for Final Approval of the

Proposed Class Action Settlement Agreement (Doc. 260) and Plaintiffs' Unopposed

Motion for Attorneys' Fees and Litigation Expenses and Costs (Doc. 262).  An

appropriate Order shall follow.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

## ORDER

### August 16, 2011

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

A fairness hearing related to the Proposed Settlement Agreement in this

action is scheduled for Monday, August 22, 2011.  In addition to several

objections lodged on the record, there have been two motions to intervene (Docs.

179, 253) filed by Carl A. Solano, objecting on behalf of his sister Diane Solano,

and the previously-named "Springstead Intervenors".  In addition to the Motions

to Intervene, the above-mentioned parties likewise filed a joint Motion for

1

Hearing, (Doc. 269) to determine the objectors' standing to appear and present argument at the fairness hearing.

We have thoroughly considered the most effective procedure for the conduct of the August 22, 2011 hearing and the Objectors' requests to actively participate, do not see cause to honor the Objectors' request to hold a hearing on that matter. Because it is the parties' burden to demonstrate at the hearing that the Proposed Settlement is fair, adequate, and reasonable, we shall take testimony and fact evidence presented only by the parties. We shall fully consider the objections lodged on the record, and will further allow the "Springstead Intervenors" and Mr. Solano, through counsel, to question the respective witnesses. Because the interests of these Objectors are sufficiently aligned, and representative of all Objectors, we direct them to designate one counsel to participate in the hearing.

We are, in part, granting the relief the Objectors seek in their respective Motions to Intervene by allowing them to reasonably participate in the August 22, 2011 hearing. Further, we incorporate by reference our March 10, 2010 Order denying the Springstead Intervenors' original Motion to Intervene, which was affirmed by the Third Circuit, and find that full intervention is unwarranted and improper. We will accordingly deny the outstanding Motions to Intervene (Docs. 179, 253).

2

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.   The Springstead Intervenors and Mr. Solano shall identify, via letter

on the docket, the attorney designated to appear in the August 22,

2011 hearing on or before Thursday, August 18, 2011;

2.   Carl A. Solano's Motion to Intervene (Doc. 179) and the Springstead

Intervenors' Motion to Intervene (Doc. 253) are respectively

**DENIED**;

3.   The Joint Motion for a Hearing (Doc. 269) is **DENIED**.


John E. Jones III
United States District Judge

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Shirl Meyers; ANYTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : | No. 09-cv-01182 |
| Plaintiffs, | : : | |
| v. | : : | Class Action |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare for the Commonwealth of Pennsylvania | : : : : : : : : | Judge Jones |
| Defendants. | : | |

## **ORDER**

### September 2, 2009

Upon consideration of Plaintiffs' Unopposed Motion for Class Certification,

it is hereby ORDERED:

I.   Plaintiffs' Motion (Doc. 15) is GRANTED based upon the following

findings:

JA36

a.    The requirements of Federal Rule of Civil Procedure 23(a) are

satisfied.

i.    The evidence indicates that there are more than 1,200 class

members.  These individuals have intellectual disabilities and

have low incomes, making it unlikely that they would file

individual lawsuits.  In addition, the class members are

dispersed throughout the Commonwealth, undermining the

expediency of joinder.  The class is thus too numerous to make

joinder practicable.

ii.    There are questions of law and fact common to the named

individual Plaintiffs and members of the class: (a) whether

Defendants have a viable integration plan for residents of state-

operated ICFs/MR; (b) whether Defendants properly evaluate

residents of state-operated ICFs/MR to asses their community

service and support needs; (c) whether Defendants' policies

and practices, including its administration of its waiting list

process, effectively exclude class members from accessing the

community mental retardation system; (d) whether Defendants'

failure to offer and, if not opposed, provide services and

supports in more integrated community settings to class

members violates the integration mandates of the Americans

with Disabilities Act (ADA) and the Rehabilitation Act (RA);

and (e) whether Defendants use methods of administration that

have the effect of discriminating against individuals with

disabilities in violation of the ADA and the RA.

iii.    The claims of the individual Plaintiffs are typical of those of

the class members.  The individual Plaintiffs' and class

members' claims arise out of the same policies, practices, and

procedures of Defendants and are based on the same legal

theories under the ADA and the RA.

iv.    The individual Plaintiffs will fairly and adequately prosecute

this lawsuit.  They have no interests antagonistic to the class or

subclass members and they have retained qualified counsel to

represent them and the class.

b.    The requirements of Federal Rule of Civil Procedure 23(b)(2) are

satisfied because final declaratory and injunctive relief would be

appropriate for the class as a whole.

II.    Plaintiffs Franklin Benjamin, by and through his next friend, Andreé York,

Richard Grogg and Frank Edgett, by and through their next friend, Joyce

McCarthy, Sylvia Baldwin, by and through her next friend Shirl Meyers,

and Anthony Beard, by and through his next friend, Nicole Truman, are hereby certified as class representatives.

III.    This case shall proceed on behalf of the following class:

> All persons who: (1) currently or in the future will reside in on of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

IV.    Attorney Robert W. Meek, Attorney Mark J. Murphy, Attorney Robin Resnick, all of the Disability Rights Network, and Attorney Stephen P. Gold are hereby appointed as class counsel based upon the following findings sufficient to satisfy Federal Rule of Civil Procedure 23(g):

a.    Counsels' experience in handling class actions and other complex litigation;

b.    Counsels' knowledge and experience with claims asserted and governing law, specifically the ADA and the RA;

c.    Counsels' experience in conducting the present litigation thus far and willingness to continue.

/s/ John E. Jones III
The Honorable John E. Jones III
United States District Judge

4