Case Nos. 11-3684, 11-3685

# United States Court of Appeals

*for the*

# Third Circuit

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock;
RICHARD GROGG and FRANK EDGETT, by and through their next friend
Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl
Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on
behalf of themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA and SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA.

CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin
Springstead; MARIA MEO, by and through her mother and guardian Grace Meo;
DANIEL BASTEK, by and through his father and guardian, John Bastek;
MICHAEL STORM, through his guardian, Polly Spare; BETH ANN LAMBO,
by and through her father and guardian, Joseph Lambo; RICHARD KOHLER, by
and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and
through her father and guardian Thomas Kashatus; and WILSON SHEPPARD,
by and through his brother and next friend, Alfred Sheppard,

Appellants in No. 11-3684,

DIANE SOLANO, by and through her brother and guardian, Carl A. Solano,

Appellant in No. 11-3685.

_____

ON APPEAL FROM THE ORDER DATED SEPTEMBER 2, 2011, BY THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA,
CIVIL ACTION NO. 09-01182

## CONSOLIDATED JOINT APPENDIX
## VOLUME II of IV (Pages JA40-JA500)

BENJAMIN J. HOFFART
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorney for Appellants in No. 11-3684*

CARL A. SOLANO
SCHNADER HARRISON SEGAL
  & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorney for Appellant in No. 11-3685*

# JOINT APPENDIX
## TABLE OF CONTENTS

### <u>Volume I</u>

1.  Springstead Objectors' Notice of Appeal, dated September 30, 2011 ....... JA1

2.  Diane Solano's Notice of Appeal, dated September 30, 2011 ................... JA3

3.  Order of the Honorable John E. Jones III, Approving Class
    Settlement dated September 2, 2011 ........................................................ JA5

4.  Memorandum of the Honorable John E. Jones III, dated
    September 2, 2011 ...................................................................................... JA7

5.  Order of the Honorable John E. Jones III, Denying Appellant Solano
    and Appellants Springstead Objectors Alternative Motions to
    Intervene, dated August 16, 2011 ............................................................ JA33

6.  Order of the Honorable John E. Jones III, Granting Motion for Class
    Certification, dated September 2, 2009 .................................................... JA36

### <u>Volume II</u>

7.  District Court Docket Entries ................................................................. JA40

8.  Plaintiff's Amended Complaint for Declaratory and Injunctive
    Relief, dated July 14, 2009 ...................................................................... JA75

9.  Plaintiff's Unopposed Motion for Class Certification, dated
    August 31, 2009 ....................................................................................... JA103

    a.  Exhibit A – Certificate of Concurrence ....................................... JA105

    b.  Exhibit B – Declaration of Robert W. Meek ............................... JA107

    c.  Exhibit D – Governor's Executive Budget 2009-10 (excerpts) ... JA141

10. Plaintiffs' Brief in Support of Unopposed Motion for Class
    Certification ............................................................................................. JA145

11. Defendants' Motion to Dismiss Amended Complaint, dated
    September 24, 2009 ................................................................................. JA165

12. Springstead Intervenors' Motion to Intervene, dated November 10, 2009 ................................................................................. JA166

    a. Exhibit B to Springstead Intervenors' Brief in Support of Proposed Motion- Ligas v. Maram, 1:05-cv-04331 (N.D. Ill. Jul. 7, 2009) (minute order) ...................................... JA170.1

13. Order Denying Defendants' Motion to Dismiss Amended Complaint, dated January 25, 2010 ....................................... JA171

14. Defendants' Answer to Amended Complaint, dated February 24, 2010 ................................................................................. JA180

15. Memorandum and Order Denying Springstead Intervenors' Motion to Intervene, dated March 10, 2010 ....................................... JA189

16. Plaintiffs' Motion for Summary Judgment, dated June 23, 2010 .......... JA211

    a. Exhibit 4 – Deposition of Kevin Casey (excerpts) ..................... JA213

    b. Exhibit 5 – Defendants' Response to Plaintiffs' First Request for Admissions ................................................................. JA243

    c. Exhibit 8 – Governor's Executive Budget FY 2010-2011 (excerpts) ...................................................................... JA259

    d. Exhibit 9 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Franklin Benjamin ....... JA265

    e. Exhibit 11 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Anthony Beard ............. JA271

    f. Exhibit 12 – Deposition of Fred Lokuta (excerpts) ..................... JA276

    g. Exhibit 13 – ODP Summary Chart re Opposition to Discharge ...................................................................... JA280

    h. Exhibit 17 – ODP Chart re Deaths/Discharges at State ICFs/MR ...................................................................... JA281

17. Plaintiffs' Proposed Summary Judgment Order (Exhibit 1 to Brief in Support, dated June 23, 2010) ................................................. JA282

18. Plaintiffs' Statement of Undisputed Facts in Support of Motion for Summary Judgment ................................................................................. JA294

19. Defendants' Motion for Summary Judgment, dated June 29, 2010 ....... JA328

    a.  Exhibit 1 – Declaration of Kevin Casey ...................................... JA330

    b.  Exhibit 2 – Deposition of Marti McIntire (excerpts) ................... JA338

    c.  Exhibit 3 – Deposition of Joseph O'Church (excerpts) ............... JA347

    d.  Exhibit 4 – The Plan, Supporting People Who Currently Reside in State Centers Who Want to Move to the Community ................................................................................. JA349

20. Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ................................................................................. JA354

21. Defendants' Response to Plaintiff's Statement of Undisputed Facts (Ex. 1 to Defendants' Brief in Opposition, dated July 14, 2010) ........... JA364

22. Plaintiffs' Answer to Defendants' Statement of Undisputed Facts ........ JA370

23. Springstead Intervenors' Motion to Stay Formal Proceedings, dated November 19, 2010 ............................................................................... JA400

24. Order Denying Springstead Intervenors' Motion to Stay Formal Proceedings, dated December 16, 2010 ................................................. JA403

25. Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment, dated January 27, 2011 .................................................................................... JA410

26. Mandate of United States Court of Appeals, dated April 27, 2011 ....... JA434

    a.  Third Circuit Opinion denying Springstead Intervenors' appeal of March 10, 2010 Order, dated April 5, 2011 ................. JA436

27. Plaintiffs' Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement and for Approval of Class Notice, dated May 26, 2011 ............................................................................... JA447

    b.  Exhibit 1 – Declaration of Robert W. Meek ............................... JA462

    c.  Exhibit 2 – Settlement Agreement ................................................ JA466

    d.  Exhibit 3 – Notice of Class Action Proposed Settlement and
        Hearing ....................................................................... JA481

28. Order Granting Plaintiffs' Unopposed Motion for Preliminary
    Approval of the Proposed Class Action Settlement and for Approval
    of Class Notice, dated May 27, 2011 ....................................... JA485

29. Objection Letters re Notice of Class Action (in order of docket
    entry- an alphabetical list of Objections received by the district court
    is provided at pages xii-xv of this Index)

- Letter from Mr. and Mrs. Vincent Drago .......................................... JA489

- Letter from W.J. Parmley .................................................. JA496

- Letter from Karen K. Blew................................................. JA499

- Letter from Jacob Kodnovich............................................ JA501

- Letter from Bob Sheetz .................................................... JA503

- Letter from Marion Kelly o/b/o Patrick Garramone ......................... JA505

- Letter from Helen Reider.................................................. JA507

- Letter from Roy Reider .................................................... JA510

- Letter from Rev. AM Gordon and Minerva Gordon......................... JA514

- Letter from Marion and Carment Attanasio, Jr. ............................... JA517

- Letter from Francis J. Beston ............................................. JA519

- Letter from Cecelia Hopkins ............................................. JA522

- Letter from Alfred R. Sheppard ......................................... JA525

- Letter from Norma Ferguson............................................ JA528

- Letter from Cheryl O. Brown ........................................... JA531

- Letter from Mary Gough .................................................................. JA533

- Letter from Arthur and Joyce Ciullo ................................................ JA537

- Letter from Doris Kalan ................................................................... JA541

- Letter from Nancy Slick .................................................................. JA544

- Letter from Elizabeth Pugh .............................................................. JA546

- Letter from Catherine T. Dymacek .................................................. JA549

- Letter from Lawrence County Association for Retarded Citizens .... JA552

- Letter from Norman Moses, Executive Director of Lawrence County Association for Retarded Citizens ........................................ JA554

- Letter from Joseph Lambo ............................................................... JA564

- Letter from James B. Lambo ........................................................... JA570

- Letter from Polly Spare .................................................................. JA574

- Letter from Florence Plenn ............................................................. JA578

- Letter from Dale and Darcene Utt .................................................... JA581

- Letter from John Bastek .................................................................. JA585

- Letter from Grace Meo .................................................................... JA592

- Letter from Amelia and Jerry Hake ................................................. JA596

- Letter from Kay Wagner .................................................................. JA600

- Letter from Gary and Mary Wills ................................................... JA602

- Letter from Kimberly Gordon .......................................................... JA605

- Letter from Dixie Henry ................................................................. JA608

- Letter from Clara Palmer ................................................................ JA610

- Letter from Mary Kashatus ................................................................. JA612

- Letter from John Hoops, Jr. ............................................................... JA614

- Letter from Suzanne Perry .................................................................. JA617

- Letter from Wilson McKinley .............................................................. JA621

- Letter from Thomas Kashatus .............................................................. JA623

- Letter from Margaret Kashatus ............................................................ JA626

- Letter from August and Winnifred Centi .............................................. JA628

- Letter from Ruth Jarrett ...................................................................... JA631

- Letter from Patricia O'Donnell ............................................................ JA634

- Letter from Margaret Tierney .............................................................. JA638

- Letter from William Hudock ............................................................... JA641

- Letter from Carole Henry .................................................................... JA643

- Letter from Wes Grebski ..................................................................... JA647

- Letter from Marian L. Lentz ................................................................ JA650

- Letter from Barbara and Donald Sabo .................................................. JA653

- Letter from Albert Knight ................................................................... JA659

- Letter from Kenneth Myers .................................................................. JA661

- Letter from Kathleen McKeaney .......................................................... JA664

- Letter from Jeremy Kashatus and Family ............................................. JA668

- Letter from Karen S. Crytzer ............................................................... JA672

- Letter from Ellen Lube ........................................................................ JA675

- Letter from Ruth Nichol ................................................................... JA677

- Letter from Deborah and Gerard Hey ............................................... JA681

- Letter from Sharon and Elmer Brice, Jr. .......................................... JA684

- Letter from Mary B. Fernan ............................................................ JA687

- Letter from Robert and Beverly Gill ................................................ JA690

- Letter from Adelaide Hardy ............................................................ JA696

- Letter from Lily Chang..................................................................... JA698

- Letter from Joan Wright .................................................................. JA700

- Letter from Bertin W. Springstead ................................................... JA703

- Letter from Dolores Drews............................................................... JA707

- Letter from Frederick Drews ............................................................ JA710

- Letter from Nancy Murray ............................................................... JA713

- Letter from Mark Drews................................................................... JA716

- Letter from Megan Irwin ................................................................. JA720

- Letter from Mr. and Mrs. John Potochnick ...................................... JA723

- Letter from Carol McDonald............................................................ JA725

- Letter from James Margolis.............................................................. JA729

- Letter from Charles McCormick ...................................................... JA731

- Letter from Eloise Moore ................................................................ JA733

- Letter from Clarence and Gail Ropp ................................................ JA735

- Letter from Trudy Sheetz ................................................................ JA738

- Letter from Geraldine Wetzel..........................................................JA743
- Letter from J. Keffer....................................................................JA745
- Letter from David Kalan ...............................................................JA747
- Letter from Richard and Jane Ruth ..................................................JA750
- Letter from Jean Milliron ..............................................................JA752
- Letter from Sen. Mary Jo White......................................................JA757
- Letter from Harold McConnell III....................................................JA760
- Letter from Mary Schneider ...........................................................JA763
- Letter from Betty Lightner .............................................................JA770
- Letter from Joseph Potera...............................................................JA774
- Letter from Ann Marie Walsh .........................................................JA778
- Letter from Barbara Ann Fritz........................................................JA781
- Letter from Rose Schafer................................................................JA784
- Letter from Tommy Kashatus ..........................................................JA787
- Letter from Debra Kleinen .............................................................JA790
- Letter from Debra Herring..............................................................JA794
- Letter from Daniel Kleinen ............................................................JA798
- Letter from William and Beverly Daugherty .....................................JA801
- Letter from Kathy Casadonte ..........................................................JA807
- Letter from Kimberley Gauronski.....................................................JA811
- Letter from Larry and Sandra Krafft ................................................JA814

- Letter from Jennifer Crawford.............................................................JA819
- Letter from Sen. Mary Jo White........................................................JA825
- Letter from Nathan P. Heller and Lesli C. Esposito.........................JA828
- Letter from Tarah Toohil...................................................................JA836
- Letter from the Staff and Students of Keystone Job Corps...............JA839
- Letter from Rickey Shaffer ...............................................................JA840
- Letter from Francis Marion ...............................................................JA843
- Letter from Linda Lotzi.....................................................................JA845
- Letter from Bertin Springstead..........................................................JA856
- Letter from William Toperzer ...........................................................JA860
- Letter from Amy Schwartz, Jerry Hake and Sara Greth ..................JA868
- Letter from Martha Ilift ....................................................................JA872
- Letter from David Parry ....................................................................JA874
- Letter from Paula Wolfe.....................................................................JA877
- Letter from Henry Sitko  ...................................................................JA880
- Letter from Beatrice Sitko .................................................................JA883
- Letter from Gerard Dunne .................................................................JA885
- Letter from David Read......................................................................JA887
- Letter from Ann Marie Vodzak..........................................................JA891
- Letter from Evelyn Crawford ............................................................JA896
- Letter from William Brill ..................................................................JA899

- Letter from James and Lucille Causer................................................JA903

- Letter from Emil and Elizabeth Gnall ...............................................JA907

- Letter from Barry and Anna Johns ....................................................JA912

- Letter from Regina Splane................................................................JA914

- Letter from Annette and Ronald Fischer..........................................JA918

- Letter from Shirley Musacchio........................................................JA922

- Letter from Carin Doddroe...............................................................JA925

- Letter from Timothy Demers ...........................................................JA927

- Letter from Rickey Shaffer...............................................................JA934

- Letter from Carl Lloyd .....................................................................JA937

- Letter from Samuel Boring...............................................................JA943

30. Diane Solano Objections to Class Action Settlement, dated
July 28, 2011....................................................................................JA948

    a. Exhibit A – E-mail Exchange Between Fred Lokuta,
Superintendent of White Haven Center, and Tom Kashatus,
President of White Haven Center Relatives and Friends
Association ..................................................................................JA999

31. Diane Solano Motion to Intervene, dated July 28, 2011 .....................JA1000

32. Springstead Objectors' Supplemental Objections to Class Action
Settlement, dated August 1, 2011........................................................JA1013

    a. Declaration of Benjamin J. Hoffart ...........................................JA1053

    b. Exhibit A – ICF/MR Resident Demographics ...........................JA1055

    c. Exhibit B – Collected ICF/MR Center Demographics for
Ebensburg, Hamburg, Polk, Selinsgrove, and White Haven
Centers........................................................................................JA1056

x

33. Springstead Objectors' Motion to Intervene, dated August 2, 2011 .... JA1062

34. Statement of Support by the United States, dated August 2, 2011[*] ..... JA1067

35. Plaintiff's Unopposed Motion For Final Approval of the Proposed
    Class Action Settlement Agreement, dated August 8, 2011 ................ JA1085

     a.  Exhibit A – Declaration of Robert W. Meek ............................ JA1087

     b.  Exhibit B – Settlement Agreement............................................ JA1099

36. Exhibit A to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Brief for Appellants, 3d Cir. Case
    No. 10-1908)[*]........................................................................................ JA1114

37. Exhibit B to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Reply Brief for Appellants, 3d Cir.
    Case No. 10-1908) [*] .............................................................................. JA1156

38. Exhibit C to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Solano's *Amicus* Brief, 3d Cir.
    Case No. 10-1908)[*].............................................................................. JA1183

39. Exhibit D to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Solano's Brief Providing
    Information Sought at Oral Argument, 3d Cir. Case No. 10-1908)[*] ... JA1215

40. Exhibit E to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Plaintiffs-Appellees' Brief, incl.
    attach 1, 3d Cir. Case No. 10-1908)[*] .................................................. JA1223

41. Exhibit G to Plaintiffs Brief in Opposition to Solano and Springstead
    Objectors' Motions to Intervene (Plaintiffs-Appellees' Response in
    Opposition to Solano's Motion to File Post-Argument Brief, 3d Cir.
    Case No. 10-1908)[*].......................................................................... JA1289

42. Transcript of Argument before Third Circuit, 3d Cir. Case No. 10-
    1908 .................................................................................................... JA1299

43. Joint Motion For Hearing, dated August 15, 2011 .............................. JA1331

---

[*] Document requested by Plaintiffs' counsel, Appellants object to the inclusion of this document pursuant to Fed. R. App. P. 30(a)(2) and L.A.R. 30.3 (a).

44. Order Regarding Fairness Hearing, dated August 18, 2011 ................. JA1336

45. Transcript of August 22, 2011 Fairness Hearing .................................. JA1339

46. Exhibit Introduced at August 22, 2011 Hearing:

    a.  Exhibit 1 – Assessment Protocol ................................................ JA1497

    b.  Court Exhibit 1 – Objection Letter from Sen. Elder Vogel .... JA1504.1

    c.  Court Exhibit 2 – Objection Letter from Rep. Chris Sainato  JA1504.2

47. Appellants Motion to Stay, dated November 8, 2011 .......................... JA1505

    a.  Exhibit A – Declaration of Carl Solano .................................... JA1522

    b.  Exhibit B – E-mail Correspondence between D. Leisch and C.
    Solano ........................................................................................ JA1536

## ALPHABETICAL LIST OF OBJECTIONS RECEIVED
## BY THE DISTRICT COURT

*The copies of the objection letters in the Appendix are included in the order in which they were filed. This alphabetized list is provided for convenience.*

Marion and Carment Attanasio, Jr. ................................................. JA517
John Bastek  .................................................. JA585, 1013
Francis J. Beston ................................................................. JA519
Karen K. Blew.................................................................... JA499
Samuel Boring................................................................... JA943
Sharon and Elmer Brice, Jr. ............................................... JA684
William Brill ..................................................................... JA899
Cheryl O. Brown ............................................................... JA531
Kathy Casadonte ............................................................... JA807
James and Lucille Causer.................................................... JA903
August and Winnifred Centi ............................................... JA628
Lily Chang........................................................................ JA698
Arthur and Joyce Ciullo ..................................................... JA537
Evelyn Crawford ............................................................... JA896
Jennifer Crawford ............................................................. JA819
Karen S. Crytzer................................................................ JA672
William and Beverly Daugherty .......................................... JA801

Timothy Demers ....................................................................................... JA927
Carin Doddroe .......................................................................................... JA925
Mr. and Mrs. Vincent Drago ...................................................................... JA489
Dolores Drews ........................................................................................... JA707
Frederick Drews ........................................................................................ JA710
Mark Drews ............................................................................................... JA716
Gerard Dunne ............................................................................................ JA885
Catherine T. Dymacek ............................................................................... JA549
Norma Ferguson ........................................................................................ JA528
Mary B. Fernan ......................................................................................... JA687
Annette and Ronald Fischer ...................................................................... JA918
Barbara Ann Fritz ...................................................................................... JA781
Sara Fuller ............................................................................................... JA1013
Marion Kelly o/b/o Patrick Garramone ..................................................... JA505
Kimberley Gauronski ................................................................................. JA811
Robert and Beverly Gill ............................................................................ JA690
Emil and Elizabeth Gnall ........................................................................... JA907
Rev. AM Gordon and Minerva Gordon ...................................................... JA514
Kimberly Gordon ....................................................................................... JA605
Mary Gough ............................................................................................... JA533
Wes Grebski ............................................................................................... JA647
Amelia and Jerry Hake ............................................................................... JA596
Adelaide Hardy .......................................................................................... JA696
Carole Henry .............................................................................................. JA643
Dixie Henry ............................................................................................... JA608
Nathan P. Heller and Lesli C. Esposito ..................................................... JA828
Debra Herring ............................................................................................ JA794
Deborah and Gerard Hey ........................................................................... JA681
John Hoops, Jr. ........................................................................................... JA614
Cecelia Hopkins ........................................................................................ JA522
William Hudock .......................................................................................... JA641
Martha Ilift ................................................................................................ JA872
Megan Irwin ............................................................................................... JA720
Ruth Jarrett ................................................................................................ JA631
Barry and Anna Johns ................................................................................ JA912
David Kalan ............................................................................................... JA747
Doris Kalan ................................................................................................ JA541
Jeremy Kashatus and Family ..................................................................... JA668
Margaret Kashatus ..................................................................................... JA626
Mary Kashatus ........................................................................................... JA612

Thomas Kashatus ................................................................JA623, 1013
Tommy Kashatus ................................................................JA787
J. Keffer ............................................................................JA745
Staff and Students of Keystone Job Corps........................JA839
Daniel Kleinen ..................................................................JA798
Debra Kleinen ...................................................................JA790
Albert Knight ....................................................................JA659
Jacob Kodnovich...............................................................JA501
Larry and Sandra Krafft ....................................................JA814
James B. Lambo.................................................................JA570
Joseph Lambo ..........................................................JA564, 1013
Lawrence County Association for Retarded Citizens.........JA552
Marian L. Lentz.................................................................JA650
Betty Lightner ...................................................................JA770
Carl Lloyd .........................................................................JA937
Linda Lotzi ........................................................................JA845
Ellen Lube .........................................................................JA675
James Margolis ..................................................................JA729
Francis Marion ..................................................................JA843
Harold McConnell III........................................................JA760
Charles McCormick ..........................................................JA731
Carol McDonald ................................................................JA725
Kathleen McKeaney...........................................................JA664
Wilson McKinley ..............................................................JA621
Grace Meo................................................................JA592, 1013
Jean Milliron .....................................................................JA752
Eloise Moore .....................................................................JA733
Norman Moses, Executive Director of Lawrence County Association for
     Retarded Citizens ........................................................JA554
Nancy Murray ...................................................................JA713
Shirley Musacchio.............................................................JA922
Kenneth Myers ..................................................................JA661
Ruth Nichol .......................................................................JA677
Patricia O'Donnell ............................................................JA634
Clara Palmer......................................................................JA610
W.J. Parmley .....................................................................JA496
David Parry ........................................................................JA874
Suzanne Perry ...................................................................JA617
Florence Plenn...................................................................JA578
Joseph Potera.....................................................................JA774

Mr. and Mrs. John Potochnick ..................................................................... JA723
Elizabeth Pugh ............................................................................................. JA546
David Read.................................................................................................... JA887
Helen Reider ................................................................................................ JA507
Roy Reider ................................................................................................... JA510
Clarence and Gail Ropp ............................................................................... JA735
Richard and Jane Ruth ................................................................................. JA750
Barbara and Donald Sabo ............................................................................ JA653
Rep. Chris Sainato...................................................................................JA1504.2
Rose Schafer ................................................................................................ JA784
Mary Schneider ............................................................................................ JA763
Amy Schwartz, Jerry Hake and Sara Greth ................................................ JA868
Rickey Shaffer.....................................................................................JA840, 934
Bob Sheetz .................................................................................................... JA503
Trudy Sheetz ................................................................................................ JA738
Alfred R. Sheppard .............................................................................JA525, 1013
Beatrice Sitko .............................................................................................. JA883
Henry Sitko .................................................................................................. JA880
Nancy Slick .................................................................................................. JA544
Carl Solano.................................................................................................... JA948
Polly Spare ...........................................................................................JA574, 1013
Regina Splane ............................................................................................... JA914
Bertin W. Springstead ...............................................................JA703, 856, 1013
Margaret Tierney.......................................................................................... JA638
Rep. Tarah Toohil ........................................................................................ JA836
William Toperzer .......................................................................................... JA860
Dale and Darcene Utt.................................................................................... JA581
Ann Marie Vodzak........................................................................................ JA891
Sen. Elder Vogel ......................................................................................JA1504.1
Kay Wagner .................................................................................................. JA600
Ann Marie Walsh.......................................................................................... JA778
Geraldine Wetzel........................................................................................... JA743
Sen. Mary Jo White......................................................................................JA757, 825
Gary and Mary Wills.................................................................................... JA602
Paula Wolfe ................................................................................................... JA877
Joan Wright ................................................................................................... JA700

APPEAL, CLOSED, HBG, SETOFF, STANDARD

# United States District Court
## Middle District of Pennsylvania (Harrisburg)
### CIVIL DOCKET FOR CASE #: 1:09-cv-01182-JEJ

Benjamin et al v. Department of Public Welfare of the
Commonwealth of Pennsylvania et al
Assigned to: Honorable John E. Jones, III
Referred to: Magistrate Judge Martin C. Carlson
(Settlement)
Case in other court: Third Circuit, 10-01908
       Third Circuit, 11-03684
       Third Circuit, 11-03685
Cause: 42:1983 Civil Rights Act

Date Filed: 06/22/2009
Date Terminated: 09/02/2011
Jury Demand: None
Nature of Suit: 446 Civil Rights:
Americans with Disabilities - Other
Jurisdiction: Federal Question

**Plaintiff**

**Franklin Benjamin**
*by and through his next friend, Andree
Yock*

represented by **Mark J. Murphy**
Disability Rights Network of PA
1315 Walnut Street
Suite 400
Philadelphia, PA 19107-4798
215-238-8070
Fax: 12157723126
Email: mmurphy@drnpa.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert W. Meek**
Disability Rights Network of
Pennsylvania
1315 Walnut Street
Suite 400
Philadelphia, PA 19107-4798
215-238-8070
Fax: 12157723126
Email: rmeek@drnpa.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen F. Gold**
Stephen F. Gold
125 S. Ninth Street
Suite 700
Philadelphia, PA 19107
(215) 627-7100
Email: stevegoldada@cs.com
*LEAD ATTORNEY*

JA40

**THIS PAGE INTENTIONALLY LEFT BLANK**

*ATTORNEY TO BE NOTICED*

**Doris M. Leisch**
Department of Public Welfare, Office
of General Counsel
801 Market Street
Suite 6092
Philadelphia, PA 19107
215-560-2191
Email: dleisch@state.pa.us
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Richard Grogg**                    represented by    **Mark J. Murphy**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Robert W. Meek**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Stephen F. Gold**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Doris M. Leisch**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frank Edgett**                     represented by    **Mark J. Murphy**
*by and through their next friend, Joyce*              (See above for address)
*McCarthy*                                             *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Robert W. Meek**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Stephen F. Gold**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Doris M. Leisch**
                                                        (See above for address)

JA41

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Wilson Sheppard**                          represented by   **Mark J. Murphy**
*by and through his next friend, Pamela*                      (See above for address)
*Zotynia*                                                     *TERMINATED: 07/14/2009*
*TERMINATED: 07/14/2009*                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Robert W. Meek**
                                                              (See above for address)
                                                              *TERMINATED: 07/14/2009*
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Stephen F. Gold**
                                                              (See above for address)
                                                              *TERMINATED: 07/14/2009*
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sylvia Baldwin**                           represented by   **Mark J. Murphy**
*by and through her next friend, Shirl*                       (See above for address)
*Meyers*                                                      *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Robert W. Meek**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Stephen F. Gold**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Doris M. Leisch**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Anthony Beard**                            represented by   **Mark J. Murphy**
*by and through his next friend, Nicole*                      (See above for address)
*Turman, on behalf of themselves and all*                     *LEAD ATTORNEY*
*others similarly situated*                                   *ATTORNEY TO BE NOTICED*

                                                              **Robert W. Meek**
                                                              (See above for address)
                                                              *LEAD ATTORNEY*

JA42

*ATTORNEY TO BE NOTICED*

**Stephen F. Gold**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Doris M. Leisch**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Department of Public Welfare of the Commonwealth of Pennsylvania** | represented by | **Allen C. Warshaw**<br>Office of General Counsel<br>3rd Fl. West, Health & Welfare Bldg.<br>7th & Forster Streets<br>Harrisburg, PA 17120<br>(717) 783-2800<br>Email: awarshaw@state.pa.us<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Howard Ulan**
PA Office of General Counsel
Health & Welfare Bldg.
3rd Floor West
Harrisburg, PA 17120
717.783.0881
Fax: 17177720717
Email: hulan@state.pa.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Doris M. Leisch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Estelle B. Richman**<br>*in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania* | represented by | **Allen C. Warshaw**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Howard Ulan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA43

                                              Doris M. Leisch
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

**Defendant**

**Gary D Alexander**              represented by **Doris M. Leisch**
                                              (See above for address)
                                              *ATTORNEY TO BE NOTICED*

**Objector**

**Mr. Carl A Solano**              represented by **Carl A. Solano**
Schnader Harrison Segal & Lewis LLP            Schnader Harrison Segal & Lewis LLP
1600 Market Street                             1600 Market St.
Suite 3600                                     Suite 3600
Philadelphia, Pa 19041                         Philadelphia, PA 19103
215-751-2202                                   215-751-2202
*Attorney for Diane Solano*                    Email: csolano@schnader.com
                                              *ATTORNEY TO BE NOTICED*

**Objector**

**VOR**                            represented by **Lesli C. Esposito**
                                              DLA Piper US LLP
                                              1650 Market Street
                                              49th Floor
                                              Suite 4900
                                              Philadelphia, PA 19103
                                              215-656-2432
                                              Email: lesli.esposito@dlapiper.com
                                              *ATTORNEY TO BE NOTICED*

                                              **Nathan P. Heller**
                                              DLA Piper LLP (US)
                                              One Liberty Place
                                              Suite 4900
                                              1650 Market Street
                                              Philadelphia, PA 19103
                                              215.656.3372
                                              Email: nathan.heller@dlapiper.com
                                              *ATTORNEY TO BE NOTICED*

**Amicus**

**UNITED STATES OF AMERICA**       represented by **Marina Mazor**
                                              United States Department of Justice
                                              950 Pennsylvania Ave., NW
                                              Washington, DC 20530
                                              202.305.3347
                                              Email: marina.mazor@usdoj.gov
                                              *ATTORNEY TO BE NOTICED*

                                              **Samantha K. Trepel**

JA44

US Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
202.514.6255
Email: samantha.trepel@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**Harriet Dichter**                   represented by   **Allen C. Warshaw**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Doris M. Leisch**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

V.

**Intervenor**

**Maria Meo**                         represented by   **John E. Riley**
                                                       VAIRA & RILEY, P.C.
                                                       1600 Market Street
                                                       Suite 2650
                                                       Philadelphia, PA 19103
                                                       215-751-2700
                                                       Fax: 12157519420
                                                       Email: j.riley@vairariley.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Michael Rato**
                                                       Sidley Austin LLP
                                                       787 Seventh Avenue
                                                       New York, NY 10019
                                                       (212) 839-5567
                                                       Email: mrato@sidley.com
                                                       *TERMINATED: 07/08/2010*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Owen H. Smith**
                                                       Sidley Austin LLP
                                                       787 Seventh Avenue
                                                       New York, NY 10019
                                                       (212) 839-5300
                                                       Email: osmith@sidley.com
                                                       *TERMINATED: 07/11/2011*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

JA45

**Sarah M. Goldstein**
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**
Vaira & Riley, P.C.
1600 Market Street
Suite 2650
Philadelphia, PA 19103
215-751-2700
Fax: 12157519420
Email: w.murray@vairariley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
212-839-5300
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Craig Springstead**                    represented by    **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 02/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA46

William J. Murray
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Benjamin J. Hoffart
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Daniel Bastek**                     represented by    John E. Riley
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Michael Rato
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Owen H. Smith
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Sarah M. Goldstein
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

William J. Murray
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Benjamin J. Hoffart
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Michael Storm**                     represented by    John E. Riley
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Michael Rato

JA47

(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Beth Ann Lambo**                     represented by **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA48

**William J. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Richard Clarke**                    represented by    **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Richard Kohler**                    represented by    **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)

JA49

*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Wilson Sheppard**                     represented by    **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sarah M. Goldstein**
(See above for address)
*TERMINATED: 01/28/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**

JA50

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Maria Kashatus**                    represented by **John E. Riley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael Rato**
(See above for address)
*TERMINATED: 07/08/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Owen H. Smith**
(See above for address)
*TERMINATED: 07/11/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William J. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin J. Hoffart**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2009 | 1 | COMPLAINT - N/C to cnsl.; no jury trial demanded. (Filing fee $350, Receipt Number 1605595) (Attachments: # 1 Civil Cover Sheet)(jc) (Entered: 06/23/2009) |
| 06/23/2009 | | SUMMONS ISSUED as to Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman and provided to Attorney for service on Defendant(s). (jc) (Entered: 06/23/2009) |
| 06/23/2009 | | SPECIAL ADMISSION FORM SENT to Mark J. Murphy. (jc) (Entered: 06/23/2009) |
| 06/23/2009 | | SPECIAL ADMISSION FORM SENT to Stephen F. Gold. (jc) (Entered: 06/23/2009) |
| | | |

JA51

| 06/26/2009 | 2 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Stephen F. Gold on behalf of all plaintiffs Attorney Stephen Gold is seeking special admission. Filing fee $ 25, receipt number 03140000000001610365.. (Gold, Stephen) (Entered: 06/26/2009) |
| 06/26/2009 | 3 | SPECIAL ADMISSIONS FORM APPROVED as to Stephen F. Gold (eo, ) (Entered: 06/26/2009) |
| 07/01/2009 | 4 | SCHEDULING ORDER: Case Management Conference set for 8/31/2009 (eo, ) (Entered: 07/01/2009) |
| 07/02/2009 | 5 | SCHEDULING ORDER: Case Management Conference set for 8/31/2009 11:30 AM before Honorable John E. Jones III. (eo, ) (Entered: 07/02/2009) |
| 07/02/2009 | 6 | SUMMONS Returned Executed by Wilson Sheppard, Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. Department of Public Welfare of the Commonwealth of Pennsylvania served on 7/1/2009, answer due 7/21/2009; Estelle B. Richman served on 7/1/2009, answer due 7/21/2009. (Meek, Robert) (Entered: 07/02/2009) |
| 07/10/2009 | 7 | MOTION for Extension of Time to to Respond to Complaint by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman. (Attachments: # 1 Certificate of Concurrence, # 2 Proposed Order) (Ulan, Howard) (Entered: 07/10/2009) |
| 07/10/2009 | 8 | ORDER granting 7 Motion to Extend Time (eo, ) (Entered: 07/10/2009) |
| 07/14/2009 | 9 | AMENDED COMPLAINT against all defendants, filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett.(Meek, Robert) (Entered: 07/14/2009) |
| 08/10/2009 | 10 | MOTION for Extension of Time to respond to amended complaint by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman. (Attachments: # 1 Certificate of Concurrence, # 2 Proposed Order)(Ulan, Howard) (Entered: 08/10/2009) |
| 08/10/2009 | 11 | First MOTION to Continue *case management conference* by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman. (Attachments: # 1 Certificate of Concurrence, # 2 Proposed Order)(Ulan, Howard) (Entered: 08/10/2009) |
| 08/10/2009 | 12 | ORDER granting 10 Motion to Extend Time to 9/28/09 to respond to amended complaint (eo, ) (Entered: 08/10/2009) |
| 08/10/2009 | 13 | ORDER granting 11 Motion to Continue CMC. Case Management Conference reset for 9/30/2009 04:00 PM before Honorable John E. Jones III. (eo, ) (Entered: 08/10/2009) |
| 08/26/2009 | 14 | NOTICE of Appearance by Allen C. Warshaw on behalf of all defendants (Warshaw, Allen) (Entered: 08/26/2009) |
| 08/31/2009 | 15 | Unopposed MOTION to Certify Class by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Brief in Support of Plaintiffs' Unopposed Motion for Class Certification, # 2 Exhibits |

JA52

| | | |
|---|---|---|
| | | A & B, # 3 Exhibits C through F, # 4 Exhibits G through J, # 5 Proposed Order)(Meek, Robert) (Entered: 08/31/2009) |
| 09/01/2009 | | DOCKET ANNOTATION: COUNSEL is adsvised that the Brief in Support contained in Document 15 filed 8/31/09 is to be REDOCKETED using the event BRIEF IN SUPPORT located under RESPONSES/REPLIES (BRIEFS). (jc) (Entered: 09/01/2009) |
| 09/01/2009 | 16 | BRIEF IN SUPPORT re 15 Unopposed MOTION to Certify Class filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett.(Meek, Robert) (Entered: 09/01/2009) |
| 09/02/2009 | 17 | ORDER granting 15 Motion to Certify Class. See order for details. (eo, ) (Entered: 09/02/2009) |
| 09/23/2009 | 18 | CASE MANAGEMENT PLAN by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman, Richard Grogg, Frank Edgett. (Meek, Robert) (Entered: 09/23/2009) |
| 09/24/2009 | 19 | SCHEDULING ORDER: Case Management Conference reset for 9/30/2009 02:30 PM before Honorable John E. Jones III (time change only). (eo, ) (Entered: 09/24/2009) |
| 09/24/2009 | 20 | MOTION to Dismiss *Amended Complaint* by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman. (Attachments: # 1 Certificate of Nonconcurrence, # 2 Proposed Order, # 3 Brief in Support of Motion to Dismiss)(Ulan, Howard) (Entered: 09/24/2009) |
| 09/24/2009 | | DOCKET ANNOTATION: COUNSEL is advised that the Brief contained in Document 20 filed 9/24/09 is to be REDOCKETED as a separate document using the event BRIEF IN SUPPORT located under RESPONSES/REPLES (BRIEFS). (jc) (Entered: 09/24/2009) |
| 09/25/2009 | 21 | BRIEF IN SUPPORT re 20 MOTION to Dismiss *Amended Complaint* filed by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman.(Ulan, Howard) (Entered: 09/25/2009) |
| 09/30/2009 | 22 | BRIEF IN OPPOSITION re 20 MOTION to Dismiss *Amended Complaint* filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C, # 4 Attachment D, # 5 Attachment E, # 6 Proposed Order) (Meek, Robert) (Entered: 09/30/2009) |
| 09/30/2009 | 24 | ORDER #1- STANDARD CASE MANAGEMENT TRACK Discovery due by 6/15/2010. Jury Selection set for 10/4/2010 09:30AM before Honorable John E. Jones III. Motions due by 7/1/2010. Pretrial Conference set for 9/1/2010 (eo, ) (Entered: 09/30/2009) |
| 09/30/2009 | 25 | ORDER #2- Practice Order. (eo, ) (Entered: 09/30/2009) |
| 10/15/2009 | 26 | REPLY BRIEF re 20 MOTION to Dismiss *Amended Complaint* filed by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman.(Ulan, Howard) (Entered: 10/15/2009) |
| | | |

JA53

| 11/10/2009 | 27 | Proposed MOTION to Intervene *Pursuant to Fed.R.Civ.P.24* by Daniel Bastek, Maria Meo, Craig Springstead, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard. (Attachments: # 1 Proposed Order, # 2 Memorandum of Law with Ex.s A and B, # 3 Certificate of Concurrence)(Murray, William) (Entered: 11/10/2009) |
|---|---|---|
| 11/10/2009 | 28 | *Proposed Intervenors'* ANSWER to 9 Amended Complaint by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard.(Murray, William) (Entered: 11/10/2009) |
| 11/12/2009 |  | DOCKET ANNOTATION: Counsel is advised that the 'Brief in Support' to Document 27 is to be refiled as a seperate document. This event can be located under 'Responses and Replies'. (aaa ) (Entered: 11/12/2009) |
| 11/12/2009 | 29 | BRIEF IN SUPPORT re 27 Proposed MOTION to Intervene *Pursuant to Fed.R.Civ.P.24* filed by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard.(Murray, William) (Entered: 11/12/2009) |
| 11/16/2009 | 30 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by John E. Riley on behalf of Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard Attorney Michael Rato is seeking special admission. Filing fee $ 25, receipt number 03140000000001723841., filed by on behalf of Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard.(Riley, John) (Entered: 11/16/2009) |
| 11/16/2009 | 31 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by John E. Riley on behalf of Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard Attorney Sarah Goldstein is seeking special admission. Filing fee $ 25, receipt number 03140000000001723916., filed by on behalf of Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard.(Riley, John) (Entered: 11/16/2009) |
| 11/16/2009 |  | DOCKET ANNOTATION: New York State Bar Record verified for Michael Rato and Sarah M. Goldstein. PA State Bar Record verified for John E. Riley. (jc) (Entered: 11/16/2009) |
| 11/18/2009 | 32 | SPECIAL ADMISSIONS FORM APPROVED as to Michael Rato (eo, ) (Entered: 11/18/2009) |
| 11/18/2009 | 33 | SPECIAL ADMISSIONS FORM APPROVED as to Sarah Goldstein (eo, ) (Entered: 11/18/2009) |
| 11/23/2009 | 34 | BRIEF IN OPPOSITION re 27 Proposed MOTION to Intervene *Pursuant to Fed.R.Civ.P.24* filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Attachment A, # 2 Attachment B, # 3 Attachment C, # 4 Proposed Order)(Meek, Robert) (Entered: 11/23/2009) |

JA54

| 12/01/2009 | | DOCKET ANNOTATION: Doc. #35 deleted. Counsel instructed to refile documents with signatures or s/. (eo, ) (Entered: 12/01/2009) |
|---|---|---|
| 12/01/2009 | 35 | STIPULATION *AND ORDER* by Wilson Sheppard, Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman, Richard Grogg, Frank Edgett, Daniel Bastek, filed by Wilson Sheppard, Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman, Richard Grogg, Frank Edgett, Daniel Bastek.(Warshaw, Allen) (Entered: 12/01/2009) |
| 12/01/2009 | 36 | ORDER approving stipulation. (eo, ) (Entered: 12/01/2009) |
| 12/07/2009 | 37 | REPLY BRIEF re 27 Proposed MOTION to Intervene *Pursuant to Fed.R.Civ.P.24* filed by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard.(Murray, William) (Entered: 12/07/2009) |
| 01/25/2010 | 38 | ORDER denying 20 Motion to Dismiss the Amended Complaint. See order for details. (eo, ) (Entered: 01/25/2010) |
| 02/24/2010 | 39 | ANSWER to 9 Amended Complaint by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman.(Warshaw, Allen) (Entered: 02/24/2010) |
| 02/25/2010 | 40 | Letter from Proposed Intervenors *concerning intervention motion and status of discovery & settlement discussions*. (Rato, Michael) (Entered: 02/25/2010) |
| 03/10/2010 | 41 | MEMORANDUM AND ORDER: The Applicant's Motion to Intervene 27 has been DENIED. Signed by Honorable John E. Jones, III on 3/10/10. (pw, ) (Entered: 03/10/2010) |
| 03/30/2010 | 42 | NOTICE OF APPEAL in NON-PRISONER Case as to 41 Memorandum & Order by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard. Filing Fee and Docket Fee PAID. Filing fee $ 455, receipt number 0314000000001838212. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Attachments: # 1 Exhibit(s) March 10, 2010 Memorandum & Order)(Rato, Michael) (Entered: 03/30/2010) |
| 03/31/2010 | 43 | USCA Case Number 10-1908 for 42 Notice of Appeal,, filed by Michael Storm, Daniel Bastek, Craig Springstead, Wilson Sheppard, Maria Meo, Richard Clarke, Richard Kohler, Beth Ann Lambo. USCA Case Manager Tina Koperna (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF). (Koperna, Tina) (Entered: 03/31/2010) |
| 04/05/2010 | 44 | AFFIDAVIT of Service for Notice of Appeal served on Counsel for Plaintiffs and Defendant on March 30, 2010, filed by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard, Maria Kashatus. (Rato, Michael) (Entered: 04/05/2010) |
| | | |

JA55

| 04/05/2010 | 45 | TRANSCRIPT PURCHASE ORDER REQUEST by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard, Maria Kashatus (Rato, Michael) (Entered: 04/05/2010) |
| 04/06/2010 | | SUPPLEMENTAL RECORD on Appeal transmitted to US Court of Appeals re 45 TPO (Transcript Purchase Order Request)Filed, 44 Affidavit of Service,. Documents and Docket Sheet available through ECF. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (jc) (Entered: 04/06/2010) |
| 06/11/2010 | 46 | MOTION to Exceed Page Limitation *for Brief in Support of Plaintiffs' Motion for Summary Judgment* by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Certificate of Concurrence, # 2 Proposed Order)(Meek, Robert) (Entered: 06/11/2010) |
| 06/11/2010 | 47 | ORDER granting 46 Motion for Leave to File Excess Pages. Plaintiffs have leave to file an overlength brief in support of their Motion for Summary Judgment that does not exceed 10,000 words. Signed by Honorable John E. Jones, III on 6/11/10 (pw, ) (Entered: 06/11/2010) |
| 06/23/2010 | 48 | MOTION for Summary Judgment by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Table of Exhibits in Support of Plaintiffs' Motion for Summary Judgment, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Certificate of Nonconcurrence)(Meek, Robert) (Entered: 06/23/2010) |
| 06/23/2010 | 49 | BRIEF IN SUPPORT re 48 MOTION for Summary Judgment filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Proposed Order, # 2 Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment)(Meek, Robert) (Entered: 06/23/2010) |
| 06/24/2010 | | DOCKET ANNOTATION: COUNSEL is advised that the Statement of Undisputed Facts contained in Document 49 filed 6/23/10 are to be REDOCKETED using the event STATEMENT OF FACTS located under OTHER ANSWERS/RESPONSE TO HABEAS PETITION. (jc ) (Entered: 06/24/2010) |
| 06/24/2010 | 50 | STATEMENT OF FACTS re 48 MOTION for Summary Judgment, 49 Brief in Support, by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Meek, Robert) (Entered: 06/24/2010) |
| 06/29/2010 | 51 | MOTION for Summary Judgment by Estelle B. Richman. (Attachments: # 1 Proposed Order, # 2 Defendants' Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment, # 3 Exhibit(s) Exh. 1, # 4 Exhibit(s) Exh. 2, # 5 Exhibit(s) Exh. 3, # 6 Exhibit(s) Exh. 4, # 7 |

JA56

| | | |
|---|---|---|
| | | Memorandum of Law in Support of Defendants' Motion for Summary Judgment)(Warshaw, Allen) (Entered: 06/29/2010) |
| 06/30/2010 | | DOCKET ANNOTATION: Counsel is advised that they are to refile their 'Statement of Facts' and their 'Brief in Support' to Document 51 as seperate events. These events can be located under Responses and Replies. (aaa ) (Entered: 06/30/2010) |
| 06/30/2010 | 52 | STATEMENT OF FACTS filed by Estelle B. Richman.(Warshaw, Allen) (Entered: 06/30/2010) |
| 06/30/2010 | 53 | BRIEF IN SUPPORT re 51 MOTION for Summary Judgment filed by Estelle B. Richman.(Warshaw, Allen) (Entered: 06/30/2010) |
| 07/01/2010 | 54 | MOTION for Order by Estelle B. Richman. (Attachments: # 1 Motion for Enlargement)(Warshaw, Allen) (Entered: 07/01/2010) |
| 07/06/2010 | 56 | ORDER granting 54 Motion for Extension until 7/12/10 to File Response (eo, ) (Entered: 07/06/2010) |
| 07/06/2010 | | DOCKET ANNOTATION: COUNSEL is advised that Document 55 filed 7/6/10 is to be REDOCKETED. Document is a statement of undisputed facts NOT a motion to amend. (jc) (Entered: 07/06/2010) |
| 07/06/2010 | 57 | STATEMENT OF FACTS *Undisputed Facts in Support of Defendants' Motion for Summary Judgment* filed by Department of Public Welfare of the Commonwealth of Pennsylvania, Estelle B. Richman.(Warshaw, Allen) (Entered: 07/06/2010) |
| 07/06/2010 | 58 | EXHIBIT #5 filed by Department of Public Welfare of the Commonwealth of Pennsylvania re 51 MOTION for Summary Judgment. (pjr) (Entered: 07/06/2010) |
| 07/06/2010 | | DOCKET ANNOTATION: At the request of counsel, doc. 55 deleted. Document has been refiled as a Statement of Undisputed Facts. (pjr) (Entered: 07/06/2010) |
| 07/06/2010 | 59 | MAIL RETURNED (Doc. 37) as "Refused". Mail sent to Pasqual J. Depena-Rondon. (pjr) (Entered: 07/06/2010) |
| 07/07/2010 | 60 | MOTION for Leave to File *A Limited Brief As Amicus Curiae* by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order, # 2 Certificate of Concurrence)(Trepel, Samantha) (Entered: 07/07/2010) |
| 07/07/2010 | 61 | BRIEF IN SUPPORT re 60 MOTION for Leave to File *A Limited Brief As Amicus Curiae* filed by UNITED STATES OF AMERICA.(Trepel, Samantha) (Entered: 07/07/2010) |
| 07/07/2010 | 62 | BRIEF IN SUPPORT re 48 MOTION for Summary Judgment, 60 MOTION for Leave to File *A Limited Brief As Amicus Curiae* filed by UNITED STATES OF AMERICA.(Trepel, Samantha) (Entered: 07/07/2010) |
| 07/08/2010 | 63 | MOTION to Substitute Attorney *Michael Rato* by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard, Maria Kashatus.(Rato, Michael) |

JA57

| | | |
|---|---|---|
| | | (Entered: 07/08/2010) |
| 07/08/2010 | | SPECIAL ADMISSION FORM AND ECF REGISTRATION FORM SENT to Owen H. Smith. (jc) (Entered: 07/08/2010) |
| 07/09/2010 | 64 | ORDER granting 60 Motion for Leave to File.Signed by Honorable John E. Jones, III on 07/09/2010 (pjr) (Entered: 07/09/2010) |
| 07/12/2010 | 65 | BRIEF IN OPPOSITION re 51 MOTION for Summary Judgment filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Plaintiffs' Response to Defendants' Statement of Undisputed Facts, # 2 Table of Exhibits, # 3 Exhibit 27, # 4 Exhibit 28, # 5 Exhibit 29, # 6 Exhibit 30, # 7 Exhibit 31, # 8 Exhibit 32, # 9 Exhibit 33, # 10 Exhibit 34, # 11 Exhibit 35, # 12 Exhibit 36, # 13 Exhibit 37, # 14 Exhibit 38, # 15 Exhibit 39, # 16 Exhibit 40, # 17 Exhibit 41, # 18 Exhibit 42, # 19 Proposed Order)(Meek, Robert) (Entered: 07/12/2010) |
| 07/14/2010 | 66 | BRIEF IN OPPOSITION re 48 MOTION for Summary Judgment *of Plaintiffs'* filed by Harriet Dichter, Department of Public Welfare of the Commonwealth of Pennsylvania. (Attachments: # 1 Exhibit(s) Defendants' Response to Plaintiffs' Statement of Uncontested Facts, # 2 Exhibit(s) Defendants' Statement of Uncontested Facts in Opposition to Plaintiffs' Motion for Summary Judgment, # 3 Exhibit(s) Exhibit A to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 4 Exhibit(s) Exhibit B to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 5 Exhibit(s) Exhibit C to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 6 Exhibit(s) Exhibit D to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 7 Exhibit(s) Exhibit E to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 8 Exhibit(s) Exhibit F to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 9 Exhibit(s) Exhibit G to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 10 Exhibit(s) Exhibit H to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 11 Exhibit(s) Exhibit I to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment, # 12 Exhibit(s) Exhibit J to Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment)(Warshaw, Allen) (Entered: 07/14/2010) |
| 07/16/2010 | 67 | Unopposed MOTION to Continue *pre-trial conference* by Department of Public Welfare of the Commonwealth of Pennsylvania, Harriet Dichter. (Attachments: # 1 Exhibit(s) Proposed order)(Warshaw, Allen) (Entered: 07/16/2010) |
| 07/26/2010 | 68 | REPLY BRIEF re 48 MOTION for Summary Judgment filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, Richard Grogg, Frank Edgett. (Attachments: # 1 Table of Exhibits, # 2 Exhibit 43, # 3 Exhibit 44, # 4 Exhibit 45, # 5 Exhibit 46, # 6 Exhibit 47, # 7 Exhibit 48, # 8 Exhibit 49, # 9 Exhibit 50, # 10 Exhibit 51)(Meek, Robert) (Entered: 07/26/2010) |
| 07/26/2010 | 69 | ANSWER TO STATEMENT OF FACTS re 68 Reply Brief, 66 Brief in Opposition,,,,,, filed by Sylvia Baldwin, Franklin Benjamin, Anthony Beard, |

JA58

| | | Richard Grogg, Frank Edgett.(Meek, Robert) (Entered: 07/26/2010) |
|---|---|---|
| 07/26/2010 | 70 | REPLY BRIEF re 51 MOTION for Summary Judgment filed by Department of Public Welfare of the Commonwealth of Pennsylvania, Harriet Dichter. (Warshaw, Allen) (Entered: 07/26/2010) |
| 08/04/2010 | 71 | SCHEDULING ORDER: Pretrial Conference set for 9/1/2010 01:30 PM in Harrisburg before Honorable John E. Jones III. (eo, ) (Entered: 08/04/2010) |
| 08/04/2010 | 72 | ORDER - Case is stricken from the October 2010 trial term. PTC on 9/1/10 and JS on 10/4/10 are cancelled. Case will be placed on a term following a ruling on the dispositive motion. (eo, ) (Entered: 08/04/2010) |
| 10/05/2010 | 73 | ORDER- By 10/8/10 stipulation as to willingness to mediate shall be filed (eo, ) (Entered: 10/05/2010) |
| 10/05/2010 | 74 | STIPULATION *re mediation* by Department of Public Welfare of the Commonwealth of Pennsylvania. (Warshaw, Allen) (Entered: 10/05/2010) |
| 10/06/2010 | 75 | ORDER REFERRING CASE for Settlement to Magistrate Judge Martin C. Carlson. (eo, ) (Entered: 10/06/2010) |
| 10/08/2010 | 76 | MOTION Participate in Mediation re 74 Stipulation by UNITED STATES OF AMERICA. (Attachments: # 1 Proposed Order, # 2 Certificate of Concurrence and Non-Concurrence)(Mazor, Marina) (Entered: 10/08/2010) |
| 10/12/2010 | | DOCKET ANNOTATION: COUNSEL is advised that Document 77 filed 10/8/10 is to be REDOCKETED using the event BRIEF IN SUPPORT located under RESPONSES/REPLIES (BRIEFS). (jc) (Entered: 10/12/2010) |
| 10/12/2010 | | DOCKET ANNOTATION: DOC # 77 deleted due to filing error; Counsel to re-file corrected document. (kn, ) (Entered: 10/12/2010) |
| 10/12/2010 | 77 | BRIEF IN SUPPORT re 76 MOTION Participate in Mediation re 74 Stipulation filed by UNITED STATES OF AMERICA.(Mazor, Marina) (Entered: 10/12/2010) |
| 10/13/2010 | 78 | ORDER - Given that there is no consensus among the parties regarding the value of the participation of the United States in settlement discussions, and taking into account the fact that the United States has provided a thorough and cogent expression of its views in its prior amicus filings, we will decline this request at the present time. Signed by Magistrate Judge Martin C. Carlson on October 13, 2010. (kjn ) (Entered: 10/13/2010) |
| 10/13/2010 | 79 | SCHEDULING ORDER - Settlement Conference set for 11/19/2010 at 1:00 PM in Harrisburg before Magistrate Judge Martin C. Carlson. Confidential settlement memorandums due by 11/12/2010. SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on October 13, 2010. (kjn ) (Entered: 10/13/2010) |
| 10/19/2010 | 80 | MOTION for Leave to Participate in Mediation *and Memorandum in Support of Springstead Intervenors' Motion for Leave to Participate in Mediation* by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard, Maria Kashatus. |

JA59

| | | |
|---|---|---|
| | | (Attachments: # 1 Certificate of Nonconcurrence Certificate of Concurrence and Non-Concurrence, # 2 Proposed Order Order Granting Springstead Intervenors' Motion for Leave to Participate in Mediation)(Riley, John) (Entered: 10/19/2010) |
| 10/19/2010 | 81 | BRIEF IN SUPPORT *of Springstead Intervenors'* re 80 MOTION for Leave to Participate in Mediation *and Memorandum in Support of Springstead Intervenors' Motion for Leave to Participate in Mediation* filed by Maria Meo, Craig Springstead, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Wilson Sheppard, Maria Kashatus.(Riley, John) (Entered: 10/19/2010) |
| 10/21/2010 | 82 | ORDER denying 80 Motion to Participate in settlement discussions. Signed by Magistrate Judge Martin C. Carlson on October 21, 2010. (kjn ) (Entered: 10/21/2010) |
| 11/19/2010 | 83 | MOTION to Stay *Formal Proceedings* by Daniel Bastek, Richard Clarke, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm.(Riley, John) (Entered: 11/19/2010) |
| 11/22/2010 | 85 | ORDER - IT IS HEREBY ORDERED THAT the parties confer and consult, and notify the Court in writing on or before December 7, 2010, whether further settlement discussions would be helpful in resolving this matter. Status Report due by 12/7/2010. Signed by Magistrate Judge Martin C. Carlson on November 22, 2010. (kjn ) (Entered: 11/22/2010) |
| 12/03/2010 | 86 | BRIEF IN OPPOSITION re 83 MOTION to Stay *Formal Proceedings* filed by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Proposed Order)(Meek, Robert) (Entered: 12/03/2010) |
| 12/16/2010 | 87 | ORDER denying 83 Motion to Stay (eo, ) (Entered: 12/16/2010) |
| 01/27/2011 | 88 | ORDER granting 48 Motion for Summary Judgment. Denying 51 Motion for Summary Judgment. Telephone conference scheduled for 1/31/11 at 10:00 a.m. Plaintiff's counsel shall initiate the call to chambers (717)221-3986. All counsel shall be prepared to proceed at the time of said call. See order for details. (eo, ) (Entered: 01/27/2011) |
| 02/04/2011 | 90 | CERTIFICATE of by Department of Public Welfare of the Commonwealth of Pennsylvania. (Warshaw, Allen) (Entered: 02/04/2011) |
| 02/04/2011 | 91 | ORDER REFERRING CASE for Settlement to Judge Magistrate Judge Martin C. Carlson. (eo, ) (Entered: 02/04/2011) |
| 02/10/2011 | 92 | SCHEDULING ORDER: A Settlement Conference is set for 2/23/2011 at 10:30 AM in Harrisburg before Magistrate Judge Martin C. Carlson. SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on February 10, 2011. (kjn ) (Entered: 02/10/2011) |
| 02/23/2011 | 94 | ORDER - A Supplemental Settlement Conference is set for 3/17/2011 at 10:00 AM in Harrisburg before Magistrate Judge Martin C. Carlson. SEE ORDER FOR COMPLETE DETIALS. Signed by Magistrate Judge Martin C. |

JA60

| | | Carlson on February 23, 2011. (kjn) (Entered: 02/23/2011) |
|---|---|---|
| 03/17/2011 | 96 | SCHEDULING ORDER: A Supplemental Settlement Conference is set for 4/7/2011 at1:00 PM in Harrisburg before Magistrate Judge Martin C. Carlson. Signed by Magistrate Judge Martin C. Carlson on March 17, 2011. (kjn ) (Entered: 03/17/2011) |
| 04/05/2011 | 97 | JUDGMENT of USCA AFFIRMED (certified copy) as to 42 Notice of Appeal filed by Michael Storm, Daniel Bastek, Craig Springstead, Wilson Sheppard, Maria Meo, Richard Clarke, Richard Kohler, Beth Ann Lambo. (Koperna, Tina) (Entered: 04/05/2011) |
| 04/05/2011 | 98 | AMENDED JUDGMENT of USCA (certified copy) as to 42 Notice of Appeal,, filed by Michael Storm, Daniel Bastek, Craig Springstead, Wilson Sheppard, Maria Meo, Richard Clarke, Richard Kohler, Beth Ann Lambo. (Koperna, Tina) (Entered: 04/05/2011) |
| 04/06/2011 | 99 | ORDER - IT IS HEREBY ORDERED THAT the parties will continue to confer and consult regarding the matters discussed at this conference, and a supplemental settlement conference previously scheduled for April 7, 2011, is RESCHEDULED and shall be conducted in the above-captioned action on: April 20, 2011 at 2:00 p.m., in the undersigneds chambers. Signed by Magistrate Judge Martin C. Carlson on April 6, 2011. (kjn ) (Entered: 04/06/2011) |
| 04/19/2011 | 100 | ORDER - The Settlement Conference is RESCHEDULED to 5/2/2011 AT 2:00 PM in Harrisburg before Magistrate Judge Martin C. Carlson. Signed by Magistrate Judge Martin C. Carlson on April 19, 2011. (kjn ) (Entered: 04/19/2011) |
| 04/27/2011 | 101 | MANDATE of USCA as to 42 Notice of Appeal,, filed by Michael Storm, Daniel Bastek, Craig Springstead, Wilson Sheppard, Maria Meo, Richard Clarke, Richard Kohler, Beth Ann Lambo (Attachments: # 1 Opinion, # 2 Clerk's Letter to District Court)(King, James) (Entered: 04/27/2011) |
| 04/29/2011 | 102 | ORDER - AND NOW, this 29th day of April, 2011, the Court having been notified that the parties have reached a settlement in the above-captioned action, IT IS HEREBY ORDERED THAT the settlement conference scheduled to take place with the Court on May 2, 2011 at 2:00 p.m. is CANCELLED. Signed by Magistrate Judge Martin C. Carlson on April 29, 2011. (kjn ) (Entered: 04/29/2011) |
| 05/04/2011 | 103 | Letter from Robert W. Meek re Status of Settlement Negotiations. (Meek, Robert) (Entered: 05/04/2011) |
| 05/24/2011 | 104 | NOTICE of Appearance by Doris M. Leisch on behalf of All Defendants (Leisch, Doris) (Entered: 05/24/2011) |
| 05/26/2011 | 105 | Unopposed MOTION to Approve Consent Judgment by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Certificate of Concurrence, # 5 Proposed Order)(Meek, Robert) (Entered: 05/26/2011) |
| 05/27/2011 | 106 | ORDER granting 105 Motion to Approve Consent Judgment. Hearing set for |

| | | |
|---|---|---|
| | | 8/22/11 at 9:00 a.m., Ct #2, Harrisburg, PA. See order for all deadlines. (eo, ) (Entered: 05/27/2011) |
| 05/27/2011 | | Set/Reset Hearings: In Court Hearing set for 8/22/2011 09:00 AM in Harrisburg - Courtroom 2 before Honorable John E. Jones III. (eo, ) (Entered: 05/27/2011) |
| 07/05/2011 | 107 | LETTER - from Mr. & Mrs. Drago re: Notice of Class Action - Proposed Settlement & Hearing. (jc) (Entered: 07/05/2011) |
| 07/07/2011 | 108 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by William J. Murray on behalf of Daniel Bastek, Richard Clarke, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm Attorney Benjamin J. Hoffart is seeking special admission. Filing fee $ 50, receipt number 0314-2227099.. (Murray, William) (Entered: 07/07/2011) |
| 07/07/2011 | 110 | LETTER - from W J. Parmley to Court of receipt of Notice of Class Action - Proposed Settlement Hearing. (jc) (Entered: 07/08/2011) |
| 07/08/2011 | 109 | RESPONSE by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg to 108 Petition for Special Admission - Pro Hac Vice,. (Attachments: # 1 Proposed Order)(Meek, Robert) (Entered: 07/08/2011) |
| 07/08/2011 | | DOCKET ANNOTATION: NY State Bar Record verified for Benjamin J. Hoffart. PA State Bar Record verified for William J. Murray, Jr. (jc) (Entered: 07/08/2011) |
| 07/11/2011 | 111 | SPECIAL ADMISSIONS FORM APPROVED as to Benjamin J. Hoffart (eo, ) (Entered: 07/11/2011) |
| 07/11/2011 | 112 | MOTION to Substitute Attorney by Craig Springstead.(Murray, William) (Entered: 07/11/2011) |
| 07/11/2011 | 255 | LETTER - from William Shotzberger re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 08/03/2011) |
| 07/13/2011 | 113 | LETTER - from Jemille Houston re: Notice of Class Action - Proposed Settlement & Hearing. (jc) (Entered: 07/13/2011) |
| 07/14/2011 | 114 | LETTER - from Karen K. Blew re: Notice of Class Action - Proposed Settlement & Hearing. (jc) (Additional attachment(s) added on 7/14/2011: # 1 Letter) (jc, ). (Entered: 07/14/2011) |
| 07/15/2011 | 115 | LETTER - from Bob Sheetz re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/15/2011) |
| 07/15/2011 | 116 | LETTER - from Marion Kelly o/b/o Patrick Garramone re: Notice of Class Action - Proposed Settlement & Hearing. (jc) (Entered: 07/15/2011) |
| 07/19/2011 | 117 | Letter from Helen Reider filed. (pjr) (Entered: 07/19/2011) |
| 07/19/2011 | 118 | Letter from Roy Reider filed. (pjr) (Entered: 07/19/2011) |
| 07/20/2011 | 119 | LETTER - from Rev. AM Gordon and Minerva Gordon re: Notice of Class |

JA62

| | | Action - Proposed Settlement and Hearing. (jc) (Entered: 07/20/2011) |
|---|---|---|
| 07/20/2011 | 120 | LETTER - from Marion and Carment Attanasio, Jr. re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/20/2011) |
| 07/20/2011 | 121 | LETTER - from Francis J. Beston re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/20/2011) |
| 07/21/2011 | 122 | LETTER - from Cecelia Hopkins re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/21/2011) |
| 07/21/2011 | 123 | LETTER - from Alfred R. Sheppard re: Notice of Class Action - Proposed Settlement Hearing. (jc) (Entered: 07/21/2011) |
| 07/22/2011 | 124 | LETTER - from Norma Ferguson re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/22/2011 | 125 | LETTER - from Cheryl O. Brown re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/22/2011 | 126 | LETTER - from Mary Gough re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/22/2011 | 127 | LETTER - from Arthur & Joyce Ciullo re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/22/2011 | 128 | LETTER - from Doris Kalan re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/22/2011 | 129 | LETTER - from Nancy Slick re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/22/2011) |
| 07/25/2011 | 130 | LETTER - from Elizabeth Pugh re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/25/2011 | 131 | LETTER - from Catherine T. Dymacek re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/25/2011 | 132 | LETTER - from Lawrence County Association for Retarted Citizens re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/25/2011 | 133 | LETTER - from Executive Director of Lawrence County Association for Retarted Citizens re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/25/2011 | 134 | LETTER - from Joseph Lambo re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/25/2011 | 135 | LETTER - from James B. Lambo re: Notice of Class Action - Proposed Settlement Hearing. (aaa ) (Entered: 07/25/2011) |
| 07/26/2011 | 136 | LETTER - from Polly Spare re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 137 | LETTER - from Florence Plenn re: Notice of Class Action - Proposed |

JA63

| | | |
|---|---|---|
| | | Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 138 | LETTER - from Dale & Darcene Utt re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 139 | LETTER - from John Bastek re: Notice of Class Action - Proposed Settlement and Hearing.(jc) (Entered: 07/26/2011) |
| 07/26/2011 | 140 | LETTER - Grace Meo re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 141 | LETTER - from Amelia & Jerry Hake re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 142 | LETTER - from Kay Wagner re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 143 | LETTER - from Gary & Mary Wills re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 144 | LETTER - from Kimberly Gordon re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 145 | LETTER - from Dixie Henry re: Notice of Class Action - Porposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 146 | LETTER from Clara Palmer re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 147 | LETTER - from Mary Kashatus re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 148 | LETTER - from John Hoops re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 149 | LETTER - from Suzanne Perry re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 150 | LETTER - from Wilson McKinley re: Notice of Class Action - Propsed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 151 | LETTER - from Thomas Kashatus re: Notice of Class Action - Proposed Settleent and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 152 | LETTER - from Margaret Kashatus re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 153 | LETTER - from August & Winnifred Centi re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 154 | LETTER - from Ruth Jarrett re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 155 | LETTER - from Patricia O'Donnell re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| | | |

JA64

| 07/26/2011 | 156 | LETTER - from Margaret Tierney re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/26/2011 | 157 | LETTER - from William Hudock re; Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 07/26/2011) |
| 07/27/2011 | 158 | Letter from Carole Henry re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 159 | Letter from Wes Grebski re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 160 | Letter from Marian L. Lentz re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 161 | Letter from Donald Sabo re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 162 | Letter from Albert Knight re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 163 | Letter from Kenneth Myers re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/27/2011 | 164 | Letter from Kathleen McKeaney re; Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/27/2011) |
| 07/28/2011 | 165 | Letter from Jeremy Kashatus & Family filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 166 | Letter from Karen S. Crytzer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 167 | Letter from Ellen Lube filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 168 | Letter from Ruth Nicholfiled re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 169 | Letter from Deborah and Gerard Hey filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 170 | Letter from Sharon and Elmer Brice, Jr. filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 171 | Letter from Jeanne C. Downey filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 172 | Letter from Mary B. Fernan filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 173 | Letter from Robert and Beverly Gill filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 174 | Letter from Adelaide Hardy filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |

JA65

| 07/28/2011 | 175 | Letter from Lily Chang filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
|---|---|---|
| 07/28/2011 | 176 | Letter from Joan Wright filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 177 | Letter from Bertin W. Springstead filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 07/28/2011) |
| 07/28/2011 | 178 | by Carl A Solano. *Objections to Class Action Settlement*. (Attachments: # 1 Certificate of service)(Solano, Carl) (Entered: 07/28/2011) |
| 07/28/2011 | 179 | MOTION to Intervene by Carl A Solano. (Attachments: # 1 Proposed Order Proposed order, # 2 Exhibit(s) Exhibit A (objections), # 3 Certificate of Nonconcurrence Certificates)(Solano, Carl) (Entered: 07/28/2011) |
| 07/28/2011 | 180 | BRIEF IN SUPPORT re 179 MOTION to Intervene filed by Carl A Solano. (Solano, Carl) (Entered: 07/28/2011) |
| 07/29/2011 | 181 | Letter from Delores Drews re. Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 182 | Letter from Frederick Drews re Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 183 | Letter from Nancy Murray re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 184 | Letter from Mark Drews re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 185 | Letter from Megan Irwin re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 186 | Letter from Mr. & Mrs. John Potochnick re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 187 | Letter from Carol McDonald re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 188 | Letter from James Margolis re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 189 | Letter from Charles McCormick re: Notice of Class Action - Proposed Settlement and Hearing. (Additional attachments given directly to chambers) (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 190 | Letter from Eloise Moore re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 191 | Letter from Clarence and Gail Ropp re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 192 | Letter from Trudy Sheetz re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |

JA66

| 07/29/2011 | 193 | Letter from Geraldine Wetzel re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 194 | Letter from J. Keffer re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 195 | Letter from David Kalan re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 196 | Letter from Richard and Jane Ruth re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 197 | Letter from Jean Milliron re: Notice of Class Action - Proposed Settlement and Hearing (ma, ) (Entered: 07/29/2011) |
| 07/29/2011 | 198 | Letter from Sen. Mary Jo White re: Notice of Class Action - Proposed Settlement and Hearing. (aaa ) (Entered: 07/29/2011) |
| 07/29/2011 | 199 | NOTICE of Appearance by Nathan P. Heller on behalf of VOR (Heller, Nathan) (Entered: 07/29/2011) |
| 07/29/2011 | 200 | MOTION to Appear Pro Hac Vice - Attorney Lesli Esposito is seeking special admission. Filing fee $ 50, receipt number 0314-2245057. by VOR. (Heller, Nathan) (Entered: 07/29/2011) |
| 08/01/2011 |  | DOCKET ANNOTATION: PA State Bar Record verified for Lesli C. Esposito and Nathan P. Heller. (jc) (Entered: 08/01/2011) |
| 08/01/2011 | 201 | Letter from Harold McConnell III filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 202 | Letter from Mary Schneider filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 203 | Letter from Betty Lightner filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 204 | Letter from Joseph Potera filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 205 | Letter from Ann Marie Walsh filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 206 | Letter from Barbara Ann Fritz filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 207 | Letter from Rose Schafer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 208 | Letter from Tommy Kashatus filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 209 | Letter from Debra Kleinen filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 210 | Letter from Debra Herring filed re: Notice of Class Action - Proposed |

| | | Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
|---|---|---|
| 08/01/2011 | 211 | Letter from Daniel Kleinen filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 212 | Letter from William & Beverly Daugherty filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 213 | Letter from Kathy Casadonte filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 214 | Letter from Kimberley Gauronski filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 215 | Letter from Larry Krafft filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 216 | Letter from Jennifer Crawford filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 217 | Letter from Sen. Mary Jo White filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/01/2011) |
| 08/01/2011 | 218 | Letter from Nathan P. Heller and Lesli C. Esposito *Objecting to Settlement*. (Heller, Nathan) (Entered: 08/01/2011) |
| 08/01/2011 | 219 | MOTION to Exceed Page Limitation by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Certificate of Concurrence and Non-Opposition, # 2 Proposed Order)(Meek, Robert) (Entered: 08/01/2011) |
| 08/01/2011 | 220 | ORDER granting 219 Motion for Leave to File Excess Pages (eo, ) (Entered: 08/01/2011) |
| 08/01/2011 | 221 | OBJECTIONS by Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. *Supplemental Objections of Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, and Wilson Sheppard to Proposed Settlement Agreement*. (Attachments: # 1 Affidavit, # 2 Exhibit(s)) (Riley, John) (Entered: 08/01/2011) |
| 08/02/2011 | 222 | SUPPLEMENTAL OBJECTIONS filed by Daniel Bastek, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 223 | MEMORANDUM OF LAW by UNITED STATES OF AMERICA *in Support of Proposed Settlement*. (Trepel, Samantha) (Entered: 08/02/2011) |
| 08/02/2011 | 224 | Letter from Pamela Breneman re: plans to attend hearing as a neutral observer. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 225 | Letter from Tarah Toohil filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 226 | Letter from The staff and students of Keystone Job Corps filed re: Notice of |

JA68

| | | Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
|---|---|---|
| 08/02/2011 | 227 | Letter from Donna Wetherill filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Main Document 227 replaced on 8/9/2011) (pjr, ). (Entered: 08/02/2011) |
| 08/02/2011 | 228 | Letter from Francis Marion filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 229 | Letter from Linda Lotzi filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 230 | Letter from Bertin Springstead filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 231 | Letter from William Toperzer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 232 | Letter from Amy Schwartz, Jerry Hake & Sara Greth filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 233 | Letter from Martha Ilift filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 234 | Letter from David Parry filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 235 | Letter from Paula Wolfe filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 236 | Letter from Henry Sitko filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 237 | Letter from Beatrice Sitko filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 238 | Letter from Gerard Dunne filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 239 | Letter from David Read filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 240 | Letter from Ann Marie Vodzak filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 241 | Letter from Evelyn Crawford filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 242 | Letter from William Brill filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 243 | Letter from James & Lucille Causer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 244 | Letter from Emil & Elizabeth Gnall filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |

JA69

| 08/02/2011 | 245 | Letter from Barry & Anna Johns filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 246 | Letter from Regina Splane filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 247 | Letter from Annette & Ronald Fischer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 248 | Letter from Shirley Musacchio filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 249 | Letter from Carin Doddroe filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 250 | Letter from Timothy Demers filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 251 | Letter from Rickey Shaffer filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 252 | Letter from Carl Lloyd filed re: Notice of Class Action - Proposed Settlement and Hearing. (pjr) (Entered: 08/02/2011) |
| 08/02/2011 | 253 | MOTION to Intervene *Pursuant to Federal Rule of Civil Procedure 24* by Daniel Bastek, Richard Clarke, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. (Attachments: # 1 Exhibit(s))(Riley, John) (Entered: 08/02/2011) |
| 08/02/2011 | 254 | BRIEF IN SUPPORT re 253 MOTION to Intervene *Pursuant to Federal Rule of Civil Procedure 24* filed by Daniel Bastek, Richard Clarke, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm.(Riley, John) (Entered: 08/02/2011) |
| 08/03/2011 | 256 | LETTER - from Samuel Boring re: Notice of Class Action - Proposed Settlement and Hearing. (jc) (Entered: 08/03/2011) |
| 08/05/2011 | 257 | CERTIFICATE of Counsel *Regarding Notice* by Robert W. Meek on behalf of Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg (Meek, Robert) (Entered: 08/05/2011) |
| 08/05/2011 | 258 | MOTION to Exceed Page Limitation *for Brief in Opposition to Motion of Craig Springstead et al. to Intervene Pursuant to Fed. R. Civ. P. 24* by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Certificate of Concurrence and Non-Opposition, # 2 Proposed Order)(Meek, Robert) (Entered: 08/05/2011) |
| 08/08/2011 | 259 | ORDER granting 258 Motion for Leave to File Excess Pages (eo, ) (Entered: 08/08/2011) |
| 08/08/2011 | 260 | MOTION to Approve Consent Judgment by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Certificate of Concurrence, # 4 Proposed Order)(Meek, Robert) (Entered: 08/08/2011) |

JA70

| 08/08/2011 | 261 | BRIEF IN SUPPORT re 260 MOTION to Approve Consent Judgment filed by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg.(Meek, Robert) (Entered: 08/08/2011) |
|---|---|---|
| 08/08/2011 | 262 | MOTION for Attorney Fees by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit A, # 2 Exhibit B, Pt. 1, # 3 Exhibit B, Pt. 2, # 4 Exhibit C, # 5 Exhibits D & E, # 6 Exhibits F, G, & H, # 7 Certificate of Concurrence, # 8 Proposed Order)(Meek, Robert) (Entered: 08/08/2011) |
| 08/08/2011 | 263 | CERTIFICATE of Counsel *regarding Notice to Class* by Doris M. Leisch on behalf of All Defendants (Leisch, Doris) (Entered: 08/08/2011) |
| 08/09/2011 | 264 | SCHEDULING ORDER: Telephone Conference set for 8/15/2011 02:30 PM before Honorable John E. Jones III. Counsel for the Plaintiffs shall initiate the call to Chambers at (717) 221-3986. When the call is placed, all counsel shall be on the line and prepared to proceed. (eo, ) (Entered: 08/09/2011) |
| 08/09/2011 |  | DOCKET ANNOTATION: Doc. 227 replaced with correct image. (pjr) (Entered: 08/09/2011) |
| 08/10/2011 | 265 | by Daniel Bastek, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. *Letter from Benjamin J. Hoffart, Esquire and John E. Riley, Esquire re: Telephone Conference set for 8/15/2011 at 2:30 p.m. before Honorable John E. Jones, III.* (Riley, John) (Entered: 08/10/2011) |
| 08/10/2011 | 266 | MOTION for Extension of Time to respond to Motion of Diane Solano to Intervene for Purpose of Objecting to Class Action Settlement (unopposed) by Department of Public Welfare of the Commonwealth of Pennsylvania, Harriet Dichter. (Attachments: # 1 Proposed Order)(Leisch, Doris) (Entered: 08/10/2011) |
| 08/11/2011 | 267 | BRIEF IN OPPOSITION re 179 MOTION to Intervene *of Diane Solano for the Purpose of Objecting to Class Action Settlement* filed by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Proposed Order)(Meek, Robert) (Entered: 08/11/2011) |
| 08/12/2011 | 268 | ORDER granting 266 Motion to Extend Time (eo, ) (Entered: 08/12/2011) |
| 08/15/2011 | 269 | MOTION for Hearing *Joint Motion of Diane Solano and Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, Wilson Sheppard Requesting Oral Argument on the Issue of Standing* by Daniel Bastek, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. (Riley, John) (Entered: 08/15/2011) |
| 08/15/2011 | 270 | BRIEF IN SUPPORT *of Joint Motion of Diane Solano and Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, Wilson Sheppard for Oral Argument on the Issue of Standing* re 269 MOTION for Hearing *Joint Motion of Diane Solano* |

JA71

| | | |
|---|---|---|
| | | *and Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, Wilson Sheppard Requesting Oral Argument on the Issue of Standing* filed by Daniel Bastek, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm.(Riley, John) (Entered: 08/15/2011) |
| 08/16/2011 | 272 | BRIEF IN OPPOSITION re 253 MOTION to Intervene *Pursuant to Federal Rule of Civil Procedure 24* filed by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Proposed Order)(Meek, Robert) (Entered: 08/16/2011) |
| 08/16/2011 | 273 | ORDER - IT IS HEREBY ORDERED: 1)The Springstead Intervenors and Mr. Solano shall identify, via letter on the docket, the attorney designated to appear in the 8/22/11 hearing, on or before Thursday, 8/18/11; 2)Motions 179 & [253 to Intervene are DENIED; & 3)The Joint Motion Requesting 269 is DENIED. SEE ORDER FOR COMPLETE DETAILS.Signed by Honorable John E. Jones, III on 8/16/11. (dh) (Entered: 08/16/2011) |
| 08/17/2011 | 274 | Letter from C. Solano. (Solano, Carl) (Entered: 08/17/2011) |
| 08/18/2011 | 275 | Letter from Robert W. Meek on behalf of Plaintiffs and Defendants. (Meek, Robert) (Entered: 08/18/2011) |
| 08/18/2011 | 276 | ORDER - IT IS HEREBY ORDERED: The parties SHALL PROVIDE to counsel any additional witness names and, if practicable, copies or descriptions of documents and record evidence, either directly or via the Court's docket, by 8/19/11, at 12:00 P.M. SEE ORDER FOR COMPLETE DETAILS.Signed by Honorable John E. Jones, III on 8/18/11. (dh) (Entered: 08/18/2011) |
| 08/18/2011 | 277 | Letter from Benjamin J. Hoffart to The Honorable John E. Jones, III. (Riley, John) (Entered: 08/18/2011) |
| 08/25/2011 | 279 | Letter from C. Solano re Supp. Authority. (Solano, Carl) (Entered: 08/25/2011) |
| 09/02/2011 | 280 | MEMORANDUM (Attachments: # 1 Settlement Agreement)(eo, ) (Entered: 09/02/2011) |
| 09/02/2011 | 281 | ORDER - 1. The Court FINDS that the Settlement Agreement is fair, reasonable, and adequate; 2. Plaintiffs Unopposed Motion for Final Approval of the Proposed Class Action Settlement Agreement (Doc. 260) is GRANTED; 3. The Settlement Agreement is APPROVED; 4. Plaintiffs Unopposed Motion for attorneys Fees, Litigation Expenses, and Costs (Doc. 262) is GRANTED;5.Defendants will pay Plaintiffs counsel the sum of $432,500 for attorneys fees, litigation expenses, and costs incurred;6. This action is hereby DISMISSED and the Clerk is directed to CLOSE this case; and 7.The Court expressly retains jurisdiction as set forth in the Settlement Agreement, in order to enter any further orders that may be necessary or appropriate in administering or implementing the terms and provisions of the settlement agreement. (eo, ) (Entered: 09/02/2011) |
| | | |

JA72

| 09/12/2011 | 282 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Fairness Hearing proceedings held on 8/22/11 before Judge Jones. Court Reporter Lori Shuey, Telephone number (717)215-1270. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/3/2011. Redacted Transcript Deadline set for 10/13/2011. Release of Transcript Restriction set for 12/12/2011. (ctrep1, ) (Entered: 09/12/2011) |
|------------|-----|-------------|
| 09/12/2011 | 283 | NOTICE TO UNREGISTERED ECF ATTORNEYS/PRO SE PARTIES regarding the filing of 282 Transcript. A copy of the transcript was sent to Benjamin J. Hoffart on 9/12/11. (lh, ) (Entered: 09/12/2011) |
| 09/19/2011 | 284 | COURT REPORTER NOTES OF PROCEEDINGS filed by L. Shuey of hearing before Judge Jones on 8/22/11. In accordance with 28 U.S.C. Section 753(b), I certify that these original notes are a true and correct record of proceedings in the United States District Court for the Middle District of PA before Judge Jones on 8/22/11. By s/ L. Shuey. (Court Reporter Notes are viewable by court staff only). (ctrep1, ) (Entered: 09/19/2011) |
| 09/29/2011 | 285 | NOTICE OF APPEAL in by Daniel Bastek, Richard Clarke, Maria Kashatus, Richard Kohler, Beth Ann Lambo, Maria Meo, Wilson Sheppard, Craig Springstead, Michael Storm. Filing Fee and Docket Fee PAID. Filing fee $ 455, receipt number 0314-2292949. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Murray, William) (Entered: 09/29/2011) |
| 09/29/2011 | 286 | NOTICE OF APPEAL in NON-PRISONER Case by Carl A Solano. Filing Fee and Docket Fee PAID. Filing fee $ 455, receipt number 0314-2293202. Court Reporter Lori A. Shuey. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Solano, Carl) (Entered: 09/29/2011) |
| 09/30/2011 | 287 | USCA Case Number 11-3685 for 286 Notice of Appeal, filed by Carl A Solano. USCA Case Manager Maria L. Reyes (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF). (Reyes, Maria) (Entered: 09/30/2011) |
| 09/30/2011 | 288 | USCA Case Number 11-3684 for 285 Notice of Appeal, filed by Michael Storm, Daniel Bastek, Craig Springstead, Wilson Sheppard, Maria Meo, Richard Clarke, Richard Kohler, Maria Kashatus, Beth Ann Lambo. USCA Case Manager Maria L. Reyes (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF). (Reyes, Maria) (Entered: 09/30/2011) |
| 10/14/2011 | 289 | TRANSCRIPT PURCHASE ORDER REQUEST filed by Carl A Solano. (pjr) (Entered: 10/14/2011) |
| 11/08/2011 | 290 | MOTION to Stay *Order Pending Appeal* by Carl A Solano. (Attachments: # 1 Proposed Order Proposed order granting limited stay, # 2 Exhibit(s) Exhibit A (with Attachment 1), # 3 Certificate of Nonconcurrence Certificate of |

JA73

| | | nonconcurrence and service)(Solano, Carl) (Entered: 11/08/2011) |
|---|---|---|
| 11/08/2011 | 291 | BRIEF IN SUPPORT re 290 MOTION to Stay *Order Pending Appeal* filed by Carl A Solano.(Solano, Carl) (Entered: 11/08/2011) |
| 11/21/2011 | 292 | Joint MOTION for Extension of Time to respond to joint motion for partial stay by objectors by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Department of Public Welfare of the Commonwealth of Pennsylvania, Frank Edgett, Richard Grogg, Gary D Alexander. (Attachments: # 1 Proposed Order)(Leisch, Doris) (Entered: 11/21/2011) |
| 11/22/2011 | 293 | ORDER granting 292 Motion to Extend Time (eo, ) (Entered: 11/22/2011) |
| 12/09/2011 | 294 | BRIEF IN OPPOSITION re 290 MOTION to Stay *Order Pending Appeal* filed by Sylvia Baldwin, Anthony Beard, Franklin Benjamin, Frank Edgett, Richard Grogg. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Proposed Order)(Meek, Robert) (Entered: 12/09/2011) |
| 12/09/2011 | | SUPPLEMENTAL RECORD ON APPEAL transmitted to US Court of Appeals re: 291 Brief in Support, 292 Joint MOTION for Extension of Time to respond to joint motion for partial stay by objectors, 293 Order on Motion to Extend Time, 290 MOTION to Stay Order Pending Appeal, 289 TPO (Transcript Purchase Order Request)Filed, 294 Brief in Opposition,. Documents and Docket Sheet available through ECF. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (jc, ) (Entered: 12/09/2011) |
| 12/09/2011 | 295 | BRIEF IN OPPOSITION re 290 MOTION to Stay *Order Pending Appeal* filed by Gary D Alexander, Department of Public Welfare of the Commonwealth of Pennsylvania. (Attachments: # 1 Affidavit Exhibit A - Declaration, # 2 Affidavit Exhibit B - Declaration, # 3 Affidavit Exhibit C - Declaration, # 4 Proposed Order)(Leisch, Doris) (Entered: 12/09/2011) |
| 12/12/2011 | 296 | REPLY BRIEF re 290 MOTION to Stay *Order Pending Appeal* filed by Carl A Solano.(Solano, Carl) (Entered: 12/12/2011) |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : |  |
| Plaintiffs, | : : | Filed via ECF System |
| v. | : : | Civil Action No. 1:09-cv-1182-JEJ |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : : | Class Action |
| Defendants. | : : |  |

_____:

## AMENDED COMPLAINT

### I.    Introduction

1.    Plaintiffs, individuals who are institutionalized in Pennsylvania's state-operated intermediate care facilities for persons with mental retardation (ICFs/MR), bring this lawsuit on behalf of themselves and others similarly situated to challenge the Defendants' continuing failure to offer and provide them with the opportunity to

receive services in integrated, community settings that are the most appropriate settings to meet their needs, resulting in their continued unnecessary segregation and institutionalization.

2.      Despite the fact that Plaintiffs and many others in the state-operated ICFs/MR want to live in community settings and that the community is the most integrated setting appropriate to meet their needs, Defendants have not offered them any alternative to remaining institutionalized.

3.      The costs of providing community services to Plaintiffs and putative class members would be far less than the costs of continuing to institutionalize them. The average annual cost of providing services in a state-operated ICF/MR is nearly $228,000 per person, more than double the average per capita cost of providing community services (including residential services) to such an individual.

4.      Defendants' failure to offer and provide community alternatives to Plaintiffs and other persons confined in ICFs/MR who are appropriate for and not opposed to discharge violates Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  Plaintiffs seek appropriate declaratory and injunctive relief.

## II.    <u>Jurisdiction and Venue</u>

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

6.    Plaintiffs' claims are authorized by 42 U.S.C. §§ 1983 and 12133, 29 U.S.C. § 794a(a)(1), and 28 U.S.C. §§ 2201 and 2202.

7.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) since Defendants reside in this District.

## III.    <u>Parties</u>

8.    Plaintiff Franklin Benjamin is a 48-year-old resident of Philadelphia, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1966. He brings this lawsuit by and through his next friend, Andreé Yock, pursuant to Federal Rule of Civil Procedure 17(c).

9.    Plaintiff Richard Grogg is a 45-year-old resident of York County, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1988. He brings this lawsuit by and through his next friend, Joyce McCarthy, pursuant to Federal Rule of Civil Procedure 17(c).

10.    Plaintiff Frank Edgett is a nearly 51-year-old resident of Cumberland County, Pennsylvania who has been institutionalized in a state-operated ICF/MR

3

since 1987. He brings this lawsuit by and through his next friend, Joyce McCarthy, pursuant to Federal Rule of Civil Procedure 17(c).

11.     Plaintiff Sylvia Baldwin is a 33-year-old resident of Allegheny County, Pennsylvania who has been institutionalized in a state-operated ICF/MR almost continuously since 1990. She brings this lawsuit by and through her next friend, Shirl Meyers, pursuant to Federal Rule of Civil Procedure 17(c).

12.     Plaintiff Anthony Beard is a 49-year-old resident of York County, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1967. He brings this lawsuit by and through his next friend, Nicole Turman, pursuant to Federal Rule of Civil Procedure 17(c).

13.     Defendant Department of Public Welfare (DPW) is the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation, including Plaintiffs and putative class members, under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1). DPW operates five ICFs/MR and funds numerous privately-operated ICFs/MR, most of which are large institutions. DPW also arranges for and funds the provision of home and community-based mental retardation services so that people with mental retardation can live in the community with non-disabled persons.

4

14.    Defendant Estelle B. Richman is the Secretary of Public Welfare for the Commonwealth of Pennsylvania.  Defendant Richman is responsible to administer and oversee DPW.  As such, Defendant Richman is responsible to administer and oversee DPW's mental retardation programs, including state and private ICFs/MR and community-based mental retardation services.  Defendant Richman also is responsible to assure that DPW's programs and services comply with relevant federal laws, including the Americans with Disabilities Act and Rehabilitation Act.

## IV.    <u>Class Action Allegations</u>

15.    Plaintiffs Benjamin, Grogg, Edgett, Baldwin, and Beard, by and through their next friends, bring this lawsuit on behalf of themselves and all other persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

16.    The size of the class makes joinder impracticable.  Currently, there are approximately 1,272 individuals who reside in Pennsylvania's five state-operated ICFs/MR.  The geographic dispersion of these individuals, their lack of resources, and their cognitive disabilities further render individual lawsuits impracticable.

5

17.    There are questions of fact and law common to all class members, including, but not limited to: (a) whether Defendants' policies and practices effectively exclude class members from accessing the community mental retardation system; (b) whether Defendants' failure to offer and, if not opposed, provide services and supports in more integrated community settings to class members violates the integration mandates of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and (c) whether Defendants use methods of administration that have the effect of discriminating against individuals with disabilities.

18.    The claims of the named Plaintiffs are typical of those of all putative class members.

19.    The named Plaintiffs will adequately protect the interests of the class. They have no interests which conflict with other class members. Plaintiffs' counsel are experienced in litigating class actions, including enforcement of the civil rights of people with disabilities.

20.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

6

**V.    Facts**

    **A.    Plaintiffs' Unnecessary Institutionalization**

21.    Plaintiff Franklin Benjamin, a 49-year-old man with mental retardation and bipolar disorder, was admitted to Ebensburg Center in 1966 when he was six years old and where he remains institutionalized more than 40 years later.

22.    Mr. Benjamin has difficulty communicating, using a few words, signs, as well as body language and facial expressions to communicate.  Mr. Benjamin is extremely sensitive to light and noise.  The congregate, institutional nature of Ebensburg Center exacerbates Mr. Benjamin's mental health issues and undermines his capacity to benefit from treatment.

23.    Mr. Benjamin, with appropriate services and supports, can live in the community.  Ebensburg Center is not the most integrated setting appropriate to meet his needs.

24.    On information and belief, DPW's staff and agents have concluded that Mr. Benjamin is appropriate for discharge to the community, but he remains unnecessarily institutionalized.

25.    Mr. Benjamin is not opposed to discharge from Ebensburg Center.  His mother is willing to consider discharge to an appropriate community placement.

26.     Plaintiff Richard Grogg, a 45-year-old man with mental retardation, was involuntarily committed to Selinsgrove Center in 1988, more than 20 years ago. He remains involuntarily committed at Selinsgrove Center.

27.     Mr. Grogg is extremely independent and sociable. He holds a number of jobs at Selinsgrove Center and in the community and is involved in his church.

28.     Mr. Grogg is so capable of managing his own money that Defendants do not even require him to have a representative payee appointed to receive his Supplemental Security Income payments.

29.     Mr. Grogg, with appropriate services and supports, can live in the community. Selinsgrove Center is not the most integrated setting appropriate to meet his needs.

30.     On information and belief, DPW's staff and agents have concluded that Mr. Grogg is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

31.     Mr. Grogg wants to be discharged from Selinsgrove Center and live in the community closer to his mother, who supports his choice.

32.     Plaintiff Frank Edgett, a 51-year-old man with mental retardation, was involuntarily committed to Selinsgrove Center in 1987, more than 20 years ago. He remains involuntarily committed to Selinsgrove Center.

8

33.    Mr. Edgett was previously admitted to Laurelton Center, a now-closed state-operated ICF/MR, in 1973 when he was 15 years old.  He was discharged to a community residential mental retardation program in 1983.  He was admitted to Harrisburg State Hospital in 1987 and then transferred to Selinsgrove Center where he remains.

34.    Mr. Edgett is very social, engaging, and independent.  He enjoys community trips.

35.    Mr. Edgett, with appropriate services and supports, can live in the community.  Selinsgrove Center is not the most integrated setting appropriate to meet his needs.

36.    On information and belief, DPW's staff and agents have concluded that Mr. Edgett is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

37.    Mr. Edgett wants to be discharged from Selinsgrove Center and live in the community.  His sister supports his choice.

38.    Plaintiff Sylvia Baldwin, a 33-year-old woman with mental retardation, bipolar disorder, and borderline personality disorder, was originally admitted to Polk Center in 1990 when she was 14 years old.  Nearly 20 years later, Ms. Baldwin remains at Polk Center.

9

39.    Ms. Baldwin was discharged twice to residential programs in the community in 1999 and 2001, but was returned to Polk Centers after relatively short time periods due to behavioral and mental health issues.

40.    Ms. Baldwin is generally very independent at Polk Center, but she has challenging behavioral issues.  Defendants' failure to develop and implement an appropriate behavioral support plan for Ms. Baldwin led Polk Center staff to use pepper spray on her in 2008 when she exhibited aggressive behavior.

41.    Ms. Baldwin, with appropriate services and supports, can live in the community.  Polk Center is not the most integrated setting appropriate to meet her needs.

42.    On information and belief, Defendants' staff and agents have concluded that Ms. Baldwin is appropriate for discharge to the community, but she remains unnecessarily segregated in an institutional setting.

43.    Ms. Baldwin wants to be discharged from Polk Center and live in the community.  Her mother supports that choice.

44.    Plaintiff Anthony Beard, a 49-year-old man with mental retardation, was admitted to Ebensburg Center in 1967 when he was seven years old.  He remains at Ebensburg Center more than 40 years later.

45.    Mr. Beard is blind and has significant bilateral hearing loss.

10

46.     Mr. Beard, with appropriate services and supports, can live in the community.  Ebensburg Center is not the most integrated setting appropriate to meet his needs.

47.     On information and belief, DPW's staff and agents have concluded that Mr. Beard is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

48.     Mr. Beard is not opposed to discharge from Ebensburg Center. Mr. Beard's mother is no longer able to travel from her home in York County to Ebensburg Center to visit Mr. Beard.  She wants him to be discharged to a community placement closer to York County.

**B.      Pennsylvania's Mental Retardation System**

49.     The Mental Health and Mental Retardation Act of 1966 (MH/MR Act), 50 P.S. §§ 4101-4704, requires DPW "[t]o assure within the State the availability and equitable provision of adequate ... mental retardation services for all persons who need them ...."  50 P.S. § 4201(1).

50.     The MH/MR Act requires DPW to operate any state facilities and to provide at least 90 percent of the funding for community-based mental retardation services.  50 P.S. §§ 4202(a), 4509(1).

11

JA85

51.     The MH/MR Act also requires the establishment of county mental health and mental retardation programs that are responsible to administer community-based mental retardation programs.  50 P.S. § 4301.  The county mental health and mental retardation programs act as the agents of DPW to conduct intake to assess service needs, to develop community services, and to arrange for funding for those services for individuals with mental retardation.

52.     DPW implements its responsibility to provide mental retardation services to Pennsylvanians who need them in the following ways:  (a) it directly operates five intermediate care facilities for persons with mental retardation (ICFs/MR); (b) it funds services in numerous privately-operated ICFs/MR; and (c) it funds the provision of community-based mental retardation services administered through its agents, the county mental health and mental retardation programs.

53.     An ICF/MR is a type of licensed facility that is funded through the joint federal-state Medical Assistance program.

a.     All ICFs/MR – whether private or state-operated -- must comply with detailed criteria established by federal regulations.  42 C.F.R. Pt. 483, Subpt. I.

b.     As a Medical Assistance service, the federal government provides a funding match for the costs of ICF/MR services in Pennsylvania.  With adjustments under the American Recovery and Reinvestment Act of 2009, the federal funding

match for Fiscal Year 2009 (October 1, 2008 to September 30, 2009) is approximately 63.1 percent.

54.    DPW directly operates five ICFs/MR (which are also called "state centers"). These state-operated ICFs/MR are: (1) Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in Berks County; (3) Polk Center, located in Venango County; (4) Selinsgrove Center, located in Snyder County; and (5) White Haven Center, located in Luzerne County.

55.    As of July 2008, the five state-operated ICFs/MR housed a total of 1,272 individuals, ranging from 129 at Hamburg Center to 347 at Selinsgrove Center.

56.    Between July 1, 2007 and May 30, 2009, 23 residents of state-operated ICFs/MR were discharged to community services, and five residents were admitted to those facilities. During that same time period, 76 residents died.

57.    All of the state-operated ICFs/MR operate at significantly less than full capacity, with Hamburg operating at a little more than 50 percent capacity.

58.    The Commonwealth's allocation to fund services at the five state-operated ICFs/MR for Pennsylvania's Fiscal Year 2008-2009 (July 1, 2008 to June 30, 2009) is nearly $290 million, an average annual cost of nearly $228,000 to provide services to each of the 1,272 residents.

59.     The Governor's proposed budget for FY 2009-2010 will increase the allocation to fund services at the five state-operated ICFs/MR to approximately $303 million, an increase of nearly 4.5 percent.  With the projection that the number of individuals at the state-operated ICFs/MR will decrease to approximately 1,240 persons (primarily due to deaths), the average annual per capita cost to serve an individual in one of those facilities will increase to more than $244,000.

60.     DPW funds an array of home and community-based services for persons with mental retardation.  The Medical Assistance program provides nearly 90 percent of the funding for these services through home and community-based services (HCBS) waivers, including the Consolidated Waiver, approved by the federal government pursuant to 42 U.S.C. § 1396n(c).

a.     HCBS waivers allow states to include in their state plans as "Medical Assistance" home or community-based services for individuals who, without such care, would require institutionalization in an intermediate care facility for persons with mental retardation, nursing facility, or similar institution.  42 U.S.C. § 1396n(c).

b.     Pursuant to HCBS waivers, states can provide an array of services, including services that cannot be funded as mandatory or optional services under

14

Title XIX, such as habilitation services, vocational services, and respite services for persons with mental retardation.  42 U.S.C. § 1396n(c)(4)(B); 42 C.F.R. § 440.180.

      c.     The purpose of Title XIX's HCBS waivers is to encourage states to provide services to assist individuals with disabilities to avoid institutionalization. 42 U.S.C. § 441.300.  As long as community-based services vis-a-vis institutional services are cost-neutral, *see* 42 U.S.C. § 1396n(c)(2)(D), the preference is to provide services in the community.

      d.     The Consolidated Waiver, established in 1986, is the largest HCBS Waiver in the Commonwealth, both in terms of the number of individuals served and expenditures.  Approximately 15,000 Pennsylvanians receive services under the Consolidated Waiver.  The Consolidated Waiver is the primary funding source for community-based mental retardation services in Pennsylvania.  The Consolidated Waiver offers a broad range of community-based mental retardation services, depending on the participant's needs, including: residential habilitation; home and community-based habilitation; day habilitation; vocational services; environmental accessibility adaptations; and transportation.  For individuals who participate in the Consolidated Waiver, there is no monetary cap on services. Participants are entitled to receive any services they need that are available under the Waiver.

15

e.    Consolidated Waiver services are Medical Assistance services and, as such, the federal government provides a funding match for those services. Currently, the federal match is 63.1 percent.

61.    The average annual cost of community-based residential services for an individual with mental retardation in Fiscal Year 2008-2009 is approximately $80,200. The average annual cost of non-residential community-based services and supports for an individual with mental retardation in Fiscal Year 2008-2009 is approximately $15,300. Accordingly, the average annual cost of community-based services for a person with mental retardation who receives residential and non-residential supports is less than $100,000 -- less than one-half of the cost of comparable services in a state-operated ICF/MR.

62.    There is a waiting list for community-based mental retardation services in Pennsylvania. Defendants divide individuals on the waiting list into three categories: "emergency" (i.e., those who need services immediately); "critical" (i.e., those who need services within two years); and "planning" (i.e., those who are anticipated to need services more than two but less than five years away).

63.    Defendants require their agents to complete Prioritization of Urgency of Need for Services (PUNS) forms for each individual with mental retardation who

16

JA90

applies for community mental retardation services and is not fully served, including individuals who reside in the state-operated ICFs/MR.

64.    Although Defendants require Supports Coordinators (i.e., case managers) to be provided to all individuals in the state-operated ICFs/MR, the Supports Coordinators who serve clients in those institutions have a much higher caseload (*i.e.*, many more clients) than Supports Coordinators who serve individuals who live in the community since DPW does not pay for supports coordination services provided to residents of the state-operated ICFs/MR.  The low ratio, combined with the distance between many Supports Coordinators and the clients living in isolated state-operated ICFs/MR, undermine the ability of Supports Coordinators to provide effective services to clients in those facilities.

## C.    Defendants' Failure to Offer Community Alternatives to State-Operated ICF/MR Residents

65.    All persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings.

66.    State-operated ICFs/MR are not the most integrated settings appropriate to the needs of any individual resident of those facilities.

67.    The Commonwealth has embraced the principle of "normalization which defines the right of the individual with mental retardation to live a life which is as

17

close as possible in all aspects to the life which any member of the community might choose." 55 Pa. Code § 64001.1.

68.    Both the Secretary of Public Welfare, Defendant Richman, and the Deputy Secretary for the Office of Developmental Programs, Kevin Casey, do not dispute that people with mental retardation can reside in the community with appropriate community-based services and supports.

69.    Many residents of state-operated ICFs/MR and their families are not opposed to discharge to the community as long as appropriate supports and services are in place.

70.    Some residents of state-operated ICFs/MR or their families who might currently be opposed to discharge to the community may not be familiar with the types of community services and supports that could be provided and, if they were provided with information and education about such services and supports, they might not be opposed to discharge.

71.    Many residents who had lived for many years in now-closed state-operated ICFs/MR and who were discharged to community-based placements despite initial opposition by them or their families now are satisfied with the community services and supports they receive.

72.    Despite the fact that the named Plaintiffs and other state-operated ICF/MR residents are appropriate for and not opposed to discharge to the community with appropriate supports and services, Defendants have failed to offer them appropriate community alternatives.

73.    Although Defendants have required PUNS forms to be completed for the named Plaintiffs and putative class members, they either are not on the waiting lists for services or are unlikely to be removed from the waiting lists despite their categorization of need.

a.    Defendants' agents have never prepared a PUNS for Plaintiff Benjamin because they do not consider him to be on the waiting list for community services.

b.    In July 2007, Defendants' agents prepared a PUNS for Plaintiff Grogg that removed him from the waiting list because "all [of his] needs [are] being met" and he has no need for community services and supports, even though he is extremely independent and capable of living in the community with appropriate services and supports.   On information and belief, Defendants' agents do not currently consider Mr. Grogg to be in need of community services and has not made and will not make any efforts to offer or develop community alternatives to meet his needs.

19

c.    Defendants' agents did not complete PUNS forms for Plaintiff Edgett until 2008, at which time Defendants' agents identified his waiting list status as "planning."  Given his status as an individual who is unnecessarily institution-alized, Plaintiff Edgett should have been placed on the "emergency" waiting list. Moreover, individuals who are in the "planning" group, such as Plaintiff Edgett, are not likely to be removed from the waiting list within five years given the number of individuals on the emergency and critical waiting lists.

d.    Defendants' agents completed a PUNS form for Plaintiff Baldwin in September 2008 that identified her waiting list status as "critical," and which indicates that community residential and other supports were first requested for Ms. Baldwin in December 2003.

e.    Defendants' agents completed a PUNS form for Plaintiff Beard in May 2008 that identified his waiting list status as "emergency," and that indicates that community services and supports were first requested for Mr. Beard in March 2006.

f.    State-operated ICF/MR residents who are on the emergency or critical waiting lists, such as Mr. Beard and Ms. Baldwin, are unlikely to receive services within two years since Defendants' agents give priority to persons living in

the community who are on the emergency and critical waiting lists over those who are institutionalized.

74.    In at least the past five fiscal years, DPW has sought and received from the General Assembly funding for initiatives to provide community-based services for individuals with mental retardation who are on the waiting list for community services, including:  more than 3,400 individuals in FY 2007-2008 and more than 1,300 individuals in FY 2008-2009.  DPW has requested funding for FY 2009-2010 to provide community-based services to nearly 800 persons on the waiting list.

75.    On information and belief, more than 1,000 of the approximately 5,500 persons who have received or will receive funding for community services under the waiting list initiatives between FY 2007-2008 and FY 2009-2010 will receive, *inter alia*, residential services and supports.

76.    Only about 23 residents of state-operated ICFs/MR have been provided with community-based services and supports through the waiting list initiatives since the beginning of Fiscal Year 2007-2008.

77.    The costs to Defendants of providing Plaintiffs and putative class members with appropriate, community-based services, including residential services, would be less than 50 percent of the average costs Defendants currently pay to provide them with services in the state-operated ICFs/MR.

78.    The costs to Defendants of providing community alternatives to state-operated ICF/MR residents could be further reduced if they implemented the "Money Follows the Person" (MFP) Rebalancing Demonstration Project.   Under this Project, the federal government authorized Pennsylvania to receive an enhanced federal match of approximately 77 percent to provide community alternatives to 87 residents of state-operated ICFs/MR (30 in calendar year 2009 and 57 in calendar year 2010). Such an increased match would defray the costs involved in transitioning people from institutional to community services (including the costs of funding, for a short period of time, both institutional and community services for the individuals). Defendants, however, have not implemented and have no plans to implement this initiative for state-operated ICF/MR residents at this time.

79.    DPW does not have an integration plan -- with specific time lines and discharge benchmarks -- to develop community alternatives for residents of state-operated ICFs/MR.

80.    DPW does not have a waiting list to provide community alternatives to residents of state-operated ICFs/MR that moves at a reasonable pace.

**D.    Irreparable Harm**

81.    Plaintiffs and putative class members have suffered irreparable harm as a result of the Defendants' actions and inactions in this case.

**VI.**  **Claims**

    **A.**  **Violation of Title II of the Americans with Disabilities Act**

82.    Paragraphs 1 through 87 are incorporated by reference.  This Count is brought solely against Defendant Richman in her official capacity for acts and omissions under state law.

83.    Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking.  As such, they are persons with disabilities protected by the Americans with Disabilities Act (ADA).  42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

84.    Plaintiffs and putative class members are eligible for community-based mental retardation services and, as such, are qualified persons with disabilities.  42 U.S.C. § 12131(2).

85.    DPW, operated and administered by Defendant Richman, is a public entity subject to the requirements of Title II of the ADA.  42 U.S.C. § 12131(1)(B).

86.    Defendant Richman violates Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d), by unnecessarily segregating Plaintiffs and putative class members in institutions, by failing to offer them mental retardation services in the community, which is the most integrated setting appropriate to meet their needs, and

by failing to provide such services to Plaintiffs and those putative class members who are not opposed to discharge.

87. Defendant Richman violates Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3), by using methods of administration that subject Plaintiffs and putative class members to discrimination through continued unnecessary segregation and institutionalization, including, but not limited to:

a. failing to effectively assess all state-operated ICF/MR residents to determine what community supports and services they need;

b. allowing DPW's agents to completely remove state-operated ICF/MR residents from the waiting list for community mental retardation services, to improperly place them on the "planning" waiting list, and/or not to treat even those on the "emergency" waiting list as priorities;

c. not assuring that Plaintiffs and putative class members have access to effective Supports Coordination services to assist them in securing appropriate community services;

d. failing to provide ICF/MR residents and their families with adequate information about the community placements to enable them to make an informed choice if and when they are offered community services; and

24

e.    failing to have a plan with specific and concrete benchmarks and timelines within which state-operated ICF/MR residents and their families will be offered and, if accepted, provided with community alternatives so that there is a waiting list that moves at a reasonable pace.

### B.    Violation of Section 504 of the Rehabilitation Act

88.    Paragraphs 1 through 93 are incorporated by reference. This Count is brought solely against Defendant DPW.

89.    Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking. As such, they are persons with disabilities protected by Section 504 of the Rehabilitation Act. 29 U.S.C. § 705(20)(B).

90.    Plaintiffs and putative class members are eligible for community-based mental retardation services and, as such, are qualified persons with disabilities pursuant to Section 504 of the Rehabilitation Act.

91.    DPW is a recipient of federal financial assistance and, as such, is subject to the requirements of Section 504 of the RA. 29 U.S.C. § 794(b).

92.    Defendant DPW violates Section 504 of the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d), by unnecessarily segregating Plaintiffs and putative class members

25

in institutions, by failing to offer them mental retardation services in the community, which is the most integrated setting appropriate to meet their needs, and by failing to provide such services to Plaintiffs and those putative class members who are not opposed to discharge.

93.     Defendant DPW violates Section 504 of the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(3), by using methods of administration that subject Plaintiffs and putative class members to discrimination through continued unnecessary institution-alization, including, but not limited to:

a.     failing to effectively assess all state-operated ICF/MR residents to determine what community supports and services they need;

b.     allowing its agents to completely remove state-operated ICF/MR residents from the waiting list for community mental retardation services, to improperly place them on the "planning" waiting list, and/or not to treat even those on the "emergency" waiting list as priorities;

c.     not assuring that Plaintiffs and putative class members have access to effective Supports Coordination services to assist them in securing appropriate community services;

d.    failing to provide ICF/MR residents and their families with adequate information about the community placements to enable them to make an informed choice if and when they are offered community services; and

e.    failing to have a plan with specific and concrete benchmarks and timelines within which state-operated ICF/MR residents and their families will be offered and, if accepted, provided with community alternatives so that there is a waiting list that moves at a reasonable pace.

## VII.    Relief

94.    Plaintiffs respectfully request that the Court award the following relief:

a.    exercise jurisdiction over this action;

b.    certify this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

c.    issue appropriate declaratory relief and injunctive relief; and

d.    grant such other relief as may be appropriate, including awarding reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §§ 1988, 12205 and 29 U.S.C. § 794a(b).

Respectfully submitted,

Dated:  July 14, 2009    By:    /s/ Robert W. Meek
                                Robert W. Meek
                                PA 27870
                                Mark J. Murphy
                                PA 38564
                                Disability Rights Network of PA
                                1315 Walnut Street, Suite 400
                                Philadelphia, PA  19107-4798
                                (215) 238-8070
                                (215) 772-3126 (fax)
                                RMeek@drnpa.org


                         By:    /s/ Stephen F. Gold
                                Stephen F. Gold
                                PA 09880
                                125 South Ninth Street, Suite 700
                                Philadelphia, PA  19107
                                (215) 627-7100
                                (215) 627-3183 (fax)
                                stevegoldada@cs.com

                                Counsel for Plaintiffs

28

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : |  |
| Plaintiffs, | : : |  |
| v. | : : | Civil Action No. 1:09-cv-1182-JEJ |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare for the Commonwealth of Pennsylvania, | : : : : : : : | Class Action  (Judge Jones) |
| Defendants. | : : |  |

_____:

## **UNOPPOSED MOTION FOR CLASS CERTIFICATION**

Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs, through their next friends and counsel, submit this Unopposed Motion for Class Certification.  Plaintiffs respectfully request the Court to certify the case to proceed on behalf of the following class:

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care

facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

In support of this Motion, Plaintiffs submit the accompanying Brief and Exhibits (including a Certificate of Concurrence (Exhibit A)), which are incorporated by reference in this Motion.

Respectfully submitted,

Dated:  August 31, 2009          By:    /s/ Robert W. Meek
                                        Robert W. Meek
                                        PA 27870 -- ECF User
                                        Mark J. Murphy
                                        PA 38564 -- ECF User
                                        Robin Resnick
                                        PA 46980 -- ECF User
                                        Disability Rights Network of PA
                                        1315 Walnut Street, Suite 400
                                        Philadelphia, PA  19107-4798
                                        (215) 238-8070
                                        (215) 772-3126 (fax)
                                        RMeek@drnpa.org

                                        Stephen F. Gold
                                        PA 09880 -- ECF User
                                        125 South 9th Street, Suite 700
                                        Philadelphia, PA  19107
                                        215-627-7100
                                        215-627-3183 (fax)
                                        stevegoldada@cs.com

                                        Counsel for Plaintiffs

2

JA104

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | :    Civil Action No. 1:09-cv-1182-JEJ <br> : |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare for the Commonwealth of Pennsylvania, | : <br> :    Class Action <br> : <br> :    (Judge Jones) <br> : <br> : <br> : |
| Defendants. | : <br> : |

## CERTIFICATE OF CONCURRENCE

Pursuant to Local Rule 7.1, I certify as follows based on personal knowledge:

1.    I am co-counsel for Plaintiffs in this lawsuit.

2.    In response to Plaintiffs' request for Defendants' concurrence in

Plaintiffs' Motion for Class Certification, Defendants' counsel, Allen C. Warshaw,

Esquire and Howard Ulan, Esquire, asked to review Plaintiffs' draft Motion. Plaintiffs' counsel forwarded to Defendants' counsel the draft Motion as well as the draft Brief in support of the Motion and proposed Order.

3.    By e-mail dated August 28, 2009, Howard Ulan, Esquire informed me that Defendants concur in Plaintiffs' Motion for Class Certification.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this 28th day of August, 2009.

/s/ Robert W. Meek
Robert W. Meek

2

JA106

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, by and through          :
his next friend, Andreé Yock; RICHARD      :
GROGG and FRANK EDGETT, by and             :
through their next friend, Joyce McCarthy; :
SYLVIA BALDWIN, by and through her         :
next friend, Shirl Meyers; ANTHONY         :
BEARD, by and through his next friend,     :
Nicole Turman, on behalf of themselves     :
and all others similarly situated,         :
                                           :
          Plaintiffs,              :
                                           :
          v.                       :    Civil Action No. 1:09-cv-1182-JEJ
                                           :
DEPARTMENT OF PUBLIC WELFARE               :
OF THE COMMONWEALTH OF                     :    Class Action
PENNSYLVANIA and                           :
ESTELLE B. RICHMAN, in her official        :    (Judge Jones)
capacity as Secretary of Public Welfare    :
for the Commonwealth of Pennsylvania,      :
                                           :
          Defendants.              :
                                           :

## DECLARATION OF ROBERT W. MEEK

     I, Robert W. Meek, hereby declare as follows based on personal knowledge:

     1.    I am the Managing Attorney for the Disability Rights Network of

Pennsylvania (DRN) and serve as lead counsel for the Plaintiffs in this lawsuit.

     2.    I have more than 30 years experience as a public interest attorney,

including more than 18 years working with the Disability Rights Network of

Pennsylvania (formerly the Disabilities Law Project). I have expertise in class action and civil rights litigation on behalf of individuals with disabilities. Among the cases in which I have represented classes of individuals with disabilities are the following: (a) *Frederick L. v. Dep't of Public Welfare*, Civil Action No. 00-4510 (E.D. Pa. Nov. 21, 2001) (ADA lawsuit to secure community services for state hospital residents); (b) *Kathleen S. v. Dep't of Public Welfare*, Civil Action No. 97-6610, 1998 WL 83973 at *3 (E.D. Pa. Feb. 25, 1998) (Exh.H) (ADA lawsuit to secure community services for state hospital residents); (c) *Kerrigan v. Phila. Bd. of Elec.*, 248 F.R.D. 470, 477 (E.D. Pa. 2008) (ADA lawsuit to challenge inaccessibility of polling places); (d) *Austin v. Dep't of Corrections*, 876 F. Supp. 1435, 1444 (E.D. Pa. 1995) (lawsuit challenging failure to provide mental health treatment to inmates of state correctional institutions in accordance with constitutional standards); and (e) *Ruth L. v. Snider*, Civil Action No. 90-5564 (E.D. Pa.) (lawsuit to challenge confinement of people with mental retardation in state psychiatric hospitals). A copy of my resume is submitted as Attachment 1 to this Declaration.

3.       Mark J. Murphy, DRN's Legal Director, and Robin Resnick, a DRN staff attorney, also will participate in the litigation of this action. Mr. Murphy has approximately 26 years of experience, including 22 years as an attorney with DRN. Ms. Resnick has approximately 23 years of experience, including 16 years as an

2

attorney with DRN.   Copies of Mr. Murphy's and Ms. Resnick's resumes are submitted as, respectively, Attachments 2 and 3 to this Declaration.

4.    Stephen F. Gold, who will co-counsel this case with DRN, has been a civil rights attorney for 40 years.  Mr. Gold has extensive experience representing people with disabilities in federal litigation, including class action lawsuits.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of August, 2009.


/s/ Robert W. Meek
Robert W. Meek

3

JA109

## ROBERT W. MEEK

Member of New Jersey and Pennsylvania Bars

## EMPLOYMENT

**Disability Rights Network of Pennsylvania**
**(formerly Disabilities Law Project)**
**1315 Walnut Street, Suite 400**
**Philadelphia, PA 19107-4798**

9/93 - Present Managing Attorney
Litigation of civil rights actions on behalf of persons with disabilities, lobbying
regarding legislation and regulations affecting persons with disabilities, intake,
community education and supervision of staff attorneys, law students, and other
staff. Performing payroll and other administrative duties.

9/90 - 8/93 Senior Attorney
Litigation of civil rights actions on behalf of persons with disabilities, lobbying
regarding legislation and regulations affecting persons with disabilities, intake,
community education and supervision of law students.

**Department of the Public Advocate, Trenton, NJ**

12/88 - 8/90 Supervising Attorney
Supervision of staff attorneys and lay advocates in representation of clients with
developmental disabilities on issues of appropriate treatment and protection of
civil rights; litigation of major cases as well as routine case work.

3/88 - 12/88 Assistant to the Commissioner
Litigation of independent projects and participation in litigation projects with the
various divisions within the department.

**Legal Aid Society of Mercer County, Trenton, NJ**

3/80 - 3/88 Senior Staff Attorney
Litigated both large-scale and routine cases on behalf of economically
disadvantaged clients on entitlement issues; participated in state-wide litigation in
cooperation with other legal services attorneys; conducted training as part of
state-wide team; represented indigents accused of non-indictable offenses in
Trenton Municipal Court (1980-1986).

**Northern Pennsylvania Legal Services, Inc., Scranton, PA**

9/78 - 3/80 Staff Attorney
Litigated housing and consumer cases on behalf of economically-disadvantaged

Attachment 1

JA110

clients; co-counseled several Section 1983 cases.

## EDUCATION

Villanova University School of Law
Villanova, PA 19085
Degree: J.D., May, 1978

University of Pennsylvania
Philadelphia, PA 19139
Degree: MA, International Relations, May 1975

United States Naval Academy
Annapolis, MD 21412
Degree: B.S., June, 1971
Major: Foreign Affairs

## PUBLICATIONS

Meek, R., "Zoning and the Fair Housing Amendments Act: Federal Law Protection for People with Mental Retardation Against Illegal Government Practices," May 1992.

Murphy, M; Resnick, R; Shane, I; and Meek, R., "Fair Housing for People with Disabilities: Zoning and Reasonable Accommodations," September 1993, updated November 1995.

Meek, R. "The Fair Housing Act - Fighting Discrimination Against People With Disabilities," Paper presented at the 9th Annual Conference of the American Association of Spinal Cord Injury Psychologists and Social Workers, Las Vegas, Nevada, September 5-7, 1995.

Meek, R., "Municipalities Must be Wary of the Pitfalls of Zoning Restrictions Against Group Living Arrangements for Persons With Disabilities," Pennsylvania Bar Association/Municipal Law Section Newsletter, Winter 1995-96.

**Significant Cases:**

Austin v. Department of Corrections, 876 F.Supp. 1437 (E.D. Pa. 1995). This class action was filed by the National Prison Project of the ACLU, the Pennsylvania ACLF and David Rudovsky, Esquire, on behalf of all prisoners in thirteen of Pennsylvania's state correctional institutions. The lawsuit alleged across-the-board constitutional violations, including failure to meet constitutional standards for mental health care. A comprehensive settlement agreement was entered and then approved by the Court in January 1995. The parties agreed that Plaintiffs would monitor implementation of the settlement agreement. Plaintiffs will receive quarterly reports as part of monitoring for three years.

2

Judy B. v. Borough of Tioga, 889 F.Supp. 792 (M.D. Pa. 1995). This case, filed under the Fair Housing Act, challenged Tioga's denial of the necessary permits to allow the creation of a single room occupancy facility for persons with mental illness and recovering substance abusers. Tioga agreed to a settlement after the court issued a preliminary injunction to require them to issue the necessary permits. The settlement grants all the relief afforded by the injunction and also bars defendants from interfering with the project.

Betz v. Snider, Civil Action No. 92-7363 (E.D. Pa.). This case was filed on behalf of a young man with autism confined at a state mental hospital challenging his confinement on substantive due process grounds. The case was settled with the state providing the plaintiff with a community-based residentla1 program. It led to an agreement with the state to identify all persons with autism/pervasive developmental disorders confined in state mental hospitals and to fund community-based residential services for them. In all, 27 such individuals were identified and funding was provided for community services for them.

Burke v. West Penn Township, Civil Action No. 3:OO-CV-0368 (M.D. Pa.). This Fair Housing Act Case ("FHA") lawsuit, which challenged the township's use of its zoning laws to bar the operation of a small group home for persons with mental retardation in a residential neighborhood, was successfully settled.

Dingess v. Super Fresh Food Markets, Inc., Civil Action No. 93-5492, (E.D. Pa). Title 111, ADA case involving architectural barriers (metal shopping cart corral) at a Philadelphia grocery store that impeded access to the store. Court-approved settlement requiring modifications to cart corral, electronic self-opening gate, accessible path of travel, three designated parking spaces, surveillance camera and buzzer/speaker system.

Dorohovech, et al. v. Department of Public Welfare, Civil Action No. 3:07-2014-TIV (M.D. Pa.) This lawsuit challenged the Department of Public Welfare's termination of Consolidated Waiver benefits to approximately 77 individuals with mental retardation based upon their residence in a personal care home as a result of an amendment to the Consolidated Waiver approved by CMS. After DPW failed to reinstate these individuals, this class action lawsuit was filed alleging violations of the Due Process Clause of the Fourteenth Amendment, Title XIX of the Social Security Act, Title II of the ADA and Section 504 of the Rehabilitation Act. The parties entered a private settlement agreement in early 2008 to establish a process to interview all class members and make determinations of whether each should be reinstated on the Consolidated Waiver or whether their needs could be met on the Person/Family Driven Supports Waiver (which is capped at $22,225 per year). Putative class members were to be reinstated on the Consolidated Waiver if they so desired. Some class members who did not wish to be reinstated because it would require a change in residence were determined to have needs that would not be met by the PFDS Waiver and they were/will be reinstated. Others who did not wish to change residences remained on the PFDS Waiver. The case will be dismissed by June 30, 2009.

3

<u>Frederick L. v. Department of Public Welfare</u> (E.D. Pa. and 3d Cir.)  This lawsuit challenged DPW's failure to provide community services to Norristown State Hospital residents who are unnecessary institutionalized.  The Third Circuit reversed the district court's entry of judgment in favor of DPW, concluding that the "gross injustice" of unnecessary institutionalization had to be addressed by a commitment by DPW to action in a manner for which it can be held accountable by the court.  The court directed DPW to develop "a viable integration plan" that, at minimum, specifies "the time-frame or target date for patient discharge, the approximate number of patients to be discharged each time period, the eligibility for discharge, and a general description of the collaboration required between the local authorities and the housing, transportation, care, and education agencies to effectuate integration into the community."  In January 2006, DPW informed the district court that it would not seek review by the Supreme Court.  At the end of February, the court held a status conference and subsequently issued an order that requires DPW to submit a viable integration plan for NSH by April 17, 2006.  DPW submitted a viable integration plan and the case was dismissed.

<u>Hardin v. SEPTA</u>, Civil Action No. 91-7434 (ED. Pa.).  This case was filed by Community Legal Service ("CLS") in 1991 on behalf of individuals who have visual impairments against the Southeastern Pennsylvania Transportation Authority ("SEPTA"), alleging that SEPTA violated the ADA and Section 504 of the Rehabilitation Act by failing to announce stops to accommodate plaintiffs' disabilities and to provide route schedules and other information in accessible formats.  CIS and SEPTA negotiated a settlement agreement in 1992.  Under the terms of the agreement, SEPTA agreed that its drivers would announce most stops and would provide schedules in accessible formats.  In 1994, DLP became involved and moved to enforce the consent decree via a contempt motion.  The Court did not grant the motion but required SEPTA to report monthly to the Court and Plaintiffs regarding its compliance with the decree.

<u>Hernandez v. Snider</u>, No. 0148 M.D. 1994 (Pa Comm. Ct.).  This case was filed on behalf of, inter alia, the Mental Health Association of Southeastern Pennsylvania to challenge DPW's issuance of a Request for Proposal for Healthchoices, a mandatory managed care plan for Medical Assistance recipients in southeastern Pennsylvania.  The lawsuit alleged that Healthchoices violated the Pennsylvania Mental Health and Mental Retardation Act of 1966 by improperly delegating to private, for-profit managed care organizations the responsibilities and duties of county mental health offices to coordinate and deliver mental health services.  The case was placed on hold after DPW decided to issue a new RFP.

<u>Kathleen S. v. Department of Public Welfare</u>, 10 F. Supp. 2d 460 (E.D. Pa 1998), app. dismissed. This class action lawsuit alleged that DPW violated the ADA's integration mandate by failing to provide residents of Haverford State Hospital with community services and by using discriminatory methods of administration that resulted in their continued unnecessary institutionalization.  Following trial, the district court granted judgment in favor of plaintiffs and awarded them all requested relief.  Following an

4

appeal, the parties entered into a settlement to resolve the lawsuit along much the same as the relief awarded by the district court.

Lakits v. East Penn School District, Civil Action No. 95-1670 (E.D. Pa.). This case was filed on behalf of a 16 year old boy with spina bifida who uses a wheelchair and who challenged the school district's failure to make the high school stadium accessible under the Americans with Disabilities Act. The case was settled by entry of a consent decree which set out specific design requirements under ADAAG.

Lind v. Snider, Civil Action No. 94-4840 (E.D. Pa.). This case challenged DPW's implementation of Act 49, a statute that terminated "chronically needy" status of many Pennsylvanians receiving General Assistance. The lawsuit alleged, inter alia, that DPW's notification of people with disabilities (and, in particular, those with mental disabilities) that their status would be terminated unless they took certain specified steps, violated the ADA because the form of the notice did not accommodate their disabilities. This case was settled after DPW agreed, inter alia, to identify many people whose disabilities probably would enable them to continue their eligibility and not to terminate benefits until they were given sufficient opportunity and assistance to retain their benefits.

Mental Health Ass'n of Southeastern Pennsylvania v. Borough of Darby, Civil Action No. 00-253 (E.D. Pa.). This lawsuit challenged the borough's requirement that plaintiff maintain a security guard on the premises of a social service center it operated in Darby for persons with mental Illness. The lawsuit alleged that Darby imposed the requirement because of the disabilities of the center's clients whom it considered a "nuisance" in violation of the ADA and the Fourteenth Amendment. The lawsuit was settled after mediation when Darby agreed to rescind the requirement.

Myers v. Branch Township, Civil Action No. 99-155 (E.D. Pa). This Fair Housing Act lawsuit challenged defendant's use of its zoning laws to exclude a small group home for persons with mental retardation and resulted in the entry of a permanent injunction to require the township to allow operation of the group home.

Phillip M. v. Snider, Civil Action No. 93-3474 (E.D. Pa). This case was filed on behalf of eight individuals who resided at Norristown State Hospital ("NSH"), and whose treating professionals determined that they were appropriate for community-based placement. The lawsuit alleged that their continued institutionalization violated their rights under the Due Process Clause of the Constitution and the ADA. The outcome was linked to full funding for the Community Hospital Integration Program Projects ("CHIPPS") which provide funding for the five southeastern Pennsylvania counties. The case was placed in civil suspension while funding was secured and to negotiate appropriate placements for the six plaintiffs who remained at the institution.

National Organization on Disability v. Tartaglione, Civil Action No. 01-1923 (E.D. Pa). This class action lawsuit against the City of Philadelphia was resolved by a settlement agreement that requires the City (1) to assure that at least one of its new electronic voting

5

machines in each polling place is independently usable by persons with visual disabilities, and (2) to comply with a process to increase the number of polling places that are accessible to persons with mobility disabilities. We continue to monitor implementation of a settlement in this class. The City secured approval from the Commonwealth Secretary of State to make its EVMs accessible to people with visual disabilities, and we anticipate that each polling place will have an accessible EVM by the spring 2006 elections in accordance with the agreement. Although the number of accessible polling places has increased since the settlement, progress is less than optimal. A meeting to discuss further strategies to address these issues was held with the City however, no real progress was made. A motion for specific performance of the settlement agreement was filed in late May, 2006. The case ultimately was settled.

Pennsylvania Protection & Advocacy v. Department of Public Welfare, Civil Action No. 1:00-CV-1582 (M.D. Pa.), No. 03-1461 (3d Cir.). This lawsuit was filed on behalf of residents of South Mountain Restoration Center, the only state-operated nursing facility in the Commonwealth which houses people with mental illness. The lawsuit alleges the DPW violated the ADA and Rehabilitation Act by, inter alia, failing to provide community services to residents and that DPW violated the federal Medical Assistance law by failing to provide adequate conditions, treatment, and services to residents. An appeal of the district court's entry of summary judgment for DPW is pending. The parties settled this lawsuit. Under the terms of the settlement reached in late December 2005, DPW will evaluate whether SMRC residents are appropriate for discharge to community mental health programs by the end of April 2006. A qualified DPW employee (recommended by PP&A) will be in charge of the evaluations and responsible for the final decisions. The evaluators will also assess whether any individuals who are appropriate for discharge are opposed to discharge and, if so, they will take appropriate steps to overcome such opposition. After the evaluations are completed, the parties will meet to discuss a time line for placements. The evaluations began in February 2006 and PP&A is participating in the meetings as advocates for the residents. We continue to monitor evaluations and placement of residents identified as appropriate for discharge to community-based mental health living arrangements.

Liberty Resources, Inc. v. Philadelphia Housing Authority (E.D. Pa.) -- This lawsuit (previously, Novakovich v. Philadelphia Housing Authority, alleges that the Philadelphia Housing Authority (PHA) violates Section 504 of the RA and the ADA by failing to assure that its Section 8 program is accessible and failing to provide assistance to individuals with disabilities to locate accessible units. The parties completed fact and expert discovery in December 2005. A settlement conference with a magistrate judge in January was unsuccessful. In late January 2006, we filed a motion for summary judgment. Briefing on the summary judgment motions was completed in April 2006. The parties were directed by the court to attempt to settle the case. After many months of attempting settlement with the assistance of a Magistrate Judge, the parties could not reach a settlement. Ultimately, the Court ruled in favor of PHA on summary judgment and no appeal was taken by plaintiffs.

6

Community Services Group, Inc. v. Wind Gap Municipal Services, (E.D. Pa. and 3d Cir.). This lawsuit was filed on behalf of a provider of a three-person group home for persons with mental retardation in a township in Northampton County. The lawsuit contended that the defendant discriminates on the basis of disability by imposing substantially higher water and sewer fees for residences designated by the defendant as "personal care homes" than those it imposes on other single family homes. In its April 2004 opinion, the court held that the defendant's actions violated the Fair Housing Act by imposing a discriminatory classification that had no legitimate purpose. The defendant has appealed the ruling. The Court of Appeals reversed the entry of summary judgment in our client's favor. The appellate court held that the defendant's imposition of substantially higher water and sewer fees for residences designated as "personal care homes" was not facially discriminatory, but remanded for further proceedings on the plaintiff's remaining claims. In January 2006, the defendant notified the plaintiff that it would no longer charge higher water and sewer fees for the residence and that it would refund all funds the plaintiff previously paid. The defendant then requested that the court dismiss the lawsuit as moot since all of the claims had been resolved. The plaintiff has asked the court not to dismiss the case, arguing that the case is not moot since it is conceivable that the defendant could simply reinstate the higher charges following dismissal. The court ruled in April 2006 that the case was not moot and scheduled a trial for July 2006. The defendants then filed a series of summary judgment motions seeking to have the case ruled moot based on a change in the municipal ordinance. Ultimately, the defendants modified the ordinance substantially in accord with the demands of the Plaintiff from the inception of the matter and the court ruled that the matter was then moot.

Noveretta v. Borough of Brookhaven, Civil Action No. 93-5748 (E.D. Pa). Fair Housing Amendments Act of 1988, Section 3604(9(3)(A)&(B) case alleging failure of a borough to allow a client with severe rheumatoid arthritis using a stair-glide lift to keep lift as a "reasonable modification for access" to her condominium home. Obtained a temporary restraining order enjoining Borough from interfering with client's use of lift and a subsequent settlement including attorneys' fees and costs.

Charles Q. v. Houstoun, Civil Action No. I:95-CV-0280, 1996 US. Dist. LEXIS 21671 (M.D. Pa Apr. 26, 1996). This lawsuit, filed in February 1995 on behalf of several residents of Harrisburg State Hospital ("HSH"), alleged that these residents continue to be confined in HSH despite the recommendations of professionals treating them that they could be provided with services in the community. The Court granted summary judgment in favor of two of the residents in April 1996 and judgment following trial for a third resident in January 1997.

Pennsylvania Protection & Advocacy v. Department of Public Welfare, Civil Action No. I:95-CV-01491 (M.D. Pa.). This case challenged the decision by DPW and its officials to bar PP&A staff from attending the treatment team meetings of five residents of HSH who are named plaintiffs in Charles Q., et al. v. Feather Houstoun, et al. The case was successfully resolved when DPW rescinded its decision.

7

<u>Pennsylvania Protection and Advocacy, Inc. v. Beard</u>, C.A. No. 1:06-CV-561 (M.D. Pa.).
DLP filed this lawsuit on behalf of PP&A to challenge the de facto denial by the
Department of Corrections (DOC) of access to inmates' mental health records. For
nearly a year, PP&A and DLP have been investigating DOC's discipline of inmates with
mental illness, their placement and treatment in Restrictive Housing Units (where they
are isolated 23 hours per day), and the impact of their isolation on their mental health. As
part of this investigation, PP&A requested that DOC produce specific records for inmates
who authorized PP&A to access their records. DOC was willing to produce the records
only if PP&A first paid excessive charges, including "search and retrieval" fees for each
inmate's records. DOC claimed that these charges were authorized by its policies and
Pennsylvania's Medical Records Act. PP&A offered to bring a portable copier to the
facilities and have its own staff copy the records, but DOC rejected that proposal. This
lawsuit followed, alleging that DOC violates the Protection and Advocacy for Individuals
with Mental Illness Act by effectively denying PP&A access to records. The case was
settled confidentially.

<u>Purcell v. Pennsylvania Department of Corrections</u>, Civil Action No. 95-6720, 1998 U.S.
Dist. LEXIS 105 (E.D. Pa. Jan. 9, 1998). This lawsuit alleged that defendants violated an
inmate's rights under the ADA to secure reasonable accommodations for his Tourette's
Syndrome and physical disabilities and interfered with his exercise of his rights under the
ADA. After the court denied defendant's motion to dismiss and motion for summary
judgment, the parties reached a settlement that required, <u>inter alia</u>, DOC to appoint an
ADA coordinator.

<u>Taylor v. USF-Red Star, Inc.</u>, Civil Action No. 03-2216 (E.D. Pa). This employment
discrimination case under Title I of the ADA and the PHRA alleged that plaintiff was
unlawfully denied the ability to return to work based on a false perception that he had
epilepsy and was completely unable to perform any of his former job as dockworker.
DLP and co-counsel won a substantial jury verdict in this employment discrimination
lawsuit. Following a five-day trial, the jury returned a verdict in favor of our client and
awarded him $158,000 in back pay, benefits and compensatory damages. The defendant
appealed, and the parties completed briefing last quarter. The Court of Appeals affirmed
the district court in all respects in a per curiam decision. The defendant filed a petition for
certiorari in the U.S. Supreme Court which was denied.

<u>Troy C. v. Philadelphia Housing</u> Authority (E.D. Pa.) -- DLP and private co-counsel filed
this lawsuit on behalf of a class of people with disabilities and who are in Medical
Assistance home and community-based (HCB) waiver programs to challenge PHA's
apparent failure to distribute certain Section 8 vouchers that were supposed to be targeted
to individuals with disabilities and participants in HCB waivers. The lawsuit alleges that
PHA's failure to distribute these targeted vouchers to individuals with disabilities violates
the ADA and RA. The court directed PHA to submit an affidavit concerning whether
these targeted vouchers were distributed to people with disabilities and in HCB Waivers.
The information PHA submitted suggests that, while PHA may have distributed the
vouchers to people with disabilities, it had no way to confirm that it distributed the
vouchers to people in the HCB waiver programs. As a result, we began negotiations to

8

determine if PHA could resolve the claim by distributing vouchers to people eligible for HCB waivers. In an effort to move this process forward, we provided PHA with information about HCB waiver-eligible individuals who need vouchers. PHA, however, now claims that it can show that it has distributed vouchers to HCB waiver recipients. Our information, however, suggests that those vouchers are project-based vouchers -- not the tenant-based vouchers that were at issue. A further conference with the court was conducted in mid-May. After many more status conferences with the Court, the parties entered settlement negotiations and a private settlement agreement was drafted. It awaits signatures of the defendants to be final.

United States and David B. v. City of Philadelphia, 838 F.Supp. 223 (E.D. Pa 1993) aff'd mem. 30 F.3d 1488 (3d Cir. 1994). Filed an amicus curiae brief on behalf of three organizations in the Fair Housing Amendments Act cases challenging the City's failure to grant a reasonable accommodation to allow the creation of housing for recovering substance abusers and persons with histories of mental Illness. The Court of Appeals concluded that the City violated the Act.

Florence K. v. Snider, C.A. No. 92-2743 (E.D. Pa. 1992). This action was filed on behalf of three women with mental Illness who were Edward K. class members (a class action seeking the discharge and appropriate community placement of all persons confined at Philadelphia State Hospital) under the Fair Housing Act seeking to enjoin neighbors who had obtained a state court injunction preventing the Plaintiffs from moving into the neighborhood. After a hearing and some settlement negotiations, the case was settled as the neighbors agreed not to seek enforcement of the state court injunction.

Michael R. v. Snider, C.A. No. 92-6897 (E.D. Pa., June 6, 1993). This case was filed on behalf of two individuals who were confined at Norristown State Hospital despite recommendations by treating professionals that they should be receiving services in the community. The lawsuit alleges that the state was violating the Due Process Clause of the U.S. Constitution by failing to provide plaintiffs with appropriate, community-based services. While the lawsuit sought relief for only two individuals, the case was a vehicle for mental health consumer organizations to lobby for expansion of the state's Community Hospital Integrated Program Projects ("CHIPP") for the Southeastern region of Pennsylvania which resulted in a $5.5 million expansion in FY 1993-94 which funded services for over 150 individuals with mental illness both in the state hospitals and the community. The case was settled with the discharge of both plaintiffs.

Ruth L. v. Snider, C.A. No. 90-5564 (E.D. Pa., July 7, 1992). This class action was filed on behalf of approximately 200 persons with a primary or exclusive diagnosis of mental retardation who were confined at state mental hospitals, challenging their confinement on constitutional grounds and seeking discharge to appropriate community-based settings. The case was settled in a non-enforceable agreement in which the state agreed to fund the placements of class members over a three- year period Plaintiffs continue to monitor implementation.

9

<u>Kathy L. v. County of Delaware</u>, C.A. No. 92-3298 (E.D. Pa., Feb. 3, 1993). This class action, filed on behalf of two women with mental retardation and the class they represented who had children removed from their homes by Delaware County Children and Youth ("CYS"), challenged CYS's failure to provide meaningful reunification and parenting training services in an accessible manner to meet their needs based on their disabilities under the ADA. The case was settled by a comprehensive consent decree requiring CYS to institute a system of identifying parents with mental retardation with whom it became involved and to provide such parents with appropriate services to meet their needs.

<u>Pulcinella v. Ridley Twp.</u>, 828 F.Supp. 204 (E.D. Pa. 1993), opinion vacated, 828 F.Supp. 204, 218 (E.D. Pa. 1993). This case was filed on behalf of a man with paraplegia, to challenge the township zoning board's refusal to grant a reasonable accommodation to allow him to build a single story addition on the home of his sister under the Fair Housing Act. The district court denied the plaintiffs' motion for a preliminary injunction hearing but the township granted the reasonable accommodation during pendency of an appeal by the plaintiff to the Court of Appeals and the case was settled.

<u>Peter M., et al. v. Department of Human Services</u>, Dkt. No. W-015459-89 (Superior Ct. of N.J., Law Div.1989). This class action was filed on behalf of approximately 5,000 individuals with developmental disabilities who are on waiting lists for community-based residential services, challenging the state's failure to fund appropriate placements under the New Jersey Constitution and the N.J. Developmental Disabilities Act of 1985. A preliminary injunction was filed on behalf of several of the named plaintiffs. Negotiations were underway with the state to settle the case when I changed employers.

<u>In the Matter of Eileen D.</u>, (Superior Ct. of N.J., Chancery Div., 1988.). This action was a challenge to a guardianship petition filed by the state against a person with mental illness and mental retardation who was confined at a state developmental center. The state sought to obtain guardianship in order to involuntarily medicate Ms. D. The Court ruled that Ms. D. was not incompetent after a two day trial.

10

## MARK J. MURPHY

## EMPLOYMENT

### Disability Rights Network of Pennsylvania (a merger of the Disabilities Law Project and Pennsylvania Protection & Advocacy), Pittsburgh, PA (1987-Present)

Legal Director, DRN (February 2007 to present); Executive Director, DLP (2003 to February 2007); Deputy Executive Director, DLP (1994-2003); Managing Attorney, DLP (1987-94).

Manage 10-attorney non-profit, public interest law firm representing persons with disabilities; responsible for overall administration and financial management of firm, as well as for supervising litigation and advocacy activities.

Directly supervise staff attorneys; counsel clients; develop and conduct litigation; and lecture extensively on a wide range of disability law issues, including the Americans with Disabilities Act, Fair Housing Act, rights of persons in institutions, employment discrimination, guardianship and consent, and architectural barriers.

Director, *National Community Integration Legal Backup Project* – Provide technical assistance, training, and litigation support to lawyers representing persons with disabilities in community integration, ADA, and housing matters throughout the United States. Project funded by National Association of Protection and Advocacy Systems (Washington, D.C.) (January 1996-present).

### University of Pittsburgh School of Law (1998-2003)

Adjunct Professor of Law – Taught courses on Law of Disability Discrimination and Mental Health Law

Attachment 2

**Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA (1983-1986)**

>Associate in Litigation Department – Responsible for litigation matters, including discovery, trial, and appeals, in a variety of commercial areas, including commercial, products liability, and insurance cases.

**Professional Associations**

>Philadelphia Bar Association
>>Legal Rights of People with Disabilities Committee
>Pennsylvania Bar Association
>>Legal Services to Persons with Disabilities Committee (Chair 2003-04)
>Allegheny County Bar Association

## EDUCATION

**University of Pittsburgh School of Law**

>Awarded juris doctor degree *magna cum laude* (1983).
>Note Editor and Member: University of Pittsburgh Law Review, Volumes 42 and 43.

**University of Pittsburgh**

>Awarded bachelor of arts degree *magna cum laude* in English Writing (1980).

## SELECTED LITIGATION

### American with Disabilities Act/Section 504

*Disabled in Action v. National Railroad Passenger Corp.*, Civil Action No. 05-cv-0326 (E.D. Pa.) – Co-counsel in pending action brought under Title II of the ADA to challenge Amtrak's refusal to provide reasonable accommodations to groups of wheelchair users and imposition of $200 fee related to seat removal for persons using wheelchairs.

2

***Warnes v. Giant Eagle, Inc.***, Civil Action No. 02-2132 (W.D. Pa.) – Co-counsel in employment action brought under Title I of ADA on behalf of man with Down Syndrome who was fired from grocery bagger position after eating a donut in alleged violation of store's no-theft policy. Jury verdict obtained for client, after which the parties reached a settlement on damages.

***Majocha v. Turner***, Civil Action No. 00-552 (W.D. Pa.) – Co-counsel for person who is deaf and his wife in suit against physicians and a medical practice that refused to provide a sign language interpreter for plaintiffs when they brought their 2-year-old son to defendants for an evaluation to determine if surgery would be necessary. Plaintiffs alleged that defendants' actions violated Title III of the ADA and Section 504 of the Rehabilitation Act. Settlement reached after court denied defendants' summary judgment motion. *See Majocha v. Turner*, 166 F. Supp.2d 316 (W.D. Pa. 2001).

***Lippold v. City of Pittsburgh***, Civil Action No. 97-2164 (W.D. Pa.) – Counsel for persons with physical disabilities in action brought to require City of Pittsburgh to comply with Title II of the ADA by installing curb ramps on streets that are re-paved or otherwise altered. Negotiated settlement requiring City to comply with the mandates of Title II prospectively and to install approximately 4,500 curb ramps over three-year period to meet past obligations.

***Pittsburgh Access Initiative*** – Counsel in eight suits filed against businesses with one-step or other barriers to access in the Southside section of the City of Pittsburgh alleging that such barriers violate Title III of the Americans with Disabilities Act. Six cases settled prior to trial with the defendant agreeing to remove barriers where such removal is readily achievable. Two cases remain pending.

***Hunsinger v. PNC Bank, N.A.***, Civil Action No. 99-867 (W.D. Pa.) – Counsel for two persons with visual impairments in this suit against large banking corporation and its brokerage subsidiary. Plaintiffs alleged that defendants' failure to ensure that its automated teller machines are independently usable by persons with visual impairments and to provide statements in alternative formats violates Title III of the Americans with Disabilities Act. Settlement reached under which Defendants will install ATMs with voice capabilities and insure provision of documents in alternative formats.

3

***Waters v. Mellon Bank Corp.***, Civil Action No. 99-CV-2825 (E.D. Pa.) – Similar case to *Hunsinger* filed against a second large banking corporation. Plaintiffs alleged that defendants' failure to ensure that its automated teller machines are independently usable by persons with visual impairments violates Title III of the Americans with Disabilities Act. Settlement reached under which Defendants will install ATMs with voice capabilities.

***Moore v. Widener University***, Civil Action No. 98-CV-4262 (E.D. Pa.) – Counsel for person with physical disability who was rejected for a faculty position and alleged employment discrimination under Title I of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Parties reached settlement after two days of trial.

***Walsh v. Tucker***, Civil Action No. 98-800 (W.D. Pa.) – Counsel in action brought on behalf of person with mental retardation against physician alleging that defendant refused to provide medical treatment due to plaintiff's disability. Negotiated pre-trial settlement.

***von Schmetterling v. Department of Revenue***, Civil Action No. 97-742 (E.D. Pa.) – Co-counsel in action brought against the Pennsylvania Lottery alleging violations of the ADA for failure to assure that licensees sell tickets in locations accessible to persons with disabilities. Settlement agreement reached requiring the Lottery to survey all stores receiving licenses to sell tickets since effective date of ADA (approximately 7,200 sites) and to rescind the license of any store that does not become accessible.

***Kochis v. West Mifflin School District***, Civil Action No. 96-1530 (W.D. Pa.) – Counsel for person with mental disability in employment action against school district, which required applicants to pass a written exam that did not test for skills related to job in question. Settlement reached via consent decree pursuant to which client obtained position he sought and other considerations.

***Fagan v. The Carnegie Institute***, Civil Action No. 94-1727 (W.D. Pa.) – Counsel for group of persons with physical disabilities challenging architectural and other barriers at the Carnegie Museum and Carnegie Lecture Hall in Pittsburgh. Negotiated consent decree requiring defendant to perform accessibility survey, create barrier removal implementation plan, and train staff members.

## Institutional/Community Integration Cases

***Sabree v. Richman***, Civil Action No. 02-3426 (E.D. Pa.), No. 03-1226 (3d Cir.) – Co-counsel in pending class action brought on behalf of persons with mental retardation awaiting community services alleging violations of Medicaid statute. After district court dismissed claims on the basis that Medicaid recipients cannot enforce the statute, Third Circuit reversed and held that such recipients have a private right of action to enforce right to Medicaid services and to obtain such services promptly. *See Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004). Case has returned to district court for further proceedings.

***Pennsylvania Protection & Advocacy v. Department of Public Welfare***, Civil Action No. 1:CV-00-1582 (M.D. Pa.) – Counsel for PP&A in this pending lawsuit filed to protect the rights of residents of South Mountain Restoration Center (SMRC), the only state-operated nursing facility in Pennsylvania. PP&A alleged that defendants violated Medical Assistance law, the Americans with Disabilities Act, the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment to the Constitution by failing to provide appropriate services to SMRC residents in the most integrated settling appropriate. In January 2003, the court granted defendants' motion for summary judgment. In March 2005, the Third Circuit reversed the grant of summary judgment for defendant; granted summary judgment to PP&A regarding issue of fundamental alteration; and remanded remaining issues back to district court.

***Frederick L. v. Department of Public Welfare***, Civil Action No. CV-00-4510 (E.D. Pa) – Counsel in this pending action on behalf of a class of institutionalized persons with mental illness. Suit alleged that defendants have failed to provide appropriate community-based treatment in violation of Americans with Disabilities Act and the Rehabilitation Act. District court granted judgment to defendants after bench trial. Successfully argued Third Circuit appeal, which resulted in judgment being vacated and case being remanded. After further proceedings, district court again entered judgment for defendants. Second appeal to Third Circuit now pending. *See Frederick L. v. Department of Public Welfare*, 157 F. Supp.2d 509 (E.D. Pa. 2001) (opinion denying motion to dismiss); 217 F. Supp.2d 581 (E.D. Pa. 2002) (opinion granting judgment to defendants); 364 F.3d 487 (3d Cir. 2004) (opinion vacating judgment and remanding to district court).

5

***Kathleen S. v. Department of Public Welfare***, Civil Action No. 97-6610 (E.D. Pa.) – Counsel for 240-member class of institutionalized persons with mental illness. Obtained judgment in favor of plaintiff class after five-day trial. Successfully argued to the District Court that defendants violated Title II of the ADA by failing to provide class members with appropriate mental health services in the most integrated setting appropriate to their needs and by using methods of administration that perpetuated the discriminatory effect of such segregation upon class members. *See Kathleen S. v. Houstoun*, 10 F. Supp.2d 460 (E.D. Pa. 1998). Presented two oral arguments to United States Court of Appeals for the Third Circuit, including one devoted primarily to the effect of the Supreme Court's *Olmstead v. L.C.* decision on this case. The case settled after the second oral argument with the relief obtained being substantially similar to that ordered by the District Court.

***Charles Q. v. Houstoun***, Civil Action No. 1:95-CV-0280 (M.D. Pa) – Counsel for four persons with mental illness who were residents of Harrisburg State Hospital, a state-operated psychiatric facility. Obtained summary judgment for two plaintiffs by successfully arguing that Title II of the ADA required that they be discharged to community-based placements because such placements are the most integrated setting appropriate to their treatment needs. *See Charles Q. v. Houstoun*, 1996 WL 447549 (M.D. Pa. Apr. 22, 1996). Obtained judgment in favor of a third plaintiff after trial, again successfully arguing that Title II of the ADA required defendant to provide community-based services.

***Richard C. v. Houstoun***, Civil Action No. 89-2038 (W.D. Pa.) – Counsel for 384-member class of institutionalized persons with mental retardation. Negotiated settlement agreement resulting in provision of community services for class members and an equal number of persons with mental retardation on waiting lists. Successfully represented class in challenge, including an eight-day trial, brought to reject settlement agreement and to decertify class. *See Richard C. v. Snider*, 1993 WL 757634 (W.D. Pa. June 22, 1993). Successfully argued appeal in Third Circuit filed by persons opposed to settlement agreement. *See id.*, 31 F.3d 1173 (3d Cir. 1994) (Table). Successfully litigated enforcement action against defendants, including a second argument in Third Circuit. *See Richard C. v. Houstoun*, slip op. (W.D. Pa. June 26, 1995), *aff'd mem.* 92 F.3d 1172 (3d Cir. 1996). Successfully litigated against intervention motion filed by persons opposed to settlement agreement and obtained the first district court and appellate court rulings in the country holding that the Supreme Court's landmark decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999),

JA125

does not permit family members or guardians of institutionalized persons to override a state's decision to provide community-based services. *See id.,* 196 F.R.D. 288 (W.D. Pa. 1999), *aff'd mem.,* 229 F.3d 1139 (3d Cir. 2000) (Table).

***Torisky v. Schweiker,*** Civil Action No. 02-499 (W.D. Pa.) – Counsel for Pennsylvania Protection & Advocacy, The Arc of Pennsylvania, and ARC Allegheny as intervenors in this pending case brought by *Richard C.* class members against the Department of Public Welfare and state officials. Plaintiffs in this case seek, in essence, to reverse the actions taken pursuant to the *Richard C.* settlement agreement. Represent the intervenors as part of effort to ensure that settlement agreement remains in full force and effect.

## Fair Housing Act

***Kurtz v. Center Township,*** Civil Action No. 00-1936 (W.D. Pa.) – Counsel for three men with mental retardation who challenged the refusal of Center Township and its Zoning Hearing Board to allow them to live as a family in a group home located in a residential zoning district. The suit alleged that the defendants' actions violated the Fair Housing Act, the ADA, and Section 504 of the Rehabilitation Act. Negotiated consent decree allowing plaintiffs to live in their home.

***Wise v. Chartiers Township,*** Civil Action No. 99-1601 (W.D. Pa.) – Counsel for two persons with mental retardation in this FHA case. Clients' move into a group home was opposed by the defendant based on a zoning ordinance that barred group homes from any of the residential districts in the township and required persons with disabilities to meet numerous standards and to locate only in commercial districts. Obtained consent decree requiring repeal of ordinance, and clients moved into their home.

***Francine P. v. City of Uniontown,*** Civil Action No. 97-458 (W.D. Pa.) – Counsel for four persons with mental illness and other disabilities in FHA challenge to failure of city and zoning hearing board to provide reasonable accommodation to minimum square footage requirement to allow development of transitional housing program in renovated school building. Preliminary injunction obtained requiring issuance of necessary building permits. Remaining issues in cases settled via consent decree shortly thereafter.

7

*ADAPT v. Department of Housing & Urban Development*, Civil Action No. 96-5881 (E.D. Pa) – Co-counsel in national housing litigation brought on behalf of numerous advocacy groups for persons with disabilities. Complaint asserted claims under the FHA and §504 of the Rehabilitation Act against HUD for its failure to assure that entities receiving federal funds to construct and rehabilitate housing meet requirements of accessibility regulations. District Court granted defendant's motion to dismiss, a decision then affirmed by the Third Circuit.

*Doe v. Township of Hampton*, Civil Action No. 94-811 (W.D. Pa.) – Counsel for four minors with mental illness in FHA and constitutional challenge to provision of zoning ordinance prohibiting more than three people from living together in a single-family residential district. Obtained temporary restraining order enjoining zoning enforcement action before local district magistrate that could have led to eviction of clients. Injunction entered via consent decree granting plaintiffs reasonable accommodations allowing them to remain in their home and ending discriminatory application of zoning code.

*In re Millcreek Township Zoning Ordinance No. 87-24*, 4 D. & C.4th 449 (Com. Pl. Erie 1989) – Counsel for six persons with mental retardation in this first case in the United States in which a court invalidated a zoning ordinance as violative of the rights of persons with disabilities under the Fair Housing Act.

*O'Connor v. Borough of McKees Rocks*, Civil Action No. 89-749 (W.D. Pa.); *Zimmer v. Moon Township*, Civil Action No. 89-1139 (W.D. Pa.); *Stewart v. Penn Township*, Civil Action No. 91-94 (W.D. Pa.); *Beaudoin v. Hempfield Township*, Civil Action No. 91-770 (W.D. Pa.); *Cox v. Township of Upper St. Clair*, Civil Action No. 93-1443 (W.D. Pa.); *Sandra G. v. Borough of Sharon Hill*, Civil Action No. 97-1634 (E.D. Pa.) – Successfully represented persons with disabilities in these FHA cases. In each case, injunctions were entered via consent decree allowing plaintiffs to remain in their homes and ending discriminatory enforcement and/or application of zoning codes.

## Medicaid/Managed Care

*Clark v. Houstoun*, Civil Action No. 4:CV:00-1396 (M.D. Pa.) – Co-counsel for class of Medicaid-eligible persons with disabilities challenging Pennsylvania's denial

8

of medically necessary dental services. Claims in this pending suit are brought under Title XIX of the Medicaid Act. Trial held in March 2005, and a decision is pending.

***Gross v. Houstoun***, Civil Action No. 00-260 (W.D. Pa.) – Successfully represented man with severe disabilities who required daily skilled nursing care but who was denied such services by his Medicaid HMO. As a result of this suit, Plaintiff began to receive 12 hours of skilled nursing care per day.

***Metts v. Houstoun***, Civil Action No. 97-4123 (E.D. Pa.) – Co-counsel in action filed on behalf of class of persons with disabilities in southeastern Pennsylvania receiving Medical Assistance benefits through mandatory managed care programs. Complaint alleged that Department of Public Welfare violated Title XIX of the Social Security Act and the Due Process Clause of the 14th Amendment by failing to ensure that the HMOs it contracts with provide timely and adequate notice of service terminations and reductions to class members. Settlement reached that requires defendant to take numerous steps to assure that its HMOs meet Title XIX and Due Process requirements.

***Joy W. v. Houstoun***, Civil Action No. 96-1168 (W.D. Pa.) – Counsel for three persons with severe physical disabilities who were denied attendant care services by the Department of Public Welfare in violation of Title XIX of the federal Medical Assistance statute. Shortly after the filing of the Complaint, DPW allocated funds necessary to assure services for the three plaintiffs and 50 other similarly situated persons.

## **Transportation**

***Richman v. SEPTA***, Civil Action No. 94-6497 (E.D. Pa.) – Co-counsel in pending class action filed on behalf of users of paratransit services in Philadelphia. Negotiated agreement to implement special master's recommendation that a statistically sound survey occur to enable assessment regarding whether SEPTA's on-time performance meets ADA requirements, as required by earlier consent decree in case. Continue to address enforcement issues.

9

JA128

## Miscellaneous

***Pennsylvania Protection & Advocacy v. Houstoun***, Civil Action No. 98-4180 (E.D. Pa.) – Appeal No. 99-1969 (3d Cir.) – Successfully represented Pennsylvania Protection & Advocacy in its effort to obtain peer review documents relating to the death of a patient at a state-operated psychiatric facility. The Third Circuit agreed with PP&A's claim that the federal Protection & Advocacy for Individuals with Mental Illness (PAIMI) Act gave it authority to obtain such records and rejected defendants' claim that the state peer review statute protected the requested documents from disclosure, the first appellate ruling of its type in the country. *See Pennsylvania Protection & Advocacy, Inc. v. Houstoun,* 228 F.3d 423 (3d Cir. 2000).

***In re Frederick F.***, 400 Pa. Super. 542, 583 A.2d 1248 (1990) – Counsel for dependent minor with mental retardation seeking community services rather than being institutionalized. Successfully argued before appellate court that plaintiff was entitled to receive necessary community-based services pursuant to state Juvenile Act despite being rejected for services under state Mental Health and Mental Retardation Act.

## SELECTED TRAININGS AND LECTURES

"Representing Adults with Disabilities: Discrimination Laws and Ethical Issues," sponsored by the Pennsylvania Bar Institute (November 2004, Philadelphia, PA)

"Representing Clients Who are Deaf/Hard of Hearing," sponsored by the Pennsylvania Bar Institute (October 2004, Philadelphia, PA/November 2004, Atlantic City, NJ)

"Guardianship and Consent Issues," sponsored by Liberty Resources, Inc. (October 2004, Philadelphia, PA)

"*Tennessee v. Lane* and Future Immunity Issues," sponsored by the National Association of Protection & Advocacy Systems (June 2004, Washington, D.C.)

"Access to Interpreters for Mental Health Services," sponsored by the Commonwealth of Pennsylvania Office of Mental Health and Substance Abuse Services (May 2003, Harrisburg, PA/June 2003, Hermitage, PA)

10

JA129

"Complex Community Integration Litigation," sponsored by the National Association of Protection & Advocacy Systems (May 2003, Washington, D.C. )

"Recent Supreme Court Federalism and Disability Rights Cases," sponsored by the National Association of Protection & Advocacy Systems (May 2003 & June 2004, Washington, D.C. )

"Introduction to Title I, II, and III of the ADA," sponsored by the National Association of Protection & Advocacy Systems (May 2003, Washington, D.C. )

"The New Federalism: An Update," sponsored by the National Association of Protection & Advocacy Systems (January 2003, San Diego, CA)

"Litigation Strategies in Community Integration Cases," sponsored by the National Association of Protection & Advocacy Systems (January 2003, San Diego, CA)

"The New Federalism: An Update," sponsored by the National Association of Protection & Advocacy Systems (June 2002, Washington D.C.)

"Litigating Class Action Cases," sponsored by the National Association of Protection & Advocacy Systems (June 2002, Washington D.C.)

"ADA Update 2002," sponsored by the Pennsylvania Bar Institute (February 2002, Pittsburgh, PA)

"Strategies for Preserving the Right to Attorneys' Fees After *Buckhannon*," sponsored by the National Association of Protection & Advocacy Systems (January 2002, San Diego, CA)

"Enforcing Federal Rights," sponsored by the National Association of Protection & Advocacy Systems (January 2002, San Diego, CA)

"The Interactive Process of the ADA: Navigating the Minefields," presented at the Employment Law Institute – West sponsored by the Pennsylvania Bar Institute (December 2001, Pittsburgh, PA)

11

"A Primer on Government Benefits," presented as part of a program on "Special Needs Trusts," sponsored by the Pennsylvania Bar Institute (November 2001, Pittsburgh, PA)

"Relief in Complex Injunctive Actions," a day-long seminar on litigating complex cases sponsored by the National Association of Protection & Advocacy Systems (June 2001, Washington, D.C.)

"Litigating Against the States – Life After *Garrett*," sponsored by the National Association of Protection & Advocacy Systems (June 2001, Washington, D.C.)

"Community Integration Litigation: Beyond *Olmstead*," sponsored by Protection & Advocacy, Inc. (March 2001, Sacramento, CA)

"The ADA After *Sutton*," presented at the Employment Law Institute – West sponsored by the Pennsylvania Bar Institute (December 2000, Pittsburgh, PA)

"Icing on the Case: The Law of Attorneys' Fees and Costs," a day-long seminar on the law of attorneys' fees and costs sponsored by the National Association of Protection & Advocacy Systems (June 2000, Washington, D.C.)

"Constitutional Issues and the ADA," sponsored by the National Association of Protection & Advocacy Systems (June 2000, Washington, D.C.)

"ADA for the Elderly," presented at Estate and Elder Law Symposium sponsored by Pennsylvania Bar Institute (February 2000, Pittsburgh, PA)

"Impact of the Supreme Court Ruling in *Olmstead v. L.C.*," sponsored by the National Association of Protection & Advocacy Systems (June 1999, Washington, D.C. and February 2000, Orlando, FL)

"Obtaining Community-Based Services Under the ADA Integration Mandate," presented at the 15th Annual Pacific Rim Conference on Disabilities (February 1999, Honolulu, HI)

"Current Strategies for Litigating Under the ADA Integration Mandate," sponsored by Hawaii Protection & Advocacy (February 1999, Honolulu, HI)

12

"Expanding Access to Mainstream Housing," sponsored by National Association of Protection & Advocacy Systems (May 1998, Washington, D.C.)

"Current Strategies for Litigating Under the ADA Integration Mandate" sponsored by National Association of Protection & Advocacy Systems (May 1998, Washington, D.C.)

*Opening Doors: A Fair Housing Training Project for Persons with Disabilities* – Developed curricular materials; conducted 11 intensive one-day trainings; and provided technical assistance and litigation support on fair housing issues to persons with disabilities, consumer organizations, and advocacy groups in Pennsylvania, New Jersey, Delaware, Maryland, Virginia, and the District of Columbia. Project conducted in partnership with the Judge David L. Bazelon Center for Mental Health Law (Washington, D.C.) and funded by the Department of Housing & Urban Development and private sources (October 1996-September 1997).

## PUBLICATIONS

"The Americans with Disabilities Act of 1990: A Summary and Review," 7 *Civil Rights Litigation and Attorney Fees Annual Handbook* (Clark Boardman Callaghan 1991).

"Title I of the Americans With Disabilities Act: Protecting the Rights of Individuals with Disabilities to Work," 10 *Civil Rights Litigation and Attorney Fees Annual Handbook* (Clark Boardman Callaghan 1994) (co-author with Robin Resnick).

*Fair Housing for People with Disabilities -- Zoning and Reasonable Accommodations* (DLP booklet) (co-author with Robin Resnick).

*Estate Planning for Families of Persons with Disabilities* (DLP booklet) (co-author with Robin Resnick).

*Accessible Parking for People with Disabilities* (DLP booklet) (co-author with Robin Resnick).

*Combatting Employment Discrimination through the Americans with Disabilities Act* (DLP booklet) (co-author with Robin Resnick).

13

*Residential Placement of Handicapped Children: Altering the Scope of a Public Education,* 43 U. Pitt. L. Rev. 789 (1982).

## AWARDS

John Heinz Memorial Award, presented by Three Rivers Center for Independent Living (November 1998)

Jean Isherwood Advocacy Award, presented by the Association for Retarded Citizens of Pennsylvania (June 1996).

Advocacy Award, presented by the Association for Retarded Citizens of Allegheny County (July 1995).

05/07

14

**ROBIN RESNICK**

## EMPLOYMENT

**Disability Rights Network of PA**
**1315 Walnut Street, Suite 400**
**Philadelphia, PA  19107-4798**

- Staff Attorney -- October 1993 through present; pro bono attorney February 1991 through September 1993; independent contractor -- September 1987 through March 1988 and August 1989 through February 1991

- Responsibilities:  research and write trial court and appellate briefs and internal memoranda on a variety of issues (including, inter alia, the Americans with Disabilities Act, the Fair Housing Act, constitutional and state-created rights of individuals with disabilities, access to facilities and records, non-consensual sterilization, and right to counsel in guardianship proceedings, class action and other procedural issues); draft complaints, discovery and settlement proposals; prepare grant proposals, quarterly and annual reports, statements for public hearings, and written comments on proposed regulations; analyze proposed legislation and regulations; draft and update booklets for public dissemination on the Fair Housing Act, the Americans with Disabilities Act and guardianship; coordinate litigation efforts for attorneys in the Philadelphia office

**Greenfield & Chimicles, Haverford, PA**

- Senior Attorney -- August 1992 through September 1993; independent contractor -- July 1988 through July 1992

- Responsibilities: researched and wrote trial court and appellate briefs on diverse issues (including, inter alia, federal securities law, subject matter jurisdiction, discovery, class certification, class action settlements, demand in corporate derivative actions, and preemption); co-authored articles and seminar materials on Federal Rule of Civil Procedure 9(b), disclosure of environmental issues under federal securities law, and partnership issues

**Honorable Frank A. Kaufman**
**Senior United States District Judge for the District of Maryland**

- Law Clerk -- August 1986 through August 1987

## EDUCATION

**University of Pennsylvania School of Law**

- Juris Doctor cum laude in 1986

- Honors and Activities:  Order of the Coif; P. Pemberton Morris Prize for Civil Procedure and Evidence; Moot Court Board; Appellate Advocacy teaching assistant; Public Interest Law Conference; research assistant

**University of Pennsylvania School of Arts and Sciences**

- Bachelor of Arts degree summa cum laude in 1983

## PUBLICATIONS

- Mark J. Murphy and Robin Resnick,  Title I of the Americans with Disabilities Act: Protecting the Rights of Individuals with Disabilities to Work , in 10   Civil Rights Litigation and Attorney Fees Handbook (Steven Saltzman and Barbara M. Wolvovitz, eds., 1994)

- Mark J. Murphy and Robin Resnick, Combating Employment Discrimination Through the Americans with Disabilities Act (2009)

Attachment 3

JA134

- Mark J. Murphy and Robin Resnick, <u>Discriminatory Zoning and the Fair Housing Act</u> (2007)

- Mark J. Murphy and Robin Resnick, <u>Icing on the Case: The Law of Attorneys' Fees</u> (2006)

- Mark J. Murphy and Robin Resnick, <u>Guardianship in Pennsylvania</u> (2007)

- Mark J. Murphy and Robin Resnick, <u>Estate Planning for Families of Persons with Disabilities: Lawyers' Edition</u> (2007)

## ADMISSIONS TO BAR

Pennsylvania Supreme Court -- 1986
United States District Court for the Eastern District of Pennsylvania -- 1994

2

JA135

## MAJOR LITIGATION

Anderson v. Department of Public Welfare, 1 F. Supp. 2d 456 (E.D. Pa. 1998). This class action lawsuit alleged that the DPW's implementation of a mandatory managed care program for Medical Assistance recipients in southeastern Pennsylvania violates the Americans with Disabilities Act ("ADA") by failing to assure that the physicians have accessible offices and failing to assure that necessary materials are provided in alternative formats for people with visual impairments. The district court granted partial summary judgment in favor of plaintiffs, holding that DPW violated the ADA by failing to assure adequate accessibility of providers. Subsequently, the parties entered into a settlement agreement that resolved all claims.

Bonnie S. v. Altman, 683 F. Supp. 100 (D.N.J. 1988). This case challenged the commitment of five women with developmental disabilities in a state facility. The court held that plaintiffs who had state guardians were not required to obtain the consent of those guardians to challenge their commitment. The case ultimately settled when defendants agreed to create community placements.

Brock v. City of Philadelphia, Civil Action No. 96-2145 (E.D. Pa.). This lawsuit challenged the City's failure to assure that developers to which it distributes federal funds to develop housing comply with the accessibility requirements of Section 504 of the Rehabilitation Act. The case was settled when the City agreed to undertake systemic reforms to: (1) assure future compliance with Section 504's accessibility requirements; (2) take specific steps to identify accessible housing and to link people with disabilities to that housing; and (3) double the amount of funding available for the home modification program to enable people to make accessibility modifications and remain in their own homes.

Burke v. West Penn Township, Civil Action No. 3:00-CV-0368 (M.D. Pa.). This Fair Housing Act ("FHA")") lawsuit, which challenged the township's use of its zoning laws to bar the operation of a small group home for persons with mental retardation in a residential neighborhood, was successfully settled.

Charles Q. v. Houstoun, Civil Action No. 1:95-CV-0280, 1996 U.S. Dist. LEXIS 21671 (M.D. Pa. Apr. 26, 1996). This case was filed on behalf of several residents of Harrisburg State Hospital, a state psychiatric facility, to challenge their continued unlawful confinement and the state's failure to provide them with appropriate, community-based services. The court granted summary judgment in favor of two of the residents in April 1996 and judgment following trial for a third resident in January 1997.

Commonwealth v. Miller, 888 A.2d 624 (Pa. 2005). DLP filed an amicus curiae brief on behalf of Pennsylvania Protection and Advocacy, The Arc of Pennsylvania, and other advocacy groups in this case concerning the standard to be used in assessing whether a defendant has mental retardation so as to be exempt from the capital punishment. The Pennsylvania Supreme Court accepted our arguments as to the standard to be used (i.e., the professional standards established by the American Association on Mental Retardation and American Psychiatric Association) and rejected the Commonwealth's assertion that the court's should apply a "forensic" standard.

Cox v. Township of Upper St. Clair, Civil Action No. 93-1443 (W.D. Pa.). This case presents a challenge under the Fair Housing Act to a zoning ordinance that limits the ability of people with disabilities to live in prime residential neighborhoods. The court rejected in large part a motion to dismiss, and the case was successfully settled.

Daniel B. v. White, Civil Action No. 79-4088, slip op. (E.D. Pa. Apr. 11, 1991). The court issued a preliminary injunction in this case against DPW and City of Philadelphia to provide community placements to nearly eighty Philadelphia residents with mental retardation confined in Woodhaven Center.

DeLong v. Houstoun, Civil Action No. 00-4332 (E.D. Pa.). This lawsuit, which challenge DPW's failure to fully implement a home and community-based waiver program for persons with mental retardation, was resolved when DPW amended and then fully implemented the waiver.

Dingess v. Super Fresh Food Markets, Inc., Civil Action No. 93-5492 (E.D. Pa.). This case asserting that a cart corral at a food market is an architectural barrier that violates Title III of the ADA settled when defendant agreed to re-design its entrance to improve accessibility.

Disabled in Action of Pennsylvania v. SEPTA, 539 F.3d 199 (3d Cir. 2008). The Third Circuit reversed the entry of summary judgment for SEPTA in this ADA lawsuit that challenged SEPTA's failure to assure that alterations to parts of two major Center City light rail stations were accessible to people with mobility disabilities. In a case of first impression, the appellate court held that the plaintiffs's

3

claims were not time-barred because the statute of limitations did not begin to run until the alterations were completed.

Doe v. Township of Hampton, Civil Action No. 94-0811 (W.D. Pa.). This FHA case brought on behalf of residents of a group home challenged a local zoning ordinance that prohibits more than three people from living together in a residential district. The case was successfully settled after the court granted our motion for a temporary restraining order and denied a motion to dismiss.

Donnelly v. Browdie, Civil Action No. 97-2875 (E.D. Pa.). This class action lawsuit was filed to challenge the reduction of home health services for people with disabilities by the Philadelphia Corporation for Aging and the Pennsylvania Department of Aging without notice and an opportunity to be heard due to a year-end funding shortfall. After we filed a motion for a temporary restraining order, arguing that defendants' actions violated the Due Process Clause, Defendants agreed to provide full funding and not to reduce plaintiff's and class members' services.

Dorohovech v. Dep't of Public Welfare, Civil Action No. 3:07-cv-2014 (M.D. Pa.). This lawsuit challenged DPW's unlawful termination of approximately 75 persons with mental retardation from the Consolidated Waiver when the Waiver was amended to exclude individuals who live in personal care homes. DPW did not afford the individuals written notice nor did it apprise them that they could remain in the Consolidated Waiver if they relocated to other residential options and that DPW could assist them to do so. DPW entered into a settlement that required it to offer these individuals the option to be reinstated into the Waiver and to assist them to identify and locate other residential options so that they could do so.

Frederick L. v. Dep't of Public Welfare, 364 F.3d 487 (3d Cir. 2004) and 422 F.3d 151 (3d Cir. 2005). This lawsuit challenged DPW's failure to provide community services to Norristown State Hospital (NSH) residents who are unnecessarily institutionalized. The Third Circuit reversed the district court's entry of judgment in favor of DPW, concluding that the "gross injustice" of unnecessary institutionalization had to be addressed by a commitment by DPW to action in a manner for which it can be held accountable by the court. On subsequent appeal after the district court re-entered judgment in favor of DPW, the Court of Appeals expressly held that DPW had an obligation under the ADA's and RA's integration mandate to develop a viable integration plan for NSH residents that included specific time lines and benchmarks for discharge. On remand, DPW submitted an integration plan that calls for the discharge of 210 NSH residents over four years.

Gottlieb v. American Airlines, Civil Action No. 94-4933 (E.D. Pa.). This case under the Air Carrier Access Act was settled following trial. In pre-trial litigation, the court rejected the defendant's summary judgment motion and held that punitive damages are available under the statute.

Granahan v. Dep't of Public Welfare, Civil Action No. 3:96-CV-1713 (M.D. Pa.). This case challenged the state's failure to provide a woman with Parkinson's disease with an automatic lift to enable her to leave a nursing facility and to return home to live with her family. After we filed suit, the state agreed to provide her with the necessary equipment.

Hayes v. Gross, 982 F.2d 104 (3d Cir. 1993). Securities class action brought on behalf of investors in Bell Savings. The Third Circuit reversed dismissal of lawsuit.

Helen L. v. DiDario, 46 F.3d 325 (3d Cir.), cert. denied, 516 U.S. 813 (1995). The Court of Appeals held that the state's failure to provide community attendant care services to a woman in a nursing home violated the ADA's mandate that public entities provide services in the most integrated setting appropriate to their needs.

Jones v. Dep't of Public Welfare, Civil Action No. 96-5331 (E.D. Pa.). This class action challenged the state's failure to provide in-home attendant care services to nursing home residents who were eligible for such services. The state resolved the lawsuit when it agreed to provide such services.

Kathleen S. v. Dep't of Public Welfare, 10 F. Supp. 2d 460 (E.D. Pa. 1998), app. dismissed. This class action lawsuit alleged that DPW violated the ADA's integration mandate by failing to provide residents of Haverford State Hospital with community services and by using discriminatory methods of administration that resulted in their continued unnecessary institutionalization. Following trial, the district court granted judgment in favor of plaintiffs and awarded them all requested relief. Following an appeal, the parties entered into a settlement to resolve this lawsuit along much the same lines as the relief awarded by the district court.

4

JA137

Kerrigan v. City of Philadelphia,, Civil Action No. 07-687 (E.D. Pa.), 248 F.R.D. 470, 2008 WL 250522, 2008 3562521 (E.D. Pa. 2008). This class action lawsuit challenges the defendants' failure to maximize the number of polling places accessible to individuals with mobility disabilities. The district court rejected the City's summary judgment motion, ruling in the plaintiffs' favor on questions of first impression concerning application of the ADA to polling place accessibility. Subsequently, the defendants entered into a comprehensive settlement, approved by the court in July 2009, which will provide independent, comprehensive accessibility surveys of the approximately 1,100 Philadelphia polling places and recommendations for temporary accessibility modifications or potential relocation sites  The settlement also includes a process by which the court can review any decisions by the defendants to reject the independent surveyors' recommendations.

Kinney v. Yerusalim, 812 F. Supp. 547 (E.D. Pa.), aff'd, 9 F.3d 1067 (3d Cir. 1993), cert. denied, 511 U.S. 1033 (1994). The District Court and Court of Appeals held that the City of Philadelphia violated the ADA by failing to build curb ramps when it resurfaces City streets.

Koch v. City of Philadelphia, Civil Action No. 95-4270 (E.D. Pa.). This class action lawsuit that challenged under the ADA Philadelphia's transition plan for the installation of curb cuts was successfully settled when the City agreed to adopt a new transition plan that would require installation of curb cuts on all streets for which the City is responsible by the end of 2001 and on all Center City streets by 1996.

In re Lambert, 589 A.2d 1180 (Pa. Super. Ct. 1991) (Table). The Superior Court reversed the appointment of a guardian for a man with mild mental retardation who had not been represented by counsel in the lower court.

Jumper v. Dep't of Public Welfare, Civil Action No. 4:98-CV-1252 (M.D. Pa.). This lawsuit alleges that DPW and the plaintiff's county MH/MR program violated the ADA by failing to provide her with community mental retardation services.

Liberty Resources, Inc. v. SEPTA, 155 F. Supp. 2d 242 (E.D. Pa. 2001), vacated as moot, 54 Fed. Appx. 769 (3d Cir. 2002). This lawsuit successfully challenged SEPTA's failure to comply with the ADA's paratransit requirements and resulted in a subsequent order to prohibit Septa from denying more than five trips daily for a six-month period.

Lind v. Snider, Civil Action No. 94-4840 (E.D. Pa.). This case challenged DPW's implementation of Act 49, a statute that terminated "chronically needed" status of many Pennsylvanians receiving General Assistance. The lawsuit alleged, inter alia, that DPW's notification of people with disabilities (and, in particular, those with mental disabilities) that their status would be terminated unless they took certain specified steps violated the ADA because the form of notice did not accommodate their disabilities. This case was settled after DPW agreed, inter alia, to identify many people whose disabilities probably would enable them to continue their eligibility and not to terminate their benefits until they were given sufficient opportunity and assistance to retain their benefits.

Metts v. Houstoun, Civil Action No. 97-4123 (E.D. Pa.). This class action lawsuit alleged that DPW violated Title XIX of the Social Security in its implementation of HealthChoices, the mandatory managed care program for Medical Assistance recipients in southeastern Pennsylvania. Specifically, plaintiffs contended that: (1) DPW failed to assure that the HealthChoices HMOs provided recipients with timely, written, and adequate notice when they denied services, and (2) DPW failed to assure that the HealthChoices HMOs did not deny medically necessary home health services, durable medical equipment, and medical supplies. The case was resolved by a detailed settlement agreement that requires DPW to undertake systemic reforms of the HealthChoices program.

Mental Health Ass'n of Southeastern Pennsylvania v. Borough of Darby, Civil Action No. 00-253 (E.D. Pa.). This lawsuit challenged Darby's requirement that the plaintiff maintain a security guard on the premises of a social service center it operated in Darby for persons with mental illness. The lawsuit alleged that Darby imposed the requirement because of the disabilities of the center's clients because it considered them a "nuisance" in violation of the ADA and the Fourteenth Amendment. A few months after the lawsuit was filed, Darby agreed to rescind the requirement.

Myers v. Branch Township, Civil Action No. 99-155 (E.D. Pa.). This Fair Housing Act lawsuit challenged defendants' use of its zoning laws to exclude a small group home for persons with mental retardation and resulted in the entry of a permanent injunction to require the township to allow operation of the group home.

National Organization on Disability v. Tartaglione, Civil Action No. 01-1923 (E.D. Pa.). This class action ADA lawsuit against the City of Philadelphia was resolved by a settlement agreement that required the City (1) to assure that at least one of its new electronic voting machines is independently usable by persons with visual disabilities, and (2) to comply with a process to increase the number of polling places that are accessible to persons with mobility disabilities.

Pennsylvania Protection and Advocacy, Inc. v. Houstoun , 228 F.3d 423 (3d Cir. 2000). This case successfully challenged DPW's refusal to provide peer review records concerning the death of a client at a state psychiatric hospital to PP&A in violation of the Protection and Advocacy for Individuals with Mental Illness Act.

Pennsylvania Protection and Advocacy, Inc. v. Department of Public Welfare, 402 F.3d 374 (3d Cir. 2005). This lawsuit was filed on behalf of residents at South Mountain Restoration Center, the only state-operated nursing facility in the Commonwealth which houses people with mental illness. The lawsuit alleges that DPW violated the ADA and Rehabilitation Act by,   inter alia, failing to provide community services to residents and that DPW violated the federal Medical Assistance law by failing to provide adequate conditions, treatment, and services to residents. The Third Circuit directed entry of summary judgment for our client on the inadequacy of DPW's fundamental alteration defense and remanded for further proceedings.

Pennsylvania Protection and Advocacy, Inc. v. Department of Public Welfare, Civil Action No. 4:95-CV-1491 (M.D. Pa.). This case alleged that DPW violated the Constitution and the ADA by retaliating against five residents of a state psychiatric hospital who filed a lawsuit to challenge their continued institutionalization and lack of treatment by prohibiting PP&A advocates from attending their treatment team meetings. The case was successfully resolved when DPW rescinded its decision.

Purcell v. Pennsylvania Department of Corrections, Civil Action No. 95-6720, 1998 U.S. Dist. LEXIS 105 (E.D. Pa. Jan. 9, 1998). This lawsuit alleged that defendants violated an inmate's rights under the ADA to secure reasonable accommodations for his Tourette's Syndrome and physical disabilities and interfered with his exercise of his rights under the ADA. After the court denied defendants' motion to dismiss and motion for summary judgment, the parties reached a settlement that required, inter alia, DOC to appoint an ADA coordinator.

Richard C. v. White, Civil Action No. 89-2038, slip op. (W.D. Pa. June 26, 1995), aff'd mem., 92 F.3d 1172 (3d Cir. 1996) (Table). Following the settlement of this class action lawsuit brought on behalf of residents of Western Center, a state mental retardation facility, the class filed a motion to enforce the settlement to require DPW to comply with its funding obligations under the settlement agreement. The court granted the plaintiffs' motion and the Third Circuit affirmed the ruling.

Richard C. v. Houstoun, 196 F.R.D. 288 (W.D. Pa. 1999), aff'd mem., 229 F.3d 1139 (3d Cir. 2000) (Table). The court denied a motion by intervenors to attempt to stop the closure of Western Center and to require continued institutionalization of class members. The court also rejected the argument that the Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581 (1999), requires states to provide institutional services to persons and/or their families who object to community placements.

Sabree v. Houstoun, 367 F.3d 180 (3d Cir. 2004). This lawsuit challenges the waiting list for community mental retardation services, alleging that DPW's failure to provide appropriate community-based ICF/MR services to class members violates the federal Medical Assistance statute. The Court of Appeals overturned the district court's decision dismissing the case. The appellate court agreed with plaintiffs that Medical Assistance recipients may bring private lawsuits under 42 U.S.C. § 1983 to enforce their entitlements to receive Medical Assistance services.

Sandra G. v. Borough of Sharon Hill, Civil Action No. 97-1634 (E.D. Pa.). This Fair Housing Act case challenged the Borough's refusal to permit operation of a small group home for persons with mental retardation. After we filed a preliminary injunction motion and proposed findings of fact and conclusions of law, the Borough agreed to allow the group home to operate without interference.

Terry v. Houstoun, Civil Action No. 94-6754 (E.D. Pa.). This lawsuit alleged that the City of Philadelphia violated Title XIX of the Social Security Act by failing to provide appropriate wheelchairs to residents of Philadelphia Nursing Home. The case was settled with Philadelphia agreed to provide wheelchairs to the nursing facility's residents according to a process and using standards that assure that the type of wheelchairs and adaptations to them will be appropriate to the needs of the residents.

Torisky v. Schweiker, 443 F.3d 438 (3d Cir. 2006). In this appeal, DLP represented advocacy organization-intervenors to challenge DPW's assertion that individuals who are not court-committed

to state institutions do not enjoy constitutional protections because they are not in state custody. The Court of Appeals rejected DPW's position that court-commitment is the sine qua non to determine whether a person is "involuntarily" in state custody and that the lower courts must examine other factors.

<u>Vickie R. v. Houstoun</u>, Civil Action No. 95-2477 (E.D. Pa.). This class action lawsuit challenged the state's failure to implement a federal Medical Assistance waiver for attendant care services in violation of Title XIX of the Social Security Act. The case was successfully resolved when the state agreed to begin to implement the waiver.

<u>Williams v. Snider</u>, No. 0013 M.D. 1993 (Pa. Commw. Ct.). This case challenged DPW's failure to seek federal funds for its attendant services program. After filing this lawsuit, DPW agreed to apply for a Medical Assistance waiver to access federal funds for attendant care services.

<u>Sullivan v. Zebley</u>, 493 U.S. 521 (1990). An <u>amicus curiae</u> brief was filed on behalf of approximately twenty organizations in support of position that the Social Security Administration violated federal law in narrowly interpreting whether children with disabilities are eligible for Supplemental Security Income.

<u>United States and David B. v. City of Philadelphia</u>, 30 F.3d 1488 (3d Cir. 1994) (Table). Filed an <u>amicus curiae</u> brief on behalf of three organizations in these Fair Housing Amendments Act cases challenging the City's failure to grant a reasonable accommodation to allow the creation of housing for recovering substance abusers and persons with histories of mental illness. The Court of Appeals concluded that the City violated the Act.

# Public Welfare

*PROGRAM OBJECTIVE: To maximize each individual's capacity for more independent living and participation in community life by providing needed training and support services.*

## Program: Mental Retardation

The Department of Public Welfare supports a comprehensive array of services for people with developmental disabilities including community residential and non-residential programs, which are provided through the counties by community-based providers, state operated institutions and private intermediate care facilities for the mentally retarded providers (ICF/MRs). In addition to state and federal funding, local funding is provided for community programs as required by the Mental Health and Mental Retardation Act of 1966.

The mental retardation program has evolved from a system of large congregate residential facilities to a flexible and dynamic system of community supports and services tailored to the needs of persons living in the community. The trend toward enhancing the natural supports that exist in the family and the community continues to define services.

In response to the recommendations of Pennsylvania's Autism Task Force, the Bureau of Autism Services was established in February 2007. Autism is a lifelong neurobiological disorder. The mission of the Bureau of Autism Services is to develop, coordinate, integrate and establish policies and services that effectively enhance the quality of life and promote independence for Pennsylvanians living with autism.

### Program Element: Institutional Services

The department provides institutional care funding for people with developmental disabilities. Services are offered through five state centers whose primary goal is to develop residents' abilities to function more independently in preparation for living in a less restrictive environment. All facilities are currently certified for Medical Assistance (MA) under standards established by the Centers for Medicare & Medicaid Services. Private Intermediate Care Facilities for the Mentally Retarded provide intensive habilitative services to persons with developmental disabilities. Large facilities are single or multiple buildings on campus-like sites accommodating more than eight persons while small facilities may be located in the community and serve eight persons or less.

### Program Element: Community Mental Retardation Services

The Mental Health and Mental Retardation Act of 1966 provides the statutory basis for the development of community-based services for people with developmental disabilities. Community living arrangements include group homes, apartments with or without a roommate and life-sharing settings with family or friends. Day services such as supported employment, pre-vocational programs, adult training and home and community habilitation are provided for people living in the community, based on individual need. Other services available include transportation, home finding, environmental accessibility modifications, adaptive appliances/equipment, specialized therapies and nursing, and educational support. Respite services are also available for families of people with developmental disabilities.

### Program Element: Services for Individuals with Autism

The department provides funding for a statewide program to support the needs of Pennsylvanians living with autism spectrum disorders. The department is developing two delivery systems to provide services for adults with autism—the Adult Community Autism Program (ACAP) and the Autism Waiver. ACAP is a pilot program for individuals age 21 or older with a diagnosis of autism spectrum disorder. Services will include behavioral supports, physician services and a wide array of community-based and institutional services that build independence while maintaining cost effectiveness. The Autism Waiver has been designed to provide behavioral supports and community-based services tailored to individuals with autism. In addition, the department is working to increase the capacity of service providers and health care professionals by providing statewide training, technical assistance and cross-system collaboration; providing support and information to families; developing models for best practices and crisis response; and establishing regional autism centers.

JA141

## Public Welfare

**Program: Mental Retardation (continued)**

### Community Mental Retardation Services



Funding for the expansion of the community program has increased by nearly $726 million since 2003-04, providing services to an additional 8,642 people. Over the same period, the state centers' population will have decreased by 20%.

| Program Measures: | 2007-08 | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 |
|---|---|---|---|---|---|---|---|
| Persons receiving mental retardation services during the fiscal year | 51,375 | 52,471 | 53,210 | 53,210 | 53,210 | 53,210 | 53,210 |
| Persons receiving residential services (at end of year): | | | | | | | |
| Private ICF/MRs | 2,595 | 2,563 | 2,540 | 2,540 | 2,540 | 2,540 | 2,540 |
| State centers | 1,320 | 1,272 | 1,240 | 1,240 | 1,240 | 1,240 | 1,240 |
| Persons receiving home and community services during the fiscal year (unduplicated) | 47,460 | 48,636 | 49,430 | 49,430 | 49,430 | 49,430 | 49,430 |
| Average cost of individuals served in the community: | | | | | | | |
| Residential services | $75,975 | $80,230 | $83,115 | $83,115 | $83,115 | $83,115 | $83,115 |
| Non-residential services (day programs or other supports) | $12,017 | $15,292 | $16,475 | $16,475 | $16,475 | $16,475 | $16,475 |
| Persons receiving autism services during the fiscal year | 64 | 355 | 590 | 590 | 590 | 590 | 590 |

### State Centers Population for the Prior, Current and Upcoming Year

| | Population July 2007 | Population July 2008 | Projected Population July 2009 | Projected Bed Capacity July 2009 | Projected Percentage Capacity July 2009 |
|---|---|---|---|---|---|
| **State Centers** | | | | | |
| Ebensburg | 307 | 294 | 285 | 402 | 70.9% |
| Hamburg | 135 | 129 | 125 | 237 | 52.7% |
| Polk | 336 | 322 | 313 | 521 | 60.1% |
| Selinsgrove | 355 | 347 | 342 | 579 | 59.1% |
| White Haven | 187 | 180 | 175 | 275 | 63.6% |
| TOTAL | 1,320 | 1,272 | 1,240 | 2,014 | 61.6% |

JA142

## Public Welfare

**Program: Mental Retardation (continued)**

### Expenditures by State Center
(Dollar Amounts in Thousands)

| | 2007-08 Actual | 2008-09 Available | 2009-10 Budget | | 2007-08 Actual | 2008-09 Available | 2009-10 Budget |
|---|---|---|---|---|---|---|---|
| **Ebensburg** | | | | **Selinsgrove** | | | |
| State funds............ | $ 26,277 | $ 24,455 | $ 25,626 | State funds............ | $ 25,981 | $ 26,318 | $ 28,828 |
| Federal funds.......... | 33,766 | 36,614 | 36,778 | Federal funds.......... | 37,151 | 40,812 | 41,367 |
| Augmentations......... | 5,988 | 5,695 | 5,887 | Augmentations......... | 7,283 | 7,024 | 7,135 |
| TOTAL............... | $ 66,031 | $ 66,764 | $ 68,291 | TOTAL............... | $ 70,415 | $ 74,154 | $ 77,330 |
| **Hamburg** | | | | **White Haven** | | | |
| State funds............ | $ 10,029 | $ 10,565 | $ 12,203 | State funds............ | $ 14,760 | $ 14,306 | $ 15,605 |
| Federal funds.......... | 16,482 | 16,296 | 17,723 | Federal funds.......... | 20,276 | 22,091 | 22,318 |
| Augmentations......... | 2,899 | 2,822 | 2,810 | Augmentations......... | 3,861 | 3,737 | 3,749 |
| TOTAL............... | $ 29,410 | $ 29,683 | $ 32,736 | TOTAL............... | $ 38,897 | $ 40,134 | $ 41,672 |
| **Polk** | | | | **Budgetary Reserve** | | | |
| State funds............ | $ 23,351 | $ 25,333 | $ 27,921 | State funds............ | $ 0 | $ 71 | $ 0 |
| Federal funds.......... | 36,931 | 38,972 | 39,566 | Federal funds.......... | 0 | 4,845 | 5,199 |
| Augmentations......... | 6,868 | 6,746 | 6,876 | Augmentations......... | 0 | 0 | 0 |
| TOTAL............... | $ 67,150 | $ 71,051 | $ 74,363 | TOTAL............... | $ 0 | $ 4,916 | $ 5,199 |
| **Maintenance and security costs for closed facilities** | | | | **Non-Facility/Other Operational costs** | | | |
| State funds............ | $ 1,793 | $ 1,308 | $ 1,329 | State funds............ | $ 1,233 | $ 831 | $ 828 |
| Augmentations......... | 1,134 | 795 | 795 | | | | |
| TOTAL............... | $ 2,927 | $ 2,103 | $ 2,124 | | | | |

### Program Recommendations:
This budget recommends the following changes: (Dollar Amounts in Thousands)

**State Centers for the Mentally Retarded**

| | |
|---|---|
| $  7,639 | —to continue current program. |
| 2,492 | —to offset the impact of nonrecurring prior year federal funds. |
| −978 | —revision of federal financial participation from 54.42% to 54.81%. |
| $  9,153 | *Appropriation Increase* |

**Intermediate Care Facilities – Mentally Retarded**

| | |
|---|---|
| $  5,429 | —to continue current program. |
| −1,367 | —to reflect individuals transferring to the community program. |
| −1,168 | —revision of federal financial participation from 54.42% to 54.81%. |
| $  2,894 | *Appropriation Increase* |

**Community Mental Retardation – Base Program**

| | |
|---|---|
| $  6,070 | —to continue current program. |
| 2,622 | —to annualize previous program revisions providing enhanced community services. |
| 5,000 | —to reflect nonrecurring prior year carryover. |
| −67 | —revision of federal financial participation from 54.42% to 54.81%. |
| $ 13,625 | *Appropriation Increase* |

**Community Mental Retardation – Waiver Program**

| | |
|---|---|
| $ 18,665 | —to annualize previous program revisions providing enhanced community services. |
| 1,665 | —to reflect 3 additional individuals transferring from the Mental Health program and the annualization of prior year transfers. |
| 1,367 | —to reflect individuals transferring from the ICF/MR program. |
| 10,000 | —to offset reduction in federal earnings. |
| −5,106 | —revision of federal financial participation from 54.42% to 54.81%. |
| 15,109 | —Initiative—Expanded Community Mental Retardation Services. To provide home and community-based services for 793 additional persons with mental retardation. |
| $ 41,700 | *Appropriation Increase* |

**Autism Intervention and Services**

| | |
|---|---|
| $  7,701 | —to continue current program and increase the number of recipients. |
| −650 | —nonrecurring cost. |
| −107 | —revision of federal financial participation from 54.42% to 54.81%. |
| $  6,944 | *Appropriation Increase* |

**MR Residential Services – Lansdowne**

| | |
|---|---|
| $ −1,050 | —nonrecurring projects. |

## Public Welfare

**Program: Mental Retardation (continued)**

### Appropriations within this Program:    (Dollar Amounts in Thousands)

| | 2007-08 Actual | 2008-09 Available | 2009-10 Budget | 2010-11 Estimated | 2011-12 Estimated | 2012-13 Estimated | 2013-14 Estimated |
|---|---|---|---|---|---|---|---|
| **GENERAL FUND:** | | | | | | | |
| State Centers for the Mentally Retarded ... | $ 103,424 | $ 103,187 | $ 112,340 | $ 112,340 | $ 112,340 | $ 112,340 | $ 112,340 |
| Intermediate Care Facilities - Mentally Retarded.............................. | 119,497 | 137,971 | 140,865 | 140,865 | 140,865 | 140,865 | 140,865 |
| Community Mental Retardation - Base Program.............................. | 186,859 | 159,549 | 173,174 | 173,174 | 173,174 | 173,174 | 173,174 |
| Community Mental Retardation - Waiver Program.............................. | 684,425 | 758,372 | 800,072 | 800,072 | 800,072 | 800,072 | 800,072 |
| Autism Intervention and Services............. | 9,955 | 20,056 | 27,000 | 27,000 | 27,000 | 27,000 | 27,000 |
| MR Residential Services - Lansdowne...... | 1,456 | 1,467 | 417 | 417 | 417 | 417 | 417 |
| TOTAL GENERAL FUND ................. | $ 1,105,616 | $ 1,180,602 | $ 1,253,868 | $ 1,253,868 | $ 1,253,868 | $ 1,253,868 | $ 1,253,868 |

JA144

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                                        :
FRANKLIN BENJAMIN, by and through       :
his next friend, Andreé Yock; RICHARD   :
GROGG and FRANK EDGETT, by and          :
through their next friend, Joyce McCarthy; :
SYLVIA BALDWIN, by and through her      :
next friend, Shirl Meyers; ANTHONY      :
BEARD, by and through his next friend,  :
Nicole Turman, on behalf of themselves  :
and all others similarly situated,      :
                                        :
              Plaintiffs,               :
                                        :
       v.                               :   Civil Action No. 1:09-cv-1182-JEJ
                                        :
DEPARTMENT OF PUBLIC WELFARE            :
OF THE COMMONWEALTH OF                  :   Class Action
PENNSYLVANIA and                        :
ESTELLE B. RICHMAN, in her official     :   (Judge Jones)
capacity as Secretary of Public Welfare :
for the Commonwealth of Pennsylvania,   :
                                        :
              Defendants.               :
_____:

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**UNOPPOSED MOTION FOR CLASS CERTIFICATION**

Robert W. Meek                    Stephen F. Gold
Mark J. Murphy                    125 South 9th Street, Suite 700
Robin Resnick                     Philadelphia, PA  19107
Disability Rights Network of PA   215-627-7100
1315 Walnut Street, Suite 400
Philadelphia, PA  19107-4798
215-238-8070

Counsel for Plaintiffs

## **TABLE OF CONTENTS**

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual and Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Question Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    Plaintiffs Satisfy the Prerequisites of Federal Rule
        of Civil Procedure 23(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    The Proposed Class Is So Numerous that
              Joinder of All Members Is Impracticable . . . . . . . . . . . . . . 6

        B.    There Are Questions of Law and Fact
              Common to the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        C.    Plaintiffs' Claims Are Typical of Those of
              Class Members . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D.    The Named Plaintiffs Will Fairly and Adequately
              Represent the Interests of the Class . . . . . . . . . . . . . . . . . . 12

    II.    This Action Is Maintainable As a Class Action Under
        Rule 23(b)(2) Since Defendants Have Acted or Refused
        to Act on Grounds Generally Applicable to the Class . . . . . . . . 14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

JA146

## **TABLE OF CITATIONS**

**Cases**

*Amchem Products, Inc. v. Windsor,*
        521 U.S. 591 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Anderson v. Dep't of Public Welfare,*
        1 F. Supp. 2d 456 (E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Baby Neal ex rel. Kanter v. Casey,*
        43 F.3d 48 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 14

*Chiang v. Veneman,*
        385 F.3d 256 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Colbert v. Blagojevich,*
        Civil Action No. 07 C 4737, 2008 WL 4442597 (N.D. Ill.
        Sept. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 15

*Cureton v. National Collegiate Athletic Ass'n,*
        Civil Action No. 97-131, 1999 WL 447313
        (E.D. Pa. July 1, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 11

*Frederick L. v. Dep't of Public Welfare,*
        364 F.3d 487 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Frederick L. v. Dep't of Public Welfare,*
        422 F.3d 151 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Goldy v. Beal,*
        429 F. Supp. 640, 649 (M.D. Pa. 1976) (three-judge court) . . . . . . . . . 15

*Hagan v. Rogers,*
        570 F.3d 146 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Hassine v. Jeffes,*
        846 F.2d 169 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

JA147

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Kathleen S. v. Dep't of Public Welfare*,
    Civil Action No. 97-6610, 1998 WL 83973 (E.D. Pa.
    Feb. 25, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12, 13, 15

*Kerrigan v. Phila. Bd. of Elec.*,
    248 F.R.D. 470 (E.D. Pa. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Long v. Benson*,
    Civil Action No. 4:08cv26-RH/WCS, 2008 WL 4571904
    (N.D. Fla. Oct. 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Metts v. Houstoun*,
    Civil Action No. 97-4123, 1997 WL 688804 (E.D. Pa.
    Oct. 22, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12

*Richard C. v. Snider*,
    Civil Action No. 89-2038, 1993 WL 757634 (W.D. Pa.
    June 22, 1993), *aff'd mem.*, 31 F.3d 1173 (3d Cir. 1994) . . . . . . . . 13, 15

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stewart v. Abraham*,
    275 F.3d 220 (3d Cir. 2001), *cert. denied,*
    536 U.S. 958 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11, 14

*Williams v. Blagojevich*,
    Civil Action No. 05 C 4673, 2006 WL 3332844
    (N.D. Ill. Nov. 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## **Statutes, Regulations and Rules**

Fed. R. Civ. P. 23(a) . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 6, 7, 8, 9, 10, 12, 14, 16

Fed. R. Civ. P. 23(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 14, 16

JA148

**INTRODUCTION**

Plaintiffs, through their next friends and counsel, submit this Brief in support of their Unopposed Motion for Class Certification. *See* Certificate of Concurrence of Robert W. Meek (Exh. A) (noting that Defendants' counsel, after reviewing the draft Motion, Brief, and proposed Order in this case, informed Plaintiffs' counsel that Defendants concurred in the Motion). Plaintiffs respectfully request that the Court certify this case to proceed on behalf of the following class:

> All persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

The criteria of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are satisfied in this case, making class certification appropriate.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs are individuals with mental retardation who are institutionalized in intermediate care facilities for persons with mental retardation (ICFs/MR), large institutions operated by Defendants Department of Public Welfare and Richman (collectively, DPW). Am. Compl. ¶¶ 1, 8-14. Plaintiffs, who are appropriate for discharge to the community and not opposed to discharge, filed this lawsuit to challenge DPW's failure to offer them appropriate community supports and services. *See id.* ¶¶ 2, 4, 23-26, 29-32, 35-37, 41-43, 46-49, 72, 86, 92.

Plaintiff Franklin Benjamin has been institutionalized at Ebensburg Center, a state-operated ICF/MR, for more than 40 of his 49 years. Am. Compl. ¶ 22. The congregate, institutional nature of Ebensburg Center undermines his capacity to benefit from treatment there since he is extremely sensitive to noise and light. *Id.* ¶ 23. Plaintiffs Richard Grogg and Frank Edgett have been institutionalized in Selins-grove Center, a state-operated ICF/MR, for 20 years each. *Id.* ¶¶ 27, 33. Messrs. Grogg and Edgett are both very independent and social. *Id.* ¶¶ 28, 35. Mr. Grogg holds jobs at Selinsgrove Center and in the community and does not even need a representative payee for his federal benefits. *Id.* ¶ 29. Plaintiff Sylvia Baldwin, has been institutionalized at Polk Center, a state-operated ICF/MR, for approximately 20 of her 33 years, and is generally independent. *Id.* ¶¶ 38, 40. Plaintiff Anthony Beard has been institutionalized at Ebensburg Center, a state-operated ICF/MR, for about 42 of his 49 years. *Id.* ¶ 44. All of the named Plaintiffs are appropriate for discharge to integrated, community-based placements and they and their involved family members are not opposed to discharge. *Id.* ¶¶ 25, 26, 32, 32, 37, 38, 42, 43, 48, 49, 53, 54.

The five named Plaintiffs are not alone. There currently are approximately 1,272 individuals residing in five state-operated ICFs/MR in Pennsylvania. Am. Compl. ¶¶ 54-55. All of these individuals, with appropriate services and supports,

2

could live in more integrated community settings. *Id.* ¶ 65. Indeed, the Common-wealth has embraced the principle of "normalization," *i.e.*, the right of individuals with mental retardation to live a life "which is as close as possible in all aspects to the life which any member of the community might choose." *Id.* ¶ 67 (citing 55 Pa. Code § 6400.1). Neither Defendant Richman, the Secretary of Public Welfare, nor Kevin Casey, the Deputy Secretary for DPW's Office of Developmental Programs, dispute that people with mental retardation can reside in the community with appropriate supports and services. *Id.* ¶ 68. Moreover, many residents of state-operated ICFs/MR and their families are not opposed to discharge to the community, provided that appropriate supports and services are offered. *Id.* ¶ 69.[1] Nevertheless, DPW has failed to offer these state-operated ICF/MR residents, like the named Plaintiffs, community alternatives. *Id.* ¶ 72. Despite Pennsylvania's appropriation in recent years of funding to provide community services to nearly 5,000 people with mental retardation in the last two fiscal years (FY 2007-2009) (including approximately 1,000 who have received residential services in the community), only about 23

---

[1] While some state-operated ICF/MR residents or their families may currently be opposed to discharge, they may not be familiar with the types of community supports and services that could be provided and, if they received information about those opportunities, they might not be opposed. Am. Compl. ¶ 70. In fact, many state-operated ICF/MR residents who were discharged to community-based placements despite opposition by them or their families are now satisfied with the community supports and services they receive. *Id.* ¶ 71.

3

residents of state-operated ICFs/MR received community-based services during that period.  *See id.* ¶¶ 56, 74-76.[2]

The provision of community supports and services to Plaintiffs and putative class members would be far less costly to Pennsylvania than is their continued institutionalization in state-operated ICFs/MR.  DPW currently pays an average of approximately $228,000 per year to serve each resident of a state-operated ICF/MR.  Am. Compl. ¶ 58.  In contrast, the average per person cost of community-based residential and non-residential mental retardation services is less than $100,000.  *Id.* ¶ 61.[3]

DPW has not even developed a viable integration plan -- with specific time lines and discharge benchmarks -- to develop community alternatives for residents of state-operated ICFs/MR, even though the Third Circuit held more than four years ago that the integration mandates of the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA) require DPW to have such plans for individuals who are

---

[2]  In contrast, approximately 76 residents of state-operated ICFs/MR died during the same period.  *See* Am. Compl. ¶ 56.

[3]  Although the federal government, through the Medical Assistance program pays over half of the costs of services for both the state ICFs/MRs and community services, *see* Am. Compl. ¶¶ 53(b), 60(e), Pennsylvania could secure an even greater federal funding match for the development of community services for state-operated ICF/MR residents under its "Money Follows the Person" Rebalancing Demonstration Project. *Id.* ¶ 78.  DPW, however, has not taken advantage of that opportunity. *Id.*

4

unnecessarily institutionalized.  Am. Compl. ¶¶ 79; *Frederick L. v. Dep't of Public Welfare*, 422 U.S. 151, 158-59, 160 (3d Cir. 2005).

Plaintiffs allege that DPW's failure to offer community supports and services to Plaintiffs and putative class members violates the integration mandates of the ADA and RA, which require public entities to provide services in the most integrated settings appropriate to their needs.  Am. Compl. ¶¶ 86, 92.  Plaintiffs also allege that DPW violates the ADA and RA by using methods of administration that subject them and putative class members to discrimination through continued unnecessary segregation and institutionalization, including, *inter alia*,  (1) failing to effectively assess Plaintiffs and putative class members to determine their community support needs; (2) excluding some state-operated ICF/MR residents (including Plaintiffs Benjamin and Grogg) from the waiting list for community mental retardation services and not giving the highest priority to others; (3) failing to assure that state-operated ICF/MR residents have access to effective case management services (known as supports coordination); (4) failing to provide state-operated ICF/MR residents and their families with adequate information about community options; and (5) failing to develop and implement a viable integration plan to provide community alternatives for state-operated ICF/MR residents.  *Id.* ¶¶ 62-64, 70, 71 73, 85, 87, 93.  Plaintiffs seek declaratory and injunctive relief.  *Id.* ¶ 94.

## QUESTION INVOLVED

Should this case be certified to proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2)?

## ARGUMENT

## I.  PLAINTIFFS SATISFY THE PREREQUISITES OF FEDERAL RULE OF CIVIL PROCEDURE 23(a).

Federal Rule of Civil Procedure 23(a) establishes four requirements, each of which must be satisfied for the maintenance of a class action:  (1) the class must be so numerous that joinder of all members is impracticable; (2) there must be a question of law or fact common to the class; (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and (4) the representative parties must fairly and adequately protect the interests of the class.  This case satisfies each of these requirements.

### A.  The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable.

Rule 23(a)(1) requires that the class must be so numerous that joinder of all class members would be impracticable.  "Impracticability does not mean impossibility, but rather that the difficulty or inconvenience of joining all members of the putative class calls for class certification."  *Cureton v. National Collegiate Athletic Ass'n*, Civil Action No. 97-131, 1999 WL 447313 at *5 (E.D. Pa. July 1, 1999) (Exh.

6

C).  As the Third Circuit has written:  "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."  *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001), *cert. denied*, 536 U.S. 958 (2002).

According to the Governor's Executive Budget for Fiscal Year 2009-2010, there were 1,272 residents in the state-operated mental retardation centers as of July 2008 and an anticipated population of 1,240 as of July 2009. *See Governor's Executive Budget 2009-2010* at E33.28, *available at* http://www.budget.state.pa.us (excerpt submitted as Exh. D).  By itself, the large number of class members in this case renders joinder impracticable.

Factors in addition to the size of the class -- including geographic dispersion of the class members, their ability to pursue individual cases, the expediency of joinder, and the practicality of multiple lawsuits -- can also militate in favor of certification.  *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993); *Cureton*, 1999 WL 447313 at *6; *Metts v. Houstoun*, Civil Action No. 97-4123, 1997 WL 688804 at *2 (E.D. Pa. Oct. 22, 1997) (Exh. E).  Here, class members are geographi-cally dispersed throughout Pennsylvania.  They also have intellectual disabilities and limited incomes, which make them unlikely to pursue individual actions.  In addition,

identifying the potential class members, filing multiple lawsuits, and joining them would not be practical.  These factors, combined with the large size of the class, make joinder impracticable and are more than sufficient to satisfy Rule 23(a)(1).

### B.  There Are Questions of Law and Fact Common to Plaintiffs and the Class.

Rule 23(a) also requires questions of law and fact common to the class.  The Third Circuit has emphasized that "the commonality standard of Rule 23(a)(2) is not a high bar:  it does not require identical claims or facts among class members, as the 'commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class.'"  *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004) (citation omitted); *accord Stewart v. Abraham*, 275 F.3d at 227; *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Here, there are a number of factual and legal issues common to Plaintiffs and all class members, including (1) whether Defendants have a viable integration plan for residents of state-operated ICFs/MR; (2) whether Defendants properly evaluate residents of state-operated ICFs/MR to assess their community service and support needs; (3) whether Defendants' policies and practices, including its administration of its waiting list process, effectively exclude class members from accessing the community mental retardation system; (4) whether Defendants' failure to offer and,

8

if not opposed, provide services and supports in more integrated community settings to class members violates the integration mandates of the ADA and RA; and (5) whether Defendants use methods of administration that have the effect of discriminating against individuals with disabilities in violation of the ADA and RA.

These common questions are more than sufficient to satisfy Rule 23(a)(2). *Cf. Chiang v. Veneman*, 385 F.3d at 265-66 (finding commonality in case involving various discrimination claims); *Colbert v. Blagojevich*, Civil Action No. 07 C 4737, 2008 WL 4442597 at \*5-\*6 (N.D. Ill. Sept. 29, 2008) (Exh. F) (finding commonality in ADA case concerning community services for up to 20,000 nursing home residents); *Kathleen S. v. Dep't of Public Welfare*, Civil Action No. 97-6610, 1998 WL 83973 at \*2 (E.D. Pa. Feb. 25, 1998) (Exh. G) (finding common issues in ADA case filed on behalf of state hospital residents to challenge their unnecessary institutionalization).

"Courts appear to consider 'common' such challenges based on alleged violations of statutory standards." *Baby Neal*, 43 F.3d at 56-57. Further, "because they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions 'by their very nature often present common questions satisfying Rule 23(a)(2).'" *Id.* at 57 (citations omitted). The nature of the statutory claims in this case and the type of relief sought (*i.e.*, only declaratory and injunctive

9

relief) buttress the conclusion that this case satisfies the commonality requirement of Rule 23(a)(2).

### C. **Plaintiffs' Claims Are Typical of Those of Class Members.**

Plaintiffs have also satisfied Rule 23(a)(3)'s typicality requirement. "Typicality entails an inquiry [into] whether 'the named Plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based.'" *Baby Neal*, 43 F.3d at 57-58 (citation omitted). "'Rule 23 does not require that the representative plaintiff have endured precisely the same injuries that have been sustained by the class members,'" as long as the harm is common to the class and the named plaintiff demonstrates a personal interest or "'real and immediate'" threat of injury. *Hagan v. Rogers*, 570 F.3d 146, 158 (3d Cir. 2009) (citation omitted). Moreover, "[t]ypicality, as with commonality, does not require 'that all putative class members share identical claims.'" *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3d Cir. 2004) (citation omitted). Claims which challenge conduct that affects the named Plaintiffs as well as the class members, such as the claims in the instant case, "usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.... Actions requesting declaratory and injunctive relief to remedy conduct directed at the class

10

clearly fit this mold." *Baby Neal*, 43 F.3d at 58; *accord* *Stewart v. Abraham*, 275 F.3d at 227.

Plaintiffs' and class members' claims in this case arise from the same policies and practices, *i.e.*, DPW's failure to properly evaluate them, offer them appropriate community alternatives to continued institutionalization in state-operated ICFs/MR, and provide those alternatives to individuals who are not opposed to discharge. Plaintiffs' and class members' claims in this case also are based on the same legal theory, *i.e.*, whether Defendants' actions violate the ADA and RA. Plaintiffs' claims for declaratory and injunctive relief to remedy Defendants' violations of federal statutory law are typical of the putative class members' claims since they are "'based on patterns and practices not special or unique to [Plaintiffs,] [and] a significant number of other members of the class have been similarly victimized by the same patterns or practices.'" *Cureton*, 1999 WL 447313 at *8 (quoting *Weiss v. York Hosp.*, 745 F.2d 786, 809 n.36 (3d Cir. 1984)).

As Judge Broderick concluded in a similar ADA case challenging DPW's failure to provide community services to Haverford State Hospital residents:

> The Defendants' allegedly discriminatory conduct which
> Plaintiffs seek to challenge under the ADA affects both
> Plaintiffs and the class members in the same way in that it
> subjects them to allegedly illegal segregation. Therefore,
> the Court finds that the third prong of Rule 23(a) is

11

satisfied and that the Defendants' objection to the typicality requirement is without merit.

*Kathleen S.*, 1998 WL 83973 at *2; *see also Colbert*, 2008 WL 4442597 at *7-*8 (claims of named plaintiffs typical of other nursing home residents in ADA case concerning community services). Rule 23(a)(3) is therefore satisfied in this case.

### D.  The Named Plaintiffs Will Fairly and Adequately Represent the Interests of the Class.

Rule 23(a)(4) requires that the named representatives fairly and adequately protect the interests of the class. This requirement has two components to assure that the absent class members' interests are diligently pursued:  (1) the interests of the named representatives are not in conflict with other class members, and (2) plaintiffs' attorneys are qualified, experienced, and generally able to conduct the litigation. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 532; *Hassine v. Jeffes*, 846 F.2d 169, 179 (3d Cir. 1988)*.

Here, Plaintiffs and members of the class share the same injuries and seek the same relief -- declaratory and injunctive relief to remedy DPW's violations of the ADA and RA. "Because the plaintiffs seek the same injunctive relief as all members of the class, the court 'can find no potential for conflict between the claims of the complainants and those of the class as a whole.'" *Metts*, 1997 WL 688804 at *4 (quoting *Hassine*, 846 F.2d at 179).

12

JA160

In addition, Plaintiffs' counsel are qualified and experienced in federal class action litigation, the rights of individuals with disabilities, the ADA, and the RA. Robert W. Meek, Mark J. Murphy, and Robin Resnick of the Disability Rights Network of Pennsylvania (formerly the Disabilities Law Project) and co-counsel, Stephen F. Gold, have decades of experience and have litigated numerous cases to enforce the rights of individuals with disabilities under the ADA and RA. *See Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 489 n.1 (3d Cir. 2004) (noting certification of class of state hospital residents represented by Messrs. Meek and Murphy and Ms. Resnick in ADA and RA integration mandate case); *Long v. Benson*, Civil Action No. 4:08cv26-RH/WCS, 2008 WL 4571904 at *3 (N.D. Fla. Oct. 14, 2008) (Exh. H) (certification of class of nursing home residents in ADA integration mandate case and Mr. Gold as class co-counsel); *Kerrigan v. Phila. Bd. of Elec.*, 248 F.R.D. 470, 477 (E.D. Pa. 2008) (certification of ADA class action represented by Messrs. Gold and Meek); *Anderson v. Dep't of Public Welfare*, 1 F. Supp. 2d 456, 462 (E.D. Pa. 1998) (certification of ADA class action represented by Mr. Gold and the Disabilities Law Project); *Kathleen S. v. Dep't of Public Welfare*, 1998 WL 83973 at *3 (certifying class of state hospital residents represented by Messrs. Meek and Murphy in ADA integration mandate lawsuit); *Richard C. v. Snider*, Civil Action No. 89-2038, 1993 WL 757634 at *5 (W.D. Pa. June 22, 1993)

13

JA161

(Exh. I) (certifying class of residents of state-operated ICF/MR represented by Mr.

Murphy), *aff'd mem.*, 31 F.3d 1173 (3d Cir. 1994) (Table); *see also* Meek Decl. ¶¶

2-4 & Att. (Exh.B).

## II.  THIS ACTION IS MAINTAINABLE AS A CLASS ACTION UNDER RULE 23(b)(2) SINCE DEFENDANTS HAVE ACTED OR REFUSED TO ACT ON GROUNDS GENERALLY APPLICABLE TO THE CLASS.

In addition to meeting the requirements of Rule 23(a), a party seeking class

certification also must establish that the case falls into at least one of the three Rule

23(b) categories. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Rule

23(b)(2) allows a class action to be maintained if:  "the party opposing the class has

acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to

the class as a whole[.]"  Fed. R. Civ. P. 23(b)(2).  "[I]t is generally recognized that

civil rights actions seeking relief on behalf of classes ... normally meet the

requirements of Rule 23(b)(2)."  *Stewart v. Abraham*, 275 F.3d at 228; *accord Baby

Neal*, 43 F.3d at 59.

This action readily meets the requirements of Rule 23(b)(2).  Plaintiffs, through

this case, seek to redress DPW's policies, practices, and procedures that deny them

the opportunity to receive services in the community -- the most integrated setting

appropriate to their needs -- rather than in institutional state-operated ICFs/MR.

Plaintiffs seek solely declaratory and injunctive relief to remedy those violations. Similar cases that involve the rights of individuals in institutions, including their right to receive community services, and that seek injunctive relief have been certified to proceed as class actions in this Circuit and elsewhere. *See, e.g.*, *Frederick L.*, 364 F.3d at 489 (noting certification of class of Norristown State Hospital residents who brought ADA and RA claims to challenge their unnecessary institutionalization); *Goldy v. Beal*, 429 F. Supp. 640, 649 (M.D. Pa. 1976) (three-judge court) (certifying class of persons involuntarily committed to institutions); *Long*, 2008 WL 4571904 at *3 (certifying class of nursing facility residents in ADA claim concerning community services); *Colbert*, 2008 WL 4442597 at *9-*10 (certifying class of nursing home residents in ADA claim concerning community services); *Williams v. Blagojevich*, Civil Action No. 05 C 4673, 2006 WL 3332844 at *5 (N.D. Ill. Nov. 13, 2006) (Exh. J) (certifying class of people with mental illness in ADA and RA case concerning community services); *Kathleen S.*, 1998 WL 83973 at *3 (certifying class in ADA case challenging unnecessary institutionalization of persons at Haverford State Hospital); *Richard C.*, 1993 WL 757634 at *4-*5 (confirming certification of class of persons in state-operated mental retardation institution). This case, too, presents a paradigmatic lawsuit for class certification.

## **CONCLUSION**

For all the reasons set forth above, Plaintiffs respectfully request that this Court certify this case to proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

Respectfully submitted,

Dated:  August 31, 2009          By:    /s/ Robert W. Meek_____
                                        Robert W. Meek
                                        PA 27870 -- ECF User
                                        Mark J. Murphy
                                        PA 38564 -- ECF User
                                        Robin Resnick
                                        PA 46980 -- ECF User
                                        Disability Rights Network of PA
                                        1315 Walnut Street, Suite 400
                                        Philadelphia, PA  19107-4798
                                        (215) 238-8070
                                        (215) 772-3126 (fax)
                                        RMeek@drnpa.org

                                        Stephen F. Gold
                                        PA 09880 -- ECF User
                                        125 South Ninth Street, Suite 700
                                        Philadelphia, PA  19107
                                        (215) 627-7100
                                        (215) 627-3183 (fax)
                                        stevegoldada@cs.com

                                        Counsel for Plaintiffs

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANKLIN BENJAMIN, et al,** | : | |
| **Plaintiffs** | : | **NO. 1:09-cv-1182-JEJ** |
| | : | |
| **v.** | : | **(JUDGE JONES)** |
| | : | |
| **DEPARTMENT OF PUBLIC WELFARE,** | : | **Filed by ECF** |
| **COMMONWEALTH OF PENNSYLVANIA** | : | |
| **and ESTELLE B. RICHMAN,** | : | **Class Action** |
| **Defendants** | : | |

## <u>MOTION TO DISMISS</u>

Pursuant to Fed. R. Civ. P. 12 (b)(6), defendants move to dismiss all claims

in the amended complaint for failure to state claims on which relief can be granted.

Respectfully submitted,


Date: <u>September  24, 2009</u>          <u>/S/ Howard Ulan</u>
                                         Howard Ulan
                                         Deputy Chief Counsel

                                         Department of Public Welfare
                                         Office of General Counsel
                                         3rd Floor West
                                         Health & Welfare Building
                                         Harrisburg, PA  17120
                                         (717) 783-2800 (phone)
                                         (717) 772-0717 (fax)
                                         hulan@state.pa.us
                                         PA #25058

JA165

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

------------------------------------------------------------------x

FRANKLIN BENJAMIN, <u>et al.</u>, on behalf of      :
themselves and all others similarly situated,      :
     :
     Plaintiffs,      :
     :    No. 09-cv-01182
   -against-      :    (Jones, U.S.D.J.)
     :
DEPARTMENT OF PUBLIC WELFARE OF      :    (Am. Compl.
THE COMMONWEALTH OF      :    Filed 7/14/09)
PENNSYLVANIA, <u>et al.</u>,      :
     :
     Defendants,      :
   -and-      :
     :
CRAIG SPRINGSTEAD, by and through his      :
father and guardian, BERTIN SPRINGSTEAD, <u>et al.</u>,      :
     :
     Proposed Intervenors.      :

------------------------------------------------------------------x

**PROPOSED INTERVENORS' MOTION FOR
<u>INTERVENTION PURSUANT TO FED. R. CIV. P. 24</u>**

Proposed Intervenors, Craig Springstead, by and through his father and

guardian, Bertin Springstead, Maria Meo, by and through her mother and guardian,

Grace Meo, Daniel Bastek, by and through his father and guardian, John Bastek,

Michael Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by

and through her father and guardian, Joseph Lambo, Richard Clarke, by and

through his father and guardian, Leonard Clarke, Richard Kohler, by and through

his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and

guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and

next friend, Alfred Sheppard (collectively, the "Springstead Intervenors"),

respectfully move this Court, pursuant to Rule 24 of the Federal Rules of Civil

Procedure, for an Order allowing the Springstead Intervenors to intervene in the

above-captioned matter.

In support of this Motion, the Springstead Intervenors aver as follows:

1.      By their Amended Complaint, dated July 14, 2009, Plaintiffs

commenced this putative class action against Defendant Department of Public

Welfare of the Commonwealth of Pennsylvania, "the Commonwealth agency that

is responsible to provide services to Pennsylvanians with mental retardation."

(Am. Compl. ¶ 13.)

2.      Plaintiffs' allegations concern "Defendants' continuing failure to offer

and provide them with the opportunity to receive services in integrated, community

settings that are the most appropriate settings to meet their needs."  (Am. Compl.

¶ 1.)  Plaintiffs seek "appropriate declaratory relief and injunctive relief" (id. ¶ 4),

pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and

28 C.F.R. § 35.130(b)(3) (id. ¶¶ 82-87), and Section 504 of the Rehabilitation Act,

29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) (id. ¶¶ 88-93).

3.      Plaintiffs seek this relief on behalf of a class that, as certified,

includes:

> All persons who: (1) currently or in the future will reside in on[e] of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

(Order, Sept. 2, 2009, § III.)

4.      The Springstead Intervenors are *de facto* members of the class certified by this court on September 2, 2009. Notwithstanding Plaintiffs' claims that appropriate care can only be provided by community-based programs, the Springstead Intervenors believe that persons with developmental disabilities should receive the care and support they require in a setting appropriate to each individual's unique needs, be it a community-based facility or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR"). Intervenors do not oppose the named Plaintiffs' right to community care for themselves, but object to this action being prosecuted on behalf of a class – including the Intervenors – who do not seek this relief.

5.      The Springstead Intervenors respectfully submit that this request for intervention is timely.

6.      The Springstead Intervenors have a concrete, legally protectable interest in their own care (more broadly, the availability of institutional care), that is implicated in this litigation. Specifically, they are all residents of ICFs/MR who do not wish to be forced into community care.

3

7.      Plaintiffs' claims, if allowed to proceed on a class action basis, will impair the Springstead Intervenors' rights to choose ICF/MR care because the Springstead Intervenors will, as a practical matter, be bound by any potential judgment or settlement in this case.

8.      Because Plaintiffs seek to force all class members to "choose" community-based care, whereas the Springstead Intervenors wish to protect their rights to choose appropriate treatment in an institutional setting, Plaintiffs do not adequately represent the Springstead Intervenors' interests.

9.      Further, Defendants, who appear to acquiesce in Plaintiffs' assertion that community placement is appropriate for all persons residing in the state-operated ICFs/MR, do not adequately represent the Springstead Intervenors' interests.

10.     In the alternative, should the Court deny this motion for intervention as of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure, the Springstead Intervenors move this Court for an Order, pursuant to Rule 24(b), allowing them to permissively intervene.

In support of this Motion, the Springstead Intervenors submit the accompanying Memorandum of Law, Proposed Order, Response to the Complaint, and Certificate Regarding Concurrence.

4

**WHEREFORE**, the Springstead Intervenors respectfully request that this

Court enter an Order allowing them to intervene in the above-captioned action.

Respectfully submitted,

Dated:  Philadelphia, Pennsylvania          **VAIRA & RILEY, P.C.**
          November 10, 2009

By:   /s/ John E. Riley       
        John E. Riley
        PA ID# 22504
        William J. Murray, Jr.
        PA ID# 73917
     1600 Market Street, Suite 2650
     Philadelphia, Pennsylvania  19103
     (215) 789-9405
     (215) 751-9420 (fax)

Of Counsel:

Michael Rato
Sarah M. Goldstein
David F. Bacon IV
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)          *Attorneys for Proposed Intervenors*

5

JA170

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 05 C 4331 | **DATE** | 7/7/2009 |
| **CASE TITLE** | Stanley Ligas, et al. vs. Barry S. Maram, et al. | | |

**DOCKET ENTRY TEXT**

For the reasons set forth in the Statement section below, the class certification order [85] is vacated and approval of the proposed consent decree is denied. Plaintiffs' counsel are to notify the class members as efficiently and inexpensively as possible of the change in status of this lawsuit. *See Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002) (requiring notice to class members when class is decertified). The case is set for a status report as to the continued litigation of the individual plaintiffs' claims on July 30, 2009, at 9:00 a.m.

■[ For further details see text below.]                                              Notices mailed.

---

### STATEMENT

   Stanley Ligas and eight other individually named plaintiffs (the "plaintiffs") filed this lawsuit on behalf of themselves and other similarly situated individuals against the State of Illinois officials who administer state programs that provide long-term care services for people with developmental disabilities (the "defendants"). In their complaint, the plaintiffs alleged that the defendants failed to provide developmentally disabled people with long-term care services in the most integrated setting appropriate for their needs in violation of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Title XIX of the Social Security Act. The plaintiffs' lawsuit relies heavily on *Olmstead v. L.C.*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court held that developmentally disabled individuals should be placed in community settings when (1) the state's treatment professionals have determined that community placement is appropriate, (2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and (3) the placement can be reasonably accommodated considering the available state resources and the needs of other people with disabilities. *Olmstead*, 527 U.S. at 587. The plaintiffs allege that, despite their requests that they be placed in a community-based setting and the fact that the plaintiffs meet the criteria set forth in *Olmstead*, the State of Illinois has refused to place them in the least restrictive setting appropriate to their needs. The plaintiffs therefore request injunctive relief on behalf of themselves and class members, requiring the defendants to place eligible developmentally disabled individuals in community-based settings with appropriate services and support or Community-Integrated Living Arrangements ("CILAs") rather than in intermediate care facilities ("ICF-DD"). On March 7, 2006, the court granted plaintiffs' motion for class certification [85].

   On November 13, 2009, the plaintiffs filed with the court a Proposed Consent Decree on behalf of the class [295], setting forth the terms of the settlement entered into between the plaintiffs and the defendants. The Proposed Consent Decree defined the class as:

   All persons in Illinois 18 years of age or older who:

JA170.1

(a)   have mental retardation and/or other Developmental Disabilities and who are eligible for Medicaid ICF/MR services;

(b)   with appropriate supports and services, could live in the community; and

(c)   either: (i) are, or will in the future be, institutionalized in private ICF-DDs with nine or more residents or (ii) are, or will in the future be, living in a home-based setting and are at risk of institutionalization because of their need for services.

(Proposed Consent Decree ¶ 2.) A "Notice of Proposed Class Action Settlement and Hearing" was sent to the class on March 31, 2009 [327].

On July 1, 2009, the court held a hearing to determine the fairness, adequacy and reasonableness of the Proposed Consent Decree and to consider any objections by class members to the Decree. In preparation for the hearing, class members submitted more than 2,500 written objections to the Proposed Consent Decree. Approximately 240 people attended the fairness hearing, and thirty-four individual class members or their legal guardians spoke at the hearing. Many more objectors were represented at the hearing by counsel. A common theme among the objectors was the concern that many developmentally disabled individuals, who are within the class definition, would be adversely affected by provisions of the Proposed Consent Decree even though the individual neither met the *Olmstead* criteria nor desired placement in a community-based setting.

The class definition included in the Proposed Consent Decree is considerably broader than the class contemplated by the plaintiffs' lawsuit and, because of the highly individualized needs of the developmentally disabled as demonstrated at the fairness hearing, is unlikely to be rectified by modification of the class definition. To proceed as a class action, the potential class must satisfy the following criteria: (1) numerosity; (2) commonality of facts and law; (3) typicality between the class claims and those of the named parties; and (4) adequacy of the representation by the named parties and class counsel. Fed R. Civ. P. 23(a). The court may review its class certification "any time before a decision on the merits." *Movement for Opportunity & Equal. v. Gen. Motors Corp.*, 622 F.2d 1235, 1278 (7th Cir. 1980). "If the certification of the class is later deemed to be improvident, the court may decertify" the class. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981).

The named plaintiffs assert that they meet the criteria set forth in *Olmstead*, but the class definition fails to restrict the class to developmentally disabled individuals that are eligible for, and desire, community placement. Indeed, many of the objections received by the court concerned class members that were neither eligible for, nor desired, community placement. And based on the objections raised at the fairness hearing, it appears that sufficient commonality does not exist among the highly specialized needs and desires of the class members and their legal guardians. Similarly, because the named plaintiffs meet the conditions set forth in *Olmstead* insofar as they have been adjudged eligible for, and desirous of, community placement, the named plaintiffs' claims are not typical of class members who may or may not satisfy the *Olmstead* criteria. It therefore became clear to the court at the fairness hearing that commonality and typicality among class members are lacking in this case. *See Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (explaining that commonality is closely related to typicality). Consequently, decertification of the class is appropriate.

In addition, briefing and arguments by the various parties' counsel as well as the statements of the individual objectors, both at the July 1, 2009 hearing and in writing, establish that the settlement negotiated by the plaintiffs and the defendants is considerably broader than was necessary to address the needs of the

class contemplated by the plaintiffs' lawsuit. For example, the Proposed Consent Decree attempts to establish annual evaluations for developmentally disabled individuals that are neither required by *Olmstead* or necessary to secure the rights of individual class members. (*See* Proposed Consent Decree ¶ 7.) The Decree also attempts to restructure the administrative process through which the State of Illinois receives applications and assesses eligibility for services available to developmentally disabled individuals. (*See* Proposed Consent Decree ¶ 6.) Moreover, on June 11, 2009, the court struck paragraph ten of the Proposed Consent Decree after receiving confirmation from the plaintiffs and the defendants that paragraph ten was not a "deal breaker," and plaintiffs' counsel indicated in a letter to this court dated July 2, 2009, that the plaintiffs were amenable to revision of paragraph seven of the Proposed Consent Decree consistent with the language proposed by the Misericordia Resident Objectors at the fairness hearing [415]. Such broad drafting of the Proposed Consent Decree overreaches the objective of the plaintiffs' lawsuit, which plaintiffs' counsel described as ensuring the plaintiffs' "right to choose" to reside in the most integrated setting appropriate to their needs.

Because commonality and typicality do not exist among class members, class certification is vacated and approval of the proposed consent decree is denied. The case will proceed as an individual lawsuit rather than as a class action. The plaintiffs are directed to notify class members of the change in status of this lawsuit. *See Culver v. City of Milwaukee*, 277 F.3d 908 (7th Cir. 2002) (requiring notice to class members when class is decertified).

| | Courtroom Deputy Initials: |
|---|---|

JA170.3

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, et. al | : | 09-cv-1182 |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC | : | |
| WELFARE, COMMONWEALTH | : | |
| OF PENNSYLVANIA and | : | |
| ESTELLE B. RICHMAN, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**January 25, 2010**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Before the Court in this action brought under the Americans with

Disabilities act and the Rehabilitation Act is Defendants Department of Public

Welfare ("DPW") and Estelle Richman's ("Richman") ("collectively,

"Defendants") Motion to Dismiss the Amended Complaint ("the Motion"). (Doc.

20). For the reasons articulated below, the Court will deny the Motion.

**I.    PROCEDURAL HISTORY**

1

Plaintiffs Franklin Benjamin[1] ("Benjamin"), Richard Grogg ("Grogg"), Frank Edgett ("Edgett")[2], Wilson Sheppard[3], Sylvia Baldwin ("Baldwin")[4], and Anthony Beard ("Beard")[5] initiated this action with the filing of a Complaint on June 22, 2009. (Doc. 1). With leave, all of above-named Plaintiffs but Wilson Sheppard (collectively, "Plaintiffs") filed an Amended Complaint on July 14, 2009. (Doc. 9). Plaintiffs are institutionalized in Pennsylvania's state-operated intermediate care facilities for persons with metal retardation ("ICFs/MR"). Plaintiffs assert that Defendants' failure to offer and provide to Plaintiffs community alternatives in lieu of institutionalization where appropriate violates Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504" or "RA").

On September 2, 2009, the Court granted Plaintiffs' unopposed Motion to Certify a Class (Docs. 15), and certified a class of all persons who: (1) currently or in the future will reside in one of Pennsylvania's ICFs/MR, (2) could reside in the

---

[1]Benjamin's interests are represented by and through his next friend, Andree Yock.

[2]Grogg's and Edgett's interests are represented by and through their next friend, Joyce McCarthy.

[3] Sheppard's interests were represented by and through his next friend, Pamela Zotynia.

[4]Baldwin's interests are represented by and through her next friend, Shirl Meyers.

[5]Beard's interests are represetned by and through his next friend Nicole Turman.

2

**THIS PAGE INTENTIONALLY LEFT BLANK**

community with appropriate services and supports, and (3) do not or would not oppose community placement. (Doc. 17). The named Plaintiffs, Benjamin, Grogg, Edgett, Baldwin, and Beard, were named as class representatives. (Doc. 17).

Defendants filed the instant Motion on September 24, 2009. (Doc. 20). The Motion has been fully briefed and, therefore, is ripe for disposition. (Docs. 21, 22, 26). Defendants assert that Plaintiffs have failed to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

3

(2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "While a complaint

attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Id.*  A plaintiff must make "a 'showing'

rather than a blanket assertion of an entitlement to relief", and "without some

factual allegation in the complaint, a claimant cannot satisfy the requirement that

he or she provide not only 'fair notice,' but also the 'grounds' on which the claim

rests."  *Phillips*, 515 F.3d at 232 (citing *Twombly*, 550 U.S. at 555 n.3).  "[A]

complaint must allege facts suggestive of [the proscribed] conduct," and the

"[f]actual allegations must be enough to raise a right to relief above the speculative

level."  *Twombly*, 550 U.S. at 555, 563 n.8.  Therefore, "stating a claim requires a

complaint with enough factual matter (taken as true) to suggest the required

element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 555 n. 3).

On the other hand, "a complaint may not be dismissed merely because it

appears unlikely that the plaintiff can prove those facts or will ultimately prevail on

the merits."  *Id.* at 231 (citing *Twombly*, 550 U.S. 554-56, 563 n.8).  Rule 8 "does

not impose a probability requirement at the pleading stage, but instead simply calls

for enough facts to raise a reasonable expectation that discovery will reveal

4

evidence of the necessary element." *Id.* at 234.

## III.    FACTUAL BACKGROUND

In accordance with the standard of review, the following facts, derived from the Amended Complaint and other submissions, are viewed in the light most favorable to the Plaintiffs.

Plaintiff Benjamin has been institutionalized at the Ebensburg ICF/MR since 1966. Plaintiffs Grogg and Edgett have been institionalized at the Selinsgrove ICF/MR for twenty (20) years each. Plaintiff Baldwin has been institutionalized at the Polk ICF/MR since 1990. Plaintiff Beard has been institutionalized at the Ebensburg ICF/MR for forty-two (42) years. (Docs. 9 ¶¶ 8-12, 22 p. 1-2). All named Plaintiffs are more or less generally independent and, with proper support, could live in more integrated community settings. (Doc. 22 p. 2). The class members and their families are generally unopposed to community integration, and community support and services would be far less costly than continued institutionalization of the residents. (Doc. 22 pp. 2-3). The Plaintiffs are either not on a waiting list for these community-based services or are likely to be removed from such a list regardless of their level of need. (Doc. 9 ¶¶ 62-63, 73). Further, Plaintiffs assert that DPW has also failed to develop an integration plan to support future community integration. (Doc. 22 p. 11).

5

## IV.    DISCUSSION

Defendants note that Plaintiffs' ADA claim is governed by *Olmstead v. L.C.*, 527 U.S. 581 (1999).  In a plurality opinion, the Supreme Court asserted that a state is required to provide community-based services for persons with mental disabilities when "(1) the State's treatment professionals determine that such placement is appropriate, (2) the affected persons do not oppose such treatment, and (3) the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others." *Id.* at 606.

The Court noted that the integration mandate "is not boundless" and is limited by "reasonable modifications" and "fundamental-alteration" clauses.[6] *Id.* at 603.  Therefore, if a state can prove that integration or modification of its policies and practices would require a fundamental alteration of its services, programs, or activities, it can avoid liability under the mandate for the state's alleged insufficient integration.  *See Olmstead*, 527 U.S. at 603-607.  In evaluating the reasonableness of modification, *Olmstead* requires consideration of the state's available resources and responsibility to other patients.  *See id.* at 604.

Defendants assert that Plaintiffs' claim for community care in lieu of

---

[6] "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

JA176

institutional care under the ADA should be dismissed because the claim fails

satisfy the third element as required by *Olmstead*, that the placement can be

reasonably accommodated.  Specifically, Defendants assert that Plaintiffs give "no

plausible account of how the relief it seeks can be granted without simply allowing

plaintiffs to jump the queue." (Doc. 21 p. 5).  Defendants essentially maintain that

Plaintiffs are requesting that DPW disregard the rights or needs of other

individuals with mental disabilities to provide Plaintiffs with community-based

services.

As Plaintiffs note, Defendants are, basically, asserting that the Plaintiffs

have not properly pleaded facts sufficient to suggest that integration would not

result in a "fundamental alteration."   Although Plaintiff will bear the initial burden

of demonstrating the availability of a reasonable accommodation, if Plaintiff is

successful in that task then the burden of proof would shift to the Defendant to

establish that the relief demanded would be unduly burdensome or require a

fundamental alteration of policy.  *See Frederick L. v. Dep't of Public Welfare*, 364

F.3d 487, 492 n. 4 (3d Cir. 2004).  Therefore, Defendants cannot properly assert

that Plaintiffs have failed to meet such a burden when in fact it belongs to

Defendants.  Accordingly, the Court will not dismiss the Amended Complaint with

respect to Plaintiffs claim under the ADA.

7

Defendants also tersely assert that Plaintiffs have no entitlement to relief under the RA because "Section 504 is simply not a deinstitutionalization statute." (Doc. 21 p. 8). The RA, however, like the ADA favors "[t]he most integrated setting appropriate to the needs of qualified individuals with disabilities." *See Frederick L.*, 364 F.3d at 491 (quoting 28 C.F.R. § 35.130(d)). As such, under Section 504, when appropriate, community-based treatment is preferable over institutionalization. We therefore find that Plaintiffs have also stated a viable claim under Section 504 of the RA.

The Court is satisfied that Plaintiffs have sufficiently alleged a cause of action under both the ADA and the RA. We note that at this stage we are neither evaluating the merits of Plaintiffs claims nor determining Plaintiffs' probability of success. We are simply evaluating whether Plaintiffs have alleged facts sufficient to state a cognizable claim under the ADA and the RA, and we find that they have. Accordingly, we will deny Defendants' Motion to Dismiss the Amended Complaint. (Doc. 20).

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      Defendants' Motion to Dismiss the Amended Complaint (Doc. 20) is **DENIED**.

/s/ John E. Jones III
John E. Jones III

8

United States District Judge

9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andree Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : | |
| **Plaintiffs** | : | |
| v. | : : : | Civil Action No. 1:09-cv-1182-JEJ (Jones, J.) |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : : | Class Action |
| **Defendants** | : | |

## ANSWER TO AMENDED COMPLAINT

1.     Admitted and denied.  It is denied that Defendants' continuing failure to offer and provide them with the opportunity to receive services in integrated, community settings that are the most appropriate settings to meet their needs, resulting in their continued unnecessary segregation and institutionalization.

JA180

2.      Admitted and denied.  It is denied that many others in the state-operated Intermediate Care Facilities for person with Mental Retardation (ICFs/MR) want to live in the community.

3.      Denied.

4.      Denied.  The allegations contained in paragraph four (4) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

5.      Denied.  The allegations contained in paragraph five (5) consist of legal conclusions which require no response.

6.      Denied.  The allegations contained in paragraph six (6) consist of legal conclusions which require no response.

7.      Denied.  The allegations contained in paragraph seven (7) consist of legal conclusions which require no response.

8.-13. Admitted

14.     Denied.

15.-20.      Denied.  The allegations contained in paragraphs fifteen (15) through twenty (20) consist of legal conclusions which require no response.

21.     Admitted.

2

22.    Admitted and denied.   It is denied that the congregate, institutional nature of Ebensburg Center exacerbates Mr. Benjamin's mental health issues and undermines his capacity to benefit from treatment.

23.  Admitted and denied.  It is denied that Ebensburg Center is not the most integrated setting appropriate to meet Mr. Benjamin's needs.

24.    Admitted and denied.  It is denied that Mr. Benjamin remains unnecessarily institutionalized.

25.    Admitted and denied.  It is denied that Mr. Benjamin is not opposed to discharge from Ebensburg Center.

26.    Admitted.

27.    Admitted and denied.  It is denied that Mr. Grogg is currently employed in the community.

28.    Denied.

29.    Admitted and denied.  It is denied that Selinsgrove Center is not the most integrated setting appropriate to meet Mr. Grogg's needs.

30.    Admitted and denied.  It is denied that Mr. Grogg remains unnecessarily institutionalized.

31.    Admitted.

32.    Admitted.

33.    Admitted.

3

34.    Admitted and denied.  It is denied that Mr. Edgett is very independent.

35.    Admitted and denied.  It is denied that Selinsgrove Center is not the most integrated setting appropriate to meet Mr. Edgett's needs.

36.    Admitted and denied.  It is denied that Mr. Edgett remains unnecessarily institutionalized.

37.    Admitted.

38.    Admitted.

39.    Admitted and denied.  It is denied that Ms. Baldwin was returned to Polk Center due to behavioral and mental health issues.

40.    Admitted and denied.  It is admitted that Ms. Baldwin has challenging mental health issues.  The remaining allegations are denied.

41.    Admitted and denied.  It is denied that Polk Center is not the most integrated setting appropriate to meet Ms. Baldwin's needs.

42.    Admitted and denied.  It is denied that Ms. Baldwin remains unnecessarily institutionalized.

43.    Admitted.

44.    Admitted.

45.    Admitted.

4

46.    Admitted and denied.  It is denied that Ebensburg Center is not the most integrated setting appropriate to meet Mr. Beard's needs.

47.    Admitted and denied.  It is denied that Mr. Beard remains unnecessarily institutionalized.

48.    Denied.

49.-53(a).    Denied.  The allegations contained in paragraphs forty-nine (49) through fifty-three (53) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

53(b). Admitted.

54.    Admitted.

55.    Admitted.

56.    Admitted and denied.  It is denied that 23 residents were discharged to community services and that 5 residents were admitted to state centers.

57.    Admitted.

58.    Admitted.

59.    Admitted.

**60.**    Denied.  The allegations contained in paragraph sixty (60) consist of legal conclusions which require no response.

61.    Admitted.

5

62.    Admitted.

63.    Admitted and denied.  It is denied that defendants require their agents to complete PUNS forms for individuals who reside in the state-operated ICFs/MR.

64.    Denied.

65.    Admitted.

66.    Denied.

67.    Admitted.

68.    Admitted.

69.    Denied.

70.    Admitted.

71.    Admitted.

72.    Admitted.

73.    Admitted and denied.  It is denied that Defendants have required PUNS forms to be completed for the Named Plaintiffs and the putative class members.

74.    Admitted.

75.    Admitted.

76.    Denied.

77.    Denied.

6

78.    Admitted and Denied.  It is denied that an increased match would defray all of the costs involved in transitioning people out of state centers.

79.    Admitted and denied.  It is denied that DPW does not have an integration plan to develop community alternatives for residents of state operated ICFs/MR.

80.    Admitted.

81.    Denied.

82.    Paragraphs one (1) through eighty-seven (87) are incorporated by reference.

83.    Admitted and denied.  It is admitted that Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking.  The remaining allegations contained in paragraph eighty-three (83) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

84-87.        Denied.  The allegations contained in paragraphs eighty-four (84) through eighty-seven (87) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

7

88.    Paragraphs one (1) through ninety-three (93) are incorporated by reference.

89.    Admitted and denied.  It is admitted that Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking.  The remaining allegations contained in paragraph eighty-nine (89) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

90-93.        Denied.  The allegations contained in paragraphs ninety (90) through ninety-three (93) consist of legal conclusions which require no response.  If, however, they are deemed factual, they are denied.

94.    Admitted.

**FIRST DEFENSE**

95.    Pennsylvania has prioritized serving people who are in the highest category of need on the community waiting list, those who present with unexpected emergencies which jeopardize the person's health or welfare, or those who could result in a new state center admission. For this and other reasons, provision of community-based services and supports for State ICF/MR residents would effect a fundamental alteration in

8

JA187

Pennsylvania's Mental Retardation System that would require Pennsylvania

to ignore the needs of those with greater needs than those of the class

members.

96.    The Amended Complaint fails to state a claim upon which

relief can be granted.

Respectfully Submitted,

Date:  <u>February 23, 2010</u>          <u>s/Allen Warshaw</u>_____
                                       Allen C. Warshaw
                                       Chief Counsel
                                       PA ID No. 17145
                                       Office of General Counsel
                                       Department of Public Welfare
                                       3rd Floor West, Health & Welfare Bldg.
                                       Harrisburg, PA  17120
                                       (717) 783-2800 (phone)
                                       (717) 772-0717 (fax)
                                       awarshaw@state.pa.us

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and ESTELLE B. | : | |
| RICHMAN, in her official capacity as | : | |
| Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM AND ORDER**

**March 10, 2010**

## I.    INTRODUCTION

Currently pending before the Court in this class action is a Motion to

Intervene filed by Craig Springstead, by and through his father and guardian,

Bertin Springstead; Maria Meo, by and through her mother and guardian, Grace

Meo; Daniel Bastek, by and through his guardian, John Bastek; Michael Storm, by

and through his guardian, Polly Spare; Beth Ann Lambo, by and through her father

1

JA189

and guardian, Joseph Lambo; Richard Clarke, by and through his father and

guardian, Leonard Clarke; Richard Kohler, by and through his sister and guardian,

Sara Fuller; Maria Kashatus, by and through her father and guardian, Thomas

Kashatus; and Wilson Sheppard, by and through his brother and next friend,

Alfred Sheppard ("Applicants" or "Springstead Intervenors") on November 10,

2009.  (Doc. 27).  For the reasons that follow, we will deny the Motion to

Intervene.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On June 22, 2009, Plaintiffs Franklin Benjamin, Richard Grogg, Frank

Edgett, Sylvia Baldwin, and Anthony Beard (collectively, "Plaintiffs") filed a

Complaint against Defendants, Department Public Welfare of the Commonwealth

of Pennsylvania and Estelle B. Richman in her official capacity as Secretary of

Public Welfare of the Commonwealth of Pennsylvania ("DPW" or "Defendants").

(Doc. 1).  On July 14, 2009, Plaintiffs filed an Amended Complaint against the

Defendants.  (Doc. 9).  On August 31, 2009, Plaintiffs filed an unopposed Motion

to certify a class.  (Doc. 15).  On September 2, 2009, the Court certified the

following class:  All persons who: (1) currently or in the future will reside in one

of Pennsylvania's state-operated intermediate care facilities for persons with

mental retardation; (2) could reside in the community with appropriate services

2

and supports; and (3) do not or would not oppose community placement ("the Class"). (Doc. 17).

In the Amended Complaint, Plaintiffs allege that DPW, as the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation, has failed to offer and provide Plaintiffs with the opportunity to receive services in integrated, community settings that are most appropriate settings to meet their needs. (Doc. 9). Plaintiffs, therefore, seek appropriate declaratory relief and injunctive relief pursuant to Title II of the American with Disabilities Act, 42 U.S.C. § 12312 and 28 C.F.R. § 35.130(b)(3) ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) ("RA" or "Section 504"). (*See* Doc. 9).

Applicants allege that they are *de facto* members of the certified class. Specifically, Springstead Intervenors assert that persons with developmental disabilities should receive the care and support they require in a setting appropriate to each individual's unique needs, whether it be a community-based facility or an Intermediate Care Facility for the Mentally Retarded ("ICF/MR"). Therefore, although Applicants do not oppose the named Plaintiffs' right to community care for themselves, they submit this Motion for Intervention based on

3

their belief that the Class would include the Springstead Intervenors who do not seek this relief.  (*See* Docs. 27, 29).

On November 10, 2009, Applicants filed the instant Motion.  (Doc. 27). The Motion has been fully briefed by all parties.  (*See* Docs. 29, 34, 37).  It is therefore ripe for disposition.

### III.    STANDARD OF REVIEW

The applicable standards for adjudicating a motion to intervene will be fully set forth within the analysis of the pending Motion.

### IV.    DISCUSSION

As we previously stated, Applicants are residents of ICFs/MR who do not wish to be "forced" into community care.  Rather, they believe that persons with developmental disabilities should receive the care and support they require in a setting appropriate to each individual's unique needs, be it a community-based facility or an ICF/MR.  Applicants argue that they have a concrete, legally protectable interest in their own care, i.e., the availability of institutional care. Applicants, therefore, assert that they are *de facto* members of the Class and seek to intervene, alleging that their rights to choose ICF/MR care would be directly affected by Plaintiffs' lawsuit should Applicants be bound by any final judgment or settlement.

4

As Applicants submit, the Federal Rules of Civil Procedure provide for two types of intervention: intervention as of right and permissive intervention. *See* Fed.R.Civ.P. 24. We will discuss the two types of intervention in turn.

## A.    <u>Intervention as of Right</u>

Federal Rule of Civil Procedure 24 ("Rule 24") provides, in pertinent part:

> **Intervention as of Right**.    On timely motion, the court must permit anyone to intervene who: . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest unless existing parties adequately represent that interest.

Fed.R.Civ.P. 24(a). The United States Court of Appeals for the Third Circuit has instructed that Rule 24(a) entitles an applicant to intervene if the applicant establishes that all of the following prongs: (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation. *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005); *see also Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998); *Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992); *Harris v. Pernsley*, 820 F.2d 592, 596 (3d

5

Cir. 1987) *cert denied*, 484 U.S. 947 (1987).[1]  The applicant carries the burden of

proving all fours parts of the test under Rule 24.   *See United States v. Alcan*

*Aluminum*, 25 F.3d 1174, n.9 (3d Cir. 1994).  We shall measure the case at bar

against the four prongs.

## 1.    <u>Timeliness of Intervention Application</u>

The first prong of the intervention as of right test concerns the timeliness of

the intervention application.  Applicants argue that the application was timely as it

was filed at an early point in the proceeding.  Here, Plaintiffs filed their amended

complaint on July 14, 2009, Defendants moved to dismiss the complaint on

September 24, 2009, and the trial is scheduled for October 2010.  Applicants

assert, therefore, that neither Plaintiffs nor Defendants can plausibly argue that

granting the instant Motion will cause any prejudice, "where the Defendants have

yet to file a responsive pleading, no discovery has taken place, and the Court has

yet to rule on the Defendant's Motion to Dismiss."[2]  (*See* Doc. 29 p. 7).  Further,

Plaintiffs concede that the Motion is not untimely and do not challenge this prong

---

[1]These cases and others cited within this Memorandum were decided prior to one or more amendments to Rule 24.  Those amendments, however, did not change the substance of Rule 24 in the subsections pertinent to this matter.  *See* Fed.R.Civ.P. 24 advisory committee's notes, 2007 Amendment ("The language of Rule 24 has been amended as part of the general restyling of the Civil Rules to make them more easily understood. . . . These changes are intended to be stylistic only.").  Therefore, the cases cited continue to control our analysis of the present Motion.

[2] The Court denied Defendant's Motion to Dismiss (Doc. 37) on January 25, 2010.  (Doc. 38).

6

because the current schedule would be unaffected if the intervention is permitted.

(*See* Doc. 34 p. 5; Doc. 37 p. 3).

Because Plaintiffs concede this point and because the application was filed approximately three months after the amended complaint was filed, no measurable discovery had been conducted in the case, and the trial is scheduled to commence in October 2010, we find that the application was, in fact, timely.

## 2. <u>Interest in the Litigation</u>

Federal Rule of Civil Procedure 24(a) requires that applicants demonstrate an interest in this action that is "significantly protectable." The Third Circuit instructs that this means that the asserted interests "must be legal interests as distinguished form interests of a general and indefinite character . . . [T]he applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene." *Harris*, 820 F.2d at 601. Further, the Third Circuit instructs that the determination of whether a "significantly protectable" legal interest exists involves a pragmatic analysis and that there is no set list of interests that qualify as sufficient for intervention. *See Kleissler v. U.S. Forest Service*, 157 F.3d 964, 969-70 (3d Cir.1998). Intervenors, however, must have "an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Id*. at 972.

7

Moreover, an applicant typically has a right to intervene where "the action will have a significant *stare decisis* effect on the applicant's rights, . . .the contractual rights of the applicant may be affected by a proposed remedy," *Harris* 820 F.2d at 601, or the applicant is the "real party in interest" and "would have standing to raise the claim" itself. *Alcan*, 25 F.3d at 1185.

Springstead Intervenors, as residents of ICFs/MR who oppose forced placement in community care, allege that they have concrete, legally protectable interests in their own care, and more broadly, the availability of institutional care. (*See* Doc. 29 p. 3). Applicants further allege that these concrete interests are directly implicated in this litigation. (*See* Doc. 29, p. 3). Specifically, Applicants assert that they have a legally protectable interest in their own care, an interest in retaining a meaningful right to choose institutional options, and an interest in "opposing Plaintiff's claims that ICFs/MR are not the most integrated settings appropriate to the needs of *any* individual resident of those facilities." *Id*. at 9 (emphasis in original). Further, Applicants contend that if Plaintiffs' claims proceed on the present class action basis, the litigation "will impair the Springstead Intervenors' rights to choose ICF/MR care because the Applicants will, as a

8

practical matter, be bound by any potential judgment or settlement in this case"[3]

resulting from Plaintiffs seeking "appropriate declaratory relief and injunctive

relief" against Defendant DPW to allow all class members to "choose" community-

based care if applicable. *Id*. at 4. Applicants argue that this language would leave

them unable to choose to remain in institutional care if they were eligible for

community-based care. Applicants cite *Olmstead v. L.C. ex rel. Zimring*, 527 U.S.

581 (1999) and *Ligas v. Maram*, No. 1:05-cv-04331 (N.D. Ill. July 7, 2009) (class

decertification order) to support their argument that they have a legally protectable

interest of the right of their own care and the right to choose the best care option in

light of his or her own personal circumstances.

In *Olmstead*, mentally disabled patients brought suit against the State,

challenging their confinement in a segregated environment and seeking placement

in community care residential programs. In a plurality opinion, Justice Ginsburg

concluded that, under Title II of the ADA, it was a violation of the ADA to force

_____

[3] Applicants assert that Plaintiffs' action threatens their choice to the best care option in light of his or her own personal circumstances because Plaintiffs seek Rule 23(b)(3) relief, which offers no ability to "opt-out,"and thus, converting the underlying litigation from a policy disagreement into a dispute with concrete consequences. (*See* Doc. 29 p. 11). In support of this argument, Applicants rely on 7C Wright, Miller & Kane, Federal Practice & Procedure, Civ. 3d § 1908 (2009) (noting that the interest requirement is "one of inclusion rather than exclusion. If there is a direct substantially legally protectable interest in the proceedings, it is clear that this requirement of the rule is satisfied . . . It is sufficient also if the judgment will have a binding effect on the would-be intervenor.").

developmentally disabled patients to reside in institutionalized settings when they are able to live more fully integrated into society at large and do not oppose doing so.  527 U.S. at 597-602.  Thus, states are required to place persons with mental disabilities in community settings when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated.  *See id*.  In so holding, however, the plurality emphasized that "nothing in the ADA or in its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.  Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it."  *Olmstead*, 527 U.S. at 583; *see also* 28 C.F.R. § 35.130(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept any accommodation . . . which the individual chooses not to accept.").  Thus, the *Olmstead* Court, albeit in dicta, recognized that states need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.

In opposition to the Motion, Plaintiffs contend that Springstead Intervenors have no direct, "significantly protectable interest" that is jeopardized by this litigation for the simple reason that Applicants are explicitly excluded from the

10

class definition.  Plaintiffs assert that the class definition, approved by this Court, "has transformed any interest the Movants might have had from one that could be significant and legally protectable . . . to one that is . . . general and remote, if not purely illusory."  (*See* Doc. 34 p. 6).  Plaintiffs allege that the class definition itself preserves the choice that Applicants seek to protect by including in the Class specifically state ICF/MR residents "who do not or would not oppose community placement."  *Id.*  Thus, because Applicants are opposed to community placement, they will not be subject to any relief granted from the decision of the underlying class action litigation.[4] [5]

While the Court does not doubt that Applicants have a bona fide concern in their own care, that concern does not rise to the level of a significantly protectable in the interest in the litigation warranting intervention as a party.  We must agree, therefore, with Plaintiffs that the definition of the Class specifically excludes

---

[4]Further, Plaintiffs assert that they carefully formulated their claims in this narrow manner pursuant to *Olmstead*'s holding that the right to community services afforded by the ADA has been limited to those individuals who are not opposed to community placement.  The language in the certified class is taken verbatim from the Supreme Court's controlling precedent. *See Olmstead,* 527 U.S. at 587 (transfer appropriate where it "is not opposed by the affected individual"); *id.* at 607 ("the affected persons do not oppose such treatment").

[5] Plaintiffs proceed to explain that Applicants' status as non-class members insulates them from any potential settlement between Plaintiffs and Defendants because a settlement is a contract, which is not binding on a non-party.  Additionally, Plaintiffs assert that a judgment on the merits in this case would not preclude any claims that Applicants may have since "one of the elements of claim preclusion res judicata is identity of the parties or their privities." *Churchill v. Star Enterprises*, 183 F.3d 184, 194 (3d Cir. 1999).

11

Applicants because they oppose community placement, despite their ability to reside in the community with appropriate services and supports.  In making this determination, we are persuaded by the holding of United States Court of Appeals for the Seventh Circuit in *Ligas v. Maram*, 478 F.3d 771 (7th Cir. 2007), and the underlying holding of the district court in that case.  Interestingly, both parties have recognized and relied on this case due to its almost identical circumstances to the instant case.  In *Ligas*, the Seventh Circuit ultimately affirmed the district court's holding that the interest of the proposed intervenors, individuals who opposed community placement and sought intervention to ensure that the disabled would still retain a choice of where they lived,  would not be threatened or impaired by the lawsuit.  *Ligas*, 478 F.3d at 774.  The Seventh Circuit reasoned that a verdict in favor of the plaintiffs would not leave the proposed intervenors without a choice of institutional care because the plaintiffs' complaint was "replete with language of choice."  *Id*. Thus, "nothing in the complaint . . . would require the state to force those who desire institutional care to move out." *Id*.

Here, as in *Ligas*, Plaintiffs have narrowly tailored the class definition to affect only those disabled individuals who "do not or would not oppose community placement."  The class definition, which this Court certified by order on September 2, 2009, clearly excludes those disabled individuals currently residing in ICFs/MR

12

JA200

who oppose discharge from the institutional setting.  The ultimate outcome of this suit, therefore, would not require the state to force those who desire institutional care to move out.[6]  Accordingly, Applicants have not demonstrated an interest in the litigation to justify intervention as of right pursuant to Federal Rule of Civil Procedure 24(a).

Although Applicants carry the burden of proving all four parts of the test under Rule 24(a) and have failed to do so with respect to the interest in the litigation prong, in the exercise of completeness, we will analyze the remaining two prongs of the test in this narrative.  *See Alcan Aluminum*, 25 F.3d n.9; *see also Harris*, 820 F.2d at 596 ("Although these requirements are intertwined, each must be met to intervene as of right.").

### 3.    Potential Impairment of the Interest

------

[6] Further, Applicants put much emphasis on the fact that the Disability Rights Network (DRN) and Defendant DPW are currently in the midst of drafting a statewide Olmstead plan to end "unnecessary" institutionalization of persons with mental illness.  Applicants argue that "the parties could use the Olmstead integration plan for people with mental illness as a framework of potential settlement in this case."  (*See* Doc. 37 p. 7).  We find this argument flawed for two reasons.  First, Applicants' argument has no basis in law.  Both the ADA and our Supreme Court in *Olmstead* unequivocally hold that no disabled individual must accept accommodation which he or she opposes.  In fact, the *Olmstead* Court recognized that States need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.  *Olmstead*, 527 U.S. at 507-602.  Therefore, Applicants' fear of being forced to live in community-based settings is unfounded.  Furthermore, courts have held that mere speculation is not enough to generate an interest in the litigation.

JA201

Once an applicant for intervention has established that he or she has a sufficient legal interest in the underlying dispute, the applicant must also show that the interest is in jeopardy in the lawsuit. *Alcan Aluminum*, 25 F.3d at 1181 n.9; *see also Harris*, 820 F.2d at 596. In making such a determination, the court is obligated to assess the "practicable consequences of the litigations," and "may consider any significant legal effect on the applicants' interest." *Id.* at 601.

Springstead Intervenors argue that they face a "tangible threat" because Plaintiffs and Defendants have both agreed to proceed on a class basis. Further, Applicants assert that the "do not or would not oppose" limitation does not alleviate the threat of harm because Plaintiffs are seeking relief before that class is precisely defined.

As we previously determined, Springstead Interveners do not have a legally protectable interest which warrants intervention as of right on part of Applicants because they are specifically excluded from the certified class in this suit. Therefore, Applicants' alleged interest cannot logically be placed in jeopardy by the case *sub judice* because that interest is not implicated in the matter at hand. Accordingly, Applicants have failed to prove this part of the intervention as of right test.

### 4.    <u>Representation by Existing Party in Litigation</u>

14

The final prong of the intervention as of right test is that Applicants must demonstrate that their interests are not adequately represented by the existing parties in the lawsuit. *Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982). Applicants must demonstrate their interests are sufficiently different that the representative cannot give those interests proper attention. The Third Circuit has instructed that representation is typically considered to be inadequate for any one of the following three reasons:

> (1)  Although applicants' interests are similar to those of a party, they are sufficiently diverse that there is a risk that the existing party cannot or will not devote proper attention to the applicant's interest;
>
> (2)  There is collusion between the representative party and the opposing party;
>
> (3)  The representative parry has not been diligent in prosecuting the litigation;

*Id.*

In its Motion to Intervene, Applicants assert that they meet the inadequate representation prong because neither Plaintiffs as a class nor Defendants adequately represent their interests. Specifically, Applicants argue that, not only do their interests "diverge from those of the Plaintiffs," Plaintiffs' interests also are "openly antagonistic of the [Springstead] Intervenors' wishes" because Plaintiffs seek to "force" all class members to choose community-based care, whereas the Springstead Intervenors wish to protect their rights to choose appropriate treatment

15

in an institutional setting. (*See* Doc. 29 pp. 17-18).  Further, the Springstead

Intervenors allege that Defendants' failure to oppose class certification

demonstrates that Defendants do not adequately represent Springstead Intervenors'

interests.

Plaintiffs counter Applicants' inadequacy of representation arguments in

several ways.  First, Plaintiffs assert that they in fact represent Applicants' interests

by "carefully framing this lawsuit and the class definition to exclude from the Class

those individuals, like Movants, who are opposed to community placement."  (*See*

Doc. 34 p. 15).  Second, Plaintiffs argue that DPW "has proved itself able to

represent the Movants' interest."  *Id.*  Plaintiffs aptly submit that there is a well-

settled presumption that "when a representative party is a government body

charged with representing the interests of proposed intervenors . . ." it will do so

adequately unless there is a "showing of gross negligence."  *Brody*, 957 F.2d at

1123 (citing *Del. Valley Citizens Council for Clean Air v. Pa.*, 674 F.2d 970, 973

(3d Cir. 1982)).  Moreover, Plaintiffs highlight that "DPW has vigorously defended

this action" and had filed a Motion to Dismiss Plaintiffs' claims in their entirety.

(*See* Doc. 34 p. 16).  Even Applicants concede that presently both Defendants and

Applicants oppose the relief sought by Plaintiffs at this stage of the litigation.  (*See*

Doc. 37 p. 13).

16

After carefully considering the record, including but not limited to the three typical reasons constituting inadequate representation as delineated by the Third Circuit, we do not find any interest alleged by Applicants that is not being adequately represented by Defendants in this action.  *See Hoots*, 672 F.2d at 1135.

Applicants have failed to demonstrate that their alleged interests sufficiently diverge with those of Defendants such that there is a risk that Defendants cannot or will not devote proper attention to Applicants' interest.  Notably, Defendants here are the Department of Public Welfare of the Commonwealth of Pennsylvania and Estelle B. Richman in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania.  Although Applicants do recognize that DPW is a governmental entity, they baldly claim that Defendants' view of the "public welfare" squarely conflicts with Applicants' personal interests.  Nonetheless, aside from this unsubstantiated allegation Applicants have made no effort to show gross negligence or bad faith on the part of DPW, and have therefore not overcome the presumption that DPW, as a governmental body charged with protecting the interests of the Springstead Intervenors, will provide adequate representation.

Because Applicants have not raised the issue of potential collusion between the representative party, Defendants, and the opposing party, Plaintiffs, this issue does not warrant discussion.

17

Finally, although Applicants attempt to downplay the parallel positions of

Defendants and Springstead Intervenors of opposing the relief sought at this early

of the litigation, Applicants fail to demonstrate that Defendants will fail to

prosecute their defenses in the future or will alter their position in this litigation.

Therefore, we find no reason to believe that the representative party is not

diligently prosecuting this lawsuit.  This translates, in our view, to a finding that

Defendants, through their able counsel, will certainly protect the interests of

Applicants as this case proceeds to trial.

We therefore conclude that Applicants have not demonstrated that their

alleged interests are not being adequately represented by Defendants in this action.

As a result of Applicants' failure with respect to this prong, as well as the

"Interest" and "Impairment" prongs of the intervention as of right test, intervention

as of right pursuant to Rule 24(a) is accordingly not warranted in the case *sub*

*judice.*

### B.    Permissive Intervention

If a party fails to meet the requirements of Rule 24(a) to intervene as a matter

of a right, that party nonetheless may be granted permission to intervene under

Rule 24(b).  Rule 24(b) provides, in pertinent part: "On timely motion, the court

*may* permit anyone to intervene who: . . . has a claim or defense that shares with the

18

JA206

main action a common question of law or fact. . . ." Fed.R.Civ.P. 24(b)(1) (emphasis added). Rule 24(b) further provides that, when a court exercises its discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed.R.Civ.P.24(b)(3). In exercising its discretion, the court should consider various factors, including whether the proposed intervenors will add anything to the litigation and whether the proposed intervenors' interests are already adequately represented in the litigation. *Hoots*, 672 F.2d at 1136.

Applicants argue that permissive intervention is warranted as there are common questions of law and fact regarding this litigation, "including, [but] not limited to: (1) whether class action treatment is appropriate; (2) whether community care is appropriate for all class members; and (3) whether community care is, in fact, desired by all class members." (Doc. 29 p. 20). Further, Springstead Intervenors contend that this Court should grant permissive intervention because the inclusion of Applicants would cause no delay or undue hardship on the parties. *Id.* This action is not scheduled for trial until October 2010. Further, at the time the Motion was filed, the Court had not resolved Defendants' responsive pleading, and no discovery had taken place. *See id.*

19

JA207

In response, Plaintiffs argue that Applicants have asserted neither a claim nor a defense, and thus, do not have a claim or defense that share common questions with the main lawsuit.  As previously detailed herein, Plaintiffs assert that Springstead Intervenors do not have an interest in this suit because they are specifically excluded by the definition of the Class as those who are opposed to community placement.  Moreover, Plaintiffs submit that adding Applicants to the litigation would prejudice the adjudication of the parties' rights.  (*See* Doc. 34 p. 18).  Plaintiffs argue allowing Applicants to intervene will result in decertification of the class, and such decertification might adversely affect other absent class members who are "isolated, have limited resources, and have disabilities that prevent them from bringing individual lawsuits." *Id.*  Finally, according to Plaintiffs, a decertification of the class might further prejudice the named Plaintiffs because if the lawsuit was limited to these five named individuals, Defendants will most likely challenge their right to secure community services ahead of other ICF/MR residents who are also waiting for community placements. *Id.* at 19.

After a thorough review of the record and in sound discretion of the Court, we find that permissive intervention pursuant to Rule 24(b) is not warranted in this case.  Assuming, *arguendo*, the Springstead Intervenors share a claim or defense with the parties in the litigation, permissive intervention is nonetheless

20

inappropriate because the Applicants' interests are already represented in the litigation, and their appearance as intervenors would not sufficiently add anything to the litigation. *See Hoots*, 672 F.2d at 1136. As discussed above, we have determined that, while the precise interests of the Applicants may not necessarily be represented by Plaintiffs, those interests are represented adequately by DPW as the governmental body charged with protecting the interests of those such as Applicants. *See supra*, § VI(A)(4). The Third Circuit has explained that if the interests of the proposed intervenors are already represented in the litigation, courts typically deny such applications to intervene. *Hoots*, 672 F.2d at 1136. Furthermore, intervention by the Applicants would not add anything to the litigation. To reiterate, Applicants' interests are not implicated in the underlying suit because, although they do present a different viewpoint than the class Plaintiffs, they are explicitly excluded from the class. As such, the circumstances do not warrant permissive intervention by the Applicants.

## V.    CONCLUSION

Because we find that intervention is unwarranted under either Federal Rule of Civil Procedure 24(a) or 24(b), we will deny the Applicants' Motion to Intervene. An appropriate Order follows.

21

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    The Applicant's Motion to Intervene (Doc. 27) is **DENIED.**

.

/s/ John E. Jones III
John E. Jones III
United Stated District Judge

22

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : | Filed via ECF System<br><br>Civil Action No. 1:09-cv-1182-JEJ<br><br>Class Action<br><br>Complaint Filed June 22, 2009 |
| Plaintiffs, | : : | Judge Jones |
| v. | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : | |

_____

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs and the Class, through their Counsel, submit this Motion for Summary Judgment on their claims under the Americans with Disabilities Act and Rehabilitation Act.  For the reasons set forth in the accompanying Brief, there are no genuine issues of material fact, and the Plaintiffs and the Class are entitled to judgment as a matter of law.  In support of this Motion, Plaintiffs and the Class submit a Statement of Undisputed Material

JA211

Facts, Brief, and Exhibits, which are incorporated by reference as if fully set forth in

this Motion, as well as a Certification of Non-Concurrence.

Dated:  June 23, 2010                    By:    /s/ *Robert W. Meek*

Robert W. Meek -  PA 27870
Mark J. Murphy - PA 38564
Robin Resnick - PA 46980
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705
215-238-8070
215-772-3126 (fax)
RMeek@drnpa.org

Stephen F. Gold
1709 Benjamin Franklin Pkwy.
2nd Floor
Philadelphia, PA  19103
215-627-7100
215-627-3183 (fax)
stevegoldada@cs.com

Counsel for Plaintiffs and the Class

2

*Condensed Transcript*

# Kevin T. Casey

January 20, 2010

Benjamin v. Department of Public Welfare

**MEDIA** COURT REPORTING
216 West Front Street
Media, PA  19063
610.566.0805   fax 610.566.0318
www.mediacourtreporting.com
mcr@mediacourtreporting.com

January 20, 2010

Kevin T. Casey

Page 5

1        Kevin T. Casey
2     Q.  One other thing; I'm sorry.  There's
3  a couple little preliminaries.  Please answer
4  with a verbal response rather than shaking
5  your head or anything like that.  If I go too
6  quickly and I mumble, as my wife insists I do
7  all the time, please ask me to repeat the
8  question, and I will be happy to do so.
9        Is there any reason why today you
10 cannot fully and adequately respond to
11 questions?
12    A.  No.
13    Q.  Just to do a little preliminary, can
14 you state your full name for the record?
15    A.  Kevin T. Casey.
16    Q.  And, Mr. Casey, what is your current
17 position?
18    A.  I'm the deputy secretary for the
19 Office of Developmental Programs in the
20 Department of Public Welfare.
21    Q.  And how long have you held that
22 position?
23    A.  Six and a half years.
24    Q.  Can you just generally tell me what
25 your responsibilities are, not in detail, but

Page 6

1        Kevin T. Casey
2  generally?
3     A.  Generally I'm the chief
4  administrator for state-run and state-funded
5  programs for people with retardation and
6  people with autism.
7     Q.  Do you have any responsibilities
8  with regard to budgetary matters within your
9  office?
10    A.  I do.
11    Q.  And what are those?
12    A.  They are generally to prepare and
13 submit for approval with the help of my staff
14 budgets each year.
15    Q.  And do you have any responsibilities
16 with regard to, say, program activities of the
17 office?
18    A.  I do.  We manage the programs in the
19 mental retardation and autism bureaus
20 including monitoring the programs, setting
21 rules and regulations for the programs, things
22 of that type.
23    Q.  And prior to your current position
24 where were you employed?
25    A.  I was employed at Pennsylvania

Page 7

1        Kevin T. Casey
2  Protection and Advocacy, now known as The
3  Disability Rights Network.
4     Q.  And how long were you employed and
5  in what position?
6     A.  15 years as its executive director.
7     Q.  And just again generally what were
8  your responsibilities with regard to that?
9     A.  The protection and advocacy system
10 is a federally funded system that provides
11 protection and advocacy to people with
12 disabilities.  Each state is required to have
13 one.  They have general authority under
14 federal law to advocate for people with
15 disabilities and protect their rights.
16    Q.  And prior to your job as executive
17 director of the Pennsylvania Protection and
18 Advocacy, where were you employed?
19    A.  I was employed for two years as the
20 chief operating officer of Bethegy, Inc.
21 That's a large multistate service system for
22 people with mental retardation.
23    Q.  And what was your job?  I'm sorry.
24 Chief operating officer?
25    A.  Yes.

Page 8

1        Kevin T. Casey
2     Q.  So what kind of responsibilities did
3  that entail?
4     A.  It included developing and running
5  and monitoring services in about eight states
6  for people with mental retardation.
7     Q.  And this was a private organization?
8     A.  It was a private organization, yes.
9     Q.  And prior to that where were you
10 employed?
11    A.  Prior to that I was for about eight
12 years the executive director of the Eastern
13 Nebraska Community Office of Mental
14 Retardation.  That office was in charge of
15 community services for people with mental
16 retardation in five counties surrounding
17 Omaha, Nebraska.
18    Q.  Any other jobs prior to that that
19 are of any significance?
20    A.  My one other job prior to that --
21 two other jobs; pardon me.  I was the
22 executive director of the McLean County
23 Association For Retarded Citizens in
24 Bloomington, Illinois prior to that about five
25 years, and then prior to that I was a direct

2  (Pages 5 to 8)

JA214

Kevin T. Casey                                    January 20, 2010

Page 9

1          Kevin T. Casey
2    service staff member and special education
3    teacher in a state hospital in Decatur,
4    Illinois.
5        Q.   What's your educational background?
6        A.   I have a bachelor's degree in human
7    services and a master's degree in special
8    education.
9        Q.   Are you familiar with the term
10   "Qualified Mental Retardation Professional,"
11   or QMRP?
12       A.   I am.
13       Q.   Can you tell me what that is?
14       A.   It's basically a federal designation
15   setting out certain qualifications for a
16   person to be a supervisor and a program
17   planner in the ICF/MR system. That's the
18   Intermediate Care Facility for the Mentally
19   Retarded System.
20       Q.   And so it's a national designation?
21       A.   You have to apply.
22       Q.   And who sets the standard, shall we
23   say?
24       A.   CMS.
25       Q.   Formerly known as the Department of

Page 10

1          Kevin T. Casey
2    Human Services?
3        A.   Yes.
4        Q.   Health and Human Services.
5            Now, are you considered a QMRP?
6        A.   I was for many years. I haven't
7    reapplied recently, so I actually don't know
8    how long that goes.
9        Q.   You're not sure how long the
10   certification is?
11       A.   I think it is considered permanent,
12   but yes, I was qualified for a number of years
13   under that.
14       Q.   Are you familiar with the lawsuit
15   captioned as Benjamin versus the Department of
16   Public Welfare?
17       A.   Generally, yes.
18       Q.   And I want to show you a document
19   that we will mark as Casey 1.
20            (Casey Exhibit 1 was marked for
21   identification.)
22       Q.   Would you please take a look at what
23   has been marked as Casey 1 and let me know
24   when you are done looking at it, and I will
25   ask you a question about it. It is two-sided.

Page 11

1          Kevin T. Casey
2        A.   I saw that. Okay.
3        Q.   Have you seen this document before?
4        A.   I have.
5        Q.   And can you tell me in what way that
6    you have become familiar with this document
7    other than today?
8        A.   I believe it was given to me by a
9    member of Mr. Warshaw's staff to look at and
10   review.
11       Q.   And were you asked to look for any
12   documents or ask other staff people to look
13   for documents to respond?
14       A.   We were asked to look for documents
15   to respond and I subsequently instructed my
16   staff to look for documents to respond.
17       Q.   I'm sorry. I forgot to ask you.
18   Just tell me what the name of the document is.
19       A.   It's the request for production.
20       Q.   Thank you.
21            And just to follow up on the
22   question prior to that, you asked staff or you
23   yourself looked for documents, and did you
24   discover any documents that you thought were
25   responsive to the request for production?

Page 12

1          Kevin T. Casey
2        A.   I primarily asked staff to look. I
3    doubt I looked myself. And I believe we found
4    a number of documents that were responsive,
5    yes.
6        Q.   You mentioned earlier the term
7    "ICF/MR" or Immediate Care Facility for the
8    Mentally Retarded. I take it you are familiar
9    with ICF/MR as a term?
10       A.   I am.
11       Q.   And are ICF/MR federally funded
12   through Medicaid?
13       A.   They are federally funded through
14   Medicaid.
15            MR. MEEK: Off the record.
16            (Short recess.)
17            MR. WARSHAW: Mr. Rato has
18   joined us. He represents the petitioners
19   for intervention in this matter, and as a
20   nonparty he has not yet seen or signed
21   onto the confidentiality order. Since it
22   is my understanding, however, that we
23   will be looking at documents which have
24   been designated confidential, I have
25   asked Mr. Rato to make a commitment that

3 (Pages 9 to 12)

JA215

January 20, 2010

Kevin T. Casey

Page 13

```
1              Kevin T. Casey
2    he will review that order and at least
3    for purposes of this deposition be bound
4    by it.
5            MR. RATO:  And provided that it
6    is the order that has been submitted on
7    the docket and so ordered by the court --
8            MR. WARSHAW:  Absolutely.
9            MR. RATO:  -- I have already
10   reviewed that order, and on behalf of the
11   potential intervenors agree to be bound
12   by it.
13           MR. WARSHAW:  Thank you very
14   much.  I appreciate that.
15           MR. MEEK:  Just for the record,
16   Mr. Rato has joined us, and Mr. Rato is
17   here as requested, and we acceded to his
18   request to appear to observe the
19   deposition, but he won't be participating
20   as far as I understand it at all, so with
21   that said, we will continue and I will
22   just start back up where we left off.
23   BY MR. MEEK:
24   Q.  Mr. Casey, I was asking you some
25   questions about ICF/MR as an Intermediate Care
```

Page 14

```
1              Kevin T. Casey
2    Facility for the Mentally Retarded, and the
3    question was posed and, I think, answered.
4    Are ICF/MRs Medicaid funded, federally
5    Medicaid Funded?
6    A.  And they are federally Medicaid
7    funded?
8    Q.  And so Pennsylvania, the Department
9    of Public Welfare, receives federal funding
10   for part of the costs of operating those
11   facilities?
12   A.  We do.
13   Q.  And are you aware what the
14   percentage of federal match is currently?
15   A.  Currently it is about 65 federal 35
16   state under the Federal Stimulus Package.
17   Q.  And that's different than what has
18   been traditionally the rate; is that correct?
19   A.  That's correct.
20   Q.  What was the approximate
21   traditional --
22   A.  The approximate traditional rate is
23   54/46, 54 federal 46 state.
24   Q.  And you mentioned the stimulus
25   package.  The American Recovery and
```

Page 15

```
1              Kevin T. Casey
2    Reinvestment Act has set that at 63 percent
3    federal.  Do you know when that particular
4    rate will expire, or will it continue?
5    A.  It will expire December 31, 2010.
6    Q.  Is there any potential for that to
7    be extended as far as you know?
8    A.  There is some potential, yes.
9    Q.  In addition to the federal funding,
10   is it correct that the federal regulations
11   also govern the requirements for operation by
12   CFMs?
13   A.  Federal regulations govern.  The
14   state is permitted to add regulations if they
15   choose as long as the regulations are not
16   contradictory to the federal regulation.
17   Q.  So, in other words, the federal
18   regulations would be a floor of what's
19   required but the state can add other
20   requirements?
21   A.  That's correct.
22   Q.  And does that include staffing and
23   the kinds of services that must be provided?
24   A.  It includes staffing and it includes
25   standards for services.  It includes -- it's
```

Page 16

```
1              Kevin T. Casey
2    essentially a licensing standard which is used
3    for licensure of those facilities.
4    Q.  And are they ever inspected by any
5    agency?
6    A.  They are inspected regularly.  The
7    inspection in Pennsylvania is done by the
8    Department of Health.
9    Q.  The Pennsylvania Department of
10   Health?
11   A.  Pennsylvania Department of Health,
12   yes.
13   Q.  Now, are there any private entities
14   that operate ICF/MRs in Pennsylvania?
15   A.  There are a number of private
16   facilities.
17   Q.  Do you know approximately how many?
18   A.  No, I don't.
19   Q.  Do you know what their capacity is,
20   number of residents?
21   A.  Their capacity is about 2,500
22   residents.
23   Q.  And does Pennsylvania operate any
24   ICF/MRs itself?
25   A.  The state, DPW, operates five, yes.
```

4  (Pages 13 to 16)

JA216

Kevin T. Casey                                                      January 20, 2010

Page 21

1          Kevin T. Casey
2    this is Casey 2 we are referring to -- how
3    many residents of state ICF/MRs died during
4    that same period?
5        A.  Adding the number in Line 1 at 59
6    and the number in Line 2 at 141, about 200
7    people.
8        Q.  Thanks.
9          Now, in addition to the state
10   operated and the privately operated ICF/MRs is
11   it correct that Pennsylvania funds
12   community-based mental retardation services?
13       A.  It is correct.
14       Q.  And when we speak of community-based
15   mental retardation services, what kind of
16   services are we talking about?
17       A.  It is a wide range of services
18   dependent on the individual needs of the
19   consumer in question ranging all the way from
20   simple help and support in the home up to and
21   including group home placements.
22       Q.  So let me just go through a couple
23   of them, possible services.
24       A.  Sure.
25       Q.  So residential services are provided

Page 22

1          Kevin T. Casey
2    to some people?
3        A.  Residential services are provided to
4    some people, yes.
5        Q.  And what kinds of residential
6    services are available?
7        A.  There are several kinds of
8    residential services available.  We will
9    provide services in the individual consumer's
10   home if that's what the family desires.  We
11   will provide services in which the individual
12   goes and lives with another family.  That's
13   called family living or life sharing.  We will
14   provide group home services, usually limited
15   to group homes under the number of four, so
16   there's usually no more than four people in a
17   group home, and those are pretty standard
18   licensed residential facilities.
19       Q.  And is there anything where an
20   individual with mental retardation would live
21   on their own with supports?
22       A.  Yes, there are a number of
23   situations in which people live on their own
24   with supports.
25       Q.  And is there another kind of service

Page 23

1          Kevin T. Casey
2    often referred to as I think day programming?
3    Is that provided?
4        A.  We provide a wide range of day
5    programs.  We try and focus them as much as we
6    can on vocational, on trying to train people
7    for and find jobs for them.  If people are not
8    capable of that kind of thing, there are a
9    wide range of day services that we can and do
10   provide.
11       Q.  And what kind of services are those
12   nonvocationally oriented services?
13       A.  There's a lot of day activity
14   services where people are involved in
15   meaningful activities during the day, perhaps
16   taking trips into the community to become
17   familiar with the community, that kind of
18   thing.  We also provide in that context some
19   services for people who are able to live
20   reasonably independently.  So we might help
21   them with cooking.  We might help them with
22   budget preparation, things of that nature.
23       Q.  Are there any services related to
24   increasing the individual's socialization
25   skills or other social skills?

Page 24

1          Kevin T. Casey
2        A.  Sure.  We do a lot of -- in
3    particular in the day services, but also in
4    the residential services we do a lot of work
5    with people on getting used to their
6    community, operating in their community, being
7    able to get around their community, behaving
8    properly in their community, that kind of
9    thing.
10       Q.  And are there any other sort of more
11   -- I guess you would call it slightly more
12   medical services like therapy, both
13   psychological --
14       A.  Sure.  We provide speech,
15   occupational and physical therapy.  We provide
16   behavioral therapy.  We will provide mobility
17   therapy of various kinds.  We will also in
18   particular in some of the Medicaid programs
19   provide mobility equipment of one kind or
20   another, a pretty wide range of things like
21   that.
22       Q.  Are there any services, for example,
23   to assist people in communication?
24       A.  Yes, there are.
25       Q.  And what would they be?

6  (Pages 21 to 24)

Media Court Reporting - 610.566.0805

JA217

Kevin T. Casey                                    January 20, 2010

Page 25

1           Kevin T. Casey
2     A.  They would include speech therapy,
3   specific speech therapy.  A lot of people with
4   mental retardation have a problem with a
5   condition called dysphasia, which is something
6   that speech therapists provide and work with.
7   We do some work on alternate forms of
8   communication like sign language and things
9   like that.
10    Q.  And is there any use of assistive
11  technology to enable the person to
12  communicate?
13    A.  Yes.
14    Q.  And what sorts of things?
15    A.  A lot.  We can use and have for
16  years used language boards of various types.
17  Kind of the development of the computer age
18  has also expanded that capability
19  significantly across the system.  A lot of
20  people use computers in various ways to either
21  talk or to communicate and interact with other
22  people.
23    Q.  Do you provide respite services?
24    A.  We do provide respite services,
25  which is a temporary service that someone

Page 26

1           Kevin T. Casey
2   might need if their family can't care for them
3   for a short period of time or if their
4   caregiver needs rest for a short period of
5   time, that kind of thing.
6     Q.  Now, the types of services you
7   described and more, as you said, are they
8   provided throughout the commonwealth?
9     A.  They are provided throughout the
10  commonwealth, yes.
11    Q.  And leaving aside the funding piece,
12  would every person with a diagnosis of mental
13  retardation be eligible to receive some type
14  of community service?
15    A.  They would be eligible to receive
16  some type of community service, yes.
17    Q.  Depending on their needs?
18    A.  Depending on their needs.
19    Q.  When we say community services and
20  community-based services, are they essentially
21  the same thing?
22    A.  Yes.
23    Q.  And community supports also would
24  be --
25    A.  I'm sorry.  Would you --

Page 27

1           Kevin T. Casey
2     Q.  Sure.  And community supports, would
3   that be a synonymous term as well?
4     A.  Yes, that is also a term used.
5     Q.  Are you familiar with the term
6   "normalization"?
7     A.  Yes, I am.
8     Q.  And can you tell me what it means?
9     A.  It is basically a term and a theory
10  that was developed by Wolf Wolfensberger in
11  the late '60s, early '70s that essentially
12  contends that people with mental retardation
13  in particular but all people with disabilities
14  do significantly better if they receive their
15  services in a normal environment, so an
16  everyday environment like you and I might live
17  in.
18    Q.  When you say "better," what do you
19  mean?
20    A.  Their life is richer.  They learn
21  more quickly.  Their life is -- and this is
22  going to sound redundant.  Their life is more
23  normal.  That is the use of the word.
24    Q.  And was this concept, the
25  normalization concept, developed by

Page 28

1           Kevin T. Casey
2   professionals in the field of mental
3   retardation?
4     A.  It was developed by both
5   professionals and family members in the field.
6     Q.  And do you know what the
7   professional basis for that determination --
8   what underlies the theory?  Are there studies?
9   Are there any kind of empirical data?
10    A.  There's years of research that
11  backed the theory.
12    Q.  And can you tell me a little bit
13  about the research that has been done to the
14  extent you know what it is?
15    A.  Sure.  Probably the most well-known
16  piece of research in that is the Pennhurst
17  Longitudinal Study.  That was done essentially
18  studying the folks who lived in Pennhurst,
19  which was a Pennsylvania institution, and
20  studied them both while they were in the
21  institution and studied how they did when they
22  left the institution.
23        There is a study out of Nebraska
24  called the Keith Schalock study which is
25  generally thought of as one of the better.  It

7  (Pages 25 to 28)

JA218

Kevin T. Casey

January 20, 2010

Page 29

1           Kevin T. Casey
2   showed that people with mental retardation
3   improved by two standard deviations after they
4   leave an institution and enter community
5   programs as an average.
6           Also, the Pennhurst study has been
7   repeated in multiple states. I couldn't name
8   them all, but it has been repeated in multiple
9   states and shown very much the same results
10  from state to state.
11          We also did a similar study on the
12  Western Center residents when -- Western
13  Center was an institution in the western part
14  of Pennsylvania that was closed a number of
15  years ago. There was a study done on those
16  folks which again showed similar results.
17          Q. So the studies showed positive
18  impact on community living for mental
19  retardation. By the same token, was the
20  adverse proposition true; that is to say, is
21  it true or do the studies show that harm is
22  caused by institutionalization to individuals
23  with mental retardation?
24          MR. WARSHAW: Excuse me. I'm
25  going to object on the grounds that you

Page 31

1           Kevin T. Casey
2      A. I would say two things: Some of the
3   earlier studies of institutions 15, 20, 25
4   years ago showed higher rates of abuse and
5   neglect in institutions than in community
6   programs. So that's one factor. The second
7   factor is related to the normalization issue
8   that we previously discussed, which is that
9   you can't have -- you can't teach people how
10  to live a normal life in an abnormal
11  environment.
12          Q. And in that abnormal environment
13  that you described; that is to say, for
14  purposes of normalization, what occurs in that
15  setting that is harmful?
16          A. What the studies indicate is that
17  people literally become institutionalized.
18  They come to rely on the structures and
19  strictures of the institution. People are
20  required to get up at a certain time of day
21  and required to go to bed at a certain time of
22  day and required to go to a certain program at
23  a certain time and things of that nature.
24          Q. Aside from what you already told us,
25  are there any other benefits to normalization

Page 30

1           Kevin T. Casey
2   are really turning him into an expert,
3   and that's not appropriate, but go ahead
4   and answer. You are asking him expert
5   questions and you haven't retained him as
6   an expert and he has no obligation to
7   give expert opinions. I'm not sure you
8   qualified him as one, although I'm sure
9   he is qualified, but in any case I will
10  let him answer the question.
11          A. Would you like to know my rate?
12          Some of the older studies,
13  Pennhurst, Keith Schalock, studies of that
14  nature, do in fact show that there is some
15  definitive harm to people remaining in
16  institutions. Institutions as they exist
17  today have not been studied in any study I'm
18  aware of on that specific factor.
19          Q. What's the nature, to the extent you
20  know, with the caveat that has been interposed
21  by Mr. Warshaw -- what's the harm? What's the
22  nature of it?
23          MR. WARSHAW: Can I just have a
24  continuing objection?
25          MR. MEEK: Sure, sure.

Page 32

1           Kevin T. Casey
2   rather than institutionalization for people
3   with mental retardation?
4      A. I think I have pretty much expressed
5   the benefits.
6      Q. In your opinion -- again, I know I
7   have not qualified you as an expert, but you
8   are presumably still a QMRP -- why is
9   normalization important?
10     A. It is important for the reasons I
11  have stated. You can't -- you cannot learn in
12  my opinion to live in the real world if you
13  are not living in the real world. You have to
14  be taught to live in the read world in the
15  real world. There are also in most
16  communities a much broader availability of
17  things to do, go to the movies, go to a play,
18  go to the park, go to -- there is just a much
19  wider range of things for an individual to do,
20  which allows the person to live their life as
21  much as possible like everybody else.
22     Q. Has Pennsylvania adopted a policy of
23  normalization?
24     A. I don't know if there is a specific
25  place or document where it has been adopted.

8  (Pages 29 to 32)

Media Court Reporting - 610.566.0805

JA219

Kevin T. Casey                                                    January 20, 2010

**Page 33**

1              Kevin T. Casey
2    We certainly have adopted it in theory.
3        Q.  And is it also the policy of
4    Pennsylvania to provide individuals with
5    mental retardation with services in the
6    community?
7        A.  It is.
8        Q.  Do you have an idea of the
9    percentage of people with mental retardation
10   who are served in the community as opposed to
11   those who are served in private and public
12   centers?
13       A.  No, I don't.
14       Q.  Do you know how many people are
15   receiving community-based services currently
16   in Pennsylvania in mental retardation centers?
17       A.  About 45,000.
18       Q.  45,000?
19       A.  Yes.
20       Q.  To move on to another subject, I'm
21   going to ask you a couple questions about
22   funding.
23            Is it correct there are two
24   essential funding streams for community-based
25   mental retardation services of Pennsylvania?

**Page 34**

1              Kevin T. Casey
2    Is that accurate?  Or a better question would
3    be what are the funding streams that fund
4    community mental retardation services in
5    Pennsylvania?
6        A.  Mental retardation services in
7    Pennsylvania are funded primarily with
8    Medicaid dollars.  Medicaid dollars, as we
9    discussed earlier, are a federal/state match.
10   There is a relatively small amount of money in
11   the program that is called state-based
12   dollars, state-only dollars, which are used
13   for a couple of things; one, services that are
14   not Medicaid eligible, and, two, services for
15   people who may not be Medicaid eligible.
16   There is also a small amount of the individual
17   consumers' SSI funding which is part of the
18   funding for residential programs.
19       Q.  Now, you mentioned state-based
20   funding.  Can you describe what that is
21   briefly?
22       A.  Yeah.  There is a certain amount of
23   money in the system -- it is roughly 150
24   million -- that is state-only money.  It goes
25   to the counties and is used by the counties at

**Page 35**

1              Kevin T. Casey
2    their discretion on mental retardation
3    services, and the counties within some pretty
4    limited rules can use the money as they choose
5    to provide mental retardation services.
6        Q.  Does the county have any
7    contribution to provision of mental
8    retardation services?
9        A.  Very little anymore.  Since they are
10   not required to match residential services
11   anymore, it is a very small amount.
12       Q.  Can you tell me -- I think you
13   mentioned a couple already -- the types of
14   services funded by purely state dollars that
15   are not eligible for Medicaid or other kinds
16   of funding?
17       A.  Actually the types of services are
18   pretty wide ranging too.  They include some
19   residential services.  They include some group
20   homes, but they are used primarily -- the
21   largest number of people who get those
22   services are people who are getting in-home
23   support services.  So some funding goes to or
24   some amount of staff support goes to either
25   the family or the individual in their home.

**Page 36**

1              Kevin T. Casey
2        Q.  Does base funding pay for respite
3    care?
4        A.  It does pay for respite care, yes.
5        Q.  How about for family support
6    services?
7        A.  It does pay for family support
8    services.
9        Q.  Any other categories?
10       A.  Some of the funding in the base
11   program is used to do some administrative and
12   monitoring things, so we have a monitoring
13   program called the independent monitoring for
14   quality.  That's funded out of the base
15   dollars.  We do some parent training that is
16   funded out of the base dollars.  And then some
17   of the county administration for
18   administration of the program in the county is
19   funded out of the base dollars.
20       Q.  Is it correct that individuals with
21   mental retardation have no entitlement to
22   base-funded services?
23       A.  That's correct.
24       Q.  I'm going to ask a couple of
25   questions about waiver funding.

9  (Pages 33 to 36)

JA220

Kevin T. Casey                                              January 20, 2010

Page 37

1            Kevin T. Casey
2        So aside from the base fund
3    services, does the state fund community mental
4    retardation services using Medicaid home and
5    community-based waiver dollars?
6        A.  Yes, we do.
7        Q.  And can you tell me what a Medicaid
8    home and community-based waiver is?
9        A.  Sure.  About 25 years ago the
10   federal government developed a waiver program
11   and the waiver is against the ICF/MR rules, so
12   it's a waiver of the ICF/MR rules to develop
13   community programs.  They funded it
14   specifically on the match we talked about.  It
15   gets a regular Medicaid match.
16       Q.  And what's the criteria for being
17   eligible for Medicaid home and community-based
18   waiver services?
19       A.  The criteria is two in the waivers
20   we run.  There are a variety of waivers in
21   Pennsylvania, and in the two waivers that we
22   run the criteria is that the person must be
23   mentally retarded by a national definition
24   and the person must be in need of what is
25   called ICF/MR level of support.  If both of

Page 38

1            Kevin T. Casey
2    those are true, they are eligible for the
3    program.
4        Q.  And what are the two waivers?  I'm
5    sorry.  I should ask you that.
6        A.  There is a waiver that is called the
7    consolidated waiver which is an uncapped,
8    waiver, which means essentially that the
9    consumer gets the services the consumer needs
10   regardless of costs.  That's the waiver we
11   generally use to fund residential services and
12   high-intensity services that people might
13   need.
14       There is a waiver called the
15   Person/Family Driven Services Waiver.  PFDS is
16   how it is most often referred to.  That is a
17   financially capped waiver.  You can receive
18   the services you need up to the cap, which is
19   currently 26,000.
20       Q.  Now, the idea of waivers is to --
21   correct me if I'm wrong -- fund community
22   services for people who are in institutions or
23   who are at risk of institutionalization; is
24   that correct?
25       A.  No, I don't think that is entirely

Page 39

1    correct.
2        Q.  Okay.  You then correct me.
3        A.  Okay.  That was the initiation of
4    the waiver program.  It was meant to both
5    avoid people going to institutions and to get
6    people out of institutions who were in
7    institutions.  It has now become a broad
8    funding stream for community programs, and
9    there actually is no longer -- there used to
10   be many years ago a requirement that you had
11   to be at risk of entering an institution to be
12   eligible for the funding.  That requirement no
13   longer exists.
14       Q.  So you don't have to be at risk but
15   you need to be -- need to need the level of
16   ICF/MR.
17       A.  You need to need that level of
18   service, yes.
19       Q.  As you mentioned earlier, the
20   federal match, the 62 percent now until the
21   end of 2010 --
22       A.  It is actually 65 percent now.
23       Q.  I'm sorry; 65 percent and the 54
24   percent sort of normal regular old match --

Page 40

1            Kevin T. Casey
2        A.  Right.
3        Q.  -- that applies also to
4    waiver-funded programs?
5        A.  It does, yes.
6        Q.  Now, does a waiver -- because it
7    waives some of the requirements of in this
8    case the ICF/MR regulations, does the state
9    allow it to limit who can get into, quote get
10   into, a waiver that has become eligible for
11   waiver services?
12       A.  No; if you are eligible, you are
13   eligible.
14       Q.  So there is no cap or ceiling on the
15   number of people that could be served?
16       A.  There is a cap in each waiver of the
17   number of people that can be served, and if we
18   want to raise that, which we do periodically,
19   we have to request permission from the Feds.
20   We have to file a waiver amendment.  Generally
21   they approve those amendments, that kind of
22   amendment; not all amendments we file, but
23   they approve that kind of amendment pretty
24   much at our request.
25       Q.  Now, there is one thing you didn't

10  (Pages 37 to 40)

JA221

Kevin T. Casey                                    January 20, 2010

Page 41

1                Kevin T. Casey
2   mention.  One of the requirements for waiver
3   eligibility is that the waiver has to provide
4   service in a cost-neutral manner; is that
5   correct?
6        A.  That is correct.  As an average it
7   has to provide services in a cost-neutral way,
8   so the cost of the services as an average
9   cannot be more than the cost as an average of
10  the ICF system.
11       Q.  Including both private and public?
12       A.  Including both private and public.
13       Q.  That are used for the average?
14       A.  Yes.
15       Q.  Obviously that would mean if there
16  is an average utilized there are some people
17  above average in cost and some people below
18  average in cost, correct?
19       A.  Obviously.
20       Q.  You already mentioned this, but it
21  was covered -- the federal government has to
22  approve all waivers and waiver amendments,
23  correct?
24       A.  They do.
25       Q.  And that means usually the Center

Page 42

1                Kevin T. Casey
2   for Medicare or Medicaid Services, CMS?
3        A.  That always means that, yes.
4        Q.  And you already mentioned this.  CMS
5   can amend the waiver and amend the cap; is
6   that correct?
7        A.  We file an amendment for --
8        Q.  You request.
9        A.  -- for those.  They either approve
10  it or don't approve it.
11       Q.  And you have mentioned the number of
12  waivers and their names, so I'm going to ask a
13  little bit about the consolidated waiver.
14            So is the consolidated waiver
15  limited to persons with mental retardation?
16       A.  It is limited to persons with mental
17  retardation.
18       Q.  And the person needs an ICF/MR level
19  of care, correct?
20       A.  Correct.
21       Q.  And there are also some financial
22  criteria?
23       A.  There are some financial
24  requirements, yes.
25       Q.  And is that essentially about how

Page 43

1                Kevin T. Casey
2   much money they have available to them?
3        A.  Basically, yes.
4        Q.  Is it correct that the consolidated
5   waiver is the largest Medicaid waiver that the
6   state operates in both numbers and persons?
7        A.  I don't know.
8        Q.  You don't know, okay.
9            Do you know how many people are
10  currently participating in the consolidated
11  waiver?
12       A.  No.
13       Q.  Do you know whether the current
14  numbers of persons served is below the maximum
15  that you've gotten authorization from CMS to
16  have?
17       A.  I don't know.
18       Q.  And you mentioned the CMS, when you
19  ask, generally approves the request for
20  increase in the number of person services?
21       A.  Yes, they do.
22       Q.  You file a waiver -- again, I think
23  we may have mentioned this, but is there any
24  limit on the costs of the services that can be
25  provided to an individual participant?

Page 44

1                Kevin T. Casey
2        A.  No; in a consolidated waiver there
3   is no limit.
4        Q.  So to your knowledge are there
5   individuals in the consolidated waiver whose
6   services exceed $200,000 annually?
7        A.  Yes.
8        Q.  $300,000?
9        A.  Yes.
10       Q.  400,000?
11       A.  Yes.
12       Q.  $500,000?
13       A.  Yes.
14       Q.  And is it correct that many of those
15  people receiving services in that 200,000 plus
16  have never been institutionalized?
17       A.  Yes, that's correct.
18       Q.  Do you have any understanding of the
19  distribution of numbers of persons whose
20  services are in that 200,000 plus as opposed
21  to the rest of the persons in the waiver?
22       A.  Yeah.  I actually asked for a number
23  on that recently.  There are about 200,000
24  whose budgets are $200,000 or more.
25       Q.  In the waiver?

11  (Pages 41 to 44)

JA222

Kevin T. Casey                                    January 20, 2010

Page 45

1          Kevin T. Casey
2      A.   In the consolidated waiver.
3      Q.   But we don't know exactly how many
4   people are in the consolidated waiver?
5      A.   I don't know the exact number.
6      Q.   How about an approximate number?
7      A.   I'm not going to give that at this
8   point because I just don't know the exact
9   number off the top of my head.
10     Q.   So I'm going to ask you a couple
11  questions about what types of services can be
12  funded by the department through the
13  consolidated waiver.  Can you just give me a
14  laundry list if you can?
15     A.   A wide range of residential
16  services, day services, therapeutic services,
17  psychiatric and behavioral services.  There's
18  a wide range of services, and the principle of
19  the program is that the service is designed to
20  the exact need of the individual.
21     Q.   Now, residential services includes
22  group homes and all the other sorts of --
23     A.   Group homes, family living, in-home
24  support, all of that.
25     Q.   Would it be fair to say the group

Page 46

1          Kevin T. Casey
2   home type of residential services is one of
3   the highest costing type services?
4      A.   Sure.
5      Q.   And you have mentioned there are
6   other types of residential living
7   possibilities?
8      A.   Yes.
9      Q.   Supported living and family living
10  and all of that?
11     A.   Yes.
12     Q.   Can you tell me what nonresidential
13  habilitation is?  What does that entail?
14         First of all, let me back up.  Is
15  nonresidential habilitation provided to people
16  in the waiver?
17     A.   It is.
18     Q.   Now tell me what it is.
19     A.   Again it's a pretty wide ranging
20  service system in which a team of people who
21  are familiar with the individual decide what
22  services they need, that perhaps,
23  hypothetically, the person needs to make their
24  bed, they need to learn to use the bathroom,
25  perhaps they need to get a job, something of

Page 47

1          Kevin T. Casey
2   that nature.  All of that can be done under
3   nonresidential habilitation.
4      Q.   And you already mentioned earlier
5   that vocational and prevocational services are
6   provided?
7      A.   We also provide vocational and
8   prevocational services, yes.
9      Q.   And what does that look like?
10     A.   Again, some of these questions are
11  hard to answer because the services are very
12  individually based, but it might look, for
13  someone who is capable of having a job, like
14  training them on job-related behaviors, how
15  you behave at work, perhaps training them
16  specifically on a specific job for a while,
17  perhaps having a job coach with them, things
18  of that nature.
19         If they are not capable of doing
20  that kind of thing yet, the services may be
21  some level of prevocational services where you
22  are doing various kinds of day activities,
23  community activities with the individual.
24  There also may be a fair number of training
25  activities going on, again teaching the person

Page 48

1          Kevin T. Casey
2   something they need to know to operate better
3   in life.
4      Q.   Do some individuals in the
5   consolidated waiver actually work in a regular
6   work environment with supports?
7      A.   Sure.
8      Q.   And I guess the question is
9   essentially the services that are provided in
10  the waiver are the same or even greater
11  perhaps than what is required to be provided
12  in ICF?
13     A.   Yes.
14     Q.   And just a couple questions about
15  the Person/Family Directed Support Waiver.
16  That again -- correct me if I'm wrong.  That
17  is limited to people with mental retardation
18  who need an ICF/MR level of care?
19     A.   Yes.
20     Q.   And meet the financial eligibility
21  requirements?
22     A.   Yes.
23     Q.   Do you know how many people
24  approximately are in the PFDS waiver?
25     A.   No.

12  (Pages 45 to 48)

JA223

Kevin T. Casey                                              January 20, 2010

Page 49

```
 1            Kevin T. Casey
 2     Q.  Do you know whether there is a cap
 3  on the PFDS waiver?
 4     A.  There's a financial cap at $26,000.
 5     Q.  Is there number of persons cap?
 6     A.  There is also a number of persons
 7  cap, same principle as the consolidated
 8  waiver.
 9     Q.  In the sense there is a cap but you
10  can request CMS to increase the cap?
11     A.  Yes.
12     Q.  Do you know whether you now have
13  people enrolled in PFDS waiver and you're
14  still below the cap that has been approved by
15  CMS?
16     A.  Yes.
17     Q.  What kind of services can be funded
18  under PFDS waiver?
19     A.  Basically the same services that can
20  be provided in the consolidated waiver except
21  it has the financial cap on it, so if you look
22  at the service definitions for the two waivers
23  they are very similar.
24     Q.  But it is likely, is it not, that
25  because of the financial cap, a person, a PFDS
```

Page 51

```
 1            Kevin T. Casey
 2  being the folks in the waiver are eligible for
 3  a wide range and use a wide range of those
 4  kinds of services.
 5     Q.  So, for example, physician care?
 6     A.  Physician care, hospital care.  Some
 7  of the speech, occupational and physical
 8  therapy are paid for out of that program.
 9  Some of the behavioral care actually can be
10  paid for out of that program.
11     Q.  Medications?
12     A.  Medications, yes.
13     Q.  Home health care?
14     A.  Home health care can be, yes.
15          (Interruption at door.)
16  BY MR. MEEK:
17     Q.  My next question is:  So the
18  services for which people are eligible based
19  on their Medicaid eligibility, people in the
20  waivers, would they be subject to the same
21  availability as someone who is not in the
22  consolidated waiver?
23     A.  Yes.
24     Q.  In Pennsylvania the Medicaid
25  program, aside from the waiver, is divided
```

Page 50

```
 1            Kevin T. Casey
 2  waiver, probably would not be able to secure
 3  group home residential services?
 4     A.  In most cases that would be true.
 5     Q.  How about family living services;
 6  are they within reach of the PFDS cap?
 7     A.  Most of the time not I would say.
 8     Q.  Is it likely also that a person
 9  within the PFDS waiver would not be able to
10  get significant amount of nursing care?
11     A.  No.  It depends on the kind and
12  level of nursing care they need.  So if they
13  need a small amount of nursing care in a given
14  week, they could probably stay under the cap.
15     Q.  Aside from the two programs we have
16  mentioned, the consolidated waiver and the
17  PFDS waiver, are you familiar with traditional
18  Medicaid programs in Pennsylvania?
19     A.  I am.
20     Q.  And does the traditional Medicaid
21  program fund any other services for people who
22  are in the consolidated waiver or PFDS waiver?
23     A.  It can.  Since in order to be in any
24  of the waivers you have to be Medicaid
25  eligible, they are eligible for -- "they"
```

Page 52

```
 1            Kevin T. Casey
 2  into two sorts of programs; is that correct?
 3  If I told you one is physical health and one
 4  is behavioral health, would you find that to
 5  be accurate?
 6     A.  I would find that to be accurate.
 7     Q.  And is it correct that behavioral
 8  health medical assistance services in
 9  Pennsylvania are provided through managed care
10  companies that contract with the counties and
11  the DPW?
12     A.  I believe that's correct in some
13  counties.  I'm not sure it is correct in all
14  counties.
15     Q.  And is that known as the Behavioral
16  Health Health Choices Program?
17     A.  Yes, it is.
18     Q.  And the Behavioral Health Health
19  Choices Program covers things like partial
20  hospitalizations?
21     A.  Uh-huh.
22     Q.  Inpatient psychiatric --
23     A.  That's correct.
24     Q.  -- at private hospitals, psychiatric
25  services?
```

13  (Pages 49 to 52)

JA224

Kevin T. Casey                                         January 20, 2010

Page 57

1              Kevin T. Casey
2        Q.  And that is in those counties a
3    fee-for-service system still operates?
4        A.  Yes, it does.
5        Q.  And is that known as Access Plus?
6        A.  Yes, it is.
7        Q.  Again, do you know -- and I'm asking
8    you percentages, which I don't expect you to
9    know, but I'm going to ask you anyway.  Do you
10   know about what percentage of medical
11   assistance recipients are in the Physical
12   Health Health Choices versus Access Plus?
13       A.  I have no idea.
14       Q.  Do you know whether the Department
15   of Public Welfare has any information that
16   breaks down the cost of Medicaid services in
17   the fee-for-service system by those in the
18   consolidated waiver or PFDS compared with
19   other Medicaid enrollees?
20       A.  I don't know.
21       Q.  I'm going to move on to another set
22   of questions about the county system.
23            Are you familiar with the entities
24   county MHMR offices?
25       A.  I am.

Page 58

1              Kevin T. Casey
2        Q.  And can you tell me what an
3    administrative entity is?
4        A.  An administrative entity is a CMS
5    Medicaid term for an organization that the
6    state picks to run the waiver program in a
7    particular geographic area of the state.
8        Q.  And so they are a contractor with a
9    county MHR program?
10       A.  No; they are a contractor with the
11   state.
12       Q.  And what's a Base Service Unit?
13       A.  A Base Service Unit is essentially a
14   subprogram in an administrative entity or a
15   county that's in charge of managing the
16   services for a particular part of that
17   geographic location.
18       Q.  And what's its relationship to the
19   county MHMR office?
20       A.  Generally they are a subcontractor
21   of the county MHMR office.
22       Q.  Are they generally operated by
23   private nongovernmental entities?
24       A.  Base Service Units generally are,
25   yes.

Page 59

1              Kevin T. Casey
2        Q.  And can you tell me briefly what the
3    role of the county MHMR office is in
4    administering the community mental
5    retardation system versus the role of the
6    Department of Public Welfare?
7        A.  Yes.  Their role is being the
8    gatekeeper at the front door of the system.
9    They make judgments about eligibility.  They
10   make judgments about kinds of programs that
11   may or may not be approved for a particular
12   consumer, and they do some general overall
13   management and monitoring of providers in the
14   system.
15       Q.  And I just want to note for the
16   record when we say -- either Mr. Casey or I
17   say "county," we are referring to the county
18   MHMR office or the administrative entity or
19   the BSU, so we are not confused.
20       A.  That's right.
21       Q.  So would it be fair to say that the
22   responsibility of DPW is ultimately to ensure
23   that Medicaid services including waiver
24   services are administered consistent with
25   federal law?

Page 60

1              Kevin T. Casey
2        A.  Yes.
3        Q.  And did DPW recently change the
4    county's role regarding Medicaid waiver
5    services pursuant to a CMS recommendation?
6        A.  Yes, we did.
7        Q.  Can you describe what those changes
8    are?
9        A.  The major change was that prior to
10   the change providers in the system were
11   essentially subcontractors of the county.  So
12   we allocated -- "we" being DPW allocated a
13   certain amount of money to each county each
14   year, and the county was responsible for
15   deciding how that money got distributed to
16   providers.  The change is that the state has
17   now taken direct control over both the rate
18   setting and the payment system for providers.
19   So we now set the rates and pay the providers
20   for whatever they do essentially and they are
21   much more now responsible to us than they are
22   responsible to the county.
23       Q.  And do you know why CMS suggested
24   such a change?
25       A.  Yes.  CMS thought that the counties

15  (Pages 57 to 60)

JA225

Kevin T. Casey                                    January 20, 2010

---

Page 61

Kevin T. Casey

1          Kevin T. Casey
2  were acting inconsistently, that you could not
3  get the same set of services in Erie that you
4  could get in Philadelphia and they thought
5  that might be a real improvement to the system
6  if we were managing and requiring that the
7  same set of services be available in each part
8  of the state.
9      Q.  Did the Department of Public Welfare
10  also change the rate structure for waiver
11  services?
12      A.  To the degree that there was a rate
13  structure previously, yes, we did.  There now
14  is a rate structure and a rate setting system
15  in Pennsylvania, which there really wasn't
16  prior to the changes.
17      Q.  And how is that implemented or
18  operationalized?
19      A.  It is operationalized through a
20  cost-based rate setting system.  The provider
21  submits to us, "us" being the state, a cost
22  report each year as to what their costs were
23  the previous year.  We examine that for
24  accuracy, reliability, things of that nature,
25  and then either approve it or don't.  If we

---

Page 63

Kevin T. Casey

1          Kevin T. Casey
2  eligible on that basis.  If they are, the
3  county declares them eligible.  Once they are
4  declared eligible, they go through a process
5  of -- we have a long waiting list for services
6  in Pennsylvania.  At that point they go
7  through a process of having a form filled out
8  that is called the PUNS form, which determines
9  essentially at what level of need they are in
10  terms of needing services, and they are then
11  generally placed on a waiting list until
12  services become available.
13      Q.  Does every person who applies get a
14  supports coordinator?
15      A.  Generally, yes.
16      Q.  And what's the job of the supports
17  coordinator?
18      A.  The job of the supports coordinator
19  is to do what the title says, to coordinate
20  supports, to help the consumer determine what
21  they need and to help them get that once that
22  determination is made.
23      Q.  Now, you mentioned PUNS, which is --
24  that's an acronym.  I know that one is an
25  acronym.

---

Page 62

Kevin T. Casey

1          Kevin T. Casey
2  don't approve it, we go back to the provider
3  and negotiate with them on how to get it
4  approved.
5          Once we agree on a rate with the
6  provider, then the provider bills to the
7  Promise System, which is the major Medicaid
8  payment system in Pennsylvania.  The provider
9  submits their bill to the Promise System and
10  it is paid off of that bill.
11      Q.  And Promise is spelled?
12      A.  P-R-O-M-I-S-E.
13      Q.  Is it an acronym?
14      A.  I don't believe so, no.
15      Q.  Can you tell me just briefly how a
16  person applies for mental retardation services
17  in Pennsylvania?
18      A.  They apply to the county MHMR
19  office.  The county MHMR office will submit a
20  request to the local county assistance office
21  to determine Medicaid eligibility, and the
22  county assistance office will go through that
23  process.  The county then makes the judgment
24  about what I previously referred to, which is
25  the ICF/MR level of care, is the person

---

Page 64

Kevin T. Casey

1          Kevin T. Casey
2      A.  It is an acronym, Priority of
3  Urgency of Need for Services.
4      Q.  And you mentioned that an individual
5  is -- I believe you said this -- assessed to
6  determine what their priority of urgency of
7  need of services is?
8      A.  They are assessed as to the urgency
9  of need.  They are not assessed on the PUNS as
10  to what they need, but simply as to the
11  urgency.
12      Q.  Is the PUNS assessment used to
13  determine a person's placement on the waiting
14  list?
15      A.  It is used to determine their
16  category on the waiting list.
17      Q.  And is it true that everyone that
18  applies for services, mental retardation
19  services, gets a PUNS assessment and a
20  category is assigned?
21      A.  Everyone is supposed to get a PUNS
22  assessment and a category assigned.  There are
23  some occasional breakdowns in the system.
24      Q.  Who conducts the assessment?
25      A.  It is usually done between the

---

16  (Pages 61 to 64)

JA226

Kevin T. Casey                                        January 20, 2010

Page 65

1              Kevin T. Casey
2    supports coordinator and the family or the
3    consumer themselves.
4        Q.  I'm going to show you a document
5    that we will mark as Casey 4.
6            (Casey Exhibit 4 was marked for
7        identification.)
8        Q.  Please take a look at Casey Exhibit
9    4, and after you are done reviewing it, let me
10   know.
11           You have had a chance to review what
12   has been marked as Casey 4?
13       A.  I have.
14       Q.  Can you tell me what Casey 4 is?
15       A.  This is the standard PUNS form used
16   in our system.  It is a blank copy of one of
17   them.
18       Q.  And this is what is used to assess a
19   person who applies?
20       A.  Category of need, yes.
21       Q.  And what are the categories, if you
22   can tell me?
23       A.  They are emergency, generally
24   defined by us to mean needing services
25   immediately; critical, generally defined as

Page 66

1              Kevin T. Casey
2    needing services sometime in the next year;
3    and planning, generally defined as needing
4    services sometime in the next five years.
5        Q.  If you look at Page 2 of Casey 4,
6    under "Critical Need" it appears to say person
7    needs support within two years, not one year;
8    is that correct?
9        A.  That's correct.
10       Q.  I just wanted to be accurate.
11           Now, if you look at Pages 2 and 3
12   again, do the criteria on those two pages for
13   the various categories, emergency, critical
14   and planning, determine the individual's
15   waiver in this category?  I believe you
16   already answered this question.  Does that
17   determine the category?
18       A.  It does determine the category of
19   the three that I previously mentioned that the
20   person is in, yes.
21       Q.  And when you say there is a waiting
22   list and a person is on a wasting list, that
23   doesn't necessarily mean that a person is
24   assigned a number and receives services in the
25   order in which their number comes up?

Page 67

1              Kevin T. Casey
2        A.  No, it does not mean that.
3        Q.  Now, is it also true that since the
4    PUNS system was created -- I have a side
5    question.  When was the PUNS system created?
6        A.  It was created roughly 15 years ago
7    essentially when the waiting list became
8    clearly identified as a serious problem.
9        Q.  Now, is it true that since the PUNS
10   system was created there have been more people
11   in the emergency category than there was
12   funding to serve them?
13       A.  That's correct.
14       Q.  And when funding becomes available
15   to provide community services to people on the
16   wasting list, is it DPW or the counties who
17   determine who on the waiting list will be
18   served?
19       A.  It is DPW.
20       Q.  DPW makes allocations to the county
21   to develop services in the community; is that
22   correct?
23       A.  No, it is not correct.
24       Q.  Tell me what the system is.
25       A.  For this?

Page 68

1              Kevin T. Casey
2        Q.  Yes.
3        A.  The system for selecting people off
4    of the emergency waiting list -- and I should
5    stipulate it has changed dramatically in the
6    last two years.  The system which is now in
7    place is that the county reviews their list
8    when money becomes available, makes a
9    determination from their point of view as to
10   who is in the most severe need, examines
11   whether they currently have system capacity in
12   their current system to serve the person.  If
13   they determine that they do not, they submit
14   to us either an individual or a list of
15   individuals who they think should get some
16   priority for the services.  We then make a
17   final determination.  I actually make the
18   final determination, but we as a system make
19   the determination as to whether or not that
20   person gets funded.
21       Q.  And essentially you rely on the
22   county's assessment of who is most needy or an
23   emergency?
24       A.  We do very heavily rely on their
25   assessment.

17  (Pages 65 to 68)

Media Court Reporting - 610.566.0805

JA227

Kevin T. Casey                                          January 20, 2010

Page 81

1              Kevin T. Casey
2    and I██████P██ at White Haven, although not
3    as familiar as with the first two I mentioned.
4        Q.  And how do you know those
5    individuals you mentioned?
6        A.  I know D██ because I know his
7    father quite well.  His father is on our
8    planning advisory committee, and I actually
9    have been working with his father on trying to
10   figure out some level of community placement
11   for him.  I know Sylvia because I have met
12   with her many times.  Each time I visit Polk I
13   usually have some level of conversation with
14   Sylvia.  I actually know her and her situation
15   quite well.  The other two individuals I'm
16   just familiar with in passing.  I have met
17   them both, but that's about -- I probably have
18   also met many of the other people on this
19   list, but in one-time settings, so A██ and
20   L███ I know I have both met because
21   Mr. Lokuta has introduced me to both of them
22   at various times when I have been at the White
23   Haven Center.
24       Q.  To your knowledge are all four of
25   the individuals -- I'm sorry.

Page 82

1              Kevin T. Casey
2    To your knowledge are all of the
3    people listed on this document, the 19
4    individuals, are they still residing at state
5    centers?
6        A.  I don't know that for a fact.
7        Q.  The individuals you know, the four
8    individuals you know, are you aware of whether
9    they are still living --
10       A.  I know D██ and Sylvia both are
11   and I think A██ and L███ are both at
12   state centers, yes.
13       Q.  Now, you mentioned Sylvia at Polk as
14   someone you are very familiar with?
15       A.  Yes.
16       Q.  Do you know how many times you met
17   with her?
18       A.  Ten at least, ten different
19   individual times.
20       Q.  Did you receive any letters from
21   her?
22       A.  I have received both letters and
23   phone calls from her.
24       Q.  And I just want to show you a
25   document that we will mark as Casey 7.

Page 83

1              Kevin T. Casey
2        (Casey Exhibit 7 was marked for
3    identification.)
4        Q.  I would ask if you would take a look
5    at that and let me know when you have reviewed
6    it.
7        A.  Okay.
8        Q.  Can you tell me what Casey 7 is?
9        A.  It is a letter I received from
10   Sylvia, and I don't know exactly when I
11   received it.  There is no date on the letter,
12   but I did receive it and I did read it.
13       Q.  And what's the gist of the letter?
14       A.  The gist of the letter is that she
15   would like to leave Polk Center and live
16   somewhere closer to her family.
17       Q.  Where is her family, do you know?
18       A.  I believe Allegheny County.
19       Q.  And can you tell me what steps, if
20   any, have been taken to act on Sylvia's
21   request to leave the community?
22       A.  Yes.  We have worked with the county
23   to find a provider willing to serve Sylvia.
24   We have found a provider who is willing to
25   serve her.  They submitted a budget to us.  We

Page 84

1              Kevin T. Casey
2    examined the budget.  It is extremely costly,
3    and we determined we were unable to afford it
4    at this point.
5        Q.  Can you tell me what it is that
6    makes Sylvia's program so costly?
7        A.  Sylvia has -- can I ask a question
8    here?
9            THE WITNESS:  I assume we are
10   operating under rules of confidentiality?
11           MR. WARSHAW:  Yes, he
12   concurred.
13       A.  Okay.  All right.
14       Sylvia has very severe psychiatric
15   problems.  She is subject to at times severe
16   behavioral outbursts, and as a result of that
17   the provider feels she needs very heavy
18   staffing.  We run a system that probably 80 to
19   85 percent of the cost of the system is staff.
20   The provider thinks Sylvia needs a good deal
21   of well-trained staff behaviorally, and the
22   budget they submitted has a lot of staff in
23   it.
24       Q.  Have you asked them to resubmit a
25   revised staffing and/or program plan?

21  (Pages 81 to 84)

JA228

Kevin T. Casey                                      January 20, 2010

Page 105

1           Kevin T. Casey
2  knowledge, is visiting community homes
3  important to demonstrate to family members
4  that the needs of the relatives could be met
5  in the community?
6     A.  Yes, it's important.
7     Q.  Can you tell me why it's important?
8     A.  When you get used to a particular
9  type of service delivery and a particular way
10 services are delivered, particularly if you
11 are reasonably happy with those services, it's
12 very difficult to make a judgment about
13 whether other alternative services might work
14 for your family member unless you see them,
15 unless you have an opportunity to see and feel
16 them.
17    Q.  I will show you another document.
18 We are going to mark this Casey 11.
19        (Casey Exhibit 11 was marked
20    for identification.)
21    Q.  Actually I'm going to ask you to
22 look at -- this is actually two documents
23 attached to each other, but the second half,
24 the last two pages, I want you to look at that
25 first.

Page 106

1           Kevin T. Casey
2     A.  Okay.
3     Q.  Now, tell me what that document is,
4  the last two pages.
5     A.  It is a Community Placement Plan for
6  an individual.
7     Q.  That is D⬛⬛W⬛⬛⬛⬛⬛?
8     A.  Uh-huh.
9     Q.  Based on this document, is there any
10 information about community opposition that
11 you can discern?
12    A.  And that would be probably if you
13 would look at the family/guardian's desires
14 and interests/awareness of options, and your
15 question again is?
16    Q.  Based on that document is there any
17 information about community opposition by the
18 family?
19    A.  No, I don't believe there is.
20    Q.  What is the last sentence of that?
21    A.  The last sentence says, "It would be
22 likely that her family would wish for her to
23 remain at Selinsgrove Center, as this has been
24 her home for many years."
25    Q.  So would you conclude from this

Page 107

1           Kevin T. Casey
2  document that the family is definitely opposed
3  to community placement?
4     A.  No, I would not conclude that from
5  this document.
6     Q.  If you would look at the first part
7  of the same document, you will find Miss
8  W⬛⬛⬛⬛'s name listed on the third page
9  where on the top it is "Selinsgrove Center,
10 Community: 5, Living Area: CF-12."
11    A.  Okay.
12    Q.  And if you look at the chart and
13 look at the column "Family expressed
14 opposition to move to the community," can you
15 tell me what that says?
16    A.  Can you tell me where she is on the
17 page?
18    Q.  She is on the third page.
19    A.  Last one on the third page, got it.
20    Q.  "Family expressed opposition to move
21 to the community."  What does it indicate
22 there?
23    A.  It indicates yes.
24    Q.  I will show you another document
25 that we will mark Casey 12.

Page 108

1           Kevin T. Casey
2        (Casey Exhibit 12 was marked
3    for identification.)
4     Q.  If you would look at the last
5  several pages first, which is the last two
6  pages -- it is double-sided.
7     A.  Okay.
8     Q.  Can you tell me what that document
9  is?
10    A.  It is a Community Placement Plan for
11 J⬛⬛B⬛⬛⬛⬛
12    Q.  And what does it indicate regarding
13 Mr. B⬛⬛⬛'s desire to live in the
14 community?
15    A.  It indicates that Mr. B⬛⬛⬛
16 expresses a desire to return to the community.
17    Q.  And does it also indicate that he,
18 Mr. B⬛⬛⬛⬛, enjoys a variety of activities
19 in the community?
20    A.  It does.
21    Q.  If you move down a page to the
22 "family/guardian's desires and
23 interests/awareness of options," can you tell
24 me what that says?
25    A.  It indicates that his sister is his

27  (Pages 105 to 108)

JA229

Kevin T. Casey                                    January 20, 2010

---

Page 109

1           Kevin T. Casey
2   family contact and that she expresses concern
3   for Jim's continued safety should he return to
4   the community.
5       Q.  If you would look at also Page 2 of
6   the Community Placement Plan, Mr. B▓▓▓▓
7   does not have a guardian; is that correct?
8       A.  Again, can you tell me where he is
9   at on this form?
10      Q.  Sure.  It would be on the flip side
11  of Page 1 of the CPP; in other words, Page 2
12  of the CPP.
13      A.  I thought you were going back to the
14  chart.  You are not going back to the chart?
15      Q.  Not yet.  The top of this page, the
16  top of what would be Page 2, but it is
17  double-sided.
18      A.  What was your question?
19      Q.  Does Mr. B▓▓▓▓ have a guardian of
20  the person I should say.
21      A.  Actually it indicates that his
22  guardianship status is that he was adjudicated
23  fiscally incapacitated and has a
24  court-appointed guardian for his benefits.
25      Q.  So that would mean that he has no

Page 110

1           Kevin T. Casey
2   guardian of the person?
3       A.  That's my understanding, yes.
4       Q.  Now, I want you to look at the
5   chart -- and the chart, that's the first
6   several pages of this exhibit -- and look for
7   Mr. B▓▓▓▓ and he is on Page -- he is the
8   very first person.  I'm sorry.
9       A.  I see him.
10      Q.  And can you tell me what the
11  indication is regarding the family opposition?
12      A.  It indicates yes, the family is
13  opposed.
14      Q.  Do you think that that conclusion
15  reflects the information in the Community
16  Placement Plan?
17      A.  Not in my opinion.
18      Q.  Do you think that the sister's
19  concerns could be allayed regarding community
20  placement?
21      A.  I wouldn't know without talking to
22  her.
23      Q.  Of course, okay.
24          When there is a conflict between an
25  individual resident's choice about living in

Page 111

1           Kevin T. Casey
2   the community and family opposition, does DPW
3   respect the individual's choice; that is to
4   say, do they operate as though that were the
5   decision and that the individual should be
6   placed, if possible?
7       A.  If there is a difference of opinion
8   between the consumer and the family and the
9   consumer is capable of making the decision, we
10  would favor the consumer's decision.
11      Q.  And how would you make a
12  determination about capability of the consumer
13  to make a decision, or the resident I should
14  say?
15      A.  Probably two things:  One,
16  guardianship status and, two, some interaction
17  with the consumer.
18      Q.  By "guardianship status" that there
19  is no guardian appointed?
20      A.  If there is no guardian appointed,
21  we would tend to assume that the consumer is
22  making the best decision they can unless there
23  is some definitive indication that they are
24  not.
25      Q.  When I referred to guardianship, I

Page 112

1           Kevin T. Casey
2   meant guardianship of the person.  Is that
3   your understanding?
4       A.  That was my understanding.
5       Q.  I'm going to show you another
6   document that we will mark as 13.
7          (Casey Exhibit 13 was marked
8   for identification.)
9       Q.  Can you please take a look at that?
10  This is similar to the prior two documents.
11  There is a chart in the beginning and then
12  there is a Community Placement Plan at the
13  end.
14      A.  Do you want me to look at the last
15  one first?
16      Q.  Yes.  I'm sorry.  It is in reverse
17  order of the way you should be looking at it.
18      A.  Okay.
19      Q.  Can you tell me what that document
20  is?
21      A.  Community Placement Plan for M▓▓
22  S▓▓▓
23      Q.  And looking down to the heading,
24  "Family/Guardian's Desires and Interests," can
25  you tell me what this says about the family's

28  (Pages 109 to 112)

Media Court Reporting - 610.566.0805

JA230

Page 113

1          Kevin T. Casey
2  opposition or nonopposition to community
3  placement for Miss S████?
4      A.  I find no indication either way in
5  that paragraph.
6      Q.  Now, if you will look at the
7  chart -- that's the first several pages of
8  this document -- and find Miss S████'s name,
9  which is going to be on Page 2, the fifth
10  one --
11     A.  I see her.
12     Q.  -- can you tell me what the chart
13  indicates regarding family opposition?
14     A.  It indicates the family is opposed.
15  Let me stipulate on all of these, by the way,
16  there may be other documents in the files
17  somewhere that indicate some level of family
18  opposition.  I have no way of knowing that.
19     Q.  Uh-huh, okay.
20         In Miss S████'s case is it not
21  correct that according to the Community
22  Placement Plan the family members no longer
23  want to have any involvement?
24     A.  It does indicate that the family no
25  longer has any involvement.

Page 114

1          Kevin T. Casey
2      Q.  And is the chart -- just based on
3  the chart and the caveat you just mentioned
4  that there may be other documents, we don't
5  know, based on the chart itself, does it seem
6  that the indication on the chart that -- I'm
7  sorry.  Based on the CCP itself, does it seem
8  accurate to list in the chart that the family
9  in this matter -- in this instance is actually
10  opposed to --
11     A.  I would not have listed the family
12  as opposed based on the information in the
13  placement plan.
14     Q.  I will show you another one that I
15  will mark as 14.
16         (Casey Exhibit 14 was marked
17         for identification.)
18     Q.  And this is more than one person.
19  It is two people.  So if you go to the back of
20  the -- three people; I'm sorry.  On the
21  document there are three different persons to
22  which the documents relate.
23         MR. WARSHAW:  Can I interrupt
24  with a question of you?  Do you have any
25  idea what the date of the cover document

Page 115

1          Kevin T. Casey
2  of these lists are?  We will obviously go
3  back and look, but do you have anything
4  that indicates --
5         MR. MEEK:  I can tell you they
6  are the supporting documents that you
7  provided us in discovery to support the
8  large chart relating to whatever -- I'm
9  sorry, Exhibit -- the chart of the totals
10  of persons opposed and not opposed,
11  family members.
12         MR. WARSHAW:  That's fine.  At
13  least I know where to go to ask.
14         MR. MEEK:  Yes.
15         MR. WARSHAW:  Thank you.
16  BY MR. MEEK:
17     Q.  Again I'm going to direct your
18  attention just to the sections regarding in
19  the documents for each person.  When you are
20  ready, just let me know.
21     A.  So there are three here, Bob?
22     Q.  Yes.
23     A.  I've looked at all three.
24     Q.  So if you would just look at the
25  first one and tell me what that is, who it

Page 116

1          Kevin T. Casey
2  relates to and what it is?
3      A.  Community Placement Plan for H███
4  R██ C████.
5      Q.  And can you look at the document,
6  first page, under "Family/guardian's desires,
7  interests and awareness of options" and tell
8  me what it states about the family's response
9  to community placement?
10     A.  It indicates that the family had
11  been involved in considering community
12  placements and it was their wish that H███
13  remain at the center.
14     Q.  Now, if you would look at the next
15  page -- I'm sorry; the page after the next
16  page, not the back end of that, but a document
17  that looks like that -- it is really the
18  second full page but third printed page.
19         Can you tell me what the note at the
20  top of that page says?
21     A.  Yes.  It says, "H███ R██ C████
22  Mother's last report before she passed away."
23     Q.  And is there a date on that report
24  that you can see?
25     A.  Not that I can see.

JA231

Kevin T. Casey                                January 20, 2010

Page 117

1           Kevin T. Casey
2      Q.  Are there any dates indicated in the
3  narrative in the body of that document?
4      A.  There is a narrative at the bottom
5  indicating an October 4 date where apparently
6  the mom is indicating she will be 84.  There
7  is a date in the middle of July 2 or 3.  I
8  cannot tell what they are referring to
9  frankly.
10     Q.  It looks like July 2003, does it
11  not?
12     A.  You are correct, it looks like July
13  2003.
14     Q.  That's the only dates on there?
15     A.  That I can see.
16     Q.  If you go back to Page 1 of Miss
17  C███s CPP, it indicates primary contact is
18  the facility director of --
19     A.  That's correct.
20     Q.  And if you would look now to the
21  chart that is the front of that document and
22  find her name, which is going to be the third
23  person on the first page, and look at the
24  fourth column, family opposition, family
25  expressed opposition to living in community,

Page 118

1           Kevin T. Casey
2  what does it indicate?
3      A.  It indicates yes.
4      Q.  Does that appear to be accurate
5  given that the parent is deceased and the
6  facility director is the decision-maker?
7      A.  I would not have expressed it that
8  way, no.
9      Q.  So it wouldn't be appropriate for
10  the state to take into account the opposition
11  of a family -- the only family member
12  remaining who is now deceased?
13     A.  Not in my opinion.
14     Q.  Let's look at the next person's CCP,
15  if you will.  Can you tell me who that is?
16     A.  It is a Community Placement Plan for
17  G████ M████.
18     Q.  If you look at the family/guardian's
19  desires, interests, what does it say with
20  regard to that?
21     A.  It indicates that G████s brother
22  W███ is her legal guardian.  It indicates
23  he is aware of options and is not opposed to
24  community placement and it indicates that the
25  BSU or county reports there are no plans for

Page 119

1           Kevin T. Casey
2  community placement as there are no local
3  facilities available to provide the necessary
4  level of care and it indicates that the
5  Ebensburg Center provides care as chosen by
6  the family.
7      Q.  If you would look at the chart again
8  in the front of the document for Ms. M███ --
9  she is on Page 2.
10     A.  On the second page, yes.
11     Q.  -- (continuing) can you tell me what
12  the chart indicates with regard to the
13  family's expression of opposition?
14     A.  It says the family is opposed.
15     Q.  So that would not necessarily be
16  accurate?
17     A.  I would regard that as inaccurate.
18     Q.  Let's look at the last person, which
19  is the last two pages of the document.  And
20  can you tell me what that is?
21     A.  It is a Community Placement Plan for
22  C██ R███, ████████.
23     Q.  And would you please look at again
24  the family/guardian's desires and interests,
25  et cetera.

Page 120

1           Kevin T. Casey
2      A.  It says that the family has
3  historically been opposed to community
4  placement.
5      Q.  In looking further in this document,
6  the CPP, can you tell me whether in fact there
7  are any living relatives?
8      A.  Where are you asking me to look?
9      Q.  It should be the bottom of the CPP,
10  but I'm not finding it right off the bat.
11  Sorry.  I'm sorry.  Under "Primary contact
12  (substitute decision-maker)," what does it
13  indicate?
14     A.  It indicates that the parents are
15  deceased and C███ has no siblings.
16     Q.  And the facility director is the
17  substitute decision-maker?
18     A.  Yes.
19     Q.  If you look at the chart now for Mr.
20  R███ -- he is on Page 2, the fourth one
21  down -- can you tell me what it says with
22  regard to the family expression of opposition?
23     A.  It indicates that the family has
24  expressed opposition to move to the community.
25     Q.  So in your view would that be

30  (Pages 117 to 120)

JA232

Kevin T. Casey                                                    January 20, 2010

Page 121

```
 1            Kevin T. Casey
 2  accurate based on the CPP?
 3      A.  They had at one point expressed
 4  opposition.  I don't think we know if there is
 5  any opposition at this point.
 6      Q.  I'm going to show you another
 7  document which I will mark as Casey 15.
 8          (Casey Exhibit 15 was marked
 9      for identification.)
10      Q.  Again if you would look at what has
11  been marked as Casey 15 and look at the last
12  page --
13      A.  Have you given me that document?
14      Q.  Yes, it is right here.
15      A.  Sorry.
16      Q.  If you look at the last couple of
17  pages, if you would, I can tell you it is
18  regarding two individuals.  Now just take a
19  moment to look at it.
20      A.  I'm ready.
21      Q.  Can you tell me what the documents
22  are that I indicated?
23      A.  The first one is a Community
24  Placement Plan for C████ B█████.
25      Q.  And can you tell me what it says
```

Page 123

```
 1            Kevin T. Casey
 2  representation of the family's position?
 3      A.  I would not have listed it that way.
 4      Q.  If you would then look at the last
 5  couple of pages on this document relating to
 6  another individual --
 7      A.  Okay.
 8      Q.  -- can you tell me what that is?
 9      A.  Community Placement Plan for H███
10  E████.
11      Q.  And again with you looking at the
12  section that deals with the family desires and
13  interests, et cetera, can you tell me what
14  that indicates?
15      A.  That indicates that it is difficult
16  to contact the mother, who is the contact
17  person.  It indicates that past reports on
18  family position have been that the family is
19  opposed.
20      Q.  Now, in your opinion should past
21  reports of -- in this situation, difficulty
22  contacting the contact person and the allusion
23  to past reports, do you think that is enough
24  to conclude that the family remains opposed to
25  placement?
```

Page 122

```
 1            Kevin T. Casey
 2  about Miss B████'s family's opposition?
 3  Again you have to go down to family --
 4      A.  I see it.  It indicates that
 5  C████'s family has historically been opposed
 6  to placement endeavors.  It also indicates the
 7  opinion that it was based on their doubt in
 8  the capabilities of community services and it
 9  indicates the family structure has changed
10  drastically in the last several years and it
11  indicates that the family would not seem today
12  to prevent C████ from leaving the White
13  Haven Center.
14      Q.  If you would look again to the front
15  of the document to find Miss B████'s name,
16  she is in -- I forget where she is on the
17  chart.  She is the very last person on the
18  second page.
19      A.  I see it.
20      Q.  If you look at Column 4 with regard
21  to family expression of opposition to the
22  community, what does it say?
23      A.  It says yes.
24      Q.  Relating back to the Community
25  Placement Plan, is that an accurate
```

Page 124

```
 1            Kevin T. Casey
 2      A.  No, I don't.
 3      Q.  Would you look at the chart on the
 4  first section of this document, and Mr. E███
 5  is in Laurelton.  He is in Laurelton, which is
 6  the first several -- here he is, middle of
 7  Page 2.
 8      A.  Where are you?
 9      Q.  Middle of Page 2.  There is a Page 2
10  at the bottom.
11      A.  I see him.
12      Q.  Can you go over to the fourth column
13  regarding the family expression of opposition?
14      A.  Yes.
15      Q.  And what does it indicate?
16      A.  It indicates yes.
17      Q.  Thank you.
18          I will ask you to look at what I'm
19  going to have marked as Exhibit 16.
20          (Casey Exhibit 16 was marked
21      for identification.)
22      Q.  If you would look at Exhibit 16,
23  moving past the first page to the second page,
24  can you tell me what that document is?
25      A.  Yes; it is a Community Placement
```

Kevin T. Casey                                          January 20, 2010

Page 165

```
 1              Kevin T. Casey
 2    Q.  Now, this question asked whether
 3  provision of community services would be a
 4  fundamental alteration.  Can you just read the
 5  answer?  Since it is very brief, can you read
 6  it out loud?
 7    A.  "Due to the current budget
 8  environment the department has prioritized
 9  serving people who are in the highest category
10  of need on the community waiting list, those
11  who present with unexpected emergencies which
12  jeopardize the person's health and welfare or
13  those who could result in a new state center
14  admission.  Thus, provision of community-based
15  services and supports for state ICF/MR
16  residents would require denying services to
17  those with greater need for those services."
18         THE WITNESS:  Can we stop for
19     just a second?  I need a glass of water.
20         (Short recess.)
21  BY MR. MEEK:
22    Q.  Now, you said the answer, as you
23  read, was based on the current budget
24  environment?
25    A.  Uh-huh.
```

Page 166

```
 1              Kevin T. Casey
 2    Q.  In fact, as we sit here today the
 3  current budget environment -- which of course
 4  everyone acknowledges is not too good, but
 5  would it be fair to say that for the fiscal
 6  years '04-'05 through '08-'09 the budget
 7  environment was far less difficult?
 8    A.  I would tell you I think the budget
 9  environment has been difficult throughout this
10  administration and has gradually gotten worse.
11    Q.  Nonetheless though, there have been
12  significant monies put into the waiting list
13  initiative?
14    A.  There has in fact.
15    Q.  I mean we are talking -- well, from
16  '94-'95, which I don't want to talk about, but
17  even since '04-'05, as you know, several
18  hundred million dollars?
19    A.  Uh-huh.
20    Q.  So the current budget environment
21  would not necessarily explain why only 54
22  people were discharged from state ICFs over
23  the last five years though, would it?
24    A.  No.  What would explain it is the
25  fact that the DPW made a policy decision which
```

Page 167

```
 1              Kevin T. Casey
 2  I participated in that the people at state
 3  centers, living at state centers, were not at
 4  risk on health and safety issues and that
 5  people who are on the waiting list were at
 6  risk on health and safety issues.  Some
 7  literally were at risk of life and limb, and
 8  that being the case, we needed to prioritize
 9  the people who were at the most risk.
10    Q.  Is it fair to expect that the
11  current budgetary constraints are not going to
12  last indefinitely?
13    A.  I hope not, but I do think we are
14  looking at another two, perhaps three years of
15  this.
16    Q.  Is there anything in the current
17  budget environment that precludes DPW from
18  developing or implementing a plan to develop
19  community services for state ICF residents
20  over some period of time in the future?
21    A.  No.
22    Q.  Going back to the interrogatory
23  answer which you just read in Casey 3, it says
24  the DPW gave priority to people on the waiting
25  list in the highest need category, so that is
```

Page 168

```
 1              Kevin T. Casey
 2  the emergency category, correct?
 3    A.  Yes.
 4    Q.  And then also priority is given to
 5  people with unexpected emergencies that could,
 6  for example, result in admission to a state
 7  center; is that correct?
 8    A.  Correct.
 9    Q.  And the interrogatory answer states
10  that to provide community services to people
11  currently in the state ICF would require
12  denying service to those with greater need.
13  That's correct?
14    A.  That is correct in my opinion.
15    Q.  Now, why is it a person at risk of
16  institutionalization in a state ICF is
17  considered to have a greater need than someone
18  who has been institutionalized for decades in
19  an ICF?
20    A.  Because in the situations we are
21  discussing in each case that I'm aware of the
22  persons we served were literally at risk of
23  life.  We found one woman living under a
24  bridge in Philadelphia and decided that we
25  needed to provide services to her.  Again, the
```

42 (Pages 165 to 168)

JA234

Kevin T. Casey                                              January 20, 2010

Page 173

        Kevin T. Casey
1
2   right here how that 273 breaks down, but I
3   certainly could if I got a quick look at the
4   data.
5       Q.  Okay.
6           So the total number, though, that
7   you just gave us, this 500 plus 273, that is
8   773?
9       A.  Yes.
10      Q.  That is the total number of persons
11  served?
12      A.  That is the total we got for this,
13  500 in special ed and 273 in other categories.
14      Q.  Here is the mathematical question:
15  Your original budget request is for 793
16  persons, but if you add those categories up,
17  it comes up to 1,188. So this was reduced --
18  so the original was a budget request for it
19  looks like 1,188 people, so it was reduced by
20  400 almost?
21      A.  In the legislative process, yes.
22      Q.  That reduction was with regard to
23  the special ed, Category D, from 642 to 500,
24  right?
25      A.  Right.

Page 174

        Kevin T. Casey
1
2       Q.  Now, I guess the question is that we
3   are harking back to your response earlier that
4   the reason for the policy decision to provide
5   services to waiting list individuals as
6   opposed to -- is that they are in dire need
7   and in some danger. Would that be true for
8   the category of daytime activities for special
9   ed graduates?
10      A.  It could be for some of those folks.
11  Less likely in the special ed category. The
12  reason for the special ed category -- and I
13  happen to know this because it was my idea.
14  The reason for the special ed category
15  originally that we discovered over a period of
16  time that if you dropped those kids when they
17  are done with special education and provide
18  them no services at all, that their need for a
19  higher level of services increases rapidly
20  over a period of time, over a short period of
21  time.
22      Q.  Can you give me an idea of what kind
23  of services are provided under that Category
24  D?
25      A.  Special ed, under the special ed

Page 175

        Kevin T. Casey
1
2   category?
3       Q.  Yes.
4       A.  Usually day services, vocational
5   services, prevocational services, things of
6   that nature.
7       Q.  And is it likely that those were
8   more -- I think you said this, but I'm not
9   sure -- funded under PFDS rather than the
10  consolidated waiver?
11      A.  Actually the special ed category is
12  funded entirely under PFDS, and if the
13  individual needed more services than the PFDS
14  category would have allowed, as soon as they
15  were done with special education, we would
16  have moved them up into one of the other
17  categories.
18      Q.  I had a question also about F and
19  what that means, "changing needs of
20  individuals enrolled in the consolidated
21  waiver."
22      A.  There is a requirement under the CMS
23  rules that if a person actually in either
24  waiver is in need of more services for a
25  variety of reasons, if they become ill, if a

Page 176

        Kevin T. Casey
1
2   family member dies or something of that
3   nature, they're entitled to those services.
4   You cannot deny those services. We started
5   doing a specific budget for that probably
6   about four or five years ago as we were
7   negotiating with CMS over the waivers.
8       Q.  And I just wanted to ask you one
9   more question about this, and that's E,
10  Category E, individuals who turn 21 and no
11  longer are in need of medical assistance
12  EPSDT. What kinds of services were they
13  receiving under EPSDT that they would not --
14  assuming they are still Medicaid eligible,
15  that they would not receive as a result of
16  turning 21?
17      A.  They actually receive a much broader
18  range of services under EPSDT than you can get
19  in the ordinary Medicaid program including at
20  times residential services, including at times
21  very expensive medical services. That's a
22  category of folks whose services tend to be
23  very expensive.
24      Q.  And finally G, "Enhancement of the
25  service coordination function through the

                              44  (Pages 173 to 176)

JA235

Kevin T. Casey                                                    January 20, 2010

Page 177

1           Kevin T. Casey
2   employment of 39 additional supports
3   coordinators," explain to me why that was
4   sought.
5       A.  We were going to -- we actually I
6   believe did not get that, but we were going to
7   try and hire an additional amount of supports
8   coordinators to drive the caseloads down in
9   some counties.  That was a part of our ongoing
10  negotiation with CMS.
11      Q.  Drive the caseloads of how many
12  people they were having --
13      A.  Yes.  If they currently had a
14  caseload of a hundred, we would hopefully
15  drive their caseload down to 50 or something
16  of that nature.
17      Q.  As of today can you tell me how long
18  a state ICF/MR resident whose desires are not
19  opposed to community service and who is on the
20  emergency waiting list will wait to get
21  discharged?
22      A.  No, I don't know.
23      Q.  And is there any way that that
24  individual or their family members would know
25  when that person is likely to be discharged?

Page 178

1           Kevin T. Casey
2       A.  No.
3       Q.  Same question with regard to persons
4   on the critical waiting list.  Is there any
5   way of knowing how long a person on the
6   critical --
7       A.  No.
8       Q.  -- list would be waiting?
9       A.  No.
10      Q.  And same with how would they know,
11  the family would know, until they were
12  discharged, same question.
13      A.  No.
14      Q.  Same question again for planning,
15  which is the lowest category.
16      A.  Sure.
17      Q.  No idea of how long that would take?
18      A.  No.
19      Q.  And no idea of the person knowing
20  how long it would take until they got
21  discharged?
22      A.  No.
23      Q.  Can we look back to Exhibit 1, Casey
24  1?  If you would turn to Page 3, you
25  previously identified Exhibit Casey 1 as the

Page 179

1           Kevin T. Casey
2   responses, request and responses to request
3   for production of documents by plaintiffs to
4   defendants.  Looking at No. 14 -- I'm sorry.
5   I said 4.  I meant 14 on Page 6, continuing
6   over to Page 7, do you know whether you were
7   asked to provide responsive documents to No.
8   14?
9       A.  I'm sorry, Bob.  Would you repeat
10  that question?
11      Q.  14 asks for any and all documents
12  concerning budget requests for initiative
13  addressing the waiting list 2005-06 including
14  whether such an issue would be used to provide
15  community services to persons and residents of
16  state ICFs.  Actually there is no response.
17      MR. WARSHAW:  Let me -- as the
18  signatory of this, I would orally correct
19  that.  That should have been answered
20  provided that should be -- should have 15
21  and 16 because I know we provided those.
22      Q.  Do you know whether you personally
23  had any e-mails responsive to this request?
24      A.  I don't recall.
25      Q.  Do you know if you looked, if there

Page 180

1           Kevin T. Casey
2   was a search of your e-mail by either you or
3   any staff person, to determine whether there
4   were any e-mails responsive to that request?
5       A.  Not by me.  Whether any other staff
6   member did or not I don't know.
7       Q.  I'm going to ask you some questions
8   about the other Money Follows the Person
9   Program.  Are you familiar with the Money
10  Follows the Person Demonstration Project?
11      A.  I am.
12      Q.  And as we discussed earlier, this is
13  not the same as the state Money Follows the
14  Person initiative of several years ago,
15  correct?
16      A.  Right.
17      Q.  Now, can you tell me what this
18  essentially is all about?
19      A.  Generally CMS had offered -- I
20  don't -- I do not remember exactly how long
21  ago.  CMS had offered generally that for a
22  period of time they would give state grants.
23  The grants would be in the form of increased
24  federal financial participation in situations
25  where they planned for and then moved people

                    45  (Pages 177 to 180)

JA236

Kevin T. Casey

January 20, 2010

Page 181

1          Kevin T. Casey
2   from institutional levels of care to community
3   levels of care, and they offered that both for
4   ICF/MR, ICF/DD for people with mental
5   retardation and developmental disabilities.
6   They also offered it for people with physical
7   disabilities who resided in nursing homes.
8       Q.  And that also included people in
9   state hospitals who are older than 65?
10      A.  Yes, that's true.
11      Q.  Now, if CMS approved the state's MFP
12  project, the state would receive federal
13  matching funds higher than the regular match.
14  Do you know what the match was?
15      A.  I believe it improved to 75/25.
16      Q.  If I told you it was 77, would that
17  sound correct?
18      A.  Yes, that would sound correct.
19      Q.  And how long would the increase in
20  federal financial participation last after --
21      A.  12 months after the person left the
22  state center or the nursing home or whatever.
23      Q.  And Pennsylvania submitted a
24  proposal to CMS, right?
25      A.  We did.

Page 182

1          Kevin T. Casey
2       Q.  And CMS ultimately approved that,
3   correct?
4       A.  They did.
5       Q.  And as originally approved in the
6   state, did the proposal include state ICF/MR
7   residents?
8       A.  It did.
9       Q.  So DPW would have gotten a 77
10  percent federal match to provide community
11  service to some of these people?
12      A.  Correct.
13      Q.  Have you been involved with the MFP
14  project for individuals with mental
15  retardation?
16      A.  No, I have not been directly
17  involved.
18      Q.  Who at ODP is responsible for that?
19      A.  Pam Kuhno is our staff member on
20  that.
21      Q.  Do you know what DPW's target was
22  for discharging state ICF residents under the
23  MFP project?
24      A.  I don't.
25      Q.  I'm going to show you a document

Page 183

1          Kevin T. Casey
2   that will be marked as Exhibit 20.
3          (Casey Exhibit 20 was marked
4   for identification.)
5          MR. MEEK:  And please mark this
6   Casey 21.
7          (Casey Exhibit 21 was marked
8   for identification.)
9       Q.  If you would take a look at what has
10  been marked as Casey 20 and just identify it
11  for me right now.
12      A.  This?
13      Q.  Yes.
14      A.  It appears to be an operational
15  protocol for the Money Follows the Person
16  rebalancing demonstration.
17      Q.  And the date?
18      A.  May 2009.
19      Q.  And the version?
20      A.  Version 1.1.
21      Q.  Now, would you identify for me
22  Exhibit 21, if you can tell me what it is and
23  whether you are familiar with it, have seen it
24  before?
25      A.  It is an e-mail from Pamela Kuhno,

Page 184

1          Kevin T. Casey
2   who I previously mentioned, to Fred Lokuta
3   asking him -- giving him information on the
4   production of documents requests, and the
5   information she gives him is an e-mail from
6   Karen Morton, who was the DPW staff member in
7   charge of the Money Follows the Person project
8   at that time, indicating some changes made in
9   the grant.
10      Q.  So does Exhibit 20, Casey 20,
11  indicate that this is an amendment of the
12  original project submission?  If you look at
13  the e-mail from Miss Morton, that probably
14  answers the question for you.
15      A.  Yes, it does.
16      Q.  And how was it amended, if you know?
17      A.  It adds private ICF/MRs as a
18  qualified institution from which individuals
19  may transition and receive the extra financial
20  participation.
21      Q.  And I take it that private ICFs were
22  not included in the original proposal?
23      A.  I would assume not.
24      Q.  Do you know why DPW sought the
25  amendment?

46  (Pages 181 to 184)

JA237

Kevin T. Casey                                    January 20, 2010

Page 189

```
 1            Kevin T. Casey
 2   really don't know to who because it doesn't
 3   say, but it appears to be a submission of some
 4   information related to the Money Follows the
 5   Person project.
 6       Q.  If I were to tell you it is the MFP
 7   implementation report to CMS for 1/09 to 6/09
 8   submitted by the Department of Public Welfare,
 9   would that ring a bell?
10       A.  That's possible, but I don't know
11   from my own independent knowledge.
12       Q.  So you have never seen this
13   document?
14       A.  I have never seen this document.
15       Q.  Do you not have any obligation to
16   sign off on such reports to CMS?
17       A.  No, I don't actually, not for this
18   project.
19       Q.  Who would?
20       A.  I would guess that Jamie Buchenauer,
21   who is now the director of this project, would
22   sign off on those.  It is possible -- although
23   I don't see a signature line on these, it is
24   possible that the secretary might also have to
25   sign off.  I just don't know that for sure.
```

Page 191

```
 1            Kevin T. Casey
 2       A.  "Four individuals transitioned from
 3   private ICF/MRs in June of 2009 per the
 4   changes in Pennsylvania's operational
 5   protocol.  For these four participants as of
 6   June 30, 2009 they were in the community and
 7   had not been reinstitutionalized."
 8       Q.  Did anyone like I guess Miss
 9   Buchenauer or anyone on her staff ever
10   communicate with you about the numbers of
11   persons discharged from the MFP demonstration
12   project?
13       A.  Not that I recall.
14       Q.  I mean persons that you would have
15   some responsibility for, people with mental
16   retardation.
17       A.  Not that I recall.
18       Q.  So you are not aware of how
19   effective or ineffective the MFP project was
20   with regard to that population?
21       A.  No.
22       Q.  Now, if you would look at Page 6,
23   back two pages, and look at No. 7 in the
24   middle, can you tell me what that is all
25   about?  I want to direct your attention to the
```

Page 190

```
 1            Kevin T. Casey
 2       Q.  Are you familiar at all with the
 3   information within this document?
 4       A.  I'm not.
 5       Q.  Let me direct you to Page 4 in any
 6   event.  And if you would, simply look down
 7   under B, "Transitions," and look down to No. 1
 8   soft of the middle of the page.  Can you tell
 9   me what that category is?
10       A.  Are you referring to number of
11   people assessed for MFP enrollment?
12       Q.  Correct.  And if you would look at
13   the chart right below that to the right, which
14   is entitled "Populations Affected," can you
15   tell me how many MR/DD persons it says were
16   under that category?
17       A.  Four.
18       Q.  Would you look at Page 8 and look at
19   the middle of the page, Measure 2, and, if you
20   would, read the explanation in the box that is
21   Measure 2?
22       A.  This first paragraph?
23       Q.  No; the bottom where it says,
24   "Please explain your year-end rate of
25   progress."
```

Page 192

```
 1            Kevin T. Casey
 2   MR/DD category rather than the MI category
 3   which is also in there.
 4       A.  What's the question?
 5       Q.  The question is:  What was the
 6   response by Miss Buchenauer on behalf of the
 7   department regarding the ability to discharge
 8   persons with MR/DD diagnoses through the
 9   program?
10       A.  She indicates, accurately by the way
11   in my opinion, that a state center -- we had
12   projected that a state center would close and
13   funding would be available to convert
14   institutional slots to waiver slots.  Due to
15   the fiscal situation that did not occur.
16       Q.  Do you know which institution that
17   was that was projected to close?
18       A.  Yes.
19       Q.  What was it?
20       A.  It was the Hamburg Center.
21       Q.  And how did the fiscal situation
22   impact the decision not to close Hamburg
23   Center?
24       A.  As I previously indicated, even with
25   the MFP increased financial -- federal
```

48 (Pages 189 to 192)

Media Court Reporting - 610.566.0805

JA238

Kevin T. Casey                                    January 20, 2010

Page 193

1              Kevin T. Casey
2    financial participation, we could not get the
3    money approved in the budget that we needed to
4    do that. We needed some additional state
5    money to do that, and we couldn't get the
6    money approved.
7        Q.   When you say "some additional state
8    money," would that be for the so-called sort
9    of transitional period?
10       A.   It would be for the transitional
11   period, yes.
12       Q.   Where the state center is still
13   operating in some capacity but you are
14   developing programs in the community for the
15   individuals residing there?
16       A.   Correct, correct.
17       Q.   Do you know how many state ICF/MR
18   residents are expected to be discharged in
19   2010 under the MFP project?
20       A.   State center residents?
21       Q.   Yes.
22       A.   I will expect that none will be
23   discharged.
24       Q.   How about how many private ICF/MR
25   residents?

Page 194

1              Kevin T. Casey
2        A.   I don't know.
3        Q.   You don't know that, okay.
4             MR. MEEK: Can we take a
5    five-minute break?
6             MR. WARSHAW: Sure.
7             (Short recess.)
8    BY MR. MEEK:
9        Q.   As you may recall, we were talking
10   about PUNS, Priority of Urgency of Needs for
11   Services, and the PUNS assessment essentially
12   determines what waiting list category,
13   emergency, critical, planning, an individual
14   is on.
15            Now, is it correct that if someone
16   does not have a PUNS assessment that person is
17   not considered to be on the waiting list?
18       A.   That's correct.
19       Q.   And therefore they would not be in
20   line to receive community services?
21       A.   That's correct.
22       Q.   Do you have any idea of the number
23   of persons currently in the emergency
24   category?
25       A.   That's right at 3,200 right now.

Page 195

1              Kevin T. Casey
2        Q.   And do you know how many people are
3    on the critical category?
4        A.   I don't.
5        Q.   Is it a larger number than 3,200?
6        A.   It is a larger number, yes.
7        Q.   Is it also accurate to say that many
8    people in the emergency category remain on the
9    waiting list a fairly long time, more than six
10   months?
11       A.   Yes.
12       Q.   More than a year?
13       A.   In some cases, yes.
14       Q.   Two years?
15       A.   In some cases.
16       Q.   Longer?
17       A.   I have had people tell me longer,
18   yes.
19       Q.   And even with all the amount of
20   waiting list issues that have gone on in the
21   last five years, the several hundred million
22   dollars and number of people served, there is
23   still a lot of people in the emergency
24   category that have not yet been served; is
25   that correct?

Page 196

1              Kevin T. Casey
2        A.   That's correct.
3        Q.   Does DPW have any policy that is
4    used to select among persons in the emergency
5    categories for services when funding becomes
6    available?
7        A.   Those most -- those who are in most
8    critical need of services.
9        Q.   This is what you talked about
10   earlier when you asked the county to give you
11   the data?
12       A.   Right.
13       Q.   And they make recommendations?
14       A.   That's correct.
15       Q.   Do they make recommendations ever on
16   the basis of what they have available as
17   opposed to what the need is for an individual?
18   In other words, you have an individual who has
19   certain emergency needs that are significant
20   and the county says well, yes, this person has
21   significant needs but we have no available
22   services. Is that part of the calculus that
23   they utilize to recommend to you who should be
24   provided funding?
25       A.   Previous to this year, yes, it would

49 (Pages 193 to 196)

JA239

Kevin T. Casey                                                January 20, 2010

Page 197

1          Kevin T. Casey
2    have been a calculus, part of a calculation.
3    The policy change we have made this year is
4    that they have to make recommendations to us
5    based on level of emergency need, one, and,
6    two, that they may not make what I would call
7    slot-based recommendations.
8          Q.   And what do you mean by "slot-based
9    recommendations"?
10         A.   By that I mean a consumer left the
11   group home on Smith Street, so we have a slot
12   open for you on Smith Street whether it meets
13   your needs or not.  We do not allow that sort
14   of recommendation anymore.
15         Q.   Is that in some sort of written
16   form, that policy?
17         A.   I'm trying to remember the name of
18   the policy, Bob.  There is a vacancy
19   management policy, yes, in place.  Whether it
20   is in the form of a bulletin yet or not, I'm
21   not sure, but there is a policy that is being
22   run essentially that works with the counties
23   on that.
24         Q.   And just so I can understand, what
25   does the policy say?

Page 198

1          Kevin T. Casey
2          A.   The policy essentially says that
3    when a county determines that a consumer is in
4    need of services they have to look at two
5    things; one, they have to look at the current
6    capacity and current vacancies to determine if
7    any of these vacancies are appropriate for the
8    individual.  If they are not present for the
9    individual and if they can't convert the
10   resources easily, then they contact our
11   regional office.  There is a vacancy manager
12   in each regional office now.  They contact our
13   vacancy manager in the regional office and ask
14   for additional funds from us or additional
15   resources from us.  We look at that, make a
16   determination as to whether or not in the
17   waiting list initiative we have the resources
18   and whether or not the person is in fact a
19   crisis.  If they are, we approve.  The
20   regional office will recommend approval to me,
21   and I will make the final decision as to
22   whether we will give the county the resources
23   or not.
24         Q.   Is there any trade-off between
25   county resources; for example, if County A

Page 199

1          Kevin T. Casey
2    doesn't have the resources but they would be
3    willing to trade in a sense some of those
4    resources for resources later or something
5    like that so you could actually provide
6    services to an individual on the waiting list?
7          A.   No.  And, again, one of the key
8    changes we have made in the last two years is
9    that the resources don't belong to the county.
10   They belong to the state.  And the state makes
11   the decision as to how to get the resources
12   used.  We have even in some situations -- this
13   is very rare, but we have in some situations
14   had counties not have anybody in need and we
15   had somebody in very severe need in the next
16   county and we made the decision to use the
17   resources for that person.
18         Q.   To your knowledge have all state
19   ICF/MR residents received a PUNS assessment?
20         A.   No, they have not.
21         Q.   Do you know approximately how many
22   have?
23         A.   I don't know the specific number.
24   It's a pretty low number.
25         Q.   And should they all have received a

Page 200

1          Kevin T. Casey
2    PUNS assessment?
3          A.   No, I don't think by policy they
4    should have.  The PUNS assessment is meant to
5    determine criteria for people who are waiting
6    in the community for services.
7          Q.   But is it not in fact true that some
8    people in the state ICF/MRs are in fact
9    waiting for community services as well?
10         A.   Yes, and some people have received a
11   PUNS assessment.  I don't know the exact
12   number.
13         Q.   I understand that, but if a person
14   in a state center doesn't have a PUNS
15   assessment, then no one is going to look at
16   them as a potential for placement in the
17   community services; is that correct?
18         A.   Not using the community waiting list
19   system, no.
20         Q.   And so there is a separate system
21   and list for people in state centers that
22   doesn't have PUNS?
23         A.   No, there is not.
24         Q.   So how does that work, that a person
25   without a PUNS in a state center who is not

Media Court Reporting - 610.566.0805

JA240

Kevin T. Casey                                      January 20, 2010

Page 209

```
1              Kevin T. Casey
2   have a question or two about it.
3        A.  Okay.
4        Q.  Could you identify what has been
5   marked Casey 25?
6        A.  Yeah.  It is a Community Placement
7   Plan for M█████ M█████████
8   █
9        Q.  And it is dated?
10       A.  It is dated 5/14/09.
11       Q.  If you look at the category we
12  looked at in a number of others of these
13  Community Placement Plans, "Family/guardian's
14  Desires and Interests," can you tell me what
15  it says with regard to the family's interest
16  and desire about community services?  You
17  don't have to read the whole thing.  Just a
18  synopsis would be fine.
19       A.  It indicates that M█████
20  stepmother would be very supportive of a move
21  for Michael into the community.
22       Q.  And could you just read the last
23  sentence?
24       A.  "As M████ is not being considered
25  for a transitional opportunity by Lehigh
```

Page 210

```
1              Kevin T. Casey
2   County, Mrs. M██████ has not visited any
3   community homes or agencies."
4        Q.  Based on this, should Mr. M█████
5   have a PUNS assessment if there is -- one, he
6   is -- or his family member is interested in
7   him moving?
8        A.  Could you repeat that question,
9   please, Bob?
10       Q.  Sure.  Given the facts about
11  Mr. M███████ that are set out here in this
12  document, Exhibit 25, should he have a PUNS?
13  Again I refer back to the policy.
14       A.  If you refer back to the policy, I
15  would give him a PUNS, yes.
16       Q.  And if I told you his name does not
17  appear on Exhibit 24 as the number of persons
18  who have PUNS in the state ICF --
19       A.  I would say that is accurate, yes.
20       Q.  So he does not have a PUNS and
21  therefore he is not on a waiting list; is that
22  correct?
23       A.  That's correct.
24       Q.  Can we go back to the PUNS
25  evaluation form which is I think Exhibit 4?
```

Page 211

```
1              Kevin T. Casey
2        A.  This one?
3        Q.  Yes, that's the one.  And we know
4   about the three criteria, but on the first
5   page there is also a place to indicate that
6   the person should come off of the waiting list
7   because all needs are met; is that correct?
8        A.  Yes.
9        Q.  Now, should that status be used if a
10  person is in the consolidated waiver and
11  receiving all necessary services under his
12  ISP?
13       A.  Yes, that's what I would use.
14       Q.  Is there any other time when that
15  should be checked off?
16       A.  You know, it speaks for itself.  Any
17  time someone is receiving all of their needs,
18  that should be checked off.
19       Q.  Looking at the PUNS manual again,
20  which is No. 23, and going to Page 5 at the
21  top it says persons fully served shall -- I
22  guess -- it is the first bullet on Page 5.
23  Could you just read that?
24       A.  Indicating one of the criteria, it
25  says, "already receiving services funded
```

Page 212

```
1              Kevin T. Casey
2   through the mental retardation system, do not
3   need new, additional, or different services
4   and therefore are considered fully served.  If
5   a person who is fully served has a PUNS form,
6   it should be made inactive and the reason for
7   change used should be 'comes off the waiting
8   list.  All needs met.'"
9        Q.  That would mean that such a person
10  with that category checked off, all needs met,
11  would not be offered any community services;
12  is that correct?
13       A.  They would not be on the waiting
14  list for community services, yes.
15       Q.  So should a person in a state ICF
16  ever be assessed as being fully served and
17  then taken off the waiting list?
18       A.  Sure, I can see circumstances where
19  that would be appropriate if you think of the
20  purpose of the PUNS form.
21       Q.  Do you know whether any state ICF
22  residents have been removed from the waiting
23  list because they are fully served?
24       A.  I do not know that for sure.
25       Q.  I will show you a document I will
```

53  (Pages 209 to 212)

Media Court Reporting - 610.566.0805

JA241

Kevin T. Casey                                    January 20, 2010

Page 225

1              Kevin T. Casey
2    this administration. I have most certainly
3    told them that I expect that within my
4    lifetime that all of the state centers would
5    be closed and that they needed to consider
6    that in looking at career options.
7        Q. Has there ever been any discussion
8    with the staff regarding plans by DPW or ODP
9    to assist in transitioning from working as a
10   state center to working in the private -- or,
11   I'm sorry, working in the community-based
12   mental retardation system?
13       A. I certainly have asked -- I
14   certainly have had staff ask me if there would
15   be any assistance available for staff to
16   transition to either community programs or
17   private ICF/MR programs, and I have told them
18   we would look at that when it was appropriate.
19       Q. I take it it has not become
20   appropriate yet as far as you believe?
21       A. In my belief it would become
22   appropriate when a center is closed.
23       Q. Now, aside from you, are you aware
24   of anyone else in DPW who has had
25   communications with ICF/MR staff about impact

Page 226

1              Kevin T. Casey
2    of closures or downsizing of state ICFs?
3        A. I'm sure it is discussed pretty
4    regularly. It is a hot issue in state
5    centers. People have jobs. They have fairly
6    good-paying jobs and good benefits in their
7    job, and they worry about it. I'm sure it is
8    discussed quite regularly.
9        Q. But do you know anyone on your staff
10   that has those discussions?
11       A. No, not specifically.
12       Q. And, again, aside from yourself, do
13   you know of any individuals within DPW or ODP
14   who have had communications with the staff,
15   ICF staff, regarding this lawsuit?
16       A. I am sure there have been
17   discussions of the lawsuit at one point or
18   another. It is again a fairly hot topic in
19   the state centers, and I'm sure people are
20   talking about it.
21       Q. Now, this is a slightly different
22   question than the one I asked before, but does
23   DPW or ODP or anyone have any formal or
24   informal agreement with state ICF staff that
25   would impact closure or downsizing of state

Page 227

1              Kevin T. Casey
2    ICF/MRs?
3        A. I don't believe so.
4        Q. I want you to look all the way back
5    to Document No. 1. Just to check on Exhibit
6    1, which was the request for production, the
7    question is looking at Production Request No.
8    12. Again, it is on Page 6.
9        A. I have it.
10       Q. Again, the request is any and all
11   communications since 2003 between DPW and
12   officials or representatives of the unions
13   that represent staff at state ICF/MRs
14   concerning the development of community
15   services and supports for state ICF/MR
16   residents and/or the downsizing or closing of
17   one or more state ICF/MRs.
18          Do you know what materials were
19   provided to respond to that?
20       A. I don't on that one, no.
21       Q. And were you asked to provide any
22   materials responsive to that request?
23       A. I was not asked to provide any
24   materials responsive to that.
25       Q. And you did not ask any staff that

Page 228

1              Kevin T. Casey
2    you are aware of to find materials to respond
3    to that?
4        A. I instructed staff to provide
5    everything that you asked for that they could
6    find, and that was the sole instruction.
7        Q. Including e-mails?
8        A. Yes.
9             MR. MEEK: Can we take a very
10       short break?
11          (Short recess.)
12   BY MR. MEEK:
13       Q. These are all over the place kind
14   of, no particular theme here.
15          Can a county MHMR office actually be
16   the administrative entity?
17       A. In most cases the county MHMR
18   administrative offices are the administrative
19   entity.
20       Q. Moving on to another subject, can
21   you tell me who Sylvia Baldwin's provider is
22   or the provider agency that you contacted to
23   give an --
24       A. I don't know their name.
25       Q. Do you have any information on them

Media Court Reporting - 610.566.0805

JA242

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, by and through                :
his next friend, Andreé Yock; RICHARD            :
GROGG and FRANK EDGETT, by and                   :              —
through their next friend, Joyce McCarthy;        :
SYLVIA BALDWIN, by and through her                :
next friend, Shirl Meyers; ANTHONY               :
BEARD, by and through his next friend,           :
Nicole Turman, on behalf of themselves           :
and all others similarly situated,               :
                                                 :
                    Plaintiffs,                  :    Civil Action No. 1:09-cv-1182-JEJ
                                                 :
           v.                                    :
                                                 :    Class Action
DEPARTMENT OF PUBLIC WELFARE                     :
OF THE COMMONWEALTH OF                           :    Judge Jones
PENNSYLVANIA and ESTELLE B.                      :
RICHMAN, in her official capacity as             :
Secretary of Public Welfare for the              :
Commonwealth of Pennsylvania,                    :
                                                 :

## DEFENDANTS' RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS

1.    There are no types of services and supports that are provided in state

ICFs/MR that cannot and are not currently provided to individuals with mental

retardation in the community mental retardation system in Pennsylvania.  (Casey

Dep. at 77)

        ADMITTED

1(a)

⟨?⟩According to DPW's Deputy Secretary for Developmental Programs, "although the average acuity in the state center[s] is significantly higher than the average acuity in the community, there is no person we are serving in the state center[s] for whom we are not serving a very similar person in the community."

ADMITTED

2.    DPW funds community mental retardation services and supports through the Consolidated Waiver that cost as much as $500,000 per person per year or more for individuals who have never been institutionalized in state ICFs/MR.

ADMITTED

3.    There are about 2,000 people in the Consolidated Waiver who receive community mental retardation services and supports that cost more than $200,000 per year

ADMITTED

4.    Individuals living in institutions, such as state ICFs/MR, cannot learn to live a normal life because they come to rely on the structures of the institutional setting.

Defendant is unable to admit or deny this statement because Defendant does not know the meaning of the term "normal life."

2

5.    People living in state ICFs/MR are more segregated than those living in the community since most state centers are in fairly rural parts of the state; most residents live in units ranging from about 16-20 people; day services tend to be provided on the grounds of the facilities; residents do not have as much opportunity as those living in the community to interact with a wide range of people and to have access to community activities.

ADMITTED.

6.    After this lawsuit was filed, DPW conducted an assessment, based on existing documentation, to determine whether state ICF/MR residents and/or their families opposed community placement and, based on this assessment, it concluded that 331 families of state ICF/MR residents did not express or otherwise indicate opposition to community placement.

ADMITTED.

7.    According to DPW's Deputy Secretary for Developmental Programs, although many families of state center residents are likely to be apprehensive about discharge to community services, those apprehensions are not well-founded and his personal experience and professional research both demonstrate that most families are satisfied with community services after their relatives are discharged.

ADMITTED.

3

JA245

8.    More than 20 families and guardians of individuals discharged to community programs from Western Center, a now-closed state ICF/MR, filed a lawsuit to secure the right to return their family members to state ICFs/MR (*Torisky v. Schweiker*, Civil Action No. 02-499 (W.D. Pa.)), but all of those families and guardians ultimately either withdrew from the case or testified that they had no complaints about the community services their family members received and did not want them to be returned to state ICFs/MR.

ADMITTED.

9.    According to DPW's Deputy Secretary for Developmental Programs, it would be possible to overcome opposition of many family members to discharge of their relatives in state ICFs/MR through effective education about community programs.

ADMITTED.

10.    It is important for state center residents and their families to visit community programs in order to make an informed decision about whether they want community services, but state ICF/MR residents and their families generally do not have an opportunity to visit community programs unless and until there is funding available.

ADMITTED.

4

11.    There is a waiting list for community mental retardation system in Pennsylvania broken down into three categories: emergency (those in need of services immediately); critical (those in need of services within two years); and planning (those who will need services in two to five years). .

ADMITTED.

12.    DPW uses PUNS assessments, administered by the Supports Coordinators, to determine an individual's waiting list category.

PARTIALLY DENIED. It is denied that PUNS are assessments.

13.    Individuals who do not have PUNS assessments and those whose PUNS assessments conclude that they are fully served (*i.e.*, all their needs are determined to be met) are not on the waiting list for community mental retardation services.

PARTIALLY DENIED. It is denied that PUNS are assessments.

14.    Only 113 state ICF/MR residents have had PUNS assessments and, of that total, 7 are on the emergency waiting list, 6 are on the critical waiting list, 65 are on the planning waiting list, and 35 have been determined to be fully served.

PARTIALLY DENIED. It is denied that PUNS are assessments.

15.    It is DPW's policy to place state ICF/MR residents on the emergency waiting list only if their health or safety is in imminent jeopardy; to place state ICF/MR residents on the critical waiting list only if they have affirmatively

5

requested community services and the AE is planning for them to move to the community; and to place state ICF/MR residents on the planning waiting list only if they have affirmatively requested community services and the AE is not currently planning for them to move.

PARTIALLY ADMITTED. It is admitted that it is DPW policy to place state ICF/MR residents on the critical waiting list only if they have affirmatively requested community services and the AE is planning for them to move to the community. It is denied that there are any other waiting list policies specific to ICF/MR residents.

16.    Some state ICF/MR residents who have asked for community services or whose families have asked for community services have had no PUNS assessment or have been determined to be fully served and, therefore, are not on the waiting list for community services.

PARTIALLY DENIED. It is denied that PUNS are assessments.

17.    Each year, there are about 700 to 750 vacancies in the Consolidated Waiver, about two-thirds of which are in residential habilitation programs (group homes.

ADMITTED

6

18.    AEs do not consider state ICF/MR residents when vacancies arise in existing community residential programs, but, instead, fill the vacancies only with individuals living in the community who are on the waiting list

DENIED.    AE's have and/or are considering ICH/MR residents when vacancies arise in existing community residential programs

19.    None of the state ICF/MR residents discharged to community placements between Fiscal Years 2004-05 and 2008-09 was discharged because a vacancy arose in the Consolidated Waiver and the AE filled the vacancy with the state ICF/MR resident.

Defendant is unable to admit or deny this statement even though it has made a reasonable inquiry because the information that it has to which it knows or can readily obtain is insufficient for it to admit or deny.

20.    For at least the last ten fiscal years, no state ICF/MR resident has been discharged to a vacancy in an existing community mental retardation program.

Defendant is unable to admit or deny this statement even though it has made a reasonable inquiry because the information that it has to which it knows or can readily obtain is insufficient for it to admit or deny.

21.    Only two of the 58 individuals discharged from state ICFs/MR since the beginning of Fiscal Year 2004-05 were provided with community supports and services because they were on the waiting list.

7

Defendant is unable to admit or deny this statement even though it has made a reasonable inquiry because the information that it has to which it knows or can readily obtain is insufficient for it to admit or deny.

22.    AEs will not offer community services to state ICF/MR residents unless DPW funds an expansion funding initiative specifically for state ICF/MR residents.

Defendant is unable to admit or deny this statement even though it has made a reasonable inquiry because the information that it has to which it knows or can readily obtain is insufficient for it to admit or deny.

23.    DPW has not adopted or implemented a plan to discharge any state ICF/MR residents who are not opposed to discharge that includes specific benchmarks to identify the number of state ICF/MR residents for whom community mental retardation services will be provided and timelines in which it will do so.

ADMITTED at this time.

24.    The integration plan developed by DPW for residents of Norristown State Hospital (NSH) in accordance with the ruling in *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151 (3d Cir. 2005), provided that DPW would seek funding to provide community services for 30 NSH residents in Fiscal Year 2006-

8

07, 30 NSH residents in Fiscal Year 2007-08, 60 NSH residents in Fiscal Year 2008-09, and 90 NSH residents in Fiscal Year 2009-10.

ADMITTED

25.    Although DPW implemented the first two years of the four-year integration plan for NSH residents (described in Request # 25 above), it sought funding to serve only 30 (rather than 60) NSH residents in the third year, and did not seek any funding to serve NSH residents in the fourth year.

DENIED. DPW sought funding for 60 NSH residents in the third year but received funding for only 30.

26.    DPW's budget proposals to the Governor's Office of the Budget generally consist of a carry-forward budget (*i.e.*, funds to maintain existing services at the same level) and for funding for expansion projects (*i.e.*, funds for new initiatives including initiatives to provide services to people on the waiting list).

ADMITTED

27.    Historically, it is easier for DPW to secure approval from the Governor's Office of the Budget for its carry-forward budget than for expansion projects.

ADMITTED

9

28.    Although funding for community supports and services for state ICF/MR residents has generally been made available only through expansion initiatives (such as that relating to the closure of Altoona Center), DPW has been able to provide funding through the carry-forward budget to provide community supports and services to a small number of state ICF/MR residents by reducing the funding provided to the state ICFs/MR to maintain budget neutrality.

ADMITTED

29.    According to the Director of the Bureau of Financial Management and Budget for DPW's Office of Developmental Programs, it would be possible to use DPW's carry-forward budget to fund community supports and services for more state ICF/MR residents than DPW previously has done.

ADMITTED only to the extent there are additional persons in State Centers who could move into low-cost settings such as family living.  At this time, there are very few, if any, such persons.

30.    DPW does not have information about the costs to provide community supports and services to current state ICF/MR residents.

DENIED.  DPW does have some information about the costs to provide community supports and services to current state ICF/MR residents.

10

JA252

31.    The average annual cost to provide community supports and services to the 58 individuals most recently discharged from state ICFs/MR is $166,113 per person.

DENIED.    Those are the projected annjual cost not the actual cost. Moreover, those individuals were not as needy as those still in state ICF/MRs.

32.    The average annual cost in Fiscal Year 2008-09 to provide community supports and services to individuals previously discharged from state ICFs/MR pursuant to funding initiatives that began in Fiscal Years 1999-2000, 2000-01, and 2001-02 was $120,000 per person.

DENIED.    Those are the projected annjual cost not the actual cost. Moreover, those individuals were not as needy as those still in state ICF/MRs.

33.    DPW does not expect to provide funding for community supports and services to allow the discharge of any state ICF/MR residents in Fiscal Years 2009-10 or 2010-11.

DENIED.    DPW anticipated funding the placement of state ICF/MR residents into vacancies in the community

34.    According to the Director of the Bureau of Financial Management and Budget of DPW's Office of Developmental Programs, the current budget environment does not explain why DPW has provided community supports and

11

services to only 58 state ICF/MR residents since the beginning of Fiscal Year 2004-05.

ADMITTED that the Director made that statement but it is DENIED that statement is accurate. There has never been enough funding to provide community based services to all those individuals requiring services. DPW has directed those funds that have been available to serving the most needy individuals which generally have not been those receiving services in state ICF/MRs

35.    DPW's provision of community services to 58 state ICF/MR residents since the beginning of Fiscal Year 2004-05 is not due to budget constraints, but, rather, due to a policy decision to prioritize people on the waiting list who live in the community.

DENIED.  There has never been enough funding to provide community based services to all those individuals requiring services. DPW has directed those funds that have been available to serving the most needy individuals who have generally been people on the waiting list who live in the community.

36.    The average per person cost in Fiscal Year 2009-10 to provide services to state ICF/MR residents is approximately $240,000 per year and this is expected to increase to approximately $256,600 per year in Fiscal Year 2010-11.

ADMITTED.

37. The costs to operate the state ICFs/MR continue to increase annually even though the population at those facilities declines each year.

ADMITTED

38. The average per person cost in Fiscal Year 2009-10 to fund private ICF/MR services is approximately $138,000 per year.

ADMITTED.

39. The average costs to provide community services to state ICF/MR residents would be less than the average costs to provide them with services in state ICFs/MR.

Defendant is unable to admit or deny this statement even though it has made a reasonable inquiry because the information that it has to which it knows or can readily obtain is insufficient for it to admit or deny because to do so would require speculation.

40. DPW has no information about what, if any, transition costs (*i.e.*, the costs to fund the development of community services for state ICF/MR residents before they are discharged while at the same time continuing to fund their services in the state ICFs/MR pending the development of those services) it actually incurred when it closed state ICFs/MR, including Altoona, Western, Embreeville, and Laurelton Centers.

13

DENIED. DPW does have some information about the costs to provide community supports and services to current state ICF/MR residents. However, some of that information is in the possession of the Counties and not in the possession of DPW.

41.    The amount of any transition costs are affected by the number of state ICF/MR residents who are discharged to community supports and services (*i.e.*, whether DPW can close a unit, building, or facility) and how quickly those discharges take place. The greater the number of people discharged and the more quickly it can be done, the fewer costs will be incurred.

Defendants are unable to admit or deny this statement because they do not understand what is meant by the term "transition costs."

42.    DPW prepared various plans to assess the costs that would be incurred and savings that would be generated if it closed Selinsgrove Center and Hamburg Center and discharged residents to community supports and services and private ICFs/MR beginning in Fiscal Year 2008-09. Those plans showed that, although there would be costs in state dollars in the first two fiscal years, the Commonwealth would begin to experience savings of state dollars in subsequent years. The savings would continue to increase each year since the costs of services in state ICFs/MR are increasing faster than the costs of services in the community.

ADMITTED.

14

43.   According to the Director of the Bureau of Financial Management for DPW's Office of Developmental Programs, the savings that DPW could realize over time if it closed Selinsgrove Center and/or Hamburg Center could be used to expand funding to provide services to individuals on the waiting list who are living in the community.

ADMITTED.

44.   According to the Director of the Bureau of Financial Management for DPW's Office of Developmental Programs, the cost/savings assessments related to the proposals to close Selinsgrove Center and Hamburg Center were never submitted to the Governor's Office of the Budget.

ADMITTED that the Director said that, however, those assessments were shared and discussed with the Governor's Office of the Budget.

45.   In an e-mail communication dated December 6, 2007, Estelle B. Richman, the former Secretary of Public Welfare, informed Kevin Casey, the Deputy Secretary for DPW's Office of Developmental Programs that DPW would not implement the plans to close Selinsgrove Center or Hamburg Center in favor of maximizing the funding available to expand community services and supports for people on the waiting list living in the community.

ADMITTED

15

46.   DPW receives funding from the federal government through Titles

XIX and XX of the Social Security Act.

ADMITTED

Date:  April 2, 2010

Allen C. Warshaw
Chief Counsel
PA ID No. 17145
Office of General Counsel
Department of Public Welfare
3rd Floor West, Health & Welfare Bldg.
Harrisburg, PA  17120
(717) 783-2800 (phone)
(717) 772-0717 (fax)
awarshaw@state.pa.us

16



# DEPARTMENT OF
# PUBLIC WELFARE

*The mission of the Department of Public Welfare is to promote, improve and sustain the quality of family life, break the cycle of dependency and protect and serve Pennsylvania's most vulnerable citizens.*

This mission is accomplished by promoting the financial independence of clients through a range of services including employment and training, work support, child care, medical assistance and transportation. The mission is also accomplished by providing community living arrangements for those in need of assistance with activities of daily living and, when necessary, through institutional care and treatment in settings that are responsive to human needs.

JA259

## Public Welfare

*PROGRAM OBJECTIVE: To maximize each individual's capacity for more independent living and participation in community life by providing needed training and support services.*

# Program: Mental Retardation

The Department of Public Welfare supports a comprehensive array of services for people with developmental disabilities including community residential and non-residential programs, which are provided through the counties by community-based providers, state operated institutions and private intermediate care facilities for the mentally retarded providers (ICF/MRs). In addition to state and federal funding, local funding is provided for community programs as required by the Mental Health and Mental Retardation Act of 1966.

The mental retardation program has evolved from a system of large congregate residential facilities to a flexible and dynamic system of community supports and services tailored to the needs of persons living in the community. The trend toward enhancing the natural supports that exist in the family and the community continues to define services.

In response to the recommendations of Pennsylvania's Autism Task Force, the Bureau of Autism Services was established in February 2007. Autism is a lifelong neurobiological disorder. The mission of the Bureau of Autism Services is to develop, coordinate, integrate and establish policies and services that effectively enhance the quality of life and promote independence for Pennsylvanians living with autism.

### Program Element: Institutional Services

The department provides institutional care funding for people with developmental disabilities. Services are offered through five state centers whose primary goal is to develop residents' abilities to function more independently in preparation for living in a less restrictive environment. All facilities are currently certified for Medical Assistance (MA) under standards established by the Centers for Medicare & Medicaid Services. Private ICF/MRs provide intensive habilitative services to persons with developmental disabilities. Large facilities are single or multiple buildings on campus-like sites accommodating more than eight persons while small facilities may be located in the community and serve eight persons or less.

### Program Element: Community Mental Retardation Services

The Mental Health and Mental Retardation Act of 1966 provides the statutory basis for the development of community-based services for people with developmental disabilities. Community living arrangements include group homes, apartments with or without a roommate and life-sharing settings with family or friends. Day services such as supported employment, pre-vocational programs, adult training and home and community habilitation are provided for people living in the community, based on individual need. Other services available include transportation, home finding, environmental accessibility modifications, adaptive appliances/equipment, specialized therapies and nursing, and educational support. Respite services are also available for families of people with developmental disabilities.

### Program Element: Services for Individuals with Autism

The department provides funding for a statewide program to support the needs of Pennsylvanians living with autism spectrum disorders. The department has developed two delivery systems to provide services for adults with autism—the Adult Community Autism Program (ACAP) and the Autism Home and Community-Based Medicaid Waiver Program. ACAP is a pilot program for individuals age 21 or older with a diagnosis of autism spectrum disorder. Services include behavioral supports, physician services and a wide array of community-based and institutional services that build independence while maintaining cost effectiveness. The Autism Waiver has been designed to provide behavioral supports and community-based services tailored to individuals with autism. In addition, the department is working to increase the capacity of service providers and health care professionals by providing statewide training, technical assistance and cross-system collaboration; providing support and information to families; developing models for best practices and crisis response; and establishing regional autism centers.

JA260

## Public Welfare

**Program: Mental Retardation (continued)**



### Community Mental Retardation Services

Funding for the expansion of the community program has increased by nearly $682 million since 2004-05, providing services to an additional 9,075 people. Over the same period, the state centers' population will have decreased by 21%.

### State Centers Population for the Prior, Current and Upcoming Year

| State Centers | Population July 2008 | Population July 2009 | Projected Population July 2010 | Projected Bed Capacity July 2010 | Projected Percentage Capacity July 2010 |
|---|---|---|---|---|---|
| Ebensburg | 294 | 286 | 277 | 402 | 68.9% |
| Hamburg | 129 | 126 | 120 | 237 | 50.6% |
| Polk | 322 | 313 | 303 | 521 | 58.2% |
| Selinsgrove | 347 | 335 | 326 | 579 | 56.3% |
| White Haven | 180 | 169 | 164 | 275 | 59.6% |
| TOTAL | 1,272 | 1,229 | 1,190 | 2,014 | 59.1% |

JA261

# Public Welfare

**Program: Mental Retardation (continued)**

## Expenditures by State Center
(Dollar Amounts in Thousands)

| | 2008-09 Actual | 2009-10 Available | 2010-11 Budget | | 2008-09 Actual | 2009-10 Available | 2010-11 Budget |
|---|---|---|---|---|---|---|---|
| **Ebensburg** | | | | **Selinsgrove** | | | |
| State funds | $ 19,659 | $ 17,917 | $ 17,979 | State funds | $ 21,039 | $ 19,131 | $ 20,276 |
| Federal funds | 39,207 | 41,578 | 45,310 | Federal funds | 43,916 | 47,482 | 50,215 |
| Augmentations | 6,333 | 5,973 | 6,454 | Augmentations | 7,022 | 6,973 | 7,075 |
| TOTAL | $ 65,199 | $ 65,468 | $ 69,743 | TOTAL | $ 71,977 | $ 73,586 | $ 77,566 |
| **Hamburg** | | | | **White Haven** | | | |
| State funds | $ 9,527 | $ 8,381 | $ 9,207 | State funds | $ 11,671 | $ 10,316 | $ 10,885 |
| Federal funds | 18,431 | 20,475 | 22,535 | Federal funds | 23,915 | 25,662 | 27,501 |
| Augmentations | 2,753 | 2,791 | 2,744 | Augmentations | 3,818 | 3,717 | 3,686 |
| TOTAL | $ 30,711 | $ 31,647 | $ 34,486 | TOTAL | $ 39,404 | $ 39,695 | $ 42,072 |
| **Polk** | | | | **Budgetary Reserve** | | | |
| State funds | $ 19,829 | $ 17,789 | $ 18,158 | State funds | $ 0 | $ 762 | $ 0 |
| Federal funds | 41,888 | 45,676 | 48,924 | Federal funds | 11,757 | 10,784 | 5,000 |
| Augmentations | 7,155 | 6,830 | 6,801 | Augmentations | 0 | 0 | 0 |
| TOTAL | $ 68,872 | $ 70,295 | $ 73,883 | TOTAL | $ 11,757 | $ 11,546 | $ 5,000 |
| **Maintenance and security costs for closed facilities** | | | | **Non-Facility/Other Operational costs** | | | |
| State funds | $ 1,189 | $ 1,183 | $ 1,111 | State funds | $ 718 | $ 717 | $ 725 |
| Augmentations | 696 | 795 | 795 | | | | |
| TOTAL | $ 1,885 | $ 1,978 | $ 1,906 | | | | |

## Program Recommendations:

This budget recommends the following changes: (Dollar Amounts in Thousands)

**State Centers for the Mentally Retarded**

| | |
|---|---|
| $ 3,990 | —to continue current program. |
| –1,845 | —revision of federal financial participation from 54.81% to 55.64%. |
| $ 2,145 | *Appropriation Increase* |

**Intermediate Care Facilities – Mentally Retarded**

| | |
|---|---|
| $ 7,031 | —to continue current program. |
| –1,403 | —to reflect 81 individuals transferring to the community program. |
| –2,227 | —revision of federal financial participation from 54.81% to 55.64%. |
| $ 3,401 | *Appropriation Increase* |

**Community Mental Retardation – Base Program**

| | |
|---|---|
| $ 7,990 | —to continue current program. |
| 4,000 | —to reflect nonrecurring prior year carryover. |
| –125 | —revision of federal financial participation from 54.81% to 55.64%. |
| $ 11,865 | *Appropriation Increase* |

**Community Mental Retardation – Waiver Program**

| | |
|---|---|
| $ 10,670 | —to annualize previous program revisions providing enhanced community services. |
| 1,403 | —to reflect 81 individuals transferring from the ICF/MR program. |
| 1,794 | —to reflect 13 additional individuals transferring from the Mental Health program. |
| –10,168 | —revision of federal financial participation from 54.81% to 55.64%. |
| 2,019 | —Initiative—Expanded Community Mental Retardation Services. To provide home and community-based services for 150 additional persons with mental retardation. |
| $ 5,718 | *Appropriation Increase* |

**Autism Intervention and Services**

| | |
|---|---|
| $ –2,132 | —nonrecurring projects. |
| –3,252 | —nonrecurring costs due to 2009-10 program implementation delays. |
| –206 | —revision of federal financial participation from 54.81% to 55.64%. |
| 4,728 | —Initiative—Expanded Autism Services. To provide home and community-based services for 226 additional persons with autism. |
| $ –862 | *Appropriation Decrease* |

All other appropriations are recommended at current year funding levels.

JA262

# Public Welfare

**Program: Mental Retardation (continued)**

**Appropriations within this Program:**                    (Dollar Amounts in Thousands)

| | 2008-09 Actual | 2009-10 Available | 2010-11 Budget | 2011-12 Estimated | 2012-13 Estimated | 2013-14 Estimated | 2014-15 Estimated |
|---|---|---|---|---|---|---|---|
| **GENERAL FUND:** | | | | | | | |
| State Centers for the Mentally Retarded ... | $ 83,632 | $ 76,196 | $ 78,341 | $ 102,905 | $ 110,743 | $ 110,743 | $ 110,743 |
| Intermediate Care Facilities - Mentally Retarded | 113,493 | 100,234 | 103,635 | 156,024 | 166,872 | 166,872 | 166,872 |
| Community Mental Retardation - Base Program Services | 179,479 | 156,619 | 168,484 | 170,128 | 171,190 | 171,190 | 171,190 |
| Community Mental Retardation - Waiver... | 620,720 | 622,849 | 628,567 | 766,348 | 810,625 | 810,625 | 810,625 |
| Autism Intervention and Services | 12,363 | 19,463 | 18,601 | 25,311 | 26,422 | 26,422 | 26,422 |
| MR Residential Services - Lansdowne | 1,379 | 417 | 417 | 417 | 417 | 417 | 417 |
| TOTAL GENERAL FUND | $ 1,011,066 | $ 975,778 | $ 998,045 | $ 1,221,133 | $ 1,286,269 | $ 1,286,269 | $ 1,286,269 |

## Public Welfare

# Program Measures

| | 2008-09 | 2009-10 | 2010-11 | 2011-12 | 2012-13 | 2013-14 | 2014-15 |
|---|---|---|---|---|---|---|---|
| **Program: Mental Retardation** | | | | | | | |
| Persons receiving Mental Retardation services during fiscal year | 53,284 | 54,080 | 54,245 | 54,245 | 54,245 | 54,245 | 54,245 |
| Persons receiving Autism services during fiscal year | 125 | 182 | 408 | 408 | 408 | 408 | 408 |
| Persons receiving residential services (at end of year): | | | | | | | |
| Private ICFs/MR | 2,579 | 2,515 | 2,515 | 2,515 | 2,515 | 2,515 | 2,515 |
| State Centers | 1,272 | 1,229 | 1,190 | 1,190 | 1,190 | 1,190 | 1,190 |
| Persons receiving Mental Retardation services during fiscal year: Home and Community Services | 48,906 | 49,739 | 49,928 | 49,928 | 49,928 | 49,928 | 49,928 |
| Average cost of individuals served in the community: | | | | | | | |
| Residential Services | $84,001 | $88,402 | $90,878 | $90,878 | $90,878 | $90,878 | $90,878 |
| Non-residential services (Day programs or other supports) | $15,593 | $16,770 | $17,233 | $17,233 | $17,233 | $17,233 | $17,233 |
| **Program: Human Services** | | | | | | | |
| **Youth Development Centers** | | | | | | | |
| Youth served | 1,395 | 1,300 | 1,350 | 1,350 | 1,350 | 1,350 | 1,350 |
| Occupancy rates | 91% | 90% | 95% | 95% | 95% | 95% | 95% |
| Youth in work experience | 764 | 670 | 600 | 600 | 600 | 600 | 600 |
| **Family Support Services** | | | | | | | |
| Children receiving child welfare services at home | 247,560 | 251,521 | 255,545 | 259,635 | 263,790 | 268,010 | 272,295 |
| Out of home placements in: | | | | | | | |
| Community residential programs | 29,324 | 28,738 | 28,165 | 27,600 | 27,050 | 26,505 | 25,975 |
| In-state institutional care programs (annual unduplicated recipients) | 4,867 | 4,818 | 4,770 | 4,720 | 4,675 | 4,630 | 4,580 |
| Children in out of state programs | 537 | 521 | 505 | 490 | 475 | 460 | 445 |
| Percent of children reunited with parents or primary caregiver within twelve months of placement | 47.6% | 48.1% | 48.6% | 49.1% | 49.6% | 50.1% | 50.6% |
| Percentage of children not returning to care within 12 months of discharge to parents or primary caregivers | 78.3% | 79.5% | 79.5% | 79.5% | 79.5% | 79.5% | 79.5% |
| Finalized Adoptions | 2,255 | 2,278 | 2,300 | 2,325 | 2,345 | 2,370 | 2,395 |
| Children reaching permanency outside of adoption | 1,869 | 1,897 | 1,925 | 1,955 | 1,985 | 2,015 | 2,045 |
| Investigations of reported child abuse | 25,779 | 25,392 | 25,010 | 24,635 | 24,265 | 23,905 | 23,545 |
| Percentage of child abuse investigations substantiated | 15.6% | 16% | 16% | 16% | 16% | 16% | 16% |

JA264

Unit: _VILLA_    Living Area: _APTS_

| Individual/County/AE of Origin | Expressed Desire to Move to Community Yes/No/Not Indicated | Family Expressed Desire to Move to Community Yes/No/Not Indicated | Expressed Opposition to Community Yes/No/Not Indicated | Family Expressed Opposition to Move to Community Yes/No/Not Indicated | PUNs Completed Yes/No | Does the Person Have a Legal Guardian? Yes/No |
|---|---|---|---|---|---|---|
| BENJAMIN, FRANKLIN / PHILADELPHIA CO. | NOT INDICATED | NOT INDICATED F.D. 14 5/M | NOT INDICATED | NOT INDICATED F.D. 14 5/M | NO | NO |
| | NOT INDICATED | F.D. 14 5/M | NOT INDICATED | F.D. 5.5 5/M | NO | NO |
| | NOT INDICATED | YES F15 | NOT INDICATED | NO | NO | NO |
| | YES INDICATED | YES F-14 5/M | NOT INDICATED | NO 5-14 | NO | NO |
| | NOT INDICATED | NO | NOT INDICATED | YES | NO | NO |
| | NOT INDICATED | NO | NOT INDICATED | YES | NO | NO |
| | | | | | | |

OMR-ISP - 44 -

Name:    Franklin Benjamin         Case #:   1264      Unit:      Villa   Apts

## August 24,  2009

Community Placement Plan

**County/Base Service Unit:**

Philadelphia County/
Philadelphia County Office of MRS
701 Market Street 5th Floor, Suite 5200
Philadelphia, PA 19106
Mr. William Mills, Case Manager
Phone Number- (215)685-4679
e-mail- william.mills@phila.gov

**The person's Desires and Interest/Awareness of Options:**

Franklin's awareness of his options or ability to make an informed decision on Community Living Arrangements (CLAs) is uncertain due to his level of functioning.  When asked about living in the community, Franklin does not respond. Franklin has his rights, code of conduct, and voter registration reviewed each year but it is not felt that he understands or is aware of these to the extent that he could exercise them without assistance.

**Family/Guardian's Desires and Interest/Awareness of Options:**

Franklin's mother, Mrs. Carolyn Benjamin, is generally pleased with his care here at Ebensburg Center.  She is opposed to transfer but may consider a community living arrangement if one becomes available.

**Primary Contact (Substitute Decision Maker):**

Franklin's mother, Mrs. Carolyn Benjamin is his primary contact.  She answers correspondence, sends an occasional card and calls occasionally.

**Legal Guardianship status:**

Franklin resides at Ebensburg Center on a 402 admission.  The Guardian Office is representative payee of his SSA funds.  He has a burial trust through the Guardian Office and a life insurance policy through his mother.

**Type of Environment Required:**

Record is Confidential and Information is Released Only with Written Authorization

JA266

OMR-ISP - 45 -

Name:  Franklin Benjamin          Case #:  1264     Unit:          Villa    Apts

## August 24, 2009

Franklin requires 24-hours awake staff.  Franklin needs an environment that is non-restrictive.  He likes to move about his environment freely.  There must be comfortable furniture available because Franklin likes to take periodic naps, wherever he may be at the time, if the mood strikes him, he will nap.  The furnishings, whether functional or decorative, must be secured.  When Franklin becomes upset, he will tear decorative items off the wall, flip or throw furniture about the room.

During hours of sleep, Franklin can experience frustration causing him to be self-abusive or aggressive with his environment.  It is very important, for this reason, that Franklin has a private bedroom.  This is to ensure the safety of his housemates.  He must also be given flexibility with his schedule.  Mornings may be difficult times for him when he has been awake during the night.

**Desired Type of Activities and Settings:**

Franklin will attend any activity that involves food.  When he goes on an outing he can't wait until he gets there, but once he is there and he has eaten, he is ready to leave.  He will not always stay in a safe area.  When he is ready to go, he will go.  He does not verbally redirect when he has his mind made up.  Often he requires the escort of more than one person, due to this undesired behavior when he is out.

When he is out, he does much better when the number in attendance is lower.  This seems to provide an environment with less noise and fewer stimuli.  He should be given the opportunity to attend community events, however, the location needs to be chosen carefully.  Franklin can be very difficult to redirect when he has his mind set on an item or location.

Franklin prefers to watch his surroundings and stay to himself.  He does not interact with his peers, but he does initiate contact with staff when needing assistance.  He relies upon staff for direction and guidance.

Franklin does not actively participate in any activity.  He requires verbal and physical gestures and prompts.  He has a short attention span.  If there is a food motivator for him, he is more receptive to the task or activity, but this should not be any longer than a 15-minute span.  Items that have been incorporated and successful were hull-less popcorn, soda, candy bars, ice cream, and various other sweets.  Franklin is able to

Record is Confidential and Information is Released Only with Written Authorization

OMR-ISP - 46 -

Name:   Franklin Benjamin          Case #:   1264    Unit:        Villa   Apts

## August 24, 2009

accomplish this on his "good" days.  If he is having a "bad" day, he will not participate in any activity or task.


**Supports Necessary for Success:**

He requires an adult day program and supports to include medical/dental, psychiatric and psychological services, escort for travel, advisor for personal/financial services, assistance in exercising his civil rights, assistance with activities of daily living and safety/evacuation procedures.


**Person's method of Communication, and needs to support communication during and after transition to a community home:**

Franklin uses few words or signs.  He makes his wants, needs, and desires known through the use of body language and facial expressions.  Franklin requires staff that are familiar with him and understand his methods of communication.  When Franklin is not understood this creates frustration for him.  When he becomes frustrated he will become self-injurious first.  He will pick at his skin and/or bang his head off the wall.  Then as he escalates, he will turn his frustration and anger towards others.  He has been known to push and/or hit his roommates and/or staff.


**Other Essential Information for supporting the person to have a successful transition to community life:**
Any transition plan for Franklin would have to include his family and their support of such a move into the community.  It is important for Franklin's providers to be aware of his extreme sensitivity to any medication changes.  It is difficult to achieve balance between the risk of the medications and his aggression and/or self-injurious behavior.

Franklin's mental health is the driving force of his life.  This can dictate his behavior on a daily basis.  It is undetermined what specifically causes him to become frustrated and have undesired behavior.  It is imperative that he be provided consistent care by consistent, familiar staff.  Franklin is mostly unpredictable.  He has been observed in the past to respond more positively to familiar, male staff.


Record is Confidential and Information is Released Only with Written Authorization

JA268

**CITY OF PHILADELPHIA**
**DEPARTMENT OF BEHAVIORAL HEALTH and MENTAL RETARDATION SERVICES**

DATE:          July 14, 2008

TO:            Charles Marcinko
               Social Worker
               Ebensburg Center

FROM:          William L. Mills
               ICF Unit Coordinator
               Philadelphia MRS

SUBJECT:       Franklin Benjamin

I am unable to attend the annual Individual Support Plan meeting scheduled on 8/26/2008 for Franklin.

FYI:

- The Life Management Plan is no longer completed.

- I have had no contact with the Benjamin family in the past year.

- There are no PPI or PUNS assessments on record at this time.

- Community placement resources are very limited due to budgetary issues.

- Franklin is not on any waiting list for community placement at this time.

If you have any further questions, please feel free to contact me at 215-685-4679.

COPY

ORIG TO
FILING
7/21/08

cc:     Gail Harrison
        File

JA269

EBENSBURG CENTER                                                    SOCIAL SERVICES

## ANNUAL FAMILY INFORMATION

Please complete and return to Social Worker, Chuck Marcinko. Thank you

Full name of your relative at Ebensburg Center: _Franklin Benjamin Jr._
Parent(s) Name: _Carolyn Benjamin_                Phone Number: ▓▓▓▓▓▓
Address:  (Street, City, State, Zip)
Has a Legal Guardian been appointed BY THE COURT for your relative? ____ Yes ___ No If "yes" when,
who and what relationship to relative: _The don't need legal Guardian this Mother_
Occupation? (If deceased, please indicate date of death:
Father's _David Benjamin Deceased_        Mother's _____
  Social Security #: ▓ _1998_              Social Security #: ▓▓▓▓▓
Employer: _N A_                            Employer: _____
Phone _____ Health _____          Phone ____ no ____ Health _____
Health Insurance for your relative? ____ Group & Policy # _____
Agreement No: _____ Name & Address of Company _____
Life Insurance for your relative? (Y – N circle one) Policy # & Amount _6,000_
Name of Insurance Co. ▓▓▓▓▓▓▓▓▓▓
Any Burial/Trust Fund for your relative? ▓▓▓ Amount & Name of Company ▓▓▓▓▓
Burial plot owned? ____ Yes ____ No ____ If yes, location ▓▓▓▓▓
Have you selected a funeral director? _Yes_ If yes, name of director _Alvin Funeral Home_
                                       Phone No: _____

Members of Household (Use back if necessary)

| Name | Relationship | Age | Health | Name | Relationship | Age | Health |
|------|-------------|-----|--------|------|-------------|-----|--------|
| Carolyn | Mother | 69 | Fair |  |  |  |  |

Other relative/friends who may be contacted in case of serious illness or death, only when you cannot be
reached: Name _Dese Whitaker_  Relationship: _Aunt_
Address: ▓▓▓▓▓▓▓▓▓▓▓▓  Phone: _____
Do you receive funds for your relative? _No_  Please indicate below:
Social Security _No_  SSI _No_  Veterans _No_  Public Assistance _No_  R/R Retirement _No_
Black Lung _No_  Civil Service _No_  Other: _____
Do you favor community living arrangements for your relative? Yes _✓_ No ____ Do you need more
Information? Yes ____ No ____ Your comments, please _____

Do you prefer a transfer to a state center closer to your home for your relative? Yes _✓_ No ____ Need more
Information? Yes ____ No ____ Your comments, please _____

Concerning the care and programs provided to your relative at Ebensburg Center, have you been:
Satisfied _Yes_ or Dissatisfied ____? If dissatisfied, please specify: _____

How can your home County office help you? Please specify: _____

Frequency and types of contact you have maintained with your relative at Ebensburg Center during the past 12
months. Except for ISP, please specify how often in the space provided.
  Leave/Vacation? _____  Visits? _____  Phone Calls? _✓_
  Attendance at ISP? _____  Packages? _____  Mail/Cards? _✓_

Do you wish to remain the decision maker for your family member? _✓_ yes ____ no
_I am his Mother I had Him_
Will you be attending this year's annual review? ____ Comments: (please use the back side if more
space is needed) _____

Date completed: _12-14-09_    Completed By: (Signature) _Carolyn Benjamin_
                              Relationship: _Mother_

JA270

E

NI = not indicated

Unit: _____    Living Area: East 2

| Individual/County/AE of Origin | Expressed Desire to Move to Community Yes/No/Not Indicated | Family Expressed Desire to Move to Community Yes/No/Not Indicated | Expressed Opposition to Move to Community Yes/No/Not Indicated | Family Expressed Opposition to Move to Community Yes/No/Not Indicated | PUNs Completed Yes/No | Does the Person Have a Legal Guardian? Yes/No |
|---|---|---|---|---|---|---|
| | NI | NO | NI | NI (crossed out) | NO | NO |
| | NI | NO | NI | YES | NO | NO |
| Anthony Beard/York | NI | YES | NI | NO | YES | NO |
| | NI | NO | NI | YES | NO | NO |
| | NI | NO | NI | YES | NO | YES |
| | NI | NO | NI | YES | YES | NO |

OMR-ISP revision 10/06

Name: Anthony Beard
Case#: 1385
Community: Horizon East II
Date Completed: 7/22/2009

## Community Placement Plan

**COUNTY/BSU:** York/Adams County MH/MR/D&A, York County Government Center, 100 West Market St., 3rd Floor, York, PA 17401-1231, York County, Andrea Singh, Supports Coordinator phone: 717-771-9826, ext. 9618.

**The Person's Desires and Interest/Awareness of Options** (BD: 01-25-1960)
It is felt that Anthony has no awareness of options and is unable to make an informed decision regarding a CLA at this time. He has lived in a state facility since 1967. He functions in the profound range of mental retardation. It is felt that he would not understand an explanation of community options. He has attended in-services on community placement in past years. It is felt that Anthony is also unable to express his feelings or opinion regarding voting. Staff who work with Anthony feel that he displays that he is content with his current living arrangement through his actions/reactions and behaviors, though he loves spending time with his mother and family during visits. Anthony resides at Ebensburg Center on a 402 (voluntary) admission 06-20-1967. He was adjudicated incapacitated on 07-13-2000. The Ebensburg Center Guardian Office is the payee of his SSA funds and the fiscal guardian of his estate. Anthony has a burial trust and life insurance policy, but no other burial arrangements.

**Family/Guardian's Desires and Interest/Awareness of Options:** Anthony's primary contact is his Mother, Carolyn Beard of ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. She maintains contact via answering correspondence; regular phone calls; and several visits. She stated she is pleased with the care at Horizon House, Ebensburg Center.

**Primary Contact (Substitute Decision Maker):** Carolyn Beard, Mother (See Above).

**Legal Guardianship Status:** No Legal Guardian of the Person at this time. The Guardian Office is the Legal Financial Guardian as of 11-14-2001

**Supports Necessary for Success:** Anthony should receive the support services he receives at the Ebensburg Center to include: medical/dental care; escort for travel; an advisor for personal/financial decisions; assistance in exercising his civil /legal rights; assistance with ADLs and safety/ evacuation procedures. A vehicle is a must for transportation. Access should be available to religious services (Protestant). Continued Family contact via visits, phone, and mail should be encouraged.

**Person's Method of Communication, and Needs to Support Communication During and After Transition to a Community Home:** Anthony has very limited communication skills that are minimal facial expressions, gestural movements, and some gross vocalizations. Staff would need to work with him extensively over a period of time. He can make simple decisions. Anthony has a profound hearing is loss.

**Other Essential Information for Supporting the Person to Have a Successful Transition to Community Life:** Anthony has been at Ebensburg Center for many years. Behavior changes should be monitored closely during transition, especially withdrawal or acting out. Anthony would require a barrier-free home with 24-hour supervision and an adult day program of his choice. He would need support services of medical and dental care, escort for

Record is Confidential and Information is Released Only with Written Authorization

OMR-ISP revision 10/06

Name: Anthony Beard
Case#: 1385
Community:  Horizon East II
Date Completed: 7/22/2009

travel, advisor for personal and financial decisions, and assistance with exercising his legal and civil rights, activities of daily living, and emergency evacuation procedures.  Until a suitable alternative placement is available, the Interdisciplinary Team recommends that Anthony continue at Ebensburg Center.  All services and supports should be in place before the transition starts. New staff should spend time hands on with Anthony and be in-serviced on his medical, physical, behavioral conditions. They should also have an understanding of working with a blind and deaf individual.  Family must be involved in any and all decisions in regards to his care.

**Type of Environment Required:** It is recommended that if Anthony should move it would be to a barrier free, ranch style dwelling with housemates. He should be offered the option of a private bedroom. It would be recommended that the house have an attached garage or carport for transfer from the house to his vehicle protected from the weather. The house should be spacious to accommodate his free movement and any other medical and adaptive equipment that may be needed.  House may need to be adapted to service a blind and deaf person. This should be located near his family.  There should be an area outside the house such as a patio or deck to access in good weather. Specialized equipment should be evaluated at the time of transition and in place before he moves. If a transition is considered, an in depth detailed transition plan would need to be developed.

**Desired Type of Activities and Settings:**   Anthony should have an adult day care setting with programming and activities that are within close proximity to his residence where outside activities are available. His staff will need to have an understanding of working with someone who is blind and deaf. The home and day program should provide a lot of opportunities for socialization with trips into the community often and as his health permits.  He enjoys a variety of activities mostly as a passive observer.

Record is Confidential and Information is Released Only with Written Authorization



**EBENSBURG CENTER**

Ebensburg Center
P. O. Box 600
Ebensburg, PA. 15931-0600

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF PUBLIC WELFARE**

Teresa George, SW
Horizon House-Unit 2
Ebensburg Center
Ebensburg, PA 15931
814-472-0429

## PLEASE RETURN THIS FORM <u>BEFORE</u> THE ISP DATE

TO:    Ebensburg Center
       Teresa George, SW
       Horizon House-Unit 2
       P.O. Box 600
       Ebensburg, PA 15931

### <u>County/BSU Response To The Notification Of Individual Annual ISP Review Meeting</u>

**For:** <u>Anthony Beard</u>                    **Location:** <u>Horizon House-Unit 2</u>

**Date and Time:** <u>Wednesday, 7/22/09 @ 1:00 PM</u>.    **Are You Able To Attend:** <u>Yes</u>

Last Contact with this Individual - Visit/Meeting? _____ Correspondence? _____

Last Contact with this Individual's Family/Substitute Decision Maker? _____

Is this Individual In the County Plan for Placement or on a Waiting List? _____

Date of your Life Management/Person Centered Plan? _____

Have You Completed a PPI Assessment for this Individual? <u>Yes</u>

Have You Completed a PUNS Assessment for this Individual? <u>Yes</u>

Projected Availability of an Appropriate Community Living Arrangement for this Individual? _____

**Signature:** _Auele M Singh_                    **Title:** <u>SC</u>

**County/BSU Name:** <u>York MH/MR</u>    **Date:** <u>6/16/09</u>

**E-mail:** <u>ausingh@york-county.org</u>

<u>Please Return This Form One Week Before The Meeting</u>

*Record is Confidential; Information Released Only with Written Authorization.*

JA274

EBENSBURG CENTER                                                    SOCIAL SERVICES

## ANNUAL FAMILY INFORMATION

Please complete and return to Social Worker: **Teresa George**, Horizon House, Thank You.

Full name of your relative at Ebensburg Center: _Anthony James Beard_
(Relationship) Name: _Carolyn Beard - Mother_    Phone Number: ▚▚▚▚▚
Address: ▚▚▚▚▚
Legal Guardian appointed **BY THE COURT** for your relative? ____ Yes    X No    If "yes," when, who, and what relationship to relative:_____
Occupation: (If deceased, please indicate date of death: _____
Father's_____    Mother's _Carolyn Beard_
    Social Security #:_____        Social Security #: ▚▚▚▚▚
    Employer_____        Employer ___—___
    Phone_____ Health_____        Phone_____ —_____ Health _Fair_
Health Insurance for your relative?_____ Group & Policy #_____
Agreement No.:_____ Name & Address of Company_____
Life Insurance for your relative? _yes_ Policy # & Amount_____
Name of Insurance Co. ▚▚▚▚▚
Any Burial/Trust Fund for your relative? _no_ Amount & Name of Company_____
Burial plot owned? ___Yes ___No No    If yes, location_____
Have you selected a funeral director? _No_. If yes, name of director_____
                                    Phone No.:_____

Members of household: (Use back if necessary)

| Name | Relationship | Age | Health | Name | Relationship | Age | Health |
|------|-------------|-----|--------|------|-------------|-----|--------|
| Carolyn Beard | Mother | 68 | Fair | | | | |

Other relatives/friends who may be contacted in case of serious illness or death, only when you cannot be reached:  Name _AARON Beard_                        Relationship _Brother_
Address: ▚▚▚▚▚                        Phone #: ▚▚▚▚▚
Do you receive funds for your relative? _No_.  Please indicate below:
**Social Security**____  **SSI**____  **Veterans**____  **Public Assistance**____  **R/R Retirement**____
**Black Lung**____  **Civil Service**____  **Other:**_____
Do you favor community living arrangements for your relative? Yes _✓_  No____  Do you need more
information? Yes _✓_  No____  Your comments, please_____

Do you prefer a transfer to a state center closer to your home for your relative? Yes____  No____  Need
more information? Yes____  No____  Your comments, please_____

Concerning the care and programs provided to your relative at Ebensburg Center, have you been
Satisfied _✓_ or Dissatisfied_____ ? If dissatisfied, please specify:_____

How can the home County office help you? Please specify _offer assistance in finding a suit-_
_able home for Anthony._
Frequency and types of contact you have maintained with your relative at Ebensburg Center during the past 12
months. Please specify how often you have contacted.
    Leave/Vacation?_____ Visits?_____ Phone Calls? _✓_
    Attendance at Staffing?_____ Packages?_____ Mail/Cards? _✓_
**Will you be attending this year's annual review?** _yes_ Comments: (please use the back side if more space
is needed)_____

Date Completed: _June 10, 2009_ Completed By: (Signature) _Carolyn Beard_
                              Relationship: _Mother_

JA275

Fred C. Lokuta                                    February 2, 2010

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -
FRANKLIN BENJAMIN, by and : CIVIL ACTION
through his next friend, :
ANDREE YOCK; RICHARD GROGG;
AND FRANK EDGETT, by and :
through his next friend, :
JOYCE MCCARTHY; SYLVIA .
BALDWIN, by and through :
her next friend, SHIRL. .
MEYERS; ANTHONY BEARD, by :
and through his next .
friend, NICOLE TURMAN, on :
behalf of themselves and .
others similarly situated :
                              :
            vs.               : 1:09-CV-1182-JE5
                              :
DEPARTMENT OF PUBLIC          :
WELFARE OF THE                :
COMMONWEALTH OF               :
PENNSYLVANIA AND ESTELLE :
B. RICHMAN, in her            :
official capacity as          :
Secretary of Public           :
Welfare of the                :
Commonwealth of               :
Pennsylvania                  :
- - -

Harrisburg, Pennsylvania
Tuesday, February 2, 2010
- - -
DEPOSITION OF FRED C. LOKUTA

- - -

MEDIA COURT REPORTING
216 West Front Street
Media, PA 19063
610.566.0805 fax 610.566.0318
www.mediacourtreporting.com
mcr@mediacourtreporting.com

---

Page 2

```
 1
 2   CAPTION: (CONTINUED)
 3       Deposition of FRED C. LOKUTA,
 4   taken pursuant to notice, at the offices
 5   of the Disability Rights Network of
 6   Pennsylvania, 1414 North Cameron Street,
 7   on the above date, beginning at
 8   approximately 9:25 a.m., before Cynthia
 9   A. Whyte, Registered Professional
10   Reporter and Notary Public.
11          - - -
12   APPEARANCES:
13       ROBERT W. MEEK, ESQUIRE
         ROBIN RESNICK, ESQUIRE
14       Disability Rights Network of
         Pennsylvania
15       1315 Walnut Street, Suite 500
         Philadelphia, PA 19109
16
         Counsel for Plaintiffs
17
18       ALLEN C. WARSHAW, ESQUIRE
         Chief Counsel
19       Department of Public Welfare
         3rd Floor West
20       Health & Welfare Building
         7th and Forster Streets
21       Harrisburg, PA 17120
22       Counsel for Defendants
23
24
25
```

---

Page 3

```
 1
 2   APPEARANCES: (CONTINUED)
 3
 4       MICHAEL RATO, ESQUIRE
         Sidley Austin, LLP
 5       787 Seventh Avenue
         New York, NY 10019
 6
         Counsel for Proposed Intervenors
 7       Craig Springstead, et al.
 8
 9           (It was stipulated by and among
10   counsel that sealing, filing and certification
11   be waived; and that all objections, except as
12   to the form of the question, are reserved
13   until the time of trial.)
14
15
16
17
18
19
20
21
22
23
24
25       (INDEX at end of transcript.)
```

---

Page 4

```
 1
 2           ...FRED C. LOKUTA, having been
 3   duly sworn, was examined and testified as
 4   follows:
 5   BY MR. MEEK:
 6       Q.  My name is Robert Meek, and I'm
 7   counsel for the plaintiffs in this matter
 8   captioned Benjamin versus the Department of
 9   Public Welfare.
10           You are represented by counsel,
11   Allen Warshaw, chief counsel with the
12   Department of Public Welfare, and also in
13   attendance is Michael Rato from Sidley Austin,
14   representing the proposed intervenors, but it
15   is our understanding that Mr. Rato is here to
16   observe and will not be participating in the
17   deposition.
18           Mr. Lokuta, would you state your
19   full name for the record.
20       A.  Yes.  My name is Fred C. Lokuta.
21       Q.  And, Mr. Lokuta, what is your
22   current employer?
23       A.  The Commonwealth of Pennsylvania,
24   Department of --
25       Q.  And what is your current position?
```

---

Fred C. Lokuta                                         February 2, 2010

| | Page 5 |
|---|---|
| | Fred C. Lokuta |
| 1 | Fred C. Lokuta |
| 2 | A. Facility director. |
| 3 | Q. And what facility is that? |
| 4 | A. White Haven Center. |
| 5 | Q. And what kind of facility is it? |
| 6 | A. It's a residential facility for |
| 7 | people, adults, with mental retardation and |
| 8 | other developmental disabilities. |
| 9 | Q. Is it what is known as an |
| 10 | intermediate care facility for the mentally |
| 11 | retarded? |
| 12 | A. It is. |
| 13 | Q. And how long have you had that |
| 14 | position? |
| 15 | A. Approximately two years. |
| 16 | Q. And what are your responsibilities |
| 17 | generally? |
| 18 | A. I'm the chief administrator for all |
| 19 | services at the facility. |
| 20 | Q. And do you have any responsibilities |
| 21 | beyond administration of the center? |
| 22 | A. I am involved in statewide projects |
| 23 | and have been asked to do a number of special |
| 24 | projects and special assignments for the |
| 25 | Commonwealth. |

Page 5

1        Fred C. Lokuta
2    A. Facility director.
3    Q. And what facility is that?
4    A. White Haven Center.
5    Q. And what kind of facility is it?
6    A. It's a residential facility for
7 people, adults, with mental retardation and
8 other developmental disabilities.
9    Q. Is it what is known as an
10 intermediate care facility for the mentally
11 retarded?
12    A. It is.
13    Q. And how long have you had that
14 position?
15    A. Approximately two years.
16    Q. And what are your responsibilities
17 generally?
18    A. I'm the chief administrator for all
19 services at the facility.
20    Q. And do you have any responsibilities
21 beyond administration of the center?
22    A. I am involved in statewide projects
23 and have been asked to do a number of special
24 projects and special assignments for the
25 Commonwealth.

Page 6

1        Fred C. Lokuta
2    Q. And can you just describe what some
3 of those are?
4    A. Well, the latest, I was asked to
5 take the program office lead on the litigation
6 that has been filed. I have also been asked
7 to assume director roles at other facilities,
8 other ICF programs, state-run programs
9 throughout the state, specifically Polk Center
10 and Selinsgrove Center.
11    Q. And what was the occasion for your
12 assuming those roles?
13    A. In Polk's situation the director
14 left her assignment and I was asked to go in
15 and fill in until a permanent director was
16 found.
17    Q. And with regard to Selinsgrove?
18    A. Selinsgrove, the director retired,
19 and again I was asked to go and fill in until
20 we were able to secure a director.
21    Q. And prior to your current position
22 as facility director at White Haven, what
23 position did you hold?
24    A. I was the director of program
25 services at White Haven. Working title is

Page 7

1        Fred C. Lokuta
2 assistant director.
3    Q. And how long were you employed in
4 that position?
5    A. Approximately two years.
6    Q. And what were your duties generally?
7    A. Basically oversaw the residential
8 aspect of the operation, day program,
9 residential. I was responsible for physical
10 therapy. Basically that's it.
11    Q. I'm sorry. I forgot to ask you a
12 preliminary question, and that is have you
13 ever been deposed before?
14    A. I have.
15    Q. And I also neglected to mention that
16 if I state a question that you don't
17 understand, please stop me and ask me to
18 repeat it or rephrase it, and if you don't
19 understand anything, just let me know.
20        And I have one further question, and
21 that is: Is there any reason why you can't
22 testify fully and completely today?
23    A. No.
24    Q. Prior to the position just
25 described, can you tell me your position prior

Page 8

1        Fred C. Lokuta
2 to that which you just described?
3    A. I was the director of residential
4 unit management at Selinsgrove Center.
5    Q. And how long did you --
6    A. The DRUM is the acronym.
7    Q. I'm sorry?
8    A. The DRUM is the acronym.
9    Q. Okay.
10    A. And basically pretty much similar to
11 the director of program services, but limited
12 to the management of the residential units.
13    Q. And how long did you hold that
14 position?
15    A. About a year and a half.
16    Q. Had you had any other positions
17 within the Department of Public Welfare prior
18 to that?
19    A. Actually I have, I have. Prior to
20 being the DRUM at Selinsgrove I was the field
21 rep in the Northeast Regional Office on the
22 community side of the program for ODP.
23    Q. And what does that mean exactly?
24    A. I was responsible for incident
25 management and IM4Q and I monitored for

Media Court Reporting - 610.566.0805

JA277

Fred C. Lokuta                                February 2, 2010

**Page 57**

```
 1           Fred C. Lokuta
 2   at White Haven.  Her mother and father are
 3   guardians.  They are opposed to health care
 4   that will sustain life regardless of whether
 5   or not it's a terminal condition.  We are
 6   aggressively doing whatever we have to do to
 7   make sure that person is receiving the
 8   appropriate and necessary health care.
 9       Q.  Right, and I can understand that,
10   but I guess I'm -- in not such a dire
11   situation; that is, there is a conflict
12   between the resident's desire to move and the
13   family members' opposition to move is what I'm
14   interested in.
15       A.  I think I mentioned that other
16   individual.
17       Q.  And I'm just asking if there is a
18   difference between whether it is a guardian --
19   the family member is a guardian or the family
20   member is not a guardian?
21       A.  The only difference is it is more
22   difficult for us to take the appropriate
23   actions with guardianship involved.
24       Q.  With regard to a family member being
25   opposed, does it matter whether the family
```

**Page 58**

```
 1           Fred C. Lokuta
 2   member is a close sanguinity as opposed to,
 3   you know, a second degree like a niece or a
 4   nephew as opposed to a sibling or a parent?
 5       A.  No, it shouldn't.
 6       Q.  I'm sorry?
 7       A.  It shouldn't.
 8       Q.  It should not, okay.
 9           Does it matter if the family members
10   maintain close contact with the individual or
11   are involved with their care and treatment?
12       A.  It should not.
13       Q.  When you say "it should not," what
14   do you mean?
15       A.  Well, again you are basing it on
16   what -- our individual support plan is driven
17   by the person.  They are adults and we try to
18   accommodate what they want.  Families are
19   going to offer advice, opinions, and in some
20   situations very strong directives.  Our team
21   is going to make the decision on what's best
22   for that person.
23           Now, again -- and I want to put this
24   in the context of families and the difficult
25   situation that we all experience because as a
```

**Page 59**

```
 1           Fred C. Lokuta
 2   parent I don't want you or anybody else
 3   telling me what my kid needs.  I'm going to
 4   tell you what my kid needs, and I know that we
 5   are dealing with an adult population here, but
 6   I can tell you that up to the day my father
 7   died he had a very definite influence on my
 8   life.
 9           MR. WARSHAW:  Can I ask for a
10   five-minute break?
11           MR. MEEK:  Sure.
12           (Short recess.)
13   BY MR. MEEK:
14       Q.  Mr. Lokuta, we are back on the
15   record.  You are still under oath.
16           I'm going to show you a document
17   that is going to be marked as Lokuta 5.
18           (Lokuta Exhibit 5 was marked
19   for identification.)
20       Q.  Please take a look at it, and when
21   you are done reviewing it, let me know.
22       A.  I am done.
23       Q.  Have you seen this document before?
24       A.  I have.
25       Q.  What is it?
```

**Page 60**

```
 1           Fred C. Lokuta
 2       A.  It's a summary document of
 3   information collected to respond to
 4   interrogatories.
 5       Q.  Were you involved in creating the
 6   document?
 7       A.  Yes.
 8       Q.  What was your role?
 9       A.  I think I did the format and helped
10   in transcribing the numbers.
11       Q.  And what does the chart purport to
12   show?
13       A.  It reflects people who express a
14   desire to move, family express a desire to
15   move, opposition to move by family and
16   individual, the number of PUNS that were
17   completed for individuals residing in state
18   centers, and guardianship; and it is based on
19   information specific to each state center.
20       Q.  And then totaled at the end,
21   correct?
22       A.  Right.
23       Q.  Now, can you tell me how the numbers
24   were determined?  Where did they come from?
25       A.  Mostly the Community Placement Plan,
```

Fred C. Lokuta                                    February 2, 2010

---

Page 113

1           Fred C. Lokuta
2      A.  No.
3      Q.  Do you know how vacancies, those
4  such vacancies, are filled?  In other words,
5  are they filled by people already in the
6  community, or are they filled by people at
7  state centers, or what?
8      A.  It is my understanding that they are
9  filled based on the waiting list.
10     Q.  The waiting list which is --
11     A.  As a result of PUNS.
12     Q.  So it is based on PUNS?
13     A.  Right.
14     Q.  Do you know who has the authority to
15  determine who should go into a vacancy?
16     A.  I believe it's each administrative
17  entity.
18     Q.  And do you know whether the
19  administrative entity needs permission from
20  the Office of Developmental Programs to do
21  that, to decide that a person should be moved
22  to a particular vacancy?
23     A.  I am not sure of the mechanics of
24  how that occurs.
25     Q.  Now, so would it be accurate to say

---

Page 114

1           Fred C. Lokuta
2  that someone who is on the waiting list who
3  has a PUNS can receive their services either
4  because an opening becomes available, because
5  there is a vacancy in a program, or because
6  DPW has funded new -- the development of
7  services through an initiative?
8      A.  Yes.
9      Q.  Are the new services sometimes
10  called expansion programs?
11     A.  Yes.
12     Q.  Because they expand the number of
13  people who are actually getting services in
14  the MR community system?
15     A.  Yes.
16     Q.  Do you know whether any of the
17  residents of White Haven who themselves or
18  whose families have expressed a desire to move
19  to the community have ever been offered an
20  opportunity to move to an existing program
21  where a vacancy occurred?
22     A.  Are you asking me -- I mean for what
23  period of time?
24     Q.  Well, let's say during your tenure
25  as White Haven facility director.

---

Page 115

1           Fred C. Lokuta
2      A.  Under expansion?
3      Q.  No; vacancy.  Has any White Haven
4  Center resident who has expressed a desire or
5  whose family has expressed a desire to move to
6  the community been offered a vacancy in the
7  system when it occurs?
8      A.  No, not in my tenure as director.
9      Q.  Do you know of any other state
10  center residents who have expressed desire to
11  move and the family has expressed a desire to
12  move who have been offered a vacancy in a
13  community-based program?
14     A.  Yes.  A█ C████ at White Haven.
15  And if I sat and thought about it, I could
16  probably come up with some people.
17     Q.  So it is not unheard of then?
18     A.  No, no, but, again, I think it --
19  A█ moved.  I don't remember what initiative
20  he was under.
21     Q.  It was an initiative, but it was not
22  a vacancy?  I'm asking about vacancies right
23  now.  I'm sorry.
24     A.  Oh, vacancies?  No, no.  I'm sorry.
25  I don't know that.

---

Page 116

1           Fred C. Lokuta
2      Q.  So the answer is none that you know
3  of?
4      A.  That I know of.
5      Q.  Regarding vacancies and state center
6  residents moving to vacancies?
7      A.  That's correct.
8      Q.  Now we are going to get to the
9  question you already answered, which is to
10  your knowledge have any White Haven residents
11  who have themselves or their families
12  expressed a desire to leave been offered
13  community services in new expansion programs?
14     A.  Yes.
15     Q.  And you mentioned one.
16     A.  A█ and Mi██ and all the people
17  who recently moved.
18     Q.  Including the person we were just
19  speaking of?
20     A.  L█████?
21     Q.  N████ B█████?
22     A.  N████, I mean her waiver slot
23  was -- it was her slot.
24     Q.  And why is that?
25     A.  The secretary and the deputy said

---

29  (Pages 113 to 116)

All State Centers

Date: as of 09-30-09

DRN Information Report
State Centers
Summary Sheet

| State Centers | Expressed Desire to Move to Community Yes/No/Not Indicated Total | | | Family Expressed Desire to Move to Community Yes/No/Not Indicated Total | | | Expressed Opposition to Move to Community Yes/No/Not Indicated Total | | | Family Expressed Opposition to Move to Community Yes/No/Not Indicated Total | | | PUNs Completed Yes/No Total | | Does the Person Have a Legal Guardian? Yes/No Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Y | N | NI | Y | N | NI | Y | N | NI | Y | N | NI | Y | N | Y | N |
| Ebensburg | 0 | 5 | 279 | 8 | 255 | 21 | 5 | 0 | 279 | 235 | 15 | 34 | 25 | 259 | 53 | 231 |
| Hamburg | 6 | 19 | 99 | 5 | 96 | 23 | 15 | 7 | 102 | 92 | 8 | 24 | 0 | 124 | 10 | 114 |
| Polk | 12 | 60 | 239 | 6 | 280 | 25 | 62 | 18 | 231 | 211 | 44 | 56 | 43 | 268 | 61 | 250 |
| Selinsgrove | 10 | 26 | 297 | 3 | 205 | 125 | 26 | 44 | 263 | 205 | 41 | 87 | 35 | 298 | 33 | 300 |
| White Haven | 8 | 161 | 2 | 6 | 149 | 16 | 19 | 9 | 143 | 149 | 6 | 16 | 2 | 169 | 62 | 109 |
| Total All Centers | 36 | 271 | 916 | 28 | 985 | 210 | 127 | 78 | 1018 | 114 | 892 | 217 | 105 | 1118 | 219 | 1004 |

Note: See specific Center report on file.

JA280

All Centers

| | Fiscal year 2004/2005 | Fiscal year 2005/2006 | Fiscal year 2006/2007 | Fiscal year 2007/2008 | Fiscal year 2008/2009 | Fiscal Year 04/05 - 08/09 |
|---|---|---|---|---|---|---|
| Deaths/At Center | 12 | 12 | 12 | 14 | 9 | 59 |
| Deaths/Hospital | 30 | 30 | 23 | 26 | 32 | 141 |
| Deaths/Total | 42 | 42 | 35 | 40 | 41 | 200 |
| | | | | | | |
| Discharges/CLA | 7 | 4 | 23 | 14 | 6 | 54 |
| Discharges/Private ICF | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | |
| Discharges/Skilled Nursing Facility | 2 | 1 | 3 | 1 | 1 | 8 |
| Discharges/Psychiatric Facility | 0 | 0 | 0 | 0 | 1 | 1 |
| Transfers | 0 | 0 | 0 | 1 | 0 | 1 |
| Discharges/Total | 9 | 5 | 26 | 16 | 8 | 64 |
| | | | | | | |
| Census 9/30/2009 | 1224 | | | | | |
| | | | | | | |
| No Familiy/Guardians | 96 | | | | | |
| | | | | | | |
| Legal Guardians | 221 | | | | | |

JA281

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ  Class Action  Complaint Filed June 22, 2009 |
| Plaintiffs, | : : | |
| v. | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : | |

_____

## <u>ORDER</u>

Upon consideration of Plaintiffs' Motion for Summary Judgment, it is hereby ORDERED on this _____ day of _____, 2010 as follows:

1.    Plaintiffs' Motion is GRANTED and summary judgment is entered in favor of Plaintiffs and the Class and against Defendants based on the following findings:

a.     Plaintiffs have established that Defendants violated the integration mandates of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794.

(1)     Plaintiffs and class members are individuals with disabilities covered by the ADA and RA because they have mental retardation, an impairment that substantially limits one or more major life activities.

(2)     Defendant Department of Public Welfare (DPW) is a state department and, as such, is a public entity subject to comply with Title II of the ADA.  DPW also receives federal funding and, as such, is required to comply with Section 504 of the RA.

(3)     Plaintiffs have met their burden to establish that Defendants violated the ADA's and RA's integration mandates by failing to offer community services to Plaintiffs and class members to allow them to be discharged from state-operated intermediate care facilities for persons with mental retardation (ICFs/MR).  Defendants concede that Plaintiffs and other state ICF/MR residents could live in the community with appropriate services and supports and, thus, the community is the most integrated setting appropriate to their needs.  Plaintiffs and certain other residents of the state-operated ICFs/MR are not opposed to discharge to community placements.  Information from DPW indicates that there are more

2

than 300 residents of state-operated ICFs/MR whose involved families or guardians are unopposed to community placement. This figure is likely to be understated and, with appropriate education and information about community services, might be increased. Plaintiffs also have demonstrated that there could be a reasonable accommodation to provide community services to state ICF/MR residents who want such services. It would be significantly less expensive to provide services to such individuals in the community than in the state-operated ICFs/MR, and Defendants also could use available vacancies in existing community programs for some class members.

(4) Defendants cannot assert a fundamental alteration defense. Defendants have failed to adopt or implement a viable integration plan that has benchmarks and timelines for discharge, which places the fundamental alteration defense "beyond [DPW's] reach." *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151, 158-59, 160 (3d Cir. 2005). Moreover, the undisputed evidence establishes that residents of state-operated ICFs/MR have been effectively excluded from access to the community mental retardation system both by barring them from the waiting list process by which people with mental retardation can secure community services and by not considering them for vacancies that arise in existing community mental retardation services. This type of exclusion from access to the community services system precludes DPW from

3

asserting a fundamental alteration defense. *Pennsylvania Protection and Advocacy, Inc. v. Pennsylvania Dep't of Public Welfare*, 402 F.3d 374, 383-86 (3d Cir. 2005).

(5)    Even if Defendants could assert a fundamental alteration defense, they have failed to satisfy their burden of proof.

(a)    The evidence demonstrates that, while there are some transition costs related to providing community services to state-operated ICF/MR residents, those costs are limited and, within approximately two years, DPW will begin to realize savings by providing community services to such individuals.  The savings will increase yearly because the cost of institutional services in state-operated ICFs/MR is growing at a far greater rate than the cost of community services.  Furthermore, the fact that there will be some costs is not sufficient to establish a fundamental alteration defense.

(b)    This also is not a case in which the Plaintiffs and class members filed this lawsuit to receive services ahead of others who are unnecessarily institutionalized and on a waiting list.  Few state ICF/MR residents are on a waiting list for community services, and Defendants admit that even those residents who are on such a waiting list will not be considered for such services even when funding is available.  Moreover, the Supreme Court in *Olmstead v. L.C.*, 521 U.S. 587 (1999), made clear that any waiting list will only shield a state

4

from liability under the ADA's and RA's integration mandate if the state has a comprehensive, effectively working plan that results in a waiting list that moves at a reasonable place. *Id.* at 605-06. Defendants have no plan and no waiting list for state ICF/MR residents, much less a waiting list that moves at a reasonable pace.

(c)    Defendants' current budgetary issues do not relieve it of liability under the ADA's and RA's integration mandates. Budget constraints alone cannot excuse compliance with the integration mandates. *See Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 995 (N.D. Cal. 2010). Moreover, budget constraints would not preclude DPW from developing an integration plan. Since the beginning of Fiscal Year 2004-2005, over $300 million was appropriated to DPW to expand community services for individuals with mental retardation. These funds have provided services to more than 7,500 non-institutionalized individuals and fewer than 60 state ICF/MR residents.

b.    Defendants have used methods of administration that have the effect of discriminating against Plaintiffs and class members in violation of the ADA and RA by:

(1)    failing to adopt and implement an integration plan for Plaintiffs and class members;

5

(2)    excluding Plaintiffs and class members from access to community services when expansion funding or vacancies in existing programs become available;

(3)    failing to provide Plaintiffs and class members and their involved families and guardians with meaningful education about community options.

c.    Plaintiffs and class members will suffer irreparable harm absent injunctive relief.  As the Supreme Court has recognized, "confinement in an institution severely diminishes the everyday life activities of individuals ...." *Olmstead*, 527 U.S. at 601.  Only injunctive relief can offer the potential to provide access to community services for Plaintiffs and class members.  The harm suffered by Plaintiffs and class members as a result of their continued unnecessary segregation cannot be remedied by monetary damages and, thus, is irreparable.

d.    Any harm to Defendants will be far less than that experienced by Plaintiffs and class members in the absence of such relief.

e.    The public interest is served by injunctive relief that enforces the ADA's integration mandate.

2.    Based upon the above findings, the Court determines that the following injunctive relief is appropriate to remedy the harm of Plaintiffs' and class members' continued unnecessary institutionalization:

6

a.     <u>Identification of Class Members</u> -- Defendants will create, maintain, and update as needed a Planning List that consists of all state ICF/MR residents who have been identified as not opposed to discharge to community services.

(1)     To determine who is on the Planning List, ODP will assess opposition to discharge by state ICF/MR residents and their involved families (*i.e.*, those family members who have consented to be designated as substitute decision makers for the residents) or guardians no later than June 30, 2011 and at least annually thereafter.  The assessments will be made by the state ICF/MR resident's social worker working with the state ICF/MR Facility Advocate.  State ICF/MR residents and/or their involved family or guardians will be placed on the Planning List if they are open to considering community placement with the understanding that they can be removed from the list in the future if their position changes.

(2)     Within thirty (30) days of entry of this Order, Defendants will place on the Planning List the named Plaintiffs and any other state ICF/MR residents identified by the ICF/MR Facility Directors as having affirmatively expressed their desire to be discharged to the community.

b.     <u>Education About Community Options</u> -- To assure that all state ICF/MR residents, their involved families, and guardians have access to

appropriate information about community options so as to make an informed choice about whether they are opposed to discharge, Defendants will take the following steps:

(1)    DPW's Office of Developmental Programs (ODP) will establish a Community Education Steering Committee within sixty (60) days of the date of this Order to develop and implement a program to educate state ICF/MR residents and their involved families and guardians about community services. The Steering Committee members, appointed by the Deputy Secretary for Developmental Programs, will include, at minimum, a state ICF/MR resident, an individual with mental retardation who lives in the community; a family member of a state ICF/MR resident, a family member of a person with mental retardation who lives in the community; a representative of the Disability Rights Network of Pennsylvania; a provider representative; a representative from ODP, and a representative from the Administrative Entities.

(a)    The Steering Committee will develop a training curriculum that addresses how the community mental retardation system works; community supports and services, including specialized programs such as those that serve individuals who are elderly, medically fragile, or have behavioral issues; funding for community services; and opportunities to participate in community life.

(b)    No later than ninety (90) days after entry of this Order, Defendants will work with Plaintiffs' counsel to agree upon a training schedule.  At minimum, Defendants will provide trainings at each state ICF/MR at least three times each year as well as outside the ICFs/MR in each of the four ODP Regions at least three times each year.  At least one training will be recorded and posted on DPW's website.

(c)    DPW will provide involved families and guardians with notice of the trainings at the facilities that serve their relatives or wards and in the Regions where they live at least thirty (30) days in advance of the training.

(d)    The Steering Committee will develop and disseminate to state ICF/MR residents, their involved families, and guardians written materials about community options, including how they can get on the Planning List or find out more information.

(e)    The Steering Committee will work with the state ICFs/MR to assure that all state ICF/MR residents, involved families, and guardians are periodically offered the opportunity to visit community placements that serve individuals whose needs are similar to the residents' needs and to meet with community services providers.

(2)    Within ninety (90) days of the date of this Order, DPW will contract with a non-profit organization to provide outreach to state ICF/MR

9

residents and their involved families and guardians. The organization will use individuals with mental retardation and family members to make one-on-one contacts with state ICF/MR residents and their involved families and guardians to discuss community supports and services.

(3)    State ICF/MR residents, their involved families and guardians will be given an opportunity after they participate in training events or have outreach contacts to state their position on discharge. To the extent that this results in any changes from their prior position on discharge, Defendants will supplement or amend the Planning List as appropriate.

(4)    DPW will continue to provide the education and outreach services required by this Order until the case is dismissed.

c.    <u>Development and Implementation of a Viable Integration Plan</u> -- Beginning in Fiscal Year 2011-2012, DPW will develop and implement a viable integration plan that provides community services to at least 100 individuals on the Planning List annually for each of the first three years. If there are state ICF/MR residents on the Planning List at the end of Fiscal Year 2013-2014, DPW continue the integration plan by providing community services to at least 75 individuals on the Planning List each year until all persons on the Planning List have been discharged. To facilitate compliance with this Plan, DPW will take at least the following necessary steps:

(1)    In submitting its budget proposal to the Governor, DPW will request as one of its top budget priorities appropriations to fund the development of community services to meet the Plan's benchmarks.

(2)    Where possible, DPW should shift funds from the carry-forward budget for state ICFs/MR to the Community Waiver budget.

(3)    DPW will modify its policies and practices to assure that persons on the Planning List have access to vacancies in existing community programs that match their needs.

    d.   <u>Reports</u>

(1)    Beginning July 1, 2011 and every six (6) months thereafter, Defendants will provide status reports to Plaintiffs' counsel and the Court on their implementation of this Order, including:  (a) describing the status of DPW's funding requests to the Governor; (b) describing whether and to what extent DPW changed the carry-forward budget to provide funding for persons on the Planning List and, if so, the status of that change; (c) describing DPW's modification of its vacancy policies; (d) stating the number of persons on the Planning List, the number of persons on the Planning List who were discharged to community services during the report period, and how many of those discharged were due to receipt of expansion funding, changes in the carry-forward budget, or

11

placement in vacancies in existing programs; and (e) describing implementation of the Order's provisions related to education and outreach.

(2)    Beginning July 1, 2011 and every six (6) months thereafter, Defendants will provide Plaintiffs' counsel with:  (a) copies of the updated Planning Lists; and (b) information that identifies all state ICF/MR residents who were discharged during the report period, including their names and addresses in the community and the names of their community residential services providers.

3.    The Court will retain jurisdiction over this lawsuit to interpret and enforce the Order as necessary.  The lawsuit will be dismissed ninety (90) days after the discharge of the last person on the Planning List.

4.    Plaintiffs will file a motion for attorneys' fees, litigation expenses, and costs with the Court within thirty (30) days of the date of this Order.

_____
John E. Jones III
United States District Judge

12

JA293

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                                                              :
FRANKLIN BENJAMIN, by and through             :
his next friend, Andreé Yock; RICHARD           :
GROGG and FRANK EDGETT, by and              :    Filed via ECF System
through their next friend, Joyce McCarthy;        :
SYLVIA BALDWIN, by and through her              :    Civil Action No. 1:09-cv-1182-JEJ
next friend, Shirl Meyers; ANTHONY              :
BEARD, by and through his next friend,            :    Class Action
Nicole Turman, on behalf of themselves           :
and all others similarly situated,                      :    Complaint Filed June 22, 2009
                                                              :
                              Plaintiffs,                   :    Judge Jones
                                                              :
                    v.                                         :
DEPARTMENT OF PUBLIC WELFARE         :
OF THE COMMONWEALTH OF                       :
PENNSYLVANIA and HARRIET                       :
DICHTER, in her official capacity as                :
Secretary of Public Welfare of the                   :
Commonwealth of Pennsylvania,                      :
_____:

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiffs and the Class submit this Statement

of Undisputed Material Facts in Support of their Motion for Summary Judgment

on their claims under Title II of the Americans with Disabilities Act and Section

504 of the Rehabilitation Act.  The exhibits referenced in this Statement are those

submitted in support of Plaintiffs' Motion for Summary Judgment.

## I.    **The Parties**

1.    Plaintiff Franklin Benjamin is a nearly 50-year-old resident of Philadelphia, Pennsylvania who has been institutionalized in Ebensburg Center, a state-operated intermediate care facility for persons with mental retardation (ICF/MR) since 1966, when he was six years old.  Am. Compl. & Answer ¶¶ 8, 21 (Exh. 2, 3).

2.    Plaintiff Richard Grogg is a 46-year-old resident of York County, Pennsylvania who has been institutionalized in Selinsgrove Center, a state-operated ICF/MR, since 1988.  Am. Compl. & Answer ¶¶ 9, 26 (Exh. 2, 3).

3.    Plaintiff Frank Edgett is a 52-year old resident of Cumberland County, Pennsylvania who has been institutionalized in Selinsgrove Center, a state-operated ICF/MR, since 1987.  Am. Compl. & Answer ¶¶ 10, 32 (Exh. 2, 3).

4.    Plaintiff Sylvia Baldwin, a 34-year-old resident of Allegheny County, Pennsylvania, has been institutionalized in Polk Center, a state-operated ICF/MR, since 1990 when she was 14 years old with two brief discharges to community programs in 1999 and 2001.  Am. Compl. & Answer ¶¶ 11, 38, 39 (Exh. 2, 3).

5.    Plaintiff Anthony Beard, a 50-year-old resident of York County, Pennsylvania, has been institutionalized in Ebensburg Center, a state-operated ICF/MR, since 1967, when he was seven years old.  Am. Compl. & Answer ¶¶ 12, 44 (Exh. 2, 3).

6.    This Court certified this case to proceed on behalf of the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

Class Certification Order (Sept. 2, 2009) (Docket # 17).

7.    Plaintiffs' and class members' mental retardation substantially limits one or more major life activities, including caring for themselves, learning, concentrating, and thinking.  Am. Compl. & Answer ¶¶ 83, 89 (Exh.2, 3).

8.    Defendant Department of Public Welfare (DPW) is the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation, including Plaintiffs and class members, under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1).  Am. Compl. & Answer ¶ 13 (Exh. 2, 3).

9.    DPW's Office of Developmental Programs (ODP) administers the state-operated and state-funded programs for people with mental retardation in Pennsylvania.  Casey Dep. at 5-6 (Exh. 4).

10.    DPW receives federal funding, including funding for the provision of mental retardation services in ICFs/MR and in the community, through Title XIX of the Social Security Act (the federal Medical Assistance statute) and Title XX of

3

JA296

the Social Security Act (block grants).  DPW's Response to Pls.' First Request for Admissions # 46 (Exh. 5).

11.    Defendant Harriet Dichter, Secretary of Public Welfare, is responsible to administer and oversee DPW, including the oversight and administration of Commonwealth-funded mental retardation services in Pennsylvania.  *See* http://www.dpw.state.pa.us/About/Secretary; 50 P.S. § 4201.

**II.    DPW's Mental Retardation System**

**A.    State-Operated ICFs/MR**

12.    DPW operates five ICFs/MR, also known as "state centers":  (1) Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in Berks County; (3) Polk Center, located in Venango County; (4) Selinsgrove Center, located in Snyder County; and (5) White Haven Center, located in Luzerne County.  Am. Compl. & Answer ¶ 54 (Exh. 2, 3).

13.    An ICF/MR is a type of licensed facility that is funded through the joint federal-state Medical Assistance program.  *See* Am. Compl. & Answer ¶ 53 (Exh. 2, 3); Casey Dep. at 12, 14, 15 (Exh. 4); *see also* 42 U.S.C. § 1396d(d); 42 C.F.R. Pt. 483, Subpt. I.

14.    Since ICF/MR services are covered by Medical Assistance, the federal government provides a funding match for their costs.  Casey Dep. at 14 (Exh. 4).

4

JA297

15.     Historically, the federal match has been approximately 54 percent, but under the American Recovery and Reinvestment Act of 2009 (which is in effect until at least December 31, 2010) the federal match is close to 65 percent.  *See* Casey Dep. at 14-15 (Exh. 4); Church Dep. at 66 (Exh. 6).

16.     As of July 2008, the five state ICFs/MR housed a total of 1,272 individuals, ranging from 129 at Hamburg Center to 347 at Selinsgrove Center. Am. Compl. & Answer ¶ 55 (Exh. 2, 3).

17.     As of September 30, 2009, the five state ICFs/MR housed a total of 1,224 residents, ranging from 124 at Hamburg Center to 334 at Selinsgrove Center. Defs.' Response to Pls.' First Set of Interrogatories # 1(a) (Exh. 7).

18.     DPW's projected census for the five state ICFs/MR in July 2010 is 1,190, ranging from an estimated 120 at Hamburg Center to 326 at Selinsgrove Center.  Governor's Executive Budget for FY ("FY") 2010-2011 at E32.26 (Exh. 8).

19.     All of the state ICFs/MR operate at significantly less than full capacity, with Hamburg Center operating at a little more than 50 percent capacity.  Am. Compl. & Answer ¶ 57 (Exh. 2, 3); *accord* Governor's Executive Budget for FY 2010-2011 at E32.26 (Exh. 8).

20.     In the five fiscal years between FY 2004-2005 and FY 2008-2009, inclusive, 200 state ICF/MR residents died.  Defs.' Response to Pls.' First Set of Interrogatories # 5(b) (Exh. 7).

21.     The anticipated census reduction in FY 2009-2010, *see* Statement of Undisputed Material Fact ## 17, 18, is expected to be attributable almost exclusively to the deaths of residents and not to discharges to community services. *See* Church Dep. at 59-60 (Exh. 6).

22.     In the five fiscal years between FY 2004-2005 and FY 2008-2009, inclusive, 54 state ICF/MR residents were discharged to community-based supports and services:  (a) 7 in FY 2004-2005; (b) 4 in FY 2005-2006; (c) 23 in FY 2006-2007; (d) 14 in FY 2007-2008; and (e) 6 in FY 2008-2009.  Defs.' Response to Pls.' First Set of Interrogatories # 5(a) (Exh. 7).

23.     Pennsylvania's allocation to fund services at the five state ICFs/MR in FY 2008-2009 (July 1, 2008 through June 30, 2009) was approximately $290 million, an average annual cost of nearly $228,000 per resident.  Am. Compl. & Answer ¶ 58 (Exh. 2, 3).

24.     The average per person cost to provide services to state ICF/MR residents in FY 2009-2010 (July 1, 2009 through June 30, 2010) is approximately $240,000, and this amount is expected to increase to approximately $256,000 in

FY 2010-2011 (July 1, 2010 through June 30, 2011).  Defs.' Response to Pls.' First Request for Admissions # 36 (Exh. 5).

25.    The costs to operate the state ICFs/MR continue to increase annually, even though the population at those facilities declines each year.  Defs.' Response to Pls.' First Request for Admissions # 37 (Exh. 5).

**B.    Privately-Operated ICFs/MR**

26.    DPW funds numerous privately-operated ICFs/MR that provide services to approximately 2,500 individuals.  Casey Dep. at 16 (Exh. 4).

27.    The average per person cost to fund services in FY 2009-2010 in privately-operated ICFs/MR in Pennsylvania is approximately $138,000 per year. Defs.' Response to Pls.' First Request for Admissions # 38 (Exh. 5).

**C.    Community Mental Retardation System**

28.    DPW funds an array of community-based mental retardation services and supports, including residential services (such as small group homes or family living situations); day programming (such as vocational training, supported employment, development of community integration skills, and socialization); therapies (including behavioral supports); home health care (including up to 24 hours per day of skilled nursing); home modifications; assistive technology; and respite services.  Casey Dep. at 21-25, 45-48, 49-50 (Exh. 4).

29.    All Pennsylvanians with mental retardation are eligible for community services.  Casey Dep. at 26 (Exh. 4).

30.    Community-based mental retardation services in Pennsylvania are funded primarily through the Medical Assistance program, specifically two home and community-based waiver programs:  the Consolidated Waiver and the Person/Family Directed Support (P/FDS) Waiver.  Casey Dep. at 34, 38 (Exh. 4).

31.    Waivers allow DPW to use Medical Assistance funding to provide services that could not otherwise be funded by the state Medical Assistance plan, such as habilitation and home modifications.  Church Dep. at 65 (Exh. 6).

32.    The federal government pays a percentage of the costs of the Consolidated and P/FDS Waivers.  Casey Dep. at 34 (Exh. 4).

33.    The percentage of the costs paid by the federal government for the Consolidated and P/FDS Waivers is the same as the percentage it pays for state ICFs/MR -- normally about 54 percent and currently about 65 percent under the American Recovery and Reinvestment Act.  Casey Dep. at 39-40 (Exh. 4).

34.    To be eligible for the Consolidated or P/FDS Waiver, an individual must need the level of care provided by an ICF/MR and meet the financial eligibility criteria.  Church Dep. at 64-65, 69-70 (Exh. 6).

JA301

35.    The Consolidated Waiver is uncapped, which means that the consumer is entitled to receive the services he needs under that Waiver regardless of cost.  Casey Dep. at 38 (Exh. 4).

36.    The P/FDS Waiver is capped so that individuals cannot receive services that cost in excess of $26,000 per year.  Casey Dep. at 38 (Exh. 4).

37.    There is a limit on the number of individuals who can receive services under the Consolidated and P/FDS Waivers, but the federal government can grant permission to amend each Waiver to increase that limit and has readily approved those types of amendments in the past.  Casey Dep. at 40, 43 (Exh. 4); Church Dep. at 66-67, 69, 70 (Exh. 6).

38.    DPW contracts with Administrative Entities (AEs), which are the county mental health and mental retardation programs, to administer the Consolidated and P/FDS Waiver programs in specific geographic areas.  Casey Dep. at 58, 228 (Exh. 4).

39.    DPW does not provide community mental retardation services directly, but, rather, pays private providers to do so.  Church Dep. at 75 (Exh. 6).

40.    The average annual cost of residential and non-residential community-based mental retardation services in Pennsylvania was slightly less than $100,000 per person in FY 2008-2009.  Am. Compl. & Answer ¶ 61 (Exh. 2, 3).

9

41.    DPW funds community mental retardation services through the Consolidated Waiver that cost as much as $500,000 per person annually or more for individuals who have never been institutionalized.  Defs.' Response to Pls.' First Request for Admissions 2 (Exh. 5).

42.    There are approximately 2,000 people in the Consolidated Waiver who receive community mental retardation services that cost more than $200,000 per person annually.  *See* Response to Pls.' First Request for Admissions 3 (Exh. 5).

## III.    <u>Unnecessary Institutionalization</u>

43.    All of the named Plaintiffs could live in the community if they were provided with appropriate supports and services.  Am. Compl. & Answer ¶¶ 23, 29, 35, 41, 46 (Exh. 2, 3).

44.    DPW's staff and agents have concluded that all of the named Plaintiffs are appropriate for discharge to the community.  Am. Compl. & Answer ¶¶ 24, 30, 36, 42, 47 (Exh. 2, 3).

45.    Defendants have admitted that all persons with mental retardation who are institutionalized in state ICFs/MR, with appropriate supports and services, could live in more integrated community settings.  Am. Compl. & Answer ¶¶ 65, 68 (Exh. 2, 3); Defs.' Response to Pls.' First Set of Interrogatories # 1(b) (Exh. 7).

10

46.    There are no types of services and supports that are provided in state ICFs/MR that cannot be and are not currently provided to individuals with mental retardation in the community system in Pennsylvania.  Defs.' Response to Pls.' First Request for Admissions # 1 (Exh. 5).

47.    According to DPW's Deputy Secretary for Developmental Programs, "although the average acuity in the state [ICFs/MR] is significantly higher than the average acuity in the community, there is no person we are serving in the state [ICFs/MR] for whom we are not serving a very similar person in the community." Defs.' Response to Pls.' First Request for Admissions # 1(a) (Exh. 5).

48.    The Commonwealth has embraced the principle of "normalization," which "defines the right of the individual with mental retardation to live a life which is as close as possible in all aspects to the life which any member of the community might choose."  Am. Compl. & Answer ¶ 67 (Exh. 2, 3) (quoting 55 Pa. Code § 6400.1).

49.    The principle of normalization is based on research that shows that people with disabilities, including those with mental retardation, do significantly better if they receive services in a "normal" environment, *i.e.*, the environment in which non-disabled people typically live.  Casey Dep. at 27-28 (Exh. 4).

50.    It is the stated policy of Pennsylvania to provide individuals with mental retardation services in the community.  Casey Dep. at 33 (Exh. 4).

11

51.    Individuals who live in institutions, such as the state ICFs/MR, cannot learn to live a normal life because institutions are abnormal settings and individuals who live in them come to rely on the structures of the institutional setting.   Casey Dep. at 31 (Exh. 4).

52.    Residents of the state ICFs/MR are more segregated than those individuals with mental retardation who receive community services since most state ICFs/MR are in more rural parts of the state; most state ICF/MR residents live in units ranging from about 16 to 20 people; day services usually are provided on the grounds of the facilities; and residents do not have as much opportunity as those living in the community to interact with a wide range of people and to have access to community activities.   Defs.' Response to Pls.' First Request for Admissions # 5 (Exh. 5).

## IV.    Lack of Opposition to Community Placement

53.    Plaintiff Benjamin has not indicated any opposition to discharge.  *See* Excerpt of DPW Chart for Ebensburg, Villa Unit, and Community Placement Plan for Mr. Benjamin (noting he has not indicated opposition to discharge) (Exh. 9).

54.    Plaintiff Benjamin's mother is willing to consider his discharge to an appropriate community placement and, therefore, is not opposed to discharge.  *See* Excerpt of DPW Chart for Ebensburg, Villa Unit, Community Placement Plan, and Annual Family Information (noting in chart and on Annual Family Information

12

document that Mr. Benjamin's mother has expressed a desire for him to move to the community) (Exh. 9).

55.    Plaintiff Grogg wants to be discharged from Selinsgrove Center and live in the community closer to his mother's home and his mother supports his choice.  Am. Compl. & Answer ¶ 31 (Exh. 2, 3).

56.    Plaintiff Edgett wants to be discharged from Selinsgrove Center and live in the community and his sister supports that choice.  Am. Compl. & Answer ¶ 37 (Exh. 2, 3).

57.    Plaintiff Baldwin wants to be discharged from Polk Center and live in the community, and her mother supports that choice.  Am. Compl. & Answer ¶ 43 (Exh. 2, 3).

58.    Plaintiff Baldwin has met with DPW's Deputy Secretary for Developmental Programs, Kevin Casey, at least 10 times and sent him letters to discuss her desire to live in the community.  Casey Dep. at 82 (Exh. 4); *see also* Letter from Sylvia Baldwin to Kevin Casey (Exh. 10).

59.    Plaintiff Beard has not indicated any opposition to community discharge.  Excerpt of DPW Chart for Ebensburg, Horizon Unit Living Area East 2, and Community Placement Plan for Mr. Beard (noting he has not indicated opposition to discharge) (Exh. 11).

60.    Plaintiff Beard's mother wants him discharged to a community placement closer to her home in York County since she is no longer able to visit him at Ebensburg Center frequently.   Excerpt of DPW Chart for Ebensburg, Horizon Unit, Living Area East 2, Community Placement Plan, and Annual Family Information (noting in chart and on Annual Family Information document that Mr. Beard's mother has expressed a desire for him to move to the community) (Exh. 11).

61.    After this lawsuit was filed, DPW conducted an assessment, based primarily on existing documentation, to determine whether the state ICF/MR residents and/or their families opposed community placement.  Defs.' Response to Pls.' Request for Admission # 6 (Exh. 5).

62.    In assessing desire for or opposition to community placement, DPW staff primarily reviewed existing documentation in the files and specifically the Community Placement Plans.  *See* Lokuta Dep. at 60-61 (Exh. 12).

63.    The results of DPW's post-lawsuit assessment of desire for/opposition to discharge shows that 78 state ICF/MR residents stated that they were not opposed to discharge, and an additional 1,018 state ICF/MR residents did not indicate any opposition to discharge.  *See* Lokuta Dep. at 59-60 (Exh. 12); Discharge Opposition Summary Sheet (Exh. 13).

14

64.    According to the DPW assessment, family members of 114 state ICF/MR residents stated that they were not opposed to community placement, and that families of an additional 217 state ICF/MR residents did not indicate any opposition to community placement.  Thus, a total of 331 state ICF/MR residents' families did not express or otherwise indicate opposition to community placement.  Discharge Opposition Summary Sheet (Exh. 13); Defs.' Response to Pls.' First Request for Admissions # 6 (Exh. 5).

65.    DPW staff concluded that the family of a White Haven Center resident, C.B., was opposed to community placement, even though documents state that changes in the family structure indicate that they would not prevent C.B.'s discharge to the community.  Casey Dep. at 121-123 (Exh. 4).

66.    DPW staff concluded that the family of a Selinsgrove Center resident, D.W., was opposed to community placement, even though the evidence in the record did not support that conclusion.  *See* Casey Dep. at 106-107 (Exh. 4).

67.    DPW staff concluded that the family of a Selinsgrove Center resident, J.B., was opposed to community placement, even though the evidence in the record did not support that conclusion.  *See* Casey Dep. at 108-110 (Exh. 4).

68.    DPW staff concluded that the family of a Selinsgrove Center resident, M.S., was opposed to community placement, even though documents indicate that her family is no longer involved.  *See* Casey Dep. at 112-113 (Exh. 4).

15

69.    DPW staff concluded that the family of an Ebensburg Center resident, H.R.C., was opposed to community placement, even though documents indicate that her parents are deceased and the Facility Director of Ebensburg Center is her substitute decision-maker.  Casey Dep. at 116-118 (Exh. 4).

70.    According to DPW's Deputy Secretary for Developmental Programs, although many families of state ICF/MR residents are likely to be apprehensive about discharge to community services, those apprehensions are not well-founded, and his personal experience and professional research both demonstrate that most families are satisfied with community services after their relatives are discharged.  Defs.' Response to Pls.' First Request for Admissions # 7 (Exh. 5).

71.    It would be possible to overcome the opposition of many family members to discharge of their relatives in state ICFs/MR through effective education about community programs.  Defs.' Response to Pls.' First Request for Admissions # 9 (Exh. 5); Am. Compl. & Answer ¶ 70 (Exh. 2, 3).

72.    It is important for state center residents and their families to visit community programs in order to make an informed decision about whether they want community services, but state ICF/MR residents and their families generally do not have an opportunity to visit community programs unless and until funding for discharge becomes available.   Defs.' Response to Pls.' First Request for Admission # 10 (Exh. 5).

16

73.    Many individuals who had lived for years in now-closed state ICFs/MR and who were discharged to the community despite initial opposition by them or their families are now satisfied with the community services and supports they receive.  Am. Compl. & Answer ¶ 71 (Exh. 2, 3); *see also* Defs.' Response to Pls.' First Request for Admissions # 8 (Exh. 5) (noting that even families who had sued after their discharge from a now-closed state ICF/MR ultimately had no complaints about community services and did not want their family members returned to state institutions).

## V.    State ICF/MR Residents Lack of Access to Community Mental Retardation Services

74.    Despite the fact that the named Plaintiffs and some other state ICF/MR residents are appropriate for and not opposed to discharge to the community, Defendants have failed to offer them appropriate community alternatives.  Am. Compl. & Answer ¶ 72 (Exh. 2, 3).

75.    There is a waiting list for community-based mental retardation services in Pennsylvania that is divided into three categories: "emergency" (*i.e.*, those who need services immediately); "critical" (*i.e.*, those who are anticipated to need services within two years); and "planning" (*i.e.*, those who are anticipated to need services in more than two, but fewer than five, years).  Am. Compl. & Answer ¶ 62 (Exh. 2, 3); Defs.' Response to Pls.' First Request for Admission # 11 (Exh. 5).

17

76.     When     individuals     with     mental     retardation     who     are     not
institutionalized in ICFs/MR seek community mental retardation services, DPW's
agents must complete a Prioritization of Urgency for Need of Services (PUNS)
form to determine the person's waiting list category.  *See* Am. Compl. & Answer ¶
63 (Exh. 2, 3); Defs.' Response to Pls.' Request for Admission # 12 (Exh. 5); Casey
Dep. at 62-65 (Exh. 4).

77.     Everyone  in  the  community  who  applies  for  mental  retardation
services is supposed to receive an evaluation using the PUNS form.  Casey Dep. at
64 (Exh. 4).

78.     Individuals  who  have  not  had  PUNS  forms  completed  or  whose
PUNS forms conclude that they are fully served (*i.e.*, all their needs are being met)
are not on the waiting list for community mental retardation services.  *See* Defs.'
Response to Pls.' First Request for Admissions # 11 (Exh. 5); Casey Dep. at 194,
200, 211-212 (Exh. 4).

79.     Individuals in the community are placed in the emergency waiting list
category if, *inter alia*, community supports are needed "to keep him/her from being
placed  in  a  state  center  [ICF/MR],  nursing  home,  large  ICF/MR  or  other
congregate settings ...."  Prioritization of Urgency of Need for Services (PUNS)
Form at 2 (Exh. 14).

18

80.    DPW's only policy with respect to the placement of state ICF/MR residents on the waiting list for community mental retardation services is to place on the critical waiting list only those state ICF/MR residents who have affirmatively requested community services *and* who the Administrative Entity is planning to move to the community.  Defs.' Response to Pls.' First Request for Admissions # 15 (Exh. 5).

81.    PUNS forms have been completed for only 113 state ICF/MR residents and, of that total, seven are on the emergency waiting list, six are on the critical waiting list, 65 are on the planning waiting list, and 35 have been determined to be fully served.  Defs.' Response to Pls.' First Request for Admissions # 14 (Exh. 5).

82.    Although Plaintiff Grogg is extremely independent, capable of living in the community with appropriate supports, and actively expresses a desire for discharge, a PUNS assessment prepared in July 2007 determined that he does not need community services and supports because "all [of his] needs [are] being met," and he was removed from the waiting list.  Am. Compl. & Answer ¶ 73(b) (Exh. 2, 3).

83.    No PUNS assessment has ever been prepared for Plaintiff Benjamin.  Am. Compl. & Answer ¶ 73(a) (Exh. 2, 3).

19

84.    A PUNS assessment completed for Plaintiff Edgett placed him in the "planning" category, but Defendants admit that he is not likely to be removed from the waiting list and provided with community services even within five years.  Am. Compl. & Answer ¶ 73(c) (Exh. 2, 3).

85.    Plaintiffs Beard and Baldwin each have had a PUNS assessment and been placed, respectively, in the "emergency" and "critical" categories, but Defendants admit that they are unlikely to be removed from the waiting list and provided with community services even within two years.  Am. Compl. & Answer ¶¶ 73(d)-(f) (Exh. 2, 3).

86.    DPW's Deputy Secretary for Developmental Programs could not say how long even those few state ICF/MR residents who are on the emergency or critical waiting lists would have to wait before they were offered community services.  Casey Dep. at 177-178 (Exh. 4).

87.    Some state ICF/MR residents who have asked for community services or whose families have asked for community services have not had PUNS forms completed or have been determined to be fully served and, therefore, are not on the waiting list for community services.  Defs.' Response to Pls.' First Request for Admissions # 16 (Exh. 5).

88.    Defendants admit that the named Plaintiffs and class members are either not on any waiting lists for community services or are unlikely ever to be

removed from the waiting lists and provided with community services regardless of their level of need. *See* Am. Compl. & Answer ¶¶ 73, 73(c) (Exh. 2, 3).

89.    Between FY 2004-2005 and 2008-2009, inclusive, DPW received $316.4 million to fund community supports and services for 6,784 individuals on the waiting list, consisting of:  (a) $33.9 million to serve 529 people in FY 2004-2005; (b) $53.8 million to serve 850 people in FY 2005-2006; (c) $38.0 million to serve 806 people in FY 2006-2007; (d) $107.4 million to serve 3,428 people in FY 2007-2008; and (e) $83.3 million to serve 1,171 people in FY 2008-2009.  Defs.' Responses to Pls.' First Set of Interrogatories # 6(a) (Exh. 7); ODP History of Waiting List Initiatives (Exh. 15).

90.    Of the 6,784 individuals on the waiting list who received services in FY 2004-2005 through FY 2008-2009, inclusive, 2,488 received residential services, consisting of:  (a) 381 in FY 2004-2005; (b) 526 in FY 2005-2006; (c) 350 in FY 2006-2007; (d) 1,036 in FY 2007-2008; and (e) 255 in FY 2008-2009. Defs.' Responses to Pls.' First Set of Interrogatories # 6(b) (Exh. 7).

91.    Of the 6,200 individuals on the waiting list who received services in FY 2006-2007 and FY 2009-10, inclusive, 2,160 were youngsters graduating from school, most of whom are not in imminent risk of danger without services. *See* Defs.' Responses to Pls.' First Set of Interrogatories # 6(a) (Exh. 7) (number of people served on waiting list); ODP History of Waiting List Initiatives (Exh. 15)

21

(same); Person/Family Directed Supports Waiver for People Out-of-School (Exh. 16) (number of people graduating from school who received services); Casey Dep. at 174 (Exh. 4); Church Dep. at 168-171, 219-220 (Exh. 6)

92.   Of the 54 state ICF/MR residents who were discharged between FY 2004-2005 and FY 2008-2009, inclusive, 36 were discharged as a result of special funding allocated pursuant to the initiative to close Altoona Center, a former state ICF/MR.  *See* Summary of Deaths and Discharges in State Centers (Exh. 17).

93.   In FY 2009-2010, DPW received funding to provide community services to 793 individuals on the waiting list.  ODP History of Waiting List Initiatives (Exh. 15).

94.   The Governor's proposed budget for FY 2010-2011 includes a request for funding to serve an additional 150 people on the waiting list.  Church Dep. at 219-220 (Exh. 6).

95.   The Director of the Bureau of Financial Management of DPW's Office of Developmental Programs testified that he does not expect funding to be available to develop community supports and services for any state ICF/MR residents in FY 2009-2010 or 2010-2011.  Church Dep. at 59-60, 220-221 (Exh. 5).

96.   Each year, there are about 700 to 750 vacancies in the Consolidated Waiver, about two-thirds of which are in residential habilitation programs (such as group homes).  Defs.' Response to Pls.' First Request for Admissions # 17 (Exh. 5).

97.    DPW has instructed the Administrative Entities to consider only individuals who are on the emergency waiting list or who meet the criteria for placement on the emergency waiting list to fill residential vacancies.  McCool Dep. at 43 (Exh. 18).

98.    Defendants have no evidence that any state ICF/MR residents in the past 10 years have been placed as a result of vacancies in community-based programs.  *See* Defs.' Response to Pls.' Requests for Admissions ## 19-21 (Exh. 5); *see also* Lokuta Dep. at 5-8, 114-116 (Facility Director of White Haven, Center who also was the Acting Director at Polk Center and Selinsgrove Center, is not aware of any state ICF/MR residents who have been offered placements created through vacancies in community programs) (Exh. 12).

99.    DPW does not have a waiting list to provide community supports and services to residents of state ICFs/MR that moves at a reasonable pace.  Am. Compl. & Answer ¶ 80 (Exh. 2, 3).

100.  DPW has not adopted or implemented a plan to offer and provide community placements to any state ICF/MR residents who are not opposed to discharge that includes specific benchmarks to identify the number of state ICF/MR residents for whom community mental retardation services will be provided and the time lines in which they will be provided.  Defs.' Response to

Pls.' First Request for Admissions # 23 (Exh. 5); Am. Compl. & Answer ¶ 79 (Exh. 2, 3).

101.  DPW developed an integration plan for residents of Norristown State Hospital (NSH) in accordance with the ruling in *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151 (3d Cir. 2005), which provided that DPW would seek funding to provide community services to 30 NSH residents in FY 2006-2007; 30 NSH residents in FY 2007-2008; 60 NSH residents in FY 2008-2009; and 90 NSH residents in FY 2009-2010. Defs.' Response to Pls.' First Request for Admissions # 24 (Exh. 5).

102.  Although DPW implemented the first two years of the four-year integration plan for NSH residents, it received funding to serve only 30 (rather than 60) NSH residents in the third year, and DPW did not seek any further funding to implement the plan in the fourth year.  Defs.' Response to Pls.' First Request for Admissions # 25 (Exh. 5).

103.  The current budget environment is not the reason for DPW's provision of community services to only 58 state ICF/MR residents since the beginning of FY 2004-2005.  Church Dep. at 176 (Exh. 6).

104.  DPW's provision of community services to only 58 state ICF/MR residents since the beginning of FY 2004-2005 is not due to budget constraints, but, rather, is due to a policy decision to prioritize people on the waiting list who

24

JA317

live in the community.  Casey Dep. at 166-167 (Exh. 4); Church Dep. at 175-176 (Exh. 6).

105.   There is nothing in the current budget environment that precludes DPW from developing and implementing a plan to provide community services to state ICF/MR residents over some period of time in the future.  Casey Dep. at 167 (Exh. 4).

## VI.    Costs and Savings of Providing Community Services to Plaintiffs and Class Members

106.   DPW's budget proposals to the Governor's Office of the Budget generally consist of a carry-forward budget (*i.e.*, funds to maintain existing services at the same level) and requests to fund expansion projects (*i.e.*, new initiatives, including initiatives to serve people on the waiting list for community mental retardation services).   *See* Defs.' Response to Pls.' First Request for Admission # 26 (Exh. 5).

107.   Historically, it is easier for DPW to secure approval from the Governor's Office of the Budget for its carry-forward budget than for expansion projects.  Defs.' Response to Pls.' First Request for Admission # 27 (Exh. 5).

108.   The Pennsylvania Legislature makes separate appropriations for the following:  state ICFs/MR; privately-operated ICFs/MR; community mental retar- dation services funded through the home and community-based waivers; and

25

"base-funded" community-based services (*i.e.*, non-waiver services).  Church Dep. at 11-12 (Exh. 6).

109.  Although DPW in a given fiscal year cannot move money among different appropriations (*e.g.*, it cannot use state ICF/MR appropriations to fund community services), DPW can revise its funding requests in subsequent fiscal years to take into account changing needs.  Church Dep. at 12-13, 16 (Exh. 6).

110.  Although funding for community supports and services for state ICF/MR residents has generally been made available only through expansion initiatives (relating to closures or downsizing of state ICFs/MR), DPW has been able to use the carry-forward budget to provide community supports and services to a small number of state ICF/MR residents by reducing the funding provided to the state ICFs/MR to maintain budget neutrality.   Defs.' Response to Pls.' First Request for Admission # 28 (Exh. 5).

111.  According to the Director of the Bureau of Financial Management and Budget for DPW's Office of Developmental Programs, it would be possible to use the carry-forward budget to fund community supports and services for additional state ICF/MR residents than DPW previously has done.  Church Dep. at 136 (Exh. 6).

26

112.    DPW does not have information about the costs to provide community supports and services to all of the remaining state ICF/MR residents.  Church Dep. at 98, 99-100 (Exh. 6).

113.    The average annual cost of providing community services and supports through the Consolidated Waiver to the 58 individuals most recently discharged from the state ICFs/MR is $166,113.  Church Dep. at 103-106, 108-109 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

114.    Eighteen of the 58 individuals most recently discharged from state ICFs/MR are from Philadelphia, which has significantly higher costs than elsewhere in the Commonwealth, and 10 are from Allegheny County, which also has higher costs than most other counties.  Church Dep. at 113-114 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

115.    The annual costs of providing community services to the 58 individuals most recently discharged state ICF/MR residents range from just under $59,000 to more than $500,000.  Church Dep. at 110-111 (Exh. 6); Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

JA320

116.  Despite the range of community services costs for the 58 most recently discharged state ICF/MR residents, the cost of services for 75 percent of those individuals was less than $169,000.  *See* Chart Summarizing Costs of Community Services for Discharged ICF/MR Residents (Exh. 19).

117.  Although the costs of community services for state ICF/MR residents may be higher on average than the community services costs for people who were never institutionalized, there is an equivalent group of people who were never institutionalized whose community services costs are at the higher end of the spectrum.  Church Dep. at 112-113 (Exh. 6).

118.  The average cost in FY 2008-2009 to provide community supports and services to individuals previously discharged from state ICFs/MR between 1999 and 2002 was $120,000 per person.  Church Dep. at 123, 125-132 (Exh. 6); Action Memorandum dated Mar. 27, 2009, Att. 3 at 3, 4, 10, 11 (Exh. 20).

119.  The average cost to provide state ICF/MR residents with community services would be less than the average cost to provide them with services in the state ICFs/MR.  *See* Defs.' Response to Pls.' Request for Admissions # 36 (admitting average per person cost to serve individuals in state ICFs/MR is $240,000 per year); Church Dep. at 108-109 (average per person cost to serve individuals discharged from state ICFs/MR under the Altoona Center closure initiative was approximately $166,000 per year), 125-132 (average per person cost

28

in FY 2008-2009 to serve individuals discharged from state ICFs/MR between 1999 and 2002 was about $120,000), 195-197, 206-207 (estimates of $145,000 and $180,000 per person used by DPW for community services for residents of Hamburg Center, the residents of which have a higher acuity level than in other state ICFs/MR) (Exh. 6).

120.  Transition costs refer to the money needed for the short-term period when DPW must fund services to individuals in state institutions while simultaneously funding the development of community services to enable their discharge (*e.g.*, finding a community home, hiring community staff).  Church Dep. at 177-178 (Exh. 6).

121.  The amount of transition costs is affected by the number of individuals discharged because if only a few people are discharged, staffing cannot be reduced.  In contrast, savings can be achieved more easily by closing units, buildings, or entire institutions.  *See* Church Dep. at 179-180 (Exh. 6).

122.  DPW has no information about what, if any, transition costs it actually incurred when it has closed state ICFs/MR, including Altoona, Western, Embreeville, and Laurelton Centers.  Church Dep. at 178 (Exh. 6).

123.  DPW prepared various plans to assess the costs that would be incurred and the savings that would be generated if it closed Selinsgrove Center and Hamburg Center and discharged residents to community supports and services and

29

private ICFs/MR beginning in FY 2008-2009.  Defs.' Response to Pls.' First Request for Admissions # 42 (Exh. 5).

124.   DPW's plans to close Selinsgrove and Hamburg Centers (referenced in Statement of Material Undisputed Fact # 123) showed that, although there would be higher costs in state dollars in the first two post-closure fiscal years, the Commonwealth would experience savings of state dollars in subsequent years, and those savings would increase each year since the cost of services in the state ICFs/MR is increasing faster than the cost of services in the community.  Defs.' Response to Pls.' First Request for Admissions # 42 (Exh. 5).

125.   According to the Director of the Bureau of Financial Management for DPW's Office of Developmental Programs, the savings that DPW would realize over time if it closed Selinsgrove Center and/or Hamburg Center could be used to expand funding to provide services to individuals on the waiting list who are living in the community.  Defs.' Response to Pls.' First Request for Admissions # 43 (Exh. 5).

126.   It would have cost DPW approximately $6 million in state dollars in FY 2008-2009 to implement its plans to close Hamburg Center and Selinsgrove Centers, which is less than the approximately $83 million that DPW received that year to provide services to individuals on the waiting list.  Church Dep. at 216 (Exh. 6).

30

127.   In an e-mail dated December 6, 2007, Estelle B. Richman, then Secretary of Public Welfare, informed Kevin Casey, the Deputy Secretary for DPW's Office of Developmental Programs, that DPW would not implement the plans to close Selinsgrove Center or Hamburg Center in order to maximize the funding available to expand community services and supports for people on the waiting list living in the community.  Defs.' Response to Pls.' First Request for Admissions # 45 (Exh. 5).

128.   In 2008, DPW received federal approval to implement a "Money Follows the Person Rebalancing Demonstration Project" (MFP Project).  *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

129.   As originally approved by the federal government, the MFP Project would allow DPW to receive an enhanced federal Medical Assistance match of 77 percent to fund community supports and services for 87 residents of state ICFs/MR moved to the community (30 in calendar year 2009 and 57 in calendar year 2010). *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

130.   The enhanced federal match under the MFP Project would be available for one year after the individuals relocated from the state ICFs/MR to the community.  *See* Am. Compl. & Answer ¶ 78 (Exh. 2, 3).

131.   DPW's MFP Project for state ICF/MR residents was expected to be used to enable DPW to close Hamburg Center.  *See* Casey Dep. at 192 (Exh. 4).

31

132.   After DPW decided not to close Hamburg Center, it sought and received approval from the federal government to allow it to use the MFP Project to relocate individuals from privately-operated ICFs/MR (rather than state ICFs/MR) to community services.  *See* Casey Dep. at 184, 192 (Exh. 4).

133.   No state ICF/MR residents have been or will be discharged under the MFP Project.  Kuhno Dep. at 19-20, 25 (Exh. 21).

134.   The federal government has extended the MFP program through federal fiscal year 2016.  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 2403(a) (2010).  DPW has no plans to expand its MFP program during that period to provide community services to residents of state ICFs/MR.  *See* Pls.' Fourth Set of Interrogatories # 1 and Defendants' Response (e-mail of Allen Warsahw) (Exh. 22).

**VII.   Impact of Continued Institutionalization**

135.   Some state ICF/MR residents who want to live in the community but are not discharged are upset because they are unable to live closer to and have more contact with their aging parents while their parents are still alive.  Sassaman Dep. at 48-50, 52-53 (Exh. 23).

136.   Some state ICF/MR residents who want to live in the community but are not discharged become hopeless and regress.  Sassaman Dep. at 50-51 (Exh. 23).

32

137.   DPW's failure to discharge Plaintiff Grogg has caused him to become less motivated and to "shut down" for periods of time because he cannot be closer to his mother and brother in the community.  Sassaman Dep. at 52-53 (Exh. 23).

138.   DPW's failure to discharge Plaintiff Benjamin has harmed him because the communal living at Ebensburg Center, including the noise and the light, exacerbates his migraine headaches and causes him to hurt himself.  McIntire Dep. at 48-50 (Exh. 24).

139.   State ICF/MR residents are not always provided with individualized treatment that focuses on their particular needs and desires.  Sassaman Dep. at 32-33 (Exh. 23); Wagner Dep. at 31-37 (Exh. 25); Dobbins Dep. at 72-73 (Exh. 26).

Respectfully submitted,

Dated:  June 23, 2010          By:     /s/ *Robert W. Meek*
                                        Robert W. Meek -  PA 27870
                                        Mark J. Murphy - PA 38564
                                        Robin Resnick - PA 46980
                                        Disability Rights Network of PA
                                        1315 Walnu  Street, Suite 500
                                        Philadelphia, PA  19107-4705
                                        215-238-8070
                                        215-772-3126 (fax)
                                        RMeek@drnpa.org

33

Stephen F. Gold
1709 Benjamin Franklin Pkwy.
2nd Floor
Philadelphia, PA  19103
215-627-7100
215-627-3183 (fax)
stevegoldada@cs.com

Counsel for Plaintiffs and the Class

34

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andree Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : | |
| | : | **Filed via ECF System** |
| **Plaintiffs** | : | |
| | : | **Civil Action No.** |
| v. | : | **1:09-cv-1182-JEJ** |
| | : | **(Jones, J.)** |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : | **Class Action** |
| | : | |
| **Defendants** | : | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the rules of this Court, Defendants hereby move for summary judgment in its favor in the above-captioned case. Based on the facts set forth in the exhibits hereto and for the reasons set forth in the accompanying Memorandum of Law in Support of Defendants' Motion for Summary Judgment, this Court

should enter judgment in favor of the Defendant.

Respectfully Submitted,

Date:  June 30, 2010

s/Allen Warshaw_____
Allen C. Warshaw
Chief Counsel
PA ID No. 17145
Office of General Counsel
Department of Public Welfare
3rd Floor West, Health & Welfare Bldg.
Harrisburg, PA  17120
(717) 783-2800 (phone)
(717) 772-0717 (fax)
awarshaw@state.pa.us

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANKLIN BENJAMIN, by and through his next friend, Andree Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated,** | : : : : : : : : : : | |
| | : | **Filed via ECF** |
| **System** | : | |
| **Plaintiffs** | : | |
| | : | **Civil Action No.** |
| v. | : | **1:09-cv-1182-JEJ** |
| | : | **(Jones, J.)** |
| **DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania,** | : : : : : : : : | **Class Action** |
| **Defendants** | : | |

## DECLARATION OF KEVIN CASEY

I, Kevin Casey, do hereby state the following:

1.  I am the Deputy Secretary for the Office of Developmental

Programs ("ODP") and have held that job or its equivalent for over 7 years –

the title of the ODP and some of its responsibilities not relevant to this case

1

changed during that period).   As such, I am responsible for the operation of ODP.

2.      Under The Mental Health and Mental Retardation Act of 1966 (MH/MR Act), 50 P.S. §§ 4101-4704, the DPW is responsible for providing services to the Pennsylvania citizens with mental retardation.

3.      ODP is the Office within the Pennsylvania Department of Public Welfare which is responsible for providing services to those persons.

4.      In carrying out this responsibility, DPW provides a broad array of services in a variety of locations:   (a) it directly operates five Intermediate Care Facilities for persons with Mental Retardation (ICFs/MR); (b) it funds services in numerous privately-operated ICFs/MR; and (c) it funds the provision of community-based mental retardation services.

5.      In total, DPW currently funds services for about 52,000 people with mental retardation who are served either in private ICF/MRs or in community settings.  DPW currently provides services to approximately 1195 persons with mental retardation in state-operated ICFs/MRs.

6.      Defendants operate five State operated ICFs/MR (which are also called "State centers"): (1) Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in Berks County; (3) Polk Center,

2

located in Venango County; (4) Selinsgrove Center, located in Snyder County; and (5) White Haven Center, located in Luzerne County.

7. All five State-operated facilities are certified by the United States Department of Health and Human Services as Intermediate Care Facilities for persons with Mentally Retardation (ICFs/MR). See 42 C.F.R. Part 483.

8. From 1995 to 2009, the census at State ICFs/MR has decreased from 3164 to1224. Today, fewer than 1200 individuals receive services in State centers.

9. Since 1996, Defendants have closed four State ICFs/MR, and four MR units on the grounds of State hospitals.

10. The number of persons served in the community has increased from about 47,000 in July of 2006 to about 52,000 today.

11. Not all persons in need of services currently receive them.

12. Appropriations from the General Assembly and available Federal matching funds have been insufficient even to provide services for all those in immediate need of services.

13. Thus, there is a long waiting list for services.

3

14.    Persons who apply for services are evaluated using an instrument known as "Prioritization of Urgency of Need for Services for Persons with Mental Retardation" (PUNS).

15.    PUNS places applicants in three categories: emergency (immediate or within the next six months); critical (need within two years); and Planning (need within five years).

16.    The emergency category currently includes about 3500 persons.

17.    In fiscal year 2008-09, the General Assembly amounts sufficient to fund services for about 274 persons in that category.

18.    When a community vacancy occurs, it has long been the policy of Defendants to give priority to those on the PUNS emergency waiting list over those in State ICFs/MR.

19.    That is because persons residing in State ICFs/MR are safe and have all their basic needs met while many persons who are categorized as in "emergency" need are generally without needed services and at risk of mental or physical harm if they do not receive services.

20.    Those on the emergency waiting list include those who are in danger of having no care provided at all (as when family care-givers die) or having grossly deficient care (as when family care-givers become disabled).

4

21.     Persons who are categorized as in "emergency" need sometimes have to wait as long as two years for services.

22.     For at least the past 16 years, DPW has tried to avoid admitting new residents into the State centers.

23.     Since July 1, 2003, Defendants have admitted only 15 persons to State ICFs/MR.

24.     Under the "waiver" program, the Federal/State Medicaid funding stream that was once available only for institutional care can be used to fund community care.

25.     Today, approximately 15, 000 persons in community care are funded under the Consolidated Waiver and 10,000 others through the Person/Family Directed Support Waiver.

26.     Because the amount that can be spent in the Person/Family Directed Support Waiver is capped at less than $30,000, services provided under that waiver would be totally inadequate for persons now residing in State centers.   It is the Person/Family Directed Support Waiver which provides services to most of the people aging out of educational programs, not the Consolidated waiver.

27.     All available funding for both State ICF/MR care and community care is expended for services to persons with mental retardation.

5

28.    The average cost of care at a State center for FY 09 – 10 is $240,000 for each person.

29.    The current average cost of providing services in the community is generally less than $240,000, however, the cost of some community placements exceeds $500,000.

30.    While the average cost of community placement is much lower than $240,000, the complexity, the complexity, the extent and, therefore, the cost of the services required by most of those persons remaining in State centers far exceeds the services required by most of those already in community placement.

31.    On June 18, 2010, Defendants adopted a Plan for relocating State center residents who do not oppose, and whose families or guardians, if any, do not oppose community care.

32.    This Plan has benchmarks for implementation.  It does not have timelines because, at this point, Defendants do not know how many people will move.

33.    As provided in the Plan, Defendants will ask the Governor for funding for at least 50 State ICF/MR residents to be funded for community care through the Consolidated waiver.

34.    Given current financial conditions, it would not be realistic to commit to a higher number.

35.    The governor's proposed budget for fiscal year 2010-11 provided less money for community placements than had been appropriated by the General Assembly in the 2009-10 fiscal.

36.    However, the Plan provides that this number will be reconsidered as financial conditions change.

37.    The Plan then sets forth a process for identifying and prioritizing among those who do not oppose community placement, planning for their placement and moving them into the community as money becomes available.

38.    Finally, it provides for the development and implementation of educational programs directed at educating residents and their families about the benefits of community placement.

39.    The commitment to move people into the community is conditioned upon the availability of the funding necessary to make such placement and a finding by professionals that the resident will benefit from such a placement.

40.    In order to avoid a fundamental alteration to State programs which would favor State center residents over other people with mental

7

retardation in greater need of services, the Plan gives DPW's Deputy Secretary for the Office of Developmental Programs the power to direct that money otherwise available to move persons presently residing in State centers into community settings be used to place other eligible and more needy persons into such settings This would only be done if the Deputy Secretary determines (1) that such a person requires such a placement in order to avoid risk of physical or mental injury or to avoid placement in a State center and (2) that there is no other money available to make such a placement.  Casey Affidavit ¶41.

I declare under penalty of perjury that the foregoing is true.


Kevin Casey
Deputy Secretary for the Office of
Developmental Programs
Pennsylvania Department of Public Welfare

8

JA337

Page 66

1    A. That was Orlando Vaddy and I believe that
2    was '07/'08.
3    Q. And do you know when the most recent
4    discharge occurred before his?
5    A. I wasn't an employee of Disability Rights
6    Network at that time, but I have participated on
7    some community transition calls. I wouldn't be
8    able to give you ---.
9    Q. Well, it was before you started at Hamburg
10   in any event?
11   A. Yes.
12   Q. Okay. Are you familiar with the residents
13   or the population at the other State Centers?
14   A. Somewhat.
15   Q. Do you have any idea about how the
16   population at Hamburg compares to the
17   populations at the other Centers?
18   A. Yes and no. I know that we have probably
19   the lowest census of individuals that reside and
20   receive services from the State Center.
21   Q. Do you have any idea as to whether the
22   population at Hamburg is older or about the same
23   demographically or younger? Well, clearly not
24   younger since ---.
25   A. I think --- and this is only based off of my

Page 67

1    level of understanding and just learning some of
2    the history of Hamburg Center. Our women at the
3    Center are older, so therefore that puts us in
4    an older category with the fact that our census
5    is lower. I think that we probably fit into
6    that category with the individuals that we have
7    still living at the Center, probably being one
8    of the older populations.
9    Q. Do you know whether the census at Hamburg
10   has always been lower than the other State
11   Centers?
12   A. How far back are you asking?
13   Q. Whatever you know.
14   A. When I started I think there may have been a
15   difference of 25 or 20 individuals, maybe 40
16   individuals between Hamburg and White Haven
17   Center. We've had a few individuals just by
18   natural causes that have passed away over the
19   last few years. I can't answer that when they
20   were at full capacity.
21   Q. Do you know what the full capacity was?
22   A. 1,800, 1500, somewhere around there.
23   Q. Do you know why Hamburg's census is as low
24   as it is today?
25   A. Individuals transferring out into the

Page 68

1    community. Possibly in some cases, I know some
2    individuals needed assistance or would have
3    benefited from programs in other placements.
4    Q. And therefore they left?
5    A. Yes.
6    Q. Are you aware of or have you heard of
7    anybody at Hamburg being in physical danger?
8    A. Being in physical danger? No.
9    Q. How about anybody who has medications
10   prescribed for them, has any of that population
11   not received any medications to your knowledge?
12   Strike that entire question. Let me ask the
13   question again.
14   Do you know of anybody who needs medication
15   and isn't getting it?
16   A. No, there are individuals occasionally on
17   the incident review that will have a missed dose
18   or for some reason maybe the medication was
19   discontinued and it wasn't appropriately charted
20   and they were given another dose of medication.
21   There are medication errors like that, but for a
22   person that needed some medication to be
23   prescribed and it was being denied, no, I don't.
24   Q. And what was Hamburg Center's response to
25   those type of medication errors?

Page 69

1    A. Well, they were responsible for reporting,
2    but they were also responsible for making sure
3    that the individual has appropriate follow-up
4    care. If they've received an additional dose
5    depending on what the medication is, they'll be
6    outsourced to go to the hospital for a second
7    opinion medically and more importantly, put a
8    corrective procedure in place so that doesn't
9    happen again.
10   Q. To your knowledge has Hamburg done that in
11   response to those types of medication errors?
12   A. When there's been medication errors like
13   that, yes.
14   Q. Are you aware of anybody who isn't getting
15   enough nutrition?
16   A. No. I often hear as an advocate though
17   folks that are not satisfied with being on a
18   tray, are not satisfied with what's offered on
19   the menu.
20   Q. What do you do when you hear that?
21   A. We'll talk about it. Some dietary needs are
22   so critical and so rigid that the individual
23   really needs to follow a dietary plan just for
24   health and safety, but we try to see if there
25   are alternatives that they can choose especially

18 (Pages 66 to 69)

JA338

## Page 70

1  when there is a restricted calorie count for
2  some reason or something like that. We'll see
3  if there are alternatives that the person could
4  choose that would give them a little bit more
5  independence in that realm.
6  Q. Is Hamburg's staff responsive to that type
7  of outreach from you?
8  A. Yes. Dietary has been very cooperative. I
9  think that one of the biggest things with that
10 is that for somebody that is on a tray or if
11 they don't know that they can ask to exchange or
12 that they can complain, if they don't know that
13 they have the option to say I'm not happy with
14 what I have, my experience is that a lot of
15 folks will not say it. So they have to sort of
16 see it or you rely on one of the primary
17 individual's staff to say, hey Ms. Dobbins, this
18 is what I noticed, she's not eating her oatmeal
19 in the morning. Dietary is going to keep
20 sending the oatmeal until somebody says hey,
21 don't send her oatmeal anymore. Their needs are
22 changing and if somebody is not documenting that
23 --- there is a flow with the State Center that
24 goes with consistency. They offer the same
25 thing over and over again, because that's what

## Page 71

1  is charted so you really need to have
2  individuals that aren't afraid to speak up.
3  Q. Are you aware of anybody at Hamburg who
4  isn't getting the medical care or attention that
5  they need?
6  A. No.
7  Q. What do you think Hamburg does well in terms
8  of caring for finding treatment for services and
9  supports for its residents?
10 A. I think that Hamburg does a very nice job in
11 providing medical care for their individuals.
12 There's areas that need work but I think overall
13 medical care on the individuals is very good.
14 They have somebody on call 24/7. A person if
15 they develop a pain or an ache, you don't have
16 to wait until a nurse comes on shift, it's
17 accessible. In my time of being there going
18 through and asking questions about the medical
19 aspect of a person's life, everyone has been
20 open and receptive to think that would be
21 beneficial. I actually have doctors that will
22 call me and ask me, this is what we're thinking
23 that would work best for the individual, from an
24 advocacy perspective how can we pursue it? And
25 I think that that bedside manner is tremendous

## Page 72

1  because they really take into consideration not
2  only their medical needs but the mental health
3  status of the person that they're caring for.
4  And it's a combination that you don't always
5  get.
6  Q. Anything else besides medical care?
7  A. They have like --- for the most part, most
8  of their staff are very good and trained very
9  well. The staff development department over
10 there they do a lot of hands-on role playing,
11 you know. If they're having --- as incidents
12 occur, they say hey, put on a red flag, that
13 there's something more going on. The
14 administration and the team doesn't hesitate,
15 they go ahead and implement something as far as
16 a corrective procedure or preventative measures
17 to ensure that we don't run into the same
18 problem again. So I think that they are very
19 proactive in that respect.
20 Q. How about the active treatment component of
21 the plan?
22 A. Well, they could, like anyplace else, use
23 some assistance. But I understand that there
24 are some obstacles that are presented as well.
25 Q. What kind of obstacles?

## Page 73

1  A. Well, if you have 12 individuals in a living
2  area that are medically involved, that are
3  physically compromised, how do you engage
4  everyone in that area in something that they're
5  all going to like? I used to develop
6  recreational programs and I think that it's very
7  difficult because of the treatments and the
8  timing and the meals and just the scheduling of
9  what goes on at a state center. There's not
10 always a lot of time for active treatment that's
11 going to be quality active treatment. In an
12 effort to identify things that Hamburg Center
13 does do good they will do craft activities but
14 because of the contractions and the physical
15 limitations in an individual's hands or the rest
16 of their body, they may not even be able to
17 touch their craft project. They might just be
18 sitting there watching it. From another
19 perspective, a lot of water therapy might be
20 more beneficial for this person but how do you
21 fit that into that schedule?
22 Q. Have you talked to them about that?
23 A. I know that they know that it's happening.
24 And there are --- the occupational therapist and
25 the physical therapist work fairly closely with

19 (Pages 70 to 73)

JA339

Page 50

1  having her meet with the provider?
2  A. I would definitely --- I would want to be
3  involved in that, absolutely, so that I'm there
4  talking with them. I have been very involved in
5  Sylvia's case and so there are a lot of
6  concerns. She is someone who would --- there's
7  a lot of supports that need to be in place for
8  her to be successful, and so I would feel like
9  my role in that is very important.
10  Q. You said there's a lot of concerns that the
11  appropriate services and supports are in place.
12  Concerns on whose part?
13  A. I think on all parts. I think on the part
14  of the team at Polk Center as far as the staff
15  that are working with her now, the facility
16  director. She's been in the community before
17  and was not successful. And, again, I think
18  that was for various reasons as far as, like I
19  said, medical or challenging behaviors, a
20  variety of things. But nobody wants that to ---
21  you know, especially when she's been there
22  before and it's been unsuccessful. I think
23  that's all the more reason for everybody to make
24  sure that those supports are put in place now on
25  the front of things.

Page 51

1  Q. I think you might've answered this, but I
2  just want to make sure. You said that people
3  are concerned. You would say that they've been
4  more concerned in planning for her than they
5  would be under normal circumstances for others
6  who are being planned for to move into the
7  community?
8  A. I would say there is a heightened level of
9  concern, yes.
10  Q. And that's because of the history with her
11  previous community experience?
12  A. Yes. I mean, again, I'm not saying that
13  they're not concerned for everybody. But, yes,
14  with her I do feel like it's heightened.
15  Q. Are you aware of anybody at Polk who is in
16  physical danger?
17  A. I don't think so, no. No.
18  Q. Do you know of anybody who doesn't get
19  enough to eat?
20  A. No.
21  Q. Do you know of anybody who is on medication
22  who is not getting that medication?
23  A. No.
24  Q. Do you know of anybody who needs some type
25  of medical intervention or medical attention

Page 52

1  that isn't getting it?
2  A. No.
3  Q. The four or five people --- I think you said
4  four or five; right? Altogether, including
5  family it'd be about seven people who said that
6  they are interested in moving to the community.
7  How long ago did each one of those people or
8  their families say that they wanted to move to
9  the community?
10  A. One of the guys --- anytime you ask him he
11  will say it. He'll let you know, so I mean,
12  that's been as recent as a month ago. The other
13  gentleman, it's been I would say probably six
14  months. Of course with Sylvia that's on a
15  regular basis, so the families --- I would say
16  it's been a couple months, probably about four
17  months since I discussed with the families that
18  have actually come to me as far as ---.
19  Q. Let me make sure that you understood what I
20  meant. I didn't mean when was the last time
21  that you talked to them and I think that
22  might've been what ---
23  A. Right.
24  Q. --- you answered. I meant when did they
25  first say that they wanted to move into the

Page 53

1  community? I'm sorry if that was unclear.
2  A. Okay. I'd say probably a year ago ---
3  Q. For all of them?
4  A. --- with the exception. Around that time
5  frame with the exception of --- I mean, again,
6  since the day that I started I was aware that
7  Sylvia wanted to move out. So hers is from, you
8  know, almost two years or whatever, but as far
9  as the rest of them, yes, probably been about a
10  year that I ---.
11  Q. And have you seen any negative impacts or
12  adverse impacts on any one of these individuals
13  because they haven't yet moved from Polk to the
14  community?
15  A. I would have to say yes, because I think
16  that just by the nature of the size of the state
17  center and the different levels that consistency
18  is very difficult. And so you have a lot of
19  staff changes. You have just different areas
20  that are playing a part in the things that when
21  you have people such as Sylvia that thrive on
22  consistency, it really does make it difficult in
23  the state center.
24  I think that does negatively impact them
25  because I think that you're seeing times --- and

14 (Pages 50 to 53)

JA340

Page 6

OBJECTION PAGE

ATTORNEY                    PAGE
        NONE MADE

Page 7

PROCEEDINGS

----------------------------------------
MARTI MCINTIRE, HAVING FIRST BEEN DULY SWORN,
TESTIFIED AS FOLLOWS:
----------------------------------------
EXAMINATION
BY ATTORNEY LEISCH:
Q. Good afternoon. My name is Doris Leisch and
I represent the Commonwealth and other
Defendants in the lawsuit titled Benjamin versus
the Commonwealth and other Defendants. Are you
familiar with that lawsuit?
A. Yes.
Q. Have you been deposed before?
A. No.
Q. Can I run through a few ground rules, as we
call them? When you answer a question you need
to make sure that you actually speak because the
court reporter can't take down nods or shakes of
the head as easily as words.
A. Okay.
Q. If you don't understand a question that I
ask, ask me to repeat it until you — or
rephrase it until you understand it. If you do
answer the question I'll assume that you

Page 8

understood the question. Are you taking any
meds today — medication today, that would
prevent you from understanding questions that I
ask?
A. No.
Q. Or from answering those questions?
A. No.
Q. Do you have any medical conditions that
would prevent you from understanding the
questions that I ask?
A. No.
Q. Or prevent you from answering the questions
to the best of your ability?
A. No.
Q. If you want to take a break at any point,
just say so and we'll take a break. If you need
something to drink just say so and we'll do that
as well. Can you state your name for the
record, please?
A. Marti McIntire.
Q. And what is your position?
A. I am the advocate at the Ebensburg Center
---the DRN advocate at the Ebensburg Center.
Q. And how long have you been there as the
advocate?

Page 9

A. A little over eight years.
Q. And before you worked as the DRN advocate at
Ebensburg what did you do?
A. I was the mental health housing specialist
in Blair County.
Q. And how long did you do that for?
A. Eleven (11) years.
Q. And how about before that?
A. I worked at Brent (phonetic) Care in Central
Pennsylvania at the Skills adult training
facility.
Q. What's your educational background?
A. I have a Bachelor's degree in individual and
family studies.
Q. I'm sorry. In what?
A. Individual and family studies.
Q. What are your job responsibilities as the
DRN advocate in Ebensburg?
A. I monitor for abuse and neglect. I am
responsible to have a caseload of people who
support needs might not be being met. I'm
responsible to provide advocacy input to most of
the governing committees. I monitor in all of
the living areas and the program areas. I meet
with families, families who have concerns. I

JA341

Page 10

1　train the staff that come in and I provide
2　written reports to my agency about what we're
3　doing.
4　Q. I think you said that you had a caseload of
5　people who aren't being provided some level of
6　services and supports?
7　A. Uh-huh (yes).
8　Q. Is that a yes?
9　A. That's a yes. I'm sorry.
10　Q. That's okay.
11　ATTORNEY MEEK:
12　Say yes or no.
13　A. Okay. Sorry.
14　BY ATTORNEY LEISCH:
15　Q. So how does that caseload of people come to
16　your attention? In other words, how does
17　somebody get onto your caseload?
18　A. I mean, they can get on in multiple ways.
19　Every center has a 24 hour report. I read
20　through that 24 hour report every day and
21　oftentimes I'll realize somehow that somebody
22　has maybe fallen several times or maybe had more
23　illnesses than you would expect them to have,
24　that kind of thing. They'll come to my
25　attention that way. Sometimes the staff will

Page 11

1　come to me and say, wow, this person needs ---
2　you know, their teeth aren't good and we need to
3　have this problem taken care of and we're having
4　problems with that, you know, that kind of
5　thing.
6　　Oftentimes when I walk through areas I'll
7　see someone and while I'm talking to them I'll
8　realize that something --- you know, they don't
9　have pants on and there's a problem with why
10　they're not wearing pants and I feel like they
11　need to be wearing pants. Or sometimes people
12　come to me. The people who live at the center
13　come to me and say, I'm having this issue.
14　Q. So are the people who are on your caseload
15　only people who, from your perspective or their
16　perspective or somebody's prospective, are
17　having problems?
18　A. Yes.
19　Q. So you don't have anybody on your caseload
20　who's doing fine?
21　A. Typically, no. Typically there's a need.
22　Q. How many people live at Ebensburg? How many
23　residents?
24　A. 285 around there.
25　Q. And what would you say is the number on your

Page 12

1　caseload?
2　A. About 35.
3　Q. The 35 people is currently?
4　A. Around there, yes.
5　Q. Would you say that that's a pretty good
6　average?
7　A. Yes, that's an average.
8　Q. So it might go up or down a little bit, but
9　pretty much it hovers around 35?
10　A. Yes.
11　Q. You said that you monitor for abuse and
12　neglect and you also do monitoring of the
13　program and living areas?
14　A. Yes.
15　Q. Is that right?
16　A. Uh-huh (yes).
17　Q. Is that monitoring activity limited to the
18　people on your caseload?
19　A. No, it is not.
20　Q. You do that for everybody who's ---
21　A. Yes.
22　Q. --- at the center? Do you participate in
23　ISP meetings?
24　A. Yes.
25　Q. Do you do that for everybody or only for

Page 13

1　some percentage of the population?
2　A. I try to do that for the people on my
3　caseload and I also try to do that sort of
4　randomly.
5　Q. And the purpose of the random participation
6　is what?
7　A. Basically just to make sure that the ISP
8　process is, you know, happening the way it's
9　supposed to happen.
10　Q. And based on your experience over the course
11　of the last eight years do you believe that the
12　ISP process at Ebensburg is happening the way
13　it's supposed to happen?
14　A. There are problems with the process, yes.
15　There are problems.
16　Q. There are problems with the process. Like
17　what?
18　A. Oftentimes we don't have the individual
19　present.
20　Q. And why is that?
21　A. Staff will oftentimes say the person didn't
22　want to come, the person chose not to come, the
23　person doesn't do well when their schedule is
24　changed.
25　Q. Do you know whether or not that's correct,

4 (Pages 10 to 13)

JA342

Page 46

1    Q. You also said that you looked to make sure
2    that people are clean and comfortable?
3    A. Uh-huh (yes).
4    Q. What are the results of that observation? I
5    mean, are you finding that people are clean and
6    comfortable or not?
7    A. I think for the most part, yes. For the
8    most part people are, yes. Occasionally they
9    need their shirts changed because there's some
10   food on their shirt or, you know, they ---
11   there's some drooling and stuff going on, that
12   sort of thing. But you don't find people
13   smelling or people --- you know, you don't find
14   that very ---. You just don't find that.
15   Q. And you had said previously as well that you
16   also look to see that they're being attended to.
17   What does that mean?
18   A. Tended. Like staff are attentive to them.
19   Q. So is that different from active treatment
20   or is that the same thing?
21   A. It's pretty much the same thing.
22   Q. So what do you do when you see that
23   somebody's shirt needs to be changed or
24   something like that?
25   A. Oh, I would just tell the staff.

Page 47

1    Q. And what happens then?
2    A. They usually change it right away.
3    Q. I just want to make sure that I'm clear
4    about this. You're saying that two people at
5    --- two residents at Ebensburg have said that
6    they want to live in the community?
7    A. They've said they want to look and see what
8    it's like.
9    Q. Okay. Sorry. And those are two of the
10   people who came from Altoona?
11   A. Yes.
12   Q. And who were the other 200 people who you
13   know about personally who don't like where they
14   are? Is that what you said?
15   A. No, I said I know 200 people. You said, do
16   I personally know all the people who live at
17   Ebensburg Center.
18   Q. Right. Okay.
19   A. I know personally 200 ---.
20   Q. So those are the only two people who you
21   know who have said that they want to move in ---
22   they want to check to see whether or not ---?
23   A. They're the only two people who have told me
24   that, yes.
25   Q. Do you know about anybody else other than

Page 48

1    those who have told you directly?
2    A. I thought I had --- I thought you asked me
3    that already. My belief is that when people ---
4    the people who are living at the state center
5    --- number one, the people who are acting out
6    ---. We talked about the people who are acting
7    out an awful lot. I believe that those people
8    by their behavior are saying that living at the
9    state center is not the best solution for them.
10   Q. Okay. I'm sorry. My question wasn't clear.
11   A. Okay.
12   Q. Other than those two people who have said
13   that explicitly to you, do you know of anybody
14   else who has said that explicitly to somebody
15   other than you?
16   A. I don't know that, no.
17   Q. I can see why you were confused. Are you
18   aware of anybody at Ebensburg who is in physical
19   danger?
20   A. I think with, you know, --- I had talked
21   before about the one guy who's ---. He had a
22   lot of migraine headaches and I --- a lot of
23   migraine headaches. And he's taking an awful
24   lot of medication for that. He is oftentimes
25   --- not his privacy, but his independence is

Page 49

1    restricted because he's on one to one
2    supervision so he won't hurt himself because he
3    does try to hurt himself quite frequently. His
4    goal is to bang his head into something until it
5    bleeds. Now, that could be from the headache,
6    you know, the symptoms --- he believes that it's
7    part of the headache. Sometimes that's from
8    psychosis. There's some psychosis involved in
9    that, but he certainly is going to hurt himself.
10   He certainly does hurt himself, so I would say,
11   yeah, he's in physical danger.
12   Q. And you said that his independence was
13   restricted because he was on one on one
14   supervision to avoid ---?
15   A. Well, someone's always looking at him.
16   Q. Right. So he has actually hurt himself?
17   I'm not clear about what you're saying about why
18   he's in physical danger.
19   A. He has hurt himself. He bangs his head into
20   the glass window or into walls, into furniture,
21   into --- if he can find a hook or something he
22   will bang --- something to cut his head.
23   Q. Is there something that the staff at
24   Ebensburg or the team should be doing that
25   they're not doing from your perspective?

13 (Pages 46 to 49)

JA343

Page 50

1    A. You know, I think that they truly are trying
2    to do everything that they can. Again, I think
3    that because he's in communal living. He's in
4    with a whole bunch of people. It's noisy. He's
5    in an area where there's light everywhere and
6    his room is very dark so that when he goes into
7    his room at least he can have some dark, but
8    then he's stuck in that room. I think that just
9    being in communal living is really exacerbating
10   his condition. So as far as the staff who are
11   there, I would have to say that probably they've
12   done what they can do.
13   Q. Anybody else besides that one person, that
14   one guy? Is there anybody other than him in
15   physical danger?
16   A. In physical danger I don't believe. Not
17   that I know of.
18   Q. You had mentioned that this gentleman takes
19   a lot of medication. Are those medications
20   prescribed?
21   A. Uh-huh (yes).
22   Q. Are you aware of people whose medications
23   are not being given to them?
24   A. No.
25   Q. Are you aware of any person who is not

Page 51

1    receiving the medical attention that he or she
2    should be getting?
3    A. I don't believe so. Well, yeah. I need to
4    change that answer. Can I change that answer?
5    Q. Sure.
6    A. I do know of someone who probably should
7    have some kind of surgery who has not had it.
8    Q. And why are you saying that that person
9    probably should've had it?
10   A. Because the person has cataracts and is
11   ambulatory and sometimes walks into things and
12   bumps into things, upsets people. He's walked
13   into other people. He's fallen down a couple of
14   times and cataract surgery --- I've been part of
15   many of the team meetings and the team
16   consensus, I believe, has been that he should
17   have that surgery. However, the doctors have
18   not been willing to --- and I'm not quite sure
19   why because there are other people who have
20   cataract surgery. We can't get the doctors to
21   actually say why he's not a candidate for that
22   surgery, so I would say he probably should have
23   it.
24   Q. So that I'm clear about what you're saying,
25   the doctors have said that he is not a candidate

Page 52

1    for the surgery. Is that what you said?
2    A. Uh-huh (yes).
3    Q. Which doctors?
4    A. He went to the doctor that comes to visit.
5    I believe he comes to visit. He comes to the
6    center to see people, an eye doctor. I believe
7    he comes. I'm not sure about that. He is the
8    doctor --- the eye doctor that most of the
9    people at the center see. He said he wasn't a
10   candidate so the QMRP, who really does want to
11   pursue this as --- you know, if possible. I
12   mean, if there's a reason for not having it,
13   then no, but if possible she would like to
14   pursue it. Asked for another opinion. The
15   other opinion was that because of his mental
16   retardation, his intellectual disability he
17   would not be a good candidate for that surgery
18   because of the follow-up care that's necessary
19   after cataract treatment. That didn't seem like
20   a very good response.
21   Q. Whose opinion was that?
22   A. That was a second doctor.
23   Q. And where was that doctor?
24   A. I believe that doctor was in Johnstown.
25   Again, I'm not sure about that.

Page 53

1    Q. So not an Ebensburg doctor?
2    A. None of these were Ebensburg doctors. The
3    Ebensburg doctor, however, said we already have
4    two opinions, that's all.
5    Q. Do you know of anybody at Ebensburg who
6    isn't getting enough food?
7    A. No. You know, back to that doctor thing
8    again. One of things that happens oftentimes at
9    the state center --- at Ebensburg Center at
10   least. I don't know about the other centers.
11   Is that we have trouble getting familiar staff
12   to take these people to a physician.
13   Q. You have trouble doing what?
14   A. Getting familiar staff. There are some kind
15   of agreements with the bargaining unit and I
16   don't know what those agreements are, but it has
17   to do with an overtime list. I don't know how
18   it works, but oftentimes we can't familiar staff
19   to take that person to the doctor so we have
20   someone taking him with his bad eyes to the
21   doctor who doesn't really understand what his
22   situation is. But he can't speak for himself at
23   all, so that doesn't --- that is a problem.
24   Q. And why is that a problem?
25   A. Because we all need to be able to

14 (Pages 50 to 53)

JA344

Page 34

1  actually being offered a placement by a
2  particular provider?
3  A. I'm not sure of that.
4  Q. Okay. That's fine. You referred to the
5  PUNS?
6  A. Yes.
7  Q. Do you know what that is?
8  A. Yes.
9  Q. Can you describe what that is, please?
10  A. It's a state-wide waiting list for people.
11  It's the priortations of their urgencies of
12  needs. There's three different categories that
13  go into it and they're specific questions that
14  have to be answered to fall under each category.
15  Q. Now, are you familiar with this whole PUNS
16  process by virtue of your position at White
17  Haven or because of the positions that you have
18  in the community?
19  A. Both actually, but the community I learned
20  about at first.
21  Q. What are the three categories?
22  A. Emergency, critical and planning.
23  Q. Do you know what those three categories
24  mean? In other words, who goes into each one of
25  those categories?

Page 35

1  A. There's specific criteria. There's lists of
2  questions and they have to be answered yes in
3  each of those questions and I'm --- without
4  having it in front of me, the actual PUNS, I
5  ---.
6  Q. Okay. If I were to ask you --- if someone
7  were to ask you who goes into --- what does the
8  emergency list mean, would you be able to in a
9  sentence describe who's on the emergency list?
10  A. Well, people in need of the services
11  immediately.
12  Q. Does immediately mean immediately?
13  A. Well, as soon as they can be provided.
14  Q. How about critical, do you know what that
15  means?
16  A. Within the next two years.
17  Q. And do you know what planning means?
18  A. That they will need those services within
19  the future and when planning for those, I think
20  it's within five.
21  Q. Okay. Based on your knowledge of the White
22  Haven residents as well as your experience in
23  the community, do you have an idea of whether
24  any of the people at White Haven would be
25  comparable to the people on the emergency

Page 36

1  waiting list?
2  A. Comparable as in their urgency?
3  Q. Yes.
4  A. I would say --- see, I'm wavering on one
5  individual.
6  Q. You can explain that, too.
7  A. Can I? He basically is going with the
8  guardian parents and he's in turmoil.
9  Q. The parents who are reluctant, but willing
10  to give it a chance to explore?
11  A. Yes. He's acting out physically and ---.
12  Q. And to make sure that I understand what
13  you're saying, because ---?
14  A. He does not want to be at White Haven. He's
15  expressed that exact statement.
16  Q. So his physical acting out, as you
17  characterize it, is in your mind, a result of
18  his wanting to leave?
19  A. He has made that statement.
20  Q. That he's acting out because he wants to
21  leave?
22  A. That he's not happy.
23  Q. Okay. Anybody else?
24  A. No.
25  Q. All right. So because of that you think

Page 37

1  that he is comparable to somebody who you would
2  have seen on the emergency waiting list in the
3  community?
4  A. I think yes.
5  Q. Is there a reason why you haven't talked to
6  more than three or four people about moving into
7  the community?
8  A. No. I really haven't had --- haven't been
9  approached and the opportunity hasn't arisen.
10  Q. So it sounds like you wait for somebody to
11  let you know that they have an interest in
12  leaving White Haven rather than approaching them
13  about the possibility of leaving?
14  A. Yes. Well, one thing that we were looking
15  to start to do at White Haven is providing more
16  education for what's available in the community
17  because we feel that some people may not know.
18  Q. Apart from the people that you have talked
19  to personally, are you aware of anybody else at
20  White Haven who wants to move to the community?
21  A. Not at this time.
22  Q. Are you aware of you know, anybody who lives
23  at White Haven who's in physical danger
24  currently?
25  A. No.

10 (Pages 34 to 37)

JA345

Page 46

1   A. Uh-huh (yes).
2   Q. What about the food? That they're not
3   getting enough or that they don't like how it
4   tastes or something else?
5   A. They want more variety. Food is a big issue
6   at state centers.
7   Q. In what way?
8   A. I think food's a big issue in everybody's
9   life. I don't know how to explain it. Food
10  choice in congregate living is not the kind of
11  food choice that you and I have, and I think
12  people who live here would like that food
13  choice, you know. We can offer people a lot of
14  different choices, but it's not the same as you
15  and I going home and being able to say, well,
16  you know, I have a pan of lasagna in the
17  refrigerator and I have a meatloaf, but I want
18  Chinese tonight. So I'm just going to go get
19  Chinese. The people that live here really don't
20  have that kind of spontaneous decision making
21  and I think many of them would like that.
22  The other thing is the different types of
23  cuisines that are out there --- the more they
24  expose people at state centers to different
25  types of food, the more they want to experience

Page 47

1   different types of food and we see that all the
2   time. At Selinsgrove and at many centers they
3   try to do a very excellent job of giving people
4   choice in food, but it's difficult. And you
5   always have like people who are on very
6   restricted diets and they want stuff that they
7   can't have. And the centers really struggle
8   with, you know, maybe in my life or your life,
9   even though we shouldn't have cheesecake because
10  we're on a low calorie diet, we could probably
11  get away with that. But the state centers
12  really have a difficulty doing that because of
13  all the regulations they're under.
14  Q. Okay. Based on your experience is there a
15  lack of adequate food?
16  A. No, I believe the amount of food, the
17  quality of food is excellent especially at
18  Selinsgrove.
19  Q. To your knowledge, based on your experience,
20  has anyone or is anybody who needs to take
21  medication regularly not doing that or not
22  getting the opportunity to do that?
23  A. I believe that the medication that is
24  prescribed and needed is being offered
25  appropriately.

Page 48

1   Q. Is that something that the staff has to
2   monitor?
3   A. Help service staff would.
4   Q. Do you know whether or not --- or do you
5   know of anybody who lives at Selinsgrove who has
6   expressed a desire to leave and has not been
7   able to leave?
8   A. Yes.
9   Q. How many people would you say that is?
10  A. Off the top of my head I would say six or
11  seven.
12  Q. And why have they not been able to leave?
13  A. The funding is not available.
14  Q. Has the inability to move to the community
15  affected those six or seven people in a bad way?
16  A. I believe, yes.
17  Q. And what do you base that belief on? Why do
18  you think that, in other words?
19  A. I believe when you desperately want to live
20  closer to your family and you --- we have a
21  gentleman here who knows that his mother is
22  aging and he desperately, desperately wants to
23  get closer to her. And he knows that she's not
24  going to be around long term, and you can tell
25  it bothers him. And he feels that he is her son

Page 49

1   and he should be there for his elderly mother.
2   So you have this I want to be with my mom, I'm
3   letting her down by being here, I can't help
4   her, I'm here. I mean, that impacts people.
5   Q. Is he the only person that you have seen
6   that with, that is to say, negative impact?
7   A. I believe the longer a person lives in a
8   state center, the negative impact of congregate
9   living becomes greater.
10  Q. But you think that that's the same whether
11  somebody has said that they want to move to the
12  community or not?
13  A. Yes.
14  Q. So there's no distinction in impact between
15  somebody who has said that they want to leave or
16  move to the community but can't and somebody who
17  has not expressed that desire?
18  A. Can you ask me that again?
19  Q. Sure. If I understand what you said in
20  response to the last question that you answered,
21  you said that you think that the longer somebody
22  stays in congregate living, the more of a
23  negative impact it has on them. So my question
24  is, is that true regardless of whether the
25  person has actually expressed the desire to move

13 (Pages 46 to 49)

JA346

Joseph O. Church                                    February 22, 2010

Page 177

Joseph O. Church

1  community.
2      Q.  Which sort of segues nicely into the
3  next set of questions.
4      Are you familiar with the term
5  "transition costs" as it relates to the
6  development of community services for people
7  living in state institutions?
8      A.  I'm familiar with the term, yes.
9      Q.  And what does it mean to you?
10     A.  Generally the transition costs would
11 be the costs of, for one thing, preparing the
12 person to move.  Plus you have to set up a new
13 place for them to move into.  You have to
14 develop new programs for them to go to because
15 they were in one setting and they are going to
16 be in a different setting in the community,
17 and generally that's what I envision being the
18 transition costs.
19     Q.  So would it include, for example,
20 the necessity of actually funding a provider
21 to seek out a placement, a residential
22 placement, hiring staff, those sorts of
23 things, while at the same time still spending
24 the money for the individual while they are at

Page 178

Joseph O. Church

1  the state center?
2      A.  That's correct; for a while there
3  would be a double cost.
4      Q.  Do you have or does DPW have any
5  information concerning what, if any,
6  transition costs DPW incurred when it closed
7  Western Center?
8      A.  A lot of the transition costs would
9  have been handled by the counties.  We would
10 have given them money, but how much of it was
11 related to transition versus how much of it
12 was related to the actual provision of direct
13 service, I don't know.
14     Q.  Would that be true also with the
15 closures of Embreeville and Laurelton?
16     A.  Yes.
17     Q.  Is there anybody at DPW who is
18 familiar with the issue of what those costs
19 would have been even though they may be
20 stashed somewhere inside a county budget
21 document?
22     A.  Not within DPW.  You would have to
23 go to the different counties and they should
24 have the information on that.

Page 179

Joseph O. Church

1
2      Q.  Based on your experience, is it the
3  transition costs that's the main impediment to
4  developing community services for state ICF/MR
5  residents?
6      A.  That would be a big piece of it.
7  The other piece of it is if you were moving
8  all of the people out of the state center, at
9  some point in time your costs on the state
10 center side become zero, and there is a
11 transition cost for those first year or two or
12 three depending on how long it takes.
13     If you don't do that, you still
14 have -- if you only take a few people from
15 each state center, two people from one and
16 five from another, you are not reducing the
17 complement at those state centers.  They still
18 need the same level of staff, so they still
19 have -- for instance, if the staff is 80 to 85
20 percent of your cost, you still have all of
21 that cost.  You have no reduction on the state
22 center side, but you have a new cost on the
23 community side, so it is -- I mean it only
24 really has a financial value if you do a large
25 enough number of people.

Page 180

Joseph O. Church

1
2      Q.  Is it possible to save some costs on
3  the institution side by closing like entire
4  units or buildings and therefore reducing the
5  complement in some way?
6      A.  You can get closer to making it
7  neutral, but it won't be neutral.  We did --
8  this is a while ago, so these numbers would no
9  longer be really valid, but at the time, which
10 is probably eight years ago now, we looked at
11 an estimate.  If you reduced the number of
12 clients in an area by 12, the savings were
13 around $45,000.  If you closed out a unit of
14 24, it jumped to about $70,000, and if you
15 closed out the whole center, it was at the
16 time I think 115 or $120,000 you were talking
17 about.
18     So there was a significant gain by
19 closing the complete institution, though there
20 is some savings related to closing the units.
21     Q.  But let's talk about a closure
22 issue, and I think you already mentioned this.
23 There were some transition costs the first
24 year or two, maybe even three?
25     A.  Yes.

45 (Pages 177 to 180)

JA347

Joseph O. Church                                    February 22, 2010

Page 181

1          Joseph O. Church
2      Q.   But does there not then become a
3   savings after that transition period?
4      A.   Yes, there is.
5      Q.   And how long does it usually take --
6   I guess it depends on two things: One, does
7   it depend on how long it takes to actually
8   close a state institution to realize the
9   savings?
10     A.   That's a big part of it, and it is
11  also the number of people in the institution.
12  The larger the institution, the longer it is
13  going to take you to do it.
14     Q.   And isn't it true that for every
15  year going out after that the cost savings
16  sort of increased once the state centers
17  closed; for example, the savings increased to
18  the department every year going forward?
19     A.   What happens is in the first year
20  there is an additional cost and there may even
21  be more in the second year.  Then it drops
22  down and you start to see a savings, and it
23  will level off eventually and it will stay at
24  that -- the first year that it starts to drop
25  is -- well, in the example that I'm thinking

Page 182

1          Joseph O. Church
2   about, which is really Hamburg, because that
3   was the latest one I looked at, the first two
4   years there was an increased cost.  The third
5   year it is almost neutral, and then the fourth
6   year you start to seeing a savings.
7      Q.   Now, is it true that -- and we
8   discussed this earlier -- that the
9   institutional side of the costs tend to
10  increase at a greater rate than the community
11  care costs --
12     A.   Yes.
13     Q.   -- essentially because of union
14  issues?
15     So the curve, shall we say, of what
16  would have been the projected costs if an
17  institution keeps climbing at a certain rate
18  but the cost for community care for those same
19  individuals is at a lower level and doesn't
20  increase as much, so ultimately every time
21  there is a much larger gap, growing gap,
22  between what it would have cost to maintain
23  those individuals in a state center as opposed
24  to what it would cost to keep them in
25  community care, correct?

Page 183

1          Joseph O. Church
2      A.   That would be -- yes.
3          MR. MEEK:  Can we take a very
4   short break.
5          MR. WARSHAW:  Sure.
6          (Short recess.)
7          MR. MEEK:  We are going to mark
8   this Church 15.
9          (Document marked for
10  identification as Church Exhibit 15.)
11  BY MR. MEEK:
12     Q.   Please look at this document, and
13  when you have had a chance to review it, let
14  me know.
15     A.   Okay.
16     Q.   Mr. Church, can you tell me what the
17  document that has been marked Church 15 is?
18     A.   This would have been the Program
19  Revision Request that we had submitted for
20  fiscal year 2005-2006.
21     Q.   And one of the items for this PRR
22  is -- I'm sorry.  Do you know whether this was
23  funded?
24     A.   I don't think it was fully funded.
25     Q.   Now, one of the items for the PRR

Page 184

1          Joseph O. Church
2   looks like it is requesting funding to
3   consolidate Altoona and Ebensburg Centers,
4   right?
5      A.   Yes.
6      Q.   And these are obviously two of the
7   state ICFs, correct?
8      A.   Yes.
9      Q.   According to the document on Page 1,
10  it indicates that 45 people from Altoona and
11  Ebensburg had moved to the community in fiscal
12  '05-'06 and remaining residents of Altoona
13  Center would move to Ebensburg?
14     A.   Correct.
15     Q.   And in fiscal '06-'07 45 people from
16  Ebensburg would move to the community,
17  correct?
18     A.   Yes.
19     Q.   So that would mean a total of 90
20  people from Altoona and Ebensburg moved into
21  the community in fiscal '05-'06 and fiscal
22  '06-'07?
23     A.   That was the intent.
24     Q.   Why did that not happen?
25     A.   Because the funding that was related

46 (Pages 181 to 184)

JA348

# *The Plan – Supporting People Who Currently Reside in State Centers Who Want to Move to the Community*

*The mission of the Department of Public Welfare is to: Promote, improve and sustain the quality of family life; Break the cycle of dependency; Promote respect for employees; Protect and serve Pennsylvania's most vulnerable citizens; and Manage our resources effectively.*

**Introduction:**  Currently, approximately 1200 individuals reside in a total of five State (Intermediate Care Facilities for Persons with Mental Retardation - ICF/MR) Centers across Pennsylvania.  These include **Ebensburg Center** located in Cambria County, **Hamburg Center** located in Berks County, **Polk Center** located in Venango County, **Selinsgrove Center** located in Snyder County and **White Haven Center** located in Luzerne County.

It is the Office of Developmental Program's (ODP's) belief that every person who currently resides in a state center can be successfully supported in community integrated setting with the right supports, appropriate planning and sufficient funding.  However, many of the 1200 people residing at the centers have lived there a long time and have complex health and behavioral problems that will be especially expensive to address in community settings.  Moreover, in the majority of cases, the resident and/or his/her family oppose moving the resident into the community.

ODP believes that most, if not all, of those persons in State Centers are receiving appropriate and adequate services.  ODP also believes that it is critical to avoid placing people from the community into the centers and that there are numerous people in the community who are not receiving adequate or appropriate services due to lack of funding necessary to provide those services who require placement in community programs in order to avoid physical or mental harm or placement in a State Center.

In the current budget environment, ODP has prioritized serving people who are in the highest category of need -- those who present with unexpected emergencies which jeopardize the person's health or welfare, or those who could result in a new state center admission.  It intends to continue that policy while, at the same

time, making significant efforts to move persons in State Centers into the community to the extent that funds are available to do so.

**Historical Placement/Service Delivery Information:**

**State Centers:** Over the past 5 fiscal years (which include FYs 04-05, 05-06, 06-07, 07-08, 08-09), **54** individuals moved to the community from state centers. During these years only **13** people have been admitted to state centers. These include by fiscal year:

**Table B**

| FY | # Who Moved | # Admitted |
|---|---|---|
| 04/05 | 7 | 0 |
| 05/06 | 4 | 2 |
| 06/07 | 23 | 6 |
| 07/08 | 14 | 3 |
| 08/09 | 6 | 2 |
| Total | 54 | 13 |

**Community Program:**  In this same time period, a total of **6784** people were served off of Pennsylvania's Waiting List which is driven by the PUNS to determine urgency of need.  These include by fiscal year:

**Table C**

| FY | # Served |
|---|---|
| 04/05 | 529 |
| 05/06 | 850 |
| 06/07 | 806 |
| 07/08 | 3428 |
| 08/09 | 1171 |
| Total | 6784 |

**Timing—**The Governor's proposed budget for fiscal year 2010-11 has been submitted to the General Assembly and DPW has been informed that no further changes are possible at this time.  Accordingly, the funding portion of the Plan set forth below cannot begin until fiscal year 2011-12.

In addition, the amount of funding to be sought under this Plan is limited by the reality that the Commonwealth is facing a financial crisis.  That part of the Plan will be revisited on an annual basis as the financial condition of the Commonwealth changes.

# The Plan:

This plan has four objectives:

1. To ask the Governor to seek funding from the General Assembly for placement of at least 50 additional persons presently residing in State Centers in community settings under the Consolidated Waiver in any given year until those persons residing in State Centers who do not oppose and whose families do not oppose placement in community settings have been placed in such settings.

2. To provide education about community options, opportunities and benefits to individuals living at the centers and their families and guardians.  To establish processes for moving persons presently residing in State Centers into the community to the extent that funds are available to do so.

3. To identify people who want to leave the centers and to identify what they will need to be appropriately supported.

4.  To maintain the practice of prioritizing serving people who are in the highest category of need, those who present with unexpected emergencies which jeopardize the person's health or welfare, or those who could result in a new state center admission.

**Steps**:

1.  To request that the Governor include in his budget request to the General Assembly funding sufficient to place at least 50 additional persons presently residing in State Centers in community settings under the Consolidated Waiver in any given year until those persons residing in State Centers who do not oppose and whose families do not oppose placement in community settings have been placed in such settings.

2.  To provide education about community options, opportunities and benefits to individuals living at the centers and their families and guardians ODP will establish a Steering Committee comprised of stakeholders who are impacted by center transition activities.  This group would be appointed by the Deputy and would include: families (from centers and community), self-advocates (from centers and the community), DPW/ODP staff (center staff, including union reps; regional office staff, budget office), advocates (DRN, Arc, VOR), counties, providers, etc.  The mission/purpose of this group would be to recommend and guide the process of providing information and training to assist people and their families to make informed choices regarding service options.  ODP will evaluate and implement appropriate recommendations within a reasonable timeframe.

ODP will develop training curriculums specifically pertaining to community living alternatives.  These curriculums will be utilized for the purpose of educating self advocates, families and staff about the various community living options that are available, how the community system works and the funding options that currently exist.  Once developed, a training schedule will be developed and made

available to all stakeholders so that each can make a better informed decision regarding community living.

To identify people who want to leave the centers and what they will need to be appropriately supported

Individuals who are identified for their desire to move to community integrated settings will be added to a planning list.

3.  ODP will develop a process to be utilized for the purpose of prioritizing, in order of need, the planning list of people who want to move to the community. Once developed, this process will be integrated into ODPs accepted transition process for people moving from state centers into the community.  Prioritization to consider, in order of significance:

    1.  Individuals who want to leave and the families agree
    2.  Individuals who want to leave and no family opposition
    3.  Individuals for whom there is no indication of preference and family supports move
    4.  Individuals for whom there is no indication of preference or opposition from person or family

Individualized budget plans will be completed for each individual who currently resides in state centers and will be updated annually around the time of each person's ISP.  These plans will be developed in coordination with the Regional Offices, Administrative Entities (AEs), and a representative from the Budget Office.

Once individualized budget plans have been developed, a request for additional funds will be initiated and once approved, transition planning will begin. **(Note: all planning for transition from state centers to community integrated settings is contingent upon the successful acquisition of approved budget requests**

ODP will include state center residents under each year's waiting list initiative, consistent with the allocation set forth above..

Additionally, ODP will revise the current waiver capacity Management Process for the purpose of including State Center residents as potential candidates for Waiting List Initiative money.

PROVIDED THAT, no person will be moved from a state center into a community placement if it is determined that that person would not benefit from such a placement as opposed to staying in the state center and

PROVIDED THAT, the Deputy Secretary may direct that money otherwise available to move persons presently residing in state centers into community

settings be used to place other persons into such settings if the Deputy Secretary determines that such person requires such a placement in order to avoid risk of physical or mental injury or to avoid placement in a state center and that there is not otherwise money available to make such a placement.

4.  To maintain the practice of admitting minimal numbers of people to state centers.

ODP will continue its existing process of monitoring all requests for placement in state centers.

ODP will continue to use the PUNS to identify people in need of emergency services and make budget requests to serve emergencies without resorting to the use of state centers.

ODP will, on an annual basis, beginning July, 2011, implement this plan utilizing the information contained on the Community Placement Plan Assessment prioritized master list.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANKLIN BENJAMIN, by and through** | : | |
| **his next friend, Andree Yock; RICHARD** | : | |
| **GROGG and FRANK EDGETT, by and** | : | |
| **through their next friend, Joyce McCarthy;** | : | |
| **SYLVIA BALDWIN, by and through her** | : | |
| **next friend, Shirl Meyers; ANTHONY** | : | |
| **BEARD, by and through his next friend,** | : | |
| **Nicole Turman, on behalf of themselves** | : | |
| **and all others similarly situated,** | : | |
| | : | **Filed via ECF** |
| **System** | | |
| **Plaintiffs** | : | |
| | : | **Civil Action No.** |
| **v.** | : | **1:09-cv-1182-JEJ** |
| | : | **(Jones, J.)** |
| **DEPARTMENT OF PUBLIC WELFARE** | : | **Class Action** |
| **OF THE COMMONWEALTH OF** | : | |
| **PENNSYLVANIA and** | : | |
| **HARRIET DICHTER, in her official** | : | |
| **capacity as Secretary of Public Welfare of** | : | |
| **the Commonwealth of Pennsylvania,** | : | |
| | : | |
| **Defendants** | : | |

DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1.    Under The Mental Health and Mental Retardation Act of 1966

(MH/MR Act), 50 P.S. §§ 4101-4704, the DPW is responsible for providing

services to the Pennsylvania citizens with mental retardation.    Casey

Declaration ¶2 (Exhibit 1 to Defendants' Motion for Summary Judgment).

1

JA354

2.    In carrying out this responsibility, DPW provides a broad array of services in a variety of locations:   (a) it directly operates five Intermediate Care Facilities for persons with Mental Retardation (ICFs/MR); (b) it funds services in numerous privately-operated ICFs/MR; and (c) it funds the provision of community-based mental retardation services.  Casey Declaration ¶4; Complaint  ¶52 (Exhibit 2 to Plaintiffs' Motion for Summary Judgment)..

3.    In total, DPW currently funds services for about 52,000 people with mental retardation who are served either in private ICF/MRs or in community settings.  DPW currently provides services to approximately 1195 persons with mental retardation in state-operated ICFs/MRs.  Casey Declaration ¶5.

4.    Defendants operate five State operated ICFs/MR (which are also called "State centers"): (1) Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in Berks County; (3) Polk Center, located in Venango County; (4) Selinsgrove Center, located in Snyder County; and (5) White Haven Center, located in Luzerne County.  Casey Declaration ¶6.

5.    All five State-operated facilities are certified by the United States Department of Health and Human Services as Intermediate Care

2

Facilities for persons with Mentally Retardation (ICFs/MR). See 42 C.F.R. Part 483. Casey Declaration ¶7.

6.     From 1995 to 2009, the census at State ICFs/MR has decreased from 3164 to1224.  Today, fewer than 1200 individuals receive services in State centers. Casey Declaration ¶8.

7.     Since 1996, Defendants have closed four State ICFs/MR, and four MR units on the grounds of State hospitals. Casey Declaration ¶9.

8.     The number of persons served in the community has increased from about 47,000 in July of 2006 to about 52,000 today. Casey Declaration ¶10.

9.     Not all persons in need of services currently receive them. Casey Declaration ¶11.

10.     Appropriations from the General Assembly and available Federal matching funds have been insufficient even to provide services for all those in immediate need of services. Casey Declaration ¶12.

11.     Thus, there is a long waiting list for services. Casey Declaration ¶13.

12.     Persons who apply for services are evaluated using an instrument known as "Prioritization of Urgency of Need for Services for Persons with Mental Retardation" (PUNS). Casey Declaration ¶14.

3

13.    PUNS places applicants in three categories:  emergency (immediate or within the next six months); critical (need within two years); and Planning (need within five years).  Casey Declaration ¶15.

14.    The emergency category currently includes about 3500 persons. Casey Declaration ¶16.

15.    In fiscal year 2008-09,  the General Assembly amounts sufficient to fund services for about 274 persons in that category.  Casey Declaration ¶17.

16.    When a community vacancy occurs, it has long been the policy of Defendants to give priority to those on the PUNS emergency waiting list over those in State ICFs/MR.  Casey Declaration ¶19.

17.    That is because persons residing in State ICFs/MR are safe and have all their basic needs met while many persons who are categorized as in "emergency" need are generally without needed services and at risk of mental or physical harm if they do not receive services.  Casey Declaration ¶19; Sassaman dep. at 46, McIntire dep. at 9-10, 46-53, Dobbins dep. at 69-72, Chroman dep. at 37, Wagner dep. at 51 (collectively Exhibit 2 to Defendants' Motion for Summary Judgment).

18.    Those on the emergency waiting list include those who are in danger of having no care provided at all (as when family care-givers die) or

4

having grossly deficient care (as when family care-givers become disabled). Casey Declaration ¶20.

19.     Persons who are categorized as in "emergency" need sometimes have to wait as long as two years for services.  Casey Declaration ¶21.

20.     For at least the past 16 years, DPW has tried to avoid admitting new residents into the State centers.  Casey Declaration ¶22.

21.     Since July 1, 2003, Defendants have admitted only 15 persons to State ICFs/MR.   Casey Declaration ¶23.

22.     Under the "waiver" program, the Federal/State Medicaid funding stream that was once available only for institutional care can be used to fund community care.  Casey Declaration ¶24.

23.     Today, approximately15, 000 persons in community care are funded under the Consolidated Waiver and 10,000 others through the Person/Family Directed Support Waiver.  Casey Declaration ¶265

24.     Because the amount that can be spent in the Person/Family Directed Support Waiver is capped at less than $30,000, services provided under that waiver would be totally inadequate for persons now residing in State centers.   It is the Person/Family Directed Support Waiver which provides services to most of the people aging out of educational programs, not the Consolidated waiver.  Casey Declaration ¶26.

5

25.    All available funding for both State ICF/MR care and community care is expended for services to persons with mental retardation. Casey Declaration ¶27.

26.    The average cost of care at a State center for FY 09 – 10 is $240,000 for each person.  Casey Declaration ¶28.

27.    The current average cost of providing services in the community is generally less than $240,000, however, the cost of some community placements exceeds $500,000.  Casey Declaration ¶29.

28.    While the average cost of community placement is much lower than $240,000, the complexity, the extent and, therefore, the cost of the services required by most of those persons remaining in State centers far exceeds the services required by most of those already in community placement.  Casey Declaration ¶30.

29.    Even when a community placement is less expensive, discharge of a resident from a State center does not result in an immediate savings of the average cost for that resident.  Church dep. at 177-181 (Exhibit 3 to Defendants' Motion for Summary Judgment).

30.    Only the "variable costs" are saved, for example, the costs  of food and medicine.  Church dep. at 177-181.

6

31.    Fixed costs, such as staffing and building maintenance, remain.
Church dep. at 177-181.

32.    The "average cost" of care for a resident of a State ICF/MR,
therefore, does not become available for community care upon the resident's
discharge.  Church dep. at 177-181.

33.    Defendants generally accrue no net savings from an institution
to community transfer unless a State center or at least a unit within that
facility is closed as a result of that transfer.  Church dep. at 177-181.

34.    For some period of time, usually measured in years, "transition
costs" are incurred, so that the full cost of care at the State ICF/MR must be
funded while the additional costs of developing community placements must
be borne.  Church dep. at 177-181.

35.    Thus, not surprisingly, under all scenarios of relief sought by
Plaintiffs that were considered by Plaintiffs' expert, Parker Dennison &
Associates, Ltd., Defendants would incur cumulative additional costs of over
$7 million to over $11 million for FY 2011-12 and 12-13.  Parker Dennison
Report at 9-13. (Exhibit 4 to Defendants' Motion for Summary Judgment –
attachments omitted).

7

36.     Under all scenarios considered by Plaintiffs' expert, no net savings would accrue to Defendants until the fourth fiscal year -- 2014. Parker Dennison Report at 9-13.

37.     On June 18, 2010, Defendants adopted a Plan for relocating State center residents who do not oppose, and whose families or guardians, if any, do not oppose community care -- Plan for Supporting People Who Currently Reside in State Centers Who Want to Move to the Community. Casey Declaration ¶31; Plan for Supporting People Who Currently Reside in State Centers Who Want to Move to the Community (Exhibit 5 to Defendants' Motion for Summary Judgment).

38.     This Plan has benchmarks for implementation.  It does not have timelines because, at this point, Defendants do not know how many people will move.  Casey Declaration ¶32.

39.     As provided in the Plan, Defendants will ask the Governor for funding for at least 50 State ICF/MR residents to be funded for community care through the Consolidated waiver.  Casey Declaration ¶33.

40.     Given current financial conditions, it would not be realistic to commit to a higher number.  Casey Declaration ¶34.

41.    The governor's proposed budget for fiscal year 2010-11 provided less money for community placements than had been appropriated by the General Assembly in the 2009-10 fiscal.  Casey Declaration ¶35.

42.    However, the Plan provides that this number will be reconsidered as financial conditions change.  Casey Declaration ¶36.

43.    The Plan then sets forth a process for identifying and prioritizing among those who do not oppose community placement, planning for their placement and moving them into the community as money becomes available.  Casey Declaration ¶37.

44.    Finally, it provides for the development and implementation of educational programs directed at educating residents and their families about the benefits of community placement.  Casey Declaration ¶38.

45.    The commitment to move people into the community is conditioned upon the availability of the funding necessary to make such placement and a finding by professionals that the resident will benefit from such a placement.  Casey Declaration ¶39.

46.    In order to avoid a fundamental alteration to State programs which would favor State center residents over other people with mental retardation in greater need of services, the Plan gives DPW's Deputy Secretary for the Office of Developmental Programs the power to direct that

9

money otherwise available to move persons presently residing in State

centers into community settings be used to place other eligible and more

needy persons into such settings This would only be done if the Deputy

Secretary determines (1) that such a person requires such a placement in

order to avoid risk of physical or mental injury or to avoid placement in a

State center and (2) that there is no other money available to make such a

placement.  Casey Declaration ¶40.


                                            Respectfully Submitted,

Date:  June 30, 2010                        s/Allen Warshaw_____
                                            Allen C. Warshaw
                                            Chief Counsel
                                            PA ID No. 17145
                                            Office of General Counsel
                                            Department of Public Welfare
                                            3rd Floor West, Health & Welfare Bldg.
                                            Harrisburg, PA  17120
                                            (717) 783-2800 (phone)
                                            (717) 772-0717 (fax)
                                            awarshaw@state.pa.us

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FRANKLIN BENJAMIN, by and through his next friend, Andree Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated,** : | |
| : | **Filed via ECF** |
| **Plaintiffs** : | |
| : | **Civil Action No.** |
| **v.** : | **1:09-cv-1182-JEJ** |
| : | **(Jones, J.)** |
| **DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania,** : | **Class Action** |
| : | |
| **Defendants** : | |

## DEFENDANTS' RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1.-24.     Undisputed.

25.     While it is true that costs increase annually on an absolute basis, they do not increase if costs are adjusted for inflation.  Kipper Report, pp.  6-7.  Exhibit G.

26.-61.    Undisputed.

63.-69.    While it is true that DPW conducted a survey, it is also clear from PSUF 65.-69.  That the survey was not particularly thorough or accurate.  There were very likely numerous errors in both directions.  Lokuta Declaration ¶ 2 , Exhibit H.  Moreover, Defendants strongly believe that if told that their family member was being moved into a community placement, many more families would oppose such placements and seek to be appointed guardians.  Lokuta Declaration ¶3.  In its Plan, DPW has committed to making a more coordinated effort to educate self advocates and their families about community living options and to making a more thorough analysis of the desires of the residents and their families.

65.    Disputed.  Currently, C.Bs. mother is incapacitated and living in a nursing home and her father is deceased.  Both had been opposed to community placement when involved and able to express opinion.  Based on current situation, White Haven Center staff is unable to ascertain for certain that the family is in favor of such of move and base the opposition on previous interactions when family was able to express opinion.  The Facility Director is listed as the substitute decision maker.  Kuhno Declaration, ¶2, Exhibit J.

66.      Disputed.  DW's mother has historically opposed community placement.  Social services called on 7-6-10 and the mother confirmed her opposition once again.  Kuhno Declaration, ¶2.

67.      Disputed.  JB has a brother who is guardian who continues to be opposed following the passing of his parents.  Social services note dated 7-6-10 documents this fact.  JB has family that continues to be opposed to community placement.  Kuhno Declaration, ¶2.

68.      Disputed.  MS's  family is elderly and has historically been very clear that they did not wish their daughter to be placed in the community.  The interdisciplinary team can only reference this longstanding wish.  Kuhno Declaration, ¶2.

69.-90.      Undisputed.

91.      Undisputed but immaterial since almost all of those persons were provided non-residential services under the Person/Family Directed Support Waiver which is capped at less than $30,000 person and is, therefore, absolutely irrelevant to persons receiving services in State centers who require residential services.  Casey Declaration ¶26.

92.-93.      Undisputed.

94.        Only 50 of the placements included in the Governor's proposed budget were residential.  The rest are, therefore, irrelevant to the Plaintiff class.  Casey Second Declaration ¶2.

95.-99.        Undisputed.

100.        Disputed.  DPW has adopted a Plan to offer and provide community placements to any state ICF/MR residents who are not opposed to discharge that includes specific benchmarks to identify the number of state ICF/MR residents for whom community mental retardation services will be provided and the time lines in which they will be provided.   Casey Delaration ¶¶ 31.- 40.

101.-102.        Undisputed.

103. – 105.  Disputed.   The current budget environment is the reason for DPW's provision of community services to only 58 state ICF/MR residents since the beginning of FY 2004-2005.  Not all persons in need of services currently receive them.   Appropriations from the General Assembly and available Federal matching funds have been insufficient even to provide services for all those in immediate need of services.  Thus, there is a long waiting list for services.  When a community vacancy occurs, it has long been the policy of Defendants to give priority to those on the PUNS ¶emergency waiting list over those in State ICFs/MR.  That is because

persons residing in State ICFs/MR are safe and have all their basic needs met while many persons who are categorized as in "emergency" need are generally without needed services and at risk of mental or physical harm if they do not receive services. Casey Declaration ¶¶ 11-13, 18-19. If there had been adequate funds to provide services to all those in need of services, DPW would have given a higher priority to moving people from State centers into community placements. Casey Second Declaration ¶3.

106.-118.    Undisputed.

119.    Disputed. It is impossible to predict the cost of providing services in the community to those presently in State centers. However, it is clear that in most cases, those remaining in State centers have much more intense and complex needs than most of those already in the community.

120.-133.    Undisputed.

134.    Disputed to the extent that Plaintiffs suggest that DPW has made a decision one way or the other regarding MFP. The Patient Protection and Affordable Care Act, Pub. L. 111-148, § 2403(a) (2010) is extremely complex and DPW is still studying all of its options under the

Act.

Respectfully Submitted,

Date:  July 14, 2010               s/Allen Warshaw
                                   Allen C. Warshaw
                                   Chief Counsel
                                   PA ID No. 17145
                                   Office of General Counsel
                                   Department of Public Welfare
                                   3rd Floor West, Health & Welfare Bldg.
                                   Harrisburg, PA  17120
                                   (717) 783-2800 (phone)
                                   (717) 772-0717 (fax)
                                   awarshaw@state.pa.us

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : | Filed via ECF System<br><br>Civil Action No. 1:09-cv-1182-JEJ<br><br>Class Action<br><br>Complaint Filed June 22, 2009 |
| Plaintiffs, | : : | Judge Jones |
| v. | : : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and HARRIET DICHTER, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : | |
| Defendants. | : : | |

_____:

**PLAINTIFFS' RESPONSES TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1.     Denied.  On or around January 2010, Defendants sent to Plaintiffs' counsel a document titled "The Plan -- Supporting People Who Currently Reside in State Centers Who Want to Move to the Community."  Meek Decl. III ¶ 2 (Pls.'

Exh. 43); Draft Plan (Pls.' Exh. 44).[1]   The evidence demonstrates that this document was nothing more than a draft.

      a.    The document has a footer stating "TR revisions to FL plan 11-24-09" (Pls.' Exh. 44 at 2-7) and has a blank space with respect to when it will begin to be implemented.  (Pls.' Exh. 44 at 7).

      b.    Any suggestion that this document is anything but a draft that was not finally adopted in January 2010 is belied by Defendants' response on April 2, 2010 that "ADMITTED at this time" that "DPW had not adopted or implemented a plan to discharge any state ICF/MR residents."   Defs.' Resp. to Pls.' First Request for Admissions # 23 (Pls.' Exh. 5) (emphasis in original).   Defendants never corrected this response.   Meek Decl. III ¶ 2(b) (Pls.' Exh. 43).

      c.    Fred Lokuta, the DPW employee who is involved in drafting the January 2010 document, testified on February 2, 2010 that the document needed to be reviewed by the Governor's Budget

---

[1] References to Plaintiffs' Exhibits 1 through 26 in this document are to those Exhibits submitted by Plaintiffs in support of their Motion for Summary Judgment (Docket # 48), which are incorporated by reference in Plaintiffs' opposition to Defendants' Motion for Summary Judgment.  References to Plaintiffs' Exhibits 27 through 42 are to those Exhibits filed with Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. (Docket # 65). References to Plaintiffs' Exhibits 43 through 51 are to those Exhibits filed with Plaintiffs' Reply Brief in Support of their Motion for Summary Judgment.

2

Office, as well as the Secretary of Public Welfare, Lokuta Dep. at 131, 138 (Pls.' Exh. 45), and there is no evidence that such a review took place.

d.    Mr. Lokuta also testified that he was unaware of any funding being sought in the FY 2010-2011 budget for the provision of services for the named Plaintiffs pursuant to the January 2010 document and that he was unaware whether any funding would be sought before the next administration is in place.  Lokuta Dep. at 151-152 (Pls.' Exh. 45).

e.    Mr. Lokuta testified that it was possible that a new administration would not go forward with the plan. Lokuta Dep. at 152 (Pls.' Exh. 45).

2.    Denied that DPW changed the draft January 2010 plan in response to Plaintiffs' comments and that it adopted an actual plan in June 2010.

a.    Any differences between the January 2010 and June 2010 documents were not due to Plaintiffs' comments.  Meek Decl. III ¶ 3 (Pls.' Exh. 43).  The June 2010 "plan" includes glaring loopholes that certainly were not requested by Plaintiffs.  *Id.* To the contrary, those loopholes are antithetical to Plaintiffs' concept of an acceptable plan.  *Id.*

3

b.    DPW did not inform Plaintiffs that it had adopted any purported plan to provide community services to state ICF/MR residents until Defendants filed their Motion for Summary Judgment on June 29, 2010 and stated that it had adopted a plan on June 18, 2010.  Meek Decl. III ¶ 4 (Pls.' Exh. 43).

c.    On June 18, 2010, after the close of fact discovery, Defendants' counsel sent an e-mail to Plaintiffs' counsel that included a "revised *Olmstead* plan" document and invited Plaintiffs' counsel to discuss that document.  Defs.' Exh. I.  Defendants' counsel did not advise Plaintiffs that DPW had "adopted" the purported plan.  *See id.*; Meek Decl. III ¶ 5 (Pls.' Exh. 43).

d.    In their Responses to Plaintiffs' First Request for Admissions dated April 2, 2010, Defendants stated that they did not "at this time" have a plan to discharge state ICF/MR residents.  Defs.' Resp. to Pls.' First Request for Admissions # 23 (Pls.' Exh. 5).  Defendants never updated that response.  Meek Decl. III ¶ 6 (Pls.' Exh. 43)

e.    DPW's purported plan was never presented to or discussed with the Planning Advisory Committee (PAC) of DPW's Office of Developmental Programs (ODP).  Suroviec Decl. ¶ 16 (Pls.'

4

Exh. 36).  The PAC advises ODP on issues of planning, policy, and program development that impact Pennsylvanians with mental retardation, and would typically be involved in reviewing and providing input on any plan to provide community services to state ICF/MR residents.  *Id.* ¶¶ 6, 18. The Deputy Secretary for ODP attended meetings of the PAC Executive Committee and the PAC on June 16 and 17, 2010, fewer than 48 hours before DPW allegedly adopted this purported plan, yet he never mentioned any such plan at those meetings.  *Id.* ¶¶ 9-15.  Indeed, DPW never provided either a draft or final version of the purported plan to the PAC at any time since this litigation was filed.  *Id.* ¶ 16.

f.   DPW never issued any public announcement of its purported plan.  *See* DPW News Releases Archive, *available at* http://listserv.dpw.state.pa.us/Scripts/wa.exe?A1=ind10&L=news-releases. (Pls.' Exh. 37).  In the past few months, DPW has issued press releases on topics including: the number of adoptions in Pennsylvania (June 23, 2010), the availability of an updated resources guide for health and human services (May

25, 2010), and a photo exhibit about children awaiting adoption (Feb. 2 and Feb. 23, 2010). *See id.*

g.  Although Fred Lokuta testified that the Governor's Budget Office would have to approve any integration plan for state ICF/MR residents, Lokuta Dep. at 138 (Pls.' Exh. 45), DPW's counsel informed Plaintiffs that no one in the Governor's Budget Office approved the "plan" that DPW purportedly adopted in June 2010.  E-mail from Allen Warshaw to Robert W. Meek dated July 15, 2010 (Pls.' Exh. 46).

3.  Denied as stated.  Plaintiffs deny that the plan has verifiable benchmarks for implementation since it is riddled with loopholes and deficiencies. Specifically:

a.  The document states that DPW will seek funding to provide community services for at least 50 state ICF/MR residents annually.  Defs.' Exh. C at 2, 3.  Yet, it also states that the request for funding will depend on the Commonwealth's financial condition.  *Id.* at 2.  The document further states that, even if DPW receives funding to provide community services to state ICF/MR residents, the Deputy Secretary can divert those resources if he unilaterally decides that any or all of the

6

funds are better used to serve non-institutionalized individuals. *Id.* at 4-5.

b.  Moreover, although DPW has repeatedly admitted that all state ICF/MR residents are appropriate for discharge and although the Deputy Secretary for Developmental Programs has testified to the *per se* harm of institutionalization, *see* Pls.' SUF & Defs.' Resp. ## 43-45, 51-52, the document would allow DPW to refuse to provide services to any individual who it unilaterally determines "would not benefit" from such a placement.  Defs.' Exh. C at 4.

c.  The document also is devoid of any provision to allow state ICF/MR residents to access vacancies in existing programs. The document states that ODP will "revise the current waiver capacity [m]anagement process for the purpose of including State Center residents as potential candidates for Waiting List Initiative money."  Defs.' Exh. C at 4.  This, however, does not address the undisputed lack of access by state ICF/MR residents to *existing* residential vacancies, *see* Pls.' SUF & Defs.' Resp. ## 96-98, but rather indicates that those individuals will be

7

eligible only for expansion funds that are allocated to the Administrative Entities to develop *new* programs.[2]

d.   DPW admits that:  (1) it has previously been able to fund new community services for some state ICF/MR residents without need for additional funding by shifting resources from the state ICF/MR budget, and (2) it could fund services for at least some additional state ICF/MR residents through this process without the need for expansion funding.  Pls.' SUF & Defs.' Resp. ## 110-111.  Yet, the purported plan does not require DPW to use this strategy to fund services for Plaintiffs and class members.

e.   Finally, any implementation of the purported plan will not occur, at the earliest, until July 2011, Defs.' Exh. C at 5, when a

---

[2]   DPW allocates a certain number of Consolidated Waiver slots and a number of P/FDS Waiver slots to each local Administrative Entity (AE). McCool Dep. at 10-11, 12-13, 22 (Pls.' Exh. 38).  This is known as the AE's Waiver Capacity.  *Id.* at 22.  The number of slots includes those persons currently receiving services and vacancies in existing services.  *Id.*  Access to vacancies in existing programs is governed by DPW's "residential vacancy management" process.  McCool Dep. at 35-36; Draft ODP Bulletin on *Waiver Capacity Management: Residential Vacancy Management for MR* (Pls.' Reply Exh. 39). DPW also can increase the AEs' Waiver Capacity if, for example, there is new funding appropriated by the Legislature for a Waiting List initiative.  *See* McCool Dep. at 19-20, 21-22 (Pls.' Exh. 38); Draft ODP Bulletin on *Waiver Capacity Commitment for Consolidated and P/FDS Waiver* at 2-3 (Pls.' Exh. 40).  Thus, the document's reference to state ICF/MR residents' access to Waiting List Initiative funds does not refer to access to existing vacancies.

8

new administration is in office.  As such, there is no assurance

that this "plan" will be implemented at all and that DPW will

ever request the Governor to seek funds to provide community

services for state ICF/MR residents.  *See* Lokuta Dep. at 152

(Pls.' Exh. 45).

4.    Denied.  There is nothing in the current budget environment that

precludes DPW from developing and implementing a plan to provide community

services to state ICF/MR residents over some period of time in the future.  Casey

Dep. at 167 (Pls.' Exh. 4).  A plan should not be constrained by current financial

conditions.  The purported plan only states that DPW will request funding from the

Governor and, if the Governor approves, from the Legislature.  It is not clear why

DPW's plan cannot request funding for greater numbers of ICF/MR residents,

particularly given that the plan seeks to implement a federal civil rights law.  If the

Governor or Legislature declines the request, then DPW can adjust its implem-

entation of the plan.  Moreover, between FY 2004-2005 and FY 2008-2009,

inclusive, when DPW received more than $316.4 million to provide community

services to nearly 6,800 people, fewer than 60 state ICF/MR residents were

discharged during that period.  Pls.' SUF & Defs.' Resp. ## 22, 89, 92.  DPW

received funding to provide community services to an additional 793 persons in

FY 2009-2010, but none of that funding was used to provide community services

9

to state ICF/MR residents.  Pls.' SUF & Defs.' Resp. ## 93, 95.  The decision to provide community services to fewer than 60 state ICF/MR residents since at least FY 2004-2005 was not due to budget constraints, but, rather, due to a policy decision to prioritize people on the waiting list who live in the community.  Casey Dep. at 166-167 (Pls.' Exh. 4); Church Dep. I at 175-176 (Pls.' Exh. 6); Defs.' Resp. to Pls.' First Request for Admissions # 45 (Pls.' Exh. 5).

5.    Denied as stated.  It is admitted that as of June 1, 2010, the Commonwealth projected that it would have a budget deficit of $1.2 billion in General Fund revenues for FY 2009-2010.  By way of further response, Plaintiffs state: (a) this statement is not material; (b) the sole evidence for this statement -- as for almost all of the statements of allegedly undisputed facts submitted by Defendants -- is Kevin Casey, the Deputy Secretary for DPW's Office of Developmental Programs, who has no personal knowledge of this issue; (c) the $1.2 billion budget deficit in FY 2009-10 was less than the $3 billion budget deficit in FY 2008-2009.  Tom Barnes, *State Budget Deficit May Exceed $3 Billion*, Pittsburgh Post-Gazette, Apr. 30, 2009, *available at* http://www.postgazette.com/pg/09120/966789-100.stm.

6.    Admitted but not material.  By way of further answer, Plaintiffs state that:  (a) the Legislature increased the appropriation for state ICFs/MR from approximately $267.9 million in FY 2009-2010 to approximately $276.8 million in

FY 2010-11, an increase of 3.25%; and (b) the Legislature increased the appropriation for community mental retardation waiver programs from approximately $1.71 billion in FY 2009-2010 to $1.765 billion in FY 2010-2011, an increase of approximately 3.3%. General Assembly Budget Bill Comparisons at 24, 26 (Pls.' Exh. 47).

7.  Denied.  The Governor's proposed budget for FY 2010-2011 requested a $5.7 million increase for the community mental retardation waiver services and a nearly $11.9 million increase in community mental retardation base services.  Governor's Executive Budget for FY 2010-2011 at E32.27 (Pls.' Exh. 8). To the extent that Defendants intend to say that the Governor's proposed budget requested less funding to provide community mental retardation services to *new* persons than had been sought in FY 2009-2010, it is undisputed that the FY 2010-2011 budget sought funding to serve 150 persons on the waiting list while the FY 2009-2010 budget sought funding to serve 793 persons on the waiting list.  Pls.' SUF & Defs.' Resp. ## 93, 94.

8.  Denied as stated.  The plan document states that the amount of funding that DPW requests will be contingent on the Commonwealth's financial condition. Defs.' Exh. C at 2.  However, the document may never be implemented. *See* Resp. to DSUF II # 3(e).  Even if implemented, this language does not simply permit DPW to seek funding to serve more than 50 state ICF/MR residents.  It also

permits DPW to ask for funding to serve fewer than 50 state ICF/MR residents (perhaps no state ICF/MR residents), depending on DPW's assessment of the Commonwealth's financial condition. There is no reason to limit DPW's obligation to simply request funding to DPW's perception of the difficulty of the Commonwealth's financial condition. Until DPW requests the funding, it cannot know whether the Legislature will appropriate it. *See* Resp. to DSUF II # 4. Indeed, the Legislature appropriated greater increases to DPW for its state ICF/MR and community services program than it did for other programs in FY 2010-2011. *See* Resp. to DSUF II # 6.

9.    Denied as stated. The plan document describes a process to identify and prioritize among those who do not oppose community placement, to plan for their placement, and to move them to the community if and when any funds are sought, become available, and are not otherwise diverted. However, the document may never be implemented. *See* Resp. to DSUF II # 3(e). Moreover, the loopholes and deficiencies in the document may mean that no state ICF/MR residents will be moved. *See* Resp. to DSUF II # 3(a)-(d).

10.    Denied as stated. The document describes the development and implementation of some programs to educate state ICF/MR residents and their families about community placement. However, the document may never be implemented. *See* Resp. to DSUF II # 3(e).

12

11.    Denied as stated.    The document states that any provision of community services to state ICF/MR residents will be conditioned upon the availability of funding necessary to make such a placement and a finding by professionals that the resident will benefit from such a placement.  Defs.' Exh. C at 2, 4-5.  Plaintiffs deny that the document reflects any "commitment to move people into the community" in light of those and other loopholes and other deficiencies in the document  *See* Resp. to DSUF II # 3.

12.    Whether Defendants' actions or inactions under the document that it presents as a plan are necessary to avoid a "fundamental alteration" to DPW's program is a conclusion of law to which no response is necessary.  Plaintiffs admit that the document that DPW presents as its purported plan states that the Deputy Secretary for Developmental Programs will have the unilateral authority to divert any funding appropriated to provide community services to state ICF/MR residents to fund community services for non-institutionalized persons if, in his unreviewable determination, he concludes that those non-institutionalized individuals are at risk of physical or mental injury or are at risk of placement in state ICFs/MR and there is no other funding available to provide services to the non-institutionalized individuals.    Defs.' Exh. C at 4-5.    By way of further response, Plaintiffs deny that this proviso in DPW's purported plan is necessary to avoid "favor[ing] State [ICF/MR] residents over other [non-institutionalized]

people with mental retardation in greater need of services." To the contrary, the proviso in the purported plan will simply allow DPW to continue its policy of favoring non-institutionalized individuals over state ICF/MR residents.

    a.    Between FY 2004-2005 and FY 2008-2009, inclusive, DPW received more than $316.4 million to provide community mental retardation services to nearly 6,800 persons, fewer than 60 of whom were state ICF/MR residents. Pls.' SUF & Defs.' Resp. ## 22, 89, 92. In FY 2009-2010, DPW received funding to provide community mental retardation to nearly 800 persons, none of whom were state ICF/MR residents. Pls.' SUF & Defs.' Resp. ## 93, 95.

    b.    According to DPW, fewer than 300 of the nearly 1,200 persons on the waiting list who received services in FY 2008-2009 were in the "emergency" waiting list category. *See* DSUF II # 20; Pls.' SUF & Defs.' Resp. # 89.

    c.    It is undisputed that thousands of the individuals who have received services in recent years are those who are aging out of the education system and who are not in immediate danger. *See* Pls.' SUF & Defs.' Resp. # 91. Although these services are generally funded through the P/FDS Waiver, DPW, in

14

requesting funds to provide services to individuals on the waiting list, had discretion as to how much of the appropriated funding would be used for Consolidated Waiver services (which has no financial cap and can be used to fund community residential services) and how much would be used for P/FDS Waiver services (which has a financial cap and has been used to fund, *inter alia*, youngsters graduating from school). *See* Church Dep. I at 26-30, 166-172 (Pls.' Exh. 33). Moreover, the General Assembly's appropriation to DPW for "mental retardation waiver services" must simply be used for waiver services; there is no legislative prohibition on how those funds are distributed among the Consolidated and P/FDS Waivers. The only limit is the Governor's informal understanding that the appropriation will be spent consistent with the funding request. *Id.* at 142-144.[3]

---

[3]    DPW's broad discretion in how to use the "community mental retardation waiver" appropriation is reflected in its actions within the last month.    The Legislature expected DPW to eliminate the Governor's proposal to fund community mental retardation services for 150 persons on the waiting list from the community mental retardation waiver appropriation.    House Comm. on Appropriations, *DPW Budget Highlights* at 3 (June 30, 2010) (Pls.' Exh. 48).    Yet, DPW subsequently announced that it intended to use the appropriation to fund services for 150 persons on the waiting list.    DPW, *Budget Update* at 2 (July 6, 2010) (Pls.' Exh. 49).

15

d.    DPW's policies have also disfavored state ICF/MR residents by excluding them from consideration for access to vacancies in existing community-based programs.  *See* Pls.' SUF & Defs.' Resp. ## 96-98.

e.    State ICF/MR residents are subject to harm in those institutions.  *See* Pls.' SUF & Defs.' Resp. ## 51, 52, 135-139.

f.    Advocates who have been at the forefront of the movement to secure funding for services for individuals on the waiting list have informed DPW that they also think that it is imperative to offer community services for state ICF/MR residents as well as individuals on the waiting list.  These advocates recognize, as DPW apparently does not, that the provision of community services for state ICF/MR residents will generate savings that will enable DPW to expand funding for non-institutionalized persons on the waiting list.  *See* Suroviec Decl. ¶¶ 19-22 (Pls.' Exh. 36); Coccia Decl. ¶¶ 4-9 & Att. A (Pls.' Exh. 41).

13.    Admitted.  By way of further response, since July 2006, fewer than 50 of the 5,000 individuals who began to receive community services were discharged from state ICFs/MR.  *See* Pls.' SUF & Defs.' Resp. ## 22, 95.

14.    Admitted but not material.

16

JA385

15.   Denied as stated.  It is unclear what Defendants mean by "immediate need."  Plaintiffs admit that the state and federal funding appropriated by the General Assembly in recent years has been less than adequate to serve all persons who are on the waiting list.  By way of further response, Plaintiffs state:

    a.    Between FY 2004-2005 and 2008-2009, inclusive, DPW received $316.4 million to fund community supports and services for 6,784 individuals on the waiting list (including funding community-based residential services for nearly 2,500 persons) and in FY 2009-2010 DPW received funding of $22.7 million (five months of funding) to serve 793 individuals on the waiting list.  Pls.' SUF & Defs.' Resp. ## 89, 90, 93; ODP History of Waiting List Initiatives (Pls.' Exh. 15).

    b.    Of the 6,200 individuals who received services between FY 2006-2007 and FY 2009-10, inclusive, 2,160 were youngsters graduating from school, most of who are not in imminent risk of danger without services.  *See* Pls.' SUF & Defs.' Resp. # 91; *see also* Resp. to DSUF II # 12(c).

    c.    DPW, in requesting funds to provide services to individuals on the waiting list, had discretion as to how much of the funding would be requested and used for Consolidated Waiver services

17

(which has no financial cap and can be used to fund community residential services) and how much would be used for P/FDS Waiver services (which has a financial cap and has been used to fund, *inter alia*, youngsters graduating from school). *See* Resp. to DSUF II # 12(c) & n.3.

16.    Denied as stated.  Plaintiffs admit that there is a waiting list for services, though it is unclear what is meant by a "long" waiting list.  By way of further response, Defendants admit that the named Plaintiffs and class members are either not on any waiting lists for community services or are unlikely ever to be removed from the waiting lists and provided with community services regardless of their level of need.  Pls.' SUF & Defs.' Resp. # 88.

17.    Denied as stated.  Plaintiffs admit that persons who are not institutionalized and who apply for community mental retardation services are evaluated using the PUNS instrument. Pls.' SUF & Defs.' Resp. # 76.  Plaintiffs deny that state ICF/MR residents are evaluated using the PUNS instrument. It is undisputed that PUNS forms have been completed for only 113 state ICF/MR residents and, of that total, seven are on the emergency waiting list, six are on the critical waiting list, 65 are on the planning waiting list, and 35 have been determined to be fully served.  Pls.' SUF & Defs.' Resp. # 81.  Moreover, some state ICF/MR residents who have asked for community services or whose families have asked for

18

JA387

community services have not had PUNS forms completed or have been determined to be fully served and, therefore, are not on the waiting list for community services. Pls.' SUF & Defs.' Resp. # 87.

18.    Denied as stated.  In addition to the emergency, critical, and planning waiting list categories, the PUNS instrument may categorize an individual as fully served (*i.e.*, all their needs are being met).  *See* PUNS Form at 1 (Pls.' Exh. 14); Pls.' SUF & Defs.' Resp. ## 78, 81, 82.

19.    Admitted.  By way of further response, only seven state ICF/MR residents are in the "emergency" category, and DPW's Deputy Secretary for Developmental Programs could not say how long even those few state ICF/MR residents who are on the emergency waiting list would have to wait before they were offered community services.  Pls.' SUF & Defs.' Resp. ## 81, 85, 86.

20.    Denied as stated.

a.    In FY 2008-2009, the General Assembly appropriated approximately $1.8 billion in state and federal funding for community mental retardation services.  *See* 2008 Pa. Laws 1735 at 1804-05.  The appropriation was not broken down by type of source of funding (Medical Assistance Waivers or base funding), by type of Waiver (*i.e.*, Consolidated of P/FDS), by waiting list category, or by expansion funding to serve new

19

people or maintenance funding to continue services for those already receiving them.  Even the Office of Developmental Programs Budget for FY 2009-2010, which indicated that it used about $1.6 billion of the community mental retardation appropriations for Mental Retardation Waiver services, does not further break down the use of those funds in the manner suggested by Defendants.  Office of Developmental Programs Budget for FY 2009-2010 at 1 (Pls.' Exh. 28).

    b.    Of the FY 2008-2009 appropriation for Mental Retardation Waiver services, DPW used $83 million to serve 1,171 persons from the waiting list.  Pls.' SUF & Defs.' Resp. # 89.  Since DPW provided services with this appropriation to only 274 persons on the emergency waiting list, the other 900 persons on the waiting list who received services that year must not have been in the emergency category.

21.   Admitted.  Plaintiffs further state that although there are 700 to 750 vacancies in the Consolidated Waiver annually (including about two-thirds in residential habilitation programs (such as group homes)), Defendants admit that they have no evidence that any state ICF/MR residents in the past 10 years have

been discharged to the community as a result of vacancies in community-based programs.  Pls.' SUF & Defs.' Resp. ## 96-98.

22.    Denied.    It is undisputed that research shows that people with disabilities, including those with mental retardation, do significantly better if they receive services in a "normal" environment, *i.e.*, the environment in which non-disabled people typically live, and thus individuals who live in institutions, such as the state ICFs/MR, cannot learn to live a normal life because institutions are abnormal settings and individuals who live in them come to rely on the structures of the institutional setting.  Pls.' SUF & Defs.' Resp. ## 49, 51.  It is also undisputed that residents of state-operated ICFs/MR are more segregated than those individuals with mental retardation who receive community services.  Pls.' SUF & Defs.' Resp. # 52.  The evidence also demonstrates that there are some state ICF/MR residents who are upset that they cannot live closer to and have more contact with their families, who have become hopeless and regressed, and who are self-injurious due to the institutional environment.  *See* Pls.' SUF ## 135-139 (to which Defendants offered no response).  Notably, the "harm" that will justify a non-institutionalized person's placement on the emergency waiting list is the possibility of institutionalization in a state ICF/MR, Pls.' SUF & Defs.' Resp. # 79, PUNS Form at 2 (Pls.' Exh. 14), while the continued harm of institutionalization

for decades in such facilities is not sufficient in DPW's view to constitute an "emergency."

23.    Denied as stated.  There are a number of reasons why a person may be categorized as having "emergency" needs. In addition to those reasons stated by DPW, a person may be placed on the emergency waiting list if:  the "family care giver needs immediate support to keep their family member at home (short term -- for 90 days or fewer)"; the "individual needs immediate support to stay in their own/family home (short term -- for 90 days or fewer)"; "immediate supports" are needed to prevent the individual's placement in a state ICF/MR or other institution; or the "individual needs immediate support to maintain his/her employment situation, obtain follow along supported employment or achieve a post-school employment outcome."  PUNS Form at 2 (Pls.' Exh. 14).

24.    Admitted.  By way of further response, the Legislature expected DPW to eliminate the Governor's proposal to fund community mental retardation services for 150 persons on the waiting list from the community mental retardation waiver appropriation and to restore provider rates and funding to meet changing needs for persons in the mental retardation waivers.  House Comm. on Appropriations, *DPW Budget Highlights* at 3 (June 30, 2010) (Pls.' Exh. 48).  Yet, DPW subsequently announced that it intended to use the appropriation to fund

services for 150 persons on the waiting list. DPW, *Budget Update* at 2 (July 6, 2010) (Pls.' Exh. 49).

25.    Admitted to the extent that "those services" refer to the services to be provided to the 150 individuals on the waiting list in FY 2010-2011.

26.    Denied as stated. Plaintiffs admit that DPW's and the Governor's request for waiting list funding for FY 2010-2011 anticipated that the funding would serve 50 persons through the Consolidated Waiver (which would include residential services) at an annualized cost of about $7.5 million and 100 persons aging out of school through the P/FDS Waiver at an annualized cost of $2.6 million. Church Dep. I at 220-21 (Pls.' Exh. 6). By way of further response:

> a.    Defendants had discretion in shaping that request, *i.e.*, determining how much of the requested funding would be used to serve persons in the Consolidated Waiver and how much would be used to serve persons in the P/FDS Waiver. *See* Resp. to DSUF II # 12(c).

> b.    The Legislature's appropriation for FY 2010-2011 did not separately appropriate specific sums to implement DPW's and the Governor's waiting list request for Consolidated and P/FDS Waiver funding. In fact, it was simply part of the large appropriation for "community mental retardation services -

waiver program." *See* Act 2010-1A at 309 (Pls.' Exh. 50).  As such, there is nothing in the Legislature's appropriation that prevents DPW from using that funding as it sees fit as long as it is for community mental retardation waiver services. Indeed, DPW unilaterally decided to implement its waiting list funding for FY 2010-2011 even though the Legislature had intended not to fund that project.  *See* Resp. to DSUF II ## 12(c) n.3 & 24.

27.    Denied.  *See* Resp. to DSUF II # 26.  By way of further response, Defendants admit that they have no idea how much it would cost to provide community services to current state center residents so they cannot assert that there are no state ICF/MR residents whose needs cannot be met without residential programs.  Pls.' SUF & Defs.' Resp. ## 112, 119.

28.    Denied as stated.  Defendants may "anticipate" this to be the case, but there is no way to predict the future with accuracy.

29.    Denied.  Defendants admit that there are no types of services and supports that are provided in ICFs/MR that cannot be and are not currently provided to individuals with mental retardation in the community system in Pennsylvania and that there is no person served in the state ICFs/MR who does not have a very similar counterpart in the community.  *See* Pls.' SUF & Defs.' Resp. ## 46, 47.  Defendants also admit that there is no evidence that any state ICF/MR

24

residents within the last 10 years has ever been placed in any vacancies, even though approximately 450 to 500 vacancies in residential programs arise annually. Pls.' SUF & Defs.' Resp. ## 96, 98. This is not surprising since DPW has instructed its agents to consider only individuals on the emergency waiting list to fill residential vacancies, and there are virtually no state ICF/MR residents on the waiting list. Pls.' SUF & Defs.' Resp. ## 81, 97. Since Defendants have never tried to match persons in the state ICFs/MR with vacancies in existing programs, they have no evidence as to whether it is difficult to match state ICF/MR residents with those vacancies.

     30.   Denied.  By way of further response:

        a.   It is undisputed that DPW has used the carry-forward budget to provide community supports and services for state ICF/MR residents by simply reducing the funds allocated to the state ICFs/MR and using those funds to develop community services for state ICF/MR residents.  DPW further admits that it would be possible to use this strategy to provide community services to more state ICF/MR residents.  Using this strategy, DPW would not need new expansion funding to provide services to state ICF/MR residents and would not incur transition costs. *See* Pls.' SUF & Defs.' Resp. ## 110-111.

25

b.   Placing state ICF/MR residents in vacancies in existing programs would not incur transition costs since no new programs would need to be developed.

c.   To the extent that some new expansion funding is needed to develop community services for state ICF/MR residents, Plaintiffs admit that transition costs will likely be involved. However, it is undisputed that: (1) DPW has no information about historical transition costs, and (2) the amount of transition costs will be affected by the number of individuals discharged because if only a few people are discharged, staffing cannot be reduced. DPW will realize savings by closing units, buildings, or entire institutions. *See* Pls.' SUF & Defs.' Resp. ## 121, 122.

d.   In the plans it prepared to close two state ICFs/MR, DPW determined that there would be higher costs in state dollars in the first two fiscal years of the plan, but that it would realize savings in subsequent years, and those savings would increase each year because the costs of state ICFs/MR are increasing faster than the costs of community services. Pls.' SUF & Defs.' Resp. ## 123-124. DPW does not dispute that it could have used those savings to expand funding for people on the waiting

26

list who are not institutionalized.  Pls.' SUF & Defs.' Resp. #

125.

31.    Denied as stated.  *See* Resp. to DSUF II # 30.

32.    Denied as stated.  The revised report of Plaintiffs' expert, Parker

Dennison & Associates, Ltd. (PDA), assessed five different scenarios -- (1)

development of community services for 300 state ICF/MR residents without

closing any institutions; (2) development of community services for 500 state

ICF/MR residents without closing any institutions; (3) development of community

services for 500 state ICF/MR residents while closing two institutions; (4)

development of community services for 700 state ICF/MR residents while closing

two institutions; and (5) development of community services for 900 state ICF/MR

residents while closing two institutions.  PDA concluded that DPW would incur

costs ranging from $7.8 million to $15.2 million in the first few years, depending

on the scenario.  PDA further concluded that, depending on the scenario, DPW

would realize cumulative savings ranging from $72.6 million and $119.8 million --

approximately 5 to 10 times the cumulative costs -- within eight years of

implementation of the scenarios.  PDA Amended Report at 7 (Pls.' Exh. 34; Defs.'

Exh. F).

33.    Denied as stated.  *See* Resp. to DSUF II # 32.

27

34.    Plaintiffs object to Defendants' reliance on the report of their expert, Mr. Kipper.  Mr. Kipper was retained solely to rebut the report of PDA.  Defs.' Exh. G at 1-2.  He offered no independent analysis.  Plaintiffs did not cite to or rely on PDA's report in their Motion for Summary Judgment.  Defendants cannot be permitted to cite to PDA's report themselves for the apparent purpose of then introducing its rebuttal report.  Notwithstanding this objection, Plaintiffs deny that there is any credible dispute that it will not take more than a few years to realize savings when DPW provides community services to state ICF/MR residents.  Defendants admit that DPW's own staff determined that it would take only two years before savings would be realized.  Pls.' SUF & Defs.' Resp. # 124.  Further, Mr. Kipper did not rebut PDA's analysis of the timelines for cost-savings in the scenarios involving closures.  *See* Defs.' Exh. G at 4 n.6.  Moreover, the analysis used by DPW's rebuttal expert is fundamentally flawed since he based his analysis of cost savings on the savings generated during years when the census reductions at the state ICFs/MR were few and sporadic (mainly due to deaths) and assumed the savings would be the same even when larger numbers of state ICF/MR residents are discharged.  *See* Parker Dep. at 45-50 (Pls.' Exh. 51).

35.    After reasonable investigation, Plaintiffs cannot admit or deny that the census in the state ICFs/MR declined from 3,164 in 1995 to 1,224 in 2009.  By way of further response:

28

JA397

a.    Plaintiffs admit that the census of the state ICFs/MR has decreased since 1995 and that the census as of September 30, 2009 was 1,224.  The census in the state ICFs/MR decreased from approximately 1,450 in FY 2004-2005 to approximately 1,224 in FY 2008-2009.  *See* Governor's Executive Budget for FY 2006-07 at E33.33 (Pls.' Exh. 27); ODP Chart re Deaths at/Discharges from State ICFs/MR (Pls.' Exh. 17).

b.    Between FY 2004-2005 and FY 2008-2009, inclusive, DPW discharged 54 state ICF/MR residents to community-based services while 200 state ICF/MR residents died during the same period.  Pls.' SUF & Defs.' Resp. # 22.

c.    The anticipated reduction in census from July 1, 2009 to July 1, 2010 is expected to be attributable almost exclusively to the deaths of residents and not to discharges to community services.  Pls.' SUF & Defs.' Resp. # 21.

36.    Denied as stated. Plaintiffs admit that there are approximately 1,195 residents in the state ICFs/MR.  Casey Decl. ¶ 5 (Defs.' Exh. B).

37.    Denied.  Plaintiffs admit that since 1996 (not 2000), DPW has closed four state ICFs/MR and four MR units on state hospital grounds.  Casey Decl. ¶ 9 (Defs.' Exh. B). By way of further response, between 1996 and 2000, inclusive,

DPW closed three state centers and has closed only one state center (Altoona Center) since 2000.

38.    Denied.  By way of further response, the e-mail to which Defendants refer states as follows: "Attached is our revised Olmstead Plan. We would welcome the opportunity to discuss this document with you. " *See* email dated June 18, 2010 from Allen W. Warshaw, DPW Chief Counsel, to Robert W. Meek, Plaintiffs' counsel. (Defs.' Exh. I, Att. 1).  Neither that e-mail nor any other actions by Defendants suggested that DPW had adopted the plan.  *See also* Resp. to DSUF II # 2.

Respectfully submitted,

Dated: July 26, 2010          By:   /s/ *Robert W. Meek*
Robert W. Meek – PA 27870
Mark J. Murphy – PA 38564
Robin Resnick – PA 46980
Disability Rights Network of PA
1315 Walnut St., Suite 500
Philadelphia, PA 19107-4705
(215) 238-8070
(215) 772-4126 (fax)
RMeek@drnpa.org

Stephen F. Gold – PA 09880
1709 B. Franklin Pkwy., 2nd Floor
Philadelphia, PA 19103
(215) 627-7100
(215) 627-3183 (fax)
stevegoldada@cs.com

Counsel for Plaintiffs and the Class

30

JA399

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
-----------------------------------------------------------x
FRANKLIN BENJAMIN, et al., on behalf of          :
themselves and all others similarly situated,    :
                                                 :
                    Plaintiffs,                  :
                                                 :        No. 09-cv-01182
        -against-                                :        (Jones, U.S.D.J.)
                                                 :        (Carlson, U.S.M.J.)
                                                 :
DEPARTMENT OF PUBLIC WELFARE OF                  :        (Am. Complaint
THE COMMONWEALTH OF                              :        Filed 7/14/09)
PENNSYLVANIA, et al.,                            :
                                                 :
                    Defendants,                  :
                                                 :
        -and-                                    :
                                                 :
CRAIG SPRINGSTEAD, by and through his            :
father and guardian, BERTIN SPRINGSTEAD,         :
et al.,                                          :
                                                 :
                    Proposed Intervenors.        :
-----------------------------------------------------------x
```

## SPRINGSTEAD INTERVENORS' MOTION
## TO STAY FORMAL PROCEEDINGS

Craig Springstead, by and through his father and guardian, Bertin

Springstead, Maria Meo, by and through her mother and guardian, Grace Meo,

Daniel Bastek, by and through his father and guardian, John Bastek, Michael

Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by and through

her father and guardian, Joseph Lambo, Richard Clarke, by and through his father

and guardian, Leonard Clarke, Richard Kohler, by and through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend, Alfred Sheppard (collectively, the "Springstead Intervenors"), respectfully move this Court to stay proceedings in the above-captioned case until this Court receives the decision of the Third Circuit in the Springstead Intervenors' current appeal or until the expiration of one hundred eighty (180) days, whichever is sooner.

For the reasons more fully set forth in the accompanying memorandum, the requested stay is appropriate because: (1) the requested stay is of reasonable duration; (2) the Springstead Intervenors will incur a significant hardship if this Court were to proceed in this action before the United States Court of Appeals for the Third Circuit issues an opinion on the Springstead Intervenors' appeal; (3) the requested stay will not result in any hardship to the current parties to the litigation; and (4) the requested stay promotes judicial economy.

                                        Respectfully submitted,

Dated:  Philadelphia, Pennsylvania      **VAIRA & RILEY, P.C.**
        November 19, 2010


                                        By:   /s/ John E. Riley
                                              John E. Riley
                                              PA ID# 22504
                                              William J. Murray, Jr.
                                              PA ID# 73917

JA401

1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 789-9405
(215) 751-9420 (fax)

Of Counsel:

Owen H. Smith
David F. Bacon IV
Benjamin J. Hoffart
**SIDLEY AUSTIN LLP**
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Proposed Intervenors*

JA402

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, | : | 09-cv-1182 |
| RICHARD GROGG, FRANK | : | |
| EDGETT, SYLVIA BALDWIN, | : | Hon. John E. Jones III |
| ANTHONY BEARD, and all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC | : | |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA et al. | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM & ORDER**

**December 15, 2010**

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

**I.     INTRODUCTION**

This is a class action, asserted by Franklin Benjamin[1], Richard Grogg[2],

---

[1]By and through his next friend, Andree Yock.

[2]By and through his next friend, Joyce McCarthy.

1

JA403

Frank Edgett[3], Sylvia Baldwin[4], and Anthony Beard[5] on behalf of all persons who: (1) currently or in the future will reside in on of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.  (*See* Doc. 9, Amended Complaint; Doc. 17, Order Certifying Class.)  Plaintiffs assert that the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") and Michael Nardone, the Secretary of DPW[6] (collectively, "Defendants"), have failed to provide appropriate community services in violation of Title II of the Americans with Disabilities Act ("ADA"), ("Title II"), and Section 504 of the Rehabilitation Act ("RA"), ("Section 504").  Plaintiffs seek declaratory and injunctive relief.  Before the Court is the "Springstead Intevenors'"[7] Motion to Stay Formal Proceedings.  (Doc. 83.)  For the subsequent reasons, we will deny the Motion to Stay.

---

[3]By and through his next friend, Joyce McCarthy.

[4]By and through her next friend, Shirl Meyers.

[5]By and through his next friend, Nicole Turman.

[6] The action was originally filed against Estelle Richman, as Secretary of DPW.  Harriet Dichter replaced Ms. Richman as Secretary, but resigned on September 15, 2010.  Michael Nardone is now acting Secretary.

[7]The Springstead Intervenors are Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Maria Kashatus, and Wilson Sheppard.

2

## II.    BACKGROUND

The Springstead Intervenors are individuals who assert that they are *de facto* members of the named class but who oppose community placement.  They maintained that any relief granted in favor of Plaintiffs would deprive them of their right to choose to remain in institutions rather than community placement, and thus filed a Motion to Intervene on November 10, 2009 (Doc. 27).  On March 10, 2010, we denied the Motion to Intervene for myriad reasons.  While we did find that their application was timely and that their concern in the subject matter of the litigation was understandable, we found that they did not have a significantly protectable interest in the lawsuit because they were, by definition, explicitly excluded from the class.  The class definition was narrowly tailored, and thus any resolution would bind only those who "do not or would not oppose community placement".  Further, we found that, even if the Springstead Intervenors had a protectable interest in the litigation, any such interest was adequately represented by the parties to the action.  (*See* Doc. 41.)  The Springstead Intervenors appealed our decision to the United States Court of Appeals for the Third Circuit, and argument is scheduled for February, 2011.  The Springstead Intervenors filed the instant Motion to Stay on November 19, 2010.  The Motion is ripe for disposition.

## III.    DISCUSSION

3

JA405

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936). To exercise that discretion within the bounds of the law, a district court must "weigh competing interests and maintain an even balance." *Id.* Courts should consider four factors: (1) the length of the requested stay; (2) the hardship that the movant would face if the stay was not granted; (3) the injury that a stay would inflict on the non-movant; and (4) whether granting a stay would streamline the proceedings by simplifying issues and promoting judicial economy. *See Structural Group, Inc. v. Liberty Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 82266, *13 (M.D. Pa. October 16, 2008) (citing *Landis*, 299 U.S. at 254-55).

In support of the Motion, the Springstead Intervenors argue that the stay requested is of reasonable duration as their appeal will be argued before the Third Circuit in a matter of a few months. Further, they maintain that failure to grant the stay will result in significant hardship to their interests because disposition of the pending motions for summary judgment or settlement of the litigation will result in significant impairment of their interest to remain in state ICF/MRs. The Springstead Intervenors moreover allege that the stay would result in no hardship to the existing parties and would, rather, promote their interest in the event that the

4

Third Circuit reverses our denial of their prior motion to intervene.  Finally, and relatedly, the Springstead Intervenors argue that a stay would promote efficiency and judicial economy because it would avoid repeating the litigation if the Third Circuit decides the appeal in their favor.

Plaintiffs oppose the Motion and first argue that the stay is of indefinite duration because there exists no adequate way to determine when any opinion would be issued by the Third Circuit.  Plaintiffs assert that even if the Third Circuit issues an opinion within the 180 days that the Springstead Intervenors request, that length of time is unduly burdensome given the advanced stage of the proceedings and the pending settlement discussions.  Furthermore, Plaintiffs note that the Springstead Intervenors took no prompt action to expedite their appeal and waited eight months to request a stay.  Second, Plaintiffs argue that the Springstead Intervenors will suffer no hardship if a stay is not granted because, as the Court decided previously, they have no protectable interest that could be jeopardized by the litigation because they are explicitly excluded from the class.  Third, Plaintiffs maintain that they will suffer significant hardship if this litigation is prolonged further because the only practical result is further delay of vindication of their civil rights.  Finally, Plaintiffs assert that a stay will merely delay rather than streamline the proceedings.

5

We find that the Springstead Intervenors' request is unwarranted.  First, we find that the length of the requested stay under these particular circumstances is unreasonable.  While under a different fact pattern a stay of six months would not seem excessive, we find that this request made by a non-party when the litigation is beyond discovery and potentially soon coming to a close is, indeed, of an unreasonable duration.  Further, we maintain our conviction that the Springstead Intervenors do not have a protectable interest that is at stake in this litigation.  As we noted previously, those who do or would oppose community placement, like the Springstead Intervenors, are specifically excluded from the class, and we would neither approve a settlement nor issue an injunction that litigates the rights of those who are not before the Court.  Therefore, we do not believe that denying a stay and allowing the litigation to proceed would in fact result in *any* hardship to the Springstead Intervenors.

Though we find that the Springstead Intervenors would suffer no significant hardship, we believe that the parties to this litigation would, indeed, face hardship if the proceedings were stayed.  The litigation is now at a stage where it is ripe to be resolved; either by mutual agreement of the interested parties or by disposition of the cross-motions for summary judgment, and the parties have significant stake in effective and prompt resolution.  Finally, we do not believe that staying the

6

proceedings will promote judicial economy and streamline the proceedings. While expeditiously resolving cases might not be the paramount or sole concern for a district court, it is important, and there are no factors present that suggest that staying the proceedings could result in more efficient or effective resolution of this case.

**IV.   CONCLUSION**

In sum, we find that the Springstead Intervenors have failed to establish "a clear and convincing case of hardship or inequity that will result if a stay is not granted." *Mid-Valley Candy Co. v. R.J. Reynolds Tobacco Co.*, 2002 WL 207116, *1 (E.D. Pa. Feb. 8, 2002). Therefore, we will deny their Motion to Stay Proceedings (Doc. 83) and allow the action to proceed.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

The Springstead Intervenors' Motion to Stay Proceedings (Doc. 83) is **DENIED.**

/s/ John E. Jones III
John E. Jones III
United States District Judge

7

JA409

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, | : | 09-cv-1182 |
| RICHARD GROGG, FRANK | : | |
| EDGETT, SYLVIA BALDWIN, | : | Hon. John E. Jones III |
| ANTHONY BEARD, and all others | : | |
| similarly situated, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC | : | |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and HARRIET | : | |
| DICHTER, in her official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM & ORDER</u>**

**January 27, 2011**

## I.    INTRODUCTION

This is a class action, asserted by Franklin Benjamin[1], Richard Grogg[2],

---

[1]By and through his next friend, Andree Yock.

[2]By and through his next friend, Joyce McCarthy.

JA410

Frank Edgett[3], Sylvia Baldwin[4], and Anthony Beard[5] on behalf of all persons who: (1) currently or in the future will reside in on of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement. (*See* Doc. 9, Amended Complaint; Doc. 17, Order Certifying Class.) Plaintiffs assert that the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") and Harriet Dichter, the Secretary of DPW[6] (collectively, "Defendants"), have failed to provide appropriate community services in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134 ("Title II"), and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794 ("Section 504"). Plaintiffs seek declaratory and injunctive relief.

Presently before the Court are two motions for summary judgment. Plaintiffs filed their Motion for Summary Judgment ("Plaintiffs' Motion") on June 23, 2010 (Doc. 48) and Defendants filed their Motion for Summary Judgment

---

[3]By and through his next friend, Joyce McCarthy.

[4]By and through her next friend, Shirl Meyers.

[5]By and through his next friend, Nicole Turman.

[6] The action was originally filed against Estelle Richman, as Secretary of DPW. Ms. Dichter since replaced Ms. Richman, but resigned on September 15, 2010. Michael Nardone is now acting Secretary.

2

("Defendants' Motion") on June 29, 2010 (Doc. 51). Both Motions have been

fully briefed, including an amicus brief filed by the United States in support of

Plaintiffs' Motion (*see* Doc. 62), and thus each is ripe for disposition. The parties

agree that there is no material factual dispute in this action and each asks the Court

to answer one legal question – whether DPW has violated Title II and Section 504

by failing to provide Plaintiffs with community support and services. Because one

common question predominates, we will resolve both Motions in this

Memorandum. For the reasons that follow, we hold that Defendants have not

complied with the integration mandates of the relevant statutes. An appropriate

Order shall enter after our analysis.

## II.    PROCEDURAL HISTORY

Plaintiffs filed the Complaint in this action on June 22, 2009 (Doc. 1) and an

Amended Complaint on July 14, 2009 (Doc. 9). Plaintiffs filed an unopposed

Motion to Certify the Class on August 31, 2009, and the Court granted the Motion

on September 2, 2009 and certified the above-named class. (Doc. 17.) On January

25, 2010, the Court denied Defendants' Motion to Dismiss (Doc. 38), and

Defendants then filed their Answer to the Amended Complaint on February 24,

2010 (Doc. 39). In the meantime, a group of individuals filed a Motion to

Intervene pursuant to Federal Rule of Civil Procedure 24, asserting that they had

interests in the litigation that were not adequately represented by the class.  (*See* Doc. 27.)  The Court denied that Motion on March 10, 2010 (Doc. 41), and the proposed intervenors filed their notice of appeal of that decision on March 30, 2010 (Doc. 42).

As noted above, Plaintiffs filed their Motion for Summary Judgment on June 23, 2010 (Doc. 48) and Defendants filed their Motion for Summary Judgment on June 29, 2010 (Doc. 51).  We referred the action to Magistrate Judge Martin Carlson for settlement discussions on October 6, 2010, but those discussions have thus far been unsuccessful.  Though the parties have not foreclosed the possibility of further settlement negotiations, we believe the most prudent course is to resolve the motions that have been pending for months and to thereafter grant the opportunity to the parties to settle on the ultimate remedy themselves prior to additional and possibly unnecessary mandates by the Court.

## III.   FACTUAL BACKGROUND

DPW is responsible for providing services to Pennsylvanians with mental retardation under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1).  One of the means by which DPW provides services to individuals with mental retardation is through the operation of five state Intermediate Care Facilities

4

for Persons with Mental Retardation ("ICFs/MR").[7]  The services provided at these facilities are covered by Medical Assistance, and, thus, DPW receives a federal government funding match for their costs.  The five state ICFs/MR housed a total of 1,272 individuals in 2008 and 1,224 individuals in 2009.  In the five fiscal years between 2004 and 2009, fifty-four residents were discharged to community-based services, and two-hundred residents died.  The anticipated census reduction in 2009-2010 is expected to be attributable almost exclusively to deaths rather than discharges.  The average cost to provide services in the state ICFs/MR is approximately $240,000 per resident per year, and is expected to increase to approximately $256,000 per resident per year in the following fiscal year.  In addittition to the state-run ICFs/MR, DPW also funds privately-operated ICFs/MR that service approximately 2,500 persons with mental retardation.

DPW also funds community-based mental retardation services in addition to the state-operated or -funded institutions.  These residential services can include small group homes, family living, vocational training, supported employment, development of skills, socialization, therapies, home health-care, and other support services.  The services are funded primarily through Medical Assistance through a

---

[7]These facilities are the Ebenseburg Center, located in Cambria County, the Hamburg Center, located in Berks County, the Polk Center, located in Venango County, the Selinsgrove Center, located in Snyder County, and the White Haven Center, located in Luzerne County.

5

waiver system, of which the federal government pays a portion of costs. Though there is a limit to the number of persons who can receive services under these programs, the federal government can grant permission to increase that limit and has readily done so in the past.

Plaintiff Benjamin has been institutionalized at the Ebensburg ICF/MR since 1966. Plaintiffs Grogg and Edgett have been institionalized at the Selinsgrove ICF/MR for twenty (20) years each. Plaintiff Baldwin has been institutionalized at the Polk ICF/MR since 1990. Plaintiff Beard has been institutionalized at the Ebensburg ICF/MR for forty-two (42) years. All named Plaintiffs' mental retardation limits one or more of their major life activities but, with proper support, they could reasonably live in the community.

With appropriate community services, all of the named Plaintiffs could live in more integrated community settings rather than institutions because they would still have available all services and supports that are currently available to them. Further, pursuant to the principle of "normalization" that the Commonwealth of Pennsylvania has embraced[8], individuals with disabilities do significantly better if they have the opportunity to live in a "normal" environment, such as the

---

[8]"This chapter [regarding community homes for individuals with mental retardation] is based on the principle of normalization which defines the right of the individual with mental retardation to live a life which is as close as possible in all aspects to the life which any member of the community might choose. . . ." 55 Pa. Code § 6400.1.

environment available when receiving community-based services.  Though the

environment in which institutionalized individuals live may be "normal" in the

sense that it is all they have known for the better part of their lives, the individuals

are more segregated because:

> most state ICFs/MR are in more rural parts of the state; most state
> ICF/MR residents live in units ranging from about 16 to 20 people; day
> services are usually provided on the grounds of the facilities; and
> residents do not have as much opportunity to interact with a wide range
> of people and to have access to community activities.

(Doc. 50, "Plaintiffs' Statement of Material Facts", ¶ 52.)  The named Plaintiffs

and others, and their appropriate guardians or family members, are unopposed to

discharge to the community and some have been actively, albeit unsuccessfully,

seeking such an opportunity.

Individuals are selected for community-based services via a waiting list that

is divided into three categories.  This categorization is determined by filling out a

"Prioritization of Urgency for Need of Services" ("PUNS") form for each person

applying for services.  Those who need services immediately are designated as

"emergency", those who will need services within two years are included on the

waiting list as "critical", and those who will need services within two to five years

are designated as "planning".  Individuals are placed in the emergency waiting list

if "community supports are needed to 'keep him/her from being placed in a state

7

center, nursing home, large ICF/MR or other congregate settings." (Doc. 50 ¶ 79.) As of the filing of Plaintiffs' Motion, only 113 state ICF/MR residents had PUNS forms completed to put them on a waiting list.

Placement on a waiting list for community services does not, however, guarantee prompt placement in those programs. Indeed, no state ICF/MR residents in the past ten years have been discharged to the community as a result of these routine vacancies.[9] Each year, there are around 700-750 vacancies for these services, and DPW instructs its agents to consider only those individuals who are on or meet the criteria for the emergency waiting list to fill the vacancies. When this litigation commenced, DPW had not formulated an integration plan (discussed below) that set benchmarks for the eventual discharge of institutionalized persons; but, on June 18, 2010, DPW apparently formulated such a plan ("the Plan"). (*See* Doc. 52 ¶ 37; Doc. 51-7.)

## IV.    DISCUSSION

Plaintiffs assert that, because they are qualified for and unopposed to community integration, their continued institutionalization violates the anti-discrimination mandates of the ADA and Section 504. Plaintiffs argue that,

---

[9]Fifty-four residents have been discharged since fiscal year 2004-2005; thirty-six of those residents were discharged as a result of special funding intended to close a former state ICF/MR.

because DPW has failed to provide services in the most integrated setting warranted and has failed to implement any plan to do so, the Court should grant their Motion for Summary Judgment and issue appropriate declaratory and injunctive relief to remedy those failures. In response, and in support of their Motion for Summary Judgment, Defendants admit Plaintiffs' pleadings to an extent, but counter that they have established the affirmative defense that the relief Plaintiffs seek would require a fundamental alteration of DPW's services and also deprive other individuals in need of important services. Defendants maintain that the eleventh-hour plan adopted in June of 2010 defeats Plaintiffs' claims regarding the absence of a viable integration plan, and argues that summary judgment should be granted in Defendants' favor because the Plan satisfies the requirements of the integration mandates.

### A.    Legal Framework of the Integration Mandate

#### 1.    The ADA and the RA

In enacting the ADA, Congress made several important findings applicable to that statute. Relevant for these purposes, Congress asserted that "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society", 42 U.S.C. § 12101(a)(1), and further found that:

(2) historically, society has tended to isolate and segregate individuals

9

> with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . .;
>
> . . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices. . . .

42 U.S.C. § 12101(a)(2), (3), (5).  Thus, Congress enacted the ADA to provide "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities", 42 U.S.C. §12101(b)(1), and establish "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities", 42 U.S.C. 12101(b)(2).  Congress set forth prohibitions regarding discrimination against persons with disabilities in employment (Title I), public services (Title II), and public accommodations provided by private entities (Title III).

This action concerns the ADA's prohibition against discrimination in public services in Title II.  Title II provides: "Subject to the provisions of this subchapter, no qualified individual with a disability[10] shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

---

[10]"Qualified individual with a disability" is defined as "an individual who, with or without reasonable modifications . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

10

or activities of a public entity[11], or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. Congress further provided that "The remedies,

procedures, and rights set forth in [§ 505 of the RA] shall be the remedies,

procedures, and rights this title provides to any person alleging discrimination on

the basis of disability in violation of [§ 12132]."

Congress directed the Attorney General to promulgate regulations to fully

implement the provisions of Title II. 42 U.S.C. § 12134. As instructed, the

Attorney General issued "General prohibitions on discrimination", including the

important "integration regulation" and "reasonable-modification regulation". *See

Olmstead v. L.C.*, 527 U.S. 581, 592 (1999). The integration regulation mandates

that "[a] public entity shall administer services, programs, and activities in the most

integrated setting appropriate to the needs of qualified individuals with

disabilities." 28 C.F.R. § 35.130(d).

### 2.    *Olmstead v. L.C.*

The Supreme Court addressed the integration mandates and subsequent

regulations of the ADA and RA in the seminal case of *Olmstead v. L.C.* In

*Olmstead*, two residents of mental-health institutions alleged that the State of

---

[11]"Public entity" means "any State or local government. . . ." and any instrumentality of a State or local government. 42 U.S.C. § 12131(1)(A)-(B).

11

Georgia violated the ADA's integration mandate by unnecessarily instituionalizing

them instead of placing them in community-based programs.  A plurality of

Justices construed the ADA's provisions and held that "[u]njustified isolation . . .

is properly regarded as discrimination based on disability."  527 U.S. 581, 597

(1999).  The Court noted that the ADA's

> [r]ecognition that unjustified institutional isolation of persons with
> disabilities reflects two evident judgments. First, institutional placement
> of persons who can handle and benefit from community settings
> perpetuates unwarranted assumptions that persons so isolated are
> incapable or unworthy of participating in community life. . . . Second,
> confinement in an institution severely diminishes the everyday life
> activities of individuals, including family relations, social contacts, work
> options, economic independence, educational advancement, and cultural
> enrichment.

*Id.* at 600-01.  The Supreme Court further recognized that, although the states have

a responsibility to provide community services, that responsibility "is not

boundless"; but, rather, is limited by the ADA's "reasonable modification" and

"fundamental alteration" provision.  *Id.* at 603.  These provisions provide that a

state need not make alterations that would require a fundamental alteration of the

nature of the services provided or the program under which they operate.  The

plurality explained the justification for these defenses as follows:

> Sensibly construed, the fundamental-alteration component of the
> reasonable-modifications regulation would allow the State to show that,
> in the allocation of available resources, immediate relief for the plaintiffs
> would be inequitable, given the responsiblity the State has undertaken

12

for the care and treatment of a large and diverse population of persons
with mental disabilities.

*Id.* at 604.  Ultimately, *Olmstead* identified three elements in an integration case:

(1) that community placement is appropriate for the individual (as determined by

the state's professionals); (2) that the individual does not oppose transfer to a more

integrated setting; and (3) that a placement in a more integrated setting can be

reasonably accommodated, "taking into account the resources available to the State

and the needs of others with mental disabilities."  *Id.* at 607.  If all three elements

are present, the state is required to provide community-based services.

### 3.    *Frederick L. v. DPW I and Frederick L. v. DPW II*

The United States Court of Appeal for the Third Circuit visited the confines

of the fundamental-alteration defense with respect to fiscal considerations in

*Frederick L. v. Department of Public Welfare*, 364 F.3d 487 (3d Cir. 2004)

("*Frederick L. I*") and *Frederick L. v. Department of Public Welfare*, 422 F.3d 151

(3d Cir. 2005) ("*Frederick L. II*").  In *Frederick L. I*, a class of individuals who

were institutionalized in the Norristown State Hospital appealed the district court's

judgment that found that DPW sufficiently established that accelerated community

placement for the plaintiffs would require a fundamental alteration of DPW's

services.  The Third Circuit noted that establishment of the fundamental alteration

defense relies on several relevant factors, including "the state's ability to continue

13

meeting the needs of other institutionalized mental health patients for whom community placement is not appropriate, whether the state has a waiting list for community placements, and whether the state has developed a comprehensive plan to move eligible patients into community care settings." *Frederick L. I*, 364 F.3d at 495; *see also* 28 C.F.R. § 42.511(c); 45 C.F.R. § 84.12(c). The Third Circuit rejected the appellants' contention that the district court solely focused on the cost-constraints of integration, and further noted that "the judiciary is not well-suited to superintend the internal budgetary decisions of DPW. . ." *Id.* at 497-98. Nonetheless, the Court found that the district court erred in "accept[ing] the Commonwealth's reliance on past progress without requiring a commitment by it to take all reasonable steps to continue that progress. . . ." *Id.* at 499. In vacating and remanding the decision, the Court articulated:

> After all, what is at issue is compliance with two federal statutes enacted to protect disabled persons. . . . [Of that group, institutionalized persons] are perhaps the most vulnerable. It is a gross injustice to keep these disabled persons in an institution notwithstanding the agreement of all relevant parties that they no longer require institutionalization. We must reflect on that more than a passing moment. It is not enough for DPW to give passing acknowledgment of that fact. It must be prepared to make a commitment to action in a manner for which it can be held accountable by the courts.

*Id.* at 500.

The action in *Frederick L. I* returned to the Third Circuit the following year.

14

JA423

Upon remand, the district court again ruled in favor of DPW, finding that DPW offered sufficient proof of a commitment to deinstitutionalization.  On appeal, DPW argued that it fully satisfied the Third Circuit's requirements because it "had 'given assurance' that it will make 'ongoing progress toward community placement.'" *Frederick L. II*, 422 F.3d at 156.  The Third Circuit interpreted *Olmstead* to require a comprehensive working plan as necessary to a fundamental alteration defense, and held that, although DPW attempted to construct a plan, its efforts were insufficient to establish that defense.  Although DPW offered promises of its commitment to deinstitutionalization, it "failed to demonstrate in reasonably measurable terms how it will comply with that commitment" such as when eligible patients could expect discharge.  *Id.* at 158.  Good-faith intentions without more are insufficient, according to the Third Circuit, because "[t]heir implementation may change with each administration or Secretary of Welfare, regardless of how genuine. . . ." *Id.*  Because DPW's plan lacked sufficient benchmarks regarding deinstitutionalization, the Third Circuit again vacated and remanded the decision with specific guidance, noting that a "viable integration plan *at a bare minimum* should specify the time-frame or target date for patient discharge, the approximate number of patients to be discharged each time period, the eligibility of discharge, and a general description of the collaboration required [between authorities to

15

effectuate the transition].”  *Id.*  at 160.

**B.     The Motions for Summary Judgment**

In this action, we are tasked with answering the same question that was at

issue in *Frederick L. I* and *Frederick L. II*, and similar cases: Does Defendants’

segregation of Plaintiffs in public institutions constitute discrimination under Title

II and Section 504?  There is no dispute that community placement would be

appropriate for an individual with appropriate services and supports and that the

individuals in this litigation are not opposed to such a placement.  Indeed, the

definition of the class itself satisfies the first two elements articulated in *Olmstead*.

Further, the existence of community programs demonstrates that providing

community support could be reasonably accomodated.  The central inquiry for the

Court to resolve, therefore, is whether Defendants have demonstrated a

commitment to action such that granting Plaintiffs’ requested relief would require a

fundamental alteration of the services already provided by the Commonwealth.

Defendants assert that there is no violation of Title II and Section 504

because DPW now has an *Olmstead* plan.  According to Defendants, DPW will

seek funding to move at least 50 institutionalized persons into community

placements per year, if DPW determines a placement is available.  Defendants

assert that the Plan identifies the process for prioritizing individuals for community

16

placement and moving them "as money comes available", and provides for the development of programs to educate residents and their guardians about the benefits of community services.  (Doc. 66 p. 11.)  Defendants admit, however, that there are contingencies to these commitments: First, no individual who would not thrive in a community placement may be moved; and, second, the money reserved to move instituionalized individuals may be directed to other, non-institutionalized individuals if a deputy secretary determines that it is necessary.  (*Id.* pp. 11-12; Doc. 51-7 p. 4.)  Defendants argue that, because the Plan was only adopted on June 18, 2010, there is no "history of implementation", but, "DPW has a long history of moving people from State centers into community placements."  In fact, Defendants note:

> From 1995 to 2009, the census at State ICFs/MR has decreased from 3164 to 1224.  Today, fewer than 1200 individuals receive services in State centers.  Since 2000, Defendants have closed four State ICFs/MR, and four MR units on the grounds of State hospitals.  Thus, there is no reason to question DPW's commitment to action.

(Doc. 66 p. 13.)  Noticeably missing from that recitation, however, is any indicator of *why* the census decreased, and no assurances that it was because of DPW's commitment to action rather than because of deaths or similar occurrences.

Defendants note that they will place no residents in the community until the new fiscal year beginning in July of 2011, and then "it would not be realistic to

17

commit to seek money for more than 50 residential placements." (Doc. 66 p. 15.)

Defendants highlight the Commonwealth of Pennsylvania's deficit and argue that

DPW simply does not have the funds to transfer individuals from institutions,

regardless of the eventual savings such community placements would eventually

realize. Further, Defendants maintain that the limited universe of community

placements must first be filled by those persons who have no services. Those

individuals take priority over institutionalized persons because "[f]or at least the

past 16 years, DPW has tried to avoid admitting new residents into the State

centers." (Doc. 52 ¶ 20.) In sum, Defendants argument centers around the

existence of the Plan that was adopted on June 18, 2010, and because DPW now

has a written plan, it has "committed itself" to desintitutionalization and, thus,

satisfies the requirements of *Olmstead*. Beyond asserting their compliance with the

integration mandates, Defendants also assert that Plaintiffs' request for

desintitutionalization itself violates the ADA and RA because, according to

Defendants, it would require them to deny services to other individuals. (Doc. 66.

P. 17.)

Plaintiffs and the United States as Amicus argue that Defendants' Plan,

"hastily assembled at the eleventh hour", does not amount to an *Olmstead* plan that

is sufficient to establish the fundamental alteration defense. In support of this

18

argument, Plaintiffs argue that "(1) on its face, the Plan lacks even the minimal

required components; (2) the Plan fails to demonstrate the requisite commitment to

integration; and (3) Defendants have not implemented the Plan." (Doc. 61 p. 15.)

First, Plaintiffs highlight that the Plan lacks any time frames or dates for discharge,

and instead provides only a target starting date of July 2011. Further, Plaintiffs

maintain that the Plan's vague declarations of a commitment to integration, without

identifiable benchmarks, are insufficient to demonstrate a "tangible commitment to

action toward deinstitutionalization for which they can be held accountable." (*Id.* p.

17.) Plaintiffs highlight that the Plan is "riddled with exceptions and loopholes."

(*Id.* p. 18.) Finally, Plaintiffs note that DPW has failed to implement the Plan, and

expresses no intention to do so until July of 2011, nearly a year after its adoption.

###    C.    Analysis

We note at the outset of our analysis that Plaintiffs filed their Motion before

any awareness of DPW adopting the June 18, 2010 Plan upon which they rely to

defeat liability. The existence of the Plan does not, however, automatically defeat

liability because we do not read *Olmstead*, *Frederick L. I*, or *Frederick L. II*, or any

of their progeny to stand for the proposition that a written document purporting a

commitment to deinstitutionalization alone satisfies the requirements of those

cases. Further, voluntary cessation of an illegal practice does not render an action

19

JA428

moot or automatically defeat liability for that practice, especially where there is a reasonable expectation where the violation may again occur or the cessation of the practice (here, the adoption of a stated practice) has *not* "completely and irrevocably eradicated the effects of the alleged violation." *See, e.g. DeJohn v. Temple Univ.*, 537 F.3d 301, 309-11 (3d Cir. 2008) (quoting *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979)). Thus, we will consider the existence of the Plan and the terms of the Plan, along with other appropriate factors, to evaluate whether DPW has sufficiently demonstrated an affirmative commitment to integration. We ultimately find that it has not.

As the Third Circuit articulated in *Frederick L. II*, "[g]eneral assurances and good-faith intentions neither meet federal law nor a patient's expectations" without providing when, if ever, a patient can expect to be discharged. *Frederick L. II*, 422 F.3d at 158. Indeed, the possibility of placement is, based upon the plain terms of the Plan, quite remote. It is contingent upon the prioritization of non-institutionalized individuals, (based upon DPW's stated policy of, essentially, using institutionalization as a last resort), DPW's assessment of the availability of funding, and the broad authority to use the funds that are allegedly directed to integrate institutionalized persons to place those who are not presently institutionalized. On its face, the Plan gives DPW nearly unfettered discretion to

20

disregard its terms – for each of the 50 individuals it purports to place each year, the deputy secretary could find, based upon unidentified prioritization procedures, that the requisite funds be directed to a non-institutionalized person.  Clearly, those who are currently receiving no services should have the opportunity to acquire supports; but within the dictates of the law DPW cannot continue to ensure this by relegating institutionalized individuals to second-class status in order to avoid subjecting any new individual to the same segregation.  We recognize that avoiding institutionalization is an important goal; however, it is not one that can be achieved by discriminating against individuals who have equal rights to community support.

Beyond the deficient commitment to action on the face of the Plan, the absence of implementation, or even any demonstrated step *toward* implementation, is insufficient for Defendants to assert a fundamental alteration defense. Defendants cite fiscal considerations for the lack of any demonstrable progress toward deinstitutionalization, and readily admit that no steps will be taken toward that goal until the new fiscal year.  Even overlooking the numerous loopholes and contingencies of the Plan, there is nothing on the record that illustrates any sort of viability of the Plan.  Defendants cannot avail themselves of a fundamental alteration defense to their continued violation of the ADA and RA by merely

21

supplying a written document that alleges a future commitment.  Considering the

absence of concrete benchmarks for deinstitutionalization in the contingency-

ridden Plan, no record of actual implementation of the Plan, and a history of

unnecessary segregation of and discrimination against institutionalized persons, we

cannot conclude that DPW has complied with or will comply with the integration

mandates of the ADA and RA.

## V.    CONCLUSION

Based upon the undisputed facts, Plaintiffs have established that Defendants

have violated the integration mandates of Section II of the ADA and Section 504 of

the RA by unnecessarily institutionalizing Plaintiffs.  Despite Defendants'

protestations, Plaintiffs are not seeking any impermissible form of "queue-

jumping" and demanding they receive services to the detriment of other

individuals.  Plaintiffs seek to be appropriately considered for community

placement, rather than be relegated to a class of persons who receive the

placements only after another class is entirely served.  Therefore, the Court will

grant Plaintiffs' Motion for Summary Judgment (Doc. 48) and deny Defendants'

Motion for Summary Judgment (Doc. 51).  We are not blind to the budgetary

constraints that Pennsylvania faces, and we are certainly mindful that DPW has

limited resources; however, DPW cannot continue its practice of unnecessarily

JA431

segregating individuals based upon their status as institutionalized.  With that said,

the present posture of this case is such that we are in no position to issue an

injunction given the need for extensive detail therein and eventual oversight for

any such relief provided.  We will, therefore, schedule a telephonic conference

with the parties to address the need for further submissions and a possible hearing

regarding the extent of injunctive relief.[12]

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.    Defendants' Motion for Summary Judgment (Doc. 51) is **DENIED;**

2.    Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED**;

     a.    Judgment is entered in favor of Plaintiffs Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, Anthony Beard, and all others similarly situated;

     b.    It is **DECLARED** that the Defendants are not in compliance with the integration mandates of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 with respect to the named Plaintiffs and all others similarly situated;

4.    This action will remain open until determination of the proper remedy;

5.    A telephonic conference call to address the procedure for determining the appropriate relief is scheduled for Monday, January 31, 2011 at 10:00 a.m.;

---

[12]We now encourage the parties, imbued with this mandate, to return to mediation to formulate a resolution that implements a realistic plan that fully complies with the ADA and RA.

23

JA432

6.    Counsel for Plaintiffs shall initiate the conference call.  The Court's phone number is (717)221-3986; and

7.    All counsel shall be prepared to proceed at the time of the said call.


<u>/s/ John E. Jones III</u>
John E. Jones III
United States District Judge

24

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 10-1908

_____

FRANKLIN BENJAMIN, by and through his
next friend, Andree Yock; RICHARD GROGG;
FRANK EDGETT, by and through their next
friend, Joyce McCarthy; SYLVIA BALDWIN, by
and through her next friend Shirl Meyers;
ANTHONY BEARD, by and through his next
friend, Nicole Turman, on behalf of themselves
and all others similarly situated

v.

DEPARTMENT OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA;
SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA

CRAIG SPRINGSTEAD, by and through his
father and guardian, Bertin Springstead;
MARIA MEO, by and through her mother and
guardian, Grace Meo; DANIEL BASTEK, by and
through his father and guardian, John Bastek;
MICHAEL STORM, by and through his
guardian, Polly Spare; BETH ANN LAMBO, by
and through her father and guardian, Joseph
Lambo; RICHARD CLARKE, by and through his
father and guardian, Leonaed Clarke; RICHARD
KOHLER, by and through his sister and
guardian, Sara Fuller; MARIA KASHATUS, by
and through her father and guardian, Thomas Kashatus;
WILSON SHEPPARD, by and through his brother
and next friend, Alfred Sheppard,

Appellants

(Pursuant to Fed. R. App. P. 12(a))

JA434

_____

On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil No. 1-09-cv-01182)
District Judge:  Hon. John E. Jones, III

_____

Argued February 7, 2011

BEFORE:  JORDAN, GREENAWAY, JR.,
and STAPLETON, *Circuit Judges*

JUDGMENT

This cause came on to be heard on the record from the United States District Court
for the Middle District of Pennsylvania and was argued by counsel on February 7, 2011.

On consideration whereof, it is now here ORDERED AND ADJUDGED by this
Court that the judgment of the said District Court entered March 10, 2010, be and the
same is hereby AFFIRMED.  Costs taxed only against Appellants-Intervenors.  All of the
above in accordance with the opinion of this Court.

ATTEST:

/s/ Marcia M. Waldron
Clerk

DATED: April 5, 2011

2

JA435

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 10-1908
_____

FRANKLIN BENJAMIN, by and through his
next friend, Andree Yock; RICHARD GROGG;
FRANK EDGETT, by and through their next
friend, Joyce McCarthy; SYLVIA BALDWIN, by
and through her next friend Shirl Meyers;
ANTHONY BEARD, by and through his next
friend, Nicole Turman, on behalf of themselves
and all others similarly situated

v.

DEPARTMENT OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA;
SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA

CRAIG SPRINGSTEAD, by and through his
father and guardian, Bertin Springstead;
MARIA MEO, by and through her mother and
guardian, Grace Meo; DANIEL BASTEK, by and
through his father and guardian, John Bastek;
MICHAEL STORM, by and through his
guardian, Polly Spare; BETH ANN LAMBO, by
and through her father and guardian, Joseph
Lambo; RICHARD CLARKE, by and through his
father and guardian, Leonaed Clarke; RICHARD
KOHLER, by and through his sister and
guardian, Sara Fuller; MARIA KASHATUS, by
and through her father and guardian, Thomas Kashatus;
WILSON SHEPPARD, by and through his brother
and next friend, Alfred Sheppard,
                                        Appellants
(Pursuant to Fed. R. App. P. 12(a))
_____

JA436

On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Civil No. 1-09-cv-01182)
District Judge:  Hon. John E. Jones, III

_____

Argued February 7, 2011

BEFORE:  JORDAN, GREENAWAY, JR.,
and STAPLETON, *Circuit Judges*

(Opinion Filed: April 5, 2011)

_____

Owen H. Smith (Argued)
Sidley Austin
787 Seventh Avenue
New York, NY  10019
  and
John E. Riley
Vaira & Riley
1600 Market Street, Suite 2650
Philadelphia, PA  19103
  Attorneys for Appellants

Mark J. Murphy
Robert W. Meek (Argued)
Robin Resnick
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107
  and
Stephen F. Gold
1709 Benjamin Franklin Parkway – 2nd Floor
Philadelphia, PA  19103
  Attorneys for Appellees

Lesli C. Esposito (Argued)

2

DLA Piper
1650 Market Street, Suite 4900
Philadelphia, PA  19103
  Attorney for Amicus Curiae
  Voices of the Retarded, Inc.

Carl A. Solano (Argued)
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA  19103
  Attorney for Amicus Curiae
  Diane Solano

Joseph A. Sullivan
Jeremy Heep
Pepper Hamilton
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA  19103
  and
Natalie Grill Einsig
Pepper Hamilton
100 Market Street, Suite 200
Harrisburg, PA  17108
  Attorneys for Amicus Curiae
  The Arc of Pennsylvania and
  Vision for Equality, Inc.

––––––––––––––––––––

OPINION OF THE COURT

––––––––––––––––––––

STAPLETON, *Circuit Judge*:

Appellants-Intervenors Springstead et al. seek to intervene in this class action

brought against Defendants Pennsylvania Department of Public Welfare ("DPW") and

Secretary of  Public Welfare to enforce rights the Plaintiffs-Appellees claim to have

under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-

3

12134, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794.  We will affirm the District Court's denial of permissive intervention and intervention of right.

## I.  Background

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), established that it is a violation of the ADA, the RA, and their implementing regulations to force developmentally disabled patients to reside in institutions when they are able and willing to live in a manner more fully integrated into the community.  At the same time, *Olmstead* and the regulations make clear that "community based treatment [cannot] be imposed on patients who do not desire it."  *Id*. at 602 (citing 28 C.F.R. § 35.130(e)(1) (1998) and 28 C.F.R. pt. 35, App. A, p. 450 (1998)).

Plaintiffs-Appellees Benjamin et al. ("Plaintiffs") are individuals with mental retardation who reside in intermediate care facilities for persons with mental retardation ("ICFs/MR") operated by the DPW.  They contend that the DPW's failure to offer community services to them and others similarly situated violates the integration mandates of the ADA and RA.  Plaintiffs sought and secured certification of the following class:

> All persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation (ICFs/MR); (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

A7.

4

Plaintiffs seek declaratory and injunctive relief. They recognize that "*Olmstead* requires that patients eligible and desirous of community placement be discharged into community-based programs [only] if placement can be reasonably accommodated, taking into account the resources of the state and the needs of other persons in its care." *Frederick L. v. Dep't. of Pub. Welfare*, 422 F.3d 151, 156-57 (3d Cir. 2005) (citing *Olmstead*, 527 U.S. at 587). Accordingly, by way of remedy, they seek an injunction directing the DPW, *inter alia*, (1) to maintain a "Planning List that consists of all state ICF/MR residents who have been identified as not opposed to discharge to community services," (2) to promptly place "on the Planning List the named Plaintiffs and any other state ICF/MR residents identified by the ICF/MR Facility Directors as having affirmatively expressed their desire to be discharged to the community," (3) to question "ICF/MR residents and/or their involved family or guardians" at least annually regarding their current preference in order to keep the Planning List current, and (4) beginning in fiscal year 2011-12, to "develop and implement a viable integration plan that provides community services to at least 100 individuals on the Planning List annually for each of the first three years" and for at least 75 individuals from that list thereafter until all on the list have been discharged. A296-99.

The Springstead Intervenors ("Intervenors") are residents of Pennsylvania ICFs/MR who would decline community placement if it were offered to them. They moved to intervene of right and permissively under Federal Rule of Civil Procedure 24. Intervenors alleged that they are de facto members of the certified class, that they have protectable interests jeopardized by this lawsuit, and that neither Plaintiffs nor the DPW

5

sufficiently represent their interests. The District Court denied the motion to intervene of right or permissively, and Intervenors timely appealed.[1]

Following the filing of this appeal, the District Court entered summary judgment in favor of Plaintiffs on the liability issue. The remedy issue remains before it.

## II. Discussion

We Court review a district court's denial of permissive intervention and intervention of right for abuse of discretion but applies a more stringent standard to denials of intervention of right. *Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992). We will reverse a district court's determination on a motion to intervene of right if the court "applied an improper legal standard or reached a decision that we are confident is incorrect." *Id.* (internal quotation marks and citation omitted).

### A.    Intervention of Right

Rule 24 provides:

> **(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:
> **(1)** is given an unconditional right to intervene by a federal statute; or
> **(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

---

[1] The District Court had jurisdiction to hear claims regarding civil rights deprivations under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343 (a)(4). This Court has jurisdiction under 28 U.S.C. § 1291 over the District Court's final decision denying Appellants' motion to intervene. *McClune v. Shamah*, 593 F.2d 482, 485 (3d Cir. 1979) (order denying intervention is considered final and appealable).

Fed. R. Civ. P. 24(a).

A petitioner seeking to intervene of right "must establish that: (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (quoting *Harris v. Pernsley*, 820 F.2d 592, 596 (3d Cir. 1987)).[2] The claimed interest in the litigation must be one that "is specific [to those seeking to intervene], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought." *Kleissler v. U.S. Forest Service*, 157 F.3d 964, 972 (3d Cir. 1998). "[T]he polestar for evaluating a claim for intervention is always whether the proposed intervenor's interest is direct or remote." *Id.*

An intervenor's interest in the litigation need not be a legal one so long as the party "will be practically disadvantaged by the disposition of the action." *Id.* at 970 (quoting 7C Charles Allan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1908, at 301 (1986) ("The central purpose of the 1966 amendment was to allow intervention by those who might be practically disadvantaged by the disposition of the action and to repudiate the view, [under the former rule], that intervention must be limited to those who would be legally bound as a matter of res judicata."). However, rather than merely showing some impact, "the

---

[2] The District Court found that the application to intervene was timely, and this issue has not been raised on appeal.

7

applicant must demonstrate that there is a tangible threat to a legally cognizable interest

to have the right to intervene." *Harris*, 820 F.2d at 601 (citations omitted) (court should

consider any "significant legal effect on the applicant's interest," such as "the *stare*

*decisis* effect on the applicant's rights" and whether "the contractual rights of the

applicant may be affected by a proposed remedy.").

      Intervenors insist that their interest in remaining in their current institutional

setting is clearly sufficient to warrant intervention.  We agree with the District Court,

however, that Intervenors' interest in maintaining their current form of care is not directly

in jeopardy in this litigation.  The current parties have deliberately defined the class and

the relief sought so that Intervenors' right to choose institutional treatment would not be

affected.

      The District Court made its intent clear.  The class it certified expressly excludes

all current and future residents of ICFs/MR who oppose, or would at any relevant time in

the future oppose, community placement.[3]  It therefore excludes Intervenors, and they

will not be personally bound by anything that is decided in this litigation.  It follows that,

if the DPW should threaten in the future to coerce them into leaving their current

---

[3] The Intervenors are critical of the class definition because they say it requires an inquiry
into the mental state of class members.  Whether that poses a problem for other purposes,
it does not pose one in the context of the issues before us.  It is sufficient for present
purposes to hold that their current opposition to community placement currently excludes
them from the class.  If they hereafter are persuaded to drop that opposition, they will no
longer be in a position to represent the interest they seek to defend here.

institutions, Intervenors would be free to file their own suit and litigate whether they have a legally enforceable right to remain in the institution where they currently reside.[4]

This does not end the matter, however.  Intervenors insist that even if they "are not current or putative class members, their interest is likely to be affected as a practical matter by the outcome of the lawsuit because the relief sought by Plaintiffs is likely to result in closure of ICFs/MR." Appellants' Br. at 28.  Intervenors do not suggest that there is a danger that any remedy afforded to Plaintiffs in this action will include a requirement that an ICF/MR be closed.  Rather, they fear that budget constraints will cause the DPW to allocate its resources in a different manner if it is required by this suit to satisfy its obligations under the ADA and that this may result in its closing one or more ICFs/MR.

While it is, of course, possible that providing additional community placements will occasion some reallocation of the limited resources of the DPW, it is not possible to determine at this point whether that reallocation will result in the closing of one or more ICFs/MR, and we decline to speculate on that matter.  It is sufficient to hold that any possible impact on Intervenors' interest in maintaining their current institutional care is not the kind of direct impact that gives rise to a right to intervene.  In virtually every suit successfully prosecuted against a governmental entity, the judgment will occasion some reallocation of limited public resources.  Every competitor for those limited resources has an interest that potentially may be adversely affected by that reallocation.  We have found

---

[4] We express no view as to whether they have such a legally enforceable right.  We assume, without deciding, that they do.

9

no case, however, suggesting that the interest of such a competitor justifies intervention in litigation addressing issues in which he or she has no other interest.  If such a competitor believes that he or she has an enforceable right for the services of the public entity, he or she may bring his or her own suit.

Where a party has an interest in property over which the court has taken jurisdiction, and the party has an interest in "being heard with respect to the disposition of [a particular] fund[,] . . . such an interest is sufficient to support an applicant's intervention as of right."  *Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 368 (3d Cir. 1995).  Here, the court has not taken control of DPW funds and Intervenors do not have a legal right to particular funds.  They may have a right to certain benefits from the state, but not a right to a particular fund.

In *Harris*, we held that a District Attorney lacked the right to intervene in a suit seeking a cap on the prison population where the DA argued such a ceiling would limit his ability to carry out his duties as a law enforcement officer.  820 F.2d at 601.  Because the DA did not administer the prison, and the consent decree placing a ceiling on the prison population would only tangentially affect his ability to prosecute, we held that he had no right to intervene.  *See Kleissler*, 157 U.S. at 969-70.  Similarly here, the relief sought by Plaintiffs - that the DPW offer a choice of community placement to ICF/MR patients who do not oppose such placement - will only tangentially affect the rights of

10

those who are opposed.  Intervenors therefore are not entitled to intervene as their interests will not be directly affected by the relief sought. [5]

IV.

Because intervention of right is not available here, the District Court did not abuse its discretion in finding that Intervenors are also not entitled to permissive intervention. *See Brody*, 957 F.2d at 124 ("[I]f intervention of right is not available, the same reasoning would indicate that it would not be an abuse of discretion to deny permissive intervention.").

V.

For the foregoing reasons, we will affirm the District Court's denial of Intervenors' application to intervene permissively and of right.

---

[5] Because we conclude that Intervenors lack sufficient interest to intervene, we do not address their contention that the DPW is an inadequate representative.

11

JA446

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ  Class Action  Complaint Filed June 22, 2009 |

                    Plaintiffs,                    :
                                                   :
            v.                                     :
                                                   :
DEPARTMENT OF PUBLIC WELFARE                       :
OF THE COMMONWEALTH OF                             :
PENNSYLVANIA and GARY                              :
ALEXANDER, in his official capacity as            :
Acting Secretary of Public Welfare of the         :
Commonwealth of Pennsylvania,                     :
                                                   :
                    Defendants.                    :
_____:

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY
APPROVAL OF THE PROPOSED CLASS ACTION SETTLEMENT
AGREEMENT AND FOR APPROVAL OF THE CLASS NOTICE**

Plaintiffs and the Class, through their counsel, submit this Motion for Preliminary Approval of the Proposed Class Action Settlement Agreement and for Approval of the Class Notice. The Motion is unopposed as set forth in the Certificate of Concurrence submitted with this Motion. In support of this Motion, Plaintiffs state as follows:

JA447

1.      Plaintiffs, individuals with diagnoses of intellectual disabilities who are institutionalized in state-operated intermediate care facilities for persons with mental retardation (state ICFs/MR), filed this class action lawsuit in June 2009. Plaintiffs alleged that Defendants, the Department of Public Welfare and the Secretary of Public Welfare (collectively, DPW), violated Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, by, *inter alia*, failing to offer them mental retardation services in the community, which is the most integrated setting appropriate to meet their needs.

2.      Plaintiffs filed a Motion for Class Certification.  By Order dated September 2, 2009, this Court certified this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of all individuals who:  (1) currently or will in the future reside in one of Pennsylvania's state ICFs/MR; (2) could reside in the community with appropriate supports and services; and (3) do not or will not oppose community placement.

3.      Defendants filed a Motion to Dismiss, which the Court denied. Defendants subsequently filed an Answer.

4.      In October 2009, nine residents of the state ICFs/MR filed a Motion for Intervention.  The residents, through their families or guardians, asserted that they were opposed to discharge from the state ICFs/MR.  DPW concurred, but

2

Plaintiffs opposed this Motion.  In March 2010, this Court denied the Motion for Intervention, holding that the proposed intervenors failed to meet three of the four criteria required for intervention as of right and that permissive intervention was not warranted.  The proposed intervenors appealed.  In April 2011, the Court of Appeals affirmed this Court's denial of intervention, concluding that the proposed intervenors' "interest in maintaining their current form of care is not directly in jeopardy in this litigation.  The current parties have deliberately defined the class and the relief sought so that the Intervenors' right to choose institutional treatment would not be affected." *Benjamin v. Dep't of Public Welfare*, No 10-1908, 2011 WL 1243683 at *3 (3d Cir. Apr. 5, 2011).  The court further explained that the possibility that "providing additional community placements will occasion some reallocation of the limited resources of DPW" did not create an interest that warranted intervention.  *Id.*  "[A]ny possible impact on Intervenors' interest in maintaining their current institutional care is not the kind of direct impact that gives rise to a right to intervene." *Id.*

5.    The parties completed extensive fact discovery in late 2009 and early 2010.  Plaintiffs requested and received numerous documents, including Community Placement Plans for all state ICF/MR residents and information concerning DPW's budgets, costs for state ICF/MR services, and costs for community services.  Plaintiffs also served and received answers to interrogatories and requests for

3

admissions. In addition, Plaintiffs deposed five fact witnesses and defended the depositions of five witnesses. Meek Declaration ¶ 2 (Exh. 1).

6.    Plaintiffs retained two experts; one expert assessed the methodology used by DPW to determine opposition to community placement and the other expert analyzed the costs and savings associated with the provision of community services to class members. DPW retained an expert to rebut Plaintiffs' expert on costs and savings. Plaintiffs defended the deposition of their financial expert and deposed DPW's rebuttal expert. Meek Decl. ¶ 3.

7.    In June 2010, the parties filed cross-motions for summary judgment.

8.    In October 2010, with the parties' agreement, the Court referred the case to the Honorable Martin C. Carlson, United States Magistrate Judge, for mediation. The parties met with the Magistrate Judge, but ultimately informed the Court that they were unable to reach consensus. Meek Decl. ¶ 4.

9.    In January 2011, this Court issued a Memorandum and Order granting summary judgment for Plaintiffs and the Class and denying DPW's motion for summary judgment. *Benjamin v. Dep't of Public Welfare*, Civil Action No. 09-cv-1182, 2011 WL 1261542 (M.D. Pa. Jan. 27, 2011). The Court declared that DPW violated the ADA's and RA's integration mandates. *Id.* at *9. As the Court observed, there was no dispute that Plaintiffs and class members are appropriate for community placement if they receive necessary supports and services. *Id.* at

4

*6.  The Court further found that some state ICF/MR residents are not opposed to discharge.  *Id.*  The Court rejected DPW's fundamental alteration defense, specifically its presentation of an integration "plan" developed on June 18, 2010. *Id.* at *8-*9.  The Court concluded that "based upon the plain terms of the Plan," the possibility that class members will be placed in the community is "quite remote."  *Id.* at *8.  Pointing to the Plan's provision that gave DPW "broad authority" to use funding received under the Plan to serve people who are not institutionalized, rather than class members, the Court explained:  "[T]hose who are currently receiving no services should have the opportunity to acquire supports; but within the dictates of the law DPW cannot continue to ensure this by relegating institutionalized individuals to second-class status in order to avoid subjecting any new individuals to the same segregation."  *Id.*

10.    Although the Court held that DPW violated the ADA's and RA's integration mandate, it did not rule on the remedy.  *Benjamin*, 2011 WL 1261542 at *10.  At the Court's suggestion, the parties agreed to return to mediation with Magistrate Judge Carlson to attempt to resolve that issue.  Meek Decl. ¶ 5.

11.    The parties met in person twice with Magistrate Judge Carlson for extensive, arms-length negotiations and subsequently continued those discussions on their own.  Meek Decl. ¶ 6.  Those negotiations yielded the Settlement Agree-

5

JA451

ment (Agreement), *id.* ¶ 7, a copy of which is submitted as Exhibit 2.  The key provisions of the Agreement are summarized as follows:

      a.    ***Identification of Class Members*** -- DPW will create a Planning List that includes all state ICF/MR residents who are not opposed to discharge. Agreement § III.1.  To determine who is on this list, DPW's Office of Developmental Programs (ODP) will assess opposition to discharge by residents, their involved families, and guardians no later than September 30, 2011 and at least annually thereafter.  *Id.* § III.2.[1]  These assessments will be undertaken by the residents' social workers or Community Transition Specialists and the Facility Advocates based on discussions with the residents and their involved family or guardian.  *Id.* § III.2.a.[2]  State ICF/MR residents who do not express a preference for discharge will be placed on the Planning List unless they have involved family or guardians who are opposed.  *Id.* § III.2.b.  State ICF/MR residents who express a preference for community placement will be placed on the Planning List unless they have guardians who oppose such placement.  *Id.* § III.2.c.

-----

    [1]  The Agreement defines "involved family" to be family members who are designated in the state ICF/MR resident's records as their substitute decision makers.  Agreement § II.13.  A "guardian" is a person appointed by a court pursuant to Pennsylvania law to serve as a state ICF/MR resident's guardian of the person.  *Id.* § II.12.
    [2]  "Facility Advocates" are individuals employed by the Disability Rights Network of Pennsylvania (DRN), Plaintiffs' counsel, and assigned to each of the state ICFs/MR to advocate for residents.  Agreement § II.10.

6

b.    ***Education about Community Placement Options*** -- To assure that state ICF/MR residents and their involved families and guardians have access to appropriate information about community options, DPW will establish a Community Partnership Steering Committee (Committee) to develop and implement a program to provide information.  Agreement § IV.1.  The Committee will develop a training curriculum and offer trainings to residents and their families and guardians at the state ICFs/MR, in the community during the course of the Agreement, and on DPW's website.  *Id.* § IV.1.c.  The Committee will also distribute written information about community placement options and offer opportunities to visit community placements.  *Id.* §§ IV.1.e, IV.1.f.  In addition, DPW will develop and implement a plan to offer one-to-one outreach to state ICF/MR residents and their involved families and guardians.  The outreach will be conducted by family members of individuals with intellectual disabilities who currently live in the community.  *Id.* § IV.2.  After these training and outreach events, state ICF/MR residents, their involved families, and their guardians will be offered the opportunity to change their position on community placement, and the Planning List will be amended to reflect any such changes.  *Id.* § IV.3.

c.    ***Integration Plan*** -- DPW will develop and implement an Integration Plan to provide community placements to:  (1) at least 50 persons on the Planning List in Fiscal Year (FY) 2011-12; (2) at least 75 persons on the

7

Planning List in FY 2012-13; (3) at least 100 persons on the Planning List in FY 2013-14; (4) at least 100 persons on the Planning List in FY 2014-15; and (5) at least 75 persons on the Planning List in FY 2015-16 and each fiscal year thereafter until all persons on the Planning List have been discharged.  Agreement § V.1.[3]

       d.    **Status Reports** -- To assure that the Agreement is being implemented, DPW will provide to Plaintiffs' counsel periodic status reports. Agreement §§ VI.1, VI.2.

       e.    **Enforcement and Jurisdiction** -- If the Court grants final approval to the Agreement, it will retain continuing jurisdiction over the case for purposes of interpretation and enforcement of the Agreement.  Agreement § VII.5. Plaintiffs may seek the remedy of specific performance, but not contempt sanctions, if Defendants fail to comply with the terms of the Agreement.  *Id.* §§ VII.2, VII.3.  Plaintiffs will not file a motion for specific performance unless and until they give DPW 30-days' notice of the alleged violation and offer to meet with DPW to discuss resolution of the dispute.  *Id.* § VII.2.

---

    [3]  The Agreement allows DPW to divert funding appropriated and allocated to implement the Integration Plan to provide community services for no more than five persons living in the community who are at imminent risk of institutionalization.  Agreement § V.5.  To the extent DPW does so, it must increase the number of state ICF/MR residents to receive community services in the following fiscal year. *Id.*

8

f.    ***Termination of the Agreement*** -- The Agreement will terminate 90 days after the provision of a community placement to the last person on the Planning List.  Agreement § VII.6.

g.    ***Attorneys' Fees, Litigation Expenses, and Costs*** -- Defendants will pay to Plaintiffs' counsel, subject to the Court's approval pursuant to Federal Rule of Civil Procedure 23(h), the sum of $432,500 for attorneys' fees, litigation expenses, and costs incurred through the final approval of the Settlement Agreement by this Court.  Agreement § VII.7.

12.    Plaintiffs request that the Court preliminarily approve the proposed Settlement Agreement.  "'[I]f the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the [C]ourt [will] direct that ... notice be given to the class members of a formal fairness hearing.'" *Kaplan v. Chertoff*, Civil Action No. 06-5304, 2008 WL 200108 at *11 (E.D. Pa. Jan. 24, 2008) (citation omitted); *see also Hanlon v. Aramark Sports, LLC*, Civil Action No. 09-465, 2010 WL 274765 at *5 (W.D. Pa. Feb. 3, 2010); *Mehling v. New York Life Ins. Co.*, 246 F.R.D. 467, 472 (E.D. Pa. 2007).  Each of these criteria for preliminary approval of the Settlement Agreement is satisfied.

9

a.    First, the Agreement is the result of "serious, informed, non-collusive negotiations."  Although the parties engaged in settlement negotiations prior to the Court's issuance of its ruling that DPW violated the integration mandates, Plaintiffs were unwilling to agree to the offers DPW made at that time. Plaintiffs resumed negotiations only after the Court issued its decision, holding that DPW violated the ADA's and RA's integration mandate.  The parties' subsequent negotiations were informed not only by the Court's ruling, but also by extensive fact and expert discovery.  The parties met twice in person with Magistrate Judge Carlson and then continued negotiations through telephone and email communications.  *See* Meek Decl. ¶¶ 6, 8

b.    Second, the Agreement does not give preferential treatment to the class representatives or any particular segments of the class.  All class members are treated equally.  *See Kaplan*, 2008 WL 200108 at *11.[4]

c    Finally, the Agreement falls within the range of possible approval analyzed in accordance with the criteria set forth by the Third Circuit's decision in *Girsh v. Jepson*, 521 F.3d 153, 157 (3d Cir. 1975), and its progeny.  *See*

---

[4]   The Agreement provides that the named Plaintiffs will be placed on the Planning List immediately.  Agreement § III.3.  This does not give Plaintiffs preferential treatment, but merely recognizes that there is no need to assess their opposition to community placement since they have already expressed their preference for such placement.  Immediate placement on the Planning List does not assure that the named Plaintiffs will receive community services ahead of other persons who will join that list through the evaluation process.

10

*In re AT & T Corp.*, 455 F.3d 160, 164-65 (3d Cir. 2006); *Kaplan*, 2008 WL 200108 at *11.

(1)    The complexity, expense, and likely duration of the litigation weigh in favor of approval.  This case was filed nearly two years ago.  Although Plaintiffs have secured a judgment as to liability, a remedy hearing would take additional time.  More significantly, DPW would have likely appealed and Plaintiffs might have appealed if a remedy devised by the Court was not adequate.  *See Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 330-31 (E.D. Pa. 2007).

(2)    The stage of proceedings weighs in favor of the Agreement.  Plaintiffs not only completed discovery, but they secured a liability judgment.  Plaintiffs and their counsel had the knowledge they needed to assess the effectiveness of potential remedies and to make an informed decision about whether the Agreement provided Plaintiffs and class members with an adequate remedy for DPW's violations of the law.  *See Kaplan*, 2008 WL 200108 at *11; *Bradburn Parent Teacher Store, Inc.*, 513 F. Supp. 2d at 331-32.

(3)    The risks of establishing liability neither favor nor disfavor the Agreement.  Plaintiffs have established liability.  Although DPW could challenge that ruling on appeal, it would be unlikely to prevail in light of the Court of Appeals' precedent.  DPW would have to secure a writ of certiorari from

11

the Supreme Court review to have any possibility of overturning the liability judgment, which would be unlikely.

(4)    Plaintiffs, however, had to consider the risk that they would not be able to secure greater relief than that afforded by the Agreement, which provides Plaintiffs with much of the relief they sought.  The Agreement closely tracks the relief requested by Plaintiffs in their summary judgment motion, including most critically establishing a comprehensive, multi-year Integration Plan with timelines and benchmarks to develop community placements for at least 400 class members in the first five years.  Given evidence that indicated there are approximately 300 state ICF/MR residents who are not opposed and whose family or guardians are not opposed to discharge, it may be that most class members will receive community services within five years.  Meek Decl. ¶ 9.  It is questionable whether the Court would have been willing to order DPW to require more community placements at a faster pace given DPW's likely arguments that it could not do so in light of current budget constraints and the administrative burdens of developing new community services. Moreover, DPW has already begun to implement the Agreement, thus affording Plaintiffs and class members relief far sooner than any relief they might secure following further litigation in this Court and subsequent appeals that could take several years.  Accordingly, the benefits

12

afforded by the Agreement far outweigh the potential risks of seeking further relief through continued litigation.

(5)   The range of reasonableness of the settlement in light of the best possible recovery and the risks of litigation also weighs in favor of approval.  The benefits conferred by the Agreement compare favorably to the best possible recovery that Plaintiffs could have secured.  The Agreement provides the Plaintiffs and class members with almost all of the relief that they ultimately could have secured if the Court, using its discretion to shape injunctive relief, afforded the Plaintiffs all of the relief they had sought and the appellate court upheld the remedy.  Given the attendant risks of litigation (including, but not limited to, the delays that would accompany further litigation and appeals), the Agreement's benefits to class members are significant.

13.   Rule 23(e)(1) requires that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." The Court should consider both the method of dissemination and its content to determine whether the notice is sufficient. *Kaplan*, 2008 WL 200108 at *11.

a.   The parties propose to notify the state ICF/MR residents and their involved families and guardians through individual notice in the form submitted as Exhibit 3.  The notice summarizes the litigation and the terms of the Agreement (including the provision relating to attorneys' fees); informs potential

class members about the fairness hearing and their right to object to the Agreement; affords them information about how to receive a copy of the Agreement; and provides information about how to contact class counsel. The content of the notice is thus sufficient. *See Kaplan*, 2008 WL 200108 at *12; *Bradburn Parent Teacher Store, Inc.*, 513 F. Supp. 2d at 329.

  b.  Notice will be provided in the following manner:

  (1)  No later than four (4) weeks after the Court approves the notice, the Facility Advocates at each of the state ICFs/MR, who are employed by Plaintiffs' counsel, will hand deliver copies of the written notice to all state ICF/MR residents. The Facility Advocates will be able to answer any questions and allay any fears that might arise with the delivery of a legal notice.

  (2)  No later than four (4) weeks after the Court approves the Notice, DPW will assure that the notice is delivered by first class mail, postage prepaid to all involved family members or guardians of state ICF/MR residents.

  c.  Counsel for Plaintiffs and DPW will file certifications of notice with the Court no later than ten (10) days prior to the date of the hearing on final approval of the proposed Settlement Agreement to certify their compliance with their respective notice obligations.

  14.  Plaintiffs also request that: (a) the Court establish a date for the hearing on final approval of the proposed Settlement Agreement; (b) that any objec-

14

JA460

tions to the proposed Settlement Agreement and notices of intention to appear be submitted no later than fourteen (14) days prior to the hearing date; and (c) that Plaintiffs' memorandum of law in support of the final approval of the proposed Agreement be submitted no later than ten (10) days prior to the hearing date.

WHEREFORE, Plaintiffs respectfully request that the Court grant this Motion.

Respectfully submitted,

Dated:  May 26, 2011        By:    /s/ *Robert W. Meek*
                                   Robert W. Meek -  PA 27870
                                   Mark J. Murphy - PA 38564
                                   Robin Resnick - PA 46980
                                   Disability Rights Network of PA
                                   1315 Walnut Street, Suite 500
                                   Philadelphia, PA  19107-4798
                                   215-238-8070
                                   215-772-3126 (fax)
                                   RMeek@drnpa.org

                                   Counsel for Plaintiffs and the Class

15

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

FRANKLIN BENJAMIN, by and through   :
his next friend, Andreé Yock; RICHARD  :
GROGG and FRANK EDGETT, by and   :
through their next friend, Joyce McCarthy;  :
SYLVIA BALDWIN, by and through her  :   Civil Action No. 1:09-cv-1182-JEJ
next friend, Shirl Meyers; ANTHONY   :
BEARD, by and through his next friend,   :   Class Action
Nicole Turman, on behalf of themselves   :
and all others similarly situated,        :   Complaint Filed June 22, 2009
                              :
        Plaintiffs,          :
                              :
       v.             :
                              :
DEPARTMENT OF PUBLIC WELFARE   :
OF THE COMMONWEALTH OF       :
PENNSYLVANIA and GARY         :
ALEXANDER, in his official capacity as  :
Acting Secretary of Public Welfare of the  :
Commonwealth of Pennsylvania,      :
                              :
        Defendants.      :

---

## DECLARATION OF ROBERT W. MEEK

    I, Robert W. Meek, hereby declare based on personal knowledge as follows:

1.    I am counsel for Plaintiffs and the Class in this lawsuit.

2.    The parties completed extensive fact discovery in late 2009 and early

2010.

       a.     Plaintiffs requested and received numerous documents, including Community Placement Plans for all state ICF/MR residents and information concerning DPW's budgets, costs for state ICF/MR services, and costs for community services.

       b.     Plaintiffs served and received answers to interrogatories and requests for admissions.

       c.     Plaintiffs deposed five fact witnesses and defended the depositions of five witnesses.

    3.     The parties also completed expert discovery in the spring of 2010.

       a.     James Conroy issued a report that assessed the methodology used by DPW to determine opposition to community placement and opined on its deficiencies.

       b.     Parker Dennison Parker & Associates, Ltd. (PDA) provided a report that analyzed the costs that would be incurred and the savings that would be realized under various scenarios for the provision of community services to class members.

       c.     Plaintiffs defended the deposition of Susan Parker from PDA.

       d.     Plaintiffs deposed R. Gregory Kipper, who DPW retained to rebut the PDA report.

4.   After the parties filed cross-motions for summary judgment and with the parties' agreement, the Court referred the case to the Honorable Martin C. Carlson, United States Magistrate Judge, for mediation.   The parties met the Magistrate Judge in November 2010, but ultimately informed the Court that they were unable to reach consensus.

5.   After the Court granted Plaintiffs' Motion for Summary Judgment as to liability, the parties agreed to the Court's suggestion to attempt to resolve the question of remedy through mediation with Magistrate Judge Carlson.

6.   The parties met in person twice with Magistrate Judge Carlson for extensive, arms-length settlement negotiations.   The parties subsequently continued negotiations on their own through emails, telephone conversations, and an exchange of settlement drafts.

7.   As a result of those negotiations, the parties finalized a Settlement Agreement (Agreement) in May 2011.   A copy of the Agreement is submitted as Exhibit 2 to Plaintiffs' Motion for Preliminary Approval of the Proposed Settlement and Approval of Class Notice.

8.   The Agreement was the result of arms-length, intensive negotiations. The parties engaged in settlement negotiations prior to the Court's issuance of its ruling that DPW violated the integration mandates, Plaintiffs were unwilling to agree to the offers DPW made at that time.   Plaintiffs resumed negotiations only

3

after the Court issued its decision, holding that DPW violated the ADA's and RA's integration mandate. The parties' subsequent negotiations were informed not only by the Court's ruling, but also by extensive fact and expert discovery.

9.    It is Plaintiffs' counsel's opinion that the Agreement is fair, adequate, and reasonable. Indeed, the Agreement closely tracks the relief requested by Plaintiffs in their summary judgment motion, including most critically establishing a comprehensive, multi-year Integration Plan with timelines and benchmarks to develop community placements for at least 400 class members in the first five years. Given evidence that indicated there are approximately 300 state ICF/MR residents who are not opposed and whose family or guardians are not opposed to discharge, it may be that most class members will receive community services within five years. Plaintiffs and class members benefit from implementation of this Agreement and the Integration Plan now, rather than potentially pursuing further litigation and appeals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of May, 2011.

/Robert W. Meek

4

JA465

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ<br><br>Class Action<br><br>Complaint Filed June 22, 2009 |
| Plaintiffs, | : : | |
| v. | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Acting Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : | |
| Defendants. | : : | |

## SETTLEMENT AGREEMENT

### I.   Introduction

WHEREAS on June 22, 2009, Plaintiffs filed this class action lawsuit, alleging, *inter alia*, that Defendants violated Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA) by unnecessarily segregating class members in state intermediate care facilities for persons with mental retardation (ICFs/MR);

JA466

WHEREAS the District Court by Order dated September 2, 2009 certified this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of all individuals who (1) currently or in the future will reside in one of Pennsylvania's state ICFs/MR; (2) could reside in the community with appropriate supports and services; and (3) do not or would not oppose community placement;

WHEREAS the District Court by Memorandum and Order dated January 27, 2011 ruled that Defendants violated and were liable under Title II of the ADA and Section 504 of the RA by failing to offer community services to Plaintiffs and class members;

WHEREAS Plaintiffs and Defendants desire to reach consensus on an appropriate remedy that will resolve this lawsuit amicably and avoid the risks and expense of further litigation;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Settlement Agreement.

**II.    Definitions**

1.    "AEs" means the Administrative Entities that contract with the Department of Public Welfare to administer the community intellectual disabilities system in specific geographic areas.

2.    "Agreement" means this Settlement Agreement.

2

JA467

3.     "Class members" means all persons who: (1) currently or in the future will reside in one of Pennsylvania's state ICFs/MR; (2) could reside in the community with appropriate supports and services; and (3) do not or would not oppose community placement.

4.     "Community placement" means residential and non-residential services and supports appropriate to meet the needs of the individual. "Residential supports and services" means living independently in one's own home or with family while receiving supportive services; living in a family living ("life-sharing") home licensed under 55 Pa. Code Ch. 6500; or living in a group home licensed under 55 Pa. Code Ch. 6400 that, unless the person chooses otherwise, houses no more than four people and that is not contiguous with other homes that serve people with disabilities or on a campus-type setting that serves people with disabilities.

5.     "Community Waiver services" means services provided under the Consolidated Waiver or the Person/Family Directed Support Waiver and any future Medical Assistance programs that might succeed those waivers.

6.     "CPP" means the Community Placement Plan that is developed for each resident of a state ICF/MR pursuant to the individual support planning process and that establishes the basic understanding of what services and supports the resident would need if he or she were to move to a community placement.

3

7.     "DRN" means the Disability Rights Network of Pennsylvania.

8.     "DPW" means the Department of Public Welfare of the Common-wealth of Pennsylvania, its officials, employees, agents, and successors.

9.     "Effective Date" means the date that the Agreement is signed by all parties.

10.    "Facility Advocate" means an individual employed by DRN under contract with DPW who is assigned to each state ICF/MR to advocate for residents.

11.    "Facility Director" means the individual designated by ODP to oversee and administer the day-to-day operation of a state ICF/MR, including any interim or acting Facility Director.

12.    "Guardian" means an individual appointed by a Pennsylvania court pursuant to 20 Pa. C.S.A. Ch. 55 to serve as the guardian of the person for a resident of a state ICF/MR.

13.    "Involved family" means family members of a state ICF/MR resident who are designated as the resident's substitute decision makers in the CPP or other state ICF/MR records.

14.    "ISP" means the Individual Support Plan created for each state ICF/MR resident (through a process in which the resident, family members and representatives, and members of the resident's Interdisciplinary Team participate)

4

that assesses, identifies, and coordinates the needed supports and services for the resident.

15.    "ODP" means the DPW Office of Developmental Programs, its officials, employees, agents, and successors.

16.    "State ICFs/MR" means Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, White Haven Center, and any other facility licensed as an ICF/MR that Pennsylvania may operate or administer in the future.

**III.    Identification of Class Members**

1.    DPW will create, maintain, and update as needed a State ICF/MR Planning List that consists of all state ICF/MR residents who have been identified as not opposed to discharge to community placement.

2.    To determine who is on the State ICF/MR Planning List, ODP will assess opposition to discharge by state ICF/MR residents and their involved families or guardians no later than September 30, 2011, and at least annually thereafter.

a.    With the exception of those state ICF/MR residents identified in Section III.3 of the Agreement, the state ICF/MR resident's social worker or Community Transition Specialist, or both, together with the Facility Advocate, will determine whether the state ICF/MR resident should be placed on the State

5

ICF/MR Planning List based on discussions with the resident and involved family or guardians to assess their position as to community placement.

b.     If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List subject to the following exceptions:

(1)     If a state ICF/MR resident does not express a preference for community placement and has involved family or a guardian who is opposed to community placement, the resident will not be placed on the State ICF/MR Planning List.

(2)     If a state ICF/MR resident expresses a preference for community placement and has a guardian who is opposed to community placement, the resident will not be placed on the State ICF/MR Planning List.

c.     If there is a disagreement among the social worker, Community Transition Specialist, and Facility Advocate as to whether a state ICF/MR resident should be placed on the State ICF/MR Planning List, the social worker, Community Transition Specialist, or Facility Advocate will notify the Facility Director, who will make the determination in conjunction with the standards in this Agreement based on review of any relevant documents and interviews with the state ICF/MR resident, the involved family or guardian, the social worker or Community Transition Specialist, and the Facility Advocate.

6

3.    DPW will immediately place on the State ICF/MR Planning List the named Plaintiffs and any other state ICF/MR residents identified by the Facility Directors as having affirmatively expressed their desire to be discharged to the community.   If one of these individuals has a guardian who subsequently objects to community placement, he or she will be removed from the State ICF/MR Planning List.

## IV.    Education about Community Placement Options

1.    To assure that all state ICF/MR residents, their involved families, and guardians have access to appropriate information about community placement options, DPW will establish a Community Partnership Steering Committee within sixty (60) days of the Effective Date to develop and implement a program to educate state ICF/MR residents and their involved families and guardians about community placement.

a.    The Deputy Secretary of ODP will appoint members of the Steering Committee, including, at minimum: a state ICF/MR resident; an individual with intellectual disabilities who lives in the community; a family member of a state ICF/MR resident; a family member of a person with intellectual disabilities who lives in the community; a representative selected by DRN; a provider representative; a representative from ODP; and a representative from the AEs.

7

b.    The Steering Committee will develop a training curriculum that addresses how the community intellectual disabilities system works; community placement, supports, and services, including specialized programs such as those that serve individuals who are elderly, medically fragile, or have behavioral issues; funding for community services; and opportunities to participate in community life.

c.    No later than ninety (90) days after the Effective Date, DPW and Plaintiffs' counsel will agree upon a training schedule.  At minimum, DPW will provide trainings at each state ICF/MR at least three times each year as well as outside the state ICFs/MR in each of the four ODP Regions at least two times each year.  At least one training each year will be recorded and made available to the public on DPW's website.

d.    DPW will provide involved families and guardians with notice of the trainings at the facilities that serve their relatives or wards and in the Regions where they live at least thirty (30) days in advance of the training.

e.    The Steering Committee will develop and disseminate to state ICF/MR residents, their involved families, and guardians written materials about community placement options, including how they can get on the State ICF/MR Planning List or find out more information.

8

f.    The Steering Committee will work with the state ICFs/MR to assure that all state ICF/MR residents, their involved families, and guardians are periodically offered the opportunity to visit community placements that serve individuals whose needs are similar to the residents' needs and to meet with community services providers.

2.    Within ninety (90) days of the Effective Date, DPW will develop and begin to implement a plan to offer one-to-one outreach to state ICF/MR residents and their involved families and guardians by family members of individuals with intellectual disabilities who currently live in the community.

3.    State ICF/MR residents and their involved families and guardians will be given an opportunity after they participate in training events or have outreach contacts to state their position on discharge.  To the extent that this results in any changes from their prior position on discharge, DPW will supplement or amend the State ICF/MR Planning List as appropriate.

4.    DPW will continue to provide the education and outreach services required by Sections IV.1 and IV.2 of this Agreement during the term of the Agreement.

V.    **Development and Implementation of a Viable Integration Plan**

1.    DPW will develop and implement a viable integration plan (Integration Plan) that provides community placements to:

9

a.    at least 50 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2011-2012;

b.    at least 75 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2012-2013;

c.    at least 100 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2013-2014;

d.    at least 100 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2014-2015; and

e.    at least 75 individuals on the State ICF/MR Planning List annually in Fiscal Year 2015-2016 and each fiscal year thereafter until all state ICF/MR residents on the State ICF/MR Planning List have been discharged.

2.    To facilitate compliance with Section V.1 of this Agreement, DPW will take at least the following necessary steps:

a.    In submitting its budget proposal to the Governor, DPW will request as one of its top budget priorities appropriations to fund the development of community placements to meet the Integration Plan's benchmarks specified in Section V.1.

b.    DPW will consider the feasibility and propriety of consolidating the budget lines for state ICFs/MR and Community Waiver services;

10

JA475

c.    Unless and until DPW consolidates the budget lines for state ICFs/MR and Community Waiver services, DPW to the extent feasible will shift funds from the carry-forward budget for state ICFs/MR to the Community Waiver services budget.

d.    DPW will modify its policies and practices to assure that persons on the State ICF/MR Planning List have access to vacancies in existing community placements that match their needs, though DPW will retain discretion to assign vacancies as it deems appropriate.

3.    DPW will work with individuals on the State ICF/MR Planning List, their involved families or guardians, their AEs, and the Facility Advocates to develop CPPs and ISPs that specify the community placements, services, and supports the individuals need to successfully transition to the community.

4.    All individuals on the State ICF/MR Planning List will be offered community placements in which four (4) or fewer individuals reside, provided, however, that any individual can choose to live in a larger community placement that is funded by the Consolidated Waiver.  Whenever an individual chooses to live in a community placement that has more than four (4) residents, DPW will notify Plaintiffs' counsel as soon as practicable after the choice has been made.

5.    DPW may divert funding appropriated and allocated to implement the Integration Plan set forth in Section V.1 of this Agreement to provide community

11

placements to individuals living in the community who it determines are at imminent risk of institutionalization, provided, however, that: (a) DPW may not divert such funding to serve more than five (5) such individuals living in the community in any fiscal year; and (b) to the extent that this diversion of funding results in fewer than the targeted number of state ICF/MR residents identified in Section V.1 receiving community placements in any fiscal year, DPW will increase the number of state ICF/MR residents for whom DPW will provide community placements in the following fiscal year to compensate for the decrease.

**VI.    Status Reports**

1.     Beginning January 1, 2012 and every six (6) months thereafter, DPW will provide a status report to Plaintiffs' counsel and the Court on its implementation of this Agreement, including: (a) the steps DPW has taken to implement the Integration Plan outlined in Section V.1 of the Agreement (including, but not necessarily limited to, the steps identified in Section V.2 of the Agreement); (b) the number of persons on the State ICF/MR Planning List at the beginning and end of the report period and the number of persons on the State ICF/MR Planning List who were discharged to community placements during the report period; (c) whether DPW diverted funding from the Integration Plan to serve individuals living in the community under Section V.5 of this Agreement and, if so, how many individuals living in the community have been served with such

12

funding; and (d) implementation of the provisions related to education and outreach in Section IV of the Agreement.

2.    Beginning January 1, 2012 and every six (6) months thereafter, DPW will provide Plaintiffs' counsel with:  (a) a copy of the updated State ICF/MR Planning List; (b) information that identifies all state ICF/MR residents who were discharged during the report period, including their names and addresses in the community and the names of their community residential services providers; and (c) the identity of any class members who, after discharge, were admitted or committed to psychiatric hospitals or state ICFs/MR or were arrested or jailed, and a description for each such person of the circumstances that led to those situations and their current status.

## VII.  Approval, Enforcement, Jurisdiction, and Attorneys' Fees

1.    Plaintiffs will petition the District Court for preliminary approval of the Settlement Agreement and for permission to provide class notice and to schedule a fairness hearing.  If the District Court grants preliminary approval, Plaintiffs will distribute the class notice to state ICF/MR residents and DPW will distribute the class notice to involved families and guardians of the state ICF/MR residents.  Plaintiffs will petition for final approval of the Agreement.

2.    Plaintiffs may file a motion for specific performance to enforce alleged violations of the Settlement Agreement, provided, however, that at least

13

thirty (30) days before Plaintiffs file any motion for specific performance, they will provide notice of the alleged violation to DPW and offer DPW the opportunity to meet with Plaintiffs to discuss the alleged violation in an effort to resolve the dispute without judicial intervention. Defendants reserve the right to assert any available defense to a claim for specific performance, including lack of funding that is not attributable to Defendants' actions.

3.    The Settlement Agreement is not nor is it to be construed as a consent decree. Plaintiffs may not seek a remedy of contempt of court for any violation of the Agreement.

4.    The Settlement Agreement will be binding on all parties, as well as their successors, only if the Agreement is approved by the District Court, provided, however, that Defendants agree to comply with the terms of the Agreement beginning on the Effective Date pending the Court's ruling on approval of the Agreement. If the Court denies approval of the Agreement or if final approval is overturned on appeal, the litigation will be reinstated in the same procedural posture as it was at the time the parties executed the Agreement.

5.    If the District Court approves the Settlement Agreement, it will retain jurisdiction over the lawsuit for purposes of interpretation and enforcement.

6.    The Settlement Agreement will terminate ninety (90) days after the provision of a community placement to the last person on the State ICF/MR Planning List, at which point the Plaintiffs will seek dismissal of the lawsuit.

7.    Defendants will pay Plaintiffs' counsel, subject to the District Court's approval, the sum of $432,500 for attorneys' fees, litigation expenses, and costs incurred through final District Court approval of the Agreement.  Nothing in this Agreement should be construed to entitle Plaintiffs to or preclude Plaintiffs from recovery of attorneys' fees, litigation expenses, and costs incurred after the final District Court approval of the Agreement.

Robert W. Meek
Mark J. Murphy
Disability Rights Network of PA
1315 Walnut Street
Suite 500
Philadelphia, PA  19107-4705
215-238-8070

Doris M. Leisch
Deputy Chief Counsel
Mary Frances Grabowski
Deputy Chief Counsel
Department of Public Welfare
Office of General Counsel
801 Market Street
Suite 6092
Philadelphia, PA  19107
215-560-2192

Counsel for Plaintiffs and the Class

Dated: May 19, 2011

Counsel for Defendants

Dated: May 19, 2011

15

JA480

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, by and through  :
his next friend, Andreé Yock; RICHARD  :
GROGG and FRANK EDGETT, by and  :
through their next friend, Joyce McCarthy;  :
SYLVIA BALDWIN, by and through her  :  Civil Action No. 1:09-cv-1182-JEJ
next friend, Shirl Meyers; ANTHONY  :
BEARD, by and through his next friend,  :  Class Action
Nicole Turman, on behalf of themselves  :
and all others similarly situated,  :  Complaint Filed June 22, 2009
  :
  :
Plaintiffs,  :
  :
  :
v.  :
DEPARTMENT OF PUBLIC WELFARE  :
OF THE COMMONWEALTH OF  :
PENNSYLVANIA and GARY  :
ALEXANDER, in his official capacity as  :
Acting Secretary of Public Welfare of the  :
Commonwealth of Pennsylvania,  :
  :
Defendants.  :
  :

**NOTICE OF CLASS ACTION**
**PROPOSED SETTLEMENT AND HEARING**

**IF YOU LIVE AT EBENSBURG CENTER,**
**HAMBURG CENTER, POLK CENTER, SELINSGROVE CENTER,**
**OR WHITE HAVEN CENTER, YOU MAY BE AFFECTED**
**BY A CLASS ACTION SETTLEMENT**

    A settlement has been proposed in a class action lawsuit about the rights of people who live at Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, and White Haven Center, which are known as State Centers. The Court will have a hearing to decide whether to approve the settlement. This Notice gives a summary of the proposed settlement and information about the hearing and your

right to object to the settlement. The United States District Court for the Middle District of Pennsylvania approved this Notice.

## ARE YOU A MEMBER OF THE CLASS?

You are a member of the Class if you live at Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, or White Haven Center and you could live in the community with the right supports and services, and if you (or your involved family or guardian) are not or would not be against living in the community.

## WHAT IS THIS CASE ABOUT?

Persons who live in the State Centers and want to live in the community (who are known as the "plaintiffs") filed this lawsuit in June 2009 against the Department of Public Welfare (DPW). The lawsuit claimed that the plaintiffs wanted to and could live in the community and that DPW violated federal laws by not offering community services to them and other persons who live at the State Centers. In January 2011, the Court decided that DPW violated federal law by not offering community services to the plaintiffs and class members because DPW did not have a plan to move plaintiffs and class members into the community. After the Court's decision, the plaintiffs and DPW agreed to a settlement that includes a plan to move class members to the community.

## WHAT DOES THE SETTLEMENT DO?

**The Planning List** -- Under the settlement, DPW will create and maintain an updated list of all persons who live at the State Centers and are not against living in the community. This is called the Planning List. To decide who is on the Planning List, DPW will talk to each person who lives at a State Center and any involved family members or guardians to find out if they are against living in the community. Every person who lives in a State Center who is not against living in the community will be placed on the Planning List. If a person does not say one way or the other if he or she wants to live in the community, he or she will be placed on the Planning List unless an involved family member or guardian does not want the person to live in the community. If a person wants to live in the community, he or she will be placed on the Planning List unless a guardian does not want the person to live in the community. Persons who live in a State Center, their families, and guardians can always change their mind about whether they want to move to the community.

2

Persons who live in State Centers, their families, and guardians will have the chance to learn about different ways of living in the community, including services that exist in the community to support people with intellectual disabilities who have complex needs (such as behavioral health issues or physical health issues). This will include being able to talk about community living with families of people with intellectual disabilities who live in the community now.

**Community Living** -- Under the settlement, DPW will develop and put in place a plan, known as a "community integration plan," for community living for class members. Under the plan, between 50 and 100 persons on the Planning List will move to the community each year between July 1, 2011 and June 30, 2016. During that time, a total of 400 class members will move to the community if the Planning List has that many people on it. If the Planning List still has people on it after June 30, 2016, 75 persons on the Planning List will continue to move to the community each year until all persons on the Planning List have moved to the community.

Before people on the Planning List move to the community, DPW will work with them, their involved families or guardians, and other involved persons to come up with a comprehensive plan for each person that say what type of placement and other services each person needs to successfully move to and stay in the community.

**Attorneys' Fees** -- Under the settlement, DPW will pay $432,500 to the lawyers for the Class for plaintiffs' attorneys' fees, litigation expenses, and costs, if the Court approves that amount. Class members, their families, and guardians will not pay any fees, expenses, or costs.

**Enforcement and Termination of the Settlement** -- The settlement will end 90 days after the last person on the Planning List moves to the community. Until then, the Court will be able to enforce the agreement if the plaintiffs ask the Court to do so.

## WHERE CAN I GET MORE INFORMATION?

You can get a copy of the Settlement Agreement from the Facility Advocate at the State Center where you live. A copy of the Settlement Agreement will also be posted on the website of the Disability Rights Network of Pennsylvania, www.drnpa.org. You can also contact the lawyer for the Class, Robert W. Meek, at the Disability Rights Network of Pennsylvania, 1315 Walnut Street, Suite 500,

3

Philadelphia, PA  19107, 215-238-8070, for a copy of the Agreement or if you have questions about lawsuit or the settlement.

## WHEN IS THE HEARING AND HOW CAN I OBJECT

The Court will hold a hearing in this case on _____, 2011 at _____ ___.m. to decide whether to approve the settlement.  The hearing will be held in Courtroom No. ___ in the Federal Building, 228 Walnut Street, Harrisburg, Pennsylvania.

If you do not like the settlement, you may object to it.  You may also object to the payment of any attorneys' fees, litigation expenses, and costs to the lawyers for the Class.  **If you want to object or if you want to go to the hearing, you must let the Court and the lawyer for the Class know by mailing your written objection or intention to appear at the hearing to each of them at the following addresses no later than _____, 2011:**

Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | Civil Action No. 1:09-cv-1182-JEJ<br><br>Class Action<br><br>Complaint Filed June 22, 2009 |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Acting Secretary of Public Welfare of the Commonwealth of Pennsylvania, | |
| Defendants. | |

## **ORDER**

Upon consideration of Plaintiffs' Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement Agreement and for Approval of the Class Notice, it is hereby ORDERED on this 27th day of May, 2011 as follows:

1.    The proposed Settlement Agreement, attached as Exhibit 2 to the Motion, is preliminarily approved as fair, adequate, and reasonable in accordance with Federal Rule of Civil Procedure 23(e). The Agreement resulted from serious, informed, and non-collusive negotiations among the parties. The Agreement treats all class members equally. The Agreement falls within the range of possible approval, given the complexity, expense, and likely duration of the litigation; the stage of proceedings at which the Agreement was reached; the risks of securing relief; and the range of reasonableness of the Agreement in light of the best possible recovery and the risks of continued litigation. *See In re AT & T Corp.*, 455 F.3d 160, 164-65 (3d Cir. 2006); *Kaplan v. Chertoff*, Civil Action No. 06-5304, 2008 WL 200108 at *11 (E.D. Pa. 2008); *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 330 (E.D. Pa. 2007).

2.    The Notice of Class Action Proposed Settlement and Hearing, attached to the Motion as Exhibit 3 (the Notice) and the plan for notifying potential class members comply with Rule 23(e)(1) and are approved. The content of the notice adequately apprises potential class members of the litigation: the terms of the Agreement; the right to object; the fairness hearing; and information on how they can receive a copy of the Agreement and contact class counsel. *See Kaplan*, 2008 WL 200108 at *12. The method to distribute notice also is appropriate. The

2

written notice will be delivered in-person to residents of the state-operated intermediate care facilities for persons with mental retardation (state ICFs/MR) and by mail to any involved family or guardians of those residents.

3.     On or before June 24, 2011, four (4) weeks after the date this Order is entered, the Facility Advocates at the state ICFs/MR, who are employed by Plaintiffs' counsel, will hand deliver copies of the written notice to all state ICF/MR residents.

4.     On or before June 24, 2011, four (4) weeks after the date this Order is entered, DPW will assure that written notices are sent by first class mail, postage prepaid to all involved families and guardians of state ICF/MR residents.

5.     Counsel for Plaintiffs and Defendants each will provide a certification of notice to this Court on or before August 8, 2011, ten (10) days prior to the final approval hearing scheduled in Paragraph 6 of this Order.  The certification notice will state when and how the notice to potential class members required by this Order was accomplished.

6.     A hearing on final approval of the proposed Settlement Agreement is hereby scheduled for August 22, 2011, at 9:00 a.m. in Courtroom 2 of the United States Courthouse and Federal Building in Harrisburg, Pennsylvania.

3

7.    Any objections or requests to participate in the hearing must be received in writing by the Clerk of this Court on or before August 2, 2011, fourteen (14) days prior to the final approval hearing scheduled in Paragraph 6 of this Order.

8.    Plaintiffs will file with the Court a memorandum of law in support of final approval of the proposed Settlement Agreement on or before August 8, 2011, ten (10) days prior to the final approval hearing scheduled in Paragraph 6 of this Order.


The Honorable John E. Jones, III
United States District Judge

4

June 27, 2011                    Mr. & Mrs. Vincent Drago
                                 237 Brandon Road
                                 West Norriton, Pa 19403

Clerk of Courts
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, Pa 17108-0983

Robert W. Meek
Disability Rights Network of Pa
1315 Walnut Street, Suite 500
Philadelphia, Pa 19107-4705

**FILED**
HARRISBURG, PA

JUL – 5 2011

MARY E. D'ANDREA, CLERK
Per _____

    I'm writing in reference to our son Joseph Drago who is currently Residing at Whitehaven Center 827 Oley Valley Road Whitehaven, Pa 18661-9602 Joseph has profound Mental Retardation; Seizure Disorder; Spastic Quadriplegia with Athetoid movement's upper and lower extremities and Flexion Contractures; Atrophy of lower extremities; blind, due to bilateral Cataracts; and Equinus Valgus of feet. Joseph is unable to care for himself at all. Staff supports him with all of his needs.

    As a result of our son's condition, we can not stress enough that we are against him living in any community arrangement.

    My wife and I are in our early eighty's and want this letter to serve as our objection to our son Joseph being moved to any other place then where he currently resides based upon my first paragraph.

    Please see enclosed documents.

                                 Sincerely
                                 Mr. & Mrs. Vincent Drago

cc. Rosemarie Durante
    Vincent Drago Jr.



**COMMONWEALTH OF PENNSYLVANIA**
**WHITE HAVEN CENTER**
827 Oley Valley Road
White Haven, Pennsylvania 18661-9602

Fred C. Lokuta                                          **Telephone: 570-443-4200**
Facility Director                                          **FAX: 570-443-4225**

June 6, 2011

Mr. & Mrs. Vincent Drago
237 Brandon Road
West Norristown, Pennsylvania 19403

Dear Mr.& Mrs. Drago,

As you may know, class action litigation was filed in Federal Court on June 22, 2009 against Pennsylvania's Department of Public Welfare (DPW). The lawsuit claimed that the named plaintiffs wanted to and could live in the community. Furthermore, it also alleged that DPW violated federal laws by not offering community services to the named plaintiffs and other class members because DPW did not have a plan to provide these services. As a result, in January 2011 the Federal Court decided that DPW had violated federal law. After the court's decision, the plaintiffs and DPW agreed to a settlement that includes a plan to move class members into the community.

Additionally, and as a result of the Federal Judge's preliminary approval of the settlement agreement, a "**Notice of Class Action – Proposed Settlement and Hearing**" (attached), which provides more specific information about the lawsuit and indicates a fairness hearing scheduled for August 22, 2011 in Harrisburg, is being sent for your review and information.

I encourage you to read the class notice carefully and call me with any questions that you may have after you have reviewed the document. I can be reached at (570) 443-4200.

Thank you.

Sincerely,

Fred C. Lokuta
Facility Director

FCL/lsm
enc.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ Class Action Complaint Filed June 22, 2009 |
|                Plaintiffs, | : : | |
| v. | : : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Acting Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : | |
|                Defendants. | : : | |

## NOTICE OF CLASS ACTION
## PROPOSED SETTLEMENT AND HEARING

**IF YOU LIVE AT EBENSBURG CENTER,
HAMBURG CENTER, POLK CENTER, SELINSGROVE CENTER,
OR WHITE HAVEN CENTER, YOU MAY BE AFFECTED
BY A CLASS ACTION SETTLEMENT**

     A settlement has been proposed in a class action lawsuit about the rights of people who live at Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, and White Haven Center, which are known as State Centers. The Court will have a hearing to decide whether to approve the settlement. This Notice gives a summary of the proposed settlement and information about the hearing and your

right to object to the settlement. The United States District Court for the Middle District of Pennsylvania approved this Notice.

## ARE YOU A MEMBER OF THE CLASS?

You are a member of the Class if you live at Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, or White Haven Center and you could live in the community with the right supports and services, and if you (or your involved family or guardian) are not or would not be against living in the community.

## WHAT IS THIS CASE ABOUT?

Persons who live in the State Centers and want to live in the community (who are known as the "plaintiffs") filed this lawsuit in June 2009 against the Department of Public Welfare (DPW). The lawsuit claimed that the plaintiffs wanted to and could live in the community and that DPW violated federal laws by not offering community services to them and other persons who live at the State Centers. In January 2011, the Court decided that DPW violated federal law by not offering community services to the plaintiffs and class members because DPW did not have a plan to move plaintiffs and class members into the community. After the Court's decision, the plaintiffs and DPW agreed to a settlement that includes a plan to move class members to the community.

## WHAT DOES THE SETTLEMENT DO?

**The Planning List** -- Under the settlement, DPW will create and maintain an updated list of all persons who live at the State Centers and are not against living in the community. This is called the Planning List. To decide who is on the Planning List, DPW will talk to each person who lives at a State Center and any involved family members or guardians to find out if they are against living in the community. Every person who lives in a State Center who is not against living in the community will be placed on the Planning List. If a person does not say one way or the other if he or she wants to live in the community, he or she will be placed on the Planning List unless an involved family member or guardian does not want the person to live in the community. If a person wants to live in the community, he or she will be placed on the Planning List unless a guardian does not want the person to live in the community. Persons who live in a State Center, their families, and guardians can always change their mind about whether they want to move to the community.

2

Persons who live in State Centers, their families, and guardians will have the chance to learn about different ways of living in the community, including services that exist in the community to support people with intellectual disabilities who have complex needs (such as behavioral health issues or physical health issues). This will include being able to talk about community living with families of people with intellectual disabilities who live in the community now.

**Community Living** -- Under the settlement, DPW will develop and put in place a plan, known as a "community integration plan," for community living for class members. Under the plan, between 50 and 100 persons on the Planning List will move to the community each year between July 1, 2011 and June 30, 2016. During that time, a total of 400 class members will move to the community if the Planning List has that many people on it. If the Planning List still has people on it after June 30, 2016, 75 persons on the Planning List will continue to move to the community each year until all persons on the Planning List have moved to the community.

Before people on the Planning List move to the community, DPW will work with them, their involved families or guardians, and other involved persons to come up with a comprehensive plan for each person that say what type of placement and other services each person needs to successfully move to and stay in the community.

**Attorneys' Fees** -- Under the settlement, DPW will pay $432,500 to the lawyers for the Class for plaintiffs' attorneys' fees, litigation expenses, and costs, if the Court approves that amount. Class members, their families, and guardians will not pay any fees, expenses, or costs.

**Enforcement and Termination of the Settlement** -- The settlement will end 90 days after the last person on the Planning List moves to the community. Until then, the Court will be able to enforce the agreement if the plaintiffs ask the Court to do so.

## WHERE CAN I GET MORE INFORMATION?

You can get a copy of the Settlement Agreement from the Facility Advocate at the State Center where you live. A copy of the Settlement Agreement will also be posted on the website of the Disability Rights Network of Pennsylvania, www.drnpa.org. You can also contact the lawyer for the Class, Robert W. Meek, at the Disability Rights Network of Pennsylvania, 1315 Walnut Street, Suite 500,

Philadelphia, PA 19107, 215-238-8070, for a copy of the Agreement or if you have questions about lawsuit or the settlement.

## WHEN IS THE HEARING AND HOW CAN I OBJECT

The Court will hold a hearing in this case on August 22, 2011 at 9:00 a.m. to decide whether to approve the settlement. The hearing will be held in Courtroom No. 2 in the United States Courthouse and Federal Building, 228 Walnut Street, Harrisburg, Pennsylvania.

If you do not like the settlement, you may object to it. You may also object to the payment of any attorneys' fees, litigation expenses, and costs to the lawyers for the Class. **If you want to object or if you want to go to the hearing, you must let the Court and the lawyer for the Class know by mailing your written objection or intention to appear at the hearing to each of them at the following addresses no later than August 2, 2011:**

Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

4



USA FAST-CLASS

RECEIVED

JUL 05 2011

PER
HARRISBURG PA        DEPUTY CLERK

Clerk of Courts
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, Pa 17108-0983

171081727

U Diago
537 Brandon Rd
West Newton, Pa.
19403

Clerk of Court                                                    6/29/11
**Federal Bldg. & United States Courthouse**
**228 Walnut Street**
**Harrisburg, PA**
**17108-0983**
RE: Class Action
    Civil Action No. 1:09-cv-1182-JEJ
    Complaint Filed June 22, 2009
    **Proposed Settlement and Fairness Hearing**
    **Hearing Date: August 22, 2011 @ 9:00 a.m.**

**FILED**
HARRISBURG, PA
JUL - 7 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**Dear Sir:**

Kindly let this notification stand that my wife and I plan on attending the *Fairness
Hearing to the Proposed Settlement of Case No. 1:09-cv-1182-JEJ,* duly noted above.

Furthermore, please note that we are also formally objecting to the following: The
Settlement Plan itself, its stratagem, and its execution. All which results in a gross lack
of fairness and integrity being forced upon those who can't speak for themselves and all
those it's supposed to serve. Where's this 'Freedom of Choice' they claim this program
is suppose to extend to all the residents. We are also objecting to the proposed obscene
legal fees and costs.

This is supposed to be a Class Action lawsuit. However, we did not ask for this class
action nor did we seek the DRN of PA to represent us; and nor did they ask us if we
wanted them to represent us. The stratagem and goal of this DRN group is to see that all
State Centers eventually be closed. Reading the Settlement Agreement exposes this ruse
quite boldly. The majority of individual *'Special Needs'* cases in our State Centers **DO
NOT** fall into the DRN's 'One Size Fits All' mentality.

A little family history for clarification. Our guardian son before being assigned by the
court to White Haven Center had been previously shuttled around by the county
between **eleven** different group home settings; served a 1.5 year term in foster care and
over **twelve** mental hospital confinements (3 months ea visit). Due to the lack of
competent staffing and proper physical health care & treatment at a group home it lead
him to get gas gangrene. Had it not been for an experimental surgical procedure he
would have lost his leg and/or his life. This kind of atrocious care and treatment
together with the instability and insecurity of not having a solid place to call home while
in the county's care for more than 18 years contributed to many mental hospital
confinements including also legal troubles & transgressions. So understand our personal
opinions here are based upon utilizing a solid working knowledge and practical living
experiences of over 47 years. However, now that he's been at White Haven Center for
well over 7+ years it has given him a new lease on life, and for the first time in many
years he's at peace with White Haven Center's wholesome environment, living

conditions and security. Sending him back to the wild streets of a Group Home situation would be a disastrous accident and relapse just waiting to crush him and his life. Know also we have a Special Needs daughter who lives at home with us and she too requires of us our full time, life time care and attention. We consider our two Special Needs children our biggest blessings and we thank God every day he gave them to us and not to someone else who maybe could not have devoted their whole lives to giving them the love, devotion and attention that would not only be necessary for their very own survival but also to lead them to have a happy, full and wholesome life.

This Settlement Agreement has a set goal to see that 50 State Center residents leave the first year and 75 each year for the next 4 years. There are about 1175 residents in the total State Center system now and the DRN wants 350 to leave in the next 5 years. White Haven has about 161 residents and on last count only 4 wished to even consider leaving. Given there's five Centers that's roughly 10 residences you need from each unit this year alone.  Question is then: Where are you getting the rest of the residences to meet just this year's goal alone? At White Haven that's 6 short... so are you going to start evicting the residences just to meet goals? How about the next four years, remember you've already asked everyone by now and all you got was 4, no one else wants to leave, ever. So then where's this freedom of choice the DRN touts. The only ones really getting a free choice are the ones that *think* they want to leave now. (By the way do they get that 90 day right of return to the Center, as they do now, if alls not as rosy as they've been miss lead to believe?) Now for those of them that wish to stay put, well that's fine for now. But in days coming that original 'free choice' they exercised and said they wanted to stay put will be negated by being told there is no more 'free choice' and they now have to leave, screaming or hollering, whether they like it or not. In actuality the only real choice any of them ever really had was basically to leave... So much then for DRN's fairness and integrity and so much for their real political agenda.

My guardian has a very 'Brittle' mental & physical health condition that cannot be properly serviced by a Group Home situation. His present physical wellness and mental stability had better not be at all compromised by any of the actions this ridiculous settlement agreement may produce, now and/or in the future. Like they say; *"If it ain't broke, don't fix it"*

Sincerely,

W J Parmley
1517 Alison Dr
West Chester, PA
19380-6316



W J Parmley
1517 Alison Dr
West Chester, PA
19380-6316

CERTIFIED MAIL

7011 0470 0002 3975 0172

RETURN RECEIPT
REQUESTED

RECEIVED

JUL X 7 2011

HARRISBURG PA.
DEPUTY CLERK

Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

UNITED STATES
POSTAL SERVICE

1000

17108

U.S. POSTAGE
WEST CHESTER, PA
19380
JUN 25, '11
AMOUNT
$5.59
00035146-08

**FILED**
HARRISBURG, PA

Karen Blew
2435 Winston Rd.
Bethlehem,Pa. 18017

JUL 1 4 2011

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

Clerk of Court                                          Robert W. Meek
Federal Building & United States Courthouse             Disability Rights Network of Pa.
228 Walnut St.                                          1315 Walnut St., Suite 500
Harrisburg,Pa. 17108-0983                               Phila.,Pa 19107-4705

Re:Benjamin v. Dept.of Pub.Welfare,No.1:09-ev-1182-JEJ

Dear Mr. Meek &Judge Jones,

I am the sister of Gregory Kodnovich who is extremely mentally & physically
handicapped and am extremely concerned that he may be removed from the Hamburg
Center where he receives excellent care. There is no other facility where Greg could get
the care he needs.

Other residents who wish to live in the community should have that option but Greg
should stay at Hamburg.

I thank God that Greg resides at Hamburg. The facility and staff are exceptional.
His removal would be a great tragedy for him.

As I understand it, the Settlement Agreement places people on the State ICF/MR
Planning List who have not indicated they want to be on the list. Greg would not want to
be on this list. Our family unanimously does not want Greg placed in the community.

The Hamburg Center does an outstanding job and cannot be replicated in the
community for residents like my brother. The residents of Penna. should be proud
that our state provides such a outstanding facility for unfortunate people like
my brother.

Please allow my brother to stay at Hamburg!

Sincerely yours,

Karen Blew

Karen K. Blew

JA499



K. BLEW
245 Winston Rd
Bethlehem, PA 18017

LEHIGH VALLEY PA 180          PM 2 T
12 JUL 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut St.
Harrisburg, Pa. 17108-0983



RECEIVED
JUL 14 2011
PER_____
HARRISBURG, PA.    DEPUTY CLERK

JA500