Case Nos. 11-3684, 11-3685

# United States Court of Appeals

*for the*

# Third Circuit

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock;
RICHARD GROGG and FRANK EDGETT, by and through their next friend
Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl
Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on
behalf of themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA and SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA.

CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin
Springstead; MARIA MEO, by and through her mother and guardian Grace Meo;
DANIEL BASTEK, by and through his father and guardian, John Bastek;
MICHAEL STORM, through his guardian, Polly Spare; BETH ANN LAMBO,
by and through her father and guardian, Joseph Lambo; RICHARD KOHLER, by
and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and
through her father and guardian Thomas Kashatus; and WILSON SHEPPARD,
by and through his brother and next friend, Alfred Sheppard,
                                                     Appellants in No. 11-3684,
DIANE SOLANO, by and through her brother and guardian, Carl A. Solano,
                                                     Appellant in No. 11-3685.

_____

ON APPEAL FROM THE ORDER DATED SEPTEMBER 2, 2011, BY THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA,
CIVIL ACTION NO. 09-01182

## CONSOLIDATED JOINT APPENDIX
## VOLUME III of IV (Pages JA501-JA999)

BENJAMIN J. HOFFART
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorney for Appellants in No. 11-3684*

CARL A. SOLANO
SCHNADER HARRISON SEGAL
  & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorney for Appellant in No. 11-3685*

# JOINT APPENDIX
# TABLE OF CONTENTS

## <u>Volume I</u>

1.  Springstead Objectors' Notice of Appeal, dated September 30, 2011 ....... JA1

2.  Diane Solano's Notice of Appeal, dated September 30, 2011 .................. JA3

3.  Order of the Honorable John E. Jones III, Approving Class
    Settlement dated September 2, 2011 ........................................ JA5

4.  Memorandum of the Honorable John E. Jones III, dated
    September 2, 2011 ......................................................... JA7

5.  Order of the Honorable John E. Jones III, Denying Appellant Solano
    and Appellants Springstead Objectors Alternative Motions to
    Intervene, dated August 16, 2011 ......................................... JA33

6.  Order of the Honorable John E. Jones III, Granting Motion for Class
    Certification, dated September 2, 2009 ................................... JA36

## <u>Volume II</u>

7.  District Court Docket Entries ............................................ JA40

8.  Plaintiff's Amended Complaint for Declaratory and Injunctive
    Relief, dated July 14, 2009 .............................................. JA75

9.  Plaintiff's Unopposed Motion for Class Certification, dated
    August 31, 2009 ......................................................... JA103

    a.  Exhibit A – Certificate of Concurrence ............................. JA105

    b.  Exhibit B – Declaration of Robert W. Meek........................... JA107

    c.  Exhibit D – Governor's Executive Budget 2009-10 (excerpts)... JA141

10. Plaintiffs' Brief in Support of Unopposed Motion for Class
    Certification ........................................................... JA145

11. Defendants' Motion to Dismiss Amended Complaint, dated
    September 24, 2009 ...................................................... JA165

12. Springstead Intervenors' Motion to Intervene, dated November 10, 2009 ................................................................................. JA166

    a. Exhibit B to Springstead Intervenors' Brief in Support of Proposed Motion- Ligas v. Maram, 1:05-cv-04331 (N.D. Ill. Jul. 7, 2009) (minute order) ...................................... JA170.1

13. Order Denying Defendants' Motion to Dismiss Amended Complaint, dated January 25, 2010 ......................................... JA171

14. Defendants' Answer to Amended Complaint, dated February 24, 2010 ................................................................................. JA180

15. Memorandum and Order Denying Springstead Intervenors' Motion to Intervene, dated March 10, 2010 ......................................... JA189

16. Plaintiffs' Motion for Summary Judgment, dated June 23, 2010 .......... JA211

    a. Exhibit 4 – Deposition of Kevin Casey (excerpts) ...................... JA213

    b. Exhibit 5 – Defendants' Response to Plaintiffs' First Request for Admissions ................................................................. JA243

    c. Exhibit 8 – Governor's Executive Budget FY 2010-2011 (excerpts) ...................................................................... JA259

    d. Exhibit 9 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Franklin Benjamin ....... JA265

    e. Exhibit 11 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Anthony Beard ............. JA271

    f. Exhibit 12 – Deposition of Fred Lokuta (excerpts) ..................... JA276

    g. Exhibit 13 – ODP Summary Chart re Opposition to Discharge ...................................................................... JA280

    h. Exhibit 17 – ODP Chart re Deaths/Discharges at State ICFs/MR ...................................................................... JA281

17. Plaintiffs' Proposed Summary Judgment Order (Exhibit 1 to Brief in Support, dated June 23, 2010) ............................................... JA282

18. Plaintiffs' Statement of Undisputed Facts in Support of Motion for Summary Judgment ................................................................. JA294

19. Defendants' Motion for Summary Judgment, dated June 29, 2010 ....... JA328

    a.  Exhibit 1 – Declaration of Kevin Casey ...................................... JA330

    b.  Exhibit 2 – Deposition of Marti McIntire (excerpts) ................... JA338

    c.  Exhibit 3 – Deposition of Joseph O'Church (excerpts) ............... JA347

    d.  Exhibit 4 – The Plan, Supporting People Who Currently Reside in State Centers Who Want to Move to the Community ................................................................................. JA349

20. Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ................................................................. JA354

21. Defendants' Response to Plaintiff's Statement of Undisputed Facts (Ex. 1 to Defendants' Brief in Opposition, dated July 14, 2010) ........... JA364

22. Plaintiffs' Answer to Defendants' Statement of Undisputed Facts ........ JA370

23. Springstead Intervenors' Motion to Stay Formal Proceedings, dated November 19, 2010 ................................................................. JA400

24. Order Denying Springstead Intervenors' Motion to Stay Formal Proceedings, dated December 16, 2010 ................................................. JA403

25. Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment, dated January 27, 2011 ..................................................................... JA410

26. Mandate of United States Court of Appeals, dated April 27, 2011 ....... JA434

    a.  Third Circuit Opinion denying Springstead Intervenors' appeal of March 10, 2010 Order, dated April 5, 2011 ................. JA436

27. Plaintiffs' Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement and for Approval of Class Notice, dated May 26, 2011 ................................................................. JA447

    b.  Exhibit 1 – Declaration of Robert W. Meek ................................ JA462

    c.  Exhibit 2 – Settlement Agreement ................................................ JA466

    d.  Exhibit 3 – Notice of Class Action Proposed Settlement and
        Hearing ...................................................................................... JA481

28. Order Granting Plaintiffs' Unopposed Motion for Preliminary
    Approval of the Proposed Class Action Settlement and for Approval
    of Class Notice, dated May 27, 2011 ...................................................... JA485

29. Objection Letters re Notice of Class Action (in order of docket
    entry- an alphabetical list of Objections received by the district court
    is provided at pages xii-xv of this Index)

- Letter from Mr. and Mrs. Vincent Drago .......................................... JA489

- Letter from W.J. Parmley ................................................................. JA496

- Letter from Karen K. Blew............................................................... JA499

- Letter from Jacob Kodnovich........................................................... JA501

- Letter from Bob Sheetz .................................................................... JA503

- Letter from Marion Kelly o/b/o Patrick Garramone ......................... JA505

- Letter from Helen Reider.................................................................. JA507

- Letter from Roy Reider .................................................................... JA510

- Letter from Rev. AM Gordon and Minerva Gordon.......................... JA514

- Letter from Marion and Carment Attanasio, Jr. ................................ JA517

- Letter from Francis J. Beston ........................................................... JA519

- Letter from Cecelia Hopkins ............................................................ JA522

- Letter from Alfred R. Sheppard ....................................................... JA525

- Letter from Norma Ferguson............................................................ JA528

- Letter from Cheryl O. Brown ........................................................... JA531

- Letter from Mary Gough ................................................................. JA533

- Letter from Arthur and Joyce Ciullo .............................................. JA537

- Letter from Doris Kalan ................................................................ JA541

- Letter from Nancy Slick ................................................................ JA544

- Letter from Elizabeth Pugh ........................................................... JA546

- Letter from Catherine T. Dymacek ................................................ JA549

- Letter from Lawrence County Association for Retarded Citizens .... JA552

- Letter from Norman Moses, Executive Director of Lawrence County Association for Retarded Citizens ........................................ JA554

- Letter from Joseph Lambo ............................................................. JA564

- Letter from James B. Lambo .......................................................... JA570

- Letter from Polly Spare ................................................................. JA574

- Letter from Florence Plenn ............................................................ JA578

- Letter from Dale and Darcene Utt .................................................. JA581

- Letter from John Bastek ................................................................ JA585

- Letter from Grace Meo .................................................................. JA592

- Letter from Amelia and Jerry Hake ................................................ JA596

- Letter from Kay Wagner ................................................................ JA600

- Letter from Gary and Mary Wills ................................................... JA602

- Letter from Kimberly Gordon ........................................................ JA605

- Letter from Dixie Henry ................................................................ JA608

- Letter from Clara Palmer ............................................................... JA610

- Letter from Mary Kashatus ............................................................... JA612
- Letter from John Hoops, Jr. ............................................................. JA614
- Letter from Suzanne Perry ............................................................... JA617
- Letter from Wilson McKinley ........................................................... JA621
- Letter from Thomas Kashatus ........................................................... JA623
- Letter from Margaret Kashatus ......................................................... JA626
- Letter from August and Winnifred Centi ........................................... JA628
- Letter from Ruth Jarrett ................................................................... JA631
- Letter from Patricia O'Donnell ........................................................ JA634
- Letter from Margaret Tierney ........................................................... JA638
- Letter from William Hudock ............................................................ JA641
- Letter from Carole Henry ................................................................ JA643
- Letter from Wes Grebski ................................................................. JA647
- Letter from Marian L. Lentz ............................................................ JA650
- Letter from Barbara and Donald Sabo .............................................. JA653
- Letter from Albert Knight ................................................................ JA659
- Letter from Kenneth Myers .............................................................. JA661
- Letter from Kathleen McKeaney ....................................................... JA664
- Letter from Jeremy Kashatus and Family .......................................... JA668
- Letter from Karen S. Crytzer ........................................................... JA672
- Letter from Ellen Lube ................................................................... JA675

- Letter from Ruth Nichol .................................................................. JA677

- Letter from Deborah and Gerard Hey ............................................... JA681

- Letter from Sharon and Elmer Brice, Jr. .......................................... JA684

- Letter from Mary B. Fernan ............................................................ JA687

- Letter from Robert and Beverly Gill ................................................ JA690

- Letter from Adelaide Hardy ........................................................... JA696

- Letter from Lily Chang..................................................................... JA698

- Letter from Joan Wright .................................................................. JA700

- Letter from Bertin W. Springstead .................................................. JA703

- Letter from Dolores Drews............................................................... JA707

- Letter from Frederick Drews ............................................................ JA710

- Letter from Nancy Murray ............................................................... JA713

- Letter from Mark Drews................................................................... JA716

- Letter from Megan Irwin ................................................................. JA720

- Letter from Mr. and Mrs. John Potochnick ..................................... JA723

- Letter from Carol McDonald............................................................ JA725

- Letter from James Margolis.............................................................. JA729

- Letter from Charles McCormick ...................................................... JA731

- Letter from Eloise Moore ................................................................ JA733

- Letter from Clarence and Gail Ropp ................................................ JA735

- Letter from Trudy Sheetz ................................................................. JA738

- Letter from Geraldine Wetzel ............................................................ JA743

- Letter from J. Keffer ...................................................................... JA745

- Letter from David Kalan .................................................................. JA747

- Letter from Richard and Jane Ruth .................................................. JA750

- Letter from Jean Milliron ................................................................ JA752

- Letter from Sen. Mary Jo White ...................................................... JA757

- Letter from Harold McConnell III .................................................... JA760

- Letter from Mary Schneider ............................................................ JA763

- Letter from Betty Lightner .............................................................. JA770

- Letter from Joseph Potera ............................................................... JA774

- Letter from Ann Marie Walsh .......................................................... JA778

- Letter from Barbara Ann Fritz ......................................................... JA781

- Letter from Rose Schafer ................................................................ JA784

- Letter from Tommy Kashatus .......................................................... JA787

- Letter from Debra Kleinen .............................................................. JA790

- Letter from Debra Herring ............................................................... JA794

- Letter from Daniel Kleinen ............................................................. JA798

- Letter from William and Beverly Daugherty .................................... JA801

- Letter from Kathy Casadonte ........................................................... JA807

- Letter from Kimberley Gauronski ..................................................... JA811

- Letter from Larry and Sandra Krafft ................................................ JA814

- Letter from Jennifer Crawford...........................................................JA819
- Letter from Sen. Mary Jo White........................................................JA825
- Letter from Nathan P. Heller and Lesli C. Esposito.........................JA828
- Letter from Tarah Toohil...................................................................JA836
- Letter from the Staff and Students of Keystone Job Corps...............JA839
- Letter from Rickey Shaffer ...............................................................JA840
- Letter from Francis Marion ...............................................................JA843
- Letter from Linda Lotzi.....................................................................JA845
- Letter from Bertin Springstead.........................................................JA856
- Letter from William Toperzer ...........................................................JA860
- Letter from Amy Schwartz, Jerry Hake and Sara Greth ..................JA868
- Letter from Martha Ilift....................................................................JA872
- Letter from David Parry ....................................................................JA874
- Letter from Paula Wolfe.....................................................................JA877
- Letter from Henry Sitko  ...................................................................JA880
- Letter from Beatrice Sitko.................................................................JA883
- Letter from Gerard Dunne .................................................................JA885
- Letter from David Read......................................................................JA887
- Letter from Ann Marie Vodzak.........................................................JA891
- Letter from Evelyn Crawford ............................................................JA896
- Letter from William Brill ..................................................................JA899

- Letter from James and Lucille Causer ................................................ JA903

- Letter from Emil and Elizabeth Gnall ............................................... JA907

- Letter from Barry and Anna Johns .................................................... JA912

- Letter from Regina Splane ................................................................ JA914

- Letter from Annette and Ronald Fischer .......................................... JA918

- Letter from Shirley Musacchio ......................................................... JA922

- Letter from Carin Doddroe ............................................................... JA925

- Letter from Timothy Demers ............................................................ JA927

- Letter from Rickey Shaffer ............................................................... JA934

- Letter from Carl Lloyd ..................................................................... JA937

- Letter from Samuel Boring ............................................................... JA943

30. Diane Solano Objections to Class Action Settlement, dated
July 28, 2011 ........................................................................................ JA948

    a. Exhibit A – E-mail Exchange Between Fred Lokuta,
Superintendent of White Haven Center, and Tom Kashatus,
President of White Haven Center Relatives and Friends
Association .................................................................................. JA999

31. Diane Solano Motion to Intervene, dated July 28, 2011 ..................... JA1000

32. Springstead Objectors' Supplemental Objections to Class Action
Settlement, dated August 1, 2011 ........................................................ JA1013

    a. Declaration of Benjamin J. Hoffart ........................................... JA1053

    b. Exhibit A – ICF/MR Resident Demographics ........................... JA1055

    c. Exhibit B – Collected ICF/MR Center Demographics for
Ebensburg, Hamburg, Polk, Selinsgrove, and White Haven
Centers ....................................................................................... JA1056

x

33. Springstead Objectors' Motion to Intervene, dated August 2, 2011 .... JA1062

34. Statement of Support by the United States, dated August 2, 2011[*] ..... JA1067

35. Plaintiff's Unopposed Motion For Final Approval of the Proposed
Class Action Settlement Agreement, dated August 8, 2011 ............... JA1085

    a. Exhibit A – Declaration of Robert W. Meek ............................ JA1087

    b. Exhibit B – Settlement Agreement............................................ JA1099

36. Exhibit A to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Brief for Appellants, 3d Cir. Case
No. 10-1908)[*]....................................................................................... JA1114

37. Exhibit B to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Reply Brief for Appellants, 3d Cir.
Case No. 10-1908) [*] ............................................................................. JA1156

38. Exhibit C to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Solano's *Amicus* Brief, 3d Cir.
Case No. 10-1908)[*]............................................................................. JA1183

39. Exhibit D to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Solano's Brief Providing
Information Sought at Oral Argument, 3d Cir. Case No. 10-1908)[*] ... JA1215

40. Exhibit E to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Plaintiffs-Appellees' Brief, incl.
attach 1, 3d Cir. Case No. 10-1908)[*] .................................................. JA1223

41. Exhibit G to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Plaintiffs-Appellees' Response in
Opposition to Solano's Motion to File Post-Argument Brief, 3d Cir.
Case No. 10-1908)[*].......................................................................... JA1289

42. Transcript of Argument before Third Circuit, 3d Cir. Case No. 10-
1908 ..................................................................................................... JA1299

43. Joint Motion For Hearing, dated August 15, 2011 .............................. JA1331

---

[*] Document requested by Plaintiffs' counsel, Appellants object to the inclusion of this document pursuant to Fed. R. App. P. 30(a)(2) and L.A.R. 30.3 (a).

44. Order Regarding Fairness Hearing, dated August 18, 2011................JA1336

45. Transcript of August 22, 2011 Fairness Hearing.................................JA1339

46. Exhibit Introduced at August 22, 2011 Hearing:

    a.  Exhibit 1 – Assessment Protocol................................................JA1497

    b.  Court Exhibit 1 – Objection Letter from Sen. Elder Vogel ....JA1504.1

    c.  Court Exhibit 2 – Objection Letter from Rep. Chris Sainato  JA1504.2

47. Appellants Motion to Stay, dated November 8, 2011 ..........................JA1505

    a.  Exhibit A – Declaration of Carl Solano ....................................JA1522

    b.  Exhibit B – E-mail Correspondence between D. Leisch and C. Solano .......................................................................................JA1536

## ALPHABETICAL LIST OF OBJECTIONS RECEIVED BY THE DISTRICT COURT

*The copies of the objection letters in the Appendix are included in the order in which they were filed. This alphabetized list is provided for convenience.*

Marion and Carment Attanasio, Jr. ..................................................JA517
John Bastek  .............................................................JA585, 1013
Francis J. Beston .............................................................JA519
Karen K. Blew...................................................................JA499
Samuel Boring...................................................................JA943
Sharon and Elmer Brice, Jr. ...................................................JA684
William Brill ...................................................................JA899
Cheryl O. Brown ...............................................................JA531
Kathy Casadonte ...............................................................JA807
James and Lucille Causer.......................................................JA903
August and Winnifred Centi ....................................................JA628
Lily Chang.....................................................................JA698
Arthur and Joyce Ciullo .......................................................JA537
Evelyn Crawford ...............................................................JA896
Jennifer Crawford .............................................................JA819
Karen S. Crytzer...............................................................JA672
William and Beverly Daugherty .................................................JA801

Timothy Demers ................................................................................... JA927
Carin Doddroe ..................................................................................... JA925
Mr. and Mrs. Vincent Drago ............................................................... JA489
Dolores Drews ..................................................................................... JA707
Frederick Drews ................................................................................... JA710
Mark Drews ......................................................................................... JA716
Gerard Dunne ...................................................................................... JA885
Catherine T. Dymacek ........................................................................ JA549
Norma Ferguson ................................................................................. JA528
Mary B. Fernan ................................................................................... JA687
Annette and Ronald Fischer ............................................................... JA918
Barbara Ann Fritz ............................................................................... JA781
Sara Fuller ......................................................................................... JA1013
Marion Kelly o/b/o Patrick Garramone ............................................. JA505
Kimberley Gauronski .......................................................................... JA811
Robert and Beverly Gill ...................................................................... JA690
Emil and Elizabeth Gnall .................................................................... JA907
Rev. AM Gordon and Minerva Gordon .............................................. JA514
Kimberly Gordon ................................................................................ JA605
Mary Gough ........................................................................................ JA533
Wes Grebski ........................................................................................ JA647
Amelia and Jerry Hake ....................................................................... JA596
Adelaide Hardy ................................................................................... JA696
Carole Henry ....................................................................................... JA643
Dixie Henry ......................................................................................... JA608
Nathan P. Heller and Lesli C. Esposito ............................................. JA828
Debra Herring ..................................................................................... JA794
Deborah and Gerard Hey .................................................................... JA681
John Hoops, Jr. .................................................................................... JA614
Cecelia Hopkins .................................................................................. JA522
William Hudock ................................................................................... JA641
Martha Ilift ......................................................................................... JA872
Megan Irwin ........................................................................................ JA720
Ruth Jarrett ......................................................................................... JA631
Barry and Anna Johns ........................................................................ JA912
David Kalan ......................................................................................... JA747
Doris Kalan .......................................................................................... JA541
Jeremy Kashatus and Family .............................................................. JA668
Margaret Kashatus .............................................................................. JA626
Mary Kashatus ..................................................................................... JA612

Thomas Kashatus ........................................................................JA623, 1013
Tommy Kashatus ................................................................................JA787
J. Keffer ............................................................................................JA745
Staff and Students of Keystone Job Corps........................................JA839
Daniel Kleinen ..................................................................................JA798
Debra Kleinen ...................................................................................JA790
Albert Knight ....................................................................................JA659
Jacob Kodnovich...............................................................................JA501
Larry and Sandra Krafft ...................................................................JA814
James B. Lambo................................................................................JA570
Joseph Lambo ..........................................................................JA564, 1013
Lawrence County Association for Retarded Citizens........................JA552
Marian L. Lentz................................................................................JA650
Betty Lightner ..................................................................................JA770
Carl Lloyd .........................................................................................JA937
Linda Lotzi .......................................................................................JA845
Ellen Lube ........................................................................................JA675
James Margolis .................................................................................JA729
Francis Marion ..................................................................................JA843
Harold McConnell III........................................................................JA760
Charles McCormick ..........................................................................JA731
Carol McDonald ...............................................................................JA725
Kathleen McKeaney...........................................................................JA664
Wilson McKinley ..............................................................................JA621
Grace Meo..................................................................................JA592, 1013
Jean Milliron ....................................................................................JA752
Eloise Moore ....................................................................................JA733
Norman Moses, Executive Director of Lawrence County Association for
      Retarded Citizens ......................................................................JA554
Nancy Murray ...................................................................................JA713
Shirley Musacchio.............................................................................JA922
Kenneth Myers ..................................................................................JA661
Ruth Nichol ......................................................................................JA677
Patricia O'Donnell ............................................................................JA634
Clara Palmer .....................................................................................JA610
W.J. Parmley .....................................................................................JA496
David Parry .......................................................................................JA874
Suzanne Perry ...................................................................................JA617
Florence Plenn...................................................................................JA578
Joseph Potera....................................................................................JA774

Mr. and Mrs. John Potochnick ............................................................. JA723
Elizabeth Pugh ................................................................................... JA546
David Read .......................................................................................... JA887
Helen Reider ...................................................................................... JA507
Roy Reider .......................................................................................... JA510
Clarence and Gail Ropp .................................................................... JA735
Richard and Jane Ruth ...................................................................... JA750
Barbara and Donald Sabo ................................................................. JA653
Rep. Chris Sainato ............................................................................ JA1504.2
Rose Schafer ...................................................................................... JA784
Mary Schneider .................................................................................. JA763
Amy Schwartz, Jerry Hake and Sara Greth ...................................... JA868
Rickey Shaffer .................................................................................... JA840, 934
Bob Sheetz .......................................................................................... JA503
Trudy Sheetz ...................................................................................... JA738
Alfred R. Sheppard ............................................................................ JA525, 1013
Beatrice Sitko .................................................................................... JA883
Henry Sitko ........................................................................................ JA880
Nancy Slick ........................................................................................ JA544
Carl Solano ........................................................................................ JA948
Polly Spare ......................................................................................... JA574, 1013
Regina Splane ................................................................................... JA914
Bertin W. Springstead ...................................................................... JA703, 856, 1013
Margaret Tierney .............................................................................. JA638
Rep. Tarah Toohil ............................................................................. JA836
William Toperzer ............................................................................... JA860
Dale and Darcene Utt ....................................................................... JA581
Ann Marie Vodzak ............................................................................. JA891
Sen. Elder Vogel ............................................................................... JA1504.1
Kay Wagner ........................................................................................ JA600
Ann Marie Walsh ............................................................................... JA778
Geraldine Wetzel ............................................................................... JA743
Sen. Mary Jo White .......................................................................... JA757, 825
Gary and Mary Wills .......................................................................... JA602
Paula Wolfe ........................................................................................ JA877
Joan Wright ........................................................................................ JA700

**FILED**
HARRISBURG, PA

Jacob Kodnovich
306 Clermont Ave
Stroudsburg, Pa 18360

JUL 1 4 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 11, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pa 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-ev-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am the brother of Gregory Kodnovich who is extremely mentally and physically handicapped and am extremely concerned that he may be removed from the Hamburg Center where he receives excellent care. His care at Hamburg is excellent and he is happy there (it is his home). There is no other facility where Greg could get the care he needs.

Other residents who wish to live in the community should have that option but Greg should stay at Hamburg.

I thank God that Greg resides at Hamburg.    The facility and staff are exceptional. His removal would be a great tragedy for him.

As I understand it, the Settlement Agreement places people on the State ICF/MR Planning List who have not indicated they want to be on the list. Greg would not want to be on this list. Our family unanimously does not want Greg placed in the community.

The Hamburg Center does an outstanding job and cannot be replicated in the community for residents like my brother. The residents of Pennsylvania should be proud that our state provides such a great facility for unfortunate people like my brother.

Please Please allow my brother stay at Hamburg

Jacob Kodnovich

JA501

KODNOVICH
306 CLERMONT AV
STROUDSBURG, PA 18360

RECEIVED

JUL 14 2011

PER
HARRISBURG, PA          DEPUTY CLERK

2228 WALNUT ST
HARRISBURG, PA

CLERK OF COURT
FEDERAL BUILDING & UNITED STATES COURTHOUSE
17108-0983

17108$9988



JA502

*CV-09-2282*

July 11, 2011

**FILED**
HARRISBURG, PA

JUL 1 5 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Dear Judge:

My name is Bobby Sheetz. I live at Selinsgrove Center. I want to come to the hearing on August 22nd. My staff will bring me. I want to continue to live at Selinsgrove Center and I will talk to you about this if you want to talk to me about it. If I cannot live in Central Building at Selinsgrove Center, I would be ok with living in one of the outer buildings, but I still want to live at Selinsgrove Center.

BOBB SHEETZ



ENV30 *Bob Sheetz*
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE
SELINSGROVE CENTER
1000 ROUTE 522
SELINSGROVE PA 17870-8707

Clerk of Court
Federal Building and United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983



CV-09-1182

**Marion Kelly**
**123 Hickory Lane**
**Wyomissing, PA 19610**
**July 12, 2011**

**FILED**
HARRISBURG, PA

JUL 1 5 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Clerk of Courts :                              RE:Civil Action #1:09-cv1182-JEJ

My son, Patrick Garramone is a resident of White Haven Center.  He was diagnosed at age three to have brain damage.  He is also autistic and bipolar.  He cannot dress himself, feed himself, speak and is not toilet trained.  December 2010, he had a feeding tube inserted because he was getting pneumonia every couple of months.  The diagnoses was that food was entering his lungs causing the problem.  He doesn't know the danger of hot water, a hot stove, cleaning supplies or anything connected with a home environment.  At times, he is in a manic state and needs one on one care so that he doesn't hurt anyone or himself.  This care could not be provided for him in community living.  My son is not a candidate for community living.  I have expressed my wishes that I do not want my son to be moved from White Haven Center.  It has been his home since 1971 and he has a rapport with all the caregivers. I am Patrick's mother and also his guardian.  His sister, Sharon Recchio, has also been named guardian of Patrick.

This class action suit is wrong.  No one but the lawyers and the courts win in this situation.  I'm opposed to the payment of $432,500. to the lawyers.  This money from the DPW could be used for persons living at the centers to improve their quality of life.  The DPW should be ashamed to agree to this payment of $432,500. to the lawyers and court.  The court should visit the center to see how well the residents are taken care of and the peace of mind a mother has with my son living at White Haven Center.  If some residents can voice their choice regarding community living, then let them be placed in the community. For those who cannot speak, let them continue to have the good quality of life they receive at White Haven Center or any of the  centers named in the law suit.

Sincerely,

*Marion Kelly*

Marion Kelly
Mother of Patrick Garramone
Cc: Robert Meek
Disability Rights Network of PA
1315 Walnut St. Suite 500
Philadelphia, PA 19107-4705

JA505

Marion Kelly
123 Hickory Lane
Wyomissing, PA 19610

FILED
HARRISP, PC PA
JUL 15 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

17101181727

Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983



Helen C. Reider
105 Hawthorne Court
Wyomissing, PA 19610

7/15/2011

Clerk of Court
Federal Building and United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

RECEIVED
HARRISBURG, PA

JUL 19 2011

MARY E. D'ANDREA, CLERK
Per

Re: **Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My name is Helen Reider and I am the mother of Geraldine Reider who is a
resident of Hamburg Center since the age of 12. Ten days after birth, Geraldine
was diagnosed with viral encephalitis and pneumonia. The after-effects of this
virus would become evident as she matured. After years of all the therapies
available, little progress was shown. Geraldine is now 53 years old with the
mental age of 3.

Geraldine must be supervised at all times 24/7/365. My daughter is non-
ambulatory, incontinent in bladder and bowel function, needs special set-up for
meals which includes foods ground to avoid choking. Her other diagnoses are HX
of the right hip dislocation, hypothyroidism, seizure disorder, localized gingivitis,
impaired vision, must be re-positioned every 2 hours, and cannot be exposed to
extreme temperatures.

Geraldine needs to be under the care of people who are trained, professionally
and otherwise, for her health and safety. Geraldine has no concept of danger.
Changes in her environment can cause her to become agitated and self-abusive.

JA507

Psychologists at Hamburg Center are available to calm or change the situation. These special needs cannot be provided in a community setting.

If the settlement of this lawsuit were to come to fruition, it would deplete the population of state centers causing some to close, which would move some residents to centers farther away from families. This would be devastating for our family and especially my daughter, as we are in constant touch with frequent visits.

I do not oppose any Plaintiffs right to choose community living, but I do not believe DRN has the right to choose for someone else. My daughter does not understand the difference between yes and no, but she does have a family to answer for her. Our family has consistently opposed the move to community living. This has not stopped DRN to allow each individual and family the FREE RIGHT to choose where they shall live. That is the right of all citizens. For the good work DRN has done, I commend them. On this point they have gone far beyond their purpose. I have not been able to find a law in our Bill of Rights that gives DRN this authority. Our retarded citizens are as diverse in their needs as are all citizens, and should be respected in the same manner. One size does not fit all.

I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community based care facilities.

I will be attending the hearing on August 22, but I will not be giving oral testimony.


Sincerely,

*Helen C. Reider*

Helen C. Reider
Guardian of Geraldine Reider



UNITED STATES POSTAL SERVICE

# Flat Rate
# Mailing Envelope

**For Domestic and International Use**

*Visit us at usps.com*

From/Expéditeur:

Reider
1537 Cortland Avenue
Reading, PA 19607-2111

To/Destinataire:

Clerk of Court
Federal Building & US Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Country of Destination/Pays de destination:

RECEIVED
HARRISBURG, PA

JUL 19 2011

MARY E. D'ANDREA, CLERK
Per _____

amount of mailable material may be enclosed, as long
envelope is not modified, and the contents are
y confined within the envelope with the adhesive
ed as the means of closure.

RNATIONAL RESTRICTIONS APPLY:

JUND WEIGHT LIMIT ON
:RNATIONAL APPLIES

oms forms are required. Consult the
national Mail Manual (IMM) at pe.usps.gov
k a retail associate for details.



EP14F

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments.

JA509

Roy C. Reider, Jr.
1537 Cortland Avenue
Reading, PA 19607

7/17/2011



Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street
Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My sister, Geraldine Reider, was born June 9, 1958. Geraldine contracted the encephalitis virus within a few days thereafter, and was left profoundly retarded. She has the mental capabilities of a 3 year old child, cerebral palsy, bound to a wheelchair for life, partially blind, has very little dexterity in her upper limbs, has seizure disorder, a permanently dislocated hip, specialized dietary needs, does not understand yes or no, and must be monitored 24/7/365.

She is a resident at the Hamburg Center in Hamburg, PA, where she is afforded quality and quality **assured** care by a staff of highly trained professionals and caregivers under a strict protocol of rules and regulations.  Hamburg Center provides a warm, social environment and other amenities such as music, limited day trips, and even an occasional birthday party. Geraldine and her co-residents are happy and healthy.

There is no guarantee that this quality assured care would be given to Geraldine in a community group home.

JA510

My mother and I are involved in Geraldine's life, visiting her regularly, and keeping ourselves apprised of her needs and any problems that may arise. The management staff at Hamburg notify us immediately in the event of any problem regarding Geraldine. We know the staff and social workers at Hamburg Center and trust them with Geraldine's care.

Every year my sister is evaluated (ISP) and every year my mother and I have opposed placement for Geraldine in a community setting during the review of the ISP. We do not oppose Plaintiff's rights to choose community care for themselves, but we object to Plaintiff's efforts to request relief on behalf of Geraldine. We are Geraldine's guardian/co-guardian, and our decision will be final.

Under Title II of the federal Americans with Disabilities Act, said Justice Ruth Bader Ginsburg, delivering the opinion of the court, "states are required to place persons with mental disabilities in community settings rather than in institutions **when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated**, taking into account the resources available to the State and the needs of others with mental disabilities. "

Who determines, specifically, the mental and physical status of those being transferred? DRN advocates, State-appointed psychiatrists...who? My mother and I will challenge any state appointed psychiatrists' evaluations with that of a third party evaluation. We know what is best for Geraldine, and no one else.

The Disability Rights Network is to be commended on their efforts, but on this issue, I totally disagree. It is my understanding that the 'planning process' of moving a state center resident to a community group home begins when a DRN advocate polls a resident, and asks them if they want to transfer. That action is morally bankrupt when the situation involves a profoundly retarded individual incapable of understanding the consequences of their response.

I object to all terms of the Settlement Agreement, and I find the legal fees agreement on page 15, extremely disturbing. A proposed $432,500 settlement in legal fees to legal counsel for Disabilities Rights Network of PA? DRN is a publically funded entity. This amount should be used to care for residents of ICF/MR

facilities, not for legal fees. I have brought this to the attention of my legislators as this is 'double-dipping'. The taxpayers of this nation should not be burdened with this fee, as we have already funded DRN both statewide and nationally.

In closing I want to reiterate my opposition to the entire Settlement Agreement.

From October 2001-February 2002, I put my life in grave danger decontaminating anthrax from the USPS facilities in New York City, Washington, D.C., and Hamilton, N.J. None of us did this task for the $12.00/hour compensation, we did it because our nation was wounded and all of us wanted to help, including all my fellow hazmat workers that cleaned up the WTC site. We believe in America and the right to choose for all citizens. What must a veteran of our Armed Services be thinking as he reviews this Settlement Agreement and sees his family member's right of choice being removed? My family's right to choose the appropriate care for my sister, Geraldine, is being jeopardized by this Settlement Agreement.

I will be attending the hearing on August 22, but I will not be giving oral testimony.

Sincerely,

Roy C. Reider, Jr.

Guardian of Geraldine Reider

JA512



UNITED STATES POSTAL SERVICE



Flat Rate
Mailing Envelope

For Domestic and International Use

Visit us at usps.com

Any amount of mailable material may be enclosed, as long
as the envelope is not modified, and the contents are
entirely confined within the envelope with the adhesive
provided as the means of closure.

INTERNATIONAL RESTRICTIONS APPLY:

4-POUND WEIGHT LIMIT ON
INTERNATIONAL APPLIES

Customs forms are required. Consult the
International Mail Manual (IMM) at pe.usps.gov
or ask a retail associate for details.

USPS packaging products have been awarded Cradle
to Cradle Certification™ for their ecologically-intelligent
design. For more information go to mbdc.com/usps.

Recycled
Paper

From/Expéditeur:

Reader
1537 Cortland Avenue
Reading, PA  19607 ~ 2111

To/Destinataire:

Clerk "A Court
Federal Building + US Courthouse
228 Walnut Street
Harrisburg, PA  17108 - 0983

Country of Destination/Pays de destination:

7010 0780 0000 0783 7130



RECEIVED
HARRISBURG, PA

JUL 1 4 2011

EP14F

JA513

**Subject:**              Lawsuit against MR Centers in PA

**Status:**               In Progress
**Percent Complete:**     0%

**Total Work:**           0 hours
**Actual Work:**          0 hours

**Owner:**                Minerva Gordon

Rev. Adelbert Gordon
Minerva Gordon
107 S. Market Street
Martinsburg, PA  16662



July 14, 2011

Clerk of Court                              Robert W. Meek
Federal Building & United States Courthouse      Disability Rights Network of PA
228 Walnut Street                           1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                   Philadelphia, PA 19107-4705

Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

We are the parents of Adelbert M. Gordon, he is 57 years old our first born.  He has the IQ of an 18 month toddler so he does what a year and a half child does with a grown man's body.  Del does not speak but he makes his wishes known, has the sight of one eye, he is a big strong young man.  Del does not have fears of high; when we lived in Pittsburgh I put him to sleep he always went to sleep in a rocker and I would transferred him to his bed (he was 7 years), I heard a crash I ran upstairs and he had broken the rung on his rocker and smashed a window and was stinting on the window frame of a second story house.  He was ready to jump out!, by the grace of God he only had a cut in his foot that was stitched at the hospital.  He try to cross a highway when he ran out of my parents house and my brother in law saved him and almost got killed.  He does not have fear of cars, he ran away from home another time and ended in a pen with cows that could have trample him to death.  Another time he scale a 6 foot fence behind our house and luckily he ended in a small country road that when I was running trying to see if he went that way (other were searching for him and taking care of my other children) , I was stopping  cars and asking if they sow a little boy on the road finally a man stop and told me that yes he saw little boy and when he spoke to him he smile and started to come in my direction.  The people at my home saw my face and new that I was ready to pass out.
Del has lived in a loving home to parents that love him and it did not work out, after a lot of prayers and consideration we made the best decision to take him to Ebensburg Center where he has 24 hour care, an excellent doctor on campus, nurses that care for him and the aides that know him and lovingly teach

him and have fun with him in his daily life. He goes to picnics, the fair, Ebensburg Center has 2 sensory rooms a spa, coffee shop on campus. They take him to the dentist (you do not know how hard it is to find a dentist or a doctor that will treat the profoundly retarded children) or a young man until they have an accident.

If he is transferred to the community, I can just see him trying to cross the street and being run over by a car or that he misbehaves and they give him too many pills and out of desperation to control him and he will be like a zombie, or that he will take his clothes off and sit outside on the curb to masturbate, these are things he has done before but at Ebensburg Center they know how to solve these problems and the problems do not become a social issue or a crime scene.

I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiff's effort to request community care for my son.

The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my son to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or I am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my son will remained in ICF/MR care. The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the list. We want our son Del Gordon to stay at Ebensburg Center where he is safe and he has a good quality of life.

Under the proposed settlement Agreement no notice will be provided to me in the event that my son, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any reason.

I object that the proposed Settlement Agreement that allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

They should have educational material that includes; how we can maintain our son in the current care environment and avoid being placed on the State ICF/MR Planning List; and educate us about the potential dangers associated with community care.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State run ICFs/MR. This depopulation and closure will deprive me and our son of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and our son. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community- based facilities.

Sincerely,
Minerva Gordon *Minerva Gordon*
Rev.A.M. Gordon *Rev. A. M. Gordon*
Parents and guardian of Del Gordon a resident of Ebensburg Center



Rev. A.M. Bolar
Minerva Bolar
107 S. Market St.
Martinsburg, PA 16662

Club of Court Federal Bldg, & United State Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

RECEIVED
JUL 20 2011
HARRISBURG, PA.
PER _____ DEPUTY CLERK

Mr. & Mrs. Carmen Attanasio, Jr.
6 McAuley Drive
Dallas, Pa. 18612

FILED
JUL 2 0 2011
PER
HARRISBURG, PA   DEPUTY CLERK

July 18, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

Robert W. Meek
Disability Rights Network of Pa.
1315 Walnut Street, Suite 500
Philadelphia, Pa. 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No.1:09-ev-1182-JEJ

Dear Mr. Meek and Judge Jones,

Our daughter was first in a facility in Exton, Pa. where the people caring for her were not
trained like the workers ar White Haven Center and she was scalded with hot water.

We moved our daughter to White Haven Center in Feb. 1972 where she received
excellent care. At one point our daughter was in the hospital for two weeks and developed
bed sores. When returned to White Haven Center the workers had healed them quickly.

We need to save our Centers in Pa. because there is such a big waiting list of people who
need the special care that these Centers give.

Our daughter passed away in September but we will be forever grateful to the people who
work at White Haven for taking such special care of our daughter.

Sincerely,

Marion and Carmen Attanasio, Jr.



RECEIVED

JUL 2 0 2011

'G PA    DEPUTY CLERK

Clerk of Court
Federal Building + United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

107 Browning Lane
Rosemont, PA 19010-1007

July 14, 2011

Clerk of The Court                              Robert W. Meek
Federal Building, U.S. Courthouse               Disability Rights Network of PA
228 Walnut Street                               1315 Walnut Street Suite 500
Harrisburg PA 17108-0983                        Philadelphia PA 19107-4705

FILED
JUL 2 0 2011
PER
HARRISBURG, PA    DEPUTY CLERK

RE: Benjamin v. Dept. of Public Welfare, No 1:09-cv-1182-JEJ

Dear Judge Jones, and Dear Mr. Meek

    My name is Francis J. Beston, father of Francis L. Beston, a resident of the Hamburg Center. My wife, Marguerite Beston, is Francis' mother and his legal guardian. We write on behalf of Francis because we feel that the subject Settlement Agreement, if finalized, would seriously, permanently and adversely affect the quality of his life, however limited it may now be.

    Francis is a 52 year old male diagnosed with profound MR plus psychiatric diagnoses of bi-polar 1/mixed disorder, and autism. He has episodes of screaming, yelling and self injurious behavior. He has scoliosis, requires a specially equipped wheelchair and can no longer walk or even go to the toilet without assistance. He has dysphagia which requires special food preparation; liquids including water must be thickened and fed cautiously. Within the past year or two he has had serious urinary tract and lower G.I. problems which had required immediate medical attention (24/7) at the Center and Reading Hospital. He is totally non-verbal, and does not actively participate in meaningful activities.

    Francis has been at Hamburg for 50 years. This is his home! We have been pleased with the quality of the medical, psychological and personal care he has received over these  years. The attention and love provided by the staff has been excellent, and most reassuring to us as parents. The level of care he now readily receives at Hamburg would be greatly diminished in a group home; the amount of support or assistance that we could provide would be very limited as we are now in our 80's  For example, I cannot push a wheelchair because of my emphysema. The Center has been Francis' home for 50 years.  He needs nothing less than what he is now receiving at Hamburg!

    As to the Settlement Agreement we really question the fairness of the procedures. For example, how valid is it to have a DRN advocate influence the decision to place a person on the Planning List when the disabled  person is non-verbal and has the mental capacity of an 18 month old? I would not want such a procedure to be in place with my son in my absence!

JA519

Unfortunately, if the Settlement Agreement is finalized the eventual outcome is predictable: the diminished population per se will force the closing of the Centers. Such a closing will have been the tragic result of an unfair process. Those who now reside at the Centers will be victims whose choice to stay there was taken away from them by default.

My wife and I plan to attend the August 22 <u>fairness</u> hearing. I respectfully request that I be allowed to participate orally at that time.

Sincerely,

FRANCIS J. BESTON

JA520

107 BROWNING LANE
ROSEMONT PA 19010-1007

RECEIVED
JUL 2 0 2011
PFR
HARRISBURG PA.    DEPUTY CLERK

17108127

PHILADELPHIA PA 191
15 JUL 2011 PM 6 T

CLERK OF THE COURT
FEDERAL BUILDING, U.S. COURTHOUSE
228 WALNUT STREET
HARRISBURG PA 17108-0083

**FILED**
HARRISBURG, PA

Mrs. Kenneth G. Hopkins
28 Featherbed Lane
Flemington, NJ 08822

JUL 2 1 2011

MARY E. U'ANDREA, CLERK
Per _____
Deputy Clerk

July 16, 2011

Clerk of Court                                    Robert W. Meek
Federal Building & United States Courthouse        Disability Rights Network of PA
228 Walnut Street                                  1315 Walnut St. Suite 500
Harrisburg, PA  17108-0983                         Philadelphia, PA 19107-4705

Re:  Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My name is Cecelia Hopkins. My brother, Mark Bonacci, lives at White Haven Center in
White Haven Center, PA.  My sister and I are the only close relatives Mark has.  We
both visited White Haven prior to requesting Mark's transfer there from a facility near
Pgh., PA.  The transfer enabled us to visit him since it brought him closer to where we
both lived.

Mark has been developmentally disabled from birth.  We were told by our parents that it
was due to birth trauma.  He found a real home atmosphere at White Haven as did we
when we visited there.  When we visit him he is always clean shaven, in clean clothes
and smiling brightly.  He is attached to the staff and looks very comfortable with all of
them we have witnessed.

He has had some health issues as he has aged and as they erupt those issues have
been met with care and competence at White Haven and we are always kept aware of
any problems.  He has a severe limp now and does not maneuver steps so being on
one level at White Haven has been a blessing.  He can walk down the halls and hold
onto the rail if he needs to and he can walk out onto the grounds without worry of falling.

While my sister and I are not in a position to be guardian to Mark, we would rather him
be able to remain at White Haven in whatever years he has left.  It seems unfair to us
that he need be moved because someone else prefers a community setting for
themselves.  I don't object to anyone choosing that situation for themselves or their
family member but I do object to them choosing it for my brother.  It seems that Mark
will be placed on the 'Planning List' even though he cannot indicate that he wants to
move.  It seems that this proposed Settlement Agreement will provide no notice to us in
the event that Mark is moved to a community setting.  Nothing I have seen indicates to
me that that type of living situation will benefit Mark in any way other than to make him
upset and fearful.  Additionally, it is my understanding that these community living
arrangements will take all funds away from existing facilities and jeopardize the quality

JA522

of ICF/MR care that is the SOP right now at White Haven.  This will certainly impact the quality of care Mark has come to enjoy these past years at White Haven.

While we are unable to attend the fairness hearing on August 22 we felt we had to send this letter of protest and hope that Mark can remain at White Haven for the remainder of his life.

Sincerely,

Cecelia L. Hopkins
Sister to Mark Bonacci

Rose Ann Hill
Sister to Mark Bonacci



Mrs. Cecelia Hopkins
28 Featherbed Ln.
Flemington, NJ 08822

FILED
HARRISBURG, PA
JUL 2 1 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

DVD PSDC
KEARNY 800.030
18 JUL 2011 PM 2 T

Clerk of Court
Federal Building & United State Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

FILED
HARRISBURG, PA

JUL ~ ~ 201~

~~ ~~ ANDREA, CLERK
Deputy Clerk

Alfred R. Sheppard
P.O. Box 42739
Philadelphia, PA 19101-2739

July 18, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street; Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek,

I submit my intention to appear and my objections too above referenced case.

Wilson H. Sheppard is my younger brother; among eight other siblings by same birth father and mother; married as and from Andrew Rudolph Sheppard and Beverly Brown Merriweather. I have Power of Attorney per the Deceased of my Father and my Mother's severely comatose stroke status prior to Her descend. Records will show I have been active in Wilson's life, since 1986; including but not limited to reoccurring employee designated payroll deductions through the United Way Program; to White Haven Center specific for Wilson H. Sheppard; until that employer closed its establishments in the Philadelphia, PA Metropolitan area; where I live and worked. Wilson has extremely limited common communicational and personal hygiene skills = However While At White Haven Center; Wilson has Learned How To Walk Independently, Feed Himself Independently and Most Importantly Participate Calmly and Congenially Among and Within Many Various Group Settings!!!!

The Sheppard Family at our Mother's Clear Directive concerning Wilson is "for Wilson to stay at White Haven Center for the duration of His Life; Because of the Excellent Care He Has Received there; at White Haven Center; In White Haven, PA." Footnote: All but one of our 10 parent's children, being placed in foster care at our Mother's persistence commitment to regain exclusive parental rights and providential care for all her children and ACHIEVING IT for all except Wilson. I/WE Know Except For, The Proper Exclusive Sheppards' Family Care our Mother's Directive is for Wilson, To Stay In The Care Of White Haven Center In White Haven, PA. Though our mother has made room for many others within the State of Pennsylvania's Foster Care System by retrieving and keeping all her other children out of the State of Pennsylvania's Welfare System(s)except for Wilson to date. The State of Pennsylvania's Welfare System, Intensive Care Facility For The Mentally Retarded (ICF/MR) IS THE BEST AND NOTHING CAN SUPPASS THAT!!! It Needs To Be Supported And Perpetuated; For Those Who Currently And Into The Future WILL REQUIRE THESE SERVICES!!!!!!

JA525

In the above objection= Some Family(s)' Are Not Ready And Requires 'TRUSTED, DISTANT, EXCLUSIVE CARE; OF THEIR LOVE ONE(S)' While They (try)/Get Their Other Issue(s) In Order = ONLY WELL SUPPORTED FAMILY CARE CAN SURPASS PENNSYLVANIA'S STATE RUN ICF/MR FACILITIES.  In addition to the above objection; their is a waiting list mention earlier on within these procedures that has not been clearly and/or properly address of 1,200 plus persons' awaiting for these community slots (which by its own decentralized design; will produce; Unavoidable Added Expenses within Logistics (in some cases travel time alone)and Extra Personnel; of which are expenses that are forecast to only go up) under the banner of "Planning List" now. What happen to that list of people and how do they relate too this new Planning List???   Do Not Do Away With State Run ICF/MR Which Have Current and Future Prudence for something; that is Only One Part Of The Process. That needs clarity for me because is seems the State is trying abandon something that WORKS EXCELLENTLY for something that:

1) The Community or Share Life Living is not prepared to do outside of its own Specialty(ies)' as Well or As A Long Term Solo Value Base Service.

2) The State Of Pennsylvania will need to pay someone else to do ICF/MRs.

3) Because of the **Permanence of Diversity** and one single payer i.e. The State of Pennsylvania; their is no reason, to date that the Best of Pennsylvania needs to be done away with; for something that at best can only match; WITHIN ITS OWN SPECIALITIES; WHAT THE STATE OF PA'S RUN ICF/MR ARE PREFORMING EXCELLENTLY WITHIN THEIR OWN SPECIALITIES. TO OBTAIN THE TOP OF THE STAIRS WITHIN THE MOST REASONABLE COST!!!!!!!!!!

From The Sheppard Family; Thanks Again Pennsylvania and Do Not Do Away With, What Cannot Be Surpassed!!!

Sincerely,

*Alfred R. Sheppard*

Alfred R. Sheppard

Page 2





U.S. POSTAGE
PAID
PHILADELPHIA, PA
191 04
JUL 19 11
AMOUNT
$5.59
00020041-13

17108

RETURN RECEIPT
REQUESTED

Clerk of Court
Federal Bldg. & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

RETURN RECEIPT

Alfred R. Sheppard
P.O. Box 42739
Philadelphia, PA 19101-2739

CERTIFIED MAIL

7008 1830 0004 4834 3739

JA527

FILED
HARRISBURG, PA

JUL 22 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

Mrs. Norma G. Ferguson

P O Box 278   3 Dogwood Lane

Mann's Choice, Pa  15550

July 17, 2011

Cleark of Court

Federal Building & United States Courthouse

228 Walnut Street

Harrisburg, Pa  17108-0983

Robert W. Meek

Disability Rights Network of PA

1315 Walnut Street, Suite 500

Philadelphia, Pa  19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-ev-1182-JEJ**

Dear Mr. Meek and Judge Jones,

   I am Norma G. Ferguson, mother of Norma Jean Ferguson, who is a Mentally Retarded individual

Living at the Ebensburg Center, in Ebensburg, Pa.


   The Ebensburg Center must remain open so that my daughter can receive the constant care that

She needs.  Norma Jean cannot do anything for herself, and is very comfortable at the Ebensburg

Center.  The Center employee's give the Caring and Unconditional Love that Individuals, like my

Daughter, need.   If the Ebensburg Center closes and these individuals are forced out into the

Community, I feel many of them will not survive.    They require Special One on One Staff, Not just

A household with one or two people looking after many of these individuals.

   The Plantiff in this case does have the right to choose what type of care they want for themselves,

But I do not want this choice for my daughter.    I want her to remain at the Ebensburg Center.

As her mother, I have the fullest confidence that Norma Jean is getting the proper care and attention

That a  person in her capacity needs.   The Ebensburg Center and Staff are wonderful, and caring.

The legals fees as stated on page 15 of the proposed settlement agreement would be better served

In facilities like the Ebensburg Center.

In finale, I am not able to attend the hearing on August 22, 2011, but wanted you to know where

I stood on this matter.    **BOTTOM LINE:   THE EBENSBURG CENTER MUST STAY OPEN!!!!!!!!!!!**

Sincerely,

Norma G. Ferguson,

Guardian for Norma Jean Ferguson

*Norma G. Ferguson*

Cc:  Ebensburg Center



JOHNSTOWN PA 159

18 JUL 2011 PM 1 T



Clerk of Courts
Federal Building +
United States Courthouse
228 Walnut Street
Harrisburg Pa 17108-083



RECEIVED

JUL 22 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

Norma G Ferguson
PO Box 2718
3 Dogwood Lane
Manns Choice Pa 15550

JA530

71 Creek Bank Drive
Mechanicsburg, PA 17050

# Cheryl O. Brown

FILED
HARRISBURG, PA

JUL 2 2 2011

MARY E. D'ANDREA, CLERK
Per

Deputy Clerk

July 18, 2011

Clerk of Court
Federal Bldg. & United State Courthouse
228 Walnut Street
Harrisburg, PA 17108-099-83

RE: Case 1:09-cv-01182-JEJ Document 105-3
FRANKLIN BENJAMIN v. DEPARTMENT OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENSYLVANIA

Dear Sir or Madam:

This letter has two objections and hearing request.

 I do object that this proposed settlement is not correct.  DPW had offered for
residents to move to community living if they choose but there were not many
community living facilities available.  This settlement would be very costly to the
residents of Pennsylvania; buying properties, payroll expense, transportation and
transportation expense, and the list goes on and on.  Having seen some of the
previous facilities, the care and compassion was not equal to the care the
residents get at the facility.  I am a Guardian of my sister who has lived at
Selinsgrove Center for over 50 years.  This would create a very traumatic even
life threatening change for her.  Selinsgrove has done an exceptional job with her
care whether medical or day to day.

Secondly, I do object that the attorney fees in the amount of $432.500 are a
burden to the DPW.  You want them to offer housing which will be a
substantial cost and now pay these high fees.  Most states are having
trouble balancing their budgets now and this would add an unexpected
burden to them and the taxpayers.

 I would like to attend the hearing and need to be informed when this is
going to be scheduled.

Sincerely,

JA531



Cheryl O. Brown
71 Creek Bank Drive
Mechanicsburg, PA 17050



RECEIVED
JUL 2 2 2011
PER _____
HARRISBURG/PA.    DEPUTY CLERK

HARRISBURG PA 171

19 JUL 2011    PM 5 L

Clerk of Court
Federal Bldg. & United State Courthouse
228 Walnut Street
Harrisburg, PA 17108-099-83

17108817727

Mary Gough
510 Burgundy Dr
Southampton PA 18966

FILED
HARRISBURG, PA

JUL 2 2 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 8, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the sister of James McKeaney who has lived at Hamburg Center for over 50 years. Jim was severely injured at birth due to a high forceps delivery. He suffered an Entradural and Subdural Hematoma.   At 6 weeks of age he underwent surgery to relieve pressure that was causing "a constant seizure" as the doctor described.  All of his life Jim has been severely handicapped requiring 24 hour care.  He can do nothing for himself nor can he communicate his needs.

Hamburg Center has provided a safe and family environment all of these 50 years. Jim still continues to thrive in spite of his major limitations. We regard the setting and staff of Hamburg to be his family. Jim knows when he is not in those surroundings as witnessed during hospital stays where he is basically alone with little contact.  His entire demeanor changes.  Because the staff can "read" him so well they are proactive and responsive to any health crisis that arises.

In the subject of Community Living Plans I recognize that these arrangements can benefit many who wish and are able to live as independently as possible with whatever support is needed.

However, I strongly believe the Community Living arrangements do not benefit all members of the population that suffer from a severe handicap or brain injury.  The safety and welfare of these individuals can not be matched or met in small settings anyway near what Hamburg Center provides.

I strongly feel that the Benjamin Settlement jeopardizes choice for both my brother, Jim, and his family who have repeatedly voiced and documented their desire to keep Jim in Hamburg Center.

- I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

JA533

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Again, while I recognize that some individuals can thrive in a community living situation, I strongly feel that Jim's injuries and need for 24/7 care do not fit that model. I plan to attend the hearing on August 22 on behalf of my brother, Jim, who has no voice in this matter and is among a growing number of vulnerable and marginalized members of society.

Sincerely,

*Mary McKeaney Gough*

Mary McKeaney Gough
Sister of James McKeaney, Hamburg Center

JA535

USA FIRST CLASS

Mary Gough
510 Burgundy Dr
Southampton PA 18966

RECEIVED

JUL 2 2 2011

PER
HARRISBURG, PA     DEPUTY CLERK

Clerk of Court
Federal Bldg & US Courthouse
228 Walnut St
Harrisburg PA 17108-0983

17101817727

Arthur & Joyce Ciullo
709 Salisbury Road
South Abington Twp, PA 18411

FILED
HARRISBURG, PA

JUL 2 2 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 20, 2011

Clerk of Court                          Robert W. Meek
Federal Building & U.S. Courthouse     Disability Rights Network of PA
228 Walnut Street                       1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983              Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

We are the parents and guardians of Gabriel Ciullo,
a resident of White Haven Center. Gabriel has been
diagnosed with "Tuberous Sclerosis," which has left him
in the profound range of mental retardation. He
requires 24 hour supervision to provide him with all
life-care skills. He is ambulatory, non-verbal and
wears protective pads and a helmet. We love him
very much and do all we can to enhance his life.

We do not oppose the Plaintiff's right to choose
community care for themselves, but strongly object
to the Plaintiff's efforts to request relief on the
behalf of our loved one, as well as, other such

1

residents, who can't speak for theirselves.

The proposed settlement agreement will depopulate and bring about the eventual closeure of our state-run facilities. This depopulation and closure will deprive us and our loved one with a choice to remain in a ICF/MR facility and impose community based care upon our loved one, which we are totally against and would be determental to health and safety of our child. This is precisely the lack of choice that the U.S. Supreme Court cautioned against in Olmstead v. Zimring.

We object to any settlement agreement that places people on a list that they have not indicated they want to be placed upon, nor comprehend what can result from being on such a list.

We also object to any settlement that ignores our wishes for NON-community placement in the event of our demise. Our opposition to community care will have no permanence,

We object that no notice would be provided to us in the event that my(our) loved one, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been

2.

placed on a State ICF/MR Planning List for any other reason.

It would be morally wrong and heartless to place individuals on a community based waiting list, who lack the ability and understanding to speak for theirselves, or have no one to speak for them to make their wishes known.

Surely, if the residents of these state-run facilities understood the choice of being placed on a list to take them away from the familiar and protective enviroment and placed elsewhere, they would detest and oppose such a move.

Personally, we have voiced our opposition to community placement for our son. That type of arrangement can not and will not provide the medical, safety and 24 hour life skill care that is provided at a state facility, such as White Haven Center. Thank God, there are facilities such as these for people like my son.

We look upon Gabriel, not as a burden, but as a special gift of God, which has enhanced our lives so greatly

Sincerely,
Arthur + Joyce Ciullo

3



Arthur R. Ciullo
709 Salisbury Rd.
Clarks Summit, PA 18411

RECEIVED

JUL 22 2011

HARRISBURG, PA
DEPUTY CLERK

Clerk of the Court
Federal Building + U.S.
228 Walnut Street
Harrisburg, PA 17108-0983

FILED
HARRISBURG, PA

JUL 22 2011

MARY E. D'ANUHEA, CLERK
Per _____ Deputy Clerk

Doris Kalan
25402 Ann's Choice Way
Warminster, PA 18974

July 18, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No.1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am the mother and co-legal guardian of a 55 year old daughter, Diane Ruth Kalan, who from the age of 8 has resided at the Hamburg Center. For 48 years she has had the excellent care provided by a compassionate, well trained staff. My co-guardians are her sister, Judith K. Price and her brother, David M. Kalan.

Diane is non-ambulatory but is provided with a wheelchair adapted to her needs. She is non-verbal and makes her needs known by facial expressions, cries or smiles. She has been classified as profoundly mentally retarded, an incapacitated individual with Bipolar 1 Psychiatric disorder. She has multiple chronic physical disabilities such as scoliosis, lower body spasms, hypothyroidism and other conditions. Her social skills are minimal and it is difficult to know how much awareness she has of her environment. Because of a stable staff, including physicians, nurses, therapists of many kinds who know better than anyone what her heeds are, she seems to respond reasonably well to them. Hamburg Center is adequately prepared with physical equipment and ever-improving techniques to meet the demands of a challenging group of individuals. I feel Diane has had a happy life at Hamburg with excellent care, lovely surroundings with an understanding and caring local community. I feel services could be provided on this campus for those who only require out-patient services. Classrooms are already available on the site. I can't conceive of a safer and better placement for Diane than where she has spent all but 8 years of her life.

I have read the Settlement Agreement, Civil Action No.1:09-cv-1182-JEJ and reject many of its conclusions which are biased in favor of the Plaintiffs. I will include a few objections. No studies have been conducted and neither DRN nor DPW have shown that the implementation of the Plan is even feasible. Are there sufficient community-care facilities available to provide the extreme 24/7 needs of residents like my daughter? Hamburg Center alone has 80% of its residents using wheelchairs and other mobility

devices.  56% of its 120 residents are 55 years of age or older.  92% are severely or profoundly MR.

The Settlement provides educational programs informing ICF/MR residents and guardians how they can be placed on the Planning List but no programs provide information about potential dangers associated with community care.  It should include presentations from State Center advocates favoring ICF/MR care.

I object to the Disability Rights Network of Pennsylvania, a publicly-funded group, receiving $432,500 for legal fees with the likelihood of that fee exceeding that amount. Those funds are better used supporting the care of residents either in ICF/MR or community-bases care facilities.  With the demand from State Officials, including the Governor, to cut funding for just about every service, I can't imagine how this entire process will be implemented by 2016.  The quality of State-run care could easily be in jeopardy.  As the number of ICF/MR residents decline and the eventual closing of Centers occurs, I feel my daughter and I will be deprived of making a meaningful choice to remain in ICF/MR care.  Instead we will be forced into a community-care facility.

I plan to attend the fairness hearing in Harrisburg on August 22, 2011 to speak on behalf of my daughter and others who oppose this Planning List solution.  They must have a voice through their guardians or other family members.  Her name should not be placed on the Community Planning List.

Sincerely,

*Doris L. Kalan*

Doris L. Kalan
Diane Ruth Kalan



LOVE

SOUTHEASTERN PA 253

18 JUL 2011    PM 5 V

Clerk of the Court
Fderl. Bldg. and US Courthouse
228 Walnut Street
Harrisburg, Pa 17108-0983



Ms. Doris L. Kalan
25402 Anns Choice Way
Warminster, PA 18974-3365

RECEIVED
JUL 22 2011
PER _____
HARRISBURG, PA        DEPUTY CLERK

17108#9600

Nancy Slick

204 Sproul Mountain

Roaring Spring, PA  16673

**FILED**
**HARRISBURG, PA**

JUL 2 2 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 15, 20011

Clerk of Court
Robert w. Meek

Federal Building & United States Courthouse
Disability rights Network of PA

228 Walnut Street
1315 Walnut Street Suite 500

Harrisburg, PA 17108-0983
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am a friend of the family of Del Gordon that is a resident of Ebensburg Center.  He is a 57 year old man with the IQ of an 18 months old baby.  He does what a child that age does with a big man's body.  I think that anyone that is good enough to live in the community should do so, but the profoundly retarded do not do well in the house next door.  They have many health issues both psychological and physical; let's do the right thing and do not take them out of their home where they are well taken care of.  They have 24 hr. care with doctors, nurses every need is taken care of, health a job, school fun times (movies, church, camp, etc.), and many schools , churches and organizations come to interact with the residents. Think of what you are doing, to the most fragile of our citizens and once those centers are close there is no turning back.

Sincerely,

*Nancy Slick*
Nancy Slick



Clerk of the Court Edw. Kelly of US Courthouse
228 Walnut St.
Harrisburg, PA 17108-0983

17108＝9800



RECEIVED
JUL 22 2011
PER _____
HARRISBURG, PA DEPUTY CLERK

Mrs. Nancy J. Dick
214 Sproul Mountain Rd
Roaring Spring PA 16673-0481

UNITED STATES POSTAGE
$ 000.44⁰
PITNEY BOWES
02 1P      JUL 20 2011
0004470833
MAILED FROM ZIP CODE 16673

JA545

**FILED**
HARRISBURG. PA

JUL 2 5 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

RE: MICHAEL A. PUGH
131 DOGWOOD
HAMBURG, PA

09-CV-1182

July 14, 2011

Attn: John J. Bostek,

I am writing in regards to the DRN/DPW outplacement issue. I am the mother of Michael Pugh, who is currently a resident of Hamburg State Hospital.

Michael has been in DPW hospital care since birth, and I am very satisfied with the care given to him at these facilities.

Michael is totally disabled and needs total care for everything! Therefore:

I OPPOSE ANY OUTPLACEMENT OF MICHAEL AND I DO NOT WANT HIS NAME ON THE OUTPLACEMENT LIST.

Sincerely
Elizabeth Pugh

Please forward copies of this letter to the appropriate persons.

JA546

John Bastek

3100 Laurel Run Avenue

Reading, PA 19605

July 20, 2011

Clerk of the Court                          Robert W. Meek
Federal Building & United States            Disability Rights Network of PA
Courthouse                                  1315 Walnut Street, Suite 500
228 Walnut Street                           Philadelphia, PA 19107-4705
Harrisburg, PA 17108-0983

Dear Judge Jones and Mr. Meek,

I am forwarding the attached letter of objection from Mrs. Elizabeth Pugh as per her
request. She is an elderly lady and apparently was confused about where her
objection letter was to be sent.

Sincerely,

John Bastek

John J. Bastek
3100 Laurel Run Avenue
Reading, PA 19605-2176

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

RECEI
JUL 2 5
HARRISBURG PA.
PER _____

17108317727

Catherine T. Dymacek                     Robin D. Mason
30 Estates Drive                         201 Piedmont Road
Reading, PA 19606                        West Chester, PA 19382

**FILED**
HARRISBURG, PA
JUL 2 5 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 22, 2011

Clerk of Court                           Robert W. Meek
Federal Building & United States Courthouse    Disability Rights Network of PA    228
Walnut Street                            1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                Philadelphia, PA 19107-4705

RE: **Benjamin v. Dept of Pub. Welfare, No. 1;09-ev-1182-JEJ**

**Dear Mr. Meek and Judge Jones,**

We are Catherine Tregellas Dymacek, sister and legal guardian; and Robin D. Mason, niece and legal guardian, of Linda M. Tregellas who has been a resident of White Haven Center at White Haven, Pennsylvania for 46 years . She is profoundly mentally retarded to a level equal to that of a three year old child and will be sixty nine years old in November of this year.

With regard to the settlement of the case mentioned above, our position is that to uproot Linda from her home of forty six years, and an environment and quality of care to which she has become accustomed, would be deleterious to her physical and emotional well being and would not be in her best interest. She could be returned to a state of self-abuse, assaultive to others, hyperactive, extreme swings in appetite, disrobing and urinating on the floor. The outstanding professional care at White Haven Center has allowed her to escape from these problems. We seriously doubt that this care can ever be duplicated in a community home. This concern is supported by reports we have had regarding clients who were relocated to community homes whose physical and mental conditions deteriorated to the point where the result was an early end of life.

We do not oppose the Plaintiff's right to choose community care for themselves, but object to the Plaintiff's efforts to request relief on Linda's behalf.

The class identification procedures on pages 5-7 of the proposed Settlement Agreement require us and Linda to continuously voice our opposition to being a placed on an ICF/MR Planning List. Our current opposition to community care has no permanence. During any lapse of time when Linda could conceivably be without legal guardianship, the proposed Settlement Agreement will ignore our recorded wishes.

JA549

It is also apparent that, under the proposed Settlement Agreement, no notice will be provided to us in the event that Linda, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason. This deeply concerns us.

It is also obvious to us that the practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive us and Linda of a meaningful choice to remain in ICF/MR care and will impose community based care upon us and Linda. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v Zimring. It is also contrary to the Courts decision for the Settlement Agreement to provide for consolidation of budget lines which will deprive State-run ICFs/MR of critical funding.

It is also obvious to us that the proposed Settlement Agreement lacks fairness to all concerned and includes elements of bias against existing State-run Centers because it provides for inadequate and one-sided status reports. Any such status report should also include reports on death, injuries and other harm resulting from relocation to community based forms of care.

Finally, as legal guardians, we do not want Linda to be relocated from the excellent care she is receiving at White Haven Center and will oppose any efforts to do so.

Respectfully yours,

Catherine T. Dymacek
30 Estates Drive
Reading, PA 19606

Legal guardians of Linda Madge Tregellas
White Haven Center
White Haven, PA

Robin D. Mason
201 Piedmont Road
West Chester, Pa 19382



CATHERINE T. DYMACEK
30 ESTATES DRIVE
READING, PA 19606

CLERK OF COURT
FEDERAL BUILDING AND UNITED STATES COURTHOUSE
WALNUT STREET
HARRISBURG, PA 17108-0983

USA FIRST CLASS
LEHIGH VALLEY PA 180

RECEIVED
JUL 25 2011
PER _____
HARRISBURG, PA.    DEPUTY CLERK

# LAWRENCE COUNTY
# ASSOCIATION FOR RETARDED CITIZENS

Room 306 • 101 S. Mercer Street • New Castle, PA 16101 • Phone (724) 658-8515 • Fax (724) 658-8566 • E-mail: lcarc@usa.net

Lawrence County Association for Retarded Citizens
101 S. Mercer Street
Central Building, Suite 306
New Castle, PA 16101

FILED
HARRISBURG, PA

JUL 2 5 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 21, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

The Lawrence County Association for Retarded Citizens has provided community residential services to individuals with mental retardation since the mid-1970's. We successfully serve many individuals who once lived in ICFs/MR.

As you know, DPW has sought for many years to close all ICFs/MR in the belief community placement is ideal for all. We are very familiar with this DPW initiative, dating back to its inception, and have never agreed with it. From experience we know community placement simply does not work for *everyone*, and have witnessed individuals suffering from ill-conceived attempts to serve them in the community.

We believe a broad continuum of services should be available based on need as determined by a well-defined process involving the individual, family, and professionals. The Proposed Settlement Agreement does not adequately address any of those issues. What it does is seek to impose a *philosophy* on *all* ICF/MR residents; a philosophy, though honorable in its intent, is nevertheless flawed.

We therefore urge you to reject the Proposed Settlement Agreement, for the well-being of those whose safety may be jeopardized for the sake of an ideal.

Sincerely,

Bradley Chill
RPD

Michelle Lagnese
RPD

Carolle Moses
RPD

Norman Moses
CEO



United Way

JA552



USA FIRST-CLASS FOREVER

PITTSBURGH PA 152

21 JUL 2011   PM  T

LAWRENCE COUNTY
ASSOCIATION FOR RETARDED CITIZENS

Room 306 • 101 S. Mercer Street
New Castle, Pennsylvania 16101

RECEIVED

JUL 2 5 2011

PER_____ DEPUTY CLERK
HARRISBURG, PA

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17101+1727

JA553

**LAWRENCE COUNTY**
**ASSOCIATION FOR RETARDED CITIZENS** 09-CV-1182

Room 306 • 101 S. Mercer Street • New Castle, PA 16101 • Phone (724) 658-8515 • Fax (724) 658-8566 • E-mail: lcarc@usa.net

EVELYN BOSTON
CHARLES CUSICK, ESQ.
RONALD DAVIS
JOHN DeCARO

CAROLYN HEASLEY
HENRY KARKI
JOHN KLINE
JOSEPH LAMBO
DOMINICK MOTTO

OLGA NARED
SHIRLEY PATTON
THOMAS PICCIONE
NORMAN MOSES

**FILED**
**HARRISBURG, PA**

JUL 25 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 21, 2011

Dear Honorable Judge Jones:

As the attached document demonstrates the decision put before you is not new. It has been put off for many years.

In reality, you must possess the wisdom of Solomon, the patience of Job and the humanity of Rev (Dr) Martin Luther King, Jr to resolve the issue to the satisfaction of all involved — however — you must satisfy the only thing that matters: the safety and welfare of those entrusted to our care.

In the end, there must be a "protected and healthful environment" for those caught in & between the community & institution.

In your pursuit I respectfully aid you....

God Bless & Be Well

Norman Moses
Exec Director

Copy: Mr. Meek
DRN



JA554

Testimony of:
Norman Moses, Executive Director
Lawrence County Association for Retarded Citizens

Presented to:

Pennsylvania House of Representatives Task Force

On

Wednesday, August 25, 1999

In

Lewisburg, Union County
Lewisburg Hotel, 136 Market Street


Mr. Moses has been the director of the Lawrence County Association for Retarded
Citizens for 24 years.  His chapter has recently been disaffiliated from the ARC, US
and ARC, PA.  The Lawrence County Association for Retarded Citizens has been a
non-profit corporation for 45 years, acting as advocate and multi-services provider.
Included in the provision of services are housing for over 100 mentally retarded adults
and children.

JA555

**<u>CHOICES</u>**

At the present time true choice for the most appropriate housing option does not exist. The choice for the mentally retarded individual appears to be the choice conferred by the reigning philosophy of the day. There now exists two extreme philosophies whose advocates are pitted against one another. This has produced a vortex that has consumed those entrusted to our care, their guardians, providers and, indeed, the legislature here before us today. The philosophies about appropriate care are so diametrically opposed that true choice has given way to philosophical persuasion as opposed to what is truly in the best interests of the mentally retarded individuals.

In the past several years, the institutions have been arbitrarily downsized in the name of humaneness. If true choice exits, we are lacking proof that when institutional preference has been exercised that it has been honored. The numbers of those residing in institutions has steadily decreased.

I do not advocate that the present institutions be repopulated. That is unnecessary. Nor do I maintain that the large institutions remain open. On the other hand, I do not advocate that all mentally retarded persons can prosper and flourish through placement in three or four bed group homes. Somewhere in between is the real truth and I present a choice clearly in the middle. For the past ten years, I have advocated for regional "protective environments" for the medically fragile and the mentally retarded persons who exhibit serious behavior problems. This idea has been dismissed as institutional since I propose to house more than four in a facility. The number would be subject to

what is workable, affordable and suitable to meet the needs of those who cannot readily benefit from full integration and who, through their explosive behavior, may pose a threat to themselves and to those with whom they live. At the present time, this cannot occur because the Commonwealth will not fund any new facility housing more than four individuals. This restriction has been imposed by the prevailing philosophy for the past twenty-five years. Simply put, choice does not exist even when professionals produce conclusive proof that a more restrictive environment is necessary. Quite clearly, the least restrictive environment has been perverted so as to mean that no restrictions are permitted.

I am absolutely convinced that many guardians and professional assessors of behavior would choose for the mentally retarded persons who could express no choice, the option of a protected environment located within communities. Currently, the choice rendered is by the prevailing philosophical argument, institutions vs. community. The "protected environment" option would lend itself to contractual arrangements with community doctors, psychiatrists and other medical and behavioral professionals. Such a facility would allow for gradual integration into the community while offering the protection necessary for those who cannot, through no fault of their own, understand the consequences their behavior may impose on others.

I offer no apology for over 30 years of pragmatic knowledge which concludes that while many mentally retarded individuals can grow and flourish in the community, there are also those who cannot. We have encountered some individuals whose aggressive and

violent behavior is such that those pose a serious threat to their roommates, staff and the community at large. When staff utilize the prescribed, sanctioned plans to curtail the behavior, they are scrutinized for abuse. A concrete example is an individual we received from a local personal care home. The county chose our facility rather than consider a more restrictive environment. Shortly after living with us, he attacked an elderly roommate and broke a staff person's arm. The episode required a call to the community's crisis team and a police escort to the psychiatric unit of our local hospital. The attending psychiatrist refused to admit the individual in spite of the fact that he was a danger to others, by stating that his primary diagnosis was mental retardation and therefore his actions were due to behavior problems rather than psychiatric problems. Despite the pleadings of the County Administrator and our agency's staff, he was returned to the group home with advice that he be handled through the legal system—by pressing assault charges against him. So much for supports in the community. What about the choice of his roommates to be free from harm? I might add the range of options for choice of placement were non-existent since the county was reluctant to choose the institutional option.

Unfortunately, within the next two weeks, after receiving medication intended to reduce his aggression, he exhibited uncontrolled violent behavior at his daytime placement in an adult training facility. With over 45 people present, staff attempted to prevent him from causing harm to those mentally retarded persons around him. During this episode, he suffered a heart attack and died. Staff employed measures in an effort to save his life. After numerous investigations by local police, representatives from OMR, the County

Administrator's office, the coroner and the pathologist, it was determined that his death was not due to staff intervention during his violent behavior. However, before the final ruling, staff underwent great scrutiny when an erroneous preliminary autopsy report indicated that his death may have been related to complications of alcohol ingestion. In disbelief, we requested further tests. Finally we received an apology from the coroner and pathologist who stated that there was no alcohol in his system. Retractions were printed in numerous newspapers, as were statements that the staff had acted appropriately in all facets of handling the situation.

I bring this to your attention to balance all the successful stories; and there are many. But I ask you, could a more reasonable choice of settings have prevented this young man's death? Was it reasonable and normal for him to be assigned 2 or 3 staff people at all times while negotiating the community? Was it reasonable for his housemates, staff and those at the adult training facility to be subjected to his explosive and dangerous behavior? I think not! The lack of choices appropriate to his needs resulted in his dealth.

We have encountered several instances where independent community professionals, of high esteem, have recommended a more restrictive setting than the community now offers. At present, that type of setting is not available, nor is the institution. County Administrators who receive their funding through OMR will not entertain the idea of a Court Commitment even when the facts support such placement. Their hesitancy would lead one t conclude that the pressure from OMR is omnipresent. Where is true choice?

Because I have strongly advocated for true choice, and because I have not adopted the prevailing philosophy that all mentally retarded citizens can reside in the community, I have undergone several "visits" to our agency. The first was an unannounced inspection by 4 OMR licensers who contended they received an anonymous complaint that we were not maintaining licensing standards in our group homes. After a through inspection, they found no violations. Within months I was also the recipient of a BFO audit having a very vague scope and lasting 15 days. It also ended with no violations. Most recently, our mother chapter, the ARC, US chose to disaffiliate my chapter because we advocated for true choice! I leave here today asking what special treatment awaits me at the conclusion of this testimony?

I commend you for the Bill of Rights document, which I believe, is an excellent attempt to bring sanity where none currently exists. In reviewing the proposed Bill of Rights, I would ask you to take a closer look at Section 4(a)(1) on page 5. If the Commonwealth's treatment professionals are determined when community-based treatment is appropriate, it will be led by the Commonwealth's philosophy and dollars, not by individual needs. Independent or community-based treatment professionals should be included in the decision-making process, as they are the professionals who will be serving the mentally retarded individuals when they return to the community.

We must stop the zealous, mean-spirited, name-calling, lies and half-truths hurled at each other. Guardians, professionals, the community, the legislature and the mentally retarded

individuals deserve better. They deserve the truth and a real choice of options most suited to their individual needs, not burdened by contesting philosophies.

## WAITING LISTS

I will spend a brief portion of my testimony on waiting lists. I believe the waiting lists now accruing in our communities are a direct result of prioritizing deinstitutionalization over community needs.

In our community nearly one hundred mentally retarded persons have been identified as being in a need of housing placement. One must realize that the number projected is based upon ideal conditions. For example, if and when a vacancy exists or new housing is available, the family of the mentally retarded individual may not wish to avail themselves of that placement. I have found more often than not, the need for placement is based upon the family or caregivers' ability to care for the mentally retarded individuals at that time. That moment in time may not correspond with the existing opportunity for placement. I believe counties react to the crisis which exists at any given moment. A more accurate picture of waiting lists would be most clearly identified by county Base Service Units presenting the information to a statewide system.

With the above in mind, make no mistake about it the waiting list in the community is real. As to the specific identity and quantity of services needed, a statewide system to

collect data is absolutely crucial.  The data must be all-inclusive and accurately portray the cost of delivering such services.

I close by extending my deepest respect to members of the House of Representatives who sit before me today for their ambitious undertaking.  Over the past two years, the committee has committed itself to establishing an appropriate course for the care and treatment of the Commonwealth's mentally retarded citizens: a cause that has not endeared them to either side.  Please keep in mind, as it appears you have, that your only interest is the appropriate care of the mentally retarded citizens.  I commend and thank you.



LAWRENCE COUNTY
ASSOCIATION FOR RETARDED CITIZENS

Room 306 • 101 S. Mercer Street
New Castle, Pennsylvania 16101

RECEIVED
JUL 2 7 2011
HARRISBURG, PA
PER _____ DEPUTY CLERK

Judge Jones
Clerk of Court
Federal Bldg. & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Mr. Joseph Lambo
2707 Graceland Rd.
New Castle, Pa. 16105

**FILED**
**HARRISBURG, PA**
JUL 2 5 2011
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 26, 2011

Clerk Of Court
Federal Building & United States
    Courthouse
228 Walnut. Street
Harrisburg, Pa. 17108-0983

Robert W Meek
Disability Rights Network of Pa.
1315 Walnut St., Suite 500
Philadelphia. Pa. 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones:

My name is Joseph Lambo, I am the father and court appointed co-guardian along with my wife Carina M. Lambo, for my daughter Beth A Lambo. Beth is a 46 year old, non-verbal female currently residing at Polk Center. Beth has been a resident of Polk Center for 42 years. Beth has been diagnosed with profound mental retardation, autism and epilepsy with an escalating seizure disorder. She has a psychiatric diagnosis of Pervasive Development Disorder. further described in her individual support plan (ISP) as "stable/consistent functioning within the profound range of mental retardation." Her mental age has been placed at 18-months.

I feel it important to provide the following excerpts from her ISP completed on February 8, 2011 for you to better understand Beth and how this agreement may ultimately impact her life:

- Change is slow and hard for Beth, she may resist change.
- She is not able to express what she knows.
- Her diagnosis of Pervasive Development Disorder affects every aspect of her life.
- She doesn't have traffic or pedestrian safety skills. She needs staff with her at all times.
- She doesn't know not to put hot foods or drinks in her mouth. She will pick up any beverage and drink it. She wouldn't be safe around household chemicals.
- She is not safe around kitchen appliances.
- She doesn't have good environmental safety awareness. There are a lot of build-in safety protections at the Center that may not be out in the community.
- She needs staff monitoring when she eats to ensure her safety.
- She may pick up objects from the floor and put them in her mouth.
- She would not be able to protect herself from financial or personal exploitation.
- She would not be able to protect herself from drowning in water over her head.
- She doesn't react to fire alarms. She needs staff to help to know where and when to go.

JA564

- She needs to have unbreakable objects (not glass) within her reach for hers and others safety.
- Beth can go with staff to community locations with much supervision and support.
- Beth has a history of having difficulty adjusting to change.
- It is recommended at this time that continued placement at Polk Center remains appropriate.

The above profile of Beth is prototypical of the population of Polk Center. Currently there are 292 residents, 176 of which are diagnosed within the profound range, and 61 of whom are diagnosed as severe; a combined total of 81% of the population. A logical conclusion would be that this population could best be served at Polk Center more safely and more cost effectively with its highly specialized level of care. In 1999 Supreme Court Justice Ginsburg concluded some individuals have needs that are so great they may require institutional care and the ultimate decision whether to leave the institution resides with the individual, not the so-called professionals.

The probable ultimate outcome of the agreement and the implementation of its integration plan will serve to reduce the population to a point that the facility will eventually be closed. It is apparent therefore that the choice as provided by Olmstead may ultimately be in jeopardy if the agreement is approved. Approval will serve to deprive Beth and others like her of the meaningful and obvious choice of remaining in a state run ICF/MR facility and impose community based care on her. This is precisely the lack of choice that the United States Supreme court cautioned against in Olmstead vs. Zimring.

I do not oppose the plaintiff's right in this case to chose the community. I do object however to their effort to request relief on behalf of Beth. Olmstead not only granted the right to live in the community it also protected the right not to do so. The DRN approach doesn't recognize the two-sided approach of the Supreme Court. They appear to be trapped in a one-sided community only mindset whereby they are continually working to counter individual and family choice by proactively seeking the elimination of the ICF/MR option.

The default to community care for those people who do not or cannot indicate if they want to be on the community placement list is once again a one sided approach to the delivery system. Failure to recognize the other side again discriminates against the right of Beth and others like her to choose institutional care.

The agreement is also objectionable in that there has been no appropriate study by either side as to the feasibility of the plan. There is no evidence that adequate community care facilities exist or that the necessary funding is in place to provide adequate care for this more intensely involved population. It appears to be a continuing social experiment that pursues academic utopia. The reality is however that in many cases placement in the community may result in a life and death situation for some. I am not willing to take the

chance that the choice may be the wrong choice that may result in a catastrophic outcome. History will be the judge of whether it is indeed the right approach to provide community care services to everyone. There are many horror stories regarding the closing of ICF/MR facilities and the failure of the community to perform at an acceptable level.

Many advocates claim that community placement is less costly than institutional care. Objective studies have demonstrated there is little or no money to be saved if the residents are moved to the community with a comparable level of care. This agreement doesn't provide documentation in that regard, it is apparent to me that it simply can't be done given the level of involvement of the remaining population. I also submit that the level of community interaction provided by state run ICF/MR's is equal to or better in some cases than interaction provided in the community. The current state-run facilities make a concerted effort to provide community involvement for their residents.

The settlement agreement provides for educational programs teaching residents and guardians about the perceived benefits of the community and how they can be placed on the planning list. There is no provision however that instructs me or my loved one on how they can stay off of the list. The prescribed educational programs should also contain warnings of the potential dangers involved in selecting community care State Center advocate should also be given the opportunity to make presentations expressing their point of view. Beside the above objection to the proposed education program I find it offensive for the DRN to assume that all families of persons residing in state facilities need to be educated. It implies that we are a bunch of dummies. May I suggest that is not the case. I am a college graduate; my wife is a registered nurse. Beth's siblings are: A brother, CPA and Corporate VP of Diebold Corporation in charge of World Wide auditing, A sister is Director of Digital Content Development for John Wiley Publishing and another sister has a masters degree in Special Education and principal certification she is the Director of Distant Education of the Midwestern Intermediary unit #4.

The class identification procedures proposed in the agreement require continuous opposition to being placed on the planning list. Provision should be provided to allow for permanent opposition to community care with the right to change being at the resident or guardians discretion. I have made provision for a successor guardian in the event of my death, many others have not, and their choice should be allowed to stand after their death.

There is no provision in the agreement to provide notice in the event Beth should some how be placed on the planning list. Guardians or decision makers should be notified in all cases when a resident is placed on the list.

The DRN has been given equal status to the DPW regarding placement on the planning list. As previously discussed in this letter the DRN has a biased approach to who should provide care. Allowing DRN such equal status is akin to being allowed to audit your own books.

Consolidating budget lines as proposed in the agreement may deprive state facilities of the funds necessary to adequately run the facility thereby jeopardizing the quality of care and risking the health and safety of the residents. Once again it could result in the imposition of community care in opposition to Olmsted. It could also serve to blur the real cost of providing services independently if line items are combined.

I agree with the concept of providing reports for those who enter community care. I do contend however that the required reports fall short. The reports should also include instances of death, injury incidents and incident allegations.

The proposed legal fee payment to the DRN attorneys is extremely disturbing. DRN is a public funded entity and should not be paid legal fees as a part of the settlement. If they are truly advocates they should insist upon utilizing the funds in support ICF/MR's or community based care. The fee also appears to be an extraordinarily large fee in that they have not undertaken feasibility or cost studies or appeared in court.

In summary, the proposed settlement agreement is a direct violation of the right to choose institutional living by my daughter Beth Lambo. Allowing the agreement to be approved would result in a self-fulfilling undertaking and will serve to bring about the ultimate motive of DRN to close state run facilities. The pursuit of such actions without regard to the effect and ultimate outcome may result in a very unhappy life or even worse death to some of the most vulnerable members of our society. To allow this to happen is unconscionable, the agreement as presented should not be approved.

I will be unable to attend the fairness hearing on August 22nd. Please allow my counsel, Benjamin Hoffart of the law firm of Sidley Austin to present my objection and to provide testimony on my behalf.

Sincerely,

Joseph Lambo
Father and Guardian of Beth Lambo

Carina M. Lambo
Mother and Guardian for Beth Lambo

```
REPORT DATE: 06/27/11 13:50           COMMONWEALTH OF PENNSYLVANIA
REPORT: M0G670-R05                    DEPARTMENT OF PUBLIC WELFARE
AS OF DATE: 06/21/11                  OFFICE OF MENTAL RETARDATION
AREA SELECTED: POLK CENTER            STATE MR CENTERS AND MR UNITS

                      POPULATION PROFILE
                 SUMMARY REPORT BY FACILITY

                  FACILITY: POLK CENTER
          SUBGROUP:

                   RESIDENT CENSUS:  292
```

```
                             TOTAL BY LEVEL
   TOTAL BY LEGAL STATUS      OF RETARDATION        TOTAL BY LENGTH OF STAY
   ---------------------     ----------------      -----------------------
   402 VOLUNTARY    201    317.  MILD         18   0-1  YEAR           4
   405 EMERGENCY      1    318.0 MODERATE      36   1-5  YEARS          1
   406 COURT         90    318.1 SEVERE        61   6-10 YEARS          0
   499 OTHER          0    318.2 PROFOUND     176   11-15 YEARS         3
                           319.  UNSPECIFIED    1   16+  YEARS        284
```

```
        TOTAL BY AGE            TOTAL BY SEX           TOTAL BY RACE
   --------------------     ----------------    --------------------------
   0-4   YEARS        0    FEMALE         151   1 WHITE/NON-HISPANC  276
   5-18  YEARS        1    MALE           141   2 WHITE/HISPANIC       0
   19    YEARS        0                         3 BLACK/NON-HISPANC   15
   20    YEARS        0                         4 BLACK/HISPANIC       0
   21-64 YEARS      195                         5 NATIVE AMERICAN      0
   65+   YEARS       96                         6 ASIAN/PAC.ISLANDR    1
                                                7 OTHER                0
                                                8 UNKNOWN              0
```

```
                   TOTAL OF SPECIAL NEEDS *
                 --------------------------------
                 NON-AMBULATORY              56
                   (AMBULATION CODES 5-6)
                 PARTIALLY AMBULATORY        45
                   (AMBULATION CODES 2-4)
                 BLIND/VISUALLY IMPAIRED    118
                   (ICD-9 369.0-369.9)
                 DEAF/HEARING HANDICAPPED    26
                   (ICD-9 389.0-389.9)
                 NON-VERBAL                 154
                   (ICD-9 784.3)
                 SPEECH DISORDER            109
                   (ICD-9 784.5)
                 CONVULSIVE DISORDER        128
                   (ICD-9 345.0-345.9)

   * NOTE: EACH CLIENT MAY HAVE MULTIPLE SPECIAL NEEDS
                 ..... END REPORT .....
```





CLERK of COURTS
Federal Building + U.S.
Courthouse
228 Walnut St.
Harrisburg, PA 17108-0983



Joseph Lambo
2707 Graceland Rd.
New Castle, PA 16105

JA569

**FILED**
HARRISBURG, PA

JUL 2 5 2011

MARY E. D'ANDREA, CLERK
Per _____
         Deputy Clerk

Mr. James B. Lambo
3114 Blue Ash Avenue NW
Canton, Ohio 44708

July 20, 2011

Clerk of Court                                          Robert W. Meek
Federal Building & United States Courthouse             Disability Rights Network of PA
228 Walnut Street                                       1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                               Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones:

My name is James Lambo and I am the brother of Beth A. Lambo. Beth is a 46 year old, non-verbal female currently residing at Polk Center. Beth has been a resident of Polk Center for 42 years; most of my lifetime as I am her younger brother and 43 years old. Beth has been diagnosed with profound mental retardation, autism, epilepsy with an escalating seizure disorder as well as a psychiatric diagnosis of Pervasive Development Disorder. Growing up with Beth, I have watched that complex diagnosis evolve and learned to explain it to myself and others often citing the simple description used by many in discussions about Beth that states that her mental age has been placed at 18-months.

Further details about Beth's challenges and limitations can be found in her individual support plan (ISP). The essence of the observations in Beth's ISP can be boiled down from my perspective to the facts that Beth is not able to express herself, she does not have the basic safety skills to function on her own in a community setting, she is unable to protect herself and is vulnerable to various hazards without direct and constant supervision, and she has a history of having extreme difficulty in adapting to change.

Beth's story is not uncommon with the current population of Polk Center. Currently, there are 291 residents, 176 of which are diagnosed within the profound range and 61 whom are diagnosed as severe: a combined total of 81% of the population. I have been visiting Beth at Polk Center for over 40 years, from childhood through my adult life. I have watched Polk Center's population shrink and change dramatically over the years. It has gone from a large institution with various levels of residents with varying skills to a much smaller facility with a remaining group of residents that have a generally consistent need for institutional care and protection. The remaining residents are the "tough ones" and

1

JA570

the care they require is specialized. Their situation is hard to deal with and difficult to talk about when considering a move into a community setting.

The Benjamin v. Dept of Pub Welfare agreement sets up a probable outcome that will ultimately reduce the population of facilities such as Polk to a point that the facility will need to be closed. This will take away an option and deprive individuals, such as my sister Beth, of the option to remain in a state run ICF/MR facility. Beth has been served well by the facility at Polk. We know this and the record shows this. How Beth will fair with imposed community-based care is hard to predict. I think it reasonable to expect that there should be an opportunity to choose between these two settings.

I do not oppose the plaintiff's right in this case to choose the community-based care. I do object however, to their effort to request relief on behalf of Beth. I understand that Beth has the right to live in a community. But I also understand that she has a right not to do so. Our family values this choice and the options. The agreement ultimately sets a scenario which removes the ICF/MR option and with it, choice.

I also object to the Agreement because no studies have been conducted and there has been no information provided to show that the implementation plan is feasible. Are sufficient community care facilities available? Are these facilities capable of meeting the current needs of my sister? Will there be enough funding to develop these community facilities to meet the specific needs of individuals such as Beth? I moved to Ohio, but am aware of Pennsylvania's financial plight. I am sure requests for funding are not easy these days. It is unclear how the numbers behind the implementation plan have been analyzed to determine how replacing "what we have" with that same thing in multiple places and calling it "what we need" will be perceived in a state that doesn't have money to spare on these type of aspirational plans. But beyond the dollars and cents, the true cost of unwise placement into the community may be the potentially catastrophic results of placing an individual in a situation that is not in their best interest from a quality of life and a safety standpoint.

The Settlement Agreement provides for educational programs for residents and guardians about the perceived benefits of community care and how they can be placed on the planning list. There is no provision that instructs my family on how Beth can stay off of the list. It would seem that the educational provisions should be more rounded, include information on the potential risks and dangers of community care, and should include presentations from State Center advocates favoring ICF/MR care to truly educate.

There is no provision in the agreement to provide notice in the event that Beth should somehow be placed on the planning list. Guardians or decision makers should be notified in all cases when a resident is placed on the list.

To crystallize my views, I wanted to share with you a recent conversation I had with my 11 year old son who is heading to 5th grade this fall. He asked me about this letter that I was working on. I explained to

2

him that there were discussions about closing Polk Center and moving his Aunt Beth into a group home and that I was writing a letter to a judge and some lawyers to explain that this would not be best for Aunt Beth. He was concerned and asked me, "Why would someone want to move her from a place where she is comfortable and has all the help that she needs." I tried to explain that this was going to be increasingly difficult to do at Polk but that a group home would try to provide the same things. He simply noted, "But if she is happy at Polk, why should we mess with that?"

In recent years, there was a television program called *Are You Smarter Than a 5th Grader?*. After my simple but very logical discussion with my son who is about to enter 5th grade, I can't help but ask the folks making these tough but terribly important decisions about my sister's options; are we being as smart as a 5th grader?

While I am deeply concerned that the proposed settlement will jeopardize my sister's well being, I will be unable to attend the fairness hearing scheduled for August 22nd. Fortunately, Beth is represented by counsel in this matter, and I respectfully ask the Court to allow Benjamin Hoffart of the law firm Sidley Austin LLP to present objections and arguments on Beth's behalf at the August 22nd fairness hearing.

Sincerely,

James B. Lambo
Brother of Beth A. Lambo

3





CLERK OF COURT
FEDERAL BLDG & UNITED STATES COURTHOUSE
228 WALNUT STREET
HARRISBURG PA 17108-0983

J. Lambo
3114 Blue Ash Ave NW.
Canton, OH 44708

JA573

Polly Spare
2010 York Rd. Apt. 209
Jamison, Pa. 18929

**FILED**
HARRISBURG, PA

July 15, 2011

JUL 2 6 2011

MARY E. D'MLUKEA, CLERK
Per _____
Deputy Clerk

Clerk of Court

Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA. 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am a legal guardian for Michael Storm, a profoundly mentally
retarded/bipolar resident at Hamburg Center ICF/MR. I plan to attend the
Fairness Hearing on August 22, 2011 and would like an opportunity to
speak.

Michael is 59 years old, has a mental age of two months, is wheelchair
dependant and has both tracheotomy and gastric tubes. He was admitted to
Hamburg Center under court order in July 2008 after a five month un -
reimbursed hospitalization at Lehigh Valley Hospital. His discharge was
held up because neither his county MH/MR office or DPW could locate
a PA. provider who would accept him. Prior to that hospitalization, he had
successfully resided in a Trexlertown group home for over 20 years. When
approached, that provider asked for $625,000 per year and a $25,000 start up
cost to continue  treatment.

Michael was Pennhurst Class - Halderman v. Pennhurst, US Supreme Court
(1978), as was my daughter. He was discharged to a group home without
notification to his mother, a post polio victim. Within three days she was
contacted by a hospital, learned that he was transferred to a group home,

JA574

[Recipient Name]
July 14, 2011
Page 2

hospitalized, and could not return to his new provider. As his advocate, I
pursued emergency readmission to Pennhurst Center - - - his "home" since
placement there at age four. He required 9 months of rehabilitation to
recover from a 3 day traumatic transfer experience.

I have been Michael's Legal Guardian and Grantor of the Michael Storm
Trust since 1988. I am very satisfied with Hamburg Center's staffing, their
availability, and his programmatic activity. Michael is receiving very good
care and is comfortable in his present environment as reflected by his
behavior.

Michael is one of 120 Hamburg Center residents. 92% are severely
/profoundly mentally disabled, 80% utilize a wheelchair or other assistive
device, 56% are over 55 years of age and many have been there over 25
years. All of the residents require 24 hr. nursing support. Michael requires
1/1 staffing and a nurse for community excursions.

The settlement agreement does not acknowledge special needs of our most
severely/ profoundly disabled people who are incapable of cost effective
and safe community inclusion.

I do not object to community placements, where appropriate, but I do object
to placement of ICF/MR residents, incapable of comprehending or
articulating their choice, being subject to an ODP Discharge Planning
Committee that does not have a balanced representation including consumer
families. (Section 1V 1a)  ODP is a member of the Pa. DPW PAC
(Department of Public Welfare Planning Advisory Committee).
ODP has a required 51% consumer family representation.

I object to consolidated budget lines that would shift funds from ICF/MR to
Waiver to accommodate the waiting list. They are not class members but
they are long overdue for special consideration due to our budgetary
limitations and provider issues.

We have about 17,000 people in need of services in Pa., reportedly over
3000 are emergencies. Five "split fund" placements per year proposed in this
settlement plan is unacceptable. We are not adequately funded to
accommodate inclusion of non-class members and there is no mention of

[Recipient Name]
July 14, 2011
Page 3

any studies by DRN or DPW supporting feasible implementation of this proposed plan.

I am concerned that consumer families may not have seen the settlement agreement. Plaintiff litigation goals have long been focused on institutional closure but ICF/MR residents have a choice option right. Olmstead V. Zimring DID NOT ELIMINATE INSTITUTIONAL CARE.

Thank you for this opportunity to share my concerns.

Sincerely,

Polly Spare
Guardian of Michael Storm

Ms. Pauline Spare
2010 York Rd Apt 209
Jamison, PA 18929-1682

SOUTHEASTERN PA 189

RECEIVED
JUL 2 6 2011
PER
HARRISBURG, PA.    DEPUTY CLERK

Clerk of Court
Federal Building, U. S. Courthouse
228 Walnut Street
Harrisburg, Pa. 17105

17106&0000

JA577

Dear Honorable Judge Jones,    09-CV-1182

I am Florence Plimm, mother of Michelle Plimm, a resident of White Haven Pine Hall since she was 15 years old, now 61, as of March 19, 2011.

Fifty years ago, we looked at several group homes, and we did not like what we saw.

When Michelle was 15, we knew a Doctor who had his son at White Haven. He could afford the best. We visited there and knew, this was the place for Michelle.

She has been there for 46 good, very good years.

This place has been my salvation. Whenever we came there unexpectedly, she was clean and well taken care of.

The atmosphere was always pleasant. God forbid for this place to go would be going back to a bad time.

I have 3 group homes in the back of my home.

These people are shunned, no one speaks to them, actually a little afraid of them, due to actions, they cannot help.

They certainly cannot be integrated.

I DISSAPROVE OF GROUP HOMES

There is no better place than White
(over)    Haven

for Michelle.

I beg of you to keep White House open.

I am past 80 years old and I must know Michelle is in White House and well taken care of.

Thank You For All Your Efforts

Sincerely
Florence Bloom

(215-725-8647)

1608 Griffith St 2nd flr
PHILA., PA. 19111

I'm sorry but my handwriting has become terrible, due to old age.

**FILED**
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

JA579

Florence Peton
F1 2
1800 Griffin St
Philadelphia, PA 19111

RECEIVED

JUL 2 6 2011

PER
HARRISBURG, PA.        DEPUTY CLERK

1710685600

Judge Jones
Clerk of Court
Federal Bldg. + United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0913

USA FIRST-CLASS FOREVER

FILED
HARRISBURG, PA

JUL 2 6 2011

MARY E. ANDREA, CLERK
Per _____ Deputy Clerk

July 20, 2011

Clerk of Court                                    Robert W. Meek
Federal Building & United States Courthouse       Disability Rights Network of PA
228 Walnut Street                                 1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                         Philadelphia, PA 19107-4705

RE:    Benjamin v Department of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek:

Our names are Dale and Darcene Utt. We are legal guardians of Darcene's brother, Mark
Shuxteau, who lives at Hamburg Center for the past 51 years. Mark is profoundly
retarded. His estimated cognitive ability is that of an infant. He has no ability to read,
write, speak or feed himself. He requires total care for his basic needs. He is non-
ambulatory, incontinent of bowel and bladder, has seizure disorder and bouts with
allergic reactions to unknown causes when outdoors.

This class action suit, Benjamin vs DPW, and its goal to close all state-run homes has
resulted in much anguish and extreme emotions on the part of our family. We would like
DRN to understand that to the vast majority of residents and their families these state-run
homes are not 'institutions,' they are 'home!' We feel Mark is being railroaded into
moving from his home of 51 years into a group home whether he and his family agree to
it or not. The goal of the DRN is to close all state-run institutions for the mentally
retarded and, quite frankly, to the 'outsider' the motivation on the part of DRN has to be
budgetary. Nothing else makes sense as to this mass exodus to group homes. How
abhorrent that the population used to cut spending is a group in which most cannot speak
for themselves and are totally vulnerable!

We are very happy for those individuals who are blessed with the ability to reason and
decide that they would prefer to move into a group home. We're thankful their choice is
honored. However, for the great numbers of mentally retarded men and women who
cannot voice an opinion, we find it outrageous that DRN has appointed itself as their
spokesman. Fortunately, Mark has legal guardians who really care first and foremost
about what is best for him and we are blessed to speak for him and say 'No' to the DRN.

As we stated earlier, the family's emotions are inflamed over this law suit and the
eventual closing of all state-run homes. In an effort to share our thoughts and those of
other families in this same situation and in hopes that the DRN and Judge Jones would
reconsider this proposed Settlement Agreement, including the closing of homes such as
our beloved Hamburg, the following will be fact based, free from emotional outburst.

Fact: For 51 years the Shuxteau family is eyewitness to the excellent quality of life and
exceptional care Mark receives at Hamburg Center. Mark is consistently happy, well fed,
well groomed, content, and known by all at Hamburg from management to support staff.

Page 1 of 3

JA581

Fact: A move for Mark will sever the life and relationships that have enabled Mark to thrive.

Fact: Mark has 24 hour medical care at Hamburg which is necessary due to his many health concerns.

Fact: DRC is to be commended for ensuring that those mentally retarded men and women who express desire to live in a group home get to do just that.

Fact: Neither DRC nor any person or entity can prove that a non-answer from a mentally retarded person in fact means 'yes'.

Fact: As legal guardians Dale and Darcene are against moving Mark from Hamburg to any other facility.

Fact: As legal guardians Dale and Darcene oppose Mark being placed on any ICF/MR Planning List.

Fact: Placing people on the State ICF/MR Planning List who have not indicated that they want to be on the List is simply wrong as the DRN presumes to know the wishes of those who cannot speak for themselves.

Fact: DRN Facility Advocates should not have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

Fact: DRN should be obligated to provide to the residents and their families statistics regarding group home abuse, staff turnover, salaries and benefits of that staff.

Fact: In Olmstead v Zimring the US Supreme Court cautioned against the lack of choice residents and families have as depopulation of state-run homes forces their closure and imposes community based care upon us.

Fact: The proposed Settlement Agreement provides for consolidating budget lines, thereby depriving state-run ICFs/MR of critical funding, jeopardizing the quality of care and risking Mark's health and safety…ultimately imposing group home status upon us, contrary to the Supreme Court's Olmstead decision.

Fact: No studies have been done and neither DRN nor DPW have made any showing that the implementation plan is feasible. Where is the evidence that sufficient community care facilities are available and capable of meeting the needs of Mark and those with similar needs?

Fact: Where is the proof that there will be sufficient funding to operate all these group homes in light of recent budget cuts?

Benjamin v Department of Public Welfare, No. 1:09-ev-1182-JEJ
Page 2 of 3
July 21, 2011

Fact:  The proposed Settlement Agreement provides for inadequate and one-sided status reports.  Any status reports should include reports on deaths, injuries and other harm resulting from relocation to community-based forms of care.

Fact:  We object that the DRN of PA, a publicly funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Final Fact:  With a waiting list of 18,000 people seeking placement, why does the DRN not make placing these individuals their priority?  Why has the DRN chosen to close state-run homes and transfer the residents before reaching out to those families who are waiting for help?.  Could it be budgetary/political and not necessarily in the best interest of the individual?

We thank you for your time and your consideration of our opinions and the above facts and look forward to an opportunity to speak at the fairness hearing on August 22, 2011.

Sincerely,

Dale and Darcene Utt
1206 S. 24th Street
Allentown, PA  18103
610-439-9039

Benjamin v Department of Public Welfare, No. 1:09-ev-1182-JEJ
Page 3 of 3
July 21, 2011

JA583



Dale A. Utt
1206 S. 24th Street
Allentown, PA 18103

RECEIVED
JUL 2 6 2011
PER _____ DN ___
HARRISBURG, PA

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983



FILED
HAR̶̶̶̶̶RG, PA

̶̶̶̶ 2011

̶̶̶̶̶̶̶REA, CLERK
Deputy Clerk

John Bastek

3100 Laurel Run Avenue

Reading, PA 19605

E-mail: jjb19605@verizon.net

July 24, 2011

Clerk of the Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the father of two disabled children. My older son lives at home with me and my younger son Danny has been a resident at Hamburg Center since 1989 and I am his court appointed guardian.

He functions in the severe range of mental retardation. He has a psychiatric diagnosis of Bi-Polar I Disorder (diagnosis code 296.42) which is characterized by periods of extreme manic behavior including assault, destruction and inappropriate vocalizations. He also suffers from psychotic behavior. Because of the severity of his condition and for the reasons that follow, I strongly object to the proposed settlement. The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of the State-run ICFs/MR. This depopulation and eventual closure will deprive me and Danny of a meaningful choice to remain in ICF/MR care and impose community based care upon Danny even though community care is not the best care for his needs. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

1

JA585

About two years ago community placement seemed like a possibility despite his behavioral issues. But all of that changed last October when my son's psychiatric & anti-psychotic medications resulted in a severe negative reaction that almost took his life and resulted in a diagnosis of Neuroleptic Malignant Syndrome (NMS). His illness was so sever that his psychiatric & anti-psychotic medications had to be stopped cold turkey and although it was necessary, medically it is a very undesirable thing to have to do. He laid in the hospital in a fetal position 24/7 for 35 days. He only ate the equivalent of 4 to 5 meals in the 35 days that he was in the hospital; he lost 40 pounds and also lost his ability to walk and he is still unable to walk..

My son finally returned to Hamburg Center to an environment of caring & loving people and within 1½ days he was sitting up in, eating and talking again. Just think about that for a moment. Medically he was getting good care in the hospital but he just laid there 24/7 in a fetal position with no sign of progress and yet within a 1½ days at Hamburg Center he was sitting up the whole day, talking and eating. The difference is that at Hamburg Center he was back home with the people with whom he spent the last 22 years.

Hamburg Center is the home for 120 people and I dread the thought of 120 people being taken from their home and in many cases being separated from the only family they have. In State Centers approximately 40% of the residents have been in the center for more than 50 years. The centers are their homes and the staffs are their families.

When my son returned to Hamburg Center his psychiatric medications were restarted but because of the NMS diagnosis his anti-psychotic meds could not be restarted. Ten days after returning to Hamburg Center a severe mania cycle started and he initially went 48 hours with no sleep followed by 3½ weeks of between 10 min to 1½ hours of sleep per day. December 23rd his mania broke and his behavior was very good for 31 days. Then a 2nd mania cycle started and increased daily getting far more intense than the last mania cycle. By March 4th the mania resulted in physical injury

2

to a number of Hamburg staff. As a result he had to be sent to the Reading Hospital
ER. State Centers are not allowed to use restraints. It was necessary to give him 5mg
of valium in each arm to calm him down before he could be transported. He was then
transported to the ER in 4 point restraints and remained in them continuously for 2 ½
days and then intermittently for an additional 3 days - and he needed to be in
restraints for his safety and the safety of the staff. After a day in the ER he was
transferred to the Reading Hospital psychiatric ward and remained there for 23 days.

Actually, we were very fortunate to have my son accepted by the Reading Hospital
psychiatric ward. It resulted only after multiple phone calls on a Saturday to the
Reading Hospital Chief psychiatrist by Ed Siminitus (The Hamburg Center Facility
Director), Dr. Von Rago (the Hamburg psychiatrist) and Dr. Ed Michalick (the Berks
County MH/MR Administrator). In a situation like this Service Access Management
(SAM) does a bed search and if the Reading Hospital had not opened up a bed for
my son he could have wound up in Philadelphia or some other part of the state
making visitations very difficult.
The psychiatric ward was reluctant to open up a bed for Danny because they knew he
would require one to one care 24/7 and that would put a strain on their staff. A bed
was only opened up after intense lobbying by the Hamburg Center Director, Dr. Von
Rago,  Dr. Michalick and the long term relationship that Hamburg had established
with The Reading Hospital over many years.

The psychiatrists treating my son and I both feel the extensive time I spent with my
son accelerated his recovery. I spent 6 to 8 hours a day with him and documented his
behavior and progress for 23 days. In that controlled environment a new anti-
psychotic medication more compatible with NMS was successfully introduced. He
returned to Hamburg March 28, 2011.

When my son is manic it takes a toll even on the best trained staff. In a State Center
environment there are enough aides so the staff can be rotated; individual staff don't
become overwhelmed and frustrated, which makes the mania worst.

3