For example, it was the 4th day in the psychiatric ward of the Reading Hospital when my son was temporally out of restraints. He became very manic when they were trying to do some medical tests. Additional staffers were called in; that just made matters worst and my son started spitting. Two staff members held him down and tried to put a mask over his face. That just made my son even more manic. The mask had stretch bands to put over his ears. I told them that he would just pull the mask off and he did.

But; two of the staff members got extremely angry and were hell bent on putting the mask back on only to have my son pull it off again. Finally they gave up and put him back in full restraints.

There was great anger in the two staff members even though they were trained to deal with severe psychiatric patients. So even the best trained staff can get frustrated, very angry, and lose control resulting in the escalation of the situation. That's why it is so important to have the capability to rotate staff which can be done in a center setting with large staff. In group homes where the number of staff members is much more limited and adequately trained staff and the ability to rotate staff would not exist.

My sons mania is most likely the worst ever seen in the State Centers. Both the Hamburg psychiatrist and all three of the psychiatrists that treated my son in the Reading Hospital said that the longer a mania cycle lasts the more severe the next mania cycle will be. The November – December mania cycle lasted 4 weeks and the 2nd mania cycle lasted 7½ weeks and was much more intense. Technically his mania cycle is not termed over until his sleep pattern returns to normal and that has not happened yet. Dr. Von Rago, the Hamburg psychiatrist, said it may take as long as 12 months to reach that milestone.

4

My son's condition frightens me. It's no secret that the State Arc and the Disability Rights Network (DRN) have been putting great pressure on the Office of Developmental Programs (ODP) to close State Centers. Because of this fact I had looked at community placement about two years ago and there was only one provider in Berks County that was interested in accepting my son. It is the largest provider in Berks County and over the years the vast majority of placements from the county went to this provider. As a result none of the other providers grew very much. About 18 months ago the State found issues with this provider and has not allowed any new placements since and there is no resolution of these issues in sight. Consequently, if the center were to be closed today there would be no provider in Berks County willing to take my son.

So what do I do? There is no community care facility capable of properly caring for my son and the best option for him is the Hamburg Center where the number of adequately trained staff minimizes the risk that Danny will have additional episodes. I hope my comments will give you a better understanding of issues I will face if Hamburg Center is closed. My greatest fear is that Hamburg Center will be closed and ODP will find a provider to take my son, most likely a small provider and at some point my son will have another mania cycle and wind up in the ER but the next time The Reading Hospital Psychiatric Ward may not accept him and he likely will wind up in Philadelphia or some other distant place making visitation difficult. Moreover, it is likely the provider would not be anxious to take him back so he could wind up with an extended stay in a psychiatric ward.

As stated above and for reasons herein, I strongly object to the proposed Settlement. The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of the State-run ICFs/MR. This depopulation and eventual closure will deprive me and Danny of a meaningful choice to remain in ICF/MR care and impose community based care upon Danny even though community care is not the best care for his

5

needs. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

I also object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

While I do not object to the Plaintiffs in this case choosing to live in a community setting, I object to their attempt to make decisions for Danny an myself. I currently choose to keep Danny in ICF/MR care and I do not want that choice taken away from me. The Settlement Agreement filed with the Court will deny me that choice or make any perceived "choice" to stay in ICF/MR care unmeaningful.

I plan to attend the August 22, 2011 fairness hearing. I respectfully request that I be allowed to give oral testimony at that time.

Sincerely,

*John Bastek*

John Bastek

Father & Court appointed Guardian of Danny Bastek

6

JA590



JUL 25 2011

READING PA 196

Clerk of the Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

1710131727



John J. Bastek
3100 Laurel Run Avenue
Reading, PA 19605-2176

RECEIVED
JUL 26
HARRISBURG, PA.
PER _____
DEPUTY CLERK

Grace H Meo
239 Timberline Dr.
Cresson, PA 16630-0123

FILED
HARRISBURG, PA
JUL 2 6 2011
MARY E. D'ANDREA, CLERK
Per
Deputy Clerk

July 18,2011

Clerk of Court                     Robert W Meek
Federal Bldg. & U S Courthouse     Disability Rights Network of PA
228 .Walnut St                     1315 Walnut St  Suite 500
Harrisburg, PA 17108-0983          Philadelphia, PA 19107-4705

RE: Benjamin v. Dept of Public Welfare, No 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am Grace Meo, Mother of Maria Meo, who resides in Ebensburg Center
since July 1967.  She was born April 10, 1958, with a brain injury at birth.
She is considered profoundly retarded, or about 2 years in age level.  She
does not speak in sentences, just words.  She must be watched at all times
since she has an unusually narrow throat and chokes on liquids and food.  A
staff person is near her at all times.  Several times she has aspirated, but an
alert staff has known what to do to help her immediately and averted several
tragedies, for which I am most grateful.  She is in a Center where all the
people are aware of her problems.  She is very active and strong, but the
medical staff have found the best medication for her to lead as *normal* and
less stressful life possible.

I am Maria's legal guardian since Oct 5, 1998, but will be 90 years old this
Thanksgiving Day, so her brother Michael will take care of her when I no
longer can.  He now drives us around at least once a week on our visits and
is aware of her need for 24hr. care.

I do not oppose anyone requesting community care, I just know my
daughter would not be safe in a community living setting.  She does not
know what street lights are, would step out in traffic at anytime, causing a
threat to anyone in the community.  Living in a community setting she
would be very unsafe in a kitchen area, hot stoves, dish detergent
(Example: Dawn - the pretty green color would be a "drink" to her.)  She is
very unsafe on steps (several group homes I have visited had 2nd floors),

free access to a bathroom would be dangerous for her and unlock door would be unsafe. Previous information of people leaving an ICF/MR Center for a community group home have ended in a tragedy because no one had time to check on the person's where a bouts! In the Centers we have no worry since there is "safety in numbers" and there is _always_ someone watching them, even when they are sleeping. In the group home who is there to check on what goes on, things can happen so quickly, if someone in charge is busy, _who_ can take over to watch the others living there!

I will not let Maria Meo's name be placed on the Planning List: she could not exist "safely" in a Community setting. She needs 24hr care!!
Please keep my daughter, Maria Meo name off the Planning List, and let her live in peace at the Center. We pay taxes and she deserves to live where she is now! Pennsylvania cares more about building another prison - how about building another "Center" to help the waiting list of people who need help in caring for their child.

This would be a help to the economy. Put more people to work, and make some sense in spending money on a good cause, helping many Pennsylvanians who need help for loved ones, **INSTEAD** of building another prison! Parents, guardians etc. have _always_ been advised they could move their loved one to the Community, it was up to them to voice their wishes. I have been President of the Board of Trustees at Ebensburg Center and President of the ACE (parent group) for many years and we stressed the fact they were free to request a move to the Community or closer to family home at anytime. A group at administrative level took charge immediately to set the wheels turning to get the move of the resident out into the Community to their satisfaction. No one, to my knowledge, was ever denied this request at Ebensburg Center.

I object to DRN of PA, ( a public funded entity), be given $432,500 in legal fees and request DRN split the $432,500 in half with the people on the "waiting" list who need help to care for their loved ones living at home or outside the Pennsylvania Centers!

I again want to emphasize that I do not want My daughter's Name on the Planning List, (she would never survive life in a Community Living.) To be sent to the community to live would surely be a tragedy to all our residents

in Ebensburg Center - each and everyone - the blind, crippled, in the wheel-chairs, profoundly helpless, unable to advance in educating them to live elsewhere, would be <u>anything</u> but fair in this *day of crime* out in the community.  Just read your newspaper!!

Give us the "choice" to stay in the Centers (out of "harms" way,) and help the people on the waiting list!

Let's make this our stand to show everyone that **Pennsylvania HAS A HEART** - a state that takes care of their own!  Let's be an example for the other 49 states and show them we can do it.  Happy Day!!

To: Judge Jones - I am in my 90th year - born November 24,1921 and cannot travel 8/22/11 to Harrisburg to speak at the hearing.  May I, please request that Attorney Benjamin J Hoffart at  Sidley Austin Law firm present my feelings about the Centers and the settlement of this case fairly for the most helpless people in the State of Pennsylvania.

Sincerely
Grace H Meo

*Grace H. Meo*

Guardian of Maria E Meo



USA FIRST-CLASS FOREVER

Grace Meo
239 Timberline Dr
Cresson, Pa 16630

Clerk of Court
Federal Bldg & U.S. Courthouse
228 Walnut St
Harrisburg, Pa 17108-0983

RECEIVED
JUL 2 6 2011
PER _____ DEPUTY CLERK
HARRISBURG, PA.

1710895800

Amelia and Jerry Hake
4655 Breezyview Road
Lancaster PA, 17512

*FILED*
*HARRISBURG, PA*
*JUL ?? ?? 20??*
*MARY E. D'ANDREA, CLERK*
*Per _____*
*Deputy Clerk*

July 18, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

We are the parents of Audrey Louise Hake, an ICF/MR resident at Selinsgrove center. Our Audrey is considered profoundly mentally retarded (pervasively developmentally delayed) as well as being hearing and visually impaired. She is nonverbal and has recently been considered to exhibit autism spectrum disorders characteristics such as stereotypy, resistance to change, sensitivity to bright lights, and self-mutilating behaviors such as hitting herself.

We feel this settlement would be unfair to our Audrey. She needs to have 24/7 care available. She lacks many skills necessary to be in a community setting, including safety skills. At Selinsgrove, Audrey has been taught to do more far more than we were ever lead to believe she could. She is happy there, which has always been our wish for all of our children. We always felt with the proper help and care she could be taught much. The staff at Selinsgrove has taught her well. Along with being in a setting in which she could learn, we were greatly aware of her need for a safe environment. Selinsgrove offers her both.

In the past we struggled long and hard to find placement for our daughter. We exhausted every avenue presented to us. We went to every local organization such as the Blind Center, Guidance Clinic, etc... We also traveled as far as the Perkins Institute in Massachusetts, with no avail. It was in absolute desperation and complete frustration that we called the Governor's Office one day. Our goal was to find out what loophole was keeping Audrey out of school. It was during this call that we were transferred to Mr. John Pittenger, The Secretary of Education for the State of Pennsylvania. Mr. Pittenger not only listened, but pursued the issue with fervor. With his assistance we were able to place Audrey in Selinsgrove Center. We are forever in his debt. While sending our daughter away from home was the hardest decision we have ever or ever will make, *it was the right thing to do!*

The staff worked with Audrey and taught her so much. They set a routine and she thrived. They set boundaries and she accepted them. State Schools/Centers are not what they were once thought to be. Our daughter is truly happy at Selinsgrove. She has a beautiful living area and she enjoys the lovely grounds. She is cared for and about by the best staff anywhere.

We also object to the proposed Settlement Agreement because this is not a "one size fits all" solution. Not everyone can be in community based care. Audrey is one of those special people. We do not feel she would have 24/7 supervision, the great medical care, or be as safe as she now is at Selinsgrove Center.

There are potential dangers that come with community based care. We worry about neighbors to the facilities and how they will interact with Audrey. She is in a portion of the population that can be easily preyed upon. We have not had any issues within the Selinsgrove community and we worry other

JA596

communities would not be as safe or accepting. We also oppose the Settlement Agreement for the following reasons:

- I do not oppose the Plaintiff's right to choose community care for themselves, but I do object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.
- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

In closing, we have no evidence that there is sufficient community care available in our area that can meet Audrey's needs. We oppose any idea of moving her from Selinsgrove Center. Selinsgrove is more than a facility to Audrey, it is her home. We had to move Audrey once to Selinsgrove and it has become a place where she thrives, we do not want to have to move from her home a second time. We oppose the Settlement Agreement in its entirety and do not want our daughter placed on the planning list.

Sincerely,

Amelia and Jerry Hake
Mother and Father of
Audrey Louise Hake





U.S. POSTAGE
PAID
COLUMBIA, PA
17512
JUL 12'11
AMOUNT
$1.08
00053807-01

UNITED STATES
POSTAL SERVICE

17108

1000        17108

RECEIVED
JUL 12 2011
PER_____
HARRISBURG, PA
DEPUTY CLERK

Clark of Court
Federal Building + United State CourtHouse
228 Walnut Street   10260
Harrisburg,   Pa.  17108-0913

Amelia and Jerry Flaker
4655 Brenyner Road
Columbia, Pa.  17512

JA599

Kay Wagner

320 Nicodemus St.

Martinsburg, PA 16662

FILED
HARRISBURG. PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 15, 20011

Clerk of Court
Robert w. Meek

Federal Building & United States Courthouse
Disability rights Network of PA

228 Walnut Street
1315 Walnut Street Suite 500

Harrisburg, PA 17108-0983
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am a friend of the family of Del Gordon that is a resident of Ebensburg Center. He is a 57 year old man with the IQ of an 18 months old baby. He does what a child that age does with a big man's body. I think that anyone that is good enough to live in the community should do so, but the profoundly retarded do not do well in the house next door. They have many health issues both psychological and physical; let's do the right thing and do not take them out of their home where they are well taken care of. They have 24 hr. care with doctors, nurses every need is taken care of, health a job, school fun times (movies, church, camp, etc.), and many schools , churches and organizations come to interact with the residents. Think of what you are doing, to the most fragile of our citizens and once those centers are close there is no turning back.

Sincerely,

*Mrs. Kay Wagner*

Kay Wagner  A friend of Del Gordon a resident of Ebensburg Center

JA600



Clerk of the Courts
Fed. Bldg. U.S. Courthouse
228 Walnut St.
Harrisburg, PA 17108-0983

17108-9800

RECEIVED
JUL 26 2011
PER
HARRISBURG, PA

JA601

Gary & Mary Wills
2363 St Augustine Rd
Dysart, Pa 16636

**FILED**
HARRISBURG, PA
JUL 2 6 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 20, 2011

Clerk of Court
Federal Bldg. & U.S. Courthouse
228 Walnut St
Harrisburg, PA 17108-0983

Robert W Meek
Disability Rights Network of PA
1315 Walnut St Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Public Welfare, No 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

We are legally appointed guardians and Brother and Sister-in-law of Sandra Wills,
residing at Ebensburg Center. We became legal guardian in August 30, 1999, at the
request of Sandra's parents Dave and Rose Wills. Sandra's parents have both since
passed away.

Sandra was born Feb 20, 1951, with severe brain damage. She has lived in State Centers
since about 1961. She was in Ebensburg Center then moved to Cresson Center until it
closed. When Cresson Center was being closed she was moved against parents wishes to
Community Living which was not good for her or the other people in the Community
Living homes. So she returned to the Center were she has been living happily ever since.

We think that Ebensburg Center is the best place for Sandra. Sandy lives at Ebensburg
Center, has her own bedroom, works, and enjoys many activities. The staff at the center
can monitor her so she is kept safe and meds are monitored to correct levels.

We feel this settlement is all one sided. We think that people in the centers that truly
wish to move out in to the community should have that choice but more people in the
community should have the choice to move into the centers. If a person in the
Community looks at the life style of the Center living and wishes to choose the Centers
for them they should be able move into the centers. Center living has a lot of positives
that community living can not guarantee.

The workers at the Centers are well trained and very observant. The workers can read
client faces, body language, expressions, and maybe just the client eyes. They can tell
you if the client is happy, sad, well, sick, or what they may want. There are many checks
and balances that are in place at the Centers that are not available in the community living
setting to protect and best serve the special needs of these Special people living at the
Centers.

We request the opportunity to talk at the fairness hearing on August 22, 2011. I request

JA602

that either my wife Mary L Wills or I, Gary F Wills be able to explain better in person why this settlement is not in the best interest of Sandra Wills or some of the other people living at the Ebensburg Center and other Centers. Please give the family the opportunity to help explain our very important concerns.

We do hereby demand to be withdrawn from this and any future class action suits. We also request that the court reduce the payment of any and all attorney fees and any other payments associated with the class action suit. The reduction to be an amount equal to one client's share. Also we request a penalty be applied of 100 times the client share to deter any future class action suits on Sandra's behalf without our prior consent.

Gary and Mary Wills

*Gary F Wills*

*Mary L Wills*

Legally appointed Guardians of Sandra Wills



USA FIRST-CLASS FOREVER

Mr + Mrs Wills
2363 St. Augustine Rd
Dysart Pa 16636

Clerk of Court
Federal Bldg + U.S. Courthouse
228 Walnut St
Harrisburg, Pa 17108-0983



RECEIVED
JUL 26 2011
PER _____ DEPUTY CLERK
HARRISBURG, PA

17108+9800

JA604

Kimberly C. Gordon

538 Barley St

Roaring Spring, PA 16673

July 21, 2011

Clerk of Court
Robert W. Meek

Federal Building & United States Courthouse
Disability Rights Network of PA.

228 Walnut St.
1315 Walnut Street, Suite 500

Harrisburg, PA 17108-0983
Philadelphia, PA 19107-4705

Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am the sister of Adelbert M. Gordon a resident of Ebensburg Center. He is a profoundly retarded 57 year old man that has the body of a grown man but the mental age of an 18 month baby, so he acts like a baby just like your children did when they were 18 months old. He does not speak, does not understand the concept of how to cross a street so if he is in the community he will cross the street just like walking in a street without cars, he will jump out of a window because he does not have fear of heights, he could break into people's home to try to find food in their refrigerator, with his size he will be mistaken for a robber and heaven only knows what will happened to him; maybe killed.

At Ebensburg Center he has a loving home with people that love him and understand him, and everything he does is easily taken care off. He goes to school, works, and is taken out on trips, camping, to the movies. His life is full of different things, churches come to entertain the residents and the college and high school have volunteers that work with the residents, they have parties every month but more important than that he has 24 hour care with nurses, a doctor a dentist on call and a lot of different staff working for those kids to have a good life. Please open you hearts to these citizens that need a safe place to have a great life and that can only be achieved at the centers because they are so fragile both physically and health wise. If there is anyone good enough to live in the community they should do so, but these are the profoundly mentally challenge they do better at the centers, where the care givers are given a good salary where they can take care of their families and they stay there most of them until they retire. In the community they have a revolving door help because their salary is a little

bit better than minimum wage.  This is why when they die (50% of MR die when they are moved to the community) usually it is because it is an accident; like the young man that died from Western Center when he was moved, he told the caregiver "I do not take baths just showers she gave him a bath and he had an epileptic fit and died.  With the change of help is so often they forgot to tell the care giver that he did not took baths.  An accident yes, but the young man died.

Please think about what you want to do to the most fragile citizen of the United States of America.


Sincerely,


Kimberly C. Gordon

*Kimberly C Gordon*

Sister of Adelbert M. Gordon a resident of Ebensburg Center



USA FIRST-CLASS FOREVER



RECEIVED

JUL 26 2011

PER _____ DEPUTY CLERK

HARRISBURG, PA

Kimberly C. Snyder
536 Beckel St
Roaring Spring, PA 16673

Clerk of court Federal Bldg. + United States Courthouse
2 1 3 Walnut Street
Harrisburg, PA 17108-0983

17108+3600

Ms. Dixie Henry
14213 Crawford Ave
Mt. Union, Pa 17066

**FILED**
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 19, 2011

Robert W. Meek                                   Clerk of Court
Disability Rights Network of PA                  Federal Building & United States Courthouse
1315 Walnut Street, Suite 500                    228 Walnut Street
Philadelphia, Pa 19107-4705                      Harrisburg, Pa. 17108-0983

Re: Benjamin V. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My name is Dixie Henry, and I am the mother and legal guardian of Robert Henry, who is a resident
living at the Ebensburg Center in Ebensburg, Pa.

My son lives in Keystone house of the Ebensburg Center, and has resided there for 43 years of his life.
He is diagnosed with profound mental retardation, blind and is wheelchair dependent for his mobility.

It is my wish that I **do not** want Robert to be moved from the home he has resided in for the past 43
years. I **do not** wish any changes for his life as Robert's needs have always been met, and he is
comfortable and happy in the environment in which he resides.

I therefore, **do not** wish for Robert to be moved to a community setting or another facility within the
state.

Thank you,

*Ms. Dixie Henry*

Ms. Dixie Henry



Mrs. Dixie Henry
14213 Crawford Lane
Mt. Union, Pa 17066

Clerk of Court
Federal Bldg & US Courthouse
228 Walnut St
Harrisburg, Pa 17108-0983

17108-9800

[Write your name here]    *Mrs. Clara Palmer (mother of Anthony Jr. DePaul)*

[Write your street address here]    *2500 S. Grande Blvd.*
*apt. # 508*

[City, State, Zip Code]    *Greensburg, Pa. 15601*

[Enter Date Here]

FILED
HARRISBURG, PA

JUL 26 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court    Robert W. Meek

Federal Building & United States Courthouse    Disability Rights Network of PA

228 Walnut Street    1315 Walnut Street, Suite 500

Harrisburg, PA 17108-0983    Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

In this paragraph describe who you are and your relationship to the loved one who you represent. Are you a guardian? Are you the parent, brother, sister, or other relative of an ICF/MR resident? Where does your loved one live? Please describe the nature of your loved one's disabilities or difficulties.

*I am Anthony J. DePaul's mother. He has been living at Ebensburg Center since 1961. Tony cannot take care of his personal needs. Tony can feed himself but that's all he can do. He does not talk, or bath himself. Tony is happy at the Center + I don't want him in Community Living. Clara Palmer Anthony's mother.*

JA610





Mrs Clara Palmer
2500 S Grande Blvd Apt 509
Greensburg PA 15601-8909

RECEIVED
JUL 2 6 2011
PER _____ DEPUTY CLERK
HARRISBURG PA.

Clerk of Circuit
Federal Bldg & United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-6983

Mary M Kashatus
55 West Main Street
Glen Lyon, Pa. 18617

**FILED**
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 19, 2011

Clerk of Court
Federal Building and United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

Re:Benjamin v. Dept. of Pub. Welfare, No.1:09-cv-1182-JEJ

Honorable Judge Jones,

    I am the Aunt and co-guardian of a 42 year old woman who has been a resident of the White Haven Center for 30 years. Maria is profoundly disabled, both physically and mentally, and is unable to do normal tasks without assistance. She neither speaks nor walks. But she seems to enjoy family visits. I try to visit her at least once a week. Weather permitting, I push her wheelchair around her home building, for there are wonderful paved paths. Otherwise, if we have to stay indoors, we spend time in the family room. I sing to her, her favorite songs -Down in the Valley is number 1. Her Grandfather sang it to her for many years, making up his own verses which included Maria's name. Number 2 is Jingle Bells -a favorite any time of the year. I believe that we are connecting on some level.

    The White Haven Center has become Maria's home. Her care-givers are her extended family. We are so blessed to have this facility where all her special needs are tended to with so much love and kindness and she is safe. Moving Maria out of her "home" would traumatize her, reducing her quality of life. That is just not right.

    I object to the proposed Settlement Agreement of this case because no studies have been conducted showing that the implementation plan is feasible, "choice" to remain in a State Center is denied with depopulation and closure, contrary to the Olmstead decision.

    We can only hope that the fairness hearing is just that.        Sincerely,

Mary M Kashatus
Co-guardian of Maria
Kashatus



Ms Mary Kashatus
55 W Main St
Glen Lyon, PA 18617-1224

RECEIVED

JUL 2 6 2011

PER HARRISBURG, PA. DEPUTY CLERK

Clerk of Court
Federal Building and Public States (courthouse)
228 Walnut Street
Harrisburg, PA 17195 - 0983

**FILED**
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

John Hoops
827 Oley Valley Road
White Haven, PA 18661

July 21, 2011

Clerk of Courts                          Robert Meek
Federal Bldg. & United States Courthouse  Disability Rights Network of PA
228 Walnut St.                           1315 Walnut St., Suite 500
Harrisburg, PA 17108-0983                Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek,

I, John Hoops, plan to attend the hearing on August 22, 2011, to support the settlement
agreement.

Sincerely,

*John R. Hoops jr*

John R. Hoops Jr.

**FILED**
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

John Hoops
827 Oley Valley Rd.
White Haven, PA 18661

July 21, 2011

Clerk of Courts                           Robert Meek
Federal Bldg. & United States Courthouse   Disability Rights Network of PA
228 Walnut St.                            1315 Walnut St., Suite 500
Harrisburg, PA 17108-0983                 Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek,

I am John R. Hoops Jr.  I am from White Haven Center and been in White Haven Center
for ten years and it is time to leave white have.  I would like another chance of life,
because I have my teammates from basketball from Wilkes-Barre.  My girlfriend also is
in Wilkes-Barre and I have a job at Dairy Queen and I work Monday and Wednesday and
Friday this year. I liked to do something to help the Military and I like animals.  I am
happy that this settlement will help me move.

Sincerely,

*John Hoops Jr.*

John R. Hoops Jr.



$ 00.44⁰

RECEIVED

JUL 2 6 2011

Clerk of Courts
Federal Bldg & United States Courthouse
228 Walnut St.
Harrisburg PA 17108-0983

17108+09838

ENV30
COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE
WHITE HAVEN CENTER
827 OLEY VALLEY ROAD
WHITE HAVEN, PA 18661-9602

JA616

Ms. Suzanne Perry
1705 S Jefferson Street
New Castle, PA 16102

**FILED**
HARRISBURG, PA

JUL 26 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 22, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W Meek
Disability Rights Network of PA
1315 Walnut St, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones:

My name is Suzanne Perry, sister and court appointed guardian for my brother Bruce T
Allen. Bruce is 50 years old, non-verbal male residing at Polk Center. Bruce has been a
resident of Polk Center since 4-15-70. Bruce has been diagnosed with profound mental
retardation, etiology: Down's syndrome. A review of scores indicates adaptive
functioning also falls within the profound range of mental retardation. Bruce can not
state, read, or write his name, identify US currency, develop a budget, make change, or
answer simple financially related questions. Bruce meets the standards for an opinion of
financial incompetence. He has not been formally adjudicated financially incompetent by
a County Court of Common Pleas. Bruce is semi-independent with respect to most
functional daily activities but, does require some assistance and/or supervision
throughout the day. Sensory problems include visual impairment and auditory
impairment (moderate to severe). Significant medical/health problems include: psoriasis,
hypothyroidism and hyperlipidemia.

I feel it is important to provide the following excerpts from his ISP, completed March
2011 for you to better understand Bruce and how this agreement may ultimately impact
his life:

- Bruce is unable to communicate verbally and this can cause a barrier to his
  acceptance.
- He is resistive to being rushed, if he were in a situation where he had to rush he
  would resist that.
- He doesn't like a lot of noise or confusion.
- He does not like change in his routine.
- He does not choose the medications he receives or the treatment for his conditions.
- His limited ambulation and the fact that he has degenerative joint disease could be
  a barrier to different things.

JA617

2

- He lacks sound localization because of his hearing loss. He may not be able to tell where sound is coming from .
- He doesn't recognize auditory cues for evacuation, nor can he independently evacuate in the event of a fire  or actual emergency.
- He doesn't recognize household or dangerous chemicals.
- Bruce could easily be victimized either financially or physically by designing persons.
- He lacks traffic or pedestrian safety skills.  He may not hear the traffic or know where the sound is coming from.  He does not look when crossing.
- I do not oppose the Plantiffs right to choose community care for themselves, but I object to the Plantiffs' efforts to request relief on behalf of my loved one.
- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to be placed on an ICF/MR Planning list.  My current opposition to community care has  no permanence if I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.
- The proposed Settlement Agreement places people on the State ICF/MR planning List who have not indicated that they want to be on the List.
- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.
- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets place on the State ICF/MR Planning List.
- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does  not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.
- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of Ste-run ICFs/MR.  This depopulation and closure will deprive me and  Bruce of a meaningful choice to remain in the ICF/MR care and will impose community based care upon me and Bruce. This is precisely the lack of choice that the United States Supreme Court cautioned against in the *Olmstead v. Zimring*.
- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of Bruce and further

3

imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.
- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should be also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.
- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of the residents either in ICF/MR or community-based care facilities.

The proposed settlement agreement is a direct violation of the right to choose institutional living by my brother Bruce Allen. The agreement as presented should not be approved.

I will be unable to attend the fairness hearing on August 22nd. Please allow Benjamin Hoffart of the law firm of Sidley Austin to present my objection and to provide testimony on my behalf.

Sincerely,

*Suzanne Perry*

Suzanne Perry
Sister and Guardian of Bruce Allen

JA619

Suzanne Perry
1705 S Jefferson St
New Castle PA 16102-1524

PITTSBURGH PA 152

22 JUL 2011 PM 5 L

CLERK OF COURT
FEDERAL BUILDING & UNITED STATES
COURT HOUSE
228 WALNUT STREET
HARRISBURG, PA 17108-0983

RECEIVED

JUL 26 2011

PER _____
HARRISBURG, PA    DEPUTY CLERK

17108+3338

JA620

Wilson McKinley
B1008 Tanglewood Drive
P.O. Box 173
Albrightsville, Pa. 18210

**FILED**
**HARRISBURG, PA**
JUL 2 6 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 18, 2011

Clerk of Court                                     Robert W. Meek
Federal Building & United States Courthouse        Disability Rights Network of Pa.
228 Walnut Street                                  1315 Walnut Street, Suite 500
Harrisburg, Pa. 17108-0983                         Philadelphia, Pa. 17107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

      My name is Wilson McKinley and I am the father of Beatrice Frances McKinley. Beatrice has been a resident of Hamburg State Hospital for over fifteen years since she was transferred there from Norristown State Hospital.

      Beatrice is 45 years old and has been a ward of the state her entire adult life. She functions at the level of a six year old but is a danger to herself and others which is why she is assigned a staff member 24 hours a day (one on one). About twenty years ago Beatrice was placed in community living and at that time her behavior was much better than it is now. That placement lasted a grueling 3 months before she was sent back to the hospital after pushing her new bedroom furniture down the steps from the second floor.

      If Beatrice is asked if she wants to try community living she will probably say yes, and if she is placed in that setting it will be a disaster. Based on her history of self mutilation and attacks on others it puzzles me why anyone would even give her that option.

      Any ruling by the court that forces the state to set the gears in motion to transfer a patient to community living based on that persons misguided desire would be wrong. The professionals that work with a patient, along with the input of concerned relatives or guardian, should be the ones to make the decision for community placement.

      I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiff's efforts to request relief on behalf of my daughter.

      Under the proposed settlement agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

      I strongly object to any ruling that would result in community placement of my daughter Beatrice.

Sincerely,

*Wilson McKinley*
Wilson McKinley
Guardian of Beatrice F. McKinley

JA621





RECEIVED

JUL 2 6 2011

PER

HARRISBURG, PA.    DEPUTY CLERK

Wilson McKinley
P.O. Box 173
Albrightsville, Pa. 18210

Clerk of the Court
Fdrl. Bldg. & US Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

17101317727

JA622

Thomas Kashatus
55 Newport Street
Glen Lyon, PA 18617

FILED
HARRISBURG, PA
JUL 2 6 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July, 21, 2011

Clerk of Court                          Robert W. Meek
Federal building & United States Courthouse    Disability Rights Network of PA
228 Walnut Street                       13315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983               Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

Maria Kashatus (42), my daughter and oldest child of five children, has been a resident of White Haven Center since April 1980. Maria began to walk and talk within two years and then became disabled allegedly as a result of high temperatures on two different occasions. At first, as Maria's abilities receded she remained at home with her family while attending special education schools. She then attended a gamut of group homes (4) as her needs and the care and needs of her siblings became overwhelming for her parents. Due to a constant changing of staff and residences and continued decrease of mental and physical abilities, it was necessary to seek an alternative living arrangement for Maria. At age of eleven and upon with the recommendation of the Children's Service Center , her base service unit, Maria was placed at White Haven Center where she has remained since. Maria is non verbal, non communicative, and exhibits a developmental state of three months. Over the years Maria has been fairly stable and reliable with her toilet training. Her mother, Margaret, and I are co-guardians of her person, her mother is representative payee of her finances.

In my opinion, Maria would be devastated with a move into the community from her **home** at White Haven Center. It would be traumatic to the point that survival would be questionable. For the past thirty one years she has developed relationships with many of the residents with whom she now lives in her **community** of White haven Center – many for that entire span. Her "quality of life" would turn for the worse if she had to leave the support system that has been built for her over the past fifteen years. Those people who are in the position of making life decisions should make it a point to see and experience state center life before they decide if our state centers are not appropriate living arrangements.

The urban, suburban, and rural community is not ready at the present time to accept our society's most vulnerable citizens. The values of just too many of today's populace have not arisen to the social acceptable level to look up those with intellectual disabilities as equals. I don't foresee this to be the case for another fifty years, at least. We still see instances of abuse as in Tunkhannock where residents afflicted with intellectual disabilities were fed feces and urine by their caregivers. We see thievery of funds of community living residents by their caregivers in Mountaintop. We see drug deals going down at the front doors of community homes that are located in the most prominent sections of our towns and cities such as Kingston. There is no place where the affects of crime and violence can escape any area of our communities. Neighbors want very little to do with "group home residents throughout their daily lives and become upset with "constant arrivals of ambulances, fire trucks, and

JA623

police cars." Common sense dictates that a State Center may be considered as a choice to be the best and safest community available.

I have attended many center, statewide, and community meetings over the years and am aware of state policy on abuse, DOH requirements, and quality of life processes. I am convinced that my daughter, Maria, is safe in a state center, and our state centers are in the best of hands. I am satisfied that current management and staff is constantly working toward goals to ensure quality of life for its residents is second to none.

Regarding the settlement I do not oppose the plaintiff's right of "choice" for themselves, but I object to their efforts to request relief on behalf of my daughter. I interpret the rulings in Olmstead vs Zimring to give that as an individual right.

As Maria is our daughter and we speak for her to reside at White Haven Center, the agreement gives no permanence to our wishes in the event of our passing. If transition to the community becomes a must due to closures, the possibility of another state center is not an option. We choose to have another state center residency as an option until Maria passes on.

I disagree with the resolution that individuals who are not able to speak for themselves will automatically be placed on the Planning List. The wishes of guardians and family who have passed on must be respected and carried out. There has to be a better way of resolving this situation and every effort must be made to ensure each and every individual is represented by a guardian prior to this determination.

The DRN facility advocates have an unfair advantage over family organization advocates when resolving the issue of the transition planning list by having full access to all residents' records. The law must be changed to take away the ultimate power rights from P & A's organizations.

The disability Rights Network claims that their goal is "not to close state centers." The agreement is overly unfair and a "smoke screen" to de-population. The agreement figures and schedule for transition over a period of time is basically a plan to close **all** centers. Without the offer of "choice" to the people on the "waiting list for services" ultimate closure will be a fact of life. When will the needs of the emergency and critical individuals on the "waiting list" become important enough to gather the attention needed for action to grant those services?

Once the transition process is put in motion, how can status reports not include statistics on deaths, injuries, and other harmful events resulting from relocation to community based forms of care? The true story of many transitions that were made in the 1990's and resulted in fatalities and abuse was never made public although many unfortunate events eventually leaked within the system.

This agreement between the DRN and DPW is so out of line with the wishes of individuals and families who are to be affected, that it should be negated in its entirety. As president of a family association that represents the residents of White Haven Center, I know from personal contact that over 90 per cent of its population and their families desire to remain at White Haven Center until they pass on. I would wish to participate in the "fairness hearing" on August 22, 2011, and give oral testimony on behalf of my daughter, Maria, and the people that I represent as President of the White Haven Center Relatives and Friends Association.


Sincerely,

THOMAS KASHATUS
Guardian of Maria Kashatus

JA624





LEHIGH VALLEY PA 180



RECEIVED

JUL 2 6 2011

PER
HARRISBURG, PA        DEPUTY CLERK

Clerk Of Court
Federal Building & US Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

Mr Thomas G Kashatus
55 Newport St
Glen Lyon, PA 18617-1214

Mrs. Margaret Kashatus
55 Newport Street
Glen Lyon, PA  18617

FILED
HARRISBURG, PA
JUL 2 6 2011
MARY E. ~~~~
Per ~~~~~~~~, CLERK
Deputy Clerk

July 21, 2011

Clerk of court                                                Robert W. Meek
Federal Building & Unites States Courthouse                   Disability Rights Network of PA
228 Walnut Street                                             1315 Walnut Street, Suite 500
Harrisburg, PA  17108-0983                                    Philadelphia, PA  19107-4705

Re:  **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My name is Margaret Kashatus.  My husband, Tom, and I have a forty two year old daughter, Maria Kashatus, who has resided at White Haven Center since 1980.

I know that my husband has submitted a letter and is planning to give oral testimony at a "fairness hearing" in Harrisburg on August 22nd.  As a mother I feel a need to express some of my personal feelings regarding the agreement between the DRN & the DPW and the above litigation.  Besides what my husband wrote, I must say that our beloved fragile residents, many of whom have outlived their parents and siblings, and aging family members need others who can identify with the problems and issues we all share.  My husband and I have accepted that role at White Haven Center  -  the role to speak out and look out for the welfare of residents and families in every aspect of life.  As we have all grown together over the past thirty one years, many have become tired and old and cannot travel the distances that have become too lengthy and speak out as we should.  The one common denominator that has kept us together is White Haven Center and the staff who work so hard to ensure that our loved ones are safe from the tribulations that are found in the community and that our loved ones continue to enjoy a quality of life they deserve.  Those of us who still have the ability must carry on to speak and look out for those who cannot no longer speak for themselves.  I have witnessed the love that these individuals and their families have for others and am moved way beyond the negativity that we witness in our towns and cities.

As no one of the residents at White Haven Center  has asked to be born with a disability or a problem, they also ask for nothing.  For many, just a smile in return for a kind word or an act might be the highlight of the day.  So please Judge Jones, before you or anyone else makes a decision that will affect so many lives, we ask you or your staff to personally take a tour of all of our state centers and witness all the good work that they do caring for our most vulnerable citizens.  Rather than endorsing a policy that will de-populate our state centers, we should be looking for ways to re-open the doors to provide much needed services for our Pennsylvanians who in desparate need of help.

Sincerely,

*Margaret Kashatus*

MARGARET KASHATUS
Guardian of Maria Kashatus



USA FIRST CLASS



RECEIVED

JUL 2 6 2011

PER
HARRISBURG, PA    DEPUTY CLERK

Clerk Of Court
Federal Building & US Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17108137?

Margaret Kashatus
55 Newport St.
Glen Lyon, PA 18617-1214

JA627

August J. Centi & Winnifred A. Centi
193 Holly Lane
Somerset, PA  15501
(814) 445-7015

**FILED**
HARRISBURG, PA
JUL 2 6 2011
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 21, 2011

Clerk of Court                              Robert W. Meek
Federal Bldg. & United States Courthouse    Disability Rights Network of PA
228 Walnut St.                              1315 Walnut Street, Suite 500
Harrisburg, PA  17108-0983                  Philadelphia, PA  19107-4705

RE: **Benjamin v. Dept. of Public Welfare, No. 1:09-1182-JEJ**

Dear Mr. Meek and Judge Jones.

We are the parents and legal guardian of our daughter Kathie A. Centi, date of birth July 31,
1969 who resides at the Ebensburg Center, P.O. Box 600 Ebensburg, PA 15931, which is an
ICF/MR State facility. Our daughter has had profound mental retardation since childhood with
refractory seizure disorder. She is non-ambulatory with quadriplegia. Her disorders have
resulted in need for total assistance with all activities of daily living and supervision at all times
for her personal safety. She was admitted to the Ebensburg Center on March 15, 2006, by way
of transfer from the Altoona Center. Her testing shows a mental age of 2.8 months with an IQ of
less than 20.

There appears to be no other treatment facility available that would meet the needs of Kathie as
the treatment she is currently received at the Ebensburg Center. The treatment needed for Kathie
is appropriate and the least restrictive available. I believe the Ebensburg Center should allow the
taking of new patients in. We firmly object to the closing of the Ebensburg Center. Having to
travel halfway across the state to a new facility would be a great inconvenience, financial
hardship, and stress to Kathie's family.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR
residents and their guardians how they can be placed on the Sate ICF/MR Planning List, but it
does not provide for any educational programs describing to me and my loved one how we can
maintain my loved one's current care environment and avoid being placed on the State ICF/MR
Planning List. These educational programs should also include information about the potential
dangers associated with community care and should include presentations from State Center
advocates favoring ICF/MR care. We also object that the Disability Rights network of Pa, a
publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the
proposed Settlement Agreement, and respectfully submit that these funds would be better served
supporting the care of residents either in ICF/MR or community-based care facilities.

JA628

Another grave concern is that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF//MR Planning List.  Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for her, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List.

Our current opposition to community care has no permanence if we pass away or are incapacitated; the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in I CF/MR care.  We do not oppose the Plaintiff's right to choose community care for them, but we object to Plaintiffs' efforts to request relief on behalf of my loved one.

We do not believe this lawsuit is fair and are totally against it.

Sincerely,

August J. Centi & Winnifred A. Centi

Parents and Guardians of Kathie A. Centi



USA FIRST CLASS

JOHNSTOWN PA 159

22 JUL 2011 PM 2 L

August J. Centi & Winnifred A. Centi
195 Roliy Lane
Somerset, PA    15501



RECEIVED
JUL 2 6 2011
PER
HARRISBURG, PA    DEPUTY CLERK

171081817127

Clerk of Court
Federal Building & United Sttes Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

# RUTH E. JARRETT

Southpoint Drive
Mechanicsburg, PA 1



July 23, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Re: **Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones:

I am writing as a family member of a resident at Selinsgrove State Center to express my objection to the proposed settlement of Benjamin v Department of Public Welfare. My brother has profound mental retardation, is non-verbal, and has been a resident of Selinsgrove State Center for many years. He also has medical problems which include a pacemaker, feeding tube, and is non-ambulatory. His care is best provided for at Selinsgrove Center and not in a community setting. The setting and layout at Selinsgrove allow him to independently propel his wheelchair throughout his unit in a safe setting. He requires close supervision and his care is performed by staff. The attendants have direct supervision from physicians and nurses at the center who are experienced in the care of those who have mental retardation and physical disabilities. He would not receive this care in a community setting. Selinsgrove Center places a resident in a unit, called a family unit, that is best suited for that resident. My brother has always been content and happy at the Center. He responds well to the staff. I have attended the annual review meetings where staff members involved in his care (medical, social worker, activities personnel, attendants) review and plan for his best care. I know that he receives better care and has more freedom to move about safely in his wheel chair at Selinsgrove Center than he would in any community setting.

I do not object to the movement of a resident of a state center to community care if that is the desire that has been expressed by the resident. I do object to placing residents on the Planning List who have not indicated that they want to be on the list, assuming that if they have not expressed objection that they desire a community setting.

Also the proposed Settlement Agreement would require me to continuously voice my opposition to my brother being placed on a Planning List for movement to community care. If I become incapacitated or pass away, the proposed Settlement Agreement would ignore my recorded desire that my brother remain in ICF/MR care.

Another reason for my opposition is that no studies have been conducted showing that the plan is even feasible. Are there sufficient community care facilities available that are capable of meeting the needs of current residents at the State Centers? Will there be sufficient funding to operate these community care facilities considering recent budget cuts? Are there reports showing injuries, other harm, deaths resulting from relocation to community-based care? Studies have not been performed to answer these questions.

I respectfully request that the objections I have voiced to the proposed settlement will be carefully considered in making a decision.

Sincerely,

*Ruth E. Jarrett*

Ruth E. Jarrett
Family Member of Henry Jarrett

USA FIRST-CLASS

HARRISBURG PA 171

23 JUL 2011   PM 5 L

RECEIVED

JUL 26 2011

PER _____
HARRISBURG, PA   DEPUTY CLERK

Clerk of the Court
Fdrl. Bldg. & US Courthouse
228 Walnut St
Harrisburg, PA 17108-0983

Ruth E. Jarrett
73 Southpoint Drive
Mechanicsburg, PA 17055

JA633

**FILED**
HARRISBURG, PA

Patricia O'Donnell                                                    19 July 2011
104 Long Pond Court
Greer, SC, 29651

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

Clerk of Court                                    Robert W. Meek
Federal Building & United States Courthouse       Disability Right Network of Pa.
228 Walnut Street                                 1315 Walnut St. Suite 500
Harrisburg, PA 17108-0983                         Philadelphia, Pa. 19107-4705

Re: Benjamin vs. Dept. of Pub. Welfare, No.1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My name is Patricia O'Donnell and I am the sister of Judith Fluck, whom I am
representing in this case. I am not her guardian, yet, but I am working on it. Judith
resides at the Hamburg Center in Hamburg , PA. My sister has been residing in the
Hamburg Center for the last 22 years, following our mother's passing. Before entering the
Hamburg Center, our mother took care of Judy and may I say our mother did not have a
reasonable life style. Judith is a 58 year old white female, who was born with Profound
Cerebral Palsy and has the mentality of a 2-3 year old child. She requires 24 hour
supervision, needs to be fed, bathed, is incontinent of both urine and feces, so she
requires to be changed, she has a seizure disorder that requires her to be monitored for
seizures, as well as having her seizure medication strictly monitored. She requires
medications to be given to her as she cannot pour her own medications as she has no idea
what a medication is, let alone taking it. She does not read or write. She cannot bathe
herself, dress herself, tend to her hygiene issues, or make her needs known. She was
diagnosed with a benign brain tumor in 2006 and is being closely monitored by a
neurosurgeon at the Hamburg Center. She has a forward flex of her posture of the neck
and upper spine, along with paresis of her lower extremities. This limits her ability to
stand and to move her legs independently. She requires Physical Therapy for this. She
cannot walk, talk or comprehend. She has Hypothyroidism, which requires medication
supervision and routine blood levels to be drawn. She has osteoporosis in the lower spine
and the right hip, putting her at increased risk for fractures, if she would fall. She has
Chronic Constipation which needs to be monitored, along with a history of Urinary Tract
Infections, and Obesity. She also needs someone to stand up for her, to speak for her, and
protect her rights from being evicted from the home she has known for the last 22 years
and where she has had  wonderful care and support

Page 1 of 3

I feel that this settlement will be harmful to both my sister and to me, and here are the reasons why.

My sister has been living at the Hamburg Center for 22 years and has grown accustom to her surroundings, the staff, and the program the staff has designed for her. She is very comfortable there and she does not respond well to changes.  In this case, by removing her from The Hamburg Center, it would be a very drastic change.  She knows the staff and trusts the staff, as do I. The staff is well trained and able to respond to her needs. Hamburg has given her a life that she has grown accustom to. The staff is superb and I know that she is loved and well taken care of, which gives me a sense of well being, as far as she is concerned. I do not have to worry about her and her care. The social workers are also superb and keep me abreast of what is going on with her and the staff is very nurturing and supportive of her. She is in a safe environment and all of her needs are met there.  I could not be any happier with her care and treatment at the Hamburg center. Taking her, and the other very needy people there away from a "home" that they have grown to love, is a travesty.  I also feel that her rights are being violated by putting her in a "group home". You know, as well as I do, that the level of care will be compromised, due to inexperienced staff that will be hired for these places. I have seen some group homes and have worked in settings like this, and have witnessed the apathy, and ethics and morals, of the class of people working in such places. In my professional opinion (I am a Licensed Registered Nurse), the care in group homes is extremely inadequate.  I do not oppose the Plaintiff's right to choose community care for themselves, but I do object to the fact that the proposed settlement agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on that list.  Why should our children be yanked out of a "home" and setting that they have grown to love and to feel safe and secure in? These people have just as much right to stay where they are and not have to leave their home. They have rights to...What about their rights??? Under the proposed settlement agreement, no notice will be provided to me, in the event that my sister, who is incapable of making decisions for herself, is going to be somehow deemed to have consented to community care or has been placed on a State ICF?MR Planning List for any other reason.  How is this fair or even legal?? I am speaking for my sister who can't???

Next, is the fact that I object to the fact that DNR Facility Advocates would have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List. They don't know anything about our people's (Loved Ones) wants and needs, or who our people are. To them they are just "a body", with no feelings, no personality, no likes, dislike etc... No studies have been done and neither DRN nor DPW have made any showing that the implementation plan is even feasible. There is no evidence that there are sufficient community care facilities available or that these facilities are even capable of meeting the needs of the current ICF/MR residents or that there will be sufficient funding to operate these community care facilities, in light of the recent budget cuts. Then What????

JA635

Lastly, I object to the fact that DRN of PA, which is a publicly funded entity, will get $432,500 in legal fees, and respectfully submit that this money could be put to better use supporting the care of the residents in ICF/MR facilities. It does not seem fair that residents of facilities like Hamburg, most of whom cannot stand up for themselves and their rights, are being persecuted by being ripped from their "home" and have to be moved to other facilities, just because a few residents didn't get their way. Do the needs of the FEW; outweigh the needs of the MANY??? Unless you have a child with special needs, you can't begin to understand the pain and heartache that families go through....At least at the Hamburg Center, our pains and heartaches have been greatly reduced. At Hamburg, we know that our children are getting the absolute best care and that they are loved and cared for. The staff does not care for the residents because they have too, it's because they want to. You have to be a special kind of person to work at this facility and they are. My sister loves it there, is cared for, cared about, and loves where she is. Are you going to take that away from her and all the other residents that have come to know and love Hamburg Center??

My husband and I would like to participate in the fairness hearing on August 22, 2011 and I would like to be able to testify at the hearing. Someone has to speak up for the residents who can't.

Patricia O'Donnell

      Sister of Judith Fluck, resident of Hamburg Center

JA636



Mrs. Patricia O'Donnell
104 Long Pond Ct.
Greer, SC 29651



GREENVILLE SC 296

19 JUL 2011 PM 1 T

RECEIVED

JUL 26 2011

PER _____
HARRISBURG, PA     DEPUTY CLERK

Clerk of Court
Federal Building + United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

Re: Benjamin vs. Dept. of Pub. Welfare,
No. 1:09-cv-3792 - JEJ

JA637

Margaret M. Tierney
3322 Friendship Street
Philadelphia, PA  19149

FILED
HARRISBURG, PA

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 22, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705

Re:  Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My name is Margaret M. Tierney.  I am the sister and legal guardian of my brother James Tierney who resides at White Haven Center.  My brother is 65 years old.  He was diagnosed as a child as being profoundly mentally retarded.  He resided at home with his family until he was 18 years old.  At that time, his disability overwhelmed our family's ability to care for him at home and he came to reside at White Haven Center.

My brother has a seizure disorder, normal pressure hydrocephalus, and needs a walker to ambulate indoors.  He needs a wheelchair to safely travel outdoors.  He cannot climb steps.  He is blind in one eye.  He does not know how to blow his own nose.  He has been treated for kidney stones and ulcerative colitis.  His verbal communication is limited to the names of some favorite foods.  He does not exhibit the ability to recognize when he is satiated with food and would consume food to the point of illness if left unsupervised.  He will take food from others if unsupervised.  He doesn't recognize the danger of consuming non-consumable solids or liquids.  He does not have the ability to shower, shave or dress independently.  His ability to toilet independently is declining.  He reacts poorly to change and can exhibit unpredictable behavior.

My brother's care at White Haven Center over the years has been outstanding and I desire that his care be continued at White Haven Center.  There is a consistent staff of caregivers, who are dedicated to the care of individuals with intellectual disabilities, and provide 24/7 awake care of the residents at the center.  There is an on-site nursing and medical staff who responds to any report by the direct-care-staff of behavior that could indicate a developing illness.  The integration of those resources has been of great benefit to my brother, because he does not have the linguistic ability to report pain or illness and seek medical attention.  Within the last month, the vigilance of direct-care-staff reporting a change in bowel habits to the medical staff, allowed my brother to be hospitalized and promptly treated for ulcerative colitis.  Left untreated, this condition could have resulted in a perforated colon, a massive abdominal infection, and possibly death.  Several years ago, the direct-care-staff correctly interpreted my brother's behavior as abnormal leading to his hospitalization and the identification of kidney stones.  He would have

1

suffered severe pain and potentially the damage and loss of a kidney if this were not detected promptly. This consistent staff of caregivers, who care enough and are trained enough to distinguish normal from abnormal in specific individuals, has enabled my brother to lead a healthy life in the least restrictive environment consistent with his condition. In addition, the campus allowed my brother freedom to walk the grounds in his younger days when he was able to walk independently and the programming at the center allows him to take trips to local restaurants and entertainment venues that greatly enhance the quality of his life. In addition to the loss of the positive benefits offered by the White Haven Center, transferring my brother to the community would cause him massive emotional trauma if he were separated from the caregivers, residents, and physical environment he has known over the past 47 years.

I have a number of objections to the proposed settlement of Benjamin v. Department of Public Welfare, No. 1:09-cv-1182-JEJ. I will address my two most serious ones.

I am concerned with the method of identification of class members in years subsequent to 2011 addressed in section III.2. This section provides for an annual assessment of opposition to discharge. I believe this leaves the door open to errors and misinterpretation in the future. If I am incapacitated and unable to voice my opposition on behalf of my brother, this settlement allows my brother to be placed on the planning list. I believe that this is unfair. Once I have stated my preference that my brother remain at the White Haven Center, I believe the reviews in subsequent years should presume no change in position unless I, the guardian, or another designated family member, affirmatively express a desire for discharge to the community.

I am also concerned with the potential of consolidating the budget lines for ICFs/MR and Community Waiver services described in Section V.2.b. My contact with residents at White Haven Center leads me to believe that the client population at State Centers is more disabled and therefore requires more services than the average person with a diagnosis of intellectual disability. While I support the right of individuals to move to the community if they feel they will be better served there, I also believe that there are economies of scale that exist at State Centers. Consolidating the line items could lead to shortchanging the individuals remaining in the State Centers in order to support those in the community with all of their needed services. I believe that this is unfair to my brother and those remaining in the State Centers and that the costs should be tracked separately so that DPW can apply for supplemental funding, if needed, to support those who have moved to the community.

In summary, I believe that the proposed settlement is unfair because it requires an annual expression of opposition to community placement in order to not be added to the planning list and the potential for merging budgets could lead to short-changing individuals who choose to remain in the State Centers. I plan to attend the fairness hearing in Harrisburg on August 22 and will be more than happy to testify at that hearing.

Sincerely,

*Margaret M. Tierney*

Margaret M. Tierney
Guardian and Sister of
James Tierney

2

JA639




U.S. POSTAGE
PAID
PHILADELPHIA,PA
JUL 23 '11
19.49
**$5.59**
00060069-15

17107

1006

Margaret M. Tierney
3322 Friendship Street
Philadelphia, PA 19149

**RETURN RECEIPT REQUESTED**

7010 0780 0002 3106 5798

CERTIFIED MAIL



RECEIVED

JUL 25 2011

PER
HARRISBURG

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

William F. Hudock
163 Ericson Road
Cordova, TN 38018
901-753-8020 (H)
901-488-8131 (C)

**FILED**
**HARRISBURG, PA**

JUL 2 6 2011

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

July 22, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182 JEJ**

   Dear Judge Jones:

I am the guardian and brother of Eleanor Hudock, resident of the White Haven Center, White
Haven, PA. Eleanor was born with cerebral palsy at birth and is severely handicap and mentally
retarded. Eleanor is incapable of making decisions for her own well-being.

I am adamantly opposed to taking Eleanor out of White Haven Center of which she has been a
resident for over 30 years. Eleanor has great care at White Haven and is familiar with her
surroundings, close friends and wonderful caregivers whom she loves and trust.

I trust the people at the White Haven Center to continue the great care and love they provide for
my sister, Eleanor. I strongly feel that any changes made in her care now will adversely affect
her well-being and mental state. Please do not change her residence, familiar environment and
the people she knows and loves. I am unable to travel to meet with you but I employ you to abide
by my wishes for Eleanor's care.

I spoke with the staff at White Haven Center and told them I am opposed to removing Eleanor
from her peaceful surroundings, loving friends and caregivers. I do not want Eleanor placed on
any State ICF/MR Planning List and will be grateful to you abiding by my wishes in the care of
Eleanor.

Respectfully yours,

William F. Hudock
Guardian of Eleanor Hudock

JA641



William T. Hudson
163 Encasen Road
Cordova, TN 38018

U.S. POSTAGE
CORDOVA, TN
JUL 38018
AMOUNT
**$5.59**
0003942R+12
17108

RECEIVED
JUL 26 2011
HARRISBURG, PA.
PER _____ DEPUTY CLERK

CERTIFIED MAIL™

7010 2780 0001 2972 8877

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17108#9800

JA642

Mrs. Carole Henry
194 Springview Rd.
Schellsburg, PA 15559

July 22, 2011

Clerk of Court
Federal Building and
United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

FILED
JUL 27 2011
PER
HARRISBURG, PA.    DEPUTY CLERK

Re: Benjamin V. Pub. Welfare, No. 1:09-
CV-1182-JEJ

Dear Judge Jones,

I understand there is to be another
court hearing August 22nd on closeing
the State Center for the mentally
challenged.

As a mother/legal guardian to
Stephan L. Wright who resides
at Ebensburg Center for the mentally
challenged, I am most concerned
and strongly object to the
settlement hearing on the proposed
agreement.
– over –

JA643

pg 2 of 3

Ebensburg Center has been Stephan's home most of his life and the residents there part of his extended family. His brother, stepfather and I visit him every week to a clean, well equipped facility and beautiful grounds.

Because he has scoliosis (curvature of the spine), he has been in a wheelchair for about 5 years and can't eat due to a bowel operation which requires a feeding tube.

The Ebensburg Center does offer community placement annually, but it is not a realistic plan for Stephan. Although community placement may benefit some, "one size does not fit all". The well staffed, well cared for and protective care of State Centers certainly is the answer for the more severely handicapped like my Stephan where the full time staff of careing, thoughtful, patient nurses, aides, etc. is available, which is needed 24/7.

Page 3 of 3

If Stephan were transferred to community placement, I'm afraid he would not understand a move from his beloved home at Ebensburg Center and family and get terribly homesick.

Please don't put Stephan on a state planing list. I'd like to know if I pass away my wishes that Stephan stay at Ebensburg Center.

I would hope the attourney's legal funds of $432.50 could be better used for the care of residents at State Centers or community based care facilities.

I don't plan to attend the court settlement hearing August 22nd, but I want it known I'm firmly against this settlement agreement.
     Please let well enough alone.

           Very Sincerely,
           Mrs. Carole Henry
           Guardian of Stephan L. Wright



Carole Henry
194 Springview Rd.
Schellsburg, PA 15559-9125

RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building and United States
228 Walnut Street
Harrisburg, PA 17108-0983

attention Judge Jones

17108$9998

JA646

Wes Grebski
160 Courtright Street
Pringle, PA 18704

July 24, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

FILED

JUL 2 7 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones,

I, Wes Grebski, am the first cousin of Elizabeth (Betty) Baran who is a long time resident at White Haven Center, White Haven, Pennsylvania. She has resided at White Haven Center for over forty years.

The settlement in Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ will severely disrupt Betty's life. I feel that White Haven Center provides Betty with the least restrictive environment based on her life skills abilities. The intense training of staff provides the support that she needs to function on both all aspects of her life. Betty feels at home at White Haven Center and frequently refers to staff members as "mommy". I feel relocating Betty who is presently seventy-nine years old would be detrimental to her physical and emotional well-being. White Haven Center with its good management practices and continuous monitoring by the PA Department of Health provides Betty with the quality of life which is due to every resident of Pennsylvania whether they have a disability or not.

- I do not oppose the Plaintiff's right to choose community care, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence if I pass away or become incapacitated. The proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the list.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

JA647

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have presented any data to show that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Sincerely,

Wes Grebski
Cousin of Elizabeth (Betty) Baran
White Haven Center

2



Wieslaw Grebski
160 Courtright St.
Pringle, PA 18704-1826

SCRANTON PA 189

25 JUL 2011   PM 1 T



RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D ANDREA, CLERK
Per _____

*attn: The Honorable Judge Jones*
*Clerk of Courts*
*Federal Building/*
*United States Courthouse*
*228 Walnut Street*
*Harrisburg, PA 17108-0983*





Marian L. Lentz
4431 Davidsburg Rd
Dover, Pa. 17315-4209

July 25, 2011

Clerk of Court                          Robert W. Meek
Federal Building & United States         Disability Rights Network of PA
Courthouse                              1315 Walnut Street, Suite 500
228 Walnut Street                       Philadelphia, PA 19107-4705
Harrisburg, PA 17108-0983

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My brother, who is now 60 yrs old, resides at the Selinsgrove Center and has been there since he was 23 yrs old. He was born with mental Retardation. He requires the use of a wheelchair to get around for about the last 12 years. I am his only surviving sibling and his family substitute decision maker. He requires assistance with his daily routine. Having been a resident at the Selinsgrove Center for all these years, any change in his life now could be very upsetting for him. The center has been his "extended family" and "home" for him for over 37 years. He has made many friends including residents and workers all over the center. The center has been able to offer him programs to attend, activities to participate in, wide areas to manipulate his wheelchair around when he wants to go somewhere. Medical personnel are always available if needed. There is that feeling that he is safe and secure being at the Selinsgrove Center.

I do not oppose the Plaintiffs right to choose care for themselves, but I do object to Plaintiffs effort to request relief for my loved one.

I do not want my brother on the Planning List, nor do I feel that I should have to state so annually to keep him in the ICF/MR care. My decision to have him at Selinsgrove Center is based on the number of people who support, love, and the care they give to him to help him live his life. My brother needs more care than a community placement could ever provide to him.

I object that the proposed settlement agreement allows DRN facility advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR planning list.

I object that the proposed Settlement Agreement provides for education programs teaching ICF/MR residents and guardians how to get on the Planning List, but does not provide educational programs describing to me how my loved one's current care environment can be maintained and avoid being placed on Planning List. These programs need to include information about the potential changes associated with community care and should include presentations from State Center advocates favoring ICF/MR Care.

JA650

Page 2

I oppose the Integration Plan. If the State Run ICF/MR are depopulated and closure is the outcome, then this closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR Care and will impose community based care upon me and my loved one. Where are the rights of my loved one?

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

I object to the proposed Settlement Agreement since no studies were conducted and neither DRN or DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient care facilities are available, are capable of meeting needs of current ICF/MR residents, or have sufficient funds to operate.

The proposed Settlement Agreement provides for inadequate, one sided status reports. Important information should include deaths, injuries, and other harm resulting from relocation to community based care.

I object that the DRN of PA a publicly-funded entity, will receive $432,500 in legal fees as described in the proposed Settlement Agreement, and respectfully submit these funds would be better served supporting the care of residents in ICF/MR or community based care facilities.

Sincerely,

*Marian L. Lentz*

Marian L. Lentz
Sister
Lee Trout

Marian L Sent
4431 Harrisburg Rd
Dover, Pa. 17315-4209

HARRISBURG PA 171

25 JUL 2011    PM 4 L

RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108 - 0983

171083-9998

JA652

1

Mr + Mrs. Donald J. Sabo                    July 19, 2011
111 Hemlock Lane
Valencia, PA 16059                          FILED

                                            JUL 27 2011

Clerk of Court
Federal Building + United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones,

My name is Barbara P. Sabo, I am the mother and
court appointed co-guardian along with my
husband Donald J Sabo for my son Donald C.
Sabo. Donald is 43 years old non-verbal male
residing at Polk Center. Donald has a
psychiatric diagnosis of Impulse Control Disorder,
Pervasive Developmental Disorder and Infantile
Autism. He is taking medication for his
mental health diagnoses and he has been
stable this past year. Donald can be very
aggressive and doesn't really know how
unsafe he makes situations / environment
when he is upset. Donald is mildly retarded.

We had Donald home with us until he was

JA653

2

thirteen years old and he attended Clarence
Brown School in Butler, Pennsylvania.
Ronald was becoming increasingly aggressive
and my husband and I had to come to the
realization we could no longer handle
his aggression. We worried Ronald could
hurt us or we could hurt him while trying
to get him under control. We were able to
have Donald placed at Devereux for
five years. Then he was placed at Elwyn
Institute. After one year they refused to
keep him because of his aggression.
Donald then went to Comfort Home in Hellam,
PA near Reading. They didn't seem to know
what to do with him. At two different times
Comfort Home had police take Donald to
Reading Hospital. Each time he was placed
in a room with padded walls and a bare
mattress on the floor, his shoes and belt
were taken from him. Donald was frightened
and did not understand what was happening.
The second time, the hospital threatened to
put him on the street because Comfort Home
did not want him anymore. I threatened a
lawsuit and told them Comfort Home had to
keep him until we got him placed elsewhere.
That's our experience with community living.

3

After that we tried to place Donald in community living but not one community placement in Pennsylvania could be found for Donald because of his aggression. They all turned us down. We finally turned to Polk Center and there we found the help he needed.

My husband and I feel it is important for you to understand Donald and how this agreement may impact his life.

Donald can have a difficult time adjusting to change.

Donald does not have pedestrian safety awareness.

He needs help around kitchen appliances and doesn't fully understand electrical safety.

He needs watched around hot food and hot water.

Donald may not recognize dangerous situations. There are a lot of built in safety features at Polk that are not in the community.

He may not appropriately respond to a fire drill and needs assistance letting him know where to go.

4

Donald could be taken advantage of
financially and physically if he were not
protected.

He is non-verbal but understands verbal
communication and will respond with
gestures to questions. He uses at least forty
different signs to communicate and directs
staff attention to what he wants. He can write
his name and recognize it but does not
know his address.

Donald can feed himself, however, he is very
selective about what he eats. It is difficult
to communicate that he can simply make
another choice. He may refuse alternate entrees
if he is upset about what he got first and
can get aggressive sometimes throwing trays
and food.

Donald has a job at Polk but most likely
could not work in the community because
of his aggression.

Donald does not like to go in the community
with a group of people. He would rather go on
community trips with just one staff person.
Donald cannot take his medication on his own.
When Donald becomes angry or frustrated
he can become aggressive and/or destructive.

5

Polk has worked hard with Donald for twenty-one years. There is a trust between Donald and the staff at Polk. Donald needs the support and structure of Polk. If he were forced to make a change to community living all this hard work and support of Polk would have to start over again at a new place. What happens if it doesn't work out and Donald becomes increasingly aggressive because he doesn't like the new place? Is there a plan in place so he could go back to Polk? Some residents do well at community living. Some residents do well at Polk. Our Son needs Polk.

Sincerely

Barbara B Sabo
Donald J. Sabo

Guardians of Donald C. Sabo



Mr. Donald J. Sabo
111 Hemlock Ln.
Valencia, PA 16059

RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D'ANDREA, CLERK

Per _____

*Clerk of Court*
*Federal Building & United States Court*
*228 Walnut Street*
*Harrisburg, PA 17108-0983*

1710839800

09-CV-1182

## Untitled
### To who this my concern  7-22-11
**My son is Albert Knight Jr. at Ebensburg Center**
My son has been in Ebensburg Center since he was 6 yr, old.

I will try & make this shortI think he has been taken care of as
posible & with love.When he first went he was a handfull for
them,he sure enjoy going back there cause that was his home for
him & that was great for me also that was what it was home for
him .Yes he cause a lot of problems & they handle with phone calls
to me with up dates
& said what they were doing about it most of the time it is in
the hospital. my son droped a dresser on his bid toe it was so bad
that they had to take it off ,then he had cauliflower ears from
banging head on the walls & floors ,scars all over his face &
head & i mean deep ones,then he put out his one eye ,then he would
eat so fast that he wolud coke & almost
die ,so then he went on a feeding tube,got to the point he couldn't
walk so it was time
for a wheel chair so now it is wheelchair & bed .Now my son can't
walk ,talk,eat & in daipers most
of time in a bed ,this is the quality life my son has ,Now i would
to know there is room for community
liveing for my son to have that kind of care in cummunity liveing
for him & who would give him this much love & care as ebensburg
center has done for the last 40 some years please done don't close
this center or move him .This is the quality
 of life my son has & i wish & hope he stays there for the rest of
 his life,My son has no way of tellig you that he wants
to go out in the cummunity to live ,So please as a father read this
very carefully & see were i'm coming from
i would love to see my son die there where he is cared for & love by
the people around
him

### Thank You
### Mr ALBERT KNIGHT
### Phone# 814-835-8997 Erie Pa 16506



FILED

JUL 27 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

### Page 1

JA659



Albert L. Knight
2927 Loveland Ave.
Erie, PA 16506

ERIE PA 165

Clerk of Court
Federal Bldg. + United St[
Courthouse
228 Walnut St
Harrisburg Pa, 17108-0983

RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D'ANDREA, CLERK
Per

17108+3800



Kenneth O. Myers
1585 Jackson Drive
Vineland, NJ 08360-4321

22 July 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of pub. Welfare, No 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the younger brother and guardian of Sarah A. Myers. My sister is a resident in Hemlock Hall at the White Haven Center located in White Haven, PA. Sarah has been intellectually and developmentally disabled since birth. As she approaches her 75th birthday she can no longer walk or stand on her own and has been diagnosed with osteoporosis and cataracts.

My concerns with the proposed Settlement Agreement are as follows:

I do not oppose the Plaintiff's right to choose community-based care for themselves, but I object to Plaintiff's efforts to request relief on behalf of my sister.

The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my sister to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community placement has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded desire that my sister remain in ICF/MR care.

The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the list.

Under the proposed Settlement Agreement no notice will be provided to me in the event that my sister, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

The proposed Settlement Agreement provides for education programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me or my sister how we can maintain my sister's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about limitations and potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

22 July 2011

Re: **Benjamin v. Dept. of pub. Welfare, No 1:09-cv-1182-JEJ**

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my sister of a meaningful choice to remain in ICF/MR care and will impose community based care on me and my sister. This is precisely the lack of choice that the United Sates Supreme Court cautioned against in *Olmstead v. Zimring*.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my sister, and further imposing community-based care upon me and my sister contrary to the Supreme Court's *Olmstead* decision.

The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status reports should also include reports on deaths, injuries and other harm resulting from relocation to community-based forms of care.

I especially object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better used supporting the care of residents either in ICF/MR or community-based care facilities.

On behalf of my sister Sarah, I believe the proposed Settlement Agreement as stated is biased in support of community-based care and will further restrict our options for meaningful choice in the type of care environment available to her and other ID individuals. I plan to attend and participate in the fairness hearing in Harrisburg on August 22, 2011 and thank you for the opportunity to be heard.

Sincerely,

Kenneth O. Myers
Guardian of Sarah A. Myers

Mr Kenneth O Myers
1585 Jackson Dr
Vineland, NJ 08360

SOUTH JERSEY NJ 080

23 JUL 2011  PM 5 L

RECEIVED
HARRISBURG, PA

JUL 27 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building & US Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17108+9800

Kathleen Govaeea
138 Hunt Drive
Horsham, PA 19044



July 8, 2011

FILED

JUL 2 7 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the sister of James McKeaney who has lived at Hamburg Center for over 50 years. Jim was severely injured at birth due to a high forceps delivery. He suffered an Entradural and Subdural Hematoma.   At 6 weeks of age he underwent surgery to relieve pressure that was causing "a constant seizure" as the doctor described. All of his life Jim has been severely handicapped requiring 24 hour care. He can do nothing for himself nor can he communicate his needs.

Hamburg Center has provided a safe and family environment all of these 50 years. Jim still continues to thrive in spite of his major limitations. We regard the setting and staff of Hamburg to be his family. Jim knows when he is not in those surroundings as witnessed during hospital stays where he is basically alone with little contact. His entire demeanor changes. Because the staff can "read" him so well they are proactive and responsive to any health crisis that arises.

In the subject of Community Living Plans I recognize that these arrangements can benefit many who wish and are able to live as independently as possible with whatever support is needed.

However, I strongly believe the Community Living arrangements do not benefit all members of the population that suffer from a severe handicap or brain injury. The safety and welfare of these individuals can not be matched or met in small settings anyway near what Hamburg Center provides.

I strongly feel that the Benjamin Settlement jeopardizes choice for both my brother, Jim, and his family who have repeatedly voiced and documented their desire to keep Jim in Hamburg Center.

- I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

JA664

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

2

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Again, while I recognize that some individuals can thrive in a community living situation, I strongly feel that Jim's injuries and need for 24/7 care do not fit that model. I plan to attend the hearing on August 22 on behalf of my brother, Jim, who has no voice in this matter and is among a growing number of vulnerable and marginalized members of society.

Sincerely,

Kathleen McKeaney Govaeea
Sister of James McKeaney, Hamburg Center

3



Ms. Kathleen Govaeea
138 Hunt Dr.
Horsham, PA 19044





UNITED STATES
POSTAL SERVICE

1000        17108

7010 3090 0000 5755 8721



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**™

**Clerk of Court**
**Federal Building & US Courthouse**
**228 Walnut Street**
**Harrisburg, PA  17108-0983**



7010 3090 0000 5755 8721

RECEIVE
HARRISBURG,

JUL 2 7 201

O'ANDREA,

1710181727

JA667

Jeremy & Kris Kashatus & Family
106 Bluebell Drive
East Stroudsburg, PA 18301

July 24, 2011



Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I honestly hope you take the time to read this letter. My name is Jeremy Kashatus, the brother of
Maria Kashatus who currently resides at White Haven Center, White Have, PA. I am Thomas &
Margaret Kashatus' fourth child. I am blessed to be employed as a Law Enforcement Agent with
the Commonwealth of Pennsylvania Board of Probation & Parole. Since I will not elaborate on
the details of my work, I will mention that some of the criminals I deal with on a regular basis
have the privilege of having many opportunities granted to them to make their lives better to
become successful members of society. By saying that, I want to say that I am not Maria's
guardian, I am her brother, and I do have a few issues/concerns that I would like to mention to
the both of you in this letter. My sister Maria, who has resided at White Haven Center for many
years now, has severe mental retardation. She did not ask to be like this nor did my parents ever
imagine that we as a family would have to be subject to complicated exposure of mental
retardation, a severe intellectual handicapped disability. My sister was born like you & I. She
prospered just like any other small child would as they got older. She was walking and talking
just like your infant children have done in the past. Then all of the sudden she became sick with
an intensely high fever. This illness caused her to have brain damage and when things couldn't
get worse, the inevitable happened, she became ill again and another high fever worsened her
mental condition and physical capacity yet again. Now, Maria is in her 40's and she cannot talk,
walk, read, pick up her nephew Christopher and hold him, she cannot go to the bathroom herself,
let alone feed herself. She needs constant care around the clock and I have to honestly say, that
she receives this great care at the White Haven Center. At this time, I request of you to STOP,
then think about this situation and finally place your feet in our family's shoes and take a good
look at what the real issue is going on here.

This settlement will not only harm my parents and our family, but rather my Sister Maria greater
than you can ever imagine. Like I requested to you before, place your feet in our family's shoes.
Now, I request of thee to place your feet in Maria's position. If you take away the White Haven
Center, where will my sister get the same quality of care that she receives at WHC? Because we
all live separate lives in this world, it is not likely that we as a family would be able to take care
of Maria like the WHC. She has amazing staff that assist her and comfort her each and every
day. In my opinion, and I can say this due to the type of work I have done or presently
accomplish, that NO ONE can do the job that the staff at White Haven Center achieve every day,
over and over again. If this change in the lawsuit continues, and Maria is transferred to another
facility or has to be moved to a nursing home, she will not receive the care that she gets now at
WHC. I understand that all people with disabilities DO NOT have the same symptoms,
disabilities, or handicaps but I object to the PLAINTIFF's efforts to request relief on behalf of

JA668

my loved one. They have no idea who my sister is nor do they have the right to make a decision on her behalf, then, the class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care. I believe that the proposed Settlement Agreement will place people on the State ICF/MR Planning List who have not indicated that they want to be on the List. Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for my sister Maria, and is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

I also object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care. I believe that if you are going to facilitate monies to educate residents and their guardians so that they can be placed on the ICF/MR panning list, then you should reserve the same amount of monies to educate the guardians who do not want their loved ones in some fly by night group home.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

2

In closing. I object to this entire DRN & ARC network of know it alls. The DNR & ARC think that all people with intellectual disabilities or handicaps can voice their own opinion and can communicate for themselves. I am so grateful that my parents took the proper steps into getting guardianship for Maria and for helping many other families at WHC do the same. We knew this day was approaching for some time. THIS IS OUR TIME TO STAND UP FOR WHAT IT RIGHT FOR OUR LOVED ONES.

When it comes to intellectual disabilities, DRN & ARC cannot make decisions for our loved ones. Yes, some loved ones can reside in a community, but my sister Maria is not one of them. When it comes down to the final aspect, the private companies just want to put money in their own pocket by feeding off of the weak. The Commonwealth of Pennsylvania spends so much wasted money on trying to **rehabilitate** criminals by offering them treatment and programming. These career criminals had opportunities to become conducive in society, yet chose to commit crime after crime to benefit themselves. This is a waste of money. Taking care of intellectual loved ones with disabilities is not a waste of the tax payers money. I believe the Commonwealth of Pennsylvania should stay invested in order to maintain and regulate places like White Haven Center because the loved ones at these facilities never really had a fair chance at life.

Sincerely,

Jeremy Kashatus & Family
Brother of Maria Kashatus-White Haven Center

3

JA670



Jeremy & Chris Kashatus
6 Bluebell Drive
East Stroudsburg, PA 18301

LEHIGH VALLEY PA 180

25 JUL 2011 PM 2 L

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per

CLERK OF COURT
FEDERAL Building ; UNITED STATES COURTHOUSE
228 WALNUT ST.
HARRISBURG, PA  17108-0983

17108-9800



**Mrs. Karen Crytzer**
**429 Kinsman Road**
**Greenville, Pa. 16125**

July 25, 2011

**Clerk of Court**                                        **Robert W. Meek**
**Federal Building & United States**            **Disability Rights Network of Pa.**
**    Courthouse**                                       **1315 Walnut St. , Suite 500**
**228 Walnut Street**                                **Philadelphia, Pa. 19107-4705**
**Harrisburg, Pa. 17108-0983**

Re: Benjamin V. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Honorable Judge Jones:

My name is Karen Crytzer; I am a sister and the Substitute Decision Maker appointed by Violet M. McLaughlin (deceased) and Virgil R. McLaughlin (deceased) for my brother Virgil LaVelle McLaughlin. Virgil is a 52-year old, non-verbal male currently residing at Polk Center.

In light of the pending lawsuit that would threaten to remove Virgil from Polk Center and place him in a group home environment, I am writing today in the hopes that you will consider the devastating impact that such a decision would have specifically on my brother's health and quality of life (and likely that of so many others).

Virgil was diagnosed with slight phenylketonuria (P.K.U.) at the age of 2 years and 10 months, and by the age of 8 was positively diagnosed with P.K.U.  He is able to walk and is currently being treated for diabetes; he is dependent on insulin and must consume a specially designed diet that is low in fat and cholesterol.  What's more, the Polk staff continually monitors my brother for signs and symptoms of hypoglycemia, which can cause an unsteady gait, change in mental status, excessive sweating, or tremors. In February and June of 2010, Virgil exhibited controlled falls resulting from low blood sugar symptoms, which can happen quickly and can be life threatening if blood sugar drops too low. Virgil also has chronic seborrheic dermatitis for which he receives lotion treatments; he suffers from mycotic nails which he is seen and treated for by a podiatrist; and he receives Bactroban to his gastrostomy stoma site.

To help you better understand the way this agreement may critically impact Virgil's life, I have provided excerpts from his ISP completed on April 20, 2010:

- Change is difficult for Virgil, he appeared unhappy to the staff when he was moved to a different unit.
- Although Virgil attended his ISP meeting with the help of staff and seemed content to sit relatively quiet and still; he made no responses that would indicate he had awareness of the purpose of the proceeding.

- Virgil needs 24-hour awake staff supervision because of a limited awareness of danger and would need assistance to evacuate the area in an emergency.
- He has freedom of movement inside the building but because he lacks basic pedestrian and general self-preservation skills, he is not permitted outside the building unsupervised.
- He does not have any understanding of what is necessary to stay healthy such as his medication and hygiene.
- He does not understand the need to remain still when medical staff is working with him at medical procedures; to prevent injury, he has to be restrained medically or physically.
- He continues to need attention to his oral hygiene even though his teeth were removed in November of 2005.
- Virgil will continue to be offered the opportunity to attend activities in the community whenever possible.  Swimming at the pool is not recommended due to the G-tube.

I believe the proposed legislation is a violation of the right of family members to choose institutional living for loved ones who would not thrive in a group home setting. Polk has been Virgil's home for 41 years; it's a place where he is comfortable and well taken care of. He knows the staff, he has a routine, and he is secure in this environment. Approval of this agreement could result in a downward spiral for my brother and others like him, possibly even resulting in death. It seems unfair that the community's most vulnerable citizens would be left without the complete care they need and deserve, if this settlement were approved. Group homes, with the additional freedoms they offer, fewer social opportunities, and less supervision, could, indeed, be the kiss of death for severely ill individuals like my brother, who simply cannot care for themselves. It is my sincere hope that the agreement as presented will not be approved.

I will, unfortunately, be unable to attend the fairness hearing on August 22.  Please allow my counsel, Benjamin Hoffart of the law firm of Sidley Austin, to present my objection and to provide testimony on my behalf.


Sincerely,

Karen S. Crytzer

Sister and Substitute Decision Maker

Karen Crytzer
429 Kinsman Rd
Greenville, Pa. 16125

FITTSBURGH PA 152

15 JUL 2011  PM 6 F

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Building + United States Court house
228 Walnut Street
Harrisburg. Pa  17168-0983

17108+9938

JA674

Ellen Lube
1001 City Ave.  EC 810
Wynnewood,, PA  19096

July 21, 2011

Clerk of Court                                             Robert W. Meek
Federal Building & United States Courthouse      Disability Rights Network of PA
228 Walnut Street                                        1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                             Philadelphia, PA  19107-4705

Re:  Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,
I am the guardian of my severely and profoundly retarded  brother, Gary Lube.  Gary is a
resident of an ICF/MR, Woodhaven Center, 2900 Southampton Rd. Phila., PA 19154. that is run
by Northwestern Human Services.  Gary has severe physical disabilities. He is non-ambulatory,
blind in one eye, has seizures disorders, melanoma and cardiomyopathy.

Gary's medical care and general safety issues are of utmost importance.  At Woodhaven there
is a nurse on duty at all times to meet any problems as they arise.  If Gary were in a residential
setting with a few "housemates"  I do not feel that his medical needs could be met.  I do not
believe that visiting nurses could provide the kind of care that Gary, with all of his needs,
requires.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR
residents and their guardians how they can be placed on the State ICF/MR Planning List, but it
does NOT provide for any educational programs on how we can maintain Gary's current
environment and avoid being placed on the State ICF/MR Planning List.

The practical implications of the integration plan described on pp. 9-12 of the proposed
Settlement Agreement will be the depopulation and eventual closing of State-run ICFs/MR.  This
depopulation and closure will deprive me and Gary of a meaniful choice to remain in ICF/MR care
and will impose community-based care upon me and Gary contrary to the Supreme Court's
Olmstead decision.

I believe that this Settlement Agreement is unfair and will harm my brother Gary and our family.
I DO NOT want Gary to be placed on the State Planning List because of the reasons stated
above.

Sincerely,

Ellen Lube
Guardian
Gary Lube



Lube
1001 City Ave. EC-810
Wynnewood, PA 19096

PHILADELPHIA PA 191

25 JUL 2011 PM 2 L

RECEIVED
HARRISBURG, PA

JUL 2 8 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building and
United States Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

17108?9998

JA676



Mrs. Ruth Nichol
318 Spring Avenue
DuBois, Pa. 15840

July 23, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Pa 17108-0983

Robert W. Meek
Disability Rights Network of Pa.
1315 Walnut St., Suite 500
Philadelphia, Pa 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

My name is Ruth Nichol. I am the mother and court appointed guardian of my 44-year old son, Robert H. Nichol. I am writing to you in reference to the above captioned case scheduled for a (settlement agreement) fairness hearing on August 22, 2011. I am asking that the agreement be denied in its current form. I believe it is structured in a way that is detrimental to my son. Here's why. My son Bob resides at Polk Center and has been there for the past 18 years. His adjustment to life at Polk has been very productive, especially given his severe mental and physical disabilities. In 1968, at the age of one, Bob was diagnosed as having tuberous sclerosis complex with severe seizure activity, mental retardation and autism.

My principal concern with the settlement agreement, in its current form, is that it will potentially threaten Bob's future living arrangement at Polk Center. The implementation of the agreement leaves open the possibility that Bob and many other similarly situated residents (at state run intermediate care facilities) are going to be victims of discrimination. The residents and/or their guardians will not have a voice in the decision making process. In order to be heard on the possible placement of a resident to a Community Placement List, the guardian must continuously oppose the placement of the resident on the planning list. Therefore, *a provision should be included to allow for a resident and/or guardian to permanently oppose community care with the right to reconsider at the resident and/or guardian's discretion.*

I certainly recognize the plaintiff's right to choose community placement, if they wish, but I do not believe that this agreement, in its current version, is in Bob's best interest. In the end, if this agreement is accepted it will be the catalyst to reduce the population at these ICF's and the facilities will ultimately be closed. For Bob, and many residents like him, this would be catastrophic.

In order to demonstrate the basis upon which my comments are predicated, some background on Bob's life is necessary. His journey to Polk was a long and arduous one. At the time of his diagnosis in 1968, Bob lived at home with me, his father (now deceased) and his remaining nine siblings. As a young child Bob was stubborn, frequently depressed, had temper tantrums, a short attention span, was nervous, abnormally sensitive to noise, and had autistic-like

1

behaviors (hand posturing, spinning and repetitious water play). In late 1975, at the age of eight, Bob was especially aggressive with bouts of screaming and head pounding. As a result, I insisted on additional medical examinations. The diagnosis was a craniotomy for the removal of a giant cell astrocytoma in the right frontal lobe. After his recovery from the operation, Bob continued to be abusive to himself, and others, and by the age of 12, it became apparent that Bob would need constant supervision and could no longer safely interact with his younger sibling.

By 1983, the frequency of Bob's explosive outbursts had increased his potential to cause harm to me and/or his younger sibling, whom he seemed to target on a frequent basis. This resulted in his placement at Allegheny Valley School in July of 1983. Bob only resided there for about six weeks. During his stay he became increasingly agitated and hostile, and finally caused physical injury to a child in a wheelchair and attacked several staff members. Bob's behavior resulted in his admission to Western Psychiatric Institute and Clinic where they began to evaluate Bob for long term placement. Bob was admitted to Polk Center on July 23, 1983.

Since his arrival in 1983, Bob has adjusted well to Polk and seems very content. His surroundings are structured, peaceful, quiet and his emotional outbursts are rare. In addition to his mental disabilities, Bob has encountered physical disabilities associated with his tuberous sclerosis. He is an insulin dependent diabetic with only limited visibility. In 1995, Bob had his right eye removed due to a detached retina and glaucoma caused in part by prolonged self-abuse as well as the tuberous sclerosis.

In reviewing Bob's ISP, it is important to note that the approval of this settlement agreement could potentially result in Bob being put on a Community Placement List. This would likely have a very detrimental impact on his future. Some specific points of concern are that:

*       Bob does not adapt well to change.
*       When his routine is disrupted, Bob tends to act out and become violent.
*       Bob has always been non-verbal with only limited communication skills and consequently he gets frustrated with change.
*       At Polk, Bob is able to travel to selected community events with proper supervision and support.
*       He does not possess any safety skills and will not recognize normal boundaries in a public setting.
*       Bob can become very agitated by loud noises and other sounds that are common place in a community setting.
*       His diagnosis of Pervasive Developmental Disorder affects his ability act appropriately in certain public settings.
*       Personality change is a symptomatic trait of tubular sclerosis.
*       Bob needs to be in a controlled setting at all times and needs to have constant supervision.
*       He would not be able to protect himself from drowning in a pool.
*       He would not understand the urgency of a fire alarm. Bob needs assistance to know where to find safety in the event of a fire.

2

JA678

* When agitated, Bob is known to gouge himself.
* When change occurs in his normal routine, he is known to bite his hands and hit himself.
* Over the past 18 years Bob has found the routine and familiarity at Polk Center to be very healthy for him.
* He is very much a creature of habit and it is recommended that his continued placement at Polk Center is not only appropriate but in his best interests.

Finally, whether by design or not, the implementation of this agreement will effectively reduce the number of residents at the state intermediate care facilities for persons with mental retardation, and as such, will make it quite likely that over the next 5 to 7 years the population at Polk Center, as well as other ICF's, will be reduced to the point of non-viability resulting in their closure. The majority of residents residing at Polk Center are classified with profound retardation and have resided there for more there 15 years. They too need to be considered a protected class.

When the U.S. Supreme Court announced its opinion in <u>Olmsted v. Zimring</u> (No.98-536), Justice Ginsburg stated,

> "Our opinion emphasizes that nothing in the ADA or its implementing regulations condones the termination of institutional treatment for persons unable to handle or benefit from community based care, nor is there any federal requirement that community based treatment be imposed on patients who do not desire it."

The court went on to conclude that Title II of the ADA requires community based treatment to be offered (1) when the State's treatment professionals have determined that such placement is appropriate, (2) when the affected persons do not oppose such treatment, and (3) when the placement can be reasonably accommodated taking into account the resources available to the State and the needs of others with mental disabilities."

I respectfully ask that this settlement agreement in its current form be denied until it makes more definite provisions for the safeguarding of those residents who need to remain at Polk Center, and that such provisions should include the ability of a resident/guardian to permanently oppose community care with the right to reconsider. The ADA is for the protection of all persons with disabilities and should not be circumvented for budgetary purposes.

Sincerely,

Ruth Nichol
Mother and Guardian of Robert H. Nichol

JA679

Mrs Ruth Michael
318 Spring Ave.
DuBois, Pa. 15801

JOHNSTOWN PA 159

25 JUL 2011 PM 2 L

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburgh, Pa. 17108-0983

17108+9983

JA680

Deborah and Gerard Hey
3439 Brickley Drive
Pittsburgh, PA 15227

July 19, 2011



Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek,

We are the siblings of William R. Hey who has resided at the Selinsgrove Center for 50 years. Our brother is severely mentally disabled. He is 64 years old and has been determined to have the mental capacity of a 9 month old child. Also, Billy does not adapt well to change. Along with his mental disability he also has many physical issues that require round the clock care and supervision. He is totally dependent on the attendants at the Center.

We know that Billy is well taken of at Selinsgrove Center and in his own way, he displays how much he enjoys living there and how much he cares for those who take care of him. We've also been told how much they, the attendants, care for him and enjoy being around him. We have the utmost trust in them as did our parents. Over the years since he has been a resident at Selinsgrove Center, they have been able to teach him things that no one had thought possible. Before our parents passed away, they had both relayed to us that they wanted him to remain at Selinsgrove Center until his death.

We feel that due to Billy's mental disability, all decisions regarding his living arrangements should be discussed and approved by us, not Billy or a representative from Selinsgrove Center, the State or any third party. This decision should be entirely dependent on us, his relatives and loved ones.

We voice these objections to the settlement:
- We do not oppose the Plaintiff's right to choose community care for themselves, but we object to Plaintiff's efforts to request relief on behalf of our loved one.
- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require us and our loved one to continuously voice our opposition to being placed on the ICF/MR Planning List. Although the proposed Settlement Agreement language seems to protect our loved one, in practice, our current opposition to community care has no permanence. If we pass away or are incapacitated, the proposed Settlement Agreement will ignore our recorded wishes that our loved one remain in ICF/MR care.
- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.
- Under the proposed Settlement Agreement no notice will be provided to us in the event that our loved one, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- We object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.
- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to us and our loved on how we can maintain our loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with the community care and should include presentations from State Center advocates favoring ICF/MR care.
- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive us and our loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon us and our loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.
- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of our loved one, and further imposing community-based care upon us and our loved one contrary to the Supreme Court's Olmstead decision.
- We object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.
- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.
- We object that the disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

For the reasons stated above, we oppose the proposed Settlement Agreement and urge the Court to reject it.

Sincerely,
Deborah and Gerard Hey
Guardians of William R. Hey (Selinsgrove Center)

Cc: Robert W. Meek
    Disability Rights Network of PA
    1315 Walnut Street
    Philadelphia, PA 19107-4705



Ms. Debbie Hey
3439 Brickley Dr
Pittsburgh, PA 15227

PITTSBURGH PA 152

25 JUL 2011 PM 7 T

**RECEIVED**
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK

Per _____

CLERK OF COURT
FEDERAL BUILDING & UNITED STATES COURT
228 WALNUT STREET
HARRISBURG, PA 17108-0983

17108+3338

JA683

Sharon and Elmer Brice, Jr.
612 Cherrington Drive
Harrisburg, PA. 17110



July 19, 2011

Clerk of the Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA. 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA. 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-CV-1182-JEJ

Dear Judge Jones & Mr. Meek,

My husband and I are representing my brother, Rodney A. Baughman, who lives at the Selinsgrove Center in Selinsgrove, PA. I am his oldest sister whom my parents have designated to be his primary contact and substitute decision maker. On May 4, 1987 my brother, Rodney, was declared incompetent by the Orphans Court of York County, PA. Rodney is a 58 yr. old ambulatory, highly social man of about the mentality of a 5 yr. old. Rodney is diagnosed with cervical degenerative disc disease, Bi-Polar Disorder, OCD, and hypothyroidism.

I oppose this lawsuit in regards to my brother because:
1. Selinsgrove has been Rodney's home since he was 15 yrs. old.
2. Rodney doesn't like change.
3. Rodney loves staff members. He knows them all by their first names.
4. Rodney has long time relationships at the center & still speaks of retired staff members.

JA684

5. Rodney lacks safety skills. Due to more mobility at the center Rodney has more freedom to socialize in safety.

6. my sister & I both have had experience working in a community home. The homes were really nice but due to unreliable & large turnover of staff would make it extremely hard for Rodney to adjust.

   I do not oppose the Plantiffs' right to choose community care for themselves, but I object to Plantiffs' efforts to request relief on behalf of my loved one. Rodney has lived at Selinsgrove for 43 years. This is his home and the staff are his extended family, whom he loves very much.

   My husband and I do plan to attend the fairness meeting on August 22, 2011 to support my brother, Rodney's civil rights.

                              Sincerely,
                              Sharon & Elmer Brice, Jr.
                              Rodney A. Baughman

Sharon and Elmer Brice
612 Cherrington Drive
Harrisburg, PA 17110



HARRISBURG PA 171

25 JUL 2011   PM 1 L



RE
HAR

JU

MARY E.
Per

Clerk of the Court
Fdrl. Bldg. & US Courthouse
228 Walnut Street
Harrisburg, PA. 17108-0983

1710809800

From: Mary (Molly) B. Fernan
233 Emmett Avenue
Ridgway, PA 15853
July 20, 2011

To:    Clerk of Court
Federal Bldg. & United States Courthouse
238 Walnut Street
Harrisburg, PA  17108-0983



RE:            IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, ET AL
            plaintiffs,
        v                                    Civil Action No. 1:09-cv-1182-JEJ

DEPARTMENT OF PUBLIC WELFARE            Class Action
OF THE COMMONWEALTH OF
PENNSYLVANIA and GARY ALEXANDER         Complaint Filed June 22, 2009
            defendants


In response to the
                    NOTICE OF CLASS ACTION
                PROPOSED SETTLEMENT AND HEARING

in regard to the rights of people who live at
            EBENSBURG CENTER, HAMBURG CENTER,
    POLK CENTER, SELINSGROVE CENTER, OR WHITE HAVEN CENTER


I object to the **settlement process** and **to the cost of the attorneys' fees** for the following
reasons:
1.   The cost of $432, 500 to the DPW if the plaintiff's win is a waste of tax
        payers' money.

2.   At the annual reviews given to the individual residents of Polk Center,
        the questions of whether the resident would like to join a group home
        is brought up every year.  The resident and his/her family are given
        the information and the choice already.  From the settlement letter
        addressed to us, it seems that the plaintiffs think the residents and their
        families are not given a choice.  We are given the choice every year.

3.   From the letter, it is implied that the residents and their families are not
        knowledgeable about the alternative community living opportunites
        for  residents of Polk  Center.  Presently serving on a sheltered workshop

JA687

board, presently serving on an Mental Health/Mental Retardation advisory
board, having had two relatives who worked in group homes and one relative
that served on a board for group homes, I have some understanding of the
services of group homes, sheltered workshops, and MR clients living with
families in the community.

4.  I conclude from the letter sent to us, that the plaintiffs think that all
MH/MR clients and their families would choose a different community setting
if only they understood its benefits. If a community setting, other than Polk
Center, would be the best for my brother, Michael, we would have chosen that
setting long ago.

5.  Michael's mental health challenges and intellectually challenged capabilities
are a challenge to any caretaker. He needs **professional** supervision,
life skill accomplishments, changing and challenging activities about every 15
minutes, a lot of social interaction, and constant surveillance. He receives
these at Polk Center. I don't know of a sheltered workshop that would
change activities every 15 minutes. I don't know of a family that could
stay up 24 hours a day to keep Mike from eloping (day or night) or taking
other people's possessions and hiding them. I don't know of any group
home facility that has **professionals** in charge of a client's care 24 hours
a day.

Michael has a community at Polk Center. He has the structure he needs. Neither
his biological family nor a group home, nor a sheltered workshop, nor living with another
family would give Mike all the attention and variety of social and work activities that he
has been accustomed to for the past 30 some years. Polk provides Michael with sheltered
workshop activities, such as, setting the table in the dining area, cleaning the floor,
working in the ceramic and leather shops. And with the money he earns, Polk helps him
to understand its value and how Mike can spend his modest earnings.

Michael has sometimes expressed the desire to live in a group home because he
thinks that he will be able to visit with his family more often. This hope of Michael's will
**not** happen. His family makes sure that Mike has physical visits from his family at once
a month. Mike comes home for visits at least 4 times a year. We visit him at least 8
times a year at Polk. This has been the routine for the past 30 years. His family's routine
will not change.

The circumstances of other residents of Polk are similar to Michael's. Families
believe that Polk Center is the best community for their loved ones. The families that
I have talked with are knowledgeable about the alternatives for their loved ones. They
choose Polk Center.

I would like to know why the plaintiffs wish to be given an opportunity to
dissuade the already prudent choices that have been made by Polk Center families. I
would like to know why the plaintiffs are taking up the court's time for an action that
will have futile results for the plaintiffs.

Sincerely,

*Molly Fernan*

Mary (Molly) B. Fernan, sister of a resident of Polk Center

Mary Fernan
233 Emmett Ave.
Ridgway, PA 15853

Civil Action No. 1:09-CV-1182-JEJ

JOHNSTOWN PA 159

26 JUL 2011 PM 3 4

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Bldg & United States Conf
238 Walnut Street
Harrisburg PA 17 08-0983

17101+1710

JA689



ROBERT & BEVERLY GILL
146 GILLS HILL RD
EQUINUNK, PA. 18417

07/21/2011

CLERK OF COURT
FEDERAL BUILDING & UNITED STATES COURT HOUSE
228 WALNUT ST
HARRISBURG, PA 17108-0983

ROBERT W. MEEK
DISABILTY RIGHTS NETWORK OF PA.
1315 WALNUT ST, SUITE 500
PHILADELPHIA, PA 19107- 4705

RE: BENJAMIN v. DEPT OF PUBLIC WELFARE, 1:09-cv- 1182-JEJ

DEAR MR. MEEK AND JUDGE JONES,

WE ARE THE PARENTS AND LEGAL GAURDIANS OF ROBIN GILL.
ROBIN IS A CURRENT RESIDENT OF WHITE HAVEN CENTER. SHE ENTERED
WHITE HAVEN CENTER IN JULY,1971 AS A PERMANENT RESIDENT AND HAS
BEEN THERE EVERY SINCE. ROBIN WAS BORN ON 11/29/62.

ROBIN IS PROFOUNDLY BRAIN DAMAGED FROM DISEASE CALLED PHENY-
LKETONURIA. (PKU FOR SHORT). DUE TO IT BEIING A NEWLY DISCOVERED
DISEASE, OUR LOCAL DOCTORS WERE UNABLE TO DIAGNOSE IT.
DR CURTAIN IN SCRANTON,PA DISCOVERED WHAT SHE HAD, BY THIS TIME
SHE WAS A YEAR OLD AND THE BRAIN DAMAGE HAD ALREADY TAKEN
PLACE. HER LIVER DOES NOT BREAK DOWN PROTEIN CAUSING TOXINS
TO FLOW INTO THE BLOOD STREAM,CAUSING THE BRAIN DAMAGE.

ROBIS HAS KNOWN WHITE HAVEN CENTER AS HOME NOW FOR FORTY
YEARS. WE VISIT HER WEEKLY,SOMETIMES BIWEEKLY, MY JOB PERM-
ITTING. WE TAKE HER OUT TO EAT AT MAC DONALDS. WE EAT IN THE
CAR AS SHE DOES NOT LIKE CROWDS OR NOISE. SHE GETS VERY
UPSET AND SCREAMS. WE PUSH HER AROUND TOWN IN HER WHEEL
CHAIR, SHE DOES REACH OUT TO HIT SOMEONE IF THEY WALK TO CLOSE
TO US. SHE IS SO USE TO THE ROUTINE AT WHC, ANY CHANGE SHE
BECOMES VERY UPSET AND TAKES QUITE A WHILE TO CALM DOWN.

SHE NEEDS 24/7 AWAKE MEDICAL STAFF.

JA690