WHEN ROBIN WAS STILL AT HOME, I WAS PUT IN THE HOSPITAL WITH
EXHAUSTIAN, OUR FAMILY DOCTOR TOLD US WE HAD TO GET HELP.
ROBIN COULD GO DAYS WITHOUT SLEEP ( SHE STILL DOES NOT SLEEP
WELL). SHE WOULD TAKE THE MATTRESSES OF THE BED, THROW FOOD
OUT OF THE REFRIDGERATOR, UPSET THE TABLES, THROW THINGS,
SERIOUSLY HURT THE OTHER CHILDREN.

WE CONTACTED MHMR, THEY RECOMMENDED WHITE HAVEN CENTER.
WE WERE VERY SCARED TO PLACE HER ANYWHERE, AS WE LIVED CLOSE
TO GROUP HOMES THAT WER NIGHTMARES FOR THEIR RESIDENTS.
ONE GROUP HOME HAD MANY DEATHS, THE CORONER DID AN
INVESTIGATION AND UNCOVERED A LOT OF ABUSE. THE OWNERS
FLED TO ANOTHER COUNTRY. THIS WAS HILLCREST HOME IN HAWLEY,
PA. ONE BOY WAS TRYING TO FLEE THE HOME AND WAS CRUSHED IN A
GARBAGE TRUCK COMPACTOR. ANOTHER HOME, OWNED BY A
SCHACKENBURG WOMEN,WHICH WAS ABOUT TEN MILES FROM OUR
HOME WAS CLOSED DUE TO THE CHILDREN KEPT IN COVERED CRIBS,
SO THEY COULD'NT GET OUT 24/7, DUE TO THIS CONFINEMENT THEY
WERE UNABLE TO WALK. SOME O THESE CHILDREN WERE MOVED TO
WHITE HAVEN CENTER, WHERE THEY WERE TAKEN EXCELLENT CARE
OF AND WERE TAUGHT HOW TO WALK AND IMPROVED GREATLY.

NY. IMPLEMENTED A PLAN TO CLOSE THEIR STATE CENTERS, WHICH
HAS PROVED TO BE A FIASCO. WE LIVE CLOSE TO THE NY. BOARDER
AND ARE IN NARROWSBURG,NY. QUITE OFTEN AS MY MOTHER RESIDES
THERE. THERE IS A HOME( KELLY'S HOME FOR ADULTS WITH MENTAL
DISABILITIES. THE RESIDENTS OF THIS HOME WALK INTO TOWN, THEY
HAVE TAKEN MAIL OUT OF LOCAL MAIL BOXES AND TRIED TO SELL
THE MAIL AT THE LOCAL DINER TO BUY FOOD THERE. THEY HAVE
TAKEN OFF THEIR CLOTHES IN THE STREET AND BOTHER PEOPLE
THEY SEE OUT IN THEIR YARDS. MY COUSIN CAN NOT LET HER
GRANDDAUHTERS OUT TO PLAY IN THE YARD ALONE AS THESE PEOPLE
WANT TO TALK AND PLAY WITH THEM.
A NURSE AT BELLVIEW HOSPITAL IN NEW YORK CITY, TOLD ME THEY
BRING PEOPLE IN THERE THAT NEED TO BE IN CENTERS,HOWEVER WERE
PUT OUT DUE TO CLOSINGS . THEY CAN ONLY KEEP THEM TEN DAYS AND
THEY ARE BACK ON THE STREETS.

AS ROBIN GETS OLDER HER HEALTH AND BEHAVIOR ARE GOING TO
GET WORSE AS DOES ALL OF US. AT LEAST WITH HER BEING AT WHC
WE KNOW SHE IS GETTING THE BEST CARE POSSIBLE. THIS IS SUCH A
PEACE OF MIND FOR US AS HER AGING PARENTS,THAT WHEN WE PASS
ON, AT LEAST WE KNOW SHE WILL BE TAKEN EXCELLENT CARE OF.
THIS IS ALL WE HAVE. WE THANK GOD EVERY DAY WE HAVE OUR
WHC FAMILY TO HELP US. WE GRATEFULLY ASK THAT YOU HELP
US KEEP IT THAT WAY.

WE NEVER HAD TO EXPERIENCE HAVING ROBIN IN A GROUP HOME AS
SOME OTHER FAMILIES OF PERSONS IN WHC. THEIR STORIES ARE
HORRIBLE AND THEY ARE SO THANKFUL THEY FINALLY GOT THEIR
LOVED ONES IN WHC.

THESE PERSONS WHO WANT TO CLOSE THE STATE CENTERS, SHOULD
GO AND HELP OUT FOR A FEW DAYS AND SEE FIRST HAND THE CARE
AND COMPASSION THAT OUR LOVED ONES RECEIVE.

COMMUNITY PLACEMENTS HAVE BEEN KNOWN TO END IN TRADGETIES.
PERSONS WHO THOUGHT THAT THEY COULD MAKE BIG MONEY BY DOING
THIS, FOUND OUT THEY COULD'NT HANDLE IT( ONE MAN EVEN
COMMITTING SUISIDE)
THERE ARE SO MANY FAMILIES THAT NEED HELP. WE ARE SO THANKFUL
THAT WHC. DIDN'T HAVE TO SAY NO TO US IN 1971.

ALSO, ATTACHED PLEASE FIND OTHER CONCERNS THAT WE AND OTHER
FAMILY MEMBERS ARE CONCERNED WITH CONCERNING THIS PROPOSAL.

WE ARE SORRY THIS LETTER IS SO LENGTHY, IT'S BEEN FORTY- NINE
YEARS OF INFORMATION CONCERNING THE WELL BEING OF OUR
DAUGHTER.

WE SINCERELY APPRECIATE ANY HELP YOU CAN GIVE TO US AND ALL
THE OTHER FAMILIES WHO NEED YOUR HELP.


                              SINCERELY,

                              *Robert H. Gill + Beverly Gill*
                              ROBERT & BEVERLY GILL
                              PARENTS AND GAURDIANS
                              OF ROBIN GILL

include:

- I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Mr & Mrs Robert Gill
146 Gills Hill Rd
Equinunk Pa 18417.

SCRANTON PA 185
26 JUL 2011 PM 1 T

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Bldg & United States Court
228 Walnut St
Harrisburg Pa 17108-0983

171083999B

JA695

July 25, 2011

Dear Sir or To whom this may concern.
My name is Adelaide Hardy. I am
the Mother of David B. Hardy.
I object to bringing David home or
living in a Community place.
He likes it at White Haven center
because there is things for him to do.
David has made a lot of friends while
he has been there. Its almost like home
to him.

Thank you so much.
Adelaide Hardy

FILED

JUL 28 2011

PER
HARRISBURG PA    DEPUTY CLERK

JA696



Ms Adelaide Hardy
PO Box 485
Cresco PA 18326-0485

Clerk of Court
Federal Bldg. + United States
Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per _____

Lily Chang on behalf of Richard Chang
1574 Sullivan Drive
Blue Bell, PA 19422



July 27, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disabilities Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub Welfare, No 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones

I am writing this for Delores Chang, mother of Richard Chang who currently resides at
Selingsgrove Center. Delores Chang, who is 83 years old does not speak good English and is not
able to write this herself, strongly opposes the proposed settlement to place residents on a
planning list to move  into a community placement setting unless they object ahead of time. We
are not opposed to allowing other residents to decide on their own but am opposed to them
deciding what is best for all others.

Richard was involved in a traffic accident when he was a child and sustained severe head trauma.
After years of trying to keep him at home unsuccessfully, his parents decided it best to allow an
institution that is more qualified to take over his care. He eventually went to Selisgrove where
they have done a tremendous job for the last 50 years. Delores regularly travels almost 600 miles
round trip to visit Richard with the assistance of his son Thomas. She has been happy knowing
that Richard is well cared for. Richard is not able to recognize anyone from his family besides
his mother and has the mental capacity of a preschool child. He requires the day to day
continuity and stability in his environment and the people he deals with that Selingsgrove Center
has provided.

The possibility that Richard will not be able to continue to stay at Selinsgrove in the event that
Delores will not be able to continue to decide for him or that any recorded wishes will be ignored
therefore jeopardizing the care and well being of Richard has caused a very stressful situation.

Again Delores is strongly opposed to the proposed changes because it should not require the
residents who are not capable of making decisions to have to have to request that their care not
be changed. If the people who wish to be placed on the waiting list so they can be moved to a
community setting, they should be able to follow the necessary procedures to do so.

Sincerely

*Delores Chang*

Lily Chang (for Delores Chang)



DELORES CHANG
1574 Sullivan Dr
Blue Bell, PA 19422



CERTIFIED MAIL™

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7011 0110 0001 3765 8915



UNITED STATES
POSTAL SERVICE



U.S.
BLUE
JUL
RM

$
00

1000                17108

RECEIVED
HARRISBURG, PA

JUL 28 2011

MARY E. D'ANDREA, CLERK
Per

CLERK OF THE COURT
FEDERAL BLDG & US COURTHOUSE
228 WALNUT ST
HARRISBURG, PA 17108·0983

17108$9800

JA699



Mrs. Joan Wright
2604 Bilmar Avenue
Reading, Penna.

7-22-2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, Penna. 17108-0983

Robert W. Meek
Disability Rights Network of Pa
1315 Walnut Street, Suite 500
Philadelphia, Pa, 19107-4705

Re: Bejamin v. Dept. of Pub. Welfare, No. 1:09-ev-1182-JEJ

Dear Mr. Meek and Judge Jones:

I am writing you as mother and guardian of Pamela Boyer, who presently resides at the Hamburg State School located in Hamburg, Penna. Pamela is grossly compromised in her abilities both physically and cognitively. She is completely dependent with all her care needs by the staff that presently care for her on a 24 hour basis. This includes her daily abilities to bath, dress, eat and be mobile. She is dependent on the staff to ensure that she is moved from on place to another, and also has become dependent on the professional staff of licensed nurses to oversee and have the ability to anticipate and intervene regarding her physical and cilinical needs. Pamela suffers with seizure activity as well as falls and other medical concerns that are monitored and acted upon in a relatively quick manner due to the expertise of the staff as they are able to obtain the necessary and correct intervention to ensure the proper care for Pamela. These actions are required and monitored 24 hours per day, as Pamela through no fault of her own, is unpredictable in her needs.

I am gravely concerned with the recent proposals that are taking place regarding the potential settlement in the class action suit of Benjamin vs. the Dept. of Public Welfare, No. 1:09-ev-1182-JEJ. The school that cares for Pamela has been doing so for many years. If it not for this school, I would not be able to have the peace of mind that my daughter is cared for by the professionals who I know, and have the utmost confidence in. They know my daughter; she is not able to communicate verbally as you and I do, therefore she is not able to make her needs known; the staff are able to interpret Pamela's behaviors and sounds she makes, thus allowing them to not only predict her needs, but to be proactive in preventing undue stress to her as well as to others. I have grave concerns that the proposed settlement will interrupt this routine, therefore creating an extreme disruption in my daughters life that could and most likely would, cause irreputable harm to her.

Over the years I have often prayed that I had not only the ability, but the knowledge to care for my Pamela on a daily basis. This is something that is even less possible at this stage of my life......I am a mother who is no longer young and who also has health concerns. These do not permit me to care for Pamela.

If Pamela were transferred to another facility, I fear the impact it would have on her emotionally, physically and mentally. I fear for her inability to adjust. Yes, Pamela is not able to communicate, but she has feelings and specific needs, and, as with many cognitively impaired persons, the trauma of change will only cause a decline in her that will not "improve with time once adjusted." She will quickly deteriorate causing, I fear, a premature demise; one that can be prevented.

My other concerns are outlined as follows:

1.  The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my daughter to continuously voice our opposition to being placed on an ICF/MR Planning List.  My current opposition to community care has no permanence.   If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my daughter remain in ICF/MR care.

2.  Under the proposed Settlement Agreement no notice will be provided to me in the event that my daughter, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

3.  The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICF's/MR.  This depopulation and closure will deprive me and my daughter of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my daughter.   This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

4.  The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICF's/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety if my daughter, and furthur imposing community-based care upon me and daughter, one contrary to the Supreme Court's *Olmstead* decision.

5.  I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible.   There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

6.  The proposed Settlement Agreement provides for inadequate and one-sided status reports.   Any such status report should also include reports of deaths, injuries, and other harm resulting from relocation to community-based care facilities.

7.  I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

ˀfortunately, I am  able to participate in the hearings scheduled for August 22, 2011, however, I would like my opnions/concerns heard.  Unlike many other families, for my daughters entire life I have had to fight for her right to the best....to be her voice and advocate.   Until I am no longer able to do so, I will continue on this journey.  This includes the proposed Settlement Agreement relating to Benjamin v Department of Public Welfare.

Respecfully submitted;

Joan Wright,
Mother/Gaurdian for Pamela Boyer
Hamburg State School

2010

J. M. Wright
2604 Bilmar Rd
Reading, PA 19604    ★

LEHIGH VALLEY PA 180

26 JUL 2010  PM 8 T

**RECEIVED**
HARRISBURG, PA

JUL 2 8 2011

MARY E. D'ANDREA, CLERK
Per

*Clerk of Court*
*Federal Building & United States Courthouse*
*228 Walnut St*

*Harrisburg, Pa. 17108-0983*

17108@9998

Bertin W. Springstead
95 Locust Trail
Newville, PA 17241



August 26, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

I am the father and guardian of my son Craig who lives at Selinsgrove Center. For a variety of reasons, which stem in large measure from behavior issues, his mother and I are unequivocally opposed to a community-based relocation. Our reason for that is not because we are against community-based living arrangements. It is because we are for whatever is best for Craig. And, for that reason, at this moment in time, we are convinced that for Craig, life at Selinsgrove Center is less restrictive, more appropriate to his needs, and consequently better equipped to enhance his quality of life.

Of course, if future circumstances give cause for reconsideration, we will do so. From that perspective, as Craig's guardian, I am opposed to the proposed settlement agreement. While there are also others, my major reasons follow:

❖ I do not oppose the right of others to choose community care for themselves, but I do object to Plaintiffs' efforts to request relief on behalf of Craig.

❖ The proposed settlement diminishes the authority of Craig as the primary decision maker to choose the services and supports he receives, to include where he lives. *But, without meaningful options there is no meaningful choice.*

  • If at some point in the future the objection to a community placement is withdrawn and Craig is subsequently discharged from Selinsgrove Center, he would not be offered an opportunity to change his mind and move back.

  • The practical implications of the proposed settlement's integration plan would be the depopulation and eventual closure of one or more of PA's state centers. As a consequence, if Selinsgrove Center were to be closed, unless provided an opportunity to move to another state center or a

suitable privately operated ICF/MR, community-based care would be Craig's only choice.

• The proposed Settlement Agreement's provisions for consolidating budget lines would deprive state centers of critical funding, thereby jeopardizing the quality of services Craig currently receives, which could impose community-based services upon him.

• I am opposed to the proposed settlement requirement to annually assess opposition to discharge by residents, and involved families or guardians, whereas an expressed preference for a community placement would remain in effect unless and until recanted without being asked. Consequently, in the event an involved family member or guardian dies or becomes incapacitated and is not replaced, his/her previously stated objections to a community placement would likely be ignored unequivocally.

❖ Under the proposed settlement there is no requirement for me to be notified if Craig is somehow deemed to have consented to community care or has been placed on the Planning List for any other reason.

❖ I am opposed to 2nd question in parts 1A and II A of the State Center (ICF/MR) Planning List Survey, which asks the person being interviewed if he/she wants to live closer to his/her family. That question would conjure up some unrealistic expectations, which for some would be a key reason for expressing a desire to be discharged to the community.

• Some residents will interpret the question as an opportunity to live at home, which, more often than not, would not be an option.

• Many family members are deceased or, due to age, are no longer able to accommodate expectations of a close relationship.

• Family members of some residents live out of state.

• And sadly, some other families would be unwilling to enter into a meaningful relationship.

❖ I object that in accordance with the proposed settlement, decisions would be made whether to place a resident on the State ICF/MR Planning List without requiring direct input from a qualified mental retardation professional or staff members who support the resident on a regular basis.

❖ The proposed settlement provides for extensive educational programs designed to teach state center residents, their involved families and guardians how the community intellectual disabilities system works including the type of placement

services and supports the community provides. However, while I do not object to that per se, I do object to the curriculum. Given the sole focus on the community it is quite likely that, intended or not, at least some training sessions would be infused with an anti state center bias, which indeed could include an intended sales pitch for a community placement.

❖ I object to the proposed Settlement Agreement because neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are or will become available, that these facilities are capable of meeting the needs of current state center residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

❖ I object that DRN of PA, a publicly-funded entity, would receive $432,500 in legal fees as the proposed Settlement Agreement calls for, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Craig's mother and I believe strongly that the best interests and preferences of each and every individual with an intellectual disability should be paramount, even if inconvenient or in conflict with someone else's philosophical persuasion. In short, it is apparent that the authors of the proposed settlement agreement do not agree. As expected and understandable the proposed settlement reflects a community bias but it was not expected to be unfair to those who prefer services provided by a state center.

Finally, please accept this letter as notice of my intention to appear at the August 22, 2011, hearing and request to be permitted to testify.

Sincerely,

Bertin W. Springstead
Father and guardian of
Craig H. Springstead




B. W. Springstead
95 Locust Trail
Newville, PA 17241

7010 2780 0002 8869 7403

RECEIVED
HARRISBURG, PA

JUL 2 8 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

JA706

Dolores J. Drews
1 Burgundy Circle
Boiling Springs, PA 17007

July 26, 2011

FILED
HARRISBURG, PA

JUL 2 9 2011

MARY E. D'ANDREA, CLERK
Per
Deputy Clerk

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones,

I am Dolores J. Drews, mother and legal guardian of my son, Paul M. Drews, who is 48 years old. Paul has lived at Selingsgrove Center for 21 years. Prior to that placement Paul lived at home, also with his brother, as well as in four different group homes (one in North Carolina and three in Pennsylvania). Paul was hospitalized three times while at group homes because of aggressive and non-conforming behavior. The lack of an integrated program and frequent turnover of staff were only two of the negative factors regarding group home living. This was extremely difficult for Paul's diagnosis as "autistic hypersensitivity". It is my strong belief that if Paul was ever again placed in a group home the same aggression, non-compliance and deep depression would occur.

Selingsgrove Center has been a "Godsend" for Paul. He has a private room with his own television, an understanding, knowledgeable and caring support system, friends, a paid work program and the opportunity to participate in the many interest groups and out of town events. Paul is an out-going man who enjoys talking with the staff and workers on the campus. Selingsgrove Center provides this type of integrated program for our son. A multi-handicapped person such as Paul requires the feeling of security, caring, consistency and acceptance that Selingsgrove Center provides.

I do not want Paul to live in a community group home – Selingsgrove is his home!

**My objections to the conditions of the settlement are as follows:**

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I object to Plaintiffs'efforts to request relief on behalf of my loved one.
- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence if I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.
- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

JA707

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.
- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.
- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.
- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in the Olmstead v. Zimring case.
- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision.
- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.
- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.
- I object that the Disability Federal Rights Law Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents in ICF/MR or community-based facilities.

In conclusion, I must emphasize that the settlement is extremely unfair in its inadequate consideration for the population segment that does not desire to be relocated to Community Homes. I plan to attend in the fairness hearing on August 22, 2011.

Sincerely,

*Dolores J. Drews*

Dolores J. Drews
Paul Michael Drews

2



HARRISBURG PA 171

27 JUL 2011  PM  4 L



RECEIVED

JUL 29 2011

PER _____
HARRISBURG, PA   DEPUTY CLERK

Col. (Ret.) Fred R. Drews
. 1 Burgundy Circle
Boiling Springs, PA 17007

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17101-31727

JA709

Frederick R. Drews
1 Burgundy Circle
Boiling Springs, PA 17007

July 26, 2011

FILED
HARRISBURG, PA

JUL 2 9 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones,

I am Frederick R. Drews, father and legal guardian of Paul M. Drews, who is a resident of the
Selingsgrove Center. Paul is 48 years old and has been a resident at Selingsgrove Center for 21
years. Paul has a history of aggression and property destruction. His diagnosis is autistic
hypersensitivity.

I believe that if Paul were moved to a Community Home it would cause irreparable damage to his
health. He lived in four Community Homes prior to his admittance to Selingsgrove Center. To put
it bluntly, they were a disaster for him. On three occasions he was hospitalized. Paul cannot live
successfully in a Community Home.

For 21 years Paul has had a reasonable and safe environment suitable to his needs at Selingsgrove
Center. Paul speaks of Selingsgrove Center as his home. There he is professionally managed and
cared for in integrated services, including medical, food service, work, religious, and recreation
programs. He has a room of his own and considerable freedom to walk around the campus. The
staff has been outstanding and Paul considers them his friends. Whenever a violent outburst
occurs the staff manages these events with prompt and safe efficiency. Without any doubt,
Selingsgrove Center is far superior to any Community Home for Paul's long-term health and
well-being. Were Paul to be uprooted and forced into a Community Home I would predict that he
would regress again to extreme severe clinical depression.

**My objections to the conditions of the settlement are as follows:**

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I object
  to Plaintiffs' efforts to request relief on behalf of my loved one.
- The class identification procedures on pages 5-7 of the proposed Settlement Agreement
  require me and my loved one to continuously voice our opposition to being placed on an
  ICF/MR Planning List. My current opposition to community care has no permanence if I
  pass away or am incapacitated, the proposed Settlement Agreement will ignore my
  recorded wishes that my loved one remain in ICF/MR care.
- The proposed Settlement Agreement places people on the State ICF/MR Planning List
  who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.
- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.
- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.
- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in the Olmstead v. Zimring case.
- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision.
- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

In conclusion, I must emphasize that the settlement is extremely unfair in its inadequate consideration for the population segment that does not desire to be relocated to Community Homes. I plan to participate in the fairness hearing on August 22, 2011.

Sincerely,

Frederick R. Drews
Paul Michael Drews

2





RECEIVED

JUL 2 9 2011

PER: _____
HARRISBURG, PA    DEPUTY CLERK

Col. (Ret.) Fred R. Drews
1 Burgundy Circle
Boiling Springs, PA 17007

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

CELEBRATING ABILITIES. EXCEEDING EXPECTATIONS.

FILED
HARRISBURG, PA

JUL 2 9 2011

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

ACHIEVA

July 26, 2011

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Dear Clerk of Court,
I am writing about the proposed settlement for the Benjamin Case, Civil Action
No. 1:09-cv-1182-JEJ. My husband and I are the parents of two adult children
with intellectual disabilities. Our son lives in a community living program with his
best friend/ roommate, is employed at one of Pittsburgh's hotels, enjoys
recreational events with his friends and enjoys going to church and on vacations
with us. Our daughter lives at home with us as she is on the waiting list to live
with her friends as our son does. She works at one of Pittsburgh's largest
grocery stores, loves to play golf and read and also likes vacation trips.

I have visited all five of Pennsylvania's state centers and know that there are
people living there who have the same support needs as my children and who I
am sure would love the opportunity to make decisions about their lives. Most
people take for granted the choices they make every day-what to eat, when to
eat, the chance to meet new people, to cook different foods, to volunteer, and to
choose who to live with. People living at state centers do not have the
opportunity to make these decisions and thereby to enjoy the richness of life.

I also know many families of people living at the state centers. Although our
experiences have been different, I respect the decision they made for their son,
daughter, sister or brother to live in a state center. That said, times have
changed since most people were placed at a state center. Today, everyone
living in a state center can be supported to live in the community. Families and
providers are caring for people with complex medical, behavioral and psychiatric
issues who require 24/7 care.

**60 YEARS**

OF EXCELLENCE
AND INNOVATION

Affiliated with The Arc of Pennsylvania and The Arc of the United States

THE ACHIEVA FAMILY
ACHIEVA Support, ACHIEVA Family Trust, ACHIEVA Resource,
The Arc of Greater Pittsburgh, The Arc of Westmoreland

711 Bingham Street
Pittsburgh, PA 15203-1007
www.achieva.info

t) 412 995 5000
f) 412 995 5001

JA713

I urge you to approve this settlement and allow people living in state centers who wish to move to community homes the opportunity to do so. It is also my fervent hope that for families who are unsure or opposed to community living for their family member that they will take the time to learn about community living from people who moved from state centers and from other families who changed their minds and now are pleased that their family member is living in the community.

Sincerely,

Nancy J. Murray
President,
The Arc of Greater Pittsburgh/ACHIEVA
711 Bingham Street
Pittsburgh, PA 15203





ACHIEVA
Celebrating Abilities
Expanding Expectations

ACHIEVA
711 Bingham Street
Pittsburgh, PA 15203-1007

RECEIVED
JUL 29 2011
PER _____ DEPUTY CLERK
HARRISBURG, PA

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg PA  17108-0983

17151*1727

JA715

Mark Drews
1627 Bolingbroke Road
High Point, N.C. 27265

July 25, 2011

FILED
HARRISBURG. PA
JUL 29 2011
MARY E. ...
Per ..........
............HEA, CLERK
Deputy Clerk

Clerk of Court
Federal Building & U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network
1315 Walnut Street
Philadelphia, PA 19107-4705

Re: **Benjamin v. Department of Public Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My name is Mark Drews and I am the brother of Paul Drews. I am also Paul's alternate
guardian. Paul is a mentally handicapped person who resides at Pennsylvania's Selinsgrove
Center. He is mentally retarded and autistic. His disabilities are evident in both his intellectual
and social capabilities. Paul experiences unprovoked incidents of aggression (towards others)
and engages in numerous acts of property destruction. He has a history of unpredictable and
unprovoked explosive aggressiveness that can be attributed to autistic hypersensitivity.
Medications are one form of treatment being used to help minimize incidents of psychotic
behavior.

It is my firm belief that the proposed Settlement Agreement will be harmful to members of our
family and in particular to Paul himself. I truly appreciate all the many fine (and appropriate)
programs offered to Paul at Selinsgrove Center. The staff is very familiar with Paul and his
needs and have made outstanding efforts on his behalf. I am convinced that a community
based living environment will not even come close to matching those benefits and programs
Paul is currently receiving at Selinsgrove Center. Paul has been in four community based
programs prior to residing at Selinsgrove Center – none were effective in meeting his needs and
none proved to be an appropriate living environment for Paul.

Among a number of Paul's disabilities includes inappropriate socialization skills and behaviors.
Paul does not express himself well verbally and therefore will often build up internal anger or
resentment toward a person (or persons) and, in an unprovoked situation, physically attack (in
an extremely violent manner) the unsuspecting individual. This has been a problem for Paul all
of his adult life. At Selinsgrove Center extensive efforts (medications, counseling, testing and

JA716

evaluations, psychological therapy, behavior modification programs, etc.) have been made to help Paul overcome these and other inappropriate behaviors. Selinsgrove staff members have come to know Paul and how to best deal with his aggressiveness and what actions are best initiated when these situations occur. A community based living environment did not work well for Paul - it also produced a negative impact on his fellow residents and staff members.

Selinsgrove Center has been the ONLY facility that has been able to help minimize Paul's inappropriate behaviors. They are the ONLY staff to continuously work to understand Paul and to work towards improvements. This is the ONLY place where no matter what problem my brother has or whatever inappropriate behaviors he displays, they have maintained an attitude of patience, consistence, and perseverance toward working to make Paul's life the best it can be.

The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for himself ,l is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

I object that the proposed Settlement Agreement allows DRN Facility Advocates to have eauql say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include informational about the dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICF/Mr. The depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in the *Olmstead v. Zimring* case.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved o, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN or DPW have made any showing that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

Selinsgrove Center has been "home" to Paul for over twenty years now. It provides a good life for Paul where he is happy, and adjusted. He is involved in excellent social and academic programs in an environment that is very appropriate for him. I believe that the Settlement Agreement is (at least in part) designed to provide greater opportunity to certain disabled people, but is not (or should not) be intended to place individuals in an environment that would be counterproductive or detrimental to the individual's quality of life. Paul Drews is such an individual. It is and will be in Paul's best interest that he remain an ongoing resident at Selinsgrove Center.

Sincerely,

Mark F. Drews, alternate guardian
and brother of Paul M. Drews

JA718



GREENSBORO NC 270
PIEDMONT TRIAD AREA
25 JUL 2011 PM 4 T

Clerk of Court (Federal Building; U.S. Courthouse)
328 Walnut Street
Harrisburg, PA 17108-0983

17108+9800



RECEIVED
JUL 2 9 2011
PER _____
HARRISBURG, PA.     DEPUTY CLERK

Mark Drews
1627 Bolingbroke Road
High Point, NC 27265



CELEBRATING ABILITIES. EXCEEDING EXPECTATIONS.



Achieva
711 Bingham Street
Pittsburgh, PA 15203

July 22, 2011
In regards to: Benjamin Settlement Agreement

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

**FILED**
HARRISBURG, PA

JUL 2 9 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Dear Robert,
I understand that the Court will hold a hearing to determine whether or not the settlement will be approved regarding the Benjamin Agreement. I am writing to you to express my support for the Benjamin Settlement Agreement. Today, individuals with disabilities have the choice to live and participate in the community as per the Americans with Disabilities Act, the Americans with Disabilities Amendments Act, and the Rehabilitation Act. As I am sure you are aware, this legislation prohibits the discrimination of people with disabilities in many environments and has stated that a disability does not diminish a person's right to live and participate in society.

Opponents of this Agreement feel that there are not enough community supports available and feel that their loved ones would receive better care and supports through State Centers. However, I disagree with this. With appropriate settings and supports, individuals with intellectual disabilities can live in integrated and inclusive community settings, where they would still have all of their needs met. Before an individual is moved into a community setting, their needs are assessed as well as types of placements and other supports and services, in order to help that individual successfully move to and remain in community settings. Supports and services available, dependent on individual need, include: small group homes, family living, vocational training, supported employment, development of skills, socialization, therapies, home health-care, and other support services. Through these supports and services, individuals with intellectual disabilities are better able to make their own decisions about where they want to live, with whom they want to live with, and what activities they would like to participate in. Through these opportunities, individuals will be able to build relationships with individuals with and without disabilities, and increase their natural supports.

**60 YEARS**

OF EXCELLENCE
AND INNOVATION

Affiliated with The Arc of Pennsylvania and The Arc of the United States

THE ACHIEVA FAMILY
ACHIEVA Support, ACHIEVA Family Trust, ACHIEVA Resource,
The Arc of Greater Pittsburgh, The Arc of Westmoreland

711 Bingham Street
Pittsburgh, PA 15203-1007
www.achieva.info

t) 412 995 5000
f) 412 995 5001

JA720

Furthermore, individuals have the opportunity to become a member of a community and participate in neighborhood activities and gatherings that they would not typically be involved in. In addition to these benefits, individuals without disabilities also benefit from having relationships with individuals with disabilities as they become more aware and accepting of all differences within communities, regardless of abilities.

Many opponents fear that their loved ones will not receive the care and supports that they need. However, just because the supports and services are provided in a different setting, does not mean that the individual with an intellectual disability would not receive the same level of care and support that they need. It only means that the services are provided in an inclusive setting and that they have the opportunity to fully participate in a community setting. With the appropriate services and supports, individuals with intellectual disabilities can and do live in community settings, where they have the opportunity to enjoy the things that you and I are allowed to enjoy everyday.

I am hopeful that individuals with intellectual disabilities, who would like to live in the community and who have the appropriate supports and services, will be able to have the basic right to choose whether or not they would like to live in an institution or in the community.


Respectfully,

Megan L. Irwin

Megan L. Irwin



ACHIEVA

Community Alliance
Developmental Services

ACHIEVA
711 Bingham Street
Pittsburgh, PA 15203-1007

$ 00.44⁰

Clerk of Court
Federal Building & U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983



RECEIVED

JUL 2 9 2011

PER _____ DEPUTY CLERK
HARRISBURG, PA

Mr. & Mrs. John Potochnick
157 Lake Heights Court
Lake Ariel, Pa. 18436

FILED
HARRISBURG. PA
JUL 29 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

July 26, 2011

Clerk of Court
Federal Building & United States Court House
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No.1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek,

We are the parents and legal guardians of John M. Potochnick, who lives at White Haven Center. He has a disease called Tuberous Sclerosis and because of this is medically fragile. His intellectual age is around 2 years. The nature of the disease causes our Son to becomes ill extremely fast. He needs 24 hour monitoring by nurses. He has only 1 kidney left because one of the tumors ruptured the main artery of his kidney and he was bleeding out. His remaining kidney is also full of these growths. He also has a severe seizure disorder.

We are afraid the ultimate goal of the DRN is to close places like White Haven Center which are so need for the medical fragile. People like our Son need 24-7 nursing care on grounds and its very important for them to have highly trained direct care staff that know him well. We have asked former director Casey why there is such a difference in the required training and background checks for Center employees compared to the little training and background checks for group home. It would seem to us that if DRN is so concerned about people like our Son they would look into this also.

We would never presume to say what's best for someone else loved one. We know our Son, are very involved in his life and know what's best for him. He is happy, loved, and well cared for. We feel like DRN is saying that we as parents and guardians are not doing our job well. Its hard for us to believe that in our country our rights as parents can be taken away, when we try very hard to do our best. A judge appointed us his guardian because he believed we would do what is best for our Son.

Why would DRN have equal say with DPW regarding who should be placed on the State Planning List? They have already deemed everyone can be served in the community. How are they going to see our Son and others as individuals with their own special needs. Our loved ones are not statistics, they are not numbers to be used in an effort to close the centers. White Haven is our Sons home he is surrounded by loving, highly trained people who are his family.

We feel strongly that before a final decision is made you need to see first hand our Sons home, the people who know him so well and care for him equally as well. When Senator Casey was Auditor General he did a number of investigations into group homes and made many suggestions. I would like to know if all of those have been implemented for the safety of those who now reside in these group homes. I know there are many people who do well and thrive in group home setting that is why we have choice, may we always have it.

Sincerely,

John D. Potochnick

Mr. and Mrs. John Potochnick
Guardian and parents of John M. Potochnick



USA FIRST-CLASS FOREVER

John Potochnick
1571 Lake Heights Ct
Lake Ariel PA 18436-4447

Clerk of Courts
Federal Bldg. United States Court House
228 Walnut St.
Harrisburg, Pa. 17108 - 0983

RECEIVED

JUL 29 2011

PER _____ DEPUTY CLERK
HARRISBURG, PA.



JA724

Carol A. McDonald
3630 Walnut Brook Drive
Rochester Hills, MI 48309

**FILED**
HARRISBURG, PA

JUL 2 9 2011

July 25, 2011    MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My name is Carol McDonald, sister and guardian of Philip W. Roll who is presently a resident of White Haven Center, White Haven PA. Phillip was born in 1949 and has been a resident of Selinsgrove and White Haven Center since 1956—he has been a resident of White Haven Center since 1967. He continues to successfully reside in Laurel Hall and he is very happy there. He has a great deal of affection for all the workers at White Haven and has expressed his desire to continue living there. Philip has struggled with Schizoaffective Disorder and has had a history of elopement and aggressive behavior. At approximately 10 years of age he achieved a mental age of 4 years, 6 months as measured by The Stanford Binet Intelligence Scale. After having lived at White Haven Center for 44 years, this is Philip's home. He is able to work for a few hours each day under the guidance of staff which he would not be able to do in a group home. Moving from White Haven would be extremely disruptive and could cause emotional and behavioral problems. At White Haven Philip lives in a community surrounded by love and compassion with a stable and highly professional staff. His living conditions are like home—he has his own room, small dining area, adjacent kitchen and living area which he shares with his fellow residents. We appreciate the fact that the staff does not have a high turnover rate and that Philip has professional medical care available to him twenty- four seven. White Haven Center provides all kinds of activities for the residents—from social to religious. They participate in the local community by attending church, Kof C, the circus, Bloomsburg Fair, Philadelphia Zoo, Shopping sprees, pot luck dinners, sporting events, local musical presentations, flea markets, fireworks, seasonal dances and parties, Special Olympics, Haunted House created by staff, and many other activities. I am concerned that if Philip were moved he would not have the same level of care from staff nor would he have availability of onsite medical care. Furthermore, if he were to wonder off, he would be in far greater danger than residing at White Haven Center. I believe if he were moved, his quality of life would be greatly diminished and he could suffer severe and life threatening consequences. I would ask—how would you like to lose your home, your family, your surroundings and the people you love after 44 years?

As Philip's legal guardian and loving sister, I object to the proposed settlement for the following reasons:

- I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

JA725

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

2

JA726

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.


- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

In closing, let me say again, that I am absolutely and unequivocally opposed to the proposed settlement and that I will vigorously oppose any effort to move Philip W. Roll from White Haven Center to a group home. Please consider all the reasons I have listed above.

Sincerely,

*Carol Ann McDonald*

Carol Ann McDonald
Guardian of Philip W. Roll.

3

Carol McDonald
3630 Walnut Brook Dr.
Rochester Hills, MI 48307

Clerk of Court
Federal Building + United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0183

RECEIVED
JUL 9 2011
HARRISBURG PA
PER
DEPUTY CLERK

JA728



Clerk of Court
Federal Building & US Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705

July 25, 2011


RE:  Potential Closure of White Haven Facility,

Dear Madam/Sir,

I understand that the continued existence of this facility is in jeopardy.  I would like to express my grave concern over this situation.

My brother, Andrew Margolis, has been a resident of White Haven for many years.  The care he receives here is superior to any he has previously received.  His, unfortunately, is a very severe and difficult case and he has been treated with the utmost sensitivity and caring.  It is difficult to imagine how another placement could provide him with the care he receives at White Haven.

Forgive me if I am being too graphic but my brother, in addition to having a very low I.Q., has loud, angry outbursts, is obsessive-compulsive, and has bowel impaction issues.  He does not like to be touched and cannot tolerate any situation in which there are many people.  How can an individual like this be served in the community?

I understand that community placement is desirable for many.  I support their right to follow this course of action but it is not the correct one for my brother.

Thank you for listening to my concerns.  Your interest is greatly appreciated.


Sincerely,


JAMES K. MARGOLIS, Ph.D,ABPP

Diplomate in Clinical Psychology

American Board of Professional Psychology


JA729



**Valley Neuropsychology Group**
1045 S. Cedar Crest Boulevard
Allentown, PA 18103-5443

LEHIGH VALLEY PA 180

25 JUL 2011    PM 2 T

RECEIVED
HARRISBURG, PA

JUL 29 2011

MARY E. D'ANDREA, CLERK

Per _____

17108598598

Clerk of Court
Federal Bldg. & U.S. Courthouse
228 Walnut St.
Harrisburg, PA 17108-0983

JA730



**Charles D. McCormick**

ATTORNEY AND COUNSELOR AT LAW

SUITE 808
67-69 PUBLIC SQUARE
WILKES-BARRE, PENNSYLVANIA 18701

PHONE: (570) 825-0500
TELEFAX: (570) 825-0547
E-MAIL: MCCORMICK@EPIX.NET

Reference   Carolyn Jones, Daughter of Thomas W. Jones
Residence:  White Haven Center
            Luzerne County, Pennsylvania

July 25, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

RE:   **Benjamin v. Dept. of Public Welfare**
      **No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones:

Please allow me to introduce myself. I am Attorney Charles D. McCormick and power of attorney for Thomas W. Jones, whose Daughter, Carolyn, has been a life-long resident of the White Haven Center, Luzerne County, Pennsylvania. I have enclosed a photocopy of Mr. Jones' Power of Attorney for your records.

Although Tom has become correspondingly frail physically and is now a resident in a personal care facility in Wilkes-Barre, Pennsylvania, I meet with him weekly and keep him informed of his Daughter's situation at White Haven. Carolyn has also had the opportunity to visit with her Dad over the last several months which has greatly encouraged Tom.

The purpose of my letter is to express Tom's concern and opposition to the community care efforts pursuant to the above-captioned matter as being inappropriate for his Daughter, Carolyn. Carolyn has lived and been nurtured in the wonderful setting of the White Haven Center since her early youth. I have enclosed her latest ISP for your reference.

Carolyn is wheel chair bound, non-verbal and requires significant staff assistance in order to maximize her living experience. As you can clearly see going through her ISP, Carolyn has thrived in the highly structured supervised and significant assisted placement at White Haven. Any move from White Haven to a community care facility would be extremely detrimental and possibly life threatening to Carolyn. Tom has made it very plain to me that he objects to the proposed settlement, and that he would object to Carolyn's placement on the planning list. Carolyn would not be capable of surviving in a community placement environment due to the level of care and interaction required for her to have a meaningful life. The White Haven Center has been nurturing and fulfilling

JA731

# Charles D. McCormick
### ATTORNEY AND COUNSELOR AT LAW

Clerk of Court                                        Robert W. Meek
Federal Building & United States Courthouse           Disability Rights Network of PA
July 25, 2011
Page 2

RE:    Benjamin v. Dept. of Public Welfare
       No. 1:09-cv-1182-JEJ

for Carolyn, and Tom has always been deeply appreciative for the quality care that has
been provided at the White Haven Center.

The proposed settlement agreement and the class identification procedures require Tom's
constant opposition; and in his increasingly frail circumstance, he is greatly concerned
that the proposed settlement agreement would ignore his firm wishes that Carolyn remain
in ICF/MR care.  Tom is also extremely concerned and objects to the equalization of the
input of DRN facility advocates to DPW personnel.  It is clear that the object of the
proposed settlement would be the repopulation and eventual closure of White Haven.
This would deprive Carolyn and Tom of a meaningful choice to remain in the form of
care that has been so beneficial to Carolyn and has allowed her to enjoy the basic
necessities of life for these many years.

There is no evidence that the implementation plan of community care facilities are
available in sufficient quantities or in sufficient size or budgeting that would allow these
community facilities to provide for Carolyn's needs.

One would suggest that the very significant legal fees proposed of $432,500. would be
better served to support the residents in either White Haven Center or community based
care facilities for those persons who feel that those facilities would be appropriate.

In summation Carolyn Jones is clearly not a party to which the planning list would be
applicable nor is a community based care facility capable of providing for Carolyn's
needs.

I thank you for allowing me to present Mr. Jones' position in this matter.

Sincerely,

CHARLES D. McCORMICK

CDM:tmh
Enclosures

JA732

Eloise Moore

102 S. Market St.

Martinsburg, PA 16662

July 21, 20011

Clerk of Court
Robert w. Meek

Federal Building & United States Courthouse
Disability rights Network of PA

228 Walnut Street
1315 Walnut Street Suite 500

Harrisburg, PA 17108-0983
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am a friend of the family of Del Gordon that is a resident of Ebensburg Center. He is a 57 year old man with the IQ of an 18 months old baby. He does what a child that age does with a big man's body. I think that anyone that is good enough to live in the community should do so, but the profoundly retarded do not do well in the house next door. They have many health issues both psychological and physical; let's do the right thing and do not take them out of their home where they are well taken care of. They have 24 hr. care with doctors, nurses every need is taken care of, health a job, school fun times (movies, church, camp, etc.), and many schools , churches and organizations come to interact with the residents. Think of what you are doing, to the most fragile of our citizens and once those centers are close there is no turning back.

Sincerely,

*Eloise Moore*

Eloise Moore

JA733

RECEIVED
HARRISBURG, PA

JUL 29 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Bldg. & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17108+0983

JA734



Clarence and Gail Ropp
6 Park Street
Jacobus, PA 17407

July 25, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

We are Clarence and Gail Ropp, parents of Rosemarie Ropp, a resident of Selingsgrove
State Center in Selingsgrove, PA. Rosemarie has severe disabilities, including physical,
mental and emotional disabilities. One of her major debilitating physical disabilities is
seizures. She cannot walk, talk, feed herself, bathe, in other words, she cannot do
anything for herself.

This settlement would harm Rosemarie if she were placed into a community setting
because she must have 24-hour medical services, which would not be available in the
community setting. We appreciate the excellent care she receives at Selingsgrove State
Center and all the love that her aides give to her. There are nurses available 24 hours
every day at this center giving her medicine based on her physical condition that day.
The nursing staff also evaluates Rosemarie's need for bed rest throughout the day
because of her condition. They also provide Rosemarie with quiet time as needed.

My objections are listed below:

- I do not oppose the Plaintiffs' right to choose community care for themselves,
  but I object to Plaintiff's efforts to request relief on behalf of my loved one.
- The proposed Settlement Agreement places people on the Sate ICF/MR Planning
  List who have not indicated that they want to be on the List.
- Under the proposed Settlement Agreement no notice will be provided to me in
  the event that my loved one, who is incapable of making decisions for
  his/herself, is somehow deemed to have consented to community care or has
  been placed on a State ICF/MR Planning List for any other reason.

JA735

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.
- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the Sate ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.
- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICF's/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in the *Olmstead v. Zimring* case.
- The proposed Settlement Agreement's provision for consolidating budget lines will deprive State-run ICF's/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

Rosemarie receives the necessary care and love she needs at Selingsgrove State Center. Her longevity of life, well beyond all the doctor's predictions, can be directly attributed to her care. Please do not take this away from her. She would be unable to survive in the community because she is so dependent on the nurses and other staff at Selingsrove State Center knowing her and her needs.

Sincerely,

Clarence and Gail Ropp
Parents, of Rosemarie Ropp

Ropp
6 PARK ST
Jacobus Pa.
17407a.

CLERK of the Court
Fedrl. Bldg. & US Courthouse
228 Walnut St.
Harrisburg, PA 17108 - 0983

LANCASTER PA 175
26 JUL 2011 PM 5 L

RECEIVED
HARRISBURG, PA
JUL 29 2011
MARY E. D'ANDREA, CLERK
Per _____

1710839600

JA737



Trudy L. Sheetz
28 Byers Drive
Quarryville, PA  17566-9262
717-786-4901

July 25, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705

Re:  Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

        As a sister of a profoundly mentally retarded, autistic, and deaf brother, it is only fitting that I express my family's alarm with what this suit against the DPW by the DRN, is doing to individuals like my brother.  Before I loose your interest of this just being another letter of protest, I should inform you, as a nurse in this commonwealth for 36 years, I have done home care in some of the community settings.
        My brother John has the mentality of a 2-4 yr. old, is non-verbal (not able to speak since birth,) has seizure disorder, autism and engages in self abuse when he becomes extremely upset.  He has also been diagnosed with early dementia, which means he will forget what little he has been taught as time goes by, like going to the bathroom and forgetting to eat.  He lives on a chopped diet, requiring supervision with all meals and drinks or he would choke and aspirate.  He enjoys rocking, swinging, going out for treats, and has many more opportunities to do this being in a state center than anyone I've encountered in a community living situation, unless they were higher function and able to learn the transit systems.
        My family and I have been very active in John's life at Selinsgrove.  Our Dad passed away June 26th, the staff took John aside to relay this and John is unable to comprehend what was being stated to him.  The staff stated they did not feel he understood what they were trying to tell him.  This is the beauty of these special people.  They do not know anything but love and caring, unless someone harms them.  They are very affectionate souls.  Of course when John becomes upset, he is a full-grown man and has the strength of two men some times.  Occasionally he will become upset, he will attempt to harm himself, most of the time with head banging or taking the heel of his hand and beating it against his cheekbone, or hitting at someone trying to intervene to keep him from hurting himself.  Why John becomes upset is a mystery.  It could be the time of day.  Evenings seem to be his time to become upset.  It has nothing to do with staff, activities, etc.  John just begins to act out.
        With all of that being said, closing the State Centers and forcing individuals like John and others with more physical disabilities out will probably be the end of their lives.

If that sounds a bit drastic, let me elaborate on what really happens with in the community. Most of the staff caring for these community residents are individuals with only 4 weeks of training. Most are not really aware of what caring for a less functioning individual involves. Many are passing out the medications; after a nurse has stopped in to pre-pour them, not fully aware of side affects or the importance of insulin dependent diabetics needing to eat within a half hour of getting their injections. I needed to give insulin in a group home. The staff person was going to put that individual on a bus to go to daily programming 20 minutes away without giving him breakfast. I instructed he had to eat within the half hour or he could go into insulin shock while in transit. The staff person told me that if she didn't put him on the bus, she would have to stay at the house with him and she was unable to be there all day. I won out, by calling her supervisor and explaining what was occurring. The staff member gave him breakfast and was then driving him to his programming. Had I hurriedly left, I shutter to think what may have occurred.

Then there was a staff person at a group home, very loving and caring to the residents. One evening one of the residents became upset for no reason they could determine and began to hit and kick at this staff member. There were two staff people for eight individuals at this home. The other staff person was afraid due to the size of the resident and did not try to intervene. The staff person being battered will live with a permanent pelvic/bladder injury, non-operable after two surgical opinions and will catherize themselves for the rest of their life.

Another incident resulted in death, when after one week at the community residence, this individual was given a peanut butter sandwich. Harmless enough, this person was not able to chew very well, and choked to death. The family was devastated, as the parents were in their late seventies and had only recently decided to try the group home, since they were concerned as to what would happen to their loved one should they not be around anymore. Of course this was accidental, but yet someone failed to familiarize themselves with this person's eating habits and needs.

I'm not slam-dunking community placements. If the individual is higher functioning on a level with a certain amount of independence, they should have a say in where they would like to live. But for individuals like my brother and a few I've related above, they need a higher level of care that the ICF/MR provides, that no community setting can give. These are special needs people, needing skilled care and availability of medical care 24/7. A nursing home for the elderly is not what they need, but could end up in.

They also do not do well with change in staff, routines and change of surroundings. My brother, as many others at Selinsgrove can wonder around in his large spacious unit, they would be restricted to smaller surroundings and unable to go outside without one to one supervision. The outside areas are secure, comfortable and homey at Selinsgrove and it is home to John. We have brought John home for weekends, sometimes it went well, but sometimes it did not. Once while driving from Mom's to my home, John just started to become upset. He wanted to head bang against the side window of the vehicle, so I put the window down to keep him from putting his head

through it. John then reached over grabbed my arm and began to twist and squeeze. He then let go, slide down in the front passenger seat and proceeded to kick my windshield and crack it. Upon arriving at my house, he got out of the car and banged his head into the hood, then went into the living room and upset a swivel rocker. The strength these individuals have is amazing when you look at their sometimes underdeveloped bodies. I knew to take him to the shower, which he enjoys and helps to calm him.

Remember with new guidelines, certain medications are chemical restraints and physical restraints are not allowed anymore. So by closing ICF/MR facilities, are we not putting these individuals at risk? Society has no acceptance of the imperfect. The child and elderly abuse is on the rise. The waiting list for special needs children is 3-5 years in Lancaster Co. Programming is geared for the young to age 23 and then many are left sitting at home. Community Group Homes provide some outings, but all too often the residents spend much of their weekend at the house and their out is to programming only.

As far as DPW not providing programming and opportunity, each year at my brother's annual review, we are asked if we would consider community placement and we decline. We as John's family feel he has the best of both worlds. He has much better care, a more stable staff, 24 hour medical personnel within the facility, and opportunities to do much more than others in the community based programs. DPW is doing the best they can, given not enough funds, not enough social service people and a broad base of problems with which they have to deal.

We do not feel that DRN has the right to lump our family member and others with similar disabilities into the same category as higher functioning individuals. Nor do they have the right to tell guardians where or how their children will live within their expectations. We have an obligation to obtain the best care for our family member that society can provide and an ICF/MR has been built and set up for the special needs and education of the mentally challenged, not the mentally ill. These special individuals can not get lost or tossed out of a home that many have known for 30-40 years.

A supposedly good Catholic family adopted four mentally challenged individuals a couple of years ago in Lancaster City. You may recall the headlines: "This is the worst thing I've ever walked into," stated the city police officer that responded to people being kept in a basement. This family had been keeping these individuals in the basement with a dirt floor, eating food cooked on a one burner hot plate. A tenant on the 3rd floor heard strange noises when he left for work and called the authorities. Not even the Priest would have thought these people could be that callous, but facts were facts. They used the money from these four to purchase properties and take vacations. No one ever followed up on how the new adoptee were doing. Do you really feel all of the mentally retarded belong in community? My experience as a nurse tells me no. If the DRN should win this case, we are stepping back in time and opening doors that should have been closed a long time ago!

I would be happy to speak on behalf of my brother and attend the meeting if it will help to shed some light on the positive side of the need to keep our ICF/MR State Centers.

Sincerely,

Cc:  Mrs. Shirley Musacchio  (mother and guardian)
      Mrs. Wendy Nichols  (sister and alternate guardian)
      Mr. Kevin Dressler  Facility Director of Selinsgrove Center
      Mrs. Lana Snyder  President Parents & Friends Assoc. of Selinsgrove Center
      John Bastek  President Penna. League of Concerned Families of Retarded Citizens


TLS/tls

USA FIRST-CLASS FOREVER

LANCASTER PA 176

26 JUL 2011 PM 5 L

Clerk of The Court
Federal Bldg, & US Courthouse
228 Walnut St.
Harrisburg, PA 17108 - 0983

1710899800

Mrs. Trudy Sheetz
28 Byers Dr.
Quarryville, PA 17566-9262

RECEIVED
HARRISBURG, PA

JUL 29 2011

MARY E. D'ANDREA, CLERK
Per _____

JA742



Geraldine Wetzel
13900 Vista Drive
Rockville, MD. 20853

July 24, 2011

Clerk of the Court                          Robert W. Meek
Federal Building & US Courthouse            Disability Rights Network of PA
228 Walnut Street                           1315 Walnut Street, Suite, Suite 500
Harrisburg, PA. 17108                       Philadelphia, PA. 19107

Re:  Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jonas,

My sister, Bernice Wetzel, resides at Selinsgrove Center, Selinsgrove PA. She has lived
there since 1987. Prior to that, she lived at Ebensburg Center, Ebensburg, PA. The
combined time she has been in State Centers is 45 years. She is profoundly disabled,
both physically and mentally.

Selinsgrove is my sister's home. The people who care for her are also her family. Her
caregivers are patient, caring and trained. She receives good medical care, special
programs designed for her and quality attention from the staff. I am quite sure she could
and would not get that type of care in the 'community'.

I do not oppose the Plaintiff's right to choose community living. What I do object to is
having that option chosen for my sister. I find it presumptuous to include my sister in the
class action suit and I strongly object to it.

I am concerned that I will continually have to make my objections known to having my
sister placed on the State ICF/MR planning list. Bernice is incapable of making this
decision. I do not want to worry if something should happen to me that my wishes will
no longer be taken into account.

I would like to be clear in stating that I object to the settlement. I also object to the fees
being paid to DPW. Those monies could be better spent at the Centers.

Sincerely,

Geraldine Wetzel
Geraldine Wetzel
Sister of Bernice Wetzel

JA743

Geraldine Wetzel
1390 Vista Dr
Rockville, MD 20853

RECEIVED
HARRISBURG, PA

JUL 29 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of the Court
Federal Building + US Courthouse
228 Walnut Street
Harrisburg, PA. 17108



JA744



July 25, 2011

Clerk of Court
Federal Bldg or US
Court House
228 Walnut St
Harrisburg, Pa 17108-0983

Please,

My Brother, Joseph V Keffer 70, is a resident at Selinsgrove Center. He would not understand the Benjamin litigation or DPW efforts toward community placement. He also has never been able to communicate.

Joseph's family, 4 Brothers and a Sister, strongly wish and pray that our Brother is never placed on a planning list and remains as long as possible at Selinsgrove Center with the care and love of the wonderful care givers, social, medical and therapy encouragement our Brother receives there.

All but one of our family are older than Joseph and will not be able to attend a hearing, but we do care. We consider the people at Selinsgrove we have come to know through annual meetings and visits, extended family.

Thank you for your time

Sincerely,
John W Keffer
3738 Starview Dr York, Pa
17402

JA745



LANCASTER PA 176
26 JUL 2011 PM 3 L

RECEIVED
HARRISBURG, PA
JUL 29 2011
MARY E. D'ANDREA, CLERK
Per ______

Clerk of Court
Federal Bldg. & U.S.
Courthouse
228 Walnut St
Harrisburg, Pa 17108-0983

17108$9800

David Kalan

75 Richdale Ave. #1

Cambridge, MA 02140

July 24, 2011


Clerk of Court                                    Robert W. Meek

Federal Building and United States Court House    Disability Rights Network of PA

228 Walnut St                                     1315 Walnut St, Suite 500

Harrisburg, PA 17108-0983                         Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am writing to you as the 58 year old brother and co-guardian of Diane Kalan (age 55), a life-long resident of the ICF/MR in Hamburg. At a very early age, it became clear to my family and our medical advisors that Diane had entered life with multiple and profound mental and physical disabilities, the severity of which were devastating. It is difficult for well-meaning people who have not had the direct experience of living with or caring for such individuals to fully grasp the pervasive extent of their needs. Every aspect of our daily lives is beyond the physical and mental grasp of my sister, from the most essential tasks of feeding and relieving herself to even the most rudimentary ability to verbalize or convey her needs or feelings. Diane has never been able to walk, to talk, to feed or to dress herself, or to participate in any significant way in her own survival.

Despite these handicaps, she has steadfastly received the love and attention of her family and the consistently humane and professional treatment of her primary caregivers at the Hamburg facility. Indeed, Hamburg has provided a network of dedicated and skilled caregivers who, over the decades, have come to be Diane's second family and my family's closest link to our sister. As Diane has aged, the range and complexity of her medical needs has grown. At Hamburg, she has immediate access to a team of medical and social work professionals who are experienced in the treatment of individuals with her acute needs. Because Diane is totally non-communicative, it is crucially important that her caregivers learn to notice, over extended periods of time, the subtle changes in her demeanor and behavior that reflect her immediate needs and general well-being. For Diane, these smallest signs are life and death signals.

The Hamburg Center and its staff provide a setting and a comprehensive range of life services which insure that the most vulnerable members of our society can receive a level of care and dignity consistent with our society's human values. If Diane were to be re-located at this point in her life, the disruption in

this fragile network of care would be horrendous. We urgently beseech the court to consider the devastating impact that the closure of the Hamburg Center will have on residents like my sister, for whom community-based facilities, even with the best intention, are woefully inadequate. My family and I have always been deeply grateful for the care that Diane has received there and it is our most fervent wish that Diane be allowed to live out her life in its warm embrace.

Sincerely,

David Kalan

JA748

Mr. David Kedan
75 Holmdale Ave Ste 1
Cambridge, MA 02140

RECEIVED
HARRISBURG, PA

JUL 29 2011

MARY E. D'ANDREA, CLERK
Per

17105+36000

Clerk of Court / Judge Jones
Federal Bldg. & U.S. Court House
228 Walnut St.
Phila. PA
17108-0983

JA749

FILED

JUL 2 9 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

Richard and Jane Ruth
3304 S Keswick Plaza
Phila PA 19114

July 26, 2011

Clerk of Court
Federal Building & Unites States Courthouse
228 Walnut St
Harrisburg PA 17108

Robert W. Meek
Disability Rights Network Of PA
1315 Walnut St, Suite 500
Phila PA 19107

Re: Benjamin v. Dept of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr Meek and Judge Jones,

We are the parents of a 42 year old severely profoundly impaired son, who has resided at the Woodhaven Center since he was sixteen. His name is John. His level of functioning is equal to that of a 2 to 4year old child and he is basically non-verbal. He also exhibits some autistic characteristics and can be aggressive to others and abusive to himself.

John has done well at the Woodhaven Center and that can be attributed to the fact that supervision at the at the facility realize that John does not work well with all staff. He, in his own way, lets it be known who he likes and if that staff is with John, his negative behaviors are reduced dramatically. This improves his quality of life on a daily basis and prevents injuries to himself and staff as well. He also has more freedom on the unit itself than he would in a community living arrangement. John does not relate in any way to his peers which makes staffing so much more important.

We do not oppose the Plaintiff's right to choose community care for themselves, but we strongly object to Plaintiffs' efforts to request relief on behalf of our son. The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

Since John is non-verbal, we are always concerned about the care he is given, but Woodhaven is an open facility and we feel confident that he is in good hands. As my husband and I are getting older, we are more concerned about our son's future than ever. We should have the power to decide what type of placement is best for John, not an organization that does not know our son or his needs and to have the peace of mind to know that these decisions will remain intact.

The threat of the closure of State Institutions has been with us all these years.....no matter what rulings are made, the threat still remains. We, as John's parents and legal guardians, should be able to decide what is best for our child without the worry that someone at sometime will decide otherwise.

Sincerely,

Mr & Mrs Richard Ruth
Parents and Guardians of
John Ruth

JA750



USA FIRST-CLASS

Clerk of Court
Federal Building & United States Courthouse
228 Walnut St
Harrisburg PA 17108

Richard W. Ruth
3304 S Keswick Plaza
Philadelphia, PA 19114

RECEIVED
HARRISBURG, PA

JUL 2 9 2011

MARY E. D'ANDREA, CLERK
Per _____

JA751



Jean McCoy Milliron
107 McCoy Road
Emlenton, PA 16373

July 25, 2011

Clerk of Court                                          Robert W. Meek
Federal Building & United States Courthouse            Disability Rights Network of Pa.
228 Walnut Street                                      1315 Walnut Street., Suite 500
Harrisburg, Pa. 17108-0983                             Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones:

I am Jean McCoy Milliron, the sister and soon to be court appointed guardian of my
brother John Craig McCoy. John is a 57 year old male who has resided at Polk Center
for the past 40 years. He does not speak and has a severe sensori neural hearing loss in
both ears leaving him completely deaf. He also functions within the Profound Range of
mental retardation. John has a mental health diagnosis of P.D.D.NOS (Pervasive
Developmental Disorder, not otherwise specified), with obsessive compulsive spectrum.
This causes him to be very ritualistic in his behaviors, and always wanting things "just
so". He does not like change in his daily routine or surroundings.

The following excerpts from John's ISP, completed April 7, 2011, will help you to
understand him and his needs:

* John has the ability to walk within familiar areas throughout his residential
  building. He needs staff monitoring when going outside his building, because of
  health, safety, and communication concerns.
* John has a failed fusion for his diagnosis of Atlanto Axial Subluxation and
  Cervical Stenosis. He is not permitted to engage in contact sports activities. He
  is supervised closely for his safety.
* He has a soft cervical collar (to wear as tolerated). He does not wear the collar
  very often because he really dislikes it. While wearing the collar and due to the
  positioning of his head, he is at greater risk of falling when he is walking,
  requiring closer supervision.
* John will ignore people who are trying to help and interact with him.
* Since he does not verbalize and is passive, John is totally dependent on staff being
  familiar with him and recognizing when he is not feeling well, is in pain, or to
  recognize safety hazards.
* John has no teeth (will not wear dentures), and he has mild dysphagia. His diet
  must be modified to a pureed diet and thickened liquids. He needs to remain
  upright after eating for at least one half hour. Medications are crushed and placed
  in pudding. He needs supervision to be sure these requirements are followed.

JA752

- John likes strings and nearly always has one with him. He watches them flutter in the wind. He tears his socks to get the strings. This is an activity he has enjoyed since childhood.
- John has no concept of danger. He needs staff with him at all times, as he has no pedestrian skills and could not hear approaching traffic.
- John could easily be victimized both physically and financially. He needs support to evacuate in the event of an emergency or fire drill.
- John needs supervision around kitchen appliances.
- John may lick the bottom of his shoes.
- John would not be able to protect himself from drowning.
- John seems to enjoy outings in the community with supervision.
- John can become frustrated, stubborn, and very uncooperative in a situation he does not like or understand. He needs support from staff that he knows and that know him during these times.
- John needs physical support from staff for most health care interventions, and a pre-medication to relieve anxiety to enable him to tolerate podiatry, optical care, X-rays, doctor appointments, and blood tests.
- Because of John's health, safety, and communication needs, he requires 24 hour supervision.
- It is recommended that John continue living at Polk Center, as he needs environmental, programmatic, physical, and emotional supports as identified throughout his ISP.

As the above profile of John shows, he is a person with severe and highly specialized needs. He lived with his family of 2 parents and 2 siblings on a dairy farm in the community for his first 17 years. With constant supervision from four family members who knew him and cared about his needs, he still was able to slip away and walk a distance and enter an unfamiliar house. Our neighbors knew who he was and brought him home in their car. If he had been living in a community where he was not known by his neighbors, this could have resulted in a tragedy.

Another time he started a fire in our living room, burning a chair and the rug. He seemed to enjoy watching the flames and had no concept of fear or danger. I, his older sister, discovered the fire and alerted our parents, who extinguished the fire. This obviously could have resulted in a tragedy.

These are only two examples of many experiences that I could relate to tell why our parents made the very difficult decision that John needed more supervision than could be provided in a community setting. He needs the level of supervision and care that is provided for him at Polk Center.

I object to individuals, however educated, well meaning and professional they may be, who have never met my brother or assessed his specialized and individualized needs, making decisions that contradict what John's family has painstakingly decided is best for

him. I fear for his safety and possibly even the safety of others if he were to be placed in the community.

John's parents are now deceased. His brother Joseph has a degree in Chemistry from Grove City College and is self-employed. I am a former elementary teacher with a Masters Degree in Elementary Education. I currently teach music. We have enough education and experience living with John to agree with the decision our parents made 40 years ago when they placed him in Polk Center. We agree with Supreme Court Justice Ginsberg that some individuals have needs that are so great that they require institutional care and that the decision to leave or stay should be made by the individual, or with individuals such as John, by his family.

The probable outcome of this Settlement Agreement and its implementation will be the eventual closing of Polk Center and other institutions similar to it. This will eliminate John's right to choose to remain in a state run ICF/MR facility and force community based care on him. He will have no choice, and we, as his family guardians, will have no choice. This discriminates against John's right to choose where he wants to live, and his family's right to choose for him.

I object to the proposed Settlement Agreement placing people on the State ICF/MR Planning List who have not indicated that they want to be on the list. I object that under the proposed Settlement Agreement no notice will be provided to me in the event that John, who is obviously incapable of making decisions for himself, is somehow counted as having chosen community care or been put on a Planning List to receive community care.

The Settlement Agreement provides for educational programs teaching ICF/MR residents ad their guardians how they can be placed on the state ICF/MR Planning List, but does not provide any educational programs describing to us how we can keep our brother's current care environment and avoid being placed on the ICF/MR Planning List. Information about possible dangers of community care should also be presented, along with presentations from those in favor of institutional care in the interest of fairness of informed choice.

I object to the proposed Settlement Agreement because no studies have been done proving that the implementation of this program is even possible. There is no evidence showing that sufficient community care facilities are available, or that they can meet the needs of current residents of ICF/MR facilities. Also, no evidence supports that funding will be available for such placements.

I object that the Disability Rights Network of Pennsylvania, a publicly funded organization, will receive over $432,000 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds could be better served supporting the care of residents in either ICF/MR or community based care facilities.

JA754

In summary, the proposed settlement agreement is a direct violation of the right to choose institutional living by my brother John Craig McCoy. If the agreement is approved, it will lead to the eventual closing of state run facilities such as Polk Center. The resulting outcome would be a very unhappy and unsafe life for John and other vulnerable members of our society. It could even lead to their deaths. This agreement should not be approved.

I would be available to attend the fairness hearing on August 22nd, if needed, and present this paper in person. I also give permission for it to be read by another individual in my absence.

Sincerely,

*Jean McCoy Milliron*

Jean McCoy Milliron
Sister and soon to be appointed guardian of John Craig McCoy

*Joseph P. McCoy*

Joseph P. McCoy
Brother and soon to be appointed sucessive guardian for John Craig McCoy

JA755

Jean Milliron
107 McCoy Road
Emlenton PA 16373

RECEIVED
HARRISBURG, PA
JUL 29 2011
MARY E. D'ANDREA, CLERK
Per _____

ERIE PA 165

Clerk of Courts
Federal Building and United States Courthouse
228 Walnut St.
Harrisburg, PA    17108-0983

17108+3898

JA756

July 29, 2011

The Honorable John E. Jones
U.S. District Judge
U.S. District Court for the Middle
 District of Pennsylvania
228 Walnut Street
Harrisburg, PA 17108

Re: Benjamin v. DPW 1:09-cv-1182

Dear Judge Jones,

I am writing to object to the proposed settlement of a class action involving the rights of intellectually disabled persons currently residing at State Centers in the Commonwealth.

As background, Polk Center, one of the larger facilities, is located in Venango County where I reside. Polk has been a part of our community for over 100 years. During that time it has been a significant employer and in more recent years its residents have become an increasingly visible presence in our community. I have had personal involvement with Polk as a past member of their community advisory board and as a therapy dog visitor. In my official capacity as their state senator, I have attended numerous events and visited with residents and their families. Most recently, I attended a day long on-site meeting with the Auditor General and his staff, to discuss recommendations of the audit team to improve the performance of the facility, both financially and operationally.

I am particularly disturbed that a group of five persons or their "next friends" can purport to speak for the entire population of the State Centers, largely because the Department of Public Welfare under the previous administration did not contest the class action status of this complaint. Since most matters were stipulated, I fear the court did not get a fair or accurate representation of the majority of the residents, their needs and the facilities themselves. While this case had been pending for some time, the settlement occurred just as a new administration walked in the door. The Secretary of DPW was not confirmed by the Senate until June 23, 2011 and their budget was not approved until two weeks later.

Proponents of "community placement" assert that residents of Polk Center are somehow isolated from society and deprived of the opportunity to benefit from activities and services. While it is true that Polk is located on a multi acre country setting, it is hardly isolated. Over the years, hundreds of area volunteers have visited and interacted with residents. Thanks in part to generous donors, the facility

boasts an indoor swimming pool specially designed for wheelchair access. Next door is a Therapeutic Riding facility where volunteers, including my grandson, help disabled persons ride horses. At the Thursday night band concerts in Franklin's park, rows of wheelchairs can be seen with residents enjoying the outdoor music. At the October community Applefest, toys and other items made in the Polk workshops are sold. I would venture to say that in contrast to the group homes of 6 or 8 persons, the residents of the state centers have a larger community of residents, visitors, staff and volunteers as well as frequent opportunities to participate in area activities.

Some residents have lived at Polk Center for 50 years or more and it is the only home they have ever known. Tearful parents have told me that placing their child there was a difficult decision but they knew that the child would be safe and cared for if something should happen to them. Now these parents are elderly and infirm. They are terrified that when they die their loved one will be taken out of Polk and placed in a group home, disoriented, confused and unhappy. Many of the residents are non-verbal and taking them away from their long-term caretakers will be traumatic.

Much is made of the fact that this relocation will only be for those who choose it. Actually, most will have this choice made for them. Roughly 80% have no guardians and over the years many have lost contact with families. The three elements that Olmstead identified as indicating community placement are 1. It is appropriate, 2. The individual does not oppose it, and 3. It can be reasonably accommodated, "taking into account the resources available to the State and the needs of others with mental disabilities".

I sincerely question how an individual, who may be functioning at the level of a five year old or younger, can make the decision to oppose community placement, particularly when the plan requires an "educational" component. Much of the literature dealing with mentally retarded defendants in criminal cases indicates that such persons are unduly susceptible to suggestion and eager for approval. How does a non-verbal person object? If a guardian opposed such a placement and is now deceased, does that opposition stand? If someone is deeply unhappy after the new placement is there a mechanism for them to return?

The third Olmstead criterion is particularly troubling. Many of the residents capable of community living have already left. I agree that DPW did not have an acceptable plan that it was implementing in a timely manner. As we begin to deal with the more seriously disabled, however, some of the plan parameters change. I have been informed that 1,207 or approximately 70% of current residents are classified as "profoundly retarded". Accommodating the needs of this group will require considerably more resources. Some have Alzheimer's and serious physical conditions. Given the age and infirmities of this population many would likely be eligible for skilled care in a nursing home regardless of their mental capacity. Statements have been made throughout this proceeding that these persons are capable of living in the community if they have appropriate services and supports. While the Olmstead criteria mentions taking into account the resources available, it appears to give little guidance as to how one would implement a plan when the resources simply are not there.

It is no secret that states are in a financial crisis. There is nothing on the limited record to even estimate what the cost of implementation would be. The current budget for the coming fiscal year calls for severe cuts in the DPW budget and relies heavily on cost savings. I find it troubling that the federal courts will be determining DPW's spending priorities in the coming years.

While I realize that the Olmstead case is controlling, much has changed since that case was decided. Young people today are not institutionalized and most are mainstreamed in the educational system. Currently, as students graduate or "age-out" of the system many are placed on a waiting list for services. That waiting list grows every year.  Since 2005, 54 persons were moved into community placement from state centers.  During the same time frame, over 6,000 persons received community services from the waiting list, a number that has steadily grown since 2005.  The goal has been to avoid placements in state centers.

Until recently, most persons (including me) were not aware of this settlement.  I certainly agree that DPW should have a plan for transitioning persons who express the desire to move to a community setting.  I also agree that the record plaintiffs in this case should be given that opportunity at the earliest possible date.  The lack of a record leads me to question the rest of the settlement, particularly the annual quotas.  How were these numbers arrived at?  Do we even know that that number of people actually wants to be relocated even after they are "educated"?  Are there sufficient community resources available to meet their needs?  Assuming those quotas are achieved, what is the impact on the survival of the institutions and on the remaining residents?  What are the financial implications for the commonwealth and for other recipients of DPW benefits?

Again, much has changed since Olmstead.  Polk Center is in many respects similar to a group home with resources, programs and community access.  I believe this case should proceed to be considered on the merits and the proposed settlement rejected.

Respectfully,

Sen. Mary Jo White
R. 21st

Harold H. McConnell III
11762 Maywood Dr
Sparta, MI 49345



July 28, 2011

Clerk of Court                                    Robert W. Meek
Federal Building & United States Courthouse       Disability Rights Network of PA
228 Walnut Street                                 1315 Walnut Street, Suite 500
Harrisburg, PA  17108-0983                        Philadelphia, PA 19107-4705

Re:  Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My name is Harold H. McConnell III, eldest brother of James Joseph McConnell. James
is a resident of Polk Center and has lived there since March of 1965 (46 years).  I have
just recently become the Substitute Decision Maker for my brother, James Joseph
McConnell due to the death of our father Harold H. McConnell Jr.  I am in the process of
petitioning for legal guardianship of James.  My two brothers and stepmother are fully
aware of this case and the provisions of the settlement agreement.  We are all in
agreement that it is best for James to stay at Polk

James was admitted to Polk Center just before his 11th birthday, when our family was no
longer able to provide the care necessary to safely manage his behavior in the home
environment.  Based on the definition of "Class members" on page 3 of the settlement
agreement, James should not be considered a "class member".  James does reside at Polk
Center, one of Pennsylvania's state ICFs/MR; however we do not believe that appropriate
supports and services are feasible for James to reside in the community, and we are
opposed to community placement.  We would be particularly concerned for James
medical care and monitoring in a community facility.  Further, we believe the transition
would be extremely difficult for James.  James is severely mentally retarded, nonverbal,
blind, and suffers from panic disorder caused by loud people and unfamiliar settings.
James responds to instability by hyperventilating, pacing, screaming, and slapping his
head.  It would take a very long time before he would reach a comfort level similar to his
home at Polk.  James has had no noted panic attacks at Polk in the last two years.  It is
totally unnecessary to force him to go through such a transition.

We support the Plaintiff's right to request community placement.  We expect the same
right for our loved one to remain at Polk without being ordered to annually express our
wishes with the threat of being paced on a list to be transferred to a community facility.

While it is appropriate for the Disability Rights Network to provide information
concerning the pros and cons of community placement and even provide for one-on-one
meetings with families who have experienced positive care in community facilities, I do
not think it is or should be the responsibility of DPW and ultimately Polk Center to

provide this information or spend more than a cooperative amount of time on this issue. Planning, organizing, and hosting three trainings each year at each facility is truly excessive. This time would be much better spent attending to the needs of the residents of Polk Center. I am not clear on whether the settlement agreement requires James and our family to participate in these trainings to be afforded the opportunity to state our position on discharge as it states in IV.3, but I am strongly opposed to required attendance. Since my family members and I all live over 8 hours away from Polk Center this would be a hardship.

The care James has received at Polk is and has always been excellent. He is evaluated annually and recommendations are made for continuous improvement of his ability to function independently and remain healthy. His annual ISP includes a Community Placement Plan that describes his environmental, programmatic, physical and emotional supports necessary for successful community placement. This plan also indicates both James' and our preference that he remains at Polk Center. I believe this evaluation is sufficient to meet your requirements.

In closing I would like to express my belief that an entire community of residents is being forced to continually express their wishes concerning community placement because a few people have asked to be transferred to the community. Again, I totally support their right to be moved and compensated financially for that move. I do not believe this case should include any resident whom, individually or through family members, expresses a desire to remain at their Pennsylvania's state ICFs/MR.

If the fulfillment of the terms of this settlement were to lead to the closure of Polk Center, James and others like him who have spent virtually their entire lives at Polk would be deprived the opportunity to stay in their home for the rest of their lives.


Sincerely,

Harold H. McConnell III

Harold H. McConnell III

Cc:    Sara McConnell - Step Mother
       Robert Cam McConnell - Brother
       Stephen David McConnell - Brother



Harold McConnell
11762 Maywood Dr
Sparta, MI 49345-9566

**RECEIVED**
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building & United States Cour
228 Walnut Street
Harrisburg, PA 17108-0983





$4.95
0009055642

U.S. POSTAGE
PAID
SPARTA, MI
49345
JUL 28 11
AMOUNT

17108

1006

UNITED STATES
POSTAL SERVICE

Apply Priority Mail Postage Here

Flat Rate Mailing Envelope

JA762

Mary Denise Schneider
4901 Skytop Drive
Emmaus, Pennsylvania

July 29, 2011



FILED
AUG 0 1 2011
PER
HARRISBURG, PA.          DEPUTY CLERK

Honorable Judge Jones
Federal Building
United States Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

Re: Benjamin vs. Dept. of Public Welfare
No. 1:09-CV-1182-JEJ

Dear Judge Jones,

My name is Mary Denise Schneider and I am
my brother's legal guardian. For the last thirty
years since the death of our parents I have been
looking out for my brother's needs. My dear
brother is Michael C. Fanerty. He resides
at Ebensburg Center and leads a productive
life there at the Center even though he is
severely retarded with many medical problems,
physical limitations and an intelligence
level of a two and a half year old child.
Michael has vision and depth perception problems,
seizure disorder (he could have a fatal seizure
at any time), suffers from bipolar disorder and has
aggression/agitation issues. As a child he suffered.

JA763

2

rheumatic fever and has heart problems, severe headaches, and a blood disorder. He is being monitored for leukemia. These conditions need round the clock medical care which he does receive at Ebensburg Center and for which I am most grateful. I hope and pray that Ebensburg Center stays open and that my brother will be able to continue living there. The care he receives could not be duplicated elsewhere.

Please do not put Michael Fenerty on any type State ICF/MR Planning List for any reason. He is not able to give his consent and his family will always speak for him.

Please do not impose community based care upon me and my brother. He is dependent on others for his safety, sense of security and twenty four hour medical care. All that he has learned in his years at Ebensburg Center will deteriorate and he will regress to the point where he will no longer be able to function. My brother does have rights and his rights will be violated if he is forced into community living. His medical care and proper supervision will be nonexistant. There will be no health and safety for my brother and this

3

violates his rights and is contrary to the Supreme Court's Olmstead decision.

Sufficient community care living arrangements are not available and money is not ever fluid for such endeavors. There will be no twenty four medical care, caring supervision and protection.

Community based forms of care are full of neglect, indifference and laxity. I am well acquainted with community living scenarios. Many are young personnel with constant cellular phone usage/texting while patients are either stuck in front of a television or drugged so they sleep all day. One employee earning $9.50 an hour and in charge of eight very handicapped adults. It starts out with two employees but one will call off work so the one left to care for everything and everyone.

No one will see the reports on deaths or injuries of a client moved into this form of "care".

In the long run no money will be saved by the closing of our State Centers. More serious problems will arise. Valid lawsuits will arise.

Persons considering being placed on the

4

Planning List to leave the Centers should be supplied with information about the real and potential dangers that go along with community care.

I do not object to another person's right to choose community care. Perhaps their physical and mental capacities are greater than that of my brother.

However, I do oppose my brother being moved from Ebensburg on another person's request. They have no right to interfere with his lifestyle and progress. If Michael is moved from Ebensburg Center it would be a disaster for Michael and my family. His entire life has been at Ebensburg since he was a young boy and he needs familiar surroundings, twenty four hour medical care and familiar routines and personnel that Ebensburg Center provides. If only you could walk in my brother's shoes for a week you would understand. Michael did not ask to be born this way and he is finally happy and doing well considering his many limitations.

He has an intelligence level of a two and a half year old child and would walk right into

5

the street either looking for Ebensburg Center or a familiar person and be struck by traffic.

As a tax payer I sincerely object to the Disability Rights Network of Pa. receiving almost half a million dollars in legal fees. This money should be used at our State Centers and not on legal fees. These attorneys, if they really cared about the disabled, should have done the work pro bono, if at all. This entire case is based upon lies. For the past thirty years, twice a year I have had to state my intentions of keeping my brother at Ebensburg Center and not placing him in "the community". How could these people been missed for their opinions so many, many times? This is not likely someone is expecting a big payoff here - obviously a person or group with no conscience.

The patients at Ebensburg Center and the other four State Centers who do not have a guardian to speak for them most likely do not have the ability to decide whether to stay at the State Center or go into a community setting. A community that does not want or accept them. To place

2

these severly handicapped persons on "the List" for leaving their Center for the "community" because they have no one to speak up for their rights is immoral and inhumane. They will lose so very much.

In the event of my death, my brother, Michael C. Fenerty, will have other family members to speak for him and we all agree that his future will be better served at Ebensburg Center, for which we are all so very grateful.

Perhaps if others had a loved family member in similar condition they would open their eyes to what might be a tragedy waiting to happen.

Please feel free to call me at any time 610-967-1998 regarding this matter.

Thank you for taking the time to read my letter.

Respectfully,

Mary Denise Schreider
Michael's Sister, Legal Guardian
and assuming Role as his mother

From
Mrs. Mary Denise K. Schneider
4901 Skytop Dr
Emmaus, PA 18049



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

**CERTIFIED MAIL**™

7011 1150 0000 1506 5434





RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per _____

Urgent

To: Judge Jones
Federal Building
U.S. Courthouse
228 Walnut St.
Harrisburg, Pa.

$5.79

# Ready**Post**

D o c u m e n t   M a i l e r

1710899600

Betty Lightner
140 E HBG AVE
Rheems PA 17570

FILED
AUG 01 2011
PER
HARRISBURG, PA.   DEPUTY CLERK

7/27/11

Clerk of Court
Federal Building + US Courthouse
228 Walnut St.
HBG   PA   17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut St. Suite 500
Philadelphia PA 19107-4705

RE: Benjamin v Dept of Pub. Welfare NO 1:09-cv-1182 5EJ

Dear Mr Meek and Judge Jones.

My name is Betty Lightner and I'm the mother of Deborah Lightner who has resided at Hamburg Center for 48 years. She is mentally and Physically disabled. My daughter needs round the clock care from docters, nurses and wonderful care-takers at Hamburg Center. She now has a feeding tube, has a history of mild to severe seizures. She has never been able to sit, walk or talk since she was born; also doesn't know who I am or other family members when we go to visit. She can't do anything for herself.

Due to this settlement my daughter and my family would not benifit from her leaving this facility that she currently resides in due te the fact that she needs round the clock care. Debbie is incapable of making decisions for herself. We need to keep MR facilities open for residents like my daughter. Being placed in the community is not an option for my daughter because

JA770

she would never get the wonderful quality care that she is given at Hamburg.

I definately don't want Debbie placed in community-based care facilities. This is my written statement. My daughter Julie and I will be attending the hearing on Aug. 22nd.

Sincerely,

Betty Lightner
parent of Deborah Lightner

Dolly Lightner
P.O. Box 77
Rheems PA 17570

Clerk of the Court
Fdrl Bldg. & US Courthouse
228 Walnut St.
Harrisburg, PA   17108-0983

PRESS HARD. YOU ARE MAKING 3 COPIES.

UNITED STATES POSTAL SERVICE

EXPRESS
MAIL

Flat Rate
Mailing Envelope
For Domestic and International Use
Visit us at usps.com.

Post Office To Addressee

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code 17570
Date Accepted Mo. 7 Day 29 Year 11
Time Accepted 11:19 AM/PM
Flat Rate or Weight 2 lbs. oz.

Day of Delivery ☐ Next ☐ 2nd ☐ 2nd Del. Day
Scheduled Date of Delivery
Postage $
Return Receipt Fee
COD Fee $
Total Postage & Fees $ 13.25
Acceptance Emp. Initials

FROM: (PLEASE PRINT)
Betty Lightner
P.O. Box 77
Rheems PA 17570

PHONE (717) 367-3946

FOR PICKUP OR TRACKING
Visit WWW.USPS.COM
Call 1-800-222-1811

**DELIVERY (POSTAL SERVICE USE ONLY)**

CUSTOMER USE ONLY

TO: (PLEASE PRINT)
Clerk of the Court
Fed. Bldg. & US Courthouse
228 Walnut St.
Harrisburg, PA

1 7 1 0 8 + 0 9 8 3

WAIVER OF SIGNATURE (Domestic Mail Only)

Addressee Copy
Label 11-B, March 2004

When used internationally
affix customs declarations
(PS Form 2976, or 2976A).

RECEIVED
HARRISBURG, PA
AUG 01 2011

MARY E. D'ANDREA, CLERK
Per _____

Please recycle.

JA773

Joseph Potera

28 Fifth St.

Larksville, Pa.  18651

July 26,2011



Clerk of Court

Federal Bld. & US Courthouse

228 Walnut St.

Harrisburg, PA 17108-0983

Robert W. Meek

Disability Rights Network of PA

13315 Walnut St., Suite 500

Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Judge Jones and Mr. Meek,

   I am writing on behalf of the White Haven Center.  For twenty-nine years I worked for DPW as a mental health aide, twenty-three of them at WHC.  Mental disability has occurred on both sides of my family.  One cousin resided at WHC from childhood until his death. Deaf, dumb and blind, with an IQ level that could not be registered; my family was told by experts he was "one of the half dozen most extreme cases of mental retardation in the entire world".  Another cousin lived until his death in a community group home.  His mentally disabled sister resides with her elderly mother and sister at home.

   These three people represent the entire range of mental retardation from total care to moderate monitoring and supervision.  Having this awareness makes me respect all options in the health care spectrum.  Each case is unique and must be handled with great sensitivity and compassion. The only study done on the death rate for de-institutionalized citizens showed an increase in mortality rates at a staggering 72 percent.   This fact was brought up in the 1997 task force hearings in Harrisburg on the five year plan.  As someone who has worked at WHC our level of commitment, our 24-7 level of nursing care, our huge compliment of medical, social, therapeutic , vocational and recreational staff make our state center more akin to a pampered Pocono resort  rather  than the gloomy dungeon  our enemies paint to the public. A look at clients weekly schedule would include day trips to concerts,

ballgames, circuses, camping trips and community social functions too numerous to list. These people are not tucked away and warehoused. They are more active in the real world than many communities run group homes. In the mid 90's under the leadership of Greg Smith WHC won a national award for progressive and innovative approaches to the MR world. Time after time state and federal review committees went out of their way to commend the staff on our up-to-date progressive and productive way of life at WHC.

It is imperative before any actual, concrete steps are taken several extremely critical issues need to be discussed and dealt with if our state center population is to be afforded the rights, safety and dignity all sides agree must be met.

Issue A. The legitimate option of a state center in the MHMR continuum. Why do ARC, DRN and DPW refuse to acknowledge Section B of the landmark Olmstead Decision? In 1999 the Supreme Court said, " on a case by case basis the institutional setting may be the only appropriate option for an MR patient perhaps in the short run and perhaps in the long run. For some an institutional setting may be the only permanent appropriate setting. " Section B also states the hospital bed setting must not be permanently vacated. "From time to time an institutional setting may be the only appropriate setting." It appears that the Supreme Court and DRN are on opposite sides of the issue. We need more clarity on this issue. For the past decade we have taken comfort in the Supreme Court decision now we are being told the spirit and intent of the Olmstead decision has been rendered powerless. In essence the Supreme Court told us in Section B state centers are a viable and permanent option in the health care spectrum. On this issue we need much more clarity and direction than what we have been given. We feel bitterly disappointed and manipulated by the entire system.

Issue B. The State waiting list. There is a huge waiting list of tens of thousands of mentally disabled citizens in PA. These are the people whose elderly parents, some in their 80's, who have been begging the state for years to place their loved one in a community group home. These individuals can no longer live at home and need community placement. The five year plan of '96 claimed group homes could save money and cut operating costs so that former state center clients would be able to live and thrive in the group home setting. As the more profoundly retarded citizens were out placed problems began to arise because these were the people who needed special care and more one-to-one monitoring. One-to-one means for one 8 hr shift one aide must be totally responsible for one client and no one else. This dramatically cuts into the profit margin. In state centers one-to-one clients were given the special care money, treatment, and monitoring their special issues demanded. This fact of life was not dealt with adequately in the group home setting. In the following 15 years one stark indisputable fact occurred. The group homes cannot assure enough workers to man the operation. The turn over rate is so bad the group home owners cannot hire enough people to supply the demand of the ever-growing waiting list. The thousands of empty state center beds mirror the thousands of people stuck on decades old waiting lists. Everyone now agrees the 15 year old five year plan was way too optimistic in its projections. We were promised a growing, thriving, profit-making, community placement approach. At this point in time as the waiting list grows into the tens of thousands the group home owners are faced with the reality they can barely manage staffing the present group homes. Thoughts of expansion are impossible at the present time. This has been occurring for over a decade with no positive steps or

relief even being discussed.  We do not understand why ARC and DRN are forcing state center clients out into the community against their will, while those in the community (waiting list) are begging to get into these very same group homes.  Incredibly we are now arguing regressively over the final 1% of the profoundly retarded?  Ninety-nine percent are either living at home or in group homes.  This 1% by its very definition and minute number represents the highest risk clients for failure, abuse, death and god knows what else.

Issue  C. Court ordered placement.  ARC, DRN and DPW constantly block placement of clients in state centers.  The only time over the last several decades a mentally retarded citizen gains admittance to a state center is by court order.  Can we all please focus like a laser on this issue?  At the MR task force hearings in 1997 when pressed about profoundly mentally retarded clients being put in the criminal justice system, Kevin Casey, co-writer of the five year plan said, 'that's an issue that deserves to be looked into.'

It is now 14 years later the status quo then is the status quo now.  The only way a profoundly retarded client is granted the option of a state center is by the ruling of a sympathetic state judge.  All the other stakeholders take the opposite side of the issue.  No option of a state center now or ever.  These state judges after weighing all options decided a state center would be the best option under the circumstances.  These handfuls of judges literally saved many retarded citizens not just their dignity but their very lives.

There is one common element in the continuing problems in the state MHMR world.  The official stated policy is one of total denial of the legitimacy of the state centers.  As we speak a certain percentage of MR residents simply cannot now or ever handle this less structured group home environment.  From this distinct group come the many well documented horror stories that have continued unabated across the entire MHMR landscape.  These people wind up being perceived as falling through the cracks in the safety net; As though these tragedies were somehow unforeseen and could not have been avoided.  Please use the resources we now have to begin to heal the wounds of the last 15 years.  Those empty beds in state centers could relieve the pressure on the waiting list.  And of course in the future any positive movement of profoundly retarded citizens misplaced in the criminal justice system should be humanely redirected into the state centers.  This is exactly the scenario the Supreme Court raised in Section B of Olmstead.  Any redirection on this issue would be a godsend for anyone who still believes in the concept of the least restrictive environment.

I firmly believe this fairness hearing could be a springboard for a new and better paradigm for all stakeholders.  Because in the end, we all owe every retarded citizen no matter what their degree of disability nothing less.  Thank you for your time.

Sincerely,

J. Potera

**CERTIFIED MAIL**™

 

7011 0470 0001 5048 7706

Mr. Joseph C. Potera
28 Fifth St.
Larksville, PA 18651

RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per_____

RETURN RECEIPT
REQUESTED

Clerk of Court
Federal Bld & U.S. Courthouse
228 Walnut St.
Harrisburg PA
17108-0983

RETURN
REQ

JA777

Ann Marie Walsh
6301 Riverdale Avenue
Bronx, New York 10471

July 28, 2011



Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-
    JEJ

Dear Mr. Meek and Judge Jones,

My name is Ann Marie Walsh, I am Jean Walsh's sister.
Jean is currently a resident at White Haven Center. I reside
in the Bronx, N.Y. I have three other sisters who live outside of
Pennsylvania and a brother who is a resident of Pennsylvania. We
are all concerned and involved in Jean's life. Jean has been
institutionalized since 1947. She is essentially non-verbal and does
not have an effective way of communicating with others. Jean is
chair bound and unable to walk. She needs at least three people to
assist in transferring her from bed to chair. She is incontinent and
in need of all ADL's. She has suffered from deep vein thrombosis,
pica, severe osteoporosis, skin breakdown and esophageal reflux
disease.

1

I am not in favor of the settlement agreement because I do not think it is in the best interest of my sister. Her present living situation has been very satisfactory. She receives necessary care and treatment at White Haven Center. The staff has been outstanding in the physical care they give Jean and in the sensitive loving care they provide. I cannot say enough in their behalf. I cannot conceive of Jean being in a community living situation. She is not a candidate now or in the future for such a lifestyle.

I am in sympathy with the Plaintiffs who do not have a right to choose the lifestyle they believe their loved ones need. I strongly object to the Plaintiffs speaking for me and my sister Jean. I do not want to live in fear that my sister may someday be placed on the planning list. Jean is in no condition now, nor will she be in the future, a candidate for community living. I am concerned that the proposed settlement may interfere with Jean's current care because a decrease in the facility's population will result in a decrease in staff and funding.

Thank you for your consideration in this matter.

Sincerely,

*Ann Marie Walsh*

Ann Marie Walsh
Jean Walsh-DOB 12/01/1936

2

ANN MARIE WALSH
6301 Riverdale Ave
Bronx, NY 10471

RECEIVED
HARRISBURG, PA

AUG 01 2011

MARY E. D'ANDREA, CLERK
Per _____

CERTIFIED MAIL™

NEW YORK NY 100

7008 1300 0001 8627 7734

U.S. POSTAGE
PAID
BRONX
10471
JUL 28, 11
AMOUNT
$2.85
00020874-09

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

17108999999

JA780



Barbara Ann Fritz
478 Buck Rd.
Holland, Pa. 18966

July 26, 2011

Clerk of Court                              Robert W. Meek
Federal Bldg. & U.S. Courthouse           Disability Rights Network of Pa.
228 Walnut Street                          1315 Walnut Street, Suite 500
Harrisburg, Pa. 17108-0983                 Philadelphia, Pa. 19107-4705

Re: Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek & Judge Jones,

My name is Barbara Ann Fritz, Sister & legal guardian for my Brother John
Hope who presently resides at Whitehaven Center – Hemlock Hall Sec. A .
John has been living at Whitehaven for over forty five years – he is currently
62 years of age.  John functions at the level of an 18 month old child and was
diagnosed with severe mental retardation . John's disabilities are such that he
cannot :  >  Speak, read or write
            >  Feed himself without being prompted
            >  Wash, dress or toilet himself without assistance
            >  Walk without assistance
            >  Negotiate steps or uneven terrain

I greatly fear John being placed in a community/group home situation, will
Jeopardize his safety, health and happiness!  John does not adjust well to
change- this could cause permanent traumatic damage to his now settled
lifeStyle.  Whitehaven Center has caring experienced and well trained
professional staff members, who understand John's "special needs".
They are excellent at communicating with residents and their families.
Whitehaven adheres to strict JCAHO required regulations, guidelines
and inspections. In my opinion, I believe group homes do not have the
same strict requirements that State Centers do!

I'm not opposed to the "choice" of Group home living for those able to do so. I do object to the efforts of others to force these changes when they are not needed or wanted.  I continually have to fight to defend my opposition to community care/group homes for John . I choose for John not to be on the ICF/MR planning list.

I look forward to attending the upcoming fairness hearing
On August 22, 2011

Sincerely,

Barbara Ann Fritz
Sister/Guardian of John Hope

BARBARA FRITZ
478 BUCK RD
HOLLAND PA 18966

7011 0110 0002 4038 0772

RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per

Att. Judge Jones

U.S. POSTAGE
PAID
LANGHORNE, PA
JUL 28 11
$2.85
00033667-06

Clerk of Court
Federal Bldg & U.S. Courthouse
228 Walnut Street
Harrisburg, Pa. 17108-0983

1710839800

JA783



Rose A. Schafer                                                           July 22, 2011
104 Red Shale Pit Rd
White Haven, Pa.18661

Clerk of Court                                          Robert W. Meek
Federal Building & United States Courthouse            Disability Rights Network of Pa.
228 Walnut Street                                      1315 Walnut Street, Suite 500
Harrisburg, Pa.17108-0983                              Philadelphia , Pa. 19107-4705

RE: Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek  and Judge Jones,

I am a sister to Joseph Sitko and his legal guardian. Joseph has lived at White  Haven Center for  45 years.
It is his home. Joseph had spinal meningitis as an infant. He was totally paralysised  until about 4 years of
age. He is a very loving and trusting individual and would never hurt anyone. My estimate is that Joseph is
on the level of a 4-5  year old.  Joseph needs help with all of his care. He does not have good motor skills
and needs help with dressing, cutting up his food, bathing , brushing his teeth, just to name a few. He does
not know the difference between hot and cold or how to adjust a spigot. He does not understand danger,
such as crossing a street , checking for traffic, strangers(if  a stranger offered a ride in a car , Joseph would
jump right in). Joseph also does not speak and  has difficulty communicating.            .

Joseph needs a routine to feel comfortable. To take him out of a home that he loves would be very traumatic
for him.  The White Haven Center is a wonderful community that Joseph truly feels is his home . The care is
exceptional, the facility is spotless. I can walk in there at anytime unannounced  and always made to feel
welcome. The Director, Mr. Fred Lokuta is the absolute best  for the facility. He cares so much for the
individuals and their wellbeing as well as the families. He is always available to the families when ever he is
needed. To change a way of life for Joseph and all of the other individuals would be a crime in my opinion.
The staff is exceptional in the care of all the individuals at White Haven Center . The grounds are well
maintained and  the White Haven Community is very proud to have the White Haven Center as part of our
Community.
Reality is that if Joseph was able to live outside of WHC on his own or with limited assistance it would
have happened a long time ago. The WHC is desperately needed by many individuals and their families.
I can not imagine any improvement in Josephs care other than where he is right now. I truly believe that
WHC is necessary for the  hundreds or thousands that desperately need  a facility to care for their loved
ones  in a safe and loving  environment. The outside world is a scary place for  people without disabilities .
Can you imagine it for an individual who has  disabilities. I am 100% against moving Joseph to  the regular
community. I object to the Plaintiff's efforts to request relief on behalf of my loved one. I do not object to
their right to choose community care for their  loved ones.

The class identifation procedures on pages 5-7 of the proposed Settlement Agreement requires me and my
loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current
opposition to community care has no permanence if I pass away or am incapacitated, the proposed
Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

The proposed Settlement agreement places  people on the State ICF/MR Planning List who have not
indicated that they want to be on the list.

Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one,
who is incapable of making decisions for himself is somehow demmed to have consented to community
care or has been placed on a State ICF/MR Planning list for any other reasons.

I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with
DPW personnel concerning who gets placed on the state ICF/MR Planning List.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning list, but it does not provide for any educational programs describing to me or my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center Advocates favoring ICF/MR care.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICF/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead vs. Zimring*.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that there is sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries and other harm resulting from relocation to community-based forms of care.

I object that the Disability Rights Network of Pa. A publicly-funded entity will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based facilities.

I don't understand how a class action lawsuit can be brought against the DPW by a few individuals against the wishes of the majority of families and individual. I did not ask them to speak for me or my brother. I know about the horrors of Penhurst and Willow Brook, but come and see for yourself what a wonderful facility we are so lucky to have at White Haven Center.

Sincerely,


Rose A. Schafer



Ms. Rose Schafer
104 Red Shale Pit Rd
White Haven, PA 18661

RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Bldg. a United States Courthouse
228 Walnut St.
Harrisburg, PA. 17108

171089998



Tommy J. Kashatus
18 East Washington Street
Adamstown, PA 19501
717.484.0633

July 27, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re:    **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones:

My name is Tommy J. Kashatus, I am forty (40) years old and I currently live in Adamstown, Pennsylvania. My oldest sister, Maria Kashatus, has been a resident at White Haven Center for nearly thirty (30) years. I can remember going to visit her at this wonderful facility since I was a child and I still visit her several times a year. My sister Maria is severely handicapped and is confined to a wheelchair. She cannot walk, talk, read, write or make decisions for herself. She is on medication to control seizures and other medical conditions. One thing is for sure, she knows who her family, friends and loved ones are. She smiles every time she sees me. She will also let someone know when she is mad or upset. The quality of care she has received, and continues to receive at White Haven Center is outstanding. The environment, Staff, location and overall operation at White Haven Center is like no other. The individuals that are employed at this Facility are to be commended for their hard work, dedication and love for the residents – they are truly wonderful people.

First of all, I must say that I am VERY disappointed with the Commonwealth of Pennsylvania, Department of Public Welfare and all of the other Organizations, people, lawyers and committees that are lobbying to close these Centers such as White Haven. There is no possible way the individuals that reside at these Institutions can be "incorporated into" or "transferred to the Community".

I am not well-versed or educated in this matter, the Agreements, Lawsuits or the Settlements, but I am learning quickly. It is an absolute shame that the friends, families and loved ones of these residents will not/do not have a choice in this matter.

I am sure in the end, these matters simply come down to numbers, money and the bottom figure….and what's in the best interest for the Commonwealth. Maybe all of the current Centers could be consolidated to one (1) new, centralized Center near Centre County where all patients can reside?? Now that would save the Commonwealth some serious money.

JA787

*July 27, 2011*
*Page -2-*

I hope that our Voices are heard and the decision is made to keep these Centers operational or an alternative Plan is developed that is in the best interest for all Parties. Let's stop wasting the hundreds of thousands of dollars and taxpayer's money and re-think this matter.

I would like to also point out that my parents; Mr. & Mrs. Thomas and Margaret Kashatus are actively involved with The Relatives and Friends Association of White Haven Center – an Organization that is fighting for the rights of the Residents at White Haven and other Centers. They have invested and exhausted countless hours of time (and money) defending what they believe is right, ethically appropriate and morally sound relative to the State Centers and the residents, specifically for my sister, Maria. The efforts they have put forth (and continue to put forth) are immeasurable. They have organized meetings, public hearings and televised recordings. They continue to be extremely active with White Haven Center's numerous activities be it the Family Picnic, Christmas Party, Birthday parties, field trips and so on. I am very proud and humbled by their actions.

Thank you for your attention and consideration in this matter.

Sincerely,

Tommy J. Kashatus

Copy:   Mr. & Mrs. Thomas Kashatus
        File



**Mr. Tom Kashatus**
PO Box 241
Denver, PA 17517-0241

LEHIGH VALLEY PA 180

28 JUL 2011  PM 2 T

RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per

CLERK OF COURT
FEDERAL BUILDING + UNITED STATES COURTHOUSE
228 WALNUT STREET
HARRISBURG, PA 17108-0983

1710889998

JA789

Debra L. Kleinen

231 Wierimus Road

Hillsdale, New Jersey 07642



July 26, 2011

Clerk of Court

Federal Building & United States Courthouse

228 Walnut Street

Harrisburg, PA 17108-0983

Robert W. Meek

Disability Rights Network of PA

1315 Walnut Street, Suite 500

Philadelphia, PA 19107-4705

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the niece of Edith Crawford, who has been a resident of White Haven Center, my father being her brother. He passed away four years ago. Aunt Edith just celebrated her 87th birthday and is still in reasonably good health, living happily at White Haven Center. To be pleading that she remain in her home and community, which is what White Haven has been to her for the past 40 years, is just mind-boggling.

Aunt Edith suffered brain damage as a child from pneumonia, convulsions and high fever . She also has epilepsy. Her father died when she was small and her mother home-schooled her and took care of her until she could no longer do so. She still follows her mom's instructions. Aunt Edith entered a residential program when she was 18. She is sharp in many ways but very dependent on caregivers, needs stability, and medical care. Most importantly, she feels safe at White Haven and part of a family.

Aunt Edith understands what might be happening and does not want to leave her home. Would you? Our family has found great comfort in knowing she is loved by the staff at White Haven. We see this when we visit or attend Family Day or the holiday party. Aunt Edith knows her caregivers, where they live, how many children they have, and tells us all about these wonderful people. They approach her with genuine kindness and caring. I have worked in social services, with developmentally disabled, intellectually disabled and homeless. In affluent Bergen County, community housing does not work well, though statistics and program websites paint another picture. The care, integration, fellowship

with others, and safety have all been major issues. For an 87-year-old, intellectually disabled woman, a move to community housing, especially with any shortcomings as noted above, would be devastating. And she is now worried, as are we, that this might happen. From what I understand, educational programs about being placed on the Planning List do not provide education on the shortcomings and possible dangers of community housing, nor is anyone offering any assurance that there will be a choice to decide what works for each individual.

I object strongly to this being a class action suit, brought by people whose situations are different than that of Aunt Edith's. If they feel wronged, then let them individually pursue legal action. I am extremely concerned for those residents who do not have a guardian or relative who cannot make a decision on their own. It is also distressing to know that there are residents on the State ICF/MR Planning List who do not want to be on the list. These residents deserve better than this. I am all for choice, but many of these residents cannot make the choice, and they are getting excellent care at White Haven. This place is NOT Willowbrook! Further, it would make sense that our family is not the only one against this lawsuit, yet we have been writing letters and speaking out for quite some time. Apparently, per the Settlement Agreement, if I were to die to become disabled, then my opposition to this suit and that of my family would be removed from any record. This is outrageous.

Other strong objections I have

• Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for him/her, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

• I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

• The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

• The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision

• I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

• The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

• I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

In conclusion, I strongly object to the lack of choice that seemingly will be the result of this class action. To remove an 87-year-old intellectually and physically disabled, vulnerable woman from her home to satisfy the needs of someone else is selfish and disturbing. We know how fighting for the "rights" of the mentally ill turned out decades ago – many, many are homeless. I am unable to attend the fairness hearing on August 22, 2011, but I hope you will take my letter into consideration.

Sincerely,

*Debra Kleinen*

Debra Kleinen, Niece of Edith Crawford



Debra Kleinen
231 Wierinus Rd
Hillsdale, NJ 07642-1000

RECEIVED
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per _____

CLERK of COURT
Federal Building + UNITED STATES COURTHOUS
228 WALNUT ST.
HARRISBURG, PA  17108-0983

17108+9983

JA793