

July 28, 2011

Honorable John E. Jones, III

c/o United States District Court for the

    Middle District of Pennsylvania

United States Courthouse

228 Walnut Street

Harrisburg, PA 17108-0983

Robert W. Meek

Disability Rights Network of PA

1315 Walnut Street, Suite 500

Philadelphia, PA 19107-4705

     RE:   **Benjamin v. DPW, No. 1:09-cv-1182-JEJ.**

Dear Judge Jones and Mr. Meek:

     I am the sister of James Jones, who our family affectionately refers to as Jimmy. I am writing on behalf of Jimmy, my parents and my other siblings. Most of my family lives in Schuylkill County. Our entire family is deeply concerned about the potential consequences the proposed settlement in the <u>Benjamin</u> case may have on Jimmy's overall future health and well-being.

     Jimmy is currently a resident at the Ebensburg Center in Western Pennsylvania. Jimmy is 53 years old and has been living at the Ebensburg Center since he was 7 years old. He can not talk, wears a diaper and has difficulty walking. Jimmy need routine prompting to do the basic activities of daily living. Even with routine prompts, Jimmy still cannot turn water on and off, brush his teeth or wash himself. He obviously is in need of full-time care.

     Simply put, moving Jimmy to another facility or trying to integrate him into the community would be devastating to his health and well-being. Over the years, Jimmy has adapted to and become very comfortable at Ebensburg Center. Our entire family is very happy with the care Jimmy has received there. Short of a need for inpatient hospitalization, Ebensburg Center has been able to provide for all of Jimmy's daily needs and we are confident the Center can and will continue to do so into the future. All of the staff members we have met at the Center have been very compassionate and caring towards Jimmy. For all intent and purposes, Jimmy really knows no other home than Ebensburg Center.

We have no intentions at all of requesting that Jimmy be listed for possible placement into the community now or in the future. However, we are very concerned that others may see fit to try and remove Jimmy from Ebensburg Center and integrate him into the community without any input from our family. This would be disastrous for Jimmy. To the extent the proposed settlement would provide even the most remote possibility that Jimmy be removed from Ebensburg Center, we are unequivocally opposed to the proposed settlement and request you do everything possible to prevent Jimmy's removal at any time from even possibly occurring.

We also have additional concerns with the proposed settlement. First, we oppose and object to any effort to request relief or potential placement on Jimmy's behalf. Second, we oppose and object to any requirement that we continually voice opposition to Jimmy's being placed on the ICF/MR Planning List. We strongly believe that our present and initial opposition to Jimmy being placed on the list should govern unless and until a change of circumstances with respect to Jimmy's condition occurs and *we* as Jimmy's family request he be considered for placement.

Third, we oppose and object to the possible placement onto the List those residents who have not indicated they wish to be placed onto the placement list. Fourth, we oppose and object to the lack of notice in the event Jimmy, who is entirely incapable of making decisions for himself, is somehow deemed to have consented to community care or placement for other reasons. Fifth, we oppose and object to allowing DNR Facility Advocates to have an equal say with DPW representatives concerning who gets placed on the ICF/MR Planning List.

Sixth, we object to the fact that the proposed settlement provides for educational programs to teach ICF/MR residents and their families/guardians how they can be placed onto the Planning List, but provides for no educational programs how to maintain their desire to not be placed onto the List and instead remain in his or her current care environment and facility. The proposed educational programs also should include information regarding potential dangers of community placement so residents and families/guardians can make informed decisions.

Seventh, the practical implications of the integration plan described on pages 9-12 of the proposed settlement agreement will be the overall depopulation and eventual closure of State run ICF/MR facilities and centers. This depopulation and closure will then deprive families like ours and residents like Jimmy a meaningful choice to remain in ICF/MR care. This will, in turn, imposed community based care upon residents and families. The United States Supreme Court in Olmstead v. Zimring specifically cautioned against lack of choice.

Along these lines, the proposed settlement agreement's provisions calling for consolidating budget lines will further deprive State run ICF/MR facilities of critical funding, which will directly jeopardize the overall quality of ICF/MR care. This will, without question,

risk the overall health and safety of Jimmy and others similarly situated and impose community based care in the face of the <u>Olmstead</u> decision.

Eighth, we opposed and object to the proposed settlement because it appears no studies have been conducted and neither DNR nor DPW have made any showing that the implementation plan is feasible.  There is no evidence that sufficient community care facilities are available, that the facilities that are available are actually capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent Statewide budget cuts.

Ninth, the proposed settlement provides for inadequate and one-sided status reports.  Any status report should also include reports on the number of deaths, injuries and other harmful events resulting from relocation to community based care placement.

Tenth, we oppose and object to DNR of PA receiving a staggering $432,500.00 in legal fees.  DNR of PA is a publicly funded entity.  To allow DNR of PA to receive public funding and then a $432,500 payment towards legal fees is "double-dipping" and should not be allowed. These substantial monies would be put to far better use supporting the care of residents in ICF/MR facilities, especially in these trying economic times and recent budget cuts.

In closing, I reiterate my family's strong objection to any proposed settlement which creates an even remote possibility of James Jones being moved to any other facility or a community-based program.

Sincerely,

Debra Herring

DEBRA HERRING, Individually and on behalf of
Mr. and Mrs. Herbert Jones (Jimmy's parents),
Mary McSurdy (Jimmy's sister), Michelle Hosler
(Jimmy's sister), Ann Marie Miller (Jimmy's
sister), Colleen Jones (Jimmy's sister), Donald
Jones (Jimmy's brother)

Debra Henning
P.O. Box 76
Orwigsburg, Pa
17961

RECEIVED
HARRISBURG

AUG 03 2011

MARY E. D'ANDREA
Per_____

Honorable John E. Jones III
c/o United States District Court for
Middle District of Pa
United States Court house
228 Walnut St.
Harrisburg Pa 17108-0983

Daniel Kleinen
231 Wierimus Rd
Hillsdale, NJ 07642

July 27, 2011



Clerk of Court
Federal Bldg & United States Courthouse
228 Walnut St
Harrisburg, PA 17108-0983

**Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

**Dear Judge Jones,**

I was recently made aware of the class action which is being done on behalf of the residents who live at Ebensburg, Hamburg, Polk, Selinsgrove and White Haven Centers allowing them to now "have a choice" to move to the community to have their needs met. Although I will not be able to attend the fairness hearing, I would like my comments to be heard. I very strongly object to this class action and believe that there are many issues being presented in this class action that are far from being correct.

I have a relative who resides at White Haven Center and I would not want her moved "into the community" under any circumstances. White Haven provides her with care that could never be matched in the setting that is being proposed.

For many years White Haven has provided care for those who are intellectually challenged, at one time as many as approximately 1800. However this number has been reduced down to the approximately 170 or so that now remain. Many of those that are no longer there have been "moved to the community", the majority of those that remain at White Haven are there because they cannot be moved to the community because their needs cannot be provided for, except as in a setting as one of the listed Centers.

To infer that the residents (or their guardians) are not aware of their options is ludicrous. This topic has come up in discussions many times in the past with residents, family members or anyone involved in the care of the resident. Anyone who wanted to move to the community, or should be moved has been given the opportunity. The Fact is, those who remain cannot and will not receive the proper care that they both need and desire in a "community" setting. This kind of care can only be provided by a center such as White Haven, which has both experience and success in the field.

The fact that residents "who don't respond" or who make no indication on which option they would like - would be "put on the list for movement to the community" is completely appalling. This totally smacks of a pre-determined discrimination which is not only unfair, but has no merit to its basis. How can residents who are not legally competent be asked to make a decision which will affect probably one of the most important questions of their lives? How do we know that the facts that will be presented to either residents or their families will be accurate, considering that those who are presenting are in a position to gain from having a resident move to the community?

I believe that a disabled person presented to the community is in a higher risk category for abuse, mistreatment and can even become victims of crime. I would like to know if this topic will be brought to light during a discussion of the benefits of moving to the community. I believe one of the most important

issues here is the resident's safety, and the security offered at the state centers is un-matched. Other strong objections I have:

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for him/her, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision

- *I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.*

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

I strongly object to the lack of choice that will be the result if the class action is approved. I am appalled that those proposing this suit are not at all considering the welfare of the residents, but are looking to gain on other fronts.

Sincerely,

Daniel Kleinen

D. Kleiner
231 Wierimus Rd
Hillsdale, NJ 07642

KEARNY NJ 070
27 JUL 2011 PM 11

**RECEIVED**
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per

CLERK of COURT
Federal Building + UNITED STATES Courtho
228 WALNUT ST.
HARRISBURG, PA 17108 - 0983

17108+9938



William + Beverly Daugherty
4495 Clifford Dr.
Hermitage, Pa. 16148

FILED
AUG 0 1 2011
PER _____
HARRISBURG, PA.    DEPUTY CLERK

July 26, 2011

Clerk of Court
Federal Building
+ United States Courthouse
228 Walnut St.
Harrisburg, Pa
17108 - 0983

Robert W. Meek
Disability Rights
Network of Pa.
1315 Walnut St. Suite 500
Philadelphia, Pa.
19107 - 4705

Reg: Benjamin v Dept of Pub. Welfare 1.09 cv-1182 JEJ

Dear Mr. Meek and Judge Jones,
My name is Beverly Daugherty I am the mother along with my husband William Daugherty, we are the parents of Paul Edward Daugherty, a 44 yr. old autistic adult residing at Polk Center. Paul has been a resident at Polk Center for 24 years. Paul has been diagnosed with autism, pervasive developmental disorder, N.O.S, anxiety disorder N.O.S. Seizure disorder which is Generalized tonic-clonic in nature and psychotic disorder N.O.S. His behaviors that

JA801

2

may impact overall functioning or quality of life are aggression self-injury and agitation Paul functions within the moderate range of mental retardation.

I do not oppose the Plaintiffs right to choose Community Care for them-selves but I object to Plaintiffs efforts to request relief on behalf of my loved one for the following reasons:

Paul does not accept change he will become aggressive and does injury to himself and others

Paul does not defend himself, he could be taken advantage of physically and financially.

Paul would not respond to fire evacuation cues. He has no awareness of traffic.

Group homes do not have properly trained staff to take proper care of Paul.

Paul will pick up any beverage and drink it He wouldnt be safe around household chemicals that arent locked up

Group homes have no on site nursing care. Non licensed people give meds

Paul resided in community living for 6 yrs. It did not work. He was very aggressive

3

threw staff down stairs and tore the place up.

It is recommended at this time that continued placement at Polk Center remains appropriate

Polk Center provides properly trained staff on grounds doctors, nurses, case managers, social workers & psychologists

Polk has a lot of built in safety protections that may not be out in the community

My current opposition to community care has no permanence if I pass away or am incapacitated, the proposed settlement agreement will ignore my recorded wishes that my loved one remain in ICF/MR care The proposed Settlement Agreement places people on the State ICF/MR planning list who have not indicated that they want to be on the list.

I find it offensive for the DRN to assume that all families of persons residing in state facilities need to be educated We are not dummies I am a registered nurse, family father is a retired steelworker has a brother who is a physician's assistant for an orthopedic surgeon.

4.

The proposed Settlement Agreements provisions for consolidating budget lines will deprive state-run ICF's/MR of critical funding thereby jeopardizing the Quality of ICF/MR care, risking the health and safety of my loved one and further imposing Community based care upon me and my loved one contrary to the Supreme Courts Olmstead decision. There is no evidence that sufficient Community Care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents or that there will be sufficient funding to operate these Community Care facilities in light of recent budget cuts.

I object that the D.R.N of Pa. a publicly funded entity will receive $432,500 in legal fees. These funds would be better served supporting the care of residents either in ICF/MR or Community based care facilities

In summary the proposed Settlement agreement is a direct violation of the right to choose institutional living by our Son Paul Daugherty following the

5

agreement to be approved would result in a self-fulfilling undertaking and will serve to bring about the ultimate motive of DRN to close state run facilities. The pursuit of such actions without regard to the effect and ultimate outcome may result in a very unhappy life or even worse death to some of the most vulnerable members of our society. To allow this to happen is unconscionable, the agreement as presented should not be approved.

We will be unable to attend the fairness hearing on August 22nd. Please allow my counsel Benjamin Hoffart of the law firm Sidley Austin to present my objection and to provide testimony on my behalf.

Sincerely,

Cecily L. Daugherty
Mother of Paul Daugherty

William Daugherty
Father of Paul Daugherty



Mr. & Mrs. William R. Daugherty Jr
4498 Clifford Dr
Hermitage, PA 16148-3814

**RECEIVED**
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per

*Clerk of Court*
*Federal Building & United States Courthouse*
*228 Walnut St.*
*Harrisburg, Pa.*
*17108-0983*

17108+9983

Kathy Drews Casadonte
6905 Valley Ridge Ct.
Raleigh, NC 27615



July 25, 2011

Clerk of Court                                   Robert W. Meek
Federal Building & United States      Disability Rights Network of PA
Courthouse                                      1315 Walnut Street, Suite 500
228 Walnut Street                            Philadelphia, PA 19107-4705
Harrisburg, PA 17108-0983

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

I am writing to you on behalf of my brother, Paul Drews, currently a resident of
Selinsgrove Center in Selinsgrove, Pennsylvania. As his sister, I am also an
Alternate Guardian, and am quite concerned about the above referenced
settlement and how it would impact Paul and our family.

While I am not opposing the law, I do not believe it should be applied to all
persons currently residing in State Centers and would like to request that Paul
Drews not be moved from Selinsgrove Center to a Community Home or placed
on the list for future community home placement. Paul has been a resident of
Selinsgrove Center for over 20 years and not only considers Selinsgrove to be
his home, but verbally refers to the center as "home", tells others that he lives at
Selinsgrove, and expresses his desire to go home to Selinsgrove when he has
been away for just a short while. While under the care of Selinsgrove staff he
has experienced the greatest amount of stability he has had in his adult life.
Prior to moving to Selinsgrove Paul had lived in 4 different group homes, none of
which were able to provide the same level of stability, support services, structure,
activities, work opportunities and relationships that Paul has had at Selinsgrove.
The staff at Selinsgrove have been caring, responsive and supportive and are
also very capable of working with his various mental disabilities and behavior
issues. They have provided Paul with individual support and attention and have
made adjustments as needed to help improve Paul's level of contentment and
functional behavior. The facilities at Selinsgrove are a part of Paul's
contentment. The open spaces, structured schedule with supervised
independence, and the residential area that provides both privacy and
community living have all helped Paul to be successful at Selinsgrove. His
retardation, autism, hypersensitivity, episodes of aggression and other disabilities
do not enable him to live successfully in a community or group home
environment.

I do not oppose the Plaintiffs' right to choose community care for themselves, but I object to the Plaintiffs' efforts to request relief on behalf of my loved one, Paul Drews.

The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the list. As one of Paul's Alternate Guardians, I am requesting that he not be placed on the list for community home placement.

Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason. I would like to request an amendment to this that WOULD require a notice to be sent. However, I strongly object to this and once again would like to request that, due to the fact that he is unable to knowingly and adequately address and answer any questions regarding his residence, that he not be placed on the list. Paul takes numerous medications to control his aggressive behaviors, self destructive behaviors and other anxiety issues. These mental health issues, coupled with his mental retardation, would never allow him to have the intellectual ability to make this living decision on his own.

I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educations programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the Sate ICF/MR Planning List. These educations programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United State Supreme Court cautioned against in the *Olmstead v. Zimring* case.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further

imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.


I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible.  There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICR/MR residents, or that there will be sufficient funding to operate these communicate care facilities in light of recent budget cuts.

Again, I am opposed to the above settlement being applied to everyone residing in State Centers and as Paul's sister and Alternate Guardian, request that he not be placed on the list for a community home.  It is my desire that he be kept under the competent care of the staff at Selinsgrove Center.   His past experiences in community home environments were detrimental to his physical and mental health and well being.  He has received high quality care and support all his years at Selinsgrove Center and is happy and content there.  I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiff's efforts to request relief on behalf of my loved one, Paul Drews.


Sincerely,

Kathy Drews Casadonte

Kathy Drews Casadonte
Sister and Alternate Guardian of
Paul Drews



**Ms. Kathy Casadonte**
6905 Valley Ridge Ct ...
Raleigh NC 27615

RESEARCH TRIANGLE REGION
NC 276 1 T
26 JUL 2011  PM

**RECEIVED**
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per ___

Clerk of the Court
Federal Building & US Courtho
228 Walnut St.
Harrisburg, PA 17108-0983

17108+3800

JA810



Kimberley Gauronski
20771 Burlington Circle
Riverside, CA 92508

July 21, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-cv1182-JEJ

Dear Mr. Meek and Judge Jones,

My sister, Gretchen C. Shaffer is a resident at Hamburg Center in Hamburg, PA, Unit 111. My younger sister, Brooke McCombie is Gretchen's guardian. As Gretchen's older sister, I love her and greatly care about her well being, and desire to have my voice heard along with her guardian's.

Gretchen is the third of four siblings, and she is 58 years old. She was born with Cerebral Palsy. She is non-ambulatory and non-verbal. She currently has breathing difficulties and is on a Bi Pap machine. She is at risk for pneumonia due to the breathing problems, and was hospitalized for pneumonia in 2010, from Sept 20th to Oct 2nd. She has dysphagia, so she has to be tube-fed, as she is at risk for aspiration. She is on anticonvulsant medication for seizures, which have occurred since childhood. She cannot move herself, so is dependent on caregivers to gently reposition her body and lift her into the adaptive equipment necessary for her daily living. Other physical ailments include scoliosis, a large hiatal hernia, osteopenia, and hypothyroidism.

Our father, who passed away in 2003, placed Gretchen in Hamburg Center. He desired that she remain there, not only because of the excellent care she receives there, but also the communication shared with the immediate family about any change in her condition, or injury. My other siblings and I receive evaluations concerning her health and well being. That is her home, and her life. She is among her friends, and to remove her from these familiar surroundings and people, I fear, might greatly distress her. At this time, she is in stable condition because of the care she receives there. Gretchen can only grunt, moan, grimace, or cry to let others know of her discomfort. She cannot voice in words the location or degree of any pain she experiences. She cannot speak for herself, so I would like to speak for her regarding the issue of the Community Care Settlement Agreement

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of Gretchen.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my sister to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my sister Gretchen remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, Gretchen, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

JA811

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my sister how we can maintain her current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my sister of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my sister. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my sister contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Again, I would like to say that I do not wish the rights to be taken away from anyone who can make the decision and voice his or her desire to be placed in community care. I do not agree that one's inability to speak should automatically be interpreted as consent to being placed on a State ICF/MR Planning List or in a community care facility. I greatly appreciate receiving a phone call or message from Hamburg Center whenever there is any change in Gretchen's health, and that I can always call to inquire about any concerns. I have visited Gretchen at Hamburg Center, and am confident that her caregivers meet all her needs. I do not believe she would receive this degree of care in a community-based facility. Gretchen needs to remain in the skilled care environment at Hamburg Center. I do not wish to see State-run ICFs/MR deprived of any funding that is needed to provide the quality of care necessary for Gretchen, and residents like her.

Regretfully, I cannot attend the fairness hearing on August 22. I do appreciate the opportunity to express my opinion and objections in this letter.

Sincerely,

*Kimberley Gauronski*

Kimberley Gauronski
Sister of Gretchen C. Shaffer

JA812

K. Gauronski
20771 Burlington Cir.
Riverside, CA 92508

SAN BERNARDINO CA 924

25 JUL 2011  PM 3 L

**RECEIVED**
HARRISBURG, PA

AUG 0 1 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of the Court
Fdrl. Bldg. & US Courthouse
228 Walnut St.
Harrisburg, PA 17108-0983

17108+9800

JA813

Larry J. Krafft, PhD & Sandra K. Krafft, RN, EdD          July 19, 2011
233 S. Sixth St. #1801
Philadelphia, PA 19106

Clerk of Court                          Robert M. Meek
Federal Building & United States Courthouse    Disability Rights Network of PA
228 Walnut Street                       1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983               Philadelphia, PA 19107-4705


FILED
AUG 0 1 2011
PER _____
HARRISBURG, PA.        DEPUTY CLERK

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

We are the parents of Bryan James Krafft who has resided at White Haven Center since he was five years of age. Bryan is now forty-five. Throughout these years Bryan has received excellent consistent care at White Haven Center. However, prior to his admission to White Haven, Bryan experienced severe trauma as a young child through repeated abuse over a year's period of time at a small private residential facility from which he was he was removed following our learning about a concealed stay in a hospital intensive care due to drug overdose. Prior to that event, following his admission to that institution, we were concerned as he was terrified of exposure to water (burned in tubs for punishment) and, following his recovery from drug overdose, we found cigarette burns on unexposed parts of his body. He had been abused severely and repeatedly, as verified through court investigation.

This institution was closed following court findings of pervasive patterns of abuse. In summary, the following conditions allowed abusive behaviors to prevail:
1) It was a small institution with few staff members. None were adequately trained professionally nor monitored effectively. Staff turnover was high.
2) On-site staff communicated a lack care for Bryan as a person. Never were they open and forthcoming about his needs and condition, nor did they allow us to find ways to assist for Bryan's welfare.
3) Parents and guardians lacked access to their children in the living units. Visitors were required to announce their intention to visit in advance, and the child was delivered to a reception area; parents were not allowed access to living quarters.
4) Professional staff such as qualified nurses, psychologists, social workers and doctors were not on staff but simply on call or not available at all.
5) When noxious events occurred staff at the institution failed to contact us and refused to acknowledge knowledge of and responsibility for Bryan's symptoms. Even when hospitalized, being in critical condition due to drug overdose, we were not contacted. The attending physician colluded with institutional staff by covering up even this incident.

In contrast, we have been extremely pleased with conditions at White Haven Center over the years.
1) We can drop in and visit Bryan at any time. We have ready and direct access to his living quarters.
2) Staff are qualified and consistently demonstrate personal knowledge, care and connection with Bryan as a person. Whenever we inquire about any aspect of his life they respond readily, thoughtfully, with care and warmth. Low staff turnover allows Bryan to bond with individual care-givers whom he trusts and to whom he responds within the realm of his capacities.

1

3) Professional staff are well-trained and available. They assess, review, assist and plan as a team. They keep us informed of any untoward incidents. They seek our advice and assistance for ideas and preferences that will maximize Bryan's well-being as a person.

4) As you will read below regarding Bryan's condition and needs, White Haven Center provides high quality professional care. The environment is physically and socially appropriate for his needs. He receives the consistent limited physical and social environment that he needs as overstimulation and change result in distress and frustration for him, and for those with him.

We, both as Bryan's parents and as mental health professionals, have experience not only with Bryan but have, over the years, had contact with various experts, parents and siblings, institutions and strategies for addressing the needs of children and adults with varying degrees of disability. We fully support the idea and practice of providing environments, relationships and expertise that serve to enhance the life quality of each individual. So it is essential that we make all reasonable efforts to optimize their opportunities for autonomy and choice in the context of necessary parameters of each person's capacity, pleasure and safety. It is reasonable that those who have the desire and capacity to live more independently in least restrictive alternate settings should be allowed to do so if feasible. Proposed actions, as presented in the case of Benjamin v. Dept. of Public Welfare, do however have implications that promise deleterious consequences for our son, Bryan, and for others of his peers who need the context and support provided by White Haven Center as presently constituted.

Our son, Bryan, has changed developmentally over the years. As a very young child he was exceptionally expressive, charming and intelligent. He was physically strong and quick. His active vocabulary included at least 300 words at age 18 months when he began to have multiple seizures, quickly losing all capacity to speak, while becoming severely frustrated and hyperactive, sleeping only in occasional ten minute periods. The home required fortification as Bryan would escape through unlocked doors or windows. He would wildly throw things from refrigerator and cupboards, from desks and drawers. He required active wakeful supervision twenty-four hours daily. Never malicious but out of control, he even threw his younger ill sibling down stairs, and impaired any normalcy for his older sibling and, of course, us, his parents. Following successive expert assessments at a number of medical research institutes our son's diagnosis remained undefined, as were speculations regarding the cause.

Today Bryan is still undiagnosed, with cause undefined. Although Bryan's hyperactivity has abated over the years, even with current medications he has seizures that must be monitored continuously. He is unable to provide basic functional self-care, lives in diapers, and so requires full time staff observation and assistance. Bryan repeats a number of words like "duck", "goose" and "hi" that survive meaninglessly from among his first words as an infant. Despite the admirable efforts of special education teachers he never, over the years, gained any noteworthy capacities. Rather than frustrate caregivers and Bryan, we have learned to counsel specialists to appreciate his pleasure in being rather than in becoming. He is unable to express his needs verbally or nonverbally, and now is generally constrained in a wheel chair, wearing a helmet to protect his head when he has seizures or when he strikes his head in frustration. When we do take him for a ride in a car he must be restrained carefully; and he now lacks active interest in his passing environment. Bryan is severely disabled physically, mentally and socially. At the same time his routine environment and relationships with staff provides a level of satisfaction that allows an adequate life experience in each moment. He is not in pain or under duress and his general health is good in this routine protected environment. Bryan is not motivated or capable of decision making regarding his needs and welfare. He is not a candidate for more independent living; instead Bryan requires an environment and care that transcends anything that such

2

independence surmises. He needs a continuously available multidisciplinary professional team with consistently careful and caring daily assistance.

In view of these considerations we, Bryan's parents, are deeply concerned regarding consequences of enacting the proposed Settlement Agreement with the Department of Public Welfare. Our concerns and opposition include the following:

1) We are deeply concerned that should Bryan outlive either or both of us or of our capacity to monitor and act in concert with his needs that representatives of the state or legal or policy mandates will act deleteriously regarding Bryan's specific personal needs and welfare. We should not be required repeatedly to reaffirm that Bryan remain off an ICF/MR planning list. Instead, only residents who are fully capable or their guardians should be allowed, through carefully established procedures, to request consideration for alternative living arrangements.

2) Therefore it is essential also that those who do not knowledgably and proactively claim membership on the ICF/MR Planning List should not be placed on it. This is the sort of travesty that is promulgated through litigation such as this, undergirded by generalized bias regarding welfare for all rather than the most appropriate disposition benefitting each person.

3) Any person placed on such a list should gain that status by competent self-initiative or by a legitimate guardian. In no case should one be placed on such a list without adequate involvement, notification and agreement.

4) DRN Facility Advocates should have no involvement in determining who would be placed on any ICF/MR Planning List. If such a list is established advocates may assist in providing parental and guardian education regarding options and assist in making requested applications. Those with and those lacking parents or guardians should be given appropriate information and assistance through specified DPW procedures that include a professional DPW team, with defined facilitation and mediation to ensure optimal resolution for each resident.

5) Any educational program and facilitation with mediation process that lacks a balanced consideration of and for sustaining the current care environment and support is clearly damaging to all persons affected. Clear and authentic consequences of any choice must be presented with all due consideration for each candidate's conditions, capacities and perspectives.

6) Whereas White Haven Center, as similar Centers in Pennsylvania, are monitored and reviewed with care, responsive to incrementally developed regulations regarding conditions, qualifications and procedures, the proposed Settlement Agreement provides for grossly inadequate status reviews and reports. These conditions alert us, Bryan's parents, to the devastating conditions and outcomes that Bryan experienced at his first institutional placement as a child. Over the years and through diverse experiences our state residential centers have learned and adapted positively to potentially hazardous and suboptimal conditions for residents. To achieve parity of resources, controls and review of conditions and opportunities for residents it will require huge additional financial and personnel resource allocations, given the proposed multiple dispersed living arrangements (rather than centralized and carefully vetted procedures and personnel). We can reasonably anticipate unnecessary travesty unless any community placements are accomplished and monitored with care, and with at least an equal level of qualitative as well as quantitative resource allocation.

7) Aligned with concern #6, if community placements are implemented these must be done with extreme strategic, logistical and educational care. Intense monitoring and measures of enhanced opportunity and life-quality must be demonstrated via dispassionate research. Not only is adequate evidence lacking regarding the merits of proposed alternatives even if facilities and competent personnel are in place but we lack evidence that there are enough such facilities

3

and funding to implement such a pervasive plan. While we support opportunities for residents who clearly desire and are deemed likely to benefit, it is typical for such institutional actions first to select the most likely-to-succeed residents in the most likely-to-succeed facilities with the most motivated and likely-to-succeed personnel; then to provide short term evidence of "success" while implementing successor facilities with decreasingly appropriate residents with increasingly inadequate supports. We have witnessed these corrosive human system change phenomena too consistently in too many settings.

8)  We appreciate advocates and advocacy groups who serve to enhance the well-being of our diverse disabled and under-abled peers. We also have, over the years, seen how some of these individuals and groups, justifiably, through their personal or secondary experiences, become radicalized in their advocacy for a "solution" to specific problems. And they then tend to commit to the idea that their solution should be applied to all or to as many as possible. It appears to us that the proposed "Settlement Agreement" is a result of such thinking, resulting in laws, policies and practices that tend to "throw out the baby with the bathwater", albeit with good intentions. The biases reflected in this "Settlement Agreement" transparently depict a strategy that would clearly lead to significant costs and human loss.

9)  So we propose that, in appreciating the good intentions of DRN of PA, that they continue their advocacy through the voluntary efforts of the many who care. But we emphasize their voluntary status and motives. Whether the coffers of the state are abundant or abysmal (our shared resources as citizens of the Commonwealth, after all) their advocacy for a resolution should absolutely not be accompanied by payment to them from communal (state) resources. Any available resources must be allocated directly to assisting our disabled citizens, whether in state institutional arrangements or in their homes with stressed and burdened families. Capable and caring lawyers are always to be found who willingly give of their talents and access for these purposes. Similarly, it is also to be acknowledged that the many caring and competently performing professionals who serve our disabled in institutions or through the DPW are most generally committed to their chosen work, living passionately and fully to enhance the lives of Bryan and so many like him.

10) We are extremely concerned and object to the proposed "Settlement Agreement" that will result in both the depopulation and evisceration of funding for White Haven and similar Centers. Consolidating budget lines should absolutely not be allowed. It risks the viability of funding for ICFs/MR, directly jeopardizing our son's current stable and supportive environment, services and well-being. Similarly, the proposed Agreement will, if implemented as described, result in the depopulation of our state's carefully developed institutions that do work for at least a significant portion of our disabled population who are not capable of community-based living as proposed. There many who are well-served by living in their current constructive communities of peers and professionals. Our son, Bryan, is among these.

We agree that it should be the right of the plaintiff to aim for achieving an alternative community care setting. Should Bryan be similarly capable and satisfied we too would have advocated. Long ago. However we are profoundly concerned that the present proposed "Settlement Agreement" advances an inappropriately dysfunctional, harmful outcome for our son, for the majority of residents at White Haven Center, and for many others. We plead for and appreciate your care-filled consideration of our concerns as we anticipate, and fear for, our son's future.

Sincerely,

Larry J. Krafft, PhD <lkrafft@temple.edu> & Sandra K. Krafft, RN, EdD sandrakrafft@comcast.net
Ph: 970-325-0332(through August 12); 215-625-8555(after August 26) or 609-602-3770(cell)

4

J. Truitt
235 S. Sixth St #1801
Philadelphia PA
19106

RECEIVED
HARRISBURG, PA

AUG 0 1 201

MARY E. D'ANDREA, CLERK
Per

Clerk of The Court
Federal Building +
United States Courthouse
228 Walnut St.
Harrisburg PA 17108-09

171063S8800

Jennifer Crawford
109 Madison Ave.
Midland Park, NJ 07432

7-27-11

Clerk of Court
Federal Building & United States Court House
228 Walnut Street
Harrisburg, PA 17108-0983

Re: Benjamin v. Dept. of Pub. Welfare
No. 1:09-cv-1182-JEJ

Dear Judge Jones, and Mr. Meek,

I am enclosing a picture of Edith Eleanor Crawford who has been a resident of White Haven Center for the past 40 years. She is my 87 year old aunt, sister to my Dad, who passed away 4 years ago. I guess I've put off writing this letter until the last minute because I feel the wishes of my aunt and my family carry no weight. That said, my Dad asked me to take care of Aunt Edith shortly before he died so I must try.

First off, look at the picture. Does Edith look unhappy, deprived, yearning to be released from a supposedly oppressive state run facility? The answer is, NO! WHC isn't a state run facility to her it is her home and her community of which she DOES NOT WANT TO LEAVE under Any circumstances. The sad part is that Edith thinks having said no to a group home is the end of this situation. The WHC staff have always told Edith that she has her rights and can make some decisions on her own. I hope that's true. I hope that her decision to stay in her home with her friends, family really, matters and gains your favor.

To remove Aunt Edith from WHC, in my opinion, would traumatize her to the point of no return. While it is true that Edith is a very sharp, verbal and aware woman. She is also mentally, emotionally and physically challenged. She suffers from major depression with psychosis, Obsessive Compulsive Disorder, epilepsy, hypothyroidism, Raynaud's Disease and suffered a mild stroke this past year. As a child she suffered from a high fever with pneumonia that left her mildly retarded. She never went to school so she was home schooled by her mother. She can read.

JA819

write, count, sing and has an outstanding memory. Remember the movie "Rainman"? She reminds me of Ray in the way she can remember dates, names, birthdays, events. At any rate, the reason I say relocating her would be traumatic is because she can't handle change. She relies on a structured daily routine to feel safe and secure. When her routine is interferred with she becomes fearful, hyper active and occassionaly aggressive. To take Aunt Edith away from her home and friends at her advanced age would send her over the edge. I implore you not to let that happen.

Let me just touch on the staff at WHC, they are also Edith's family. She knows the staff, their spouses, their kids, their birthdays. She's been to a few of their homes, they LOVE Edith. They take her and her fellow residents to the movies weekly and to church if she wants to go. She's been to the circus and to dinner theatre. She goes to lunch at Perkins, to the bank and maybe the store with an aide... just the two of them. These people are amazing, creative, compassionate human beings and my family and I have always rested easy knowing Aunt Edith is in their care. By the way, they named the canteen after Edith because she likes coffee so much. The sign says Welcome to Edie's Cafe. Edith is proud of that.

You are aware of the numerous objections to the proposed settlement of this lawsuit layed out in all the other letters you have received. I am equally outraged by the proposed settlement but one point in particular sticks in my throat and I just can't swallow it.

That the implications of the proposed settlement

JA820

agreement which is the depopulation and closure of WHC robs Aunt Edith and her family of having a CHOICE in whether she stays in her home or not. I do not object to others wanting to leave WHC, although I've never met these Plaintiffs in all my many visits there. That is a personal decision made by the resident, if possible, and family. I vehemently object to the Plaintiffs efforts to have that choice taken away from me. How dare they? How do they sleep at night? It would never even occur to me to start something like this. I find this whole situation appalling and potentially heart breaking plus un-fair.

 I ask respectfully that you take my words into consideration in making your decision and thank you for your time.

Sincerely,

Jennifer L. Crawford

Soon to be Guardian of Edith E. Crawford

cc: Mr. Meek





Evelyn Crawford on left. Sister-in-law to Edith
Edith in the center
Jennifer Crawford (me) on right = with my Aunt

Christmas Family Dinner
Dec. 2010

This is just a small corner of the gym —
the staff at WHC decorates the entire
center like this.
Such care and dedication!

Edith on her way
to a costume party
as an angel.

EXPRESS MAIL

UNITED STATES POSTAL SERVICE®

Flat Rate Mailing

For Domestic and International Use

Visit us at usps.com

PRESS HARD. YOU ARE MAKING 3 COPIES

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code

Day Accepted

Time Accepted
☐ AM
☐ PM

Flat Rate ☐ or Weight
lbs. ozs.

**Delivery Attempt**
Mo.   Day
☐ AM
☐ PM

**Day of Delivery**
☐ Next ☐ Day ☐ 2nd ☐ Partial Day

Scheduled Date of Delivery
Month    Day

Scheduled Time of Delivery
☐ Noon
☐ 3 PM

Military
☐ 2nd Day
☐ 3rd Day

Int'l Alpha Country Code

**Postage**
$

**Return Receipt Fee**
$

**COD Fee**
$

**Insurance Fee**
$

**Total Postage & Fees**
$

Acceptance Emp. Initials

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt
Mo.   Day    Time
☐ AM
☐ PM

Employee Signature

Delivery Date
Mo.   Day    Time
☐ AM
☐ PM

Employee Signature

Label Here:

**Addressee Copy**
Label 11-F, April 2004

PostOffice To Addressee

**FROM:** (please print)

RHODA H. COBIN M.D. P.A.
75 N. MAPLE AVE STE 202
RIDGEWOOD NJ 07450-3262

PHONE (   )

**TO:** (please print)

PHONE (   )

FOR PICKUP OR TRACKING, visit www.usps.com or Call 1-800-222-1811

$0.00

RECEIVED
HARRISBURG, PA.
AUG 01 2011

MARCIA M. WALDRON, CLERK

When used internationally, affix customs declarations (PS Form 2976, or 2976A).

Cradle to Cradle Certification is awarded to products that pursue an innovative vision of production and commerce that eliminates the concept of waste.

This USPS® packaging has been certified for a material content, recycled or as material control, and manufacturing characteristics.

Please recycle.

EP13F

JA824

21ST SENATORIAL DISTRICT
**MARY JO WHITE**

SENATE BOX 203021
THE STATE CAPITOL
HARRISBURG, PA 17120-3021
(717) 787-9684
TTY (800) 365-1581
FAX: (717) 787-6088
EMAIL: mwhite@pasen.gov
WEBSITE: senatormjwhite.com

**COMMITTEES**

ENVIRONMENTAL RESOURCES & ENERGY,
CHAIRMAN
APPROPRIATIONS
PUBLIC HEALTH & WELFARE
CONSUMER PROTECTION & PROFESSIONAL
LICENSURE
JUDICIARY

ENVIRONMENTAL QUALITY BOARD
JOINT CONSERVATION COMMITTEE
PENNSYLVANIA COMMISSION ON SENTENCING
WILD RESOURCE CONSERVATION FUND

**Senate of Pennsylvania**

July 29, 2011

The Honorable John E. Jones
U.S. District Judge
U.S. District Court for the Middle
 District of Pennsylvania
228 Walnut Street
Harrisburg, PA 17108

Re: Benjamin v. DPW 1:09-cv-1182

Dear Judge Jones,

I am writing to object to the proposed settlement of a class action involving the rights of intellectually disabled persons currently residing at State Centers in the Commonwealth.

As background, Polk Center, one of the larger facilities, is located in Venango County where I reside. Polk has been a part of our community for over 100 years. During that time it has been a significant employer and in more recent years its residents have become an increasingly visible presence in our community. I have had personal involvement with Polk as a past member of their community advisory board and as a therapy dog visitor. In my official capacity as their state senator, I have attended numerous events and visited with residents and their families. Most recently, I attended a day long on-site meeting with the Auditor General and his staff, to discuss recommendations of the audit team to improve the performance of the facility, both financially and operationally.

I am particularly disturbed that a group of five persons or their "next friends" can purport to speak for the entire population of the State Centers, largely because the Department of Public Welfare under the previous administration did not contest the class action status of this complaint. Since most matters were stipulated, I fear the court did not get a fair or accurate representation of the majority of the residents, their needs and the facilities themselves. While this case had been pending for some time, the settlement occurred just as a new administration walked in the door. The Secretary of DPW was not confirmed by the Senate until June 23, 2011 and their budget was not approved until two weeks later.

Proponents of "community placement" assert that residents of Polk Center are somehow isolated from society and deprived of the opportunity to benefit from activities and services. While it is true that Polk is located on a multi acre country setting, it is hardly isolated. Over the years, hundreds of area volunteers have visited and interacted with residents. Thanks in part to generous donors, the facility

boasts an indoor swimming pool specially designed for wheelchair access. Next door is a Therapeutic Riding facility where volunteers, including my grandson, help disabled persons ride horses. At the Thursday night band concerts in Franklin's park, rows of wheelchairs can be seen with residents enjoying the outdoor music. At the October community Applefest, toys and other items made in the Polk workshops are sold. I would venture to say that in contrast to the group homes of 6 or 8 persons, the residents of the state centers have a larger community of residents, visitors, staff and volunteers as well as frequent opportunities to participate in area activities.

Some residents have lived at Polk Center for 50 years or more and it is the only home they have ever known. Tearful parents have told me that placing their child there was a difficult decision but they knew that the child would be safe and cared for if something should happen to them. Now these parents are elderly and infirm. They are terrified that when they die their loved one will be taken out of Polk and placed in a group home, disoriented, confused and unhappy. Many of the residents are non-verbal and taking them away from their long-term caretakers will be traumatic.

Much is made of the fact that this relocation will only be for those who choose it. Actually, most will have this choice made for them.   Roughly 80% have no guardians and over the years many have lost contact with families. The three elements that Olmstead identified as indicating community placement are 1. It is appropriate, 2. The individual does not oppose it, and 3. It can be reasonably accommodated, "taking into account the resources available to the State and the needs of others with mental disabilities".

I sincerely question how an individual, who may be functioning at the level of a five year old or younger, can make the decision to oppose community placement, particularly when the plan requires an "educational" component . Much of the literature dealing with mentally retarded defendants in criminal cases indicates that such persons are unduly susceptible to suggestion and eager for approval. How does a non-verbal person object? If a guardian opposed such a placement and is now deceased, does that opposition stand? If someone is deeply unhappy after the new placement is there a mechanism for them to return?

The third Olmstead criterion is particularly troubling. Many of the residents capable of community living have already left. I agree that DPW did not have an acceptable plan that it was implementing in a timely manner. As we begin to deal with the more seriously disabled, however, some of the parameters change. I have been informed that 1,207 or approximately 70% of current residents are classified as "profoundly retarded". Accommodating the needs of this group will require considerably more resources. Some have Alzheimer's and serious physical conditions. Given the age and infirmities of this population many would likely be eligible for skilled care in a nursing home regardless of their mental capacity. Statements have been made throughout this proceeding that these persons are capable of living in the community if they have appropriate services and supports. While the Olmstead criteria mentions taking into account the resources available, it appears to give little guidance as to how one would implement a plan when the resources simply are not there.

It is no secret that states are in a financial crisis. There is nothing on the limited record to even estimate what the cost of implementation would be. The current budget for the coming fiscal year calls for severe cuts in the DPW budget and relies heavily on cost savings. I find it troubling that the federal courts will be determining DPW's spending priorities in the coming years.

While I realize that the Olmstead case is controlling, much has changed since that case was decided. Young people today are not institutionalized and most are mainstreamed in the educational system. Currently, as students graduate or "age-out" of the system many are placed on a waiting list for services. That waiting list grows every year.  Since 2005, 54 persons were moved into community placement from state centers.   During the same time frame, over 6,000 persons received community services from the waiting list, a number that has steadily grown since 2005.  The goal has been to avoid placements in state centers.

Until recently, most persons (including me) were not aware of this settlement.  I certainly agree that DPW should have a plan for transitioning persons who express the desire to move to a community setting.  I also agree that the record plaintiffs in this case should be given that opportunity at the earliest possible date.  The lack of a record leads me to question the rest of the settlement, particularly the annual quotas.  How were these numbers arrived at?  Do we even know that that number of people actually wants to be relocated even after they are "educated"?  Are there sufficient community resources available to meet their needs?  Assuming those quotas are achieved, what is the impact on the survival of the institutions and on the remaining residents?  What are the financial implications for the commonwealth and for other recipients of DPW benefits?

Again, much has changed since Olmstead.  Polk Center is in many respects similar to a group home with resources, programs and community access.  I believe this case should proceed to be considered on the merits and the proposed settlement rejected.

Respectfully,

Sen. Mary Jo White
R. 21st