

**DLA Piper LLP (US)**
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania  19103-7300
www.dlapiper.com

Nathan P. Heller
nathan.heller@dlapiper.com
**T**  215.656.3372
**F**  215.606.2132

Lesli C. Esposito
lesli.esposito@dlapiper.com
**T**  215.656.2432
**F**  215.606.2132

August 1, 2011

*VIA ELECTRONICALLY FILED (ECF)*

Clerk of Court
Federal Building and United States Courthouse
228 Walnut Street
Harrisburg, PA  17108-0983


Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705


Re:    **Benjamin v. Dept. of Public Welfare, No. 1:09-cv-1182-JEJ**

Dear Clerk and Mr. Meek:

      This is a Letter of Objection to the proposed settlement in the above-referenced case on behalf of VOR.[1]  VOR is a national, nonprofit advocacy organization dedicated to ensuring that individuals living with intellectual disabilities receive the care and support they need in settings that are appropriate to fulfill those needs.  The proposed settlement between the named plaintiffs and the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW") will directly affect the rights of approximately 1,200 residents of Intermediate Care Facilities for the Mentally Retarded ("ICFs/MR") throughout Pennsylvania, and will prevent them from receiving the care necessary to meet their individual needs.  VOR objects to the proposed settlement, under which DPW will transfer residents from ICFs/MR to community settings regardless of their wishes and, most unacceptably, despite their needs.  In doing this, the DPW will be

---

[1] Voice of the Retarded, Inc.

EAST\45367844.1



Clerk of Court
Robert W. Meek
August 1, 2011
Page 2

placing at risk the well-being of hundreds of individuals who currently reside in one of the ICFs/MR throughout the Commonwealth of Pennsylvania.

Indeed, the proposed settlement provides for the creation of a State ICF/MR Planning List from which ICF/MR residents will be transferred into community facilities. If an ICF/MR resident requests, or, in the alternative, does not oppose, community placement, the resident will be placed on the State ICF/MR Planning List. In the case of individuals whose profound intellectual disabilities prevents them from providing a definitive answer requesting or opposing transfer, involved family members or guardians can provide an answer. VOR, however, is greatly concerned for the many individual residents who are not able to make or communicate a choice, and have no legal guardian to speak on their behalf. In those cases, the proposed settlement provides for those residents to be placed on the State ICF/MR Planning List for eventual relocation to a community facility, regardless of the fact that an ICF/MR is the only place that can provide the care they need. In fact, with approximately 80% of ICF/MR residents having no advocate to defend their needs, hundreds of individuals with severe intellectual disabilities will be placed on the State ICF/MR Planning List to await transfer to a community facility, only because they are incapable of objecting.

Although this Court dismissed a motion to intervene filed by various residents of ICFs/MR, reasoning that the "mere speculation" of forced community placement was not sufficient to generate an interest in the litigation, it is safe to say that the interest of those would-be intervenors is no longer merely speculative. Indeed, the proposed settlement provides for the community placement of 400 current ICF/MR residents over the course of five years, and continued placement after that until all ICF/MR residents on the State ICF/MR Planning List have been discharged into the community. Those residents who wish to be placed in the community will not, unfortunately, be the only individuals on the State ICF/MR Planning List, as any resident who is "not opposed" to community placement will be placed on the List – even those who cannot communicate their opposition and have no one to speak on their behalf.

The true intent of this proposed settlement is a surreptitious relocation of all residents of ICFs/MR. Even if a resident is able to communicate a choice, vehemently opposes transfer from an ICF/MR to a community setting, and is permitted to remain in the facility, it is likely that this resident will still be forced to relocate once the resident populations at ICFs/MR drop below what is fiscally possible for the state to maintain. By

EAST\45367844.1

JA829



Clerk of Court
Robert W. Meek
August 1, 2011
Page 3

decreasing the size of ICFs/MR, diverting resources to community programs, and, ultimately, limiting the ability of ICFs/MR to provide on-going, high-quality care to those residents who remain, the proposed settlement, in effect, is forcing all current and future residents into community settings without regard for their individualized needs.

**DRNs' Nationwide Movement to Close ICFs/MR**

Given the past practices of Disability Rights Networks ("DRNs") throughout Pennsylvania and across the country, the closure of Pennsylvania ICFs/MR was likely the goal all along. There have been remarkably similar lawsuits brought by other DRNs across the country, and these cases illustrate a growing movement by state governments and DRNs to close state institutions, such as Pennsylvania's ICFs/MR, and relocate all residents to community settings.

The Pennsylvania DRN is Pennsylvania's federally-designated and funded Protection and Advocacy System ("P&A"). P&As, located in each state, are one of the four federally-funded programs authorized by the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), and are charged with protecting "the legal and human rights of individuals with developmental disabilities" by pursuing "legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals." Despite this, state P&As have implemented a strategy to close all ICFs/MR, under which a scheme of class action lawsuits are filed across the country. Like the present action, all such class action lawsuits are brought pursuant to Federal Rule of Civil Procedure 23(b)(2), which does not require notice at the time of filing and does not permit class members to opt out of the lawsuit, thereby subjecting residents of ICFs/MR to the outcome of lawsuits to which they object. Since 1996, these lawsuits have sought primary relief in the form of "community integration," and have achieved that same relief through settlements with the States, resulting in the forced community integration of hundreds of individuals who, had they the choice, would likely have chosen to remain in ICFs/MR. Twenty-eight class action lawsuits of this type were filed by P&As in various states, resulting in the closure of at least fifteen ICFs/MR in nine states, including two in Pennsylvania: Embreeville and Western Center.

In 1994, for example, the California P&A filed a lawsuit in state court seeking the relocation of more than 2,000 residents in California ICFs/MR to community centers. In



Clerk of Court
Robert W. Meek
August 1, 2011
Page 4

*Coffelt v. Department of Developmental Services*, Civil Action No. 91-6401 (Cal. Super. Ct. 1994), approximately 10 named plaintiffs negotiated a settlement agreement with the state, in which the majority of affected families did not participate, despite the fact that a survey of those families found that 98% of the respondents opposed P&A representation of their family members. Implementation of the settlement caused more than 2,000 residents to be relocated from state ICFs/MR to community settings – some as a result of a transfer request, but many more because of forced relocation as a result of the closing of two facilities. As discussed in detail below, many who were forcibly relocated died as a result.

Another P&A lawsuit, *Brown v. Bush*, Civil Action No. 98-cv-673 (S.D. Fla. 1998), was filed in Florida in 1998, expressly calling for the closure of state ICFs/MR. Family members of ICF/MR residents unsuccessfully sought intervention. Ultimately, the case was settled, and, per the settlement agreement, two ICFs/MR in Florida were closed, again forcing into community facilities those residents who opposed community placement.

In 2005, the New Jersey P&A filed *New Jersey Disability Rights Network v. Davy*, Civil Action No. 3:05-cv-04723 (D.N.J. 2005), seeking, once again, to relocate all residents of state ICFs/MR to community facilities. The New Jersey P&A represented to the court that 2,400 people were inappropriately institutionalized in New Jersey ICFs/MR, yet a survey of families in all but one New Jersey Developmental Center revealed that 96% of all respondents were satisfied with their current placements.

That same year, the Illinois P&A filed a lawsuit that was factually similar to the above-captioned case. *Ligas v. Maram*, Civil Action No. 1:05-cv-04331 (N.D. Ill. 2005), was brought by just nine named plaintiffs on behalf of 6,000 residents in privately operated ICFs/MR in Illinois. Nine residents sought intervention in the matter, objecting to the Plaintiffs' claims that all residents experience unnecessary regression, deterioration, isolation and segregation. These residents also disagreed with the contention that all residents in ICFs/MR would prefer to live in a home that is integrated in the community rather than an institution. Much like the present matter, however, because the original Complaint allowed for "choice," the District Court denied intervention. The appellate court upheld denial of intervention, but questioned the certification of a class that was dependent on knowing class members' "states of mind." In 2008, the parties proposed a settlement agreement, under which ICFs/MR beds



Clerk of Court
Robert W. Meek
August 1, 2011
Page 5

would be reduced over a period of time.  A group of objectors, led by the residents who unsuccessfully moved for intervention, submitted numerous written objections to the Court.  As a result, the Court rejected the proposed settlement agreement, decertified the class, and granted intervention to the group of objectors.  A new settlement, that took into account the concerns of the objectors, was proposed and, ultimately, accepted by the Court.  This settlement provides for the transfer of residents of ICFs/MR only if they *affirmatively* request transfer.

As *Ligas* demonstrates, a case involving analysis of the level of care needed by thousands of mentally disabled individuals, as well as their choice of care, warrants an approach to settlement that incorporates and considers individual needs and concerns and requires affirmative choice (silence alone is not enough).  Unfortunately, the named parties in the above-referenced case did not learn from *Ligas*, and have not considered the needs of those who will be most adversely affected.

Each lawsuit filed by a State DRN involving ICFs/MR follows the same pattern and has the same ultimate goal of closing ICFs/MR and relocating residents to community facilities.  The Pennsylvania DRN is repeating the same legal strategy here.  On behalf of a few named plaintiffs, it asked the court to: 1) certify the case as a class action lawsuit by all residents of PA's ICFs/MR; 2) require that all center residents be evaluated by state professionals to determine if, with proper services and supports, a community placement would be appropriate; and 3) order DPW to provide a community placement to all state center residents who do not object.  The parties agreed to class certification and negotiated a settlement despite the fact that concerns by interveners were well know and even before many of the potential class members and affected individuals have been made aware of the lawsuit.  In good faith and in the spirit of achieving the most suitable settlement,[2] the parties should have included

---

[2] *Ligas* and *Capitol People First* (a case in CA) are two cases that illustrate the benefit of a collaborative process, especially during settlement negotiations. In both cases, good outcomes were achieved when satisfied families of ICF/MR residents were allowed to participate in settlement discussions.  In *Ligas*, after nearly five years and a failed attempt at settlement, a second settlement, involving the families, was finally reached and approved that supports both expanded community options but allows for true choice. In *Capitol People First*, a case subsequent to *Coffelt*, families were granted intervention and were closely involved in the final successful settlement agreement. Transfer outcomes, in stark contrast to *Coffelt*, were positive, reflecting the value of a collaborative process involving families of ICF/MR residents.

EAST\45367844.1

JA832



Clerk of Court
Robert W. Meek
August 1, 2011
Page 6

representatives of the families who expressed concern.  Perhaps the failure to include these representatives indicates the parties true intent.

Based on the consequences of similar cases brought across the country by DRNs, as well as the current class definition, VOR strongly believes that the intent of the proposed settlement is to close ICFs/MR and force individuals into community settings, even when such programs do not provide the appropriate level of care for those individuals.  While VOR fully supports the named plaintiffs' desires to be placed in a community setting, surely there is a more collaborative solution that will allow for residents to remain in the ICFs/MR if they so choose, or, particularly, if they lack the intellectual abilities to choose for themselves and have no one to speak on their behalf.

**DRNs' Nationwide Movement Creates Substantial Risk of Abuse and Neglect**

The large-scale, forced, migration of residents from ICFs/MR to community settings should not be taken lightly, as it has had a devastating effect on the health, well-being, and mortality of many individuals.  Many of the individuals who are relocated require a greater level of care and support than can be provided in community facilities.  In fact, in over half of the states, there are detailed reports of widespread failure regarding the quality of care in community-based settings for persons with developmental disabilities.  A summary of over 100 newspaper articles and reports addressing the increased risks and dangers facing individuals who are relocated from ICFs/MR to community homes can be found on VOR's website, http://www.vor.net/images/AbuseandNeglect.pdf.  This summary illustrates systemic abuse, neglect and mismanaged care in community facilities, affecting thousands of extremely vulnerable people across the country.

Improperly relocating individuals to community settings results in tragedies ranging from physical, emotional, and financial abuse to sickness, injury, and even death.  Many of these outcomes are a result of inadequate consideration of the resulting consequences of separating vulnerable people from the specialized care they receive in ICFs/MR, while simultaneously doing away with the critical safety net that is the ICFs/MR themselves – a safety net on which these individuals have come to rely and depend.  Indeed, many of these residents have spent most of their lives in the ICFs/MR, and, for them, these facilities are the only homes they know.



Clerk of Court
Robert W. Meek
August 1, 2011
Page 7

The lessons learned from more than 25 states should demonstrate the range of needs of the intellectually disabled, which require a wide variety of diverse care options. The safety and health risks, as well as the increase in mortality rates, for individuals who are moved from ICFs/MR to community facilities have been well-documented in numerous studies and investigations.

In California, for example, over 2,000 people were transferred from ICFs/MR to community facilities between 1993 and 1995 due to the previously discussed California P&A lawsuit, *Coffelt v. Department of Developmental Services*. One year after the mass-transfer, a 1996 peer-reviewed study found that the risk of mortality was 72% higher for those who were transferred, as compared to those who stayed. A peer-reviewed study concerning the same 2,000 individuals was conducted in 1998, and it found that the risk of mortality was 67% higher for those individuals who had been transferred. Four years after the transfer, the risk of mortality was 88% higher in community facilities than in ICFs/MR. A decade later, in 2005, the risk of mortality was still 47% higher in the community than in institutions.

As noted, the increased mortality rates and risks to health, safety and well-being are not limited to California. Indeed, similar risks and outcomes have been documented in over half the states engaged in transferring patients from ICFs/MR to community facilities. In 2001, Pennsylvania's then-Auditor General, Robert P. Casey, Jr., released a two-year audit examining Pennsylvania's oversight of Personal Care Homes, or community facilities. The audit found serious deficiencies in the state's oversight of these facilities and proposed over thirty recommendations to better protect residents' health and safety. Among other things, the audit found that DPW renewed licenses without verifying that serious violations were corrected; licensed new care homes without ensuring that administrators and staff were qualified; failed to impose fines and penalties as required by law; and investigated almost half of the complaints it received late. In the 2-year time period covered by the audit, capacity in care homes increased by 34%, with nearly 50,000 residents living in 1,800 community facilities. There were just 34 employees monitoring those homes and residents. Overall, the audit found that DPW was too slow and ineffective in ensuring the safety of mentally retarded individuals living in those community facilities.

As previously mentioned, two Pennsylvania ICFs/MR were closed due to DRN lawsuits, including Western Center. The Commonwealth closed Western Center in



Clerk of Court
Robert W. Meek
August 1, 2011
Page 8

1998 and moved its remaining 380 residents to community facilities. Parents and families of residents made unanswered pleas and filed last minute court appeals to block the closing, alleging injuries to residents who had already been transferred. Essentially ignored by the court, approximately 23 of those individuals had died in group homes within two years.

While some ICF/MR residents may be capable of living successfully and healthfully in community programs, such settings are not suited to all individuals. Indeed, the individuals most unsuited for these settings, and most in need of the specialized care and support provided at ICFs/MR, are those who are most likely to be unable to speak for themselves, and, further, have no involved families or guardians to speak for them. Based on the proposed settlement, these individuals will be unfairly placed on the State ICFs/MR Planning List simply because they are not capable stating whether they would like to remain in the ICFs/MR. For the above reasons, VOR objects to the proposed settlement, and, instead, requests that the named plaintiffs, the DPW, and the would-be intervenors go back to the drawing board to ensure that the needs of all individuals involved are addressed. In addition, VOR hereby requests the right to speak at the Fairness Hearing by and through its counsel on this matter.

**DLA Piper LLP (US)**

Sincerely,

Nathan P. Heller

Lesli C. Esposito

EAST\45367844.1

JA835



**TARAH TOOHIL, Member**
**116th Legislative District**

P.O. Box 202116
Harrisburg, PA 17120-2116
Phone: (717) 260-6136

Toll-Free: (855) 282-0611

**House of Representatives**
Commonwealth of Pennsylvania
Harrisburg

1 West Broad Street
Suite 100
Hazleton, PA 18201
Phone: (570) 450-7905

ttoohil@pahousegop.com
www.reptoohil.com

August 1, 2011



Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

**RE: Benjamin v. Dept. of Public Welfare**
**No. 1:09-CV-1182-JEJ**

Dear Judge Jones:

Thank you for the opportunity to contact you regarding the Settlement of the above mentioned case. While I will not be available to testify at the August 22, 2011 Fairness Hearing, I hope that this Honorable Court will review this letter with regard to your decision.

My main concern with the proposed Settlement Agreement is that the integration plan will cause the depopulation and eventual closure of State-run ICFs/MR. While this concern is not specifically spelled out in the Settlement Agreement, it is clearly a potential consequence due to cost efficiency of providing meaningful care to a declining population.

Specifically, this concern grows out of regard to the ICF/MR in my District, the White Haven Center. I am writing in support of the full continuation of services at the White Haven Center. I am requesting that this Honorable Court amend the Settlement Agreement so that the White Haven Center has an assurance that it will remain open.

The White Haven Center provides a loving home atmosphere with many dedicated employees. I have experienced firsthand how they care for the residents as if the residents are part of their own family. It is this family atmosphere that makes the White Haven Center an integral part of our community. In addition, the White Haven Center has a state-of-the-art campus style facility that has been remodeled to include a heated therapeutic pool and buildings which utilize the benefits of solar energy. This center is in a highly accessible location which makes it easy and cost efficient for health care providers and service organizations to reach the residents.

Finally, in my constituency, I have seen an ever increasing demand for the exact type of services that the White Haven Center is currently equipped to provide. Furthermore, I am constantly



contacted by parents and siblings who are searching for an alternative to the group homes or community centers which are currently being pushed. These special needs families have unfortunately found that cost cutting alternatives fail to provide the structure and stability that our more severely disabled citizens need and furthermore, deserve. Recent statistics show that the number of individuals which severe autism and disabilities are a rising number in the population. Their needs are special and extremely complex. The impact that losing such a facility would have on the disabled community would be detrimental.

Your Honor, I thank you for your time, attention and for allowing me to provide this letter to you. I know that you are faced with a very difficult decision. I am sure that you will come to the conclusion that the White Haven Center is an ICF/MR worth fighting for and let this Settlement Agreement state this.

Yours in service,

Tarah Toohil
State Representative
116th Legislative District

TT/jd

EMELY URGENT

**Please Rush To Addressee**

RECEIVED
HARRISBURG, PA

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per

t us at usps.com

EXPRESS HARD YOU ARE MAKING 3 COPIES

FROM: (PLEASE PRINT)
Rep. Tarah Toohil
1 W. Broad St
Suite 100
Hazleton, PA 18201

PHONE: 570 450-7105

ORIGIN (POSTAL SERVICE USE ONLY)

FOR PICKUP OR TRACKING
Visit WWW.USPS.COM
Call 1-800-222-1811



UNITED STATES POSTAL SERVICE®

EXPRESS MAIL

DELIVERY (POSTAL USE ONLY)

TO: (PLEASE PRINT)
Clerk of Court
Federal Building - US Courthouse
228 Walnut Street
Harrisburg, PA
17108

Addressee Copy
Label 11-G, March 2004

Post Office To Addressee

CUSTOMER USE ONLY







Please Recycle

When used internationally affix customs declarations (PS Form 2976, or 2976A).

JA838

# KEYSTONE
## Job Corps Center



235 W. Foothills Drive
Drums, PA 18222-2410
Phone: (570) 788-1164
Fax: (570) 788-119

To Whom It May Concern:

    The students of Keystone Job Corps have enjoyed their experiences at The White Haven Center. They are disappointed about the center's closure and they feel as if they are losing some of their friends that they have made during their time volunteering at the center. The nurse's and staff have been great mentors for our students, especially to the many students that are in our medical trades. They have taught our students to treat their future patients with dignity and respect. This has been a great learning experience, never to be forgotten by the students that have spent time with the residents and staff.

    Thank you from all of the Keystone Job Corps students and staff for allowing us the great opportunity of spending time at the center. Most importantly thank you for letting our students be a part of the White Haven Center community.

Sincerely,

The staff and students of Keystone Job Corps

FILED
HARRISBURG, PA
AUG 0 2 2011
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

Rickey V Shaffer
336 Fieldbrook Dr
Washington, Pa. 15301

July 21, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-ev1182-JEJ

Dear Mr. Meek and Judge Jones,

My sister, Gretchen C. Shaffer is a resident at Hamburg Center in Hamburg, PA, Unit 111. My younger sister, Brooke McCombie is Gretchen's guardian. As Gretchen's older brother, I love her and greatly care about her well being, and desire to have my voice heard along with her guardian's.

Gretchen is the third of four siblings, and she is 58 years old. She was born with Cerebral Palsy. She is non-ambulatory and non-verbal. She currently has breathing difficulties and is on a Bi Pap machine. She is at risk for pneumonia due to the breathing problems, and was hospitalized for pneumonia in 2010, from Sept 20th to Oct 2nd. She has dysphagia, so she has to be tube-fed, as she is at risk for aspiration. She is on anticonvulsant medication for seizures, which have occurred since childhood. She cannot move herself, so is dependent on caregivers to gently reposition her body and lift her into the adaptive equipment necessary for her daily living. Other physical ailments include scoliosis, a large hiatal hernia, osteopenia, and hypothyroidism.

Our father, who passed away in 2003, placed Gretchen in Hamburg Center. He desired that she remain there, not only because of the excellent care she receives there, but also the communication shared with the immediate family about any change in her condition, or injury. My other siblings and I receive evaluations concerning her health and well being. That is her home, and her life. She is among her friends, and to remove her from these familiar surroundings and people, I fear, might greatly distress her. At this time. she is in stable condition because of the care she receives there. Gretchen can only grunt, moan, grimace, or cry to let others know of her discomfort. She cannot voice in words the location or degree of any pain she experiences. She cannot speak for herself, so I would like to speak for her regarding the issue of the Community Care Settlement Agreement.

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of Gretchen.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my sister to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my sister Gretchen remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, Gretchen, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

JA840

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my sister how we can maintain her current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my sister of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my sister. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v.Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my sister contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Again, I would like to say that I do not wish the rights to be taken away from anyone who can make the decision and voice his or her desire to be placed in community care. I do not agree that one's inability to speak should automatically be interpreted as consent to being placed on a State ICF/MR Planning List or in a community care facility. I greatly appreciate receiving a phone call or message from Hamburg Center whenever there is any change in Gretchen's health, and that I can always call to inquire about any concerns. I have visited Gretchen at Hamburg Center, and am confident that her caregivers meet all her needs. I do not believe she would receive this degree of care in a community-based facility. Gretchen needs to remain in the skilled care environment at Hamburg Center. I do not wish to see State-run ICFs/MR deprived of any funding that is needed to provide the quality of care necessary for Gretchen, and residents like her.

Regretfully, I cannot attend the fairness hearing on August 22. I do appreciate the opportunity to express my opinion and objections in this letter.

Sincerely, *Rickey V Shaffer*

Rickey V Shaffer
Brother of Gretchen C Shaffer



3C JUNE 2002
195 USPS

U.S. POSTAGE
PAID
MEADOW LANDS,PA
15347
AUG 01 11
AMOUNT
$16.15
00069532-04

1007

*Rush To Addressee*

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail. Misuse may be a violation of federal law.

*FOR PICKUP OR TRACKING CALL 1-800-222-1811*

EG890983298US

EG890983298US

**EXPRESS MAIL**
UNITED STATES POSTAL SERVICE ®

Addressee Copy
Label 11-B, March 2004

Post Office To Addressee

DELIVERY (POSTAL USE ONLY)

| Delivery Attempt | Time | | Employee Signature |
| Mo.     Day | | ☐ AM ☐ PM | |
| Delivery Attempt | Time | | Employee Signature |
| Mo.     Day | | ☐ AM ☐ PM | |
| Delivery Date | Time | | Employee Signature |
| Mo.     Day | | ☑ AM ☐ PM | |

CUSTOMER USE ONLY

WAIVER OR SIGNATURE
Additional merchandise insurance is void if customer requests waiver of signature.
I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and authorizes that delivery employee's signature constitutes valid proof of delivery.

☐ NO DELIVERY ☐ Weekend ☐ Holiday
Waiver Signature

AL SERVICE USE ONLY)

| Day of Delivery | Postage |
| ☐ Next ☐ 2nd ☐ 2nd Del Day | $ 16.15 |
| Scheduled Date of Delivery | Return Receipt Fee |
| Month    Day | $ |
| Scheduled Time of Delivery | COD Fee | Insurance Fee |
| ☐ Noon ☐ 3 PM | $ | $ |
| Military | Total Postage & Fees |
| ☐ 2nd Day ☐ 3rd Day | $ 16.15 |
| Int'l Alpha Country Code | Acceptance Emp. Initials |

PHONE ( ) 724 74 3580

1 SMITH
6 FIELDSHIRE DR
ssington, IA 15301

TO: [PLEASE PRINT]    PHONE ( )
CLERK OF COURT
FEDERAL BLDG & U.S. COURTHOUSE
228 WALNUT ST
HARRISBURG PA

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES)
1 7 1 0 8 + 0 7 8 3

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

UP OR TRACKING
w.usps.com
222-1811

EMS

JA842

Mr. Francis J. Marlow
656 Harris Point Drive
Virginia Beach, VA  23455

FILED
HARRISBURG, PA
AUG 0 3 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

31 July 2011

Clerk of Court                          Robert W. Meek
Federal Building & US Courthouse        Disability Rights Network of PA
228 Walnut Street                       1315 Walnut Street,  Suite 500
Harrisburg, PA 17108-0983               Philadelphia, PA  19107-4705

Re:    BENJAMIN V. Dept of Pub Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

My sister, Isabel G. Marlow, for whom I am Plenary Guardian, has resided at White Haven Center since
1966.  At a very young age, my sister was diagnosed with Mild Mental Retardation.  She is currently 66
years old.  It was my father's wish that Isabel always be secure and cared for and, as a result, she was
placed at White Haven.  Our father died in 1972.  Before he died, he and my step-mother visited Isabel
at least once a month, frequently twice; my step-mother continued to visit Isabel at least 3-4 times per
year after my father's death and before her own death in 1996. In fact, she died of complications after
suffering a heart attack while bringing Isabel home for Christmas 1995.  Our step-mother was a terrific
person and loved Isabel very much.  It was both my father's and step-mother's wish that Isabel remain
secure at White Haven, though they were continually dogged with threats of closing the facility.
Personally, since my retirement from the US Navy in 1994, I have continued to visit Isabel five times
every year from my home in Virginia Beach and bring Isabel down to our aunt's near Pottstown every
Christmas time.

I do not oppose the Plaintiff's right to choose community care for themselves, but I very, very much
object to the Plaintiff's efforts to request "relief" on behalf of my sister.  White Have is home, yes,
HOME, to my sister.  And, it has been a good home over all these years.  My parents and I have
steadfastly remained involved with my sister's living at White Haven.

The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and
my sister to continually and repeatedly voice our opposition to being placed on an ICF/MR Planning List.
My current opposition to community care has no permanence if I die or am incapacitated; the proposed
Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

At the moment, to be honest, my wish is that my sister pass-away before I do because, when I do die,
there will be no one to look after Isabel's welfare.  Given history, it will certainly not be the
Commonwealth of Pennsylvania, nor will it be the myriad 'self-interest' "rights groups" which pop-up
from time to time.

Well, "what a pickle, isn't it?"  Not for you, but for me and my sister.  Please do not allow my sister's
security at White Haven to be jeopardized by this suit.  How evil that would be.

Most sincerely,

*Francis J. Marlow*
FRANCIS J. MARLOW
GUARDIAN OF ISABEL G. MARLOW

JA843



Linda M. Lotzi
18943 Highstream Drive
Germantown, Maryland  20874

**FILED**
**HARRISBURG, PA**
AUG 0 2 2011
MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

August 2, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

My name is Linda Lotzi and I live in Germantown, Maryland.  I am representing my sister,
Lauren Lotzi of White Haven Center, Pennsylvania.

I am the primary contact and the court appointed personal guardian of my sister, Lauren Lotzi
effective, July 29, 1998 in the Luzerne County Orphans' Court.  Lauren was adjudicated an
incapacitated person.  She is unable to receive and evaluate information effectively and to make
and communicate decisions concerning essential requirements for her physical health and safety
and her daily living conditions.  I was appointed to act for her at all times and to take into
account and consideration the wishes and decisions of my sister, Lauren Lotzi.  I was given full
authority and responsibility to decide where Lauren shall live and how meals, personal care,
transportation, and recreation shall be provided, and to authorize and consent to medical and
surgical procedures necessary for the well-being of Lauren, and taking into account the wishes of
my sister, Lauren to the extent that she can appropriately communicate her wishes and desires.

**Lauren's home for the last 40 years has been White Haven Center (WHC) an  Intermediate
Care Facility for the Mentally Retarded (ICF/MR) and is located at 827 Oley Valley Road,
White Haven, Pennsylvania 18661.**  Lauren's parents, Lawrence and Rose Giarratano Lotzi
admitted her in June of 1971. Her father passed away in April 1973 and her mother passed away
July 1994.  Their wishes were for Lauren to reside at the center as long as she is safe and happy.

**Lauren's medical diagnoses include:**
1.) Severe profound mental retardation due to corticocerebellar damage and prenatal hyposia,
2.) Tonic/clonic seizure disorder,
3.) Fibrocystic breast disease-bilateral,
4.) Seizure disorder,
5.) Degenerative osteoarthritis of the spine,
6.) Spastic quadriplegia,
7.) Vision impairment,
8.) Low hyperopia,

JA845

9.) Dysphasia,
10.) Polyps on neck.

**Lauren requires numerous medications to keep her health optimal.** Medications are administered by a nurse, each and every day according to the doctors' orders. Medical procedures and annual exams are routinely done, such as physicals and mammograms.

**Lauren is non-verbal and unable to communicate what she wants.** Staff is able to determine her needs, wants, likes and dislikes through an interpretive understanding of Lauren's disposition, vocalizations, gestures, facial expressions and mannerisms after decades of staff interaction.

**Lauren is non-ambulatory and is confined to a wheelchair to prevent falls while moving around her home.** She must be routinely repositioned in a lounge chair (with seatbelt) and a gel cushion to prevent pressure sores. Due to her physical limitations, she receives a daily tub shower with a shower trolley. Lauren sleeps in a regular bed with padded side rails. Lauren has never had a bed soar.

**Lauren requires a wheelchair van for transportation purposes.** Lauren lacks self-preservation skills and must be evacuated in the event of an emergency.

**Lauren has urinary and bowel incontinence and must wear an adult device, which must be checked routinely and changed as needed.** She requires total assistance in all areas of self-care and hygiene. Precautions need to be taken when lifting and transferring due to degenerative osteoarthritis of the spine.

**Lauren's current diet consists of a 1500 calorie weight control, high protein, high fiber ground with puree fruit.** She has intolerance to eggs, egg products, milk and milk products. Lauren requires total assistance during meals. Liquids need to be thickened to pudding consistency to prevent choking due to dysphasia.

**This settlement will harm my family and my loved one Lauren in particular.** Laurens has demonstrated over the years her resistance and adverse reaction to changes in her environment and changes by her caregivers. One example that I will never forget happened approximately 20 years ago. Lauren's medical team called my mother and said that they were moving Lauren back to Pocono Hall, her original building. She was transferred to Laurel Hall, which is located behind her building. She was only there a week and stopped eating and started losing weight. When she returned back to her original building, Pocono Hall, she still was not eating. The team asked my mother to come up to visit. For the first few days, we were quite apprehensive because she continued to refuse food. I then held my sister's mouth open and my mother put food in her mouth and then I push her chin upwards to close her mouth and attempted to get her to swallow the food. I would tell Lauren, "Don't worry, you are home with your friends and you are going to stay here. I promise you will never leave your friends again". Reluctantly and eventually she began eating food. In this situation we were lucky that we got her to start eating. The outcome could have been detrimental.

**Lauren's mother was diagnosed with breast cancer and the staff at White Haven Center were very compassionate throughout her illness, while also supporting our family and La___'s needs.** Our mother was very weak and sick but still made sure she saw Lauren each an___ ___nth, traveling 500 miles each trip. As our mother became more ill, she never gave up ___ ___ visit Lauren. It made Lauren so happy when my mother entered her room. Lauren wo___ ___up and get very excited. Lauren's eyes were wide open and fixated on Mom the ent___ ___ we were visiting sometimes for hours. Mom would feed her home cooked meals and giv___ ___ots of hugs. Mom had such a difficult time leaving Lauren, but she knew that Lauren was ___ ___he best place possible for her. That last visit was particularly hard. We were in the car trav___ ___ng and mom was worried about Lauren. I told my mother not to worry that I will always visit ___auren and make sure that she's well cared for. I'll never forget her birthdays or the holidays. I'll bring her my Thanksgiving dinners and always visit her. When we arrived at White Haven Center the staff realized how ill my mother was. They knew my mother loved Lauren with all her heart and looked forward to her visits. The staff held us and told us that Lauren will be fine, don't worry. Just enjoy your visit. Their words and compassion that they expressed helped consoled my mother's worries. I think my mom knew this was going to be the last time she saw Lauren. And it was. The staff knew how to console my mom and I knew when the time comes that they will console my sister Lauren the same way.

**The next visit without our mother, the trip I dreaded, I had to tell Lauren, mom was no longer here.** When I arrived, I went to Laurens' section. She was surrounded by staff and all her friends. The staff already knew our mother had passed. I just had to tell Lauren. I looked at Lauren and held her hand. I said, "Mom went to heaven and she is with our dad." I was looking at her, she seemed happy at first. She started looking for our Mother. She saw me but not our Mother. I could tell she was looking for her, she kept looking around. It was the first time I had been around my sister without our mother. Whenever I was around, she knew Mom would be around. She kept looking, and looking for Mom. All of a sudden, she must have understood, the smile disappeared, she became very sad. I noticed for the first time ever that Lauren's eyes tear and tears were falling from her cheeks. I have never seen my sister cry. She expressed herself and has felt the pain of losing our mother. I held my sister and told her that I will always be there for her and I will visit her every month." Tears were falling from my face and hers as I held my sister. She understood what I said. Although my sister can't tell me what she is feeling with words, she does understand her surroundings. For the next few months, each and every time I would arrive without our mother I would notice Lauren looking all around as though she was looking for her. The staff at White Haven supported me through a very difficult time and I knew Lauren was in good hands and that helped me get through a difficult time in my life.

**Laurens friends were all around when she was told her mother passed away.** I was standing next to Lauren's friend of forty years, Rosie. She was trying to get my attention. I looked at Rosie and she looked at me and then she looked up at the ceiling and then she looked at me and then she looked up at the ceiling again and then looked at me. I felt she was trying to tell me something but I could not figure out what she was trying to say. I asked, Rosie "What are you trying to say?" again she looked up at the ceiling and then looked at me. I asked Mary Ellen, one of the workers, "What is Rosie trying to tell me?" Mary Ellen said, "Rosie is telling you and Lauren, that her mother is also in heaven". Just then my heart felt an overwhelming feeling, I connected with Rosie. Her mommy and Lauren's mommy are in heaven together. What a

moment that was. Mary Ellen understood what Rosie was trying to tell me. I couldn't have figured it out. Mary Ellen has been employed with White Haven Center for 27 years, along with numerous other employees that have dedicated their lives caring for our family members who are very fragile individuals. You can't find this experience within a community home setting. It will absolutely shock my sister and her friends if they are removed from the only home they have known and in some cases have never had family visits. The staff at White Haven Center has become the only family they have. Each and every month I visit, I see the connection that the individuals have with staff. Understanding what they are trying to express is not found on a piece of paper that you can refer to in a spare moment. You need to know what they are trying to say right then and there. What was Rosie trying to say? The inexperienced worker that doesn't know the individual will not be able to understand what Rosie was trying to tell me. Rosie will be trapped within her body as well as all the others like her. They may shut down and lose the will to live.

**Lauren is well taken care of by the staff at White Haven Center.** The staff is highly qualified and they have the experience, knowledge and skills to appropriately care for Lauren as well as all the other individuals. Our family has always greatly appreciated the exemplary care and compassion shown by staff towards Lauren and her friends. Staff knows how to get Lauren to laugh and smile. Staff is always interacting with her and the other residents. I hear the girls giggling when one of the staff workers says something funny or I'll see a worker give a hug to one of the girls. The staff know what they like and what they don't like.

**Lauren's mom was asked if she would want Lauren to be placed in a community home.** My mother refused any type of community residential setting. She wanted White Haven Center to be Lauren's home forever as long as she continued to be happy and received the best care possible. I have experienced as a young child all the way through my adulthood, what it is like to have a sister with severe profound mental retardation. I felt the struggles my parents had with Lauren when we were young. I remember many times when Lauren would fall to the floor and have a seizure. I was only five years old. Mom would scream for the tongue depressor (a popsicle stick wrapped with gauze). Years ago, that's what they used to help prevent them from swallowing their tongue while having a seizure. I remember how hard it was on our family when Lauren was brought to White Haven Center to live. I was very sad and did not understand. Back then there were no supports in place to help family's keep their loved one home. Society dictated then that institutions were the best way to support a family with a child that has disabilities. Today, forty years later, again society is trying to dictate what is best for my sister and her friends. Has society seen her home? Do they care and know what will happen to my sister if she is removed from her home? Maybe she will stop eating again and then place a tube in her belly to feed her. Many years ago when Lauren left our home and White Haven Center became her home we never expected that there would be a possibility that White Haven Center would close their doors. I can't bear to see my sister lose her home again. She doesn't deserve to experience the loss of her home again.

**Lauren has had visits from her sisters, brother, Aunts, Uncles, nieces, nephews, cousins and friends throughout the years and always enjoys being surrounded by family.** I travel once a month, 500 miles, for the last 40 years threw all sorts of storms to visit with my sister Lauren. I arrive in the afternoon and leave after dinner. I feed Lauren lunch and dinner. While strolling

around the facility, I talk with her and reminisce about old times. I may sit on the bench and hold her hand and tell her how much I love her. We do crafts together and decorate her room with her crafts. I watch the staff as they interact with the residents all day. I talk with staff and Lauren's friends. My son comes with me, he's is 25 years old and he started coming when he was two months old. My friends will come up with me and visit with Lauren. They think that White Haven Center is extraordinary.

**Lauren has developed many friendships and wonderful memories in the past 40 years at WHC.** Lauren wakes up early in the morning with her roommates and familiar staff gets them ready for the daily routine, cleaning, bathing, dressing, and feeding is the morning routine. They may get ready for a party or picnic, or maybe a trip to the mall for a new outfit, but they are always surrounded by familiar faces which make them feel happy and safe all the time. The families that come to visit their loved ones on the weekends or even during the week have become a special family to me. We have a lot of wonderful experiences that we have share with each other through years.

**Lauren feels safe and comfortable because she receives around the clock professional care by the staff at White Haven Center.** White Haven Center was established in 1956 and is an Intermediate Care Facility for Mentally Retarded individuals with developmental disabilities. Lauren has challenging physical conditions requiring a high level of supervision and around the clock care. The center provides professionals doctors, dentists, social workers, psychologists, program specialists and recreation activity managers. Lauren always smells and looks clean. The clothes she wears are neat and clean, properly fitting and weather appropriate.

**Lauren and I attend her yearly Individual Support Plan to assure that the mental health supports needed to help attain the quality of life she desires.** Once a year we have her ISP meeting were we discuss what has happened in the past year and what her goals will be for the next year. If I have any concerns or comments staff is always available and willing to help.

**Lauren's building has the perfect landscape view.** When I visit with Lauren we sit outside on their porch and we are surrounded by beautiful mountains, fresh air blowing, and deer feeding on the fields of green grass, the birds singing and the fragrant flowers are blooming. There is a feeling of peace and tranquility which surrounds the grounds and you feel safe and secure.

**Lauren attends many social functions on and off the grounds.** Lauren attends local activities with her friends, such as going to the mall, or having a picnic at a park. For Christmas one year she was escorted by a Naval Officer to attend a Party. She wore a long evening gown with sparkling jewelry and her hair was styled with curls. She looked great and had a wonderful time.

**Lauren always participates in the Halloween festivities.** Halloween time is when the employees get creative and the individuals have a blast. They decorated a haunted building and open it to the residents. They do a superb (scary) job. Costume contests by each building continue the excitement throughout the holiday and in the past Lauren has dressed as an energizer bunny, a hippy, and a fairy.

**The Open House Picnic has become a family tradition at White Haven Center.** Every year, White Haven Center plans an outdoor picnic for the residents and their families and friends. The festivities include food, games, activities and entertainment for the entire day. Later in the evening the campfire starts. The delight of seeing so many people having such a great time is an event that everyone looks forward to year after year.

**Lauren attends church every Sunday with her friends.** Rev. Kirsten facilitates the religious needs of the individuals. A few years ago when my sister and I were strolling around outside the facility, Rev. Kirsten introduced herself to me and asked if Lauren and I wanted to attend mass that day. I told Rev. Kirsten, that I have never been to church with my sister and I would love to attend mass. So we gathered in the solarium at Pocono Hall with all of Laurens friends. As Rev. Kirsten continued with Mass I looked around and saw so many individuals' very happy, singing and listening as she talked about God wishes. Lauren was also very happy, clapping her hands and listening to the music. My heart was full of joy. It was a wonderful visit attending church with my sister at her home. Life could not be any better.

**I am concerned that the settlement in this lawsuit will affect the ability for White Haven Center to continue to care for the residents.** The past decade, the population at White Haven Center has decreased dramatically. Through the years, there has been a push to close all institutions regardless of family's wishes and even the individual's wishes. The planning list will reduce the population at White Haven Center. If the population continues to decrease, the center will not be able to stay open because it will cost too much to operate the facility. Therefore the center will be forced to close and any remaining individuals will be forced out of the only home they have known and will be placed in unfamiliar surroundings and staff and ultimately ending up in the community against their wishes and families wishes. I am not opposed to any individual wanting to leave a center to live in a community home if that is their own desires – not an agency that doesn't have the individuals best interest at heart. There needs to be choice for all individuals. This settlement agreement will not benefit my sister, it will only hurt her. But if the agencies continue to advocate for all centers to be closed, then ultimately Lauren and all of her friends will lose their home.

**Lauren and her friends will be separated from each other.** All her friends that she has grown to love will be spread out though-out the different community's and will not be able to enjoy life with each other. Lauren will always wonder why her friends are no longer around her. Where are they? What are they doing? How are they doing? She will not be happy in any other place, unless she is with her friends and the staff that has taken care of her most of her life. Lauren doesn't want to move to a new environment, new surroundings, and a new home with people that she doesn't know. I wouldn't.

**The following are some of my concerns regarding what would happen if my loved one was transferred to another facility.**
- Staff in community homes will not be able to determine Laurens' needs, wants, and dislikes. Lauren is resistant to change, she will stop eating.
- Community homes do not have the special emergency backup systems in case of electrical outages caused by snow and lighting storms throughout the seasons. Lauren's

life depends on having electricity and water at all times. If her food can't be blended she will not be able to eat. If she doesn't stay warm she will get sick.

- Community homes are located near places that have a higher crime rate, are more populated and are congested with traffic. White Haven Center is a safe, less populated and less traffic problems.
- Community home employees have lowers wage employees with less experience and a higher rate of turnover of employees. White Haven Center employees have decade of service and experience.
- Community homes need to regularly do background checks on employees.
- Not enough follow-ups visits to make sure residents are safe, happy, and that supports are properly assessed and implemented.
- Community home staff is notified that State officials are coming for inspections (there should be no notification).
- Community Neighborhoods aren't accepting of individuals that have intellectual disabilities. Neighbors are not always supportive.
- Community homes are struggling with budget cuts.
- There is a waiting list with 16,378 families asking for assistance with their child that has intellectual developmental disabilities.
- What happens if the residents don't adjust to community setting?
- If the weather gets bad and employee can't make it in to work then there will not be enough staff to safely supervise residents.
- Residents who get sick and have severe disabilities will need to be transported to a hospital to be evaluated for illness. I am scared that they won't have enough staff and decide not to take Lauren to the hospital.
- In my own neighborhood a child clearly with disabilities was being bullied by the kids on the playground, police came a few times. The family moved.
- I am employed by the Public School System as a Substitute Para-Educator. I work with children that have intellectual developmental disabilities. The children come to school dirty and the teachers wash their hair in the sinks. The students make fun of the disabled. I hear the R word used all the time. I do correct the students and let them know that it is not appropriate.

**The following are my objections to the Class Action Settlement:**
- I do not oppose the Plaintiff's right to choose community care for them, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Our family and Lauren are opposed to placement in a community residential setting. We don't feel that a community environment would afford Lauren the same quality of care and treatment that she currently receives at the White Haven Center. We feel that her needs would not be met in all areas. We also feel that she would not receive the same level of medical monitoring that she currently receives at the facility. Given the freedom, safety and services that Lauren has at White Haven Center, it is our belief that White Haven Center is the least restrictive environment to meet her needs and a community residential setting would be more restrictive.

**I am available and would like to participate in the fairness hearing on August 22, 2011.**
You may contact me at (301) 528-0802. Thank you for this opportunity to express my concerns.

Sincerely,

Linda Lotzi

Linda Lotzi
Guardian of Lauren Lotzi (White Haven Center Resident)

JA853

**Linda M. Lotzi**
Secretary

**Relatives and Friends Association of
White Haven Center, PA**
18943 Highstream Drive, Germantown, MD 20874
Phone (301) 528-0802
Cell (240) 751-7289
Email: lindalotzi@verizon.net

"If we want a love message to be heard, it has got to be
sent out. To keep a lamp burning, we have to keep
putting oil in it." Mother Teresa



My Sister

Lauren's

40 Wonderful Years

at

White Haven Center,

Pennsylvania

"If we want a love message to be heard,

it has got to be heard.

To keep a lamp burning,

we have to keep putting oil in it."

*Mother Teresa*

**Mission of**
**Relatives and Friends Association**
**of**
**White Haven Center,**
**Pennsylvania**

A. To provide advocacy for the general welfare and quality of life for all persons in residence at White Haven Center.

B. To maintain a close liaison with the White Haven Center administration staff and all care-givers.

C. To establish and maintain a good relationship with all those who formulate legislative and administrative policy that affects all residents, staff, and the Center as a whole.

D. To insure that White Haven Center remains open as a MR facility and to encourage reopening unused residential buildings to accommodate the "waiting list" of developmental disabled citizens and their families of Pennsylvania.

**Together in**

*** Compassion * Friendship * Courage ***

*** Acceptance * Diversity * Respect * Dignity ***

CENTERLINES

**PLEASE NOTE: This is an amendment to the letter I sent July 26, 2011. The only change is the date. It is changed from August 26, 2011, the incorrect date, to July 26, 2011, which is the correct date.**

Bertin W. Springstead
95 Locust Trail
Newville, PA 17241

**FILED**
**HARRISBURG, PA**
**AUG - 2 2011**
Per **MARY E. D'ANDREA, CLERK**
*Deputy Clerk*

July 26, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

I am the father and guardian of my son Craig who lives at Selinsgrove Center. For a variety of reasons, which stem in large measure from behavior issues, his mother and I are unequivocally opposed to a community-based relocation. Our reason for that is not because we are against community-based living arrangements. It is because we are for whatever is best for Craig. And, for that reason, at this moment in time, we are convinced that for Craig, life at Selinsgrove Center is less restrictive, more appropriate to his needs, and consequently better equipped to enhance his quality of life.

Of course, if future circumstances give cause for reconsideration, we will do so. From that perspective, as Craig's guardian, I am opposed to the proposed settlement agreement. While there are also others, my major reasons follow:

❖ I do not oppose the right of others to choose community care for themselves, but I do object to Plaintiffs' efforts to request relief on behalf of Craig.

❖ The proposed settlement diminishes the authority of Craig as the primary decision maker to choose the services and supports he receives, to include where he lives. *But, without meaningful options there is no meaningful choice.*

   • If at some point in the future the objection to a community placement is withdrawn and Craig is subsequently discharged from Selinsgrove Center, he would not be offered an opportunity to change his mind and move back.

JA856

• The practical implications of the proposed settlement's integration plan would be the depopulation and eventual closure of one or more of PA's state centers. As a consequence, if Selinsgrove Center were to be closed, unless provided an opportunity to move to another state center or a suitable privately operated ICF/MR, community-based care would be Craig's only choice.

• The proposed Settlement Agreement's provisions for consolidating budget lines would deprive state centers of critical funding, thereby jeopardizing the quality of services Craig currently receives, which could impose community-based services upon him.

• I am opposed to the proposed settlement requirement to annually assess opposition to discharge by residents, and involved families or guardians, whereas an expressed preference for a community placement would remain in effect unless and until recanted without being asked. Consequently, in the event an involved family member or guardian dies or becomes incapacitated and is not replaced, his/her previously stated objections to a community placement would likely be ignored unequivocally.

❖ Under the proposed settlement there is no requirement for me to be notified if Craig is somehow deemed to have consented to community care or has been placed on the Planning List for any other reason.

❖ I am opposed to the 2nd question in parts 1A and II A of the State Center (ICF/MR) Planning List Survey, which asks the person being interviewed if he/she wants to live closer to his/her family. That question would conjure up some unrealistic expectations, which for some would be a key reason for expressing a desire to be discharged to the community.

• Some residents will interpret the question as an opportunity to live at home, which, more often than not, would not be an option.

• Many family members are deceased or, due to age, are no longer able to accommodate expectations of a close relationship.

• Family members of some residents live out of state.

• And sadly, some other families would be unwilling to enter into a meaningful relationship.

❖ I object that in accordance with the proposed settlement, decisions would be made whether to place a resident on the State ICF/MR Planning List without requiring direct input from a qualified mental retardation professional or staff members who support the resident on a regular basis.

❖ The proposed settlement provides for extensive educational programs designed to teach state center residents, their involved families and guardians how the community intellectual disabilities system works including the type of placement services and supports the community provides. However, while I do not object to that per se, I do object to the curriculum. Given the sole focus on the community it is quite likely that, intended or not, at least some training sessions would be infused with an anti state center bias, which indeed could include an intended sales pitch for a community placement.

❖ I object to the proposed Settlement Agreement because neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are or will become available, that these facilities are capable of meeting the needs of current state center residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

❖ I object that DRN of PA, a publicly-funded entity, would receive $432,500 in legal fees as the proposed Settlement Agreement calls for, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Craig's mother and I believe strongly that the best interests and preferences of each and every individual with an intellectual disability should be paramount, even if inconvenient or in conflict with someone else's philosophical persuasion. In short, it is apparent that the authors of the proposed settlement agreement do not agree. As expected and understandable the proposed settlement reflects a community bias but it was not expected to be unfair to those who prefer services provided by a state center.

Finally, please accept this letter as notice of my intention to appear at the August 22, 2011, hearing and request to be permitted to testify.

Sincerely,

Bertin W. Springstead
Father and guardian of
Craig H. Springstead

BERTIN SPRINGSTEAD
(717) 776-0496
THE UPS STORE #2878
STE 15
950 WALNUT BOTTOM RD
CARLISLE PA 17015-7601

1 LBS    1 OF 1
SHP WT: 1 LBS
DATE: 01 AUG 2011

SHIP   CLERK OF COURT
TO:  FED L BLDG & U S  COURTHOUSE
     228 WALNUT ST

HARRISBURG  PA 17108-0983



PA 171 9-20

UPS GROUND



TRACKING #: 1Z 74W 913 03 7576 8346

BILLING  P/P

15h 13.00H ZIP 450 18.5U 07/2011



William G. Toperzer
4049 East Huber Street
Mesa, AZ 85205-4023

July 26, 2011

Clerk of Court                                    Robert W. Meek
Federal Building & United States Courthouse       Disability Rights Network of PA
228 Walnut Street                                 1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                         Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

I am writing in objection to the subject Case as an "involved family member" of a long-term
resident of Hamburg Center. I will first provide background on the beloved family member,
second state my specific objections to the Settlement, and third explain some first-hand concerns.

**Family Member Background**

I am the brother (and primary surviving relative) of Carol Toperzer, a 65 year old female who has
resided at Hamburg Center for nearly 50 years, since she was 16. Prior to that, she was cared for
at home solely by my late mother in the days long before the support services that exist today.
The task was stressful and all-consuming and eventually led to my mother's premature death.
Carol has been profoundly mentally and physically impaired since birth and is unable to perform
any of her own care despite diligent efforts to train her for the simplest tasks like using a spoon.
She is bed and wheelchair bound and in general physically frail. She does not speak, her vision is
uncertain, and any cognitive skills are marginal. Any response gestures are broad at best,
consisting of her version of a smile or an indiscriminate moan.

Carol is totally dependent 7 x 24 on the Hamburg Center staff for all services including feeding,
dressing, bathing, diaper changing, and other personal hygiene. Her entire diet must be
administered in puree or liquid form; in recent years the caregiver must feed Carol slowly in very
small bites to prevent choking. She has been hospitalized multiple times for pneumonia and
possible food aspiration. Use of a feeding tube has been considered. Representative of her age,
Carol's health is in decline and her annual review lists an increasing number of health conditions
that require monitoring by the Center's nursing staff and physicians.

I, and my late father, have rejoiced in the fine care Carol receives at the Hamburg Center in a
highly stable environment. Likewise, we have been totally opposed to community placement for
Carol because we do not believe there is any way – in a small group setting – to duplicate the level
of on-site professional care Carol currently receives. As Carol ages and her health further declines
I foresee the unmatched benefits of having a readily available medical staff on site (nurses and
doctors), versus having to urgently call those professionals into a small scale group setting, or

**1:09-cv-1182-JEJ – William Toperzer Objections**                          **Page 1**

worse, having to transport Carol in her increasingly frail condition to be examined on a frequent basis. The institutional setting is the best alternative for Carol. She has lived there for her entire adult life and is comfortable there. Community placement would be an unacceptable disruption to her life and would cause me great mental distress.

In 1998, I convinced my then 91 year old father to move from Pennsylvania to Arizona (where I was previously transferred for employment) so that I could care for him in his later years. In conjunction with that move, and to expedite future care decisions, my father turned over Carol's financial fiduciary role to the DPW Guardian Officer at Hamburg Center.

Legally, Carol is categorized as "competent" regarding her affairs. Neither my father nor I have ever sought legal guardianship because we felt the risks of not being able to contact us in an emergency outweighed any other benefits. My father died in 2003 and I am therefore the involved family member who continues to monitor Carol's care. His deathbed wish was that Carol remain in the care of Hamburg Center.

**Settlement Objections**

With that background stated, let me now turn to the Settlement.

Objection 1 – Plaintiffs and DRN Do Not Represent My Sister

> I do not oppose the named Plaintiffs' right to seek community care for themselves, however, I object to Plaintiffs' efforts to seek a disruptive and possible life-threatening change on behalf of my loved one.

> Furthermore, neither my father (to the best of my knowledge) nor I have ever been directly approached by the Disability Rights Network (DRN) to determine our interest (or not) in having them represent Carol and her best interests. In fact, the DRN's single-minded position to use community based care for all mentally retarded Persons is 100% COUNTER to what my father and I have always felt is best for Carol.

> The reference "Person(s)" herein and hereafter is derived from the terminology found in the Settlement Agreement and the DPW *State Center (ICF/MR) Community Planning List Assessment* form.

> From my research to date, it also appears that DRN could have a vested interest representing the commercial (albeit non-profit) providers of care for mentally retarded Persons.

> While DRN is free to advocate for the named Plaintiffs, they are NOT an advocate for our wishes and I object that we were included in this case and the Settlement without proper consultation or representation.

Objection 2 – Class Membership Determination

> In reviewing the process to determine if a Person is a member of the Class, I am concerned that the determination is insufficient with regard to: a) the support services the Person truly needs, b) the Person's health, and c) the Person's underlying medical diagnosis. Specifically, in reviewing the *State Center (ICF/MR) Community Planning List Assessment* form, the

JA861