Page 2

the record and Edith would be placed on the Planning List. Under the proposed Settlement Agreement no notice will be provided to us in the event that my loved one, who is incapable of making decisions for him/her, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

It seems that the integration plan described on pages 9-12 of the proposed Settlement Agreement is to close State-run ICFs/MR, which means residents such as Edith really have no choice. This is precisely the lack of choice that the United States Supreme Court cautioned against in Olmstead v. Zimring.

The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision

There have been no feasibility studies performed by either DRN or DPW nor have they shown that there are adequate safe facilities available where residents will have a sense of community while receiving medical care they need. Nor is there any proof that there is or will be sufficient funding for multiple community-based facilities, if communities even allow them to exist in their neighborhoods, especially with the current economy and ongoing budget cuts. The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

Instead of paying lawyers nearly half a million dollars in legal fees, which are described in the Settlement Agreement, I think this money could be better spent on care of residents in all kinds of facilities.

In conclusion, we are vehemently opposed to what DRN is doing. They should be advocating for ALL based on individual needs, but this appears to be about money. To even think about removing an 87-year-old from what has been her home (for decades) where she is safe and receives excellent care is an outrage. I am unable to attend the fairness hearing on August 22, 2011, but I hope you will take my letter into consideration.

Sincerely,

*Evelyn Crawford*

Evelyn Crawford, sister-in-law of Edith Crawford

Robert Crawford, Jr, nephew of Edith Crawford

EVELYN CRAWFORD
109 Madison Ave
MIDLAND PARK NJ 07432



DVO PSDC
KEARNY NJ 070
28 JUL 2011 PM 7 L

RECEIVED
HARRISBURG, PA

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per

CLERK of COURT
FEDERAL BLDG + UNITED STATES COURTH
228 WALNUT ST.
HARRISBURG, PA 17108-0983

17108+9998

JA898

William F. Brill
9704 Delamere Court
Rockville, MD 20850

July 27, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

FILED
AUG 0 2 2011
PER
HARRISBURG, PA.     DEPUTY CLERK

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

I am the brother and legal guardian for my sister, Ethel Brill, who has been at the White Haven Center since 1976.

Let me tell you about Ethel. Ethel was born in 1937 (age 74) and has been in the PA State Center system since 1949. She has the mental capacity of a three year old because of damage to her at the time of her birth. Currently Ethel has the following diagnoses for which she is being treated by the staff at White Haven:

- Bipolar (mood disorder) mixed with manic episodes coexisting with Obsessive Compulsive Disorder
- Arterial Sclerosis Heart Disease (thickening of the walls of the arteries) and Transient Ischemic Attack, which is a deficiency of blood in an artery due to a constriction or actual obstruction of that blood vessel
- Congestive Heart Failure (engorgement of pulmonary vessels)
- Type 2 Diabetes
- Hyperlipidemia (one or more elevated lipids in the blood)
- GERD (Gastroesophagael Reflux Disease)
- Fibrocystic Breasts
- Cataracts of both eyes
- Blepharitis (inflammation of the eyelids)
- Ocular Rosaceous (red rash around the eyes)
- Sleep Apnea

As a precaution Ethel has a number of Health Support Procedures that are provided by the White Haven Center. They include:

- 24 hour 1:1 supervision within arm's length when medically indicated
- Abdominal binder to prevent dislodging of a feeding tube
- Bed alarm to prevent falls
- Wheelchair with seatbelt, lap tray with belt and Velcro leg straps to prevent leg drop off
- Seat belt on all chairs to prevent falls
- Padded bedrails to prevent falls
- Darco boots to prevent injury to feet
- One-piece clothing/jumpsuit for daytime and one piece pajama to reduce injury from skin picking
- Diet restrictions to control calorie intake/weight

During the past few years Ethel has been hospitalized a number of times – about eight times per year for the last three or four years.

I have personally visited some "group homes" in the Wilkes-Barre area. In general, I am not opposed to the concept of "group homes." However, I cannot imagine my sister Ethel, with all her health and support issues, ever being in a "group home." Since she is incapable of speaking for herself and speaking as her court appointed guardian, I strongly support the concept of individual choice. My choice is that she remains at the White Haven Center.

The settlement will be harmful to Ethel and to me. Given her enormous disabilities, the White Haven Center has been able to provide the best "quality of life" that is possible. My objections to the settlement include:

- I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

The settlement is only fair to those who agree with it. It is unfair to my sister.

2

Sincerely,

William F. Brill
Guardian of Ethel Brill

3

WF Brill
9704 Delamere Ct.
Rockville MD 20850

WILMINGTON DE 197

28 JUL 2011 PM 2 L

RECEIVED
HARRISBURG, PA

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

171083999B

James W. Causer and H. Lucille Causer      Gary L. Causer

125 Forest Circle      3713 S. George Mason Drive, #1703W

Portage, PA 15946      Falls Church, VA 22041

July 25, 2011

Clerk of Court      Robert. W. Meek

Federal Building & United States Courthouse      Disability Rights Network of PA

228 Walnut Street      1315 Walnut Street, Suite 500

Harrisburg, PA 17108-0983      Philadelphia, PA 19107-4705

FILED

AUG 0 2 2011

PER _____
HARRISBURG, PA.  DEPUTY CLERK

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones:

We are the father (James W. Causer), mother (H. Lucille Causer) and brother (Gary L. Causer) of Thomas Alan Causer who is a client at Ebensburg Center. We are well pleased with the excellent quality care that the doctors, nurses, aids and staff provide Thomas at Ebensburg Center. Thomas was court committed to Ebensburg Center in 1978 because of epileptic seizures and other mental and physical problems that require 24 hour a day nursing and custodial care with doctors on call. Thomas is unable to talk and requires regular medication, monitoring and adjustments for his epileptic seizures and other problems. He requires that his food must be ground up when he eats and is unable to make informed decisions for himself.

We believe that this settlement is unfair to the clients, biased against clients that do not express a preference for community living, and could potentially harm Thomas. We furthermore request that Thomas NOT be placed on the planning list so that he can remain in Ebensburg Center. While I do not oppose the Plaintiff's right to choose community care for himself, it is not appropriate to impose a "one size fits all" solution to every client in state institutions, especially those who require constant care or cannot make decisions for themselves.

The class identification procedures on pages 5-7 of the proposed settlement agreement requires us to continually (yearly) voice our opposition to Thomas being placed on the IFC/MR planning list. Our current opposition to community care has no permanence if we pass away or are incapacitated and the proposed settlement agreement will ignore our recorded wishes that Thomas remain in ICF/MR care. The agreement should not place any current resident on the planning list who has not indicated that

JA903

they want to be on the list unless a parent (or closest relative) indicates so.  In cases of non-response by a parent, guardian or closest relative such as a brother, a resident that cannot respond should remain under IFC/MR care.

 Every client is different and has different needs. These needs may require constant care at an institution such as Ebensburg Center such as is necessary for our son/brother.  Higher caliber clients that are capable of making informed decisions and fully are able to determine their medical and living care needs should be able to make their own decisions about institutional v. community care, but many or most of the clients  are nor capable of such decisions and need unbiased advocacy.

It is not clear from this settlement what happens if a resident cannot express a preference for IFC/MR v. community care, but the parents or family members do not agree with the social worker, facility advocate, community transition specialist or the facility director.  The parents, guardian or responsible family member should have first say over anybody else, whether the resident should stay at the IFC/MR or be placed on a planning list.  If the resident does not have a responsible family member or guardian only then should the facility director make the determination after consulting with the social worker, facility advocate, & community transition specialist.

Safeguards need to be in place to ensure that a resident's preference is not falsely determined, and in all cases the family members should be immediately informed if someone determines that the resident has made a preference.  This settlement does not have these safeguards specified.

We further object to the implications of this settlement that as residents are placed on the planning list and eventually removed from IFC/MRs to community care, they will not be replaced with other special people needing IFC/MR care but will instead be denied placement because DPW will not allow new clients in IFC/MR facilities even though there are long lists of families needing and awaiting placement in these IFC/MR facilities.  As a result the IFC/MR population will continue to dwindle and eventually force closure or consolidation of IFC/MR facilities.  Clients currently in an IFC/MR facility should not have to suffer from the risk of closure due to dwindling IFC/MR populations resulting from community placement and budget cuts to IFC/MR facilities preventing new clients.  This could eventually result in clients that need critical IFC/MR level care being forced into inferior community care.  This is precisely the lack of choice the United States Supreme Court cautioned against in Olmstead v. Zimring. Consolidating clients to a reduced number of IFC/MR facilities also places an extra burden on family members and guardians (particularly elderly family members with health problems), who will be unable to visit their loved ones as often, because of vastly increased traveling distance to a consolidated facility.

People that need IFC/MR care but are denied placement are as important as those clients who wish to be removed from IFC/MRs and placed in the community.  IFC/MR budgets and facilities should be increased (not reduced) to admit those clients needing critical IFC/MR care but are waiting to placed in an IFC/MR facility.

 Although there are educational programs set up in this agreement to tout the plusses of being placed in a community facility, there is no educational program to show the advantages of staying in an IFC/MR

and risks of being placed in a community home.  There have been numerous examples in the past of clients being placed in communities only to be abused or found dead due to improper care or neglect.

In summary, we believe that this settlement is not fair to the clients in state institutions.  Furthermore we request that Thomas not be placed on the planning list so that he may remain in Ebensburg Center and continue to receive the constant nursing and custodial care that he requires. Although we would like to participate in the fairness hearing on August 22, 2011, health issues prevent us from attending.

Sincerely,

*James W. Causer*
*H. Lucille Causer*

James W. Causer and H. Lucille Causer

Parents of Thomas Causer

*Gary L Causer*

Gary L. Causer

Brother of Thomas Causer

James & Lucille Causer
125 Forest Circle
Portage, PA 15946

**RECEIVED**
HARRISBURG, PA

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building & United States Cou.
228 Walnut Street
Harrisburg, PA 17108-0983

17108+3338

JA906

Erin & Elizabeth Gnall
501 Tunnel Rd,
Barnesville, PA 18214


FILED
AUG 0 2 2011
PER
HARRISBURG, PA.    DEPUTY CLERK

July 28, '11

Clerk of Court                                    Robert W. Meek
‗ Federal Building & United States Courthouse    ‗ Disability Rights Network of PA
‗ 228 Walnut Street                               ‗ 1315 Walnut Street, Suite 500
Harrisburg, PA 17108-0983                         Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

We are the parents and Co Guardians of our son Thomas M. Gnall who is currently a resident of White Haven Center an ICF/MR. Our son, Thomas, is profoundly retarded, has Down's Syndrome and is also autistic. He has never spoken a word. He has no concept of danger. He does not understand verbal instructions and has a very limited attention span. He cannot follow instructions or directions. He needs help with all his basic needs. Needs help with basic hygiene. He is a grabber and thrower. He will grab things and put them in his mouth whether it's food or objects. He is dentureless and all his food has to be ground or mashed. If given something he doesn't like he will throw it anywhere. He will disrobe himself anywhere at any time. He can be very stubborn at times and will sit down anywhere and not get up. He is very strong and be difficult to move. He cannot speak but makes a lot of annoying sounds that disturb people. His vision is very poor and holds things very close to his eyes. He has cataracts and limited vision and is not a candidate for removal of cataracts because he could do damage to his eyes.

We adamantly oppose any community placement for our son.

We do not oppose the Plaintiff's right to choose community care for themselves, but we do object to the Plaintiff's efforts to request relief on behalf of our loved one.

Although the proposed settlement agreement language seems to protect our loved one, in practice, our current opposition to community care has no permanence. If we pass away or are incapacitated, the proposed settlement agreement will ignore our recorded wishes that our loved one remain in ICF/MR care.

The proposed settlement agreement places people on the state ICF/MR planning list who have not indicated that they want to be on the list. We were already contacted about this and stated that we do not want our loved one on the list.

Under the proposed settlement agreement no notice will be provided to us in the event that our loved one, who is incapable of making decisions for himself, is somehow deemed to have consented to community care or has been placed on a state ICF/MR planning list for any other reason.

We also object that the proposed settlement agreement allows DRN (Disability Rights Network) facility advocates to have equal say with DPW personnel concerning who gets placed on the state ICF/MR planning list.

The proposed Settlement Agreement provides for Educational programs teaching ICF/MR Residents and their Guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any Educational Programs Describing to us or our Loved One how we can maintain our Loved One's Current Care Environment and avoid being placed on the State ICF/MR Planning List. These Educational Programs should also include information about the potential Dangers associated with Community Care and should include presentations from State Center Advocates favoring ICF/MR Care.

The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the die population and the eventual closure of State-run ICFs/MR. This Depopulation and Closure will deprive us and our Loved One of a meaningful Choice to Remain in ICF/MR Care and will impose Community Based Care upon us and our Loved One. This is precisely the lack of Choice that the United States Supreme Court cautioned against in Olmstead v Zimring.

The proposed Settlement Agreement's provisions for consolidating Budget Lines will deprive State-run ICF's/MR of Critical Funding, thereby Jeopardizing the Quality of ICF/MR care, Risking the Health and Safety of our Loved One, and further imposing Community-Based Care upon us and our Loved One Contrary to the Supreme Court's Olmstead Decision.

We object to the proposed Settlement Agreement Because no studies have been Conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible.

There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

The proposed settlement agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

We object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed settlement agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

For the reasons stated above we opposed the proposed settlement agreement and urge the court to reject it.

Sincerely,

Emil Gnall

Emil Gnall

Elizabeth Gnall

Elizabeth Gnall

Parents and Co. Guardians of Thomas M. Gnall

*Emil & Elizabeth Gnall*
*501 Tunnel Road*
*Barnesville, PA 18214*

RECEIVED
HARRISBURG, PA

AUG 0 2 2011

MARY'E D'ANDREA, CLERK
Per

CLERK OF COURT
FEDERAL BUILDING & UNITED STATES COURTHOUSE
228 WALNUT STREET
HARRISBURG, PA 17108-0983

171068$9999



Mr. & Mrs. Barry Johns
220 Johns Rd.
Adrian Pa. 16210

Dear Mr. Merk & Judge Jones,

We are the parents of Lisa Johns,who resides at Polk Center in Polk Pa. Our names are Barry & Anna Johns. Lisa is 40 years old and non-verbal. She has lived at Polk for 22 years. Lisa's diagnosis is profound mental retardation and Autism. She also suffers with dysphagia and pica. Her mental age has been placed at 18 months.

Lisa was on the John Merk Unit of W.P.I.C. in Pittsburgh in 1979. Lisa has self injurious behavior. She was medicated for the S.I.B. which helped minimally, but she was over medicated and became a fall risk. She was sent to the Reabilition Center in Butler Pa. She was again sent to the John Merk Unit of W.P.I C.

While at the John Merk Unit this time her S.I.B. really escalated. They tried every thing they could do to get her S.I.B. under control. Including medication changes, behavior therapy, and restraints. They were very frustrated, and more or less said there was nothing they could find to really control her S.I.B. They reconmended Polk Center at that time, saying that they were the only place that was permitted to use the then controversial "Water Mist Therapy" which really meant someone would spray her in the face when every time she would slap herself, bite herself or do other self injurious behavors. So she was moved to Polk Center.

Upon arriving at Polk Lisa underwent a lengthy examination and their treatment team was able to come up with a individualized regime of medication and treatment geared just for her, that really showed some progress. Because of their concentrated team effort, they never had to implement the "Water Mist Therapy" and were able to get her S.I.B. under control with much less flare ups. As parents of Lisa we were pleased with the progress our daughter was having.

Our daughter has remained at Polk since September of 1989. Lisa is on a constant one to one due to her Pica and inablity to distinguish edible things as well as other safety issues.

These are some of the reasons why Lisa resides at Polk Center. And we fell that Lisa would not be a good candidate for community placement. Lisa has sometimes severe S.I.B., on one instance she bit completly through her bottom lip. Polk has been successful with this problem. When they see this problem starting they know what to do before it gets out of control. Lisa also has a life long history of  intermittent sleep patterns. Data taken from Nov. 2008 until Jan. 2009 indicated that she sleeps an average of slightly more than 2 hours during the night shift. Staff has reported that Lisa has been up as much as 24 to 36 hours without any sleep. And this continues to be her pattern even to date.

There are no group homes available that can give the care that Lisa requires to manage her multiple diagnosis's. If group homes have problems they can't deal with, they send them to psychiatric units and I'm sure, because I personally have worked on a psychaitric unit as a psychiatric nurse assistant for 27 years, that such units can not deal with problems like Lisa's. Because even the Merk Unit at W.P.I.C. was unable to help Lisa.

So we as Lisa's parents ask please do not be part of the decision makers that cause Lisa to have to leave Polk Center. Our daughter Lisa and her family really need them !

Sincerly
Barry Johns
Anna Johns

JA912

Clerk of Court
Federal Bld. & United States
    Courthouse
228 Walnut St.
Harrisburg, Pa.
            17108-0983

17108+3333

RECE
HARRISBU

AUG 0 2
MARY E. D'ANDR
Per

Regina A. Splane
1208 Gelston St.
Pittsburgh, PA
    15220



FILED
AUG 0 2 2011
HARRISBURG, PA.    DEPUTY CLERK

July 29, 2011

Clerk of Court          Robert W. Meek
Federal Bldg &          Dis. Rts Net. of PA
U. S. Courthouse        1315 Walnut St. St 500
228 Walnut St.          Philadelphia, PA
Harrisburg, PA                  19107-4705
    17108-0983

Dear Mr. Meek and Judge Jones,
    I am writing on behalf of
our son, James (Mickey) Splane
who has resided at Selinsgrove
Center since June 24, 1958.
    Jim is almost 60 yrs. old.
He is severely disabled. He is
non-verbal, half blind, half deaf,
wheel-chair bound and has a
feeding tube. He cannot do anything
for himself.

2

Jim has received excellent care at Selinsgrove Center. I am sure there are many other people like Jim that need the care they can get only at the state Centers. There will always be a need for the state Centers.

The people who are bringing this law-suit, let them leave the Centers and live elsewhere, but don't let them force the closing of the Centers and cause turmoil and anguish for the residents of the Centers and their loved ones.

My husband and I are in our 80's and both have major health problems. We could not take care of Jim, nor do we have family members to do so.

3

We consider this law-suit a waste of time and money and would like to see it thrown out of court.

Please keep the State Centers open for the poor souls who need this kind of care.

Sincerely,
(John) and Regina A. Splane
(JOHN) and REGINA A. SPLANE
for our Son
JAMES M. SPLANE



Mrs. Regina Splane
1208 Gelston St.
Pittsburgh PA 15220

PITTSBURGH PA 152

RECEIVED
HARRISBURG

AUG 0 2

MARY E. D'ANDREA
Per

Clerk of Court

Federal Building and

United States Courthouse

228 Walnut St.

Harrisburg, PA 17108-098

171084333A

JA917

Annette and Ronald Fischer
1906 Valley Road
Coatesville PA 19320

July 27, 2011

**FILED**

AUG 0 2 2011

PER
HARRISBURG, PA.    DEPUTY CLERK

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Mr. Meek and Judge Jones,

Thank you so much for taking the time to express my concerns and thoughts on the impact of this settlement would be on my sister Robin Gill who resides at White Haven Center in White Haven PA. My sister Robin is severely mentally handicapped from PKU since she was an Infant. She needs 24 hour around the clock care and the hardest decision my parents how to make was to come to terms with is that they could not provide the care my sister required at home. My family and I are so grateful for White Haven Center. White Haven has given our family peace of mind that my sister is in a place that is able to give her the care and services she so desperately needs. My family and I would want nothing more than Robin (We call her "Sissy") to live at home with my parents, but we know that this is impossible with the medical and psychological care she requires.

I often dream of winning the lottery so I could build a larger home for my Parents and hire a staff of around the clock care so "Sissy" could live at home with her family. Since my chances of winning the lottery are not good, I am at peace that "Sissy" is in the best place for her well being, and that is at White Haven Center.

My sister Robin is 2 years older than I am. She will be 49 in November. She has been living at White Haven for approximately 42 years. White Haven is her home and she even refers to it as that. My Parents who are elderly make a 2 hour trip each weekend to go visit and take her out for a ride and to McDonalds (Her favorite place to eat). When she gets tired of riding she will say "Go Home" and that means she is ready to go back to the center. White Haven is the next best place to home. Over the 40 years we have never had a complaint or concern regarding the facility and staff. White Haven is very clean and very comfortable and it has a sense of home to it. The staff is professional and very friendly. They have family events throughout the year for the residents and family to enjoy. I look forward to them each year because it is such a great time for everyone. We actually had my parents 50th wedding anniversary party at White Haven in January so Sissy could be part of the celebration. The staff at White Haven we so wonderful in helping to keep the celebration a surprise and helped us by setting a room aside for us to have cake and ice cream.

I too, could have been in my sisters shoes. I often wonder, what if I was the one that was stricken with this horrible birth defect and had to be placed in a home. I can tell you from my experience I would want to be at White Haven because of the wonderful care they offer.

I had the opportunity to work at a Private Group Home Facility for the Mentally Handicapped about 25 years ago. The name of the so called "home" was Stillmeadow near Scranton PA.

JA918

I could not believe the difference between the State run White Haven and privately run Stillmeadow. The staff at Stillmeadow was underpaid over worked and the living condition for the residents could not compare to that of White Haven. I could only take working at Stillmeadow for a short time and could not work at a place where the residents were not given the proper care they deserve. I remember telling my mother how happy I was that "Sissy" was in White Haven Center and not in a privately run facility like Stillmeadow. To me the private owned facilities are about making money, so they hire staff at minimum wage with no benefits and have the staff work double shifts because of under staffing. The ones who end up suffering because of this practice are the residents. These residents need caregivers who are able to meet their needs and not be overworked and underpaid so the owner can make a profit. I can tell you that I was not surprised when I learned that Stillmeadow had been closed down.

If White Haven Center was to close I feel it would be very harmful for my sister. White Haven is her home and she does not adapt well to change. She is somewhere where she is well taken care of and knows the staff as part of her family. We know staff members who have worked at White Haven for years and there is a less change over which is beneficial to the residents. I could write a 10 page letter on how wonderful and great I think White Haven is and how in my heart I feel this is the best place for my sister to be since she is unable to live at home.

My parents not only have had the heartbreak of putting my sister in a home years ago when she was 7, but now face the anguish that she will be taken away from the home she has known for over 40 years and from a place we know she is well taken care and is very comfortable there. I know Sissy will have a hard time adapting to new caregivers and new surroundings that are not familiar to her.

Below is a list of Objections to the Settlement that we feel strongly about.

 I do not oppose the Plaintiff's right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for his/herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

2

JA919

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

I wish to thank you again for your time and understanding on this matter that is so close to our hearts. My sister is everything to me and my family and we only want the very best for her. Since Sissy is unable to fight for what is best for her we want to do everything we can to fight for her and what we feel is right for her. She has had a very hard life, please consider her and other residents who are already safe and well taken care of when you make this decision.

Sincerely,

Annette Fischer
Sister of Robin Gill

3

Fischer
1900 Valley Road
Coatesville, PA 19320

USA
FIRST-CLASS

RECEIVED
HARRISBURG PA

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per _____

Clerk of Court
Federal Building + United States Court
22-8 Walnut St
Harrisburg, PA 17108

17108899

JA921

Shirley Musacchio
24 Wesley Road
Quarryville, PA 17566
Ph# 717-786-1629



July 28, 2011

Clerk of Court
Federal Building & United States
Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 walnut Street, Suite 500
Philadelphia, PA 19107-4705

RE: Benjamin v. Dept. of Pub. Welfare, No 1:09-cv-1182-JEJ

Dear Mr. Meek and Judge Jones,

    As the mother and guardian of my son John, living at Selinsgrove Center, I am writing to appeal to your human kindness and to state how upsetting this whole idea to close all ICF/MR facilities is. Too those of us with profoundly mentally retarded children, they may be adults in body, but would you want your children placed in a house of someone else's choosing, knowing they may not be well supervised and placed in harm's way? Well, that is what this feels like to a mother who has always had and always will have a two year old.

    How anyone can possibly think that asking a non-verbal, profoundly mentally retarded, deaf and autistic individual if they wish to live in an outside community and actually expect to get a response is just a delusional idea. John needs 24/7 supervision by qualified medical staff, due to his mental retardation, seizure disorder, self-abuse, aids with his daily living habits and especially safety. As my daughter Trudy Sheetz related in a letter sent to you and being in the healthcare field, group home and private homes are not doing what is best for the retarded.

    The ICF/ MR was a Godsend to my child, as he had initially been placed in a state mental hospital at age 5years. The doctors said he needed a special type of environment where he could grow and learn to become as functional as possible and a mental hospital was not that place. The doctors fought very hard to get John into Selinsgrove, because they felt he had a better chance of a good quality of life. Selinsgrove and their staff have provided just that. John could not feed himself well, toilet and had many more behaviors at the state hospital, than after he was at the Center. He quickly identified with other people like himself. Now he is developing dementia as well.

    I made the hardest decision of my life in letting John go to the hospital and then the Center. But when I see how much better his life is over friends and neighbors, that have profoundly mentally retarded children now, out of their twenties and spending most of their time just sitting at home, I thank God that I gave John the best opportunity he had.

    It appalls me to think that after 40 years, my son may be taken away from the only

real home he knows. These individuals do not do well with changes, not in surroundings or staff. Why would anyone deliberately increase their behaviors and anxiety by uprooting them from their lifestyle?

Community living is fine for much higher functioning people and they are able to tell their desires. This just is a nightmare for not only John and others like him, but as an aging mother, it is just heartbreaking to think of what the rest of my son's life may be like.

I object to the proposed settlement, because the truth about the number of tragedies that have occurred has not been studied or released to the public. Many of us, parents of mentally challenged children know that things do and have occurred, but have been kept quiet.

I definitely object to the DRN receiving any fees for their part in this. With a proposed fee of $432,500.00, one would feel this money could benefit the ICF/MR and community based residents with a better quality of care.

As I need to use a walker and wheel chair for mobility now, I am unable to speak at the meeting. However, should my daughters Trudy and Wendy, alternate guardians for John, be asked to speak on my behalf and on John's, they have my full support and agreement to do so. We as John's family are in total agreement to keep the ICF/MR facilities in place.

Sincerely,

Shirley Musacchio

Shirley Musacchio
Guardian for:
John R. Church, Jr.


Cc: Mrs. Trudy Sheetz, (alt. Guardian for John)
　　Mrs. Wendy Nichols, (alt. Guardian for John)
　　Mr. Kevin Dressler, Facility Director of Selinsgrove Center
　　Mrs. Lana Snyder, President Parents & Friends Assoc. of Selinsgrove Center
　　Mr. John Bastek, President Penna. League of Concerned Families of Retarded Citizens
　　Mr. Bertin Springstead, 95 Locust Trail, Newville, PA 17241


SAM/tls

Shirley Musacchio
24 Wesley Rd.
Quarryville, PA
17566

HARRISBURG PA 171

Clerk of Court
Federal Bldg. & United States
228 Walnut St.                Courthouse
Harrisburg, PA 17108-0983

RECEIVED
HARRISBURG, PA.

AUG 0 2 2011

MARY E. D'ANDREA, CLERK
Per_____

17108-0983

JA924

FILED
HARRISBURG, PA

Carin Doddroe
4910 79th Street East
Bradenton, FL 34203

July 29, 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Dear Judge Jones and Mr. Meek,

I am the sister and alternate guardian of my brother Craig Springstead who lives at Selinsgrove Center. For a variety of reasons, which stem in large measure from behavior issues, I along with my mother and father am unequivocally opposed to a community-based relocation. Our reason for that is not because we are against community-based living arrangements. It is because we are for whatever is best for Craig. And, for that reason, at this moment in time, we are convinced that for Craig, life at Selinsgrove Center is less restrictive, more appropriate to his needs, and consequently better equipped to enhance his quality of life.

It is with great dedication and love for their son, Craig Springstead, that my father and mother have devoted their efforts in an attempt to share with this court their true belief of what is good for their son's welfare and many other mentally challenged individuals with an intellectual disability currently residing in the state run centers. I ask that you please take their plea, and that of others to be affected by the Court's decision regarding the proposed Settlement Agreement with much heart and care. This decision that will be made by the Court will be an undeniably important ruling which will impact the future lives of these very special human beings. Many, my brother included, are not capable of understanding the world in which they live, but do find comfort in that which they know. Selinsgrove Center is that comfort. I am asking that the Court look at this ruling with compassion and understanding. These human beings we are referring to, mean a great deal to us as family members and their welfare is of our utmost concern. My father, Bertin Springstead, will be there in court with you on August 22. It is my hope that the Court will truly listen to the concerns he has along with other guardians of a loved one with a mental/intellectual disability whose future welfare and comfort will be greatly impacted by this decision.

With Respect,

*Carin E. Doddroe*

Carin E. Doddroe
Sister and alternate guardian of
Craig H. Springstead



ORIGIN ID: BOKA (941) 751-2070
WILLIAM CROCKET
PARK MALL CENTER 266
7282 55TH AVENUE EAST
BRADENTON FL 34203
UNITED STATES US

TO FEDERAL BUILDING OF US COURTHOUSE
CLERK OF THE COURT
228 WALNUT STREET

HARRISBURG PA 17108
(941) 751-2070

SHIP DATE: 01AUG11
ACTWGT: 0.5 LB
CAD: 101392579/WSXI2250

BILL SENDER

FedEx
Express

TUE - 02 AUG A2
PRIORITY OVERNIGHT
DSR
17108
PA-US MDT

TRK# 7950 3095 0619
0201,

XH MDTA

Envelope



Express
FedEx

**TIMOTHY F. DEMERS**
2310 N AVENIDA SORGO
TUCSON, AZ 85749-9305
520 749-5190    610 780-7238





August 1, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: **Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-JEJ**

Honorable Judge Jones and Mr. Meek:

I will NOT be able to attend the hearing on the proposed settlement on August 22, 2011 for the above referenced action. I do, however, have some comments and objections to the proposed settlement. I can, if requested, provide a sworn statement in writing, or by telephone or video conference.

My brother Peter J. Demers is a resident of the Hamburg Center, Hamburg, PA. My brother is 46 years old and has been a resident of Hamburg for almost thirty years. Peter has severe cerebral palsy. His brain cannot control most muscular functions: he cannot stand, walk, sit himself up, feed himself, or control his bodily (intestinal) functions. He is able to move his head and his eyes, make facial expressions, and he is able to vocalize to some degree. Peter can understand everything that is said to him, although he cannot speak clearly. He can say no, sometimes can say yes, and he can say thank you and a few other words. Some of the personnel at Hamburg who have worked with Peter for many years can understand what he is trying to say. Peter is diagnosed as mildly retarded, but he appears quite intelligent to me. Peter recognizes people, says hello to people, loves to interact with people, and has a great sense of humor. He relishes slapstick pratfall-type comedy, especially when it occurs in real life, and understands subtle jokes and sarcastic or ironic statements. He enjoys music and sports, and likes to hear about animals, the natural world, and current events. He attends church and enjoys the attention of religious officials. Peter can smile, and can laugh deeply and loudly, and does so often. I would venture to say that everyone who works at Hamburg knows Peter, he is very friendly, outgoing and sociable.

Peter is the youngest of seven children, all of whom are alive. Unfortunately, none of us live in Pennsylvania any longer. Our parents passed away in 2001. Peter can say our sister's name most easily ("dee dee," for Deirdre), and talks about her frequently. Dede lives in Boston and visits Peter regularly. I lived in Pennsylvania until five years ago, and have continued to

visit Peter when I can. We have a brother in Boston, one in New York, one in Austin, and one in Phoenix. We all visit when we can, and we write. One or more of us almost always attends the Hamburg annual picnic in September. Peter enjoys cards and visits from all of us, and knows all of us.

None of us siblings have been appointed legal guardian for Peter. The staff at Hamburg typically contacts my sister Dede or me with questions or developments relating to Peter.

Peter is cognizant, interested, and sociable. Unfortunately, he cannot control his body to allow him to do things he might like. He is 100% dependent on care from others. He uses a specialized wheel chair, but cannot propel it by himself. He needs complete help with washing, dressing, everything. He began living at Hamburg when he was too strong and heavy for our mother to safely handle him. Hamburg is his home, and the people there are not just workers at the Center, but are his friends.

Peter's physical care needs are extreme, and require specialized equipment and training. Peter loves to attend movies, ballgames, concerts, outdoor events like fairs, and loves to go shopping. He cannot travel in a regular car, he cannot sit in a normal seat. His wheelchair is oversized, and the entire chair (with Peter in it) must be wheeled onto an adapted bus or other vehicle large enough to accommodate his chair. Peter cannot take a bath or shower like most people, he needs a special "table" and needs people to wash him. Peter enjoys swimming in the pool at Hamburg, but of course they have a ramp and a special pool wheel chair to get him into the water. The people at Hamburg have the equipment, training, and ability to help someone like Peter. They also have the experience of having dealt with him and his specific needs. Peter is easily scared of new things, and likes new procedures explained to him so that he doesn't get upset.

I certainly have no opposition to community based care for people who might prefer that type of facility. I also would have no objection to Peter being placed in a community facility if that were in Peter's best interest. I cannot imagine, however, a community facility having the extensive physical facilities, equipment, and staffing levels necessary for someone with Peter's extreme physical needs. Peter cannot perform any function by himself, he can't even shift his body to a new position by himself. In addition, in a community based setting, likely there would be fewer people overall, both residents and caretakers. Peter thrives on social interaction, he jokes around with people, loves to be introduced to new people, have people recognize him, talk to him. If a community facility would have fewer opportunities for Peter to see and speak with other people, it would not be as beneficial for Peter.

My siblings and I are very concerned that a community facility would be the wrong thing for Peter. We, and our parents before us, have been very pleased with the level of personal care and attention that Peter has received at Hamburg. Some of the workers there have been absolute saints, taking the extra time to try and understand what Peter wants or is trying to say, what would make him happy or comfortable. Unlike some of the other residents, Peter is able to understand and say thank you, and that may help make it more enjoyable for them to work with him. The personal care and attention he has received would be hard to replicate, especially since

2

JA928

there is a fairly long "learning curve" in working with Peter. He can't vocalize precisely what he wants, so there is always some amount of guessing and learning.

I am an attorney, but I am not a litigator and I do not understand the legal criteria for class action lawsuits. Nevertheless, I do not understand how this case came to be a class action that affects residents like Peter. The level of care a person needs is, obviously, highly dependent on the person's specific physical or mental needs. A community facility may be perfectly appropriate for a person with one set of physical conditions, but not another. I do not understand how Peter could become part of a class of plaintiffs solely because he lives in a state facility; that conclusion does not seem to recognize that although all the members of such purported class have a common thread, their conditions and needs can be vastly different. I have no knowledge of the conditions and objectives of the named plaintiffs in this suit, and it may be that such persons are suitable candidates for a community facility, and should be entitled to pursue that objective. I resent, however, that the lawyers representing those plaintiffs have concluded, or are arguing, that my brother Peter and all other state facility residents should be part of a broader "class" solely because they are such residents. Health care is necessarily personal and dependent on specific health conditions. It seems illogical to me that all the residents of the several state facilities can be deemed a single class that may be entitled to the objective in the settlement, that being care in a community facility, when such a facility may clearly not be in the best interest of the specific person. In my opinion, a class action should not have been permitted when the purported members of the class have such widely disparate conditions and needs.

As I understand the fundamental conclusion in the *Olmstead v. Zimring* decision, the Supreme Court determined that: (1) persons must be allowed to live in community facilities when treatment professionals have determined that community placement is appropriate for the specific person (I am not aware of that happening in Peter's case); (2) the person does not oppose it (that is a big part of the issue in Peter's case); and (3) the placement can be reasonably accommodated, which I take to mean that the state can afford a community facility that would provide the level of services needed. That last item is a huge unknown to me. Although I recognize that the *Olmstead* case dealt directly with patients who were mentally ill, and may not have had physical problems as does Peter, the majority opinion recognizes a fact of life that the plaintiffs in the Benjamin action do not seem to sufficiently acknowledge: "For other individuals, no placement outside the institution may ever be appropriate." (527 US 581, at 605.) This may unfortunately be true as to someone like Peter, not because of his mental condition, but because of his physical condition.

I have set forth below some specific concerns about and objections to the proposed Settlement Agreement:

- I do not oppose the named plaintiff's right to choose community care for themselves, but I object to their efforts to request relief on behalf of my brother Peter.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List. The Settlement Agreement is an "opt out," not an "opt in." Given that someone who is in a position to choose a community facility can easily do so, and that moving to a community facility is a material

3

and substantive change from the current living arrangement, common sense would seem to suggest that such a material change should be the subject of an affirmative "opt in," rather than automatically applied to all who do not "opt out." In the case of my brother Peter, where there is no legally appointed guardian, and where Peter may or may not be able to first, understand the question, and second, communicate any response to the question, the Settlement creates a presumption that Peter is on the List. It should be the other way around, people should be able to elect to be on the List, not have to communicate a decision not to be on it. I don't know how Peter would effectively communicate that decision.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require Peter and/or me to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or become incapacitated, the proposed Settlement Agreement will ignore my previously recorded wishes that Peter remain at Hamburg.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my brother Peter, who may be capable of making a decision for himself, but may be incapable of effectively communicating that decision, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows Disability Rights Network Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List. While I am sure that the hearts of the members of the Advocates are in the right place, they do not know my brother and they do not know his specific condition and needs.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to my brother Peter and our siblings how we can maintain Peter's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care. In Peter's specific case, the education should also be fair in that it should realistically describe if the level of potential for social interaction and opportunities for outside social events (concerts, movies, shopping, etc.) would be less in a community setting because of staffing or equipment insufficiencies.

- The ultimate practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and probable eventual closure of State-run ICFs/MR. Such depopulation and closure will necessarily deprive my brother Peter of one or more meaningful choices to remain in ICF/MR care and will ultimately impose community based care upon Peter. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead*.

4

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, potentially risking the health and safety of my brother, and further imposing community-based care upon my brother, contrary to the ideals set forth in the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts. Finally, there is no evidence, other than a seemingly foregone conclusion, that a community facility is automatically better for the resident than one of the current state centers. Specifically with respect to my brother Peter, it is almost inconceivable to imagine a community facility that would be capable of having the level of physical accommodations and specialized equipment necessary to properly care for my brother, let alone the adequate staff. At Hamburg, there are always multiple staff personnel available on each unit at all times, so that when one resident needs temporary assistance by two or more staff, there are still other staff personnel to assist with the remaining residents. Peter often needs two people (sometimes three) to help move him, place him in his chair, into his bed, etc. The smaller number of residents at a community facility would not likely permit the employment of an adequate number of personnel to give residents such as Peter the intense amount of attention that he needs at various times throughout the day.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care. Moreover, some method of reporting should be devised to measure the increase or decrease in social activities and social interaction. For a person like Peter who is highly social but physically incapable of accessing social outlets and opportunities on his own, this is an extremely important aspect.

- I absolutely object to the Disability Rights Network of Pennsylvania receiving $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement. The legal fees will be paid by the Commonwealth of Pennsylvania, which, like most states today, is under extreme budget pressure. It seems ironic that the Pennsylvania Department of Public Welfare should be forced to pay the legal fees of an entity such as DRN which, to my knowledge, is itself publicly funded, and presumably whose job or mission it is to seek the very result granted by the proposed Settlement. On top of that, payment of these fees just leaves fewer financial resources for the Department to care for my brother Peter and all the other residents of the state centers, which are the same plaintiffs that the lawsuit is purportedly trying to benefit. My strong preference would be for no fees to be paid to the Disability Rights Network, and to have those funds used by the Department to provide care to the residents of the state centers.

5

JA931

- With regard to the proposed payment of legal fees, in my view, this case should not have been accepted as a class action. Moreover, as I understand the history of this case, the complaint was filed in June 2009, and a decision was issued by the Court in January 2011, based on a motion for summary judgment (no trial has been held). Thus, for a case in existence for no more than 20 months from date of filing to decision, with no trial, fees in excess of $400,000 seem high, if not exorbitant. In addition, it is my understanding that certain people who objected to the suit and the definition of the class were represented by the law firm of Sidley Austin LLP, which provided counsel pro bono. Sidley Austin is a well known firm and the fact that they provided counsel on a pro bono basis is commendable. In order to encourage other firms to provide counsel in future situations where the issues are complicated and the members of a "class" are not easily categorized, I would rather see a portion of the $432,000 allocated to the firm of Sidley Austin, instead of all such fees paid to the Disability Rights Network. But, my preference is that no attorney's fees be paid to any party, the Department should retain all its funds to provide care.

As I hope I have articulated clearly above, I have no objection to community facilities in general or for the care of the named Plaintiffs and any other persons for whom such care would be suitable. I do not believe that such a community facility would be suitable for my brother Peter. Until it can be demonstrated that a community facility would be more beneficial to Peter than his current residence status at Hamburg, I object to my brother being automatically deemed a member of the class, and I believe that membership in such class should be on an opt in v. an opt out basis. Finally, I object to the payment of legal fees for the reasons described above.

Very Truly Yours,

Timothy F. Demers

Brother of Peter J. Demers,
Resident of Maple 101, Hamburg Center

6

JA932

Align top of **FedEx Express®️ Shipping Label** here.

ORIGIN ID: DNYA (212) 839-5746
MARLON WILSON
SIDLEY AUSTIN LLP
787 7TH AVENUE
22ND FLOOR
NEW YORK, NY 10019
UNITED STATES US

SHIP DATE: 01AUG11
ACTWGT: 0.5 LB
CAD: 0757391/CAFE2472

BILL SENDER

TO CLERK OF COURT
USDC FOR THE MIDDLE DISTR. OF PA
FEDERAL BLDG & U.S. COURTHOUSE
228 WALNUT STREET
HARRISBURG PA 171080893
REF: 48577-90020-36632JC

DEPT: BENJAMIN HOFFAB1



**FedEx**
Express

**E**

TUE – 02 AUG A2
PRIORITY OVERNIGHT

TRK# 4805 3185 4297
(0201)

DSR
17108
PA-US
MDT

ZN MDTA



Align bottom of **Peel and Stick Airbill** here.

FILED
HARRISBURG, PA
AUG 02 2011
MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

Rickey V Shaffer
336 Fieldbrook Dr
Washington, Pa. 15301

July 21, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W Meek
Disability Rights Network of PA
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705

Re: Benjamin v. Dept of Pub. Welfare, No. 1:09-ev1182-JEJ

Dear Mr. Meek and Judge Jones,

My sister, Gretchen C. Shaffer is a resident at Hamburg Center in Hamburg, PA, Unit 111. My younger sister, Brooke McCombie is Gretchen's guardian. As Gretchen's older brother, I love her and greatly care about her well being, and desire to have my voice heard along with her guardian's.

Gretchen is the third of four siblings, and she is 58 years old. She was born with Cerebral Palsy. She is non-ambulatory and non-verbal. She currently has breathing difficulties and is on a Bi Pap machine. She is at risk for pneumonia due to the breathing problems, and was hospitalized for pneumonia in 2010, from Sept 20th to Oct 2nd. She has dysphagia, so she has to be tube-fed, as she is at risk for aspiration. She is on anticonvulsant medication for seizures, which have occurred since childhood. She cannot move herself, so is dependent on caregivers to gently reposition her body and lift her into the adaptive equipment necessary for her daily living. Other physical ailments include scoliosis, a large hiatal hernia, osteopenia, and hypothyroidism.

Our father, who passed away in 2003, placed Gretchen in Hamburg Center. He desired that she remain there, not only because of the excellent care she receives there, but also the communication shared with the immediate family about any change in her condition, or injury. My other siblings and I receive evaluations concerning her health and well being. That is her home, and her life. She is among her friends, and to remove her from these familiar surroundings and people, I fear, might greatly distress her. At this time, she is in stable condition because of the care she receives there. Gretchen can only grunt, moan, grimace, or cry to let others know of her discomfort. She cannot voice in words the location or degree of any pain she experiences. She cannot speak for herself, so I would like to speak for her regarding the issue of the Community Care Settlement Agreement.

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I object to Plaintiffs' efforts to request relief on behalf of Gretchen.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my sister to continuously voice our opposition to being placed on an ICF/MR Planning List. My current opposition to community care has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my sister Gretchen remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, Gretchen, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

JA934

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my sister how we can maintain her current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my sister of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my sister. This is precisely the lack of choice that the United States Supreme Court cautioned against in *Olmstead v. Zimring*.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my sister contrary to the Supreme Court's *Olmstead* decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

Again, I would like to say that I do not wish the rights to be taken away from anyone who can make the decision and voice his or her desire to be placed in community care. I do not agree that one's inability to speak should automatically be interpreted as consent to being placed on a State ICF/MR Planning List or in a community care facility. I greatly appreciate receiving a phone call or message from Hamburg Center whenever there is any change in Gretchen's health, and that I can always call to inquire about any concerns. I have visited Gretchen at Hamburg Center, and am confident that her caregivers meet all her needs. I do not believe she would receive this degree of care in a community-based facility. Gretchen needs to remain in the skilled care environment at Hamburg Center. I do not wish to see State-run ICFs/MR deprived of any funding that is needed to provide the quality of care necessary for Gretchen, and residents like her.

Regretfully, I cannot attend the fairness hearing on August 22. I do appreciate the opportunity to express my opinion and objections in this letter.

Sincerely, *Rickey V Shaffer*
Rickey V Shaffer
Brother of Gretchen C Shaffer



**3C JUNE 2002**
**I95 USPS**

U.S. POSTAGE
PAID
MEADOW LANDS,PA
15347
AUG 01, 11
AMOUNT
**$16.15**
00069532-04

1007

*Rush To Addressee*

This packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail. Misuse may be a violation of federal law.

## FOR PICKUP OR TRACKING CALL 1-800-222-1811

E G 8 9 0 9 8 3 2 9 8 U S

**Addressee Copy**
Label 11-B, March 2004

✉ *EXPRESS MAIL*
UNITED STATES POSTAL SERVICE ®

**Post Office To Addressee**

**DELIVERY (POSTAL USE ONLY)**

| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo.     Day | | | |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo.     Day | | | |
| Delivery Date  8  2 | Time | ☑ AM ☐ PM | Employee Signature |
| Mo.     Day | | | |

**CUSTOMER USE ONLY**

WAIVER OF SIGNATURE (Domestic Mail Only)
Additional merchandise insurance is void if
customer requests waiver of signature.
I wish delivery to be made without obtaining signature
of addressee or addressee's agent (if delivery employee
judges that article can be left in secure location) and I
authorize that delivery employee's signature constitutes
valid proof of delivery.

☐ NO DELIVERY    Weekend/Holiday    Customer Signature

**TO: (PLEASE PRINT)    PHONE (  )**

CLERK OF COURT
FEDERAL BLDG + U.S. COURTHOUSE
228 WALNUT ST
HARRISBURG PA

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)
1 7 1 0 8 + 0 7 8 3

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**SERVICE USE ONLY**

| Day of Delivery | | Postage |
| ☐ Next ☐ 2nd ☐ 2nd Del. Day | | $ 16.15 |
| Scheduled Date of Delivery | | Return Receipt Fee |
| Month  1  Day  2 | | $ |
| Scheduled Time of Delivery | | COD Fee    Insurance Fee |
| ☐ Noon ☐ 3 PM | | $       $ |
| Military | | Total Postage & Fees |
| ☐ 2nd Day ☐ 3rd Day | | $ 16.15 |
| Int'l Alpha Country Code | | Acceptance Emp. Initials |

OZS.

PHONE (  ) 724 746 5360

SHAFFER
6 FIELDBROOK DR
WASHINGTON, PA 15301

**FOR PICKUP OR TRACKING**
**www.usps.com**
**1-800-222-1811**

✉EMS

Carl N. Lloyd
2999 State Route 890
Sunbury, PA 17801



August 1, 2011

Clerk of Court
Federal Building & United States Courthouse
228 Walnut Street
Harrisburg, PA 17108-0983

Robert W. Meek
Disability Rights Network of PA 1315 Walnut Street, Suite 500 Philadelphia, PA 19107-4705

Re: Benjamin v. Dept. of Pub. Welfare, No. 1:09-cv-1182-.TEJ

Dear Mr. Meek and Judge Jones,

I am Carol Lloyd's younger brother, Carl Lloyd. Carol has been a resident of the Selinsgrove Center since the early 1980's. She is wheelchair bound and completely dependent on the care of others. She does not speak and no one knows how much she is able to understand.

Carol has always received great care at the Selinsgrove Center and I would not want to put her through the stress of moving her away from the surroundings, and people, to which she has become accustomed. I agree that higher functioning individuals should have the option to go to community care, but in Carol's situation I fear it would be detrimental to her well being.

- I do not oppose the Plaintiffs' right to choose community care for themselves, but I do object to the Plaintiffs' efforts to request relief on behalf of my loved one.

- The class identification procedures on pages 5-7 of the proposed Settlement Agreement require me and my loved one to continuously voice our opposition to being placed on an ICF/MR Planning List My current opposition to community care has no permanence. If I pass away or am incapacitated, the proposed Settlement Agreement will ignore my recorded wishes that my loved one remain in ICF/MR care.

- The proposed Settlement Agreement places people on the State ICF/MR Planning List who have not indicated that they want to be on the List.

- Under the proposed Settlement Agreement no notice will be provided to me in the event that my loved one, who is incapable of making decisions for herself, is somehow deemed to have consented to community care or has been placed on a State ICF/MR Planning List for any other reason.

- I object that the proposed Settlement Agreement allows DRN Facility Advocates to have equal say with DPW personnel concerning who gets placed on the State ICF/MR Planning List.

- The proposed Settlement Agreement provides for educational programs teaching ICF/MR residents and their guardians how they can be placed on the State ICF/MR Planning List, but it does not provide for any educational programs describing to me and my loved one how we can maintain my loved one's current care environment and avoid being placed on the State ICF/MR Planning List. These educational programs should also include information about the potential dangers associated with community care and should include presentations from State Center advocates favoring ICF/MR care.

- The practical implications of the integration plan described on pages 9-12 of the proposed Settlement Agreement will be the depopulation and eventual closure of State-run ICFs/MR. This depopulation and closure will deprive me and my loved one of a meaningful choice to remain in ICF/MR care and will impose community based care upon me and my loved one. This is precisely the lack of choice that the United States Supreme Court cautioned against in the Olmstead v. Zimring case.

- The proposed Settlement Agreement's provisions for consolidating budget lines will deprive State-run ICFs/MR of critical funding, thereby jeopardizing the quality of ICF/MR care, risking the health and safety of my loved one, and further imposing community-based care upon me and my loved one contrary to the Supreme Court's Olmstead decision.

- I object to the proposed Settlement Agreement because no studies have been conducted and neither DRN nor DPW have made any showing that the implementation plan is feasible. There is no evidence that sufficient community care facilities are available, that these facilities are capable of meeting the needs of current ICF/MR residents, or that there will be sufficient funding to operate these community care facilities in light of recent budget cuts.

- The proposed Settlement Agreement provides for inadequate and one-sided status reports. Any such status report should also include reports on deaths, injuries, and other harm resulting from relocation to community-based forms of care.

- I object that the Disability Rights Network of Pennsylvania, a publicly-funded entity, will receive $432,500 in legal fees as described on page 15 of the proposed Settlement Agreement, and respectfully submit that these funds would be better served supporting the care of residents either in ICF/MR or community-based care facilities.

I really feel that it is in Carol's best interest to stay at Selinsgrove Center where she receives excellent care and is surrounded by people who care and look out for her needs and interests.

Sincerely,

Carl N. Lloyd
Family member of Carol Lloyd

Mailing Envelope

**For Domestic and International Use**

UNITED STATES
POSTAL SERVICE

1007

RECEIVED
HARRISBURG, PA

NT     Please Rush To Addressee

AUG 02 2011

MARY E. D'ANDREA, CLERK
Per

When used int
affix customs c
(PS Form 2976

Addressee Copy
Label 11-B, March 2004

EXPRESS
MAIL
UNITED STATES POSTAL SERVICE®

Post Office To Addressee

429310574US

| DELIVERY (POSTAL USE ONLY) | | | |
|---|---|---|---|
| Delivery Attempt | Mo. Day | Time □ AM □ PM | Employee Signature |
| Delivery Attempt | Mo. Day | Time □ AM □ PM | Employee Signature |
| Delivery Date | Mo. Day | Time □ AM □ PM | Employee Signature |

SERVICE USE ONLY)

Day of Delivery     Postage
□ Next □ 2nd □ 2nd Del. Day     $
Scheduled Date of Delivery     Return Receipt Fee
Month     Day     $
Scheduled Time of Delivery     COD Fee     Insurance Fee
□ Noon □ 3 PM     $     $
Military     Total Postage & Fees
□ 2nd Day □ 3rd Day     $
Int'l Alpha Country Code     Acceptance Emp. Initials

CUSTOMER USE ONLY

PHONE (     )     522-9442

J Lloyd
SR 890
Pa 17801

TO: (PLEASE PRINT)     PHONE (     )

Clerk of Court
Federal Ring e US Courthouse
228 Walnut St
Harrisburg, Pa

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES)

1 7 1 0 8 + 1 7 8 3

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

P OR TRACKING
.usps.com
22-1811

EMS

CERTIFIED
cradletocradle
SILVER

Cradle to Cradle Certification
to products that pursue an in
vision of ecologically-intellige
eliminates the concept of wa
This USPS® packaging has b
for its material content, recy
manufacturing characteristic



INTENTIONALLY LEFT BLANK

**THIS PAGE INTENTIONALLY LEFT BLANK**

FILED
HARRISBURG, PA

June 18, 2011

JUL 11 2011

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

To Whom it may concern:

This letter is in response to the Civil Action No. 1:09-CV-1182-JEJ.

We are the parents of Albert Lynn Boring residing at the Ebensburg Center. We would also add that we have legal guardianship of Albert.

Albert has tried the community living experience. I would also add that for Albert it was a bad experience.

Albert has been at Ebensburg Center for 45 yrs. To Albert it is his home away from Mom & Dad's home. We have Albert almost every Sunday home for supper. We also have Albert home for 2 or 3 day stays about 4 times a year. Albert has befriended many at Ebensburg Center and they also have become friends with Albert. Albert has learned much at the Center and enjoyed life to the fullest for his situation.

(over)

JA943

We have the utmost respect for the personel at the Center, and although not perfect, would not want him anywhere else.

Albert's experience in community living was completely opposite. The first week or 10 days was like a vacation, so Albert done okay. But as the days became more and more, Albert started to be disgruntled and unhappy. We ended up going to the house and picking Albert up at 1:00 A.M. because Albert wouldn't get out of the motor van. We brought Albert home with us for a week and tried to get Albert settled back down. Finally when he settled down some, we took him back to Ebensburg Center. He had to readjust to the Center and eventually became his old self. We are opposed to Albert trying the change again.

Sincerely yours,
Samuel L. Boring

Addendum

I would also like to add that I do object to the settlement and the attorney fees, litigation expenses, and costs to the lawyers for the class. The reason I object is because I wonder about who decides for the residents whom have no one in the family who will stand up for them. I would also have some questions on the lawyers knowledge into these family matters. Are these lawyers trained in family and resident care? Are these lawyers family members of a resident at these care centers? How should some who have little knowledge of these situations be able to make decisions as to what parents or residents do? The parents have heard the rumors for years that some people in goverment want to close these care centers. This to me and mine

is a wrong decision.

These care centers have been doing a wonderful job, with good trained personell. Leave them alone and let the residents alone also. The ones I've seen and met seem to enjoy life there. It's they're home. Many have been there for years and don't like change. How many of us, whom we say live a normal life, like to have change forced on us?

So yes I do object.

Sincerely,
Samuel L. Boring





Mr. Samuel Boring
351 Clawson Rd
New Florence, PA 15944



Clerk of Court
Federal Bldg. + United States Courthouse
228 Walnut Street
Harrisburg   PA   17108-0983

RECEIVED
JUL 11 2011
PER _____
HARRISBURG, PA.
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on behalf of themselves and all others similarly situated,

                    *Plaintiffs,*

     v.

**DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania,**

                    *Defendants.*

**Civil Action No. 1:09-cv-1182-JEJ**

Class Action

Complaint Filed June 22, 2009

_____

## OBJECTIONS OF DIANE SOLANO,
## BY AND THROUGH HER BROTHER AND GUARDIAN, CARL A. SOLANO,
## TO CLASS ACTION SETTLEMENT
## AND NOTICE OF INTENTION TO APPEAR AT HEARING

_____

Carl A. Solano
SCHNADER HARRISON SEGAL & LEWIS LLP
   *Attorney and Guardian for Diane Solano*
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202

# TABLE OF CONTENTS

*Page*

INTEREST AND POSITION OF OBJECTOR DIANE SOLANO ............................................... 1

DIANE'S RIGHT TO PARTICIPATE AND OBJECT ................................................ 6

OBJECTIONS .................................................................................................... 8

— OBJECTION TO CLASS CERTIFICATION ........................................................... 8

I.    THE CLASS IS NOT APPROPRIATE FOR CERTIFICATION UNDER RULE 23(b)(2) OF THE RULES OF CIVIL PROCEDURE ............................................................ 8

    A.    The Class Was Improperly Certified Under Rule 23(b)(2) Because It Is Not Cohesive and Is Improperly Defined ............................................. 9

    B.    The Class Was Improperly Certified Under Rule 23(b)(2) Because It Depends on an Opt-Out Provision Not Permitted Under the Rule ......................... 18

    C.    The Class Was Improperly Certified Because the Named Plaintiffs' Claims Are Not Typical of Those of All Other Class Members and Those Plaintiffs Are Not Adequate Representatives of the Class ................................ 20

    D.    The Class Certification Did Not Comply with the Procedural Requirements of Rule 23 .............................................................................. 23

— OBJECTIONS TO TERMS OF THE SETTLEMENT .......................................... 25

II.    THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY MOVING THEM TO COMMUNITY FACILITIES EVEN IF RELOCATION IS INAPPROPRIATE ......................................................... 25

    A.    The Settlement Compels the Relocation to Community Facilities of State Center Residents Who Need Comprehensive Care and Have Not Expressed Any Desire To Be Relocated ................................................. 26

    B.    The Settlement Fails To Provide for Individualized Determinations of Whether Each State Center Resident Is Capable of Moving to Community Facilities and Whether Such Facilities Are Available To Accommodate Each Resident's Needs ................................................................. 30

    C.    The Settlement Fails To Provide Protections for State Center Residents Who Make Improvident Decisions To Relocate to Community Facilities ......... 33

III.   THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO CREATE PROCEDURES THAT WILL ENABLE INFORMED DECISION-MAKING ABOUT THEIR CARE OPTIONS ........................................... 34

     A.   The Class Certification Notice Requires Class Members To Decide About Their Care Without Adequately Explaining the Consequences of Agreeing To Community Relocation ..................................................................34

     B.   The Settlement Lacks Unbiased Procedures Necessary To Assure That Relocation Decisions Are Properly Made ..........................................................36

IV.   THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO PROTECT THOSE ELECTING TO REMAIN IN THE STATE CENTERS AND BY DEPRIVING THE STATE CENTERS OF RESOURCES........................ 38

     A.   The Settlement Contains No Protections Against Closing of the State Centers or Reduction in the Quality of Care That They Offer ............................42

     B.   The Settlement Improperly Mandates Transfers to Community Programs of State Funds That Are for the Benefit of State Center Residents....................43

V.    THE SETTLEMENT PROVIDES FOR ATTORNEYS' FEES THAT ARE INAPPROPRIATE ............. 44

REQUEST TO BE HEARD ...................................................................................................... 45

JA950

# TABLE OF AUTHORITIES

*Page*

## *Cases*

*Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa. 2006) & 2009 U.S. Dist. LEXIS 1540 (W.D. Pa. 2009)..................................................................................42

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................9

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999)..............................................................................................................9, 11

*Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993).................................................20

*Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011)........................42

*Benjamin v. Dep't of Publ. Welfare*, 267 F.R.D. 456 (M.D. Pa. 2010), *aff'd*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011) ...............................................................4, 26, 39

*Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. Dist. LEXIS 40100 (M.D. Pa. 2011)..............10, 22

*Carlough v. Amchem Prods., Inc.*, 5 F.3d 707 (3d Cir. 1993) ........................................7

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004) .......................................................15

*Devlin v. Scardelletti*, 536 U.S. 1 (2002) .................................................................20

*Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006) .......................................7

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975).............................................................8

*Gould v. Alleco*, 883 F.2d 281 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990)....................20

*Harris v. Pernsley*, 820 F.2d 592 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987) .............................7

*In re Bear*, 44 Pa. D.&C. 4th 225 (C.P. Dauphin 1999) ...............................................28

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)....................................8

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.), *cert. denied*, 534 U.S. 889 (2001)......................................................................................................................44

*In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001) ................................29

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)...........................9, 15, 23

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010)...........................25, 29

iii

*In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999)...............................................................................8

*In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294 (3d Cir. 2005) ...............................................44

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009).................................. 20-21

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)...............................................8

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981) .........................................................18

*Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007)......................................................15

    Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx?submit=showbr &shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006) ...........................................................15

*Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009) (No. 05 C 4331) .......................15

*Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lexis 34122 (N.D. Ill. 2010) ....................... 40-41

*Marino v. Ortiz*, 484 U.S. 301 (1988).........................................................................................7

*Neal ex re. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ..........................................................9, 21

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)....................................................... *passim*

*Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011) ...................................44

*Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179 (3d Cir. 2006) ...................................................24

*Wal-Mart Stores, Inc. v. Dukes*, 2011 U.S. LEXIS 4567 (U.S. 2011) ..............................5, 14, 18

### Statutes

Americans with Disabilities Act, Title II, 42 U.S.C. §§ 12131 *et seq.*.................................. *passim*

Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq.* ..................................................................................................................................44

Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.* ..................................................................................................................................44

### Court Rules

Federal Rules of Civil Procedure

    Rule 23(a)(2)....................................................................................................................10

    Rule 23(a)(3), (4) .............................................................................................................20

iv

JA952

Rule 23(b)(2)..................................................................................3, 5, 8-9, 15, 18-20

Rule 23(c)(1) ................................................................................................24

Rule 24 ........................................................................................................40

### *Other Authorities*

J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com/regionstate/20000416western4.asp* (Apr. 16, 2000)................42

Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., Text rev., 2000) .................................................................................. 1, 12-13

Center on Budget and Policy Priorities, "States Continue to Feel Recession's Impact," *http://www.cbpp.org/cms/?fa=view&id=711* (June 17, 2011)................................................13

Disability Rights Network of Pennsylvania, "About DRN," *http://drnpa.org/page/about-drnpa* (2011) ........................................................................................................44

K.K. Walsh, *et al*., "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research," 41 MENTAL RETARDATION 103 (2003)................................................................................................................ 14, 37-38

VOR, "Media Coverage Highlighting the Increasing Need for More Effective Federal and State Protections . . .," *http://www.vor.net/images/AbuseandNeglect.pdf* (2011) ...................34

_____

NOTE: All Internet materials are as accessed on July 27, 2010.

v

## INTEREST AND POSITION OF OBJECTOR DIANE SOLANO

These objections are filed on behalf of Diane Solano, a 56-year-old resident of White Haven Center. White Haven is one of the intermediate care facilities for the mentally retarded (ICFs/MR) that are the subject of this litigation. Because Diane is mentally incapacitated, she files these objections by and through her brother, Carl A. Solano, Esquire ("Objector"). Carl was appointed Diane's legal guardian on July 20, 2004, as the successor to Diane's parents, her original guardians. *In re Diane Solano*, No. 3215 of 1998 (C.P. Luzerne 2004).

*Diane.* Diane has been diagnosed as having "profound mental retardation."[1] Her mental age is at or below 1 year. The extent of her mental and intellectual incapacity is extreme:

• She is incapable of caring for herself. She must rely on others for all daily needs, including food, clothing, bathing, and toilet activities. She needs 24-hour care, seven days a week.

• She has limited comprehension skills, and can understand only the simplest directions, usually in connection with a routine that has developed over time; she therefore cannot be provided with advance care or safety instructions, since they are meaningless to her. She has no comprehension of everyday dangers and therefore would be at extreme risk from them.

• She is non-verbal and cannot communicate her wants or needs. She therefore must depend on others anticipating her needs and providing for them.

• She is very quiet and passive, spending most of her time sitting in the lotus position, or moving from chair to chair. She can easily be lost in a crowd.

---

[1]    "Profound mental retardation" is a medical diagnosis (diagnostic code 318.2) based on an intelligence quotient below 20 or 25. Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 42 (4th ed., Text rev., 2000). The text uses this term instead of "intellectual disability" when formal accuracy is required.

Diane's developmental disabilities stem from Down's Syndrome, and, like other aging Downs victims, Diane has early stages of dementia and possible Alzheimer's disease. She has also developed other physical conditions that require daily medications and physician and nursing care, including cataracts, diverticulosis, thalassemia minor, and osteoporosis. She has special dietary restrictions and protocols that apply to her bedtime.

Diane has resided at White Haven Center all of her adult life, and it is what she knows as her home. She moved to White Haven Center on August 25, 1965, and her daily behavior since that time shows that she knows and feels comfortable with White Haven's staff and physical surroundings. From all outward indications, the familiarity of Diane's surroundings is an important and valuable part of her life.

Because of Diane's condition, her guardians consistently have concluded that White Haven Center is the most appropriate setting for her care. In the 46 years she has lived there, Diane has received excellent care that has accommodated her special needs. White Haven has been able to provide such care because it has both the facilities and the 24-hour staff support that is required to care for such individuals. Objector is unaware of available "community" facilities that could provide similar support of the same quality.

***This litigation.*** This action was brought by State Center residents who claim that they are capable of living in community homes where they will benefit from increased socialization. Objector does not oppose providing relief to these named plaintiffs and anyone situated similarly to them. But the record in this litigation creates the false impression that large numbers of State Center residents (the members of the class certified in this case) are similar to these named plaintiffs when in fact they are not. Data from the Department of Public Welfare (DPW) disclose that ***three-fourths of all State Center residents are diagnosed as having profound men-***

2

*tal retardation, just like Diane*.  And to the extent they are just like Diane, these class members are not capable of living in community facilities unless they are provided with a full range of medical, psychosocial, and personal-care services 24 hours each day.  The litigants have masked this fact by stating that "all" State Center residents can live in the "community" with "appropriate services and supports," but they have not explained that the only "services and supports" that would be "appropriate" for most State Center residents would be those providing comprehensive care on a 24/7 basis.  The facilities best equipped to provide such services are ICFs/MR like White Haven, and the parties have provided no evidence that there is a sufficient number of small "community" facilities that are similarly equipped to do this job.  Thus, for three-fourths of the State Center residents, this litigation may not result in deinstitutionalization;  rather, it may result in relocation from a state institution to a private one.  Alternatively (and much worse), it may result in transfer to a local facility that is incapable of providing the full level of care and support needed by these individuals.

Because of their "profound" level of disability, most of these class members are completely dependent on others to look out for their interests.  The summary judgment record establishes, however, that 82% of them do not have guardians.  This means that the settlement puts hundreds of people with profound intellectual disabilities at the mercy of this Court, which must oversee the litigation and review the terms of the parties' settlement to be sure that these highly vulnerable individuals are protected.  There is substantial reason for concern.  The parties stipulated to bind all State Center residents to their litigation's outcome by having the case certified as a Rule 23(b)(2) class action.  In doing so, they failed to acknowledge the substantial differences among the class members in the levels of care they require and in their abilities to live in the community.  And now, in their settlement, they have provided that those class members who cannot understand what this case is about and, therefore, are incapable of expressing opposi-

tion to being moved out of the State Centers and to some "community" facilities are automatically to be listed among those to be moved, even though many of them have lived in the State Centers for decades and know no other home and no other care-givers.  Indeed, the parties have agreed to set quotas for the numbers of people they will ship out:  400 over the next five years.

**Diane's interest.**  Objector opposes the settlement for all of the reasons set forth below.  A principal reason is that the settlement threatens Diane's ability to continue to receive care and support at White Haven by improperly moving so many individuals out of the State Centers that continued provision of high-quality care there may be impaired.  If (as discussed below) this case should not apply to all State Center residents because it was improperly certified as a class action, and if (as discussed below) it has resulted in a settlement agreement that improperly removes residents from the State Centers who should not be removed, then the litigation will adversely affect residents like Diane by decreasing the size of the Centers, diverting the resources devoted to them, and, ultimately, threatening to impair the Centers' continued ability to provide high-quality care to those who remain.

When a similar concern was raised last year by a group of putative intervenors, this Court viewed it as too speculative to give rise to a protectable interest meriting intervention. *Benjamin v. Dep't of Publ. Welfare*, 267 F.R.D. 456, 462 n.6 (M.D. Pa. 2010), *aff'd*, 2011 U.S. App. LEXIS 7124 (3d Cir. 2011) (not precedential).  The concern no longer is speculative.  Part IV of the settlement agreement calls for 400 residents of the State Centers — about one-third of their total population — to be moved out of the Centers within five years, with more to follow. Significantly, those 400 residents are ***not*** just individuals who, like the named plaintiffs, claim that their rights were infringed because they want to be relocated and were stymied in their efforts.  Instead, many (perhaps most) will have no understanding of what is happening to them

4

and will be moved solely because they cannot speak for themselves and have no guardians to speak for them (making each such individual, in the words of p. 2 of the settlement notice, someone who "does not say one way or the other if he or she wants to live in the community").  The settlement thus is being used improperly to depopulate the Centers by removing individuals incapable of expressing a view about where they prefer to live.  Once it does so, the Commonwealth is likely to find it more difficult to devote the financial resources needed to maintain the current level of care at the State Centers in light of their dwindling population.  Again, this is not speculation:  Paragraph V.2.c. of the settlement agreement ***explicitly provides for state funds to be diverted from the State Centers to "community" funding programs***.

The settlement thus places Objector in a bind.  His preference is to oppose participation in the class so that Diane can live in the White Haven Center, an opt-out option that this Court said in its intervention decision would protect residents' right under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to remain in their current housing.  But even assuming that this ability to opt out of what otherwise would be a mandatory Rule 23(b)(2) class survives the Supreme Court's statement in *Wal-Mart Stores, Inc. v. Dukes*, 2011 U.S. LEXIS 4567, *40-*43 (U.S. 2011), that Rule 23(b)(2) opt outs are forbidden, exercise of that option now will leave Diane threatened because the settlement will dramatically change the nature of the State Centers, reallocate funding, and thereby threaten a reduction in the quality of care provided at White Haven.  That possibility has forced Objector to reconsider his opposition and, reluctantly, to defer opting out of the class settlement because (in the words of the class definition) it is possible that he "would not oppose community placement" in the future if settlement-induced changes at the Centers leave him with no better alternative.

Diane should not be made the victim of this unpalatable choice.

5

## DIANE'S RIGHT TO PARTICIPATE AND OBJECT

Diane has a right to participate in these proceedings and to object because she is a member of the certified class.  Alternatively, she can participate as an intervenor.

*Membership in the certified class.*  On September 2, 2009, this Court certified the following class:

> All persons who:  (1) currently or in the future will reside in one of Pennsylva-nia's state-operated intermediate care facilities for persons with mental retarda-tion; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

As a resident of the White Haven Center, Diane meets the first requirement of the class defini-tion.  Though they had no basis to do so (as explained below in the objection to the class certifi-cation), the parties incorrectly stipulated that Diane and all other State Center residents meet the second requirement;  in Paragraph 65 of the answer to the amended complaint, DPW admitted an allegation that "*All* persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community set-tings," and the class was certified on that basis.  If permitted to do so, Objector will challenge this incorrect determination, but for now it is binding on the parties.  Whether Diane is a member of the class therefore turns on the third prong of the class definition.

That third prong asks whether the putative class member "do[es] not or would not oppose community placement."  The first part of that question is easy:  Objector ***does*** presently oppose community placement because he believes that White Haven Center provides a more ap-propriate facility for Diane's care.  But the second part of this question — "would not oppose" — changes this inquiry considerably, since the question asks whether Objector's opposition might possibly change at some time in the future.   As discussed above, Objector would be

6

forced to change his view if the settlement forces a reduction in the quality of care at White Haven Center.  Therefore, despite his current belief that "community" relocation would not be in Diane's best interest, Objector's fiduciary obligations as Diane's guardian foreclose any unalterable statement that he "would not oppose" community placement in the future if conditions change to such an extent that he must consider that alternative.  For that reason, Diane is a member of the class and has a right to participate in these proceedings.

*Alternative motion to intervene.*  If the Court concludes that Objector does not have a right to participate because Diane is not a member of the class, Objector moves to intervene so that these objections may be heard.  *See Marino v. Ortiz*, 484 U.S. 301 (1988); *Gaskin v. Pennsylvania*, 197 Fed. Appx. 141 (3d Cir. 2006).  To comply with Chapter IV of this Court's Local Rules, Objector is filing the intervention motion as a separate document.  Objector makes that motion only as an alternative basis for presenting his objections.  *See generally Carlough v. Amchem Prods., Inc.*, 5 F.3d 707 (3d Cir. 1993) (intervention unnecessary for objecting class members).  As explained in the motion, these objections seek to advance an interest of Diane that may be affected or impaired by the settlement and that is not adequately represented by an existing party.  In this situation, the Court of Appeals has advised that even if an individual is not entitled to intervene for all purposes, it is appropriate to permit her limited intervention for the purpose of objecting to a class settlement.  *See Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987) ("permitting persons to appear in court, either as friends of the court or as interveners for a limited purpose, may be advisable where third parties can contribute to the court's understanding of the consequences of the settlement proposed by the parties").

**OBJECTIONS**

Diane's objections fall into two categories:  objections to class certification (Part I below, pp. 8-24) and objections to the terms of the settlement (Parts II through V, pp. 25-44).

OBJECTION TO CLASS CERTIFICATION

I.    THE CLASS IS NOT APPROPRIATE FOR CERTIFICATION UNDER RULE 23(B)(2) OF THE RULES OF CIVIL PROCEDURE.

An objector to a class settlement may object on the ground that the class should not have been certified.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009); *see generally In re Prudential Ins. Co. Amer. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).  A court reviewing a class settlement must consider this issue separately from the fairness of the settlement itself, *Prudential*, at 308, although issues relating to the propriety of the certification may be considered in connection with the fairness analysis.  *See id.* at 323-24 & n.73 (3d Cir. 1998) (listing class certification issues among appropriate class settlement factors for consideration).[2]  This case should not have been certified as a class action because it does not meet the requirements of Federal Rule 23.  If the named plaintiffs are entitled to the relief they requested, they should receive it, but that does not mean that the same injunctive relief should apply to every other resident of a State Center.  Differences among the class members make such an across-the-board adjudication erroneous.

---

[2]    In *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), the Court of Appeals identified a risk of maintaining class certification as a factor favoring approval of a class settlement, but the pertinent risk in that inquiry is that a ***properly certified*** class may be decertified if it becomes unmanageable for trial.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004); *Prudential*, 148 F.3d at 321.  *Girsh* does not approve settlement of a class that was not eligible for certification under Rule 23.

8

A.    **The Class Was Improperly Certified Under Rule 23(b)(2) Because It Is Not Cohesive and Is Improperly Defined.**

Plaintiffs obtained certification under Rule 23(b)(2), which provides for a mandatory class, without opt-outs, of similarly situated plaintiffs seeking injunctive or declaratory relief. The Court of Appeals has emphasized that this type of a class must be cohesive, and that its members therefore must share a predominance of common issues that exceeds even that required under Rule 23(b)(3). *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999). The relief sought in the action must benefit the entire class. *Neal ex re. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).

It was plaintiffs' burden to prove the cohesiveness of the class. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 320-21 (3d Cir. 2008). But plaintiffs didn't even try; their class certification motion and brief made no mention of cohesiveness or predominance. Rather than opposing certification on that basis, however, defendants did not oppose the motion at all. In this setting, this Court was required to give "rigorous consideration of all the evidence" and to "make a definitive determination that the requirements of Rule 23 have been met." *Peroxide*, 552 F.3d at 320-21. The fact that the certification motion was unopposed did not obviate this obligation, which protects unnamed class members from being bound by a mandatory class order that should not have been entered. As the Supreme Court warned in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), courts must give "undiluted, even heightened, attention" to issues of commonality and predominance in the settlement context because those inquires are designed "to protect absentees by blocking unwarranted or overbroad class definitions." The Court did not hold a class certification hearing here before it certified the class. A rigorous consideration of the evidence makes clear that the class that was certified was improper and that the class definition was, in the language of *Amchem*, "overbroad."

9

The class is defined as all residents of State Centers who "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement." These requirements mirror elements of plaintiffs' cause of action under *Olmstead*, which requires that a proposed placement be appropriate for the affected individual, unopposed, and reasonably accommodated in light of available resources. 527 U.S. at 606. Indeed, in granting summary judgment on liability, this Court held that "the definition of the class itself satisfies the first two elements articulated in *Olmstead*." *Benjamin v. Dep't of Publ. Welfare*, 2011 U.S. Dist. LEXIS 40100 at *20 (M.D. Pa. 2011).[3] But, for the following reasons, the class defined by these elements is not susceptible to cohesive treatment or proof in a class action. Because the defects discussed here relate both to the definition of the class and to the cohesiveness of a class under that definition (as well as to general commonality under Rule 23(a)(2)), all of these issues are discussed here together.

*First*, a class *defined* according to whether or not each of its 1,272 members (the number of State Center residents at the time this case was filed) is able to reside in the community "with appropriate services and supports" necessarily requires individualized identification of *which* class members are in fact capable of meeting that requirement. Such identification, in turn, requires an individualized analysis of just what the "appropriate services and supports" are for each individual to live in the community and whether it is feasible for the Commonwealth to

---

[3]    The Court's grant of summary judgment turned largely on the unproven allegations presented on the class certification motion, such as that "all of the named Plaintiffs could live in more integrated community settings rather than institutions because they would still have available all services and supports that are currently available to them." 2011 U.S. Dist. LEXIS at *8. Though this statement referred to the "named plaintiffs," the Court apparently used it as a basis to grant summary judgment with respect to the entire class. As discussed in the text, however, there is no evidence supporting this conclusion with respect to all class members because of differences in the services and supports they would require. The issues discussed in the text thus implicate not only class certification, but also liability.

provide them. These individualized questions dwarf any supposed common issues in this case. *Cf. Barnes*, 161 F.3d at 146 (class to provide medical monitoring relief for smokers may not be certified because each class member would have individualized medical monitoring needs).

Residents of the state centers have a range of abilities and needs that will compel differing answers to whether they are able to be relocated to a community facility, and they must have these abilities and needs assessed individually. The amended complaint alleged (¶ 65) that "[a]ll persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings," and the defendants admitted this allegation — making it a critical predicate for the class certification. But no evidence supports this allegation or admission. In particular, plaintiffs presented no evidence that each resident of the State Centers is capable of living in the community with services and supports that ***actually*** can be provided in community facilities and that the Commonwealth ***actually*** can and will provide despite its present funding crisis. Instead, they just avoided those questions entirely. Because of that lack of proof, class certification was improper.

There should be no question that the services and supports needed by each individual to live in the community will vary with each individual's personal condition. Some may be relatively minor, such as transportation to a job. But for individuals like Diane who have profound intellectual and developmental deficiencies, the needs will be substantial. Because of her profound disabilities, Diane and those like her need 24-hour care seven days per week. A failure to provide such care would be catastrophic. Diane is incapable of caring for herself in any way, and she is incapable of learning how to do so. Her passivity, inability to comprehend dangers, and impossibility of complying with instructions make it essential that professional personnel always are available to tend to all of her needs, which range from significant medical and psy-

11

chosocial needs, to provision of daily hygiene and personal care, to quick responsiveness to emergencies. Indeed, it is difficult to imagine a "community" facility equivalent to White Haven Center in which Diane and others like her could be placed, other than, perhaps, a day-care center or nursing home — unpalatable alternatives to say the least.[4]

Diane is not unique. To the contrary, one of the important facts about this case that has not been discussed by the parties is that *most of the residents of the State Centers have profound levels of intellectual retardation*, just like Diane. April 2011 data from the five State Centers (as provided by the White Haven superintendent, Ex. A) show that of the 1207 residents then residing there, 890 (74%) were diagnosed as profoundly retarded, just like Diane. The services and supports needed by these individuals necessarily include 24-hour care. In addition, such profoundly retarded State Center residents are likely to have physical conditions that will require additional services and supports. *See generally* Am. Psych. Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 44 (4th ed., Text rev. 2000) ("DSM-IV-TR").[5]

---

[4]   The most recent "Community Placement Plan" prepared by White Haven Center as part of Diane's 2010 Individual Support Plan provides, "In the event that the White Haven Center is no longer a living arrangement option, then a Community-based ICF/MR or Community Living Arrangement (CLA) with 24 hour-awake supervision would be necessary." It continued that the facility would have to be a "single floor, barrier free dwelling," with staff in the immediate area and a bathroom "adapted to meet Diane's needs." In other words, if relocated, Diane would have to be moved to an institutional facility similar to where she lives now at White Haven.

[5]   The Manual describes "profound mental retardation" as follows:

> The group with Profound Mental Retardation constitutes approximately 1%–2% of people with Mental Retardation. Most individuals with this diagnosis have an identified neurological condition that accounts for their Mental Retardation. During the early childhood years, they display considerable impairments in sensorimotor functioning. Optimal development may occur in a highly structured environment with constant aid and supervision and an individualized relationship with a caregiver. Motor development and self-care and communication skills may improve if appropri-

*…Continued*

12

JA965

The April 2011 data show that, like Diane, 712 (59%) of the residents are non-verbal. Nearly half (564 individuals) are unable to walk. In addition, 56% (670 residents) have seizure disorders, 27% (330 residents) have cerebral palsy, 26% (316) have autism, 23% (283) are visually impaired, and 16% (188) require an enteral feeding tube for nutrition. Ex. A.

Of course, if money were no object and unlimited funds were available to provide each State Center resident with any support that might be needed, the substantial needs of the State Centers' most disabled residents might not be of concern for purposes of class certification, since the Commonwealth would provide whatever services and supports any individual required. But the Court can take judicial notice of the continuing fiscal crisis facing the Commonwealth,[6] and there is no evidence in this record that the Commonwealth intends or is able to make unlimited funding available to provide, without limitation, *any* type of service or support that is necessary to permit every State Center resident's relocation to a community facility. Indeed, defendants consistently have cited the "current budget environment" to explain their failure to do so up to now. *See* Defs. Resp. to Pl. Undisp. Facts re Sum. J. (Dkt. #66, Att. 1) ¶¶ 103-05.

While the Commonwealth can provide 24-hour care cost-effectively to multiple residents sharing such similar needs in the State Centers, the settlement agreement, at ¶ V(4) on p. 11, provides that the community facilities to which residents would be relocated are each to have no more than four residents. Plaintiffs have presented no evidence that there is an adequate

---

*Continued from previous page*

               ate training is provided. Some can perform simple tasks in closely supervised and sheltered settings.

    DSM-IV-TR at 44.

[6]    The Commonwealth's projected budget deficit is nearly $4 billion. *See* Center on Budget & Policy Priorities, "States Continue to Feel Recession's Impact," *http://www.cbpp.org /cms/?fa=view&id=711* (June 17, 2011) (Table 1, listing state budget gaps).

number of such small facilities capable of providing 24-hour care to individuals who need it, and they have provided no explanation of what funds would be available to make such care available. Plaintiffs have sought to hide this problem by emphasizing that the cost of community facilities for the developmentally disabled historically has been far below that of State Centers, *see, e.g.,* Am. Compl. ¶¶ 58, 61, without explaining why: that those who have been relocated to the community before now generally have been less disabled and needed fewer supports and services than the far more seriously disabled residents who remain in the Centers and would be subject to the settlement agreement. *See generally* K.K. Walsh, *et al.*, "Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research," 41 MENTAL RETARDATION 103, 105, 117-18 (2003) (generally discussing differences in cost comparisons).

    To be a "common question" for purposes of Rule 23, a question must be capable of generating "common answers" that will lead to resolution of the case. *Wal-Mart*, 2011 U.S. LEXIS 4567, *19-*20 (quotation omitted). But the part of the class definition that asks whether class members are capable of living in the community can generate no commonality at all because its predicate condition — that the class members will be provided with "appropriate services and supports" — will produce differing answers that depend on what supports are available. Plaintiffs' effort to avoid this deficiency by merely referring to "appropriate services and supports" without further definition or explanation merely seeks to substitute a generality for the rigorous examination that class certification requires. As the Supreme Court emphasized in *Wal-Mart*, at *19, generalized common issues are "not sufficient to obtain class certification" because the individualized differences that lie beneath the surface make those questions incapable of classwide resolution. Whether a class member can obtain relief depends on just what services and supports are "appropriate" *for that individual*, whether *those* services *actually* can be provided in the community with the resources that are available, and whether defendants have vi-

14

JA967

olated the class member's rights by failing to provide for community placement in light of the **actual** availability of those services and supports. Because those questions will produce different answers for each class member, a class should not have been certified.

      **Second**, even if an otherwise non-opt-out class under Rule 23(b)(2) could be defined by what is, in effect, an opt-out provision for residents opposing relocation (something that, as discussed below, is doubtful), satisfaction of the remaining part of plaintiffs' class definition — determination whether each resident "do[es] not" or "would not" oppose relocation — again would require individualized analyses that make cohesiveness and predominance of common issues impossible. The question turns on each individual's personal choice. By definition, that is an individualized question that will produce different answers for each class member. Indeed, the Court of Appeals has explicitly held that a class may not be defined by reference to the state of mind of its members, since a class definition must be based on common objective criteria. *Chiang v. Veneman*, 385 F.3d 256, 271-72 (3d Cir. 2004), *overruled on other grounds*, *Hydrogen Peroxide*, 552 F.3d at 318 n.18. **This defect alone makes class certification improper.**[7]

---

[7]    When this Court denied intervention by relocation opponents last year, it based its decision largely on plaintiffs' opt-out provision and the holding in *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774-75 (7th Cir. 2007) (*Ligas I*), that a district court could deny intervention if such a provision would protect the opponents. *See* 267 F.R.D. at 462-63. However, in dicta during the appeal, the Seventh Circuit commented on the opt-out provision's likely invalidity because it required individualized inquiries into class members' states of mind. *See* Oral Arg. Recording, *http://www.ca7.uscourts.gov/fdocs/docs.fwx ?submit=showbr&shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006). *See also* 478 F.3d at 775 (questioning, but not ruling on, propriety of class definition). In light of those comments and after a conference with the district court, the parties **stipulated to amend the class definition to remove the opt-out provision** as part of a settlement. At a hearing on approval of that settlement at which it received 2,500 objections, including 240 by those who appeared in person, the court denied approval and **decertified the class**. *See Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009) ("*Ligas II*") (Ex. B to 11/12/09 Br. in Supp. of Motion to Intervene (Doc. #29)). As discussed later in these objections, the court then permitted class opponents to intervene.

Indeed, this part of the class definition is improper not only because it will produce differing individualized responses, but because in many cases it will produce no responses at all. The question depends on the ability of a class member to choose whether he or she opposes community relocation. While some State Center residents may be capable of making this decision or will have guardians or other designated decision-makers to decide for them, those State Center residents who have severe mental disabilities (such as those, like Diane, who are diagnosed as profoundly retarded) will not be capable of doing so. As Diane's Individual Support Team at White Haven concluded when it drafted a "Community Placement Plan" for her last year: "Diane's functioning level does not support the idea she can comprehend these matters. Therefore, it is highly unlikely she has any interest or awareness of community-based placement options." Individual Support Plan: Diane Solano, Sept. 21, 2010. Similar conclusions undoubtedly apply to other State Center residents too: they are intellectually unable to decide whether they "do not" or "would not" oppose community relocation, since the concept is meaningless to them.

This issue would be less important if these class members had guardians. But the evidence in this case is that 82% of the State Center residents (1004 out of the 1223 then surveyed) do not have guardians. *See* Pl. Motion for Sum. J. (Doc. #48), Ex. 13 (DRN Info. Report, 2009). Many of them have depended on their parents to make important decisions for them. As they have aged, they have seen their parents pass away; and because their siblings and other relatives may live far away and may have had little contact with them, no one else has stepped in to fill this need. And so they are at the mercy of everyone else.

So how could plaintiffs prove that the proposed class consists of members who "do not or would not oppose community placement" when substantial numbers of those pur-

16

ported class members are intellectually incapable of answering the question themselves and have

no guardians or other decision-makers to answer for them?  They couldn't, and they didn't try.

At the time of class certification, plaintiffs simply ignored this problem, counting on the fact that

certification was unopposed and, therefore, no one would raise the question.  And now that there

is a settlement, they have sought to deal with the issue by a sleight-of-hand.  Rather than actually

proving that the class consists only of class members who want to move out of the State Centers

into the "community," the settlement says that a State Center resident who **remains silent** on this

question is **conclusively presumed** to want to be relocated (or, at least, to not oppose it).  In the

words of the class settlement notice, at p. 2, "If a person does not say one way or the other if he

or she wants to live in the community, he or she will be placed on the Planning List unless an

involved family member or guardian does not want the person to live in the community."[8]  So, if

a State Center resident is intellectually incapable of saying whether he or she opposes relocation

and, accordingly, says nothing at all, plaintiffs will deem that resident to meet the class definition

on the theory that the silence means the resident "do[es] not or would not oppose community

placement."  Obviously, that is no proof of the class requirement at all.  And because, as dis-

cussed below, this requirement was included in the class definition to preserve residents' right to

remain in a State Center under *Olmstead*, plaintiffs' solution to their class definition problem vi-

olates the residents' civil rights to boot.

       The question of who is eligible to move to the community is the predominant

question in this litigation.  It depends on whether a class member is capable of relocation and

---

[8]    Similarly, plaintiffs' motion for preliminary class approval (p. 6) says, "State ICF/MR residents who do not express a preference for discharge will be placed on the Planning List unless they have involved family or guardians who are opposed."  *See also* Set. Ag. ¶ III(b) ("If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List . . .").

whether, in view of their right of choice under *Olmstead*, he or she desires relocation.  Only upon resolution of these questions could it be found whether the Commonwealth violated federal law in depriving the class members of their rights.  Because these pivotal questions can only be answered individually, and not in common for the entire class, class certification was improper.  Plaintiffs failed to prove that predominant common issues make the class sufficiently cohesive for certification under Rule 23(b)(2).

### B.    The Class Was Improperly Certified Under Rule 23(b)(2) Because It Depends on an Opt-Out Provision Not Permitted Under the Rule.

The portion of the class definition that depends on whether a class member "do[es] not or would not oppose class certification" is, in effect, a provision enabling those State Center residents who do not want to be bound by the injunction or settlement resulting from the class action to opt out of it.  Objector welcomes this opportunity, since, as noted, he presently prefers that Diane remain in the White Haven Center.  But the validity of this opt-out provision is doubtful.  Rule 23(b)(2) makes no provision for opt outs, and the Court of Appeals has long held that participation in a class under Rule 23(b)(2) is mandatory.  *See Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393-95 (3d Cir. 1981).  The Supreme Court's decision in *Wal-Mart* has now emphasized this point.  The Court described Rule 23(b)(2) classes as "mandatory classes" from which there is "no opportunity . . . to opt out."  2011 U.S. LEXIS 4567, *41.  *See id.* at *43.

In light of these precedents, that part of the class definition that permits State Center residents who otherwise would be part of the class to opt out of it by saying they oppose the requested relief appears invalid.  And that leaves class members who oppose the class action in a quandary.  They may wish to state opposition to community relocation and thereby to exclude

18

themselves from any provisions of the settlement.  But if the opt-provision is invalid, that exclusion may be ineffective.  That result is untenable.

Plaintiffs have said that they defined the class in a way that permits those opposing relocation to the community to not be a part of it so that they could preserve each class member's right under *Olmstead* to remain in a State Center if he or she so desires.  That indeed is a legitimate purpose;  any effort to deprive class members of their right to live where they choose would be constitutionally infirm.  But Rule 23(b)(2) makes clear that plaintiffs' class definition is not the proper way to protect class members' rights.  Rather, a class action that really did seek to vindicate all class members' federal rights under *Olmstead* would seek relief on behalf of *all* State Center residents who have been deprived of their right to live in the type of facility that they choose.  Such an inclusive class would seek to vindicate *all* residents' choices — both those of residents who want (and are able) to move to the community, and those who do not.  By doing so, it would more accurately apply *Olmstead*, under which mentally incapacitated individuals are entitled to live not only in non-institutional settings, but, if they so choose, to live in institutional settings too.  A case seeking enforcement of *all* class members' choices would require no opt-outs, since the injunction would democratically demand enforcement of all *Olmstead* options, not just those options that plaintiffs advocate and other class members oppose.

It is readily apparent why plaintiffs did not define their class so inclusively.  Though they say they recognize the rights under *Olmstead* of class members who want to stay in the State Centers, plaintiffs want to do nothing to advance those rights.  A resident can try to preserve his or her right to remain in a State Center only by affirmatively declaring opposition to relocation — something that profoundly retarded residents who lack guardians to speak for them

19

cannot do.  The settlement exposes plaintiffs' action as one to force relocation, not to enforce free choice.

Indeed, by limiting the right to stay in State Centers to just those who affirmatively opt out of the class, the class definition risks impairing the rights of those class members by depriving them of the ability to be heard regarding the settlement's terms, since non-parties generally lack standing to object to a settlement by the class.  *See Gould v. Alleco*, 883 F.2d 281, 284 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990).  Of course, if this were a normal Rule 23(b)(2) class without opt-outs, all class members would have a right to object and be heard.  *See Devlin v. Scardelletti,* 536 U.S. 1, 7-10 (2002); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1307-10 (3d Cir. 1993).  Plaintiffs cannot deprive class members of their right to object to a settlement that will directly affect where they live by employing an improper Rule 23(b)(2) class definition.

For all of these reasons, the Court should hold that the class defined by plaintiffs could not be certified.  Alternatively, the Court should order that any class consist of all State Center residents unlawfully deprived of a right to live in a type of facility that they choose, whether that is a State Center or somewhere else.

**C.    The Class Was Improperly Certified Because the Named Plaintiffs' Claims Are Not Typical of Those of All Other Class Members and Those Plaintiffs Are Not Adequate Representatives of the Class.**

Rule 23(a) requires that parties seeking class certification prove that their claims are "typical of the claims . . . of the class" and that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(3), (4).  These requirements are interrelated.  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009).  They require that the named plaintiffs' claims be sufficiently similar in factual circumstances to those of the rest of the

20

class that the plaintiffs' representation will be fair to the rest of the class members. *Id.* at 597-98; *see Neal*, 43 F.3d at 59 ("the interests of the class members [must be] so like those of the individual representatives that injustice will not result from their being bound by such judgment)."

Plaintiffs are residents of three of the five State Centers at issue in this litigation — Polk, Ebensburg, and Selinsgrove.   The amended complaint contains meager information about each plaintiff, but none is alleged to be profoundly retarded.  Indeed, plaintiff Grogg is alleged to be "extremely independent and sociable" and to have the ability to hold a job, be involved in his church, and manage his own money.  Am. Compl. ¶¶ 27-28.   Plaintiff Edgett is similarly alleged to be "social, engaging, and independent," *id.* ¶ 34, and plaintiff Baldwin is described as "generally very independent," *id.* ¶ 40.  Each of the plaintiffs is alleged to want (or not to oppose) community relocation, and each has a living relative (for plaintiff Edgett, a sister; for the rest, a mother) who is participating in the decision to seek such relief.

Plaintiffs have presented no evidence that they are typical of the other residents of the State Centers, and the few facts recited above demonstrate that they are different from many class members in ways that are significant to the issues in this case.  Their differences in degree of intellectual disability mean that they must have differences in the types of services and supports they will need to live in the community.  There is no allegation or evidence, for example, that any of them requires 24-hour care for personal hygiene or medical services.  If, as it appears, it is more feasible to provide the services and supports needed by these individuals for community living than to provide the more extensive services and supports that would be needed by, for example, a profoundly retarded resident like Diane, then these individuals are not typical of the many profoundly retarded class members (74% of the class) who are more like Diane than them and whose support needs are much more difficult to fulfill.

21

Similarly, the allegations make clear that none of the named plaintiffs is typical of those State Center residents who are intellectually incapable of choosing whether they want to be moved out of their State Center homes and who have no guardian or other designated decision-maker to speak for them — the class members who, under the settlement, will be moved out because their incapacity prevented them from answering the question about choice. Such class members present far different issues than do those who, like the named plaintiffs, are capable of exercising an option about where to live.

In another important difference, none of the plaintiffs is a resident of the State Centers in Hamburg or in White Haven (Diane's home). Although the original complaint included a White Haven resident, Wilson Sheppard, as a plaintiff, Mr. Sheppard withdrew as a plaintiff after learning more about the case, and he then was one of the residents who sought to intervene last year in opposition to the relief requested by the plaintiffs. The apparent premise of plaintiffs' case is that all State Centers, including White Haven, are fungible for purposes of a demand that residents be moved elsewhere. But there is no evidence of that. One purported reason why continued residence in each State Center is supposed to be a bad thing is that the State Centers are located in rural communities isolated from community population centers. 2011 U.S. Dist. LEXIS 40100, at *8 (summary judgment opinion), *quoting* Pl. Stmt. of Undisputed Facts in Support of Sum. J. (Doc. #50) at 12. But Diane's home, White Haven, is in the Poconos, and her parents placed her there because it was just a half hour's drive from their home north of Wilkes-Barre. A rigorous factual examination would show that White Haven residents have access to and are provided opportunities to participate in multiple activities in the northeastern Pennsylvania community, from attendance at local hockey games, to church events, to local fairs; they are not isolated. The record provides no evidence of whether and to what extent the same is true for residents of the State Centers where the named plaintiffs reside.

22

Finally, and most fundamentally, the named plaintiffs have interests different from those of other class members regarding the appropriate relief. Because of their purported abilities to care for themselves independently, the named plaintiffs do not share the needs of other class members for comprehensive care in intermediate care facilities, and, indeed, seek relief limited to "discharge" from the ICFs. Other class members need ICF support, however, and want to maintain their receipt of it. Each of these groups would benefit from different forms of relief, but plaintiffs seek only a single type of relief — discharge — which is of no benefit to the others. Plaintiffs' request for only one form of relief places these two groups in conflict, since the settlement would remove residents from the State Centers and require a reallocation of funding that would harm the State Center residents who wish to remain. This conflict makes the named plaintiffs inadequate representatives of these other class members.

Plaintiffs were required to provide proof that their situations are typical of and not adverse to those of Diane and other White Haven residents, but they failed to do so. Accordingly, they failed to establish typicality and adequacy of their representation, and thus failed to prove that a class should be certified.

### D. The Class Certification Did Not Comply with the Procedural Requirements of Rule 23.

A class may not be certified unless the Court holds a hearing at which the facts necessary for certification are proven. *See Peroxide*, 552 F.3d at 307. No hearing or other fact-finding proceeding on certification was held in this case. Rather, plaintiff moved for certification and defendants did not oppose the motion, causing the Court to enter an order granting certification the next day. Because the facts necessary to meet each of the requirements for class certification were not proven at a hearing, the certification was improper and should be vacated.

23

In addition, the class certification order failed to comply with the requirements of Rule 23(c)(1)(B) that the order "define the class and the class claims, issues, and defenses." As the Court of Appeals held in *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187-88 (3d Cir. 2006), that rule requires "that the text of the order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." Paragraph III of the Court's September 2, 2009 certification order repeated plaintiffs' proposed class definition, but, for the reasons already explained, that definition did not enable determination of the class members in a sufficiently "discernible, clear, and precise" way; that is because the elements of the definition do not state things that all class members have in common, and because a significant number of putative class members are incapable of answering the third part of the definition (whether or not they oppose community relocation) at all. In addition, no part of the Court's order listed the claims or issues to be treated on a class basis.

Objector understands that the defendants elected to defend this case only by asserting a fundamental alteration defense based on their late adoption of an *Olmstead* plan that the Court found inadequate. But defendants' failure to raise other issues that impact class members in different ways does not mean that the case does not present those issues. Whether all State Center residents can indeed live in the community because the services and supports they require can feasibly be provided is one of those issues, and the foregoing text identifies others. Rule 23(c)(1)(B) required that these issues be identified so that there could be a clear recognition of whether they are susceptible to class adjudication.

24

OBJECTIONS TO TERMS OF THE SETTLEMENT

**II.    THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY MOVING THEM TO COMMUNITY FACILITIES EVEN IF RELOCATION IS INAPPROPRIATE.**

In deciding whether to approve a class action settlement, this Court "acts as a fiduciary, guarding the claims and rights of the absent class members." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) (citing cases). Its responsibility is especially keen where, as here, those class members are intellectually incapacitated and, in many cases, lack guardians or other decision-makers to protect their interests. It is particularly important, then, that this Court rigorously scrutinize this settlement for protection of the class members' rights, including their fundamental rights under *Olmstead*. Any infringement of those rights affects not only the class members whose interests are impaired, but the interests of all other class members (like Diane) who are victims of the effect that an improper settlement will have on their own interests.

The Supreme Court made clear in *Olmstead* that mentally incapacitated individuals have a right to remain under institutional care and that they may not be deprived of that right. *See Olmstead*, 527 U.S. at 583. As the lead opinion by Justice Ginsberg (joined by Justices O'Connor, Souter, and Breyer) stated, "the ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." *Id.* at 604. "[N]othing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings"; "[n]or is there any federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 602 (portion of opinion also joined by Justice Stevens). In his concurrence, Justice Kennedy (joined by Justice Breyer) cautioned that "[i]t may be . . . that those who remain institutionalized are indeed

25

the most severe cases" and that care must be taken to assure that inappropriate removal of individuals to community facilities not do more harm than good.  *Id.* at 609-10.  As he added, "It would be unreasonable, it would be a tragic event, then, were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision."  *Id.* at 610.  He cautioned against pressuring States "into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition," and placing "state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts."  *Id.*  Justice Ginsberg agreed, observing that it is not "the ADA's mission to drive States to move institutionalized patients into an inappropriate setting," since, for some individuals, "no placement outside the institution may ever be appropriate."  *Id.* at 605.

This Court recognized a right to institutional care when it denied intervention by those seeking to remain in the State Centers, but it held that the right was not then implicated because plaintiffs' opt-out provision protected those opposing community relocation from any infringement of their right.  267 F.R.D. at 460-63.  The settlement now makes clear that the right is directly and adversely implicated, in several ways.

A.    **The Settlement Compels the Relocation to Community Facilities of State Center Residents Who Need Comprehensive Care and Have Not Expressed Any Desire To Be Relocated.**

A fundamental aspect of *Olmstead* is freedom of choice.  An incapacitated individual may choose to live in a community setting, but is not required to do so and may not be compelled to do so against his or her wishes.  527 U.S. at 602.  The terns of the settlement agreement, however, provide for relocation of State Center residents to community facilities

even where those residents have not stated any desire to be relocated and where they have re-
mained silent on the question because they are incapable of understanding what this issue is
about. That is an infringement of those residents' rights.

Paragraph III.2.a. of the Settlement Agreement (p. 6) says that placement on the
list of individuals eligible for relocation will be "based on discussions with the resident and in-
volved family or guardians to assess their position as to community placement." It must be re-
membered, however, that three-quarters of the State Center residents are profoundly retarded,
meaning that many of them have intellectual capabilities equivalent to those of infants. It there-
fore makes no sense to expect that they can comprehend any question about where they would
choose to live or can engage in any "discussion" about it. As noted above, Diane's 2010 Com-
munity Placement Plan states that her "functioning level does not support the idea she can com-
prehend these matters," and it is likely that other profoundly retarded State Center residents are
in a similar situation. It must also be remembered that 82% of the State Center residents have no
legal guardians to make decisions for them.[9] Thus, there likely will be many residents for whom
there can be no response to a "discussion" question about a residential preference other than si-
lence.

The settlement notice says how the parties have elected to deal with these indi-
viduals: "If a person does not say one way or the other if he or she wants to live in the communi-
ty, he or she will be placed on the Planning List . . . ." Notice, p. 2. The Settlement Agreement,

---

[9]     The settlement agreement provides that the parties will honor the decisions of guardians
or "involved family" members. "Involved family" is defined restrictively to include only
those residents' family members "who are designated as the resident's substitute decision
makers in the [resident's Community Placement Plan] or other state ICF/MR records."
Set. Ag. ¶ II.15. The record contains no information regarding how many State Center
residents have such "involved family" members. In many cases, such family members
identified in ICF/MR records may be parents who are now deceased.

27

¶ III.b. (p. 6), confirms that this is the automatic default selection, stating:  "If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List" unless a guardian or family decision-maker expresses opposition.

Making this the default selection for these individuals is a convenient way to re-move individuals from the Centers, but it infringes the rights of these individuals to stay where they are.  Though the individuals may not be able to express a preference, there is no reason to believe they would be indifferent to relocation if they could comprehend what is happening to them.  The bureaucratic references to "ICFs/MR" in the parties' submissions mask a central fact: the State Centers at issue here are these individuals' *homes*, and, for many of these residents, they are the only homes they have known.  Diane has resided at White Haven for *45 years*.  State Center census data suggests that many other residents also have lived there for many decades; indeed, some of the named plaintiffs made similar allegations about themselves.  Diane's daily behavior shows that she knows and feels comfortable with the White Haven staff and physical surroundings, and their familiarity appears to be an important and valuable part of her life.  It is reasonable to assume that the same may be true for other Center residents.  In this situation, care must be taken not to rip these vulnerable individuals from the security and stability that they have known for so long.  As the court stated in another Pennsylvania decision dealing with the forced relocation of a profoundly retarded individual, *In re Bear*, 44 Pa. D.&C. 4th 225, 260 (C.P. Dauphin 1999):

> This court asks what would it do to the quality of life of a profoundly retarded man, physically disabled as well, to remove him from his home of 44 years, from what little joys of life he has living in the comfort of his surroundings, cared for by people who know and love him and provide for his every need?  Surely, justice demands we allow him the dignity not to disrupt and uproot him from this.

28

*See also In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.) (en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001).

The sentiment expressed by the Court in *Bear* underlies the concerns of many guardians who have opposed relocation of their loved ones from the State Centers. It is the basis for the views of many of the objectors here. But for those State Center residents whose parents or other relatives consistently opposed relocation but are now dead, the settlement's provision for automatic relocation of residents incapable of expressing a preference flies in the face of those deceased loved ones' wishes. It appears this is deliberate. The summary judgment record includes deposition testimony that plaintiffs' counsel elicited from former DPW Deputy Secretary Kevin Casey that if a family member stated opposition to community relocation, that opposition should no longer be honored once the family member dies or is otherwise unavailable. Pl. Motion for Sum. J. (Doc. #48), Ex. 4 (K. Casey 1/20/2010 Dep. at 114-24).

This Court's obligation as a "fiduciary" for unnamed class members, *Pet Food*, 629 F.3d at 349, bestows a special responsibility to protect vulnerable members of the class from being relocated merely because they are incapable of speaking for themselves. The Court should order that the provisions in the settlement agreement that automatically place on the Planning List for relocation any State Center resident who remains silent regarding a preference for relocation is invalid and that no State Center resident shall be moved unless that resident clearly expresses that he or she is willing to move.

29

**B.    The Settlement Fails To Provide for Individualized Determinations of Whether Each State Center Resident Is Capable of Moving to Community Facilities and Whether Such Facilities Are Available To Accommodate Each Resident's Needs.**

Although *Olmstead* recognizes that institutional housing may be necessary for many incapacitated individuals and that nothing in federal law "condones termination of institutional settings for persons unable to handle or benefit from community settings," 527 U.S. at 602, 605, the parties have made no provision for individualized determinations of whether it would be appropriate to move each State Center resident to the community. Instead, as discussed in connection with the impropriety of class certification, the parties dealt with this issue by trading blanket allegations that **all** State Center residents are capable of moving, so long as otherwise unidentified services and supports are available. It nevertheless appears that the defendants themselves doubt the propriety of relocating all State Center residents. In the last-minute *Olmstead* Plan they proposed in connection with their cross-motion for summary judgment (Ex. 4 to the motion (Dkt. #51, Att. 6), at p. 4), defendants included a proviso that no person would be moved to the community if it were determined that the individual would not benefit from the relocation — thereby suggesting a recognition that some class members may not benefit. *See also* Def. Memo. in Support of Defs. Motion for Sum. J. (Dkt. #53) at 14.

This issue is too important to be treated as cavalierly as the parties have done up to now. An inappropriate relocation can cause a profoundly retarded individual serious harm if the community facility cannot provide the full level of care that the individual requires. Indeed, even if it *can* provide such care, any decision to relocate such individuals must be made with caution in light of the psychological stress it may cause for them to be taken away from the homes and personnel they have known for much of their lives in circumstances where they may

30

be incapable of understanding what is happening. As the Supreme Court cautioned, relocation should not be condoned if there is no showing that the individual would benefit from it.

Yet, the settlement agreement makes no provision for such individualized findings, and apparently is based on an *assumption* that relocation is appropriate for everyone. This Court should reject the settlement for this reason, and should require that individualized determinations of capability and benefit be made. Though *Olmstead* provides for deference to "the reasonable assessments of [a State's] own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program," 527 U.S. at 602, that presupposes there will be *individualized* assessments. Here, although the settlement calls for development of Community Placement Plans and Individual Support Plans "that specify the community placements, services, and supports the individuals need to successfully transition to the community," Set. Ag. ¶ V.3. (p. 11), it nevertheless starts with an assumption that everyone is capable of moving. The Court should hold that any such assumption is inadequate and improper and that individualized determinations are required.

The Court also should hold that these determinations must be based on a critical and unbiased review of the entire record relating to the individual, including an assessment of the accuracy of any information in the individual's file. Diane's personal experience is that some State Center residents may have had records placed in their files that contain misleading information about their capabilities to live in community settings. In particular, in 2002-03 DPW developed a "Community Plan" for Diane that incorrectly claimed Diane was "involved in several informal discussions [about community living] each year"; said that she was developing "skills" in "Financial Management," such as "hold[ing] a quarter or a similar sized object in her hand"; also claimed that she would hold a writing implement and scribble "to make a mark when asked to

31

JA984

sign her name" and "use a push button switch to activate an appliance"; and purported to discern her pleasure from participating in such things as going to restaurants and on shopping trips, "community camping experiences," church services and "bible study group," and fishing.

The plan provoked such shock and concern on the part of Diane's parents, who were then her guardians, that they wrote complain about it. Ltr., Nick & Catherine Solano to Walter Rapasky (Apr. 11, 2003). They explained that "Diane is unable to 'be involved' in any 'discussion' about anything — and especially not about changing her housing to 'community living,' a concept she is unable to comprehend." They disputed the Plan's description of Diane's supposed "Life Skills," explaining that "[m]any of the items listed as among Diane's 'skills' are things that we do not recognize as being possessed by our daughter and that we fear will lead those reviewing the summary to misunderstand Diane's condition."[10] They concluded: "[W]e believe that the plan does a disservice to Diane to suggest or imply that she is something that she

---

[10] In particular, their letter explained:

> . . . There may have been some time when Diane happened to have a pencil in her hand and happened to make a mark on a piece of paper while she had it, but we seriously doubt that she did so with any recognition that she was drawing or scribbling, and we are confident that she had no intent to "sign her name" when she did so. . . . [Nothing should] be interpreted to mean that Diane can run appliances, or even turn on a light switch; we are aware of no such capability. . . .

> . . . It may be true that Diane will hold "a quarter or similar sized object in her hand," just as she sometimes may hold a pencil, or a rock, or a blade of grass. But that does not mean that she has any appreciation of what a quarter is, and we are disturbed by your characterization of this ability as "pre money management" (Plan, p. 5); it has nothing to do with any ability of Diane to "manage money" or even to comprehend what money is. . . .

> . . . [T]he summary makes it sound as though Diane has some sort of active social life. . . . [I]f Diane is brought somewhere, she will stay there; but that does not mean that she understands where she is or has an interest in being there. . . .

JA985

is not, and we request that it be re-worded so that it does not create an impression that Diane has greater capabilities than she actually possesses." No one disputed this assessment by Diane's parents, and the objectionable items in the "Community Plan" were not subsequently repeated. Diane's experience raises the possibility that similar reports were made about other State Center residents, some of whom may not have had vigilant guardians like Diane's who would set the record straight. For this reason, the Court should require that any determination of eligibility for community relocation be made critically and be subject rigorous and unbiased review.

      **C.**    **The Settlement Fails To Provide Protections for State Center Residents Who Make Improvident Decisions To Relocate to Community Facilities.**

The settlement also provides no clear protections for State Center residents who have inappropriately been relocated to community facilities and need to return. Though there are repeated assurances in the settlement documents that residents who elect to remain in State Centers can change their minds and get placed on the relocation Planning List, the agreement says nothing about those who are sent to community facilities that fail to provide for their needs. But if it turns out that community facilities are not providing these individuals with the care and services they require, there must be some assurance that these individuals will be able to return to the State Center facilities that were providing them quality care before they were removed. The Court should refuse to approve the settlement so long as the agreement contains no provisions containing such assurances.

The agreement also makes no provision for reports that will enable the Court to determine whether individuals moved to community facilities have received proper care. This is a glaring omission. Part VI. of the Agreement contains detailed provisions for status reports on such things as progress in depopulating the State Centers, diversion of funding from the State

Centers to community programs, and reinstitutionalization of the residents because of commitments to psychiatric hospitals or incarceration.  But it says nothing about reports showing whether the residents are being provided with proper care.  A primary reason for concern about relocating profoundly retarded individuals is that historically there have been instances of abuse, neglect, and criminal victimization of such individuals in community settings.  *See* VOR, "Media Coverage Highlighting the Increasing Need for More Effective Federal and State Protections . . .," *http://www.vor.net/images/AbuseandNeglect.pdf* (2011).  The Court should require that the periodic reports required under Paragraph VI.2. include reports of any class members who have incurred physical or other harm after being relocated to a community facility.

### III.    THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO CREATE PROCEDURES THAT WILL ENABLE INFORMED DECISION-MAKING ABOUT THEIR CARE OPTIONS.

Apart from directly impairing class members' rights under *Olmstead*, the settlement impairs their ability to exercise those rights by requiring them to make decisions about their care without providing them with the full range of information needed to make those decisions free of undue or improper influence.

#### A.    The Class Certification Notice Requires Class Members To Decide About Their Care Without Adequately Explaining the Consequences of Agreeing To Community Relocation.

The class notice says that if a class member does not express opposition to community relocation, he or she will be placed on a "Planning List" and then will be taught about community placement.  Meanwhile, defendants "will develop and put in place . . . a 'community integration plan'" that will relocate 400 or more State Center residents over the next five years.

34

The notice (as well as the settlement agreement) is vague about two important issues.  The first concerns how agreement to participate in the settlement affects class members' rights to stay in the State Centers.  As already explained, Objector presently believes the White Haven Center is the best facility for Diane and wants her to stay there, but he may have to participate in the settlement to assure that he can change his mind if the settlement forces a deterioration in the quality of care in the Centers.  Can he conditionally participate in the settlement, or, once he agrees to do so, does he waive the right to have Diane remain in the White Haven Center indefinitely?  The class notice does not say.  Paragraph IV.3. of the settlement agreement (at p. 9) says there will be a second opportunity to state a position on "discharge" after receipt of "training" about community relocation, and that the Planning List will be amended in light of any restatement of position.  This implies that a failure to opt out of the settlement does not waive any right to continue residing in a State Center, but nothing in the agreement explicitly says that.  The settlement needs to be clarified to assure class members that they will never waive their right to State Center residency merely by participating in the settlement — especially since many, like Objector, may be participating only out of a reluctant resignation that they need to protect their options.

The second issue concerns how an actual community placement will take place.  The settlement notice says (at p. 3), "Before people on the Planning List move to the community, DPW will work with them, or their involved families or guardians, and other involved persons to come up with a comprehensive plan for each person that say[s] what type of placement and other services each person needs to successfully move to and stay in the community."  The Settlement Agreement contains similar provisions and suggests that only community facilities housing four or fewer residents will be offered (subject to a right to choose to live in a larger facility).  Set. Ag. ¶ V.3., 4. (p. 11).  Does this mean that residents (or their guardians) will have an absolute

35

right to choose the specific facility in which the resident will be placed?  Or does it mean that the individual may choose only a "type" of facility?  It is essential that class members or their families have the absolute final say about where they will live.  The Court should require that this be made explicit.

These defects in the class notice underscore a more fundamental deficiency in this case.  There never has been any showing that those State Center residents needing comprehensive care of the type they are receiving in the State Centers can feasibly be provided with that care in community facilities — particularly, the four-person facilities that the settlement says will be used.  The settlement notice provides no information about what facilities are available and what services and supports they can provide in light of available financial and other resources.  Without this information, no class member can make an informed choice about how to respond to the settlement and whether to oppose community relocation.  The settlement agreement, ¶¶ IV.1., V.3., defers providing this information until after a class member agrees to participate in the class and to undergo "training" about community options.  In view of this deferral of critical information, any class  participation is necessarily tentative.

**B.    The Settlement Lacks Unbiased Procedures Necessary To Assure That Relocation Decisions Are Properly Made.**

Because choice is such an essential part of any remedy under *Olmstead*, implementation of the settlement begins with procedures to determine whether State Center residents want to consider relocation to the community.  The Settlement Agreement provides that this assessment will be made by DPW's Office of Developmental Programs, using the services of the resident's social worker or Community Transition Specialist and the "Facility Advocate."  Set. Ag. ¶ III.2.a, c.  The "Facility Advocate" is an employee of plaintiffs' counsel, the Disability

36

JA989

Rights Network (DRN), who is "to advocate for residents." Set. Ag. ¶ II.10. There is no reason why DRN should have any role in this decision. Whether a State Center resident should consider community relocation is a sensitive question that should be made by DPW's professional staff. That decision should not be a matter of "advocacy" — and, particularly, not advocacy by the organization that seeks to promote just one choice (relocation) and that is seeking to be paid hundreds of thousands of dollars in legal fees in this case for its advocacy of that single choice. The settlement's provision for participation by DRN in this decision taints the process, and the Court should not approve the settlement with this provision.

Similarly, the Agreement's provisions for "education" of class members about community placement options appear designed to provide one-sided information that would induce selection of community options, rather than balanced information needed for unbiased decision-making. The eight-member "Community Partnership Steering Committee" (the name itself suggests a purpose to steer residents toward a community option) is to include a DRN representative, a provider representative, and a representative of the Administrative Entities that contract with DPW to administer the community system. Set. Ag. ¶ IV.1.a. The other members are a State Center resident and family member, a community resident and family member, and someone from the Office of Developmental Programs. *Id.* The deck therefore is stacked with members who will advocate for community placement. The curriculum is similarly one-sided, focusing on community placement and "opportunities to participate in community life." Set. Ag. ¶ I.V.b., e., f. While there is no question that State Center residents should be provided with accurate information about the benefits of community options, the settlement makes no provision for information about any of the risks of community living or the legitimate concerns regarding

safety and care in community settings.[11]  These most vulnerable individuals need *neutral* information, not propaganda, and the Court should refuse to approve the settlement without obtaining assurances that balanced information will be provided.

IV.  **THE SETTLEMENT IMPROPERLY INFRINGES ON THE RIGHTS OF CLASS MEMBERS UNDER *OLMSTEAD* BY FAILING TO PROTECT THOSE ELECTING TO REMAIN IN THE STATE CENTERS AND BY DEPRIVING THE STATE CENTERS OF RESOURCES.**

    The foregoing objections focus on inadequate, inappropriate, or deleterious aspects of the settlement with respect to class members opting for community care and regarding the procedures for deciding whether to opt for such care.  In addition, however, the settlement adversely affects those State Center residents who opt to remain in the State Centers.

    Plaintiffs consistently have sought to avoid discussion of these residents and to

---

[11]     As one commentator has summarized —

> [P]ositive outcomes reported in the literature associated with deinstitutionalization and community-based services include increased choice, behavioral improvement, improved social interaction of certain segments of the population, integration in rural settings, and inclusion in various day-to-day activities.  However, such positive findings need to be considered in relation to findings of increased mortality in community settings, problems in vocational services and employment, and problems of Individual Habilitation Plan objectives and behavioral technology.  Recent work has also highlighted problems in access, utilization, and quality in community-based health care and personal care for people with mental retardation and developmental disabilities, [along with] higher rates of verbal abuse and relatively greater exposure to crime among individuals who lived in dispersed community settings.

Walsh, 41 MENTAL RETARDATION at 116 (citations omitted).  The commentary concluded that "as institutions increasingly provide services to people with severe and profound cognitive deficits, complex needs, challenging behaviors, and diminishing skills, concerns about quality of *care* may outweigh those of satisfaction," while "[i]n community settings . . . with a more heterogeneous and able population, it may be that quality of life, satisfaction, and interest in self-determination takes on more importance."  *Id.* (emphasis in original).

38

pretend that the litigation has nothing to do with them.  By providing an option to refuse community care, plaintiffs claim that they have insulated these residents from any adverse consequences of this case.  And by so doing, they claim, they have foreclosed any right of these residents to be heard here, since (plaintiffs say) these residents are not affected by the settlement.

That is not true.  The litigation will have a direct effect on those State Center residents who elect to remain in the State Centers.  In the first place, it specifically provides for a transfer of State funds from the State Centers to community care, thus depriving the State Centers of needed resources.  Beyond that, it threatens to change the nature of the State Centers by depleting their populations and impairing their ability to continue to provide high-quality care.  These consequences clearly give these State Center residents an interest in having objections to the settlement heard.  Contrary to what may have been the case when the Court declined to permit intervention by those preferring to remain in the State Centers (and when the Court of Appeals affirmed that decision), the settlement makes clear that these consequences no longer are speculative and that they deserve consideration.

Though plaintiffs may wish to deny it, all *Olmstead* issues are interrelated, and their law suit cannot wall off just one form of relief and claim no effect on the rest.  Class members are being asked to make critical decisions about whether to stay in the State Centers or to move out, and their choices necessarily require a comparison of the risks and benefits of each.  Those risks and benefits will depend in part on the resources available, and those resources will depend on how any remedy is structured and what this Court orders.  In light of these different factors, the class members do not (as plaintiffs argue) divide neatly into those favoring the State Centers and those seeking community placement.  The third part of plaintiffs' class definition — the part on which they rely to exclude relocation opponents from having a say in the case — asks

only whether class members "would not oppose community placement" in all circumstances, thus inviting class members (like Objector) to acknowledge that there might be situations in which they would not object, depending on all of the circumstances at the time. Those circumstances include the relative risks and benefits under *Olmstead*.

This interrelationship of issues under *Olmstead* is why the district court in *Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lexis 34122 (N.D. Ill., Apr. 7, 2010) ("*Ligas III*"), the long-running Illinois litigation to which this Court referred in its 2010 opinion denying intervention, ***permitted*** those opposed to community relocation to be heard when considering a proposed class settlement in that case, even though it had denied them intervention in the case's earlier phase. In this Court's intervention decision, it relied on the Seventh Circuit's affirmance of the denial of intervention in *Ligas* on the basis of an opt-out provision in the class definition that was similar to the one used by plaintiffs here. 267 F.R.D. at 462-63. But after that affirmance, the opt-out provision was removed to comply with Rule 23, and the district court then decertified the *Ligas* class. *See* fn. 7, *supra*. The plaintiffs in *Ligas* then proposed a new class definition and a new settlement, and again those opposing relocation moved to intervene. This time (in an opinion issued just one month after this Court's denial of intervention here), the court ***granted*** the intervention motion, agreeing that the intervenors had an interest under *Olmstead* in assuring that their needs of institutional residence "be considered in determining the State's obligation to provide the 'community-based' services" at issue. *Ligas III*, 2010 U.S. Dist. Lexis 34122, at *11.

The court in *Ligas* explained that the Supreme Court in *Olmstead* was "very much aware of competing claims on limited State resources" and required those resources to be taken into account along with "the needs of others with mental disabilities." *Id.* at *13-*14, *quoting (second quote)* 527 U.S. at 607. In view of these considerations, the court concluded that "the

40

Proposed Intervenors have a right under *Olmstead* to have their needs considered" in assessing the proposed settlement.  *Id.* at *14 (emphasis added).  Otherwise, their "future ability to have their needs considered in balance with the State's obligations to other individuals with mental disabilities would be significantly impaired 'as a practical matter.'"  *Id.* at *16-*17 (quoting Fed. R. Civ. P. 24).  Since the State planned to reduce institutional capacity upon approval of a settlement relocating residents to "community" facilities, the litigation implicated the intervenors' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement" — what the court collectively called an interest "in the equitable distribution of State resources among individuals with mental disabilities."  *Id.* at *18-*20.  The court also held that the intervenors had an interest in participating in decisions about certification of a new class, since, even if the intervenors were excluded from the class under the plaintiffs' re-revised class definition, the *Ligas* parties were soliciting institutional residents to see if they would withdraw their opposition to relocation, and such class identification procedures would impact the intervenors' rights.  *Ligas III*, at *23-*25.

The same is true here.  As in *Ligas*, this litigation implicates all class members' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement."  All class members, including those who presently may not favor relocation, therefore have a right to be heard.

The Third Circuit's affirmance of this Court's denial of intervention does not call for a contrary conclusion.  Nothing in that decision — which was based on intervention law, not class settlement law — says or suggests it would be an abuse of discretion for this Court to consider relocation opponents' interests when assessing the settlement's fairness.  The settlement had not been negotiated at the time of the Court of Appeals' decision, and its terms, such as the

required transfer of funds from the State Centers, were not known.  The Court of Appeals be-

lieved that the only class members who would be placed on a planning list would be those who

"affirmatively expressed their desire to be discharged to the community," 2011 U.S. App. Lexis

7124, at *4, not those who simply remained silent when asked.  The facts have changed since the

Court of Appeals' decision, and the applicable legal standards are different as well.  Intervention

aside, this Court's obligations as a "fiduciary" for all class members require that it consider all

class members' interests in assessing the proposed settlement here.

### A.    The Settlement Contains No Protections Against Closing of the State Centers or Reduction in the Quality of Care That They Offer.

Although *Olmstead* makes clear that the Commonwealth must continue to make

institutional facilities available to those who need them, and although the settlement purports to

enforce class members' rights under *Olmstead*, nothing in the settlement provides any assurance

that the State Centers will remain available to class members.  The entire focus of the settlement

is on depletion of the Centers' resources by transferring funds and removing residents — wheth-

er those residents want to be removed or not.  The settlement thus threatens to impair the Cen-

ters' continued ability to provide high-quality care to those who remain.

To protect all class members' rights under *Olmstead*, this Court should insist that

there be no impairment of care at the Centers.  It is the fear that the Centers will close[12] or will

---

[12]    The fear is not unfounded.  The Commonwealth has been closing centers across the state as their populations decline.  *See, e.g., Alexander v. Rendell*, 2006 U.S. Dist. Lexis 3378 (W.D. Pa., Jan. 30, 2006) & 2009 U.S. Dist. Lexis 1540 (W.D. Pa., Jan. 12, 2009) (clos-ing of Altoona Center against residents' wishes); J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com /regionstate/20000416western4.asp* (Apr. 16, 2000) (reporting closure of Western Center while "several dozen parents stood helplessly behind police barricades . . . as their men-tally retarded children who had lived there for decades were driven away").

be so starved of resources that they cannot continue to function effectively that has caused so many class members and their guardians to speak out in opposition to this settlement.  The Court has the authority to allay the fears of these class members by refusing to approve any settlement that fails to include assurances that defendants will continue to abide by their obligation under *Olmstead* to continue to provide quality institutional care and, in doing so, will continue to operate the State Centers and provide them with sufficient financial and other resources to permit the Centers to provide the same high-quality care that they provide today.

**B.    The Settlement Improperly Mandates Transfers to Community Programs of State Funds That Are for the Benefit of State Center Residents.**

Rather than assuring continuance of quality care by the State Centers, the settlement contains a provision that will deprive the Centers of the financial resources needed for that care.  Paragraph 2.b. calls for defendants to consider consolidating the budget lines for the State Centers and community services.  Paragraph 2.c. then provides, "Unless and until DPW consolidates the budget lines for state ICFs/MR and Community Waiver services, DPW to the extent feasible will shift funds from the carry-forward budget for state ICFs/MR to the Community Waiver services budget."  The settlement thus obligates defendants to take money away from the State Centers and to turn it over to community services programs instead.

Objector has no opposition to any requirement that the Commonwealth provide adequate funding for community services.  But there is no basis in this lawsuit for that funding to be taken from that allocated to the State Centers.  Although the funding reallocation is to be made only "to the extent feasible," the settlement agreement does not explain what this means and there is nothing in the agreement to establish that feasibility is tied in any way to continued provision of quality care.

43

This provision of the settlement thus is likely to result in a reduction in the quality of services provided by the State Centers because of a reduction of funds.  Since such a result is directly forbidden by *Olmstead*, this Court should refuse to approve the settlement so long as this provision remains in it.

## V.     THE SETTLEMENT PROVIDES FOR ATTORNEYS' FEES THAT ARE INAPPROPRIATE.

Under the settlement, defendants will pay DRN $432,500 in attorneys' fees. There is nothing in the settlement agreement documenting how this number was reached and nothing to suggest that the parties made any effort to comply with the criteria for fee awards set forth in the Third Circuit's extensive case law on the subject.  *See In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 299-307 (3d Cir. 2005) (citing cases); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir.), *cert. denied*, 534 U.S. 889 (2001).  That case law calls for application of a lodestar approach to fee calculation in the absence of a common fund, but the settlement documents contain no lodestar calculations.[13]

The Court should refuse to approve the settlement unless it receives proof that the award is fair and reasonable.  Otherwise, the money the Commonwealth has agreed to spend on fees can better be spent on providing care to the class members in this case.

---

[13]     Indeed, the settlement documents contain no information demonstrating that DRN is eligible for any fee award at all.  DRN exists by virtue of the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001 *et seq.*,  and Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801 *et seq.*, pursuant to which DRN is financed by federal funds.  According to its web site, 98% of its funding comes from these and other federal statutes.  *See* Disability Rights Network of Pennsylvania, "About DRN," *http://drnpa.org/page/about-drnpa* (2011).  Just recently, several members of the Supreme Court commented about the questionable constitutionality of the statutory framework under which DRN and similar organizations have been established.  *See Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1641 n.7 (2011); *id.* at 1642-05 (Kennedy, J. concurring).

JA997

**REQUEST TO BE HEARD**

I intend to appear at the class settlement hearing and request permission to be heard.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano, I.D. No. PA 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202
Fax: (215) 972-7363
E-mail: *CSolano@Schnader.com*

Dated: July 28, 2011.

45

JA998

<u>Exhibit A</u>

E-Mail Exchange Between Fred Lakuta, Superintendent of White Haven Center, and
Tom Kashatus, President of White Haven Center Relatives and Friends Association

| Level of MR | Ham | Ebe | Polk | Sel | WHC | Total |
|---|---|---|---|---|---|---|
| Mild | 4 | 2 | 19 | 14 | 8 | 47 |
| Moderate | 7 | 4 | 35 | 25 | 10 | 81 |
| Severe | 22 | 18 | 64 | 46 | 39 | 189 |
| Profound | 91 | 255 | 188 | 245 | 111 | 890 |

| Age | | | | | | |
|---|---|---|---|---|---|---|
| 22-14 | 8 | 17 | 41 | 22 | 23 | 111 |
| 46-55 | 51 | 160 | 85 | 81 | 58 | 435 |
| 56-60 | 27 | 82 | 40 | 107 | 27 | 283 |
| 61-65 | 13 | 17 | 51 | 62 | 20 | 163 |
| 66-over | 25 | 3 | 90 | 58 | 40 | 216 |

| Special Needs | | | | | | |
|---|---|---|---|---|---|---|
| Autism | 24 | 81 | 134 | 35 | 42 | 316 |
| Cerebral Palsy | 53 | 56 | 68 | 137 | 16 | 330 |
| Hearing Impairment | 11 | 37 | 30 | 85 | 12 | 175 |
| Ambulatory | 32 | 141 | 124 | 179 | 82 | 558 |
| Partial/non Ambulatory | 92 | 138 | 97 | 151 | 86 | 564 |
| Seizure Disorder | 60 | 174 | 174 | 187 | 75 | 670 |
| Non-Verbal | 83 | 199 | 166 | 168 | 96 | 712 |
| Visual Impairment | 19 | 45 | 143 | 50 | 26 | 283 |
| Enteral Feeding | 49 | 45 | 28 | 51 | 15 | 188 |
| Tracheotomies | 10 | 7 | 3 | 7 | 2 | 29 |
| Duel Diagnosis | 119 | | | | 119 | |
| MM Plan | 31 | | | | 31 | |

-----Original Message-----
From: Tom Kashatus [mailto:tomkash@verizon.net]
Sent: Tuesday, April 19, 2011 7:51 AM
To: Lokuta, Fred C.
Subject: Statistics & Demographics

Fred,      Is it possible that I can have a recap of the
demographics of White Haven Center so that I can brush up for the WVIA
panel discussion?  I don't know if this comes under privacy or
not.      Tom K

JA999