Case Nos. 11-3684, 11-3685

# United States Court of Appeals

*for the*

# Third Circuit

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock;
RICHARD GROGG and FRANK EDGETT, by and through their next friend
Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl
Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on
behalf of themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA and SECRETARY OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA.

CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin
Springstead; MARIA MEO, by and through her mother and guardian Grace Meo;
DANIEL BASTEK, by and through his father and guardian, John Bastek;
MICHAEL STORM, through his guardian, Polly Spare; BETH ANN LAMBO,
by and through her father and guardian, Joseph Lambo; RICHARD KOHLER, by
and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and
through her father and guardian Thomas Kashatus; and WILSON SHEPPARD,
by and through his brother and next friend, Alfred Sheppard,

Appellants in No. 11-3684,

DIANE SOLANO, by and through her brother and guardian, Carl A. Solano,

Appellant in No. 11-3685.

---

ON APPEAL FROM THE ORDER DATED SEPTEMBER 2, 2011, BY THE UNITED
STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA,
CIVIL ACTION NO. 09-01182

## CONSOLIDATED JOINT APPENDIX
### VOLUME IV of IV (Pages JA1000-JA1547)

BENJAMIN J. HOFFART
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Attorney for Appellants in No. 11-3684*

CARL A. SOLANO
SCHNADER HARRISON SEGAL
 & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2000

*Attorney for Appellant in No. 11-3685*

# JOINT APPENDIX
## TABLE OF CONTENTS

### <u>Volume I</u>

1. Springstead Objectors' Notice of Appeal, dated September 30, 2011 ....... JA1

2. Diane Solano's Notice of Appeal, dated September 30, 2011 .................. JA3

3. Order of the Honorable John E. Jones III, Approving Class Settlement dated September 2, 2011 ........................................ JA5

4. Memorandum of the Honorable John E. Jones III, dated September 2, 2011 ....................................................... JA7

5. Order of the Honorable John E. Jones III, Denying Appellant Solano and Appellants Springstead Objectors Alternative Motions to Intervene, dated August 16, 2011 ............................................. JA33

6. Order of the Honorable John E. Jones III, Granting Motion for Class Certification, dated September 2, 2009 .................................................. JA36

### <u>Volume II</u>

7. District Court Docket Entries ................................................. JA40

8. Plaintiff's Amended Complaint for Declaratory and Injunctive Relief, dated July 14, 2009 ...................................................... JA75

9. Plaintiff's Unopposed Motion for Class Certification, dated August 31, 2009 ....................................................................... JA103

    a. Exhibit A – Certificate of Concurrence ........................................ JA105

    b. Exhibit B – Declaration of Robert W. Meek................................ JA107

    c. Exhibit D – Governor's Executive Budget 2009-10 (excerpts)... JA141

10. Plaintiffs' Brief in Support of Unopposed Motion for Class Certification ........................................................................ JA145

11. Defendants' Motion to Dismiss Amended Complaint, dated September 24, 2009 ................................................................. JA165

12. Springstead Intervenors' Motion to Intervene, dated November 10, 2009 .................................................................................. JA166

    a. Exhibit B to Springstead Intervenors' Brief in Support of Proposed Motion- Ligas v. Maram, 1:05-cv-04331 (N.D. Ill. Jul. 7, 2009) (minute order) ...................................... JA170.1

13. Order Denying Defendants' Motion to Dismiss Amended Complaint, dated January 25, 2010 ........................................ JA171

14. Defendants' Answer to Amended Complaint, dated February 24, 2010 .................................................................................. JA180

15. Memorandum and Order Denying Springstead Intervenors' Motion to Intervene, dated March 10, 2010 ........................................ JA189

16. Plaintiffs' Motion for Summary Judgment, dated June 23, 2010 .......... JA211

    a. Exhibit 4 – Deposition of Kevin Casey (excerpts) ...................... JA213

    b. Exhibit 5 – Defendants' Response to Plaintiffs' First Request for Admissions ........................................................ JA243

    c. Exhibit 8 – Governor's Executive Budget FY 2010-2011 (excerpts) ...................................................................... JA259

    d. Exhibit 9 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Franklin Benjamin ....... JA265

    e. Exhibit 11 – Community Placement Plan (CPP), Annual Family Information, and DPW Chart re Anthony Beard ............. JA271

    f. Exhibit 12 – Deposition of Fred Lokuta (excerpts) ..................... JA276

    g. Exhibit 13 – ODP Summary Chart re Opposition to Discharge ...................................................................... JA280

    h. Exhibit 17 – ODP Chart re Deaths/Discharges at State ICFs/MR ...................................................................... JA281

17. Plaintiffs' Proposed Summary Judgment Order (Exhibit 1 to Brief in Support, dated June 23, 2010) ................................................ JA282

18. Plaintiffs' Statement of Undisputed Facts in Support of Motion for Summary Judgment ...............................................................................JA294

19. Defendants' Motion for Summary Judgment, dated June 29, 2010 ....... JA328

    a.  Exhibit 1 – Declaration of Kevin Casey ...................................... JA330

    b.  Exhibit 2 – Deposition of Marti McIntire (excerpts) ................... JA338

    c.  Exhibit 3 – Deposition of Joseph O'Church (excerpts) ............... JA347

    d.  Exhibit 4 – The Plan, Supporting People Who Currently Reside in State Centers Who Want to Move to the Community .................................................................................. JA349

20. Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment ...............................................................................JA354

21. Defendants' Response to Plaintiff's Statement of Undisputed Facts (Ex. 1 to Defendants' Brief in Opposition, dated July 14, 2010)........... JA364

22. Plaintiffs' Answer to Defendants' Statement of Undisputed Facts........ JA370

23. Springstead Intervenors' Motion to Stay Formal Proceedings, dated November 19, 2010 ..............................................................................JA400

24. Order Denying Springstead Intervenors' Motion to Stay Formal Proceedings, dated December 16, 2010 ................................................. JA403

25. Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendants' Motion for Summary Judgment, dated January 27, 2011 ....................................................................................JA410

26. Mandate of United States Court of Appeals, dated April 27, 2011 ....... JA434

    a.  Third Circuit Opinion denying Springstead Intervenors' appeal of March 10, 2010 Order, dated April 5, 2011 ................. JA436

27. Plaintiffs' Unopposed Motion for Preliminary Approval of the Proposed Class Action Settlement and for Approval of Class Notice, dated May 26, 2011 ............................................................................JA447

    b.  Exhibit 1 – Declaration of Robert W. Meek ................................ JA462

c.  Exhibit 2 – Settlement Agreement ................................................ JA466

d.  Exhibit 3 – Notice of Class Action Proposed Settlement and
     Hearing ....................................................................................... JA481

28. Order Granting Plaintiffs' Unopposed Motion for Preliminary
    Approval of the Proposed Class Action Settlement and for Approval
    of Class Notice, dated May 27, 2011 ...................................................... JA485

29. Objection Letters re Notice of Class Action (in order of docket
    entry- an alphabetical list of Objections received by the district court
    is provided at pages xii-xv of this Index)

• Letter from Mr. and Mrs. Vincent Drago .......................................... JA489

• Letter from W.J. Parmley ................................................................. JA496

• Letter from Karen K. Blew ................................................................ JA499

• Letter from Jacob Kodnovich ........................................................... JA501

• Letter from Bob Sheetz .................................................................... JA503

• Letter from Marion Kelly o/b/o Patrick Garramone ......................... JA505

• Letter from Helen Reider .................................................................. JA507

• Letter from Roy Reider ..................................................................... JA510

• Letter from Rev. AM Gordon and Minerva Gordon .......................... JA514

• Letter from Marion and Carment Attanasio, Jr. ................................ JA517

• Letter from Francis J. Beston ............................................................ JA519

• Letter from Cecelia Hopkins ............................................................. JA522

• Letter from Alfred R. Sheppard ........................................................ JA525

• Letter from Norma Ferguson ............................................................ JA528

• Letter from Cheryl O. Brown ............................................................ JA531

- Letter from Mary Gough .................................................................. JA533

- Letter from Arthur and Joyce Ciullo ............................................... JA537

- Letter from Doris Kalan ................................................................. JA541

- Letter from Nancy Slick ................................................................. JA544

- Letter from Elizabeth Pugh ............................................................ JA546

- Letter from Catherine T. Dymacek ................................................. JA549

- Letter from Lawrence County Association for Retarded Citizens .... JA552

- Letter from Norman Moses, Executive Director of Lawrence
  County Association for Retarded Citizens ....................................... JA554

- Letter from Joseph Lambo............................................................... JA564

- Letter from James B. Lambo ........................................................... JA570

- Letter from Polly Spare .................................................................. JA574

- Letter from Florence Plenn............................................................. JA578

- Letter from Dale and Darcene Utt................................................... JA581

- Letter from John Bastek ................................................................. JA585

- Letter from Grace Meo ................................................................... JA592

- Letter from Amelia and Jerry Hake................................................. JA596

- Letter from Kay Wagner ................................................................. JA600

- Letter from Gary and Mary Wills.................................................... JA602

- Letter from Kimberly Gordon ......................................................... JA605

- Letter from Dixie Henry ................................................................. JA608

- Letter from Clara Palmer................................................................. JA610

- Letter from Mary Kashatus ................................................................. JA612

- Letter from John Hoops, Jr. ............................................................... JA614

- Letter from Suzanne Perry .................................................................. JA617

- Letter from Wilson McKinley .............................................................. JA621

- Letter from Thomas Kashatus ............................................................. JA623

- Letter from Margaret Kashatus .......................................................... JA626

- Letter from August and Winnifred Centi ........................................... JA628

- Letter from Ruth Jarrett ..................................................................... JA631

- Letter from Patricia O'Donnell .......................................................... JA634

- Letter from Margaret Tierney ............................................................. JA638

- Letter from William Hudock .............................................................. JA641

- Letter from Carole Henry ................................................................... JA643

- Letter from Wes Grebski .................................................................... JA647

- Letter from Marian L. Lentz .............................................................. JA650

- Letter from Barbara and Donald Sabo ............................................... JA653

- Letter from Albert Knight .................................................................. JA659

- Letter from Kenneth Myers ................................................................ JA661

- Letter from Kathleen McKeaney ........................................................ JA664

- Letter from Jeremy Kashatus and Family .......................................... JA668

- Letter from Karen S. Crytzer .............................................................. JA672

- Letter from Ellen Lube ....................................................................... JA675

- Letter from Ruth Nichol ................................................................. JA677

- Letter from Deborah and Gerard Hey ............................................. JA681

- Letter from Sharon and Elmer Brice, Jr. ........................................ JA684

- Letter from Mary B. Fernan ........................................................... JA687

- Letter from Robert and Beverly Gill .............................................. JA690

- Letter from Adelaide Hardy ........................................................... JA696

- Letter from Lily Chang .................................................................. JA698

- Letter from Joan Wright ................................................................. JA700

- Letter from Bertin W. Springstead ................................................. JA703

- Letter from Dolores Drews ............................................................. JA707

- Letter from Frederick Drews .......................................................... JA710

- Letter from Nancy Murray ............................................................. JA713

- Letter from Mark Drews ................................................................. JA716

- Letter from Megan Irwin ................................................................ JA720

- Letter from Mr. and Mrs. John Potochnick .................................... JA723

- Letter from Carol McDonald .......................................................... JA725

- Letter from James Margolis ............................................................ JA729

- Letter from Charles McCormick ..................................................... JA731

- Letter from Eloise Moore ............................................................... JA733

- Letter from Clarence and Gail Ropp .............................................. JA735

- Letter from Trudy Sheetz ............................................................... JA738

- Letter from Geraldine Wetzel .......................................................... JA743

- Letter from J. Keffer ..................................................................... JA745

- Letter from David Kalan ................................................................ JA747

- Letter from Richard and Jane Ruth ................................................. JA750

- Letter from Jean Milliron ............................................................... JA752

- Letter from Sen. Mary Jo White ..................................................... JA757

- Letter from Harold McConnell III ................................................... JA760

- Letter from Mary Schneider ........................................................... JA763

- Letter from Betty Lightner ............................................................. JA770

- Letter from Joseph Potera .............................................................. JA774

- Letter from Ann Marie Walsh ......................................................... JA778

- Letter from Barbara Ann Fritz ........................................................ JA781

- Letter from Rose Schafer ............................................................... JA784

- Letter from Tommy Kashatus .......................................................... JA787

- Letter from Debra Kleinen ............................................................. JA790

- Letter from Debra Herring .............................................................. JA794

- Letter from Daniel Kleinen ............................................................. JA798

- Letter from William and Beverly Daugherty .................................... JA801

- Letter from Kathy Casadonte .......................................................... JA807

- Letter from Kimberley Gauronski .................................................... JA811

- Letter from Larry and Sandra Krafft ................................................ JA814

- Letter from Jennifer Crawford............................................................JA819
- Letter from Sen. Mary Jo White......................................................JA825
- Letter from Nathan P. Heller and Lesli C. Esposito.........................JA828
- Letter from Tarah Toohil.................................................................JA836
- Letter from the Staff and Students of Keystone Job Corps..............JA839
- Letter from Rickey Shaffer .............................................................JA840
- Letter from Francis Marion .............................................................JA843
- Letter from Linda Lotzi...................................................................JA845
- Letter from Bertin Springstead........................................................JA856
- Letter from William Toperzer .........................................................JA860
- Letter from Amy Schwartz, Jerry Hake and Sara Greth ..................JA868
- Letter from Martha Ilift ..................................................................JA872
- Letter from David Parry ..................................................................JA874
- Letter from Paula Wolfe..................................................................JA877
- Letter from Henry Sitko  .................................................................JA880
- Letter from Beatrice Sitko...............................................................JA883
- Letter from Gerard Dunne ...............................................................JA885
- Letter from David Read....................................................................JA887
- Letter from Ann Marie Vodzak........................................................JA891
- Letter from Evelyn Crawford ..........................................................JA896
- Letter from William Brill .................................................................JA899

- Letter from James and Lucille Causer.................................................JA903

- Letter from Emil and Elizabeth Gnall ...............................................JA907

- Letter from Barry and Anna Johns ....................................................JA912

- Letter from Regina Splane.................................................................JA914

- Letter from Annette and Ronald Fischer...........................................JA918

- Letter from Shirley Musacchio..........................................................JA922

- Letter from Carin Doddroe................................................................JA925

- Letter from Timothy Demers ............................................................JA927

- Letter from Rickey Shaffer................................................................JA934

- Letter from Carl Lloyd ......................................................................JA937

- Letter from Samuel Boring................................................................JA943

30. Diane Solano Objections to Class Action Settlement, dated
July 28, 2011........................................................................................JA948

    a.  Exhibit A – E-mail Exchange Between Fred Lokuta,
Superintendent of White Haven Center, and Tom Kashatus,
President of White Haven Center Relatives and Friends
Association ...................................................................................JA999

31. Diane Solano Motion to Intervene, dated July 28, 2011 .....................JA1000

32. Springstead Objectors' Supplemental Objections to Class Action
Settlement, dated August 1, 2011.......................................................JA1013

    a.  Declaration of Benjamin J. Hoffart...........................................JA1053

    b.  Exhibit A – ICF/MR Resident Demographics ...........................JA1055

    c.  Exhibit B – Collected ICF/MR Center Demographics for
Ebensburg, Hamburg, Polk, Selinsgrove, and White Haven
Centers.......................................................................................JA1056

33. Springstead Objectors' Motion to Intervene, dated August 2, 2011 .... JA1062

34. Statement of Support by the United States, dated August 2, 2011 [*] ..... JA1067

35. Plaintiff's Unopposed Motion For Final Approval of the Proposed
Class Action Settlement Agreement, dated August 8, 2011 ............... JA1085

    a. Exhibit A – Declaration of Robert W. Meek ............................ JA1087

    b. Exhibit B – Settlement Agreement............................................. JA1099

36. Exhibit A to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Brief for Appellants, 3d Cir. Case
No. 10-1908) [*]...................................................................................... JA1114

37. Exhibit B to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Reply Brief for Appellants, 3d Cir.
Case No. 10-1908) [*] .............................................................................. JA1156

38. Exhibit C to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Solano's *Amicus* Brief, 3d Cir.
Case No. 10-1908) [*].............................................................................. JA1183

39. Exhibit D to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Solano's Brief Providing
Information Sought at Oral Argument, 3d Cir. Case No. 10-1908) [*] ... JA1215

40. Exhibit E to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Plaintiffs-Appellees' Brief, incl.
attach 1, 3d Cir. Case No. 10-1908) [*].................................................. JA1223

41. Exhibit G to Plaintiffs Brief in Opposition to Solano and Springstead
Objectors' Motions to Intervene (Plaintiffs-Appellees' Response in
Opposition to Solano's Motion to File Post-Argument Brief, 3d Cir.
Case No. 10-1908) [*].......................................................................... JA1289

42. Transcript of Argument before Third Circuit, 3d Cir. Case No. 10-
1908 ................................................................................................... JA1299

43. Joint Motion For Hearing, dated August 15, 2011 ............................... JA1331

---

[*] Document requested by Plaintiffs' counsel, Appellants object to the inclusion of this document pursuant to Fed. R. App. P. 30(a)(2) and L.A.R. 30.3 (a).

44.Order Regarding Fairness Hearing, dated August 18, 2011.................JA1336

45.Transcript of August 22, 2011 Fairness Hearing...................................JA1339

46.Exhibit Introduced at August 22, 2011 Hearing:

    a.  Exhibit 1 – Assessment Protocol.................................................JA1497

    b.  Court Exhibit 1 – Objection Letter from Sen. Elder Vogel .... JA1504.1

    c.  Court Exhibit 2 – Objection Letter from Rep. Chris Sainato  JA1504.2

47.Appellants Motion to Stay, dated November 8, 2011 ..........................JA1505

    a.  Exhibit A – Declaration of Carl Solano ....................................JA1522

    b.  Exhibit B – E-mail Correspondence between D. Leisch and C. Solano ......................................................................................JA1536

## ALPHABETICAL LIST OF OBJECTIONS RECEIVED
## BY THE DISTRICT COURT

*The copies of the objection letters in the Appendix are included in the order in which they were filed. This alphabetized list is provided for convenience.*

Marion and Carment Attanasio, Jr. ...................................................JA517
John Bastek  ............................................................JA585, 1013
Francis J. Beston .............................................................JA519
Karen K. Blew...............................................................JA499
Samuel Boring................................................................JA943
Sharon and Elmer Brice, Jr. ..................................................JA684
William Brill ................................................................JA899
Cheryl O. Brown .............................................................JA531
Kathy Casadonte .............................................................JA807
James and Lucille Causer.....................................................JA903
August and Winnifred Centi ..................................................JA628
Lily Chang..................................................................JA698
Arthur and Joyce Ciullo .....................................................JA537
Evelyn Crawford ............................................................JA896
Jennifer Crawford ..........................................................JA819
Karen S. Crytzer............................................................JA672
William and Beverly Daugherty ..............................................JA801

Timothy Demers ............................................................................... JA927
Carin Doddroe.................................................................................. JA925
Mr. and Mrs. Vincent Drago............................................................ JA489
Dolores Drews.................................................................................. JA707
Frederick Drews............................................................................... JA710
Mark Drews ..................................................................................... JA716
Gerard Dunne .................................................................................. JA885
Catherine T. Dymacek ..................................................................... JA549
Norma Ferguson............................................................................... JA528
Mary B. Fernan ............................................................................... JA687
Annette and Ronald Fischer ............................................................ JA918
Barbara Ann Fritz............................................................................ JA781
Sara Fuller ..................................................................................... JA1013
Marion Kelly o/b/o Patrick Garramone ......................................... JA505
Kimberley Gauronski....................................................................... JA811
Robert and Beverly Gill .................................................................. JA690
Emil and Elizabeth Gnall ................................................................ JA907
Rev. AM Gordon and Minerva Gordon........................................... JA514
Kimberly Gordon ............................................................................ JA605
Mary Gough .................................................................................... JA533
Wes Grebski .................................................................................... JA647
Amelia and Jerry Hake.................................................................... JA596
Adelaide Hardy ............................................................................... JA696
Carole Henry ................................................................................... JA643
Dixie Henry ..................................................................................... JA608
Nathan P. Heller and Lesli C. Esposito .......................................... JA828
Debra Herring ................................................................................. JA794
Deborah and Gerard Hey ................................................................ JA681
John Hoops, Jr.................................................................................. JA614
Cecelia Hopkins .............................................................................. JA522
William Hudock ............................................................................... JA641
Martha Ilift ..................................................................................... JA872
Megan Irwin .................................................................................... JA720
Ruth Jarrett ..................................................................................... JA631
Barry and Anna Johns ..................................................................... JA912
David Kalan ..................................................................................... JA747
Doris Kalan ..................................................................................... JA541
Jeremy Kashatus and Family .......................................................... JA668
Margaret Kashatus .......................................................................... JA626
Mary Kashatus ................................................................................ JA612

Thomas Kashatus ...........................................................................JA623, 1013
Tommy Kashatus ...................................................................................JA787
J. Keffer ................................................................................................JA745
Staff and Students of Keystone Job Corps...........................................JA839
Daniel Kleinen ......................................................................................JA798
Debra Kleinen .......................................................................................JA790
Albert Knight ........................................................................................JA659
Jacob Kodnovich...................................................................................JA501
Larry and Sandra Krafft ........................................................................JA814
James B. Lambo.....................................................................................JA570
Joseph Lambo ..............................................................................JA564, 1013
Lawrence County Association for Retarded Citizens............................JA552
Marian L. Lentz.....................................................................................JA650
Betty Lightner .......................................................................................JA770
Carl Lloyd .............................................................................................JA937
Linda Lotzi ............................................................................................JA845
Ellen Lube .............................................................................................JA675
James Margolis ......................................................................................JA729
Francis Marion ......................................................................................JA843
Harold McConnell III............................................................................JA760
Charles McCormick ..............................................................................JA731
Carol McDonald ....................................................................................JA725
Kathleen McKeaney...............................................................................JA664
Wilson McKinley ..................................................................................JA621
Grace Meo....................................................................................JA592, 1013
Jean Milliron .........................................................................................JA752
Eloise Moore .........................................................................................JA733
Norman Moses, Executive Director of Lawrence County Association for
        Retarded Citizens ........................................................................JA554
Nancy Murray .......................................................................................JA713
Shirley Musacchio.................................................................................JA922
Kenneth Myers ......................................................................................JA661
Ruth Nichol ...........................................................................................JA677
Patricia O'Donnell ................................................................................JA634
Clara Palmer..........................................................................................JA610
W.J. Parmley ..........................................................................................JA496
David Parry ...........................................................................................JA874
Suzanne Perry ........................................................................................JA617
Florence Plenn.......................................................................................JA578
Joseph Potera.........................................................................................JA774

Mr. and Mrs. John Potochnick ...................................................................... JA723

Elizabeth Pugh ............................................................................................ JA546

David Read ................................................................................................. JA887

Helen Reider ............................................................................................... JA507

Roy Reider .................................................................................................. JA510

Clarence and Gail Ropp ............................................................................... JA735

Richard and Jane Ruth ................................................................................. JA750

Barbara and Donald Sabo ............................................................................ JA653

Rep. Chris Sainato ...................................................................................... JA1504.2

Rose Schafer .............................................................................................. JA784

Mary Schneider ........................................................................................... JA763

Amy Schwartz, Jerry Hake and Sara Greth ................................................... JA868

Rickey Shaffer ............................................................................................. JA840, 934

Bob Sheetz ................................................................................................. JA503

Trudy Sheetz ............................................................................................... JA738

Alfred R. Sheppard ...................................................................................... JA525, 1013

Beatrice Sitko .............................................................................................. JA883

Henry Sitko ................................................................................................. JA880

Nancy Slick ................................................................................................. JA544

Carl Solano ................................................................................................. JA948

Polly Spare ................................................................................................. JA574, 1013

Regina Splane ............................................................................................. JA914

Bertin W. Springstead ................................................................................. JA703, 856, 1013

Margaret Tierney .......................................................................................... JA638

Rep. Tarah Toohil ........................................................................................ JA836

William Toperzer .......................................................................................... JA860

Dale and Darcene Utt ................................................................................... JA581

Ann Marie Vodzak ....................................................................................... JA891

Sen. Elder Vogel ......................................................................................... JA1504.1

Kay Wagner ................................................................................................ JA600

Ann Marie Walsh ......................................................................................... JA778

Geraldine Wetzel ......................................................................................... JA743

Sen. Mary Jo White ..................................................................................... JA757, 825

Gary and Mary Wills .................................................................................... JA602

Paula Wolfe ................................................................................................. JA877

Joan Wright ................................................................................................. JA700

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

_____

FRANKLIN BENJAMIN, by and through his next       :
friend, Andrée Yock; RICHARD GROGG and           :
FRANK EDGETT, by and through their next          :
friend Joyce McCarthy; SYLVIA BALDWIN, by        :
and through her next friend, Shirl Meyers;       :
ANTHONY BEARD, by and through his next           :       **Civil Action No. 1:09-cv-1182-JEJ**
friend Nicole Turman, on behalf of themselves    :
and all others similarly situated,               :
                                                 :       Class Action
                            *Plaintiffs,*        :
                                                 :
              v.                                 :
                                                 :       Complaint Filed June 22, 2009
DEPARTMENT OF PUBLIC WELFARE OF THE              :
COMMONWEALTH OF PENNSYLVANIA and GARY            :
ALEXANDER, in his official capacity as Secre-    :
tary of Public Welfare of the Commonwealth       :
of Pennsylvania,                                 :
                                                 :
                            *Defendants.*        :

_____

**MOTION OF DIANE SOLANO,
BY AND THROUGH HER BROTHER AND GUARDIAN, CARL A. SOLANO,
TO INTERVENE
FOR PURPOSE OF OBJECTING TO CLASS ACTION SETTLEMENT**

_____

Diane Solano, by and through her brother, Carl A. Solano, moves to intervene in this action for the limited purpose of presenting and having the Court consider her objections to the proposed class action settlement.  In support of this motion, she states:

1.       In June 2009, plaintiffs filed this case as a class action under the Americans with Disabilities Act (ADA) and the Rehabilitation Act.

2.       Plaintiffs are five residents of three of the Commonwealth's intermediate care facilities for persons with mental retardation ("ICFs/MR" or "State Centers") who say they

**THIS PAGE INTENTIONALLY LEFT BLANK**

want to be relocated to community facilities and seek injunctive and declaratory relief that would permit their relocation.

3.    On September 2, 2009, the Court granted an unopposed motion for certification of a class of all residents of the State Centers who "could reside in the community with appropriate supports and services" and "do not or would not oppose community placement."

4.    In March 2010, the Court denied a motion by nine State Center residents to intervene to protect their right under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to remain in the State Centers, and a year later the Court of Appeals affirmed that decision.

(a)    In its opinion denying intervention, this Court concluded that the litigation did not threaten the nine residents' right to remain in the State Centers because the nine could exclude themselves from the class by declaring their opposition to community placement under the final prong of the class definition.

(b)    Movant Diane Solano was not one of the nine State Center residents who filed the 2010 motion to intervene, though she did participate as an *amicus curiae* in the Court of Appeals.

5.    In January of this year, the Court entered summary judgment for the plaintiffs on liability.

6.    In May 2011, the parties entered into an agreement of settlement.  The Court tentatively approved the settlement on May 27, 2011.

7.    The Court has scheduled a hearing on final approval of the settlement for August 22, 2011, and has ordered that any objections to the settlement be filed by August 2,

2

2011.

8.    Movant Diane Solano is filing objections to the settlement as a member of the class.  Alternatively, by this motion, she seeks leave to intervene so that she can present her objections at the fairness hearing.

9.    Diane Solano ("Diane") is a 56-year-old resident of the State Center at White Haven.  She has been diagnosed as having "profound mental retardation," and has an intelligence quotient below 20 and a mental age at or below 1 year.  Because of her incapacity, she files this motion (and is also filing her objections to the settlement) by and through her brother, Carl A. Solano, Esquire ("Objector," or "Carl").  Carl was appointed Diane's legal guardian on July 20, 2004, by an order of the Court of Common Pleas of Luzerne County.

10.    Because of Diane's mental and intellectual incapacity, she is in need of 24-hour care for all of her daily needs.

11.    Diane has resided at the White Haven Center all of her adult life, and it is what she knows as her home.

12.    Because of Diane's condition, her guardians consistently have concluded that the most appropriate setting for her care is White Haven.  In the 46 years she has lived there, Diane has received excellent care that has accommodated her special needs.

13.    The terms of the settlement are presented in the motion for approval of the settlement that was filed by plaintiffs, and a copy of the settlement agreement is an exhibit to that motion.  Among other things, the settlement provides as follows:

(a)    The Department of Public Welfare (DPW) and plaintiffs' counsel

3

are to assess all State Center residents' opposition to being moved out of the Centers and into community facilities. Those who do not express unalterable opposition to being relocated to a community facility (that is, who do not say that they "do not or would not" oppose relocation) will be placed on a Planning List for relocation. That includes any individuals who remain silent on the question, even if their silence results from inability to comprehend what is being asked.

       (b)    Those on the Planning List will receive "training" about the benefits of community placements under a program to be set up by a "Community Partnership Steering Committee" consisting of representatives of plaintiffs' counsel, provider representatives, DPW, and others.

       (c)    Plans for community placements, support, and services then will be devised as part of a broader "Integration Plan" that is to move 400 State Center residents to community facilities in the next five years. Unless an individual otherwise requests, the placements will be in facilities housing no more than four individuals.

       (d)    DPW is to shift funds from the State Centers' budgets to community programs.

       (e)    This Court would retain jurisdiction to enforce the settlement, and plaintiffs' counsel will be paid $432,500 in counsel fees.

       14.    Diane's objections are attached to this motion as Exhibit A. They include the following:

       (a)    The case was inappropriate for class certification under Federal Rule 23(b)(2), because:

4

JA1003

(i)      It is not cohesive and is improperly defined;

(ii)      It depends on an opt-out provision not permitted under the Rule 23(b)(2);

(iii)      The named plaintiffs' claims are not typical of those of all other class members and those plaintiffs are not adequate representatives of the class; and

(iv)      The class certification did not comply with the procedural requirements of Federal Rule 23.

(b)      The settlement improperly infringes on the rights of class members under *Olmstead* by moving them to community facilities even if relocation is inappropriate, because it:

(i)      Compels the relocation to community facilities of State Center residents who need comprehensive care and have not expressed any desire to be relocated;

(ii)      Fails to provide for individualized determinations of whether each State Center resident is capable of moving to community facilities and whether such facilities are available to accommodate each resident's needs; and

(iii)      Fails to provide protections for State Center residents who make improvident decisions to relocate to community facilities.

(c)      The settlement improperly infringes on the rights of class members under *Olmstead* by failing to create procedures that will enable informed decision-making about

5

JA1004

their care options, in that:

     (i)  The class certification notice requires class members to decide about their care without adequately explaining the consequences of agreeing to community relocation; and

     (ii)  The settlement lacks unbiased procedures necessary to assure that relocation decisions are properly made.

    (d)  The settlement improperly infringes on the rights of class members under *Olmstead* by failing to protect those electing to remain in the State Centers and by depriving the State Centers of resources, in that:

     (i)  The settlement contains no protections against closing of the state centers or reduction in the quality of care that they offer; and

     (ii)  The settlement improperly mandates transfers to community programs of state funds that are for the benefit of State Center residents.

    (e)  The settlement provides for attorneys' fees that are inappropriate

    15.  Objector believes that White Haven currently is the most appropriate facility for Diane and therefore currently opposes her relocation to the community. However, because of uncertainty about what may happen to the State Centers if the settlement is implemented, and, in particular, about whether the State Centers will be able to continue to administer the same quality of excellent care that they have provided in the past, Objector reluctantly agrees that he might not oppose community relocation in the future if that becomes a better alternative. For this reason, Objector believes Diane is entitled to file objections as a member of the class

6

JA1005

(that is, as someone who "would not" oppose community placement in the future if conditions at the State Centers change for the worse), and Objector is filing on that basis.

16.    Nevertheless, plaintiffs have informed Objector that because he currently opposes Diane's relocation and has made that fact known, they will argue that Diane should not be allowed to file objections as a member of the class.  In e-mail to Objector this morning confirming plaintiffs' non-concurrence in this motion, their counsel stated:  "Just to be abundantly clear, it is Plaintiffs' contention that you do not have standing to object to the settlement because you oppose community services for your sister and therefore, are not a class member. We do not accept that you have the right to object to the settlement agreement."  E-mail, R. Meek to C. Solano, July 28, 2011, 8:55 a.m.  Objector prepared this motion in anticipation of plaintiffs' position, and is filing it as an alternative means of protecting his right to object and be heard on behalf of Diane.

17.    This motion seeks intervention only for the limited purpose of having Diane's objections heard and determined by this Court in the event the Court determines that Diane may not assert those objections as a member of the class.  If the Court agrees that Diane has a right to have her objections heard and considered because she is a member of the class, then this motion is unnecessary and need not be decided.

18.    Because Diane seeks intervention solely so that her objections are heard and determined by the Court, the attachment of her objections to this motion as Exhibit A should be deemed to satisfy the requirement of Federal Rule 24(e) that the motion be accompanied by a "pleading" setting forth the matters for which intervention is being sought, and Diane respectively requests that her objections be deemed to satisfy that requirement.

7

19.    The Court of Appeals has instructed that "permitting persons to appear in court, either as friends of the court or as interveners for a limited purpose, may be advisable where third parties can contribute to the court's understanding of the consequences of the settlement proposed by the parties." *Harris v. Pernsley*, 820 F.2d 592, 603 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987).  Intervention is an appropriate way to preserve objections to a class settlement if the objector is not recognized as otherwise having a right to participate.  Accordingly, courts have granted motions to intervene for the limited purpose of having class settlement objections heard.

20.    Diane should be permitted to intervene as of right for the limited purpose of objecting and being heard in opposition to the class action settlement.

(a)    Under Rule 24(a) of the Rules of Civil Procedure, an individual may intervene as of right if (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

(b)    A motion to intervene to object to a class settlement is timely if, as here, it is made within the time for responses set forth in a class action settlement notice.

(c)    By definition, the parties to a settlement agreement will not be representing the interests of an objector to the settlement like Diane.  Therefore, the interests of Diane are not adequately represented here.

(d)    Diane has an interest at issue in this litigation that may be affected or impaired by the settlement.  That interest is in Diane's right to appropriate care under

8

*Olmstead*, a right that is implicated and may be impaired in a variety of ways by the settlement agreement.

(i)      The agreement sets up procedures for determining whether Diane and other State Center residents should be relocated to community facilities. Diane has an interest in being sure that those procedures adequately protect her interest in maintaining appropriate care and that any decision-making pursuant to the settlement is done in her best interest and is informed by full, unbiased, and objective information. Some of her objections are directed to preservation of this interest.

(ii)      Diane has an interest in assuring that if she were to agree to consider community placement, her right to the most appropriate such placement will be protected. In this connection, the settlement presents serious questions about the availability of community facilities that can provide the 24-hour care Diane would need and about how much say Objector would have in choosing any specific community facility in which she would be placed. The settlement also raises serious questions about protection of Diane's rights after she is relocated to a community facility. Although the settlement purports to advance the interests of Diane and others to move to community settings, it does nothing to assure Diane's safety and protection once she exercises that option.

(iii)      Diane has an interest under *Olmstead* in continuing to live in an institutional facility if that is best for her, but the settlement makes no provision to protect this interest. The settlement provides for 400 individuals to be moved out of the State Centers over five years, and is likely to result in relocation of many State Center residents who should not be relocated. Meanwhile, the settlement agreement provides that DPW is to "shift funds

from the carry-forward budget for state ICFs/MR to the Community Waiver services budget," thus taking money away from the State Centers and turning it over to community services programs instead.  By improperly depleting the State Centers' populations and depriving them of funds, the settlement creates a substantial risk that the Centers will face a reduction of financial resources that will force a reduction in the quality of the care that they can provide.  Contrary to what may have been the case when the Court declined to permit intervention last year, these consequences no longer are speculative in light of the settlement, and they deserve consideration.

       (iv)    All of these *Olmstead* issues are interrelated, and all of them are directly affected by the settlement.  Class members are being asked to make critical decisions about whether to stay in the State Centers or to move out, and their choices necessarily require a comparison of the risks and benefits of each location.  Those risks and benefits will depend in part on the resources available, and those resources will depend on how any remedy is structured and what this Court orders.  The third part of plaintiffs' class definition — the part on which the Court relied last year to deny intervention — asks only whether class members "would not oppose community placement" in all circumstances, thus inviting class members (like Objector) to acknowledge that there might be situations in which they would not object, depending on all of the circumstances at the time.  Those circumstances include the relative risks and benefits under *Olmstead*.

       (v)    This litigation implicates all class members' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement."  All class members, including those like Diane who presently may not favor relocation, therefore have a right to be heard.  *See*

10

*Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lexis 34122 (N.D. Ill., Apr. 7, 2010).

(vi)    Neither this Court's decision denying intervention last year nor the Third Circuit's affirmance of that decision call for a contrary conclusion. The settlement had not been negotiated at the time of those decisions, and the settlement's terms, such as a requirement for a transfer of funds from the State Centers, were not known. This motion seeks leave to intervene only so that objections to the class settlement may be heard. This motion thus presents far different issues than those that confronted this Court last year or that confronted the Court of Appeals.

(e)    When considering the fairness of a class settlement, this Court "acts as a fiduciary, guarding the claims and rights of the absent class members." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) (citing cases). In doing so, it can only benefit from the views of all of those who will be affected by the settlement. The Court therefore should exercise its discretion to permit Diane to intervene as of right for the limited purpose of objecting to the settlement and presenting those objections at the fairness hearing.

21.    Alternatively, Diane should be permitted to intervene permissively for the limited purpose of objecting to the class action settlement and being heard.

(a)    Under Federal Rule 24(b)(1)(B), the Court may permit intervention by anyone who "has a claim or defense that shares with the main action a common question of law or fact."

(b)    Diane meets this test, since she raises concerns about her right to care under *Olmstead* that she shares in common with other members of the class.

11

JA1010

(c)    Whether the Court should grant permissive intervention depends on whether the proposed intervenor will add anything new to the case or will delay or prejudice others' rights.

(i)    The fact that Diane seeks to intervene only for the limited purpose of presenting objections to the settlement weighs strongly in favor of permitting her to intervene here.

(ii)    By intervening, Diane seeks to file objections within the time set by this Court's order, so that her intervention will not cause delay.

(iii)    Diane's objections will present issues that the parties, having agreed to the settlement, will not present, and so they add something new.

(iv)    Diane's intervention will not prejudice anyone, since her objections raise issues of interest and concern to all class members.

WHEREFORE, Diane Solano, by and through her guardian Carl A. Solano, requests leave to intervene for the limited purpose of having her objections to the settlement heard and considered at the fairness hearing at which she is permitted to appear.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano, I.D. No. PA 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000
Fax:  (215) 972-7363
E-mail:  *CSolano@Schnader.com*

Dated:  July 28, 2011.

12

JA1011

## CERTIFICATIONS

I, CARL A. SOLANO, certify that:

*Non-concurrence.*  On July 26, 2011, I e-mailed each of the counsel for the parties in this case to seek their concurrence in this motion.  Neither concur.

*Service.*  On July 28, 2011, I served a copy of this motion and memorandum by first-class mail, postage prepaid, addressed to:

Robert W. Meek, Esquire
DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
1315 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19107-4705
  *Attorney for Plaintiffs*

Doris M. Leisch, Esquire
Deputy Chief Counsel
OFFICE OF GENERAL COUNSEL, DEPARTMENT OF PUBLIC WELFARE
801 Market Street, Suite 6092
Philadelphia, Pennsylvania 19107
  *Attorney for Defendants.*

/s/ *Carl A. Solano*
_____
Carl A. Solano

Dated:  July 28, 2011.

JA1012

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

AUG 0 ? 202?

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

```
------------------------------------------------ x
FRANKLIN BENJAMIN, et al., on behalf of          :
themselves and all others similarly situated,    :
                                                 :
                    Plaintiffs,                  :
                                                 :     No. 09-cv-01182
        -against-                                :     (Jones, U.S.D.J.)
                                                 :
DEPARTMENT OF PUBLIC WELFARE OF                  :     (Am. Complaint
THE COMMONWEALTH OF                              :     Filed 7/14/09)
PENNSYLVANIA, et al.,                            :
                                                 :
                    Defendants.                  :
                                                 :
------------------------------------------------ x
```

**SUPPLEMENTAL OBJECTIONS OF CRAIG SPRINGSTEAD, MARIA MEO, DANIEL BASTEK, MICHAEL STORM, BETH ANN LAMBO, RICHARD KOHLER, MARIA KASHATUS, AND WILSON SHEPPARD TO PROPOSED SETTLEMENT AGREEMENT**

John E. Riley
William J. Murray, Jr.
VAIRA & RILEY, P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 789-9405
(215) 751-9420 (fax)

And

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, and Wilson Sheppard*

## Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................5

    A. Commencement of the Lawsuit and the Unopposed Class Certification. ...........5

    B. The Springstead Objectors....................................................................6

    C. The Springstead Objectors' Attempts to be Heard. ...................................7

    D. The Proposed Settlement .....................................................................8

ARGUMENT......................................................................................................9

I.   THE SPRINGSTEAD OBJECTORS ARE CURRENT OR FUTURE MEMBERS OF
    THE CLASS AND HAVE STANDING TO OBJECT TO THE PROPOSED
    SETTLEMENT AGREEMENT........................................................................9

II.  THE PLAINTIFF CLASS IS NOT APPROPRIATELY CERTIFIED UNDER
    FEDERAL RULES OF CIVIL PROCEDURE 23(a) AND (b). ...........................11

    A. The class does not satisfy the commonality, typicality, and adequacy requirements
       of Federal Rule of Civil Procedure 23(a). ...........................................12

    B. The class is incohesive and is improperly defined by the mental state of its
       members, thereby creating an opt-out provision not permitted under Rule
       23(b)(2)...................................................................................18

III. THE SETTLEMENT PROPOSED BY PLAINTIFFS AND DEFENDANTS WILL
    IMPROPERLY VIOLATE THE RIGHTS OF THE SPRINGSTEAD OBJECTORS
    AND OTHER CLASS MEMBERS AND CANNOT BE APPROVED UNDER
    RULE 23(e). .........................................................................................26

    A. The proposed settlement will deny class members from selecting the form of care
       that is appropriate to their individual needs, a right that was recognized by the
       Supreme Court in Olmstead. ............................................................27

    B. The settlement agreement requires Defendants to award DRN attorneys fees that
       are excessive and inappropriate. .......................................................34

CONCLUSION ................................................................................................36

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Baby Neal ex rel. Kanter v. Casey,*
    43 F.3d 48 (3d Cir. 1994) ...................................................................... 11-12

*Barnes v. Am. Tobacco Co.,*
    161 F.3d 127 (3d Cir. 1998) ............................................................. 18,19, 24

*Benjamin v. Dep't of Pub. Welfare,*
    No. 10-1908, 2011 U.S. App. LEXIS 7124 (3d Cir. Apr. 5, 2011) ................ 11, 18

*Chiang v. Veneman,*
    385 F.3d 256 (3d Cir. 2004) ....................................................................... 25

*Ehrheart v. Verizon Wireless,*
    609 F.3d 590 (3d Cir. 2010) ....................................................................... 27

*Eisman v. Pan Am. World Airlines,*
    336 F. Supp. 543 (E.D. Pa. 1971) ............................................................... 25

*Frederick L. v. Department of Public Welfare of Pennsylvania*
    364 F.3d 487, 497 (3d Cir. 2004) ............................................................... 31

*Gen. Telephone Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) ...................................................................... 12, 13, 16

*Geraghty v. United States Parole Comm'n,*
    719 F.2d 1199 (3d Cir. 1983) ..................................................................... 19

*Hayden v. Freightcar Am., Inc.,*
    No. 3:2007-201, 2008 WL 375762 (W.D. Pa. Jan. 11, 2008) .......................... 25

*In re Cendant Corp. Prides Litig.,*
    243 F.3d 722 (3d Cir. 2001) .................................................................. 34-35

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2009) ................................................................. 12, 20

*In re Ins. Brokerage Antitrust Litig.,*
    579 F.3d 241 (3d Cir. 2009) ....................................................................... 11

iii

*In re Pet Food Prods. Liab. Litig.,*
    629 F.3d 333 (3d Cir. 2010) .......................................................26

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998), *cert. denied* 525 U.S. 1114 (1999).....................passim

*In re Schering Plough Corp. ERISA Litig.,*
    589 F.3d 585 (3d Cir. 2009) .......................................................16

*Nat'l Org. for Women, Inc. v. Scheidler,*
    172 F.R.D. 351 (N.D. Ill. 1997) ...................................................25

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ..............................................................passim

*Wal-Mart Stores, Inc. v. Dukes,*
    131 S. Ct. 2541, 180 L. Ed. 2d 374 (June 20, 2011) ........................passim

*Williams v. City of Philadelphia,*
    270 F.R.D. 208 (E.D. Pa. 2010) ...................................................17

**STATUTES**

Developmental Disabilities Assistance and Bill of Rights Act of 2000.......................35

Fed. R. Civ. P. 23(a)(2) ...........................................................13, 14, 16

Fed. R. Civ. P. 23(c)(1)(C) ..............................................................12

Fed. R. Civ. P. 23 (a) ...........................................................3, 12, 13

Fed. R. Civ. P. 23 (a)(3) ...............................................................16

Fed. R. Civ. P. 23 (a)(4) ...............................................................17

Fed. R. Civ. P. 23 (a) and 23(b)(2) ...............................................14, 27

Fed. R. Civ. P. 23 (b) ...............................................................12, 18

Fed. R. Civ. P. 23 (b)(2) ...........................................................passim

Fed. R. Civ. P. 23 (e) ..............................................................passim

Help America Vote Act, 42 U.S.C. 15401, *et seq* .........................................35

Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.* ...........................................................................35

iv

Craig Springstead, by and through his father and guardian, Bertin Springstead, Maria

Meo, by and through her mother and guardian, Grace Meo, Daniel Bastek, by and through his

father and guardian, John Bastek, Michael Storm, by and through his guardian, Polly Spare, Beth

Ann Lambo, by and through her father and guardian, Joseph Lambo, Richard Kohler, by and

through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and

guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend,

Alfred Sheppard (collectively, the "Springstead Objectors"), by and through their counsel, Vaira

& Riley, P.C. and Sidley Austin LLP, hereby submit these objections to the settlement proposed

by Plaintiffs Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, and Anthony

Beard (collectively "Plaintiffs") and Defendants Pennsylvania Department of Public Welfare and

the Secretary of the Department of Public Welfare (collectively "Defendants") in the above-

captioned matter.  The objections and arguments detailed herein are in further supplement to

objection letters provided to the Court and Plaintiffs' counsel, the Disability Rights Network

("DRN") pursuant to the procedure established by the notice provisions proposed by Plaintiffs

(Dkt. #105, Ex. 3) and approved by the Court (Dkt. #106).

## PRELIMINARY STATEMENT

After more than two years of watching people they have never met assure this Court that

they would be happier and healthier if forced out of the state-run ICFs/MR they have called

home for 20, 30, even 40 years, the Springstead Objectors finally have the opportunity to express

their own views to the Court and express their *choice* to remain in ICF/MR care.  As their letters

of objection and these supplemental objections make clear, the proposed settlement agreement

does not reflect the interests or choices of the Springstead Objectors and numerous other

residents of Pennsylvania's ICFs/MR.  Counsel for the named Plaintiffs who commenced this

action have never purported to represent the Springstead Objectors' interests and views, but

rather have been entirely hostile to the Springstead Objectors' efforts to make those interests and views known. Defendants' counsel have not directly opposed the Springstead Objectors' efforts, but they also have never attempted to meaningfully protect the Springstead Objectors' rights and interests. The result is a proposed settlement agreement that entirely ignores the fundamental interests and choices of the Springstead Objectors and dozens, if not hundreds, of other class members. Despite neither Plaintiffs' nor Defendants' counsel showing any desire to protect or even respect the Springstead Objectors' rights and interests, this case has proceeded on behalf of a class that includes the Springstead Objectors and other dissenting class members, and the proposed settlement agreement now before the Court, if approved, will have a dire impact on the their right to choose the best form of care for their own highly individual needs.

Given the lack of attention or respect Plaintiffs' and Defendants' counsel have afforded their desires, it is not surprising that the Springstead Objectors have been reluctant members of the class since it was certified by the Court. While they are reluctant, they clearly are members of this class, meeting all three prongs of the present class definition. The Springstead Objectors' current opposition, however, does not remove them from the class because the as-defined class also includes current ICF/MR residents who "*would not oppose* community placement." While the Springstead Objectors currently oppose community placement and wish to stay in the ICF/MR centers they call home, they would not oppose community placement if certain circumstances, such as this lawsuit, deteriorate the high level of care currently provided in state-run ICFs/MR. Unlike Plaintiffs' DRN counsel, the Springstead Objectors and their families are concerned with their living arrangements as a matter of life and death, and therefore cannot afford to be purely ideological in where that care is provided. What is more, Plaintiffs' DRN

2

counsel has specifically admitted that the present class allows those opposed to community care to change their minds to become class members.

While the Springstead Objectors undeniably are part of the present class, the present class was not properly certified because Plaintiffs' and Defendants' counsel bypassed the evidentiary analysis required by Rule 23. Furthermore, Plaintiffs' and Defendants' counsel have provided (and the Court has relied upon) *demonstrably false* arguments – specifically, that all current ICF/MR residents are capable of residing in the community and that *no* state operated ICF/MR facility is the most integrated setting appropriate to the needs of *any* developmentally disabled person. While the named Plaintiffs may be ideal candidates to reside in and benefit from community care, the fundamental premises upon which this case was commenced simply do not apply to the Springstead Objectors and most other ICF/MR residents. Due to the highly individualized care needs of each and every ICF/MR resident, not to mention the individual choice of where that care should be provided, the named Plaintiffs are hardly representative or adequate under Rule 23(a). Nor do they satisfy the Rule 23(a) commonality, typicality, and adequacy requirements.

The present class also fails to satisfy the cohesiveness requirements of Rule 23(b)(2) because of the highly individualized assessments of which ICF/MR residents are capable of living in community placement and do not oppose such placement. Moreover, the class definition's third prong includes those ICF/MR residents who "would not" oppose community placement, thereby improperly defining the class based on the mental state of putative members and creating an opt-out provision not allowed for a Rule 23(b)(2) class.

These clear class definition issues aside, the settlement proposed by Plaintiffs and Defendants is fundamentally unfair and cannot be approved under Rule 23(e) because it will

3

prevent class members from selecting the form of care that is appropriate to their individual

needs, a right that was recognized by the Supreme Court in *Olmstead v. L.C. ex rel. Zimring*,

527 U.S. 581 (1999). If this case is truly about the *choice* afforded to those with developmental

disabilities, the proposed settlement clearly is concerned only with the choices of a few and

ignores or repudiates the choices of other class members like the Springstead Objectors.

The Supreme Court's *Olmstead* decision stressed that the developmentally disabled have

the right to choose the best form of care appropriate to their individual needs. The proposed

settlement will take away that choice. Because they believe that ICF/MR care categorically

cannot be the best form of care for anyone, Plaintiffs and their DRN Counsel initiated this

litigation seeking relief that would forever reduce the availability of ICF/MR care in

Pennsylvania. The proposed settlement currently before the Court, if approved, will achieve that

goal by depleting the ICF/MR population and starving state-run centers of necessary funding.

Contrary to *Olmstead* the proposed settlement with *take away* the choice of Pennsylvania's

developmentally disabled citizens and will force many class members, including the Springstead

Objectors to accept a form of treatment they do not desire. Plaintiffs' DRN counsel seeks to

achieve this policy goal by crafting a class definition and settlement agreement exploiting the

vulnerabilities of ICF/MR residents who cannot speak for themselves and who have no guardian

to speak in their stead to indicate their opposition to community placement.

The Springstead Intervenors support the five named Plaintiffs' efforts to obtain

community placement for themselves, and do no oppose the community placement of any

current ICF/MR resident who wants and could benefit from residence in a community care

facility. But no matter how well-intended the five named Plaintiffs may be, the Springstead

Objectors know too well the impact of unintended consequences and know that no single

4

solution – especially a one-sided settlement favoring community placement – can adequately

meet the needs of Pennsylvania's entire developmentally disabled community.

For all the reasons discussed below and for the many reasons provided in the Springstead

Objectors' letters of objection, the proposed settlement agreement should be rejected and the

class decertified.

## BACKGROUND

**A.    Commencement of the Lawsuit and the Unopposed Class Certification.**

This action was commenced on June 22, 2009, by the five named Plaintiffs alleging in

their Complaint (Dkt. #1) that the manner in which Pennsylvania provides services to the

developmentally disabled violates the Americans with Disabilities Act, the Rehabilitation Act,

and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).  In

their first and Amended Complaints (Dkt. #9), Plaintiffs primarily complain that the Defendants'

provision of services in public intermediate care facilities for the mentally retarded ("ICFs/MR")

– comprehensive facilities that combine residential, recreational and medical care in one facility

– violates the Supreme Court's *Olmstead* holding that persons with developmental disabilities

have the right to *choose* to live in the "most integrated setting appropriate" to their needs and

desires.  The five Plaintiffs alleged in their Amended Complaint that ICF/MR care is not

"appropriate to the needs of *any* individual resident of those facilities," and sought relief on

behalf of a class including:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for persons with
> mental retardation; (2) could reside in the community with appropriate
> services and supports; and (3) do not or would not oppose community
> placement.

(Am. Compl., Dkt. #9, at ¶¶ 57, 65-66.)  No analysis or evaluation of the purported class was

made at that time, or indeed, even today.  Accordingly, Plaintiffs' allegation that ICF/MR care is

not appropriate for anyone is based exclusively upon an ideological position, not medical analysis.

Based on this unsupported, but also unchallenged, assumption that community care is the only appropriate "choice" for the developmentally disabled and their families, Plaintiffs filed an Unopposed Motion to Certify a Class on August 31, 2009 without conducting any discovery, survey, or analysis to determine how many of the approximately 1,200 individuals in public ICFs/MR desire or actually could benefit from community care. Moreover, no one made any effort to contact the legal guardians of ICF/MR residents, who – unlike Plaintiffs' counsel – are the individuals with the legal right to make such placement decisions. Rather, Plaintiffs' Amended Complaint states that the class is intended to include all or virtually all of the more than 1,200 individuals residing in ICF/MR care at the time this case was initiated. (Dkt. #9, at ¶ 16.) Defendants conceded this point without caveat, exception, or clarification, and did not oppose Plaintiff's motion for class certification on this or any other ground. The Court certified the class two days later. (Dkt. #17.)

**B.      The Springstead Objectors.**

Craig Springstead is a 50-year-old resident of Selinsgrove Center, a public ICF/MR that has been his home for 28 years. (Intervenors' Resp. to Am. Compl., Dkt. # 28, ¶ A.) Mr. Springstead has been diagnosed with moderate mental retardation, bipolar disorder, mood disorder with psychotic features, generalized anxiety disorder, and intermittent explosive disorder. (*Id.*) Michael Storm is a 56 year-old resident of Hamburg Center, a public ICR/MR, who is developmentally disabled and is dependant upon both tracheotomy and feeding tubes. (*Id.*, ¶ D.) Beth Ann Lambo is a 43-year-old resident of Polk Center, a public ICF/MR, where she has lived for 40 years. (*Id.*, ¶ E.) Ms. Lambo has been diagnosed with profound mental retardation, autism, and disruptive behavior disorder; she has a mental age of 18 months and is

unable to detect danger. (*Id.*) Richard Kohler is a 60-year-old resident of Selingsgrove Center –

where he has lived since 1968 – who is developmentally disabled, deaf, and blind. (*Id.*, ¶ G.)

Both Maria Kashatus and Wilson H. Sheppard are in their forties, have been residents of White

Haven Center, a public ICF/MR, for most of their lives, and are developmentally disabled and

non-verbal; in addition, Ms. Kashatus is restricted to a wheelchair. (*Id.*, ¶¶ H, I.) Maria Meo is a

51-year-old resident of Ebensburg Center, which has been her home since 1967. (*Id.*, ¶ B.) She

is developmentally disabled but independent and able to make her wishes known. (*Id.*) Finally,

Daniel Bastek is a 38-year-old resident of Hamburg Center, where he has lived for 20 years; he

has been diagnosed with moderate mental retardation, bipolar disorder, and pervasive

developmental disorder. (*Id.*, ¶ C.) The Springstead Objectors have not and do not oppose

Plaintiffs' right to choose community care for themselves, but have and continue to object to

Plaintiffs' blanket pursuit of class-wide relief that will impair the Springstead Objectorss'

interest in preserving their individual right to choose ICF/MR care.

### C. The Springstead Objectors' Attempts to be Heard.

Recognizing that neither Plaintiffs nor Defendants represented the interests of ICF/MR

residents who do not want to be forced into community care, the Springstead Objectors –

residents of ICFs/MR who do not wish to be forced out of their current homes and do not believe

that community placement provides the best or most appropriate care option for them – moved to

intervene. (Dkt. #27.)[1]

Plaintiffs opposed the Springstead Objectors' intervention (Dkt. #34), and on March 10,

2010, the Court denied the Springstead Objectors' motion based upon findings that (1) "the

---

[1]    At the time of their proposed intervention, the Springstead Objectors were defined and referred to as the "Springstead Intervenors." In addition to those residents currently defined as the Springstead Objectors, the Springstead Intervenors included Mr. Richard Clarke, a 52 year-old resident of the Polk center who passed away earlier this year.

definition of the [certified class] specifically excludes [those who] oppose community

placement," (2) that Defendants adequately represented the Springstead Objectors' personal

interests simply by defending the suit on the ground that DPW does not have funding to provide

all of the accommodations sought by Plaintiffs, and (3) that the Springstead Objectors' views

"would not sufficiently add anything to the litigation." (Mem. & Order, Dkt. #41.)

 The Springstead Objectors timely filed an appeal of the Court's Order with the Third

Circuit Court of Appeals on March 30, 2010. (Dkt. ## 42, 43.) Before the Third Circuit issued a

briefing schedule, Plaintiffs and Defendants filed cross-motions for Summary Judgment with the

Court on June 23, 2010 and June 29, 2010. (Dkt. ## 48, 51.) After settlement negotiations

before a federal Magistrate Judge failed to resolve the case, the Court issued a Memorandum and

Order on January 27, 2011, holding that Defendants are not in compliance with the integration

mandates of the ADA and Rehabilitation Act, thereby granting, with respect to liability only,

Plaintiffs' Motion for Summary Judgment and scheduling further proceedings to determine the

appropriate scope of injunctive relief. (Dkt. #88.) On April 5, 2011, the Third Circuit Court of

Appeals entered a judgment affirming the Court's March 10, 2010 Order denying the

Springstead Objectors' proposed intervention. (Dkt. #98.)

### D. The Proposed Settlement

 Shortly thereafter, on April 29, 2011, the Court indicated in an Order that Plaintiffs and

Defendants had given the Court notice that a settlement had been reached. (Dkt. #102.) On May

26, 2011 Plaintiffs filed an Unopposed Motion for Preliminary Approval of the Proposed Class

Action Settlement. (Dkt. #105.) The Court granted Plaintiffs' Motion, preliminarily approving

the settlement the next day, May 27, 2011 (Dkt. #106), and scheduled a fairness hearing for

August 22, 2011.

# ARGUMENT

I.   **THE SPRINGSTEAD OBJECTORS ARE CURRENT OR FUTURE MEMBERS OF THE CLASS AND HAVE STANDING TO OBJECT TO THE PROPOSED SETTLEMENT AGREEMENT.**[2]

When granting Plaintiffs' unopposed motion for class certification, the Court certified a class under Rule 23(b)(2) of the Federal Rules of Civil Procedure comprised of "more than 1200 class members" who:

> (1) currently or in the future will reside in on[e] of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

(Class Cert. Order, Dkt. #17.) Even though the Springstead Objectors currently object to Plaintiffs' efforts to obtain relief on their behalf, the Springstead Objectors are class members under all the objective criteria in the class definition. As to the subjective "do not or would not" future state of mind element of the class definition, the Springstead Objectors cannot predict with certainty the possible ramifications of the proposed settlement on ICF/MR care, and thus cannot conclude that DRN's effort's to undermine ICF/MR care may not deteriorate such care to the point that community care could be the best form of care for the Springstead Objectors in the future.

First, as described *supra*, each of the Springstead Objectors is a current resident of a state-operated ICF/MR, thereby satisfying the first prong of the class definition. Second, despite the lack of any discovery, evaluation, or evidence in support, Plaintiffs and Defendants somehow made the therapeutic determination that *all* current residents of ICFs/MR, including the Springstead Objectors, are capable of living in the community thus satisfying the class

---

[2]   If the Court determines that the Springstead Objectors are not members of the class (and therefore are not entitled to present objections to the proposed settlement), the Springstead Objectors respectfully move to intervene in the action.

definition's second prong.[3]  (*See* Am. Compl., Dkt. #9, ¶ 65; Defs.' Mot. Sum. J., Dkt. #51, Ex. 6

("It is the Office of Developmental Program's belief that every person who currently resides in a

state center can be successfully supported in [a] community integrated setting with the right

supports.")).  Without being provided any alternative, the Court relied on the one-sided

"arguments" offered by the parties. (*See* March 10, 2010 Mem. & Order, Dkt. #41, at 12 (stating

that the Springstead Objectors have the "ability to reside in the community with appropriate

services and supports")).  Even though the Springstead Objectors strongly disagree with the

Court's finding that they are capable of living in community care, they are nevertheless bound by

it.

Finally, the Springstead Objectors satisfy the third prong of the class definition, because

even though they currently oppose community placement, it is possible they "would not oppose"

community placement if certain circumstances, such as this lawsuit, deteriorate the high level of

care currently provided in state-run ICFs/MR.[4]

Plaintiffs and their DRN counsel acknowledge that the class, as defined, permits those

currently opposed to community placement to change their minds.  Indeed, a large part of the

proposed settlement is devoted to a DRN-run "education" plan designed specifically to persuade

families and guardians to stop stubbornly insisting upon their right to choose ICF/MR care.

While discussing their plan before the Court of Appeals, Plaintiffs stated that

> residents, guardians, and their families may change their minds during the
> course of the implementation process, [and] state ICF/MR residents, involved
> families, and guardians have the right to be added to or removed from the
> Planning List during the course of implementation.

---

[3]     As further discussed in detail below, this cursory allegation serves as the foundation for Plaintiffs' claims, the Defendants' lack of a defense, and the current settlement.  It is also, as a practical matter, absolutely false.

[4]     As discussed fully *infra*, the Springstead Objectors respectfully submit that the settlement agreement proposed by Plaintiffs and Defendants will result in a substantial deterioration of the resources available to ICFs/MR and will ultimately lead to the closure of some or all ICF/MR facilities.

JA1026

Brief of Plaintiffs-Appellees at 11, *Benjamin v. Dep't of Pub. Welfare*, No. 10-1908, 2011 U.S.

App. LEXIS 7124 (3d Cir. Apr. 5, 2011). Indeed, Plaintiffs' DRN counsel explicitly

acknowledged before the Court of Appeals that the Springstead Objectors would "be included in

the class in the future if they change their minds and decide they want community services." *Id.*

at 26.[5] Accordingly, the Springstead Objectors have standing to object to the proposed

settlement.

## II.    THE PLAINTIFF CLASS IS NOT APPROPRIATELY CERTIFIED UNDER FEDERAL RULES OF CIVIL PROCEDURE 23(a) AND (b).

In order to approve the proposed settlement, the Court "must determine that the

requirements for class certification under Federal Rule of Civil Procedure 23(a) and (b) are met

and must determine that the settlement is fair to the class under Federal Rule of Civil Procedure

23(e)." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 257 (3d Cir. 2009). The Third

Circuit has stated that district courts should "apply[] the class certification requirements of Rules

23(a) and (b) separately from [a] fairness determination under Rule 23(e)." *In re Prudential Ins.*

*Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 308 (3d Cir. 1998), *cert. denied* 525

U.S. 1114 (1999). To approve this settlement under Rule 23, the Court must determine that the

class is appropriate, that the requirements of all four subsections of Rule 23(a) are satisfied, and

that the requirements of at least one subsection of Rule 23(b) are satisfied. *See Baby Neal ex rel.*

*Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). In the present case, none of these elements are

met.

---

[5]    Plaintiffs have also stated in their papers opposing the Springstead Objectors' proposed intervention, and again in papers they submitted to the Third Circuit, that a Rule 23(e) hearing before the Court is the appropriate forum for the Springstead Objectors to voice their objections to the current litigation. See Pl. Mem in Opp. Intervention, (Dkt. #34 at 12, 17 n. 8); *see also* Brief of Plaintiffs-Appellees at 43, *Benjamin*, No. 10-1908, 2011 U.S. LEXIS 7124 (3d Cir. Apr. 5, 2011).

When, as here, a class does not satisfy the Rule 23 requirements, the Court may amend or

alter its class certification order at any time prior to final judgment and approval of a settlement.

Fed. R. Civ. P. 23(c)(1)(C); *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 160, n. 16

(1982).

### A.    The class does not satisfy the commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a).

Under Federal Rule of Civil Procedure 23(a):

> [o]ne or more members of a class may sue or be sued as representative parties
> on behalf of all members only if: (1) the class is so numerous that joinder of
> all members is impracticable, (2) there are questions of law or fact common to
> the class, (3) the claims or defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the representative parties will fairly
> and adequately protect the interests of the class.

A court may not certify a class "without finding that each Rule 23 requirement is met" and must

find that each particular Rule 23(a) requirement is satisfied by a preponderance of the evidence.

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 310 (3d Cir. 2009); *see also Falcon*,

457 U.S. at 161 (class certification is proper only when the court "is satisfied, after a rigorous

analysis, that the prerequisites of Rule 23(a) have been satisfied").  The present class was

proposed by Plaintiffs, unopposed by Defendants, and, without the benefit of any evidence

supplied by the parties, certified by the Court just two days later.  Upon careful analysis,

however, the class fails to meet three of the four Rule 23(a) prerequisites to class certification.6

*1.    There are no questions of law or fact common to the class.*

In order to meet the "commonality requirement" of Rule 23(a), Plaintiffs must prove that

there are questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2).  While

all of the class members here have developmental disabilities and live in ICFs/MR, these are

---

6    The Springstead Objectors assume, *arguendo*, that the numerosity requirement is met.  It should be noted,
however, that all class members will have to be individually evaluated to determine their preference.  As
such, it is unclear why joinder of all individuals who choose community care would be impractical.

common facts, not common questions. While the lack of commonality may have been arguable

(but unargued) when the class was certified, recent decisions of the Supreme Court have made it

manifestly apparent today.

The United States Supreme Court recently provided a detailed discussion of the

commonality requirement in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 180 L. Ed. 2d 374

(June 20, 2011). The *Wal-Mart* case involved 1.5 million workers alleging sex discrimination

and seeking class certification under Rule 23(a) and 23(b)(2). *Wal-Mart*, 180 L. Ed. 2d at 385-

86. When reviewing the Rule 23(a)(2) commonality requirement, the *Wal-Mart* court stated that

"[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the

same injury,'" *Id.* at 389 (quoting *Falcon*, 457 U.S. at 157). Importantly, the court observed that

possessing the "same injury" does not mean that the class members all "suffered a violation of

the same provision of law," but requires that the common contention "be of such a nature that it

is capable of classwide resolution -- which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke" *Id.* at 389-

90. The court further observed that significant dissimilarities between class members may show

that the required commonality does not exist. *Id.* at 395. Ultimately, the *Wal-Mart* court

determined that there was no question of law or fact common to the *Wal-Mart* class because

there was "nothing to unite all of the plaintiffs' claims." *Id.* at 395, n. 10.

In the current case, there is no common thread uniting all members of the class apart from

the exceedingly generalized fact that all class members are ICF/MR residents. The class

members have different emotional needs, different medical requirements, and different physical

strengths and weaknesses. But Plaintiffs have sought to create an illusion of similarity by

alleging that all current residents of ICFs/MR *could* live in community settings with "appropriate

13

services and supports." However, this generalization obfuscates the dramatic differences between the mental and physical needs of individual class members and the drastically different types of "services and supports" that would be required for class members with such different needs to live in a community setting.

While the Court had no responsibility to assess the reasonableness or accuracy of the parties' stipulation that all ICF/MR residents can live in community care at the earlier stages of this case, it has the obligation to do so now. The differences between representative named Plaintiffs and representative members of the class like the Springstead Objectors are illustrative of this non-commonality. Notably, none of the named Plaintiffs are alleged to be classified as profoundly retarded. Rather, Plaintiff Richard Grogg "is extremely independent and sociable," "holds a number of jobs," is "involved in his church," and "is so capable of managing his own money" that he does not require "a representative payee . . . to receive his Supplemental Security Income payments." (Am. Compl., Dkt. #9, ¶¶ 26-28.) Plaintiff Frank Edgett is "very social, engaging, and independent" and "enjoys community trips" and Plaintiff Sylvia Baldwin is described as "generally very independent." (*Id.* ¶¶34, 40.) Statistics kept by the ICFs/MR facilities indicate that, unlike the named Plaintiffs, the vast majority of ICF/MR residents experience profound developmental disabilities that make them unlikely candidates for community placement. *See* ICF/MR Demographics, Hoffart Decl., Exs. A, B. Beth Ann Lambo is one such ICF/MR resident diagnosed with profound mental retardation. Ms. Lambo is a 43 year-old resident of Polk Center, where she has lived for over 40 years. Her mental age has been placed at 18 months, she is unable to discern danger, and she suffers from epilepsy and an escalating seizure history. (Prop. Intervenors Answer to Am. Compl., Dkt. #28, ¶ E.) Moreover, unlike several of the Plaintiffs who are described as independent, many ICF/MR residents rely

14

on the assistance of ICF/MR staff for their daily needs. For example, Michael Storm, a 56 year-old resident of the Hamburg Center is dependent on tracheotomy and feeding tubes and Maria Kashatus, a 41 year-old resident of the White Haven Center is non-verbal and relies on a wheelchair. (*Id.* ¶¶ D, H.) While the Plaintiffs seem to be ideal candidates for community care facilities, community placement is not a viable treatment option under any realistic scenario for Ms. Lambo, Mr. Storm, Ms. Kashatus, and many other current residents of ICFs/MR.

Not withstanding the obvious importance of determining precisely what supports and services will be necessary for each individual to *survive*, let alone be happy, in a community care environment, Plaintiffs' advocates seek to have the Court ignore those troublesome "details" and turn its attention to more important issues like the consolidation of budget lines and mandating Orwellian "educational" programs. Sadly and ironically, in their zeal to wield *Olmstead* as a sword rather than shield and move class members into the "community," Plaintiffs try to jam the entire class into their Procrustean bed, stretching or squashing inconvenient differences in the name of "integration."

Due to the drastic differences between the ability of Plaintiffs and other class members to successfully transition to community care, Plaintiffs' allegations of harm and requests for relief are also not shared by many, if not the majority of other class members. Notably, Plaintiffs' allegations that the Commonwealth of Pennsylvania has denied ICF/MR residents of the rights guaranteed under the ADA are not shared by *any* of the Springstead Objectors and many other residents of ICFs/MR who are members of the class. Similarly, Plaintiffs' immediate desire to be placed in community care is not shared by the many residents of ICFs/MR who wish to remain in their current homes and care environments.

15

Since there is no "common contention" across all members of the class and no common issue of law or fact uniting the class members' interests, the class fails to satisfy the commonality requirement of Rule 23(a)(2).

2.    *Plaintiffs claims are not typical of the claims of the class.*

Rule 23(a)(3) mandates that class representatives have the same interest and injury as the other members of the class. *Falcon*, 457 U.S. at 156. The Rule 23(a)(3) typicality requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the *entire class* through the pursuit of their own goals." *Prudential*, 148 F.3d at 311 (emphasis added). For typicality to exist between representative plaintiffs and the class:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

As already discussed, Plaintiffs' factual circumstances, claims, and desires are drastically different from – and in some cases diametrically opposed to – the factual circumstances, claims (if any), and desires possessed by the Springstead Objectors and many other members of the class. Rather, Plaintiffs, in their self-interested desire for an immediate transition to community care have made sweeping claims about all other class members' ability to live in the community without consideration for class members' actual ability to live in community settings and without regard to the dangers community care would present.

16

3. *Plaintiffs' repeated efforts to silence the voices of other class members serve as evidence that Plaintiffs do not and will not fairly and adequately protect the interests of all class members.*

Rule 23(a)(4) requires the Court to ensure that Plaintiffs "will fairly and adequately protect the interests of the class." Among the factors courts consider when evaluating adequacy of representation is the presence of conflicts preventing the representative plaintiffs from adequately protecting class members' interests. *Williams v. City of Philadelphia*, 270 F.R.D. 208, 215 (E.D. Pa. 2010).

Throughout this litigation, Plaintiffs and DRN have doggedly pursued their community-only ideology without care or regard to the views or concerns of class members who cannot reside in community care or do not currently wish to leave their ICF/MR homes. For example, when supporting their Motion for Summary Judgment, Plaintiffs criticized Defendants' "failure" to implement plans to close the Selingsgrove and Hamberg Centers – the desired homes and care environments of Messers. Springstead, Kohler, Storm, and Bastek – and use the resulting savings to "maximize funding" for those desiring community placement. (Pl. Mem. in Supp. Sum. J., Dkt. #49, at 12, 28.) The named Plaintiffs are each capable of living in community care, so their DRN counsel alleges that all ICF/MR residents are able to live in community care even though, as the Springstead Objectors' submissions to the Court detail, many current ICF/MR residents are not able to reside in community care facilities without jeopardizing their safety. Moreover, when class members who do not desire immediate transfers to community care, such as the Springstead Objectors, have sought to provide the Court with their views on the claims Plaintiffs have asserted on behalf of the class, Plaintiffs' DRN counsel routinely have endeavored to prevent the expression of these views. In one instance of opposition before the Third Circuit, Plaintiffs' counsel even argued at great length that *the Defendants* to this action, not Plaintiffs, represented the interests of class members such as the Springstead Objectors. Brief of Plaintiffs-

17

Appellees at 39, *Benjamin*, No. 10-1908, 2011 U.S. App. LEXIS 7124 (3d Cir. Apr. 5, 2011).

After more than two years of making dangerous, sweeping, and inaccurate generalizations about

class members' ability to live in community care, and repeatedly opposing class members'

efforts to make their views known to the Court, Plaintiffs' actions clearly show that their

interests are not aligned with the interest of many other members of the defined class.

**B.    The class is incohesive and is improperly defined by the mental state of its members, thereby creating an opt-out provision not permitted under Rule 23(b)(2).**

The class also utterly fails to satisfy Rule 23(b).  Rule 23(b)(2) allows for the certification

of a class when "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  As the Supreme Court recently stated in *Wal-Mart*,

"[t]he key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy

warranted -- the notion that the conduct is such that it can be enjoined or declared unlawful only

as to all of the class members or as to none of them."  180 L.Ed. 2d at 396.  The Supreme Court

further observed that because it is intended only for those cases where a "single injunction or

declaratory judgment would provide relief to each member of the class," classes certified under

Rule 23(b)(2) provide no opportunity for class members to opt-out.  *Wal-Mart*, 180 L.Ed. 2d at

396-97.  The Third Circuit has observed that "[w]hile 23(b)(2) class actions have no

predominance or superiority requirements, it is well established that the class claims must be

cohesive."  *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).  Simply, "[i]njuries

remedied through (b)(2) actions are really group, as opposed to individual injuries."  *Id.* at 143,

n. 18 (quoting *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983)).

The cohesiveness requirement serves two purposes.  "First, unnamed members with valid

individual claims are bound by the action without the opportunity to withdraw and may be

18

prejudiced by a negative judgment in the class action." *Barnes*, 161 F.3d at 143 (citing *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 628 (E.D. Pa. 1976)). Thus, "[t]he court must ensure that significant individual issues do not pervade the entire action because it would be unjust to bind absent class members to a negative decision where the class representatives' claims present different individual issues than the claims of the absent members present." *Id.* (quoting *Santiago*, 72 F.R.D. at 628). Second, if significant individual issues were to arise on a regular basis "the suit could become unmanageable and little value would be gained in proceeding as a class action . . . ." *Id.* (quoting *Santiago*, 72 F.R.D. at 628)). To avoid these problems the Third Circuit has provided to "the district court the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances." *Geraghty v. United States Parole Comm'n*, 719 F.2d 1199, 1205-06 (3d Cir. 1983). There hardly could be a set of factual circumstances more unique and disparate than the individual medical, social, and psychological needs of each individual ICF/MR resident.

> *1.    The class does not satisfy the cohesiveness requirement of Rule 23(b)(2) because it requires highly individualized assessments of which class members are capable of living in community care and which individuals do not or would not oppose community placement.*

The class certified by the Court in this case is defined as all current and future residents of Pennsylvania ICFs/MR who are able to "reside in the community with appropriate services and supports," and do not or would not oppose community placement. While Plaintiffs' counsel has sought to portray the class as a homogenous, like-minded group by making sweeping generalizations about class members' ability and desire to live in community care facilities, the class definition will necessarily involve highly individualized, case-by-case determinations of which current and future ICF/MR residents satisfy the second and third prongs of the class definition. Individual determinations concerning the ability to reside in community care and

19

desire to make such a transition will need to be made for each and every member of the class.
These individual determinations will pervade the entire action and severely mitigate any benefit
achieved by proceeding on a class basis.

>    **a.    Ability to live in the community and provision of supports and services.**

Plaintiffs' counsel have sought to create the illusion of cohesiveness with respect to the

class definition's second prong by alleging in their Amended Complaint that all current residents

of ICF/MR, "with appropriate supports and services, could live in more integrated community

settings." (Am. Compl., Dkt. #9, ¶ 65.) This illusion of cohesiveness was further perpetuated

when Defendants admitted this allegation in their Answer to Plaintiffs' Amended Complaint.

(Dkt. #39, ¶65.)[7] Plaintiffs have not offered any evidence suggesting that all current ICF/MR

residents are capable of living in the community with the assistance of services and supports that

are *actually provided* in existing community care facilities or that are capable of being provided

in community care facilities. Moreover, Plaintiffs and their DRN advocates seek to have the

Court ignore the reality that in some circumstances class members' medical conditions, aside

from any developmental disability, are so severe that they essentially would require construction

of a one-person ICF to safely meet their needs.

When certifying a class, the Court must "make whatever factual and legal inquiries are

necessary" and "consider all relevant evidence" to make factual findings "by a preponderance of

the evidence" and not just some "threshold showing by a party." *Hydrogen Peroxide*, 552 F.3d

at 307. Rather than providing the Court with the detailed evidence it needs to make an accurate

---

[7]    Defendants admission of this allegation is perplexing because as recently as 2008, DPW representatives were quoted as saying that not all ICF/MR residents would be able to transition to the community and that there would always be a need for ICFs/MR. *See* Amanda O'Rourke, *State: 348 need Selinsgrove Center*, The Daily Item, Sunbury, PA (Aug. 3, 2008), *http://dailyitem.com/0100_news/x691296962/State-348-need-Selinsgrove-Center* (quoting DPW press secretary Stacey Witalec as stating "There will always be some individuals who have such a unique situation or a high level of care that's needed that it may not be appropriate for them to move into the community. There will always be a need [for ICFs/MR].")

20

and valid class certification decision, Plaintiffs have sought to circumvent the evidentiary requirements of Rule 23 altogether.

Unfortunately, many residents of ICFs/MR, including the Springstead Objectors, do not have the luxury of living under the hypothetical guise that they could live in a community setting if the Commonwealth were somehow to manage to provide some undefined combination of supports and services. Defendants have admitted the harsh reality that the Commonwealth of Pennsylvania has limited funds to provide supports and services to the developmentally disabled living in community care facilities and it is unrealistic to assume that new funding for so-called "appropriate supports and services" will become available even though the Commonwealth is operating at a significant budget deficit. (*See* Defs.' Mem. In Supp. Sum. J., Dkt. #66, at 14-15.)8 Here again, Plaintiffs seek to sidestep a significant barrier to their pursuit of class-wide relief by arguing that, historically, the costs of providing services to developmentally disabled residents of community care facilities has been less than the cost of providing those same services to residents in state-run facilities. However, when touting the supposed cost efficiencies of community care, Plaintiffs fail to take into account that the majority of the residents who are able to transition to community care facilities are more independent, less disabled, and require fewer supports and services than more seriously disabled individuals who are unable to leave the care of ICFs/MR. In reality, what Plaintiffs seek is for the Court to grant them a legislative change that they have been unable to obtain.

### b.    Desire to live in community care.

The third prong of the class definition, which includes in the class those residents of ICF/MR who "do not or would not oppose community placement" calls for an individual,

---

[8]    In fact, it would appear that a more significant problem would (and should) be those developmentally disabled individuals who are not receiving appropriate services *anywhere*. It is unclear why Plaintiffs and their DRN counsel are untroubled by this issue.

21

personal choice from each putative member of the class.  As with the other elements of class

certification, Plaintiffs have provided the Court with no evidence showing how many current

ICF/MR residents wish to be transitioned to community care.  Instead, just like they assume that

all ICF/MR residents are capable of transitioning to community care, Plaintiffs simply assume

that most, if not all, ICF/MR residents "would not oppose" community placement, and any initial

opposition will disappear once the ICF/MR residents and family members are properly

"educated" on the subject.  (Pl. Mem. in Supp. Sum. J., Dkt. #49, at 5-6.)  Making matters worse,

Plaintiffs ask this Court to force the Commonwealth to budget for the move of hundreds of

people without knowing how many – if any – want to move.

      In reality, ICF/MR residents, guardians, and families will respond with their own,

different and individual responses based on whether or not they desire community care.

Plaintiffs' strident generalization about ICF/MR residents' non-opposition to community care

also hides the fact that many ICF/MR residents are non-verbal or are so significantly disabled as

to be unable to truly evaluate or indicate their care preferences and do not have a guardian or

family member to speak on their behalf.  Of the 1,223 individuals living in ICF/MR care as of

September 30, 2009, 1004 of these individuals – 82% – did not have a guardian to assist in their

decision or communicate their willingness or opposition to living in community care.  (DRN

Information Report, State Centers, Summary Sheet, Pl. Mot. Sum. J., Dkt. #48, Ex. 13.)

Moreover, the statistics maintained by ICF/MR Centers indicate that as of April 19, 2011, 890 of

the 1,207 residents of Pennsylvania's ICFs/MR were classified as profoundly mentally retarded.

*See* Center Statistics, Hoffart Decl., Exs. A, B.  These same statistics show that 712 of the 1,207

individuals living in ICF/MR in April of 2011 were non-verbal.  *Id.*

22

Here again, rather than providing the Court with an honest and accurate picture of the class, Plaintiffs relied on their own generalized allegations, which the Defendants once again failed to oppose. Plaintiffs have offered no proof that the more than 1,200 residents of ICF/MR purportedly in this class uniformly desire to be transitioned to community care. Instead, Plaintiffs have endeavored to create a class identification procedure bypassing the individual assessments of whether ICF/MR residents desire community placement. (*See, e.g.*, Pl. Mot. for Prelim. Class Approval, Dkt. #105, ¶11.a. ("State ICF/MR residents who do not express a preference for discharge will be placed on the Planning List unless they have involved family or guardians who are opposed.")). This assertion conclusively refutes the idea that this case has to do with what the individual wants. Instead, the case is driven by what DRN wants. They assume in their narrow and arrogant manner that they know best. Unable to convince the Commonwealth legislature of their infallibility, DRN seeks to have this Court endorse their purported ability to know what's best for 1,200 people they have never met.

Plaintiffs' advocates' belief in their superiority and Defendants' indifference, however, are inadequate substitutes for the evidence of cohesion required to properly certify a class under Rule 23(b)(2) and which is lacking here. In their efforts to certify a class, Plaintiffs did not address cohesion because, in fact, no cohesion exists. While the Defendants have granted the Plaintiffs a wide berth to pursue class certification, Defendants' immediate surrender (which the Plaintiffs argue should count as the Springstead Objectors' adequate representation in this matter) did not and does not relieve the Court of its obligation to find by a preponderance of all available evidence that the class proposed by Plaintiffs is sufficiently cohesive to warrant certification as a non-opt out Rule 23(b)(2) class.

23

2.    *The class includes an opt-out provision that is invalid under Rule 23(b)(2) and is impermissibly defined by the mental state of putative class members.*

The third prong of the class definition proposed by Plaintiffs that identifies class members based on their current or future opposition to community care constitutes an opt-out provision that is not valid under Rule 23(b)(2). Participation in a Rule 23(b)(2) class is not discretionary and members of a Rule 23(b)(2) class cannot simply opt-out of the class relief. *Wal-Mart*, 131 S. Ct. at 397 ("The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action."); *Barnes*, 161 F.3d at 142-43 ("[I]n a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out."). As the class in the present action is certified under Rule 23(b)(2), the prong of the class definition purportedly allowing class members to opt-out of the class by opposing and continuing to oppose community placement is invalid.

Previously in this litigation, Plaintiffs' DRN counsel have argued that the class definition was constructed to preserve class members' right under the Supreme Court's *Olmstead* decision to select the form of care that is best for their individual needs. (*See, e.g.*, Pl. Mem. in Opp. Intervention, Dkt. #34, at 6 ("Plaintiffs formulated the case in this narrow way in recognition that the right to community services afforded by the ADA and RA has been limited to those individuals who are not opposed to such services." (citing *Olmstead*, 527 U.S. at 607))). The Court has also found, that the class definition mirrors and satisfies the requirements of *Olmstead*. (*See, e.g.*, Jan, 27, 2011 Mem. & Order, Dkt. #88, at 16 ("the definition of the class itself satisfies the first two elements articulated in *Olmstead*")). A class certified under Rule 23(b)(2) however, is not the proper vehicle to preserve and protect class members' rights under *Olmstead*.

Notably, the plaintiffs in *Olmstead* did not bring claims on a class basis. Rather, the *Olmstead* decision concerned only the individual rights of the two named plaintiffs and did not

24

address class certification questions. *See Olmstead*, 527 U.S. at 602-03 ("[i]n this case . . . there is no genuine dispute concerning the status of [the two plaintiffs] *as individuals* 'qualified' for noninstitutional care . . . [as] neither woman opposed such treatment.") (emphasis added). Because *Olmstead* sought only to protect the individual rights of persons with mental disabilities, linguistic similarity between the class definition and the Supreme Court's *Olmstead* holding is not an appropriate basis for class certification.

Moreover, even outside of a Rule 23(b)(2) non-opt-out class, the Third Circuit and other courts have frowned upon class definitions characterized by the subjective mindset of class members. *See, e.g., Chiang v. Veneman*, 385 F.3d 256, 271 (3d Cir. 2004) ("defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation."). Federal District Courts in Pennsylvania have also long held that class certification is inappropriate when based on potential class members subjective mental state. *See Eisman v. Pan Am. World Airlines*, 336 F. Supp. 543, 547 (E.D. Pa. 1971) ("courts have dismissed class actions where the vague and indefinite description of the purported class depends on the subjective state of mind of a particular individual, rendering it difficult, if not impossible, for the Court to determine whether any given individual is within or without the alleged class"); *Hayden v. Freightcar Am., Inc.*, No. 3:2007-201, 2008 WL 375762, at *9, *11 (W.D. Pa. Jan. 11, 2008) (citing to and adopting Third Circuit's *Chiang* reasoning). This principle is not unique to the Third Circuit or Pennsylvania courts. *See, e.g., Nat'l Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 358 (N.D. Ill. 1997) ("when [class] membership is defined solely by state of mind, the case is generally deemed unascertainable"); Wright, Miller & Kane, Federal Practice &

JA1041

Procedure § 1760 (3d ed. 1998) ("a class defined with reference to the state of mind of its members will not be allowed to proceed under Rule 23").

The danger of granting wide-ranging relief to a class that is based on the mental state of its members, such as the class here, should be especially acute in this case where the class is defined by the subjective, future mindset of mentally retarded persons who will be required to affirmatively voice opposition to community placement – to the Plaintiffs' DRN advocates' satisfaction, of course – in order to avoid being moved from their current homes. While the Springstead Objectors and several other ICF/MR residents currently have guardians who are able to speak on their behalf, documents submitted by Plaintiffs in support of their motion for summary judgment indicate that not only do the vast majority of ICF/MR residents not have guardians to make elections about appropriate forms of care, but that DRN is *counting on that fact* to meet its annual "integration" targets. (*See* Motion for Class Approval at II.a. (stating that guardianless class members who say nothing will be placed on the ICF/MR Planning list and forced from their current homes); *see also* DRN Information Report, State Centers, Summary Sheet, Pl. Mot. Sum. J., Dkt. #48, Ex. 13 (indicating that, as of September 30, 2009, 219 ICF/MR residents had guardians, compared to 1004 ICF/MR residents without guardians)).

### III. THE SETTLEMENT PROPOSED BY PLAINTIFFS AND DEFENDANTS WILL IMPROPERLY VIOLATE THE RIGHTS OF THE SPRINGSTEAD OBJECTORS AND OTHER CLASS MEMBERS AND CANNOT BE APPROVED UNDER RULE 23(e).

Even assuming *arguendo* that the class could have been properly certified pursuant to Rules 23(a) and 23(b)(2), "a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." *Prudential*, 148 F.3d at 316. Under Rule 23(e) the Court bears the "important responsibility of protecting absent class members . . . ." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010).

26

When exercising this important responsibility under Rule 23(e), the Court assumes a fiduciary relationship with absent class members to protect and guard their rights. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010). That need for judicial protection is especially acute when, as here, the absent class members are developmentally disabled individuals, many of whom have no guardians.

### A.    The proposed settlement will deny class members from selecting the form of care that is appropriate to their individual needs, a right that was recognized by the Supreme Court in *Olmstead*.

In *Olmstead*, the Supreme Court held that that the Americans with Disabilities Act affords persons with developmental disabilities the right to choose to live in the "most integrated setting appropriate," taking into account the available resources and the individual's desires and needs. 527 U.S. at 595. Although *Olmstead* certainly supports Plaintiffs' right to choose community care for themselves, it also expressly rejected the one-size-fits-all approach advocated by Plaintiffs and recognized that community-based care is not always the most appropriate form of care for all mentally-disabled individuals:

> Unjustified isolation, we hold, is properly regarded as discrimination based on disability. But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.

*Olmstead*, 527 U.S. at 597. Both *Olmstead* and the applicable federal regulations affirm the Springstead Objectors and other ICF/MR residents have a right to choose institutional care over community-based care. *Id.* at 602 (holding there is no "federal requirement that community- based treatment be imposed on patients who do not desire it") (citing 28 C.F.R. § 35.130(e)(1) (1988) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept."); 28 C.F.R pt. 35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option of declining to accept a particular accommodation.")). As the Olmstead court observed, "it [is not]

27

the ADA's mission to drive States to move institutionalized patients into an inappropriate setting" and "for [some] individuals, no placement outside the institution may ever be appropriate." *Olmstead*, 527 U.S. at 605.

> *I.* *To avoid having community placement imposed upon them under the proposed settlement, class members incapable of making or communicating care decisions will be required to affirmatively oppose community placement.*

Pages 5-7 of the proposed settlement agreement (Dkt.#105, Ex. 2) provide a detailed protocol for the "Identification of Class Members."9  These identification procedures indicate that ICF/MR residents' opposition to community placement will be determined prior to September 30, 2011, "*and at least annually thereafter*." (*Id.* at III.2.)  Under the proposed plan, the determination will be performed by a ICF/MR social worker or someone described as a "Community Transition Specialist"10 working with a DRN-employed Facility Advocate. (*Id.* at III.2.a.)  This annual assessment and placement on the State Planning list prioritizing the resident for placement in a community care facility will be based on "discussion with the resident, and involved family or guardians to assess their position as to community placement." (*Id.*)  If an ICF/MR resident "does not express opposition to *considering* community placement" he or she will be placed on the State Planning List. (*Id.* at III.2.b.)  ICF/MR residents that do not affirmatively express opposition to community placement will be removed from the State Planning List only when involved family members or guardians make their affirmative opposition to community placement known. (*Id.* at III.2.b.1 & III.2.b.2.)

---

9  Indeed, Plaintiffs' own nomenclature underscores, better than the Springstead Objectors can, the manifest impropriety of this class.  It is hornbook law that a class certified under Rule 23 should be objectively identifiable.  Yet, here Plaintiffs expressly acknowledge that only after certification, settlement, and judgment will they make any attempt to (unilaterally) evaluate who wants to move to community care.

10  While the proposed settlement plan does not define "Community Transition Specialist," the Springstead Objectors believe that this person's role in the assessment process is self-evident provided the title.

28

While *Olmstead* found that the ADA guarantees that the developmentally disabled may choose to live in the most integrated settings appropriate to individuals' desires and needs, the proposed settlement plan envisions that ICF/MR residents who have expressed *no indication* that they desire community placement will be placed on the State Planning list. By establishing a class identification procedure that requires ICFs/MR residents, their guardians, or family members to affirmatively oppose community placement to exclude themselves from class relief, the Plaintiffs misconstrue the tenet of affirmative choice that is the hallmark of the Supreme Court's *Olmstead* decision. As the *Olmstead* court made clear, there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." 527 U.S. at 602.

In reality, the proposed settlement provides that the majority of decisions concerning whether institutional or community care represents the "most integrated setting" appropriate to class member's needs will be made, not by class members, but by persons employed by DRN, Plaintiffs' counsel in the present action. As the statistics maintained by the state ICFs/MR show, 890 of the 1,207 current residents of ICFs/MR are classified as possessing a profound mental disability. These same statistics show that 712 of the 1,207 current ICF/MR residents are classified as "non-verbal." Thus, nearly 75% of the current residents of state-run ICFs/MR will be unable to express any opposition to community placement.

Moreover, the vast majority of class members unable to voice their opposition to community placement do not have legal guardians to state that opposition on the class member's behalf. As the statistics Plaintiffs provided in support of their motion for summary judgment reveal, 1004 of the 1,223 residents of state-run ICF/MRs – 82% of the ICF/MR population – did not have a legal guardian. The settlement agreement also fails to provide any assurance that guardians' or family members' opposition to community care will have any permanence in the

29

event that the guardian or family member passes away or is otherwise unable to voice their

annual opposition to community care for their ward or loved one.11  Thus, the procedure

outlined in the proposed settlement agreement realistically provides that the choice between

ICFs/MR and community care will be made for most class members by employees of DRN who

categorically believe that state-operated ICFs/MR are not the most integrated settings appropriate

to the needs of *any* individual resident of those facilities.  (*See* Pl. Amend. Compl., Dkt. #9, ¶

66.)

> 2. *The integration plan detailed in the proposed settlement agreement would*
> *significantly depopulate state-run ICF/MR centers and deprive ICFs/MR of*
> *necessary funding, thereby constructively imposing community care upon on class*
> *members irregardless of their desire or opposition to being placed in a*
> *community care facility.*

Pages 9-12 of the proposed settlement agreement detail a "integration plan" that requires

Defendants to transfer residents and funding away from state-run ICFs/MR.  This integration

plan compelling Defendants to move *at least* 400 ICF/MR residents – roughly 35% of the current

ICF/MR population – into community care over the next five years.  (Proposed Settlement

Agreement, Dkt. #105, Ex.2, V.1.a-e.)  The integration plan further provides that Defendants will

continue to transition at least 75 ICF/MR residents into community care "each fiscal year

thereafter until all state ICF/MR residents in the ICF/MR Planning List have been discharged."

(*Id.*, V.1.e.)  The integration plan also requires Defendant DPW to make community care

funding "one of its top budget priorities," to consider "consolidating the budget lines for state

ICFs/MR and Community Waiver services," and, prior to consolidating the budget lines, to "shift

---

11    Moreover, even though the proposed settlement agreement purports to maintain choice for class members, the
      "Identification of Class Members" procedures requiring ICF/MR residents and their involved family and
      guardians to annually oppose community placement inevitably will chill class members' choice to live in
      ICF/MR care.  Annual assessments of whether class members oppose or desire community placement
      necessarily imply that the choice to live in ICF/MR care is somehow wrong.  The Springstead Objectors and
      their guardians further object to the settlement agreement on the basis that these annual assessments will
      operate to steer the particularly vulnerable residents of ICFs/MR onto the State ICF/MR Planning List.

funds from the carry-forward budget for state ICFs/MR to the Community Waiver services budget." (*Id.*)12

Without question, these provisions of the settlement agreement will impair the quality of care in state-run ICFs/MR and will result in closure of at least some ICFs/MR. While Plaintiffs will no doubt argue that the proposed settlement agreement says nothing about closing centers or making ICF/MR care unavailable, Plaintiffs are staunch proponents of closing ICF/MR facilities and using the funding from shuttered facilities to promote community care initiatives. (*See* Pl. Mem. in Supp. Sum. J., Dkt. #49, at 11-12 (criticizing DPW for failing to close the Hamburg and Selinsgrove Centers to "maximize funding" for community care initiatives)).

The Third Circuit Court of Appeals has expressly stated that disadvantaging ICF/MR residents by transferring funds to foster community placements is not acceptable under *Olmstead.* In *Frederick L. v. Department of Public Welfare of Pennsylvania*, a case involving the community placement of mental health patients from a state-run facility to community settings, the Third Circuit observed:

> Assuming a limited pool of budgetary resources, if DPW had siphoned off monies appropriated for institutional care for mental health patients in order to increase community placements, DPW would have run afoul of *Olmstead* prohibition on favoring those "who commenced civil actions" at the expense of institutionalized mental health patients who are not before the court. Any effort to institute fund-shifting that would disadvantage other segments of the mentally disabled population would thus fail under *Olmstead.*

364 F.3d 487, 497 (3d Cir. 2004).

---

12    It should also be noted that, even assuming *arguendo*, that in this lawsuit the claims and forced moves sought by Plaintiffs were appropriate, there is no legal "claim" or right vindicated by the consolidation of budget lines or the stripping of ICF/MR funding. In DRN's view of the world, it does not matter if individuals who want to move to the community such as Plaintiffs are permitted to do so; their federal rights apparently are still entreated upon by the *mere existence* of viable ICF/MR care for those who desire to remain in their homes.

Plaintiffs have, and presumably will continue to, argue that community placements save money and do not impact the services offered in ICFs/MR. However, Defendants have noted that the cost savings of community placements are largely illusory. As Defendants stated in their papers supporting their Motion for Summary Judgment, "[e]ven when a community placement is less expensive, discharge of a resident from a State center does not result in an immediate savings of the average cost for that resident." (Defs. SOF, Dkt. #52, at ¶29.) Therefore the cost of care of an ICF/MR resident "does not become available for community care upon the resident's discharge" and "Defendants generally accrue no net savings from an institution to community transfer unless a State center or at least a unit within that facility is closed as a result of that transfer." (*Id.* at ¶¶32, 33.)

Defendants have noted that severe financial constraints already limit the services DPW currently is able to provide. (Defs.' Mem. in Supp. Sum. J., Dkt. #53, at 4.) Depleting ICFs/MR of residents and limited, necessary funding undoubtedly will result in the closure of ICF/MR facilities and impair the level of care they provide to the developmentally disabled. Thus, the "viable integration plan" provided by the settlement agreement will, contrary to the tenets of *Olmstead*, impose community care upon the Springstead Objectors and other class members for whom ICF/MR care is the most appropriate and integrated form of care for their unique and individual needs.

3.    *The educational initiatives of the proposed settlement agreement are decidedly pro-community care, do not provide a full range of information and seek to impose community care upon class members by impeding their ability to conduct a meaningful evaluation of available care options*

The "Education about Community Placement Options" found on pages 7-9 of the proposed settlement agreement call for the establishment of a "Community Partnership Steering Committee . . . to develop and implement a program to educate state ICF/MR residents and their

32

involved families and guardians about community placement." (Settlement Agreement, Dkt #105, Ex. 2, at IV.1.)  The settlement agreement provides that the Community Partnership Steering Committee, true to its name, is to be comprised predominately of community care advocates: a DRN representative, a provider representative, a representative of the groups that administer community care programs for DPW, a community care resident, a community care resident's family member, and a representative of the Office of Developmental Programs.  (*Id.* at IV.1.a.)

In addition to its name and membership, the identified activities and goals of the Community Partnership Steering Committee further reveal that the Committee's purpose is to conduct an aggressive campaign steering ICF/MR residents into community care elections.  The settlement agreement does not provide for programs educating ICF/MR residents about the drawbacks or limitations of community care, does not provide education programs letting ICF/MR residents and involved family and guardians how to get the most benefit from ICF/MR care, and does not establish any mechanism by which ICF/MR residents and their involved family and guardians can ensure that they remain in ICF/MR care.  Moreover, the settlement agreement's education program does not provide for any mechanism educating class members initially desiring community placement how they can change their mind and return to ICF/MR care in the event community settings prove to be inappropriate to their needs.[13]

---

[13]     The settlement agreement's reporting provisions will also fail to provide class members with complete and accurate information necessary for a meaningful evaluation of available care options.  The reporting provisions found on pages 12-13 of the settlement agreement mandate that DPW will semi-annually report to Plaintiffs' counsel and the Court on the steps it has taken to implement the Integration Plan, the number of persons discharged to community care from the State ICF/MR Planning list, and the implementation of the settlement agreement's education and outreach plans.  To their credit, Plaintiffs' counsel will also receive reports about the identity of class members who, after discharge to the community, were admitted to psychiatric hospitals or state ICFs/MR or were arrested or jailed.  These reports (in an appropriately redacted form) should be made available to all ICF/MR residents or their guardians contemplating community care and should also include information on deaths, injuries, and any other harm resulting from relocation to community-based forms of care.

33

The Springstead Objectors fully support education programs providing ICF/MR residents and their involved family and guardians with accurate information about the benefits of community care. However, the Springstead Objectors object to the one-sided, biased education program called for by the settlement agreement that will deprive residents of all information necessary to make meaningful choices about the most appropriate form care for their individual needs. An education program designed to prompt residents to choose community care, is little more than a coercive version of the imposition of community care expressly rejected by the Supreme Court in *Olmstead.*

**B.  The settlement agreement requires Defendants to award DRN attorneys fees that are excessive and inappropriate.**

The Springstead Objectors respectfully submit that DRN, a publicly funded organization, should not be entitled to *any* attorneys fees, let alone the excessive fees contemplated by the settlement agreement. Pursuant to federal law, the Developmental Disabilities Assistance and Bill of Rights Act of 2000, 42 U.S.C. § 15001, *et seq.*, Protection and Advocacy for Individuals with Mental Illness Act, 42 U.S.C. § 10801, *et seq.*, the Help America Vote Act, 42 U.S.C. 15401, *et seq*, and several other provisions of federal law, DRN receives considerable federal funds. DRN's own website indicates that 98% of its funding comes from governmental sources. About DRN, Disability Rights Network of Pennsylvania, *http://drnpa.org/page/about-drnpa.* The Springstead Objectors respectfully question the propriety of a $432,500 legal fee payment from the Commonwealth treasury to compensate an organization already receiving public funds.

The settlement agreement also fails to provide any basis for how the fee award was calculated. In the absence of a common fund, Third Circuit case law calls for the use of a lodestar fee determination process. *In re Cendant Corp. Prides Litig.*, 243 F.3d 722, 732 (3d Cir. 2001) ("There are two primary methods for calculating attorneys' fees: the percentage-of-

recovery method and the lodestar method. . . . 'The lodestar method is more commonly applied

in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially

beneficial litigation in cases where the expected relief has a small enough monetary value that a

percentage-of-recovery method would provide inadequate compensation.'") (quoting *Prudential*,

148 F.3d at 333). In order to apply the lodestar method, "[a] court determines an attorney's

lodestar by multiplying the number of hours he or she reasonably worked on a client's case by a

reasonable hourly billing rate for such services given the geographical area, the nature of the

services provided, and the experience of the lawyer." *Id.* at 732 n.11 (quoting *Gunter v.

Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)). No such calculation is

provided by the settlement agreement and Plaintiffs have offered no other proof or

documentation supporting an award of $432,000 in a case in which Plaintiff's counsel took

extremely limited discovery and only received token opposition from Defendants.

   The Springstead Objectors object to this fee award and respectfully submit that these

funds could better benefit the developmentally disabled residents of Pennsylvania if they were

used to provide services or supports to residents of ICFs/MR or community care facilities. The

Springstead Objectors take particular note that, at the average costs for the provision of

community services Plaintiffs quoted in their papers supporting their summary judgment motion,

this fee award of $432,000 would provide nearly enough funding to provide community care for

four of the five named Plaintiffs for one year. (*See* Pl. SOF, Dkt. #50, ¶116 (stating that the cost

for 75% of the individuals recently charged to community care the annual care cost for those

individuals was less than $169,000 per person)).

35

## CONCLUSION

The Springstead Objectors respectfully request to be heard at the August 22, 2011 fairness hearing and further request that the Court (1) deny the current motion seeking approval of the settlement, (2) decertify the class, (3) allow the named Plaintiffs' action to proceed on an individual, not class, basis, and (4) grant any other relief that the Court deems fair and equitable.

Respectfully submitted,

Dated:  Philadelphia, Pennsylvania  
       August 1, 2011

**VAIRA & RILEY, P.C.**

By:  /s/ John E. Riley  
       John E. Riley  
       PA ID# 22504  
       William J. Murray, Jr.  
       PA ID# 73917  
1600 Market Street, Suite 2650  
Philadelphia, Pennsylvania  19103  
(215) 789-9405  
(215) 751-9420 (fax)

Of Counsel:

**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart  
787 Seventh Avenue  
New York, New York  10019  
(212) 839-5300  
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace Meo,*
*Daniel Bastek, Michael Storm, Beth Ann Lambo,*
*Richard Kohler, Maria Kashatus, and Wilson*
*Sheppard*

36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

-------------------------------------------------------------x
FRANKLIN BENJAMIN, et al., on behalf of     :
themselves and all others similarly situated,     :
      :
              Plaintiffs,     :
      :     No. 09-cv-01182
      -against-     :     (Jones, U.S.D.J.)
      :
DEPARTMENT OF PUBLIC WELFARE OF     :     (Am. Complaint
THE COMMONWEALTH OF     :     Filed 7/14/09)
PENNSYLVANIA, et al.,     :
      :
             Defendants.     :
-------------------------------------------------------------x

**DECLARATION OF BENJAMIN J. HOFFART**

1.      I am an attorney duly admitted to practice law in the State of New York and via

*pro hac vice* in this Court, and I am employed by the firm Sidley Austin LLP, attorneys for Craig

Springstead, by and through his father and guardian, Bertin Springstead, Maria Meo, by and

through her mother and guardian, Grace Meo, Daniel Bastek, by and through his father and

guardian, John Bastek, Michael Storm, by and through his guardian, Polly Spare, Beth Ann

Lambo, by and through her father and guardian, Joseph Lambo, Richard Kohler, by and through

his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and guardian,

Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend, Alfred

Sheppard (collectively, the "Springstead Objectors").

2.      I submit this declaration in support of the Springstead Objectors' Supplemental

Objections to the Proposed Settlement Agreement solely to present the Court a true and correct

copy of the following documents in support thereof:

          **Exhibit A:**    ICF/MR resident demographics provided to Tom Kashatus by Fred
                            Lokuta, April 19, 2011.

**Exhibit B:**    Collected ICF/MR Center Demographics for Ebensberg (March 31, 2011), Hamburg (March 25, 2011), Polk (June 27, 2011), Selinsgrove (March 31, 2011), and White Haven (July 26, 2011) Centers.

3.    I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing is true and correct.

Executed:    New York, New York                **SIDLEY AUSTIN LLP**
             August 1, 2011

                                                By:    /s/ Benjamin J. Hoffart
                                                       787 Seventh Avenue
                                                       New York, New York  10019
                                                       (212) 839-5300
                                                       (212) 839-5599 (fax)


                                                *Attorneys for Craig Springstead, Grace Meo,*
                                                *Daniel Bastek, Michael Storm, Beth Ann Lambo,*
                                                *Richard Kohler, Maria Kashatus, and Wilson*
                                                *Sheppard*

JA1054

| Level of MR | Ham | Ebe | Polk | Sel | WHC | Total |
|---|---|---|---|---|---|---|
| Mild | 4 | 2 | 19 | 14 | 8 | 47 |
| Moderate | 7 | 4 | 35 | 25 | 10 | 81 |
| Severe | 22 | 18 | 64 | 46 | 39 | 189 |
| Profound | 91 | 255 | 188 | 245 | 111 | 890 |

| Age | | | | | | |
|---|---|---|---|---|---|---|
| 22-14 | 8 | 17 | 41 | 22 | 23 | 111 |
| 46-55 | 51 | 160 | 85 | 81 | 58 | 435 |
| 56-60 | 27 | 82 | 40 | 107 | 27 | 283 |
| 61-65 | 13 | 17 | 51 | 62 | 20 | 163 |
| 66-over | 25 | 3 | 90 | 58 | 40 | 216 |

| Special Needs | | | | | | |
|---|---|---|---|---|---|---|
| Autism | 24 | 81 | 134 | 35 | 42 | 316 |
| Cerebral Palsy | 53 | 56 | 68 | 137 | 16 | 330 |
| Hearing Impairment | 11 | 37 | 30 | 85 | 12 | 175 |
| Ambulatory | 32 | 141 | 124 | 179 | 82 | 558 |
| Partial/non Ambulatory | 92 | 138 | 97 | 151 | 86 | 564 |
| Seizure Disorder | 60 | 174 | 174 | 187 | 75 | 670 |
| Non-Verbal | 83 | 199 | 166 | 168 | 96 | 712 |
| Visual Impairment | 19 | 45 | 143 | 50 | 26 | 283 |
| Enteral Feeding | 49 | 45 | 28 | 51 | 15 | 188 |
| Tracheotomies | 10 | 7 | 3 | 7 | 2 | 29 |
| Duel Diagnosis | 119 | | | | 119 | |
| MH Plan | 31 | | | | 31 | |

-----Original Message-----
From: Tom Kashatus [mailto:tomkash@verizon.net]
Sent: Tuesday, April 19, 2011 7:51 AM
To: Lokuta, Fred C.
Subject: Statistics & Demographics


Fred,      Is it possible that I can have a recap of the
demographics of White Haven Center so that I can brush up for the WVIA
panel discussion?  I don't know if this comes under privacy or
not.      Tom K

# EBENSBURG CENTER

### POPULATION PROFILE SUMMARY REPORT
### TOTAL ON BOOKS – 276
### March 31, 2011

## Total by Gender

| | |
|---|---|
| Male | 167 |
| Female | 109 |

Updated 1-31-2011
## Total by Level of Retardation

| | |
|---|---|
| Mild | 3 |
| Moderate | 4 |
| Severe | 19 |
| Profound | 250 |

## Total by Age Group

| Age | Male | Female |
|---|---|---|
| 20 – 30 | 1 | 1 |
| 31 – 35 | 1 | 0 |
| 36 – 40 | 1 | 1 |
| 41 – 45 | 4 | 6 |
| 46 – 50 | 17 | 7 |
| 51 – 55 | 65 | 44 |
| 56 – 60 | 68 | 38 |
| 61 – 65 | 9 | 10 |
| 66 – 70 | 1 | 0 |
| 71 – 75 | 0 | 1 |
| 76 – 80 | 0 | 0 |
| 81 – 85 | 0 | 1 |
| 86 – 90 | 0 | 0 |
| 91 – 95 | 0 | 0 |
| Total: | 167 | 109 |

## Total by Length of Stay

| | |
|---|---|
| 0 – 10 Years | 56 |
| 11 – 15 years | 6 |
| 16 – 20 years | 7 |
| 21 – 25 years | 5 |
| 26 – 30 years | 24 |
| 31 – 35 years | 4 |
| 36 – 40 years | 9 |
| 41 – 45 years | 46 |
| 46 – 50 years | 103 |
| 51 – 55 years | 17 |
| 56 – 60 years | 0 |
| 61 – 65 years | 0 |
| 66 – 70 years | 0 |

## Total by Legal Status

| | |
|---|---|
| 402 Voluntary | 250 |
| 406 Court | 26 |

## Total by Race

| | |
|---|---|
| White Non/Hispanic | 231 |
| White Hispanic | 1 |
| Black Non/Hispanic | 41 |
| Asian | 1 |
| Other | 2 |

Updated 1-31-2011
## Total by Ambulation

| | |
|---|---|
| Ambulatory | 154 |
| Partially Ambulatory | 0 |
| Non-Ambulatory/Non Mobile | 122 |

## Total by Religion

| | |
|---|---|
| Catholic | 120 |
| Jewish | 5 |
| Protestant | 150 |
| Other | 1 |
| Unknown | 0 |

JA1056

### HAMBURG CENTER STATISTICS AND DEMOGRAPHICS (3/25/11)

#### Statistics

- Hamburg Center currently serves 120 residents.
- The individuals residing at Hamburg Center require 24 hour nursing supports specific to people with developmental disabilities, as well as enhanced individualized direct care staffing for daily living activities.
- Approximately 40% of the people that live at the Center receive nutrition/liquids by enteral feeding. Nine individuals also have tracheotomies.
- Over 80% of the people in residence utilize a wheelchair, walker or some other mobility device.
- 56% of Hamburg Center's population is over 55 years of age.
- 92% of the individuals served are at a level of severe or profound MR.

#### Detailed Profile of Individuals

##### Total by Gender

| | |
|---|---|
| Male | 60 |
| Female | 60 |

##### Total by Level of Intellectual Disability

| | |
|---|---|
| Mild | 4 |
| Moderate | 6 |
| Severe | 20 |
| Profound | 90 |

##### Total by Age Group

| | |
|---|---|
| Under 22 years of age | 0 |
| 22-45 years of age | 6 |
| 46-55 years of age | 49 |
| 56-60 years of age | 28 |
| 61-65 years of age | 16 |
| 66 years and over | 21 |

##### Total by Legal Status

| | |
|---|---|
| 402 Voluntary | 85 |
| 406 Court | 35 |

##### Total by Race

| | |
|---|---|
| White/Non-Hispanic | 103 |
| Black/Non-Hispanic | 16 |
| Asian | 1 |

##### Total by Ambulation

| | |
|---|---|
| Ambulatory | 31 |
| Partially Ambulatory | 23 |
| Non-Ambulatory/Non Mobile | 66 |

##### Total by Religion

| | |
|---|---|
| Catholic | 39 |
| Jewish | 6 |
| Protestant | 73 |
| Other | 2 |

##### Special Needs

| | |
|---|---|
| Autism | 23 |
| Cerebral Palsy | 52 |
| Hearing Impairment | 9 |
| Seizure Disorder | 61 |
| Non-Verbal | 81 |
| Visually Impaired | 18 |
| Enteral Feedings | 52 |
| Tracheotomies | 9 |

##### Population by County

| | |
|---|---|
| Allegheny | 4 |
| Bedford | 1 |
| Berks | 18 |
| Bucks | 2 |
| Carbon | 1 |
| Chester | 3 |
| Cumberland | 1 |
| Dauphin | 1 |
| Delaware | 10 |
| Huntingdon | 1 |
| Lancaster | 5 |
| Lehigh | 20 |
| Lycoming | 1 |
| Montgomery | 3 |
| Northampton | 15 |
| Philadelphia | 27 |
| Schuylkill | 3 |
| Washington | 1 |
| York | 2 |

REPORT DATE: 06/27/11 13:50                    COMMONWEALTH OF PENNSYLVANIA
REPORT: M0G670-R05                             DEPARTMENT OF PUBLIC WELFARE
AS OF DATE: 06/21/11                           OFFICE OF MENTAL RETARDATION
AREA SELECTED: POLK CENTER                     STATE MR CENTERS AND MR UNITS

POPULATION PROFILE
SUMMARY REPORT BY FACILITY

FACILITY: POLK CENTER
SUBGROUP:

RESIDENT CENSUS:   292

| TOTAL BY LEGAL STATUS | | TOTAL BY LEVEL OF RETARDATION | | TOTAL BY LENGTH OF STAY | |
|---|---|---|---|---|---|
| 402 VOLUNTARY | 201 | 317. MILD | 18 | 0-1  YEAR | 4 |
| 405 EMERGENCY | 1 | 318.0 MODERATE | 36 | 1-5  YEARS | 1 |
| 406 COURT | 90 | 318.1 SEVERE | 61 | 6-10 YEARS | 0 |
| 499 OTHER | 0 | 318.2 PROFOUND | 176 | 11-15 YEARS | 3 |
| | | 319.  UNSPECIFIED | 1 | 16+  YEARS | 284 |

| TOTAL BY AGE | | TOTAL BY SEX | | TOTAL BY RACE | |
|---|---|---|---|---|---|
| 0-4   YEARS | 0 | FEMALE | 151 | 1 WHITE/NON-HISPANC | 276 |
| 5-18  YEARS | 1 | MALE | 141 | 2 WHITE/HISPANIC | 0 |
| 19    YEARS | 0 | | | 3 BLACK/NON-HISPANC | 15 |
| 20    YEARS | 0 | | | 4 BLACK/HISPANIC | 0 |
| 21-64 YEARS | 195 | | | 5 NATIVE AMERICAN | 0 |
| 65+   YEARS | 96 | | | 6 ASIAN/PAC.ISLANDR | 1 |
| | | | | 7 OTHER | 0 |
| | | | | 8 UNKNOWN | 0 |

TOTAL OF SPECIAL NEEDS *

| | |
|---|---|
| NON-AMBULATORY (AMBULATION CODES 5-6) | 56 |
| PARTIALLY AMBULATORY (AMBULATION CODES 2-4) | 45 |
| BLIND/VISUALLY IMPAIRED (ICD-9 369.0-369.9) | 118 |
| DEAF/HEARING HANDICAPPED (ICD-9 389.0-389.9) | 26 |
| NON-VERBAL (ICD-9 784.3) | 154 |
| SPEECH DISORDER (ICD-9 784.5) | 109 |
| CONVULSIVE DISORDER (ICD-9 345.0-345.9) | 128 |

* NOTE: EACH CLIENT MAY HAVE MULTIPLE SPECIAL NEEDS
..... END REPORT .....

# SELINSGROVE CENTER

POPULATION PROFILE SUMMARY REPORT
TOTAL ON BOOKS – 312
March 31 – 2011

Total by Gender

Male          185
Female        127

Updated 5-6-09
Total by Level of Retardation

Mild          14
Moderate      22
Severe        42
Profound      234

Total by Age Group

| Age | Male | Female |
|-----|------|--------|
| 20-30 | 0 | 1 |
| 31-35 | 2 | 0 |
| 36-40 | 5 | 1 |
| 41-45 | 5 | 3 |
| 46-50 | 14 | 8 |
| 51-55 | 28 | 18 |
| 56-60 | 61 | 36 |
| 61-65 | 51 | 30 |
| 66-70 | 10 | 6 |
| 71-75 | 8 | 10 |
| 76-80 | 1 | 6 |
| 81-85 | 0 | 3 |
| 86-90 |  | 4 |
| 91-95 |  | 1 |

JA1059

Total by Length of Stay

| | |
|---|---|
| 0-10 Years | 5 |
| 11-15 Years | 9 |
| 16-20 Years | 18 |
| 21-25 Years | 14 |
| 26-30 Years | 14 |
| 31-35 Years | 15 |
| 36-40  Years | 19 |
| 41-45 Years | 35 |
| 46-50 Years | 33 |
| 51-55 Years | 143 |
| 56-60 Years | 2 |
| 61-65 Years | 3 |
| 65-70 Years | 1 |

Total by Legal Status

| | |
|---|---|
| 402 Voluntary | 251 |
| 406 Court | 61 |

Total by Race

| | |
|---|---|
| White Non/Hispanic | 275 |
| White Hispanic | 5 |
| Black Non/Hispanic | 31 |
| Asian | 2 |

Updated 3-6-09

Total by Ambulation

| | |
|---|---|
| Ambulatory | 171 |
| Partially Ambulatory | 71 |
| Non-Ambulatory/Non Mobile | 70 |

Total by Religion

| | |
|---|---|
| Catholic | 88 |
| Jewish | 10 |
| Protestant | 213 |
| Other | 1 |
| Unknown | 0 |

```
REPORT DATE: 07/26/11 08:27              COMMONWEALTH OF PENNSYLVANIA
REPORT: M0G670-R05                       DEPARTMENT OF PUBLIC WELFARE
AS OF DATE: 06/21/11                     OFFICE OF MENTAL RETARDATION
AREA SELECTED: WHITEHAVEN CENTER         STATE MR CENTERS AND MR UNITS

                        POPULATION PROFILE
                   SUMMARY REPORT BY FACILITY

                 FACILITY: WHITEHAVEN CENTER
         SUBGROUP:

                 RESIDENT CENSUS:  161
```

|                                  | TOTAL BY LEVEL OF RETARDATION |                          |
|----------------------------------|------------------------------|--------------------------|
| **TOTAL BY LEGAL STATUS**        |                              | **TOTAL BY LENGTH OF STAY** |
| 402 VOLUNTARY          132        | 317.  MILD               6   | 0-1   YEAR            0   |
| 405 EMERGENCY            1        | 318.0 MODERATE           9   | 1-5   YEARS           1   |
| 406 COURT               28        | 318.1 SEVERE            41   | 6-10  YEARS           3   |
| 499 OTHER                0        | 318.2 PROFOUND         105   | 11-15 YEARS           4   |
|                                  | 319.  UNSPECIFIED        0   | 16+   YEARS         153   |

| **TOTAL BY AGE**       |       | **TOTAL BY SEX** |      | **TOTAL BY RACE**        |      |
|------------------------|-------|------------------|------|--------------------------|------|
| 0-4    YEARS           | 0     | FEMALE           | 67   | 1 WHITE/NON-HISPANC      | 145  |
| 5-18   YEARS           | 0     | MALE             | 94   | 2 WHITE/HISPANIC         | 2    |
| 19     YEARS           | 0     |                  |      | 3 BLACK/NON-HISPANC      | 14   |
| 20     YEARS           | 0     |                  |      | 4 BLACK/HISPANIC         | 0    |
| 21-64  YEARS           | 117   |                  |      | 5 NATIVE AMERICAN        | 0    |
| 65+    YEARS           | 44    |                  |      | 6 ASIAN/PAC.ISLANDR      | 0    |
|                        |       |                  |      | 7 OTHER                  | 0    |
|                        |       |                  |      | 8 UNKNOWN                | 0    |

```
                 TOTAL OF SPECIAL NEEDS *
        -------------------------------
        NON-AMBULATORY                  55
          (AMBULATION CODES 5-6)
        PARTIALLY AMBULATORY            17
          (AMBULATION CODES 2-4)
        BLIND/VISUALLY IMPAIRED         21
          (ICD-9 369.0-369.9)
        DEAF/HEARING HANDICAPPED        10
          (ICD-9 389.0-389.9)
        NON-VERBAL                      93
          (ICD-9 784.3)
        SPEECH DISORDER                 38
          (ICD-9 784.5)
        CONVULSIVE DISORDER             83
          (ICD-9 345.0-345.9)

* NOTE: EACH CLIENT MAY HAVE MULTIPLE SPECIAL NEEDS
            ..... END REPORT .....
```

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

```
----------------------------------------------------------x
FRANKLIN BENJAMIN, et al., on behalf of      :
themselves and all others similarly situated,  :
                                               :
                      Plaintiffs,              :
                                               :    No. 09-cv-01182
           -against-                           :    (Jones, U.S.D.J.)
                                               :
DEPARTMENT OF PUBLIC WELFARE OF                :    (Am. Complaint
THE COMMONWEALTH OF                            :    Filed 7/14/09)
PENNSYLVANIA, et al.,                          :
                                               :
                      Defendants.              :
----------------------------------------------------------x
```

**MOTION OF CRAIG SPRINGSTEAD, MARIA MEO, DANIEL BASTEK, MICHAEL STORM, BETH ANN LAMBO, RICHARD KOHLER, MARIA KASHATUS, AND WILSON SHEPPARD TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24**

Craig Springstead, by and through his father and guardian, Bertin Springstead, Maria Meo, by and through her mother and guardian, Grace Meo, Daniel Bastek, by and through his father and guardian, John Bastek, Michael Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by and through her father and guardian, Joseph Lambo, Richard Kohler, by and through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her father and guardian, Thomas Kashatus, and Wilson Sheppard, by and through his brother and next friend, Alfred Sheppard (collectively, the "Springstead Objectors"), respectfully move to intervene in the above-captioned action for the limited purpose of presenting and having the Court consider the Springstead Objectors' objections to the proposed class action settlement.

In support of this Motion, the Springstead Objectors aver as follows:

1.      By their Amended Complaint, dated July 14, 2009, Plaintiffs commenced this putative class action against Defendant Department of Public Welfare of the Commonwealth of

JA1062

Pennsylvania, "the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation." (Am. Compl. ¶ 13.)

2.    The five named Plaintiffs are residents of three of the five state-operated intermediate care facilities for persons with mental retardation ("ICFs/MR") in the Commonwealth of Pennsylvania.

3.    Plaintiffs' allegations concern "Defendants' continuing failure to offer and provide them with the opportunity to receive services in integrated, community settings that are the most appropriate settings to meet their needs."  (Am. Compl. ¶ 1.)  Plaintiffs seek "appropriate declaratory relief and injunctive relief" (id. ¶ 4), pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3) (id. ¶¶ 82-87), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) (id. ¶¶ 88-93).  The five named Plaintiffs seek immediate relocation to community care facilities.

4.    Plaintiffs seek this relief on behalf of a class that, as certified, includes:

> All persons who: (1) currently or in the future will reside in on[e] of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

(Order, Sept. 2, 2009, § III.)

5.    On March 10, 2010, the Court denied a motion by the Springstead Objectors, who had sought to intervene to protect their right to remain in state-operated ICFs/MR.  The Third Circuit Court of Appeals later affirmed this decision.  In the Order denying the proposed intervention, the Court found that the present litigation did not threaten the Springstead Objectors' ability to remain in ICF/MR care because the Springstead Objectors' opposition to community placement removed them from the certified class.

2

JA1063

6.      On January 27, 2011, the Court entered summary judgment for the Plaintiffs on liability without determining appropriate relief.

7.      On May 26, 2011, Plaintiffs and Defendants entered into a proposed settlement agreement, and on May 27, 2011 this agreement was tentatively approved by the Court.

8.      The Court has ordered that objections to the settlement be filed by August 2, 2011.

9.      The Court has scheduled a hearing for final approval of the settlement for August 22, 2011.

10.     The Springstead Objectors have filed objections to the proposed settlement as members of the class.

11.     This motion seeks intervention in the event that the Court determines that the Springstead Objectors are not members of the class.

12.     In addition to letters sent to the Clerk of Court and Plaintiffs' counsel in accordance with the notice procedures proposed by Plaintiffs and approved by the Court, the Springstead Objectors have, through counsel, filed a memorandum setting forth supplemental objections.  These supplemental objections have been attached hereto as Exhibit A and, in accordance with Federal Rule of Civil Procedure 24(c), set forth the basis for which intervention is sought.

13.     The Springstead Objectors should be permitted to intervene as of right.

14.     Rule 24(a) of the Federal Rules of Civil Procedure allows individuals to intervene as of right when (1) the intervention is timely; (2) the individual proposing intervention has an interest in the litigation; (3) the individual's interest may be affected or impaired by disposition

of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

15.     The Springstead Objectors' Motion to Intervene to present their objections to the proposed settlement agreement to the Court is timely because it is made within the time for responses to the proposed settlement agreement set forth in the class action settlement notice approved by the Court.

16.     As set forth more fully in the Springstead Objectors' supplemental objections, attached as Exhibit A, the Springstead Objectors have an interest in choosing the form of care most appropriate to their individual needs.  That interest is at issue in the present litigation.

17.     As set forth more fully in the Springstead Objectors' supplemental objections, attached as Exhibit A, the Springstead Objectors' interest in choosing the form of care most appropriate to their individual needs is jeopardized by the settlement agreement proposed by Plaintiffs and Defendants.

18.     As set forth more fully in the Springstead Objectors' supplemental objections, attached as Exhibit A, the Springstead Objectors' interests are not being represented by either Plaintiffs or Defendants in the present litigation.

19.     Alternatively, the Court should permissively allow the Springstead Objectors to intervene pursuant to Federal Rule of Civil Procedure 24(b), for the purpose of the objecting to the proposed settlement agreement.

**WHEREFORE**, the Springstead Objectors respectfully request that this Court enter an Order allowing them to intervene in the above-captioned matter for the limited purpose of appearing and presenting their objections to the proposed settlement agreement at the August 22, 2011 fairness hearing.

4

JA1065

Respectfully submitted,

Dated:  Philadelphia, Pennsylvania
        August 2, 2011

**VAIRA & RILEY, P.C.**

By:<u>   /s/ John E. Riley        </u>
       John E. Riley
       PA ID# 22504
       William J. Murray, Jr.
       PA ID# 73917
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania  19103
(215) 789-9405
(215) 751-9420 (fax)

**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace Meo,*
*Daniel Bastek, Michael Storm, Beth Ann Lambo,*
*Richard Kohler, Maria Kashatus, and Wilson*
*Sheppard*

5

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Thurman, on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>) Filed via ECF System<br>)<br>) Civ. No. 1:09-cv-1182 (JEJ)<br>)<br>) (Judge Jones) |
| Plaintiffs, | )<br>) Complaint filed June 22, 2009 |
| v. | )<br>) Class Action |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania; | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## STATEMENT OF SUPPORT BY THE UNITED STATES

The United States submits this Statement in support of final approval of the

proposed Settlement Agreement in accordance with this Court's Order of May 27,

2011.[1]  Order, May 27, 2011, ECF No. 106.  The proposed Settlement Agreement

---

[1] The Settlement Agreement can be found attached to the Unopposed Motion to Approve Consent Judgment, Exhibit 2, ECF No. 105-2.

JA1067

seeks to remedy Defendants' violations of title II of the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").[2] *See* Mem. &

Order, Jan. 27, 2011, ECF No. 88.  The Department of Justice has enforcement

authority for and issues regulations implementing title II and thus has a strong

interest in the resolution of this lawsuit.

The United States supports the proposed Settlement Agreement because it

advances the important public interest in community integration, *see Olmstead v.*

*L.C.,* 527 U.S. 581 (1999), and because it fairly, reasonably, and adequately

affords relief to class members.  Accordingly, this Court should grant final

approval of the Settlement Agreement.

---

The United States plans to attend the hearing on final approval of the proposed
Settlement Agreement scheduled for August 22, 2011, and requests this Court's
leave to participate in the hearing.

[2] In all ways relevant to this discussion, the ADA and Section 504 of the
Rehabilitation Act are generally construed to impose similar requirements. *See*
*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 91 n.5 (3d Cir.
2011); *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379
n.3 (3d Cir. 2005).  This principle follows from the similar language employed in
the two acts.  It also derives from the congressional directive that implementation
and interpretation of the two acts "be coordinated to prevent[ ] imposition of
inconsistent or conflicting standards for the same requirements under the two
statutes." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999) (citing
42 U.S.C. § 12117(b)) (alteration in original; internal quotation marks omitted).

2

# I.  STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The underlying goals of the ADA are to afford persons with disabilities "full participation, independent living, and economic self-sufficiency."  *Id.* § 12101(a)(7).  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  *Id.* § 12101(a)(2).  For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities.  Specifically, title II of the ADA decrees that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

As directed by Congress, the Attorney General issued regulations implementing title II, which are based on Section 504.  *See* 42 U.S.C. § 12134(a).  These regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  The preamble to the

3

"integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § 35.130(d), app. A, at 572 (2010).

Twelve years ago, the Supreme Court held that under title II of the ADA and its integration regulation, "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. The Court recognized that such segregation is a form of discrimination because the institutionalization of persons who can benefit from community settings "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and because "confinement in an institution severely diminishes the everyday life activities of individuals." *Id.* at 600-01.

Public entities are required to provide community-based services for persons with disabilities who would otherwise be entitled to institutional services when (a) community placement is appropriate; (b) the affected persons do not oppose such treatment; and (c) the placement can be reasonably accommodated, taking into account the resources available to the entity and the needs of others who are receiving disability services from the entity. *Olmstead*, 527 U.S. at 607. To comply with the ADA's integration requirement, a state must reasonably modify its policies, procedures, or practices when necessary to avoid discrimination. *See*

4

28 C.F.R. § 35.130(b)(7).  The obligation to make reasonable modifications may be excused only where a state demonstrates that the requested modifications would "fundamentally alter" the programs or services at issue.  *Id.*; *see also Olmstead*, 527 U.S. at 604-07.

## II. SUMMARY OF FACTS

Plaintiffs filed this lawsuit on June 22, 2009, on behalf of themselves and all other persons who:  (1) do or will reside in one of Pennsylvania's large, state-run, congregate care institutions[3]; (2) could live in the community if provided with appropriate services; and (3) do not or would not oppose such a placement. Compl. ¶ 15, ECF No. 1.  Plaintiffs amended the complaint on July 14, 2009, alleging that Defendants violated title II of the ADA and Section 504 of the Rehabilitation Act by unnecessarily segregating class members in large congregate care institutions.  Amend. Compl. ¶ 4, ECF No. 9.  Specifically, Plaintiffs alleged that Defendants unnecessarily institutionalized Plaintiffs – for years, if not decades – who can and want to reside in the community if provided with appropriate services and supports.  *See id.* ¶¶ 16, 18, 21-48.  This Court certified the class on September 2, 2009.  *See* Order, Sept. 2, 2009, ECF No. 17.

---

[3] These facilities are known as "intermediate care facilities for persons with developmental disabilities" ("ICF/DD").

5

JA1071

In November 2009, a group of individuals living in Pennsylvania's state-run congregate care institutions who opposed receiving services in the community then attempted to intervene in this suit. Proposed Mot. to Intervene, Nov. 11, 2009, ECF No. 27. The Court denied the motion, finding that definition of the class specifically excluded the prospective intervenors because they opposed community placement, and that they thus lacked a "significantly protectable interest in the litigation." Mem. & Order at 11-12, Mar. 10, 2010, ECF No. 41. The Third Circuit affirmed this Court's denial of intervention on April 27, 2011. Op. at 3-4, ECF No. 101-1.

Plaintiffs moved for summary judgment granting their claims for relief on June 23, 2010, and Defendants cross-moved for summary judgment on June 29, 2010. Mot. for Summ. J., June 23, 2010, ECF No. 49; Mot. for Summ. J., June 29, 2010, ECF No. 51. The United States, as *amicus curiae*, submitted a brief in support of Plaintiffs' motion on July 7, 2010. Br. in Supp., Jul. 7, 2010, ECF No. 62. The Court then granted summary judgment in favor of the Plaintiff class, ruling that Defendants violated title II of the ADA and Section 504 by failing to offer community services to Plaintiffs and class members. Mem. & Order, Jan. 27, 2011, ECF No. 88. The parties subsequently negotiated a proposed Settlement Agreement and filed it with the Court. *See* Mot. for Prelim. Approval, ECF No. 105; Settlement Agreement, ECF No. 105-2. The parties now seek the Court's

6

approval of the Agreement as a fair, reasonable, and adequate settlement of the

Plaintiff class' claims.

## III.   ARGUMENT

Federal courts favor settlement of class action litigation, given the

"overriding public interest in settling complex litigation . . . ." *In re Warfarin*

*Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004).  There is an "especially

strong" presumption in favor of approval of voluntary settlements in "'class actions

. . . where substantial judicial resources can be conserved by avoiding formal

litigation.'"  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010)

(quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*,

55 F.3d 768, 784 (3d Cir. 1995)).

Before approving a proposed settlement, a court must determine that the

agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In *Girsh v.*

*Jepson*, the Third Circuit identified nine non-exclusive factors to evaluate the

fairness of a proposed settlement:

> (1) [T]he complexity, expense and likely duration of the litigation . . . ;
> (2) the reaction of the class to the settlement . . . ; (3) the stage of the
> proceedings and the amount of discovery completed . . . ; (4) the risks
> of establishing liability. . . ; (5) the risks of establishing damages . . . ;
> (6) the risks of maintaining the class action through the trial . . . ; (7)
> the ability of the defendants to withstand a greater judgment . . . ; (8)
> the range of reasonableness of the settlement fund in the light of the
> best possible recovery . . . ; [and] (9) the range of reasonableness of the

7

> settlement fund to a possible recovery in light of all the attendant risks
> of litigation . . . .

521 F.2d 153, 157 (3d Cir. 1975) (quoting *City of Detroit v. Grinell Corp.*, 495

F.2d 448, 463 (2d Cir. 1974)) (internal quotations omitted).  Since then, the Third

Circuit has expanded the *Girsh* factors to include additional, non-exclusive factors.

*See In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283,

323 (3d Cir. 1998).[4]  While a district court must make findings as to each of the

nine *Girsh* factors before approving a settlement, a court may consider additional

factors where appropriate and "useful for a thoroughgoing analysis . . . ."  *In re Pet*

*Food Prods. Liability Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (citing *Prudential*,

148 F.3d at 323).  An analysis of the relevant factors indicates that the proposed

---

[4] The *Prudential* court laid out the following factors:

> [T]he maturity of the underlying substantive issues, as measured by
> experience in adjudicating individual actions, the development of
> scientific knowledge, the extent of discovery on the merits, and other
> factors that bear on the ability to assess the probable outcome of a trial
> on the merits of liability and individual damages; the existence and
> probable outcome of claims by other classes and subclasses; the
> comparison between the results achieved by the settlement for
> individual class or subclass members and the results achieved – or
> likely to be achieved – for other claimants; whether class or subclass
> members are accorded the right to opt out of the settlement; whether
> any provisions for attorneys' fees are reasonable; and whether the
> procedure for processing individual claims under the settlement is fair
> and reasonable.

148 F.3d 323.

8

Settlement Agreement is fair, reasonable, and adequate, and thus merits this Court's final approval.

### A. Continued Litigation Would Be Complex, Expensive, and Lengthy

A trial to determine the appropriate remedy for Defendants' discrimination would be complex, lengthy, expensive, and most importantly, unnecessary. A remedy phase would involve complex policy questions about how to structure and fund the appropriate relief that are more easily answered by experts in the field and policymakers than by the courts. *See In re AT&T Corp.*, 455 F.3d 160, 166, 170-71 (3d Cir. 2008) (where remaining factual issue following partial summary judgment was "not 'straightforward or simple'" first *Girsh* factor weighed in favor of approval of settlement); *see also* Mem. & Order at 22, Jan. 27, 2011, ECF No. 88 ("[T]he present posture of this case is such that we are in no position to issue an injunction given the need for extensive detail therein . . . ."). Addressing the question of remedy in an adversarial setting would also involve the testimony of numerous experts at significant expense, and a possible appeal to the Third Circuit, adding further expense and time. Here, all parties have agreed to the terms of the proposed Settlement Agreement, obviating the need for what would be a complex, lengthy, and expensive continuation to the litigation. The first *Girsh* factor thus weighs in favor of settlement.

9

**B. The Few Objections to the Settlement Agreement Should Not Be Accorded Significant Weight**

The Third Circuit has warned that courts should be "cautious about inferring support from a small number of objectors to a sophisticated settlement." *Prudential*, 148 F.3d at 318 (quoting *In re Gen. Motors*, 55 F.3d at 812). As of August 1, 2011, the Court received requests on behalf of 77 institutionalized individuals asking that they not be moved from their current placements. *See, e.g.*, Letters, ECF Nos. 107, 110, 114-19, 121-29, 130-31, 134. A handful of additional writers who do not represent class members state their general support for Pennsylvania's state-run institutions, and their wish for them to remain open. *See, e.g.*, Letters, ECF Nos., 120, 129, 132-33, 142, 190, 198, 204, 218. Out of a potential class of 1272 individuals, *see* Am. Compl. ¶ 16, ECF No. 9, only 58, or 4.6%, raise concerns about the Agreement. Of these, the most common concern is the payment of legal fees to Plaintiffs' counsel – not the substance of the Agreement. *See, e.g.*, Letters, ECF Nos. 110, 116-119, 124, 125, 126, 128, 134, 138-41, 143, 149, 151, 153, 155, 158-60, 163-64, 169, 172-73, 176-81.

Moreover, the few writers who raise concerns about the Agreement are not class members, nor do they represent class members. The parties have explicitly defined the class to include all persons who "do not or would not oppose community placement." Settlement Agreement Pt. II ¶ 3, ECF No. 105-2. These

10

writers uniformly oppose the idea of community placement for themselves or their affected family member.  They thus publically declare that they are opting out of the class; they do not, however, object to the adequacy of the remedy.  Such expressions of personal preference, however sincere, do not bear on the fairness, adequacy, and reasonableness of the remedy.  *See, e.g.*, *Gaskin v. Pennsylvania*, 389 F. Supp. 2d 628, 644 (E.D. Pa. 2005) (declining to consider concerns raised by non-class members in approving settlement remedying ADA, Section 504 claims); *see also* Fed. R. Civ. P. 23(e)(5) (expressly permitting only "class members" to object to the proposed Settlement Agreement).

In contrast, a class member eloquently captured the significance of the Agreement to the class, stating that "I have been waiting to leave [Hamburg Center] for over a year now, and not a day goes by when I don't express my desire to live in a group home."  Letter from Jemille Houston, ECF No. 113.  Another class member wrote, "I am from White Haven Center and been in White Haven Center for ten years and it is time to leave . . . .  I am happy that this settlement will help me move."  Letter from John Hoops, ECF No. 148.  In addition, The Arc of Pennsylvania, the State's largest advocacy organization for people with developmental disabilities, whose members include thousands of individuals with disabilities and their families – including many class members – supports the Agreement.  *See* Letter, ECF No. 171; *see also* Letters, ECF Nos. 184, 185

11

JA1077

(statements of support from The Arc of Greater Pittsburgh/ACHIEVA).  This

Court should approve the proposed Agreement because it will provide class

members with a long-awaited remedy for Defendants' discrimination.  The

concerns of non-class members should not limit or delay this relief when those

who oppose community placement may opt out of the class.

### C. The Stage of Proceedings Weighs Heavily in Favor of Approval

The stage of the proceedings weighs heavily in favor of approval here.

Courts consider the stage of proceedings a proxy for evaluating the extent of

counsel's "appreciation of the merits of the case prior to settlement."  *In re AT&T*,

455 F.3d at 167 (noting that the district court found that counsel had a "'thorough

and exhaustive'" appreciation of merits following discovery, motion practice, and

two weeks of trial).  The parties reached the proposed Settlement Agreement

following two years of litigation, including extensive discovery, this Court's entry

of summary judgment finding Defendants liable for discrimination, and months of

settlement negotiations.  The parties have thus fully identified and evaluated the

merits of the legal issues, and had the benefit of this Court's ruling on the issue of

liability before they reached an agreement.

12

**D. Plaintiffs Face Risks in Establishing the Remedy Through a Contested Proceeding**

Although this Court established Defendants' liability, the structure, content, and form of relief remain uncertain if Plaintiffs proceed to a contested remedy phase. As noted above, designing a remedy in the context of this case is far more complex than a simple calculation of damages, as it involves questions of policy and allocation of limited government resources. A negotiated remedy thus provides Plaintiffs with a significantly greater degree of control over the many details involved in creating a safe yet expeditious community integration plan. *See Pet Food Prods.*, 629 F.3d at 351 (noting that the district court examined fourth and fifth *Girsh* factors together and found that uncertainty in establishing liability or damages weighs in favor of settlement approval).

**E. Modification of the Class Remains a Possibility**

Uncertainty in maintaining class certification also weighs in favor of settlement. A district court retains the authority to decertify or modify a class at any time if it proves unmanageable, or if it becomes apparent that members of a class have divergent interests. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 260 (3d Cir. 2009); *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001). Moreover, "proceeding to trial would always entail the risk, even if slight, of decertification." *Cendant Corp.*, 264 F.3d at 239. While the risk of

13

decertification here appears slight, it nonetheless remains a possibility.  This factor

thus supports approval of the Settlement Agreement.

### F.  The Record Contains No Indication That Defendants Can Withstand a Greater Judgment

This factor addresses whether Defendants could withstand the imposition of

a remedy that costs significantly more than the price of the proposed Settlement

Agreement.  *See id.* at 240.  The parties negotiated the Settlement Agreement

following development of a record that included many uncontested facts regarding

the costs of providing services to individuals both in Defendants' congregate care

institutions and in community placements.  *See, e.g.*, Defs. Statement of

Undisputed Facts ("SUF") ¶¶ 10,15, 24-27, June 29, 2010, ECF No. 51-3.  In

particular, there was no dispute that "[a]ll available funding for both State

ICF/[DD] care and community care is expended for services to persons with

mental retardation."  *Id.* ¶ 25; *see also* Pl. SUF ¶ 25, July 12, 2010, ECF No. 65-1;

Mem. & Order at 22, Jan. 27, 2011, ECF No. 88 ("We are not blind to the

budgetary constraints that Pennsylvania faces, and we are certainly mindful that

DPW has limited resources . . . .").  Thus, the parties' discussions focused on how

best to allocate the finite resources available to Defendants for providing services

to individuals with developmental disabilities in a manner that vindicates the

integration rights of those individuals.  The parties painstakingly negotiated such a

14

settlement over a period of more than two months following this Court's order

granting summary judgment.[5]  The record thus contains no indication that

Defendants could withstand a greater judgment.

### G. The Settlement Represents a Fair and Reasonable Agreement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

The final two *Girsh* factors "evaluate whether the settlement represents a

good value for a weak case or a poor value for a strong case." *Warfarin Sodium*,

391 F.3d at 538.  Plaintiffs' case is strong, as demonstrated by this Court's ruling

granting summary judgment on liability to Plaintiffs.  Yet as discussed above,

Plaintiffs faced uncertainty about the scope of the remedy that the Court would

order.

In light of the risks of continued litigation, the Settlement Agreement

represents a fair and reasonable compromise between the parties that ultimately

vindicates class members' right to receive community-based services under the

ADA and *Olmstead*.  The Settlement Agreement increases community capacity for

class members who choose to reside in community-based settings.  In doing so, the

Settlement Agreement offers relief to individuals who are unnecessarily

institutionalized.  Any compromises the proposed Settlement Agreement makes are

---

[5] The parties also engaged in extensive negotiations prior to this Court's grant of summary judgment.

reasonable in light of the inevitable risks, expense, and delays associated with proceeding to a contested remedy phase.[6]  The Settlement Agreement thus strikes a reasonable balance between the strength of Plaintiffs' claims and the benefits of a negotiated settlement.

### H. The Additional *Prudential* Factors Weigh in Favor of Approval

Finally, the relevant considerations the Third Circuit outlined in *Prudential* also weigh in favor of approval.  *See* 148 F.3d at 323.  First, the substantive claims at issue are fully mature:  this Court granted summary judgment resolving the issue of liability.  The parties then negotiated the remedy over the course of more than two months in sessions mediated by a magistrate judge.  The advanced stage of litigation here indicates that the Settlement Agreement merits this Court's approval, as the parties have had ample opportunity to assess the merits of the claims and evaluate the relief warranted.  *See Parks v. Portnoff Law Assocs.*, 243 F. Supp. 2d 244, 253 (E.D. Pa. 2003).  Additionally, the proposed Settlement Agreement accords class members the right to opt out of the settlement.  Indeed, it defines the class to exclude individuals who independently or through their involved families or guardians oppose community placement, and provides a

_____

[6] As argued in this Statement of Support, the proposed Settlement Agreement accords fair, reasonable, and adequate relief to Plaintiffs and class members.  The Settlement represents a compromise and does not, therefore, represent the full extent of relief available under title II of the ADA and Section 504.

process through which individuals and their involved families or guardians have

ample opportunity to express any opposition.  Settlement Agreement, Pt. II ¶2; Pt.

III ¶2, ECF No. 105-2.  The relevant *Prudential* considerations therefore both

indicate that the proposed Settlement Agreement merits this Court's approval.

### IV.    CONCLUSION

For the foregoing reasons, this Court should grant final approval of the

Settlement Agreement.

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division

ALISON BARKOFF
Special Legal Counsel for
*Olmstead* Enforcement

JONATHAN M. SMITH
Chief
Special Litigation Section

MARY R. BOHAN
Deputy Chief
Special Litigation Section

*s/ Samantha K. Trepel*

17

JA1083

SAMANTHA K. TREPEL
DC992377
Trial Attorney
Special Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC  20530
Tel: (202) 514-6255
Fax: (202) 514-4883
samantha.trepel@usdoj.gov

Attorneys for the United States

18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____    :
                                            :
FRANKLIN BENJAMIN, by and through           :
his next friend, Andreé Yock; RICHARD       :
GROGG and FRANK EDGETT, by and              :
through their next friend, Joyce McCarthy;  :
SYLVIA BALDWIN, by and through her          :    Civil Action No. 1:09-cv-1182-JEJ
next friend, Shirl Meyers; ANTHONY          :
BEARD, by and through his next friend,      :    Class Action
Nicole Turman, on behalf of themselves      :
and all others similarly situated,          :    Complaint Filed June 22, 2009
                                            :
                Plaintiffs,                 :
                                            :
         v.                                 :
DEPARTMENT OF PUBLIC WELFARE                :
OF THE COMMONWEALTH OF                      :
PENNSYLVANIA and GARY                       :
ALEXANDER, in his official capacity as      :
Secretary of Public Welfare of the          :
Commonwealth of Pennsylvania,               :
                                            :
                Defendants.                 :
_____     :

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL
OF THE PROPOSED CLASS ACTION SETTLEMENT AGREEMENT**

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs and the Class,

through their counsel, submit this Motion for Final Approval of the Proposed Class

Action Settlement Agreement.  The Settlement Agreement should be approved

because it is fair, adequate, and reasonable.  In support of this Motion, Plaintiffs

submit the accompanying Brief, Exhibits, and Certificate of Concurrence, which

are incorporated by reference as if fully set forth herein.

JA1085

Respectfully submitted,

Dated:  August 8, 2011          By:    /s/ *Robert W. Meek*
                                       Robert W. Meek -  PA 27870
                                       Mark J. Murphy - PA 38564
                                       Robin Resnick - PA 46980
                                       Disability Rights Network of PA
                                       1315 Walnut Street, Suite 500
                                       Philadelphia, PA  19107-4798
                                       215-238-8070
                                       215-772-3126 (fax)
                                       RMeek@drnpa.org

                                       Counsel for Plaintiffs and the Class

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ<br><br>Class Action<br><br>Complaint Filed June 22, 2009 |
| Plaintiffs, | : : : |  |
| v. | : : |  |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : | |
| Defendants. | : | |

_____:

## DECLARATION OF ROBERT W. MEEK

I, Robert W. Meek, hereby declare based on personal knowledge as follows:

1.    I am a Managing Attorney for the Disability Rights Network of Pennsylvania (DRN), and counsel for Plaintiffs and the Class in this lawsuit.

2.    The parties completed extensive fact discovery in late 2009 and early 2010.

JA1087

a.    Plaintiffs requested and received numerous documents, including Community Placement Plans for all state ICF/MR residents and information concerning DPW's budgets, costs for state ICF/MR services, and costs for community services.

b.    Plaintiffs served and received answers to interrogatories and requests for admissions.

c.    Plaintiffs deposed five fact witnesses and defended the depositions of five witnesses.

3.    The parties also completed expert discovery in the spring of 2010.

a.    James Conroy issued a report that assessed the methodology used by DPW to determine opposition to community placement and opined on its deficiencies.

b.    Parker Dennison & Associates, Ltd. (PDA) provided a report that analyzed the costs that would be incurred and the savings that would be realized under various scenarios for the provision of community services to class members.

c.    Plaintiffs defended the deposition of Susan Parker from PDA.

d.    Plaintiffs deposed R. Gregory Kipper, who DPW retained to rebut the PDA report.

2

4.    After the parties filed cross-motions for summary judgment and with the parties' agreement, the Court referred the case to the Honorable Martin C. Carlson, United States Magistrate Judge, for mediation.  The parties met the Magistrate Judge in November 2010, but ultimately informed the Court that they were unable to reach consensus.

5.    After the Court granted Plaintiffs' Motion for Summary Judgment as to liability, the parties agreed to the Court's suggestion to attempt to resolve the question of remedy through mediation with Magistrate Judge Carlson.

6.    The parties met in person twice with Magistrate Judge Carlson for extensive, arms-length settlement negotiations.  The parties subsequently continued negotiations on their own through emails, telephone conversations, and an exchange of settlement drafts.

7.    As a result of those negotiations, the parties finalized a Settlement Agreement (Agreement) in May 2011.  A copy of the Agreement is submitted as Exhibit B to Plaintiffs' Motion for Final Approval of the Proposed Settlement.

8.    The Agreement was the result of arms-length, intensive negotiations. The parties engaged in settlement negotiations prior to the Court's issuance of its ruling that DPW violated the integration mandates, Plaintiffs were unwilling to agree to the offers DPW made at that time.  Plaintiffs resumed negotiations only

3

after the Court issued its decision, holding that DPW violated the ADA's and RA's integration mandate.

9.     Plaintiffs' counsel's assessment of the factual issues relating to liability and remedy were informed by the extensive fact and expert discovery they completed, the parties' briefing on the summary judgment motions, and their discussions of those issues with Defendants and their counsel during settlement negotiations.  Plaintiffs and their counsel had a full opportunity to develop an appreciation of the merits of the case and to make an informed judgment about the settlement.

10.     I and the other attorneys at DRN who litigated this case have decades of experience in disability rights litigation, including many cases to secure community services for individuals who are unnecessarily institutionalized.

11.     It is Plaintiffs' counsel's opinion that the Agreement is fair, adequate, and reasonable.  Indeed, the Agreement closely tracks the relief requested by Plaintiffs in their summary judgment motion, including most critically establishing a comprehensive, multi-year Integration Plan with timelines and benchmarks to develop community placements for as many as 400 class members in the first five years.  Given evidence that indicated there are approximately 300 state ICF/MR residents who are not opposed and whose family or guardians are not opposed to discharge, it may be that most class members will receive community services

4

JA1090

within five years. Plaintiffs and class members benefit from implementation of this Agreement and the Integration Plan now, rather than potentially pursuing further litigation and appeals.

12.    DRN's Facility Advocates, who work at the state ICFs/MR, hand-delivered the class notice approved by the Court to each state ICF/MR resident by June 24, 2011 (other than some individuals who were hospitalized and three who refused to accept the notices), and were available to answer any questions they might have. *See* Plaintiffs' Certificate of Notice ¶ 4 (Docket # 257). DRN also posted the class notice and the full Settlement Agreement on its website, www.drnpa.org, in mid-June 2011 and it has been available there since that time.

13.    As of the August 2, 2011 deadline for statements relating to the Agreement, I have received letters from one state ICF/MR resident and the families or guardians of 101 other state ICF/MR residents in opposition to the Settlement Agreement. In many cases, multiple family members or friends of the same residents wrote letters. Either based on statements in those letters or in the individuals' Community Support Plans provided in discovery, it appears that those state ICF/MR residents have substitute decision makers or court-appointed guardians. The only exceptions are a Polk resident whose sister wrote a letter than did not include his last name and a Selinsgrove resident whose Community Support Plan did not include a substitute decision maker. Nevertheless, both of

5

those individuals obviously have substitute decision makers available through the family members who wrote those letters.  A listing of the state ICF/MR opponents is submitted as Attachment 1.

14.    As of August 2, 2011, I also received letters from three state ICF/MR residents who support the Agreement and want community placements.

15.    As of August 2, 2011, I received letters from miscellaneous individuals and organizations who expressed both support for the Agreement (such as The Arc of Pennsylvania) and opposition to the Agreement.

16.    As of August 2, 2011, I received letters from the families of two residents of Woodhaven Center, a private ICF/MR that is not at issue in this lawsuit, who mistakenly believe that the Agreement will apply to them.

17.    The Governor's Executive Budget for FY 2011-12 submitted to the Legislature included a new funding initiative to develop community services for 50 persons on the Planning List in this case.  It is my understanding that the Legislature appropriated the requested funding for that initiative.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of August, 2011.

/s/ *Robert W. Meek*
Robert W. Meek

6

JA1092

**ATTACHMENT 1**

## LIST OF STATE ICF/MR OPPONENTS AS OF AUGUST 2, 2011

| State ICF/MR | Name of Resident | Name of Opponent(s) | Relationship |
|---|---|---|---|
| Ebensburg | Albert Boring | Samuel L. Boring | Father/Substitute Decision Maker |
| Ebensburg | Thomas Causer | James, H. Lucille, & Gary Causer | Parents & Brother/Parents are Guardians |
| Ebensburg | Kathie Centi | August & Winnifred Centi | Parents/Guardians |
| Ebensburg | Anthony DePaul | Clara Palmer | Mother/Substitute Decision Maker |
| Ebensburg | Michael Fenerty | Mary Denise Schneider | Sister/Guardian |
| Ebensburg | Norma J. Ferguson | Norma G. Ferguson | Mother/Substitute Decision Maker |
| Ebensburg | Adelbert Gordon | A.M. & Minerva Gordon | Parents/Guardians |
| | | Kimberly Gordon | Sister |
| | | Nancy Slick, Kay Wagner, Eloise Moore | Friends of Family |
| Ebensburg | Robert Henry | Dixie Henry | Mother/Guardian |
| Ebensburg | James Jones | Mr. & Mrs. Herbert Jones Debra Herring, Mary McSurdy, Michelle Hosler, Ann Marie Miller, Colleen Jones, and Donald Jones | Parents//Substitute Decision Makers Siblings |
| Ebensburg | Albert Knight, Jr. | Albert Knight | Father/Substitute Decision Maker |
| Ebensburg | Maria Meo | Grace Meo | Mother/Guardian |
| Ebensburg | Sandra Wills | Gary & Mary Wills | Brother & Sister-in-Law/Guardians |
| Ebensburg | Stephan Wright | Carole Henry | Mother/Guardian |
| Hamburg | Daniel Bastek | John Bastek | Father/Guardian |
| Hamburg | Francis L. Beston | Francis J. Beston | Father/Guardian |
| Hamburg | Pamela Boyer | Joan Wright | Mother/Guardian |
| Hamburg | Peter Demers | Timothy Demers | Brother/Substitute Decision Maker |
| Hamburg | Judith Fluck | Patricia O'Donnell | Sister/Substitute Decision Maker Per Letter: "Working on guardianship" |
| Hamburg | Diane Kalan | Doris & David Kalan | Mother & Brother/Co-Guardians |
| Hamburg | Gregory Kodnovich | Jacob Kodnovich/Karen Blew | Siblings/Brother Substitute Decision-Maker |
| Hamburg | Deborah Lightner | Betty Lightner | Mother/Substitute Decision Maker |
| Hamburg | James McKeaney | Kathleen Govaeea | Sister/Substitute Decision Maker |
| | | Mary Gough | Sister |

JA1094

| State ICF/MR | Name of Resident | Name of Opponent(s) | Relationship |
|---|---|---|---|
| Hamburg | Beatrice McKinley | Wilson McKinley | Father (Mother Listed as Substitute Decision Maker) |
| Hamburg | Michael Pugh | Elizabeth Pugh | Mother/Substitute Decision Maker |
| Hamburg | Geraldine Rieder | Helen & Roy Reider | Mother & Brother/Mother is Substitute Decision Maker |
| Hamburg | Gretchen Shaffer | Kimberly Gauronski | Sister |
| | | Rickey V. Shaffer | Brother |
| | | | Brooke McCombie, Sister, is Guardian |
| Hamburg | Dale Sobe | Suzanne Sobe | Mother/Substitute Decision Maker |
| Hamburg | Mark Shuxteau | Dale & Darcene Uit | Sister & Brother-in-Law/Guardians |
| Hamburg | Michael Storm | Polly Spare | Guardian |
| Hamburg | Carol Toperzer | William Toperzer | Brother/Substitute Decision Maker |
| Hamburg | Linda Zepp | Doris & Francis Zepp | Parents/Substitute Decision Maker |
| Polk | Bruce Allen | Suzanne Perry | Sister/Guardian |
| Polk | Paul Daugherty | Beverly & William Daugherty | Parent/Substitute Decision Maker |
| Polk | Michael ??? | Mary Fernan | Sister |
| Polk | John Hartman | Susan Avril | Sister/Parents Listed as Substitute Decision Maker |
| Polk | Jeffrey Ilift | Martha & Richard Ilift | Parents/Guardians |
| Polk | Lisa Johns | Barry & Anna Johns | Parents/Substitute Decision Makers |
| Polk | Beth Lambo | Joseph Lambo & James Lambo | Father/Co-Guardian |
| | | | Brother |
| Polk | James McConnell | Harold McConnell | Brother/Substitute Decision Maker (Guardianship Pending) |
| Polk | John McCoy | Jean Milliron | Sister/Pending Guardianship |
| Polk | Virgil McLaughlin | Karen Crytzer | Sister/Substitute Decision Maker |
| Polk | Robert Nichol | Ruth Nichol | Mother/Guardian |
| Polk | Robert Read | David Read | Brother/Guardian |
| Polk | Donald C. Sabo | Barbara & Donald J. Sabo | Parents/Guardians |
| Selinsgrove | Rodney Baughman | Sharon & Elmer Brice, Jr. | Sister & Brother-in-Law/Sister is Substitute Decision Maker |
| Selinsgrove | George Bowers | Robert Bowers | Brother/Substitute Decision Maker |
| Selinsgrove | Unnamed | Cheryl Brown | Sister/Guardian |

2

| State ICF/MR | Name of Resident | Name of Opponent(s) | Relationship |
|---|---|---|---|
| Selinsgrove | Richard Chang | Lily Chang for Dolores Chang | Mother/Substitute Decision Maker |
| Selinsgrove | John Church, Jr. | Shirley Musacchio | Mother/Guardian |
| | | Trudy L. Sheetz | Sister/Alternate Guardian |
| Selinsgrove | Paul Drews | Frederick & Dolores Drews | Parents/Guardians |
| | | Mark Drews & Kathy Drews | Siblings/Alternate Guardians |
| | | Casadonte | |
| Selinsgrove | Audrey Hake | Amelia & Louise Hake | Parents/Mother (Amelia) is Substitute Decision Maker |
| | | Amy Schwartz, Jerry Hake, Sara | Siblings |
| | | Greth | |
| Selinsgrove | William Hey | Deborah & Gerard Hey | Siblings/Guardians |
| Selinsgrove | Henry Jarrett | Ruth Jarrett | Sister/Substitute Decision Maker |
| Selinsgrove | Joseph Keffer | J. Keffer | Brother/Substitute Decision Maker |
| Selinsgrove | Dennis Kennedy | Helen Cox | Mother/Guardian |
| Selinsgrove | Richard Kohler | Sara Fuller | Sister/Guardian (per Springstead "Supplemental Objections"; no separate letter) |
| Selinsgrove | Carol Lloyd | Carl Lloyd | Brother/Substitute Decision Maker |
| Selinsgrove | Dennis Parry | David & Althea Parry | Parents/Brother Listed as Substitute Decision Maker |
| Selinsgrove | Rosemarie Ropp | Clarence & Gail Ropp | Parents/Mother is Substitute Decision Maker |
| Selinsgrove | James Splane | Regina & John Splane | Parents/Mother is Substitute Decision Maker |
| Selinsgrove | Craig Springstead | Bertin Springstead | Father/Guardian |
| | | Carin E. Doddroe | Sister/Alternate Guardiane |
| Selinsgrove | David Taylor | Curtis & Arlene Troutman | Parents/Mother is Substitute Decision Maker |
| Selinsgrove | Lee Trout | Marian Lentz | Sister/Substitute Decision Maker |
| Selinsgrove | Bernice Wetzel | Geraldine Wetzel | Sister/Substitute Decision Maker |
| White Haven | Mildred Attanasio | Marion & Carmen Attanasio | Parents/Guardians |
| White Haven | Elizabeth Baran | Wes Grebski | Cousin/Substitute Decision Maker |
| White Haven | Mark Bonacci | Cecelia Hopkins | Sister/Substitute Decision Maker |
| White Haven | Ethel Brill | William Brill | Brother/Guardian |
| White Haven | Gabriel Ciullo | Arthur & Joyce Ciullo | Parents/Guardians |
| White Haven | Marvin Cohen | Beverly Cohen | Sister/Co-Guardian |
| White Haven | Edith Crawford | Debra L. Kleinen | Niece |

3

| State ICF/MR | Name of Resident | Name of Opponent(s) | Relationship |
|---|---|---|---|
| | | Daniel Kleinen | Unspecified Relative |
| | | Evelyn Crawford | Sister-in-Law |
| | | Jennifer Crawford | Niece |
| White Haven | Joseph Drago | Mr. & Mrs. Vincent Drago | Parents/Substitute Decision Makers |
| White Haven | Raymond Dunne | Gerard Dunne | Brother/Guardian |
| White Haven | Candace Fitzgerald | Paula Fitzgerald Wolfe | Sister/Guardian |
| White Haven | Patrick Garramone | Marion Kelly | Mother/Guardian |
| White Haven | Robin Gill | Robert & Beverly Gill | Parents/Guardians |
| | | Annette & Ronald Fischer | Sister & Brother-in-Law |
| White Haven | Thomas Gnall | Emil & Elizabeth Gnall | Parents/Guardians |
| White Haven | Daniel Hardy | Adelaide Hardy | Mother/Guardian |
| White Haven | John Hope | Barbara Fritz | Sister/Guardian |
| White Haven | Eleanor Hudock | William Hudock | Brother/Guardian |
| White Haven | Carolyn Jones | Thomas Jones (through Charles D. McCormick, Power of Attorney) | Father/Guardian |
| White Haven | Maria Kashatus | Margaret & Thomas Kashatus | Parents/Guardians |
| | | Mary Kashatus | Aunt/Co-Guardian |
| | | Jeremy, Thomas, and Jonathan Kashatus | Brothers |
| White Haven | Bryan Krafft | Larry & Sandra Krafft | Parents/Guardians |
| White Haven | Lauren Lotzi | Linda Lotzi | Sister/Guardian |
| White Haven | Andrew Margolis | James Margolis | Brother/Co-Guardian |
| White Haven | Isabel Marlow | Francis Marlow | Sister/Guardian |
| White Haven | Sarah Myers | Kenneth Myers | Brother/Guardian |
| White Haven | Phillip Parmley | W.J. Parmley | Parent/Guardian |
| White Haven | Michelle Plenn | Florence Plenn | Mother/Substitute Decision Maker |
| White Haven | John Potochnick | Mr. & Mrs. John Potochnick | Parents/Guardians |
| White Haven | Philip Roll | Carol McDonald | Sister/Guardian |
| White Haven | Bobby Sheetz | Bobby Sheetz | Self |
| White Haven | Wilson Sheppard | Alfred Sheppard | Brother; Mother is Substitute Decision Maker |
| White Haven | Joseph Sitko | Beatrice Sitko | Mother |

4

JA1097

| State ICF/MR | Name of Resident | Name of Opponent(s) | Relationship |
|---|---|---|---|
| | | Rose Schafer | Sister/Guardian |
| | | Henry Sitko | Brother |
| White Haven | Diane Solano | Carl Solano | Brother/Guardian |
| White Haven | David Thomas | Janice T. Fenlason | Sister/Guardian |
| White Haven | James Tierney | Margaret Tierney | Sister/Guardian |
| White Haven | Linda Tregellas | Catherine Tregellas Dymacek & Robin D. Mason | Sister & Niece/Co-Guardians |
| White Haven | Jennifer Vangrossi | Annie Vangrossi | Sister/"Working on Guardianship" |
| White Haven | Jean Walsh | Ann Marie Walsh | Sister/Guardian |
| White Haven | Marc Wesley | Mattie Wesley | Mother/Guardian |
| White Haven | James Zuchoski | Ann Marie Vodzak | Brother/Guardianship in process |

5

JA1098

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

---

FRANKLIN BENJAMIN, by and through
his next friend, Andreé Yock; RICHARD
GROGG and FRANK EDGETT, by and
through their next friend, Joyce McCarthy;
SYLVIA BALDWIN, by and through her
next friend, Shirl Meyers; ANTHONY
BEARD, by and through his next friend,
Nicole Turman, on behalf of themselves
and all others similarly situated,

         Plaintiffs,

       v.

DEPARTMENT OF PUBLIC WELFARE
OF THE COMMONWEALTH OF
PENNSYLVANIA and GARY
ALEXANDER, in his official capacity as
Acting Secretary of Public Welfare of the
Commonwealth of Pennsylvania,

         Defendants.

---

: 
: 
: 
: 
: Civil Action No. 1:09-cv-1182-JEJ
: 
: Class Action
: 
: Complaint Filed June 22, 2009
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 
: 

## SETTLEMENT AGREEMENT

### I. Introduction

WHEREAS on June 22, 2009, Plaintiffs filed this class action lawsuit, alleging, *inter alia*, that Defendants violated Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA) by unnecessarily segregating class members in state intermediate care facilities for persons with mental retardation (ICFs/MR);

WHEREAS the District Court by Order dated September 2, 2009 certified this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) on behalf of all individuals who (1) currently or in the future will reside in one of Pennsylvania's state ICFs/MR; (2) could reside in the community with appropriate supports and services; and (3) do not or would not oppose community placement;

WHEREAS the District Court by Memorandum and Order dated January 27, 2011 ruled that Defendants violated and were liable under Title II of the ADA and Section 504 of the RA by failing to offer community services to Plaintiffs and class members;

WHEREAS Plaintiffs and Defendants desire to reach consensus on an appropriate remedy that will resolve this lawsuit amicably and avoid the risks and expense of further litigation;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Settlement Agreement.

**II.**  **Definitions**

1.    "AEs" means the Administrative Entities that contract with the Department of Public Welfare to administer the community intellectual disabilities system in specific geographic areas.

2.    "Agreement" means this Settlement Agreement.

2

3.    "Class members" means all persons who: (1) currently or in the future will reside in one of Pennsylvania's state ICFs/MR; (2) could reside in the community with appropriate supports and services; and (3) do not or would not oppose community placement.

4.    "Community placement" means residential and non-residential services and supports appropriate to meet the needs of the individual. "Residential supports and services" means living independently in one's own home or with family while receiving supportive services; living in a family living ("life-sharing") home licensed under 55 Pa. Code Ch. 6500; or living in a group home licensed under 55 Pa. Code Ch. 6400 that, unless the person chooses otherwise, houses no more than four people and that is not contiguous with other homes that serve people with disabilities or on a campus-type setting that serves people with disabilities.

5.    "Community Waiver services" means services provided under the Consolidated Waiver or the Person/Family Directed Support Waiver and any future Medical Assistance programs that might succeed those waivers.

6.    "CPP" means the Community Placement Plan that is developed for each resident of a state ICF/MR pursuant to the individual support planning process and that establishes the basic understanding of what services and supports the resident would need if he or she were to move to a community placement.

3

7.    "DRN" means the Disability Rights Network of Pennsylvania.

8.    "DPW" means the Department of Public Welfare of the Common-wealth of Pennsylvania, its officials, employees, agents, and successors.

9.    "Effective Date" means the date that the Agreement is signed by all parties.

10.    "Facility Advocate" means an individual employed by DRN under contract with DPW who is assigned to each state ICF/MR to advocate for residents.

11.    "Facility Director" means the individual designated by ODP to oversee and administer the day-to-day operation of a state ICF/MR, including any interim or acting Facility Director.

12.    "Guardian" means an individual appointed by a Pennsylvania court pursuant to 20 Pa. C.S.A. Ch. 55 to serve as the guardian of the person for a resident of a state ICF/MR.

13.    "Involved family" means family members of a state ICF/MR resident who are designated as the resident's substitute decision makers in the CPP or other state ICF/MR records.

14.    "ISP" means the Individual Support Plan created for each state ICF/MR resident (through a process in which the resident, family members and representatives, and members of the resident's Interdisciplinary Team participate)

4

that assesses, identifies, and coordinates the needed supports and services for the resident.

15.    "ODP" means the DPW Office of Developmental Programs, its officials, employees, agents, and successors.

16.    "State ICFs/MR" means Ebensburg Center, Hamburg Center, Polk Center, Selinsgrove Center, White Haven Center, and any other facility licensed as an ICF/MR that Pennsylvania may operate or administer in the future.

**III.    Identification of Class Members**

1.    DPW will create, maintain, and update as needed a State ICF/MR Planning List that consists of all state ICF/MR residents who have been identified as not opposed to discharge to community placement.

2.    To determine who is on the State ICF/MR Planning List, ODP will assess opposition to discharge by state ICF/MR residents and their involved families or guardians no later than September 30, 2011, and at least annually thereafter.

a.    With the exception of those state ICF/MR residents identified in Section III.3 of the Agreement, the state ICF/MR resident's social worker or Community Transition Specialist, or both, together with the Facility Advocate, will determine whether the state ICF/MR resident should be placed on the State

5

ICF/MR Planning List based on discussions with the resident and involved family or guardians to assess their position as to community placement.

b.    If the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List subject to the following exceptions:

(1)    If a state ICF/MR resident does not express a preference for community placement and has involved family or a guardian who is opposed to community placement, the resident will not be placed on the State ICF/MR Planning List.

(2)    If a state ICF/MR resident expresses a preference for community placement and has a guardian who is opposed to community placement, the resident will not be placed on the State ICF/MR Planning List.

c.    If there is a disagreement among the social worker, Community Transition Specialist, and Facility Advocate as to whether a state ICF/MR resident should be placed on the State ICF/MR Planning List, the social worker, Community Transition Specialist, or Facility Advocate will notify the Facility Director, who will make the determination in conjunction with the standards in this Agreement based on review of any relevant documents and interviews with the state ICF/MR resident, the involved family or guardian, the social worker or Community Transition Specialist, and the Facility Advocate.

6

JA1104

3.    DPW will immediately place on the State ICF/MR Planning List the named Plaintiffs and any other state ICF/MR residents identified by the Facility Directors as having affirmatively expressed their desire to be discharged to the community.    If one of these individuals has a guardian who subsequently objects to community placement, he or she will be removed from the State ICF/MR Planning List.

IV.    **Education about Community Placement Options**

1.    To assure that all state ICF/MR residents, their involved families, and guardians have access to appropriate information about community placement options, DPW will establish a Community Partnership Steering Committee within sixty (60) days of the Effective Date to develop and implement a program to educate state ICF/MR residents and their involved families and guardians about community placement.

a.    The Deputy Secretary of ODP will appoint members of the Steering Committee, including, at minimum: a state ICF/MR resident; an individual with intellectual disabilities who lives in the community; a family member of a state ICF/MR resident; a family member of a person with intellectual disabilities who lives in the community; a representative selected by DRN; a provider representative; a representative from ODP; and a representative from the AEs.

7

JA1105

b.     The Steering Committee will develop a training curriculum that addresses how the community intellectual disabilities system works; community placement, supports, and services, including specialized programs such as those that serve individuals who are elderly, medically fragile, or have behavioral issues; funding for community services; and opportunities to participate in community life.

c.     No later than ninety (90) days after the Effective Date, DPW and Plaintiffs' counsel will agree upon a training schedule.  At minimum, DPW will provide trainings at each state ICF/MR at least three times each year as well as outside the state ICFs/MR in each of the four ODP Regions at least two times each year.  At least one training each year will be recorded and made available to the public on DPW's website.

d.     DPW will provide involved families and guardians with notice of the trainings at the facilities that serve their relatives or wards and in the Regions where they live at least thirty (30) days in advance of the training.

e.     The Steering Committee will develop and disseminate to state ICF/MR residents, their involved families, and guardians written materials about community placement options, including how they can get on the State ICF/MR Planning List or find out more information.

f.   The Steering Committee will work with the state ICFs/MR to assure that all state ICF/MR residents, their involved families, and guardians are periodically offered the opportunity to visit community placements that serve individuals whose needs are similar to the residents' needs and to meet with community services providers.

2.   Within ninety (90) days of the Effective Date, DPW will develop and begin to implement a plan to offer one-to-one outreach to state ICF/MR residents and their involved families and guardians by family members of individuals with intellectual disabilities who currently live in the community.

3.   State ICF/MR residents and their involved families and guardians will be given an opportunity after they participate in training events or have outreach contacts to state their position on discharge.  To the extent that this results in any changes from their prior position on discharge, DPW will supplement or amend the State ICF/MR Planning List as appropriate.

4.   DPW will continue to provide the education and outreach services required by Sections IV.1 and IV.2 of this Agreement during the term of the Agreement.

**V.   <u>Development and Implementation of a Viable Integration Plan</u>**

1.   DPW will develop and implement a viable integration plan (Integration Plan) that provides community placements to:

9

a.    at least 50 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2011-2012;

b.    at least 75 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2012-2013;

c.    at least 100 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2013-2014;

d.    at least 100 state ICF/MR residents on the State ICF/MR Planning List in Fiscal Year 2014-2015; and

e.    at least 75 individuals on the State ICF/MR Planning List annually in Fiscal Year 2015-2016 and each fiscal year thereafter until all state ICF/MR residents on the State ICF/MR Planning List have been discharged.

2.    To facilitate compliance with Section V.1 of this Agreement, DPW will take at least the following necessary steps:

a.    In submitting its budget proposal to the Governor, DPW will request as one of its top budget priorities appropriations to fund the development of community placements to meet the Integration Plan's benchmarks specified in Section V.1.

b.    DPW will consider the feasibility and propriety of consolidating the budget lines for state ICFs/MR and Community Waiver services;

10

c.    Unless and until DPW consolidates the budget lines for state ICFs/MR and Community Waiver services, DPW to the extent feasible will shift funds from the carry-forward budget for state ICFs/MR to the Community Waiver services budget.

d.    DPW will modify its policies and practices to assure that persons on the State ICF/MR Planning List have access to vacancies in existing community placements that match their needs, though DPW will retain discretion to assign vacancies as it deems appropriate.

3.    DPW will work with individuals on the State ICF/MR Planning List, their involved families or guardians, their AEs, and the Facility Advocates to develop CPPs and ISPs that specify the community placements, services, and supports the individuals need to successfully transition to the community.

4.    All individuals on the State ICF/MR Planning List will be offered community placements in which four (4) or fewer individuals reside, provided, however, that any individual can choose to live in a larger community placement that is funded by the Consolidated Waiver.  Whenever an individual chooses to live in a community placement that has more than four (4) residents, DPW will notify Plaintiffs' counsel as soon as practicable after the choice has been made.

5.    DPW may divert funding appropriated and allocated to implement the Integration Plan set forth in Section V.1 of this Agreement to provide community

11

placements to individuals living in the community who it determines are at imminent risk of institutionalization, provided, however, that: (a) DPW may not divert such funding to serve more than five (5) such individuals living in the community in any fiscal year; and (b) to the extent that this diversion of funding results in fewer than the targeted number of state ICF/MR residents identified in Section V.1 receiving community placements in any fiscal year, DPW will increase the number of state ICF/MR residents for whom DPW will provide community placements in the following fiscal year to compensate for the decrease.

## VI.    Status Reports

1.    Beginning January 1, 2012 and every six (6) months thereafter, DPW will provide a status report to Plaintiffs' counsel and the Court on its implementation of this Agreement, including: (a) the steps DPW has taken to implement the Integration Plan outlined in Section V.1 of the Agreement (including, but not necessarily limited to, the steps identified in Section V.2 of the Agreement); (b) the number of persons on the State ICF/MR Planning List at the beginning and end of the report period and the number of persons on the State ICF/MR Planning List who were discharged to community placements during the report period; (c) whether DPW diverted funding from the Integration Plan to serve individuals living in the community under Section V.5 of this Agreement and, if so, how many individuals living in the community have been served with such

12

funding; and (d) implementation of the provisions related to education and outreach in Section IV of the Agreement.

2.    Beginning January 1, 2012 and every six (6) months thereafter, DPW will provide Plaintiffs' counsel with:  (a) a copy of the updated State ICF/MR Planning List; (b) information that identifies all state ICF/MR residents who were discharged during the report period, including their names and addresses in the community and the names of their community residential services providers; and (c) the identity of any class members who, after discharge, were admitted or committed to psychiatric hospitals or state ICFs/MR or were arrested or jailed, and a description for each such person of the circumstances that led to those situations and their current status.

## VII.   Approval, Enforcement, Jurisdiction, and Attorneys' Fees

1.    Plaintiffs will petition the District Court for preliminary approval of the Settlement Agreement and for permission to provide class notice and to schedule a fairness hearing.  If the District Court grants preliminary approval, Plaintiffs will distribute the class notice to state ICF/MR residents and DPW will distribute the class notice to involved families and guardians of the state ICF/MR residents.  Plaintiffs will petition for final approval of the Agreement.

2.    Plaintiffs may file a motion for specific performance to enforce alleged violations of the Settlement Agreement, provided, however, that at least

13

thirty (30) days before Plaintiffs file any motion for specific performance, they will provide notice of the alleged violation to DPW and offer DPW the opportunity to meet with Plaintiffs to discuss the alleged violation in an effort to resolve the dispute without judicial intervention. Defendants reserve the right to assert any available defense to a claim for specific performance, including lack of funding that is not attributable to Defendants' actions.

3.    The Settlement Agreement is not nor is it to be construed as a consent decree. Plaintiffs may not seek a remedy of contempt of court for any violation of the Agreement.

4.    The Settlement Agreement will be binding on all parties, as well as their successors, only if the Agreement is approved by the District Court, provided, however, that Defendants agree to comply with the terms of the Agreement beginning on the Effective Date pending the Court's ruling on approval of the Agreement. If the Court denies approval of the Agreement or if final approval is overturned on appeal, the litigation will be reinstated in the same procedural posture as it was at the time the parties executed the Agreement.

5.    If the District Court approves the Settlement Agreement, it will retain jurisdiction over the lawsuit for purposes of interpretation and enforcement.

14

6.    The Settlement Agreement will terminate ninety (90) days after the provision of a community placement to the last person on the State ICF/MR Planning List, at which point the Plaintiffs will seek dismissal of the lawsuit.

7.    Defendants will pay Plaintiffs' counsel, subject to the District Court's approval, the sum of $432,500 for attorneys' fees, litigation expenses, and costs incurred through final District Court approval of the Agreement.  Nothing in this Agreement should be construed to entitle Plaintiffs to or preclude Plaintiffs from recovery of attorneys' fees, litigation expenses, and costs incurred after the final District Court approval of the Agreement.

Robert W. Meek
Mark J. Murphy
Disability Rights Network of PA
1315 Walnut Street
Suite 500
Philadelphia, PA  19107-4705
215-238-8070

Doris M. Leisch
Deputy Chief Counsel
Mary Frances Grabowski
Deputy Chief Counsel
Department of Public Welfare
Office of General Counsel
801 Market Street
Suite 6092
Philadelphia, PA  19107
215-560-2192

Counsel for Plaintiffs and the Class

Counsel for Defendants

Dated: May 19, 2011

Dated: May 19, 2011

15

JA1113

# United States Court of Appeals

*for the*

# Third Circuit

Case No. 10-1908

FRANKLIN BENJAMIN, by and through his next friend, Andree Yock;
RICHARD GROGG; FRANK EDGETT, by and through their next friend, Joyce
McCarthy; SYLVIA BALDWIN, by and through her next friend Shirl Meyers;
ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf
of themselves and all others similarly situated

– v. –

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MIDDLE PENNSYLVANIA

## BRIEF FOR APPELLANTS AND APPENDIX
### Volume I of II (Pages A-1 to A-39)

OWEN H.SMITH, ESQ.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

– and –

JOHN E. RILEY, ESQ.
VAIRA & RILEY, P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 751-2700

*Attorneys for Appellants*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

STATEMENT OF THE CASE................................................................2

STATEMENT OF FACTS ....................................................................5

STANDARD OF REVIEW ..................................................................11

SUMMARY OF ARGUMENT ..............................................................11

ARGUMENT ..................................................................................16

I.    THE DISTRICT COURT ERRED IN FINDING THAT THE SPRINGSTEAD INTERVENORS' INTEREST IN THEIR OWN CARE DOES NOT RISE TO THE LEVEL OF A SIGNIFICANTLY PROTECTABLE INTEREST. ............................................................16

    A.    The Springstead Intervenors Have A Sufficient Interest In Their Own Care And Where Such Care is Provided.........................................17

    B.    The Springstead Intervenors' Interest Is At Risk In The Present Action. ..................................................................................21

        1.    The Springstead Intervenors Are Current Or Putative Members Of The Class. ....................................................................22

        2.    The Practical Consequences Of The Litigation Pose A Risk To The Springstead Intervenors' Interest........................................28

    C.    The Springstead Intervenors Interests Are Not Adequately Represented By The Current Parties......................................31

II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE SPRINGSTEAD INTERVENORS' MOTION IN THE ALTERNATIVE TO INTERVENE BY PERMISSION. ....................................................34

CONCLUSION................................................................................36

i

# TABLE OF AUTHORITIES

**CASES**

*Alexander v. Rendell,*
    246 F.R.D. 220 (W.D. Pa. 2007) ........................................................30

*Brody v. Spang,*
    957 F.2d 1108 (3d Cir. 1992) ....................................................11, 4

*Chiang v. Veneman,*
    385 F.3d 256 (3d Cir. 2004) ............................................................25

*Cont'l Cas. Co. v. SSM Group, Inc.,*
    No. 94-7789, 1995 WL 422780 (E.D. Pa. July 13, 1995)...................34

*Eisman v. Pan American World Airlines,*
    336 F. Supp. 543 (E.D. Pa. 1971)...................................................26

*Harris v. Pernsley,*
    820 F.2d 592 (3d Cir. 1987), *cert. denied,* 484 U.S. 947 (1987) ...............passim

*Hayden v. Freightcare America, Inc.,*
    No. 3:2007-201, 2008 WL 375762 (W.D. Pa. Jan. 11, 2008)...........................26

*Hoots v. Pennsylvania,*
    672 F.2d 1133 (3d Cir. 1982) ........................................................32

*In re Cmty. Bank of N. Va.,*
    418 F.3d 277 (3d Cir. 2005) ............................................................16

*In re Real Estate Title & Settlement,*
    869 F.2d 760 (3d Cir. 1989) ...........................................................22

*Kleisser v. U.S. Forest Serv.,*
    157 F.3d 964 (3d Cir. 1998) ...................................................passim

*McClune v. Shamah,*
    593 F.2d 482 (3d Cir. 1979) ..........................................................1, 2

*Mountain Top Condominium Assoc'n. v. Dave Stabbert Master Builder, Inc.,*
    72 F.3d 361 (3d Cir. 1995) .............................................................34

ii

*Nat'l Org. for Women v. Scheidler,*
    172 F.R.D. 351 (N.D. Ill. 1997) .......................................................26

*Olmstead v. L.C.,*
    527 U.S. 581 (1999)................................................................passim

*Phila. Recycling & Trans. Station, Inc. v. City of Phila.,*
    Civ. A. No. 95-4597, 1995 WL 517644 (E.D. Pa. Aug. 29, 1995)...................33

*U.S. v. City of Phila.,*
    798 F.2d 81 (3d Cir. 1986) ...............................................................11

**STATUTES**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343(a) ...........................................................................1

29 U.S.C. § 794................................................................................7

42 U.S.C. § 1213...............................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................3, 22, 26

Fed. R. Civ. P. 24..........................................................................passim

Wright, Miller & Kane, *Federal Practice & Procedure* ...................................17, 26

JA1117

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4), which confer upon district courts original jurisdiction of, respectively, all civil actions arising under the Constitution, laws, or treaties of the United States; any civil action to redress the deprivation, under color of State law, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and any civil action to recover damages or secure equitable relief under any Act of Congress providing for the protection of civil rights.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which confers Circuit Courts of Appeal with jurisdiction to hear appeals from all final decisions of the district courts of the United States.  The district court's denial of the appellants' motion for intervention is a final decision for purposes of § 1291. *McClune v. Shamah*, 593 F.2d 482, 485 (3d Cir. 1979).

## STATEMENT OF ISSUES

1.    Whether the district court erred in denying the Springstead Intervenors' motion for intervention as of right on the grounds that the Springstead Intervenors (a) do not have a sufficient interest in the action (A-17); (b) do not

1

have an interest at risk of impairment by disposition of the action (A-18); and (c) are adequately represented by Defendants in the litigation (A-22).

    2.    Whether the district court abused its discretion by denying the Springstead Intervenors' motion for permissive intervention (A-25).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court. There are no other related cases or proceedings that are completed, pending or about to be presented before this Court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

The five named plaintiffs commenced the underlying action against the Pennsylvania Department of Public Welfare and certain state officials, claiming that the manner in which Pennsylvania provides services to the developmentally disabled violates the Americans with Disabilities Act, the Rehabilitation Act and the Supreme Court's decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999). Plaintiffs' core complaint is that Defendants' provision of services in public intermediate care facilities for the mentally retarded ("ICFs/MR") – institutional facilities combining residential, recreational and medical care in one facility – violates *Olmstead*, in which the Supreme Court held that persons with developmental disabilities have the right to choose to live in the "most integrated setting appropriate," taking into account the available resources and the individuals' desires and needs.

2

Shortly after commencing this action, Plaintiffs sought to certify a class comprised of all persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated ICFs/MR; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement. Defendants did not oppose the motion, and it was granted by the district court on the day after it was filed. Plaintiffs seek (but do not specify) "appropriate" declaratory and injunctive relief on behalf of this large, fluidly-defined class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, from which class members cannot opt-out. Both Plaintiffs and Defendants represented to the district court that the approved class includes all, or virtually all, current residents of the state-operated ICFs/MR. While some individuals, such as the Springstead Intervenors, currently oppose community care, the certified class leaves class membership open in the event (as Plaintiffs allege) that those who currently oppose community-based care change their views in the future. Plaintiffs and Defendants also concurred before the district court, prior to discovery, medical analysis, or even a survey of class members, that community-based care was, without exception, appropriate for all of the approximately 1,272 current residents of the ICFs/MR. Plaintiffs also have gone a step farther, wielding *Olmstead* as a sword rather than a shield, explicitly stating that ICF/MR care is not appropriate *for anyone*. For their part, Defendants attempted to appease Plaintiffs by stating

3

JA1120

their intention to move all ICF/MR residents to community care "as soon as fiscally feasible."

Shortly after the district court certified Plaintiffs' class, the Springstead Intervenors-Appellants moved to intervene. The Springstead Intervenors (defined below) are among the 1,272 residents of ICFs/MR, but do not wish to be forced out of their current homes and do not believe that community placement provides the best or most appropriate care option for them. While the Supreme Court's *Olmstead* decision established the right of the developmentally disabled to choose community setting if medically appropriate, nothing in *Olmstead* requires that community care be that choice. Because neither Plaintiffs nor Defendants represent the interests of ICF/MR residents who do not want to be forced into community care, the Springstead Intervenors sought to intervene. The Defendants concurred in the Springstead Intervenors' motion and the Plaintiffs opposed it. By Memorandum and Order dated March 10, 2010 (the "Order"), the district court denied the motion. The Springstead Intervenors timely filed a notice of appeal of the Order on March 23, 2010.

Since that time, the parties have raced headlong through discovery and toward resolution of their dispute without considering, probing or raising crucial facts certain to affect the legal and practical outcome of the litigation. The parties' cross-motions for summary judgment, which include competing proposed plans for

4

moving ICF/MR residents into community care, are currently pending before the district court. While Plaintiffs' and Defendants' plans employ different mechanisms for implementing a non-existent community care requirement, they are consistent in praising the purportedly universal virtues of community care. Lost in all of this, however, are the voices of those who do not want their current form of care to be taken away. Indeed, without the Springstead Intervenors participation in the litigation to date, the district court has been deprived of a complete record on which to assess the parties' plans, and to render a just decision that will directly impact the lives of the Springstead Intervenors and many of the Commonwealth's most vulnerable citizens.

### STATEMENT OF FACTS

The Pennsylvania Department of Public Welfare ("DPW"), under the direction of the Secretary of Public Welfare for the Commonwealth of Pennsylvania (collectively "Defendants"), is responsible for providing a broad range of services, including residential services, to Pennsylvanians with mental retardation. A-53 (Am. Compl. ¶¶ 13-14). In performance of this responsibility, DPW operates five intermediate care facilities for persons with mental retardation ("ICFs/MR") throughout the state. A-94 (¶ 54). The ICF/MRs provide residential facilities, medical care, educational and entertainment programs, and many other services to residents. DPW also arranges, funds, and provides home and

5

community-based services that allow persons with mental retardation to live

outside of ICFs/MR. *See* A-248 (Pl.'s Sum. J. Br.); A-314 (Def.'s Sum. J. Br.).

Named plaintiffs Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia

Baldwin, and Anthony Beard (the "Plaintiffs"), are all current residents of DPW-

operated ICFs/MR. A-88 (Am. Compl. ¶¶ 21-48). Mr. Benjamin is a 49-year-old

man with mental retardation and bipolar disorder who "has difficulty

communicating, using a few words, signs, as well as body language and facial

expressions to communicate." A-88 (¶ 22). Mr. Grogg is a 45-year-old man with

mental retardation who "is extremely independent and sociable," "holds a number

of jobs," is "involved in his church," and "is so capable of managing his own

money" that he does not require "a representative payee . . . to receive his

Supplemental Security Income payments." A-89 (¶¶ 26-28). Similarly, Mr.

Edgett, a 51-year-old man with mental retardation, "is very social, engaging, and

independent." *Id.* (¶¶ 32, 34). Ms. Baldwin is a 33-year-old woman with mental

retardation, bipolar disorder, and borderline personality disorder who is "generally

very independent" and was twice discharged from her ICF/MR "to residential

programs in the community," though she "was returned . . . after relatively short

time periods due to behavioral and mental health issues." A-90 (¶¶ 37-40). Mr.

Beard is a 49-year-old man with mental retardation who is blind and suffers from

hearing loss. A-91 (¶¶ 44-45).

On July 14, 2009, these Plaintiffs filed an amended putative class action

complaint (the "Amended Complaint") against Defendants alleging that the

manner in which DPW provides community-based services violates Title II of the

Americans with Disabilities Act ("ADA," 42 U.S.C. § 1213), Section 504 of the

Rehabilitation Act (29 U.S.C. § 794), and the Supreme Court's decision in

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). A-104-108 (Am. Compl.

¶¶ 82-93). Plaintiffs allege that ICF/MR care is not "appropriate to the needs of

any individual resident of those facilities," A-98 (Am. Compl. ¶¶ 65-66), and seek

"appropriate declaratory relief and injunctive relief" on behalf of a class that, as

certified, includes:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for persons
> with mental retardation; (2) could reside in the community with
> appropriate services and supports; and (3) do not or would not oppose
> community placement.

A-57 (Am. Compl. at ¶ 57); A-31 (Class Cert. Order). Based on their

unquestioned (and unchallenged) assumption that community care is the only

appropriate choice for ICF/MR residents, Plaintiffs sought class certification

without conducting any discovery, survey, or analysis to determine how many of

the nearly 1,300 individuals currently in DPW-run ICFs/MR desire community

care. Likewise, neither Plaintiffs nor Defendants made any serious effort to

7

contact the legal guardians of ICF/MR residents, who have the legal right to make such placement determinations.

Nonetheless, the Amended Complaint makes clear that Plaintiffs understand the class to include all or virtually all of the nearly 1,300 individuals currently residing in the five ICFs/MR operated by DPW.  A-86 (Am. Compl. at ¶ 16). DPW has conceded this point without caveat, exception, or clarification, and did not oppose Plaintiffs' motion for class certification on this – or any other – ground. Instead, both parties proceeded on the conclusory assumption that all ICF/MR residents were in the class.  The district court granted Plaintiffs' motion for class certification one day after it was filed.  A-111-112 (Mot. for Class Cert.); A-27 (Class Cert. Order).

Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Clarke, Richard Kohler, Maria Kashatus, and Wilson Sheppard (collectively, the "Springstead Intervenors" or "Intervenors") are all current residents of DPW-operated ICFs/MR and are *de facto* members of the certified class. A-28 (Class Cert. Order).[1]  Craig Springstead is a 50-year-old resident of Selinsgrove Center, a public ICF/MR that has been his home for 28 years. A-163 (Intervenors' Resp. to Am. Compl. ¶ A).  Mr. Springstead has been diagnosed with

---

[1] Mr. Sheppard, one of the Intervenor-Appellants, was originally identified as a named plaintiff, until it became apparent that neither he nor his family sought the relief requested on his behalf by Plaintiffs.

moderate mental retardation, bipolar disorder, mood disorder with psychotic

features, generalized anxiety disorder, and intermittent explosive disorder. *Id.*

Michael Storm is a 56 year-old resident of Hamburg Center, a public ICR/MR,

who is developmentally disabled and is dependant upon both tracheotomy and

feeding tubes. A-164 (¶ D). Beth Ann Lambo is a 43-year-old resident of Polk

Center, a public ICF/MR, where she has live for 40 years. *Id.* (¶ E.) Ms. Lambo

has been diagnosed with profound mental retardation, autism, and disruptive

behavior disorder; she has a mental age of 18 months and is unable to detect

danger. *Id.* Richard Clarke is a 52-year-old resident of Polk Center, where he has

lived for more than 40 years. *Id.* (¶ F.) Mr. Clarke depends on staff for most daily

activities, and requires both a feeding tube and wheelchair. *Id.* Richard Kohler is

a 60-year-old resident of Selingsgrove Center – where he has lived since 1968 –

who is developmentally disabled, deaf, and blind. A-165 (¶ G). Both Maria

Kashatus and Wilson H. Sheppard are in their forties, have been residents of White

Haven Center, a public ICF/MR, for most of their lives, and are developmentally

disabled and non-verbal; in addition, Ms. Kashatus is restricted to a wheelchair.

*Id.* (¶¶ H, I). Maria Meo is a 51-year-old resident of Ebensburg Center, which has

been her home since 1967. A-163 (¶ B). She is developmentally disabled but

independent and able to make her wishes known. *Id.* Finally, Daniel Bastek is a

38-year-old resident of Hamburg Center, where he has lived for 20 years; he has

been diagnosed with moderate mental retardation, bipolar disorder, and pervasive developmental disorder. *Id.* (¶ C).

The Springstead Intervenors do not oppose Plaintiffs' right to choose community care for themselves, but object to Plaintiffs' request for relief on their behalf as well. A-154 (Mot. to Intervene ¶ 4). Because the Plaintiffs' blanket pursuit of class-wide relief impairs the Springstead Intervenors' interest in preserving their individual right to choose ICF/MR care, and because neither Plaintiffs nor DPW adequately represent their interests, the Springstead Intervenors filed a Motion for Intervention on November 10, 2009. *Id.*

On March 10, 2010 the district court denied the Springstead Intervenors' motion for intervention based primarily on its observation that "the definition of the [certified class] specifically excludes [those who] oppose community placement," notwithstanding that neither the parties nor the district court made any attempt to discern who those individuals might be. A-5. The district court also determined that Defendants adequately represent the Intervenors' personal interests simply by defending the suit on the ground that DPW does not have funding to provide all of the accommodations Plaintiffs seek. Finally, despite the fact that the Intervenors were the only ones who have voiced objection to community placement without exception, and were the only ones to question the propriety of the parties making placement determinations without input from ICF/MR

10

residents, the district court nonetheless concluded that the Intervenors' unique

views "would not sufficiently add anything to the litigation." A-25.

This appeal followed.

## STANDARD OF REVIEW

"[A]n applicant 'shall be permitted to intervene' if he or she satisfies the

requirements of [Rule 24(a)(2)]." *Harris v. Pernsley*, 820 F.2d 592, 597 (3d Cir.

1987), *cert. denied*, 484 U.S. 947 (1987).  Accordingly, the "review of [a] district

court's decision[] denying intervention of right is more stringent than the abuse of

discretion review accorded to denials of motions for permissive intervention." *Id.*;

*accord Brody v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992).  This Court "will

reverse a district court's determination on a motion to intervene of right if the court

'has applied an improper legal standard or reached a decision that we are confident

is incorrect.'" *Id.* (quoting *U.S. v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968,

992 (2d Cir. 1984)).  A district court's denial of permissive intervention is

reviewed for abuse of discretion.  *U.S. v. City of Phila.*, 798 F.2d 81, 90 (3d Cir.

1986).

## SUMMARY OF ARGUMENT

In this action, Plaintiffs seek declaratory and injunctive relief requiring the

state to determine Plaintiffs' eligibility for community services and provide them

with community-based care.  If this were the only relief sought by Plaintiffs, the

11

JA1128

Springstead Intervenors would enthusiastically support them. But there is more to this case than the named Plaintiffs' desire to live where they choose. Plaintiffs also seek to require the state to provide community care to a class consisting of all current and future ICF/MR residents who "could reside in the community with appropriate services and supports" and who "do not or would not oppose" community placement.

Plaintiffs' "could" and "would" phraseology provides little, if any, space for dissenting views. Specifically, Plaintiffs have alleged from the outset that community placement offers the most appropriate form of care for *all* residents of the ICFs/MR, including the Springstead Intervenors, and that most, if not all, such residents "would not oppose" community care if properly "educated" on the subject. Defendants, for their part, uncritically agreed with Plaintiffs' allegations in this regard, and put up no opposition to Plaintiffs' motion for class certification. Moreover, the district court, upon granting class certification, found that Plaintiffs' proposed class – which is the class as certified – likely includes all or virtually all ICF/MR residents.

In light of these developments, the Springstead Intervenors sought to intervene in the proceedings below to protect their interests as residents of the ICFs/MR who oppose community placement. The Springstead Intervenors now appeal from the district court's order denying their motion for intervention.

12

JA1129

Intervention as of right "shall" be ordered where the proposed intervenor makes a timely application and demonstrates: (i) an interest in the action; (ii) potential impairment of that interest as a "practical" matter; and (iii) inadequate representation by the parties. The district court made clear errors of law and fact in holding that the Springstead Intervenors do not meet each of these three requirements.

*First*, the Springstead Intervenors' interest in their own care and where they receive such care is clearly sufficient to warrant intervention. In the proceedings below, Plaintiffs and Defendants have blindly assumed that community care is the best form of care, without exception, for *all* developmentally disabled persons, regardless of preference, disability, or other medical conditions, an allegation which the Springstead Intervenors strenuously dispute. *Olmstead*, in fact, explicitly recognized that community-based care is not always the most appropriate form of care and, together with applicable federal regulations, affirms the right of ICF/MR residents to choose institutional care. Moreover, the Springstead Intervenors' interest in their own care implicates their fundamental right to personal safety. Given the severe physical, emotional and/or mental disabilities of many of the Springstead Intervenors, community-based care is not only inappropriate but potentially dangerous.

*Second*, the Springstead Intervenors' interest in their own care, and in where they receive such care, is at risk of impairment in the litigation. The district court based its determination to the contrary on the erroneous premise that the Springstead Intervenors are not members of the certified class. This formalistic determination that the Springstead Intervenors are not class members rests on the illusory restriction that the class does not include those who oppose community placement, while ignoring that portion of the class definition which includes those who "would not oppose" such placement *in the future*. Indeed, Plaintiffs allege that most, if not all, ICF/MR residents who currently oppose community placement "would not oppose" such placement in the future if properly educated on the subject. For obvious reasons, a class defined, in part, by the subjective, future mindset of mentally retarded individuals who may "change their minds" concerning community placement once they have been "educated" is, frankly, offensive, and presents a direct, substantial risk to the Springstead Intervenors' interest in remaining in their current homes. In any event, even assuming the Springstead Intervenors are not current or putative class members, their interest is at risk nonetheless because the practical result of Plaintiffs' request for relief will be the closure of ICFs/MR.

*Third*, the district court erred in holding that Defendants adequately represent the Springstead Intervenors' interests in the litigation. Defendants, for

14

instance, failed to oppose class certification at all, uncritically accepted Plaintiffs' proposal for an excessively broad class definition, failed to contest Plaintiffs' claim that community-based care is the most appropriate care option for *all* developmentally disabled persons, and have proffered an *Olmstead* plan that is all but certain to result in the transfer of ICF/MR residents to the community, whether or not they oppose it. Defendants, for their part, never purported to represent the Springstead Intervenors' interests before the district court, and are not contesting the instant appeal.

*Finally*, the district court abused its discretion in denying the Springstead Intervenors motion in the alternative for permissive intervention. The Springstead Intervenors' potential claims are directly at stake in the district court action, and their presence would add the perspective of ICF/MR residents in opposition to community placement. Given the uniformity of Plaintiffs' and Defendants' positions in this case, the Intervenors' voices are essential to reaching a resolution of this matter that is in the best interests of the developmentally disabled community as a non-heterogeneous whole .

For these reasons, the Springstead Intervenors respectfully request that this Court reverse the decision below and remand with instructions to the district court to grant the motion for intervention.

15

## ARGUMENT

I.  **THE DISTRICT COURT ERRED IN FINDING THAT THE SPRINGSTEAD INTERVENORS' INTEREST IN THEIR OWN CARE DOES NOT RISE TO THE LEVEL OF A SIGNIFICANTLY PROTECTABLE INTEREST.**

"[I]ntervention controversies arise in many different contexts, and require the court to consider the pragmatic consequences of a decision to permit or deny intervention." *Harris v. Pernsley*, 829 F.2d 592, 597 (3d Cir. 1987). Federal Rule of Civil Procedure 24(a)(2) "restricts the district court's discretion," however, "by providing that an applicant 'shall be permitted to intervene' if he or she satisfies the requirements of the Rule." *Id.* (quoting *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987) (Brennan, J., concurring)). To intervene as a matter of right pursuant to Rule 24(a)(2),

> the prospective intervenor must establish that: (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

*In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (citation omitted); *see also Kleisser v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998); *Harris*, 820 F.2d at 596.

In the proceedings below, the district court made errors of law and fact when it incorrectly determined that the Springstead Intervenors (i) do not have a sufficient interest in the action; (ii) do not have an interest that is at risk of being

16

JA1133

impaired by disposition of the action; and (iii) are adequately represented, in any event, by Defendants in the litigation.[2] As set forth below, each of these factors clearly favors the Springstead Intervenors' right to intervene in this case, and the Order should therefore be reversed.

A.  **The Springstead Intervenors Have A Sufficient Interest In Their Own Care And Where Such Care is Provided.**

The Springstead Intervenors have a concrete, protectable interest in their own care and in preserving their right to remain in ICFs/MR, which they believe is the most appropriate form of care for them in light of their unique circumstances. This interest is more than sufficient to satisfy Rule 24:

> The polestar for evaluating a claim for intervention is always whether the proposed intervenors' interest is direct or remote. Due regard for efficient conduct of the litigation requires that intervenors should have an interest that is specific to them, is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.

*Kleisser*, 157 F.3d at 972. *See also* Wright, Miller & Kane, *Federal Practice & Procedure*, Civ. 2d § 1908 (1996 ed.) (noting the interest requirement is "one of inclusion rather than exclusion" and that "[i]f there is a direct substantial legally protectable interest in the proceedings, it is clear that this requirement is satisfied").

---

[2] The timeliness of Appellants' motion was not disputed below, and is not at issue in this appeal.  A-11 (Order).

Plaintiffs in this case are attempting to redefine the care options available to those with developmental disabilities in furtherance of the belief that "State-operated ICFs/MR are not the most integrated settings appropriate to the needs of *any* individual resident of those facilities." A-98 (Am. Compl. ¶ 66) (emphasis added); *see also* A-263 (Pl.'s Sum. J. Br.) ("Plaintiffs and class members are unnecessarily segregated in institutional settings and . . . community placement is appropriate."). The Springstead Intervenors – themselves residents of the ICFs/MR – strenuously disagree with Plaintiffs' central justification for seeking class-wide relief. And, just as Plaintiffs have an interest in pursuing community placement as their preferred care option, the Springstead Intervenors have an interest in preserving a meaningful right to institutional care – that is, the right to continue living in their homes of the past 20, 30, and even 40 years. *See* A-163 (Intervenors' Resp. to Am. Compl. ¶¶ A-I).

Although the Supreme Court's decision in *Olmstead* certainly supports Plaintiffs' right to choose community care, it also expressly rejected Plaintiffs' one-size-fits-all approach:

> Unjustified isolation, we hold, is properly regarded as discrimination based on disability. But we recognize, as well, the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities.

*Olmstead*, 527 U.S. at 597. The *Olmstead* Court thus recognized that community-based care is not always the most appropriate form of care for all mentally-disabled

18

JA1135

individuals.  Both *Olmstead* and the applicable federal regulations acknowledge

the Springstead Intervenors' interest in their own care, and affirm their right to

choose institutional care over community-based care.  *Id.* at 602 (holding there is

no "federal requirement that community based treatment be imposed on patients

who do not desire it") (citing 28 C.F.R. § 35.130(e)(1) (1988) ("Nothing in this

part shall be construed to require an individual with a disability to accept an

accommodation . . . which such individual chooses not to accept."); 28 C.F.R pt.

35, App. A, p. 450 (1998) ("[P]ersons with disabilities must be provided the option

of declining to accept a particular accommodation.")).

    Moreover, the Springstead Intervenors' interest in this litigation implicates

their fundamental right to personal safety.  Several of the Springstead Intervenors

suffer from severe physical, emotional and/or mental disabilities (in addition to

mental retardation) that demand substantial medical care and supervision on a

constant basis, rendering community placement not only inappropriate but

potentially dangerous.  For example, Intervenor Craig Springstead has been

diagnosed with, among other disabilities, bipolar disorder, mood disorder with

psychotic features, generalized anxiety disorder, and intermittent explosive

disorder, A-163 (Intervenors' Resp. to Am. Compl. ¶ A); Michael Storm is

dependent upon both tracheotomy and feeding tubes, A-164 (¶ D); Beth Ann

Lambo's mental age has been placed at 18 months and she is unable to discern

19

dange, *id.* (¶ E); Richard Clarke is dependent on ICF/MR staff for most daily

activities and requires a feeding tube and wheelchair, *id.* (¶ F); and Richard Kohler

is deaf and blind, A-165 (¶ G). These individuals, among others, have a profound

and protectable interest in challenging Plaintiffs' unopposed claim that "[t]here are

no types of services and supports that are provided in state ICFs/MR that cannot be

and are not currently provided to individuals . . . in the community system." A-

301.11 (Pl.'s St. of Undisp. Facts ¶ 46). *See Olmstead*, 527 U.S. at 602

("[N]othing in the ADA or its implementing regulations condones termination of

institutional settings for persons unable to handle or benefit from community

settings."). Indeed, while Plaintiffs seek class-wide relief based on a hypothetical

model of community care that assumes homogenous preferences, unlimited

funding, expertly-trained staff, and sufficient manpower for constant supervision at

many widely-dispersed locations, the Springstead Intervenors should not be forced

to risk their own safety and well-being so that Plaintiffs may test this unsupported

theory.

In light of these facts, the Springstead Intervenors' interest in their own care,

and in particular their right to choose institutional care, clearly constitutes an

interest "specific to them" that is not shared by the existing parties, which is

"capable of definition," and which will be "directly affected" by the proceedings

below. *Kleisser*, 157 F.3d at 972. This is especially true where, as here, the parties

20

have moved in virtual lock-step toward reducing the care options available to

current residents of the ICFs/MR. The district court's determination to the

contrary was clear error.

B.    The Springstead Intervenors' Interest Is At Risk In The Present
Action.

The Springstead Intervenors' interest in their own care is at risk of

impairment in the proceeding below, where Plaintiffs seek declarative and

injunctive relief providing that all residents of ICFs/MR who (i) can be moved to

community-based care, and (ii) "do not or would not" affirmatively oppose being

moved, (iii) *must be moved* to the community. *See* A-104, 105 (Am. Compl. ¶¶ 86,

92). In addition, Plaintiffs' requested relief includes the Orwellian mandate that

the state "educate" all residents of ICFs/MR, including the Springstead

Intervenors, on the purported benefits of community placement. *See* A-292 (Pl.'s

Proposed Sum. J. Order) Plaintiffs claim that once residents become "familiar

with the types of community services and supports that could be provided," most if

not all "would not oppose" community placement. A-99 (Am. Compl. ¶ 70); *see*

*also* A-263-265 (Pl.'s Sum. J. Br.).

Despite the sweeping relief sought by Plaintiffs and the class, the district

court reasoned that the Springstead Intervenors' interest is not at risk because "the

definition of the Class explicitly excludes [them] . . . ." A-15-16 (because

Proposed Intervenors "are specifically excluded from the certified class in this

suit," their "alleged interest cannot logically be placed in jeopardy"). In this the

district court erred.

### 1.    The Springstead Intervenors Are Current Or Putative Members Of The Class.

In granting Plaintiffs' motion for class certification, which Defendants did

not oppose, the district court certified a class under Rule 23(b)(2) of the Federal

Rules of Civil Procedure comprised of "more than 1200 class members" who:

> (1) currently or in the future will reside in on[e] of Pennsylvania's
> state-operated intermediate care facilities for persons with mental
> retardation; (2) could reside in the community with appropriate
> services and supports; and (3) do not or would not oppose community
> placement.

A-28, 30 (Class Cert. Order). By anything other than the most formalistic

standard, this class definition *objectively includes the Springstead Intervenors*.

And, the class as certified under Rule 23(b)(2) "do[es] not provide the right to opt

out." *In re Real Estate Title & Settlement*, 869 F.2d 760, 763 (3d Cir. 1989). As a

result, disposition of the action poses "a tangible threat" to the Springstead

Intervenors' "legally cognizable interest." *Harris*, 820 F.2d at 601 (3d Cir. 1987)

(citing *United States v. Perry County Board of Education*, 567 F.2d 277, 279 (5th

Cir. 1978)).

Plaintiffs and Defendants in the proceedings below have agreed that *all*

current residents of ICFs/MR fit within the second prong of the class definition,

*i.e.*, those who "could reside in the community with appropriate services and

22

JA1139

supports" and, accordingly, for whom community placement purportedly offers the most appropriate form of care. *See, e.g.,* A-98 (Am. Compl. ¶ 65); A-304 (Def.'s Mot. Sum. J., Ex. 6 ("every person who currently resides in a state center can be successfully supported in [the] community")). Further, the district court has already found that the Springstead Intervenors *in particular* have the "ability to reside in the community with appropriate services and supports." A-16 (Order).

This is simply not the case. The Springstead Intervenors believe that ICFs/MR provide the most appropriate form of care given their unique circumstances. Further, as explained above, many of the Springstead Intervenors suffer from severe physical, emotional and/or mental disabilities that no realistic form of community-based care could accommodate in a safe or appropriate manner. Neither party in the litigation, however, has bothered to raise these concerns. To the contrary, both parties have propounded the *ipse dixit* that all ICF/MR residents could live in the community, and have even agreed on purported scientific evidence that all "people with disabilities, including those with mental retardation, do significantly better if they receive services in . . . the environment in which non-disabled people typically live." A-301.11 (Pl.'s St. of Undisp. Facts ¶ 49; *see* A-381 (Def.'s Resp. to Pl.'s St. of Undisp. Facts ¶¶ 26-61). It is no surprise, therefore, that the district court uncritically (and erroneously) adopted their view.

23

The Springstead Intervenors' exclusion from the litigation and, in particular, from the process of fact discovery – *e.g.*, from questioning Defendants about the services *actually* available in community-based care, from challenging Plaintiffs' scientific evidence, and from offering scientific evidence of their own suggesting that community-based care can result in negative outcomes (including increased mortality rates) for certain members of the population – has undoubtedly deprived the district court of a complete factual record. The Springstead Intervenors' interest in their own care, including where they receive such care, is directly, immediately and substantially at risk as a result.

The district court erred, moreover, in finding that the Springstead Intervenors' interest is not at risk because they are excluded from the certified class by the third prong of the class definition – *i.e.*, those individuals who "do not or would not oppose" community placement. A-15-16 (emphasis added). The court mechanically reasoned that the Springstead Intervenors are not members of the class because they currently "oppose community placement." *Id.* But the simple fact that the Springstead Intervenors *currently oppose* community placement does not by itself answer the question. The class as certified includes those who "do not *or would not* oppose" community placement. A-30 (Class Cert. Order) (emphasis added).

24

Plaintiffs have argued – and Defendants have not contested – that most, if not all, ICF/MR residents "would not oppose" community placement once "educated" on the subject. A-251-52 (Pl.'s Sum. J. Br.). Thus, while Plaintiffs admit that they are presently aware of only 331 families who "do not oppose" such placement, A-251, they purport to represent "a now-certified class of over 1,200 individuals" – presumably including those individuals who "would not oppose" community placement in the future, *see* Dist. Ct. Dkt. No. 22, at 10 n.6 (Pl.'s Br. in Opp. to Mot. to Dismiss); *see also* A-86 (Am. Compl. ¶ 16) (describing "size of the class" as "approximately 1,272 individuals who reside in Pennsylvania's five state-operated ICFs/MR"). Plaintiffs appear to base this assertion on the district court's finding "that there are more than 1,200 class members." A-28 (Class Cert. Order). By any objective measure, the Springstead Intervenors fit within a class defined, in part, by the *future* mindset of ICF/MR residents.

The district court failed to recognize that its class definition, insofar as it is based on the future mindset of ICF/MR residents, poses an especially pernicious risk to members of this particular class. This Court and others have long frowned upon class definitions characterized by the subjective mindset of class members.[3]

---

[3] The Third Circuit Court of Appeals has previously held that class certification cannot be based on subjective factors such as state of mind. *See Chiang v. Veneman*, 385 F.3d 256, 271 (3d Cir. 2004) ("defining a class by reference to those who 'believe' they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation.").

25

That concern should be especially acute in this case, where the class is defined by the subjective, future mindset of mentally retarded persons who must *affirmatively* voice opposition to community placement to avoid being moved from their current homes. Beth Ann Lambo's circumstances are illustrative. Beth Ann is a 43 year-old resident of Polk Center, a state-operated ICF/MR, where she has lived almost her entire life. A-164 (Intervenors' Resp. to Am. Compl. ¶ E). As noted above, Beth Ann's mental age has been placed at 18 months and she is unable to discern danger; she also suffers from epilepsy and an escalating seizure history. *Id.* Community placement is not a viable treatment option for her under any realistic scenario. Nevertheless, the district court has already determined, without any

---

Federal District Courts in Pennsylvania have also long held that class certification is inappropriate when based on potential class members subjective mental state. *See Eisman v. Pan Am. World Airlines*, 336 F. Supp. 543, 547 (E.D. Pa. 1971) ("courts have dismissed class action where the vague and indefinite description of the purported class depends on the subjective state of mind of a particular individual, rendering it difficult, if not impossible, for the Court to determine whether any given individual is within or without the alleged class"); *see also Hayden v. Freightcare America, Inc.*, No. 3:2007-201, 2008 WL 375762 (W.D. Pa. Jan. 11, 2008) (citing to and adopting Third Circuit's *Chiang* reasoning). This principle is not unique to the Third Circuit or Pennsylvania. *See, e.g., Nat'l Org. for Women v. Scheidler*, 172 F.R.D. 351, 357 (N.D. Ill. 1997) ("when [class] membership is defined solely by state of mind, the case is generally deemed unascertainable"); Wright, Miller & Kane, *Federal Practice & Procedure* § 1760 (3d ed. 1998) ("a class defined with reference to the state of mind of its members will not be allowed to proceed under Rule 23"). Of course, this Court will only have the opportunity to review the district court's class certification decision on appeal, a very unlikely scenario given that the existing parties agreed to class treatment as currently certified.

JA1143

opposition from the state or input from the Springstead Intervenors, that Beth Ann

has the "ability to reside in the community with appropriate services and supports."

A-16 (Order).  Although Beth Ann currently opposes community placement, that

will not protect her if she fails to affirmatively voice opposition to transfer when

questioned at some unspecified time in the future.  In that event, according to

Plaintiffs, Beth Ann *must be moved* out of her home of 40 years and into the

community.  Beth Ann's interest, like that of all the Springstead Intervenors, is

therefore presently at risk.[4]

Finally, by pursuing litigation without first determining whether the

individuals who will be impacted by the proposed relief desire such relief,

Plaintiffs have excluded the Springstead Intervenors (among other potential

dissenters) from a process that could drastically limit their ability to choose the

form of care most appropriate to their own needs.[5]  Indeed, because Plaintiffs seek

---

[4] The Springstead Intervenors are not the only ICF/MR residents at risk. *Amicus* Diane Solano, for example, has been diagnosed with profound mental retardation, has an intelligence quotient below 20, and a mental age at or below one year.  She is non-verbal and cannot communicate her wants or needs, much less affirmatively oppose being moved from virtually the only home she has ever known.  It is noteworthy, moreover, that according to the survey of ICF/MR residents Plaintiffs rely on for their claims, many current residents do not have guardians who can protect their interests. *See* A-238 (Ex. 13 to Pl.'s Sum. J. Mot.).

[5] Plaintiffs were able to make their subjective determination that the Proposed Intervenors purportedly fall outside a class of persons who "do not or would not oppose" community placement only after the Proposed Intervenors sought to protect their individual interests by attempted intervention in the litigation.

27

JA1144

injunctive and declaratory relief on behalf of a class that does not permit opt-outs,

the current class definition provides no protection to the Springstead Intervenors.

If, for example, the class definition applied to otherwise eligible individuals who

"choose" community placement, then the court would be able to determine, if

necessary, the number of affected class members, and to narrowly tailor relief that

both fully satisfies class members and protects the interests of those who would not

choose community care.  However, the proposed class definition has it backward –

attempting to provide relief *before* ascertaining the class.  Under these

circumstances, the district court must make its determinations in a vacuum, which

already has resulted in the erroneous finding that community-based care is the

most appropriate form of care for the Springstead Intervenors.  *See* A-12 (Order).

Thus, the Springstead Intervenors' ability to protect their interests has been and

will continue to be impacted by the Plaintiffs' efforts to exclude dissenting and

differing viewpoints from the current litigation.

### 2.    The Practical Consequences Of The Litigation Pose A Risk To The Springstead Intervenors' Interest.

Even assuming *arguendo* the Springstead Intervenors are not current or

putative class members, their interest is likely to be affected as a practical matter

by the outcome of the lawsuit because the relief sought by Plaintiffs is likely to

result in closure of ICFs/MR.  The district court failed to consider this practical

consequence of the litigation, and thus erred in holding that the Intervenors'

interests are not at risk because "the ultimate outcome of this suit . . . would not require the state to force those who desire institutional care to move out." A-17.

"Rule 24(a)(2) directs the courts to consider the practical consequences of the litigation in passing on an application to intervene as of right." *Harris*, 820 F.2d at 601. As this Court has recognized, "the [district] court is not limited to consequences of a strictly legal nature but may consider any significant legal effect on the applicant's interest." *Id.* (quotation and citation omitted); *see also Kleissler*, 157 F.3d at 970 ("pragmatism is a substantial factor that must be considered [on intervention]").

Defendants have made clear that awarding Plaintiffs the requested class-wide relief would likely result in the closure of ICFs/MR. Defendants have noted, for example, that severe financial constraints already limit the range of services DPW is able to provide, and that under the current circumstances "funds have been insufficient even to provide services for all those [persons with developmental disabilities] in immediate need of services." A-315 (Def.'s Sum. J. Br.). And, though Defendants acknowledge that, on average, annual costs of community care are less than those for institutional care on a per capita basis, Defendants also explained that they "generally accrue no net savings from an [individual] institution to community transfer *unless a State center or at least a unit within that facility is closed as a result of that transfer.*" A-317 (Def.'s Sum. J. Br.) (emphasis

added).  Likewise, Plaintiffs have criticized Defendants' past failure to implement plans to close the Selinsgrove and Hamburg ICFs/MR and use the cost savings to "maximize funding" for the provision of community based services.  A-257-258 (Pl.'s Sum. J. Br.).

Yet even if Defendants prevail in the litigation, the Springstead Intervenors interest in their own care will be no less at risk.  Defendants, after all, have proposed an *Olmstead* plan to the district court that would result in the transfer of ICF/MR residents to community-based care even if they oppose such placement. A-307 (Def.'s Sum. J. Br.); *see also* A-151.6 (Def.'s Mot. to Dismiss Br.).  Indeed, reading between the lines, Defendants' plan reveals a disturbing if unspoken reality: as a practical matter, any systemic shift of funding to community-based programs will necessitate the expedited closure of existing ICFs/MR.  This is not mere speculation; as one federal district court in Pennsylvania has observed, "[i]t is . . . apparent . . . that the Defendants have been and are continuing a policy and system-wide process of closure of the ICF/MR facilities in Pennsylvania." *Alexander v. Rendell*, 246 F.R.D. 220, 232 (W.D. Pa. 2007).  Such closures will drastically limit the Springstead Intervenors' ability to choose the form of care most appropriate to their needs, and lead to the precise result that the Justice Kennedy, in his *Olmstead* concurrence, ruefully warned against:

> It would be unreasonable, it would be a tragic event, then, were the
> Americans with Disabilities Act . . . to be interpreted so that States

had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision.

*Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring in judgment).

Thus, the Springstead Intervenors will suffer concrete and substantial practical consequences from disposition of the instant litigation, whether or not they are members of the certified class. With both parties advocating positions that ultimately would force the Springstead Intervenors out of ICFs/MR despite their opposition to community placement, intervention under Rule 24 is the only method by which the Intervenors' interests might be accounted for and potentially protected. *See Kleissler*, 157 F.3d at 972 (finding that timber companies and local schools have an interest in lawsuits that would close forests to logging or reduce the methods of logging available to those companies).

C.  The Springstead Intervenors Interests Are Not Adequately Represented By The Current Parties.

Finally, the Intervenors' interest in remaining in ICF/MR care "is not adequately represented by an existing party in the litigation." *Harris*, 820 F.2d at 596. As the district court observed:

> Representation will be considered inadequate on any of the following three grounds: (1) that although the applicant's interests are similar to those of a party, they diverge sufficiently that the existing party cannot devote proper attention to the applicant's interests; (2) that there is collusion between the representative party and the opposing party; or (3) that the representative party is not diligently prosecuting the suit.

31

*Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982). The district court clearly erred, however, in determining that there is no "interest alleged by [the Springstead Intervenors] that is not being adequately represented by the Defendants in this action." A-21. In support of this determination, the district court merely noted that Defendants were defending the action thus far (notwithstanding that they failed to oppose class certification) and made much of the "parallel positions of the Defendants and Springstead Intervenors of [sic] opposing the relief sought at this early [stage] of the litigation." A-22.

For many of the reasons outlined above, it is abundantly clear that Defendants *do not* adequately represent the Springstead Intervenors interest in their own care. For instance, Defendants never contested, but rather conceded, Plaintiffs' allegation that community-based care is the most appropriate form of care for *all* current residents of the ICFs/MR, including the Springstead Intervenors. The Defendants concession on this point has, as noted above, directly, immediately and substantially placed the Intervenors' interest at risk. *See supra* at 24. Defendants likewise conceded the propriety of class treatment notwithstanding the impropriety of the subjective, ever-shifting class definition proposed by Plaintiffs and accepted by the district court. Finally, Defendants have themselves proposed an *Olmstead* plan that would ultimately move individuals opposed to community placement into community-based care. A-307 (Ex. 6 to Def.'s Sum. J.

32

Mot.)  Indeed, Defendants have stated their intention to move all ICFs/MR

residents to community care "as soon as fiscally feasible."  A-151.6 (Def.'s Mot. to

Dismiss Br.).

 Having taken these positions, Defendants cannot reasonably be deemed to

represent the Springstead Intervenors' personal interests in their own care, and in

particular their right to choose institutional care over community-based care.  *See*

*Phila. Recycling & Trans. Station, Inc. v. City of Phila.*, Civ. A. No. 95-4597, 1995

WL 517644, at * 2 (E.D. Pa. Aug. 29, 1995) (explaining that when a party to the

litigation has "reach[ed] some accommodation with plaintiff or take some other

position that that may adversely affect" the interests of a proposed intervenor, that

party ceases to adequately represent the proposed intervenor's interest).

Defendants, like many governmental entities, have "numerous complex and

conflicting interests" that cause personal interests, such as those of the Springstead

Intervenors, to "become lost in the thicket of sometimes inconsistent governmental

policies."[6] *Kleisser*, 157, F.3d at 973-74.  Such conflicting interests undermine any

purported assertion of adequate representation.

 Under these circumstances, the district court's failure to properly recognize

the divergent interests at stake is reversible error.  *Mountain Top Condominium*

---

[6] In fairness, Defendants have never purported to represent the Springstead
Intervenors' interests.  They did not oppose the motion for intervention below, and
they have chosen not to participate in the instant appeal.

*Assoc'n. v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 368-69 (3d Cir. 1995)

("The most important factor in determining adequacy of representation is how the

interest of the absentee compares with the interest of the present parties. If the

interest of the absentee is not represented at all, or if all existing parties are adverse

to him, then he is not adequately represented.") (quoting 7C Wright, Miller &

Kane, *Federal Practice & Procedure* § 1909, at 318-19 (1986)).

## II. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE SPRINGSTEAD INTERVENORS' MOTION IN THE ALTERNATIVE TO INTERVENE BY PERMISSION.

The district court abused its discretion when it denied the Intervenors'

motion, in the alternative, for permissive intervention under Rule 24. "Permissive

intervention is available upon timely application 'when an applicant's claim or

defense and the main action have a question of law or fact in common.'" *Brody v.

Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992) (quoting Fed. R. Civ. P. 24(b)).

Permissive intervention is warranted where there is potential commonality of

the intervenors' "claim or defense" with the pending action, broadly defined. *See

Cont'l Cas. Co. v. SSM Group, Inc.*, No. 94-7789, 1995 WL 422780, at *5 (E.D.

Pa. July 13, 1995) (citation omitted). Here, the Intervenors have an interest in

many of the questions of law and fact arising from the parties' claims and defenses,

including, but not limited to: (1) whether class action treatment is appropriate; (2)

whether community care is appropriate for all class members; and (3) whether community care is, in fact, desired by all class members.

The district court abused its discretion in denying permissive intervention on the sole basis that "the [Intervenors'] interests are already represented in the litigation, and their appearance as intervenors would not sufficiently add anything to the litigation." A-25. As noted above, the district court's determination in this respect was erroneous. Defendants have stated their intent to move all ICF/MR residents to community-based care, and have proposed a plan to do so that does not expressly exclude moving individuals, such as the Springstead Intervenors, who oppose community placement. A-307 (Ex. 1 to Def.'s Sum. J. Br.). Although Plaintiffs have contested certain aspects of Defendants' plan, they have not contested that aspect. Thus, it is clear that Defendants do not represent the Intervenors' interest, and it is equally clear that the Intervenors' opposition to Defendants' *Olmstead* plan would add to the litigation needed representation of ICF/MR residents opposed to community placement. The district court's decision denying permissive intervention should, therefore, be reversed.[7]

---

[7] The district court correctly determined that the Proposed Intervenors' motion to intervene was timely filed. A-19.

JA1152

## CONCLUSION

This Court should vacate the Order denying the Springstead Intervenors'
Motion For Intervention and remand to the district court with instructions that the
Springstead Intervenors be permitted to intervene in the action, conduct discovery,
and participate in all proceedings as parties.

Respectfully Submitted,


/s/ Owen H. Smith
Owen H. Smith
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

-and-

John E. Riley
William J. Murray, Jr.
VAIRA & RILEY P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 789-9405
(215) 751-9420 (fax)

36

JA1153

## CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies pursuant to Third Circuit Local Appellate

Rule 46.1 that the attorneys whose names appear on the foregoing Appellate Brief,

Owen H. Smith, John E. Riley, and William J. Murray, Jr. are members of the bar

of this Court.

Dated:  August 10, 2010

Owen H. Smith

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1.    This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8,321 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  August 10, 2010

Owen H. Smith

# United States Court of Appeals

*for the*

# Third Circuit

Case No. 10-1908

FRANKLIN BENJAMIN, by and through his next friend, Andree Yock;
RICHARD GROGG; FRANK EDGETT, by and through their next friend, Joyce
McCarthy; SYLVIA BALDWIN, by and through her next friend Shirl Meyers;
ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf
of themselves and all others similarly situated

– v. –

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MIDDLE PENNSYLVANIA

**REPLY BRIEF FOR APPELLANTS**

OWEN H. SMITH, ESQ.
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

– and –

JOHN E. RILEY, ESQ.
VAIRA & RILEY, P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 751-2700

*Attorneys for Appellants*

# Table of Contents

|  |  | Page |
|---|---|---|
| SUMMARY OF ARGUMENT | | 1 |
| ARGUMENT | | 3 |
| I. | THE SPRINGSTEAD INTERVENORS' INTERESTS IN THEIR OWN CARE WARRANT INTERVENTION | 3 |
| | A. There Is No Dispute That The Motion To Intervene Was Timely And That The Springstead Intervenors Have An Interest In The Litigation. | 3 |
| | B. The Springstead Intervenors' Interests Are At Risk And Are Not Adequately Represented By DPW | 4 |
| | 1. The Springstead Intervenors' Interests Remain At Risk Because Of The Improper Class Definition. | 5 |
| | 2. The Springstead Intervenors Continue To Be Current Or Putative Members Of The Class. | 8 |
| | 3. The Springstead Intervenors' Interest Is At Risk Even If They Are Not Current Or Putative Members Of The Class. | 12 |
| | 4. DPW Does Not Adequately Represent The Springstead Intervenors' Interests. | 15 |
| II. | THE DISTRICT COURT ERRED IN DENYING PERMISSIVE INTERVENTION | 20 |
| CONCLUSION | | 22 |

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Rendell,*
  246 F.R.D. 220 (W.D. Pa. 2007) ....................................................... 13

*Baldridge v. Clinton,*
  139 F.R.D. 119 (E.D. Ark. 1991) ..................................................... 15

*Brody v. Spang,*
  957 F.2d 1108 (3d Cir. 1991) ..................................................... 16, 20

*Cont'l Cas. Co. v. SSM Group, Inc.,*
  No. Civ. 94-7789, 1995 WL 422780 (E.D. Pa. July 13, 1995) .................. 20, 21

*Doe v. Allentown Sch. Dist.,*
  No. 06-cv-1926, 2009 WL 2058726 (E.D. Pa. July 10, 2009) .................. 17, 19

*Grutter v. Bollinger,*
  188 F.3d 394 (6th Cir. 1999) ....................................................... 16

*Harris v. Pernsley,*
  820 F.2d 592 (3d Cir. 1987) ....................................................... 13

*Hoots v. Pennsylvania,*
  672 F.2d 1133 (3d Cir. 1982) ..................................................... 16

*In re Cmty. Bank of N. Va.,*
  418 F.3d 277 (3d Cir. 2005) ................................................. 3, 4, 8, 12

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ....................................................... 18

*Kleisser v. U.S. Forest Serv.,*
  157 F.3d 964 (3d Cir. 1998) ................................................... *passim*

*Ligas ex rel. Foster v. Maram,*
  478 F.3d 771 (7th Cir. 2007) ................................................... 11, 16

*Ligas ex rel. Foster v Maram,*
  Civ. No. 1:05-cv-4331, slip op. (N.D. Ill. July 7, 2009) ...................... 11, 12

JA1158

*Olmstead v. L.C.,*
   527 U.S. 581 ...............................................................................14, 15

*Powell v. Ridge,*
   No. Civ. A. 98-1223, 1998 WL 599387 (E.D. Pa. Sept. 10, 1998)...................19

*United States v. Philadelphia,*
   798 F.2d 81 (3d Cir. 1986) ..........................................................................16

**OTHER AUTHORITIES**

28 C.F.R § 35.12(e)(1)........................................................................................15

Fed. R. Civ. P. 24 .................................................................................*passim*

JA1159

Appellants Springstead Intervenors[1] respectfully submit this reply brief in further support of their appeal and in response to the Brief for Appellees.

## SUMMARY OF ARGUMENT

The district court made clear errors of law and fact in denying the Springstead Intervenors' motion to intervene in this action. As current residents of DPW-operated ICFs/MR throughout Pennsylvania, the Springstead Intervenors have direct, immediate, and profound interests at stake in this case. Plaintiffs' effort to exclude Intervenors from the litigation, and to justify the district court's erroneous decision denying intervention, is based upon incorrect legal standards and unsupported factual assertions. At their core, the district court's decision and Plaintiffs' arguments on appeal are based on a single, flawed premise – *i.e.*, that the Springstead Intervenors right to live where they choose will not be affected by this litigation because they are not current or putative members of the certified class. That premise is legally and factually wrong.

At every turn, Plaintiffs have attempted to obfuscate the parameters of the certified class, the number of ICF/MR residents included in the class, and the potential impact of their claims for relief. In their evident struggle to keep the Springstead Intervenors from interfering with the sweeping policy objectives

---

[1] Terms not specifically defined herein have the meanings set forth in the Springstead Intervenors' Brief For Appellants ("Op. Br.").

underlying their claims, Plaintiffs purport to speak for their adversary in this litigation (DPW) and, indeed, for the ICF/MR community as a whole. The time has come for the Springstead Intervenors to speak for themselves.

The Springstead Intervenors have the right to intervene in this action because:

- Plaintiffs concede that the Springstead Intervenors' application was timely and that their interests in the litigation are significantly protectable;

- The Springstead Intervenors' interests are at risk of impairment as members of the certified class and, in any event, because the likely consequences of Plaintiffs' requested relief will be the closure of ICFs/MR; and

- DPW never purported to adequately represent the Springstead Intervenors' interests in this case, and its conduct of the litigation to date demonstrates that fact.

Accordingly, the district court's denial of intervention should be vacated.

The Springstead Intervenors are entitled to participate in this action to protect their interests in their own care, and in where that care is provided – their homes of the last 20, 30 and even 40 years.

2

JA1161

## ARGUMENT

I.    **THE SPRINGSTEAD INTERVENORS' INTERESTS IN THEIR OWN CARE WARRANT INTERVENTION**

A.    **There Is No Dispute That The Motion To Intervene Was Timely And That The Springstead Intervenors Have An Interest In The Litigation.**

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, intervention "shall" be granted where "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 314 (3d Cir. 2005) (citation omitted); *see also Kleisser v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998).

There is no question before this Court concerning the first two of these requirements. The timeliness of the Springstead Intervenors' application was not challenged below. *See* A-10 (Order). And, as to the interest requirement, this Court has held that an interest sufficient to justify Rule 24 intervention is one that is "specific to [the intervenor] and capable of definition." *Kleissler*, 157 F.3d at 972. Plaintiffs concede that that this element has been met, noting that the Springstead Intervenors' interest in their own care, and in preserving their right to remain in ICFs/MR, is "specific" to the Springstead Intervenors and is "capable of definition." Appellees' Br. at 19. Plaintiffs likewise concede that "the integration

3

JA1162

mandate of the ADA does not require the discharge of even unnecessarily institutionalized individuals if they are opposed to discharge." Appellees' Br. at 9. There can be no dispute, therefore, that the Springstead Intervenors have a legally protectable interest in this case, and that the district court erred in holding otherwise. As a result, the only issues remaining before this Court are (1) whether the Springstead Intervenors' interests are at risk, and (2) whether those interests are adequately represented by DPW.

### B.  The Springstead Intervenors' Interests Are At Risk And Are Not Adequately Represented By DPW.

The district court applied the wrong legal standards in holding:  (i) that the Springstead Intervenors' "legal interests" will not be affected or impaired by the litigation; and (ii) in any event, that the current defendants adequately represent the Springstead Interventors' interests.  To warrant intervention of right, the Springstead Intervenors need not show that their interests are certain to be adversely affected, but rather that their interests "*may be* affected or impaired, *as a practical matter*, by the disposition of the action." *In re Cmty. Bank of N. Va.*, 418 F.3d at 314 (emphasis added and citation omitted).  Plaintiffs offer no credible argument that the Springstead Intervenors have failed to meet this inclusive standard.  Likewise, the district court's holding that DPW represents the Springstead Intervenors' interests – when DPW itself disclaims that responsibility

4

– cannot be credited.  The Springstead Intervenors are therefore entitled to intervene in this action.

### 1.    The Springstead Intervenors' Interests Remain At Risk Because Of The Improper Class Definition.

The district court erred in holding that the Springstead Intervenors' interests could not possibly be impaired by disposition of the action because they are excluded from the certified class, when the class definition expressly includes all residents of ICFs/MR who not only "do not oppose" community placement, but also those who "would not oppose" such placement in the future.  Plaintiffs' brief underscores the impropriety of this class, stating – almost in passing – that "[t]he Olmstead Court did not explain what constituted 'opposition' to community placement."  Appellees' Br. at 29.  Yet, shockingly, Plaintiffs have determined the current class composition based on the following DPW survey results:

- "78 state ICF/MR residents *did not oppose* community placement," *id.* at 8 (emphasis added); and

- "1,018 state ICF/MR residents *indicated no opposition* to community placement," *id.* (emphasis added).[2]

---

[2] Plaintiffs play a similar shell game with respect to families of ICF/MR residents. Plaintiffs state that "family members of 114 state ICF/MR residents indicated that they did not oppose community placement," and that an "additional 217 [families] . . . did not indicate any opposition."  Appellees' Br. at 8.  Plaintiffs thus conclude that "at least approximately 331 [families] . . . do not oppose discharge."  *Id.*  This is pure obfuscation.  There is obviously a difference between "not opposing" community placement and "not indicating opposition" to community placement.  It is not clear whether those who "did not indicate" opposition failed to do so because (i) they were not asked, (ii) they did not respond, or (iii) their response was

5

Notwithstanding Plaintiffs' contention that the class is limited to those who "do not or would not oppose" community placement (by Plaintiff's apparent admission, 78 individuals), Plaintiffs argue that "[m]any, although not all, residents are . . . not opposed to discharge." Id. at 7. The district court likewise determined that the class is comprised of "more than 1200 class members." A-28 (Class Cert. Order). This begs the crucial question of what is required of a developmentally disabled person to "indicate opposition" to community placement in a manner sufficient to avoid "becoming" a class member. It is not clear, for instance, whether the 1,018 residents who purportedly "indicated no opposition" to community placement in fact "indicated" anything at all. There certainly is no evidence suggesting that any of these individuals "indicated" that they *favor* community placement. The relief Plainitffs seek from the district court thus portends a subjective and potentially manipulative *post hoc* determination where ICF/MR residents will be evaluated as to whether they are class members "only after they have an opportunity to receive information about community options." Appellees' Br. at 30.

---

unclear. This kind of purposely vague, disingenuous representation is precisely why the Springstead Intervenors are unwilling to stand idly by and simply take Plaintiffs' word that resolution of this suit through judgment or settlement will not affect their interests.

6

Indeed, it is still not entirely clear – as a practical matter – which current residents of the ICFs/MR are or will be considered class members. Plaintiffs' brief appears to suggest that those who "initial[ly] oppose" transfer, but later change their minds, are included in the class. Appellees' Br. at 9. Plaintiffs' proposed order, submitted to the district court along with their motion for summary judgment, indicates the same. See A-296 (Proposed Sum. J. Order). Plaintiffs also suggest that those who currently oppose community placement, but who have not "visit[ed] community programs" or are not "familiar with community services" should be included in the class.3 Appellees' Br. at 8-9.

Such an amorphous, ever-shifting class definition is an inappropriate basis for the imposition of the requested declaratory relief and the administration of DPW's programs. The Federal Rules of Civil Procedure, after all, do not provide a process for the Springstead Intervenors or any other ICF/MR residents to "opt out" of this class. However, they do provide the Springstead Intervenors with the right to intervene where, as here, their interests may be at risk.

---

[3] Notably, Plaintiffs do not specify what a purported class member and/or his or her guardian will be required to communicate to demonstrate "familiarity" with community services.

7

JA1166

## 2.    The Springstead Intervenors Continue To Be Current Or Putative Members Of The Class.

Plaintiffs contend that the Springstead Intervenors have not shown that their interests "*may be* affected or impaired, *as a practical matter*, by the disposition of the action," *In re Cmty. Bank of N. Va.*, 418 F.3d at 314 (emphasis added), because "the class definition . . . ordered by the district court encompasses *only* those state ICF/MR residents who 'do not or would not oppose community placement,'" Appellees' Br. at 20. Plaintiffs summarily assert that this class, as certified, "excludes those individuals – including the [Springstead Intervenors] – who are opposed to community services." *Id.*

The fallacy of Plaintiffs' argument is self-evident. The class as defined includes those who currently "do not oppose" community placement *and* those who "would not oppose" such placement at any time in the future. *See, e.g.*, A-30 (Class Cert. Order); A-296 (Proposed Sum. J. Order). The class definition thus is based, in part, on the future mindset of current ICF/MR residents, including those residents – such as the Springstead Intervenors – who currently oppose being transferred to the community. Plaintiffs assert that the Springstead Intervenors "are excluded from the class," but only for "[a]s long as [they] oppose community placement." Appellees' Br. at 26. However, Plaintiffs cite no precedent, nor are the Springstead Intervenors aware of any, holding that a class defined by particular

8

individuals' future mental state – to the extent such a class is proper at all – categorically excludes those individuals based on their present mental state.

Moreover, the district court erroneously determined in its decision denying intervention that the Springstead Intervenors fall within the second prong of the class definition – *i.e.*, those ICF/MR residents who "could reside in the community with appropriate services and supports." *See* Op. Br. at 22-23. And Plaintiffs and Defendants have effectively stipulated that "appropriate services and supports" exist in the community for all current ICF/MR residents, including the Springstead Intervenors. *See* Appellees Br. at 6.

No evidence in the record supports or explains these conclusory but profoundly consequential assertions. *See* Op. Br. at 27-28 & n.4; *Amicus* Diane Solano Br. at 13-14. Plaintiffs simply offered them without proof. And Defendants conceded them without challenge. The Springstead Intervenors, however, strenuously contest these purported "facts" and believe that they can submit evidence to the district court (if given the chance) which contradicts them. Notwithstanding this stark disagreement, the district court determined that the Springstead Intervenors "would not sufficiently add anything to the litigation." A-25 (Order). In fact, the exclusion of the Springstead Intervenors from the proceedings below has prevented the development of an adequate record upon which the district court could rightly determine the true scope of the class,

9

including which residents of the ICFs/MR can safely live in the community or, in fact, want to live there.

Plaintiffs' requested relief, in the form of a proposed summary judgment order, directly contradicts their assertion that the Springstead Intervenors are not members of the class. A-290-301 (Proposed Sum. J. Order). That order would require DPW to "educate" the Springstead Intervenors on the purported "benefits" of community care, and would mandate that DPW determine whether the Springstead Intervenors "oppose" community placement at least once a year, every year. *Id.* at 295-300. Plaintiffs' proposed order would mandate that any ICF/MR resident who is "identified as not opposed to discharge to community services" automatically be placed on a "Planning List" of residents to be moved from the ICFs/MR, without first requiring a determination of whether that individual can safely reside in the community, much less whether community-based care is the best form of care in light of that individual's unique circumstances. *See* A-296, 299-300. Plaintiffs' proposed order assumes, in other words, that community care is optimal for everyone. It is not. Nevertheless, if at any time in the future, the Springstead Intervenors do not sufficiently "indicate opposition" to community placement, Plaintiffs' requested relief would require that they be "discharged" from their current homes. *See* A-296, 299; Op. Br. at 21.

10

For these reasons, Plaintiffs' reliance on the Seventh Circuit's decision in *Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007), is unavailing. The court in *Ligas* was not asked to address (and did not address) the specific question presented here: whether a class defined to include both those who "do not oppose" or "would not oppose" community placement in the future categorically excludes individuals currently opposed to such placement. Indeed, the class as defined in *Ligas* did not even distinguish between those who "do not oppose" and those who "would not oppose" community placement, providing the court with no reason to consider the distinction between the current and future mindset of potential class members. *Id.* at 775 (noting the "formulation of the class would require an inquiry into the mental state of the proposed class members, the appropriateness of which we will not judge here").

Finally, despite the Seventh Circuit's affirmance, the district court in *Ligas* subsequently decertified the class because of, among other things, "many of the objections received by the court concern[ing] class members that were [not] eligible for . . . community placement." *Ligas ex rel. Foster v Maram*, Civ. No. 1:05-cv-4331, slip op., at 2 (N.D. Ill. July 7, 2009) (Ex. B to Motion for Intervention, Dist. Ct. Dkt. No. 27); *see also Amicus* Voices of the Retarded, Inc. ("VOR") Br. at 13-16 (discussing the *Ligas* litigation). Although Plaintiffs attempt to minimize the practical outcome of *Ligas* by arguing that the class definition

11

there was broader than the class definition here, *see* Appellee's Br. at 25 n.10, the

district court's decertification order made clear that "because of the highly

individualized needs of the developmentally disabled," the impropriety of class

treatment was "unlikely to be rectified by modification of the class definition,"

*Ligas*, Civ. No. 1:05-cv-4331, at 2.

In light of the foregoing, it is clear that the Springstead Intervenors'

acknowledged interest "*may be* affected or impaired, *as a practical matter*, by the

disposition of the action" because they are current or putative class members. *In re*

*Cmty. Bank of N. Va.*, 418 F.3d at 314 (emphasis added and citation omitted). The

district court thus erred in denying the Springstead Intervenors' motion to

intervene.

### 3. The Springstead Intervenors' Interest Is At Risk Even If They Are Not Current Or Putative Members Of The Class.

Assuming *arguendo* the Springstead Intervenors are not current or putative

class members, they nonetheless have a right to intervene in this action because

their interests are squarely at risk. The district court's determination to the

contrary was based on an erroneous standard – *i.e.*, that the Springstead Intervenors

must establish that this lawsuit directly impacts a formal legal interest, which

Plaintiffs contend is not possible so long as the Springstead Intervenors are not

class members. Appellees' Br. at 37. This Court, however, has consistently

rejected that standard, instead recognizing that "pragmatism is a substantial factor

12

JA1171