that must be considered" on a motion to intervene. *Kleissler*, 157 F.3d at 970.

Indeed, when Rule 24 was amended in 1966, "[t]he central purpose of the . . .

amendment was to allow intervention by those who might be practically

disadvantaged by the disposition of the action and to repudiate the view, [under the

former rule], that intervention must be limited to those who would be legally

bound as a matter of res judicata." *Id.* Thus, in evaluating a motion for

intervention, "the [district] court is not limited to consequences of a strictly legal

nature but may consider any significant legal effect on the applicant's interest."

*Harris v. Pernsley*, 820 F.2d 592, 601(3d Cir. 1987).

     Evidence in the record below indicates that the likely consequences of this

litigation will be closure of ICFs/MR. *See* Op. Br. at 29. Moreover, based on its

substantial experience with similar litigation, *Amicus* VOR believes that Plaintiffs'

claims "put[] the future viability of Pennsylvania's ICFs/MR in serious jeopardy."

*Amicus* VOR Br., at 9. This is not "pure conjecture," as Plaintiffs assert,

Appellees' Br. at 35, but a reasonable expectation of the pragmatic consequences

of the litigation based on evidence and experience, *see* Op. Br. at 29-31; *Alexander*

*v. Rendell*, 246 F.R.D. 220, 232 (W.D. Pa. 2007) ("It is . . . apparent . . . that the

Defendants have been and are continuing a policy and system-wide process of

closure of the ICF/MR facilities in Pennsylvania."). Plaintiffs notably "indicated

no opposition" to *Amici* VOR and Solano's assertion that this litigation is *intended*

to close at least some ICFs/MR. *See* Appellees' Br. at 35 n.17. Of course, it cannot reasonably be disputed that the closure of ICFs/MR will have "a significant legal effect" on the Springstead Intervenors' interest in their own care.

Plaintiffs argue that "there is no evidence" that DPW "has any current plans to close any state ICF/MR" or "plans to close all of them." *Id.* at 35. Plaintiffs, however, never sought evidence of this sort from DPW, and therefore cannot rely on its absence to assert that the Springstead Intervenors have misapprehended the nature of this litigation. Plaintiffs also argue that the Springstead Intervenors seek an improper "advisory opinion" concerning their right to stay in an ICF/MR. *Id.* at 37-38. They do not. *Olmstead* itself establishes that right, explicitly recognizing the "need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities," and that "[e]ach disabled person is entitled to treatment in the most integrated setting possible for that person – recognizing on a case-by-case basis, that setting may be an institution." *Olmstead v. L.C.*, 527 U.S. 581, 597, 604. Further, the district court has already determined, in the absence of any factual support, that the Springstead Intervenors *in particular* are eligible for community placement, A-16 (Order), while the parties below have stipulated that all ICF/MR residents can receive appropriate care in community settings, *see* Op.

14

JA1173

Br. at 22-24. Thus, the Springstead Intervenors merely seek intervention to protect their right to appropriate care.[4]

### 4. DPW Does Not Adequately Represent The Springstead Intervenors' Interests.

The district court applied the wrong legal standard in determining that DPW adequately represents the Springstead Intervenors' interests. The district court required the Springstead Intervenors to demonstrate that DPW has acted "with gross negligence" on the basis that DPW is a government entity ostensibly charged with representing the interests of ICF/MR residents. A-20 (Order). The standard in this Circuit, however, does not require such a showing; rather, the Springstead Intervenors are only required to "rebut[] the presumption" of adequate representation by showing that "their interests diverge" from DPW's interests in

---

[4] Plaintiffs hyperbolic assertion that recognizing the Springstead Intervenors' interest in this litigation "would eviscerate the ADA's integration mandate" is not only unfounded but also beside the point. There is nothing in *Olmstead* or this Court's jurisprudence that would countenance the purported use of the so-called "integration mandate" to trample individuals' acknowledged right to choose their own care. *See* 28 C.F.R § 35.12(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept."); *see also Olmstead*, 527 U.S. at 597, 604-05; *Baldridge v. Clinton*, 139 F.R.D. 119, 127 (E.D. Ark. 1991) ("The law is settled: the constitution does not require that habilitation of mentally retarded persons be provided in a community setting."). Moreover, even assuming Plaintiffs are correct (which they are not), their concern about access to the judicial process to achieve legislative and policy objectives does not override the Springstead Intervenors' right to intervene in litigation where, as here, their personal and legal interests are directly at risk. Fed. R. Civ. P. 24(a).

the case.  *Brody v. Spang*, 957 F.2d 1108, 1123-24 (3d Cir. 1991) (intervenor must

only show "divergence of interests"); *see also Kleissler*, 157 F.3d at 973-74

(intervenor must only show that "representation may be inadequate").  The

Springstead Intervenors can discharge this burden by demonstrating that their

interests, "though similar to those of an existing party, are nevertheless sufficiently

different that the representative cannot give the applicant's interest proper

attention." *Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982).[5]  The

Springstead Intervenors have clearly met that burden.  *See* Op. Br. at 31-33.

Indeed, here, the circumstances could not be more clear.  DPW has never

purported to represent the Springstead Intervenors' interests.  It did not oppose the

Springstead Intervenors' motion to intervene below, but rather concurred in it, A-

158 (Cert. Regarding Concurrence), and it does not oppose the instant appeal.

Plaintiffs, who stand as DPW's adversary in the proceedings below, are in no

position to define precisely the interests that DPW represents or the interests it

does not.  This case is therefore distinguishable from *Ligas*, 478 F.3d at 774, where

---

[5] Plaintiffs rely on the Seventh Circuit's decision in *Ligas*, 478 F.3d at 774, to
assert that the Springstead Intervenors must demonstrate that DPW has acted in
"bad faith" or with "gross negligence" to establish inadequate representation.  *See*
Appellees' Br. at 39-40.  *Ligas*, however, is not the law of this Circuit, and the
other case that Plaintiffs cite, *United States v. Philadelphia*, 798 F.2d 81, 90 (3d
Cir. 1986), makes that perfectly clear.  *See also Brody*, 957 F.2d at 1123-24;
*Kleissler*, 157 F.3d at 973-74.  *Cf. Grutter v. Bollinger*, 188 F.3d 394, 400 (6th Cir.
1999) (explaining that the Sixth Circuit "has declined to endorse a higher standard
for inadequacy when a governmental entity is involved").

16

the state actively opposed intervention in the district court and contested the appeal

to the Seventh Circuit on the ground, among others, that it adequately represented

the proposed intervenors' interests.[6]

Moreover, DPW's conduct in defense of Plaintiffs' claims demonstrates that

it does not adequately represent the Springstead Intervenors' interests. As this

Court has explained, the government often "represents numerous complex and

conflicting interests" in litigation concerning public policy and, in the process, the

particular interests of individuals "may become lost in the thicket of sometimes

inconsistent governmental policies." *Kleissler*, 157 F.3d at 973-74. *See also Doe*

*v. Allentown Sch. Dist.*, No. 06-cv-1926, 2009 WL 2058726, at *5 (E.D. Pa. July

10, 2009) ("Governmental entities have litigation interests that are inherently

different from the interests of private litigants.").

In *Kleissler*, 157 F.3d at 973, for example, the Court held that a government

agency's decision not to appeal an adverse ruling in a related case indicated that it

did not adequately represent the proposed intervenors' interests. Similarly, here,

DPW has failed to represent the Springstead Intervenors' interests by, among other

---

[6] Plaintiffs' effort to explain away DPW's silence as possibly "a litigation decision
to delay this case and divert Plaintiffs' attention from the core issues," Appellees'
Br. at 42-43, makes no sense, is proffered without any evidentiary support, and is
thoroughly unpersuasive. DPW's non-opposition to the motion to intervene (and
this appeal) should be taken at face value: a concession that the movants are
entitled to their requested relief.

17

things, not contesting certification of an improper and overbroad class,[7] conceding

erroneously and without justification that all current ICF/MR residents – including

the Springstead Intervenors – are eligible to be moved to community care, and

proposing its own plan to transfer ICF/MR residents to community care that would

ultimately result in the transfer of even those individuals who oppose community

placement. *See* Op. Br. at 31-33.

---

[7] Plaintiffs argue in their brief that the class is sufficiently "cohesive." *See* Appellees' Br. at 32. Although the Springstead Intervenors' did not raise this issue in their opening brief, Plaintiffs' argument is misleading and necessitates a response. Plaintiffs completely ignore this Court's decision in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 320-21 (3d Cir. 2008), which held that plaintiffs bear the burden of proving cohesiveness, that the district court's decision on class certification must reflect "rigorous consideration of all the evidence," and that "the text of the order . . . must include," among other things, "a readily discernable, clear, and precise statement of the parameters defining the class . . . to be certified."

Plaintiffs assert that the parameters of the class are "discernable, clear, and precise," and that the class is "cohesive," simply because the class includes all "state ICF/MR residents" other than those opposing transfer to community care. Appellees' Br. at 33. As an initial matter, Plaintiffs admit that the class also includes all "state ICF/MR residents" who currently oppose transfer but "would not oppose" it in the future (whomever they may be). This open-ended provision renders the class indiscernible, unclear, and imprecise on its face. Moreover, Plaintiffs' argument completely overlooks the second prong of the class definition – *i.e.*, those for whom community placement constitutes an appropriate form of care – which by its very nature undermines class "cohesiveness." That determination is necessarily highly individualized, and one which both the parties and the district court indisputably glossed over. Indeed, it is clear that the district court in this case made no independent assessment of ICF/MR residents' eligibility for community placement; rather, it signed Plaintiff's proposed order the day after it was filed. The district court's order included a finding – not based on *any* consideration of evidence, much less "rigorous consideration" – that "there are more than 1,200 class members." A-28 (Class Cert. Order).

Plaintiffs' strained attempt to minimize these clear indications of divergent interests between DPW and the Springstead Intervenors is unavailing. The conduct that Plaintiffs largely dismiss as DPW's "strategic" decision-making is likely to have a direct and profound impact on the Springstead Intervenors' interest in their own care. *See* Appellees' Br. at 40; Op. Br. at 32-33. And, the mere fact that DPW has opposed some (though certainly not all) of Plaintiffs' applications for relief, or that DPW filed a motion to dismiss the case, is of no moment. *See, e.g.*, *Powell v. Ridge*, No. Civ. A. 98-1223, 1998 WL 599387, at *3 (E.D. Pa. Sept. 10, 1998) (granting motion for intervention, and rejecting argument that having the same "ultimate objective" as plaintiffs was sufficient to show adequate representation); *Allentown Sch. Dist.*, 2009 WL 2058726, at *5 (The "'tactical similarity' of the 'legal contentions' of a current party with that of a proposed intervenor . . . does not assure adequate representation.") (quoting *Sierra Club v. Robertson*, 960 F.2d 83, 86 (8th Cir. 1992)).

At nearly every significant turn in the litigation, DPW has elected a course of action that has left the Springstead Intervenors' interests exposed and at risk. To be clear, the Springstead Intervenors do not challenge that DPW's position is based upon its good-faith attempt to discharge its duties in an even-handed manner. It is likewise clear, however, that the Springstead Intervenors have more than met their

burden of showing that DPW's interests diverge from their own. *See Brody*, 957 F.2d at 1123-24; *Kleissler*, 157 F.3d at 973-74.

## II.    THE DISTRICT COURT ERRED IN DENYING PERMISSIVE INTERVENTION

"Permissive intervention is available upon timely application 'when an applicant's claim or defense and the main action have a question of law or fact in common.'" *Brody*, 957 F.2d at 1115 (quoting Fed. R. Civ. P. 24(b)).  The district court abused its discretion in denying the Springtead Intervenors' motion for permissive intervention.  *See* Op. Br. at 34-35.  Plaintiffs' arguments to the contrary are unpersuasive.  As an initial matter, Plaintiffs, who opposed the Springstead Intervenors' timely motion to intervene and have opposed this appeal, cannot be heard to complain that granting intervention at this juncture would be untimely or prejudicial.  Plaintiffs cite no cases, nor are the Springstead Intervenors' aware of any, in which timeliness and prejudice under Rule 24(b) are examined as of the time of appeal, rather than at the time the underlying motion was filed in the district court.

Second, Plaintiffs' argument that the Springstead Intervenors' have no "claim or defense" in this litigation is excessively formalistic and misplaced.  It is well-established that "[i]n interpreting the requirements of Rule 24(b) 'the words 'claim or defense' have not been read in a technical sense.'" *Cont'l Cas. Co. v. SSM Group, Inc.*, No. Civ. 94-7789, 1995 WL 422780, at *5 (E.D. Pa. July 13,

1995) (citing 3B J. Moore, et al., Moore's Fed. Practice § 24.01[2] at 354). What is required for permissive intervention, and what is present here, are common questions of law or fact among the parties and Intervenors. *Id.*

Finally, Plaintiffs' cannot justifiably oppose the Springstead Intervenors' request to intervene on grounds that it would prejudice the rights of other class members when Plaintiffs' themselves have shown such blatant disregard for the rights and interests of the Springstead Intervenors, who are confronted with the likelihood that Plaintiffs' "class action" will cause them great harm.

Thus, for the reasons set forth above and in the Springstead Intervenors' Opening Brief, the district court's denial of permissive intervention was an abuse of its discretion.

## **CONCLUSION**

This Court should vacate the Order denying the Springstead Intervenors

Motion for Intervention and remand to the district court with instructions that the

Springstead Intervenors be granted intervention in the action, be given the

opportunity to conduct discovery, and be allowed to participate in all proceedings

as parties.

Respectfully Submitted,


/s/ Owen H. Smith
Owen H. Smith
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

-and-

John E. Riley
William J. Murray, Jr.
VAIRA & RILEY P.C.
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
(215) 789-9405
(215) 751-9420 (fax)

JA1181

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that:

1.     This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5022 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated:  September 23, 2010

/s/ Owen H. Smith
Owen H. Smith

No. 10-1908

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock; RICHARD
GROGG and FRANK EDGETT, by and through their next friend Joyce McCar-
thy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers;
ANTHONY BEARD, by and through his next friend Nicole Turman, on behalf of
themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary
of Public Welfare of the Commonwealth of Pennsylvania.

CRAIG STRINGSTEAD, by and through his father and guardian, Bertin Springstead; MARIA
MEO, by and through her mother and guardian Grace Meo; DANIEL BASTEK, by and
through his father and guardian, John Bastek; MICHAEL STORM, by and through his
guardian, Polly Spare; BETH ANN LAMBO, by an through her father and guardian, Joseph
Lambo; RICHARD CLARKE, by and through his father and guardian, Leonard Clarke;
RICHARD KOHLER, by and through his sister and guardian, Sara Fuller; MARIA
KASHATUS, by and through her father and guardian, Thomas Kashatus; and WILLIAM
SHEPPARD, by and through his brother and next friend, Alfred Sheppard,

*Appellants.*

---

On Appeal from the Order dated March 10, 2010, by the United States District
Court for the Middle District of Pennsylvania, Civil Action No. 09-01182

---

## BRIEF *AMICUS CURIAE* OF DIANE SOLANO, BY AND THROUGH
## HER BROTHER AND GUARDIAN, CARL A. SOLANO, IN SUPPORT OF
## APPELLANTS' ARGUMENT FOR REVERSAL
### (Filed by Consent Pursuant to Fed. R. App. P. 29(a))

---

Carl A. Solano
SCHNADER HARRISON SEGAL & LEWIS LLP
*Attorney for Amicus Curiae*

1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202

JA1183

# TABLE OF CONTENTS

*Page*

INTEREST OF *AMICUS CURIAE*.................................................:...............1

ARGUMENT ..............................................................................................2

I.    ALL INDIVIDUALS RESIDING IN STATE CENTERS HAVE AN INTEREST
      THAT MAY BE IMPAIRED IF PLAINTIFFS PREVAIL IN THE LITIGATION ..............4

    A.    All Center Residents Have an Interest in Not Being Displaced
      from Their Homes .............................................................................5

    B.    The Threat to the Interests of Residents Opposing Relocation
      Is Not Removed by Deletion of Relocation Opponents from
      the Plaintiffs' Certified Class ............................................................6

II.   THE INTERESTS OF THOSE OPPOSING RELOCATION WILL NOT
      ADEQUATELY BE REPRESENTED BY THE CURRENT PARTIES TO THE
      CASE...........................................................................................20

CONCLUSION...............................................................................25

# TABLE OF AUTHORITIES

*Page*

*Cases*

*Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa., Jan. 30, 2006)
& 2009 U.S. Dist. LEXIS 1540 (W.D. Pa., Jan. 12, 2009) ................................. 7-8

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) ...................... 10-11

*Brody v. Spang*, 957 F.2d 1108 (3d Cir. 1992) ............................................................. 8

*Frederick L. v. Dep't of Publ. Welfare*, 364 F.3d 487 (3d Cir. 2004) ................... 8-9

*Hoots v. Pennsylvania*, 672 F.2d 1133 (3d Cir. 1982) ............................................. 21

*In re Bear*, 44 Pa. D.&C. 4th 225 (C.P. Dauphin 1999) ............................................ 6

*In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844
(Pa. Cmwlth.), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001) .............. 22-23

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ........... 10-11

*Kleissler v. U.S. Forest Serv.*, 157 F.3d 964 (3d Cir. 1998) ................................... 8-9

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) .................... 6, 8-9, 12, 22-23

*Court Rules*

Federal Rules of Civil Procedure

Rule 23(b)(2) ............................................................................................. 10-11

*Other Authorities*

J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh
Post-Gazette*, *http://www.post-gazette.com/regionstate/20000416western
4.asp* (Apr. 16, 2000) ...................................................................................... 8

Pa. Budget & Policy Center, "2009-10 State Budget Analysis: Plan Compro-
mises Many State Services," *http://pennbpc.org/2009-10-Budget-
Analysis* (Nov. 6, 2009) .................................................................................. 24

ii

JA1185

Pa. Budget & Policy Center, "Missed Opportunities: An Analysis of 2010-11 Budget," *http://www.pennbpc.org/missed-opportunities-analysis-2010-11-budget* (July 8, 2010) ................................................................24

Pa. Dep't of Revenue, TAX UPDATE, June/July 2010, *http://www.portal.state.pa.us/portal/server.pt/document/886524/taxupdate_150_pdf*..........................24

NOTE:  All Internet materials are as accessed on August 12, 2010.

JA1186

## INTEREST OF *AMICUS CURIAE*

Diane Solano is a 55-year-old resident of White Haven Center, a state-operated intermediate care facility for the mentally retarded, where she has resided all of her adult life. Diane is mentally incapacitated, and she files this *amicus* brief by and through her brother, Carl A. Solano, Esquire. Carl was appointed Diane's legal guardian on July 20, 2004, and therefore has authority to file this brief on her behalf. All parties have consented to the filing of this *amicus* brief.

The Disability Rights Network of Pennsylvania (DRN) brought this action in the name of five individuals who reside in White Haven or one of Pennsylvania's four other state-operated centers and on behalf of a class of all other residents of such centers. The complaint seeks an order that those residing in the state centers should be relocated to other, "community" facilities instead, and it aims to reduce the populations of the state centers to such an extent that most, if not all, of them will have to be closed — even though many residents, including Diane (through her guardian), do not wish for that to happen. This appeal is by residents who were refused permission to intervene in the case and thereby rendered unable to protect their interests in opposing relocation of center residents. This lawsuit and this appeal will directly affect Diane's fundamental interest in being able to continue residing in the only home she has ever known as an adult, and Diane thus has a significant interest in the outcome of this litigation.

JA1187

# ARGUMENT

Like the plaintiffs and the putative intervenors, Diane resides in one of Pennsylvania's intermediate care facilities for the mentally retarded. These facilities, sometimes referenced by the bureaucratic acronym "ICF/MR," are comprised of "single or multiple buildings on campus-like sites accommodating more than eight persons." PA. GOVERNOR'S EXEC. BUDGET 2009-10 (Ex. D to Pl. Mot. for Class Certif.) at p. E33.27. There are five such "state centers," located in White Haven (where Diane resides), and Ebensburg, Hamburg, Polk, and Selinsgrove. Their total population in 2008 was 1,272. *Id.* at E33.28. All of the residents have cognitive disabilities and mental retardation.

This lawsuit seeks to close the centers. The amended complaint claims they "are not the most integrated settings appropriate to the needs of *any* individual resident." A98 (¶ 66) (emphasis added). It alleges, "All persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings." A98 (¶ 65). It insists that it would be better for center residents to be "discharge[d] to the community," and claims that residents and their families who disagree must be misinformed. *See* A99 (¶ 70) ("residents . . . or their families who might currently be opposed to discharge to the community may not be familiar with the types of community services and supports that could be provided and, if they were

2

provided with information and education about such services and supports, they might not be opposed to discharge"). Plaintiffs demand injunctive relief that would result in transfer of center residents to community housing. *See* A108 (¶ 94); 290-301 (Proposed Sum. J. Order). To convince misinformed residents and their families to abandon their opposition, their proposed decree would require the Commonwealth to impose a one-sided pro-relocation "educational" program. *See* A296-99 (Proposed Sum. J. Order). The Commonwealth defendants have mounted little opposition to plaintiffs' claims. *See* 357-79 (Def. Sum. J. Resp.), 389-90 (listing of Commonwealth defendants' substantive admissions).

Plaintiffs sued on behalf of all residents of state centers who "could reside in the community with appropriate services and supports" and "do not or would not oppose community placement." A86 (¶ 15). Plaintiffs' motion for cer-tification of such a class was not opposed by defendants, and the trial court granted the motion the day after it was filed, entering plaintiffs' form of order and findings without material change. A27-30. But not all center residents (or their guardians) share the DRN parties' view of the state centers or want to be transferred from them into the "community." Several of them sought to intervene to protect their rights, but the trial court refused to permit them to do so. This Court should re-verse that decision; residents whose homes are under attack should not be frozen out of the proceedings that will determine the future of where they will live.

## I.   ALL INDIVIDUALS RESIDING IN STATE CENTERS HAVE AN INTEREST THAT MAY BE IMPAIRED IF PLAINTIFFS PREVAIL IN THE LITIGATION.

The plaintiffs and the putative intervenors all are residents of the state centers. The question presented by this case is whether those individuals should continue to live there. Plaintiffs seek to compel the Commonwealth to transfer to community residences *all* center residents who "could reside in the community with appropriate services and supports," and the trial court certified a class consisting of *all* such center residents, subject to an ambiguous opt-out provision defined by whether they "do not or would not oppose community placement." The trial court held that because of this opt-out provision, the putative intervenors and other residents opposing community relocation have no interest in the outcome of the case, since plaintiffs have defined their class to exclude them. But being shut out of the litigation does mean the resident opponents are shielded from the litigation's impact. To the contrary, by framing the litigation in a way that removes from the courtroom those voices opposed to the relocation plan, plaintiffs have enhanced the possibility that unwarranted injunctive relief will be ordered with respect to all state centers and will affect a large number of center residents who, due to their cognitive disabilities and lack of legal guardians, have no ability to speak for themselves. Such an order will adversely affect not only those residents, but all others — including the putative intervenors and Diane — as well.

4

### A. All Center Residents Have an Interest in Not Being Displaced from Their Homes.

The bureaucratic references to "ICFs/MR" in plaintiffs' complaint mask a central fact: the centers at issue here are these individuals' *homes*, and, for many of these residents, they are the only home they have known. *Amicus* Diane Solano provides just one example. Diane has resided at White Haven since August 25, 1965 — that is, for *45 years*. She moved to White Haven on her eleventh birthday, and so has never known any other home during her adult life. Her daily behavior shows that she knows and feels comfortable with the White Haven staff, and with White Haven's physical surroundings. She has her favorite places there, her favorite chairs, a daily routine. From all outward indications, the familiarity of Diane's surroundings is an important and valuable part of her life.

Diane is not able to communicate any of this directly. As noted below, Diane is classified as having "profound mental retardation," which means that she has an intelligence quotient below 20 and a mental age at or below 1 year. Because of her condition, the security and stability of her home has been a principal focus of Diane's legal guardians, who have observed her consistently over the years. Initially, those guardians were Diane's parents; following their deaths, Diane's brother has served in that role. All of Diane's guardians have recognized the importance of maintaining Diane's secure and stable residential care at White Ha-

5

JA1191

ven. As the court stated in the analogous case of *In re Bear*, 44 Pa. D.&C. 4th 225, 260 (C.P. Dauphin 1999):

> This court asks what would it do to the quality of life of a profoundly retarded man, physically disabled as well, to remove him from his home of 44 years, from what little joys of life he has living in the comfort of his surroundings, cared for by people who know and love him and provide for his every need? Surely, justice demands we allow him the dignity not to disrupt and uproot him from this.

The trial court recognized that center residents have an interest in continuing to live in state centers if they choose to reside there or if those facilities are the most appropriate residential settings for their care. Common sense supports that conclusion, and the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601-02 (1999), verifies its correctness. Indeed, grudgingly, even the DRN plaintiffs appear to recognize this interest of those residents opposing relocation. There therefore should be no question that center residents like the putative intervenors have a significant interest at stake in this litigation.

**B.    The Threat to the Interests of Residents Opposing Relocation Is Not Removed by Deletion of Relocation Opponents from the Plaintiffs' Certified Class.**

The trial court held that, even though center residents who oppose relocation have an interest in continuing to stay in their homes, that interest is not implicated by this case because the plaintiff class includes only residents who "do not or would not oppose community placement." Conflating the questions whether

6

the putative intervenors have an interest in the litigation and whether the litigation may potentially impair that interest, the court held that exclusion of those opposing relocation from the plaintiff class meant that "this suit . . . would not require the state to force those who desire institutional care to move out," and so the intervenors' residential interest "cannot logically be placed in jeopardy . . . because that interest is not implicated in the matter at hand." A17-18 (Op. 13-14).

In so holding, the trial court failed to perceive the real and practical threat this litigation poses to the interests of the intervenors and other center residents. Without participation by those who oppose residential relocation, there is a substantial risk that mentally incapacitated residents who have no guardians and cannot make decisions for themselves will wrongly be moved into "community" housing by default, drastically (and improperly) reducing center populations to a point that will require some or all of the centers to close and thereby forcing all residents (including intervenors and other residents) out of their homes.

This is not a speculative concern:  plaintiffs allege that *all* center residents should be relocated, A98 (¶¶ 65-66); defendants say they share that objective, A151.7 (trial court brief ); and the Commonwealth — against the wishes of center residents — has been closing centers across the state as their populations decline. *See, e.g., Alexander v. Rendell*, 2006 U.S. Dist. LEXIS 3378 (W.D. Pa., Jan. 30, 2006) & 2009 U.S. Dist. LEXIS 1540 (W.D. Pa., Jan. 12, 2009) (closing of

Altoona Center against residents' wishes); J. Ackerman, "Western Center Will Be Staffed Until April 26," *Pittsburgh Post-Gazette*, *http://www.post-gazette.com /regionstate/20000416western4.asp* (Apr. 16, 2000) (reporting closure of Western Center while "several dozen parents stood helplessly behind police barricades . . . as their mentally retarded children who had lived there for decades were driven away"). Such closures clearly are a central objective of plaintiffs' advocates.

This threat creates a sufficient basis for intervention. This Court has held that where an environmental action threatened to restrict logging in a forest, intervention was appropriate both for foresters who might lose logging contracts and local schools that might lose funds from the logging companies. *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 970 (3d Cir. 1998). It has held that students opposing a ban on school prayer at public school graduation ceremonies could intervene to challenge the proposed remedy in a consent decree that might affect their future exercise of free speech rights in the school. *Brody v. Spang*, 957 F.2d 1108 (3d Cir. 1992). Here, plaintiffs seek an injunction that will govern future operations of all state centers and may compel transfers of sufficient numbers of residents to cause some centers to close. *Olmstead* recognizes, however, that civil actions may not be used to institute funding shifts that would disadvantage those mentally disabled residents who require continued care in institutions. *See* 527 U.S. at 604-06; *Frederick L. v. Dep't of Publ. Welfare*, 364 F.3d 487, 497 (3d Cir.

8

2004). Intervention must be considered pragmatically, with a view toward whether disposition of the action will cause the putative intervenors to be "practically disadvantaged" by the result, *Kleissler*, 157 F.3d at 970 (quoted citation omitted), and the district court failed to recognize the critical practical ramifications here.

This lawsuit is framed in terms of residents' civil rights to relocate to community settings if they so choose and are able to do so, and *amicus* (like all others in this case) agrees that any center resident who can move to a community residence should be able to choose voluntarily do so. But the sad and overarching fact here is that many center residents are so mentally incapacitated that they are incapable of making that decision for themselves, and many do not have legal guardians to make it for them. That means that many residents are vulnerable to a decision-making process sponsored by the plaintiff advocates in this case that can result in relocations that are inappropriate. Intervenors do not seek to interfere with individual decisions regarding relocation of other individual residents, but they and all center residents have an important interest in assuring that the *process* by which those decisions are made comports with *Olmstead* and all applicable legal requirements for protecting all residents' rights, so that an injunction affecting the centers is not entered inappropriately.

Unfortunately, the conduct of this litigation to date — particularly, the class certification that plaintiffs secured — evidences a marked departure from

9

such a process. Plaintiffs moved to certify a class consisting of all 1,272 residents of state centers in Pennsylvania, for whom they sought declaratory and injunctive relief under Rule 23(b)(2) of the Federal Rules of Civil Procedure. Rule 23(b)(2), of course, provides for a mandatory class, without opt-outs, and for that reason this Court has emphasized the need for the class to be cohesive — requiring that its members share a predominance of common issues that exceeds even that required under Rule 23(b)(3). *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998). The specific equitable relief sought by plaintiffs is designed to result in residential relocation of each of the 1,272 residents who can be moved to a "community" setting, *see* A290-301 (Prop. Sum. J. Order), and the class thus is defined to encompass all residents who "could reside in the community with appropriate services and supports" and "do not or would not" oppose relocation. A30.

It was plaintiffs' burden to prove the cohesiveness of such a class. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307, 320-21 (3d Cir. 2008). But plaintiffs didn't even try; their motion made no mention of cohesiveness or predominance. *See* A111-12 (Pl. Mot.); Pl. Class Certif. Br. Rather than opposing certification on that basis, however, defendants did not oppose the motion at all. *See* A116-17. And, despite this Court's instructions in *Peroxide*, 552 F.3d at 320-21 (district courts, after "rigorous consideration of all the evidence," must "make a definitive determination that the requirements of Rule 23 have been met"),

10

the trial court made no analysis of the issue either, taking less than a day to sign a form of order that ignored cohesiveness altogether. *See* A27-30.

The resulting class that was certified is completely improper. A class *defined* according to whether or not each of its 1,272 members is able to reside in the community "with appropriate services and supports" necessarily requires individualized identification of *which* class members are in fact capable of meeting that requirement, which, in turn, requires an individualized analysis of just what the "appropriate services and supports" are for each individual — all questions that dwarf any supposed common issues in this case. *Cf. Barnes*, 161 F.2d at 146 (class to provide medical monitoring relief for smokers may not be certified because each class member would have individualized medical monitoring needs). Similarly, even if an otherwise non-opt-out class under Rule 23(b)(2) could be defined by what is, in effect, an opt-out provision for residents opposing relocation, satisfaction of that part of plaintiffs' class definition again would require individualized analyses of whether each resident "do[es] not" or "would not" (whatever *that* means) oppose relocation, again making cohesiveness and predominance of common issues impossible. Plaintiffs do not deny this. Rather, as explained by the district court, they opposed intervention here because it would "result in decertification of the class," which would interfere with their effort to secure a system-wide injunction applicable to everyone. *See* A24 (Op. 20).

11

JA1197

This unopposed steamrolling of an inappropriate class certification inevitably foretold the course of future proceedings in this case. While this appeal awaited a briefing schedule, the parties exchanged summary judgment submissions that were rife with concessions by defendants about the propriety of placing center residents elsewhere. *See, e.g.*, A248-78, 361-75, 389-409. Since the denial of intervention foreclosed participation by those who would tell a contrary story, the summary judgment briefing has consisted largely of an unrealistic dialogue about hypothetical center residents who readily can be moved to community residences if only enough money can be found to do so. *See id.* The court's certification of an unopposed class without consideration of individualized issues relating to each resident thus has allowed individualized interests to be bypassed as the case moves toward drafting of a relocation decree, and thus has jeopardized residents' fundamental interest in ***individualized adjudication*** of the critical relocation issues this case presents. The significance of that interest is highlighted by examination of the two requirements for relief under plaintiffs' class definition that the certification decision glossed over — requirements that mirror the essential elements for awarding any relief under *Olmstead. See* 527 U.S. at 587, 607.

▶ **The requirement that a resident "could reside in the community with appropriate services and supports."** Residents of the state centers have a range of abilities and needs that will compel differing answers to whether they

are able to be relocated to a community, and they must have these abilities and needs assessed individually.  But although they included this qualification in their class definition, plaintiffs have alleged that *"[a]ll persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings."* A98 (¶ 65).  Remarkably, the Commonwealth defendants have admitted this allegation. A201.  Apparently, then, the parties believe relocation is appropriate for everyone.  The facts are to the contrary, and *amicus* Diane provides one illustration of a resident for whom community relocation would be not just inappropriate, but potentially catastrophic:

- As noted, Diane has profound mental retardation.  As a result, she is totally incapable of caring for herself.  She must rely on others for all daily needs, including food, clothing, bathing, and toilet activities.  She needs 24-hour care, seven days a week.

- Diane has limited comprehension skills, and can understand only the simplest directions, usually in connection with a routine that has developed over time; she therefore cannot be provided with advance care or safety instructions, since they are meaningless to her.  She has no comprehension of everyday dangers and therefore would be at extreme risk from them.

- Diane is non-verbal and cannot communicate her wants or needs.  She therefore must depend on others anticipating her needs and providing for them.

• Diane is very quiet and passive, spending most of her time sitting in the lotus position, or moving from chair to chair. She can easily be lost in a crowd.

• Diane's mental retardation stems from Down's Syndrome. She has developed physical conditions that require daily medications and physician and nursing care, including cataracts, diverticulosis, thalassemia minor, and osteoporosis. Like other aging Downs victims, Diane also has early stages of dementia and possible Alzheimer's disease. She has food intolerances, special dietary restrictions, and protocols that apply to her bedtime.

Clearly, plaintiffs' assertion that all residents can be relocated to community settings does not apply to Diane. The "services and supports" that she would require in the community would necessitate 24-hour care identical to what she receives now at White Haven, and it is difficult to imagine an equivalent "community" facility in which she could be placed, other than, perhaps, a day-care center or nursing home — unpalatable alternatives to say the least.

Diane is not the only center resident with such special needs. Indeed, the undersigned guardian's observations of those White Haven residents present when he has visited his sister are that a very large number of those residents have such special needs. State funding disparities confirm that conclusion. Plaintiffs emphasize that the cost of community facilities for the mentally retarded is far below that of state centers, *see* A94, 97 (Am. Compl. ¶¶ 58, 61), but they do not ex-

14

plain the reason: that those who have been relocated to the community generally are less disabled and need fewer supports and services than the far more seriously disabled residents of the centers. Of course, the specific needs of each center resident differ with individual circumstances, but that is just the point. By engineering the unopposed certification of a class of *all* residents, plaintiffs will litigate relocation issues on a classwide basis as to all center residents without regard to their individual differences. Only after the litigation is resolved (through judgment or consent decree) will any attention be paid to the differences among individuals, as efforts are then made to apply to each of them a classwide decree. That is not just contrary to the class certification rules, but it is contrary to the needs of the individuals whose rights are at stake here.

▶ **The requirement that a resident "do[es] not or would not oppose community placement."** Far more problematic than the issue of individual needs and circumstances is the question of individual choice. At least *needs* usually can be determined objectively. For many, if not most, of the centers' residents, *choice* cannot. This may not be self-evident, but it is a necessary consequence of the severe mental disabilities of the centers' populations; the residents simply are not capable of choosing for themselves. An Individual Support Team at White Haven addressed this issue when it considered whether *amicus* was eligible for a community placement plan in 2008, concluding: "Diane's functioning level does

15

not support the idea she can comprehend these matters. Therefore, it is highly un-likely she has any interest or awareness of placement options."[1] Similar conclu-sions undoubtedly apply to other center residents too.

This is where guardians can play an essential role. But most center re-sidents lack guardians. According to the Relatives and Friends Association of White Haven Center, a resident support organization, nearly two-thirds of all White Haven residents (107 out of 168 current residents) do not have legal guar-dians, and the percentage at the other state centers is even higher. Meanwhile, cen-ter residents are aging. Many of them have seen their closest relatives, their par-ents, pass away; and their siblings and other relatives may live far away and may have had little contact with them.

As a result, any determination of center residents' "choice" will be made by someone other than the residents themselves who lacks any legal relation-ship to the individual. How will they purport to do so? The amended complaint gives one hint, alleging that at least one of the plaintiff's desires was discerned by interpreting such things as "body language and facial expressions." A88 (¶ 22). But experience with Diane suggests that any such interpretation by someone who is not closely familiar with the individual is highly suspect, as it can require many

---

1. The quotation is from Diane's Individual Support Plan dated Oct. 1, 2008. Copies of this and all other documents referenced in the footnotes will be made available to the Court upon its request.

years of observation to make an educated guess whether any such movements indicate preferences or are merely impulsive behavior. Using such means to try to discern answers to such a complex and important question as whether a resident opposes relocation of his or her home will, in many cases, replace what should be reasoned decision-making with mere speculation, and, often, pure fiction.

On top of that, the process is subject to manipulation. Again, *amicus'* own experience provides a telling example. Diane undergoes an annual review under procedures mandated by defendant Department of Public Welfare. Following a review in late 2002 and early 2003, there was appended to her individual support plan a "Community Plan" that discussed issues related to the possibility of eventually transferring Diane to a community setting. At best, the "plan" can only be described as misleading. It said Diane "has been involved in several informal discussions [about community living] each year," and, after acknowledging that Diane is non-verbal, claimed that staff nevertheless were "able to determine her wants, needs, likes and dislikes through an interpretative understanding of Diane's disposition, facial expressions, and mannerisms."[2] In a "Life Skills Summary," the Plan claimed Diane would do such things as hold a writing implement and scribble "to make a mark when asked to sign her name," "use a push button switch to activate an appliance," accompany staff to restaurants and on shopping trips, partici-

---

2.    All quotations in this paragraph are from pages 1-6 of Diane's Community Plan dated Dec. 9, 2002.

pate in "community camping experiences," and "attend chapel services or bible study group." It also said she "engage[s] in group activities," "goes fishing with staff support," and "goes to the movies and indicates her enjoyment." And it identified among Diane's "skills" in "Financial Management" that she "will hold a quarter or a similar sized object in her hand."

The plan provoked shock and concern on the part of Diane's parents, who were then her guardians, and they wrote to complain about it. Their letter[3] merits extended quotation:

- With respect to the statement that Diane had "been involved" in discussions of community placement each year, they said (at p. 1):

> In fact, Diane is unable to "be involved" in any "discussion" about anything — and especially not about changing her housing to "community living," a concept she is unable to comprehend. We fear that the phrasing of this answer and of similar items about Diane in the Plan is misleading, in that it suggests that Diane has capabilities that she simply does not possess and that Diane actually has been doing things that she simply is not able to do.

- Here is part of their response to the "Life Skills Summary" (at p. 2-4):

> Many of the items listed as among Diane's "skills" are things that we do not recognize as being possessed by our daughter and that we fear will lead those reviewing the summary to misunderstand Diane's condition. . . .

---

3.    The letter is from Nick and Catherine Solano to Walter Rapasky and is dated Apr. 11, 2003.

. . . There may have been some time when Diane happened to have a pencil in her hand and happened to make a mark on a piece of paper while she had it, but we seriously doubt that she did so with any recognition that she was drawing or scribbling, and we are confident that she had no intent to "sign her name" when she did so. . . . [Nothing should] be interpreted to mean that Diane can run appliances, or even turn on a light switch; we are aware of no such capability. . . .

. . . It may be true that Diane will hold "a quarter or similar sized object in her hand," just as she sometimes may hold a pencil, or a rock, or a blade of grass. But that does not mean that she has any appreciation of what a quarter is, and we are disturbed by your characterization of this ability as "pre money management" (Plan, p. 5); it has nothing to do with any ability of Diane to "manage money" or even to comprehend what money is. . . .

. . . [T]he summary makes it sound as though Diane has some sort of active social life. . . . [I]f Diane is brought somewhere, she will stay there; but that does not mean that she understands where she is or has an interest in being there. . . .

• Their letter concluded (p. 4):

[O]ur objection and concern is with the way that the items are stated. They imply that Diane is a knowing, active participant in the world around her, when in fact we do not believe that is true. A reader who did not know our daughter might misread this report to imagine that Diane is some sort of outgoing fisherman who attends Bible school, eats in restaurants, and goes to the movies. Sadly, those are not activities of which Diane is capable in any meaningful way. . . . [W]e believe that the plan does a disservice to Diane to suggest or imply that she is something that she is not, and we request that it be re-worded so that it does not create an impression that Diane has greater capabilities than she actually possesses.

No one disputed this assessment by Diane's parents, and the objectionable items in the "Community Plan" were not subsequently repeated. But one has to wonder what kinds of reports were made about those residents who did not

JA1205

have vigilant guardians to set the record straight. Whether through inaccurate reports in their files or contemporary claims by strangers to be able to discern their "wants, needs, likes and dislikes," center residents are extraordinarily vulnerable to having their futures decided by others determined to advance goals and objectives that may not be in the best interests of the residents themselves. Someone must look out for the interests of those for whom residential relocation may not be appropriate — not just to protect the interests of those residents, but also to insure the integrity of the process by which this litigation, which will determine the continued viability of the centers themselves, goes forward.

The trial court erred in holding that the putative intervenors lack a sufficient interest in this litigation to justify their intervention, and its decision should be reversed. Indeed, on remand it may be appropriate to direct that, if this case is to continue as a class action, putative intervenors shall be permitted to intervene on behalf of a class of all individuals who "do or would oppose community placement." It also may be appropriate to appoint guardians *ad litem* on behalf of those residents who do not have guardians.

## II.    THE INTERESTS OF THOSE OPPOSING RELOCATION WILL NOT ADEQUATELY BE REPRESENTED BY THE CURRENT PARTIES TO THE CASE.

The trial court held that even if the putative intervenors have interests that may be impaired by this case, those interests will adequately be represented by

20

the present parties. That determination was error.

The trial court did not find that intervenors' interests will be protected by plaintiffs. After all, DRN has worked for years to close state centers, and can hardly be considered a party that will devote "proper attention," *Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982), to the interests of residents who want or need to stay there. In fact, plaintiffs argued below that their method of representing opponents' interests was to frame the case in such a way as to shut them out of it. *See* A20 (Op. 16). Clearly, the interests of those who oppose plaintiffs' scheme to close the centers will not be advanced by plaintiffs themselves.

That leaves the defendant, the Department of Public Welfare. The trial court held that it would *presume* that the Department, as a government agency, would look after the interests of everyone, thereby making appellants' intervention unnecessary. A20-21 (Op. 16-17). There are several reasons the trial court's reliance on this presumption was erroneous.

The first, and most telling, reason is that the progress of the litigation to date has proven just the opposite. Although the trial court noted the Department's early opposition to the relief sought by plaintiffs, that opposition was based on grounds inconsistent with the views advocated by the putative intervenors. Rather than insisting on individualized determinations of relocation eligibility, the Department stipulated to certification of plaintiffs' class. On the merits, the De-

21

partment focused mainly on its objection to "queue-jumping" — that is, allowing plaintiffs from the state centers to displace others who are in line for community placements. *See* A151.6-151.8 (Br. in Support of Defs.' Mot. to Dismiss). More recently, after intervention was denied and while this appeal has been pending, the Department has filed summary judgment briefs that oppose entry of an adverse judgment only because it plans voluntarily to institute a plan that will provide relief similar to what plaintiffs are requesting. *See* A368-75 (Sum. J. Br.), A304-08 (Plan). Advocacy on behalf of residents who need or desire continued residency in the state centers has not been a focus of the Department's defense.

Not only has the Department not advocated on behalf of relocation opponents, but in prior litigation it has aggressively taken positions on these issues that were adverse to their interests. A prime example is *In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.) (en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001), in which the Department tried to remove a profoundly retarded resident from the Polk Center against the express wishes of her guardian, arguing that only the Department, and not the guardian, was entitled to any say in the matter. The trial court rejected that position in light of *Olmstead*'s teaching that a resident should not be removed from her home if she opposes removal, and it held that, because of the resident's incompetence, only her guardian could speak for her. Challenging that holding on appeal, the Department

22

argued that "*Olmstead* only requires nonopposition [by the resident,] *not 'compe-tent' nonopposition*," so that an incompetent resident's guardian need not be in-volved — a view Commonwealth Court correctly characterized as "bizarre." 771 A.2d at 851 (emphasis in original). The Department's positions in these cases pro-vide no comfort that it will represent the interests of relocation opponents here.

Indeed, the Department has said that its official policy is to do what-ever it can to relocate residents to the community. The Governor's budget mes-sage says that the "primary goal" of the state centers "is to develop residents' abili-ties to function more independently in preparation for living in a less restrictive environment" and that a trend toward community supports "continues to define [the] services." PA. GOV. EXEC. BUDGET 2009-10 (Ex. D to Pl. Mot. for Cl. Cer-tif.), at E33.27. In this litigation, the Department has stated that "defendants have the objective of community placement as soon as fiscally feasible." A151.7 (Br. in Support of Defs.' Mot. to Dismiss). The experience of *amicus* with the 2002-03 "Community Plan" that mischaracterized her abilities in an apparent effort to im-prove the chances of her relocation suggests the extent to which the Department has been intent on following this plan of action.

The Department agrees it has a financial incentive to do so. As framed by plaintiffs, this litigation provides the Government with an opportunity to save large sums through residential relocations. *See* A94, 97 (Am. Compl. ¶¶ 58,

23

JA1209

61). Those supposed savings are illusory, since the per capita costs of services and supports needed to adequately care in the community for profoundly disabled state center residents like *amicus* would far exceed the current costs of caring for those less disabled residents currently in community facilities. But the Government says it can save money if it closes the state centers, A317, and plaintiffs propose that the Government shift funds from the centers to the community facilities they favor, A286, A300. The illusion that the government thereby can save hundreds of millions of dollars must be tempting. The Commonwealth ended the 2009-10 fiscal year with a $1.176 *billion* budget deficit. *See* Pa. Dep't of Revenue, TAX UPDATE, June/July 2010, *http://www.portal.state.pa.us/portal/server.pt/document/886524 /taxupdate_150_pdf*, at 6. That budget already had cut many state services, *see* Pa. Budget & Policy Center, "2009-10 State Budget Analysis: Plan Compromises Many State Services," *http://pennbpc.org/2009-10-Budget-Analysis* (Nov. 6, 2009), and the new 2010-11 budget makes still further cuts, *see id.*, "Missed Opportunities: An Analysis of 2010-11 Budget," *http://www.pennbpc.org/missed-opportunities-analysis-2010-11-budget* (July 8, 2010). The Commonwealth needs to save money, and this case makes the state centers an alluring target.

In the end, the most telling reason the trial court erred in relying on the Department to represent the proposed intervenors' interests is that the Department itself *does not oppose intervention by appellants*. Any reliance on a pre-

JA1210

sumption that the Department will watch after intervenors' interests must evaporate upon notice that the Department itself does not oppose intervention, thus impliedly acknowledging that putative intervenors' interests might better be protected by their own participation in the case. Clearly that is correct. No one will watch out for the interests of those who oppose residential relocation unless intervention is permitted, and the trial court erred in failing to recognize that fact.

## CONCLUSION

In their paternalistic belief that only they know what is best for all, the DRN parties purport to speak for all 1,272 residents of the state centers, regardless of their incompetency and inability to defend themselves from this single-minded objective of moving them out of their homes. Someone must speak for the other side, and there is no reason to believe the Department will do so. All putative intervenors have sought in this case is a seat at the table, so that they can help to assure that decisions are made in the best interests of all center residents and of preserving the centers for those who, like intervenors and *amicus*, still need them. The district court erred in denying that request. For all of the foregoing reasons,

25

this Court should reverse the district court's decision and remand with instructions that appellants be permitted to intervene.

Respectfully submitted,

Carl A. Solano, I.D. No. 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000

*Attorney for Amicus Curiae*

Dated:  August 12, 2010.

26

JA1212

## CERTIFICATIONS

I, CARL A. SOLANO, certify:

*Bar membership.* I am a member in good standing of the Bar of this Court.

*Type volume.* This brief complies with Federal Rule of Appellate Procedure 29(d) and contains 6,316 words, as counted by the Firm's Microsoft Office Word 2007 word-processing software.

*Electronic filing.* The electronic version of this brief was prepared in portable document format (*.pdf*) and is identical to the paper version of this brief. A virus scan was run on the electronic version of this brief using this Firm's Symantec Anti-Virus Corporate Edition Version 10.1.4 software, and no virus was detected.

*Service.* On August 12, 2010, I served one paper copy of this brief on all counsel in this appeal by first-class mail, postage prepaid, addressed to:

> Owen H. Smith, Esquire
> SIDLEY AUSTIN LLP
> 787 Seventh Avenue
> New York, New York 10019
>     *Attorney for Intervenor-Appellants*

> Robert W. Meek, Esquire
> DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
> 1315 Walnut Street, Suite 500
> Philadelphia, Pennsylvania 19107-4705
>     *Attorney for Plaintiff-Appellees*

Allen C. Warshaw, Esquire
OFFICE OF GENERAL COUNSEL
PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE
Third Floor West, Health & Welfare Building
Harrisburg, Pennsylvania 17120
*Attorney for Defendants.*

Carl A. Solano

Dated:  August 12, 2010.

No. 10-1908

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on behalf of themselves and all others similarly situated,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania.

CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin Springstead; MARIA MEO, by and through her mother and guardian Grace Meo; DANIEL BASTEK, by and through his father and guardian, John Bastek; MICHAEL STORM, by and through his guardian, Polly Spare; BETH ANN LAMBO, by an through her father and guardian, Joseph Lambo; RICHARD CLARKE, by and through his father and guardian, Leonard Clarke; RICHARD KOHLER, by and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and through her father and guardian, Thomas Kashatus; and WILLIAM SHEPPARD, by and through his brother and next friend, Alfred Sheppard,

*Appellants.*

---

On Appeal from the Order dated March 10, 2010, by the United States District Court for the Middle District of Pennsylvania, Civil Action No. 09-01182

---

## [PROPOSED] BRIEF BY *AMICUS CURIAE* DIANE SOLANO
## PROVIDING INFORMATION SOUGHT AT ORAL ARGUMENT

---

Carl A. Solano
SCHNADER HARRISON SEGAL & LEWIS LLP
*Attorney for Amicus Curiae*

1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2202

# TABLE OF CONTENTS

Page

Supplemental Information Sought at Oral Argument.................................................1

# TABLE OF AUTHORITIES

Page

## *Cases*

**_Primary case:_**

*Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. Lᴇxɪs 34122 (N.D. Ill., Apr. 7, 2010) ...............................................................................1-6; Ex. A

**_Other cases:_**

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) ...............................6

*In re Bear*, 44 Pa. D.&C. 4th 225 (C.P. Dauphin 1999)...........................................1

*In re Easly*, 46 Pa. D.&C. 4th 374 (C.P. Venango 2000), *aff'd*, 771 A.2d 844 (Pa. Cmwlth.) (en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001)........................................................................................................1

*Kleissler v. United States Forest Serv.*, 157 F.3d 964 (3d Cir. 1998) ...................1, 6

*Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007) ...................................2

    Argument, *http://www.ca7.uscourts.gov/fdocs/docs.fwx?submit=showbr &shofile=06-1327_023.mp3* (7th Cir., Oct. 30, 2006)........................................2

*Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009)...............2, 5; Ex. B

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999).........................................3-5

## *Court Rules*

Federal Rules of Civil Procedure

    Rule 23 ...............................................................................................2, 5-6

    Rule 24(a)(2)....................................................................................1, 3, 6

## Supplemental Information Sought at Oral Argument

During the argument on February 7, 2011, the Court sought authority supporting a federal right of intervenors and *amicus* to continue to reside in their present state center homes. Intervention requires "an interest relating to the property or transaction that is subject to the action," Fed. R. Civ. P. 24(a)(2), and the interest does *not* have to be a federal right. *See Kleissler v. United States Forest Serv.*, 157 F.3d 964, 973 (3d Cir. 1998) (permitting intervention by those with economic and policy interests that were not legal rights). Intervenors who have lived in their homes at the state centers for decades and view centers' staff and fellow residents as their families and community have a strong interest in being able to stay there — particularly in light of the turmoil relocations to places ("ICF/MRs" or otherwise) with different staff, residents, and surroundings is likely to cause to those mentally incapable of understanding what is being done to them. *See In re Bear*, 44 Pa. D.&C. 4th 225, 260 (C.P. Dauphin 1999) (describing ICF/MR resident's interest in remaining in "his home for nearly all his life"); *see also In re Easly*, 46 Pa. D.&C. 4th 374, 412-14 (C.P. Venango 2000), *aff'd*, 771 A.2d 844, 855 (Pa. Cmwlth.) (en banc), *appeal denied*, 567 Pa. 731, 786 A.2d 991 (2001).

Even if a federal right were required, however, intervention would be appropriate here. The closest authority is *Ligas ex rel. Foster v. Maram*, 2010 U.S.

Dist. LEXIS 34122 (N.D. Ill., Apr. 7, 2010) ("*Ligas III*," copy attached as Ex. A).

This Court is familiar with earlier stages of the *Ligas* case, which involved a class-action claim similar to that of plaintiffs here. In *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 774-75 (7th Cir. 2007) (*Ligas I*), the Seventh Circuit affirmed denial of intervention by those opposing relocation to "community" facilities because the court believed a clause limiting the class to those "who would not oppose community placement" removed the intervenors from risk. During argument, however, the Court of Appeals expressed skepticism about the validity of that clause under Rule 23 because it required individualized inquiries into class members' states of mind.[1] After remand, the trial court learned of the appellate court's comments and removed the "would not oppose" condition from the class definition. Then, at a hearing on a proposed settlement of the case, it received 2,500 objections, including 240 by those who appeared in person. As a result, the court decertified the class and declined to approve the settlement. *See Ligas ex rel. Foster v. Maram*, slip op. (N.D. Ill., July 7, 2009) ("*Ligas II*," attached as Ex. B).

The plaintiffs then returned to the trial court with a new class definition and a new proposed settlement, and again those opposed to relocation moved to intervene. This time, in *Ligas III*, the district court *granted* the intervention mo-

---

1. A recording of the argument is available at *http://www.ca7.uscourts.gov /fdocs/docs.fwx?submit=showbr&shofile=06-1327_023.mp3*. *See also* 478 F.3d at 775 (questioning, but not ruling on, propriety of class definition).

tion, agreeing that the intervenors had an interest under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), in assuring that their needs of institutional residence "be considered in determining the State's obligation to provide the 'community-based' services" at issue. *Ligas III*, 2010 U.S. Dist. LEXIS 34122, at *11.

Declaring that it "reads *Olmstead* to grant the Proposed Intervenors a right to intervene in this litigation," *id.* at *13, the court explained that the Court in *Olmstead* was "very much aware of competing claims on limited State resources" and required those resources to be taken into account along with "the needs of others with mental disabilities." *Id.* at *13-*14, *quoting (second quote)* 527 U.S. at 607. In view of these considerations, the court concluded that "the Proposed Intervenors have a ***right*** under *Olmstead* to have their needs considered" in connection with consideration of the proposed settlement. *Id.* at *14 (emphasis added). Otherwise, their "future ability to have their needs considered in balance with the State's obligations to other individuals with mental disabilities would be significantly impaired 'as a practical matter.'" *Id.* at *16-*17 (quoting Rule 24). Since the State planned to reduce institutional capacity upon approval of a settlement relocating residents to "community" facilities, the litigation implicated the intervenors' interests in their "care and placement," the quality of the essential services and supports provided to them, and the "financial viability of their selected living arrangement" — what the court collectively called an interest "in the equitable distribution of State resources among individuals with mental disabilities." *Id.* at *18-

3

*20. Though the court recognized that this interest probably could be vindicated in separate litigation, it found intervention a preferable course. *Id.* at *21.

The foregoing holdings recognize a federal "right under *Olmstead*" to intervene in a case like this. *Id.* at *13-*14. Although the court did not explicitly discuss a right to stay in a specific institutional home, its recognition of a right to challenge a reduction in institutional capacity that would affect a resident's "selected living arrangement," *id.* at *20-*21, supports such a right. At the least, the decision recognizes a right to contest a reallocation of resources away from an individual's institutional home and an improper reduction of institutional capacity.

*Ligas III* also held that the intervenors had an interest in participating in decisions about certification of a new class, since, even if the intervenors were excluded from the class under the plaintiffs' re-revised class definition, the *Ligas* parties were soliciting center residents to see if they would withdraw their opposition to relocation, and such class identification procedures would impact intervenors' rights. *Ligas III*, at *23-*25. That holding applies directly here. Center residents comprise the most vulnerable of classes. Few have guardians. Most could not answer when asked if they want to relocate, but 88% of those who answered (271 out of 307) said No, and 97% of their families (985 out of 1,013) said No. A238. Nevertheless, plaintiffs here, like those in *Ligas III*, plan to send these vulnerable individuals one-sided pro-relocation "educational" materials to get them to

4

change their minds, *see* A264-65, A296-99; and if they don't change, their exclusion from the class may preclude their ability to object to any decree. As in *Ligas III*, intervenors have an interest in participating in class certification issues to protect their own interests and the integrity of the class identification process under such a regime (and, hopefully, to protect the other Center residents too).

It is revealing that during argument plaintiffs' counsel admitted they oppose intervention mainly because it will result in decertification of the class to which they and the Commonwealth have stipulated. *See also* A24 (Op. 20) (same observation by district court). That admission can only mean that plaintiffs recognize their class (like the original class that was decertified in *Ligas*) fails to satisfy the requirements of Rule 23 and cannot withstand legitimate opposition.[2] Plaintiffs

---

2.    As *amicus* pointed out in her main brief, the class is not cohesive, both because of individualized state-of-mind issues regarding opposition and also because of individualized questions regarding residents' ability to reside in the "community" with "appropriate services and supports." On the latter point, plaintiffs point to the statement in *Olmstead*, 527 U.S. at 602, that a State "generally may rely on the reasonable assessments of its own professionals" to determine the propriety of community placement. But while that "generally" may be true, nothing in *Olmstead* states that a State's determinations are irrebuttably shielded from challenge by the residents, their guardians, or others in an appropriate position to question a particular determination — particularly when the availability of "appropriate services and supports" will depend on funding allocations and themselves will be matters of individualized determinations. *See, e.g., Ligas II*, slip op. at 2 (noting that although class was defined to include those who could live in the "community" with "appropriate services and supports," objectors showed that many class members "were [not] eligible for . . . community placement").

5

seem to suggest that the Court should overlook their failure to comply with Rule 23 and should deny intervention to challenge it because binding mentally incapacitated Center residents in an improper Rule 23(b)(2) class somehow is supposed to be good for them. *See* A24. That turns both Rules 23 and 24 on their head. This Court demands strict adherence to class cohesiveness requirements to **protect** class members needing individualized decision-making, *Barnes v. American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998), and Rule 24 authorizes intervention where the parties are not adequately protecting the interests at stake, *see Kleissler*, 157 F.3d at 972-74. *Ligas III* establishes the propriety of intervention in these circumstances.

So far as *amicus* can determine, *Ligas III* is the case most on point regarding the questions asked by the Court during argument. It strongly supports a right to intervene in this case.

Respectfully submitted,

/s/ *Carl A. Solano*
_____
Carl A. Solano, I.D. No. 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000
*Attorney for Amicus Curiae*

Dated: [To be filed and dated upon Court's allowance].

JA1222

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 10-1908

FRANKLIN BENJAMIN, BY AND THROUGH HIS NEXT FRIEND ANDREE YOCK;
RICHARD GROGG AND FRANK EDGETT, BY AND THROUGH THEIR NEXT FRIEND,
JOYCE MCCARTHY; SYLVIA BALDWIN, BY AND THROUGH HER NEXT FRIEND, SHIRL MEYERS;
ANTHONY BEARD, BY AND THROUGH HIS NEXT FRIEND, NICOLE TURMAN,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

APPELLEES,

V.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA
AND SECRETARY OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA,

CRAIG SPRINGSTEAD, BY AND THROUGH HIS FATHER AND GUARDIAN, BERTIN SPRINGSTEAD;
MARIA MEO, BY AND THROUGH HER MOTHER AND GUARDIAN, GRACE MEO;
DANIEL BASTEK, BY AND THROUGH HIS FATHER AND GUARDIAN, JOHN BASTEK; MICHAEL
STORM, BY AND THROUGH HIS GUARDIAN, POLLY SPARE; BETH ANN LAMBO,
BY AND THROUGH HER FATHER AND GUARDIAN, JOSEPH LAMBO; RICHARD CLARKE,
BY AND THROUGH HIS FATHER AND GUARDIAN, LEONARD CLARKE; RICHARD KOHLER,
BY AND THROUGH HIS SISTER AND GUARDIAN, SARA FULLER; MARIA KASHATUS,
BY AND THROUGH HER FATHER AND GUARDIAN, THOMAS KASHATUS;
WILSON SHEPPARD, BY AND THROUGH HIS BROTHER AND NEXT FRIEND, ALFRED SHEPPARD,

APPELLANTS.

APPEAL FROM ORDER OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT
OF PENNSYLVANIA ENTERED MARCH 10, 2010 IN CIVIL ACTION NO. 1:09-CV-1182

BRIEF FOR APPELLEES

MARK J. MURPHY                    1315 WALNUT STREET, SUITE 500
ROBERT W. MEEK                    PHILADELPHIA, PA 19107-4705
ROBIN RESNICK                     (215) 238-8070
DISABILITY RIGHTS NETWORK OF PA   *COUNSEL FOR APPELLEES*

JA1223

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Appellees state that they do not have any parent corporation, that they issue no stock, and that there is no publicly held corporation that is not a party to this proceeding which has any financial interest in the outcome of the proceeding.

Dated:  September 9, 2010          By:   /s/ Robert W. Meek
                                         Robert W. Meek
                                         Counsel for Appellees

# TABLE OF CONTENTS

Table of Citations ................................................................ iii

Statement of Issues ............................................................. 1

Statement of the Case .......................................................... 1

Statement of Facts ............................................................. 4

Related Cases and Proceedings ................................................ 12

Summary of Argument ......................................................... 12

Argument ..................................................................... 15

    I.    Standard of Review ..................................................... 15

    II.    The Basis for Plaintiffs' Legal Claims ............................... 15

    III.    The District Court Did Not Abuse Its Discretion
in Determining that the Applicants Failed to Meet
their Burden to Prove that They Have a Right to
Intervene Under Rule 24(a) ............................................. 18

        A.    Since They Are Explicitly Excluded from
the Class Definition, the Applicants Have
No Significantly Protectable Interest .................................... 19

        B.    Whatever Interest the Applicants May Have Is
Not Jeopardized By This Lawsuit ........................................ 22

            1.    The Class Definition Assures that This
Lawsuit Presents No Tangible Threat to
Any Legal Interests the Applicants May
Have ......................................................... 23

JA1225

2.    The Parties' Requested Relief Demonstrates
That the Applicants' Legal Interests Are Not
Jeopardized By This Lawsuit.......................................26

3.    The Class Definition Is Consistent With,
and Indeed Required by, the Supreme Court's
and This Court's Precedents ........................................28

4.    Applicants' Speculative Fear of Institutional
Closures Is Not Sufficient to Demonstrate
That Their Legal Interests Are Jeopardized
By This Lawsuit .........................................................35

C.    The Applicants' Rights Are Adequately
Represented by the Government Defendants .......................39

IV.    The District Court Did Not Abuse Its Discretion
in Declining to Permit Applicants to Intervene
Pursuant to Rule 24(b) ....................................................44

Conclusion ........................................................................47

ii

# TABLE OF CITATIONS

## Cases

*Alexander v. Rendell*,
    Civil Action No. 3:2005-419, 2009 WL 82227 (W.D. Pa. Jan. 12, 2009)...36

*Alexander v. Rendell*,
    246 F.R.D. 220 (W.D. Pa. 2007) .........................................................36, 37

*Baby Neal ex rel. Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ..........................................................................33

*Barnes v. American Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).........32, 33

*Brody ex rel. Sugzdinis v. Spang*,
    957 F.2d 1108 (3d Cir. 1992) ....................................................................39

*CSX Transp. v. City of Philadelphia*,
    Civil Action No. 04-cv-5023, 2005 WL 1677975
    (E.D. Pa. July 15, 2005) ............................................................................41

*Disability Advocates, Inc. v. Paterson*,
    Civil Action No. 03-CV-3209, 2010 WL 786657
    (E.D.N.Y. Mar. 1, 2010), *app. pending*  ....................................................30

*Disability Advocates, Inc. v. Paterson*,
    653 F. Supp. 2d 184 (E.D.N.Y. 2009), *app. pending* .................................30

*Estate of Kelly ex rel. Gafni v. Multiethnic Behavioral Health, Inc.*,
    Civil Action No. 05-3700, 2009 WL 2902350 (E.D.
    Pa. Sept. 9, 2009) ...............................................................................40, 44

*Frederick L. v. Dep't of Public Welfare* (*Frederick L. II*),
    422 F.3d 151 (3d Cir. 2005) ........................................16, 17, 34, 38, 42, 46

*Frederick L. v. Dep't of Public Welfare* (*Frederick L. I*),
    364 F.3d 487 (3d Cir. 2004) ................................................................16, 17

JA1227

*Hoots v. Pennsylvania*,
   672 F.2d 1133 (3d Cir. 1982) ....................................................39

*In re Diet Drugs Product Liability Litig.*,
   Civil Action No. 98-20626, 1999 WL 673066
   (E.D. Pa. Aug. 26, 1999) ...........................................................32

*Kleissler v. United States Forest Service*,
   157 F.3d 964 (3d Cir. 1998) .....................................................19

*Liberty Mutual Ins. Co. v. Treesdale, Inc.*,
   419 F.3d 216 (3d Cir. 2005) ...............................18, 19, 20, 22, 44

*Ligas ex rel. Foster v. Maram*,
   478 F.3d 771 (7th Cir. 2007) ...............................13, 23, 24, 40, 45

*Ligas ex rel. Foster v. Maram*,
   Civil Action No. 1:05-cv-4331, slip op. (N.D. Ill.
   July 7, 2009) .............................................................................25

*Ligas ex rel. Foster v. Maram*,
   Civil Action No. 1:05-cv-4331, 2006 WL 644474
   (N.D. Ill. Mar. 7, 2006) ........................................................23, 24

*People First of Tennessee v. Clover Bottom Developmental Center*,
   Civil Action No. 3:95-1227, slip op. (M.D. Tenn. May 28, 2010) .............21

*Philadelphia Recycling & Transfer Station, Inc. v. City of Philadelphia*,
   Civil Action No. 95-4597, 1995 WL 517644
   (E.D. Pa. Aug. 29, 1995) ..........................................................43

*Olmstead v. L.C.*,
   527 U.S. 581 (1999) .................15, 16, 17, 20, 21, 22, 29, 31, 33, 34, 41, 46

*Richard C. v. Houstoun*,
   No. 99-3841, slip op. (3d Cir. July 20, 2000) (non-precedential)..............38

*Sullivan v. DB Investments, Inc.*,
   ___ F.3d ___, 2010 WL 2736947 (3d Cir. July 13, 2010),
   *vacated, rehearing en banc granted*, slip op. (3d Cir. Aug. 27, 2010)........3

iv

JA1228

*United States v. Alcan Aluminum, Inc.*,
    25 F.3d 1174 (3d Cir. 1994) ........................................................................15

*United States v. City of Philadelphia*,
    798 F.2d 81 (3d Cir. 1986) .........................................................................40

## **Statutes and Regulations**

29 U.S.C. § 794 ...........................................................................................1

42 U.S.C. §§ 12131-12134 ..........................................................................1

Fed. R. Civ. P. 23(a)(2)...............................................................................33

Fed. R. Civ. P. 23(b)(2) ..............................................................2, 29, 32, 33

Fed. R. Civ. P. 23(e) ...........................................................................25, 43

Fed. R. Civ. P. 24(a) ..........................................................................1, 12, 18

Fed. R. Civ. P. 24(b) ..........................................................................1, 14, 44

Fed. R. Civ. P. 24(b)(1)(B) .........................................................................44

Fed. R. Civ. P. 24(c) ...................................................................................44

Pa. R. Prof. Conduct 3.3 ............................................................................41

## **Miscellaneous**

Health Care Financing Administration, *Developing Comprehensive*
 *Effectively Working Plans - Initial Technical Assistance*
 *Recommendations* (Jan. 14, 2000), *available at*
 *http://www.cms.gov/smdl/downloads/smd011400c.pdf* ........................................29

7A Charles A. Wright, *et al.*, *Federal Practice & Procedure*
§ 1760 (3d ed. 2005) ...........................................................................32

JA1229

**STATEMENT OF ISSUES**

1.    Did the district court correctly hold that the Applicants-Appellants (Applicants) cannot intervene under Rule 24(a) since their interests are adequately represented by the government Defendants and their exclusion from the class definition leaves them without any significantly protectable legal interest that is tangibly threatened by this litigation?

2.    Did the district court abuse its broad discretion in declining to permit the Applicants to intervene under Rule 24(b)?

**STATEMENT OF THE CASE**

Plaintiffs-Appellees (Plaintiffs) are individuals with mental retardation who are institutionalized in intermediate care facilities for persons with mental retardation (ICFs/MR) operated by Defendants, Department of Public Welfare and the Secretary of Public Welfare (collectively, DPW).  Am. Compl. ¶¶ 1, 8-14, 55 (A-82, A-84-A-86, A-89).  Plaintiffs filed a Complaint in June 2009 (A-53) and an Amended Complaint in July 2009 (A-82).  Plaintiffs, who are appropriate for and not opposed to receiving community services, contend that Defendants' failure to offer community services to them and others similarly situated violates the integration mandates of Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794.  *See* Am. Compl. ¶¶ 2, 4, 23-26, 29-32, 35-37, 41-43, 46-48, 72, 86, 92 (A-

82, A-88-A-92, A-104-A-105, A-106-A-107).  Plaintiffs seek only declaratory and injunctive relief.  *Id.* ¶ 94 (A-108).

After reviewing a comprehensive Motion and Brief by the Plaintiffs (Docket ## 15, 16), the district court issued an Order that certified this case to proceed on behalf of the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; *and* (3) *do not or would not oppose community placement.*

Order dated Sept. 2, 2009 at 4 (emphases added) (A-30).

DPW filed a Motion to Dismiss the Amended Complaint in its entirety (Doc. # 20).  The district court denied that Motion (A-31), and DPW subsequently filed its Answer.  (A-196).

In October 2009, while DPW's Motion to Dismiss was pending, the Applicants, nine residents of the state ICFs/MR, filed a Motion for Intervention to intervene on the side of DPW.  (A-152).  The Applicants, through their guardians or next friends, asserted that they are opposed to discharge from the ICFs/MR. The Applicants asserted no claims against DPW nor did their Response to Plaintiffs' Amended Complaint assert any counterclaims against the Plaintiffs.  *See* Applicants' Response ¶¶ A-H (A-163-A-166).  The only relief they apparently sought was decertification of the class.  *See* Applicants' Response at 33 (A-193).

2

JA1231

By Memorandum and Order dated March 10, 2010, the district court denied the Motion for Intervention.   (A-5).   The district court determined that the Applicants failed to meet three of the four criteria required for intervention as a matter of right under Federal Rule of Civil Procedure 24(a).  Mem. at 6-18 (A-10-A-22).  Specifically, the district court concluded that:  (1) the Applicants' "bona fide concern in their own care ... does not rise to the level of a significantly protectable interest" because the class definition specifically excludes individuals, like the Applicants, who oppose community placement; (2) the "Applicants' alleged interest cannot logically be placed in jeopardy" since they are not class members; and (3) the Applicants had no interest that was not adequately represented by the government Defendants.  *Id.* at 11-18 (A-15-A-22).  The district court also declined to exercise its discretion to permit the Applicants to intervene pursuant to Federal Rule of Civil Procedure 24(b), concluding that "the Applicants' interests are already represented in the litigation, and their appearance as intervenors would not sufficiently add anything to the litigation."  *Id.* at 21 (A-25). The Applicants filed a notice of appeal on March 20, 2010.  (A-1).

3

JA1232

The parties completed all discovery in June 2010.  Plaintiffs and Defendants filed cross-motions for summary judgment in late June 2010,[1] which are pending. (A-205, A-302).[2]

## **STATEMENT OF FACTS**

DPW provides services to approximately 1,200 persons in five state ICFs/MR that range in size from approximately 125 persons to 325 persons. Am. Compl. & Answer ¶ 55 (A-94, A-200); Pls.' SUF & Defs.' Resp. ## 12, 17, 18 (A-301.4, A-301.5, A-380).[3]  DPW also funds services for approximately 2,500 individuals in privately-operated state ICFs/MR.  Pls.' SUF & Defs.' Resp. # 27 (A-301.7, A-381).   In addition, DPW funds an array of community-based mental retardation services and supports for more than 50,000 Pennsylvanians.  Defs.' Br. in Support of Motion for Summary Judgment at 3 (A-314).   The community services funded by DPW include residential services (such as small group homes),

_____

[1]  The United States filed an *amicus* brief in support of Plaintiffs' Motion for Summary Judgment.  (Doc. ## 62, 64).

[2]  Applicants assert that "the parties have raced headlong through discovery and toward resolution of their dispute ...."  Applicants' Br. at 4.  The parties have done nothing more than comply with the district court's September 30, 2009 scheduling Order (Doc. # 24), which afforded the parties nearly nine months for discovery and required dispositive motions to be filed by July 1, 2010.

[3]  References to "Pls.' SUF and Defs.' Resp." is to Plaintiffs' Statement of Undisputed Material Facts filed in support of their Motion for Summary Judgment (A-301.1) and to Defendants' Responses to those Statements (A-380).

4

day programs (such as vocational training, development of community integration skills, and socialization), therapies, and home health care (including up to 24 hours a day of skilled nursing).  Pls.' SUF & Defs.' Resp. # 28 (A-301.7, A-381).

Plaintiff Franklin Benjamin, now nearly 50 years old, has been institutionalized at Ebensburg Center, a state ICF/MR, since he was six years old. *See* Am. Compl. ¶ 22 (A088); Pls.' SUF & Defs.' Resp. # 1 (A-301.2, A-380).  The congregate, institutional nature of Ebensburg Center undermines his capacity to benefit from treatment there since he is extremely sensitive to noise and light.  Am. Compl. ¶ 23 (A-88).  Plaintiffs Richard Grogg, 46 years old, and Frank Edgett, 52 years old, have been institutionalized at Selinsgrove Center, a state ICF/MR, for 20 years each.  *Id.* ¶¶ 27, 33 (A-89, A-90); Pls.' SUF & Defs.' Resp. ## 2-3 (A-301.2, A-380).  Messrs. Grogg and Edgett are both very independent and social.  Am. Compl. ¶¶ 28, 35 (A-89, A-90).  Plaintiff Sylvia Baldwin, 34 years old, has been institutionalized at Polk Center, a state ICF/MR, for approximately 20 years and is generally independent. *Id.* ¶¶ 38, 40 (A-90, A-91); Pls.' SUF & Defs.' Resp. # 4 (A-301.2, A-380).  Plaintiff Anthony Beard, 50 years old, has been institutionalized at Ebensburg Center, a state ICF/MR, since he was seven years old.  Am. Compl. ¶ 44 (A-91); Pls.' SUF & Defs.' Resp. # 5 (A-301.2, A-380).  All of the named Plaintiffs are appropriate for discharge to integrated, community-based placements, and they and their involved family members are not opposed to

discharge.  Am. Compl. ¶¶ 25, 26, 31, 32, 37, 38, 42, 43, 47, 48 (A-88-A-92); Pls.' SUF & Defs.' Resp. ## 43-44, 53-60 (A-301.10, A-301.12-A-301.14, A-381).

It is beyond dispute that individuals who live in state ICFs/MR are more segregated than those who live in the community.  Pls.' SUF & Defs.' Resp. # 52 (A-301.12, A-381).  State ICFs/MR are in more rural parts of the state; most state ICF/MR residents live in units ranging from 16 to 20 people; day services are usually provided on the institutional grounds; and residents do not have as much opportunity to have access to community activities.  *Id.*

The parties do not dispute that all state ICF/MR residents, with appropriate services and supports, could live in more integrated community settings.  Am. Compl. & Answer ¶ 65 (A-98, A-201); Pls.' SUF & Defs.' Resp. # 47 (A-301.10, A-381).  There are no types of mental retardation services and supports that are provided in the state ICFs/MR that cannot be and are not currently being provided through DPW's community service system to Pennsylvanians with mental retardation.  *Id.* # 46 (A-301.11, A-381).  According to DPW's Deputy Secretary for Developmental Programs, "although the average acuity in the state [ICFs/MR] is significantly higher than the average acuity in the community, there is no person we are serving in the state ICFs/MR for whom we are not serving a very similar person in the community."  *Id.* # 47 (A-301.11, A-381).

6

JA1235

DPW has not offered community services to residents of state ICFs/MR, Am. Compl. & Answer ¶ 72 (A-100, A-201), Pls.' SUF & Defs.' Resp. # 74 (A-301.17, A-382), even though the provision of community supports and services to Plaintiffs and class members would on average be less costly to DPW than continuing to institutionalize them.  Am. Comp. & Answer ¶¶ 58, 61 (A-94, A-97, A-200); Pls.' SUF & Defs.' Resp. ## 23-24, 116, 118 (A-301.6, A-301.28, A-380, A-384).  Although there is a waiting list for community-based mental retardation services in Pennsylvania, Defendants admit that Plaintiffs and class members either are not on the waiting list or are not likely to be removed from the waiting list regardless of their level of need. Am. Compl. & Answer ¶¶ 62, 63, 73 (A-97, A-98, A-100-A-102, A-201); Pls.' SUF & Defs.' Resp. ## 75, 82-88 (A-301.17, A-301.19-A-301.21, A-382, A-383).  DPW thus does not have a waiting list for such individuals that moves at a reasonable pace.  Am. Compl. & Answer ¶ 80 (A-103, A-201); Pls.' SUF & Defs.' Resp. # 99 (A-301.23, A-383).

Many, although not all, residents of state-operated ICFs/MR and their families are not opposed to discharge provided that appropriate community supports and services are offered.  *See* Am. Compl. ¶¶ 69, 70 (A-99).  After this lawsuit was filed, DPW conducted an assessment, based primarily on existing documentation, to determine whether state ICF/MR residents or their families opposed community placement.  Pls.' SUF & Defs.' Resp. # 61 (A-301.14, A-381).

7

DPW determined that 78 state ICF/MR residents did not oppose community placement, and 1,018 state ICF/MR residents indicated no opposition to community placement. Pls.' Summary Judgment Motion, Exh. 13 (A-238). DPW further determined that family members of 114 state ICF/MR residents indicated that they did not oppose community placement, and the families of an additional 217 state ICF/MR residents did not indicate any opposition to community placement. *Id.* Thus, there are at least approximately 331 state ICF/MR residents whose families do not oppose discharge. *Id.*

Some families of state ICF/MR residents are opposed to discharging their relatives to community services because they are apprehensive about the care provided in the community. *See* Pls.' SUF & Defs.' Resp. # 70 (A-301.16, A-382). Experience has demonstrated, however, that information about available community services can sometimes allay those concerns. *See id.* # 71 (A-301.16, A-382); Am. Compl. & Answer ¶ 70 (A-99, A-201). It is particularly important for state ICF/MR residents and their families to have an opportunity to visit community programs so that they can make an informed choice about whether they want to choose community services. Pls.' SUF & Defs.' Resp. # 72 (A-301.16, A-382).[4] Indeed, many former residents who had lived for years in now-closed state

---

[4]    As DPW's Deputy Secretary for Developmental Programs testified: "When you get used to a particular type of service delivery and a particular way

8

ICFs/MR and who were discharged to small, community-based placements over their or their family members' initial opposition now are happy with the community supports and services they receive, as are their families.  Am. Compl. & Answer ¶ 71 (A-99, A-201); Pls.' SUF & Defs.' Resp. ## 73 (A-301.17, A-382).[5]

Plaintiffs have acknowledged since the inception of this lawsuit that there will be some state ICF/MR residents, like the Applicants, who may be familiar with community services and still not want to be discharged.  Recognizing that the integration mandate of the ADA does not require the discharge of even unnecessarily institutionalized individuals if they are opposed to discharge, *see* discussion, *infra*, at 15, 20, 29, Plaintiffs have actively worked to assure that this litigation does not require anyone who is opposed to discharge to accept community placement.

▪    Plaintiffs' Amended Complaint and Motion for Class Certification narrowly framed the class definition to exclude state ICF/MR

---

services are delivered, particularly if you are reasonably happy with those services, it's very difficult to make a judgment about whether other alternative services might work for your family member unless you see them, unless you have an opportunity to see and feel them."  Casey Dep. at 105 (A-224).

[5] Even families who sued DPW when their relatives were discharged from a now-closed state ICF/MR ultimately had no complaints about the community services their relatives received and testified that they did not want their family members returned to state institutions.  Pls.' SUF & Defs.' Resp. # 73 (A-301.17, A-382).

residents who are opposed to discharge. *See* Am. Compl. ¶ 15 (A-86); Pls.' Class Certification Motion (A-111-A-112). The district court's class certification Order adopted that explicit exclusion. (A-30).

- Plaintiffs' Amended Complaint limits the scope of their claims, asserting that DPW violated the ADA's integration mandate by "unnecessarily segregating Plaintiffs and putative class members in institutions, by failing to offer them mental retardation services in the community, ... and *by failing to provide such services to Plaintiffs and those putative class members who are not opposed to discharge*." Am. Compl. ¶¶ 86, 92 (emphasis added) (A-104-A-105, A-106-A-107).

- The relief that Plaintiffs seek in their Motion for Summary Judgment concretely protects the rights of those state ICF/MR residents who are opposed or whose guardians or involved families are opposed to community placement. Plaintiffs' proposed order would require Defendants to develop a "Planning List" of class members. Proposed Order ¶ 2.a (A-296). "To determine who is on the Planning List, [Defendants] will assess opposition by state ICF/MR residents and their involved families (*i.e.*, those family members who have consented to be designated as substitute decision makers for the

10

JA1239

residents) or guardians no later than June 30, 2011 and at least annually thereafter." *Id.* ¶ 2.a.(1) (A-296). Recognizing that residents, guardians, and their families may change their minds during the course of the implementation process, state ICF/MR residents, involved families, and guardians have the right to be added to or removed from the Planning List during the course of implementation. *See id.* ¶ 2.a.(1), 2.b.(3) (A-295-A-296, A-299).

In their Motion for Summary Judgment, Defendants asserted that they "adopted" an integration "plan" for state ICF/MR residents on June 18, 2010 (less than two weeks prior to the due date for dispositive motions). Defs.' Summary Judgment Br. at 7-9 & Exh. 6 (A-318-A-320, A-304-308). While Defendants' "plan" is flawed in many ways, *see* discussion, *infra*, at 27 n.11, it properly addresses state ICF/MR residents who are opposed to discharge. Defendants' purported plan would not force state ICF/MR residents who are opposed or whose families are opposed to discharge to accept community placement. Step 1 of the "plan" indicates that, to the extent any funding is ever appropriated and available to fund community services for state ICF/MR residents, DPW will provide community services to those state ICF/MR residents "who do not oppose and whose families do not oppose placement in community settings." Plan at 3 (A-306). Step 3 of the "plan" states that Defendants will develop a planning list of

11

residents for discharge that will consist only of those who are not opposed or whose families are not opposed to discharge. *Id.* at 4 (A-307).

The premise of the Applicants' efforts to intervene is erroneous. Far from "proceed[ing] on the conclusory assumption that all ICF/MR residents were in the class," Applicants' Br. at 8, Plaintiffs and DPW time and again have taken steps to assure that those state ICF/MR residents who oppose or whose families or guardians oppose community placement are excluded from the class and will not be forced to accept community placement.

## RELATED CASES AND PROCEEDINGS

To Plaintiffs' knowledge, there are no related cases or proceedings before this court or any other federal or state court or agency.

## SUMMARY OF ARGUMENT

The district court neither applied an improper legal standard nor reached an incorrect decision in concluding that the Applicants failed to meet three of the four mandatory criteria for intervention as of right under Federal Rule of Civil Procedure 24(a). First, the Applicants' "interest in their own care and where they receive such care," Applicants' Br. at 13, is not a significantly protectable interest. Since the Applicants are explicitly excluded from the class definition and will not be subject to any relief, the lawsuit will not affect the Applicants' interest in their own care in a substantially concrete fashion.

12

JA1241

Second, any interest the Applicants could conceivably have in this case is not in significant jeopardy. As both the district court in this case and the Seventh Circuit, in the virtually identical case of *Ligas v. Maram*, 478 F.3d 771 (7th Cir. 2007), correctly held, the interests of persons who are opposed to community placement are not jeopardized by an ADA integration mandate lawsuit on behalf of a class that is defined to exclude those individuals who are opposed to discharge. Any doubt that this litigation does not jeopardize the Applicants' interests is laid to rest by the relief the parties have sought in their pending summary judgment motions. The Applicants' challenge to the validity of the class definition is both irrelevant to the question of whether they have a right to intervene and substantively unfounded. To the contrary, the class definition is fully supported by the Supreme Court's and this Court's binding precedents. Finally, the Applicants' assertion that their "practical" interests are jeopardized because relief will result in the closure of state institutions is speculation that cannot justify intervention.

Third, the district court correctly determined that any interest the Applicants might conceivably have in this case is adequately represented by the government Defendants. Although the Plaintiffs and Defendants have agreed on certain points, the Defendants have zealously fought this lawsuit. Indeed, if Defendants prevail on their pending summary judgment motion, the Applicants will have achieved the result that they desire -- the end of this litigation with no enforceable rights to

13

community placement for Plaintiffs or any other state ICF/MR residents.  A mere difference in legal strategy as to how that result is achieved does not undermine the conclusion that the Defendants are adequately representing the Applicants' interests.

In addition, the district court acted well within its broad discretion when it denied the Applicants' permission to intervene pursuant to Federal Rule of Civil Procedure 24(b).  Aside from the delay that would be caused by permitting intervention at this juncture, there is no reason for intervention.  The Applicants share no claims or defenses in common with the parties to this case since they have asserted neither claims nor defenses.  Furthermore, any "interest" the Applicants have is not at stake since they are excluded from the class.  Finally, the relief that the Applicants seek -- decertification of the class -- would greatly harm the class members who lack the personal and financial resources to pursue individual lawsuits to obtain community services and would contravene precedent.

14

# ARGUMENT

## I. STANDARD OF REVIEW

This Court of Appeals reviews denials of motions for intervention as of right and for permissive intervention for abuse of discretion, though the abuse of discretion review applied to the denial of a motion for intervention as of right is "'more stringent'" than that applied to the denial of a motion for permissive intervention. *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1179 (3d Cir. 1994) (citations omitted). The Court will reverse the denial of motion for intervention as of right "only if [it] find[s] the district court 'has applied an improper legal standard or reached a decision [it is] confident is incorrect.'" *Id.* (citation omitted).

## II. THE BASIS FOR PLAINTIFFS' LEGAL CLAIMS

To understand the flaws in the Applicants' intervention arguments, it is important to understand the legal underpinnings of Plaintiffs' claims. Plaintiffs' integration mandate claims stem from the Supreme Court's ruling in *Olmstead v. L.C.*, 581 U.S. 527 (1999), which confirmed that unnecessary segregation in institutions constitutes discrimination under Title II of the ADA. *Id.* at 597-601. Accordingly, the Court held that states must provide community services to persons who have been determined by the state's treatment professionals to be appropriate for discharge and who are not opposed to discharge unless the state can demonstrate that it would be a fundamental alteration to provide community

15

JA1244

services to the individual. *Id.* at 587, 602-07. The Court indicated that states which have a "comprehensive, effectively working plan" with a waiting list for community services that moves at a reasonable pace would be able to establish a fundamental alteration defense. *Id.* at 605-06. If such a plan and waiting list exist, the Court reasoned, it would be inappropriate to allow individuals to use litigation to jump ahead of others on the waiting list. *Id.* at 606.

Following *Olmstead*, this Court recognized that the unnecessary institutionalization of people with disabilities is a "gross injustice" that requires the state to "make a commitment to action in a manner for which it can be held accountable by the courts." *Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 500 (3d Cir. 2004) (*Frederick L. I*). Subsequently, this Court clarified that the ADA's integration mandate requires a state to adopt a "viable integration plan" to provide community services to persons who are unnecessarily institutionalized and not opposed to discharge. *Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151, 160 (3d Cir. 2005) (*Frederick L. II*). Such a plan must specify "the time-frame or target date for patient discharge" and the "approximate number of patients to be discharged each time period." *Id.*

Thus, the Applicants' core assertion -- that the parties seek to implement a "non-existent community care requirement," Applicants' Br. at 5 -- is contrary to the Supreme Court's and this Court's interpretations of the ADA's integration

16

mandate. *Olmstead* and the *Frederick L.* decisions unequivocally establish that the ADA requires, absent a valid defense, the provision of community services to unnecessarily institutionalized individuals who are not opposed to discharge.

Beyond this misunderstanding of the integration mandate, the Applicants' contentions seemingly ignore key aspects of *Olmstead* and the *Frederick L.* decisions, including:  (1) the presumption that the state's treatment professionals can make accurate determinations concerning whether community services are appropriate for persons in their care; (2) the need for class-based lawsuits to prevent the use of litigation to jump ahead of others waiting for community services; and (3) the requirement that states adopt and implement viable integration plans with specific time lines and benchmarks for discharge of persons who are unnecessarily institutionalized and not opposed to community placement.

The only relevant issue in this appeal is whether the parties and the district court adequately considered the *Olmstead* Court's direction that the integration mandate does not require individuals to accept community placement if they are opposed to discharge.  The class definition, the scope of this lawsuit, and the parties' summary judgment motions all demonstrate that the parties and the district court have excluded persons -- like the Applicants and others who may oppose discharge -- from this lawsuit and, as such, intervention is not warranted.

17

### III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DETERMINING THAT THE APPLICANTS FAILED TO MEET THEIR BURDEN TO PROVE THAT THEY HAVE A RIGHT TO INTERVENE UNDER RULE 24(a).

A person who seeks to intervene as a matter of right under Federal Rule of Civil Procedure 24(a) must establish:

> 1) a timely application for leave to intervene, 2) a sufficient interest in the underlying litigation, 3) a threat that the interest will be impaired or affected by the disposition of the underlying action, and 4) that the existing parties to the action do not adequately represent the prospective intervenors' interests.

*Liberty Mutual Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005). "'Each of these requirements must be met to intervene as of right.'" *Id.* (citations omitted).  In concluding that the Applicants did not satisfy three of the four requirements for intervention as of right, the district court neither applied an incorrect legal standard nor reached a decision that was blatantly incorrect so as to warrant reversal.[6]

---

[6]  While the Motion for Intervention was timely when filed approximately three months after the case was initiated, allowing intervention now -- after the close of discovery and while dispositive motions are pending -- would be extremely disruptive.

## A.  Since They Are Explicitly Excluded From the Class Definition, the Applicants Have No Significantly Protectable Interest.

"To justify intervention as of right, the applicant must have an interest 'relating to the property or transaction which is the subject of the action' that is 'significantly protectible.'"  *Kleissler v. United States Forest Service*, 157 F.3d 964, 969 (3d Cir. 1998).  "[T]he polestar for evaluating a claim for intervention is whether the proposed intervenors' interest is direct or remote."  *Id*. at 972; *see also Liberty Mutual Ins. Co.*, 419 F.3d at 220 (a "significantly protectible interest" is one that is not "of a general and indefinite character.").  To qualify as significantly protectable, an interest must be:  (1) "specific to the [proposed intervenors]"; (2) "capable of definition"; and (3) "directly affected in a substantially concrete fashion by the relief sought."  *Kleissler*, 157 F.3d at 972.

The Applicants state that they have an interest in "their own care and where such care is provided," specifically in "preserving their right to remain in ICFs/MR," which they argue is necessary for their personal safety.  Applicants' Br. at 17, 19.  Admittedly, this interest is specific to the Applicants and capable of definition.  It is not, however, "directly affected in a substantially concrete way by the relief sought" as required to justify intervention as of right.  *Kleissler*, 157 F.3d at 972.  To the contrary, the narrow scope of this litigation has transformed any interest the Applicants might have had in remaining in ICFs/MR from one that

might be "directly affected in a substantially concrete way" to one that is purely illusory.

Contrary to the central contention of the Applicants and their *Amici*, the Plaintiffs and district court have adhered to the *Olmstead* Court's ruling that limits the integration mandate only to persons who are not opposed to community placement. In accordance with *Olmstead*, 527 U.S. at 602-03, the Amended Complaint raised claims only on behalf of those state ICF/MR residents who do not oppose community placement. Am. Compl. ¶¶ 86, 92 (A-104-105, A-106-107). More significantly, the class definition proposed by the Plaintiffs and ordered by the district court encompasses *only* those state ICF/MR residents who "do not or would not oppose community placement" and, conversely, excludes those individuals -- including the Applicants -- who are opposed to community services. (A-30). Since the Applicants are opposed to community placement, they are not members of the class and will not be subject to any relief. As such, this lawsuit does not "directly affect[] in a substantially concrete way" the Applicants' general interests in remaining in ICFs/MR.

The Applicants' purported interest in retaining a right to choose ICF/MR care rests on a fallacy, *i.e.*, that they are class members who will be forced by this lawsuit to leave ICFs/MR and accept community placement. Such a fallacy cannot give rise to an interest that justifies intervention as a matter of right. *See Liberty*

20

*Mutual Ins. Co.*, 419 F.3d at 225-26 (finding that proposed intervenors did not have a legally protectable interest since the premise of that interest -- *i.e.*, that one of the parties was insolvent -- was "baseless").  Plaintiffs have carefully framed and litigated this lawsuit to adhere to *Olmstead*'s exclusion of those opposed to community integration from claims under the ADA's integration mandate.  The district court thus correctly concluded that the Applicants' "bona fide concern in their own care ... does not rise to the level of a significantly protectable interest in the litigation warranting intervention as a party" given their exclusion from the class definition.  Mem. at 11-12 (A-15-A-16).[7]

The Applicants alternatively contend that they have an interest in proving that "community-based care is not always the most appropriate form of care" for all persons with mental retardation.  Applicants' Br. at 18.  Since the Applicants are excluded from the class and will not be forced by this litigation to accept community placement, however, the question of whether their needs could be met

---

[7]  The Applicants not only wrongly insist that this lawsuit will force them out of state ICFs/MR, but they compound their error by suggesting that the only alternative to state ICFs/MR is community services.  Applicants ignore the fact that there are numerous privately-operated ICFs/MR in Pennsylvania that they could choose.  Pls.' SUF & Defs.' Resp. # 27 (A-301.7, A-381).  Thus, *Amicus* VOR's reliance on *People First of Tennessee v. Clover Bottom Developmental Center*, Civil Action No. 3:95-1227, slip op. at 16-24 (M.D. Tenn. Mar. 28, 2010), VOR *Amicus* Br. at 4, is misplaced.  Unlike that case, Plaintiffs in this lawsuit do not seek to preclude individuals from choosing care in private ICFs/MR or even from remaining in state ICFs/MR.

21

in the community is a purely hypothetical, academic issue. It has no concrete impact on the Applicants.[8]

## B. Whatever Interest the Applicants May Have Is Not Jeopardized By This Litigation.

Even assuming *arguendo* that the Applicants have a significantly protectable legal interest in this action, intervention as a matter of right is warranted only if they can show that such interest "'is in jeopardy.'" *Liberty Mutual Ins. Co.*, 419 F.3d at 226 (citation omitted). The Applicants "'must demonstrate that their legal interests may be affected or impaired, as a practical matter, by the disposition of the action.'" *Id.* (citation omitted). This required the district court to determine whether the litigation will have "'any *significant legal effect* on the [Applicants'] interest.'" *Id.* (emphasis added; citation omitted). "'It is not sufficient that the claim be incidentally affected; rather, there must be a *tangible threat* to the

---

[8]   The Applicants and *Amicus* Solano contend that *only* Defendants can provide them with proper care. Simultaneously, they discredit Defendants' ability and authority to determine whether their needs can be met in the community. The Applicants even dispute the Defendants' description of their own community programs. *See* Applicants' Br. at 20 (taking issue with Defendants' admission about the broad scope of their community services); Solano *Amicus* Br. at 16-18 (while insisting that she remain in state care, she disputes that the state has knowledge of her strengths and needs). These positions are not merely internally inconsistent. They disregard the Supreme Court's admonition that "the State generally may rely on the reasonable assessments of its own professionals" to determine if a person is appropriate for community services. *Olmstead*, 527 U.S. at 602.

22

applicant's *legal* interest.'" *Id.* at 226-27 (emphases added; citation omitted). As the district court held, the Applicants fail to satisfy this criterion.

### 1. The Class Definition Assures that This Lawsuit Presents No Tangible Threat to Any Legal Interest The Applicants May Have.

Once again, the Applicants' argument that their interests will be jeopardized rests on a false premise, *i.e.*, that the Applicants are members of the class. As outsiders to this case, this lawsuit presents no tangible threat to the Applicants' legal interests.

In holding that the Applicants' interests were not in jeopardy, the district court correctly relied on *Ligas ex rel. Foster v. Maram*, 478 F.3d 771 (7th Cir. 2007). Mem. at 12-13 (A-16-A-17). The plaintiffs in *Ligas*, individuals with developmental disabilities, brought a class action lawsuit under the ADA's integration mandate to challenge their unnecessary institutionalization. The district court in *Ligas* certified a class similar to the one in this case, consisting of Illinois residents with mental retardation or other developmental disabilities who: lived in privately-run institutions or were at risk of institutionalization; qualified for long-term care; could live in the community with appropriate supports and services; and "*would not oppose community placement.*" *Ligas ex rel. Foster v.*

23

*Maram*, Civil Action No. 1:05-cv-4331, 2006 WL 644474 at *5 (N.D. Ill. Mar. 7, 2006) (emphasis added).[9]

After the *Ligas* class was certified, individuals opposed to community placement sought to intervene "to ensure that the disabled would still retain a choice of where they lived." *Ligas*, 478 F.3d at 773. The district court held that any interest of the proposed intervenors would not be threatened or impaired by the lawsuit, and the Court of Appeals agreed. *Id.* at 774. The appellate court reasoned that the lawsuit would not leave the proposed intervenors without a choice of institutional care, writing:

> [T]he complaint is "replete with language on choice." Nothing in the complaint, either on its face or as correctly construed by the district court, would require the state to force those who desire institutional care to move out.

*Id.*

Citing *Ligas*, the district court here correctly observed that the Plaintiffs in this case "narrowly tailored the class definition to affect only those disabled individuals who 'do not or would not oppose community placement,'" thus

---

[9]   In *Ligas*, it appears that the district court -- at some point prior to its certification of the class and the appeal of the intervention motion -- dismissed a previously-proposed class definition and "instruct[ed] ... the plaintiffs to ensure that parties such as [the proposed intervenors who were opposed to community placement] not be included in a future request to certify a class ...." *Ligas*, 478 F.3d at 776.

"exclud[ing] those disabled individuals currently residing in ICFs/MR who oppose discharge from the institutional setting."  Mem. at 12-13 (A-16-A-17).  As such, "[t]he ultimate outcome of this suit ... would not require the state to force those who desire institutional care to move out."  *Id.* at 13 (footnote omitted).[10]

Ignoring *Ligas*, the Applicants insist that the class definition does not protect their interests, arguing that Plaintiffs and the district court rely on a "formalistic standard" to assess the scope of the class definition.  *See* Applicants' Br. at 22.  On the contrary, Plaintiffs and the district court rely on the plain language of the definition -- virtually the same definition used in *Ligas*.  Persons who "do not or would not" oppose community placement are in the class.  (A-30).  Conversely,

_____

[10]    The district court in *Ligas* subsequently decertified the class after the parties entered into a consent decree that changed the class definition to include all institutionalized persons *regardless of whether they are opposed to community placement.  Ligas ex rel. Foster v. Maram*, Civil Action No. 1:05-cv-4331, slip op. (N.D. Ill. July 7, 2009) (Exh. B to Motion for Intervention) (Doc. # 27).  The district court correctly used the procedures of Rule 23(e) to provide notice to all affected persons and their families.  Upon receipt of several thousand objections by individuals opposing community placement, the district court rejected the proposed settlement.  *Amicus* VOR's assertion that *Ligas* "foreshadows exactly what could happen in the present case if intervention is not allowed," VOR *Amicus* Br. at 14-15, is incorrect and unsupported by the record in this case.  The history of the *Ligas* litigation could not diverge more radically from the history of this case where the parties have taken concrete steps to assure that this litigation does not apply to persons who are opposed to community placement.  *See* discussion, *supra*, at 9-12.  Of course, if the parties ever sought to resolve this case in a manner that could affect the Applicants' interests, Rule 23(e) would assure, as in *Ligas*, that the Applicants would receive notice and an opportunity to be heard.

25

JA1254

those who do oppose community placement, such as the Applicants and *Amicus* Solano, are not in the class.

The Applicants further assert that they *may* be class members because the definition excludes persons who "would not" oppose community placement. *See* Applicants' Br. at 24. This assertion is doubly flawed. First, the reference to "do not or would not" is disjunctive. As long as the Applicants oppose community placement, they are excluded from the class. They will not be entitled to any benefits that the litigation might afford to class members and will not be bound by any judgment. Second, intervention is not warranted because the Applicants could be included in the class in the future if they change their minds and decide they want community services. In those circumstances, this litigation would not jeopardize their interests; it would benefit them by allowing them to receive the community services that they want.

### 2. The Parties' Requested Relief Demonstrates That the Applicants' Legal Interests Are Not Jeopardized By This Lawsuit.

The Court need not speculate on whether the Applicants' legal interests may be tangibly threatened by the litigation based solely on the class definition. Plaintiffs' and Defendants' pending cross-motions for summary judgment provide irrefutable proof that the Applicants' legal interests are not jeopardized in any way by this litigation.

JA1255

The Defendants' Motion for Summary Judgment, if granted, obviously will advance -- not undermine -- the Applicants' legal interests. Defendants seek an order that will result in the end of the Plaintiffs' case (with preclusive effect for class members), which seems to be the goal of the Applicants and their *Amici* as well. Nor does the Defendants' purported integration plan present any tangible threat to the Applicants' legal interests. This "plan," to the extent that it is ever implemented at all,[11] explicitly limits the provision of community services to those state ICF/MR residents who are not opposed or whose families are not opposed to discharge. *See* Plan at 3, 4 (A-306, A-307). The Applicants' and *Amicus* VOR's contention that this purported plan "would result in the forced transfer of ICF/MR residents to community-based care even if they oppose such placement," *see* Applicants' Br. at 15, 30, 32, 35; VOR *Amicus* Br. at 8, is contradicted by the express terms of that document.

The Applicants' legal interests also will not be tangibly threatened if Plaintiffs prevail on their Motion for Summary Judgment and secure the relief they

---

[11]    As Plaintiffs have argued in the district court, Defendants' purported plan is legally insufficient to avoid liability. It will not be implemented until July 2011, after a new administration comes into office. There is no assurance that the next administration will follow this plan at all. Further, the "plan" is riddled with significant loopholes that could well prevent any funding from ever being requested or used to provide community services to class members. *See* Pls.' Br. in Opp. to Defs.' Summary Judgment Motion at 9-21 (A-342-A-354).

27

request.  Plaintiffs' proposed summary judgment order requires DPW to assure the provision of community services to persons on a "Planning List" that consists only of those state ICF/MR residents who are not opposed or whose involved families or guardians are not opposed to such placement.  Proposed Order ¶¶ 2.a-2.c (A-295-A-300).  Thus, the Applicants' insistence that the Plaintiffs seek to force them to accept community placements against their will is belied by the narrow relief that Plaintiffs seek.

In sum, the Applicants' and their *Amici*'s insistence that the litigation will force them out of the state ICFs/MR is based on sheer fantasy, completely contradicted by the actual positions the Plaintiffs and Defendants have taken in this case.  Given the relief requested by the parties, the Applicants cannot establish that this lawsuit poses a "tangible threat" to their interests in remaining in the state ICFs/MR.

### 3.  The Class Definition Is Consistent With, and Indeed Required by, the Supreme Court and This Court's Precedents.

Perhaps realizing that the plain language of the class definition does, in fact, exclude them from the class, the Applicants and *Amicus* Solano challenge the propriety of the class definition.  Applicants Br. at 25-26 & n.3; Solano *Amicus* Br. at 11-20.  This appeal, however, is not about the class definition or class certification in the abstract.  The issue is whether the Applicants' legal interests will be jeopardized by this lawsuit.  The Applicants and *Amicus* Solano are excluded from

28

the class as it has been defined and certified by the district court.  As such, they cannot meet the criteria for intervention as of right since their legal interests are not jeopardized.  The Applicants' efforts to divert attention from their failure to satisfy the requirements for intervention should not distract this Court from that issue.

Even if the class definition has some bearing on the propriety of intervention, the class definition is appropriate.  It comports with Rule 23(b)(2), and is essentially mandated by precedent.

*Olmstead* held that the integration mandate does not require the provision of community services to institutionalized persons who are opposed to discharge. *Olmstead*, 587 U.S. at 602.  Such individuals, therefore, must be excluded from the class definition and any relief afforded by an integration mandate lawsuit, which is precisely what Plaintiffs and the district court did in this case.

The *Olmstead* Court did not explain what constituted "opposition" to community placement.  At minimum, individuals with disabilities and their involved families or guardians must be able to make *informed* choices.  *See* HCFA, *Developing Comprehensive Effectively Working Plans - Initial Technical Assistance Recommendations* at 8 (Jan. 14, 2000), *available at* *http://www.cms.gov/smdl/downloads/smd011400c.pdf*.

Although some individuals, families, and guardians, like the Applicants and *Amicus* Solano, might have all the information they need to make an informed

29

decision about community placement, many others do not. *See* discussion, *supra*, at 8-9. State ICF/MR residents and their involved families or guardians should be provided with "accurate information and a meaningful choice" about community options before they are definitively determined to be opposed to discharge. *See Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 267 (E.D.N.Y. 2009), *app. pending*. This includes comprehensive education about community services as well as the opportunity to visit specific community placements. *See Disability Advocates, Inc. v. Paterson*, Civil Action No. 03-CV-3209, 2010 WL 786657 at *3 (E.D.N.Y. Mar. 1, 2010) (agreeing in integration mandate case that it was appropriate to provide unnecessarily segregated individuals with information about community placement in a comprehensive, in-depth, multi-faceted manner to assess their opposition to discharge), *app. pending*. Given the need to assure that state ICF/MR residents, families, and guardians are able to make informed decisions, it is necessary to permit them to make decisions on opposition (and, thus, whether they are included in the class) only after they have an opportunity to receive information about community options.[12]

---

[12] Plaintiffs' proposed relief and DPW's purported integration plan include programs to provide education about community options to state ICF/MR residents, families, and guardians to enable such persons to decide whether they want to be included in a "planning list" of persons for whom community services will be developed. *See* Pls.' Summary Judgment Proposed Order ¶ 2.b (A-296-299); DPW "Plan" at 3 (A-306-A-307). These straightforward efforts to provide

The Applicants nevertheless suggest that the class is improperly defined because it is based on the "future mindset" of state ICF/MR residents and, therefore, is unduly subjective. *See* Applicants' Br. at 25 & n.3. It is not. Opposition to discharge is an objective element of an ADA integration mandate claim under *Olmstead*. Since opposition must be informed, however, a class definition must allow people to make their decision about whether they oppose community placement after they receive appropriate information. To require assessment of opposition before state ICF/MR residents, their families and guardians have an opportunity to learn about community options would be contrary to the integration mandate and, indeed, common sense. All class members need not be ascertainable at the beginning of the lawsuit as long as the "general outlines" of the membership is determinable. *See* 7A Charles A. Wright, *et al.*, *Federal Practice & Procedure* § 1760 at 136-37 (3d ed. 2005) (collecting cases). The class definition in this case sufficiently and concretely describes the parameters for membership. While some class members may be added and some dropped during the course of the litigation, this cannot defeat class certification. *Id.* at 139 & n.8.

───────────────────────────────

accurate information about community options are not an "offensive," "Orwellian" scheme, as Applicants suggest, nor "presumptuous" as VOR suggests. *See* Applicants' Br. at 14, 21; *Amicus* Br. at 10. The Applicants' and *Amici*'s virulent opposition to the mere provision of information about community options is telling. Information can do no harm.

31

*Amicus* Solano further complains (though Applicants do not) that the class is not sufficiently "cohesive" to warrant certification because factual issues as to appropriateness for community treatment and opposition to discharge predominate. Solano *Amicus* Br. at 11-20.  This case, however, does not present the type of factual variations found to undermine class certification in *Barnes v. American Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999), cited by Ms. Solano.[13]

In *Barnes*, this Court rejected certification in a mass tort action that sought medical monitoring for cigarette smokers.  The highly individualized issues in *Barnes* for the potentially hundreds of thousands of class members -- multiple defendants, multiple different products, different levels of exposure, addiction, causation, the need for monitoring, and the statute of limitations -- cannot be compared to the straightforward issues in this narrow and well-defined class.[14]

_____

[13] Amicus *Solano* also relied on *Sullivan v. DB Investments, Inc.*, No. 08-2784, 2010 WL 2736947 (3d Cir. July 13, 2010), in support of her assertion that the class definition was improper.  This Court subsequently vacated that ruling and granted rehearing en banc.  *Sullivan v. DB Investments, Inc.*, No. 08-2784, Order (3d Cir. Aug. 27, 2010).

[14]   *Barnes* has not even precluded Rule 23(b)(2) class certification of all medical monitoring claims.  *See In re Diet Drugs Products Liability Litigation*, Civil Action No. 98-20626, 1999 WL 673066 at *12 (E.D. Pa. Aug. 26, 1999) (distinguishing *Barnes* and holding that Rule 23(b)(2) class in medical monitoring case could be conditionally certified).

The pool of potential class members in this case is limited and readily identifiable, *i.e.*, state ICF/MR residents. Among that pool, the key determinant of class membership will be opposition. This issue -- which can be readily assessed once appropriate information is provided -- does not render the class unduly indefinite. So, too, the issue of "appropriateness" for community services does not fatally undermine the class's cohesion. The Supreme Court conferred substantial authority on state treatment professionals to assess the propriety of community placement. *Olmstead*, 527 U.S. at 602. Here, the state's treatment professionals -- who work with state ICF/MR residents daily and are familiar with community resources -- have determined that, with appropriate supports and services, all state ICF/MR residents can live in the community.[15]

_____

[15]   This case is far closer to *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994), than *Barnes*. In the former case, this Court held that the district court should have certified a Rule 23(b)(2) class of all children in the custody of the Department of Human Services who have been abused or neglected. *Id.* at 53-54. The court rejected arguments that Rule 23(a)(2)'s commonality requirement was not satisfied because of the varied and individualized circumstances of the children. *Id.* at 57. As in *Baby Neal*, Rule 23(b)(2) certification is appropriate here since "plaintiffs request declaratory and injunctive relief against a defendant engaging in a common course of conduct toward them, and there is therefore no need for *individualized* determinations of the propriety of injunctive relief." *Id.* (emphasis in original). Plaintiffs do not ask the district court to assess the specific community service needs of class members, but only to require Defendants to offer such services to those who are not opposed to them.

JA1262

The Applicants' and *Amicus* Solano's challenges to the class definition imply that class certification is impossible in an ADA integration mandate case.[16]  Such a conclusion is untenable.  The Supreme Court has suggested that these cases should be brought through class actions to assure that individual lawsuits are not used to displace persons higher on a waiting list.  *Olmstead*, 527 U.S. at 606.  This Court in *Frederick L. II* directed states to adopt "viable integration plans" with specific benchmarks and time lines for the discharge of persons who are unnecessarily institutionalized and not opposed to discharge.  *Frederick L. II*, 422 F.3d at 160.  These decisions plainly anticipate that states *must* provide wide-ranging relief for *all* persons who are unnecessarily institutionalized and not opposed to discharge.  Given that the evidence indicates that there are more than 330 state ICF/MR residents whose families or guardians do not oppose discharge, *see* discussion, *supra*, at 7-8, it is imperative that this case proceed as a class action.  To decertify the class, as the Applicants urge, would leave these individuals with no real means to secure relief.

---

[16]  Plainly, no class definition ever would satisfy the Applicants and their *Amici*.  They would object to a definition of "all persons in state ICFs/MR" since it does not exclude individuals who are opposed to community services.  They also would object to a definition of "all persons in state ICFs/MR who are entitled to community services under the ADA's integration mandate" because it implicitly requires the determination of propriety for discharge and opposition.

34

JA1263

### 4.  Applicants' Speculative Fear of Institutional Closures Is Not Sufficient to Demonstrate That Their Legal Interests Are Jeopardized by This Lawsuit.

Since the litigation plainly excludes the Applicants and others who oppose discharge from any relief that will provide community services, the Applicants and their *Amici* resort to speculation to justify their alleged right to intervene.  They contend that as a "practical" matter, the Plaintiffs' requested relief and/or Defendants' purported integration plan will result in the closure of one or more state ICFs/MR and thus require them to relocate.  *See* Applicants' Br. at 28-31.[17] This argument cannot prevail.

First, this argument is pure conjecture.   DPW has not closed any state ICFs/MR since Altoona Center in 2005, and there is no evidence that it has any current plans to close any state ICF/MR and certainly no plans to close all of them and to "force" Applicants to accept community placement.  *See* Pls.' SUF & Defs.' Resp. # 127 (A-301.31, A-384) (DPW rejected proposals to close Selinsgrove and

-----------------------

[17]    *Amici* further contend that the case is motivated entirely by a national conspiracy to close institutions to move residents to unsafe community programs. *See* Solano *Amicus* Br. at 8 (asserting that closures are the "central objective" of "plaintiffs' advocates"); VOR *Amicus* Br. at 7, 10-16 (asserting that this case is part of "decades-long litigation movement" to close all ICFs/MR).  These allegations should not divert the Court's attention from the simple fact that Plaintiffs have made every effort to assure that this litigation does not require individuals, such as Applicants and *Amicus* Solano, to accept community placement if they are opposed to discharge.

Hamburg Centers).    Moreover, when DPW closed Altoona Center, it ultimately gave the individuals who resided there the option of transferring to another state ICF/MR in lieu of receiving community services; it did not force them to accept community services.    *See Alexander v. Rendell*, Civil Action No. 3:2005-419, 2009 WL 82227 at *5 (W.D. Pa. Jan. 12, 2009).

Speculation about Defendants' potential future actions to provide or not provide community services to persons who are institutionalized is insufficient to warrant intervention as a matter of right.    In *Alexander v. Rendell*, 246 F.R.D. 220 (W.D. Pa. 2007), residents of Altoona Center filed suit to stop the closure of that state ICF/MR.    *Id.* at 223.    The plaintiffs in that case and DPW ultimately agreed that Altoona Center residents could be transferred to another state ICF/MR if they opposed community placement.    *Id.*    Subsequently, individuals and organizations filed a motion to intervene in the lawsuit due to concerns that DPW's position in that lawsuit would restrict access to community placement in the future for other state ICF/MR residents.    *See id.* at 224 n.2.    The court held that intervention as a matter of right was not warranted since, *inter alia*, the issues before the Court related only to a finite group of individuals, *i.e.*, the former residents of Altoona Center, and would not apply to others.    *Id.* at 231.    The case "do[es] nothing to prevent further delivery of community services ...."    *Id.* at 232.    Since "[a]ny eventual judgment ... will not touch upon or impact the residential status of any

36

resident in any Pennsylvania ICF/MR facility or of any community-based care facility who was not a resident of the Altoona Center at the time of its closure," the court held there was no threat to the legal interests of the proposed intervenors. *Id.*

Like the proposed intervenors in *Alexander*, the Applicants in this case cannot establish that this lawsuit will impact their legal interests since any judgment will not extend to them. Rather, the Applicants and their *Amici* are "only seeking to obtain a 'favorable opinion' and not a 'favorable judgment' in litigation that will not impair any [of their] alleged interests." *Alexander*, 246 F.R.D. at 237. The mere possibility that DPW might one day close a state ICF/MR is not sufficient to show that this lawsuit creates a tangible threat to any legal interest of the Applicants.[18]

Second, this lawsuit does not foreclose the Applicants from pursuing whatever legal rights they might have if and when DPW ever decides to close a state ICF/MR. The judiciary, however, cannot issue a purely advisory opinion

---

[18] Almost any lawsuit could have ramifications that impact third-parties, but the potential for impact does not create the kind of tangible jeopardy to concrete interests required for intervention as a matter of right. For instance, a company faced with a product liability action might be forced to terminate some employees if it was found liable and a large judgment was imposed. Certainly, though, the mere prospect of that outcome would not give the employees the right to intervene in the product liability action.

37

concerning what rights, if any, the Applicants would have if DPW ever decides to close a state ICF/MR.[19]

Finally, it is imperative to recognize that the Applicants' and their *Amici*'s arguments, if accepted by this Court, would eviscerate the ADA's integration mandate. The Applicants and their *Amici* would preclude any actions that could hypothetically result in a reduction in the population of state institutions because such a reduction *might* one day result in the closure of one or more state ICFs/MR and, thus, require them to relocate to another state ICF/MR or to a private ICF/MR. This fear leads the Applicants and *Amici* to object on principal to the mere existence of DPW's purported integration plan to provide community services to state ICF/MR residents who are not opposed or whose families are not opposed to community placement. *See* Applicants' Br. at 30. Yet, this Court has unequivo-cally held that the ADA's integration mandate requires states to adopt integration plans to provide community services to persons who are unnecessarily institutionalized and not opposed to discharge. *Frederick L. II*, 422 F.3d at 160.

_____

[19]   Plaintiffs do not suggest that the Applicants have any concrete constitutional or statutory right to demand that the Commonwealth provide them with services in any specific institution. *See Richard C. v. Houstoun*, No. 99-3841 slip op. at 9 (3d Cir. July 20, 2000) (non-precedential) (Attachment 1) ("*Olmstead* ... did not ... decide ... that efforts to place persons with disabilities who reside in state-run institutions into more integrated community-based settings where treatment professionals believe such placements are appropriate can be a form of discrimination under the ADA.").

JA1267

The Applicants and their *Amici* should not be permitted to intervene based on an argument that class-based relief that affords community services to state ICF/MR residents who are not opposed to discharge is not permissible when this Court has held that the ADA requires states to have viable integration plans that provide precisely such relief.

### C. The Applicants' Rights Are Adequately Represented by the Government Defendants.

To justify intervention as a matter of right, the Applicants also must demonstrate that their interest in the litigation is not adequately represented by an existing party. Absent collusion or a failure to prosecute, a potential intervenor can establish this element only by showing that his interests "diverge sufficiently [from the party's interests] that the existing party cannot devote proper attention to the applicant's interests." *Brody ex rel. Sugzdinis v. Spang*, 957 F.2d 1108, 1122-23 (3d Cir. 1992). The burden, "however minimal," rests with the Applicants to satisfy this criterion. *Hoots v. Pennsylvania*, 672 F.2d 1133, 1135 (3d Cir. 1982). As the district court correctly concluded, whatever interests the Applicants might have are adequately represented by the government Defendants. Mem. at 17-18 (A-21-A-22).

"[W]hen a representative party is a governmental body charged by law with protecting the interests of the proposed intervenors, the representative is presumed to adequately represent their interests unless there is a showing of gross negligence

39

JA1268

or bad faith." *Ligas*, 478 F.3d at 774; *accord United States v. City of Philadelphia*, 798 F.2d 81, 90 (3d Cir. 1986).   In *Ligas*, the Seventh Circuit held that the proposed intervenors, individuals opposed to community placement, failed to overcome the presumption that the government defendants adequately represented their interests since there was no evidence that the defendants were grossly negligent or acted in bad faith.   *Ligas ex rel. Foster*, 478 F.3d at 774.

The Applicants do not assert that the government Defendants have been grossly negligent or acted in bad faith.   The Applicants only contend that the Defendants' failure to oppose class certification, their admission that all state ICF/MR residents are appropriate for discharge, their proposal of a purported integration plan, their non-opposition to the intervention motion, and the possibility that they may settle with the Plaintiffs all demonstrate a conflict with the Applicants' interests.   Applicants' Br. at 32.   They do not.

Defendants' non-opposition to class certification reflects only a difference in litigation tactics.   Defendants filed a motion to dismiss and now have filed a motion for summary judgment.   Defendants' decision not to oppose class certification, but rather to try to defeat the claims and thereby bind all class members to the decision and preclude relitigation, is a reasonable strategic choice. The Applicants "fail to appreciate the difference between an intervenor's interest in the litigation and an intervenor's interest in litigation strategy."   *Estate of Kelly ex*

40

*rel. Gafni v. Multiethnic Behavioral Health, Inc.*, Civil Action No. 05-3700, 2009 WL 2902350 at *8 (E.D. Pa. Sept. 9, 2009).   A disagreement with litigation strategy is not sufficient to conclude that DPW cannot represent the Applicants' interest capably.  *See CSX Transp. v. City of Philadelphia*, Civil Action No. 04-cv-5023, 2005 WL 1677975 at *5 (E.D. Pa. July 15, 2005) (the government adequately represented the proposed intervenors' interest, even though it adopted a narrower defense than that preferred by the proposed intervenors and sought slightly different relief since "these superficial differences do not reflect any true divergence of interests").

Defendants' stipulation that all state ICF/MR residents are appropriate for discharge accords with a party's and counsel's obligation of candor before the tribunal.  *See* Pa. R. Prof. Conduct 3.3.  Defendants' treatment professionals at the state ICFs/MR, who work with the residents day in and day out, are in the best position to know whether they can be provided with services in the community. They have made that decision -- a decision that must be afforded deference under *Olmstead*, 587 U.S. at 602 -- and Defendants' refusal to contradict the professional judgment of their own employees can hardly be criticized.   Moreover, this concession did not prevent Defendants from continuing to vigorously defend against Plaintiffs' claims and to seek judgment against them on other grounds.

41

The Defendants' decision to propose an integration plan for state ICF/MR residents also does not reflect their failure to represent the Applicants' interests. First, the express terms of the plan (to the extent it is ever implemented at all) would not provide community services to those state ICF/MR residents who are opposed or whose families are opposed to discharge. *See* DPW's "Plan" at 3, 4 (A-306, A-307). Second, the Applicants' criticism of the purported "plan" is really nothing more than a criticism of this Court, which held that Defendants *must* adopt an integration plan for persons who are unnecessarily institutionalized. *Frederick L. II*, 422 F.3d at 160. Certainly, Defendants' attempt (however belated, half-hearted, and ultimately unavailing) to comply with this Court's directive in *Frederick L. II* cannot demonstrate that they are not adequately representing the Applicants' interests. Finally, the Defendants seek to use their plan to justify the entry of judgment against Plaintiffs; they do not seek an order to require them to implement their plan. As such, the Defendants' "plan" is fully consistent with Applicants' ultimate interest, *i.e.*, that the Plaintiffs' claims fail.

The Applicants' and *Amicus* Solano's suggestion that Defendants' non-opposition to the intervention motion and non-participation in this appeal demonstrates that they do not adequately represent the Applicants' interests, Applicants' Br. at 33 n.6; Solano *Amicus* Br. at 24-25, also is unpersuasive. Defendants' non-opposition to the intervention motion can just as easily be

interpreted as a litigation decision to delay this case and divert Plaintiffs' attention from the core issues (which would be consistent with, not adverse to, the Applicants' aims).

Finally, the Applicants' assertion that the government Defendants may not represent their interests because they might enter into a settlement detrimental to the Applicants' interests also lacks merit. This case is a class action that requires court approval after notice and a hearing. Rule 23(e) would require notice to persons affected by any proposed settlement and an opportunity for them to be heard by the district court. If the parties here sought to enter into an agreement that impacted those opposed to discharge, the Applicants and others would receive notice and be heard by the court before any settlement could be approved.[20]

The district court's finding that the Applicants' "bald[] claim" of a conflict was "unsubstantiated" without any "effort [by Applicants] to show gross negligence or bad faith on the part of DPW," Mem. at 17 (A-21), is even stronger today in light of the Defendants' continued vigorous defense of this action and their

---

[20]    The Applicants misplace their reliance on *Philadelphia Recycling & Transfer Station, Inc. v. City of Philadelphia*, Civil Action No. 95-4597, 1995 WL 517644 (E.D. Pa. Aug. 29, 1995). Applicants' Br. at 33. Although the court in that case suggested the City would not adequately represent the proposed intervenor's interests since it might reach a settlement adverse to the proposed intervenor, *id.* at *2, it was not a class action, and the City could settle the case without any notice to or recourse by the intervenor.

43

efforts to secure a judgment against the Plaintiffs.  The Applicants' argument that their interests are not represented by Defendants thus cannot be sustained.

### IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO PERMIT APPLICANTS TO INTERVENE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 24(b).

When, as here, there is no right to intervene, a district court may nevertheless grant permission to intervene to a person who "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B); *accord Liberty Mutual Ins. Co.*, 419 F.3d at 227.  The court must consider, as well, "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(c); *accord Estate of Kelly ex rel. Gafni*, 2009 WL 2902350 at *8.  The decision whether to permit intervention is "highly discretionary."  *Liberty Mutual Ins. Co.*, 419 F.3d at 227.

Initially, it must be noted that allowing intervention at this stage of the proceedings would indeed unduly delay and prejudice Plaintiffs' rights.  Plaintiffs filed this case 15 months ago.  The parties have completed discovery and filed cross-motions for summary judgment.  To allow intervention at this stage would delay resolution of the merits of the Plaintiffs' claims.  The Applicants would be permitted to begin discovery anew (and, due to the delay, the Plaintiffs would have to renew discovery as well to overcome the staleness of evidence), dispositive motions would have to be re-filed, and the ultimate disposition of the case

44

JA1273

(whether through trial or summary judgment) will be significantly postponed. This is not a case for money damages. It is a case that involves the rights of individuals who have been unnecessarily institutionalized for years -- decades in many instances. Each day causes continuing irreparable harm, and further delays should not be countenanced, particularly where, as here, the Applicants took no steps whatsoever to expedite this appeal until four months after it was filed.

Moreover, the Applicants have no "claim or defense" that share common questions with the main lawsuit since they have asserted neither a claim nor a defense. Instead, they assert an amorphous "interest" in "questions of law and fact" arising from the parties' claims and defenses. Applicants' Br. at 34. Even assuming that such vague "interests" rise to a legal claim or defense, they are not sufficient to justify permissive intervention. In *Ligas*, the Seventh Circuit upheld the denial of permissive intervention based on these precise "interests." *Ligas*, 478 F.3d at 775-76. The court noted that those interests were addressed by the district court's "instructions to the plaintiffs to ensure that parties such as [the proposed intervenors who were opposed to community placement] not be included in a future request to certify a class ...." *Id.* at 776.

The Applicants' contention that they should be permitted to intervene to oppose Defendants' purported integration plan, Applicants' Br. at 35, is unpersuasive. Once again, the Applicants misrepresent both the substance of the

45

"plan" and its import.  First, contrary to the Applicants assertion, the plan expressly excludes persons who are or whose families are opposed to community placement. Plan at 3, 4 (A-306, A-307).  Second, this Court *required* Defendants to adopt a viable integration plan for persons who are unnecessarily institutionalized in *Frederick L. II*, 422 F.3d at 160.  Intervention could not foreclose the Defendants from taking an action that this Court has demanded.  Finally, the Defendants have presented their "plan" to the district court to justify judgment in their favor, which is consistent with the Applicants' stated interests to see Plaintiffs' claims fail.

In addition, the Court should not permit intervention because doing so would prejudice the adjudication of the parties' rights.  Most absent class members are isolated, have limited resources, and have disabilities that prevent them from bringing individual lawsuits.  Thus, intervention to decertify the class and exclude other state ICF/MR residents who seek community placement or who, after receipt of appropriate information, might opt for community placement would prejudice the rights of those absent class members by effectively foreclosing their ability to secure relief.

Decertification of the class could even prejudice the named Plaintiffs.  Since *Olmstead* strongly suggests that ADA integration mandate cases should proceed on a class basis, *see* discussion, *supra*, at 34, DPW would no doubt challenge their right to secure community services ahead of the approximately 300 other state

46

ICF/MR residents who are waiting for and not opposed to community placements, potentially leaving even the named Plaintiffs unnecessarily institutionalized in state ICFs/MR contrary to their wishes, for many years, and perhaps for the rest of their lives.

## CONCLUSION

For all the reasons set forth above, Plaintiffs-Appellees respectfully request that this Court affirm the district court's Memorandum and Order denying the Applicants-Appellants' Motion for Intervention.

Respectfully submitted,


Dated:  September 9, 2010        By:   /s/ Robert W. Meek

Mark J. Murphy
Robert W. Meek
Robin Resnick
Disability Rights Network
   of Pennsylvania
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705
(215) 238-8070

Counsel for Appellees

47

JA1276

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-3841

———————

RICHARD C, by his next friend, Kathy B., on behalf of himself and all
others similarly situated; MARK LUNZ; JOHN C. LUNZ, III; WAYNE
LUNZ, by their next friend, Eileen Lunz, on behalf of themselves and all
others similarly situated; PENNSYLVANIA PROTECTION AND
ADVOCACY, INC., on behalf of the Members of the Class;
ASSOCIATION FOR RETARDED CITIZENS/PENNSYLVANIA, on
behalf of the Members of the Class; ASSOCIATION FOR RETARDED
CITIZENS ALLEGHENY, on behalf of the Members of the Class; LARRY
HARRIS, by his next friend, James Harris, on behalf of himself and all
others similarly situated; MICHAEL CARUSO, by his next friend Louise
Lamonica, on behalf of himself and all others similarly situated; DAVID
GARRIS, by his next friend Theresa L. Scotti, on behalf of himself and all
others similarly situated;

ALLEGHENY COUNTY; WESTERN CENTER BOARD OF TRUSTEES;
WESTERN CENTER PARENTS GROUP; LEE NOCK; CECELIA
WRANA,

(Intervenor-plaintiff in D.C.)

KAREN F. SNIDER, SECRETARY DEPARTMENT OF PUBLIC
WELFARE, COMMONWEALTH OF PENNSYLVANIA; STEVEN M.
EIDELMAN, Deputy Secretary for Mental Retardation, Department of
Public Welfare; ERIC M. BOST, Facility Director, Western Center

----------------------------

DANIEL TORISKY; AUDREY SMITH; IRENE KELLER;
LAURA MOONEY; EDWARD TORISKY; RALPH KELLER;
LARRY SMITH; SUSAN RILEY,

Appellants
Pursuant to F.R.A.P. 12(a)

ATTACHMENT 1

JA1277

Appeal from the United States District Court

For the Western District of Pennsylvania

D.C. No.: 89-cv-02038

District Judge: Honorable William L. Standish

Submitted Under Third Circuit LAR 34.1(a)

July 20, 2000

Before: RENDELL and ROSENN, <u>Circuit Judges</u>, and O'NEILL, <u>District Judge</u>.\*

(Filed: July 25, 2000)

MEMORANDUM OPINION

<u>ROSENN</u>, Circuit Judge.

This litigation was originally filed in 1989 to challenge the treatment of residents

at the Western Center in Canonsburg, Pennsylvania, a state-run intermediate care facility

for persons with mental retardation.  In 1993, the parties to the litigation entered into a

settlement agreement (the "Settlement Agreement").  In late 1998 and early 1999,

Appellants, a group comprised of guardians of Western Center residents, and another

group comprised of residents themselves, each moved to intervene in the litigation for the

---

\* Honorable Thomas N. O'Neill, Jr.,  United States Senior District Court Judge for the
Eastern District of Pennsylvania, sitting by designation.

2

purpose of enforcing certain provisions of the Settlement Agreement. The United States

District Court for the Western District of Pennsylvania denied the motions to intervene as

untimely. This appeal followed. We will affirm.

I.

This appeal comes at the apparent tail end of a litigation that has remained on

various court dockets over the course of the past 11 years. As originally conceived, the

litigation concerned the treatment of residents at the Western Center. In September 1989,

the plaintiffs in this action, four mentally retarded residents of the Western Center and

three organizations that advocate on behalf of individuals with mental retardation, filed a

complaint naming as defendants various officials of the Pennsylvania Department of

Public Welfare ("DPW"). The complaint alleged, inter alia, that DPW violated (1) Title

XIX of the Social Security Act by failing to assure that Western Center complied with

federal Medical Assistance Regulations, (2) Section 504 of the Rehabilitation Act by

discriminating against class members based on the severity of their disabilities, and (3)

the Fourteenth Amendment to the U.S. Constitution by failing to provide class members

with treatment in accordance with the judgment of their treatment professionals,

including, when appropriate, services in community-based settings. The district court

thereafter certified a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(2).

In September 1992, after approximately three years of litigation and settlement

3

negotiations, the parties to the litigation entered into the Settlement Agreement. The

agreement expressed a preference for placing class members in treatment options based in

their own communities, rather than at the Western Center facility. Specifically, it

required DPW to evaluate each class member by December 1, 1992 to determine if

community services were appropriate; to develop community placements for those class

members determined to be appropriate for such placements pursuant to a "person-

centered" planning process; to develop and implement procedures to monitor the quality

of community services; and to protect the health and safety of center residents. The

Settlement Agreement also provided a dispute resolution mechanism.

Shortly after the parties reached agreement, the Western Center Board of

Trustees, the Western Center Parents Group, and two individuals moved to intervene for

the purpose of challenging the proposed settlement. Among the members of the two

organization-intervenors were Daniel Torisky and Laura Mooney, each of whom were

family members and legal guardians of Western Center residents. The district court

granted their motion to intervene. Ultimately, however, the court approved the Settlement

Agreement by order dated June 22, 1993. This court affirmed by judgment order. See

Richard C. v. Snider, 31 F.3d 1173 (3d Cir. 1994) (table).

Late in 1995, the intervenors moved to discontinue their involvement in the case.

The district court granted their request.

4

Meanwhile, the parties went about implementing the Settlement Agreement. As a result of the Settlement Agreement's mandate, the number of residents housed at Western Center began to diminish as more and more patients were moved to community placements. In early 1993, Western Center housed approximately 360 residents. On January 29, 1998, Governor Ridge announced his intention to close the Western Center facility by June 30, 1999. By late 1998 and early 1999, 98 class members remained at the facility, and the staff employed at the facility was drastically reduced.

After Governor Ridge's announcement, several individuals, including some of the Proposed Intervenors, took various steps in opposition to his decision to close the Western Center. These included seeking the intervention of a federal agency and meeting personally with Governor Ridge to express their views. On December 30, 1998, after these attempts proved unsuccessful, appellants Daniel Torisky, Audrey Smith, Irene Keller, and Laura Mooney, all of whom were family members and legal guardians of Western Center residents, filed a motion to intervene in these proceedings. Their objective was to compel the state to continue to operate the Western Center. Specifically, they requested that the court stay the out-placement of class members residing at the facility into community-based treatment programs pending cessation of alleged violations of the Settlement Agreement and of federal law. Three months later, on March 24, 1999, another group comprised of Western Center residents Edward Torisky, Ralph Keller, Larry Smith, and Susan Riley moved to intervene, with the same objective. These

5

guardian- and resident-intervenors are collectively referred to herein as the "Proposed Intervenors."

By order dated September 29, 1999, the district court denied the Proposed Intervenors' motions to intervene as untimely. Specifically, the court reasoned that excessive prejudice to the plaintiffs and defendants would result from permitting intervention at that late stage, and that the Proposed Intervenors had not provided a satisfactory explanation for their delay in seeking to become involved in the litigation. The court also rejected an additional argument made by the Proposed Intervenors that a recent decision of the United States Supreme Court affected the proper interpretation of the Settlement Agreement.

The Western Center facility did not close on schedule. However, by April 2000 only 49 residents remained. At the present time, only five residents remain, and the facility is now officially closed.

II.

Federal Rule of Civil Procedure 24(a) states:

> Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

6

Fed. R. Civ. P. 24(a). This court has held that an applicant seeking to intervene as of right must show that:

> (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in litigation.

Harris v. Reeves, 946 F.2d 214, 219 (3d Cir. 1991), cert. denied, 503 U.S. 952 (1992); see also Kleissler v. United States Forest Serv., 157 F.3d 964, 969 (3d Cir. 1998); Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 365-66 (3d Cir, 1995). "Although these requirements arc intertwined, each must be met to support intervention as of right." Harris, 946 F.2d at 219.

The timeliness of a motion to intervene "is to be determined by the [district] court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review." N.A.A.C.P. v. State of New York, 413 U.S. 345, 366 (1973); see also Kleissler, 157 F.3d at 969. In determining whether a motion to intervene is timely, a court should consider "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay." Mountain Top, 72 F.3d at 369; see In re Fine Paper Antitrust Litig., 695 F.2d 494, 500 (3d Cir. 1982).

Having reviewed the arguments made before the district court and on appeal, we hold that the district court's ruling denying intervention is amply supported by the record. The Proposed Intervenors have failed to satisfactorily explain their delay in moving to

7

intervene in the litigation. Indeed, Appellees have pointed to substantial evidence that the Proposed Intervenors knew of the alleged facts underlying their motion long before the motions were filed. Moreover, given the then-impending closure of Western Center and the reduced staff with which it was operating, granting the motion to intervene may have resulted in prejudice to the parties (all of whom opposed the motions). Accordingly, the court did not abuse its discretion in denying the motions to intervene.

The Proposed Intervenors' also argue that the Supreme Court's recent decision in Olmstead v. L.C. ex rel. Zimring, 119 S. Ct. 2176 (1999), renders their request timely. The timeliness of a motion to intervene is to be determined by reference to the timing of the motion in the context of the entire litigation. See United States v. Alcan Aluminum, 25 F.3d 1174, 1181 (3d Cir. 1994). If a recent change in the law recognizes the viability of a previously unrecognized purpose for intervention, a motion to intervene based on that change and filed shortly after its announcement may be timely. Here, however, the Proposed Intervenors' reliance on Olmstead, a decision interpreting the Americans with Disabilities Act ("ADA"), is misplaced.

There is some question as to whether the Proposed Intervenors' ADA argument has any place in these proceedings, as the Settlement Agreement was not based on any claim under the ADA. We need not resolve this issue, however, because the Proposed Intervenors' interpretation of Olmstead is mistaken. As the district court correctly stated, Olmstead held that in certain circumstances the ADA may require a state to move a

8

JA1284

person with a disability who resides in a state institution into a community-based setting,

provided treatment professionals feel such placement is appropriate, the affected person

does not oppose such placement, and the placement can be reasonably accommodated.

119 S. Ct. at 2190. The basis for this holding was the Court's conclusion that under the

ADA, "unjustified institutional isolation of persons with disabilities is a form of

discrimination." Id. at 2187. This conclusion, in turn, rested on indications in the ADA

that Congress considered unjustified "segregation" of persons with disabilities to be a

form of discrimination. Id. (citing 42 U.S.C. §§ 12101(a)(2), 12101(a)(5)).

The Olmstead Court did not, as Proposed Intervenors contend, decide the

converse proposition, that efforts to place persons with disabilities who reside in state-run

institutions into more integrated community-based settings where treatment professionals

believe such placements are appropriate can be a form of discrimination under the ADA.

Accordingly, the district court correctly rejected this argument.

III.

For the foregoing reasons, the order of the district court will be affirmed. Each

side to bear its own costs.

9

JA1285

TO THE CLERK:

Please file the foregoing opinion.

/s/ Max Rosenn
Circuit Judge

10

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-3841

———————

RICHARD C, by his next friend, Kathy B., on behalf of himself and all
others similarly situated; MARK LUNZ; JOHN C. LUNZ, III; WAYNE
LUNZ, by their next friend, Eileen Lunz, on behalf of themselves and all
others similarly situated; PENNSYLVANIA PROTECTION AND
ADVOCACY, INC., on behalf of the Members of the Class;
ASSOCIATION FOR RETARDED CITIZENS/PENNSYLVANIA, on
behalf of the Members of the Class; ASSOCIATION FOR RETARDED
CITIZENS ALLEGHENY, on behalf of the Members of the Class; LARRY
HARRIS, by his next friend, James Harris, on behalf of himself and all
others similarly situated; MICHAEL CARUSO, by his next friend Louise
Lamonica, on behalf of himself and all others similarly situated; DAVID
GARRIS, by his next friend Theresa L. Scotti, on behalf of himself and all
others similarly situated;

ALLEGHENY COUNTY; WESTERN CENTER BOARD OF TRUSTEES;
WESTERN CENTER PARENTS GROUP; LEE NOCK; CECELIA
WRANA,

(Intervenor-plaintiff in D.C.)

KAREN F. SNIDER, SECRETARY DEPARTMENT OF PUBLIC
WELFARE, COMMONWEALTH OF PENNSYLVANIA; STEVEN M.
EIDELMAN, Deputy Secretary for Mental Retardation, Department of
Public Welfare; ERIC M. BOST, Facility Director, Western Center

-------------------------

DANIEL TORISKY; AUDREY SMITH; IRENE KELLER;
LAURA MOONEY; EDWARD TORISKY; RALPH KELLER;
LARRY SMITH; SUSAN RILEY,

Appellants
Pursuant to F.R.A.P. 12(a)

———————

Appeal from the United States District Court
For the Western District of Pennsylvania
D.C. No.: 89-cv-02038

JA1287

District Judge: Honorable William L. Standish

Submitted Under Third Circuit LAR 34.1(a) July 20, 2000

Before: RENDELL and ROSENN, Circuit Judges, and O'NEILL, District Judge.*

(Filed: July 25, 2000)

## JUDGMENT

This cause came to be heard on the record from the United States District Court for the Western District of Pennsylvania and was submitted under Third Circuit LAR 34.1(a).

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED by this Court that the judgment of the district court entered October 1, 1999 be and is hereby affirmed. All of the above in accordance with the opinion of this Court. Each side to bear its own costs.

ATTEST:

Marcia M. Waldron, Acting Clerk

Dated: July 25, 2000

---

* Honorable Thomas N. O'Neill, Jr., United States Senior District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

JA1288

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

FRANKLIN BENJAMIN, by and through his
next friend Andree York, *et al.*,

        Plaintiffs-Appellees,

            v.                No. 10-1908

DEPARTMENT OF PUBLIC WELFARE
OF THE COMMONWEALTH OF
PENNSYLVANIA, *et al.*,

        Defendants.

CRAIG SPRINGSTEAD, by and through his
father and guardian, Bertin Springstead, *et al.*,

        Proposed Intervenors-Appellants.

## APPELLEES' RESPONSE IN OPPOSITION TO MOTION OF *AMICUS CURIAE* DIANE SOLANO TO FILE POST-ARGUMENT BRIEF

Plaintiffs-Appellees (Plaintiffs), through their undersigned counsel, submit this Response to oppose the Motion of *Amicus Curiae* Diane Solano to file a post-argument brief. In support of their opposition, Plaintiffs state as follows:

1.    At no time during oral argument did the Court request the parties or *amici* to submit supplemental authority on any issue, including the question of whether there is "authority supporting a federal right of intervenors and *amicus* to

JA1289

continue to reside in their present homes at the state centers at issue in the litigation." Motion at 2.

2.    *Amicus* Solano's assertion that her counsel was not prepared to address that question, Motion at 2, is disingenuous. Plaintiffs asserted in their Brief that the Appellants and *Amicus* do not "have any concrete constitutional or statutory right to demand that the Commonwealth provide them with services in any specific institution." Appellees' Br. at 38 n.19 (citing *Richard C. v. Houstoun*, No. 99-3841 slip op. at 9 (3d Cir. July 20, 2000) (non-precedential)). Thus, the question of the Appellants' and *Amicus*'s right to remain in the institutions was one that all counsel should have been prepared to address.

3.    The only new case cited in Ms. Solano's proposed brief is *Ligas ex rel. Foster v. Maram*, Civil Action No. 05 C 4331, 2010 U.S. Dist. LEXIS 34122 (N.D. Ill. Apr. 7, 2010) (*Ligas III*). Yet, Ms. Solano admits that the court in *Ligas III* did not recognize any right of institutionalized persons to remain in specific institutions. Proposed Br. at 4. All of the other authorities cited in her proposed brief previously have been cited by Ms. Solano and simply rehash arguments she presented in her *Amicus* Brief and at oral argument. Accordingly, Ms. Solano's proposed brief does not address the sole issue that she claims justifies its

2

JA1290

submission, *i.e.*, whether institutionalized individuals have a federal right to remain in the specific institutions in which they currently live.[1]

4.    Ms. Solano relies on *Ligas III* primarily to support her assertion that the Appellants are entitled to intervene.  Ms. Solano, however, ignores the unique procedural background of the *Ligas* litigation that distinguishes it from this case.[2]

a.    As Plaintiffs previously explained, Pls.' Br. at 24, the Court of Appeals refused to permit the families and guardians to intervene in the *Ligas* litigation since the class definition at the time explicitly excluded persons who

---

[1]    As Plaintiffs explained in their Brief and at oral argument, residents of state ICF/MRs have no federal right to reside in any specific institution.  *See* Pls.' Br. at 38 n.19.  ICFs/MR, including state ICFs/MR, are a Medical Assistance-funded program.  Pls.' SUF & Defs.' Resp. # 12 (A-301.4, A- 380); *see also* 42 U.S.C. § 1396d(d).  Medical Assistance recipients like Ms. Solano have a right to choose among qualified and willing providers of ICF/MR services.  *See* 42 U.S.C. § 1396a(a)(23)(B); *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 785 (1980); *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273, 281 (5th Cir. 2008).  This includes the many private ICFs/MR that are available in Pennsylvania.  Pls.' SUF & Defs.' Resp. # 26 (A-301.7, A-381).  Providers, though, have no obligation to participate in the Medical Assistance program or, if they do, to accept all eligible clients.  *Miller*, 547 F.3d at 281.  Conversely, Medical Assistance recipients do not have a right to remain in the ICF/MR of their choice if the provider is not qualified or willing to serve them.  *See O'Bannon v. Town Court Nursing Center*, 447 U.S. at 785.

[2]    The parties have been aware of the *Ligas* litigation, which they discussed in their briefs and during oral argument.  Ms. Solano, though, fails to offer any explanation why she, the Appellants, or the other *amicus* never previously cited *Ligas III*, which was issued four months prior to the submission of their briefs and ten months prior to oral argument.

opposed discharge (as does the class definition in this case). *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773-74 (7th Cir. 2007).

      b.    Following remand, the parties entered into a proposed consent decree in which the parties defined a "settlement class" to include all institution-alized persons *regardless of whether they are opposed to community placement*. *Ligas ex rel. Foster v. Maram*, Civil Action No. 1:05-cv-4331, slip op. (N.D. Ill. July 7, 2009) (Exh. B to Solano Motion). This change triggered the district court's use of Rule 23(e) to provide notice to all affected persons and their families. Upon receipt of several thousand objections by individuals opposing community placement, the district court rejected the proposed consent decree and decertified the class.

      c.    Subsequently, the parties in *Ligas* filed a second proposed consent decree with a new class definition. *Ligas III*, 2010 U.S. Dist. LEXIS 34122 at *8. Residents of the institutions opposed to discharge then filed another motion to intervene for the limited purposes of participating in the consideration of the pending motion for settlement class certification and approval of the proposed settlement. *Id.* at *9.

      d.    There is no doubt that the factual background of *Ligas III* -- *i.e.*, the parties' significantly changing the class definition -- played a critical role in the court's decision to allow intervention. Indeed, the court twice stressed that it could

4

not "ignore its previous experiences with this litigation ...." *Ligas III*, 2010 U.S. Dist. LEXIS at *19, *24. This case presents a very different factual predicate. From defining the class narrowly to requesting relief that allows families and guardians to make discharge decisions, Plaintiffs have actively sought to assure that individuals who are opposed to discharge are not forced to accept community services. *See* Pls.' Br. at 9-11, 26-28.

e.    There is another factual distinction between *Ligas III* and this case.    The *Ligas III* court was concerned that the state had not litigated a fundamental alteration defense, which includes consideration of the demands on state resources from persons other than the litigants. *Ligas III*, 2010 U.S. Dist. LEXIS at *11-*14 (citing *Olmstead v. L.C.*, 527 U.S. 581, 607 (1999)). The court wrote that, since the state defendants "do not believe it is proper, necessary, or advisable to raise the fundamental-alteration defense at this point in the litigation, this court simply has no basis to address the third prong of the *Olmstead* equation." *Ligas III*, 2010 U.S. Dist. LEXIS at *14 (footnote omitted).    In contrast, the Defendants in this case vigorously asserted a fundamental alteration defense. *See Benjamin v. Dep't of Public Welfare*, slip op. (M.D. Pa. Jan. 27, 2011) (Docket # 88).

5.    Aside from these factual distinctions, the legal foundations of the ruling in *Ligas III* are questionable as well.

5

JA1293

a.    The court concluded that intervention to challenge the proposed consent decree was appropriate because any ruling or settlement should consider the "needs" of the proposed intervenors in light of the limited resources of the state. *See Ligas III*, 2010 U.S. Dist. LEXIS 34122 at *14. As this Court suggested during oral argument in this case, a rule that allows intervention as of right by any person who might be affected by a lawsuit that implicated a state's limited resources would open a Pandora's Box. Litigation involving states would become a free-for-all. In this case, for example, it is not merely the Appellants who could assert such an attenuated and speculative "interest" in the state's allocation of resources, but also the Commonwealth's employees, contractors, and recipients of almost any state-funded service (such as people with mental illness or physical disabilities or state university students). *Olmstead* does not compel a different conclusion. Rather, *Olmstead* indicates that it is the states' role to consider the impact of funding community services on the needs of other persons with disabilities and to address those needs, as they deem appropriate, in the context of the fundamental alteration defense. *See Olmstead*, 527 U.S. at 605. This is precisely what has happened in this case.

b.    The *Ligas III* Court also erred in concluding that intervention was appropriate, despite its recognition that the proposed intervenors could file their "own lawsuit against the State if and when their [assumed] right to equitable

6

JA1294

services has actually been violated." *Ligas III*, 2010 U.S. Dist. LEXIS 34122 at

*20. The court reasoned that intervention should be permitted to avoid duplicative

litigation. *Id.* at *21. Allowing intervention based on sheer speculation that future

events will somehow impact a putative "right to equitable care" is not required by

Federal Rule of Civil Procedure 24. Such a speculative "interest" -- that may never

be impacted by the lawsuit -- does not justify intervention as of right.

     6.    In addition to concluding that the proposed intervenors had an interest

in the proposed settlement, the court in *Ligas III* also held that they had an interest

in class certification. This ruling, too, has no bearing on this case because it was

premised on a markedly different factual background.

     a.    The *Ligas III* court conceded that "it is not immediately clear

how the proposed class definition translates into a direct interest of the Proposed

Intervenors" since the proposed revised class definition included only persons with

a current record that reflects an affirmative request for community services and,

thus, excluded anyone opposed to community services. *Ligas III*, 2010 U.S. Dist.

LEXIS 34122 at *23. The court emphasized, however, that the parties had been

actively soliciting individuals with disabilities to return forms that requested

community services. *Id.* at *23-*24. This fact, coupled with the "court's previous

experience with this litigation [that] cannot be ignored," *id.* at *24, was sufficient

to give rise to an interest in class certification.

7

JA1295

b.   In contrast, the Appellants and *Amicus* Solano have no such interest in class certification in this case.  As the Appellants conceded during oral argument, they are explicitly excluded from the class definition.  Pls.' Br. at 9-12. Unlike the *Ligas* litigation, the parties here have not attempted to undermine, subvert, or disrespect the ability of families and guardians to object to community placement.  To the contrary, both Plaintiffs and Defendants agree that involved families and guardians can make decisions for state ICF/MR residents.  *See* Pls.' Br. at 9-12.[3]  Moreover, Plaintiffs' proposal to afford families and guardians opportunities to learn about community options and to change their minds about discharge over time (either for or against community placement) is far different from the activities in *Ligas III*, where the parties apparently sought to go over the heads of families and guardians and have the institutionalized persons sign forms

---

[3]   Ms. Solano's purported concern that few state ICF/MR residents have guardians to make decisions, Proposed Br. at 4, is unwarranted since involved family members can make decisions, and the vast majority of state ICF/MR residents have involved family members.  *See* Chart (A-238).  For those persons not competent to make their own decisions and who have neither involved families nor guardians, it is appropriate for the Facility Directors to make those decisions. Facility Directors are responsible to provide care and are authorized to make important health care and other decisions for these individuals based on their first-hand knowledge about their wants and needs.  *See* 50 P.S. § 4417(c).  There is no reason they cannot also make informed decisions about community services in the absence of other decision-makers.

8

that would make them permanent class members.  *Ligas III*, 2010 U.S. Dist. LEXIS 34122 at *23-*24.[4]

7.    *Amicus* Solano also argues in her Proposed Brief that Plaintiffs, by expressing concerns that the Appellants will seek to decertify the class, have implicitly conceded that the class does not satisfy the requirements of Federal Rule of Civil Procedure 23.  Proposed Br. at 5-6.[5]  This is nonsense.  Plaintiffs are confident that they would defeat a decertification motion, but do not want to devote time and resources to such an effort (and the potential appeal that would follow), particularly at this late stage of the litigation where doing so could delay relief.

8.    At the end of the day, the Appellants have conceded that the class definition explicitly excludes them from the scope of the class.  As such, this lawsuit will not force them to accept community services and they will not be

---

[4]  Individuals with disabilities and their families have the right to make informed choices about whether to accept or reject community options. Accordingly, the provision of education about their options is a necessary prerequisite to making a decision that is meaningful, *see* Pls.' Br. at 30; *Disability Advocates, Inc. v. Paterson*, Civil Action No. 03-CV-3209, 2010 WL 786657 at *3 (E.D.N.Y. Mar. 1, 2010), *app. pending*; *Messier v. Southbury Training School*, 562 F. Supp. 2d 294, 333, 337-38 (D. Conn. 2008), and it is appropriate that the "process of assessing choice" be continuous rather than frozen at a single point in time. *Messier*, 562 F. Supp. 2d at 340.

[5]  Ms. Solano makes no effort to link this assertion to the purported reason for filing this supplemental brief, *i.e.*, that there is some right to remain in any particular institutional placement.

9

bound by rulings of the District Court. Accordingly, they have no interest that will be jeopardized by this litigation. Allowing the Appellants and *Amici* to intervene would empower them to hold hostage Plaintiffs and others who do want to leave, destroying their right to community services and forcing them to remain unnecessarily institutionalized.

WHEREFORE, Plaintiffs and the Class respectfully request that the Court deny *Amicus* Solano's request to file another brief.

Respectfully submitted,


Dated: February 18, 2011          By:   /s/ Robert W. Meek
                                        Robert W. Meek
                                        Mark J. Murphy
                                        Robin Resnick
                                        Disability Rights Network of PA
                                        1315 Walnut Street, Suite 500
                                        Philadelphia, PA  19107-4705
                                        (215) 238-8070

                                        Counsel for Plaintiffs-Appellees


10

JA1298

1

```
      IN THE UNITED STATES COURT OF APPEALS
              FOR THE THIRD CIRCUIT
       FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

------------------------x
PA DEPARTMENT OF        :
PUBLIC WELFARE, et al.  :
        Appellants,     :
     v.                 : Case No. 10-1908
FRANKLIN BENJAMIN, et al.:
        Appellees.      :
------------------------x
```

Pennsylvania

Monday, February 7, 2011


    The following pages constitute the proceedings held

in the above-captioned matter before the HONORABLE KENT

JORDAN, the HONORABLE JOSEPH GREENAWAY, JR.,

and the HONORABLE WALTER STAPLETON held at the U.S.

Court of Appeals for the Third Circuit.

JA1299

## Capital Reporting Company
### PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

**2**

1  A P P E A R A N C E S
2
3  On behalf of the Appellants:
4  OWEN H. SMITH, ESQUIRE
   Sidley Austin, LLP
5  787 Seventh Avenue
   New York, New York 10019
6  (212) 839-5300
7  LESLI C. ESPOSITO, ESQUIRE
   DLA Piper
8  One Liberty Place
   1650 Market Street, Suite 4900
9  Philadelphia, PA 19103-7300
   (215) 656-2432
10
   CARL A. SOLANO, ESQUIRE
11 Schnader Harrison Segal & Lewis
   1600 Market Street, Suite 3600
12 Philadelphia, PA 19103
   (412) 577-5200
13
14 ROBERT W. MEEK, ESQUIRE
   Disability Rights Network of PA
15 1315 Walnut Street, Suite 500
   Philadelphia, PA 19107
16 (215) 238-8070
17
   On behalf of the Appellee:
18
19
20
21
22

**4**

1            P R O C E E D I N G S
2       THE COURT:  All right, Mr. Smith?
3       MR. SMITH:  Hi.
4       THE COURT:  You may proceed.
5       MR. SMITH:  May it please the Court, my name
6  is Owen Smith, with the law firm of Sidley Austin,
7  appearing on behalf of the appellants.  With the
8  Court's indulgence, I'd like to reserve five minutes of
9  my time for rebuttal.
10      THE COURT:  All right.
11           ORAL ARGUMENT
12      BY MR. SMITH:
13      The District Court abuses discretion in
14 denying appellants' Motion to Intervene as of right.
15 First, because appellants' interest is clearly
16 implicated in litigation in which their ability to
17 reside in the community is being adjudicated.
18      Second, appellants' interest may be affected
19 or impaired as a practical matter, because the relief
20 sought doesn't ensure that their current opposition to
21 community placement will protect them in the future.
22      THE COURT:  Can you start with your first

**3**

1       C O N T E N T S
2
3  ORAL ARGUMENT                     PAGE
4  Owen H. Smith               4
5  Lesli C. Esposito          24
6  Carl A. Solano             29
7  Robert W. Meek             41
8
9  REBUTTAL ARGUMENT                 PAGE
10 Owen H. Smith              53
11
12
13
14
15
16
17
18
19
20
21
22

**5**

1  point, and explain to me, because I did, of course, see
2  it in your briefing repeatedly where you said, "In
3  essence, we are two in the class."  It seemed like the
4  Court was doing everything it could to say, "If you
5  don't -- if you want to be where you are, you're not
6  part of this group."  And, in fact, the language seemed
7  to, as the original, not the reformulated class in
8  Lygus (ph), but the original class in Lygus did.
9       It seemed to track the language of Olmstead
10 (ph).  How did the Court misstep there?  Why do you
11 think that after framing it the way it did, that your
12 clients, who say, "We don't want to be in the class,"
13 are somehow in the class?
14      MR. SMITH:  I'd like to address that
15 question, Your Honor, first by discussing the interest
16 involved.  Here, the Court -- the plaintiffs have
17 asserted that all residents of the ICF's, the public
18 ICF's in Pennsylvania, can be moved to community care.
19 And the State, the Commonwealth, has not opposed that.
20 They admitted that, the Court --
21      THE COURT:  The relief they sought had to do
22 with people who do not want to move into the community?

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

6

1      MR. SMITH:  Your Honor, the second prong of
2  the class definition identifies individuals who can be
3  moved to the community.  The third prong of the class
4  definition provides that individuals who oppose being -
5  - moving to the community, or would oppose being moved
6  to the community in the future, are not in the class.
7      THE COURT:  Right.
8      MR. SMITH:  But, it's important to recognize
9  that in the Court's decision denying the appellants'
10  Motion to Intervene, the Court specifically found that
11  the appellants could be moved to the community, and
12  that community placement would be appropriate for them.
13  There have been no facts put before the Court to
14  support that.
15      THE COURT:  I -- the Court did not say that
16  the relief sought by the plaintiffs in this action does
17  not have anything to do with these interveners.  The
18  relief sought -- you said you wanted to discuss the
19  class definition later, so I was asking you first, is
20  there anything in this record that indicates that the
21  plaintiff -- the relief that the plaintiffs seek will
22  have some direct benefit -- direct effect on these

7

1  interveners?
2      MR. SMITH:  Yes, Your Honor, and I think in
3  two, at least in two ways.  First, the remedy the
4  plaintiffs are seeking in the form of an injunction
5  from the District Court would require the interveners
6  to voice affirmative opposition every year, year after
7  year, in order to avoid being moved to the community.
8      THE COURT:  How --
9      THE COURT:  Where do you --
10      THE COURT:  -- where do you get that?
11      THE COURT:  -- get that?
12      MR. SMITH:  Your Honor, if you look at page
13  290 --
14      THE COURT:  [Inaudible]
15      MR. SMITH:  -- if you look at page 296 of the
16  record before you, the plaintiffs proposed order on
17  summary judgment contains provisions for the
18  identification of class members.  And that proposed
19  order would require the Commonwealth to ask all
20  residents of public ICFs/MR, every year, whether or not
21  they oppose being moved to the community.
22      THE COURT:  Okay.  So, your problem is that

8

1  the Commonwealth will come back and ask again?
2      MR. SMITH:  Well, Your Honor, the
3  Commonwealth -- if the plaintiffs' relief, which they
4  seek is granted, the Commonwealth would be forced to
5  ask again, and again, year after year, and --
6      THE COURT:  Which they're not bothered by
7  evidently.  The Commonwealth isn't opposing it, right?
8      MR. SMITH:  -- that's correct, Your Honor.
9  And I think that that does go to whether or not the
10  Commonwealth is adequately representing my clients'
11  interests below.  But, on the point of harm, or
12  potential harm to my clients' interests.  My clients
13  are before you today because their guardians have stood
14  up.
15      THE COURT:  Right.
16      MR. SMITH:  And if the relief sought here is
17  open-ended ad infinitum, then, you know, there is the
18  possibility that my guardians in the future will not be
19  able to stand up on behalf of the interveners and
20  oppose.
21      THE COURT:  Well, then some --
22      THE COURT:  Will not be able to stand up and

9

1  say, "We oppose?"
2
3      MR. SMITH:  Correct, Your Honor.
4      THE COURT:  Community-based care?
5      MR. SMITH:  I'm sorry?
6      THE COURT:  There won't be -- what you said
7  the proposed order would require, is a response every
8  year.  And your concerned that at some time in the
9  future, the guardians on behalf of those that they are
10  taking care of, won't be able to respond?  I don't
11  understand that.
12      MR. SMITH:  Your Honor, as a hypothetical ten
13  years from now, if one of my clients' guardians were to
14  pass away, or become incapacitated for some reason, and
15  were not able to stand up for the interests of their
16  client, there is some question about what would be
17  required of a severally mentally handicapped individual
18  to sufficiently indicate their opposition to being
19  moved.
20      THE COURT:  Why would it be any different
21  than it was the prior nine years?
22      MR. SMITH:  Well, Your Honor, if the guardian

JA1301

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

10

1  themself were asked about whether they opposed having
2  their -- the individual moved to the community, they
3  could certainly voice their opinion yes, or no, about
4  whether they were in opposition.  But, the question is,
5  for instance, my client, Beth Ann Lambo, who has -- is
6  46 years old, is severally mentally retarded, has the
7  mental capacity of roughly an 18 month old, is unable
8  to discern danger.  If her guardian, Joe Lambo, were to
9  pass away, or were to become incapacitated, what is it
10 that Beth Ann Lambo would have to do to avoid being
11 swept into this class ten years from now?
12      THE COURT:  Well, assuming your hypothetical
13 that Ms. Lambo's guardian is unable, for any reason,
14 incapacitated, or is no longer able to act as a
15 guardian.  Will Ms. Lambo be in a position to, entitled
16 to, wouldn't somebody be a replacement guardian?  I
17 mean what you're posing is, as a hypothetical, what I
18 think everybody is taking as a given, which is, these
19 are people who can't really speak adequately for
20 themselves.
21      But, they do have guardians, and those -- and
22 it's within the realm of possibility that Ms. Lambo, or

11

1  her guardian, in some combination of decision-making
2  between the two, might change their mind.  What's wrong
3  with a class where the Court says, "Nobody's going to
4  make you move if you don't want to move.  And if you
5  change your mind someday, the Commonwealth will ask."
6      MR. SMITH:  Your Honor, I'd like to just take
7  a step back, and note that while this Court has found
8  that the interests and impairment prongs of the
9  intervention analysis are automatically satisfied by
10 class membership, that doesn't mean that you have to be
11 a class member in order to marry intervention.  And
12 here, in addition to the potential that we will become
13 class members in the future, we also -- there is also a
14 risk that the remedy the plaintiffs' are seeking is
15 likely to result in a severe reduction of the
16 populations, the population of these institutional --
17      THE COURT:  That's fine.  And if you want to
18 move to another topic, that's okay with me, Mr. Smith,
19 but I want to make sure I understand your argument.
20 Are you acknowledging that at least the way it's
21 framed, whether you're comfortable with the future
22 Commonwealth coming back to your clients in the future

12

1  or not?  At least the way it's framed, your clients are
2  not members of this class.
3      MR. SMITH:  We are, at present, not members
4  of the class because we currently oppose being moved,
5  correct.
6      THE COURT:  Okay, now -- then, fine.  Let's
7  move to your second point, which is, as I understand
8  it, is even if we're not in a class, we're going to be
9  affected.
10     MR. SMITH:  Correct.
11     THE COURT:  Okay.  Please.
12     MR. SMITH:  Yes.  So, as to the point about
13 us being affected in a practical way, which is the
14 standard under the impairment prong of the intervention
15 analysis.  In a practical way, by the remedy that's
16 being sought, the first point that I wanted to raise
17 was that we would need to remain constantly vigilant in
18 order to avoid being swept in the class.
19     The second point is that the practical result
20 of the relief being sought will be the reduction, the
21 significant reduction of the population of the ICFs/MR.
22 And that is likely to result in the closure of some, or

13

1  all, of the ICFs/MR.  Now --
2      THE COURT:  If that's true, don't -- doesn't
3  your argument hinge on the assertion that your clients
4  have a right, not just to institutional care, but to
5  care in a specific institution?  That is, they're
6  entitled to be in ICF/MR Scranton.  All right, I'm
7  making names up.
8      I don't know if there's actually one there,
9  but you know that that's the one, and I get to stay
10 there.  Not that they're entitled to institutional care
11 somewhere under the Commonwealth's authority.
12     MR. SMITH:  I think there are two responses
13 to that.  First, the response is, "no," in a sense
14 because the Court has found below that we could be
15 moved to the community.  And so, that puts us at risk
16 if, at a later time, the State attempts to move us to
17 the community, and we need to proceed in enforcing our
18 rights to stay in an institution in some administrative
19 tribunal of the State.
20     Where, while we would certainly contest that
21 there's any res judicata or collateral estoppel effect
22 on the Court's finding about our ability to reside in

JA1302

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

14

1    the community, it's certainly naive to think that a
2    state administrative tribunal would simply brush past a
3    District Court finding of that fact.  Second, I think
4    that depending on the circumstances for the particular
5    individual, there may be a right under the ADA and
6    Olmstead to remain in a particular institution.
7         THE COURT:  So, you are asserting that.
8    You're saying, "We get to stay where we want to stay,
9    not where you choose to put us, in an institutional
10   setting."
11        MR. SMITH:  Your Honor, I see my time has
12   expired.  May I answer the question?
13        THE COURT:  Please answer.  And if that is
14   your position, I take that it is, what's your authority
15   for that?
16        MR. SMITH:  Sure, Your Honor.  That is our
17   position that it's possible that certain individuals
18   would have the right to remain in a particular
19   institution.  Olmstead held that the ADA entitled
20   individuals to the most integrated setting appropriate
21   to their needs.  Olmstead said that this -- what this
22   can mean, and this is a quote from the opinion.

15

1    "That's a setting that enables individuals to interact
2    with non-disabled persons to the fullest extent
3    possible."
4         Now, certainly my clients, for instance, may
5    reside in the White Haven Center, for example, which is
6    very close to their families.  And that's the only
7    interaction with non-disabled persons that they ever
8    have.  If we were to move them from the White Haven
9    Center, all the way across the state --
10        THE COURT:  Right.
11        MR. SMITH:  -- to, for example, the Polk
12   Center, which is six hours away from their families,
13   that may, for the lack of a better word, disintegrate
14   them from the community in a way that will violate
15   their rights.
16        THE COURT:  That would certainly be -- I have
17   no question that would be upsetting for the families
18   and probably upsetting for the mentally disabled person
19   involved, but what you're saying is that as a matter of
20   federal law, there's a right under the ADA to be
21   institutionalized close to the family.  Is that what it
22   comes down to?

16

1         MR. SMITH:  Your Honor, I don't believe that
2    that's what it comes down to.  I believe that we're
3    entitled to intervene, whether or not that right exists
4    under federal law.  We're entitled to intervene because
5    our interests in our own care is at issue in the
6    litigation below, because the Court is deciding, and
7    has decided, that we could live in the community.  And
8    in the future, that may become an issue when the State
9    attempts to move us to the community.
10        THE COURT:  How are you defining "community?"
11   I mean I understand your example with regard to the
12   family, but when Olmstead talks about community,
13   they're not including, you know, familial convenience
14   in their definition of community.  That seems to have
15   broadened it much more than Olmstead intended.
16        MR. SMITH:  Your Honor, I think that Olmstead
17   found that for some individuals, institutionalization
18   is discriminatory precisely because it does not allow
19   them to act as other non-disabled persons do in their
20   everyday lives.  And they specifically cited
21   interaction with other non-disabled persons.
22        THE COURT:  Right, but that's with regard to

17

1    community-based versus institutional, but I think it
2    comes back to the question that Judge Jordan (ph) had.
3    When you focus on this, what authority is there that
4    your clients have the ability to choose the facility?
5    I mean if your only basis is the -- what you
6    extrapolated from Olmstead, fine.  But, is there
7    anything other than that?
8         MR. SMITH:  Your Honor, that issue has not
9    been litigated in any District Court in the circuit.
10   It has not been presented to this Court.  And I do not
11   cite any precedent aside from Olmstead that
12   potentially, could provide us with that right.  But I
13   just want to reiterate that I do not believe that it's
14   necessary to find that we have that right, or that we
15   don't have that right, in order for us to merit
16   intervention in this case.
17        THE COURT:  And at bottom, the reason you say
18   that is because you say, "The Court said at some point
19   we could be in the community, and that's the way we're
20   affected."  Have I got you right?
21        MR. SMITH:  The Court said that we could be
22   in the community, and that, as a practical matter,

JA1303

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

18

1  could affect us in the future, yes.
2       THE COURT:  In the future, all right.
3       THE COURT:  It said you could be in the
4  community with appropriate services?
5       MR. SMITH:  Yes, Your Honor.
6       THE COURT:  Defining the people in a
7  particular situation and they're not going to put
8  anybody in there if their condition is not such that
9  they don't have the adequate services in the community.
10       MR. SMITH:  I would direct your --
11       THE COURT:  And he wasn't adjudicating what
12  interveners, who haven't even intervened yet, were
13  capable of doing in the community or not, was he?
14  MR. SMITH:  Well, Your Honor, I think that the phrase,
15  "could reside in the community with appropriate
16  services and supports," needs to be viewed with
17  realistic bounds.  And I don't think that the Court was
18  suggesting that "with appropriate services and
19  supports," would entail moving an ICF/MR into a
20  community.  There are individuals who require
21  institutional care, and in fact, Justice Kennedy's
22  concurrence in the Olmstead decision recognized that

19

1  and warned courts not to proceed too rapidly through
2  this process without -- and potentially damaging
3  people's right to remain in an institution.
4       THE COURT:  All right.
5       THE COURT:  It seems to me that you're saying
6  we may, as a practical matter, whether or not we're
7  included in the class, as a practical matter, we may be
8  affected because there are limited resources, and the
9  Department may choose to -- will have to implement the
10  relief that's being given here.  And that may mean that
11  some institutions will be closed because public funds
12  are limited.
13       Now, is that -- can we live with a rule that
14  anybody that is competing for public resources is
15  entitled to intervene in a case having to do -- that's
16  going to put a burden on public resources?  I realize
17  you say that the relief here, somehow, is designed so
18  that it will -- that they're asking for relief that
19  will directly affect the interveners.  I have trouble
20  seeing that.
21       Clearly, if they were asking for relief, that
22  would have a direct effect on interveners, you'd be

20

1  entitled to intervene as of right.  But, assuming that
2  the relief will not directly affect them, is it
3  sufficient to say, well, that Pennsylvania's going to
4  have to fund anything that comes out of this lawsuit,
5  and they're going to have to find the money somewhere
6  in the limited budget.  And therefore, since I'm in the
7  budget and want things financed by the budget, that I'm
8  entitled to intervene in their lawsuit.
9       MR. SMITH:  Well, Your Honor, I think what
10  makes this situation different from the hypothetical
11  that you proposed, is that the State here, has conceded
12  that when they move one individual from an institution,
13  they don't save any money unless they close an entire
14  wing of that institution or the institution as a whole.
15  So, I think that it's not merely speculative that funds
16  will be transferred away from these institutions and
17  that that will have an effect on us.  I think that
18  there is evidence in the record below demonstrating
19  that there is a likely practical effect of this -- of
20  the proposed remedy.
21       I'd also like to point out that the
22  plaintiffs' proposed remedy on summary judgment, which

21

1  I pointed to earlier at -- on page 296 of the record --
2  in seeking to identify class members makes no provision
3  for individual determination of who should be moved to
4  the community.  If the plaintiffs' remedy is granted,
5  simple failure to oppose will require the State to put
6  you on -- the individual on a planning list to be
7  placed in the community.
8       THE COURT:  But, if you have a guardian, why
9  is that a particular concern?  I mean presumably, the
10  guardian would step in.  Even in your hypothetical,
11  which I think Judge Jordan responded to adequately,
12  which is, you know, there'd be a substitute guardian.
13  But, that guardian will be able to act on your client
14  or whomever's behalf, and respond in a way that's
15  appropriate for them.  If it's someone who's higher
16  functioning, then your client, maybe they do.  If they
17  don't, but they'll have the opportunity to vote,
18  express their thoughts on where they should be.
19       MR. SMITH:  It is certainly possible that
20  some of my clients would wind up with a substitute
21  guardian in the future, if one of their current
22  guardians were to pass away, or to become

JA1304

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

22

1  incapacitated, or for some other reason cease being
2  their guardian.  But, it's also possible that my
3  clients would just become wards of the State.  And in
4  that respect, I think it's important to recognize that
5  all of my clients here, who have -- and the only
6  individuals in any of the ICF's who have stood up and
7  voiced their opposition at this point, to being moved,
8  are those who have guardians.
9      THE COURT:  Well, you wouldn't contend, would
10  you, that because some people disagree with the
11  Commonwealth that the Department is ipso facto an
12  inadequate representative of the interests of mentally
13  disabled folks, would you?  I mean that's a pretty --
14  that would be a pretty dramatic position to take that
15  you just can't trust the Commonwealth.
16      MR. SMITH:  Yeah, that's not our position,
17  Your Honor.  I hope -- our position is, first, that the
18  District Court abused its discretion because in ruling
19  that the Commonwealth adequately represented our
20  interests, it held that we had failed to show gross
21  negligence on the part of the Commonwealth, which is
22  not the standard in this circuit.  The standard in this

23

1  circuit is a mere presumption that a state agency
2  adequately represents the interests of individuals that
3  it's charged with representing.  And here, that
4  presumption is rebutted by the fact that the State
5  didn't oppose, at any point below, that all individuals
6  in the institutions are capable of being moved to the
7  community.
8      THE COURT:  With appropriate services.
9      MR. SMITH:  That's correct.
10      THE COURT:  I mean isn't that -- when you put
11  that qualifier on it, I suppose -- now, you say, well,
12  realistically, that can't mean appropriate services
13  because they're not going to build an institution for
14  one purpose.  But, that's a very strong qualifier,
15  isn't it, "with appropriate services?"  I mean as a
16  theoretical matter, anybody could be in any setting
17  with appropriate services, right?
18      MR. SMITH:  Theoretically, Your Honor, but
19  the State has also admitted in discovery responses, I
20  believe in response to our request for admission in the
21  proceedings below, that there is not an individual in
22  the institutions for whom they're not serving an

24

1  equivalent person --
2      THE COURT:  Um-hmm.
3      MR. SMITH:  -- in the community, which would
4  seem to suggest that, in fact, there are services in
5  this -- and supports in the community that could be
6  provided for anyone in these institutions.  We
7  fundamentally disagree with that.  We don't think that
8  that's true, but we're being prevented from testing
9  those factual assumptions below.
10      THE COURT:  Right.  Okay, thank you.
11      MR. SMITH:  Thank you.
12      THE COURT:  Any other questions?
13      THE COURT:  I'm content.
14      THE COURT:  No.  Thank you though.
15
16
17      THE COURT:  Thank you.  Thank you very much,
18  Mr. Smith.  We'll have you back on rebuttal.  And we'll
19  hear from first [inaudible] Amicus.
20      ORAL ARGUMENT
21  BY MS. ESPOSITO:
22      Hi.  Lesli Esposito representing Amicus,

25

1  Voice of the Retarded, or VOR, V-O-R.  Thank you for
2  allowing me to speak today.
3      VOR is a nationwide non-profit advocacy
4  organization dedicated to ensuring that individuals
5  with mental retardation receive the care and support
6  they need in the settings appropriate to fulfill those
7  needs.  VOR is not opposed to community-based care.
8  VOR advocates for a range of care and services.
9      There are certain serious risks associated
10  with the mass movement of disabled individuals to
11  community settings.  These risks of abuse, neglect, and
12  serious health concerns, are due, in part, to the
13  decreased oversight that exists in community settings.
14  Contrary to statements in Amicus, the ARC's brief, and
15  certain statements by appellees, there is, in fact,
16  decreased oversight in community settings.  In ICFs/MR,
17  there is --
18      THE COURT:  How is that going to be relevant,
19  though, to the specific question before us, Ms.
20  Esposito, which is whether or not Mr. Smith's clients
21  are entitled to intervene in this particular action?  I
22  think I understand the position of Voices of the

JA1305

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

26

1  Retarded, Inc., to be, as you just articulated it,
2  there are dangers associated with the community
3  placement.  Just as I'm sure others would argue, there
4  are dangers associated with institutional placement,
5  but how does that impact the specific legal question
6  we're faced with?
7          MS. ESPOSITO:  VOR believes that if the
8  intervener appellants are not permitted to intervene in
9  this matter, then absent that intervention, the rights
10 of those individuals who do not wish to leave the
11 ICFs/MR will not be protected.  And we feel that the
12 serious risks associated with community settings go to
13 the -- I guess, the strength and importance of those
14 interests.
15         THE COURT:  Well, is your position that the
16 resolution of the class action could essentially make
17 the ICR's extinct?
18         MS. ESPOSITO:  Yes.  We think that there is
19 that serious possibility that because this is brought
20 as a class action, and not merely on behalf of the
21 named plaintiffs who are seeking community placement,
22 that the result could be closing all five remaining

27

1  ICFs/MR.  And while there are private ICFs/MR, we don't
2  believe that those are really a true substitute, due in
3  large part to the fact that there is a lengthy wait
4  list for those institutions.  So, it really is not a
5  viable option to go into those facilities.
6          THE COURT:  So, is the argument that
7  intervention -- well, the argument isn't that class
8  action itself is inappropriate, is it?  Are you saying
9  that class action itself is not an appropriate vehicle
10 under these circumstances?
11         MS. ESPOSITO:  No.  We're certainly not
12 saying that a class action is not an appropriate
13 vehicle.  We're simply saying that because this was
14 brought as a class action, the interests of the
15 interveners are at serious risk, and Your Honor
16 referenced the Lygus case.  And when you look at that
17 case that was a case where potential interveners were
18 not allowed to intervene, a settlement was negotiated,
19 and there were, I believe, thousands of objections
20 presented at the fairness hearing, which caused the
21 Court to reject the settlement.
22         THE COURT:  Wasn't the class definition in

28

1  Lygus changed?  I mean isn't it the fact that the class
2  definition, which was upheld by the Seventh Circuit,
3  was changed by the District Court.  And then, there
4  were mass objections to it that led to the
5  decertification.  Am I right factually?
6          MS. ESPOSITO:  Yes, Your Honor.
7          THE COURT:  Okay.  So, the decertification
8  and the mass of objections that were made, they're not
9  really pertinent to what we're dealing with because
10 what we're dealing with is a class shaped on the same
11 lines as the class certification, which the Seventh
12 Circuit upheld in Lygus, not the class certification as
13 it changed later, and which led to objection, right?
14         MS. ESPOSITO:  True, but in Lygus, the
15 parties that attempted to intervene were ultimately
16 part of the settlement negotiations that have now
17 resulted in a proposed settlement that the proposed
18 interveners in that matter agreed with being presented
19 to the Court.  And at this point, a fairness hearing is
20 scheduled, and they do not anticipate there being any
21 objections based on the participation of those
22 individuals.

29

1          THE COURT:  Okay.  Thank you very much, Ms.
2  Esposito.
3          MS. ESPOSITO:  Thank you very much.
4          THE COURT:  Mr. Solano?
5             ORAL ARGUMENT
6  BY MR. SOLANO:
7          Good morning Your Honors, may it please the
8  Court.  My name is Carl Solano.  I am a guardian for my
9  sister, Diane, who is a resident at one of these
10 centers in White Haven.
11         I am here representing her as an Amicus, and
12 I want to thank the Court for allowing me permission to
13 argue on her behalf today.  Thank you.
14         THE COURT:  We're grateful to have you here,
15 Mr. Solano.
16         MR. SOLANO:  Your Honor, what's the interest
17 and how it is affected?  Diane has lived at the White
18 Haven Center for 45 years.  That's what she knows as
19 her home.  She knows the people there who care for her.
20 She knows the facilities.  That is all she knows.
21         She has a mental age of one year or less.
22 She is incapable of living in the community.  Judge

JA1306

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

30

1  Jordan, you ask is there a right to live in a specific
2  center.  I believe there is.
3        I believe that for someone in that situation,
4  who has lived there their entire life, they have an
5  interest.  And, Your Honor, the question under the
6  Kleissler case -- I think I said that right -- which I
7  believe, is the Court's primary authority with respect
8  to intervention, is it does not have to be a legal
9  right under federal law.  It has to be a protected
10  interest.
11        There certainly is an interest in maintaining
12  your home.  There is a further interest under state
13  law.  We cite the Bair [ph] case and the Easley [ph]
14  case in the Amicus brief, in which state courts have
15  recognized an interest in staying there, when you have
16  lived there, as my sister has, for 45 years.
17  There is an interest here.
18        THE COURT:  I'm sorry, I missed that cite.
19  What was the case you referred to?
20        MR. SOLANO:  Your Honor, they're cited in the
21  Amicus brief.  One is In re Bair, it's a Commonwealth
22  Court -- excuse me, a Common Pleas Court case in

31

1  Pennsylvania.  The other one is called In re Easley, a
2  Commonwealth Court case in Pennsylvania.
3        They're not precisely on point, but I believe
4  Judge Stapleton, when you read them, you will see that
5  they recognize an interest in living in a facility of
6  longstanding duration.  And those facilities were state
7  centers, as we have here.
8        MR. SOLANO:  How is it affected?  It is
9  affected because the plaintiffs' contend, and the
10  Commonwealth has agreed, that every resident of a state
11  center can be moved to the community, everyone.  And
12  the Commonwealth has contended, and the state has
13  agreed, that the policy is to move everyone to a state
14  center.
15        Now, the plaintiffs' say, and the
16  Commonwealth agrees, that the protection against that
17  is opposition.  If you oppose it, we can't force you to
18  move.  I want to get to that in a second, and talk
19  about guardians.
20        But, the fact of the matter is that this
21  litigation, if successful, will result in depopulation
22  of most of the centers.  It is a financial -- it's

32

1  obviously a financial necessity that some of the
2  facilities will have to close.  You can't keep them all
3  open.
4        Judge Stapleton, it's not a question of
5  competing for government funds.  There's more to it
6  than that.  It's a question of, how do you choose where
7  you are going to spend specific government funds with
8  respect to housing mentally incapacitated individuals
9  under circumstances where they have been living in
10  these facilities for 45 years or longer.
11        THE COURT:  Mr. Smith --
12        MR. SOLANO:  I'm sorry, Your Honor.
13        THE COURT:  -- Mr. Smith mentioned, in his
14  presentation, an illusion to a right to live at a
15  particular facility.  Are you proposing that -- I
16  presume you agree with him, or you do not on that
17  point?
18        MR. SOLANO:  I submit, Judge Greenaway, that
19  where you have individuals who have been living in
20  these facilities for as long as they have, and where
21  that is the only care, and in affect, family that they
22  know, they have an interest.  And Judge Greenaway, I'm

33

1  trying to be careful here and say "interest" because
2  that's the language of Rule 24.  Not "right", not
3  "federal right", not "legal right".  It is "interest."
4        They have an interest in staying in those
5  facilities.  That is the sufficient to allow them to be
6  heard.  I think we need to be clear here.
7        I think we all agree, no one in this case,
8  certainly not the interveners, certainly not me, no one
9  in this case opposes the relocation of any resident of
10  any of these centers who is capable of being relocated,
11  and who wants to move.  We're in favor of that.
12        THE COURT:  Well, Mr. Solano?  Mr. Solano?
13  How would you have had the District Court frame the
14  class?  The District Court clearly was at pains to try
15  to make sure that nobody, like yourself speaking for
16  your sister, Diane, who did not want to be moved into
17  the community, would be bound in any way by this class.
18  That seems -- I mean would you agree that that seems to
19  be the focus and effort of the way the class was
20  framed?
21        MR. SOLANO:  I agree that that was the
22  effort, yes, Your Honor.

JA1307

## Capital Reporting Company
### PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

34

1        THE COURT:  Okay.  So, if the Court miss-
2  stepped somehow, how -- what should the Court have said
3  or done, or could the Court have done anything that
4  would have given you, as a concerned guardian for your
5  sister and others like you, the sense of peace of mind,
6  or comfort, that what's being done here is addressed to
7  people seeking community-based housing?  And not people
8  like my sister, who does not want to move, who I don't
9  want to have moved.  How could they have done it
10  differently?  How could the Court have done it
11  differently?
12        MR. SOLANO:  Your Honor, in terms of class
13  definition, there may not have been anything further
14  that the Court could have done.  Your Honor, I submit,
15  and I disagree with my colleague, Ms. Esposito.  I
16  submit that a class could be certified here.
17        THE COURT:  Um-hmm.
18        MR. SOLANO:  There are so many individualized
19  issues.  They predominate in so way (sic) particularly,
20  on a 23(b)(2) non-opted out class, that there cannot
21  possibly be the cohesiveness necessary to permit a
22  class certification.  But, we're not talking here about

35

1  class certification.  We're talking about intervention.
2        THE COURT:  Um-hmm.
3        MR. SOLANO:  And so, yes, maybe the class
4  certification order tried to protect that right.  The
5  question is, whether the individuals who may be outside
6  that class, and my argument assumes I'm not a member of
7  this class.  I will assume that.
8        THE COURT:  Um-hmm.
9        MR. SOLANO:  The question is, whether their
10  interests, nevertheless, are so affected that they
11  should be permitted to participate in this litigation.
12  And Your Honor, we submit they do because the interest
13  is strong, and because the interest is clearly going to
14  be affected because some of these institutions are
15  going to need to close.
16        Now, Your Honor, I know I'm out of time, but
17  let me just talk for a second about guardians, because
18  Your Honor, the record says that 82 percent of the
19  residents of these institutions have no guardians.
20  That's at page 238.  There's a chart in which you can
21  calculate it.
22        The guardians that they do have are dying.

36

1  Their guardians are their parents.  In some situations,
2  siblings such as myself, can get appointed as new
3  guardians.  In many cases, that doesn't happen.
4        The families live far away.  The families
5  have had no association with these individuals.  And as
6  a result, they get no new guardian.  And, Your Honor,
7  there is some chilling testimony in the record, which
8  you can find, and I can find a cite for you in a
9  second, in which you will see that it is the position
10  of the plaintiffs, and it is the position with which
11  the State agreed at a deposition.  That once a guardian
12  dies, the guardian's opposition no longer counts.
13        That the family opposition no longer counts.
14  That at that point, the individual is considered a ward
15  of the State, and it is a question of whether the State
16  opposes it, and of course, we know they don't because
17  it is the State policy to favor removal from the
18  institution.  And it is the State's statement that "All
19  individuals can be removed from the institution." The
20  deposition cite, Your Honor, is at page 226 to 228 of
21  the Appendix.
22        So, Your Honor, the central point here is

37

1  that you are dealing with an extraordinarily vulnerable
2  population of individuals.  These are people that
3  cannot make decisions for themselves.  If you look at
4  that same page of the chart, which I cited to you a
5  minute ago, you will see that when they asked, "What is
6  your view about moving to the community?"  Seventy-five
7  percent didn't say anything because they're incapable
8  of saying anything.  They don't understand the
9  question.
10        Most of them don't have guardians.  It is
11  impossible to discern what their needs are, what their
12  wants are, what their desires are.  And so, they are
13  extraordinarily vulnerable to an incorrect decision
14  being made.
15        They have needs, medical needs, care needs,
16  security needs, and there is an extraordinary risk in
17  this case that if a wrong decision is made, it will be
18  catastrophic.  All we are asking for here is a seat at
19  the table, so that we can make sure that the decision
20  is made correctly, and with full knowledge of all of
21  the issues, because we believe that all of the issues
22  and facts were not explored.

JA1308

38

1    THE COURT:  Let me keep you here for just a
2  second --
3    MR. SOLANO:  Thank you.
4    THE COURT:  -- to ask a follow-up question,
5  Mr. Solano, with the indulgence of my colleagues.  How
6  would intervention meet the concern you've just raised?
7  I understand the concern you've just raised to be, the
8  vast majority of the population don't have guardians.
9  And so, no one can speak for them, and the State's not
10  -- can't -- and I don't want to put words in your
11  mouth, or you wouldn't perhaps, put it this harshly,
12  but in effect, you seem to be saying, the Commonwealth
13  has its financial interests here, and their interest is
14  to get people into the community.  So, they're not
15  really going to be paying attention here the way a
16  guardian might.
17    Assuming all that were true, for the sake of
18  discussion, what would intervention do to address that
19  problem?  That they're a large population, they're
20  wards of the State, they don't have guardians, and they
21  may get moved into community-based housing when they
22  would rather not be.  How does admitting to the case,

39

1  or allowing the intervention of people who do have
2  guardians, going to address the problem you've
3  identified?
4    MR. SOLANO:  We can assure that the factual
5  and legal issues in the case are appropriately framed
6  and litigated, so that the Court has the correct facts.
7  For example, this case starts --
8    THE COURT:  Um-hmm.
9    MR. SOLANO:  -- with a stipulation.  They
10  admitted, they allege it, the Commonwealth concedes it,
11  in effect, a stipulation.
12    THE COURT:  Um-hmm.
13    MR. SOLANO:  This case starts with a
14  stipulation.  They admitted they -- they alleged, the
15  Commonwealth concedes it.  In effect, a stipulation --
16    THE COURT:  Um-hmm.
17    MR. SOLANO:  -- that these individuals are
18  isolated in rural institutions so that they are not
19  sufficiently integrated in the community.  They make it
20  sound like they're in the middle of Siberia.  My sister
21  is in White Haven.
22    My parents deliberately placed her in White

40

1  Haven because it's about 30 minutes away from where
2  they live, just outside of Wilkes-Barre.  She's in the
3  Poconos.  The Hamburg facility is 30 minutes from
4  Allentown.  Selinsgrove is in the Susquehanna Valley,
5  they're not in the middle of nowhere.
6    They are not isolated.  They have all sorts
7  of activities outside.  That's one fact, Your Honor,
8  that we would contest --
9    THE COURT:  So --
10    MR. SOLANO:  -- the second fact we -- we
11  would contest facts as the answer, and I can give you
12  other examples, Your Honor, if you'd like them.
13    THE COURT:  -- all right.  Your point then,
14  if I get it, is your point is, by speaking for those
15  who do have guardians, the Court would have a different
16  perspective overall?
17    MR. SOLANO:  A much different perspective,
18  they would have the facts, which right now, it doesn't
19  have because the facts were stipulated to the contrary.
20    THE COURT:  Okay.  Any other questions?
21    THE COURT:  No.
22    MR. SOLANO:  Thank you very much, Your Honor.

41

1    THE COURT:  Thank you, Mr. Solano.  All
2  right, Mr. Meek?
3    ORAL ARGUMENT
4  BY MR. MEEK:
5    If it please the Court, Your Honor, my name
6  is Robert Meek.  I represent plaintiffs/appellees in
7  this matter and the class.
8    Your Honor, we'd first like to emphasize that
9  as we have tried throughout this litigation, and I
10  believe the Commonwealth has as well, is to protect the
11  interests of persons like the interveners, who do
12  oppose community services.  And that's why the class
13  was framed as it was.  That's why the relief we sought
14  was framed as it was.
15    And the interveners will not have any impact
16  upon them by any relief granted by the Court.  And
17  their interests, if I may speak to Mr. Smith's points.
18  Their interests are not legally protected interests
19  because, I think Mr. Smith acknowledged, but Mr. Solano
20  does not, that there is no right to a particular
21  institutional setting that the interveners can
22  demonstrate.

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

42

1    THE COURT:  Well, why don't you speak to that
2  point?
3    MR. MEEK:  Sure.
4    THE COURT:  Speak directly to the question
5  of, do people have a right to be in a specific
6  institution.
7    BY MR. MEEK:
8    Now, what people in ICFs/MR have, is the
9  right to ICF/MR level of services.  They're right is --
10  it's under -- these facilities are funded through the
11  Medicaid program, which is a joint state/federal
12  program where the State pays approximately 50 percent
13  of the costs, and the federal government pays the other
14  50 percent.  The problem is that the Medicaid program
15  also requires people to receive services from any
16  willing provider -- willing and able provider -- so,
17  there are providers of Medicaid services that not only
18  the State operated ICF/MRs, but over 200 providers of
19  privately operated ICFs, which house around 2,500
20  persons.
21    So, the fact is that the real interests of
22  the appellants is the continued right to ICF/MR

43

1  services, not the particular ICF at which they
2  currently reside.  So, if the State were, at some point
3  in the future, to stop operating state -- one or more
4  state operated ICFs, the appellants would still have
5  the right to ICF/MR services, albeit at a different
6  location, but they would still have that right, and
7  that cannot be denied.    They're eligible
8    THE COURT:  And their ability to be heard in
9  this instance wouldn't affect or you're saying there's
10  no interest, so they don't have a right to try to
11  affect the -- essentially, the conversation in the
12  lawsuit?
13    MR. MEEK:  Well, the question is, Judge
14  Greenaway, the relief is couched in terms that anyone
15  who is opposed, is not going to be affected by any
16  remedy that's imposed or negotiated by the parties.
17  So, they do not add anything to the conversation.  The
18  --
19    THE COURT:  Well, speak to Mr. Solano's
20  point, then, Mr. Meek which is that they do have
21  something to add because the Court isn't getting an
22  accurate factual statement.

44

1    BY MR. MEEK:
2    The facts -- I think that Mr. Solano's point
3  is the facts are that some people are not appropriate
4  for community services.  I believe that's the main
5  contention he makes.  And -- but, the concept
6  [inaudible] all the relief goes and tracks Olmstead,
7  and Olmstead says very clearly, as does Frederick L.
8  II, from this Court, that the State is entitled to rely
9  on the professional judgment of its treating
10  professionals at those institutions to make the
11  determination of whether an individual with a mental
12  retardation is appropriate for community services.
13    That is what the language of Olmstead is --
14  you know, the language of Olmstead is [inaudible] said
15  where the State professionals determine [inaudible]
16  appropriate, and the person is not opposed, and it can
17  be reasonably accommodated by the State.  That makes
18  out a claim for integration mandate.  So, there's no
19  factual record that the interveners can make that would
20  undermine the requirement of this Court and the Supreme
21  Court that the professionals are entitled to deference
22  in their determination of appropriation for community

45

1  services.
2    THE COURT:  Well, I thought Mr. Smith raised
3  the point that -- and Mr. Solano as well -- about
4  opposition.  Mr. Solano's point helps Mr. Smith's point
5  because he says 82 percent or 82.6, I think it was,
6  percent of the folks in ICFs don't have guardians.
7    Mr. Smith raised the point that you'd have
8  to, under what's proposed, either specifically vote or
9  voice your opposition.  So, therefore, it would appear,
10  putting the two together, 82 percent of the people have
11  no ability to voice their opposition in futuro and
12  that's their concern that that particular fact be taken
13  into account in the lawsuit.  And it's one of their
14  indicia as to why they should be permitted to
15  intervene.
16    MR. MEEK:  Again, I -- Your Honor, I think
17  that Judge Jordan made this point.  They're
18  interveners, and their guardians have guardians, so
19  they can't really speak to that.  But, more to the
20  point, because these -- the State is, in fact,
21  operating as a de facto guardian for many people,
22  because family members have either died, or no longer

JA1310

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

46

1  have contact, and the individual has no guardian or
2  other family member willing to take responsibility for
3  the individual.
4       And the fact that the State -- and I don't
5  mean the State, but the facility director, through the
6  treatment professionals at each of those facilities who
7  have cared for the individual for years, who the
8  appellants and [inaudible] stress are very caring and
9  can do a great job of protecting their interests and
10  caring for them.  Those are the individuals that should
11  be, and are, in place to protect the interests as to
12  whether an individual is opposed or not opposed to the
13  placement in the community.
14       THE COURT:  So, let me make sure I understand
15  because I don't want to speak for anybody else.  But,
16  if I understood the argument that was being made by
17  Amicus and by Mr. Smith on behalf of the interveners,
18  the position that they've got is, the Commonwealth has
19  a fundamental interest, financially, into getting
20  people into lower cost housing.  So, they're going to
21  move people, if they don't say, "stop."
22       And people can't say stop, by definition,

47

1  because the population is people who are mentally
2  disabled.  And the Commonwealth is saying, no matter
3  how many times the guardians, the people -- you know,
4  the loving parents, siblings, etc., said, "No, no, no,"
5  every year when the Commonwealth came back, when they
6  pass from the scene, the Commonwealth will be there to
7  say, "And now we say, 'yes' for you."
8       And that is a system that's being set up
9  by this litigation, which is fundamentally wrong, or
10  unfair, or bad for folks who are institutionalized.
11  They shouldn't be put in the position where once their
12  loved ones pass from the scene, they are sort of "at
13  the mercy" of Commonwealth actors who have financial
14  interests in moving them on.  That's -- I repeat, I
15  don't presume to speak for them, but that's kind of the
16  tenor of the argument as I understand it.
17       And I would like you to speak to that
18  argument, which is, by the way this is set up, at some
19  point, the Commonwealth is going to get what it wants,
20  in its financial interests, by default, and no one will
21  be there to stop it because of the way the class is
22  arranged.

48

1       MR. MEEK:  Well, I -- first of all, Your
2  Honor, I don't think it's necessary solely a financial
3  interest that motivates the Commonwealth.  They are
4  interested and motivated by providing appropriate
5  services to the people they have been caring for in
6  institutional care.  They are -- based on scientific
7  evidence, of the understanding and belief that it is
8  appropriate for anyone to be served in the community,
9  given the sufficient supports and services.
10       All of this though, I must say, Your Honor,
11  still misses the point that even if the Commonwealth
12  closed all the facilities, the private ICFs will still
13  be available, and --
14       THE COURT:  Ms. Esposito says, "Waiting lists
15  a mile long."  It's really not meaningful.
16       MR. MEEK:  -- I'm not sure that's accurate,
17  Your Honor, and even if it were, the Commonwealth is
18  not about to dump people in the street while they're on
19  a waiting list for a private ICF.  I don't think that
20  we can presume that.  But, back to your point.
21       I think that the Commonwealth is being cast
22  in this very cold, harsh light that they're an

49

1  uncaring, unwilling to take into account people's
2  needs.  And that's just not the case.  By one -- on one
3  hand, the appellants and Amici [ph] are saying, "The
4  Commonwealth takes great care of people, and we think
5  they do a good job, and they know what they're doing,
6  and they've done a good job."
7       On the other hand, they say, "But, they
8  really don't understand these individuals.  They don't
9  really get that they have serious problems, and they
10  don't really understand, they couldn't possibly survive
11  in the community."  That can't be true.  Both of those
12  things cannot be true.
13       The fact is that the Commonwealth, through
14  its professionals, and again, we have to get down to
15  what Olmstead and Frederick L. II says, is that the
16  Commonwealth is entitled to rely on its professionals
17  to make those determinations of whether a person's
18  appropriate for services, and also, in the absence of
19  anyone else speaking for the individuals at the ICFs,
20  there is no one else but the State to speak for them.
21  There is no -- and the State, through its
22  professionals, are the most well placed persons to

JA1311

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

50

1 understand the wants and needs of the individual who
2 they've cared for, for years.  And the fact that the
3 family and guardian, in the past, has opposed that
4 community services, really doesn't necessarily speak to
5 whether the individual, if him or herself actually
6 opposes or does not oppose.
7      I think that you have to leave the decision-
8 making to the professionals, which is what Olmstead
9 requires, and what Frederick L. II requires.
10     THE COURT:  Okay.  Anything else?
11     MR. MEEK:  No further questions, Your Honor?
12     THE COURT:  Actually, just give me --
13     THE COURT:  Okay.
14     THE COURT:  -- just a couple seconds.  I
15 understand your legal argument.  Maybe this is a little
16 off the grid.  What's the practical downside of having
17 them intervene?
18     MR. MEEK:  Class decertification.  And that
19 will impair, not only the class' ability, [if] those
20 people do not oppose to gain the relief they seek.
21 But, in fact, because of how Olmstead is framed, the
22 individual plaintiffs would also be likely foreclosed

51

1 because they would be accused of so-called, "cue
2 jumping" if they were to continue a litigation on
3 behalf of a few people.
4      The -- what Olmstead said was that the -- and
5 that would be a violation of fundamental [inaudible] of
6 the State's programs, if you allow some individuals,
7 because they brought litigation, to jump ahead of
8 everyone else who's similarly situated and who wants to
9 leave, and is appropriate for leaving.  You cannot do
10 that under Olmstead because that undermines the State's
11 ability to function as it should, to take into account
12 all their interests, etc.
13     THE COURT:  How would allowing them to
14 intervene result in cue jumping?
15     MR. MEEK:  Because, Your Honor, they would --
16 their main intent is to decertify the class.  So, once
17 that's done, the class members who are -- many of whom
18 could not bring litigation on themselves --
19     THE COURT:  Okay.  So, I'm with you.  I
20 didn't understand that your argument was presuming
21 decertification, but you're saying --
22     MR. MEEK:  -- that's the intent of the

52

1 appellants.
2      THE COURT:  -- if they're allowed to
3 intervene, it will result in decertification.
4      MR. MEEK:  That's -- Your Honor, I don't
5 think there's any other way to read what they've said
6 in their briefs.  They seek decertification.
7      THE COURT:  Um-hmm.
8      MR. MEEK:  And what other --
9      THE COURT:  And why would intervention, in
10 and of itself, result in decertification?
11     MR. MEEK:  -- intervention, in and of itself,
12 would not, of necessity --
13     THE COURT:  All right.
14     MR. MEEK:  -- you know, ipso facto result in
15 decertification.  But, that is the intent of the
16 appellants.  I don't think they can deny that.
17     And as a consequence, that would be brought
18 to the District Court.  The Court would be then in a
19 position to have to decide whether it should decertify,
20 and if it should do that, then our clients are out of
21 court.  The plaintiffs -- the class is out of court,
22 and also the plaintiffs themselves because of the cue-

53

1 jumping problem.
2      THE COURT:  Okay.  Thank you very much, Mr.
3 Meek.
4      MR. MEEK:  Thank you, Your Honor.
5      THE COURT:  Mr. Smith, your rebuttal?
6      THE COURT:  Do you want to start with class
7 decertification?
8      MR. SMITH:  Yes, sir.
9         REBUTTAL ARGUMENT
10 BY MR. SMITH:
11     Your Honors, our main intent is not to
12 decertify the class.  And I believe that the point that
13 decertification may result from our participation,
14 actually --
15     THE COURT:  Would you stipulate that you
16 wouldn't.
17     MR. SMITH:  -- no, Your Honor.  I think that
18 we will certainly move the Court, under Rule 21(c) --
19 or 23(c) -- to decertify the class.  If the class is
20 not cohesive, and if it's not proper, it shouldn't be a
21 class action.  But, that simply proves the point that
22 we should be in this litigation to test whether or not

JA1312

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

54

1 the unopposed class --
2    THE COURT: So, is Mr. Meek right? Your
3 purpose is to decertify the class?
4    MR. SMITH: -- no, Your Honor. Our purpose
5 is to have a voice in the litigation. Whether or not
6 the class is decertified, it's important that our voice
7 be there. In the case of Brody, which is cited in our
8 briefs, this Court recognized that there may be, and in
9 fact, could be an interest in the remedy phase of
10 litigation, even if proposed interveners didn't have an
11 interest in the merits phase.
12    THE COURT: So, following Brody, is your
13 secondary position that you be permitted a limited
14 intervention for remedy purposes only? I think that's
15 one of the things that Brody stood for.
16    MR. SMITH: That is what Brody says, Your
17 Honor. We believe that we should be permitted to
18 intervene in the class -- intervene in the litigation
19 and move to decertify the class, simply because the
20 Court has issued summary judgment making factual
21 findings about our ability to move to the community.
22 And we believe that that should not be a factual

55

1 finding that applies to every single individual in the
2 ICFs/MR.
3    That being said, at the very least, we have
4 an interest in how the remedy is formed here that's
5 going to apply to the class, in part, because we could
6 become part of the class in the future. So, even
7 assuming that we don't have an interest in the merits
8 phase of this litigation, we do absolutely have an
9 interest in the way the Court shapes the remedy. And
10 in its summary judgment decision, the Court
11 specifically left open what the remedy will be here.
12    THE COURT: Do you -- is it your thought that
13 clearly, the District Court is -- has the
14 responsibility to determine what the rights of people
15 who want to have community placement are, and to
16 enforce those rights?
17    MR. SMITH: I would concede that.
18    THE COURT: But, do you understand that the
19 District Court will oversee how the Department will
20 decide to comply with the judgment in the Court in
21 terms of financing it and closing institutions, or not
22 closing institutions. Do you think the District Court

56

1 is going to get into that?
2    MR. SMITH: To the best of my understanding,
3 Your Honor, the parties following the District Court's
4 decision on summary judgment, agreed to go to mediation
5 to determine amongst themselves what the appropriate
6 remedy would be, which they would obviously, have to
7 take to the Court for approval. But, we certainly
8 believe that having our voice --
9    THE COURT: Well, they can't get a remedy
10 they haven't asked for, right?
11    MR. SMITH: -- that's correct --
12    THE COURT: You would agree with that?
13    MR. SMITH: -- but I would, again --
14    THE COURT: Okay. And now, they've got the
15 remedy. Somehow the remedy is in a judgment.
16    MR. SMITH: -- correct, Your Honor.
17    THE COURT: And the District Court, you
18 think, is going to say, "Well, wait a minute, I've got
19 to see how the Department is going to satisfy its
20 obligations under this judgment in a way that's not
21 going to adversely affect anybody else." Is the
22 District Court really going to go to board meetings of

57

1 the Department to decide how the State is going to meet
2 its obligations under this judgment?
3    MR. SMITH: No, Your Honor. I don't expect
4 the State to.
5    THE COURT: Okay. Then it won't matter if
6 you're not there. And you're saying we should be there
7 because we have to have a voice in how they are going
8 to meet their obligations to the plaintiffs. We ought
9 to have a voice. And if that's the decision that's
10 going to be made in the Board of Directors meetings at
11 the Department, how is it going to matter whether you
12 were interveners when the rights of the people who want
13 to live in a community were decided and a judgment was
14 entered with respect to their rights?
15    MR. SMITH: Well, Your Honor, because -- Your
16 Honor, I want -- I just want to emphasize that I
17 believe that we have a right to intervene with respect
18 to the merits of this decision, but with respect to the
19 remedy in particular, I think that what we need to
20 ensure is that the rights of everyone in the ICFs/MR
21 are being accounted for in the remedy, and that the
22 remedy does not only -- that the remedy doesn't affect

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

58

1  everyone's rights as opposed to, only as you say, the
2  individuals who want to be moved are and are qualified to
3  be moved to the community.
4          THE COURT:  So --
5          THE COURT:  If you have --
6          THE COURT:  -- I'm sorry.
7          THE COURT:  -- a right to -- if your clients
8  have a right to retain placement in specific
9  institutions, can they not protect that right by
10  bringing their own suit?  Why do they need to be in a
11  suit that's talking about somebody else's rights?  Why
12  don't they sue and rely on their own rights?
13         MR. SMITH:  That cuts exactly to the core of
14  why we need to be involved in the merits of this case
15  because the parties have conceded.  Both parties have
16  agreed and the District Court has found that everyone
17  can be moved to the community.  So, in a later
18  proceeding whether it be before a State Administrative
19  Tribunal, or a State Court, or a [UI], whomever, there
20  are factual findings by the federal court here that
21  state that we can be moved to the community.
22         THE COURT:  How could that be?  How could

59

1  those findings of fact, assuming they are as you
2  characterize them.  How could they possibly be
3  preclusive of people who are not in the class?
4          MR. SMITH:  We -- I don't believe that they
5  would be preclusive, Your Honor.  But, I don't think --
6          THE COURT:  But --
7          MR. SMITH:  -- I also don't think it's
8  realistic to assume that in a subsequent proceeding
9  that whatever court or tribunal is addressing this,
10  would simply brush aside those facts.  I think that
11  they will color the proceedings.
12         THE COURT:  So, you're saying that even
13  though, as a matter of law, they couldn't be
14  preclusive, sort of [UI] that they'll end up being?
15         MR. SMITH:  Well, they will certainly, I
16  think, realistically, Your Honor, and this inquiry
17  about impairment is an inquiry centered on
18  practicality.  As a practical matter, it will influence
19  significantly, any further proceedings about whether or
20  not we could be moved out of the particular location
21  that we call home.
22         THE COURT:  So, that presumes that courts

60

1  won't take separate litigation for people that aren't
2  precluded at face value and hear those facts without
3  being affected by what was said in a different lawsuit,
4  right?
5          MR. SMITH:  Well, I might -- I think what it
6  presumes is the potential that the State, if it decides
7  that it's in the State's interest to move all residents
8  out of a particular ICF/MR, could use this factual
9  finding as a sword against us in subsequent
10  proceedings.
11         THE COURT:  Okay.
12         MR. SMITH:  They could.  And that could color
13  the proceedings.
14         THE COURT:  Let me ask you this question.
15  Procedurally, if you are allowed to intervene in a
16  limited manner -- I know that's not first position --
17  but in a limited manner for remedy only, right.  In
18  that procedural posture, I presume you would not be
19  permitted to move to decertify.  Is that wrong?
20         MR. SMITH:  I believe that the ability to
21  move to decertify under Rule 23 would apply, as long as
22  there's -- there hasn't been a final judgment entered

61

1  by the District Court.  And there hasn't been a final
2  judgment entered here.  So, despite the fact that the
3  Court has entered a decision on summary judgment, on
4  the merits, that would not preclude us from moving to
5  decertify the class at this juncture.
6          THE COURT:  So, procedurally, I'm just
7  interested.  You'd move for reconsideration of summary
8  judgment and then move for decertification, I guess.
9          MR. SMITH:  Well, to be frank, Your Honor, we
10  have not decided on our litigation strategy.
11         THE COURT:  Oh, okay.
12         MR. SMITH:  And once our Motion to Intervene
13  --
14         THE COURT:  I'm just sort of trying --
15         MR. SMITH:  -- is granted.
16         THE COURT:  -- to interpret.
17         MR. SMITH:  But, I do want to reiterate that
18  if the class is an inappropriate class --
19         THE COURT:  Yeah.
20         MR. SMITH:  -- our Motion to Decertify will
21  be granted.  If it is an appropriate class, it will be
22  denied.  And the question, I assume, will be

JA1314

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011

62

1  cohesiveness.  Whether or not it's appropriate to have
2  a class, where individual determinations about people's
3  ability to reside in the community is insufficient for
4  a class in Lygus.
5      THE COURT:  Okay.  Thank you very much, Mr.
6  Smith.
7      MR. SMITH:  Thank you.
8      THE COURT:  Thank you, one and all for your
9  time and your participation.  It's very much
10  appreciated.
11      THE COURT:  Yeah.
12      THE COURT:  Can we take five?
13      THE COURT:  Yeah, sure.
14      (END OF RECORDING)
15
16
17
18
19
20
21
22

63

1      CERTIFICATE OF TRANSCRIBER
2      I, Eve Jemison, do hereby certify that this
3  transcript was prepared from audio to the best of my
4  ability. I am neither counsel nor party to this action
5  nor am I interested in the outcome of this action.
6
7
8
9      EVE JEMISON
10
11
12
13
14
15
16
17
18
19
20
21
22

JA1315

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 1

| 1 |
| --- |
| **10019** 2:5 |
| **10-1908** 1:5 |
| **1315** 2:15 |
| **1600** 2:11 |
| **1650** 2:8 |
| **18** 10:7 |
| **19103** 2:12 |
| **19103-7300** 2:9 |
| **19107** 2:15 |

| 2 |
| --- |
| **2,500** 42:19 |
| **200** 42:18 |
| **2011** 1:8 |
| **21(c** 53:18 |
| **212** 2:6 |
| **215** 2:9,16 |
| **226** 36:20 |
| **228** 36:20 |
| **23** 60:21 |
| **23(b)(2** 34:20 |
| **23(c** 53:19 |
| **238** 35:20 |
| **238-8070** 2:16 |
| **24** 3:5 33:2 |
| **29** 3:6 |
| **290** 7:13 |
| **296** 7:15 21:1 |

| 3 |
| --- |
| **30** 40:1,3 |
| **3600** 2:11 |

| 4 |

**4** 3:4

**41** 3:7

**412** 2:12

**45** 29:18 30:16 32:10

**46** 10:6

**4900** 2:8

| 5 |
| --- |
| **50** 42:12,14 |
| **500** 2:15 |
| **53** 3:10 |
| **577-5200** 2:12 |

| 6 |
| --- |
| **656-2432** 2:9 |

| 7 |
| --- |
| **7** 1:8 |
| **787** 2:5 |

| 8 |
| --- |
| **82** 35:18 45:5,10 |
| **82.6** 45:5 |
| **839-5300** 2:6 |

| A |

**ability** 4:16 13:22 17:4 43:8 45:11 50:19 51:11 54:21 60:20 62:3 63:4

**able** 8:19,22 9:10,15 10:14 21:13 42:16

**above-captioned** 1:11

**absence** 49:18

**absent** 26:9

**absolutely** 55:8

**abuse** 25:11

**abused** 22:18

**abuses** 4:13

**accommodated** 44:17

**account** 45:13 49:1 51:11

**accounted** 57:21

**accurate** 43:22 48:16

**accused** 51:1

**acknowledged** 41:19

**acknowledging** 11:20

**across** 15:9

**act** 10:14 16:19 21:13

**action** 6:16 25:21 26:16,20 27:8,9,12,14 53:21 63:4,5

**activities** 40:7

**actors** 47:13

**actually** 13:8 50:5,12 53:14

**ad** 8:17

**ADA** 14:5,19 15:20

**add** 43:17,21

**addition** 11:12

**address** 5:14 38:18 39:2

**addressed** 34:6

**addressing** 59:9

**adequate** 18:9

**adequately** 8:10 10:19 21:11 22:19 23:2

**adjudicated** 4:17

**adjudicating** 18:11

**administrative** 13:18 14:2 58:18

**admission** 23:20

**admitted** 5:20 23:19 39:10,14

**admitting** 38:22

**adversely** 56:21

**advocacy** 25:3

**advocates** 25:8

**affect** 18:1 19:19 20:2 32:21 43:9,11 56:21 57:22

**affected** 4:18 12:9,13 17:20 19:8 29:17 31:8,9 35:10,14 43:15 60:3

**affirmative** 7:6

**against** 31:16 60:9

**age** 29:21

**agency** 23:1

**ago** 37:5

**agreed** 28:18 31:10,13 36:11 56:4 58:16

**ahead** 51:7

**al** 1:4,5

**albeit** 43:5

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 2

allege 39:10

alleged 39:14

Allentown 40:4

allow 16:18 33:5
51:6

allowed 27:18 52:2
60:15

allowing 25:2
29:12 39:1 51:13

am 28:5 29:8,11
63:4,5

Amici 49:3

Amicus 24:19,22
25:14 29:11
30:14,21 46:17

amongst 56:5

analysis 11:9
12:15

Ann 10:5,10

answer 14:12,13
40:11

anticipate 28:20

anybody 18:8
19:14 23:16
46:15 56:21

anyone 24:6 43:14
48:8 49:19

anything 6:17,20
17:7 20:4
34:3,13 37:7,8
43:17 50:10

Appeals 1:1,14

appear 45:9

appearing 4:7

appellants 1:4 2:3
4:7,14,15,18
6:9,11 26:8
42:22 43:4 46:8

49:3 52:1,16

Appellee 2:17

appellees 1:6
25:15

Appendix 36:21

applies 55:1

apply 55:5 60:21

appointed 36:2

appreciated 62:10

appropriate 6:12
14:20 18:4,15,18
21:15
23:8,12,15,17
25:6 27:9,12
44:3,12,16
48:4,8 49:18
51:9 56:5 61:21
62:1

appropriately
39:5

appropriation
44:22

approval 56:7

approximately
42:12

ARC's 25:14

aren't 60:1

argue 26:3 29:13

argument 3:3,9
4:11 11:19 13:3
24:20 27:6,7
29:5 35:6 41:3
46:16 47:16,18
50:15 51:20 53:9

arranged 47:22

articulated 26:1

aside 17:11 59:10

asserted 5:17

asserting 14:7

assertion 13:3

associated 25:9
26:2,4,12

association 36:5

assume 35:7 59:8
61:22

assumes 35:6

assuming 10:12
20:1 38:17 55:7
59:1

assumptions 24:9

assure 39:4

attempted 28:15

attempts 13:16
16:9

attention 38:15

audio 63:3

Austin 2:4 4:6

authority 13:11
14:14 17:3 30:7

automatically 11:9

available 48:13

Avenue 2:5

avoid 7:7 10:10
12:18

away 9:14 10:9
15:12 20:16
21:22 36:4 40:1

_____

**B**

bad 47:10

Bair 30:13,21

based 28:21 48:6

basis 17:5

become 9:14 10:9
11:12 16:8 21:22
22:3 55:6

behalf 2:3,17 4:7
8:19 9:9 21:14
26:20 29:13
46:17 51:3

belief 48:7

believe 16:1,2
17:13 23:20
27:2,19 30:2,3,7
31:3 37:21 41:10
44:4 53:12
54:17,22 56:8
57:17 59:4 60:20

believes 26:7

benefit 6:22

BENJAMIN 1:5

best 56:2 63:3

Beth 10:5,10

better 15:13

board 56:22 57:10

bothered 8:6

bottom 17:17

bound 33:17

bounds 18:17

brief 25:14
30:14,21

briefing 5:2

briefs 52:6 54:8

bring 51:18

bringing 58:10

broadened 16:15

Brody
54:7,12,15,16

brought 26:19
27:14 51:7 52:17

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 3

brush 14:2 59:10

budget 20:6,7

build 23:13

burden 19:16

---

C

calculate 35:21

capable 18:13 23:6
33:10

capacity 10:7

care 5:18 9:4,10
13:4,5,10 16:5
18:21 25:5,7,8
29:19 32:21
37:15 48:6 49:4

cared 46:7 50:2

careful 33:1

caring 46:8,10
48:5

Carl 2:10 3:6 29:8

case 1:5 17:16
19:15 27:16,17
30:6,13,14,19,22
31:2 33:7,9
37:17 38:22
39:5,7,13 49:2
54:7 58:14

cases 36:3

cast 48:21

catastrophic 37:18

caused 27:20

cease 22:1

center 15:5,9,12
29:18 30:2
31:11,14

centered 59:17

centers 29:10

31:7,22 33:10

central 36:22

certain 14:17
25:9,15

certainly 10:3
13:20 14:1
15:4,16 21:19
27:11 30:11 33:8
53:18 56:7 59:15

CERTIFICATE
63:1

certification
28:11,12 34:22
35:1,4

certified 34:16

certify 63:2

change 11:2,5

changed 28:1,3,13

characterize 59:2

charged 23:3

chart 35:20 37:4

chilling 36:7

choose 14:9 17:4
19:9 32:6

circuit 1:1,14 17:9
22:22 23:1
28:2,12

circumstances
14:4 27:10 32:9

cite 17:11 30:13,18
36:8,20

cited 16:20 30:20
37:4 54:7

claim 44:18

class 5:3,7,8,12,13
6:2,3,6,19 7:18
10:11
11:3,10,11,13

12:2,4,8,18 19:7
21:2 26:16,20
27:7,9,12,14,22
28:1,10,11,12
33:14,17,19
34:12,16,20,22
35:1,3,6,7
41:7,12 47:21
50:18,19
51:16,17 52:21
53:6,12,19,21
54:1,3,6,18,19
55:5,6 59:3
61:5,18,21
62:2,4

clear 33:6

clearly 4:15 19:21
33:14 35:13 44:7
55:13

client 9:16 10:5
21:13,16

clients 5:12
8:10,12 9:13
11:22 12:1 13:3
15:4 17:4 21:20
22:3,5 25:20
52:20 58:7

close 15:6,21 20:13
32:2 35:15

closed 19:11 48:12

closing 26:22
55:21,22

closure 12:22

cohesive 53:20

cohesiveness 34:21
62:1

cold 48:22

collateral 13:21

colleague 34:15

colleagues 38:5

color 59:11 60:12

combination 11:1

comes 15:22 16:2
17:2 20:4

comfort 34:6

comfortable 11:21

coming 11:22

Common 30:22

Commonwealth
5:19 7:19
8:1,3,4,7,10
11:5,22
22:11,15,19,21
30:21
31:2,10,12,16
38:12 39:10,15
41:10 46:18
47:2,5,6,13,19
48:3,11,17,21
49:4,13,16

Commonwealth's
13:11

community
4:17,21 5:18,22
6:3,5,6,11,12
7:7,21 10:2
13:15,17 14:1
15:14
16:7,9,10,12,14
17:19,22
18:4,9,13,15,20
21:4,7 23:7
24:3,5
25:11,13,16
26:2,12,21 29:22
31:11 33:17 37:6
38:14 39:19
41:12 44:4,12,22
46:13 48:8 49:11
50:4 54:21 55:15

57:13 58:3,17,21 62:3

**community-based** 9:4 17:1 25:7 34:7 38:21

**competing** 19:14 32:5

**comply** 55:20

**concede** 55:17

**conceded** 20:11 58:15

**concedes** 39:10,15

**concept** 44:5

**concern** 21:9 38:6,7 45:12

**concerned** 9:8 34:4

**concerns** 25:12

**concurrence** 18:22

**condition** 18:8

**consequence** 52:17

**considered** 36:14

**constantly** 12:17

**constitute** 1:10

**contact** 46:1

**contains** 7:17

**contend** 22:9 31:9

**contended** 31:12

**content** 24:13

**contention** 44:5

**contest** 13:20 40:8,11

**continue** 51:2

**continued** 42:22

**contrary** 25:14

40:19

**convenience** 16:13

**conversation** 43:11,17

**core** 58:13

**correct** 8:8 9:3 12:5,10 23:9 39:6 56:11,16

**correctly** 37:20

**cost** 46:20

**costs** 42:13

**couched** 43:14

**counsel** 63:4

**counts** 36:12,13

**couple** 50:14

**course** 5:1 36:16

**court** 1:1,14 4:2,4,5,10,13,22 5:4,10,16,20,21 6:7,10,13,15 7:5,8,9,10,11,14, 22 8:6,15,21,22 9:4,6,20 10:12 11:3,7,17 12:6,11 13:2,14 14:3,7,13 15:10,16 16:6,10,22 17:9,10,17,18,21 18:2,3,6,11,17 19:4,5 21:8 22:9,18 23:8,10 24:2,10,12,13,14 ,17 25:18 26:15 27:6,21,22 28:3,7,19 29:1,4,8,12,14 30:18,22 31:2 32:11,13 33:12,13,14

34:1,2,3,10,14,1 7 35:2,8 38:1,4 39:6,8,12,16 40:9,13,15,20,21 41:1,5,16 42:1,4 43:8,19,21 44:8,20,21 45:2 46:14 48:14 50:10,12,13,14 51:13,19 52:2,7,9,13,18,2 1 53:2,5,6,15,18 54:2,8,12,20 55:9,10,12,13,18 ,19,20,22 56:7,9,12,14,17, 22 57:5 58:4,5,6,7,16,19, 20,22 59:6,9,12,22 60:11,14 61:1,3,6,11,14,1 6,19 62:5,8,11,12,13

**courts** 19:1 30:14 59:22

**Court's** 4:8 6:9 13:22 30:7 56:3

**cue** 51:1,14 52:22

**current** 4:20 21:21

**currently** 12:4 43:2

**cuts** 58:13

---
D
---

**damaging** 19:2

**danger** 10:8

**dangers** 26:2,4

**de** 45:21

**dealing** 28:9,10 37:1

**decertification** 28:5,7 50:18 51:21 52:3,6,10,15 53:7,13 61:8

**decertified** 54:6

**decertify** 51:16 52:19 53:12,19 54:3,19 60:19,21 61:5,20

**decide** 52:19 55:20 57:1

**decided** 16:7 57:13 61:10

**decides** 60:6

**deciding** 16:6

**decision** 6:9 18:22 37:13,17,19 50:7 55:10 56:4 57:9,18 61:3

**decision-making** 11:1

**decisions** 37:3

**decreased** 25:13,16

**dedicated** 25:4

**default** 47:20

**deference** 44:21

**defining** 16:10 18:6

**definition** 6:2,4,19 16:14 27:22 28:2 34:13 46:22

**deliberately** 39:22

**demonstrate** 41:22

**demonstrating** 20:18

**denied** 43:7 61:22

JA1319

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 5

**deny** 52:16

**denying** 4:14 6:9

**Department** 1:3 19:9 22:11 55:19 56:19 57:1,11

**depending** 14:4

**depopulation** 31:21

**deposition** 36:11,20

**designed** 19:17

**desires** 37:12

**despite** 61:2

**determination** 21:3 44:11,22

**determinations** 49:17 62:2

**determine** 44:15 55:14 56:5

**Diane** 29:9,17 33:16

**died** 45:22

**dies** 36:12

**different** 9:20 20:10 40:15,17 43:5 60:3

**differently** 34:10,11

**direct** 6:22 18:10 19:22

**directly** 19:19 20:2 42:4

**director** 46:5

**Directors** 57:10

**Disability** 2:14

**disabled** 15:18 22:13 25:10 47:2

**disagree** 22:10 24:7 34:15

**discern** 10:8 37:11

**discovery** 23:19

**discretion** 4:13 22:18

**discriminatory** 16:18

**discuss** 6:18

**discussing** 5:15

**discussion** 38:18

**disintegrate** 15:13

**District** 1:2 4:13 7:5 14:3 17:9 22:18 28:3 33:13,14 52:18 55:13,19,22 56:3,17,22 58:16 61:1

**DLA** 2:7

**done** 34:3,6,9,10,14 49:6 51:17

**downside** 50:16

**dramatic** 22:14

**due** 25:12 27:2

**dump** 48:18

**duration** 31:6

**dying** 35:22

———— E ————

**earlier** 21:1

**Easley** 30:13 31:1

**effect** 6:22 13:21 19:22 20:17,19 38:12 39:11,15

**effort** 33:19,22

**either** 45:8,22

**eligible** 43:7

**else** 46:15 49:19,20 50:10 51:8 56:21

**else's** 58:11

**emphasize** 41:8 57:16

**enables** 15:1

**enforce** 55:16

**enforcing** 13:17

**ensure** 4:20 57:20

**ensuring** 25:4

**entail** 18:19

**entered** 57:14 60:22 61:2,3

**entire** 20:13 30:4

**entitled** 10:15 13:6,10 14:19 16:3,4 19:15 20:1,8 25:21 44:8,21 49:16

**equivalent** 24:1

**Esposito** 2:7 3:5 24:21,22 25:20 26:7,18 27:11 28:6,14 29:2,3 34:15 48:14

**ESQUIRE** 2:4,7,10,14

**essence** 5:3

**essentially** 26:16 43:11

**estoppel** 13:21

**et** 1:4,5

**Eve** 63:2,9

**everybody** 10:18

**everyday** 16:20

**everyone** 31:11,13 51:8 57:20 58:16

**everyone's** 58:1

**everything** 5:4

**evidence** 20:18 48:7

**evidently** 8:7

**exactly** 58:13

**example** 15:5,11 16:11 39:7

**examples** 40:12

**excuse** 30:22

**exists** 16:3 25:13

**expect** 57:3

**expired** 14:12

**explain** 5:1

**explored** 37:22

**express** 21:18

**extent** 15:2

**extinct** 26:17

**extraordinarily** 37:1,13

**extraordinary** 37:16

**extrapolated** 17:6

———— F ————

**face** 60:2

**faced** 26:6

**facilities** 27:5 29:20 31:6 32:2,10,20 33:5 42:10 46:6 48:12

**facility** 17:4 31:5 32:15 40:3 46:5

JA1320

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 6

fact 5:6 14:3 18:21
    23:4 24:4 25:15
    27:3 28:1 31:20
    40:7,10 42:21
    45:12,20 46:4
    49:13 50:2,21
    54:9 59:1 61:2
facto 22:11 45:21
    52:14
facts 6:13 37:22
    39:6 40:11,18,19
    44:2,3 59:10
    60:2
factual 24:9 39:4
    43:22 44:19
    54:20,22 58:20
    60:8
factually 28:5
failed 22:20
failure 21:5
fairness 27:20
    28:19
familial 16:13
families 15:6,12,17
    36:4
family 15:21 16:12
    32:21 36:13
    45:22 46:2 50:3
favor 33:11 36:17
February 1:8
federal 15:20 16:4
    30:9 33:3 42:13
    58:20
feel 26:11
final 60:22 61:1
financed 20:7
financial 31:22
    32:1 38:13

47:13,20 48:2
financially 46:19
financing 55:21
finding 13:22 14:3
    55:1 60:9
findings 54:21
    58:20 59:1
fine 11:17 12:6
    17:6
firm 4:6
first 4:15,22 5:15
    6:19 7:3 12:16
    13:13 22:17
    24:19 41:8 48:1
    60:16
five 4:8 26:22
    62:12
focus 17:3 33:19
folks 22:13 45:6
    47:10
follow-up 38:4
force 31:17
forced 8:4
foreclosed 50:22
form 7:4
formed 55:4
frame 33:13
framed 11:21 12:1
    33:20 39:5
    41:13,14 50:21
framing 5:11
frank 61:9
FRANKLIN 1:5
Frederick 44:7
    49:15 50:9
fulfill 25:6

full 37:20
fullest 15:2
function 51:11
functioning 21:16
fund 20:4
fundamental
    46:19 51:5
fundamentally
    24:7 47:9
funded 42:10
funds 19:11 20:15
    32:5,7
future 4:21 6:6
    8:18 9:9
    11:13,22 16:8
    18:1,2 21:21
    43:3 55:6
futuro 45:11

——— G ———
gain 50:20
getting 43:21
    46:19
given 10:18 19:10
    34:4 48:9
government
    32:5,7 42:13
granted 8:4 21:4
    41:16 61:15,21
grateful 29:14
great 46:9 49:4
Greenaway 1:12
    32:18,22 43:14
grid 50:16
gross 22:20
group 5:6
guardian 9:22

10:8,13,15,16
    11:1
    21:8,10,12,13,21
    22:2 29:8 34:4
    36:6,11 38:16
    45:21 46:1 50:3
guardians 8:13,18
    9:9,13 10:21
    21:22 22:8 31:19
    35:17,19,22
    36:1,3 37:10
    38:8,20 39:2
    40:15 45:6,18
    47:3
guardian's 36:12
guess 26:13 61:8

——— H ———
Hamburg 40:3
hand 49:3,7
handicapped 9:17
happen 36:3
harm 8:11,12
Harrison 2:11
harsh 48:22
harshly 38:11
Haven 15:5,8
    29:10,18 39:21
    40:1
haven't 18:12
    56:10
having 10:1 19:15
    50:16 56:8
health 25:12
hear 24:19 60:2
heard 33:6 43:8
hearing 27:20
    28:19

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 7

**held** 1:10,13 14:19
22:20

**helps** 45:4

**hereby** 63:2

**herself** 50:5

**Hi** 4:3 24:22

**higher** 21:15

**hinge** 13:3

**home** 29:19 30:12
59:21

**Honor** 5:15 6:1
7:2,12 8:2,8
9:3,12,22 11:6
14:11,16 16:1,16
17:8 18:5,14
20:9 22:17 23:18
27:15 28:6 29:16
30:5,20 32:12
33:22 34:12,14
35:12,16,18
36:6,20,22
40:7,12,22
41:5,8 45:16
48:2,10,17 50:11
51:15 52:4
53:4,17 54:4,17
56:3,16
57:3,15,16
59:5,16 61:9

**HONORABLE**
1:11,12,13

**Honors** 29:7 53:11

**hope** 22:17

**hours** 15:12

**house** 42:19

**housing** 32:8 34:7
38:21 46:20

**hypothetical** 9:12
10:12,17 20:10

21:10

─────────

**I**

**ICF** 43:1 48:19

**ICF/MR** 13:6
18:19 42:9,22
43:5 60:8

**ICF/MRs** 42:18

**ICFs** 42:19 43:4
45:6 48:12 49:19

**ICF's** 5:17,18 22:6

**ICFs/MR** 7:20
12:21 13:1 25:16
26:11 27:1 42:8
55:2 57:20

**ICR's** 26:17

**I'd** 4:8 5:14 11:6
20:21

**identification** 7:18

**identified** 39:3

**identifies** 6:2

**identify** 21:2

**II** 44:8 49:15 50:9

**illusion** 32:14

**I'm** 9:5 13:6 20:6,7
24:13 26:3 30:18
32:12,22 35:6,16
48:16 51:19 58:6
61:6,14

**impact** 26:5 41:15

**impair** 50:19

**impaired** 4:19

**impairment** 11:8
12:14 59:17

**implement** 19:9

**implicated** 4:16

**importance** 26:13

**important** 6:8
22:4 54:6

**imposed** 43:16

**impossible** 37:11

**inadequate** 22:12

**inappropriate**
27:8 61:18

**inaudible** 7:14
24:19 44:6,14,15
46:8 51:5

**Inc** 26:1

**incapable** 29:22
37:7

**incapacitated** 9:14
10:9,14 22:1
32:8

**included** 19:7

**including** 16:13

**incorrect** 37:13

**indicate** 9:18

**indicates** 6:20

**indicia** 45:14

**individual** 9:17
10:2 14:5 20:12
21:3,6 23:21
36:14 44:11
46:1,3,7,12
50:1,5,22 55:1
62:2

**individualized**
34:18

**individuals** 6:2,4
14:17,20 15:1
16:17 18:20 22:6
23:2,5 25:4,10
26:10 28:22
32:8,19 35:5
36:5,19 37:2
39:17 46:10

49:8,19 51:6
58:2

**indulgence** 4:8
38:5

**infinitum** 8:17

**influence** 59:18

**injunction** 7:4

**inquiry** 59:16,17

**instance** 10:5 15:4
43:9

**institution** 13:5,18
14:6,19 19:3
20:12,14 23:13
36:18,19 42:6

**institutional** 11:16
13:4,10 14:9
17:1 18:21 26:4
41:21 48:6

**institutionalizatio
n** 16:17

**institutionalized**
15:21 47:10

**institutions** 19:11
20:16 23:6,22
24:6 27:4
35:14,19 39:18
44:10 55:21,22
58:9

**insufficient** 62:3

**integrated** 14:20
39:19

**integration** 44:18

**intended** 16:15

**intent** 51:16,22
52:15 53:11

**interact** 15:1

**interaction** 15:7
16:21

JA1322

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 8

interest 4:15,18
5:15 29:16
30:5,10,11,12,15
,17 31:5 32:22
33:1,3,4
35:12,13 38:13
43:10 46:19 48:3
54:9,11 55:4,7,9
60:7

interested 48:4
61:7 63:5

interests 8:11,12
9:15 11:8 16:5
22:12,20 23:2
26:14 27:14
35:10 38:13
41:11,17,18
42:21 46:9,11
47:14,20 51:12

interpret 61:16

intervene 4:14
6:10 16:3,4
19:15 20:1,8
25:21 26:8 27:18
28:15 45:15
50:17 51:14 52:3
54:18 57:17
60:15 61:12

intervened 18:12

intervener 26:8

interveners 6:17
7:1,5 8:19 18:12
19:19,22
27:15,17 28:18
33:8 41:11,15,21
44:19 45:18
46:17 54:10
57:12

intervention
11:9,11 12:14
17:16 26:9 27:7
30:8 35:1

38:6,18 39:1
52:9,11 54:14

involved 5:16
15:19 58:14

ipso 22:11 52:14

isn't 8:7 23:10,15
27:7 28:1 43:21

isolated 39:18 40:6

issue 16:5,8 17:8

issued 54:20

issues 34:19 37:21
39:5

it's 6:8 10:22
11:20 12:1
14:1,17 17:13
20:15 21:15
22:2,4 23:3
30:21 31:22
32:4,6 40:1
42:10 45:13
48:2,15 53:20
54:6 59:7 60:7
62:1,9

I've 56:18

_____
        J
Jemison 63:2,9

job 46:9 49:5,6

Joe 10:8

joint 42:11

Jordan 1:12 17:2
21:11 30:1 45:17

JOSEPH 1:12

JR 1:12

Judge 17:2 21:11
29:22 31:4
32:4,18,22 43:13
45:17

judgment 7:17
20:22 44:9 54:20
55:10,20
56:4,15,20
57:2,13 60:22
61:2,3,8

judicata 13:21

jump 51:7

jumping 51:2,14
53:1

juncture 61:5

Justice 18:21

_____
        K
Kennedy's 18:21

KENT 1:11

Kleissler 30:6

knowledge 37:20

_____
        L
lack 15:13

Lambo
10:5,8,10,15,22

Lambo's 10:13

language 5:6,9
33:2 44:13,14

large 27:3 38:19

later 6:19 13:16
28:13 58:17

law 4:6 15:20 16:4
30:9,13 59:13

lawsuit 20:4,8
43:12 45:13 60:3

least 7:3 11:20
12:1 55:3

leave 26:10 50:7
51:9

leaving 51:9

led 28:4,13

legal 26:5 30:8
33:3 39:5 50:15

legally 41:18

lengthy 27:3

Lesli 2:7 3:5 24:22

less 29:21

Let's 12:6

level 42:9

Lewis 2:11

Liberty 2:8

life 30:4

light 48:22

likely 11:15 12:22
20:19 50:22

limited 19:8,12
20:6 54:13
60:16,17

lines 28:11

list 21:6 27:4
48:19

lists 48:14

litigated 17:9 39:6

litigation 4:16
16:6 31:21 35:11
41:9 47:9
51:2,7,18 53:22
54:5,10,18 55:8
60:1 61:10

little 50:15

live 16:7 19:13
30:1 32:14 36:4
40:2 57:13

lived 29:17
30:4,16

JA1323

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 9

| | | | |
|---|---|---|---|
| lives 16:20 | 53:13 54:8 | merely 20:15 26:20 | 34:9 38:21 58:2,3,17,21 59:20 |
| living 29:22 31:5 32:9,19 | maybe 21:16 35:3 50:15 | merit 17:15 | movement 25:10 |
| LLP 2:4 | mean 10:17 11:10 14:22 16:11 17:5 19:10 21:9 22:13 23:10,12,15 28:1 33:18 46:5 | merits 54:11 55:7 57:18 58:14 61:4 | moving 6:5 18:19 37:6 47:14 61:4 |
| location 43:6 59:20 | | middle 1:2 39:20 40:5 | myself 36:2 |
| long 32:20 48:15 60:21 | | mile 48:15 | |
| longer 10:14 32:10 36:12,13 45:22 | meaningful 48:15 | mind 11:2,5 34:5 | **N** |
| longstanding 31:6 | mediation 56:4 | minute 37:5 56:18 | naive 14:1 |
| loved 47:12 | Medicaid 42:11,14,17 | minutes 4:8 40:1,3 | nationwide 25:3 |
| loving 47:4 | medical 37:15 | miss 34:1 | necessarily 50:4 |
| lower 46:20 | Meek 2:14 3:7 41:2,4,6 42:3,7 43:13,20 44:1 45:16 48:1,16 50:11,18 51:15,22 52:4,8,11,14 53:3,4 54:2 | missed 30:18 | necessary 17:14 34:21 48:2 |
| Lygus 5:8 27:16 28:1,12,14 62:4 | | misses 48:11 | necessity 32:1 52:12 |
| | | misstep 5:10 | neglect 25:11 |
| **M** | | Monday 1:8 | negligence 22:21 |
| main 44:4 51:16 53:11 | | money 20:5,13 | negotiated 27:18 43:16 |
| maintaining 30:11 | meet 38:6 57:1,8 | month 10:7 | negotiations 28:16 |
| majority 38:8 | meetings 56:22 57:10 | morning 29:7 | neither 63:4 |
| mandate 44:18 | member 11:11 35:6 46:2 | Motion 4:14 6:10 61:12,20 | Network 2:14 |
| manner 60:16,17 | | motivated 48:4 | nevertheless 35:10 |
| Market 2:8,11 | members 7:18 11:13 12:2,3 21:2 45:22 51:17 | motivates 48:3 | nine 9:21 |
| marry 11:11 | | mouth 38:11 | nobody 33:15 |
| mass 25:10 28:4,8 | membership 11:10 | move 5:22 11:4,18 12:7 13:16 15:8 16:9 20:12 31:13,18 33:11 34:8 46:21 53:18 54:19,21 60:7,19,21 61:7,8 | Nobody's 11:3 |
| matter 1:11 4:19 15:19 17:22 19:6,7 23:16 26:9 28:18 31:20 41:7 47:2 57:5,11 59:13,18 | mental 10:7 25:5 29:21 44:11 | | non-disabled 15:2,7 16:19,21 |
| | mentally 9:17 10:6 15:18 22:12 32:8 47:1 | | non-opted 34:20 |
| | | | non-profit 25:3 |
| may 4:4,5,18 14:5,12 15:4,13 16:8 19:6,7,9,10 29:7 34:13 35:5 38:21 41:17 | mentioned 32:13 | moved 5:18 6:3,5,11 7:7,21 9:19 10:2 12:4 13:15 21:3 22:7 23:6 31:11 33:16 | nor 63:4,5 |
| | mercy 47:13 | | note 11:7 |
| | mere 23:1 | | nowhere 40:5 |
| | | | **O** |

JA1324

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 10

objection 28:13

objections 27:19
28:4,8,21

obligations 56:20
57:2,8

obviously 32:1
56:6

Oh 61:11

okay 7:22 11:18
12:6,11 24:10
28:7 29:1 34:1
40:20 50:10,13
51:19 53:2 56:14
57:5 60:11 61:11
62:5

old 10:6,7

Olmstead 5:9
14:6,19,21
16:12,15,16
17:6,11 18:22
44:6,7,13,14
49:15 50:8,21
51:4,10

ones 47:12

open 32:3 55:11

open-ended 8:17

operated 42:18,19
43:4

operating 43:3
45:21

opinion 10:3 14:22

opportunity 21:17

oppose 6:4,5 7:21
8:20 9:1 12:4
21:5 23:5 31:17
41:12 50:6,20

opposed 5:19 10:1
25:7 43:15 44:16
46:12 50:3 58:1

opposes 33:9
36:16 50:6

opposing 8:7

opposition 4:20
7:6 9:18 10:4
22:7 31:17
36:12,13
45:4,9,11

option 27:5

ORAL 3:3 4:11
24:20 29:5 41:3

order 7:7,16,19
9:7 11:11 12:18
17:15 35:4

organization 25:4

original 5:7,8

others 26:3 34:5

ought 57:8

outcome 63:5

outside 35:5
40:2,7

overall 40:16

oversee 55:19

oversight 25:13,16

Owen 2:4 3:4,10
4:6

_____

P

PA 1:3
2:9,12,14,15

page 3:3,9 7:12,15
21:1 35:20 36:20
37:4

pages 1:10

pains 33:14

parents 36:1 39:22
47:4

participate 35:11

participation
28:21 53:13 62:9

particular
14:4,6,18 18:7
21:9 25:21 32:15
41:20 43:1 45:12
57:19 59:20 60:8

particularly 34:19

parties 28:15
43:16 56:3 58:15

party 63:4

pass 9:14 10:9
21:22 47:6,12

past 14:2 50:3

paying 38:15

pays 42:12,13

peace 34:5

Pennsylvania
1:2,7 5:18 31:1,2

Pennsylvania's
20:3

people 5:22 10:19
18:6 22:10 29:19
34:7 37:2 38:14
39:1 42:5,8,15
44:3 45:10,21
46:20,21,22
47:1,3 48:5,18
49:4 50:20 51:3
55:14 57:12 59:3
60:1

people's 19:3 49:1
62:2

percent 35:18 37:7
42:12,14
45:5,6,10

perhaps 38:11

permission 29:12

permit 34:21

permitted 26:8
35:11 45:14
54:13,17 60:19

person 15:18 24:1
44:16

persons 15:2,7
16:19,21 41:11
42:20 49:22

person's 49:17

perspective
40:16,17

pertinent 28:9

ph 5:8,10 17:2
30:13 49:3

phase 54:9,11 55:8

Philadelphia
2:9,12,15

phrase 18:14

Piper 2:7

placed 21:7 39:22
49:22

placement 4:21
6:12 26:3,4,21
46:13 55:15 58:8

plaintiff 6:21

plaintiffs 5:16
6:16,21 7:4,16
8:3 11:14 20:22
21:4 26:21
31:9,15 36:10
50:22 52:21,22
57:8

plaintiffs/
appellees 41:6

planning 21:6

Pleas 30:22

please 4:5 12:11
14:13 29:7 41:5

Poconos 40:3

point 5:1 8:11
12:7,12,16,19
17:18 20:21 22:7
23:5 28:19 31:3
32:17 36:14,22
40:13,14 42:2
43:2,20 44:2
45:3,4,7,17,20
47:19 48:11,20
53:12,21

pointed 21:1

points 41:17

policy 31:13 36:17

Polk 15:11

population 11:16
12:21 37:2
38:8,19 47:1

populations 11:16

posing 10:17

position 10:15
14:14,17
22:14,16,17
25:22 26:15
36:9,10 46:18
47:11 52:19
54:13 60:16

possibility 8:18
10:22 26:19

possible 14:17
15:3 21:19 22:2

possibly 34:21
49:10 59:2

posture 60:18

potential 8:12
11:12 27:17 60:6

potentially 17:12

19:2

practical 4:19
12:13,15,19
17:22 19:6,7
20:19 50:16
59:18

practicality 59:18

precedent 17:11

precisely 16:18
31:3

preclude 61:4

precluded 60:2

preclusive
59:3,5,14

predominate
34:19

prepared 63:3

present 12:3

presentation 32:14

presented 17:10
27:20 28:18

presumably 21:9

presume 32:16
47:15 48:20
60:18

presumes 59:22
60:6

presuming 51:20

presumption
23:1,4

pretty 22:13,14

prevented 24:8

primary 30:7

prior 9:21

private 27:1
48:12,19

privately 42:19

probably 15:18

problem 7:22
38:19 39:2 42:14
53:1

problems 49:9

procedural 60:18

procedurally
60:15 61:6

proceed 4:4 13:17
19:1

proceeding 58:18
59:8

proceedings 1:10
23:21 59:11,19
60:10,13

process 19:2

professional 44:9

professionals
44:10,15,21 46:6
49:14,16,22 50:8

program
42:11,12,14

programs 51:6

prong 6:1,3 12:14

prongs 11:8

proper 53:20

proposed 7:16,18
9:7 20:11,20,22
28:17 45:8 54:10

proposing 32:15

protect 4:21 35:4
41:10 46:11 58:9

protected 26:11
30:9 41:18

protecting 46:9

protection 31:16

proves 53:21

provide 17:12

provided 24:6

provider 42:16

providers
42:17,18

provides 6:4

providing 48:4

provision 21:2

provisions 7:17

public 1:4 5:17
7:20 19:11,14,16

purpose 23:14
54:3,4

purposes 54:14

puts 13:15

putting 45:10

_____
Q

qualified 58:2

qualifier 23:11,14

question 5:15 9:16
10:4 14:12 15:17
17:2 25:19 26:5
30:5 32:4,6
35:5,9 36:15
37:9 38:4 42:4
43:13 60:14
61:22

questions 24:12
40:20 50:11

quote 14:22

_____
R

raise 12:16

raised 38:6,7
45:2,7

JA1326

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 12

| | | | |
|---|---|---|---|
| **range** 25:8 | **reformulated** 5:7 | 23:3 24:22 29:11 | **retain** 58:8 |
| **rapidly** 19:1 | **regard** 16:11,22 | **represents** 23:2 | **retardation** 25:5 44:12 |
| **rather** 38:22 | **reiterate** 17:13 61:17 | **request** 23:20 | **retarded** 10:6 25:1 26:1 |
| **re** 30:21 31:1 | **reject** 27:21 | **require** 7:5,19 9:7 18:20 21:5 | **rights** 2:14 13:18 15:15 26:9 55:14,16 57:12,14,20 58:1,11,12 |
| **real** 42:21 | **relevant** 25:18 | **required** 9:17 | |
| **realistic** 18:17 59:8 | **relief** 4:19 5:21 6:16,18,21 8:3,16 12:20 19:10,17,18,21 20:2 41:13,16 43:14 44:6 50:20 | **requirement** 44:20 | |
| **realistically** 23:12 59:16 | | **requires** 42:15 50:9 | **risk** 11:14 13:15 27:15 37:16 |
| **realize** 19:16 | | **res** 13:21 | **risks** 25:9,11 26:12 |
| **really** 10:19 27:2,4 28:9 38:15 45:19 48:15 49:8,9,10 50:4 56:22 | | **reserve** 4:8 | **Robert** 2:14 3:7 41:6 |
| | **relocated** 33:10 | **reside** 4:17 13:22 15:5 18:15 43:2 62:3 | **roughly** 10:7 |
| **realm** 10:22 | **relocation** 33:9 | **resident** 29:9 31:10 33:9 | **rule** 19:13 33:2 53:18 60:21 |
| **reason** 9:14 10:13 17:17 22:1 | **rely** 44:8 49:16 58:12 | | **ruling** 22:18 |
| **reasonably** 44:17 | **remain** 12:17 14:6,18 19:3 | **residents** 5:17 7:20 35:19 60:7 | **rural** 39:18 |
| **rebuttal** 3:9 4:9 24:18 53:5,9 | **remaining** 26:22 | **resolution** 26:16 | _____ |
| **rebutted** 23:4 | **remedy** 7:3 11:14 12:15 20:20,22 21:4 43:16 54:9,14 55:4,9,11 56:6,9,15 57:19,21,22 60:17 | **resources** 19:8,14,16 | S |
| **receive** 25:5 42:15 | | **respect** 22:4 30:7 32:8 57:14,17,18 | **sake** 38:17 |
| **recognize** 6:8 22:4 31:5 | | | **satisfied** 11:9 |
| **recognized** 18:22 30:15 54:8 | | **respond** 9:10 21:14 | **satisfy** 56:19 |
| | | **responded** 21:11 | **save** 20:13 |
| **reconsideration** 61:7 | **removal** 36:17 | **response** 9:7 13:13 23:20 | **scene** 47:6,12 |
| | **removed** 36:19 | | **scheduled** 28:20 |
| **record** 6:20 7:16 20:18 21:1 35:18 36:7 44:19 | **repeat** 47:14 | **responses** 13:12 23:19 | **Schnader** 2:11 |
| | **repeatedly** 5:2 | **responsibility** 46:2 55:14 | **scientific** 48:6 |
| **RECORDING** 62:14 | **replacement** 10:16 | | **Scranton** 13:6 |
| | **represent** 41:6 | **result** 11:15 12:19,22 26:22 31:21 36:6 51:14 52:3,10,14 53:13 | **seat** 37:18 |
| **reduction** 11:15 12:20,21 | **representative** 22:12 | | **second** 4:18 6:1 12:7,19 14:3 31:18 35:17 36:9 38:2 40:10 |
| **referenced** 27:16 | **represented** 22:19 | **resulted** 28:17 | |
| **referred** 30:19 | **representing** 8:10 | | |

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 13

secondary 54:13

seconds 50:14

security 37:16

seeing 19:20

seek 6:21 8:4
50:20 52:6

seeking 7:4 11:14
21:2 26:21 34:7

seem 24:4 38:12

seemed 5:3,6,9

seems 16:14 19:5
33:18

Segal 2:11

Selinsgrove 40:4

sense 13:13 34:5

separate 60:1

serious 25:9,12
26:12,19 27:15
49:9

served 48:8

services
18:4,9,16,18
23:8,12,15,17
24:4 25:8 41:12
42:9,15,17
43:1,5 44:4,12
45:1 48:5,9
49:18 50:4

serving 23:22

setting 14:10,20
15:1 23:16 41:21

settings
25:6,11,13,16
26:12

settlement
27:18,21
28:16,17

Seventh 2:5

28:2,11

Seventy-five 37:6

severally 9:17 10:6

severe 11:15

shaped 28:10

shapes 55:9

She's 40:2

Siberia 39:20

siblings 36:2 47:4

sic 34:19

Sidley 2:4 4:6

significant 12:21

significantly 59:19

similarly 51:8

simple 21:5

simply 14:2 27:13
53:21 54:19
59:10

single 55:1

sir 53:8

sister 29:9 30:16
33:16 34:5,8
39:20

situated 51:8

situation 18:7
20:10 30:3

situations 36:1

six 15:12

Smith 2:4 3:4,10
4:2,3,5,6,12 5:14
6:1,8 7:2,12,15
8:2,8,16
9:3,5,12,22
11:6,18
12:3,10,12 13:12
14:11,16 15:11
16:1,16 17:8,21

18:5,10,14 20:9
21:19 22:16
23:9,18
24:3,11,18
32:11,13 41:19
45:2,7 46:17
53:5,8,10,17
54:4,16 55:17
56:2,11,13,16
57:3,15 58:13
59:4,7,15
60:5,12,20
61:9,12,15,17,20
62:6,7

Smith's 25:20
41:17 45:4

so-called 51:1

Solano 2:10 3:6
29:4,6,8,15,16
30:20 31:8
32:12,18
33:12,21
34:12,18 35:3,9
38:3,5
39:4,9,13,17
40:10,17,22
41:1,19 45:3

Solano's 43:19
44:2 45:4

solely 48:2

somebody 10:16
58:11

someday 11:5

somehow 5:13
19:17 34:2 56:15

someone 21:15
30:3

somewhere 13:11
20:5

sorry 9:5 30:18

32:12 58:6

sort 47:12 59:14
61:14

sorts 40:6

sought 4:20 5:21
6:16,18 8:16
12:16,20 41:13

sound 39:20

speak 10:19 25:2
38:9 41:17
42:1,4 43:19
45:19 46:15
47:15,17 49:20
50:4

speaking 33:15
40:14 49:19

specific 13:5 25:19
26:5 30:1 32:7
42:5 58:8

specifically 6:10
16:20 45:8 55:11

speculative 20:15

spend 32:7

stand 8:19,22 9:15

standard 12:14
22:22

Stapleton 1:13
31:4 32:4

start 4:22 53:6

starts 39:7,13

state 5:19 13:16,19
14:2 15:9 16:8
20:11 21:5 22:3
23:1,4,19
30:12,14
31:6,10,12,13
36:11,15,17
38:20 42:12,18
43:2,3,4

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 14

44:8,15,17 45:20
46:4,5 49:20,21
57:1,4
58:18,19,21 60:6

**state/federal** 42:11

**statement** 36:18
43:22

**statements**
25:14,15

**State's** 36:18 38:9
51:6,10 60:7

**STATES** 1:1

**stay** 13:9,18 14:8

**staying** 30:15 33:4

**step** 11:7 21:10

**stepped** 34:2

**stipulate** 53:15

**stipulated** 40:19

**stipulation**
39:9,11,14,15

**stood** 8:13 22:6
54:15

**stop** 43:3 46:21,22
47:21

**strategy** 61:10

**street** 2:8,11,15
48:18

**strength** 26:13

**stress** 46:8

**strong** 23:14 35:13

**submit** 32:18
34:14,16 35:12

**subsequent** 59:8
60:9

**substitute**
21:12,20 27:2

**successful** 31:21

**sue** 58:12

**sufficient** 20:3
33:5 48:9

**sufficiently** 9:18
39:19

**suggest** 24:4

**suggesting** 18:18

**suit** 58:10,11

**Suite** 2:8,11,15

**summary** 7:17
20:22 54:20
55:10 56:4
61:3,7

**support** 6:14 25:5

**supports** 18:16,19
24:5 48:9

**suppose** 23:11

**Supreme** 44:20

**sure** 11:19 14:16
26:3 33:15 37:19
42:3 46:14 48:16
62:13

**survive** 49:10

**Susquehanna** 40:4

**swept** 10:11 12:18

**sword** 60:9

**system** 47:8

------------

**T**

**table** 37:19

**taking** 9:10 10:18

**talk** 31:18 35:17

**talking** 34:22 35:1
58:11

**talks** 16:12

**ten** 9:12 10:11

**tenor** 47:16

**terms** 34:12 43:14
55:21

**test** 53:22

**testimony** 36:7

**testing** 24:8

**thank**
24:10,11,14,17
25:1
29:1,3,12,13
38:3 40:22 41:1
53:2,4 62:5,7,8

**that's** 8:8 11:17,18
12:15 13:2,9
15:1,6 16:2,22
17:19 19:10,15
21:14 22:13,16
23:9,14 24:8
29:18 33:2 35:20
40:7 41:12,13
43:16 44:4 45:12
47:8,14,15 48:16
49:2 51:17,22
52:4 54:14 55:4
56:11,20 57:9
58:11 60:16

**themself** 10:1

**themselves** 10:20
37:3 51:18 52:22
56:5

**theoretical** 23:16

**Theoretically**
23:18

**there'd** 21:12

**therefore** 20:6
45:9

**there's** 13:8,21
15:20 32:5 35:20
43:9 44:18 52:5

60:22

**they'll** 21:17 59:14

**they're** 8:6 13:5,10
16:13 18:7 19:18
20:5 23:13,22
28:8 30:20 31:3
37:7 38:14,19
39:20 40:5 42:9
43:7 45:17 46:20
48:18,22 49:5
52:2

**they've** 46:18 49:6
50:2 52:5 56:14

**third** 1:1,14 6:3

**thoughts** 21:18

**thousands** 27:19

**throughout** 41:9

**today** 8:13 25:2
29:13

**topic** 11:18

**track** 5:9

**tracks** 44:6

**TRANSCRIBER**
63:1

**transcript** 63:3

**transferred** 20:16

**treating** 44:9

**treatment** 46:6

**tribunal** 13:19
14:2 58:19 59:9

**tried** 35:4 41:9

**trouble** 19:19

**true** 13:2 24:8 27:2
28:14 38:17
49:11,12

**trust** 22:15

**try** 33:14 43:10

Capital Reporting Company
PA Department of Public Welfare v. Franklin Benjamin, et al.  02-07-2011
Page 15

trying 33:1 61:14

---
**U**

U.S 1:13

UI 58:19 59:14

ultimately 28:15

Um-hmm 24:2
34:17 35:2,8
39:8,12,16 52:7

unable 10:7,13

uncaring 49:1

undermine 44:20

undermines 51:10

understand 9:11
11:19 12:7 16:11
25:22 37:8 38:7
46:14 47:16
49:8,10 50:1,15
51:20 55:18

understanding
48:7 56:2

understood 46:16

unfair 47:10

UNITED 1:1

unless 20:13

unopposed 54:1

unwilling 49:1

upheld 28:2,12

upon 41:16

upsetting 15:17,18

---
**V**

Valley 40:4

value 60:2

vast 38:8

vehicle 27:9,13

versus 17:1

viable 27:5

view 37:6

viewed 18:16

vigilant 12:17

violate 15:14

violation 51:5

voice 7:6 10:3 25:1
45:9,11 54:5,6
56:8 57:7,9

voiced 22:7

Voices 25:22

VOR 25:1,3,7,8
26:7

V-O-R 25:1

vote 21:17 45:8

vulnerable 37:1,13

---
**W**

wait 27:3 56:18

waiting 48:14,19

Walnut 2:15

WALTER 1:13

ward 36:14

wards 22:3 38:20

warned 19:1

wasn't 18:11 27:22

ways 7:3

we'd 41:8

WELFARE 1:4

we'll 24:18

we're 12:8 16:2,4
17:19 19:6 24:8
26:6 27:11,13
28:9,10 29:14

33:11 34:22 35:1

whatever 59:9

whether 7:20 8:9
10:1,4 11:21
16:3 19:6 25:20
35:5,9 36:15
44:11 46:12
49:17 50:5 52:19
53:22 54:5 57:11
58:18 59:19 62:1

White 15:5,8
29:10,17
39:21,22

whole 20:14

whom 23:22 51:17

whomever 58:19

whomever's 21:14

who's 21:15 51:8

Wilkes-Barre 40:2

willing 42:16 46:2

wind 21:20

wing 20:14

wish 26:10

wrong 11:2 37:17
47:9 60:19

---
**Y**

yet 18:12

York 2:5

yourself 33:15

you've 38:6,7 39:2

JA1330

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
-------------------------------------------------------------x
FRANKLIN BENJAMIN, et al., on behalf of      :
themselves and all others similarly situated, :
                                              :
              Plaintiffs,                     :
                                              :    No. 09-cv-01182
        -against-                             :    (Jones, U.S.D.J.)
                                              :
DEPARTMENT OF PUBLIC WELFARE OF               :    (Am. Complaint
THE COMMONWEALTH OF                           :    Filed 7/14/09)
PENNSYLVANIA, et al.,                         :
                                              :
              Defendants.                     :
-------------------------------------------------------------x
```

**JOINT MOTION OF DIANE SOLANO AND CRAIG SPRINGSTEAD,
MARIA MEO, DANIEL BASTEK, MICHAEL STORM, BETH ANN
LAMBO, RICHARD KOHLER, MARIA KASHATUS, WILSON SHEPARD
REQUESTING ORAL ARGUMENT ON THE ISSUE OF STANDING**

Craig Springstead, by and through his father and guardian, Bertin

Springstead, Maria Meo, by and through her mother and guardian, Grace Meo,

Daniel Bastek, by and through his father and guardian, John Bastek, Michael

Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by and through

her father and guardian, Joseph Lambo, Richard Kohler, by and through his sister

and guardian, Sara Fuller, Maria Kashatus, by and through her father and guardian,

Thomas Kashatus, and Wilson Sheppard, by and through his brother and next

friend, Alfred Sheppard (collectively, the "Springstead Objectors"), and Diane

Solano, by and through her brother and guardian, Carl Solano, respectfully move

the Court to schedule oral argument to determine the issue of Ms. Solano's and the Springstead Objectors' standing to appear at the fairness hearing scheduled for August 22, 2011 and present objections to Plaintiffs' and Defendants' proposed settlement.

In support of this Motion, the Springstead Objectors aver as follows:

1. By their Amended Complaint, dated July 14, 2009, Plaintiffs commenced this putative class action against Defendant Department of Public Welfare of the Commonwealth of Pennsylvania, "the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation." (Am. Compl. ¶ 13.)

2. The five named Plaintiffs are residents of three of the five state-operated intermediate care facilities for persons with mental retardation ("ICFs/MR") in the Commonwealth of Pennsylvania.

3. Plaintiffs' allegations concern "Defendants' continuing failure to offer and provide them with the opportunity to receive services in integrated, community settings that are the most appropriate settings to meet their needs." (Am. Compl. ¶ 1.) Plaintiffs seek "appropriate declaratory relief and injunctive relief" (id. ¶ 4), pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3) (id. ¶¶ 82-87), and Section 504 of the Rehabilitation Act,

2

JA1332

29 U.S.C. § 794 and 28 C.F.R. § 41.51(d) (id. ¶¶ 88-93).  The five named Plaintiffs

seek immediate relocation to community care facilities.

4.      Plaintiffs seek this relief on behalf of a class that, as certified,

includes:

> All persons who: (1) currently or in the future will reside
> in on[e] of Pennsylvania's state-operated intermediate
> care facilities for persons with mental retardation;
> (2) could reside in the community with appropriate
> services and supports; and (3) do not or would not
> oppose community placement.

(Order, Sept. 2, 2009, § III.)

5.      On March 10, 2010, the Court denied a motion by the Springstead

Objectors, who had sought to intervene to protect their right to remain in state-

operated ICFs/MR.  The Third Circuit Court of Appeals later affirmed this

decision.  In the Order denying the proposed intervention, the Court found that the

present litigation did not threaten the Springstead Objectors' ability to remain in

ICF/MR care because the Springstead Objectors' opposition to community

placement removed them from the certified class.

6.      On January 27, 2011, the Court entered summary judgment for the

Plaintiffs on liability without determining appropriate relief.

7.      On May 26, 2011, Plaintiffs and Defendants entered into a proposed

settlement agreement, and on May 27, 2011 this agreement was tentatively

approved by the Court.

JA1333

8.    The Springstead Objectors and Ms. Solano filed objections to the proposed settlement as members of the class.  In the event that the Court determines the Springstead Objectors and Ms. Solano are not members of the class, the Springstead Objectors and Ms. Solano have moved the Court to allow them to intervene in the action and present their objections to the proposed settlement agreement.

9.    On August 8, 2011, Plaintiffs filed a Motion to Approve Consent Judgment.

10.    The Court has scheduled a hearing for final approval of the settlement for August 22, 2011.

11.    The issue of the Springstead Objectors' and Ms. Solano's standing to present their objections to the proposed settlement at the August 22, 2011 fairness hearing has not been decided by the Court.

**WHEREFORE**, the Springstead Objectors and Ms. Solano respectfully move this Court to enter an Order scheduling an oral argument, at a date and time prior to the August 22, 2011 fairness hearing, to hear and address arguments concerning  the Springstead Objectors' and Ms. Solano's standing to present objections to the proposed settlement.

Dated:  Philadelphia, Pennsylvania                    Respectfully submitted,
August 15, 2011


**VAIRA & RILEY, P.C.**                         **SCHNADER HARRISON SEGAL &**
                                                **LEWIS LLP**

By:___/s/ John E. Riley_____
John E. Riley (PA ID# 22504)                    By____/s/ Carl A. Solano_____
William J. Murray, Jr. (PA ID# 73917)           Carl A. Solano (PA ID#.23986)
1600 Market Street, Suite 2650                  1600 Market Street, Suite 3600
Philadelphia, Pennsylvania  19103               Philadelphia, PA 19103
T: (215) 789-9405                               Telephone: (215) 751-2000
F: (215) 751-9420                               Fax: (215) 972-7363
                                                E-mail: CSolano@Schnader.com

                                                *Brother and Guardian of Diane Solano*
**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart
787 Seventh Avenue
New York, New York  10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace*
*Meo, Daniel Bastek, Michael Storm,*
*Beth Ann Lambo, Richard Kohler,*
*Maria Kashatus, and Wilson Sheppard*

5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, *et. al.*,      :      1:09-cv-1182
                                   :
                                   :
         Plaintiffs                :
                                   :
         v.                        :
                                   :
DEPARTMENT OF PUBLIC ,             :      Hon. John E. Jones III
WELFARE OF THE                     :
COMMONWEALTH OF                    :
PENNSYLVANIA and GARY              :
ALEXANDER, in his official capacity :
as Secretary of Public Welfare of the :
Commonwealth of Pennsylvania       :
                                   :
         Defendants.               :

## ORDER

### August 18, 2011

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

The Court is in receipt of a letter from Carl A. Solano, Esquire, requesting

clarification of our August 16, 2011 Order. (Doc. 274.) We have also received a

letter from Robert W. Meek, Esquire, counsel fo Plaintiffs and the class,

responding to the said Solano letter. (Doc. 275.) To clarify, the Court first

acknowledges that Mr. Hoffart and Mr. Solano represent only the Springfield

Intervenors and Diane Solano, respectively. We note that we selected counsel to

1

participate in the hearing not because of an erroneous assumption of

representation, but rather because of the commonality between the objections

propounded by their clients and nearly all remaining Objectors.  As such, the

participation by counsel will not be binding on the unrepresented, or otherwise

represented Objectors, and will serve only to assist the Court in evaluating the

Proposed Settlement Agreement.  Relatedly, we also note that, with respect to our

present intent to not take testimony from individual Objectors during the hearing,

we are in receipt of, have reviewed, and will fully consider all written objections

as filed.  They are a part of the record.  The numerous written objections filed are

indeed comprehensive and at times even eloquent, as well as strikingly similar,

and the Court intends to exercise its discretion to avoid eliciting duplicative

testimony.[1]  Finally, we agree with counsel that their participation would be

hampered without any advance notice regarding the evidence the parties intend to

present.  Since Mr. Solano filed his letter, via the aforementioned Meek letter

Plaintiffs and Defendants have identified some of the witnesses each party, at this

time, intends to call.  We shall now direct the parties to provide to Messrs. Hoffart

and Solano the identities of any additional witnesses and, if practicable, copies or

---

[1]The Court reserves the right to allow individual Objectors to speak on the record at the hearing.  However, and as noted, the written objections we have received are similar and stress the same concerns and themes.

descriptions of documents and record evidence either directly or via the Court's

docket.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.  The parties **SHALL PROVIDE** to counsel any additional witness

    names and, if practicable, copies or descriptions of documents and

    record evidence, either directly or via the Court's docket, by August

    19, 2011, at 12:00 p.m.


_____
John E. Jones III
United States District Court

3

```
1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   FRANKLIN BENJAMIN, et al.,      :
3                    Plaintiffs    :
                                   :   Case Number
4           vs.                    :   1:09-CV-01182
                                   :   (Judge Jones)
5  DEPARTMENT OF PUBLIC WELFARE    :
   OF THE COMMONWEALTH OF          :
6  PENNSYLVANIA and GARY           :
   ALEXANDER, in his official      :
7  capacity as Secretary of        :
   Public Welfare of the           :
8  Commonwealth of Pennsylvania,   :
                    Defendants     :
9

10

11

12
                   TRANSCRIPT OF PROCEEDINGS
13                 IN RE:  FAIRNESS HEARING

14
            Before:  HONORABLE JOHN E. JONES, III
15
            Date  :  August 22, 2011; 9:01 a.m.
16
            Place :  Courtroom Number 2, 9th Floor
17                   Federal Building
                     228 Walnut Street
18                   Harrisburg, Pennsylvania

19

20

21

22

23

24
                      Lori A. Shuey, RMR, CRR
25                    U.S. Official Court Reporter
```

```
1   COUNSEL PRESENT:

2        DISABILITY RIGHTS NETWORK OF PA
         BY:  ROBERT W. MEEK, ESQ.
3             ROBIN RESNICK, ESQ.

4            For - Plaintiffs and the Class

5        PENNSYLVANIA OFFICE OF GENERAL COUNSEL
         DEPARTMENT OF PUBLIC WELFARE
6        BY:  DORIS M. LEISCH, DEPUTY CHIEF COUNSEL

7            For - Defendants

8        U.S. DEPARTMENT OF JUSTICE
         SPECIAL LITIGATION SECTION-CIVIL RIGHTS DIVISION
9        BY:  SAMANTHA K. TREPEL, ESQ.

10           For - United States of America

11       SIDLEY AUSTIN, LLP
         BY:  BENJAMIN HOFFART, ESQ.
12
             For - Springstead Objectors
13
         SCHNADER, HARRISON, SEGAL & LEWIS, LLP
14       BY:  CARL A. SOLANO, ESQ.

15           For - Objector Diane Solano

16

17

18

19

20

21

22

23

24

25
```

                         I N D E X


                         WITNESSES

PAMELA KUHNO                                              PAGE

  Direct by Ms. Leisch                                     15

  Cross by Mr. Hoffart                                     45

  Redirect by Ms. Leisch                                   59

COLEEN SASSAMAN                                          PAGE

  Direct by Mr. Meek                                       62

  Cross by Mr. Hoffart                                     72

PATRICIA McCOOL                                          PAGE

  Direct by Ms. Leisch                                     78

  Cross by Mr. Hoffart                                     94

  Redirect by Ms. Leisch                                  100



                         EXHIBITS

DEFENDANTS' EXHIBITS                    IDENTIFIED    ADMITTED

  1 - State Center (ICF/MR) Community       22           93
      Planning List Assessment Protocol


COURT EXHIBITS                                           PAGE

  1 - Letter dated 7/29/11, Senator Vogel               101
      to Judge Jones

  2 - Letter dated 7/29/11, Representative              101
      Sainato to Judge Jones

JA1341

1          THE COURT:  All right.  We are assembled this morning

2   in the matter of Benjamin, et al., versus the Department of

3   Public Welfare, and this is a fairness hearing as previously

4   scheduled by the Court.  I'll go through some procedural

5   history in a moment, but, Counsel, would you enter your

6   appearances starting with counsel for the plaintiffs.

7          MR. MEEK:  Your Honor, Robert Meek for the plaintiff,

8   along with my colleague Robin Resnick.

9          THE COURT:  Good morning.

10          MS. LEISCH:  Your Honor, Doris Leisch for the

11   defendants.

12          THE COURT:  All right.  And per the Court's order, do

13   you want to enter your appearances for the purposes of this

14   proceeding?  If you would, Mr. Hoffart.

15          MR. HOFFART:  Sure.  Benjamin Hoffart for eight

16   individuals known in this proceeding as the Springstead

17   intervenors or objectors.

18          THE COURT:  Very well.  Thank you.

19          MR. SOLANO:  Good morning, Your Honor.  Carl Solano,

20   and I am here as a representative of my sister, Diane Solano.

21          THE COURT:  All right.  Very well.  Thank you, Mr.

22   Solano.

23          MR. SOLANO:  Thank you.

24          MS. TREPEL:  Good morning, Your Honor, Samantha Trepel

25   for the United States.

1          THE COURT:  Didn't mean to exclude you on the first

2     go-round.  Good morning to you, as well.

3          All right.  Just to set the stage a bit and recite

4     some procedural history, by our order of May the 27th of this

5     year, we gave preliminary approval to a settlement that was

6     reached in this matter, a preliminary settlement -- well, a

7     settlement.  It was preliminary approval of the settlement, let

8     me be clear, after a mediation before United States Magistrate

9     Judge Martin Carlson, and notices per Rule 23(e)(1) were

10    approved.

11         They were appropriately distributed as certified in

12    Paragraph 6 of the plaintiffs' filing of August the 8th of

13    2011.  There was a cut-off date established of August the 2nd.

14    We received, by the cut-off date, a number of responses, and

15    they're a matter of record.  And they've also been cataloged in

16    submissions in this case from the plaintiff pursuant to seeking

17    approval of the settlement.

18         But to briefly summarize, there is a letter from an

19    ICF/MR resident objecting.  There are approximately 100 letters

20    from family members or guardians of individuals who are

21    residents of state ICF/MRs.  These are in opposition, as I've

22    said.  There are approximately three letters from state ICF/MR

23    residents that are in support of the preliminary settlement

24    agreement.

25         Per the Court's most recent orders, in an attempt to

1   conduct this in a reasonable way and an orderly way, we

2   determined that we would take testimony in support of final

3   approval in this fairness hearing.  It's my understanding that

4   counsel are prepared to present some testimony.  And in our two

5   most recent orders, those of August 16 and August 18, we

6   requested that counsel for some of the objectors be prepared to

7   question the witnesses and gave them leave to do so.

8           It's my understanding, Counsel, that, Mr. Hoffart,

9   you're going to do the questioning.  Is that correct, sir?

10          MR. HOFFART:  That's correct.

11          THE COURT:  And, Mr. Solano, you're going to argue at

12  the conclusion of the testimony.  Is that correct, sir?

13          MR. SOLANO:  Yes, Your Honor.

14          THE COURT:  All right.  This does not preclude,

15  necessarily, hearing from individual objectors.  We'll take

16  that as it comes and make a determination as to how that should

17  best be handled after we take testimony.  So with that then,

18  are we ready to proceed?

19          MR. MEEK:  Your Honor, you wish us to proceed with

20  testimony rather than -- would you prefer a short recitation of

21  the standards for approval, or would you prefer testimony?

22          THE COURT:  I understand what the standards are.  If

23  you feel that you want to state them as a precursor to

24  testimony, I won't prevent you from doing that.

25          MR. MEEK:  Very briefly, Your Honor.

```
 1            THE COURT:  Very well.  Thank you.

 2            MR. MEEK:  If you don't mind.  And also, Your Honor, I

 3     would also ask that after I give my brief synopsis of the

 4     standards, that at some point Ms. Leisch would like to speak to

 5     it, also, if that's possible.

 6            THE COURT:  That's fine.

 7            MR. MEEK:  Very well, Your Honor.  Your Honor, may it

 8     please the Court, this matter is before the Court on a

 9     settlement fairness hearing.

10            As the Court is well aware, a judgment for liability

11     was entered by the Court against the Department of Public

12     Welfare, and the Court urged the parties to then mediate and

13     reach settlement with regard to any remedy that might be

14     imposed or taken up as a result of the finding of liability

15     against the State.

16            This case, Your Honor, as you know, is founded on

17     the -- some precedent in the Third Circuit, Frederick L. being

18     the main case, which five years ago our Court of Appeals

19     instructed the states to create integration plans for persons

20     institutionalized in state facilities.  This lawsuit was

21     brought to force that mandate with regard to state centers, the

22     ICF/MRs in the state.  So we should just be clear, the subject

23     matter of the fairness hearing is solely the remedy.  The

24     liability has been established.

25            Your Honor, a presumption of fairness attaches to this
```

1    particular settlement, and the settlement is fair, adequate,

2    and reasonable for the following reasons:

3          Notice was adequate, as the Court has pointed out, and

4    distribution was made to all state center residents and their

5    families and guardians giving them approximately 40 days to

6    respond to the notice.

7          The standards under which the class action should be

8    approved have been met here, and the presumption of fairness

9    attaches to this case because the negotiations, as the Court

10   also has said, were conducted at arm's length through, in fact,

11   mediation before the U.S. Magistrate Judge.

12         There was sufficient discovery.  The parties have

13   completed discovery.  In fact, the parties went to summary

14   judgment, cross-motions for summary judgment.  The proponents

15   of the settlement are experienced counsel in this sort of

16   litigation.  And, finally, there was only a small fraction of

17   the class, if any, that was opposed to the settlement.

18         The main points that I think we want to address today

19   here is the reaction of the class, which is one of the factors

20   the Court must undertake to examine.  As the Court pointed out,

21   there were letters in opposition to the settlement agreement

22   from persons representing about 101 state center residents.

23   There's one state center resident, as the Court has pointed

24   out, that wrote a letter objecting to the settlement, and there

25   were three state center residents approving of the settlement.

1              The main opposition generally seems to be focused on

2    the fact that writers believe that this settlement will cause

3    their family members at wards to be placed or moved out of

4    state centers contrary to their wishes.  That is not accurate.

5    In fact, the express language of the settlement agreement is

6    that state center residents will not be placed if they give no

7    preference and their family or guardians oppose.  If they

8    oppose, they will not be placed, either.

9              If there's any kind of placement on the so-called

10   planning list, which is part of the settlement agreement which

11   would be created to determine who would be discharged from --

12   to community services, if there's any movement of a person or

13   proposed movement of a person, the family member or guardian

14   would be notified of any action being taken.

15             There's a couple other concerns that were raised about

16   the process, the assessment process.  There were concerns

17   raised that the Disability Rights Network advocates would have

18   full say or more than their fair share of who gets placed on

19   the planning list.  That is not accurate, and we'll develop

20   that in testimony, Your Honor.

21             The advocate is assisting the state person, who is

22   called a community transition specialist, who really is the

23   person that controls the agenda with regard to the planning

24   process and placing persons on the placement list.

25             Also, the entire process, the protocol in question

1    here which we'll introduce into evidence, will be developed to

2    show that this is a transparent process, that there's no bias

3    implicit in the questioning of residents or their family

4    members to assess whether they are opposed to community

5    placement.

6         And, finally, one of the major concerns is that --

7    from the writers in opposition was that there was fear that the

8    discharge of residents from state centers through the

9    settlement agreement would cause the closure of the state

10   centers.  The settlement agreement does not contemplate, let

11   alone compel, the closure of any state center, so that is not a

12   well-founded concern.

13        In fact, because liability is already entered in this

14   case, disapproval of this settlement would not result in the

15   termination of litigation, but, in fact, a remedy hearing would

16   probably be ordered by the Court and a remedy established by

17   order of the Court rather than by settlement.

18        Your Honor, I'm going to, at this point, ask

19   Ms. Leisch if she wishes to speak to -- I'm sorry, Ms. Leisch

20   reminds me that I should mention, we have a motion pending for

21   attorneys' fees, as well, Your Honor.  And we recognize that

22   there were some concerns about that, and it does seem like a

23   large number.

24        However, the hours and the rates are reasonable.

25   They're established through appropriate surveys that have been

1    conducted, and they are commensurate with the experience of

2    counsel.  Myself, Ms. Resnick, and Mr. Murphy have, in total,

3    about 90 years of experience, and our rates reflect that

4    experience.  Also, the figure includes about $68,000 of fees

5    and costs that the plaintiffs advanced in this litigation, as

6    well.

7            And, finally, the fee number was cut off at June 30th,

8    and I can tell you, Your Honor, that we spent a fair amount of

9    time since that on this case that we will not receive any

10   compensation for.  So in that sense, we believe that the

11   attorneys' fees are also fair, adequate, and reasonable and

12   should be approved, as well.

13           THE COURT:  Very well.  Thank you, Mr. Meek.  Do you

14   want to make some introductory comments?

15           MS. LEISCH:  Your Honor, what I would like to do is

16   address a few of the issues that objectors have raised that we

17   won't necessarily be presenting testimony on.

18           First, with respect to the attorneys' fees, among the

19   objections were that the Commonwealth agreed to pay an amount

20   of fees without demonstrating what the lodestar was or taking

21   into consideration what the lodestar was.  In fact, during the

22   course and before the amount was negotiated, the Commonwealth

23   had access to and reviewed in excruciating detail the hours

24   expended, as well as the hourly rates, as well as the costs.

25           And I do want to point out, as Mr. Meek alluded to,

1    that the fees that we negotiated were supported by

2    documentation of hours worked through the beginning of May, and

3    as part of the negotiation -- and those fees and costs came to

4    not quite $500,000.  And as part of the negotiations,

5    plaintiffs' counsel agreed to the 432,500 to go through today.

6    So they were -- so the 432,5 actually includes much more than

7    was originally submitted since there was a lot of activity

8    between the beginning of May and today.

9         The other thing I wanted to point out in response to

10   the specific concerns that the funds that will be paid to

11   plaintiffs' counsel could more appropriately be used to develop

12   community programs for people with intellectual disabilities is

13   that $250,000 of that will not be coming from the Office of

14   Developmental Programs' budget, but, instead, will be paid by

15   the Commonwealth's self-insurance program and therefore

16   wouldn't be available, in any event, for development of

17   community placements.

18        Two other items that I wanted to mention, the

19   education program that many objectors raised as being one-sided

20   and bias because the education program was directed to

21   informing people about -- that is to say, state residents and

22   their families or guardians -- about the availability of

23   community living, what types of community living are available,

24   the options, et cetera, et cetera, et cetera, people thought

25   that that was -- the objectors thought that it presented a

1    one-sided view.

2         And the reason that the settlement agreement focuses

3    on the education of community living is because since the

4    families, as evidenced by the objections, are well aware of the

5    types of services and the quality of services provided at the

6    state centers, we didn't think that it was necessary to include

7    education, so to speak, about the services that are available

8    and provided at the state centers.

9         And, finally, I wanted to clarify the objections

10   based -- and concerns, frankly, based on the items in the

11   settlement agreement about the diversion of funding from the

12   state centers to the communities.  There are two provisions in

13   the settlement agreement that deal with that issue.

14        The first is that the Commonwealth will consider the

15   feasibility of combining the community appropriation and the

16   state center appropriation.  Currently in the general fund

17   budget that's passed by the General Assembly every year and

18   signed by the Governor, those two items are actual separate

19   appropriations.

20        So, number one, the settlement agreement requires only

21   that the Department consider the feasibility of combining the

22   two; and, number two, the reason it's written that way is

23   because the Department doesn't have the authority to combine

24   appropriations and, in fact, would have to seek approval both

25   from the Governor's budget office, as well as the General

1   Assembly, and the General Assembly would actually have to

2   combine those two appropriations.

3        The second term of the agreement that deals with

4   funding is that the Department will consider, to the extent

5   feasible, of moving carry-forward funds from the state centers

6   to the community.  Carry-forward funds, for those who are

7   unfamiliar with the budget lingo, are funds that are available

8   because they weren't expended in a previous fiscal year in the

9   next fiscal year.

10        So, for example, in fiscal year 2011, let's say,

11   hypothetically, the Department had appropriated -- or, rather,

12   had budgeted $100 million for something, let's say community

13   programs, and of that $100 million, only $85 million was

14   expended.  So the carry-forward would be the money that was

15   left over that would be available, possibly, to move from the

16   state centers -- in other words, the money that the state

17   centers did not expend could be moved to the community programs

18   because the state centers didn't need the money anymore, so it

19   could be moved to the community programs.

20        So two things on the funding issue:  One, there's no

21   requirement that we do anything but rather just that the

22   Department consider whether it would be feasible, efficient,

23   wise, et cetera, to make those kinds of changes; and, number

24   two, it would only be after the state centers didn't need the

25   funding anymore rather than diverting resources from the state

1    centers initially.

2         THE COURT:  Very well.  Thank you.  I think we'll

3    reserve argument until after the testimony is taken, and I say

4    that for Mr. Solano and Mr. Hoffart's benefit mainly.  With

5    that, are we prepared to take some testimony?

6         MR. MEEK:  Ms. Leisch is going to call the first

7    witness, Your Honor.

8         THE COURT:  Very well.  Thank you.

9         MS. LEISCH:  Your Honor, Pam Kuhno is the Department's

10   first witness.

11        THE COURT:  All right.  Thank you.

12        MS. LEISCH:  Your Honor, would you prefer us standing

13   or sitting?

14        THE COURT:  No preference.  Whatever makes you

15   comfortable.

16        MS. LEISCH:  Thank you.

17      PAMELA KUHNO, called as a witness, having been duly sworn

18   or affirmed, testified as follows:

19        COURTROOM DEPUTY:  Please state your name and spell

20   your name for the record.

21        THE WITNESS:  Sure.  Pamela Kuhno, K-u-h-n-o.

22        THE COURT:  You may proceed.

23        MS. LEISCH:  Thank you.

24                       DIRECT EXAMINATION

25   BY MS. LEISCH:

Exam. - Pamela Kuhno

1    Q.   Can you hear me okay?

2    A.   I sure can.

3    Q.   Okay.  Ms. Kuhno, where do you work?

4    A.   I work for the Office of Developmental Programs in the

5    Department of Public Welfare.

6    Q.   And what is your position there?

7    A.   I am the Director of Division for ICF/MR Programs.

8    Q.   And who do you report to?

9    A.   I report to Kevin Friel, the Deputy Secretary.

10   Q.   How long have you held that position?

11   A.   For six years.

12   Q.   What did you do before you became the Division Director for

13   ICF/MR Services?

14   A.   I worked for Pennsylvania Protection and Advocacy.

15   Q.   And how long did you do that?

16   A.   I worked there from 1994 until 2005.

17   Q.   Before your position with PP&A, did you also work in the

18   community system?

19   A.   I worked in the special education field.

20   Q.   What are your responsibilities as the Division Director for

21   ICF/MR Services?

22   A.   As the Director for ICF Services, I'm responsible for the

23   management of the five state centers, and I'm also responsible

24   for the programmatic oversight of private ICF/MR programs.

25   Q.   And in your capacity as Division Director, are you familiar

Exam. - Pamela Kuhno

1   with the settlement agreement in this case?

2   A.  Yes, I am.

3   Q.  And how did you become familiar with it?

4   A.  I became familiar with it through the course of my job

5   duties.  I'm responsible for the five state centers, and the

6   litigation directly relates to the five state centers.

7   Q.  And are you familiar with the planning list that the state

8   centers are required to establish under the settlement

9   agreement?

10  A.  Yes, I am.

11  Q.  How are you familiar with the planning list?

12  A.  I am responsible in my position for the oversight and

13  direction of the assessment process that will lead to the

14  planning list.

15  Q.  Have you actually read the settlement agreement?

16  A.  Yes, I have.

17  Q.  Has a process been developed for establishing the planning

18  list?

19  A.  Yes.

20  Q.  Did you participate in the development of that process?

21  A.  Yes, I did.

22  Q.  So you're familiar with the process?

23  A.  I am very, yes.

24  Q.  Please explain what the process is.

25  A.  The process -- and I'll describe it from the perspective of

Exam. - Pamela Kuhno

1    the people who are involved -- the process is carried out by

2    community transition specialists in the state centers.  There

3    is one community transition specialist that's identified in

4    each one of the five state centers.  They are Department of

5    Public Welfare staff, and they are selected by the facility

6    director at their respective facilities.

7    Q.  Did the community -- or do the community transition

8    specialists have any particular qualifications that would have

9    led the center directors to choose them to engage in this

10   process?

11   A.  Yes.  They are all either QMRPs, which are qualified mental

12   retardation -- I apologize for the antiquated language, but

13   that's the official term -- qualified mental retardation

14   professionals.

15   Q.  What does that mean?

16   A.  It is -- actually, it's a very specific position that is

17   laid out in the -- in our regulations, in our federal

18   regulations, that requires a specific level of education for

19   coordination of services for people who live in the state

20   centers.  So that qualified mental retardation professional has

21   a caseload or a living area that they're responsible for

22   coordinating all of the services for those people.

23   Q.  So the people who are currently serving as the community

24   transition specialists, are they also maintaining their

25   caseload at the same time?

Exam. - Pamela Kuhno

1    A.  No, they are not.  And they're also social workers who are

2    carrying out the assessments.  But these are people who are

3    pulled from their regular job duties to complete these

4    assessments.

5    Q.  So who is covering their regular job duties?

6    A.  Their coworkers.

7    Q.  Is the interest assessment process, that is to say, the

8    process for establishing the planning list, the same in all the

9    state centers?

10   A.  Yes, it is.

11   Q.  How do you know that?

12   A.  Because we developed a protocol that provides guidance to

13   all of the community transition specialists.

14   Q.  Who participates in that interest assessment process other

15   than the community transition specialists?

16   A.  Also, per the settlement agreement, the facility advocate,

17   and there's one facility advocate at each one of the state

18   centers, and obviously the person, their involved family or

19   guardian in each portion of that assessment.

20          The community transition specialist and the facility

21   advocate talk to both the individual and to their involved

22   family or guardian, if there is involved family or guardian, to

23   complete a standard set of assessment questions with them, and

24   those responses are recorded.

25   Q.  Does anybody other than those people who you've just

Exam. - Pamela Kuhno

1    identified, that is to say, the resident, the community

2    transition specialist, the guardian or family member, and the

3    facility advocate ever participate in any of the assessments?

4    A.   Yes.

5    Q.   And when is that?

6    A.   For people who are not able to express themselves verbally

7    or communicate independently, staff who know the person will

8    and understand their communication modality will participate in

9    the assessment process with them, as well.  And any other

10   supporters, anybody that the person wants involved we'll

11   involve.

12   Q.   So what's to stop a particular staff member or the

13   community transition specialist or the facility advocate, for

14   that matter, or family member or guardian, for that matter,

15   to -- what's to stop them from interpreting a particular

16   gesture in a particular way during the assessment?

17   A.   Well, what we specified in the assessment protocol is that

18   the person's communication, their mode of communication, is

19   documented in their ISP, which is their individual service

20   plan.  Everybody who lives in a state center has an ISP, and

21   every one of those ISPs has a communication profile that

22   explains and documents how they communicate, and that is what

23   is used as a reference in the assessment process.

24   Q.   Okay.  So you mean that that communication mechanism or

25   method had to have been written down in the ISP before the

Exam. - Pamela Kuhno

1   interview took place?

2   A.  Correct.

3   Q.  Not for the purpose of the interview?

4   A.  No.

5   Q.  Are the residents and the family members or guardians

6   interviewed at the same time?

7   A.  They can be.

8   Q.  Are they usually?

9   A.  No.  From what I -- from the feedback that I have received,

10  no.

11  Q.  So how are the interviews conducted?

12  A.  Typically with the individuals who live at the state

13  centers, those interviews are conducted in person by the

14  community transition specialist and facility advocate.  And the

15  community transition specialist, with families, calls them and

16  speaks with them.

17          And if the family wants to meet in person to complete

18  the assessment, they will make arrangements to do so.  If they

19  want to make arrangements to have their meeting in conjunction

20  with their family member's assessment, arrangements will be

21  made in that regard, as well.  But phone calls are done because

22  many families live a distance from the state centers, and from

23  a logistics' perspective, it's helpful.

24  Q.  Okay.  Now, after those interviews are completed, what do

25  the -- you mentioned that the community transition specialist,

Exam. - Pamela Kuhno

1   I believe, records the results?

2   A.  Yes.

3        MS. LEISCH:  Your Honor, may I approach the witness?

4        THE COURT:  You may.

5   BY MS. LEISCH:

6   Q.  I am handing you what we've marked for identification, at

7   the moment, Exhibit 1.  Can you describe, please, what this

8   document is?

9   A.  The first two pages is a current draft of the state center

10  community planning list assessment protocol that I was just

11  talking about earlier.  And then the third through last pages

12  are a copy of the form that the community transition specialist

13  utilizes to complete the assessment.

14  Q.  Who participated in developing this document?

15  A.  Myself, facility directors at each one of the state

16  centers, the community transition specialists.  It was reviewed

17  both by the community division -- you're going to be speaking

18  with Ms. McCool later, she had an opportunity to review and

19  comment -- and the facility advocates reviewed and commented on

20  it.

21  Q.  Did you receive any comments from the facility advocates on

22  the protocol?

23  A.  Not that I recall.

24  Q.  I want to direct your attention to the first page, second

25  bullet under subject heading, The Person's Interest in