Exam. - Pamela Kuhno

1    Community Living.

2    A.  Um-hum.

3    Q.  Next to the last line, or let's say the last sentence, I'm

4    quoting, If the person is responsive but vacillates in their

5    answer to the questions within the same assessment session,

6    their response will be recorded as no preference and additional

7    information and training will be provided to help the person

8    make an informed choice.

9    A.  Um-hum.

10   Q.  Okay.  So, first of all, the person that's -- just since

11   it's taken out of context, the person that we're talking about

12   here is the resident?

13   A.  Yes.

14   Q.  Has it happened, to your knowledge, that a resident has

15   gone back and forth during the course of an interview session?

16   A.  Yes.

17   Q.  How long do those interviews typically last?

18   A.  I would estimate about 15 minutes.

19   Q.  So how is a decision made that that -- rather than going

20   with one or the other response, that that person should be

21   listed as no preference?

22   A.  It was part of a discussion.  We have regular meetings with

23   the community transition specialists.  And there are also times

24   that we pull in the facility advocates because they're part of

25   doing this process.  And we want to make sure that everybody

Exam. - Pamela Kuhno

1    has an opportunity to ask questions for clarification as we go

2    along and to make sure that they're all doing the process

3    consistently.  And so this particular issue was raised by one

4    of the community transition specialists as a question.  It

5    wasn't in the protocol originally.

6    Q.  What type of -- again, referring to the same sentence, what

7    type of additional information and training does this sentence

8    refer to?

9    A.  It refers to individualized information and training for

10   the particular person who is unsure, who is vacillating between

11   a yes and no answer.  What the community transition specialist

12   and that person's interdisciplinary team will do is to sit down

13   and talk about the person seems to have some wavering, has some

14   interest, may not have all the information that they need, what

15   particular information would be helpful to this person so that

16   they can make an informed decision.

17   Q.  Who's on the resident's or on any resident's

18   interdisciplinary team?

19   A.  Their interdisciplinary team obviously includes the

20   individual, their involved family or guardian, the QMRP, that's

21   the person who coordinates the person's team, social worker,

22   direct care staff are a very important part of the

23   interdisciplinary team, vocational staff.

24   Q.  Any treating professionals?

25   A.  Yes, absolutely, clinicians such as nurses, physical

Exam. - Pamela Kuhno

1   therapists, the people who are involved with the person based

2   upon their needs.

3   Q.   Okay.  So when it says that additional training, additional

4   information and training will be provided to help the person

5   make an informed choice, does that mean that that information

6   and training is going to be geared toward getting that person

7   to say yes all the time, or does it mean something else?

8   A.   No, it means -- and for a person who may not be expressing

9   themselves clearly, it might be a speech therapist or a

10  psychologist who's assisting the person in identifying what

11  they really mean.  But the information that would be provided

12  to the person would be really geared towards helping them make

13  the decision that's best for them.

14  Q.   So is the intent that the product or the outcome of

15  providing that additional information and training might be

16  that the answer is that the resident does not want to move?

17  A.   It could be.

18  Q.   Turning to Page 3, which is, as you pointed out, the

19  questionnaire that's asked of both the residents and then the

20  family members, the questions that are listed under the

21  person's position, awareness, or interest in community living,

22  are those questions asked of the resident exactly as written?

23  A.   Yes.

24  Q.   Okay.  What happens if the resident doesn't understand the

25  question?

Exam. - Pamela Kuhno

1    A.  Then the community transition specialist who typically --
2    well, in each one of the state centers is a person who has
3    worked there for a number of years, is usually familiar with
4    the people that they're speaking with, will try to rephrase the
5    question in a manner that is more understandable for the
6    person.
7    Q.  Okay.  So do you have any idea about how, for example, on
8    Page 4, the question "do you understand your options of living
9    in the community" might be rephrased?
10   A.  Do you know what kinds of services are available in the
11   community.
12   Q.  And what happens if the person doesn't understand what the
13   community is?
14   A.  If they don't understand what the community is, that's a
15   situation where I think, as you go through the questionnaire,
16   it would be difficult for the person to give a firm answer, and
17   we would probably wind up with a situation where more
18   information would be provided to the person in the future per
19   their ID team.
20   Q.  And what would go on the survey as the outcome of their
21   interview?
22   A.  It would most likely be no preference.
23   Q.  Did staff receive training on how to conduct the assessment
24   interviews before they did them?
25   A.  Yes.

Exam. - Pamela Kuhno

1   Q.   What kind of training?

2   A.   They received -- well, they all participated in the

3   development of the protocol and the questionnaire.  But before

4   the assessment process began, there were two particular

5   meetings that were held where the assessment process was

6   reviewed and information was provided not only about the

7   assessment process, but about services in general.  It was a

8   general orientation training for those transition specialists.

9   Q.   Now I want to switch gears a little bit here.

10  A.   Um-hum.

11  Q.   During your many years working in the community system, as

12  well as the system that generally serves persons with

13  intellectual disabilities, particularly at the state centers,

14  have you come to know persons with intellectual disabilities?

15  A.   Yes.

16  Q.   Do you know any state center residents?

17  A.   Yes.

18  Q.   Based on your experience, is a person who has been

19  diagnosed as having profound mental retardation always

20  incapable of communicating his or her wishes or desires?

21  A.   No, they're not.  I mean, I know people who have a

22  diagnosis of profound mental retardation who are able to

23  communicate, not every person.  It's all based upon

24  individualized responses.  But there are definitely people who

25  are able to consistently communicate their wishes and desires.

Exam. - Pamela Kuhno

1    Q.  Conversely, I'm going to ask -- I'm going to ask the

2    converse question.  Is a person who's been diagnosed with mild

3    mental retardation always capable of communicating his or her

4    wishes or desires?

5    A.  No, not always.  Again, it's on a person-by-person basis.

6    There are people who may not who have mild mental retardation

7    or mild intellectual disability, who are not consistently able

8    to communicate their wishes and desires.

9    Q.  And speaking of being able to communicate, do you know what

10   it means when the state centers list somebody or identify

11   somebody as being nonverbal?

12   A.  It means somebody who does not verbally express themselves.

13   Q.  So would that include people who can express themselves

14   otherwise?

15   A.  Yes.

16   Q.  So if somebody is nonverbal, that category means people

17   can't speak?

18   A.  Correct.

19   Q.  Does it mean people who can speak with an augmentative

20   communication device?

21   A.  Let me make sure I understand the question.  A person can

22   be nonverbal -- and I'll try to word this -- a person can be

23   nonverbal, they don't speak, but they have another mode of

24   communication.  They can use assistive technology, they can use

25   pictures, they can use sign language.  There's a vast array of

Exam. - Pamela Kuhno

1   reliable methods of communication for people who are not

2   verbal.

3   Q.  Okay.  So then the term "nonverbal" includes only those

4   people who cannot speak?

5   A.  Correct.

6   Q.  So it wouldn't include somebody who can communicate with an

7   augmentative communication device or sign language?  Those

8   people are not -- are considered nonverbal?

9   A.  Correct.

10  Q.  Okay.  I want to go back to the assessment interviews.  You

11  just testified about the different ways that somebody who is

12  nonverbal could communicate his or her desires.  Do you know

13  whether or not that has actually happened during the interview

14  process?

15  A.  Oh, based upon the number of assessments that have been

16  completed, it has to have been.  I don't have direct -- I

17  wasn't there.  I'm not there during the completion of the

18  assessments.

19  Q.  Why do you say that it would have had to have been?

20  A.  Because there are a large number of people who are

21  technically not verbal who live at the state centers but

22  communicate in other ways, and because such a large number of

23  the assessments have been done, just by virtue of statistics.

24  Q.  How many assessments have been completed thus far, do you

25  know?

Exam. - Pamela Kuhno

1   A.  Around 840.

2   Q.  Do you happen to know what percentage that is of the state

3   center residents?

4   A.  Well, there are 1150 state center residents.

5   Q.  Do the math now.  So about 1150?

6   A.  Right.

7   Q.  Are you familiar with the results of the assessments that

8   have been conducted thus far?

9   A.  Yes, I am.

10  Q.  Are those results discussed during the meetings that you

11  mentioned that take place with you and a whole host of other

12  people who participate in the assessments?

13  A.  Not really.  The questions have been -- the focus has been

14  more on the process of completing the assessments and how

15  they're going generally.

16  Q.  So how do you know or how are you familiar with the outcome

17  of the assessments that have been conducted?

18  A.  Well, when the community transition specialist completes

19  the assessment and records the results, we have -- the

20  Department has developed a means of keeping track of that

21  information.  It's a lot of information.  And we know that

22  there are reporting requirements that we're going to have to

23  comply with, so we have a method of keeping track of it.  So I

24  asked my information technology people to tell me.

25  Q.  Okay.  As you know, I believe having read the settlement

Exam. - Pamela Kuhno

1  agreement, the agreement requires that any disagreements about

2  whether or not the resident wants to move to the community, any

3  disagreements between the community transition specialist and

4  the facility advocate would be referred to the facility

5  director for resolution.  To your knowledge, have any

6  disagreements occurred?

7  A.  No.

8  Q.  Based on the approximately 840 assessments that have been

9  completed to date, I'm going to ask you a few questions.

10  A.  Okay.

11  Q.  How many residents who have been interviewed have no

12  guardian or involved family member, approximately?

13  A.  I would say approximately a little over a hundred.

14  Q.  Do you have any idea -- so a little over a hundred.

15  A.  Um-hum.

16  Q.  Over 1150 would give you the percentage?

17  A.  Correct, so about 10 percent.

18  Q.  And how many residents have no preference -- okay, hold on

19  a second.  I want to make sure that you understood the last

20  question that I asked.

21  A.  Okay.

22  Q.  How many people who have been interviewed have --

23  A.  Oh, who have been interviewed.

24  Q.  -- no guardian or involved family member?

25  A.  Okay.  So a little over a hundred out of 840, so that gives

Exam. - Pamela Kuhno

1  us -- please don't make my math skills look --

2  Q.  Hold on a second.  The little over a hundred, are those the

3  residents that have no family or guardian and have expressed no

4  preference?

5  A.  I believe so.

6  Q.  Okay.  So do you know how many of the residents who have

7  been interviewed have no family member or guardian and either

8  want to leave and move to the community or have said that they

9  do not want to leave?

10  A.  Okay.  So the number of people who have no family, no

11  guardian, and want to leave, that is about 12 or 13 people.  In

12  that same category for who don't want to leave, I believe

13  that's about 30 people.  Forgive me for not knowing the exact

14  numbers, but that's about 30 people who have no family, no

15  guardian, and don't want to leave.  So they're expressing their

16  own opinions, and that's how that has played out.

17  Q.  And the intent is that the state centers and the Department

18  will honor that preference?

19  A.  Absolutely.

20  Q.  How many of the residents who have been interviewed thus

21  far want to move but their guardians don't want them to move?

22  A.  I think that's around ten people.  It's a small number.

23  Q.  And how many want to move, don't have guardians but have

24  substitute decision-makers who don't want them to move, if you

25  know?

Exam. - Pamela Kuhno

1  A.  That one I'm not recalling exactly.

2  Q.  Do you know how many interviewed residents have no

3  preference and their guardians don't want them to move?

4  A.  One more time.  It's really hard to keep track of all of

5  these categories.  I want to make sure I answer the right

6  question.

7  Q.  The resident has been -- excuse me, the resident has no

8  preference, according to the survey, and the resident's

9  guardian does not want the resident to move.

10 A.  Oh, that is -- that's, I believe, at around a hundred and

11 some.

12 Q.  Okay.

13 A.  It's in the low 100s.

14 Q.  And do you know how many interviewed residents who are

15 registered as having no preference have substitute

16 decision-makers that don't want them to move?

17 A.  That's about 260.

18 Q.  So is that category, the last category, the largest

19 category?

20 A.  Oh, yes.  Absolutely, yes.

21 Q.  I want to move to the development of the planning list

22 itself.

23 A.  Okay.

24 Q.  Will each state center have its own planning list, or will

25 there be one centralized planning list for all the state

Exam. - Pamela Kuhno

1  centers?

2  A.  One centralized planning list.

3  Q.  Has the planning list been established?  In other words,

4  have people been placed, for lack of a better way of saying it,

5  on the planning list?

6  A.  Really, at this point it's only people who are named

7  plaintiffs or who have extreme -- who have affirmatively stated

8  that they want to move to the community.

9  Q.  Will a resident be placed on the planning list as the

10  planning list is established without that person's guardian or

11  substitute or involved family member being notified that the

12  person is going on the planning list?

13  A.  No.

14  Q.  What happens if the resident says that they don't want

15  their family member to know?  Does that ever happen?

16  A.  That does happen.

17  Q.  And how does that happen?

18  A.  Well, there are people who have very close relationships

19  with their families and don't want to hurt anybody's feelings

20  or to have disagreements like the rest of us do with our own

21  families about things that they may or may not disapprove of in

22  our lives.  And so the person may want to move to the community

23  and may ask that their team keep that information private.

24  It's a really difficult circumstance.

25          And what teams try to do is to help support the person

Exam. - Pamela Kuhno

1    to understand that the best way of moving forward in their

2    lives to get -- to achieve what, you know, they want or at

3    least to take that really -- that big piece of tension out of

4    their lives is helping them to communicate with their family,

5    helping them to be able to get to a point where they can sit

6    down with their family and talk with them about what they want

7    openly.  And we wouldn't put the person on the planning list

8    without that conversation happening.

9    Q.  Separate and apart from the planning list and the

10   settlement agreement, has that type of circumstance arisen in

11   the past, that is to say where a resident has said, I really

12   would rather that my family member not know that this is what I

13   want?

14   A.  It happens rarely, but it has happened.

15   Q.  And has that effort to get the resident to talk to the

16   family member been successful in those situations?

17   A.  Yes.

18   Q.  How will the decision be made, as you establish the

19   planning list, about the order in which residents who are on

20   the list will move to the community?

21   A.  We have not determined those criteria yet.  The only thing

22   that is clear right at this moment is that people, individuals

23   who are affirmatively stating that they want to move to the

24   community will be placed on the planning list.

25   Q.  And how come the criteria -- first of all, will criteria be

Exam. - Pamela Kuhno

1   established?

2   A.   Yes.

3   Q.   And how come they haven't been established yet?

4   A.   Well, because we need to look at the results of the

5   completed assessments, which should be completed by the end of

6   September.

7   Q.   And what types of considerations are you going to take into

8   account in establishing a criteria?

9   A.   Well, the needs of the people who are on the planning list,

10  geography, where they want to go to live.  Typically as you

11  move forward you try to help people identify housemates that

12  they might like to live with in the future, and it really helps

13  to look at a full planning list of people who want to move to

14  the community before establishing the criteria around how to

15  move forward.

16  Q.   Why does geography matter?

17  A.   Well, geography matters because there are five state

18  centers all across the state but throughout the state, and

19  there are -- you know, there are 67 counties across the state

20  who serve those people.  We want to make sure to serve people

21  in an effective and efficient way and not take too many people

22  from one center or from one regional area but to spread it out

23  more.

24  Q.   Let's say that in the first year you're aware that the

25  settlement agreement calls for 50 people to be moved into the

Exam. - Pamela Kuhno

1  community.  So let's say that all 50 people wanted to move to

2  Venango County.  Would that be a problem?

3  A.  It could be, yes.

4  Q.  And why is that?

5  A.  It could be a problem because that concentrated effort of

6  planning to move that number of people into a small county like

7  Venango County would make it very challenging.

8  Q.  So one of the things that you take into consideration is

9  the capacity in the county?

10  A.  Yes.

11  Q.  Both existing capacity and capacity to develop new

12  programs?

13  A.  Correct.

14  Q.  Does the complexity of a person, a resident's

15  needs -- strike that.  Will the complexity of a resident's

16  needs factor into how quickly that resident can move to the

17  community?

18  A.  Yes, it does.

19  Q.  And why is that?

20  A.  Well, because the more complex the person's needs are, the

21  more services and supports that have to be coordinated and put

22  into place before the person is able to move.  So that

23  typically takes a longer planning period.

24  Q.  Will it matter whether a person's needs can be met by an

25  existing vacancy in the community or a new program has to be

Exam. - Pamela Kuhno

1    developed for that person?

2    A.  Yes, that absolutely will factor in.

3    Q.  And why is that?

4    A.  Well, if the person is moving into an existing vacancy, the

5    home is open, it's licensed, it's staffed.  All of the

6    components of a community home are there.  For a person who

7    would be moving into a new location, all of those pieces have

8    to be arranged.

9    Q.  What happens after everyone is put on the planning list and

10   the priority is established and decisions have been made about

11   who is going to move in the first year?  What happens next?

12   A.  What happens next is that that information -- there will be

13   lists.  And the other important partner who has been involved

14   in the development of everything has been -- there are

15   community transition leads in the ODP regional offices.

16         There are four ODP regional offices in the four

17   quadrants of the state, and those staff have been involved

18   across the board with all of the planning.  They're not

19   directly involved with the assessments, but they have been

20   involved in the planning around moving forward and towards

21   transitioning people into the community.

22         So what will happen is, lists will be developed broken

23   down by region and by county, and the community transition

24   specialist in the state center will communicate with the

25   regional office transition lead.  They will share those lists,

Exam. - Pamela Kuhno

1   and then the regional office will make contact with the

2   counties where people have been identified for transition.

3           Once the county has been notified, planning meetings

4   will start to be scheduled so that the person's team from the

5   state center, which I talked about before, will meet with the

6   county supports coordinator who is responsible for coordinating

7   all of the services and arranging all of those services for the

8   person.

9           That supports coordinator will come to the center,

10  meet the person, talk with their team, learn about the person,

11  and schedule planning meetings so that their needs for services

12  in the community can start to be identified.

13  Q.  Understanding that it's a very individualized process, is

14  there an average length of time between the time that someone

15  is identified as wanting to go into the community, being on the

16  planning list, the planning starts, and the move to the

17  community?

18  A.  Yeah, it's a little less than a year.  It's probably around

19  nine months.

20  Q.  So what happens if at any point during that time either the

21  resident or a guardian or involved family member who originally

22  said "I want to go to the community" changes their minds?

23  A.  Well, the first thing that would happen is that we would

24  want to sit down with people and talk about why, because it's

25  important to understand that.  But if the person or their

Exam. - Pamela Kuhno

1    involved family or guardian do not want the transition to move

2    forward, the name would be -- their name would be removed from

3    the planning list and we would honor their request.

4    Q.  Would that happen right away, or would that happen at the

5    annual reassessment that the settlement requires?

6    A.  It would happen right away.

7    Q.  And speaking of the annual reassessment, you had previously

8    mentioned that all state residents have an ISP?

9    A.  Yes.

10   Q.  Again, what's an ISP?

11   A.  An individual service plan.

12   Q.  And how often is the ISP reviewed?

13   A.  Annually.

14   Q.  Does the entire team review the ISP?

15   A.  Yes.

16   Q.  And during the ISP review that happens annually -- the team

17   includes the family or guardian, as well as the resident?

18   A.  Yes.

19   Q.  Does the ISP review or does the team address during the ISP

20   review whether or not the family or the resident wants to move

21   to the community?

22   A.  Yes, that's part of the ISP.

23   Q.  So the annual assessment process that's called for in the

24   settlement agreement will be in addition to the assessment that

25   takes place in the ISP review team meeting?

Exam. - Pamela Kuhno

1    A.  Moving forward, after this initial round of assessments is

2    completed, this community assessment process, interest

3    assessment process, will become part of the ISP, the annual

4    ISP.  So it will all be done at the same time.

5    Q.  Okay.  So family members, guardians, residents aren't being

6    asked to make any decisions or do anything different from what

7    they've been doing -- or more frequently or less frequently

8    than they have been doing until now?

9    A.  Correct.

10   Q.  Switching gears again, generally speaking, what do state

11   centers do about a guardian's wishes about living in the

12   community or about anything else, for that matter, after a

13   guardian passes away?

14   A.  After the guardian passes away, we've been advised in the

15   past, over the years, by DPW counsel that the wishes of the

16   deceased guardian can no longer be honored.

17   Q.  So has that actually happened in the past that you're aware

18   of?

19   A.  That I'm aware of?  Not that I've personally been involved

20   with, but I'm sure that it has.

21   Q.  Do you know, based on your position, what the state

22   centers' response has been if somebody has expressed concern

23   about that?

24   A.  Well, and quite frequently families talk with, very

25   regularly with social workers, facility directors, other -- I

Exam. - Pamela Kuhno

1   mean, they have regular ongoing dialogue with staff in the

2   state centers.

3          Typically the response would be for -- if they had a

4   concern about what would happen moving forward in the future,

5   after they pass away, is to talk with their lawyers, their

6   representatives who helped them to arrange their -- the

7   guardianship that's in place currently to ask for advice.

8   Q.  You had mentioned that you're aware that the settlement

9   agreement requires that 50 people on the planning list move to

10  the community this fiscal year.

11  A.  Um-hum.

12  Q.  Did ODP, Office of Developmental Programs, get the funding

13  for those 50 people this year?

14  A.  Yes.

15  Q.  And was the budget for the state centers reduced to

16  accommodate the funding for those 50 people to move into the

17  community?

18  A.  No.

19  Q.  What will happen if it turns out that there are not 50

20  people on the planning list as a result of the interviews?

21  A.  We would place the people on the planning list and only the

22  people on the planning list.

23  Q.  So whether it's this year or subsequent years, each of

24  which has a specified number of people who are supposed to be

25  moving to the community, if that number isn't reached, will the

Exam. - Pamela Kuhno

1    Department look to get people on the planning list to meet that
2    quota?
3    A.   There's not a quota, per say.  There's just the
4    availability of funding for 50 people to move to the community,
5    so no.
6    Q.   And then, finally, just a few questions about the census
7    over the course of years.  Has the state centers' census
8    remained constant let's say over the last ten years?
9    A.   No.
10   Q.   What's happened to it?
11   A.   It's declined considerably.
12   Q.   And what do you mean by "considerably"?
13   A.   Over the last ten years, it has been -- it's declined by
14   more than half.
15   Q.   So as the census in the state centers has declined, what's
16   been the impact on the quality of care provided at the state
17   centers as a result of the census becoming smaller?
18   A.   The quality of care has increased.  It's improved.
19   Q.   In what way?
20   A.   Well, people are living in smaller environments.  Because
21   there are fewer people living in the state centers, they can
22   live in smaller, more individualized, personalized
23   environments.
24          Also, as -- it's kind of interesting, as the
25   population has decreased, the ratio of staff available to

Exam. - Pamela Kuhno

1   provide supports to people has increased.  And that most likely

2   is related to the fact that we staff based on individualized

3   needs.  And people's needs, as they've gotten older, have

4   increased.  So that -- so there's a richer staffing ratio.

5           We've also been engaged in, as the rest of the ODP

6   service system has been, in implementing a quality management

7   strategy that has really helped us to target and improve our

8   performance in a wide variety of areas.

9   Q.  So do you think that has anything to do with -- that last

10  thing that you mentioned, the quality management strategy, does

11  that have anything to do with the declining census?

12  A.  No.  It has to do with providing the best services that we

13  can to people.

14  Q.  So it's been your experience that this 50 percent decline

15  in the state centers hasn't affected -- well, hasn't reduced

16  the staffing ratios?

17  A.  Right.

18  Q.  And, in fact, has increased the staffing ratios?

19  A.  Correct.

20          MS. LEISCH:  I have no other questions.

21          THE COURT:  All right.  Thank you.  Mr. Meek.

22          MR. MEEK:  No questions for this witness, Your Honor.

23          THE COURT:  All right.  Thank you.  Mr. Hoffart.

24          MR. HOFFART:  Thank you.

25                          CROSS-EXAMINATION

Exam. - Pamela Kuhno

BY MR. HOFFART:

1

2  Q.  Ms. Kuhno, I'd like to just follow up on some of the

3  questions that Ms. Leisch was asking you, particularly with

4  respect to the assessment protocol that I believe you still

5  have in front of you.

6        My first question is, Ms. Leisch asked you several

7  questions about profoundly retarded residents.  Now, I believe

8  that's a medical term.  Correct?

9  A.  It's a diagnostic term.

10  Q.  Okay.  And can a profoundly retarded individual understand

11  the type of questions that you will be asking in this

12  assessment process?  Can they comprehend, for example,

13  decisions between institutional care and community care?

14  A.  It depends on the person.  It's individualized.  There are

15  some people and probably a large percentage of people who have

16  a diagnosis of a profound intellectual disability who most

17  likely do not understand those questions.  But there are

18  people, based on my experience in meeting and knowing people

19  who live in the state centers, who can communicate that and

20  understand that.

21  Q.  Do you have any idea of how many current state residents

22  are -- state center residents are classified as profoundly

23  retarded?

24  A.  It's a large percentage.  I believe it is somewhere between

25  75 and 80 percent.

Exam. - Pamela Kuhno

1    Q.  And of those people, do you have any sort of personal

2    estimate of how many of those people can and cannot understand?

3    A.  No, no, I don't.

4    Q.  And is it also your understanding or can you tell us how

5    many state center residents are currently without a guardian or

6    involved family member?

7    A.  You know what, I wouldn't want to guess at that question.

8    I have a pretty good idea, but I don't want to give an

9    incorrect figure.  So it's -- I'm not sure.

10   Q.  Is it the majority of state center residents?

11   A.  Yes, it is the majority, yes.

12   Q.  Can you give an example of how a profoundly retarded

13   resident could communicate, affirmatively communicate that they

14   want to move to a community facility?

15   A.  They could utilize assistive technology, so that means they

16   could use a device that could help them to communicate that.

17   They could use gestures.  And, again, all of these types of

18   communication modalities would be documented in the person's

19   ISP.  They could use gestures, they could -- I believe I said

20   that they could use a picture system.  They could utilize sign

21   language.  They could utilize eye contact.  There's a wide

22   variety of communication modes for people.

23   Q.  And so will this variety of communication methods, will

24   that require some interpretation by the community transition

25   specialist and the facility advocate?

Exam. - Pamela Kuhno

1    A.  We're trying to take that interpretive decision-making out

2    of it by requiring that if we are communicating with a person

3    who is nonverbal, that that communication mode be documented in

4    their ISP.  They can also request assistance from speech

5    therapists and other staff who know the person very well.

6    Q.  And are profoundly retarded individuals able to use sign

7    language and communication devices and all the methods you just

8    described?

9    A.  Communication devices, certainly.  ASL, I'm not sure.  And

10   the other modalities, certainly, yes.

11   Q.  And just to clarify, the people that will be performing the

12   assessment, the CTS, the community transition specialist, and

13   the facility advocate -- I believe you said the CTS is a DPW

14   employee.  Is that correct?

15   A.  Correct, yes.

16   Q.  And who employs the facility advocate?

17   A.  The facility advocate is employed by DRN, the Disability

18   Rights Network.

19   Q.  And you gave several -- you're talking about the

20   assessments that have already been completed.

21   A.  Um-hum.

22   Q.  On the basis of those assessments, do you have any -- can

23   you tell us today how many state center residents have

24   affirmatively said that they want to move into the community?

25   A.  I believe, if I'm adding correctly, there are approximately

Exam. - Pamela Kuhno

1    28 or 30 people who have affirmatively said, I want to move to

2    the community.

3    Q.  Do you have a sense of how many people have said, no, they

4    do not want to move to the community?

5    A.  Yes.  And that's 39, 38 or 39.

6    Q.  38 or 39 residents have said no?

7    A.  Yeah.

8    Q.  And how many people expressed no preference?

9    A.  That is -- you know what, it's about a hundred, I believe.

10   Q.  I wanted to ask some questions specifically about the

11   protocol that you and your colleagues developed in response to

12   this litigation.  And specifically, I believe it's on Page 3,

13   it's the first page of the questionnaire, there are several

14   questions at the bottom of that page in Part 1.  Who will these

15   questions be asked of?

16   A.  Well, the first portion is the individual who lives at the

17   state center.

18   Q.  Okay.

19   A.  So that's the person's position, awareness, interest in

20   community living.  So on the first page, that's the person.

21   Q.  And under Section 1A, there's two -- on Page 3, there are

22   two boxes or two rows to the chart that is underneath that.

23   The second of those, can you explain, what is the purpose of

24   the question, Do you want to live closer to your family?

25   A.  To get a sense of where the person wants to live.

Exam. - Pamela Kuhno

1   Q.  Will you ask this question of residents who no longer have

2   family members?

3   A.  I don't believe so.

4   Q.  When asking this question, will it be explained to the

5   individual that this does not mean that they will be living at

6   home with their family member?

7   A.  If the person was to ask that question, it could be.  But

8   that's not what's on -- that's not part of the form.

9   Q.  So you'll ask the question as is on the form?

10  A.  Yeah.

11  Q.  Without further clarification?

12  A.  If the person requires further clarification, if they ask

13  the question, certainly the community transition specialist

14  would respond to them and clarify for them.

15  Q.  And before asking this question, would either DPW or the

16  DRN representative confirm that there actually is a community

17  facility capable of meeting the resident's needs that is, in

18  fact, closer to their family?

19  A.  Well, part of the planning process would be if the person

20  wants to move to the community and they've indicated that they

21  would like to live closer to their family as part of that

22  decision, planning would occur with the outcome around the

23  person living closer to their family.

24          So it would -- the planning could include the person

25  moving to a vacancy that's available, so there would be an

Exam. - Pamela Kuhno

1   already existing community home that had a vacancy that was

2   close by to where their family lived, or a community living

3   arrangement would be developed that would be close by to the

4   person's family, if that's what was important to them and part

5   of the planning for them to move to the community.

6   Q.  I see.  I just want to make sure I understand.  So prior to

7   asking the question, there would actually be no assessment of

8   whether a community facility were available that, in fact, was

9   closer to the person's family?

10  A.  Well, it wouldn't be because the planning process is not

11  dependent upon there being a community home right there

12  already.  The planning process can include the development of a

13  community home that meets the person's needs.  And if being

14  close to their family is identified in that process as

15  something that's important -- and because that's such an

16  important thing to so many people, that's why that question is

17  there.  We want to know that for planning purposes.  So we

18  would plan for the person to move closer to their family, so

19  there doesn't have to be a facility already there.

20  Q.  I understand.  And because this is such an important thing

21  to so many people, is this question, in your opinion, in any

22  way included on this assessment form as a way of eliciting a

23  positive response?

24  A.  No.  It's included as information that is helpful to help

25  the person plan their life.

Exam. - Pamela Kuhno

1  Q.  Turning the page then off of Page -- I believe this is Page

2  3 to Page 4 and then the second -- there's a second part, Part

3  2, communication supported with the input of others.

4  A.  Um-hum.

5  Q.  Am I correct in understanding that this is the part of the

6  assessment that will involve when someone has their involved

7  family or their guardian present or participating in the

8  assessment?

9  A.  It can, if the family -- if the family wants to be

10  included, they will be.

11  Q.  Okay.  And so when it says -- you know, the questions

12  appear to be the same and everything.  And there's then --

13  below that there's a guardian, involved family, substitute

14  decision-maker's position, awareness, and then, again, very

15  similar questions down below.

16      Do you know in the assessments that have already been

17  completed, have family members asked what they should do?  When

18  these questions are asked of a family member, has anyone said,

19  what do you think I should do?

20  A.  I'm not aware of that specific question being asked.  None

21  of the community transition specialists have told me that.

22  Q.  How would you respond to that?  How would you respond to

23  that question?  If a family member came to you and asked, what

24  should I do, I'm being asked these questions about whether I

25  should put my loved one in community care, how would you

JA1389

Exam. - Pamela Kuhno

1  respond to that question?

2  A.  I would respond to them that they need to have more

3  information about the options that are available to them and

4  that I could help them to do that.

5  Q.  And is that the training portion?  I see then we continue,

6  once we go off the form, to the very back of this, there's a

7  community living planning work plan.

8  A.  Right.

9  Q.  Is that part of giving family members and residents more

10  information about the process?

11  A.  Right, and keeping track of it so that we can be

12  accountable, yeah.

13  Q.  As part of this process, will you explain or will somebody

14  explain to residents, guardians, family members, the potential

15  dangers that are associated with community care living

16  arrangements?

17  A.  What we would do is to provide information about the

18  services that are available.  We'd also provide information

19  about the incident management and risk management system that

20  exists, both in the state centers and in the community, so

21  that -- and about licensing and the quality indicators that are

22  available for them to look at in assessing whether they want to

23  move to the community.

24        There are a wide variety of different processes that

25  are in place in the community to assess the quality of programs

Exam. - Pamela Kuhno

1    there, and that's -- that's the information that we would

2    provide and help people to get that information so that they

3    could make a decision.

4    Q.  Are you familiar with -- I believe it was the Western

5    Center?

6    A.  Yes.

7    Q.  The closure of the Western Center.  Do you recall what

8    happened to the individuals who resided in the Western Center

9    when it was closed?

10   A.  There were well over 300 people who were placed in the

11   community out of Western Center, and the majority of people who

12   moved to the community from Western Center moved into very

13   positive, good services.  And there were people who did not

14   have positive outcomes, for sure.

15   Q.  And will the experiences of the Western Center residents

16   who were moved into the community, both positive and negative,

17   will those be made available?

18   A.  If people were to ask for it, absolutely.

19   Q.  So anywhere, at any time in this assessment process will

20   negative aspects of community care be volunteered to families,

21   guardians, residents?

22   A.  I think it's important to provide all of the information as

23   it's requested.  It's interesting, there are good things that

24   happen in every service system, and unfortunately -- and we

25   work every day to our utmost extent to try to prevent bad

Exam. - Pamela Kuhno

1   things from happening.  Unfortunately, bad things happen in

2   every service setting in the community and in state centers and

3   in privatized CF/MRs.

4         And it's heartbreaking to people who support people

5   with intellectual disabilities when those bad things happen.

6   And that's why we have an incident management and a risk

7   management system in place, so that we can become aware of when

8   those things happen, learn from them, and put measures in place

9   to try to prevent them from ever happening again.

10        So that's why I think it's really important to provide

11  information about that, but I think that you have to look at

12  both the good and the bad, and that happens across the board in

13  all service settings.

14  Q.  Have people conducted any assessments with family members,

15  with residents, with guardians explaining to them that this is

16  still, in some sense, a learning process, what you just

17  described, that people continue to learn, that there will be

18  pluses, there will be minuses?  Has that been explained, that

19  this is still an ongoing process that people are learning from?

20  A.  Well, I'm not sure that they would explain it that way,

21  because what we're doing in supporting people in any system,

22  community or state centers, we're learning all the time and

23  we're continually making improvements.

24        That quality management strategy that I referred to

25  earlier, that's the way that the Office of Developmental

Exam. - Pamela Kuhno

1    Programs learns from our experiences, both in the state centers

2    and in the community.  We're providing human services, and so

3    we always have to continue to learn so that we're responding to

4    people's individualized needs.

5              So I'm not sure that the community transition

6    specialists would say to a family, this is a learning process,

7    because this is the business that they're in, this is what they

8    do on a day-to-day basis.  They're part of that quality

9    management strategy.  They're part of those meetings where they

10   sit down and look at, from an ISP to a risk management meeting

11   to whatever, they sit down and they look at what's happened for

12   this person in the past year, how can we make their life

13   better.  And that happens across the board in all of the ODP

14   service systems.

15   Q.  And the information that's being provided to families, is

16   it just about community placement and community care

17   facilities, or are you -- or is the assessment process supposed

18   to educate people about all services and all care options,

19   including state center care?

20   A.  Well, we haven't moved forward yet, we're just pulling

21   together the group that's going to be recommending the

22   curriculum to ODP as part of that steering committee that's

23   outlined in the settlement agreement.  So that's not set in

24   stone yet.  But we certainly would respond to anybody's

25   questions about any services that are available in the ODP

Exam. - Pamela Kuhno

1    system.

2        And if families have questions about the services in

3    the state centers that they need to learn more about,

4    absolutely.  And there's actually -- we -- the Colasanti

5    consortium just released -- and the Colasanti consortium is an

6    independent group, it's not part of ODP, it's not part of DPW,

7    but we're helping them to distribute information, training and

8    education materials for families.  That's the purpose of the

9    Colasanti trust.  But that includes information about a wide

10   variety of topics.

11   Q.  Am I correct in understanding that the family resident or

12   guardian would need to ask for that information, it's not being

13   volunteered to them?  Is that correct?

14   A.  I think that we're being responsive to everybody's requests

15   about any information.  So -- and, actually, we're asking

16   families -- a mailing just went out for the Colasanti

17   consortium information, and we're asking people, would you like

18   this, and that includes information about the state centers and

19   also about the community system and also about benefits, the

20   whole nine yards.

21   Q.  And before you testified that the decrease in population of

22   state centers has improved the quality of care in the state

23   centers.  Are you telling people that?

24   A.  I think it's apparent to everybody that the quality of care

25   has improved in state centers.  We have a quality council that

Exam. - Pamela Kuhno

1    meets regularly.  There are families and people who live in the
2    state centers who are part of that quality council, and they
3    know, they get a chance to look at the data, so I hope
4    that they're -- and we publish those reports.  They're
5    available to people if they want to look at them.  Each state
6    center also has a quality council.  That information is being
7    shared there.  So we're communicating that information outside
8    of the context of the litigation.
9    Q.  Let's take an example of, perhaps, a guardian or a family
10   member who lives out of state and may not, just by distance, by
11   reason of distance, may not be able to visit the state center
12   on a regular basis.  When they have this assessment process
13   conducted, if they participate, will the improved quality of
14   state center care be volunteered to them?
15   A.  The quality of care in any setting really isn't part of the
16   assessment process.  The community transition specialists are
17   asking the questions that are on the form, and that's what
18   they're utilizing.  If somebody were to ask a question about
19   quality of care anywhere, they would try to answer the question
20   to the best of their ability, but the assessment process is
21   specific to the questions that are contained on this form.  So,
22   no, I don't think so, because it's not been part of -- outlined
23   as part of the process.
24   Q.  I see.  So am I correct in understanding that
25   the assessment -- it's not part of the assessment team's job to

Exam. - Pamela Kuhno

```
1    make sure that there's a full and fair weighing of the various
2    options, that it's simply their job to ask the questions on the
3    form and get responses?  They're not volunteering anything
4    about the care options, they're simply asking and receiving
5    responses?
6              MS. LEISCH:  Objection.
7              THE WITNESS:  Correct.
8              THE COURT:  Hang on.  Do you have an objection?
9              MS. LEISCH:  I do have an objection, Your Honor.  It's
10   argumentative.
11             THE COURT:  I'm going to give some latitude to
12   Mr. Hoffart.  Mr. Hoffart, I would try to avoid what I would
13   characterize as excessively argumentative questions just for
14   the record.  I get your point, and I'm going to give you as
15   much latitude as I can.  So you may continue.  I think the
16   question was answered.  We'll take it subject to the objection
17   and overrule the objection specifically, but you may continue.
18             MR. HOFFART:  Thank you, Your Honor.  I understand.
19   Thanks.
20             THE COURT:  Any other questions?
21             MR. HOFFART:  Just one last question.
22   BY MR. HOFFART:
23   Q.  You've said that quality in care increases as the
24   population decreases because of the things -- the ratios of
25   staff to residents improves, so on and so forth.
```

Exam. - Pamela Kuhno

1    A.   Um-hum.

2    Q.   But you've also closed state centers over the past ten

3    years as the populations of those centers have decreased.  Is

4    that correct?

5    A.   Yes.

6    Q.   And do you plan, in the terms that this settlement plan

7    envisions, in the next five years or the next -- let's say the

8    next ten years, does DPW plan to close any state centers?

9    A.   I can't answer for ten years from now.  I can only tell you

10   about right now, and, no, there are no plans to close a state

11   center.

12           MR. HOFFART:  Nothing further, Your Honor.

13           MS. LEISCH:  Your Honor, I have a couple on redirect,

14   please.

15           THE COURT:  Go ahead.

16                     REDIRECT EXAMINATION

17   BY MS. LEISCH:

18   Q.   Referring back to Exhibit 1, can you please look again at

19   Section 1 and Section 2 of the questionnaire that starts on

20   Page 3 --

21   A.   Um-hum.

22   Q.   -- and explain what the difference is between those two

23   sections?

24   A.   Oh, sure.  For Section 1, that is utilized for people who

25   are verbal.  You and I talked about that in my testimony

Exam. - Pamela Kuhno

1    earlier, so that would be completed with people who are able to

2    verbally express or independent with use of assistive

3    technology.  And two would be for people that use other modes

4    of communication.

5    Q.   Okay.  So you had testified during cross-examination that

6    Section 2 was used for those residents who were interviewed

7    with their family members.  Is that correct?

8    A.   It could happen.  Section 2 could be completed with family

9    members.  Both sections could be completed with family members.

10   But it's not part of the protocol that it has to be completed

11   with their family member.

12   Q.   So Section 1 and Section 2 speaks to -- or speak to the

13   ability of the resident to communicate?

14   A.   Correct.

15   Q.   I believe at the beginning of your testimony you testified

16   that the majority of state residents do not have guardians or

17   involved family members.

18   A.   Correct.

19   Q.   That's right, they do not have?

20   A.   Do not.  The majority do not have guardians.

21   Q.   Or involved family members?

22   A.   Oh, not family -- guardians.  Involved family members, the

23   majority of state center residents do have involved family

24   members.

25          MS. LEISCH:  I have nothing else.

```
 1            THE COURT:  All right.  You have no questions.   Is
 2     that correct?
 3            MR. MEEK:  No questions, Your Honor.
 4            THE COURT:  All right.  Thank you.  You may step down.
 5     How many other witnesses do we have that you intend to present?
 6     How about from the defense side?
 7            MS. LEISCH:  I have one other witness, Your Honor.
 8            THE COURT:  All right.  And you have?
 9            MR. MEEK:  Just one, Your Honor.  And a great deal of
10     her testimony would be redundant to what's already been
11     testified, so I would skip through those parts.
12            THE COURT:  Yes, I think we want to avoid repetitive
13     testimony.
14            MR. MEEK:  I will do my utmost, Your Honor.
15            THE COURT:  All right.  Let's take, Liz, a brief break
16     here, about ten minutes, just to give Lori a break, and we'll
17     come back and we'll take the next witness for the defense, and
18     then we'll take your witness.  All right?
19            MR. MEEK:  Very well.  Thank you, Your Honor.
20            THE COURT:  All rise.
21       (Recess taken.)
22            THE COURT:  All right.  We'll take your next witness.
23            MS. LEISCH:  Your Honor, for the purpose of
24     continuity, the witness that the plaintiffs are planning to
25     call is also somebody who has participated in the planning
```

```
 1   process at the center.  Our next witness is going to be talking
 2   about the planning process for the move into the community.  So
 3   it's up to Your Honor if you would rather have the continuity
 4   of what's happening in the center and then talk about --
 5             THE COURT:  Are you suggesting that it's better to do
 6   it that way?
 7             MS. LEISCH:  That's what we had thought initially,
 8   yes.
 9             MR. MEEK:  Yes, Your Honor, just for purposes of sort
10   of making sense.
11             THE COURT:  That's fine.  If you want to do it that
12   way, that's fine.
13             MR. MEEK:  And I'll be brief, Your Honor, because a
14   lot of territory has been covered.
15             THE COURT:  It would seem, yes, that was very
16   comprehensive testimony, but we'll take your witness.
17             MR. MEEK:  We'll call Coleen Sassaman.
18      COLEEN SASSAMAN, called as a witness, having been duly
19   sworn or affirmed, testified as follows:
20             COURTROOM DEPUTY:  Please state your name and spell
21   your name for the record.
22             THE WITNESS:  My name is Coleen Sassaman.  It's
23   C-o-l-e-e-n S-a-s-s-a-m-a-n.
24                       DIRECT EXAMINATION
25   BY MR. MEEK:
```

Exam. - Coleen Sassaman

1   Q.  Good morning, Ms. Sassaman.  Who do you work for?

2   A.  I work for the Disability Rights Network.

3   Q.  And what's your current position?

4   A.  I hold a dual role.  I'm currently the facility advocate

5   for Selinsgrove Center.  I also hold the role of the facility

6   advocacy team leader.

7   Q.  And how long have you had the -- both of those roles?

8   A.  I've been the facility advocate of Selinsgrove Center since

9   March of 1999.  I've been the team leader since spring of 2005.

10  Q.  Could you briefly describe your responsibilities as a

11  facility advocate?

12  A.  My responsibilities as a facility advocate is to make sure

13  that the advocacy needs of everybody who lives at Selinsgrove

14  Center is met.  That includes ensuring that they know their

15  rights, ensuring that their rights are not unduly modified

16  without appropriate interventions and training plans.  I make

17  sure that people are receiving appropriate supports and

18  services according to what they need.  I'm very active in the

19  leadership and self-advocacy groups at the center.

20  Q.  Based on your experience, do you know residents at the

21  state center?

22  A.  Yes, I do.

23  Q.  How do you know them?

24  A.  Because I've been there for 12 years now.

25  Q.  Do you have interaction with state center residents

Exam. - Coleen Sassaman

1   regularly?

2   A.   Yes, I do.

3   Q.   How regularly?

4   A.   On a daily basis.

5   Q.   How many other facility advocates are there in the system?

6   A.   There is one at Polk.  We right now have two at Ebensburg

7   because one is in the process of retiring and we're

8   transitioning a new advocate in.  We have one at White Haven

9   and one at Hamburg Center.

10  Q.   Do all the facility advocates have the same

11  responsibilities as you in your role as facility advocate, not

12  as team leader?

13  A.   Yes, they do.

14  Q.   What's your role as a team leader, briefly?

15  A.   My role as a team leader is to ensure that the team has

16  consistent direction, that we meet the contractual

17  responsibilities as per the facility advocacy contract, and to

18  provide direction and guidance on advocacy issues.

19  Q.   The contract you're referencing, with whom is that

20  contract?

21  A.   The contract is with -- I think it's DGS, but it's a

22  contract to provide advocacy services in the state centers.

23  ODP, I guess, holds that contract.

24  Q.   Okay.  Are you familiar with the settlement agreement in

25  the Benjamin litigation?

Exam. - Coleen Sassaman

1   A.   Yes, I am.

2   Q.   And are you aware of the assessment process that's called

3   for in the settlement agreement?

4   A.   Yes, I am.

5   Q.   Are you involved with the assessment process?

6   A.   Yes, I am.

7   Q.   Can you tell me your involvement, what your role is in the

8   assessment process?  First of all -- I'm sorry, strike that.

9   You heard testimony from Ms. Kuhno earlier today?

10  A.   Um-hum.

11  Q.   Does Ms. Kuhno's testimony accurately set out how the

12  assessment process works, in your view?

13  A.   Yes, it does.

14  Q.   What's your role as a facility advocate in the assessment

15  process?

16  A.   My role is basically a passive observer and to make sure

17  that the process is occurring as laid out in the protocol.

18  Q.   Now, you participated in interviews with both residents of

19  the state center, as well as guardians and involved family

20  members.  Is that correct?

21  A.   Yes, I have.

22  Q.   And how many of those interviews have you done in both

23  categories, approximately?

24  A.   At Selinsgrove we are done with everybody who resides

25  there, which is, I think, 308 people.  And we have -- I would

Exam. - Coleen Sassaman

1    say we are between a half and three-quarters of the way

2    completed with the family interviews.

3    Q.  Do you use, in the interview process, any kind of form?

4    A.  Yes, we do.

5    Q.  And are you familiar with -- I'm going to show you what's

6    been marked as Exhibit 1.

7           MR. MEEK:  Your Honor, may I approach the witness?

8           THE COURT:  You may.

9    BY MR. MEEK:

10   Q.  I'm going to show you what's been marked Exhibit 1 for the

11   record.  Ms. Sassaman, are you familiar with that document

12   marked Exhibit 1?

13   A.  Yes, I am.

14   Q.  And what is it?

15   A.  It is the tool that we use when we meet with the

16   individuals who live at the state centers and the tool we use

17   when we call their family members.

18   Q.  And are you referring to, when you say "the tool," the

19   document that begins on the third page of that exhibit?

20   A.  Yes, the document that says, State Center ICF/MR Community

21   Planning List Assessment.

22   Q.  And who conducts the interview of the family member,

23   guardian, or resident?

24   A.  The community training -- transition specialist.

25   Q.  And do you offer any information to the family members or

Exam. - Coleen Sassaman

1  guardians if they ask questions?

2  A.  Very, very rarely.  Every great now and then I have

3  clarified something that a community transition specialist has

4  not known or has just looked to me to clarify.

5  Q.  Can you give me a very short example of that?

6  A.  We had one family member that was very clearly under the

7  impression that the Benjamin litigation was a closure of all

8  state centers, and I explained to them that it absolutely was

9  not.

10 Q.  Have any of the family members or guardians you interviewed

11 expressed opposition or -- opposition to discharge or concerns

12 about discharge?

13 A.  Yes, they have.

14 Q.  And what happens when the person, a guardian or a family

15 member, expresses concerns or opposition about discharge of

16 their family member?

17 A.  Cheri basically documents that.

18 Q.  Who is Cheri?

19 A.  Cheri is a community transition specialist at Selinsgrove

20 Center.  She basically --

21 Q.  What's her full name?  I'm sorry.

22 A.  Cheri Rozinski.

23 Q.  Okay.

24 A.  She basically documents that.  She tries to document it

25 word for word on the form, and we go on to the next question.

Exam. - Coleen Sassaman

1    Q.   Okay.  When a family member or guardian states they're

2    opposed to discharge, do you offer any opinions about that

3    decision?

4    A.   No, we do not.

5    Q.   Does the community transition specialist ever offer an

6    opinion about that?

7    A.   No, she does not.

8    Q.   Do you or the community transition specialists ever correct

9    what you understand to be misimpressions regarding discharge to

10   community services, like the one example you gave?  Have there

11   been other instances where people misstate what they believe is

12   the facts but you know that are not true?

13   A.   Yes, there have been.

14   Q.   And what do you do when that happens?

15   A.   Cheri, as far as I'm aware, I know, because I'm signing off

16   on the form, Cheri documents what they say and we go on to the

17   next question.

18   Q.   So you do not make any attempt to correct that

19   misimpression?

20   A.   No.

21   Q.   After you've completed a phone call with the family or

22   guardian or have a personal interview with the family or

23   guardian, what happens?

24   A.   If we have already interviewed the individual, we review

25   the form together.  There has been no instance where we did not

Exam. - Coleen Sassaman

1   agree on what was on the form, and we both sign off on the

2   form.

3   Q.  With regard to the interviews of the residents, is it

4   generally true that they're conducted in person?  Is that

5   correct?

6   A.  Yes, we conduct them in person.

7   Q.  And, again, the form that's been introduced as Exhibit 1 is

8   the form you use for that interview, as well.  Is that correct?

9   A.  Yes.

10  Q.  Again, do you offer information to the resident during the

11  interview process?

12  A.  No.

13  Q.  If they ask questions, do you attempt to answer them?

14  A.  Sometimes they'll say, what's this about, and we have to

15  answer that a couple times.  And sometimes they get confused

16  as -- at Selinsgrove Center, the center itself is structured

17  with a community system.  We don't call it wards, we call it

18  communities.

19       So sometimes, even though we explain to them we're not

20  talking about -- when we say, do you want to move into the

21  community, we're not talking about another community at

22  Selinsgrove Center, we're talking about the community, for

23  example, where Boscov's is, where the mall is, where they take

24  vacations, you know, the community outside of Selinsgrove.  So

25  we would clarify that.

Exam. - Coleen Sassaman

1  Q.  You heard Ms. Kuhno testify that at times, with certain

2  residents, other persons are brought in during the interview.

3  Is that correct?

4  A.  Yes, it is.

5  Q.  And why and when would someone else be present in such an

6  interview?

7  A.  If the person was not verbal, if the person did not use

8  assistive technology or a picture board and if the person was

9  communicating via head movements or very specific sign language

10  that they themselves have developed and familiar staff have

11  learned to read.

12  Q.  Okay.  And what does the familiar staff person do during

13  the interview?

14  A.  They help us ask the questions and interpret what the

15  person is trying to communicate to us.

16  Q.  And after completion of the interview with the resident,

17  what occurs?

18  A.  If we're done with the form, we discuss it and sign off.

19  If we're not done with the form, we put it in the pile to call

20  the family next.

21  Q.  Have there been any instances where you and the community

22  transition specialist have disagreed regarding the position of

23  a resident as to community services?

24  A.  No, there has not been.

25  Q.  Just want to ask you a slightly broader question.  In your

Exam. - Coleen Sassaman

1    position as supervisor of the other facility advocates, have

2    you had an opportunity to learn what their experiences have

3    been during the assessment process?

4    A.  We discuss the assessment process during our biweekly team

5    meetings, so we do discuss it.

6    Q.  And are you aware as to whether they have had similar

7    experience to your experience in the process?

8    A.  Yes.

9    Q.  Okay.  And do they utilize the same forms as you are using?

10   A.  Yes, they do.

11   Q.  Other than your role in the assessment process as you've

12   described it, do you have any authority to decide whether a

13   state ICF resident should be placed on the planning list for

14   discharge?

15   A.  No, I do not.

16   Q.  Have you in any way attempted to influence the preference

17   of either a substitute decision-maker or guardian or resident

18   during the assessment process?

19   A.  No, I have not.

20   Q.  If a family member asks you, a family member or guardian

21   asks you, what should I do, what should I -- how should I

22   respond to that question, what is your response to that

23   question?

24   A.  I would say that they need to answer how they truly feel,

25   but I would also challenge them to try to find more information

Exam. - Coleen Sassaman

1   so that they are making an informed decision.

2          MR. MEEK:  Thank you.  No further questions, Your

3   Honor.

4          THE COURT:  All right.  Thank you, Mr. Meek.  Any

5   questions?

6          MS. LEISCH:  No, Your Honor.

7          THE COURT:  Mr. Hoffart, any questions?

8          MR. HOFFART:  Yes.

9                   CROSS-EXAMINATION

10  BY MR. HOFFART:

11  Q.  Ms. Sassaman, I believe you said that your -- correct me if

12  I'm wrong, but I believe you characterized your role as sort of

13  a passive observer, you're there to make sure that the process

14  is done according to protocol.  Is that correct?

15  A.  Absolutely.

16  Q.  But at the same time doesn't the protocol give you the

17  ability to agree or disagree with what's going on in the room?

18  A.  Protocol gives us the ability to say that the process was

19  not followed as per the protocol.  It does not give us the

20  ability to second-guess the information that's being presented

21  or documented on the form.

22          I mean, I think, obviously, if a community transition

23  specialist would document absolutely something different than

24  what was said, I would expect the facility advocates at all the

25  centers to question that because we want accurate information

Exam. - Coleen Sassaman

1    on the forms.

2    Q.  I don't know if you have this in front of you, but are you

3    familiar with the proposed settlement in this litigation?

4    A.  Yes, I am.

5    Q.  Now, I realize that you don't have this in front of you,

6    but there's a -- on Page 6 of the document -- and just for the

7    record, I'm looking at ECF Number 105-2.  I believe it was the

8    Exhibit 2 to Mr. Meek's motion for approval of the settlement.

9             On Page 6 of that under Paragraph paren. 2, letter C,

10    there's a large paragraph describing -- and I can just read

11    portions of it:  If there is a disagreement among the social

12    worker, community transition specialist, and the facility

13    advocate as to whether an ICF/MR resident should be placed on

14    the state ICF/MR planning list, the social worker, community

15    transition specialist, or facility advocate will notify the

16    facility director who will make the determination in

17    conjunction with the standards of this agreement based on a

18    review of any relevant documents and interviews with the state

19    ICF/MR resident, the involved family or guardian, the social

20    worker, the community transition specialist, and the facility

21    advocate.

22            That was a lot I just read to you, but my real

23    question is, what type of disagreement does this envision, or

24    have you experienced a disagreement when conducting these

25    assessments?

Exam. - Coleen Sassaman

1   A.  We have not experienced any disagreements.  I would believe

2   that that would envision a situation where somebody maybe was

3   nonverbal and you would be reviewing their ISP to see what

4   their communication style was, and if there would be a

5   difference between the entities in interpreting that

6   communication style, I think at that point the facility

7   advocate would be throwing up the red flag saying, you know,

8   we're really not sure if we're accurately capturing what this

9   person is trying to communicate.

10  Q.  What is your understanding, who in the room -- or when the

11  assessment is being conducted, who is most familiar with the

12  resident's communication style, how they respond to questions,

13  their ability to respond to questions?  Is there one person

14  conducting the assessments more or less capable to do that than

15  someone else?

16  A.  I think it depends on the person.  I think the community

17  transition specialist at each center know the individuals very

18  well, so they know their communication styles.  For those that

19  they don't know extremely well, there is a direct care staff or

20  a familiar staff person, sometimes it's the residential

21  services supervisor, we've had RSWs, which is residential

22  service workers, or the direct care staff involved in those

23  interviews because they have had good relationships with the

24  people that we're interviewing and they can interact with them

25  and sometimes interpret their communication style better than

Exam. - Coleen Sassaman

1    the rest of us can.

2    Q.  You testified that you have sometimes offered clarifying

3    information when family members -- you gave the example of

4    somebody who misunderstood the purpose of the litigation, and

5    you said something in that, you said that when you're

6    clarifying what community care means, you said the word

7    "vacations."  Do you actually use the word "vacations" when

8    you're clarifying what community care involves?

9    A.  When we're talking to the individuals that live at

10   Selinsgrove Center, they're very aware of what the word

11   "vacations" means, because they take vacations, they go to the

12   beach, they go to the Poconos.  They are very aware of what

13   "vacations" mean.  So at Selinsgrove I would have no problem

14   talking about the concept of vacation to anybody who lives

15   there.

16   Q.  But when someone asks for clarification with respect to

17   community care, did you use the word "vacation"?

18   A.  I do not recall.  I was using that as an example.  We try

19   to describe to them the difference between communities at

20   Selinsgrove Center and life in the community at large.

21   Q.  And when clarifying what community care means, have you

22   ever described prior attempts by a state center resident to

23   live in community care?  Have you used examples of residents

24   who have transitioned in the community previously?

25   A.  I have not because basically what my mission is and what I

Exam. - Coleen Sassaman

1    believe the mission of the community transition specialists are

2    is to get the information and document it as what the

3    individual is saying.  There is minimal clarification.  It does

4    not happen often.

5    Q.  Do you believe that the protocol gives you the role to, if

6    asked, provide that information, or is it something that just

7    hasn't come up, it just hasn't happened so far in the

8    assessments you've already conducted?

9    A.  If during an assessment an individual or a family member

10   would direct a question specifically at me, I would answer it

11   to the best of my ability.

12   Q.  And do you talk -- when clarifying community care options

13   or what that means, do you talk in terms of more and less

14   restrictive environment?

15   A.  No, I do not.

16   Q.  And of the assessments you've already conducted, do you

17   know how many people affirmatively asked to be moved to

18   community care?

19   A.  I do not have that number off the top of my head.

20   Q.  Is it more than five?

21   A.  I believe so, yes.

22   Q.  More than ten?

23   A.  I believe so.

24   Q.  More than 15?

25   A.  I'm not comfortable -- at this point I just don't know.

Exam. - Coleen Sassaman

1   Q.  Do you know how many individuals have expressed no

2   opposition to being placed on the planning list?

3   A.  I do not know.

4   Q.  Have individuals expressed no opposition to being placed on

5   the planning list?

6   A.  Yes, they have.

7   Q.  And were those individuals placed on the planning list?

8   A.  We have not developed a planning list at this point.  We

9   are still doing the screen and working through the tool.

10   Q.  But is it your anticipation that the individuals who have

11   expressed no preference in terms of being moved to community

12   care will be placed on the planning list?

13   A.  If they express no preference and they have no families,

14   then they will -- it is my understanding they will go on the

15   planning list.  If they express no preference and their

16   substitute decision-maker or guardian is opposed, it is my

17   understanding that they will not be put on the planning list.

18         MR. HOFFART:  Nothing further, Your Honor.

19         THE COURT:  All right.  Thank you, Mr. Hoffart.  Any

20   additional questions, Mr. Meek?

21         MR. MEEK:  No questions, Your Honor.

22         THE COURT:  All right.  That concludes your testimony.

23   Thank you.  You may step down.  And that's your sole witness.

24   Is that correct?

25         MR. MEEK:  That is correct, Your Honor.

```
 1              THE COURT:  And you have one additional witness.  Is
 2      that correct?
 3              MS. LEISCH:  Yes, Your Honor.
 4              THE COURT:  All right.  You may call your witness.
 5              MS. LEISCH:  I would call Patricia McCool.
 6              THE COURT:  Very well.
 7         PATRICIA McCOOL, called as a witness, having been duly
 8      sworn or affirmed, testified as follows:
 9              COURTROOM DEPUTY:  Please state your name and spell
10      your name for the record.
11              THE WITNESS:  Patricia, P-a-t-r-i-c-i-a, McCool,
12      M-c-C-o-o-l.
13              THE COURT:  You may proceed.
14              MS. LEISCH:  Thank you, Your Honor.
15                          DIRECT EXAMINATION
16      BY MS. LEISCH:
17      Q.  Ms. McCool, where do you work?
18      A.  I work for the Office of Developmental Programs.
19      Q.  In Pennsylvania?
20      A.  In the Department of Public Welfare in Pennsylvania.
21      Q.  And what's your position there?
22      A.  I'm the Acting Bureau Director for the Bureau of Supports
23      for people with intellectual disabilities.
24      Q.  And how long have you held that position?
25      A.  A year and a half.
```

Exam. - Patricia McCool

1  Q.  And what did you do before you became the Acting Bureau

2  Director?

3  A.  I was the Director of the Division of Community Services

4  within that same bureau.

5  Q.  And before that?

6  A.  I was the Regional Program Manager for the Central Region

7  Office of Developmental Programs.

8  Q.  And that's also with the Department of Public Welfare?

9  A.  That is correct.

10  Q.  And how long did you hold that position?

11  A.  Five years.

12  Q.  And what did you do before you held that position?

13  A.  Prior to coming to work at the Commonwealth, I was the

14  Director of Mental Retardation Services for Butler County

15  Mental Health/Mental Retardation Program.

16  Q.  And how long did you have that position?

17  A.  Twenty-two and a half years.

18  Q.  And what did you do before that?

19  A.  I was a residential program worker at the ARC of Butler

20  County.

21  Q.  What does that mean, residential program worker?

22  A.  I worked in a group home.

23  Q.  What are your responsibilities in your current position?

24  A.  In my current position, I ensure that the services and

25  supports that people are receiving in the community are meeting

Exam. - Patricia McCool

1    their needs, are adhering to our regulations, our policies, our

2    bulletins, our laws.

3    Q.  You're familiar with the process that's used to develop a

4    community-based program for a person with intellectual

5    disabilities?

6    A.  Yes, I am.

7    Q.  Can you please describe that process?

8    A.  Individuals who are receiving services through the Office

9    of Developmental Programs have an individual support plan

10   developed.  That plan is based on a person-centered method.  It

11   looks at assessed needs for the individual.  It involves a team

12   meeting, a process with the supports coordinator, who is the

13   person at the community level who is responsible for ensuring

14   that that individual receives the programs and services and

15   supports that are identified in that plan.

16         Also involved in the team meeting and the planning

17   process would be the individual family, if they're involved,

18   any providers who support that person, any friends, anybody

19   that individual would want to have involved on their team.

20   Q.  How long does that planning process usually take for

21   somebody who is new to the community?

22   A.  For somebody who is newly enrolled in services in the

23   community, it depends on the individual needs, it could take a

24   month, two months.

25   Q.  It could take longer, as well?

Exam. - Patricia McCool

1   A.  It could take longer, as well.

2   Q.  And how often does this planning team meet for somebody who

3   is currently receiving services?

4   A.  At least annually or unless the individual's needs would

5   change throughout the year, and the team would then get

6   together to make a change to the plan for that individual.

7   Q.  For somebody who is new to the community system, what

8   happens after the plan is developed?

9   A.  Once the plan has been developed and the services and

10  supports that the person needs have been identified, then the

11  person would be able to choose a willing and qualified

12  provider, or if that person had a legal guardian or just as a

13  matter of the team process supporting that person, they would

14  choose a provider to support them.

15  Q.  And what happens if there is no qualified or willing

16  provider?

17  A.  If the person is enrolled in the services, then we would

18  work with the providers in the community to develop a plan for

19  that individual to support them and develop a place for that

20  person to be supported.

21  Q.  And is that an example of the type of person that would

22  take longer to plan for than one or two months?

23  A.  Yes.

24  Q.  Are you familiar with the needs of persons who live at the

25  state centers?

Exam. - Patricia McCool

1  A.  Yes.

2  Q.  Are you familiar with the needs of people who live in the

3  community?

4  A.  Yes, I am.

5  Q.  And do you agree that state center residents have more

6  serious or complex needs than people who are currently being

7  served in the community?

8  A.  I do not agree with that.

9  Q.  And why is that?

10  A.  We support all individuals based on their needs, whether

11  it's somebody in the state center or somebody who is in a

12  community program.  We're able to support whatever needs they

13  have.

14  Q.  Are there currently people with the same types of needs as

15  the residents in state centers who are currently living in the

16  community?

17  A.  Yes, there are.

18  Q.  Is 24-hour awake supervision currently available in the

19  community?

20  A.  If that's what the person needs.

21  Q.  And how about housing that's on a single floor that's

22  accessible for somebody who needs a wheelchair or uses a

23  wheelchair?

24  A.  If that's what the person needs, that's available.

25  Q.  And what about other physical disabilities, let's say, for

Exam. - Patricia McCool

1   example, cerebral palsy or the inability to eat by themselves,

2   is that type of need also addressed or available, is support

3   for that type of need available in the community?

4   A.  Absolutely.

5   Q.  Can you think of any type of need for which a service is

6   not available or could not be developed in the community?

7   A.  No, I cannot.

8   Q.  Are you familiar with the settlement agreement in this

9   case?

10  A.  Yes, I am.

11  Q.  How are you familiar with it?

12  A.  I was part of the team that worked on that settlement.

13  Q.  You're familiar with the process that's being used to

14  develop the planning list for people to move to the community

15  if they don't express opposition to moving?

16  A.  Yes, I am.

17  Q.  Do you have any responsibilities regarding the planning

18  list?

19  A.  I am part of the team that will develop the criteria to

20  determine which individuals would be placed in the community

21  first.  I also participated in the development review, the

22  planning documents, and gave comments.

23  Q.  The criteria that you referred to are the criteria that

24  Ms. Kuhno testified to earlier?

25  A.  Yes.

Exam. - Patricia McCool

1   Q.  Do you have any role in the planning process for people who

2   have been identified as being ready to move to the community

3   from the planning list?

4   A.  I do not directly staff, I supervise it.

5   Q.  And is the planning process -- well, has the planning

6   process for people on the planning list been developed?

7   A.  The planning process that we do with the individuals who

8   are in the state center is essentially the same as the planning

9   process in the community.  We utilize the person's center

10  planning method, we utilize the team support, and they're

11  developed in the same method as people who are currently in the

12  community.

13  Q.  What does "person-centered planning" meaning?

14  A.  Person-centered planning is really looking at the

15  individual and looking at what the individual needs and how it

16  would best be -- how they would best be supported in the

17  community.  It's looking at what does that person hope to

18  achieve, how will that person feel most comfortable in the

19  community, and it is a method that we have developed over the

20  past three years.

21  Q.  What existed before?

22  A.  It was more of a medical model.

23  Q.  So you said for the most part, the planning process for the

24  people who are going to move from the state centers is more or

25  less the same as what exists for people who are currently in

Exam. - Patricia McCool

1    the community?

2    A.  Yes.

3    Q.  What role, if any, do the staff who are familiar with the

4    residents at the state centers from the state centers have in

5    that planning process?

6    A.  Well, the individuals who have been identified on the

7    planning list as the people who are coming out through the

8    settlement, the regional office staff who have been identified

9    as the liaison for the settlement receive that information from

10   the community transition specialist at the state center.  They

11   would notify the appropriate county office that these are the

12   individuals we're looking to plan for and that they would be

13   contacted by the community transition specialist from the state

14   center, and then they work together to do the joint planning.

15        So the supports coordinator and the county person

16   would attend those planning meetings at the state center as

17   they start to develop the plan for that person and look at what

18   is needed to support them into the community.  So it really

19   bridges from the planning that's taking place in the state

20   center with all the people who are normally involved in that

21   planning team for that individual, then bridges out into the

22   community with the same people being involved.

23   Q.  The people who will participate in this planning process,

24   this joint planning process between people who know the person

25   at the state center and people who are going to prepare for the

Exam. - Patricia McCool

1   person to move into the community, have those people received

2   training on the planning process?

3   A.  They have received some training.  We have another training

4   that will be scheduled as we identify additionally the people

5   in the regional offices who have participated in this kind of

6   planning process in the past.

7   Q.  What kind of training?

8   A.  We will be training on the -- just the essential lifestyles

9   planning, which is a form of person-centered planning that

10  we're actually using for this process.

11  Q.  It sounds like the answer to this you've already -- you've

12  already answered this question, but just to be clear, will

13  everybody who moves from the state centers get the same

14  services if they move to the community?

15  A.  The services that the individual needs will be provided

16  regardless of whether they're in a state center or in a

17  community setting.

18  Q.  Okay.  So does every person who will move from the planning

19  list to the community, will every person get the same services?

20  A.  Yes, if that's what they need.

21  Q.  Okay.  If -- let me state the question differently.

22  A.  Okay.

23  Q.  Is there a predetermined package of services that a person

24  who moves from the state center will get when they move to the

25  community?

Exam. - Patricia McCool

1   A.  No.

2   Q.  What's the decision point going to be as to what types of

3   services the person will get?

4   A.  Part of the planning process is identifying what their

5   assessed needs are and identifying what services and supports

6   would best meet the need of that individual, and then that is

7   how the plan is developed for that person.

8   Q.  So what will happen if a state center resident needs a

9   program or services that currently don't exist?

10  A.  Then that would be developed.

11  Q.  And where will the person live while that's being

12  developed?

13  A.  They would remain in the state center until that's

14  developed.

15  Q.  Does the planning process include any type of transition or

16  trial period from the state center to the community?

17  A.  Yes.

18  Q.  What's the nature of that?

19  A.  There are several different ways that we do the

20  transitioning.  There is a trial visit period when the person

21  leaves the state center and they're in the community and during

22  that time where they would be able to go back to the state

23  center.

24        But the transition period, what we look at as

25  transition visits, the provider would identify who is going to

Exam. - Patricia McCool

1    support that individual, what staff.  We would have them meet

2    the individual at the state center.  If possible, if

3    geographically possible, we would have that person come from

4    the center.  They would be able to tour the home, take a look

5    at what they might be doing during the day so they get familiar

6    with that process.

7         We've had people who have come from state centers who

8    have chosen what kind of drapes they're having in their room

9    and their bedspreads and looked at how they're going to furnish

10   their room and help to furnish the other living areas or

11   identify what their preferences would be.  So as much as

12   possible we want to have people feel as comfortable as possible

13   when they're leaving the state center that they are familiar

14   and know familiar faces.

15        If geographically it's not possible to do that, we are

16   able to have staff from the community program go to the state

17   center.  We often have people from the community program where

18   the individual will be going who works with the staff at the

19   state center and interviews them and gets to know what are the

20   best ways possible to support this particular individual in the

21   community.

22   Q.  So what happens if during the course of this planning

23   process, let's say after the person has picked out drapes or

24   bedspreads or furniture or whatever, a person changes their

25   mind or the guardian or involved family member changes their

Exam. - Patricia McCool

1    mind?  What happens then?

2    A.  Then they don't come out into the community.

3    Q.  This process of transition and engagement that you just

4    testified to, is that open only to the resident or is that

5    something that guardians and family members are invited to

6    participate in, as well?

7    A.  Absolutely, we would want everybody to participate as much

8    as possible.  The value of that is that people are able to

9    really support the person, maybe identify areas that somebody

10   had not already identified that would need to be addressed.  So

11   as much as possible, we want everybody involved.

12   Q.  Based on your many years of experience in the system or

13   otherwise, have you gotten to know people with intellectual

14   disabilities?

15   A.  Yes.

16   Q.  And how have you done that?

17   A.  When I was at the county, when I was the mental retardation

18   director, I participated in a lot of planning processes.  I did

19   monitoring of programs.  I participated with plans for people

20   who were coming from state centers into the community.  I

21   supported staff in our -- standing up for ourselves,

22   self-advocacy organization, and would transport people back and

23   forth and also participate in those meetings, just a lot of

24   that kind of experience.

25   Q.  Based on your experience, would you agree with Ms. Kuhno's

Exam. - Patricia McCool

1    testimony about whether somebody with a profound mental

2    retardation necessarily is incapable of communicating his

3    wishes or desires?

4    A.   I believe that everybody is capable of expressing their

5    wishes and desires regardless of their diagnosis.

6    Q.   You think that everybody can do that?

7    A.   Yes.

8    Q.   How --

9    A.   I have seen some people also, again, regardless of their

10   diagnosis, who have not -- have not chosen to make that --

11   their wishes known or may have had -- needed a lot more support

12   than others who have.  I think there are some people who are

13   not able to, but it is not by virtue of their diagnosis.

14   Q.   Okay.  So, in other words, you're saying that it's not the

15   diagnosis that controls whether or not somebody is capable of

16   communicating?

17   A.   That's correct.

18   Q.   When did you start working as a houseparent?

19   A.   In October, 1978.

20   Q.   Okay.  So in the 30-plus years since you've been in the

21   system, has the system, the community service system stayed the

22   same?

23   A.   No.  It has changed significantly.

24   Q.   What are some of the changes that you've seen?

25   A.   In addition to changing to the more person-centered

Exam. - Patricia McCool

1   planning process, I have seen where we have developed both for

2   the community and the state center programs more safeguards,

3   more monitoring processes, more involvement of people in

4   people's lives.

5           We've instituted the incident management processes.

6   Ms. Kuhno had referenced we have healthcare quality units that

7   are available in the community that are staffed with nurses and

8   behavioral health specialists who support people in residential

9   programs.

10          We have monitoring, formalized monitoring from the

11  supports coordinators who support the individuals and are

12  responsible for developing the plans.  We have just implemented

13  standardized provider monitoring and also monitoring of the

14  supports coordination organizations.  We have standardized

15  planning processes.  We have standardized reports that are

16  available to everybody within the community, providers,

17  supports coordinators, county program staff, Office of --

18  Q.  What types of --

19  A.  I'm sorry.

20  Q.  I'm sorry.

21  A.  Office of Developmental Program staff, so that we are able

22  to see what is happening at any point in time with an

23  individual, look at service notes, look at incidents, look at

24  monitoring forms to make sure the people's needs are being met.

25          We have developed processes to train people in the

Exam. - Patricia McCool

1    community of their rights, particularly around their right to

2    be free from abuse and neglect and what to do in the event that

3    they would feel that they were a victim of that.  Both in the

4    community program and in the state center there's been a lot of

5    work to really have people become as independent as possible

6    and as safe as they can be.

7    Q.  Does the Department have any requirements for provider

8    qualifications?

9    A.  Yes, we do.  We have standardized provider qualifications

10   for every service that's provided.

11   Q.  And does the Department require any training for direct

12   care staff?

13   A.  For our licensed program, we have specific training, and

14   for our unlicensed services, we also have training

15   requirements.

16   Q.  What kind of services are unlicensed?

17   A.  Respite services would be unlicensed, home and community

18   habilitation that's provided to individuals living in their own

19   home or living in the home with their family members, those are

20   unlicensed settings -- services.

21   Q.  You referred to the incident management system.  What types

22   of incidents does that system monitor?

23   A.  It monitors neglect, abuse, death, misuse of funds,

24   individual to individual abuse, missing person, legal

25   involvement, hospitalization, emergency room visits,

Exam. - Patricia McCool

1    psychiatric hospitalizations, to name a few.

2    Q.  And what happens as a result of an incident being reported,

3    briefly?

4    A.  There are requirements at both the provider and the county

5    level and also at the Office of Developmental Program level to

6    review those incidents within 24 hours and ensure that measures

7    have been taken so that the individual is safe wherever they

8    are and that whatever happened with that incident, what

9    happened to cause that incident, that's addressed, or any

10   further -- any other further actions that need to occur based

11   on that incident that happened.

12   Q.  Do you know whether the number of incidents, let's say of

13   abuse and neglect, in the community and the state centers are

14   comparable or the same or different?

15   A.  We've looked at the figures, we've looked at the incidents

16   per one thousand people for all the -- for several of the

17   different categories for incidents, and we found them to be

18   within two to four percent of each other.  So it's very

19   similar, the rates of occurrence.

20        MS. LEISCH:  Your Honor, I have no other questions.  I

21   would move to admit Exhibit 1.

22        THE COURT:  All right.  Any objection to one?

23        MR. MEEK:  No objection, Your Honor.

24        THE COURT:  All right.  Any questions, Mr. Meek, for

25   the witness?

Exam. - Patricia McCool

1          MR. MEEK:  No questions, Your Honor.

2          THE COURT:  Mr. Hoffart.

3          MR. HOFFART:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5     BY MR. HOFFART:

6     Q.  Ms. McCool, you testified that it's your belief that there

7     are no state center residents that couldn't have the same

8     services and supports provided for them in the community.  Is

9     that correct?

10    A.  That is correct.

11    Q.  Are you aware of individuals who have sought to live in the

12    community and have been told that there are not adequate

13    supports or services for their needs?

14    A.  I am not aware of that.

15    Q.  Are you familiar with -- I don't know how familiar you are

16    with individual state residents.  Are you familiar with my

17    client, Mr. Michael Storm?

18    A.  I have met him, yes.

19    Q.  And is it your belief that Mr. Storm could live in the

20    community?

21    A.  Yes.

22    Q.  Do you know, has Mr. Storm ever tried to or sought

23    community care in the past?

24    A.  He was living in the community prior to his admission to

25    the state center.

JA1432

Exam. - Patricia McCool

1    Q.  And do you know why he was moved to the state center?

2    A.  My understanding is that he had some physical needs that it

3    was getting difficult to support in the community.  We did have

4    community providers identified who were able to support him,

5    but his advocate really felt that he would be better supported

6    in the state center.

7    Q.  Did those community providers request a certain -- certain

8    funding for his support, do you recall?

9    A.  All community providers request funding for people's

10   support.

11   Q.  Sure.  Do you recall what the request of funding was for

12   Mr. Storm's -- to meet his physical needs?

13   A.  I do not know that exact figure.

14   Q.  Along the lines of -- you testified that a number of --

15   that community services are currently being provided to people

16   that are -- you know, all people in state centers have a

17   counterpart in the community.  Is that correct?  Am I

18   characterizing your testimony correct?

19   A.  The needs of the people in the state center could be met

20   the same in the community and in the state center, and there

21   are people who have the same needs in the community being

22   supported now.

23   Q.  Okay.  Do you know what percentage of community care

24   residents have been diagnosed as being profoundly retarded?

25   A.  I do not know.

Exam. - Patricia McCool

1    Q.  Do you believe it's the majority of community care

2    residents have a diagnosis of profound mental retardation?

3    A.  I do not want to say what my belief would be because I

4    don't really have those facts in front of me.  I know that we

5    support people in the community in all ranges and all diagnoses

6    of mental retardation.

7    Q.  Does DPW have a policy of not moving residents, you know,

8    who come into the system for the first time, does DPW have a

9    policy of giving them community care as a preference versus

10   state center care?

11   A.  Individuals have the right to choose whether they would be

12   supported in the community or an ICF/MR setting.

13   Q.  What I'm getting at is, I'm curious to know, if somebody,

14   through, you know, the assessment process we've been talking

15   about today, if they elect to live in community care, can they

16   elect to go back to state center care, or is it going to be

17   DPW's policy to find alternative community care services for

18   them?

19   A.  During the trial visit period, when they are in the

20   community from the state center, they would have that

21   opportunity.  Once that trial visit is completed, if there

22   would be a -- if an individual would say, this is not meeting

23   my needs, we would certainly go through the planning process,

24   we would look at what was the reason why they felt or why their

25   family felt, whatever the reason is that they felt that a

Exam. - Patricia McCool

1    return to the state center would be most appropriate and try to

2    work within the system that we have in the community to support

3    them where they are and address their concerns.

4    Q.  And where would the individual live during the time that

5    the improved supports are being developed?

6    A.  Wherever it was most appropriate for them to remain.

7    Q.  But can a resident who selects community care through this

8    process, can they elect to go back to a state center?

9    A.  If it's outside the trial visit period, there would have to

10   be a 406 commitment hearing.

11   Q.  Has DPW had to close any community care facilities?

12   A.  DPW, through its licensing, has had to sanction providers.

13   Some of those residential providers have voluntarily closed.

14   Q.  And do you know why they voluntarily closed?

15   A.  Because of incidents of -- the one in particular that I'm

16   thinking of, there were incidents of abuse that the provider

17   determined that they would no longer be providing services.

18   Q.  And when you talk about incidents of abuse, do you recall

19   when the last incident of abuse was reported to you?  How

20   frequently are incidents of abuse reported to you from

21   community care facilities?

22   A.  We review the reports on a 24-hour basis so we would know

23   within 24 hours any incidents of abuse that have been reported,

24   whether it's in the state center or in the community.

25   Q.  How often do those reports come in?

Exam. - Patricia McCool

1   A.  They have to be reported within 24 hours of the incident

2   occurring.

3   Q.  Right, but how many incidents, how frequently is an

4   incident reported?

5           THE COURT:  Counsel, I think your question might be

6   confusing the witness.

7           THE WITNESS:  It is.

8           THE COURT:  Do you mean over a year, do you mean over

9   a month?

10          MR. HOFFART:  Correct.

11          THE COURT:  No, I'm giving you a choice.  You're going

12  to have to delineate a time frame, how many were received in

13  2011, how many were received in 2010, if the witness knows.  I

14  think your question is imprecise.

15          MR. HOFFART:  Sure.  Thank you, Your Honor.

16  BY MR. HOFFART:

17  Q.  Ms. McCool, do you know how many incidents of abuse have

18  been reported to DPW in 2011?

19  A.  I do not know that figure off the top of my head.

20  Q.  Do you know how many incidents of abuse were reported in

21  2010?

22  A.  I do not have that figure off the top of my head.

23  Q.  Going back -- I apologize, going back to the questions

24  about someone who was in a state center, elected community

25  care, and decides that they want to move back to the state

Exam. - Patricia McCool

1  center, you say they need a new commitment hearing.  Is that

2  right?

3  A.  That's correct.

4  Q.  Why is that?

5  A.  Because we are not -- we do not accept people on voluntary

6  commitments at this time.  I was involved in a situation when I

7  did work in the community with an individual who had come into

8  the community from Polk Center, and it really was not working

9  out for that person, and it was his desire to return to the

10 state center.  And we did have the commitment hearing, and he

11 returned to the state center.

12 Q.  And does DPW or the State, is there a policy to oppose

13 commitment to the state center at the commitment hearings?

14 A.  It is our policy to support individuals wherever it is best

15 that they be supported.  And if we did not believe that -- at

16 that time that the state center was the only place that could

17 support that person, we would oppose those, absolutely.

18 Q.  Is there any preference that -- on the part of the DPW, the

19 State, that the person should be, if at all possible, moved to

20 community care?

21 A.  The Office of Developmental Programs believes that

22 community care, inclusion in the community, is in the best

23 interest of all people.

24        MR. HOFFART:  Nothing further, Your Honor.

25        THE COURT:  Thank you, Mr. Hoffart.  Ms. Leisch, any

Exam. - Patricia McCool

1    additional questions for the witness?

2         MS. LEISCH:  Just one, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MS. LEISCH:

5    Q.  How long is the trial period that you referred to for

6    somebody who is moving from the state center to the community?

7    A.  It's typically 60 days.

8    Q.  And what's the significance of that trial period?

9    A.  It really gives the person the time to really get familiar

10   and get comfortable and really understand what life in the

11   community really means for that person and gives an opportunity

12   for everybody supporting that person to make sure that the

13   supports that were developed through the planning process

14   really are meeting that person's needs.

15   Q.  So during that 60-day period, the person could come back to

16   the state center if it wasn't working out in the community

17   without having to go through a formal commitment hearing?

18   A.  Yes.

19        THE COURT:  Thank you.  All right.  That concludes

20   your testimony, ma'am.  Thank you.

21        THE WITNESS:  Thank you.

22        THE COURT:  You may step down.  Any other witnesses to

23   be presented?

24        MR. MEEK:  No, Your Honor.

25        MS. LEISCH:  No, Your Honor.

1          THE COURT:  All right.  I'll note at this time that in

2     addition to the aforereferenced, as I started out today,

3     letters that have been received and have been docketed in this

4     case, the Court has also received two letters from elected

5     officials.  We'll make copies available to counsel, if you want

6     them.  They are similar.

7          One is from Senator Elder Vogel of the 47th Senatorial

8     District in opposition to the proposed settlement.  The other

9     is from Chris Sainato, who is a state representative in the

10    Ninth Legislative District.  Both of them speak specifically to

11    the Polk Center and concerns that they have with respect to

12    Lawrence County, in particular.

13         And, Liz, I'm going to give these to you.  I want to

14    mark these as court exhibits.  We'll put those in.  And again,

15    Counsel, you can see Liz if you want to have copies of those

16    letters.  We'll make them a part of the record.

17         Now, folks, all of the spectators who are here, as you

18    can tell, the Court regards this as a most serious matter.  I

19    will tell you that I have received not just submissions in

20    support of the proposed settlement from counsel that I'm

21    considering, but I have, as I said earlier, received letters,

22    approximately 100 in number.  I have looked at them all as they

23    came in.  It is unnecessary for you to reiterate anything that

24    is in the letters.  I'm entirely aware of the nature of the

25    objections.  The letters are similar in terms of the concerns

1    that the objectors to the proposed settlement have.

2         And at the conclusion of this proceeding, as you heard

3    at the outset, based on orders that I entered last week, we're

4    going to permit Mr. Solano to argue, and that argument

5    obviously would be against the proposed settlement.  I thought

6    that that was the appropriate and just thing to do under the

7    circumstances.

8         With that, is there anyone who did not submit a

9    letter -- and I want to see a show of hands -- who wishes to

10   identify themselves?  You'd have to be sworn in and state

11   opposition.  And it would be more than just simply saying that

12   you disagree with the proposed settlement.  Anybody who wants

13   to speak?

14        All right.  I'd ask those folks who have raised your

15   hands, would you come forward, please.  Ma'am, what we're going

16   to do, I think the best thing to do is have you come right up

17   to the front here.  We'll take you first.  We'll take the

18   gentleman second, if you'll just stand by, sir, and let's swear

19   you in first.

20     JUDY PARMLEY, called as a witness, having been duly sworn

21   or affirmed, testified as follows:

22        COURTROOM DEPUTY:  State your name and spell your name

23   for the record.

24        MS. PARMLEY:  J-u-d-y P-a-r-m-l-e-y, Judy Parmley.

25        THE COURT:  All right.  Ma'am, you may go ahead.

1          MS. PARMLEY:  Okay.  I'm here to represent my son,

2     Phillip Parmley, who is a resident of White Haven Center.  And

3     I come with a wealth of experience in what my son endured out

4     in the community and group homes.  He was in 27 years of group

5     home and community living.  There was abuse, there was

6     abandonment by group home staff, there were various incidents

7     where items were stolen from him.

8          Some of the most traumatic incidents were the gas

9     gangrene that he encountered from an incident in a group home.

10    It was not reported as required by state law within 24 hours.

11    He was put in a hospital with a choice of amputating his leg or

12    having exploratory surgery.  Fortunately, he did survive this.

13    I cannot begin to describe the horrors that we had when he was

14    out in the community.

15          THE COURT:  And how long ago was that, ma'am?

16          MS. PARMLEY:  Well, that's encompassing past the last

17    seven years, the last seven years he's been in White Haven, so

18    this goes back, like I said, 27 years of this.

19          THE COURT:  So it was over seven years ago that he was

20    last in community -- in the community?

21          MS. PARMLEY:  Yes.

22          THE COURT:  All right.

23          MS. PARMLEY:  He was abandoned by staff, along with a

24    client that was far less capable than him.  This was like at 3

25    and 4 o'clock in the morning out near a Wawa and only was

```
 1  helped by calling home, and my husband went and picked him up.

 2  He was taken by group home providers to a motel where he was

 3  kept for nine days while we frantically tried to find out where

 4  he was at.

 5          THE COURT:  I understand.

 6          MS. PARMLEY:  I can truthfully say that the community

 7  is not the placement for my son.  He is medically fragile.  He

 8  is multi-handicapped, as well as we have a daughter that's

 9  multi-handicapped at home.

10          THE COURT:  Have you been interviewed yet in

11  connection with the plan as it relates to community placement?

12  Have you had occasion to --

13          MS. PARMLEY:  No, I wouldn't say I was interviewed so

14  much as it was offered, and I firmly, as well as my husband,

15  refuse it.  We do not want it.

16          THE COURT:  And do you understand what that means

17  under the proposed settlement agreement?

18          MS. PARMLEY:  I believe I do.  I see that I don't have

19  a choice, my son does not have a choice, that eventually he

20  will be moved out in the community against my wishes.

21          THE COURT:  I'm not sure that that's what the

22  settlement agreement says.  I might disagree with the way that

23  you've characterized the settlement agreement.  You've

24  indicated that you don't want him moved into community

25  placement.
```

```
 1          MS. PARMLEY:  I definitely don't.

 2          THE COURT:  And why do you think he's going to be

 3   moved over your objection?

 4          MS. PARMLEY:  Well, I guess the trend is showing that

 5   they want to close the state institutions down.  If this

 6   happens, then at some point I anticipate that my son will be

 7   moved.

 8          THE COURT:  So your concern isn't necessarily in the

 9   short-term over your objection that he'll be moved, it is that

10   ultimately the state facilities will close and there will be no

11   choice.  Is that fair?

12          MS. PARMLEY:  Yes, yes.

13          THE COURT:  All right.  Thank you very much.  I

14   appreciate it, ma'am.  Thank you.  Sir, if you'd come forward.

15   Liz, do you want to swear in the witness, please.

16       JAMES COLLINS, called as a witness, having been duly sworn

17   or affirmed, testified as follows:

18          COURTROOM DEPUTY:  State your name and spell your name

19   for the record, please.

20          MR. COLLINS:  James M. Collins, J-a-m-e-s

21   C-o-l-l-i-n-s.

22          THE COURT:  All right.  Mr. Collins, anything that you

23   want to say to the Court?

24          MR. COLLINS:  Yes, I'm here on behalf of Maleta

25   Rankin.  She's at Polk Center.  And for the last -- I'd say for
```

1   the last 25 years, we've been trying to get her into a center

2   and to a group home in York, Pennsylvania.  So they tell us, in

3   Polk Center, she's going on a list.  So it goes on another ten

4   years.  Well, she should be up there at the top of the list.

5   Now they don't even talk about a list.

6           THE COURT:  So are you in favor of community

7   placement?

8           MR. COLLINS:  Yes, most definitely.

9           THE COURT:  All right.

10          MR. COLLINS:  She's in Polk Center, we're in York,

11   Pennsylvania.

12          THE COURT:  Well, what we're looking for today are

13   objectors to the proposed settlement.  It sounds like you're in

14   favor of the settlement, you just don't --

15          MR. COLLINS:  I'm only concerned about her.

16          THE COURT:  The ability to take advantage of community

17   placement?

18          MR. COLLINS:  To take her into community placement.

19          THE COURT:  All right.

20          MR. COLLINS:  Because they mistreat her.

21          THE COURT:  I understand.  Well, the purpose of this

22   proceeding is to allow people to speak against, both in favor

23   of and against the proposed settlement.  You're in favor of the

24   settlement?

25          MR. COLLINS:  For her, because it's her situation.  It

1    might not suit everybody's situation.

2          THE COURT:  I understand.  You might have some people

3    you can talk to today with respect to her situation.  They're

4    nodding in the back as I speak.  You might want to take

5    advantage of doing that.

6          MR. COLLINS:  Yeah.  Well, I don't know who to talk

7    to.

8          THE COURT:  Particularly as it relates --

9          MR. COLLINS:  Everybody I try to talk to, they pass

10   the buck, pass the buck, pass the buck, and nothing --

11         THE COURT:  I understand, I understand.  Well, why

12   don't you take advantage of that opportunity while you're here

13   today.

14         MR. COLLINS:  Who do I talk to?

15         THE COURT:  Well --

16         MR. MEEK:  Me, Your Honor.

17         THE COURT:  Mr. Meek.

18         MR. MEEK:  He can talk to me, Your Honor, and I'll get

19   him in touch with the facility advocate.

20         THE COURT:  All right.  Thank you, sir, very much.

21         MR. COLLINS:  Thank you.

22         THE COURT:  I appreciate it.  Anybody else?  I see

23   some other hands.  Yes, sir, do you want to come forward.

24         MR. BESTON:  Your Honor, I have some prepared remarks.

25   I tried desperately to --

```
1            THE COURT:  You're going to have to come forward, sir.

2   We can't take you from your seat, if you don't mind.  We're

3   going to have to swear you in, sir, if you're going to speak on

4   the record.  All right?

5       FRANCIS BESTON, called as a witness, having been duly sworn

6   or affirmed, testified as follows:

7            COURTROOM DEPUTY:  State your name and spell your name

8   for the record, please.

9            MR. BESTON:  My name is Francis Beston, B-e-s-t-o-n.

10           THE COURT:  All right.  Now, Mr. Beston, go ahead.

11           MR. BESTON:  I did write the letter, and I tried in

12  my --

13           THE COURT:  You've submitted a letter?

14           MR. BESTON:  I did.

15           THE COURT:  I do recall.

16           MR. BESTON:  I tried, in my remarks in my hand, to

17  avoid duplicating what might have been in the letter.  So most

18  of what I would like to read was not in the letter that you

19  read.

20           THE COURT:  And if you want to just hand it up, that's

21  okay, too.  I can take it in writing, and I'll supplement the

22  record with that.  It isn't necessary for you to read it.  You

23  needn't do so.

24           MR. BESTON:  Whatever pleases the Court.

25           THE COURT:  I'll take it under consideration, as I
```

1    will any evidence in this matter.  So that would be helpful.

2    I'm glad you prepared it in writing, and I'll certainly

3    consider it.

4            MR. BESTON:  It's somewhat marked up.

5            THE COURT:  That's all right.

6            MR. BESTON:  I appreciate the --

7            THE COURT:  It's not the first marked-up document that

8    I ever received.

9            MR. BESTON:  I appreciate the consideration.

10           THE COURT:  Thank you.

11           MR. BESTON:  Thank you.

12           THE COURT:  All right.  Thank you, sir, very much.

13   Two more, both gentlemen, if you would come forward, whomever

14   else.  And, again, we're looking for folks who have not

15   submitted a letter previously and want to speak.  Yes, sir.

16   All right.  Liz, do you want to swear in this witness.

17       ALFRED SHEPPARD, called as a witness, having been duly

18   sworn or affirmed, testified as follows:

19           COURTROOM DEPUTY:  State your name and spell your name

20   for the record.

21           MR. SHEPPARD:  Alfred Raymond Sheppard.  A-l-f-r-e-d,

22   Raymond, R-a-y-m-o-n-d, Sheppard, S-h-e-p-p-a-r-d.

23           THE COURT:  All right.  Go ahead, sir.  Did you submit

24   a letter previously in this case?

25           MR. SHEPPARD:  Yes.

```
 1              THE COURT:  Okay.  Well, if you've submitted a letter,
 2     I'm going to consider that.  I have considered it.  Is there
 3     anything that you want to say in addition to what's in the
 4     letter?  You needn't do --
 5              MR. SHEPPARD:  It's not in the letter.  I have
 6     something that's not in the letter.
 7              THE COURT:  Okay.
 8              MR. SHEPPARD:  This is an amendment, as well.
 9              THE COURT:  Very well.  I'll certainly take that under
10     consideration.
11              MR. SHEPPARD:  Thank you.
12              THE COURT:  All right.  Thank you, sir, very much.
13     Yes, sir.  Let's swear you in first.
14        KENNETH MYERS, called as a witness, having been duly sworn
15     or affirmed, testified as follows:.
16              COURTROOM DEPUTY:  State your name and spell your name
17     for the record.
18              MR. MYERS:  Kenneth, K-e-n-n-e-t-h, Myers, M-y-e-r-s.
19              THE COURT:  All right.  Mr. Myers, have you submitted
20     a letter previously?
21              MR. MYERS:  Yes, I have, sir.
22              THE COURT:  All right.
23              MR. MYERS:  But I have comments that I feel are
24     relevant to the testimony that was given here regarding the
25     interview process and placement on the planning list because
```

1    I've had an interview during the interim period while this

2    preliminary agreement has gone forth.

3            THE COURT:  All right.  Go ahead.

4            MR. MYERS:  I'd just like to point out that despite

5    the testimony here, the facility advocate at White Haven Center

6    was very insistent on inserting her views into the interview

7    process and questioned me repeatedly about the wisdom of my

8    choices as guardian for my sister.  I felt that was extremely

9    inappropriate, and I told her so.  And after the third or

10   fourth time that I admonished her to stop doing that, she

11   finally stopped.

12           THE COURT:  I understand.

13           MR. MYERS:  But I feel that that kind of interview

14   process for somebody who is not as stubborn as me could be

15   extremely intimidating.

16           THE COURT:  I understand.

17           MR. MYERS:  Because I admire this young woman's

18   enthusiasm and dedication, but I think having such a biased

19   point of view in that environment is not appropriate.

20           The other thing I'd like to point out to the Court is

21   that I've been doing this ISP process with my sister for ten

22   years now, and my mother did it for 20 years before that.  And

23   the point is that there are three pages on that document that

24   have nothing to do but talk about community placement.

25           And it confuses me and concerns me that even more

1    resources that should be taking care of my sister in her

2    current environment where she's safe and well cared for have to

3    be expended on basically a duplication of efforts, as I see it.

4              THE COURT:  I understand.

5              MR. MYERS:  And I appreciate your time.

6              THE COURT:  Thank you, Mr. Myers.  Thank you.  All

7    right.  Have we missed anybody?  You're standing, ma'am.  Do

8    you want to come forward, please.

9              MS. LOTZI:  I have written a letter.

10             THE COURT:  No, I can't take it from back there.

11   You're going to have to come forward, ma'am, if you want to

12   speak.

13             MS. LOTZI:  Thank you.

14             THE COURT:  All right.  Do you want to swear her in,

15   please, Liz.

16      LINDA LOTZI, called as a witness, having been duly sworn or

17   affirmed, testified as follows:

18             COURTROOM DEPUTY:  Please state your name and spell

19   your name for the record.

20             MS. LOTZI:  My name is Linda Lotzi, and it's L-i-n-d-a

21   L-o-t-z-i.

22             THE COURT:  All right.  Yes, ma'am, now go ahead.

23             MS. LOTZI:  Hi.  Thank you very much for letting me

24   have this opportunity to speak.  I have a sister at White Haven

25   Center.  She's been there 40 years.  I gave you a lot of the

1    information, and I also showed you a poster picture.  And I

2    wanted to bring it up and show you and talk a little bit about

3    it.

4            White Haven Center is a beautiful, safe place for my

5    sister.  She loves it there.  I love it there.  My family has

6    loved it there.  My mother and father, our parents, have passed

7    away.  I became her guardian, and I will make sure that White

8    Haven takes wonderful care of her.  If there's ever a problem,

9    I bring it to their attention, and I haven't had any problems.

10           THE COURT:  Understood.

11           MS. LOTZI:  If you notice this door right here, this

12   is the back door of my sister's room.  When she's put out on

13   the patio, she sits out there and she sees the deer.  In my

14   neighborhood, I go out and I have drug addicts on the corners,

15   I have parents fighting, and I have kids calling each other

16   names.  It's not an environment for my sister.  For some people

17   it is.

18           And I'm not opposed to people going into the

19   community, but right now I'm very concerned because -- I might

20   not have understood a little bit of this settlement, but I

21   think I understand that if the guardians pass, that they

22   will -- the resident will end up going on the planning list if

23   there are no guardians or no one to speak of, even though for

24   40 years we have documented that we want her to stay there.

25           So now am I going to have to go home and hire a lawyer

```
 1    so I can get more people to make sure that if I have an

 2    accident today -- I, right now, am the only one that will speak

 3    up for her.  My sister has two other siblings.  They have a

 4    life that they have not been able to help me out with.

 5              I go up once a month.  I drive 250 miles.  I walk in

 6    that building.  I don't have to announce myself.  I go back to

 7    my sister's room.  She's surrounded by all her friends, all her

 8    family, all the people that love her and take care of her and

 9    want the best for her.

10              I see that, because when I walk in there, I sit there

11    and I -- I sit and feed my sister her lunch.  It's pureed.  If

12    she gets the wrong kind of food, she could get very, very ill.

13              THE COURT:  I think I understand the gist of your

14    testimony, and certainly you're well satisfied with the care

15    that she's getting, and we'll accept that.  If you want to

16    leave that, that's fine, and I'll certainly take a look at it.

17              MS. LOTZI:  I will leave this with you.

18              THE COURT:  And your objection is, as I understand

19    it -- and I don't want to mischaracterize it, so you tell me if

20    I'm wrong -- particularly what would happen to her after you

21    pass.  Is that correct?

22              MS. LOTZI:  That's part of it.  And then she will stop

23    eating.

24              THE COURT:  I understand.

25              MS. LOTZI:  She's moved from one building to another
```

1    and stopped eating, and it took us seven days to get food back

2    in her mouth.  I promised her, I looked into her eyes, I said,

3    Lauren, this is your home, I promise you won't move again.

4         THE COURT:  Understand.  All right.

5         MS. LOTZI:  I don't want to break that promise, and I

6    don't want to see her stop eating.  Right now I enjoy so much

7    sitting there feeding, spooning that food into her.  I travel

8    250 miles just to feed her lunch and dinner.

9         THE COURT:  I understand.

10        MS. LOTZI:  When I do that, I watch all the men and

11   women that are around.  I see how well cared they are.

12        THE COURT:  I understand.

13        MS. LOTZI:  I see they hug them, they love them.

14   They're clean.  Their room is clean.  I open up my sister's

15   drawers all the time.  I remember when my father was -- I was

16   five years old.  We went to my sister.  She was at a community

17   home, one of the first community homes.  And I saw him drag her

18   out with her suitcase, and he's yelling at my mom, we've got to

19   get her out of here, she's filthy dirty.  From that day on --

20        THE COURT:  No, I understand.  That's a great

21   endorsement of the center.

22        MS. LOTZI:  I don't want that to happen to her again.

23        THE COURT:  No, I understand.  Well, thank you.

24        MS. LOTZI:  And it hasn't in 40 years.  And thank you

25   very much.

```
 1          THE COURT:  Thank you, ma'am.
 2          MS. LOTZI:  And I'd love you to come see my sister's
 3     place.  I invite you, Judge Jones, please.
 4          THE COURT:  Thank you for the invitation.
 5          MS. LOTZI:  Thank you.
 6          THE COURT:  Thank you.
 7       (Applause.)
 8          THE COURT:  All right.  That would seem to be all the
 9     folks who want to speak in addition to the letters that you've
10     already submitted, which, as I said, I deeply appreciate and
11     have been very helpful to me.
12          We're going to take some argument.  I will alert
13     counsel -- and I'm trying to find a way to do this properly --
14     I have a 12:30 meeting out of the building that I must attend,
15     and I don't want to start argument and then stop argument.
16     That doesn't seem like a particularly good idea.
17          Mr. Solano, I presume you want to argue.  Is that
18     correct?
19          MR. SOLANO:  Yes, Your Honor.
20          THE COURT:  You have some things you want to say, of
21     course.  Maybe we should break at this point and then come back
22     for argument.  I'm not sure of any other way to do it so that
23     everybody can be fairly heard.  Anybody have an objection to
24     that?
25          MR. MEEK:  I have no objection, Your Honor.  Do you
```

 1    have any time frame regarding argument?

 2            THE COURT:  Duration-wise?

 3            MR. MEEK:  Yes.

 4            THE COURT:  Well, you know, I think fairly, because

 5    you've already made your submissions, maybe the best way to

 6    proceed would be to let Mr. Solano go first, it seems to me, as

 7    an objector, to summarize his position, which I think may --

 8    although I recognize and he has indicated in letters to the

 9    Court what his precise representation is.  I suspect that his

10    argument will fairly encompass some of the points that we've

11    heard today.  And then we'll give both you, Mr. Meek, and

12    Ms. Leisch the opportunity to respond.  You know, I think 10 to

13    15 minutes each would probably work.  Mr. Solano, would your

14    argument fit within that time frame?

15            MR. SOLANO:  Your Honor, I will do my best.  I'll be

16    honest, I planned a bit longer than that, but I will do the

17    best I can.

18            THE COURT:  Well, we're not going to hold you to a

19    superperfect time limit, but I think -- you know, let's call it

20    15 and try to work with that, if we can.  I think that would be

21    helpful.

22            MR. SOLANO:  Your Honor, whatever guidance you give me

23    to shut up, I will do so.

24            THE COURT:  I don't use that word in court, and I'm

25    not going to use it with you.  So let's do that.  I think,

```
 1   basically, it would be best to reconvene at 2 o'clock and take
 2   that argument.
 3           And I say to all the good folks who have come here
 4   assembled today, you can stay around if you want to.  That's
 5   perfectly okay.  And you have seats and you can reserve them
 6   for the afternoon if you want to, or you needn't stay if you
 7   don't want to.  That's quite up to you in terms of what you
 8   want to do.
 9           But we will reconvene at 2 o'clock to hear counsel's
10   argument.  I believe we've taken the testimony that's
11   necessary.  We've heard from many individual objectors, so at
12   this point we'll move into argument.  Mr. Meek, anything you
13   want to add?
14           MR. MEEK:  No, Your Honor.
15           THE COURT:  Ms. Leisch?
16           MS. LEISCH:  No, Your Honor.
17           THE COURT:  Either Mr. Solano or Mr. Hoffart, anything
18   before we recess?
19           MR. SOLANO:  No, Your Honor.
20           MR. HOFFART:  No, Your Honor.
21           THE COURT:  All right.  Then we'll be in recess until
22   2:00 p.m. this afternoon.  We'll hear arguments from counsel at
23   that time.
24           COURTROOM DEPUTY:  All rise.
25       (A luncheon recess was taken.)
```

JA1456

```
 1          THE COURT:  All right.  We're reconvening in the

 2    matter of Benjamin versus DPW, et al.  This is a fairness

 3    hearing, as everyone knows, and we took the time to take

 4    testimony this morning and also heard from some individual

 5    objectors who wanted to speak, and we received their testimony,

 6    as well, and we set aside this afternoon for some argument by

 7    counsel.  And it's my understanding that, Mr. Solano, you want

 8    to argue.  Is that correct, sir?

 9          MR. SOLANO:  Yes, Your Honor.

10          THE COURT:  You may proceed.

11          MR. SOLANO:  Thank you, Your Honor.  Your Honor, may I

12    remain seated?

13          THE COURT:  Certainly.  That's fine.

14          MR. SOLANO:  Thank you.  Judge Jones, thank you again

15    for the opportunity to be able to be heard today.  We

16    appreciate that.

17          We do ask that the Court decline to approve the

18    settlement because it is not fair to the members of the class.

19    And what I'd like to do this afternoon is to talk about some of

20    the fairness issues that were explored in the testimony today,

21    and then I'd like to address Mr. Meek's contention that the

22    Court can deal with those residents who have objected simply by

23    excluding them from the class and then not consider their

24    objections otherwise because they lack standing.  We disagree

25    with that.  I'd like to discuss that separately.
```

1          But first let me talk about the fairness issues.  We

2    know that the test is whether the settlement is fair and

3    reasonable for the members of the class, and the Third Circuit

4    has said that in making this determination, Your Honor acts as

5    a fiduciary for the class members.

6          So with that as background, I'd like to start by

7    talking about the most vulnerable members of this class, those

8    who are incapable of understanding what this case is all about

9    and who have no one other than this Court to look after their

10   interests.

11         Your Honor, the statistics that we've obtained from

12   DPW tell us that 74 percent of the residents in the state

13   centers are diagnosed as having profound mental retardation.

14   And, in fact, I think Ms. Kuhno said it was even higher than

15   that.  Your Honor, that's a medical diagnosis that means that

16   these individuals have intellectual abilities at the lowest

17   levels measurable.  They have mental ages of toddlers and

18   infants.  And I know this firsthand because my sister is in

19   this category.

20         Diane is going to be 57 years old this Thursday.  Her

21   mental age is under one year.  She's nonverbal, she's quiet,

22   she's passive.  She cannot comprehend those things that are

23   second-nature to us, such as dangers, medical needs, personal

24   hygiene, and, in particular, there is no neat way that she

25   could comprehend what this court proceeding is about.  There's

```
 1    no way she could comprehend issues relating to residential
 2    options or community placement.
 3            And Ms. Kuhno, this morning, testified that that's
 4    true for a large percentage of those who are diagnosed as
 5    having profound mental retardation.  And Your Honor has
 6    received and I know you have read the objection letters, and
 7    you see that many of the objection letters describe their loved
 8    ones in precisely the same terms and with the same lack of
 9    capabilities.  They are incapable of making these decisions for
10    themselves.
11            Now, Ms. Kuhno and Ms. McCool testified, well, they
12    can communicate.  Your Honor, my sister can communicate in the
13    sense that if she doesn't like where she is, she'll leave, and
14    that pretty much tells you she doesn't want to be there
15    anymore.  But that's not the question here.  The question is
16    whether they can understand the issues that we're talking about
17    and then communicate a preference regarding them.  And there's
18    no way that they can do that.
19            Now, many of those who are represented by the people
20    in this room are the lucky ones.  They have people to stand up
21    for them and object on their behalf.  But, Your Honor,
22    according to the evidence that was presented by the plaintiffs
23    at the summary judgment proceedings, 82 percent of all state
24    center residents do not have guardians, and a substantial
25    number of them also do not have involved family members.  It's
```

1    not clear from the record what that number is.

2         I believe Ms. Kuhno said a majority may have involved

3    family members, Mr. Meek has pointed to an exhibit that says

4    that maybe there's a large number, but remember that the

5    settlement defines involved family in a very narrow way.  It's

6    only those designated as the resident's substitute

7    decision-makers on the community placement plan.  It's not

8    clear how many of them there are, but we noted there are a

9    number who don't have those.

10         And one of the ways that we know that is that when you

11   take a look at the protocol that was introduced today as

12   Exhibit 1, there's a place on that protocol to deal with those

13   individuals who do not have guardians or family members and are

14   unable to respond to questions.  These are the most vulnerable

15   individuals in this class.  How does the settlement deal with

16   them?  It deals with them by automatically placing them on the

17   planning list for relocation.

18         Your Honor, that was the testimony this morning, I

19   believe by Ms. Sassaman, but it's also pretty much spelled out

20   in the protocol.  The protocol says, on Page 1, in its

21   instructions to those people who will fill out the forms, If

22   the person does not provide input in any manner that can be

23   discerned in response to the questions in this section,

24   indicate that they have no preference regarding living in the

25   community and provide no responses to awareness and interest

1    questions.  Well, people are not going to be able to provide

2    input if they don't understand what you're talking about.

3        And then the protocol says, on Page 2, in identifying

4    those residents that are going to be placed on the planning

5    list, among the categories are:  Persons who have no preference

6    and no involved family or guardian.

7        So, Your Honor, what this settlement does is, it takes

8    advantage of the fact that an individual cannot comprehend what

9    this case is all about and doesn't know what is going on and

10    has no one else to speak for them, and it puts that person on

11    the planning list to be relocated to a community facility.

12        Your Honor, this is unconscionable.  There is no

13    reason to believe that just because an individual doesn't

14    understand what's happening to them and can't answer these

15    questions, that they don't care about being moved out of a

16    state center.

17        Your Honor, we know that many of these individuals

18    have lived there for decades.  We know that many of them call

19    them home.  And one of the things that was most striking about

20    the objection letters is how many of the objectors talked about

21    this being their home.  There may be some residents who want to

22    move, and they certainly should be permitted to do that, but

23    there are all sorts of indications that many of these residents

24    are happy and comfortable where they are and among the others

25    that live there with them.

1              And, Your Honor, Mr. Meek has pointed out many times

2      that we should defer to the professional judgments of those

3      people in the state centers who assess these individuals.

4      Well, Your Honor, with respect to my sister, that's the

5      professional judgment.  Diane's ISP contains notations from the

6      professional staff that say she recognizes friends and staff,

7      demonstrates enjoyment being with both her friends and staff by

8      facial expression.

9              And, Your Honor, she's not alone.  The objection

10     letters show that that is true of the loved ones of those

11     individuals who were written about.  Wes Grebski, the cousin of

12     one of the White Haven residents, says that Betty Baran at

13     White Haven calls the staff members there mommy.  Sharon Brice

14     says that her brother calls the Selinsgrove staff members by

15     their first names and considers them extended family.  Samuel

16     Boring says his son Albert considers the other residents at

17     Ebensburg his friends.

18             You heard Linda Lotzi's testimony this morning.  She's

19     the one that wrote that poignant letter about how the other

20     residents at White Haven helped her sister cope with the fact

21     that she had to tell her sister that her mother had died.  Tom

22     Kashatus talks about how his daughter Maria, who was here this

23     morning in a wheelchair, would be devastated to leave the other

24     White Haven residents, something that I found touching because

25     Maria happens to be my sister Diane's roommate.

1          Your Honor, many of these letters use words like

2     devastating, traumatized, and there is no reason to believe

3     that those state center residents who did not have people write

4     objection letters on their behalf would feel differently.

5     There's no reason to believe that the fact that they're

6     unrepresented and the fact that they're incapable of answering

7     a questionnaire means that they have no preference about being

8     moved out of the state centers.

9          We know under *Olmstead* that residents have a right to

10    institutional living.  Justice Ginsburg tells us in *Olmstead*

11    that there's no federal requirement that community-based

12    treatment be imposed, that nothing in the ADA condones

13    termination of institutional settings.

14         But this settlement turns *Olmstead* on its head.  This

15    settlement says that the most incapacitated and disabled

16    residents of these facilities have to repeatedly and clearly

17    affirm that they desire to stay where they are because if

18    they're incapable of saying what they want one way or the

19    other, they go on the planning list.  Your Honor, that's

20    perverse.  It makes no sense.  That should not be the default.

21         One of the objection letters, that of Gabriel Ciullo's

22    parents, called this provision of the settlement morally wrong

23    and heartless.  At the least, Your Honor, it's unfair, and we

24    submit that on the basis of this provision alone, Your Honor

25    ought to disapprove the settlement.

```
 1              The other fairness issue I want to talk about is bias.
 2    Your Honor, many of these residents may be able to make
 3    decisions about where they live if they receive appropriate
 4    information and appropriate help, but the process that was
 5    described this morning says that they're not going to get any
 6    information at all, it sounds like.  And it sounds like, you
 7    know, rather than being given a neutral presentation of pros
 8    and cons, they're going to be asked questions that are going to
 9    induce them to give affirmative answers.
10              Your Honor, there are serious cons here.  There are
11    significant reasons why institutional living may be better for
12    some of these individuals.  There are historical concerns about
13    quality of care due to low wages and high turnover, about
14    potentials for abuse and injury.  There are serious concerns
15    about whether community environments really are the more
16    restrictive environment.
17              That's certainly the case for my sister.  My sister is
18    able, at White Haven, to roam the hallways of spacious rooms.
19    If she were relocated, she'd be in a four-person community
20    facility where, Your Honor, she can't possibly have the same
21    amount of freedom.  These issues need to be discussed, but
22    there's no indication that anybody is going to be providing
23    this information.
24              Your Honor, take a look at the protocol.  Look at the
25    questions that are asked in the protocol to try to elicit
```

1   whether the individuals want to move, want to be relocated.

2   One of them is, Do you want to live closer to your family?

3   Your Honor, you know, clearly everybody is going to answer yes

4   to that.

5         One of the objectors, William Toperzer, commented that

6   questions like that are like asking a lactose-intolerant

7   resident whether they want ice cream.  I mean, of course they

8   want to live closer to the family.  But the question is, would

9   they be able to if they're relocated?  Is that really a fair

10   summary of what this process is about?

11        The fact of the matter is that many families are

12   dispersed.  The fact of the matter is, as Craig Springstead

13   says in the letter, that many of these families no longer

14   exist, and yet we're asking questions that compare community

15   relocation to things like vacation in Ms. Sassaman's testimony.

16        Your Honor, that's not a fair way to present this

17   information and to ask about it.  And that puts aside

18   Mr. Myers' testimony this morning about whether or not some of

19   the individuals during these questioning sessions are actually

20   trying to steer people in a particular direction.  We assume

21   that most are not, but, nevertheless, that possibility exists.

22        Your Honor, we need assurance that this is a fair

23   process, an objective process, and that the process is done

24   without bias.  And, Your Honor, you should not approve this

25   settlement unless those assurances are written into it.

1        Your Honor, another issue that's particularly

2   important is what happens to these residents if they decide to

3   relocate to community facilities and it doesn't work.  Can they

4   move back to a state center?  Well, I understand, Your Honor,

5   that there's some sort of tryout period, but my understanding

6   from the testimony this morning is that after that tryout

7   period ends, the answer is no.

8        So here we have an individual who was doing well in an

9   institutional setting, has now been moved to a community

10  facility, the community facility didn't work out, and the only

11  way that they're going to get back into a state center again is

12  if there's some sort of new commitment hearing.  They have to

13  go to court.  Your Honor, that's not fair.  And we submit, Your

14  Honor, that you shouldn't approve the settlement unless there's

15  a clear provision in it that if this doesn't work out, they can

16  move back to a state institution.

17       Your Honor, let me talk about the objectors and the

18  standing question and those issues that have been raised by

19  Mr. Meek.  First of all, Your Honor, I respectfully disagree

20  with Mr. Meek's statement this morning that the number of

21  objectors is small.  He says there's about a hundred objectors

22  out of a population of 1100.  That's a false statistic.

23       Again, Your Honor, we know that more than

24  three-quarters of the residents are too disabled to file

25  objections for themselves.  We know that more than 80 percent

1    of them don't have guardians to file objections for them.  And

2    we know a substantial number of them don't have involved family

3    members.

4         I think the testimony this morning is that there's at

5    least 100 individuals so far that have been assessed and were

6    so profoundly retarded that they couldn't answer the question

7    and they had no guardian or family member to speak for them,

8    and that's just at this point in the process.  There's a lot of

9    people in that category.

10        Let's just look at guardians.  Your Honor, as I

11   tallied up the information in the chart Mr. Meek attached to

12   his affidavit, you received objection letters from about 60

13   guardians.  That, by my tally, is about 27 percent of all

14   residents who have guardians.  That's a pretty significant

15   number, particularly when you consider, Your Honor, that many

16   of these guardians are old.  You have gotten objection letters

17   from people in their 80s and 90s, and many of them tell you how

18   they're in very poor health and yet they went through the

19   effort of sending you these objection letters.

20        Your Honor, the Court of Appeals has warned that

21   courts should be cautious about inferring support for a

22   settlement from a small number of objectors.  Your Honor, this

23   is not a small number of objectors.

24        Now, Mr. Meek says that the solution to the objector

25   problem is to just say they're not part of the class, and

1    therefore they don't go on the planning list, and that's the

2    end of the matter.  Your Honor, that doesn't solve the problem.

3    First of all, Your Honor, this is not a matter as to which you

4    just say no and it goes away.

5           I think you heard this morning that the system is

6    designed to keep coming back to the guardians and the family

7    members and everyone else annually to raise these same

8    questions and to ask whether they want to go on the planning

9    list all over again.  And so just opting out of the settlement

10   doesn't mean that you never have to participate in the

11   settlement process again.

12          And so, Your Honor -- and, as a matter of fact, you

13   may actually have to change your mind if you suddenly find that

14   the state centers are no longer able to provide the same

15   quality of care.  Maybe you have to start considering other

16   options.

17          And so, Your Honor, the objections that have been

18   raised about fairness and about process are objections that

19   cannot be remedied just by saying, well, you can opt out of the

20   settlement, so you're not a part of it, so don't worry about

21   it.  These individuals have to continue to worry about it.

22          Your Honor, you've heard a lot of concerns that have

23   been voiced in the objection letters and you heard them this

24   morning, concerns about what is going to happen to the state

25   centers and the quality of care there.  The concerns are real.

         1          They are -- the problem, of course, is that this is a

         2    class at war with itself.  We have five individuals who have

         3    sued because they want to be discharged but a great many

         4    individuals who are profoundly retarded and need and want to

         5    stay where they are.

         6          The choice to stay in institutional care is not

         7    something that has been made lightly, and I know Your Honor

         8    knows that.  It's a matter of a sensitive choice between the

         9    safety of an individual and cares about whether this person

        10    will receive proper care and whatever theoretical benefits are

        11    going to occur in the community, many of which are doubtful

        12    when you're dealing with a profoundly retarded individual.

        13          However, for many of these individuals, institutional

        14    care really is the best place for them.  And again Mr. Meek

        15    says we'll look to the professionals.  I am.  My sister's

        16    community placement plan says that if White Haven is no longer

        17    an option for her, then the place to which she should be

        18    located is another ICF/MR because that's what she needs.

        19          And that's not unique to my sister.  You saw that in

        20    the objection letters of Ruth Polk talking about her son at --

        21    excuse me, Ruth Nichol talking about her son at the Polk

        22    Center.  Jean Milliron says that the same thing is in the ISP

        23    for her son, as well.

        24          We also have the problem that there's not -- community

        25    centers, community facilities aren't out there right now.  I

1    think Ms. McCool was very candid in saying they're going to

2    have to develop them, but they don't exist today.  This idea

3    that everybody can be relocated to the community easily,

4    they're not there.

5            And, Your Honor, again, you have the objection

6    letters.  You can see the struggle that John Bastek had trying

7    to find a community center for his son and found that they just

8    don't exist.  Poly Spare told you the same thing.  William

9    Toperzer told you how he kept asking the representative from

10   DRN, just tell me, name me, tell me what facility can she go

11   to, and was given no answer.

12           So, Your Honor, if some of this sounds inconsistent

13   with what you have been told in this litigation so far, it's

14   because it is.  I mean, you have been told by the parties that

15   every resident of a state center can be relocated to a

16   community facility.  But, Your Honor, that contradicts my

17   sister's ISP and many other people's.  It contradicts what the

18   professionals have said.  It contradicts Justice Ginsburg's

19   judgment that for some individuals, institutional care is the

20   only care that's going to be appropriate.  And, Your Honor,

21   it's just not true.

22           And, Your Honor, I think that explains why, when

23   you've got these letters, you detected the anger.  I'm sure you

24   detected the anger in these letters.  Many of these

25   individuals, people will tell you, this is the hardest decision

```
1    they ever made in their life.  I believe many people actually
2    have that quote in it.  And so they put their loved ones in
3    these institutions.  They sift through these meetings once a
4    year in which they're asked if they should relocate, and they
5    say no.  They don't do that without knowledge.  As a matter of
6    fact, many of them have gone out and researched and decided no.
7           And they trusted DPW to care for their loved ones and
8    abide by the decisions that they made and they felt secure in
9    their knowledge, and now they feel betrayed.  They feel as
10   though now actions are being made that have jeopardized the
11   care for their loved ones.  And on top of all of that, they're
12   told that if they die, the wishes that they have set forth in
13   writing or on the records are no longer going to be honored
14   unless they go out and hire a lawyer and find some way to
15   protect that in some other way.
16          These individuals have a right to institutional care.
17   Your Honor, we appreciate, we recognize Your Honor's comments
18   and Your Honor's opinion on intervention, that the right to
19   institutional care under Olmstead can't be taken away from
20   them.  We certainly hope that's right.  But, Your Honor, what
21   is threatened here is the right of these individuals to
22   continue to live in their present homes, in the present state
23   centers.
24          And I know Mr. Meek argues that there is no legal
25   right to live in a particular state center, and I don't know
```

1    whether that's right or wrong, but I do know that that is an

2    interest and I believe that that is an interest that Your Honor

3    should take into account when you consider the fairness of this

4    settlement.

5         Mr. Meek says that any fear that care at the state

6    centers or a state center is going to close is speculative, and

7    he cites the Court of Appeals' affirmance of Your Honor's

8    intervention opinion in support of that.  Well, Your Honor,

9    that was an intervention decision.  And the law on intervention

10   talks about whether there's an interest that's affected in a

11   direct way, and Your Honor and the Court of Appeals concluded

12   that that interest was not sufficiently direct.

13        But we're beyond intervention here.  We're talking

14   about fairness.  And we're talking about what the Court should

15   consider in acting as a fiduciary in the best interest of all

16   class members.  And no law says you cannot consider this

17   interest.  It's not speculative.

18        Your Honor, we all understand and nothing in the

19   settlement agreement says a state center is going to be closed,

20   but, Your Honor, we believe that that is a significant risk.

21   The litigation is brought by a plaintiff, DRN, who has made it

22   very clear that that has been one of their objectives through

23   litigation over and over again, and the letter that you

24   received from VOR details that.

25        The settlement calls for removal of up to 400

1    residents from the state centers, about a third of the

2    population.  It reaches that number by including people who are

3    incapable of saying one way or the other what they want, and so

4    therefore they go on a list.

5         The settlement calls for transfers of funds.  Now,

6    Your Honor, we heard testimony this morning about, well, those

7    are only excessive funds.  Your Honor, this is one of the

8    tightest budgets that the State has ever enacted.  I can't

9    imagine that there are going to be excessive funds.

10         Your Honor, we submit it's common sense that these

11    changes are likely to lead to closings of the state centers

12    because DPW has been closing state centers and closed two of

13    them over the last ten years.

14         Your Honor, the Governor's budget message says that he

15    favors community facilities rather than institutions,

16    particularly in this time of financial tightness.  Your Honor,

17    every objector, I think, just about every one has read those

18    tea leaves, and they read them to say that the state centers,

19    care in the state centers is in jeopardy.

20         And it's not just the objectors, Your Honor.  We see

21    the letters from a number of public officials who have read it

22    the same way.  Senator Mary Jo White's letter -- Senator White

23    has been with us today -- says that.  So does Representative

24    Toohil.  I believe Senator Baker's letter does, as well.  And,

25    Your Honor, they're certainly informed enough to know what

1    those risks are.

2         Now, Your Honor as an officer of the court, I want to

3    say quickly, we recognize that if 400 residents of the state

4    centers came forward and affirmatively said, we want to move

5    out, and, as a result, the state centers were depopulated, we'd

6    have no basis to complain about that.  They have a right to

7    live where they wish, and whatever effect that causes to the

8    state centers is something we have to live with.

9         But that's not what's happening here.  This is a

10   settlement that is going to cause depopulation of the state

11   centers through procedures that we respectfully submit are

12   unfair and improper, and that's why the objectors have

13   standing.  The objectors have standing and a right to be heard

14   in opposition to a settlement that places their chosen form of

15   residence in jeopardy through provisions that are unfair and

16   unreasonable.

17        Your Honor, we respectfully ask that you refuse,

18   decline to approve this settlement because it's unfair.  Thank

19   you.

20        THE COURT:  Thank you, Mr. Solano, for that very

21   cogent argument.  I appreciate that.  Is that Senator White?

22   Senator White?  I've known Senator White for a long time.  I'm

23   sorry I didn't recognize you previously.  Anything you want to

24   say or you're just here for observational purposes?

25        SENATOR WHITE:  Mr. Solano has been very eloquent.

 1  Thank you.

 2        THE COURT:  Good to have you in my courtroom.  Nice to

 3  see you again.  I'm sorry that I missed you previously.  All

 4  right, next.  I don't have a set protocol.

 5        MS. TREPEL:  Your Honor, if I may offer just a brief

 6  comment in support of the agreement --

 7        THE COURT:  Certainly.

 8        MS. TREPEL:  -- for the United States.  Thank you.

 9  The Americans with Disabilities Act, in its implementing

10  regulations, require public entities to administer services in

11  the most integrated setting appropriate to the needs of

12  qualified individuals with disabilities.  The Department of

13  Justice has enforcement --

14        MR. SOLANO:  Your Honor --

15        THE COURT:  I'm sorry, you're going to have to get a

16  mic because Mr. Solano can't hear you.  Why don't we move that

17  mic over.

18        MS. TREPEL:  Sorry about that.  Is that better?

19        MR. SOLANO:  Thank you.

20        MS. TREPEL:  The Department of Justice has enforcement

21  authority in issues, regulations implementing the ADA and, as a

22  result, has a strong interest in the resolution of this

23  lawsuit.

24        The United States has previously filed an amicus brief

25  in support of plaintiffs' motion for summary judgment and a

1  statement in support of this Court's approval of the settlement

2  agreement.  The United States now offers these comments in

3  further support of the settlement agreement.

4          THE COURT:  I realize you have a prepared text there,

5  and I don't want to cut you short.  You've made a submission

6  already, and I appreciate that, and I'm going to take that

7  under consideration.

8          What I would challenge you to do, and I would

9  challenge counsel, as well, for the parties, is to be

10  responsive to Mr. Solano's points and those that we've heard

11  here today.  It isn't necessary to reiterate anything that

12  you've submitted to the Court previously because, frankly,

13  that's not necessarily going to help me today.  So if you want

14  to extrapolate, and I'm challenging you to get outside your

15  prepared text, if you want to --

16          MS. TREPEL:  I understand that, Your Honor.

17          THE COURT:  -- and get to Mr. Solano's points.

18          MS. TREPEL:  Sure.

19          THE COURT:  That's going to be helpful, or anything

20  else that was not in your submission.

21          MS. TREPEL:  Thank you, Your Honor.  I'll try to be

22  very responsive.

23          THE COURT:  All right.

24          MS. TREPEL:  The proposed settlement agreement

25  provides plaintiffs with the relief that directly vindicates

 1   their rights under *Olmstead*, and so I would like to refocus the

 2   conversation to those individuals.

 3         Your Honor has previously found that the individuals'

 4   in state centers rights under the ADA and *Olmstead* were

 5   violated.  This agreement provides very narrowly tailored

 6   relief that vindicates the integration rights of those

 7   individuals.  It gives those individuals who, together with

 8   their guardians or involved family members, are not opposed to

 9   community placement with a place to live in the community, and

10   it does that by using a very clear and ordered process the

11   settlement agreement establishes.

12         It identifies those individuals who are not opposed,

13   and then it offers them a community placement in stages until

14   all those who wish to live in the community have been able to

15   do so.  This is very narrowly tailored relief for the

16   violations that this Court previously found.  In its order

17   granting summary judgment to plaintiffs, the Court found that

18   the manner in which defendants were managing the waiting list

19   for community services violated the integration rights of those

20   in the state centers.

21         To remedy this violation, the settlement establishes a

22   system that appropriately considers members of the plaintiff

23   class for community services and no longer impermissibly

24   relegates them to the end of a waiting list.  Because the

25   agreement directly remedies the defendants' prior

1    discrimination, it provides fair and adequate relief to class

2    members.

3          While this Court has heard from individuals who have

4    concerns about the effects of the agreement on those who wish

5    to remain in the state centers, those comments were filed by

6    nonclass members.  As the Third Circuit noted, the parties

7    define the class and the relief sought, so that individuals who

8    wish to choose institutional treatment, their rights will not

9    be affected.

10          THE COURT:  But am I to be -- let me ask you this

11    question.  Am I to be blind to the impact -- and perhaps this

12    is a question for Ms. Leisch or for Mr. Meek, but I'll ask it

13    to you because you raise the point.

14          They may not be class members, but one of Mr. Solano's

15    comments, particularly that, for example, by expressing no

16    opinion, for example, you default into a position that

17    Mr. Solano says is unconscionable, that you could be profoundly

18    disabled and you find yourself in a group that has to

19    repeatedly -- or in a realm where you have to repeatedly

20    indicate your desire not to go into community placement year

21    after year after year.  What about that?

22          MS. TREPEL:  Well, first, Your Honor, I do agree that

23    questions addressing the particulars of the settlement

24    agreement are, perhaps, best directed to the parties.

25          THE COURT:  All right.

1              MS. TREPEL:  But I would say that those comments from

2      Mr. Solano don't undermine the fairness of the agreement for

3      the class members who wish to take advantage of it.  But,

4      again, I think perhaps that's a better -- a question better

5      directed to the parties.

6              THE COURT:  All right.  Very well.  Thank you.

7              MS. TREPEL:  In closing, I would just say that, you

8      know, the class members who wish to take advantage of the

9      settlement have perhaps said it best in the letters, that it's

10     time to leave, they're very happy that the settlement will help

11     them move, and so I would ask this Court to approve the

12     settlement agreement because it provides fair, adequate, and

13     reasonable relief to longstanding discrimination the plaintiff

14     class has suffered.

15             THE COURT:  Thank you very much.  Appreciate it.

16     Who's next?  Mr. Meek.

17             MR. MEEK:  Your Honor, if it's all right, I'll remain

18     seated.

19             THE COURT:  That's fine.

20             MR. MEEK:  Your Honor, I don't profess to have the

21     eloquence of Mr. Solano, but I will attempt to refute many of

22     what plaintiffs consider to be mischaracterizations of what the

23     settlement agreement says and what it does.

24             And first and foremost, we must be mindful of the fact

25     that the language of *Olmstead* is that a person who is not

1    opposed to community services is who we are talking about and

2    who has the right to leave.  It does not require an affirmative

3    "I want to leave" kind of expression.

4         And, of course, the Court understood that we were

5    talking about people who may not be able to express themselves

6    well or clearly, and I think the protocol goes to great lengths

7    and the questioner goes to great lengths to try to establish,

8    without any doubt, the actual preference of the individual.

9         And, in fact, we saw some of the statistics that some

10   people with very, very severe disabilities, very, very severe

11   ID are able to express themselves.  And, of course, by the same

12   token, there are people who are higher functioning who have

13   difficulty expressing themselves.

14        THE COURT:  Do you agree with Ms. McCool's statement

15   that everybody currently institutionalized in the ICF/MR

16   setting can express themselves sufficient that they can have

17   some reaction to this questionnaire?  And I don't want to

18   mischaracterize her testimony.

19        MR. MEEK:  I don't think that's -- Your Honor, I don't

20   believe that's what she testified to.

21        MS. LEISCH:  Right.

22        MR. MEEK:  I think that everyone can express

23   themselves, but she admitted and agreed and I would agree that

24   not everyone could express themselves and would not necessarily

25   understand the questions.

```
 1          THE COURT:  What I'm grappling with -- and to just,
 2    perhaps, jump you ahead a little bit -- is this:  And it may be
 3    a function of my not understanding it, and you can enlighten
 4    me.  We have a circumstance where we have -- and I think you
 5    would concede this point -- a significant number of individuals
 6    who are in the centers who are profoundly disabled.  Is that --
 7          MR. MEEK:  That's correct, Your Honor.
 8          THE COURT:  And you would probably know the number,
 9    I'm pretty sure -- or not number but a percentage.  Can you
10    estimate that percentage?
11          MR. MEEK:  The percentage, I think, that has been
12    kicked around is in the 70s.
13          THE COURT:  In the 70s.  And --
14          MR. MEEK:  Your Honor, though, I might point out to
15    you that the vast majority of individuals, even in that class
16    of person, have substitute decision-makers, people who are
17    family members or other relatives who make decisions for them.
18          THE COURT:  And who could effectively veto, is that --
19          MR. MEEK:  Correct.
20          THE COURT:  Okay.
21          MR. MEEK:  Absolutely correct, Your Honor.
22          THE COURT:  So follow my question for just a moment.
23    As I see some of the objections -- and I've read these letters,
24    as I said earlier, and I take them seriously, as I obviously
25    take the proposed settlement seriously.  What about the
```

1    circumstance where the substitute decision-makers, the

2    guardians, the parents, are deceased, the elderly resident who

3    has lost that person who speaks for them?

4        There is a common stripe through these letters, you've

5    read it and I've read it, which is that their loved ones feel

6    that when they're gone, when they've passed, that these folks

7    will be shoved, as it were, out of the nest.

8        MR. MEEK:  Your Honor, they have the opportunity, they

9    have it now, they could exercise that opportunity to get a

10   substitute guardian or some successor guardian or a successor

11   substitute decision-maker, which is even easier, which is

12   simply naming some other person to take their place.  And the

13   Department accepts those people as though they were guardians

14   in most respects, not all respects.

15       So the process that they're concerned about is totally

16   within their control.  They can name that successor guardian or

17   they can name a successor substitute decision-maker, which, of

18   course, the latter case of which doesn't require any court

19   intervention at all, simply a matter of contacting the center

20   and saying, my brother, sister, son, daughter is now going to

21   be or will be the substitute decision-maker when I'm gone.

22       THE COURT:  Who could exercise the same veto power, as

23   I understand in the agreement?

24       MR. MEEK:  Yes, Your Honor.  The only circumstance

25   where they cannot exercise veto power is if the person, the

1    resident themselves has said affirmatively, I want to leave.

2    That's the only time.  The guardian can do it even if the

3    individual says, I want to leave.

4            THE COURT:  All right.

5            MR. MEEK:  So the primary guardian is given their full

6    rights like under the guardianship law.  The substitute

7    decision-maker is given nearly the same rights, other than the

8    circumstance where the individual has affirmatively said they

9    want to leave and the substitute decision-maker is opposed.

10   And even in those circumstances, I think that there would be a

11   lot of dialogue to see if there could be some consensus

12   reached.

13           So the notion that there's this vast number of people

14   out there who have no one to look after them is just not true.

15   And besides that, Your Honor, the number of persons -- and I

16   think Ms. Kuhno's testimony was of the 840 persons that have

17   already been assessed, about a hundred of them fell in that

18   category of not having a guardian or a family member and did

19   not -- were not able to express a preference.

20           So extrapolating to the 1100 number, we might have

21   another 20 or 25 people that may be falling in that category.

22   So we're talking about 125 people who aren't able to express a

23   preference and have no guardian or family member to speak for

24   them.

25           Those 125 people are protected, Your Honor, by the

1  facility director.  The facility director has the authority, by

2  statute, to make healthcare decisions on behalf of persons who

3  have no person to speak for them.

4          THE COURT:  Well, simply put, it sounds like

5  Mr. Solano doesn't trust the facility director to make the

6  right decision.

7          MR. MEEK:  The right decision in Mr. Solano's view is

8  the only decision that he thinks is correct, which is

9  institutional care.

10          THE COURT:  Well, that might or might not be true.  I

11  think what Mr. Solano is concerned about is the individual who,

12  for example, playing off your comment a minute ago, is without

13  guardian, without substitute caregiver, without the ability to

14  get one because they lost them along the way, never had them,

15  they're at the protection, as you say, of the facility

16  director.

17          And what Mr. Solano questions, among other things, is

18  why, for someone who, for example, is profoundly disabled, who

19  cannot express themselves in any meaningful way as it relates

20  to the questionnaire, setting aside how they express

21  themselves, but certainly might not be able to respond to these

22  questions in any meaningful way in the questionnaire, why

23  default them, I guess is one of Mr. Solano's points, into the

24  planning list?  Why should that be?

25          MR. MEEK:  Your Honor, I would answer that with a

1    question.  Why default them into institutional care when the

2    State's policy and every professional that's involved with the

3    analysis of persons with intellectual disabilities says,

4    without exception, any legitimate ones, that community services

5    are beneficial to people with even profound ID?

6          In fact, the findings of the expert we had in our case

7    were that persons with profound mental retardation had even

8    greater relative gains than others in other higher categories

9    of intellectual development.

10          THE COURT:  All right.

11          MR. MEEK:  So the point is that a professional, the

12    professionals in ID and the professionals that operate the

13    state centers and the facility director who oversees them, they

14    have made the determination that in the general case, that care

15    in a community center setting is better.

16          However, this is not a debate about that, nor should

17    it be, Your Honor.  The Supreme Court has already made the

18    decision.  The Court said institutionalization is

19    discrimination if the person is appropriate and they do not

20    oppose that.  The "do not oppose" language was chosen very

21    carefully by the Court.  I am sure it wasn't an accident.  It

22    didn't require an affirmance, it required non-opposition.  And

23    the Court understood that we were going to be talking about a

24    lot of people who would not be able to express themselves.

25          So it's very clear to me that the Court knew what it

1    was talking about and understood that these circumstances would

2    arise.  I submit that we're talking about a very small

3    percentage of the class of people -- not the class, the group

4    of people that are residents of the state centers fall into

5    that category.

6           And I think that it's somewhat ironic that the persons

7    who have written in opposing the settlement agreement find

8    fault with the facility director who -- and the staff there who

9    have been caring for their loved ones for years and years, now

10   they don't agree with them, and so it's a biased, prejudiced,

11   and unfair process.  That just smacks of nonreality, Judge.

12          THE COURT:  All right.  Very well.  Thank you,

13   Mr. Meek.  Ms. Leisch.

14          MS. LEISCH:  Your Honor, I'm not going to repeat the

15   points that Mr. Meek has addressed, but I do want to address a

16   couple of the issues that Mr. Solano raised.

17          First, as far as the testimony is concerned or his

18   summary of the testimony, Ms. Kuhno testified actually that

19   people who are categorized as having profound intellectual

20   disabilities can, in fact, understand at times, as well as

21   communicate.

22          The point of the testimony and ultimately Ms. McCool

23   also clarified that the point of the testimony was to say that

24   just because somebody has a profound diagnosis doesn't mean,

25   per se, that they are incapable of understanding or

1    communicating, just as the converse is not true, which is that

2    somebody who has a mild disability is necessarily somebody who

3    can understand and communicate.

4        The main thing, though, that I want to focus on is, as

5    Mr. Meek said, the option for defaulting, to use that term,

6    people who have no one to speak for them and cannot understand

7    and communicate their own preference is institutionalization,

8    and the question really is, why should that be the option?

9    What's the alternative?

10        No one has offered an alternative to saying they --

11    they are at least going to be planned for, and that's the major

12    point that the Department wants to make is, one would think,

13    hearing what people have said, that somebody goes on the

14    planning list and they're out the door the next day.

15        As people have testified, as both Ms. McCool and

16    Ms. Kuhno testified, the planning process is a very well

17    developed, sometimes quite drawn-out process, and to the

18    extent, as Mr. Solano points out, that community programs don't

19    exist to meet the needs of particular people, those people will

20    stay in the state centers whether they're on the planning list

21    or not -- well, notwithstanding their being on the planning

22    list -- until those community placements are developed

23    sufficiently to meet their needs.

24        It is absolutely not the case and it was never

25    contemplated, it's not going to happen under the settlement

1    agreement that people are going to go onto the planning list

2    and move into the community whether or not their needs can be

3    met.

4            And that's one of the reasons that probably plaintiffs

5    aren't necessarily crazy about, that the Department hasn't yet

6    started prioritizing, for lack of a better way of saying, who

7    is going to move first, because in order to be able to do that,

8    the Department wanted to see who is on the list, where is it

9    going to play out, what are the resources available in what

10    area, what are the needs.  And, frankly, somebody who is going

11    to cost a lot of money to develop a new program for is probably

12    not going to move as quickly as somebody who could move into an

13    existing vacancy with some additional supports or different

14    supports.

15            And that really is the major message that the

16    Department wants to convey, not only to the Court, but also to

17    everybody who is in this courtroom, that we are not going to

18    let people be dumped into the community, that we are going to

19    make sure that the services that they need are going to be

20    offered before they move into the community.

21            And then the only other thing that I want to point to

22    is Ms. Sassaman's testimony about the vacation, about how

23    communities go on vacation.  What she testified to is that in

24    order to distinguish between the communities that they have at

25    Selinsgrove --

```
 1              THE COURT:  I understood the point she was trying to
 2    make.
 3              MS. LEISCH:  All right.  She wasn't saying that a
 4    community is like vacation.
 5              THE COURT:  I got that.  I didn't bounce off the back
 6    of a truck.
 7              MS. LEISCH:  Apparently others might have, however.
 8              THE COURT:  I picked that up.  Anything else?
 9    Mr. Solano wants one more word, and I'm going to give it to
10    him, but I'll let you finish up, Ms. Leisch.  Anything else?
11              MS. LEISCH:  Thank you.
12              MR. SOLANO:  Your Honor, the only thing I wanted to --
13              THE COURT:  No, hold it.  Ms. Leisch wasn't finished,
14    Mr. Solano.
15              MR. SOLANO:  I'm sorry.  Forgive me.
16              THE COURT:  Stand by.  Hang on.  Okay, Ms. Leisch.
17              MS. LEISCH:  To address the point that objectors or
18    parents or guardians, involved family have to restate their
19    objection every year in order for a person not to be moved onto
20    the planning list, first, it's no different than what's been
21    going on for a very long time since the ISP process has been
22    developed.
23              And in addition to that, people are allowed to change
24    their minds.  People are allowed to change their minds in
25    favor, having opposed, and people are allowed to change their
```

1    minds to oppose having initially been in favor of it.  And

2    that's what that annual assessment is supposed to be taking

3    into account.

4         THE COURT:  Thank you, Ms. Leisch.  Mr. Meek, I want

5    to go back to you for just a second because I'm not sure that I

6    understand one of the points that Mr. Solano raised, and I'm

7    not sure that you spoke to it by way of enforcement of the

8    settlement.  This settlement, if implemented, obviously doesn't

9    cover only class members, does it?

10        MR. MEEK:  Well, Your Honor, to get on the planning

11   list, one has to be in the category that they're not opposed to

12   community services, and that defines the class.  If you're not

13   opposed, you're a class member; if you're opposed, you're not a

14   class member.  So long as you're opposed, you're not a class

15   member, so you don't get to go on the planning list.  So the

16   only --

17        THE COURT:  But --

18        MR. MEEK:  The only effect is that -- the only

19   process, which is what Ms. Leisch said, the only process that

20   any person who is not a class member who opposes -- who still

21   opposes community services for their loved one is the

22   assessment every year that they go through anyway.

23        MS. LEISCH:  There is one other thing, actually --

24        THE COURT:  Yes, go ahead.

25        MS. LEISCH:  -- which is to the extent that people

```
 1    want it, the educational materials also apply to people who are
 2    not necessarily class members because they oppose placement but
 3    that is available to everybody, and that's part of the
 4    settlement agreement.
 5             THE COURT:  Understand.  All right.  Mr. Solano, I'll
 6    give you two minutes to wrap up if you have additional argument
 7    you want to make.
 8             MR. SOLANO:  Thank you, Your Honor.  On that last
 9    point, that is why the settlement applies to everyone whether
10    they oppose it now or not, because they're going to keep
11    getting asked and they keep getting new materials.
12             THE COURT:  I understand.
13             MR. SOLANO:  The 100 or 125 individuals who are
14    profoundly retarded and have no family members or guardians,
15    first of all, I don't see that as a small number.  But with
16    respect, Your Honor -- the facility director I don't think has
17    anything to do with that.
18             As you read the protocol, the protocol says that those
19    individuals are going to be treated as -- are going to be
20    classified as having no preference, and they automatically go
21    on the planning list.  If the facility director was making that
22    decision, Your Honor, that might be a different story.
23             I mean, White Haven's facility director is sitting
24    right there.  I trust them.  But, Your Honor, that's not the
25    process that is laid out in this protocol, and I just wanted to
```

1    correct that.

2         Why should the default be institutionalization?  How

3    about because these individuals have been living there for

4    decades?  How about because they've developed relationships

5    with the staff and the other residents?  Your Honor, there's no

6    reason to believe that they want to move.  Thank you, Your

7    Honor.

8         THE COURT:  All right.  Thank you very much.

9       (Applause.)

10        THE COURT:  All right.  The Court has appropriate

11   submissions and argument.  Senator, did you want to hand

12   something up, did you say?

13        SENATOR WHITE:  No, Your Honor.  Could I make a brief

14   statement?

15        THE COURT:  Absolutely.  Please come forward.  Happy

16   to hear from you.  This is Senator Mary Jo White, Liz.  We

17   don't have to have her identify herself because she's known to

18   the Court, but do you want to swear her in.

19     SENATOR MARY JO WHITE, called as a witness, having been

20   duly sworn or affirmed, testified as follows:

21        THE COURT:  Go ahead, Senator.

22        SENATOR WHITE:  Your Honor, I've submitted written

23   comments, so I won't repeat any of that.  But one thing nobody

24   is talking much about is resources.  I've been on the Senate

25   Appropriation Committee for 14 years now.  The last budget was

1  the most difficult I've ever seen.

2        I did not come prepared to comment today, so I don't

3  remember the exact number, but the Department of Public

4  Welfare -- perhaps some people may know -- has been given a

5  precise number to reduce their budget.  Certainly facilities

6  could be created in the communities, but I don't know how

7  they're going to be paid for.

8        I called Polk Center, which is in my district, on

9  Friday, and I was told that of the 285 residents, there are 50

10  who have no parents or guardians to speak for them.  So it is

11  not a small number.

12        I was at the Venango County Fair last week.  I saw

13  Polk Center residents.  They are at the fair with their

14  custodians, their attendants.  I did not see anyone from a

15  group home.  These people are out in our communities.  We've

16  welcomed them.  We've had them for 150 years.  We love them and

17  care about them.  They have formed bonds and relationships not

18  only with each other, but with their caretakers.  I think to

19  take people who have lived in that setting for 15, 20 years and

20  take them out into a strange environment with unfamiliar people

21  is cruel.

22        We heard so much here about the person who cares for

23  them can look -- by looking at them can sense, with a nonverbal

24  person, how they're trying to communicate.  That's very true.

25  With the turnover in a group home and new people, that

1    communication is lost.  I think -- I think this is a very bad

2    and unfair settlement, particularly to those people who have no

3    one to speak for them, and I'm trying to do that today.  So

4    thank you for listening.

5         THE COURT:  Thank you, Senator.

6    (Applause.)

7         THE COURT:  All right.  We will close the record in

8    this matter.  We'll take everything under advisement.  We will

9    render our decision in a timely fashion.  I don't think it's

10   necessary to receive any additional submissions.  Anybody care

11   to make them?

12        MR. MEEK:  No, Your Honor.

13        MS. LEISCH:  No thank you, Your Honor.

14        THE COURT:  I have yours in writing.  I think I

15   understand, Mr. Solano, your position very expressly,

16   Mr. Hoffart, as well.

17        And I appreciate your attendance here, as well, today

18   and to all who took the time to -- and, obviously, the position

19   of the United States, I appreciate that, as well -- to all who

20   took the time to come here today.  I appreciate your

21   attendance.  It's very meaningful to the Court, and we

22   appreciate that.  And we have incorporated, as I said, the

23   letters that many of you have written and the additional

24   comments that were made here today.

25        With that, we'll adjourn the proceedings, and, again,

1   thank you all.

2          COURTROOM DEPUTY:  All rise.

3      (Whereupon, the proceedings were adjourned at 2:58 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2            I hereby certify that the proceedings and

3       evidence are contained fully and accurately in

4       the notes taken by me on the within

5       proceedings and that this copy is a correct

6       transcript of the same.

7            Dated in Harrisburg, Pennsylvania, this

8       2nd day of September, 2011.

9

10
                        **/s/ Lori A. Shuey**
11                      Lori A. Shuey, RMR, CRR
                        U.S. Official Court Reporter
12                      United States Courthouse
                        228 Walnut Street, P.O. Box 983
13                      Harrisburg, PA  17108-0983
                        (717)215-1270
14

15

16

17

18

19

20

21

22

23

24

25

**State Center (ICF/MR) Community Planning List Assessment Protocol**

Purpose:  This Protocol is to provide a consistent process for ODP and DRN to complete the State Center (ICF/MR) Community Planning List Assessment.   A State ICF/MR Planning List of residents who do not oppose community placement will be developed based on the results.  These assessments will initially be completed by the ODP Community Transition Specialists (CTS) together with the Facility Advocates by 9/30/11. Annual reassessments will be completed by the resident's Social Worker together with the Facility Advocate. Annual Assessments will be completed by the resident's Social Worker together with the Facility Advocate beginning January 2012.

Process for completion of Assessment:
- The CTS and Facility Advocate will establish a schedule for completion of Assessments.  This schedule will take into consideration the availability of the resident, their guardian, involved family and key team members to assist the resident with communication of their opinion.  Meetings with involved family can be conducted by telephone or other electronic communication if more convenient for the involved family.
- The CTS and Facility Advocate will complete the assessment based on discussions with the residents and their involved family or guardian to determine their position regarding community placement.
- All participants in completion of the Assessment will be listed on the form.
- The CTS and Facility Advocate will determine Assessment results and sign/date the form.

The Person's Interest in Community Living:
- If the resident is able to communicate independently (verbally or with assistive technology), complete Section I.  The person will be afforded the opportunity to complete the assessment privately with the CTS and Facility Advocate in order to have the opportunity to express their opinions freely.
- If the resident is not able to communicate independently, complete Section II and indicate in the listing of assessment participants who is supporting the person to provide input. The mode of communication must be supported by documentation in the resident's State Center Individual Support Plan (ISP).  If the person does not provide input in any manner that can be discerned in response to the questions in this section, indicate that they have no preference regarding living in the community, and provide "no" responses to awareness and interest questions. If the person is responsive, but vacillates in their answer to the questions within the same assessment session, their response will be recorded as 'no preference' and additional information and training will be provided to help the person make an informed choice.

The Involved Family/Guardian's Interest in Community Living:
- Complete the 'Involved Family/Guardian' section based on discussions with them. 'Involved family' means family members who are designated as their substitute decision makers and 'Guardian' means an individual appointed by a Pennsylvania court to serve as guardian of the person. If there is no Guardian or Involved Family

identified as substitute decision makers, do not complete this portion of the assessment.

- After 3 unsuccessful attempts to contact the Guardian or Involved Family by phone, the CTS will send a letter (sample attached) by Certified Mail to notify the Guardian/Involved Family of the need to complete the assessment and that no response on their part will result in the an indication of 'no preference' on the Assessment.
- Based on the answers provided in the Assessment, check the description of the Assessment result in the categories provided.

Process for Development of State ICF/MR Placement List:  Based on the Assessment result, residents will be placed on the State ICF/MR Planning List in the following categories:

- Person wants to live in the community and the involved family/guardian support
- Person wants to live in the community and has no involved family/guardian
- Person wants to live in the community and there is no guardian opposition
- Person wants to live in the community and there is no family (not guardian) opposition
- Person has no preference and the involved family/guardian supports
- Person has no preference and has no involved family/guardian
- Person has no preference and there is no involved family/guardian opposition
- If one of these parties subsequently objects to community placement, the resident will be removed from the State ICF/MR Planning List.

Process for Resolution of Disagreement:

- If there is a disagreement between the CTS and/or social worker (for annual redeterminations) and the Facility Advocate about whether the resident should be placed on the State Center ICF/MR Planning List, either party will notify the Facility Director who will make the determination in conjunction with the standards in the Benjamin Settlement Agreement based on reviews of any relevant documents and interviews with the resident, his/her involved family/guardian, the CTS, the Social Worker and the Facility Advocate.

### State Center (ICF/MR) Community Planning List Assessment

**Name of Person:** _____ **Date of Assessment:** _____
**BSU#:** _____    **Residence**: _____
**Administrative Entity/County**: _____
**County MH/MR Office Contact Person/phone number**:_____ /(    )_____
**Supports Coordinator/phone number**:_____ /(    )_____

| | |
|---|---|
| **PUNS Completed?**<br>If yes, date:<br>Category of need identified:  Planning, Critical, Emergency (circle) | ☐ Yes    ☐ No |

The purpose of the State Center Community Planning List Assessment is to determine:

- The position of each person who currently resides in a State Center (ICF/MR) with regards to community living.
- The position of involved family/guardian of each person who currently resides in a State Center (ICF/MR) with regards to community living.
- The level of awareness of each person who currently resides in a State Center (ICF/MR) with regard to available community living options.
- The level of awareness of involved family/guardian of each person who currently resides in a State Center (ICF/MR) with regard to available community living options.
- The interest of each person who currently resides in a State Center (ICF/MR) with regards to exploring community living options.
- The position of involved family/guardian of each person who currently resides in a State Center (ICF/MR) with regards to exploring community living options.

### The Person's Position/Awareness/Interest in Community Living:

| | |
|---|---|
| **I.    Communication  - Independent Mode:**<br>Person communicates verbally or is independent with use of assistive technology to communicate (If NO, go to Section II) | ☐ Yes    ☐ No |

| | |
|---|---|
| **A.  Position**:<br>Do you want to live in the community?  If not, why?<br><br>If the person indicates no preference, check 'no preference'. | ☐ Yes    ☐ No<br><br>☐ No preference |
| Do you want to live closer to your family?<br><br>If no family/guardian, check 'no family/guardian'. | ☐ Yes    ☐ No<br><br>☐ No family<br>   or  guardian |

JA1499

| **B. Awareness:**<br>Do you understand your options of living in the community? | ☐ Yes ☐ No |
|---|---|
| What do you know about community living options?<br>Explain: | |
| **C. Interest:**<br>Are you interested in learning more about community living options? | ☐ Yes ☐ No |

**II. Communication - Supported with input of others Mode:**
Complete for all people with "NO" in Section I
Circle all that apply:  gestures, eye movement, sign language, sounds, body language, communicating via behaviors (explain), other(explain):
*(Indicate below in 'Assessment Participants' section who is assisting/supporting the person to provide their input.)*

| **A. Position:**<br>Do you want to live in the community? If not, why?<br><br>If the person indicates no preference, check 'no preference'. | ☐ Yes ☐ No<br><br>☐ No preference |
|---|---|
| Do you want to live closer to your family?<br>If no family/guardian, check 'no family/guardian'. | ☐ Yes ☐ No<br>☐ No family<br>or  guardian |
| **B. Awareness:**<br>Do you understand your options of living in the community? | ☐ Yes ☐ No |
| What do you know about community living options?<br>Explain: | |
| **C. Interest:**<br>Are you interested in learning more about community living options?<br>If the person indicates no preference, check 'no preference'. | ☐ Yes ☐ No<br>☐ No preference |

**Guardian, Involved Family/Substitute Decision maker's**
**Position/Awareness/Interest in Community Living:**
**Guardian:** _____     **Involved Family/SDM:** _____
**No Guardian/Involved Family/SDM:** _____

| **A. Position:**<br>Do you want your family member to live in the community? If not, why?<br>If the person indicates no preference, check 'no preference'. | ☐ Yes ☐ No<br>☐ No<br>preference |
|---|---|
| Do you want your family member to live closer to your family?<br>If the person indicates no preference, check 'no preference'. | ☐ Yes ☐ No<br>☐ No<br>preference |

| | |
|---|---|
| Would you support your family member in pursuing community living options? | ☐ Yes   ☐ No |
| **B.  Awareness**: <br> Do you understand options related to community living? | ☐ Yes   ☐ No |
| Is your understanding based on previous community living experience? <br> Explain: | ☐ Yes   ☐ No |
| What do you currently know about community living options? <br> Explain: | |
| How do you currently perceive community living? <br> Explain: | |
| **C.  Interest**: <br> Are you interested in learning more about community living options? | ☐ Yes   ☐ No |
| Would you support your family member in learning more about community living options? <br> Explain: | ☐ Yes   ☐ No |
| What information would you find helpful in expanding you or your family member's knowledge and understanding with regards to community living options or in addressing any concerns you may have? <br> Explain: | |
| | |

Assessment Participants:

_____

_____

_____

Name/Title of Person(s) completing Assessment: _____

_____

(Form – 5/31/11)

JA1501

**<u>Assessment Results</u>: (check one)**

☐ Person wants to live in the community and the family/guardian supports

☐ Person wants to live in the community and has no family/guardian

☐ Person wants to live in the community and there is no family/guardian opposition

☐ Person wants to live in the community and the family opposes

☐ Person wants to live in the community and the guardian opposes

☐ Person has no preference and the family/guardian supports

☐ Person has no preference and has no family/guardian

☐ Person has no preference and there is no family/guardian opposition

☐ Person has no preference and the family/guardian opposes

☐ Person is opposed to living in the community and their family/guardian is interested in community living

☐ Person is opposed to living in the community and has no family/guardian

☐ Person is opposed to living in the community and there is no family/guardian opposition

☐ Person is opposed to living in the community and the family/guardian opposes

**<u>Signature indicates agreement with above determination:</u>**
Facility Advocate: _____
Date: _____

Community Transition Specialist/Social Worker: _____
Date: _____

**Final determination, if disagreement between above parties:**

Facility Director _____
Date: _____

(Form – 5/31/11)

JA1502

**<u>Community Living Planning Work Plan</u>**

<u>Purpose:</u>   The Community Living Planning Work Plan will be utilized to document and track the plans to *create and develop opportunities to enhance the person and their involved family/guardian's knowledge, understanding, and awareness related to Community Living options.
(*via training sessions, observations, visits, conversation, partnerships, sharing information, personal interaction, group support)

| Actions | Responsible Person | Target Date | Status |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(Form – 5/31/11)

JA1503



**COMMONWEALTH OF PENNSYLVANIA**


**[Center Letterhead]**



Date:


Address
Address
Address


Dear _____,

During the past several weeks, we have tried to reach you by phone for the purpose of completing a Community Interest Assessment with you.  In June, you received a copy of the Class Member notice which described the _Benjamin v. Alexander_ litigation and Settlement Agreement.  The Settlement Agreement requires that the Office of Developmental Programs assess the interest in community placement of residents of State Centers and their involved family and guardians by September 30, 2011, and annually thereafter.  This process will strengthen our ongoing dialogue about this while at the same time allowing us to document any change that you may experience in your attitude toward community living.

I ask that you contact me at your earliest convenience so as to allow us to plan accordingly and in compliance with the _Benjamin v. Alexander_ Settlement Agreement.  If we do not receive word from you by September 19, 2011, you will be listed as having **_no preference_** about planning for [name of resident] to move to the community.  I look forward to hearing from you in the near future and to discussing this endeavor of great importance to all people residing in the State Centers.  I can be reached at 570 443-4284.



Sincerely,



_____,
Community Transition Specialist


JA1504

SENATOR
**ELDER VOGEL, JR.**
47TH SENATORIAL DISTRICT

SENATE BOX 203047
THE STATE CAPITOL
HARRISBURG, PA 17120-3047
(717) 787-3076
FAX (717) 772-2756

301 CENTRAL BUILDING
101 SOUTH MERCER STREET
NEW CASTLE, PA 16101
(724) 654-1444
FAX (724) 656-3182

488 ADAMS STREET
ROCHESTER, PA 15074-1940
(724) 774-0444
FAX (724) 773-7384

COMMITTEES
————
LOCAL GOVERNMENT, VICE CHAIR
AGRICULTURE & RURAL AFFAIRS
ENVIRONMENTAL RESOURCES & ENERGY
PUBLIC HEALTH & WELFARE
URBAN AFFAIRS & HOUSING
MAJORITY POLICY



**Senate of Pennsylvania**

July 29, 2011

The Honorable John Jones
Federal Building and U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17108

Dear Judge Jones,

I write to comment regarding the proposed settlement agreement between the Pennsylvania Department of Public Welfare and the Disability Rights Network of Pennsylvania. As a Senator representing concerned parents of severe intellectually disabled children, and also those in the Lawrence County community who are service providers to the mentally disabled community, I write to express concern and ask you not to concur in the proposed settlement agreement.

My concern lies in the efforts of some to strip guardians and parents of their rights to continue to assist their children in choosing the best care available, with the goal, it would appear to some, of closing state run institutional facilities such as Polk Center. After discussions with constituents, it has become clear that the cost savings – purportedly to be saved by moving many severely mentally disabled individuals into community care - are highly questionable, and in fact may cost the Commonwealth much more in the end.

Moving many of the most vulnerable members of our society into community care, away from the care they receive in an institutional setting, may cause great harm to these individuals who cannot care for themselves. While institutional care is not always right for every patient, we need an agreement that allows people with disabilities to continue the care they are currently receiving if they choose to do so. I appreciate the opportunity to contact you on behalf of my constituents, and thank you for your consideration.

Sincerely,

ELDER VOGEL JR.
Senator, 47th District

EV/ot

Court exhibit 1

JA1504.1

CHRIS SAINATO, MEMBER
30 EAST WING
P.O. BOX 202009
HARRISBURG, PENNSYLVANIA 17120-2009
PHONE: (717) 772-2436
FAX: (717) 783-8536

Z-PENN BUILDING
20 SOUTH MERCER STREET
NEW CASTLE, PENNSYLVANIA 16101
PHONE: (724) 656-1112
1-800-866-2215
FAX: (724) 656-3352



COMMITTEES

DEMOCRATIC CHAIRMAN, VETERANS
AFFAIRS AND EMERGENCY PREPAREDNESS
BOARD MEMBER, PENNSYLVANIA
EMERGENCY MANAGEMENT AGENCY
POLICY COMMITTEE
NORTHWEST CAUCUS
SOUTHWEST CAUCUS

## House of Representatives
### COMMONWEALTH OF PENNSYLVANIA
### HARRISBURG

July 29, 2011

The Honorable John Jones
Federal Building and U.S. Courthouse
228 Walnut Street
Harrisburg, PA 17108

Dear Judge Jones,

I am writing to you in regards to the proposed settlement agreement between the Disability Rights Network of Pennsylvania and the Department of Public Welfare. As a Representative, I am an advocate for the worrisome parents of severely disabled children as well as the service providers to the mentally disabled of Lawrence County. I express my genuine concern to you, and ask you not to coincide with the proposed settlement agreement.

My apprehension lies within the efforts to strip parents and guardians of their abilities to choose the best care available to their children. This includes the potential closing of some state run facilities such as Polk Center. After many conversations with my constituents, it is clear that the alleged cost savings in moving many severely mentally disabled individuals into community care is problematic. In fact, this may cost the Commonwealth much more than anticipated.

By moving the most vulnerable of our population in to community care, rather than the setting they currently are cared for, could be detrimental to the well-being of these individuals. We need to reach an agreement that permits those with disabilities to choose their own care, even if this includes their current situation. I appreciate and thank you for opportunity to contact you on behalf of my constituents.

Sincerely,

Chris Sainato

Chris Sainato
State Representative
9th Legislative District

Court exhibit 2

♻ PRINTED ON RECYCLED PAPER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

FRANKLIN BENJAMIN, by and through
his next friend, Andrée Yock; RICHARD
GROGG and FRANK EDGETT, by and
through their next friend Joyce McCar-
thy; SYLVIA BALDWIN, by and through
her next friend, Shirl Meyers; ANTHONY
BEARD, by and through his next friend
Nicole Turman, on behalf of themselves
and all others similarly situated,

     *Plaintiffs,*

  v.

**DEPARTMENT OF PUBLIC WELFARE OF
THE COMMONWEALTH OF PENNSYLVANIA
and GARY ALEXANDER, in his official
capacity as Secretary of Public Welfare
of the Commonwealth of Pennsylvania,**

     *Defendants.*

**Civil Action No. 1:09-cv-1182-JEJ**

Class Action

Complaint Filed June 22, 2009

_____

## JOINT MOTION BY OBJECTORS DIANE SOLANO, CRAIG SPRINGSTEAD, MARIA MEO, DANIEL BASTEK, MICHAEL STORM, BETH ANN LAMBO, RICHARD KOHLER, MARIA KASHATUS, AND WILSON SHEPPARD FOR A PARTIAL STAY OF THIS COURT'S ORDER DATED SEPTEMBER 2, 2011 PENDING OBJECTORS' APPEALS

_____

   Diane Solano, by and through her brother and guardian, Carl A. Sola-

no; Craig Springstead, by and through his father and guardian, Bertin Springstead;

Maria Meo, by and through her mother and guardian, Grace Meo; Daniel Bastek,

by and through his father and guardian, John Bastek; Michael Storm, by and

through his guardian, Polly Spare; Beth Ann Lambo, by and through her father and guardian, John Lambo; Richard Kohler, by and through his sister and guardian, Sara Filler; Maria Kashatus, by and through her father and guardian, Thomas Kashatus; and Wilson Sheppard, by and through his brother and next friend, Alfred Sheppard (collectively, "Appellants"), move for a partial stay, pending resolution of their appeals to the United States Court of Appeals for the Third Circuit, of this Court's order dated September 2, 2011 approving the parties' class action settlement.

During the hearing this Court held on the fairness of the settlement agreement in this case, the Court heard evidence and argument about misuse of the procedures in the settlement agreement to compel relocation of the most vulnerable group of residents now living in the State Centers — "profoundly retarded" individuals who lack guardians or relatives to speak for them and who are incapable of comprehending questions about any "choice" between continuing to live in the State Centers and moving to "community" facilities. The settlement compels relocation of these individuals (many of whom have lived in their present homes for decades and view the Centers' staff members as family) through the contrivance of declaring that they have "No preference" about where they live because they did not (because they could not) answer questions about that issue.

Though it approved the settlement, the Court expressed "serious

2

doubts" about this aspect of the settlement and asked the parties to consider modifying it.  Appellants have now learned that at least half — and perhaps far more than half — of all the residents who ended up on the "Planning List" for relocation probably fall within this category and that the Department of Public Welfare ("DPW") plans to begin relocating some of these most vulnerable residents by the end of the current fiscal year — before the Court of Appeals is likely to decide the appeal in this case.  Accordingly, Appellants move to stay this aspect of this Court's order so that these residents may be spared from being removed from their homes before the Court of Appeals can act.

In support of this motion, Appellants state:

1.      This is a class action under the Americans with Disabilities Act (ADA) and the Rehabilitation Act.  Plaintiffs are five residents of three of the Commonwealth's intermediate care facilities for persons with mental retardation ("ICFs/MR" or "State Centers") who say they want to be relocated to community facilities and seek injunctive and declaratory relief that would permit their relocation.

2.      The class consists of all residents of the State Centers who "could reside in the community with appropriate supports and services" and "do not or would not oppose community placement."

3

JA1507

3.     Appellants are residents of the State Centers who are members of the class because, although they do not presently wish to be relocated to community facilities, they have alleged they might not oppose community placement in the future if changed conditions in the State Centers make relocation appropriate.

4.     On August 22, 2011, the Court held a hearing to consider whether to approve a settlement of this action that had been reached by plaintiffs and DPW.  In advance of that hearing, the Court received more than 100 objections to the settlement from guardians, family members, and others who spoke on behalf of State Center residents.  Appellants were among those objectors, and, by an order dated August 16, 2011, the Court permitted Appellants to participate in the August 22, 2011 hearing.

5.     Following the hearing, on September 2, 2011, the Court issued a memorandum opinion and an order by which it approved the settlement.  In its order, the Court found that the settlement "is fair, reasonable, and adequate."  In its memorandum opinion, however, at pages 15-16, the Court observed:

> Although we give our approval to Proposed Settlement Agreement and its terms, we advise the parties to implement the settlement with caution.  To our admittedly untrained eye, it appears as though the assessment protocol that has been developed to effectuate the Proposed Settlement Agreement may imply an unintended bias toward community placement.  Reviewing the questionnaire to be utilized causes us to entertain serious doubts as to whether it is the proper tool for gauging whether the profoundly disabled, and especially those with no guardian to speak for them, are opposed to community placement.

4

Indeed, we wonder about the wisdom of defaulting such individuals into a no preference category without greater analysis.  And we have no doubt that the stated fears of many objectors, including those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real.  We urge those responsible for implementing the policy to consider these concerns, and if necessary revise the protocols in question.

6.    According to evidence presented at the August 22, 2011, hearing and in the record prior to the hearing, three-fourths of all State Center residents are classified as "profoundly retarded," *see* Notes of Testimony ("N.T.") 45; D. Solano Obj., Ex. A, meaning that they have intellectual abilities at the lowest levels measurable and thus are incapable of making decisions on their own behalf or of comprehending issues relating to those decisions.  The evidence also is that 82% of State Center residents have no guardians and many have no involved family members.  *See* N.T. 46, 60; Pl. Motion for Sum. J., Ex. 13.  The evidence in the record is that many State Center residents (including many plaintiffs and many objectors) have resided in the State Centers for decades.  There is also evidence presented in the Objection Letters that were received by the Court and made part of the record that many of the long-term State Center residents are content to live there, consider the residences their homes, and would be traumatized if they were forced to move.

7.    On September 29, 2011, Appellants filed appeals from this Court's decision.  The initial appellate briefs in the case are due to be filed in early

JA1509

December 2011.

8.    Although the Court advised the parties to implement their set-
tlement with caution, urged them to consider the concerns expressed by the Court,
and suggested that they revise the settlement's assessment protocol to address
those concerns, Appellants are aware of no actions taken by the parties to the set-
tlement to undertake such actions and believe no modifications of the settlement
have been made.  To the contrary, the parties have completed the process of deter-
mining who should be placed on the "Planning List" of residents slated for reloca-
tion to community facilities, and all indications are that the parties used the settle-
ment's unmodified assessment protocol to do so.

9.    In an e-mail dated November 3, 2011, Doris Leisch, counsel for
DPW, confirmed to Appellants that the Planning List has been finalized, there are
238 persons on it, and 50 of those persons are scheduled to be relocated from their
State Center homes to "community" facilities by the end of the current fiscal year
on June 30, 2012.  C. Solano Declaration (appended as Ex. A) and its Attachment 1
— E-mail, D. Leisch to C. Solano and R. Meek (11/4/2011) (included as part of e-
mail thread in Attachment 1 to Ex. A).

10.    Ms. Leisch also has informed counsel that five of the residents
who will be relocated in the current fiscal year are classified as expressing "no pre-

ference" regarding relocation and have no guardians or involved family members to speak on their behalf. *Id.* Under the State Center (ICF/MR) Community Planning List Assessment Protocol, which was admitted as Defendants' Exhibit 1 at the August 22, 2011 hearing ("Protocol"), at p. 1, residents are identified as having "no preference" if they "do[] not provide input in any manner that can be discerned in response to questions" on the questionnaire, which is what would happen if the resident is so mentally incapacitated that he or she is unable to understand the questions being asked. These five residents thus are within the precise group of vulnerable State Center residents about whom this Court expressed concern in its September 2, 2011 decision.

11. DPW has not told Appellants the total number of residents on the Planning List who are unable to oppose community placement and who have no guardians or family members able to speak on their behalf. From the information in the record, Appellants believe that the number is substantial.

a. Ms. Leisch's e-mails suggest that the Planning List includes more than just the five residents in this extremely vulnerable group who are slated for relocation in the current fiscal year.

b. At the August 22, 2011 hearing on approval of the settlement, Pamela Kuhno, the Director of the Division for ICF/MR Programs in

7

DPW's Office of Developmental Programs, testified that approximately 100 out of 840 residents who had been assessed at that time were listed as having "No preference" and had no guardians or involved family members.  N.T. 31-32.  Plaintiffs' counsel estimated that when all assessments were completed, the number might rise to 125.  N.T. 145.  This would mean more than half of the 238 residents on the Planning List are likely to be in this group.

c.    In addition, the Protocol, at p. 2, provides that if DPW was unable to contact a resident's guardian or involved family member during the assessment process, that guardian or family member would be listed as having "No preference" regarding a resident's relocation.  DPW appears to have followed this aspect of the protocol in creating the Planning List, and, as a result, a number of residents who have guardians or involved family members may have been placed on the List solely because DPW was unable to contact those guardians or family members.  Because these guardians and family members were not contacted, the settlement takes no account of their views, and, therefore, the residents who have these guardians and family members are in the same position as those who have no guardians or family members to speak on their behalf.  Accordingly, this motion treats all of these residents as part of this same vulnerable group.  Appellants are not aware of how many residents were placed on the Planning List merely because DPW was unable to reach their loved ones.

8

JA1512

12.    In light of DPW's plan to relocate some of these most vulnerable members of the class during the current fiscal year, Appellants request that, pending resolution of their appeals, the Court stay that portion of its September 2, 2011 decision that permits the parties to relocate to community facilities any State Center residents who are profoundly retarded and who do not have guardians or involved family members who have been able to speak on their behalf. Such residents can be identified by reference to those provisions of the Protocol that:

a.    identify residents as having "No preference" pursuant to the instruction on page 1 of the Protocol that states, "If the person does not provide input in any manner that can be discerned in response to the questions in this section, indicate that they have no preference regarding living in the community and provide 'no' responses to awareness and interest questions," and

b.    provide for the inclusion of such residents if either (1) they have "no involved family/guardian," or (2) there is "no family/guardian opposition" because, pursuant to the instruction on page 2 of the Protocol, "[a]fter 3 unsuccessful attempts to contact the Guardian or involved family by phone [and] Certified Mail [there was] no response on their part[, resulting] in an indication of 'no preference' on the Assessment."

13.    To enable an informed decision about the issues raised by this

9

JA1513

motion, the Court also should order the parties to identify how many of the persons described in the preceding paragraph are on the Planning List. In particular, DPW should be required to state how many residents who are said to have "No preference" about relocation have been included on the List (a) because they have no guardians or interested family members, or (b) because DPW was unable to contact their guardians and interested family members.

14.    Appellants do not seek a stay with respect to any other State Center residents who would be subject to the Court's order. In particular, they do not seek to stay application of the order to relocation of any of the named plaintiffs or any other State Center residents who (either personally or through their guardians or involved family members) have said they actually wish to relocate.

15.    Appellants request that the stay remain in effect only until Appellants' appeals are decided.

16.    In considering whether to grant a stay, the Court should consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991); *see al-*

10

JA1514

*so Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  Each of these requirements is met.

17.    Appellants have a substantial likelihood of prevailing on the merits of this case, and, especially, to prevail with respect to inclusion on the Planning List of profoundly retarded State Center residents who lack guardians and involved family members able to speak on the residents' behalf.

a.    Such residents have a right under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), to remain in the State Centers where many of them have resided for decades, and they should not be relocated where, as here, there is no clear indication that they desire to be moved elsewhere.  As this Court has observed, the settlement's assessment protocol evidences an apparent "bias toward community placement" and raises "serious doubts as to whether it is the proper tool for gauging whether the profoundly disabled, and especially those with no guardian to speak for them, are opposed to community placement."  There is a substantial likelihood that the Court of Appeals, in light of the fiduciary obligation to assess a settlement's impact on those certified class members who are affected by it, will find that the parties failed to prove that this aspect of the settlement is fair and reasonable for these extraordinarily vulnerable residents.

b.    There also is a substantial likelihood that the Court of

11

Appeals will conclude that no class should have been certified that would include these residents as members, since such certification would depend on a determination whether these residents "do not or would not oppose community placement" and there is no way to determine whether there is such subjective opposition by these residents. The parties' solution to this problem — to just declare that these residents have "No preference" because they are incapable of stating otherwise (or, even, of comprehending what is being asked) is both an infringement on the residents' rights and, in the case of DPW, an abuse of residents committed to its care.

18.    A stay of this aspect of the Court's decision will prevent irreparable harm to these individuals. Some of them have lived in the State Centers for two or more decades. Relocation will wrench them out of the only homes they have ever known and place them in unfamiliar surroundings where they will no longer be in the care of the familiar staff personnel who have cared for them for years — personnel that these individuals may view as the equivalent of their families and community. Testimony during the August 22, 2011 hearing stated that it is DPW's policy not to permit individuals transferred out of a State Center to return if a community residence does not work out. N.T. 96-99. The relocation of these residents during the current fiscal year therefore will remove these most vulnerable class members from their State Center homes without a right of return and before the Court of Appeals can act. Although the no-return policy would be over-

12

ridden if there is a reversal on appeal, these individuals will be subjected to trauma during the period of their dislocation, which may be prolonged because it may take time for DPW to move them back to the State Centers after the Court of Appeals rules. Meanwhile, due to their profound intellectual impairments, these individuals will not understand what has been done to them or why — a fact likely to enhance their traumas and cause irreparable aggravation of their injuries. Common decency calls for a stay of any relocation decision with respect to these individuals until the Court of Appeals has ruled on its legality.

19. A stay will not injure any other parties. Appellants have limited the stay they request here to just that aspect of the settlement that has the potential to cause the greatest harm to the greatest number of State Center residents affected by it, and this motion relates only to that part of the settlement that the Court itself identified as presenting significant concerns about fairness and potential for harm. Those State Center residents who (personally, or through their guardians or involved family members) wish to relocate to community facilities pursuant to the settlement would not be affected by the stay, and therefore may still be relocated while the appeal progresses. The stay will assure just that those most vulnerable residents, as to whom the settlement's provisions are most doubtful, will not be harmed by it.

20. Indeed, the stay may enable five more residents who actually

13

JA1517

wish to relocate to community facilities and are not among the 45 such residents now slated to move in Fiscal 2011-12 to be added to this year's list in place of the five residents who would be subject to the stay.  If there are more than 45 residents who have actually expressed a desire to move, the stay would enable those residents to be given a higher position on the Planning List.  If, on the other hand, there are no more than 45 residents who actually want to be relocated, and if that is why DPW has included 5 "profoundly retarded" residents with no guardians on the list to be moved in Fiscal 2011-12, then this fact alone exposes the settlement as a contrivance designed mainly to remove the most vulnerable and defenseless residents from the Centers, and not as a device to effectuate a majority of residents' right of choice.  This action did not need to be certified as a class action to secure relocation rights for just 45 individuals.

   21. The public interest supports this result.  That interest cannot possibly call for relocation of helpless individuals who cannot advocate for themselves and who most likely would oppose being relocated from the homes where they have resided for many years.  While DPW may favor the relocation program in the hope it will save money, there will be no savings if the Court of Appeals reverses and DPW then has to go through the expense of moving these residents back to the State Centers.  The public interest of the Commonwealth's taxpayers calls for this aspect of the decision to be stayed until the Court of Appeals rules.

JA1518

22.    Appellants delayed filing this motion while engaging in discussions with DPW's counsel to see if the need for the motion could be obviated.  On October 21, 2011, after Appellants informed the parties that they planned to seek a stay because they had learned that members of the vulnerable group of residents sought to be protected by this motion were likely to be placed on the Planning List and in jeopardy of being relocated, Ms. Leisch asked Appellants to defer filing of the motion.  She related her expectation that no residents in this vulnerable group would be included on the Planning List for relocation in Fiscal 2011-12 and said she needed additional time to confirm that expectation.  Appellants agreed to the requested delay.  But when, on November 3, 2011, Ms. Leisch informed Appellants that some residents in the vulnerable group would indeed be scheduled for relocation in Fiscal 2011-12, Appellants told the parties that they would go forward with this motion.  On November 4, 2011, Ms. Leisch again requested more time to consult with her client, and Appellants agreed to defer filing the motion until today.  *See* Ex. A, Attach. 1 (e-mail thread between D. Leisch and C. Solano containing relevant messages).

23.    At the hearing on August 22, 2011, Ms. Kuhno testified that it takes an average of about nine months to plan for relocation of an individual to a "community" setting and then accomplish that relocation.  N.T. 36.  According to Ms. Leisch, DPW did not finalize the Planning List until October 31, 2011.  *See*

15

Ex. A, Attach. 1 (Oct. 31, 2011 e-mail included in e-mail thread).  Therefore, since Fiscal 2011-12 will end on June 30, 2012, which is less than eight months from now, planning for relocations by that date will need to begin immediately.  Accordingly, Appellants are filing this motion at this time so that the motion may be granted before DPW expends substantial resources planning for relocations of these vulnerable residents, thereby saving taxpayer funds and furthering the public interest.

24.    For these reasons, all of the factors to be considered in granting a stay support the limited stay requested in this case.

WHEREFORE, Appellants respectfully request that, pending resolution of Appellants' appeals, the Court stay that portion of its September 2, 2011 decision that permits relocation of any State Center resident who has been placed on the Planning List because (a) he or she was deemed to have expressed "No preference" because (in the words of the assessment protocol) he or she failed to "provide input in any manner than can be discerned in response to the questions" on the protocol used to implement the settlement, and (b) no guardian or involved family member could speak on the resident's behalf, either because no such guardian or family member exists or because DPW was unable to contact that person and therefore deemed the person to have "No preference" regarding where the resident

16

should live.

The Court should order DPW to identify how many residents meet this description.

Respectfully submitted,

/s/ *Carl A. Solano* ____

Carl A. Solano, I.D. No. PA 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000
Fax: (215) 972-7363
E-mail: *CSolano@Schnader.com*

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10016
Telephone: (212) 839-5300
Fax: (212) 839-5599
E-mail: *bhoffart@sidley.com*

*Attorneys for Appellants*

Dated: November 8, 2011.

17

JA1521

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : | Civil Action No. 1:09-cv-1182-JEJ |
| *Plaintiffs,* | : | Class Action |
| v. | : | |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and GARY ALEXANDER, in his official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : : : : : : : | Complaint Filed June 22, 2009 |
| *Defendants.* | : | |

## DECLARATION OF CARL A. SOLANO

I, CARL A. SOLANO, am counsel for one of the Appellants in this case, Diane Solano, and state that the following is true and correct:

1.    On October 20, 2011, I notified Doris Leisch, counsel for defendant Department of Public Welfare (DPW), that appellants planned to file a motion to stay pending their appeal of that portion of this Court's September 2,

PHDATA 3666020_1

JA1522

2011 order that permitted relocation of those residents of the State Centers who have no guardians or involved family members and, due to their inability to understand the issues in this case, are identified as having "no preference" regarding whether they should be moved from the State Centers to "community" facilities.

2.    On October 21, 2011, Ms. Leisch telephoned me.  In that call, Ms. Leisch said that DPW was still in the process of completing the Planning List and that she believed it was possible that none of the residents sought to be protected by the motion for a stay would be placed on the Planning List and scheduled for relocation in Fiscal 2011-12, in which case the motion might be unnecessary.  In light of that information, I told Ms. Leisch that Appellants would defer filing their motion until they learned the composition of the list of residents who would be moved in Fiscal 2011-12.

3.    Thereafter, Ms. Leisch and I communicated by e-mail.  True and correct copies of our communications, which are in a series of messages comprising a single e-mail thread, are attached to this declaration as Attachment "1."  In those communications, and in particular in an e-mail dated November 3, 2011, which is a part of Attachment "1," Ms. Leisch informed me that there are

PHDATA 3666020_1

JA1523

238 persons on the Planning List and that five of them are among the individuals sought to be protected by this motion.

4.     In later e-mails, Ms. Leisch and I discussed whether it would be necessary for Appellants to file this motion, or whether it could be deferred. Ultimately, I informed Ms. Leisch of Appellants' conclusion that it is necessary to file the motion at this time.

5.     In the e-mails, I also asked Ms. Leisch and Robert Meek, counsel for plaintiffs, whether they would concur in the motion. They both said they would not do so.

6.     True and correct copies of all of these e-mails are included in the thread that is Attachment "1."

I verify that the facts contained in the foregoing Declaration are true and correct to the best of my knowledge.  I understand that the statements made herein are subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

CARL A. SOLANO

Executed:  November 8, 2011

3

PHDATA 3666020_1

JA1524

# Attachment 1

PHDATA 3666020_1

**Solano, Carl**

| | |
|---|---|
| **From:** | Solano, Carl |
| **Sent:** | Monday, November 07, 2011 3:11 PM |
| **To:** | 'Leisch, Doris'; 'Hoffart, Ben' |
| **Cc:** | 'Meek, Robert' |
| **Subject:** | RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE |

Doris, thank you for your message and for the alternative proposal. Under that proposal, however, planning to move the five residents will continue apace, with the aim to be able to move them to "community" facilities by June 30, 2012. The only reason to defer our motion would be the possibility that you might not meet that June 30 deadline, but nothing in your e-mail suggests that you will not try to meet the deadline. Indeed, it appears that DPW *must* try to meet the deadline in order to comply with the terms of the settlement. If you succeed in making preparations to relocate these individuals by the deadline, we would be forced to file our motion in March or early April, which may require the Court to decide it on an expedited basis. While we appreciate your representation that you would not oppose such a motion as untimely, the Court nevertheless may be of the view that we should have filed sooner, and, in particular, that we should have moved before the Commonwealth expended time and resources on planning to relocate these individuals. For all of these reasons, we plan to file now.

In our initial conversation on October 21, 2011, you told me that DPW might not plan to move any residents in the category at issue here during the current fiscal year, but would instead move only those residents this year who have actually expressed a desire to move (either themselves, or through their guardians or family members). It may be that there ended up being only 45 residents on the Planning List who have an actual desire to move, in which case DPW had to add the 5 residents categorized as having "no preference" and no guardian or family in order to reach 50 people for Fiscal 2011-12. Whatever the reason, so long as those 5 people are on the list, we plan to file our motion.

Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:       (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:      www.schnader.com

1

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Monday, November 07, 2011 12:09 PM
To: Solano, Carl; 'Hoffart, Ben'
Cc: 'Meek, Robert'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Thank you for waiting.
In an effort to reach an accommodation, Plaintiffs and the Department
have an alternative proposal for you to consider, in light of the
projected dates by which the five residents are likely to move to the
community, informed by the timing of the Third Circuit's decision on
intervention last year.
To avoid the need to move for a stay now, I will commit to letting you
know in March or early April the status of the planning process for
the five individuals and whether, given that status, the Department
expects that they will move to the community before the end of the
fiscal year.  If the planning process has proceeded more expeditiously
than currently anticipated, the objectors could move for a stay at
that point.  We would of course not object to the motion as untimely.
If, on the other hand, it's likely that none of the five individuals
will move before the end of the fiscal year and therefore before the
Third Circuit is likely to rule on the merits, there would be no need
to request a stay.
We believe that this proposal would meet your needs while at the same
time avoiding use of judicial resources unless necessary.
Regarding the group that you added in your email on Friday - i.e.,
those who expressed no preference and whose guardians or family
members did not respond to the interest assessment - no one in that
category is on the planning list for this fiscal year.
Please let me know what you think of the proposal.

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554
_____
From: Solano, Carl [CSolano@schnader.com]

2

JA1527

Sent: Friday, November 04, 2011 1:32 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

We will wait until Monday.  We plan to seek a stay until resolution of
the appeal with respect to relocation of any resident who has been
placed on the Planning List because he or she is identified as having
"no preference" and has no guardian or involved family member.  We
include in this category any resident whose guardian or involved
family member is identified as having "no preference" merely because,
pursuant to the first full bullet on the second page of the Assessment
Protocol, the Department was unable to contact that individual.

Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:     (215) 751-2202
Fax:       (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:       www.schnader.com


-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, November 04, 2011 1:09 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

I'm frankly quite surprised that you'v decided to proceed, given the
Department's projected schedule, particularly in light of the court's
schedule in ruling on the intervention appeals last year.
I would like to discuss our position on your motion with my clients
and am not in the office today.  I would appreciate your holding off
until Monday, when I will get back to you.
Have a good weekend.
Doris

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554
_____

From: Solano, Carl [CSolano@schnader.com]
Sent: Thursday, November 03, 2011 3:26 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

To Doris Leisch and Robert Meek:

In view of the information in this message, appellants plan to go
forward with a stay motion.  Previously, we were informed that both
plaintiffs and DPW would oppose such a motion if it were filed.
Please confirm that this position has not changed.


Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:      (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:       www.schnader.com



-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Thursday, November 03, 2011 10:28 AM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good morning.

4

JA1529

Development of the prioritized planning list for this fiscal year is now complete.  In deciding who should be on the list this year, Department staff undertook a very detailed review of each of the 238 persons on the larger Planning List, with primary consideration going to whether the resident would benefit from living in the community and whether residential and other services exist or could be developed to support the resident in the community, as well as whether friends of the resident would also be moving, for the purpose of looking at roommate pairings, county and provider capacity to develop appropriate programs, etc.  The Facility Advocates did not participate in the review or decision-making.  After conducting its intensive review, the Department identified only five people who expressed no preference and have no identified guardian or other family member to move this year. As I mentioned in my email last week, active planning has begun only for the class representatives and four people who were admitted to one of the state centers in the last year or so.  Now that the list is final for this year, active planning will begin for all residents on the list.

Given the various considerations that are called into play in developing a community program for someone, including among other things identifying providers, locating and purchasing homes, and constructing a service package that will meet the person's needs, we do not expect that these five residents will move until as late in the fiscal year as June.  Frankly, given the vississitudes associated with developing new community programs, early in the next fiscal year is more probable, as I have informed Plaintiffs' counsel.

As emphasized in the Department's testimony at the fairness hearing, no one will move until the needed program is developed and in place . No one will move for the sake of meeting a predetermined timetable. Please let me know if you have any questions.

---

From: Leisch, Doris
Sent: Tuesday, November 01, 2011 9:24 PM
To: Leisch, Doris; Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good evening.
I was overly optimistic in thinking that I would have no questions when reviewing the list, which I was unable to get the answers to today because those with answers were not in the office.  In addition to the usual out-of-office activities, some people have been displaced from their homes because of power outages.

5

I hope to be able to get back to you tomorrow.

---

From: Leisch, Doris
Sent: Monday, October 31, 2011 6:48 PM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good evening, gentlemen.  I hope you're in the safety of your homes,
away from the witches, goblins, and other creatures that are roaming
tonight.
I received the planning list for this fiscal year this evening.    I
will review and let you know tomorrow whether anyone in the population
you're concerned about is on the list.

---

From: Leisch, Doris
Sent: Thursday, October 27, 2011 3:32 PM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

The latest hot-off-the-presses update is that we this afternoon
received everything needed from planning partners in order to be able
to proceed with finalizing the list.  Because reviewing all of the
information will take some time, the list will be final by Monday,
Halloween.

---

From: Solano, Carl [CSolano@schnader.com]
Sent: Thursday, October 27, 2011 11:46 AM
To: Leisch, Doris
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Do you still expect the list for this fiscal year to be completed this
week?

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Thursday, October 27, 2011 11:41 AM
To: Solano, Carl

6

Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Hello, all.  I haven't responded sooner because I was out of the
office entertaining family visiting from Austria.

Carl, I read the statement in your earlier email below that "We very
recently heard that efforts were continuing to move forward to carry
out 50 relocations by June 30," to mean that planning was underway to
move 50 people; that's what I was referring to as misinformation.  The
more recent, more specific statement attributed to Pam Kuhno is of
course accurate and, it seems, unremarkable, since it merely reflects
the intent to implement the settlement agreement.
In any case, the final list for this fiscal year is still under
development, which I confirmed again today.  You might remember from
the testimony at the fairness hearing that the prioritization of the
50 people who will move every fiscal year takes into account a number
of different considerations, including among other things a person's
desire to move, geographic location, county and provider capacity to
develop appropriate residential and other services for persons who are
on the planning list.  It is a collaborative effort among various
players, not just the Department.  Such collaboration often takes more
time than anticipated at the outset.
I will let you know when the list for this fiscal year is final if
anyone on the list is someone who has expressed no preference and has
no guardian or other family member.  The "list of 50" in subsequent
fiscal years won't be developed until the start of each fiscal year,
so I won't soon have any information to impart about fiscal year 2012-
2013.

From: Solano, Carl [CSolano@schnader.com]
Sent: Monday, October 24, 2011 1:46 PM
To: Leisch, Doris
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, I'm not sure what you mean by being misinformed.  We were told
that Pamela Kuhno has been saying during training sessions at the
State Centers that there are approximately 240 people on the Planning
List and that the plan still is to move 50 of those people during this
fiscal year (by June 30).  What part of this is incorrect?  Your e-

7

JA1532

mail talking about "the 50 people who will move this year" seems to
confirm our understanding.

Our question went to which people will be moved first.  If none of the
"50 people who will move this year" are "people who expressed no
preference and have no guardian or family member," we will take that
information into account, though we would still want to know if any of
the "people who expressed no preference and have no guardian or family
member" will be slated to move in FY 2012-13 if the appeal is not
decided by then.  I understand your e-mail to say that you do not yet
know these answers, but that you will let us know this week.  Is that
correct?

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Monday, October 24, 2011 10:53 AM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good morning, all.
The final prioritization to identify the 50 people who will move this
year has not yet been completed and is scheduled to be completed this
week, so it appears that your source is misinformed.  State Center
staff have received training, so it could be that that's the cause for
the misinformation.  Planning is in progress only for the named
plaintiffs and those few residents who were admitted to a State Center
in the last year; neither group includes people who expressed no
preference and have no guardian or involved family member.
In the event that you file your motion notwithstanding this
information, we oppose the motion.  If you want to wait until the
planning list for this year is final, which will be this week, I'll
get back to you with updated information.

_____

From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 3:38 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, we didn't know that until you told it to us today.  We very
recently heard that efforts were continuing to move forward to carry

8

out 50 relocations by June 30, and no one has told us who is being
moved first.  We're holding off for now on the basis of your
representation that nothing will happen in the near future, but we did
not want to wait so long that we would have to present the issue to
the Court as an emergency.

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, October 21, 2011 3:26 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

To avoid any misunderstanding, the reason I'm unable to respond is
because I haven't been able to get the information, not because the
information is unclear.  I'm not in the office, and the person whom I
need to talk to is also not in the office.  I can tell you that no one
on the planning list is on the eve of moving to the community, so I'm
not sure I understand the sense of urgency.
Doris

_____
From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 2:13 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, we are willing to wait until Monday, but we do not want to wait
longer.  If the answer is still unclear on Monday, then that may
suggest that our motion is necessary.  We'll look forward to hearing
further from you.  Have a good weekend.

Carl

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, October 21, 2011 12:52 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Hello, all.

9

JA1534

I'm not going to be able to get the information today. I hope to have
it on Monday.  Please let me know if you will hold off on filing until
I get back to you.

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554

_____

From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 12:06 PM
To: 'Meek, Robert'
Cc: 'Hoffart, Ben'; Leisch, Doris
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Mr. Meek, I had called Doris Leisch yesterday to discuss the motion,
and I sent the e-mails this morning because I had not yet spoken to
her.  We have now spoken, and it may be that, based on information
that she will be confirming, it will not be necessary to file the
motion today.  I will let you know our plans once I hear back from
Doris.
Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:      (215) 972-7363
E-mail:   CSolano@Schnader.com
Web:      www.schnader.com


From: Meek, Robert [mailto:rmeek@drnpa.org]
Sent: Friday, October 21, 2011 11:58 AM
To: Solano, Carl
Cc: 'Hoffart, Ben'; 'Leisch, Doris'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

10

JA1535

Mr. Solano-I will oppose your motion for a partial stay. I'd
appreciate a bit more warning than a few hours when you plan to file
motions. I am not always in my office.

RWM

_____
From: Solano, Carl [mailto:CSolano@schnader.com]
Sent: Friday, October 21, 2011 11:23 AM
To: Meek, Robert
Cc: 'Hoffart, Ben'
Subject: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Ms. Meek, Ben Hoffart and I plan to file a motion with Judge Jones
requesting a limited stay pending appeal of his decision to the extent
it permits relocation to "community" facilities of profoundly retarded
State Center residents who have no guardians or involved family
members to speak on their behalf.  These are the residents about which
Judge Jones expressed concern in his Sept. 2, 2011 opinion.  We would
not seek a stay insofar as the decision applies to other State Center
residents.  We plan to file the motion today.

Please confirm whether you will oppose the motion for a partial stay
so that I can represent your position in a certificate of concurrence.
Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:       (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:       www.schnader.com

11

JA1536

**Solano, Carl**

| | |
|---|---|
| **From:** | Solano, Carl |
| **Sent:** | Monday, November 07, 2011 3:11 PM |
| **To:** | 'Leisch, Doris'; 'Hoffart, Ben' |
| **Cc:** | 'Meek, Robert' |
| **Subject:** | RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE |

Doris, thank you for your message and for the alternative proposal.  Under that proposal, however, planning to move the five residents will continue apace, with the aim to be able to move them to "community" facilities by June 30, 2012.  The only reason to defer our motion would be the possibility that you might not meet that June 30 deadline, but nothing in your e-mail suggests that you will not try to meet the deadline.  Indeed, it appears that DPW *must* try to meet the deadline in order to comply with the terms of the settlement.  If you succeed in making preparations to relocate these individuals by the deadline, we would be forced to file our motion in March or early April, which may require the Court to decide it on an expedited basis.  While we appreciate your representation that you would not oppose such a motion as untimely, the Court nevertheless may be of the view that we should have filed sooner, and, in particular, that we should have moved before the Commonwealth expended time and resources on planning to relocate these individuals.  For all of these reasons, we plan to file now.

In our initial conversation on October 21, 2011, you told me that DPW might not plan to move any residents in the category at issue here during the current fiscal year, but would instead move only those residents this year who have actually expressed a desire to move (either themselves, or through their guardians or family members).  It may be that there ended up being only 45 residents on the Planning List who have an actual desire to move, in which case DPW had to add the 5 residents categorized as having "no preference" and no guardian or family in order to reach 50 people for Fiscal 2011-12.  Whatever the reason, so long as those 5 people are on the list, we plan to file our motion.

Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:        (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:      www.schnader.com

1

JA1537

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Monday, November 07, 2011 12:09 PM
To: Solano, Carl; 'Hoffart, Ben'
Cc: 'Meek, Robert'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Thank you for waiting.
In an effort to reach an accommodation, Plaintiffs and the Department
have an alternative proposal for you to consider, in light of the
projected dates by which the five residents are likely to move to the
community, informed by the timing of the Third Circuit's decision on
intervention last year.
To avoid the need to move for a stay now, I will commit to letting you
know in March or early April the status of the planning process for
the five individuals and whether, given that status, the Department
expects that they will move to the community before the end of the
fiscal year.  If the planning process has proceeded more expeditiously
than currently anticipated, the objectors could move for a stay at
that point.  We would of course not object to the motion as untimely.
If, on the other hand, it's likely that none of the five individuals
will move before the end of the fiscal year and therefore before the
Third Circuit is likely to rule on the merits, there would be no need
to request a stay.
We believe that this proposal would meet your needs while at the same
time avoiding use of judicial resources unless necessary.
Regarding the group that you added in your email on Friday - i.e.,
those who expressed no preference and whose guardians or family
members did not respond to the interest assessment - no one in that
category is on the planning list for this fiscal year.
Please let me know what you think of the proposal.

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554
_____
From: Solano, Carl [CSolano@schnader.com]

2

JA1538

Sent: Friday, November 04, 2011 1:32 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

We will wait until Monday.  We plan to seek a stay until resolution of
the appeal with respect to relocation of any resident who has been
placed on the Planning List because he or she is identified as having
"no preference" and has no guardian or involved family member.  We
include in this category any resident whose guardian or involved
family member is identified as having "no preference" merely because,
pursuant to the first full bullet on the second page of the Assessment
Protocol, the Department was unable to contact that individual.

Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:        (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:        www.schnader.com


-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, November 04, 2011 1:09 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

I'm frankly quite surprised that you'v decided to proceed, given the
Department's projected schedule, particularly in light of the court's
schedule in ruling on the intervention appeals last year.
I would like to discuss our position on your motion with my clients
and am not in the office today.  I would appreciate your holding off
until Monday, when I will get back to you.
Have a good weekend.
Doris

3

JA1539

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554
_____

From: Solano, Carl [CSolano@schnader.com]
Sent: Thursday, November 03, 2011 3:26 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

To Doris Leisch and Robert Meek:

In view of the information in this message, appellants plan to go
forward with a stay motion.  Previously, we were informed that both
plaintiffs and DPW would oppose such a motion if it were filed.
Please confirm that this position has not changed.


Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:      (215) 972-7363
E-mail:   CSolano@Schnader.com
Web:      www.schnader.com



-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Thursday, November 03, 2011 10:28 AM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good morning.

JA1540

Development of the prioritized planning list for this fiscal year is
now complete.  In deciding who should be on the list this year,
Department staff undertook a very detailed review of each of the 238
persons on the larger Planning List, with primary consideration going
to whether the resident would benefit from living in the community and
whether residential and other services exist or could be developed to
support the resident in the community, as well as whether friends of
the resident would also be moving, for the purpose of looking at
roommate pairings, county and provider capacity to develop appropriate
programs, etc.  The Facility Advocates did not participate in the
review or decision-making.  After conducting its intensive review, the
Department identified only five people who expressed no preference and
have no identified guardian or other family member to move this year.
As I mentioned in my email last week, active planning has begun only
for the class representatives and four people who were admitted to one
of the state centers in the last year or so.  Now that the list is
final for this year, active planning will begin for all residents on
the list.
Given the various considerations that are called into play in
developing a community program for someone, including among other
things identifying providers, locating and purchasing homes, and
constructing a service package that will meet the person's needs, we
do not expect that these five residents will move until as late in the
fiscal year as June.  Frankly, given the vississitudes associated with
developing new community programs, early in the next fiscal year is
more probable, as I have informed Plaintiffs' counsel.
As emphasized in the Department's testimony at the fairness hearing,
no one will move until the needed program is developed and in place .
No one will move for the sake of meeting a predetermined timetable.
Please let me know if you have any questions.

_____

From: Leisch, Doris
Sent: Tuesday, November 01, 2011 9:24 PM
To: Leisch, Doris; Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good evening.
I was overly optimistic in thinking that I would have no questions
when reviewing the list, which I was unable to get the answers to
today because those with answers were not in the office.  In addition
to the usual out-of-office activities, some people have been displaced
from their homes because of power outages.

5

I hope to be able to get back to you tomorrow.

---

From: Leisch, Doris
Sent: Monday, October 31, 2011 6:48 PM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good evening, gentlemen.  I hope you're in the safety of your homes,
away from the witches, goblins, and other creatures that are roaming
tonight.
I received the planning list for this fiscal year this evening.   I
will review and let you know tomorrow whether anyone in the population
you're concerned about is on the list.

---

From: Leisch, Doris
Sent: Thursday, October 27, 2011 3:32 PM
To: Solano, Carl
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

The latest hot-off-the-presses update is that we this afternoon
received everything needed from planning partners in order to be able
to proceed with finalizing the list.  Because reviewing all of the
information will take some time, the list will be final by Monday,
Halloween.

---

From: Solano, Carl [CSolano@schnader.com]
Sent: Thursday, October 27, 2011 11:46 AM
To: Leisch, Doris
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Do you still expect the list for this fiscal year to be completed this
week?

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Thursday, October 27, 2011 11:41 AM
To: Solano, Carl

6

Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Hello, all.  I haven't responded sooner because I was out of the
office entertaining family visiting from Austria.

Carl, I read the statement in your earlier email below that "We very
recently heard that efforts were continuing to move forward to carry
out 50 relocations by June 30," to mean that planning was underway to
move 50 people; that's what I was referring to as misinformation.  The
more recent, more specific statement attributed to Pam Kuhno is of
course accurate and, it seems, unremarkable, since it merely reflects
the intent to implement the settlement agreement.
In any case, the final list for this fiscal year is still under
development, which I confirmed again today.  You might remember from
the testimony at the fairness hearing that the prioritization of the
50 people who will move every fiscal year takes into account a number
of different considerations, including among other things a person's
desire to move, geographic location, county and provider capacity to
develop appropriate residential and other services for persons who are
on the planning list.  It is a collaborative effort among various
players, not just the Department.  Such collaboration often takes more
time than anticipated at the outset.
I will let you know when the list for this fiscal year is final if
anyone on the list is someone who has expressed no preference and has
no guardian or other family member.  The "list of 50" in subsequent
fiscal years won't be developed until the start of each fiscal year,
so I won't soon have any information to impart about fiscal year 2012-
2013.

---

From: Solano, Carl [CSolano@schnader.com]
Sent: Monday, October 24, 2011 1:46 PM
To: Leisch, Doris
Cc: 'Meek, Robert'; 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, I'm not sure what you mean by being misinformed.  We were told
that Pamela Kuhno has been saying during training sessions at the
State Centers that there are approximately 240 people on the Planning
List and that the plan still is to move 50 of those people during this
fiscal year (by June 30).  What part of this is incorrect?  Your e-

7

JA1543

mail talking about "the 50 people who will move this year" seems to
confirm our understanding.

Our question went to which people will be moved first.  If none of the
"50 people who will move this year" are "people who expressed no
preference and have no guardian or family member," we will take that
information into account, though we would still want to know if any of
the "people who expressed no preference and have no guardian or family
member" will be slated to move in FY 2012-13 if the appeal is not
decided by then.  I understand your e-mail to say that you do not yet
know these answers, but that you will let us know this week.  Is that
correct?

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Monday, October 24, 2011 10:53 AM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Good morning, all.
The final prioritization to identify the 50 people who will move this
year has not yet been completed and is scheduled to be completed this
week, so it appears that your source is misinformed.  State Center
staff have received training, so it could be that that's the cause for
the misinformation.  Planning is in progress only for the named
plaintiffs and those few residents who were admitted to a State Center
in the last year; neither group includes people who expressed no
preference and have no guardian or involved family member.
In the event that you file your motion notwithstanding this
information, we oppose the motion.  If you want to wait until the
planning list for this year is final, which will be this week, I'll
get back to you with updated information.

_____
From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 3:38 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, we didn't know that until you told it to us today.  We very
recently heard that efforts were continuing to move forward to carry

8

JA1544

out 50 relocations by June 30, and no one has told us who is being
moved first.  We're holding off for now on the basis of your
representation that nothing will happen in the near future, but we did
not want to wait so long that we would have to present the issue to
the Court as an emergency.

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, October 21, 2011 3:26 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

To avoid any misunderstanding, the reason I'm unable to respond is
because I haven't been able to get the information, not because the
information is unclear.  I'm not in the office, and the person whom I
need to talk to is also not in the office.  I can tell you that no one
on the planning list is on the eve of moving to the community, so I'm
not sure I understand the sense of urgency.
Doris

_____
From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 2:13 PM
To: Leisch, Doris; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Doris, we are willing to wait until Monday, but we do not want to wait
longer.  If the answer is still unclear on Monday, then that may
suggest that our motion is necessary.  We'll look forward to hearing
further from you.  Have a good weekend.

Carl

-----Original Message-----
From: Leisch, Doris [mailto:dleisch@pa.gov]
Sent: Friday, October 21, 2011 12:52 PM
To: Solano, Carl; 'Meek, Robert'
Cc: 'Hoffart, Ben'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Hello, all.

9

I'm not going to be able to get the information today. I hope to have
it on Monday.  Please let me know if you will hold off on filing until
I get back to you.

Doris M. Leisch | Deputy Chief Counsel
Department of Public Welfare
Governor's Office of General Counsel
Commonwealth of Pennsylvania
801 Market Street, Suite 6092
Philadelphia, Pa 19107
Phone 215-560-2192 | Fax 215-560-5554

---

From: Solano, Carl [CSolano@schnader.com]
Sent: Friday, October 21, 2011 12:06 PM
To: 'Meek, Robert'
Cc: 'Hoffart, Ben'; Leisch, Doris
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Mr. Meek, I had called Doris Leisch yesterday to discuss the motion,
and I sent the e-mails this morning because I had not yet spoken to
her.  We have now spoken, and it may be that, based on information
that she will be confirming, it will not be necessary to file the
motion today.  I will let you know our plans once I hear back from
Doris.
Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:      (215) 972-7363
E-mail:   CSolano@Schnader.com
Web:      www.schnader.com


From: Meek, Robert [mailto:rmeek@drnpa.org]
Sent: Friday, October 21, 2011 11:58 AM
To: Solano, Carl
Cc: 'Hoffart, Ben'; 'Leisch, Doris'
Subject: RE: BENJAMIN v. DEPT. OF PUBLIC WELFARE

JA1546

Mr. Solano-I will oppose your motion for a partial stay. I'd
appreciate a bit more warning than a few hours when you plan to file
motions. I am not always in my office.

RWM

_____

From: Solano, Carl [mailto:CSolano@schnader.com]
Sent: Friday, October 21, 2011 11:23 AM
To: Meek, Robert
Cc: 'Hoffart, Ben'
Subject: BENJAMIN v. DEPT. OF PUBLIC WELFARE

Ms. Meek, Ben Hoffart and I plan to file a motion with Judge Jones
requesting a limited stay pending appeal of his decision to the extent
it permits relocation to "community" facilities of profoundly retarded
State Center residents who have no guardians or involved family
members to speak on their behalf.  These are the residents about which
Judge Jones expressed concern in his Sept. 2, 2011 opinion.  We would
not seek a stay insofar as the decision applies to other State Center
residents.  We plan to file the motion today.

Please confirm whether you will oppose the motion for a partial stay
so that I can represent your position in a certificate of concurrence.
Carl Solano
<mailto:CSolano@Schnader.com>
Carl A. Solano
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Phone:    (215) 751-2202
Fax:       (215) 972-7363
E-mail:    CSolano@Schnader.com
Web:       www.schnader.com

11

JA1547