No. 11-3684, 11-3685

*In The*

# United States Court of Appeals

*for the*

# Third Circuit

———————————

**FRANKLIN BENJAMIN**, by and through his next friend, **ANDRÉE YOCK**; **RICHARD GROGG** and **FRANK EDGETT**, by and through their next friend **JOYCE MCCARTHY**; **SYLVIA BALDWIN**, by and through her next friend, **SHIRL MEYERS**; **ANTHONY BEARD**, by and through his next friend **NICOLE TURMAN**, on behalf of themselves and all others similarly situated,

**v.**

**DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA** and **ESTELLE B. RICHMAN**, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania.

**CRAIG SPRINGSTEAD**, by and through his father and guardian, **BERTIN SPRINGSTEAD**; **MARIA MEO**, by and through her mother and guardian **GRACE MEO**; **DANIEL BASTEK**, by and through his father and guardian, **JOHN BASTEK**; **MICHAEL STORM**, by and through his guardian, **POLLY SPARE**; **BETH ANN LAMBO**, by and through her father and guardian, **JOSEPH LAMBO**; **RICHARD CLARKE**, by and through his father and guardian, **LEONARD CLARKE**; **RICHARD KOHLER**, by and through his sister and guardian, **SARA FULLER**; **MARIA KASHATUS** by and through her father and guardian, **THOMAS KASHATUS**; and **WILSON SHEPPARD**, by and through his brother and next friend, **ALFRED SHEPPARD**,

*Appellants, No. 11-3684*

**DIANE SOLANO,** by and through her brother and guardian, **CARL SOLANO,**

*Appellant, No. 11-3685*

———————————

On Appeal from the Order dated September 2, 2011, by the United States District Court for the Middle District of Pennsylvania, Civil Action No. 09-01182

———————————

**BRIEF *AMICI CURIAE* OF VOR, INC. (Formerly, Voice of the Retarded, Inc.) AND 92 MEMBER AMICI\* IN SUPPORT OF APPELLANT'S ARGUMENT FOR REVERSAL (File By Consent Pursuant to Fed. R. App. P.29 (a))**

———————————

*\* List of Amici on following page*

## LIST OF AMICI:

| | | |
|---|---|---|
| VOR, Inc.* | Kate Govaeea* | Shirley Musacchio* |
| Ellie Adams | Wes Grebski* | Kenneth O. Myers* |
| Frank Beston* | John P. Gregor | Celine M. Nauman |
| Richard Bolger | Adelaide Hardy* | Patricia O'Donnell* |
| Sharon & Elmer Brice* | Deborah & Gerard Hey* | Frances Fowler Parker |
| William F. Brill* | William F. Hudock* | Satish & Neela Patel |
| Walter Buchholz | Ruth Jarrett* | Mary Shaffer Raderstorf |
| Helen Cox | Doris L. Kalan* | Leonora Polizzi |
| Andy & Irene Crichton | Mary Kashatus* | Joseph Potera* |
| William & Beverly | C.W. Koopman | David Rosen |
| Daugherty* | Sandra Krafft* | Barbara Sabo* |
| Guy Di Marzio | Dr. Michael and Rosa | Alfred, Allan & |
| Carin Doddroe* | Kurtz | Carmella Sames |
| Dolores J. Drews* | Arthur Leibowitz | Andrea A. Sarris |
| Gerald S. Dunne* | Linda Leichter | Charlene Shaffer |
| Catherine Dymacek* | Jane Lemmon | Trudy Sheetz* |
| Beverly Evans | Betty Lightner* | Beatrice Sitko* |
| Susan B. Farina | Linda Lotzi* | Eugene Shuxteau |
| Norma Ferguson* | Lawrence Lotzi | Kathryn Spare |
| Kimberley Gauronski* | Francis J. Marlow* | Margaret M. Tierney* |
| The Giarratano Family (6) | Charles McCormick* | Bill Toperzer* |
| Gaetana Giarratano | Michael & Thomas | Daniel Torisky |
| Emil & Elizabeth Gnall* | McKeaney | Christopher W. Tyler |
| Mindy & Richard Goldstein | Wilson McKinley | Gary & Mary Wills* |
| Reverend Adelbert Gordon* | Doris Jane Miller | C.L. & Donna |
| Minerva Gordon* | Jean McCoy Milliron* | Witzleben |
| Mary Gough* | Charlotte Morris | |

*These individuals also filed objections to the settlement in the District Court.

NANCY SHANE RAPPAPORT
LESLI C. ESPOSITO
DLA PIPER LLP (US)
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103
(215) 656-3300
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................1

II.   ARGUMENT.....................................................................................5

    A.    Who We Are:  VOR, Inc. and The 92 Amici .......................................5

    B.    Those For Whom VOR Speaks ............................................................6

    C.    This Matter Follows Others In a Long Line of Lawsuits
        Resulting in the Shut-Down of Intermediate Care Facilities for
        the Intellectually Disabled, Nationally and Locally............................8

        1.    Protection & Advocacy Systems Are Filing Similar Suits
            Nationwide Already Resulting in the Closure of
            ICFs/MR in At Least Nine States, Abolishing The Right
            to Choose..................................................................................10

        2.    Prior Actions Have Already Resulted In ICF/MR
            Closures Here in Pennsylvania .................................................12

    D.    This Settlement Will Result In Abuse, Neglect, and Death
        Following The Closures of Pennsylvania's ICFs/MR For the
        Intellectually Disabled........................................................................16

        1.    National mortality studies show the profoundly
            intellectually disabled are at real risk if placed in
            community settings ..................................................................16

        2.    The profoundly intellectually disabled are at even greater
            risk because DPW has proposed to slash funding to
            Pennsylvania's Community-Based Provider
            Organizations .........................................................................21

    E.    The District Court's Rubber-Stamped Certification of a Class
        Was Unconscionable ..........................................................................23

    F.    Even the District Court Recognized the Inevitable Harm In
        Approving the Proposed Settlement.....................................................28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Brown v. Bush,*
No. 98-cv-673 (S.D. Fla. March 1998) .................................................................................11

*Coffelt v. Department of Developmental Services,*
No. 91-6401 (Cal. Super. Ct. Jan. 1994) ............................................................................12

*Hunt v. Meszaros,*
No. PJM 91-2564 (D. Md. 1991) ........................................................................................11

*Jackson v. Fort Stanton Hospital and Training School,*
757 F.Supp. 1241 (D. N.M. 1990) .....................................................................................12

*Ligas v. Maram,*
478 F.3d 771 (7th Cir. 2007) .............................................................................................25

*Ligas v. Maram,*
No. 1:05-cv-04331 (N.D. Ill. July 2005) .................................................................24, 25, 27

*Martin v. Taft,*
222 F.Supp.2d (S.D. Ohio 2002) ......................................................................................12

*Michigan Association for Retarded Citizens v. Smith,*
475 Supp. 990 (E.D. Mich. 1979) .....................................................................................12

*Mumford v. Department of Public Welfare of the Commonwealth of Pennsylvania, et al.,*
No. 11-3312 (October 5, 2011 E.D. Pa.) ...........................................................................22

*Nelson v. Snider,*
No. 94-CV-440 (E.D. Pa. 1994) ........................................................................................13

*Olmstead v. L.C. ex rel. Zimring,*
527 U.S. 581 (1999)..........................................................................................2, 12, 30

*People First of Washington, Inc. v. Rainier Residential Habilitation Center, et al.,*
No. C96-5906 FDB (W.D. Wash. 1997) .............................................................................7

*Richard C. v. Houstoun,*
196 F.R.D. 288 (W.D. Pa. 1999) .......................................................................................13

*Torisky, et al v. Schweiker, et al,*
No. 05-1496 (M.D. Pa. 2001) .......................................................................................13, 14

*Travis D., et al. v. Eastmont Human Services Center,*
No. 96-93 (D. Mont. 1996) ................................................................................................11

*United States v. Commwlth. of Pennsylvania,*
832 F. Supp. 122 (E.D. Pa., 1993) ...............................................................................12, 13

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................1

II.  ARGUMENT.....................................................................5

A.  Who We Are:  VOR, Inc. and The 92 Amici .......................................5

B.  Those For Whom VOR Speaks ...........................................6

C.  This Matter Follows Others In a Long Line of Lawsuits
     Resulting in the Shut-Down of Intermediate Care Facilities for
     the Intellectually Disabled, Nationally and Locally............................8

     1.   Protection & Advocacy Systems Are Filing Similar Suits
          Nationwide Already Resulting in the Closure of
          ICFs/MR in At Least Nine States, Abolishing The Right
          to Choose..................................................................10

     2.   Prior Actions Have Already Resulted In ICF/MR
          Closures Here in Pennsylvania .................................................12

D.  This Settlement Will Result In Abuse, Neglect, and Death
     Following The Closures of Pennsylvania's ICFs/MR For the
     Intellectually Disabled........................................................16

     1.   National mortality studies show the profoundly
          intellectually disabled are at real risk if placed in
          community settings ................................................16

     2.   The profoundly intellectually disabled are at even greater
          risk because DPW has proposed to slash funding to
          Pennsylvania's Community-Based Provider
          Organizations .........................................................21

E.  The District Court's Rubber-Stamped Certification of a Class
     Was Unconscionable .........................................................23

F.  Even the District Court Recognized the Inevitable Harm In
     Approving the Proposed Settlement.....................................28

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Brown v. Bush*,
   No. 98-cv-673 (S.D. Fla. March 1998) .................................................................11

*Coffelt v. Department of Developmental Services*,
   No. 91-6401 (Cal. Super. Ct. Jan. 1994) ...........................................................12

*Hunt v. Meszaros*,
   No. PJM 91-2564 (D. Md. 1991) .........................................................................11

*Jackson v. Fort Stanton Hospital and Training School*,
   757 F.Supp. 1241 (D. N.M. 1990) ......................................................................12

*Ligas v. Maram*,
   478 F.3d 771 (7th Cir. 2007) .............................................................................25

*Ligas v. Maram*,
   No. 1:05-cv-04331 (N.D. Ill. July 2005) ..................................................24, 25, 27

*Martin v. Taft*,
   222 F.Supp.2d (S.D. Ohio 2002) ........................................................................12

*Michigan Association for Retarded Citizens v. Smith*,
   475 Supp. 990 (E.D. Mich. 1979) ......................................................................12

*Mumford v. Department of Public Welfare of the Commonwealth of Pennsylvania, et al.*,
   No. 11-3312 (October 5, 2011 E.D. Pa.) .............................................................22

*Nelson v. Snider*,
   No. 94-CV-440 (E.D. Pa. 1994) .........................................................................13

*Olmstead v. L.C. ex rel. Zimring*,
   527 U.S. 581 (1999).............................................................................2, 12, 30

*People First of Washington, Inc. v. Rainier Residential Habilitation Center, et al.*,
   No. C96-5906 FDB (W.D. Wash. 1997) ................................................................7

*Richard C. v. Houstoun*,
   196 F.R.D. 288 (W.D. Pa. 1999) .........................................................................13

*Torisky, et al v. Schweiker, et al*,
   No. 05-1496 (M.D. Pa. 2001) ........................................................................13, 14

*Travis D., et al. v. Eastmont Human Services Center*,
   No. 96-93 (D. Mont. 1996) ................................................................................11

*United States v. Commwlth. of Pennsylvania*,
   832 F. Supp. 122 (E.D. Pa., 1993) ................................................................12, 13

ii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 .................................................................................................................28

H.R. 2032 .............................................................................................................................11

*1,200 Deaths and Few Answers*, The New York Times (November 6, 2011) ........................19, 22

Shaville, Strauss, and Day, *Deinstitutionalization in California:  Mortality of Persons with Developmental Disabilities after Transfer into Community Care, 1997-99, Life Expectancy Project,* Section 1, Journal of Data Science 3, p. 372 (2005)................................9

*State Probes Abuse of Disabled*, Albuquerque Journal, November 18, 2003 ..............................12

Strauss, David and Shavelle, Robert, *Policy Implications of Mortality Research: Authors' Perspectives, What Can We Learn From the California Mortality Studies?*, Mental Retardation, p. 407 (October 1998) ..........................................................................18

Walsh, Kastner and Green, *Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research*, Mental Retardation, Volume 41, Number 2, pp. 103-122 (April 2003; unpublished update, 2009)..............................................9

## I.    <u>Introduction</u>

VOR, Inc. and the 92 individual amici here (collectively "Amici") support the appeals to this Court to overturn a class action settlement that will inevitably cause harm to, if not the untimely death of, their dependents and loved ones. Although the class representatives claim to speak on behalf of all persons with intellectual and developmental disabilities in Pennsylvania Intermediate Care Facilities for the Mentally Retarded ("ICFs/MR"),[1] their interests are, in fact, diametrically opposed to the interests of a significant portion of the class they claim to represent -- most notably, the interests of individuals so profoundly intellectually disabled they cannot speak for themselves. These are persons whose interests are not only unrepresented in the class certified improperly here, but whose health and welfare stand to suffer the greatest losses if the settlement agreement is left unturned. It is the parents, family members and guardians of these profoundly intellectually disabled who the Amici represent.

The individual plaintiffs in the underlying action are five ICF/MR residents who filed suit claiming they were entitled to, but had been deprived of, the right to choose an alternative form of care. Specifically, they claimed a right to relocate to a community based facility. At the outset, it should be recognized that the Amici

---

[1] In nearly all states and in certain federal laws, the term "mental retardation" has been replaced by "intellectual disability." This brief will, therefore, refer to "mental retardation" as "intellectual disability," except in the case of direct quotes or titles.

1

do not dispute anyone's right to choose an alternative form of care, which the United States Supreme Court recognized in *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999). Rather, the Amici take issue with the District Court's improper decision to certify a class and force a settlement onto the profoundly intellectually disabled that is, itself, at odds with *Olmstead*. Indeed, the actions by the parties below and the District Court will simply result in a shift of all intellectually disabled from one setting to another, this time eliminating the right to choose by the profoundly intellectually disabled. One type of service, one type of residence, does not suit the welfare of ***all*** intellectually disabled. The solution is not to move everyone from one type of facility to another. This is not only in direct contravention of *Olmstead*, but will cause unspeakable harm to those in need of institutional care.

The District Court granted plaintiffs' unopposed request for class certification based on their blanket and unproven assertion that:

> All persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings.

Amended Complaint, ¶ 65. (A56) We know this allegation to be false. Indeed, the Amici represent individuals for whom an integrated community setting would ***not*** be sufficient. Many ICFs/MR residents receive rigorous around-the-clock care that is simply not available in the community. Significantly, ***these individuals***

*constitute the vast majority of the Commonwealth's population of intellectually disabled citizens.*

Nonetheless, without questioning plaintiffs' underlying support for, or otherwise testing their sweeping allegation, the District Court certified a class of individuals that is so broad, it includes *all* intellectually disabled individuals presently residing in ICFs/MR unless they have the capacity to choose to stay.  It puts the fate of those who cannot speak for themselves in the hands of individuals who know nothing about them or their limitations and with whom their interests may not be aligned.  With no say in the Court's ruling, the rights of the profoundly intellectually disabled have been compromised by the very definition of the class, the resultant settlement agreement, and the inevitable closures that will ensue.

Notably, the District Court itself recognized this unfortunate result in its final ruling questioning the assessment protocol for the proposed settlement.  The Court prefaced its paradoxical ruling by recognizing that the proposed settlement agreement may imply a bias towards community placement and expressing "serious doubts" as to whether it lays out the proper tool for determining whether the profoundly disabled, especially those without a guardian to speak for them, are opposed to community placement.  "Indeed," noted the District Court, "we wonder about the wisdom of defaulting such individuals into a no preference category

without greater analysis." *See* September 2, 2011 Memorandum, p. 15.[2] (A21)

Even for those who can speak through a family member or guardian, their choice to stay will result in displacement when the state facilities are shut down for lack of funding, as has been the national trend. Over the last few decades, Protection & Advocacy Systems ("P&As") across the nation, like Pennsylvania's Disability Rights Network, have filed or participated in numerous class action lawsuits resulting in the closure of at least 14 ICFs/MR for persons with intellectual disabilities in 8 states, including two in Pennsylvania.

While the Amici do not oppose the individual plaintiffs' right (and others similarly situated) to choose a different form of care, they do believe that individuals will be inappropriately displaced, by the very nature of the class. With the closure of state-run ICFs/MR, the rights of the intellectually disabled to choose the 24-hour a day care that they require will be stripped away.[3] Moreover, they will be placed in community-based facilities that are inadequate to serve many of their needs, where physical abuse, neglect and even death awaits them. Placing

---

[2] In light of these appeals, the District Court is now trying to distance itself from this language calling it "mere dicta" and an "inconsequential observation" it made in approving the settlement. *See,* December 19, 2011 Order Denying Motion to Stay. (A69)

[3] According to the "Pennsylvania Waiting List Campaign," funded in part by Disability Rights Network of Pennsylvania ("DRN"), there are 15,826 individuals with developmental disabilities waiting for services in Pennsylvania (http://www.pawaitinglistcampaign.org/). Nearly, 11,000 of these individuals are in "critical" or "emergency" situations. In the face of such tremendous need, it is unconscionable that the DRN is attempting to force the displacement of these individuals from their long-time state ICF/MR homes to an already over-stressed network of community and private ICFs/MR settings.

4

individuals with profound intellectual disabilities into a community-based facility

is like leaving a one-year-old without around-the-clock care.  Such treatment is

unheard of and violates their rights as citizens of this Commonwealth.

## II.    Argument

### A.    Who We Are:  VOR, Inc. and The 92 Amici

VOR is a non-profit advocacy organization dedicated to insuring that

individuals with intellectual disabilities receive the care and support they require in

an environment appropriate to their needs.  Because not all individuals with

intellectual disabilities are afflicted with the same condition, each is unique and

their respective conditions fall within a diverse spectrum of severity levels.  VOR's

mission is to work with people with intellectual disabilities, their families and

guardians, as well as with organizations, government entities, public officials, and

anyone concerned, to educate and assist them in selecting the appropriate day-to-

day personal care environment for those who are intellectually disabled.

The 92 individual Amici listed on this case caption are the family members,

guardians, individuals, and entities that will be directly effected by having

intellectually disabled loved ones harmed by the parties' settlement.  The

individual Amici also include individuals who have already lived through the

nightmare of having intellectually disabled loved ones shut out of their respective

ICF/MR homes when similar settlements forced those facilities to close. Each of the individual Amici are members of VOR.

The Amici possess a vast, specialized knowledge directed to the issues before this Court – knowledge that is founded upon a broad-base of experience of advocating for the daily personal and health care needs of people with intellectual and developmental disabilities, which includes the challenges, successes, and tragedies faced by each, as well as their family members, guardians, and caregivers, and the years of research and statistics gathered from reputable sources, as discussed below. The Amici's involvement in this case is to assist in providing useful, factual information to the Court surrounding events that have resulted from similar settlement agreements, to speak from experience with respect to the adverse implications of community placement for people with profound intellectual disabilities, and most significantly, to lend a voice to those simply unable to speak for themselves.

### B.     Those For Whom VOR Speaks

Not all people with intellectual disabilities have the same condition. There is a spectrum of severity that varies greatly among them. Thus, some individuals with intellectual disabilities are far more disabled than others. Depending upon each disabled person's unique condition, his or her appropriate care environment

could be in community placement, as Appellees argue in this action, or in a 24-hour care state ICF/MR, as Appellants contend.

There have been many differences in opinion over the care of the mentally disabled. *See People First of Washington, Inc. v. Rainier Residential Habilitation Center, et al.*, No. C96-5906 FDB (W.D. Wash. 1997) (recognizing "great debate" in how to best treat, care for, and accommodate intellectually and developmentally disabled individuals -- institutionalized care or a "continuum" of care, recognizing that, while some disabled persons can function in community settings, others are so severely disabled they require constant protection and care ). *Id.* Indeed, moving all mentally disabled individuals into a community setting is quite idealistic, as community placement is not safe for ***all*** individuals with intellectual disabilities. While many individuals with developmental disabilities will live lives that are fully integrated into their respective communities, others have cognitive and/or physical limitations so significant that they function at the level of a newborn or an infant. Proper placement depends upon a careful examination of whether appropriate support services exist to meet each individual's unique daily living and/or medical requirements. The disabled are entitled to choose where to reside -- in their own home, in a family home, in a community-based facility, or in a licensed ICF/MR.

VOR speaks on behalf of all individuals who are intellectually disabled to insure that they receive the appropriate care they require. But for those that are

wholly unable to advocate for themselves, who cannot safely move into a community setting, like the Appellants in this case, VOR is especially determined. Under all circumstances, VOR advocates for the preservation of choice for residential placement, including facility-based care, without eliminating the option of community placement. Thus, the ability of some individuals to benefit from community-based settings should not limit the choice of others with greater needs to remain in a licensed facility-based setting. Yet, the settlement approved by the District Court in this case gravely threatens to take away the choice of facility-based care for many.

## C.    This Matter Follows Others In a Long Line of Lawsuits Resulting in the Shut-Down of Intermediate Care Facilities for the Intellectually Disabled, Nationally and Locally.

It costs the state and federal governments a great deal of money to provide daily services to the residents living in state-operated ICFs/MR because the residents of these facilities have more serious disabilities than the typical residents of community facilities. As Appellees/Plaintiffs alleged, the average cost to provide services to each resident in a state ICF/MR in FY 2008-09 was $228,000 per resident. *See* Plaintiffs' Statement of Undisputed Material Facts in Support of Summary Judgment, p. 6-7. (A164-165) That cost was expected to increase to $240,000 per person in FY 2009-10 and further increase to $256,000 per person in FY 2010-11 - - a 12% increase in two years. (A164-165) By contrast,

Appellees/Plaintiffs allege that the average annual cost of community-based residential services for people with intellectual disabilities in FY 2008-09 was approximately $80,200.  Amended Complaint, p. 16. (A55)

The anticipated savings resulting from an ICF/MR closure, however, are questionable.  In contrast to the all-inclusive ICF/MR cost figures, costs associated with community-based care routinely exclude significant items such as room and board, health care, transportation and day programs.  *See* Walsh, Kastner and Green, *Cost Comparisons of Community and Institutional Residential Settings: Historical Review of Selected Research*, Mental Retardation, Volume 41, Number 2, pp. 103-122 (April 2003; unpublished update, 2009). (A193) And, of course, they do not include the cost of caring for those with more serious disabilities.

Many also advocate for closure on the premise it is more humane to serve individuals with intellectual disabilities in community settings, which, they claim, offers more independence and opportunities.  Thus, there has been a growing movement by the state governments and P&As across the country to close state facilities, such as Pennsylvania ICFs/MR, and relocate all residents to community housing.  *See, e.g.*, Shaville, Strauss, and Day, *Deinstitutionalization in California: Mortality of Persons with Developmental Disabilities after Transfer into Community Care, 1997-99, Life Expectancy Project,* Section 1, Journal of Data

Science 3, p. 372 (2005). (A159)  But such placement is not appropriate for those who require more services than funding will allow in the communities.

> **1.** **Protection & Advocacy Systems Are Filing Similar Suits Nationwide Already Resulting in the Closure of ICFs/MR in At Least Nine States, Abolishing The Right to Choose.**

The present lawsuit is another in a long line of similar lawsuits that have played-out across the country resulting in settlements that ultimately cause the closure of numerous state-run ICFs/MR.  Those who choose to remain served in the ICFs/MR (because the facilities are better equipped to serve their disabilities), are eventually forced into community placement as there remains insufficient funding to keep the facilities open for so few residents.  Indeed, in response to lawsuits challenging the quality of care in state-run facilities, states have opted to close down the ICFs/MR and transfer the remaining few into communities not equipped to serve their needs, instead of improving the around-the-clock care that they require.  While the courts expressed an interest in preserving the rights of the intellectually disabled to receive community services, class certification and settlement only served to transfer, *en masse*, residents from ICFs/MR to community homes.  As a result, the diminished number of residents lead to the eventual closing of the ICFs/MR.

At the root of each of these lawsuits is the certification of a class that is staggeringly overbroad, involving disabled individuals with a myriad of

intellectual capacities and physical handicaps, no two of whom are alike.  Because these individuals do not have the ability to understand the meaning of being included or excluded from a class,[4] they get swept up in the class and eventually are placed in community settings ill-equipped to provide for their demanding needs.  These lawsuits take away the disabled's right to choose facility-based care, since the main side-effect of certifying large classes is to leave behind too few residents in the ICFs/MR to warrant continued funding.

Over the last few decades, there have been numerous class action lawsuits filed by Protection & Advocacy Systems ("P&As") across the states.  The lawsuits have resulted in the closure of at least 14 ICFs/MR in 8 states, including two in Pennsylvania.  *Brown v. Bush*, No. 98-cv-673 (S.D. Fla. March 1998) (calling for closure of two state ICFs/MR, eliminating residents' choice in care) (A223); *Travis D., et al. v. Eastmont Human Services Center,* No. 96-93, (D. Mont. 1996) (A270) (defining class as consisting of "all those individuals with developmental disabilities who are presently, have been or will be residents of the Montana [ICF/MR]"; ultimate settlement called for downsizing and eventual closure of ICF/MR); *Hunt v. Meszaros*, No. PJM 91-2564 (D. Md. 1991) (A298) (although case eventually dismissed, filing of action resulted in transfer of so many residents

---

[4] Legal guardians (often close relatives) are often unaware of the lawsuit because federal law does not require that they be notified.  Federal legislation (H.R. 2032) is pending which would require that legal guardians, where appointed, receive advance notice and a right to opt out of P&A class action lawsuits involving their family members' ICF/MR home.

at outset, facility shut down); *Jackson v. Fort Stanton Hospital and Training School*, 757 F.Supp. 1241 (D. N.M. 1990) (certifying class consisting of all persons who resided at ICF/MR or who would become residents during pendency of action, and all persons who had been transferred from two ICFs/MR to other state facilities; transfer to community settings resulted in closure of two ICFs/MR)[5]; *Michigan Association for Retarded Citizens v. Smith,* 475 Supp. 990 (E.D. Mich. 1979) (class action resulting in closure of ICF/MR); *Martin v. Taft*, 222 F.Supp.2d (S.D. Ohio 2002) (seeking choice of integrated community services per *Olmstead*; ICFs/MR shut down due to decline in populations throughout litigation); *Coffelt v. Department of Developmental Services*, No. 91-6401 (Cal. Super. Ct. Jan. 1994) (A324) (implementing settlement caused more than 2,000 residents to be transferred from state ICFs/MR, resulting in closure of two ICFs/MR).

### 2.    Prior Actions Have Already Resulted In ICF/MR Closures Here in Pennsylvania.

The trend has hit home. Closures of ICFs/MR have already occurred right here in Pennsylvania. One case, filed by the Department of Justice, involved the state-operated Embreeville Center located in Coatesville, Pennsylvania. *United States v. Commwlth. of Pennsylvania*, 832 F. Supp. 122 (E.D. Pa., 1993).

---

[5] The Governor later initiated an independent inquiry to track down former residents of one ICF/MR who had apparently "slipped through the cracks," receiving no state services and no monitoring. *See State Probes Abuse of Disabled*, Albuquerque Journal, November 18, 2003). (A426)

Individual plaintiffs, the Pennsylvania P&A, and the Arc-Pennsylvania, also filed suit. *Nelson v. Snider*, No. 94-CV-440 (E.D. Pa. 1994) (A428). Both lawsuits alleged violation of the rights of the plaintiffs to choose settings appropriate for their care. *Commwlth. of Pennsylvania*, 832 F. Supp. at 124-136. However, because the Pennsylvania P&A was a named plaintiff, families strongly objected, claiming that the P&A would not represent the true interests of their loved ones. The court subsequently consolidated the matters and the parties eventually settled, agreeing to the downsizing and eventual closure of the Embreeville Center by September 1997. *See* Settlement Agreement (A499).

Three years later in 2000, Western Center, a state-run ICF/MR located in Pittsburgh that had cared for more than one hundred developmentally disabled individuals also closed as a result of an action that was filed in 1993 by the Pennsylvania P&A claiming violation of rights of the intellectually disabled. *Richard C. v. Houstoun*, 196 F.R.D. 288 (W.D. Pa. 1999). As part of the parties' settlement, a plan was created to downsize the facility and then close it permanently.

In October 2001, parents of former residents of Western Center filed a related lawsuit claiming the Commonwealth violated the Americans with Disabilities Act by closing the Center. *See Torisky, et al v. Schweiker, et al*, No. 05-1496 (M.D. Pa. 2001)) (A531). The parents who filed the action believed their

loved ones had received appropriate non-abusive care at Western Center. *See Western Center,* Opacity (April 2010), http://www.opacity.us/site/108_western center.htm. Following the decision to close the center, the parents led and participated in numerous protests to keep the facility open, but, in the end, fell victim to the Commonwealth's ultimate decision to move their loved ones out without the parents' involvement. *Id.* On the day of the move, 20 to 30 State Troopers forcefully held the parents at bay while their loved ones were taken out a back door to residences unknown to them or their parents. *Id.*

Along with monetary relief for physical and psychological damage, the parents sought to require the Commonwealth to reopen Western Center, or maintain some facility in Western Pennsylvania that maintained that same level of around-the-clock care. *Id.* The parents feared that their loved ones would not receive adequate care in community placement.[6] *Id.* Unfortunately, the families had insufficient funds to pursue the action further, and were, therefore, compelled to dismiss their claims without prejudice.

---

[6] The families' concerns were well-founded. On May 8, 2000, then-Auditor General Robert Casey released an audit of Pennsylvania community group homes finding serious deficiencies that threatened the health and safety of residents, including allegations of abuse and unexpected deaths that were not investigated promptly, direct care workers with criminal backgrounds, and inadequately trained caregivers. (http://www.auditorgen.state.pa.us/archives/Performance/Group Home0400FinalRpt.html). On October 8, 2001, another audit of community personal care homes was released also finding serious deficiencies. (http://www.auditorgen.state.pa.us/archives/ Performance/PCH/PCH-TableOfContents.html).

All of the foregoing cases demonstrate a national trend by P&As and state governments to close ICFs/MR. They have continued to close ICFs/MR, without regard to choice, monitoring and the need for highly qualified staff and specialized services. The decision to close these facilities is tempting to courts and governments when faced with the *myths* of improving quality of life and saving money. Thus, residents with intellectual disabilities who, by default became members of a class, get moved into community placement. This results in a significant decline in the number of residents in the ICFs/MR, allowing the states to simply close them. The end result squelches the rights of the intellectually disabled to choose facility-based care.

In the present case, Appellees'/Plaintiffs' intent to move all Pennsylvania ICF/MR residents to community placement is clear. Their Amended Complaint states that ICFs/MR "are not the most integrated settings appropriate to the needs of ***any*** individual resident." *See* Amended Complaint (emphasis added) (A56). Although the Amici do not oppose the rights of the Appellees/Plaintiffs', and those similarly situated, to choose community placement, community placement is ***not*** an appropriate setting for all intellectually disabled individuals, many of whom ***do*** require extensive supervision and care. The problem posed by the wide-spread closures of state-run ICFs/MR is that those who choose to remain in these facilities will eventually be forced into community placement because of their closures,

eliminating the option of facility care altogether.  More important, as discussed below, research shows that these individuals *will* ultimately face neglect, abuse, and death in community placement because there simply is not enough services to care for them.

### D. This Settlement Will Result In Abuse, Neglect, and Death Following The Closures of Pennsylvania's ICFs/MR For the Intellectually Disabled.

#### 1. National mortality studies show the profoundly intellectually disabled are at real risk if placed in community settings.

Over the course of several years, VOR has gathered reliable statistics and information based on real-life occurrences that support the fact that the medical care required for profoundly disabled individuals is entirely deficient in the community setting.  Perhaps the most thorough and recent study relating to the risks of abuse and neglect of people with intellectual disabilities upon their transfer from ICFs/MR to community placement was performed by Robert Shavelle, David Strauss, and Steven Day.  *See Deinstitutionalization in California:  Mortality of Persons with Developmental Disabilities after Transfer into Community Care, 1997-1999,* Journal of Data Science 3 (2005) (A213).  Using information that the authors gathered on 1,878 children and adults who were moved from the ICF/MR setting to community placement between April 1, 1993 and December 31, 1999, they analyzed the increased mortality rate between those that moved into

community placement, and those that stayed behind in ICF/MR setting. (A213) The reason the authors studied mortality rates was because it was a simple, unambiguous measure of the quality of health care that awaited these individuals upon deinstitutionalization. (A214) In performing their study, the authors compared the California Development Evaluation Report data base (1997-1999) with information from the California Department of Health Services (1999). (A214) They also took into consideration factors such as age, sex, feeding and mobility skills to predict the probability of death for each of the individuals involved. (A215)

Based on the data they collected and analyzed, the authors found a 47% increase in mortality in community placement settings over that expected in ICFs/MR. (A218) The authors reasoned that the higher mortality rates for community placement individuals were due to lack of continuity of care, centralized record keeping, intensive supervision, and access to immediate medical care. (A218) Although the article does not focus on the political issues often involved in the decisions to deinstitutionalize, they did touch on them, citing two primary factors: (1) the cost of savings of deinstitutionalization, as well as (2) the "social value" of integration. A218-A219) The authors noted that these issues needed to be weighed against the increased risk of mortality that was readily apparent from the years of studies they conducted. (A220)

In an article written by Shavelle and Strauss in 1998, the authors further point out there is no reason to believe that the problems of increased mortality are confined to California.  *See* Strauss, David and Shavelle, Robert, *Policy Implications of Mortality Research:  Authors' Perspectives, What Can We Learn From the California Mortality Studies?*, Mental Retardation, p. 407 (October 1998). (A550) They cite to a 1993 Congressional Report that documented shortcomings in four other states, namely Connecticut, Massachusetts, Michigan, and New York, which Congressional investigators indicated provided "typical examples of abuse, neglect and profiteering," as well as a 1996 article by P.D. Hall that highlighted the evolution of problems with the provision of medical care in various communities.  *Id.* (citing, U.S. House of Representatives, 1993, and Hall, P.D., *There's No Place Like Home:  Contracting Human Services in Connecticut*, 1970-1995 (Working Paper No. 234), New Haven, Yale University Program on Non-Profit Organizations)). (A549) Both the Congressional Report and Hall's report were based on data collected on individuals who were deinstitutionalized and harmed or died as a result of receiving non-effective care and medical services after being placed in community settings.

The media has also reported extensively on tragedies due to ill-prepared community settings.  *See Media Coverage Highlighting the Increasing Need for*

18

*More Effective Federal and State Protections in the Ever-Expanding Community System of Care for People with Mental Retardation (March 2008)* http://www.vor.net/images/stories/pdf/Abuse-and-Neglect-revised.pdf.    Most recently, The New York Times exposed alarming mortality rates in the states' community homes for people with intellectual disabilities.    According to The Times, there were 1,200 preventable mortalities in state-run group homes over a period of 10 years.  *See, 1,200 Deaths and Few Answers*, The New York Times, (November 6, 2011) (A552).  It is remarkable that these deaths, averaging more than 100 a year, occurred during a period of significant deinstitutionalization in New York, and occurred without raising any apparent concern or investigation by the P&A, which is supposed to protect and advocate for these vulnerable citizens.  The apparent apathy could speak to P&As bias in favor of community settings, no matter the outcome.

The evidence of abuse, neglect, and even death is not limited solely to reports and research.  The individual experiences of VOR members, such as Dan Torisky one of the individually named Amici, are illustrative of the effects of community placement on loved ones.  Before being placed at Western Center, Daniel Torisky and his wife developed nine group homes in an effort to create an appropriate residential setting for their son, Edward.  Even with their loving commitment to Edward, however, none of their group homes could safely

accommodate Edward's extreme needs.    Western Center was their salvation. When it closed in 2000 due to a P&A lawsuit, Mr. Torisky was forced to arrange private ICF/MR support for Edward.

Mr. Torisky also led the lawsuit on behalf of 20 former Western Center residents (including Edward) alleging violations of federal law due to the trauma of forced transfer from Western, as well as injuries sustained during and after transfer, by some former residents.    Mr. Torisky was well aware of the risks facing former Western Center residents.    In 2007, three years before Western's closure, in a fax to then-Secretary of DPW, Nancy Thaler, Mr. Torisky provided this horrifying account of one former resident:

> Knew you would want to be aware that [D.M.] earns additional money as a prostitute, which is taken from her by her landlord allowing her to live in a basement in Washington County. It would seem to me that even though the Western Region Office says that [D.M.] 'signed herself out of the system' she is severely mentally retarded and deserves a better life.  She told me personally that she wants to live in an apartment like they have at Western Center.  More than once she said 'I want to go back to Western.'

*See* Torisky Letter (A561).

In total, at least 37 former Western Center residents have died since the Center closed; countless more have suffered abuse.    *See VOR Weekly E-Mail Update,* Dan Torisky, (December 19, 2009). (A561)   There can be no doubt that community placement is ill-equipped to service the needs of individuals with

profound intellectual disabilities, i.e. those who are unable to speak for themselves (and, therefore, cannot assert their interest in being excluded from the certified class), who survive on feeding tubes, are confined to a bed, and/or have the mental capacity of an infant or one year old. For many, a move to community placement from their current ICF/MR setting *will, in fact,* result in abuse, neglect, and/or death. These individuals require 24-hour care and immediate medical assistance that is not available to them in community placement. Thus, the only humane alternative is to advocate for their right to have licensed, facility-based care.

> **2.    The profoundly intellectually disabled are at even *greater* risk because DPW has proposed to slash funding to Pennsylvania's Community-Based Provider Organizations.**

In addition to the fact that community placement is not equipped with the proper services to care for the profoundly mentally disabled, just this month, Pennsylvania's DPW, a Defendant in this action (that exists to protect the needs of the mentally disabled), requested a 6% slash in funding to community-based provider organizations. *See Testimony Presented to The House Human Services Committee by Shirley Walker*, *President and CEO of PAR,* (December 13, 2011), www.par.net/portals/0/Mailman/Testimony2011.1213ODPRAFtoHouseHuman ServicesCmte.pdf. The DPW recommended to the Governor that the costs of existing mortgages, utilities, housing maintenance, and food for those placed in residential community living be capped at $7,000 per person, per year. *See*

21

*Analysis of DPW's Proposal to Cap Payment for Food and Housing for People with Intellectual Disabilities Living in Group Homes,* http://www.par.net/portals/0/Mailman/RS2011.0330AnalsyisofProposedCaponRoomandBoard.pdf.   According to the DPW, its  proposal is based on responses it received from 25 of the 49 state directors of Medicaid home and community-based waiver programs serving people with intellectual disabilities.  *Id.*

In  response  to  the  recent  proposed  cuts,  reports  from  several  residential service  providers  state  that  if  DPW's  proposal  were  to  be  included  in  the Commonwealth's final budget, payment for these fixed costs would be reduced by $1 to $2 million per agency.  *Id.*  Within a short time, mortgage payments for the residential facilities housing people with intellectual disabilities would be missed, bank lines of credit would be called, payrolls would be missed, mortgages would be foreclosed, and residents of hundreds of group homes would need to seek care in,  none  other  than,  state-run  ICFs/MR.   With  the  closure  of  *both*  community-based and state-run facilities (which will result if this settlement goes forward) the fate of Pennsylvania's intellectually disabled teeters on the unknown.[7]

---

[7] To date, at least one matter has been filed against the Commonwealth contesting these budget cuts and seeking appropriate residential habilitation services for the intellectually disabled individuals involved in those suits.  *Mumford v. Department of Public Welfare of the Commonwealth of Pennsylvania, et al.*, No. 11-3312 (October 5, 2011 E.D. Pa.).  The *Mumford* matter recently settled with an agreement by the Commonwealth to provide appropriate residential rehabilitation services in a community setting for those plaintiffs by January 15, 2012. *See, Mumford* Settlement Agreement.  (A568)

**E.    The District Court's Rubber-Stamped Certification of a Class Was Unconscionable.**

Though not unusual based on the trend of cases discussed above, the District Court's certification of the Appellees'/Plaintiffs' proposed class in this matter is simply alarming.   On September 2, 2009, the District Court certified a class consisting of:

> All persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with   appropriate services and supports; and (3) do not or would not oppose community placement.

*See* September 2, 2009 Order.  (A39)  The Court's decision to certify the class was egregious because: (1) it included those who "would not" oppose community placement (because they do not possess the mental capacity to make an informed decision); and (2) the argument supporting the proposed class was grounded upon a baseless allegation set forth in Appellees'/Plaintiffs' Amended Complaint, not testimony or even affidavit.  The Amended Complaint stated that, "[a]ll persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings."    Amended Complaint, ¶ 65.  (A56)    Rather than requiring any substantiated evidence from Appellees/Plaintiffs to support this allegation or delving into what might constitute "appropriate" supports and services for the

mentally disabled, the District Court relied upon this allegation and rubber-stamped the class.  September 2, 2009 Order. (A5)  It is unfortunate and most telling that the DPW admitted this allegation in its responsive pleading **and** did not oppose Appellees'/Plaintiffs' proposed class.  *See* February 24, 2010 Answer to Amended Complaint.  (A604)

In a moment of, perhaps, supreme clarity, the District Court, *sua sponte,* reconsidered the rationale underlying its class certification decision.  In its September 2, 2011 Memorandum approving the parties' settlement, the Court stated, "***Indeed, we wonder about the wisdom of defaulting such individuals into a no preference category without greater analysis***."  *See* September 2, 2011 Memorandum, p. 15. (A21)  However, the Court approved the settlement without further thought.

In a lawsuit similar to this, the Illinois P&A filed a complaint on behalf of 6,000 people who reside in ICFs/MR.  *Ligas v. Maram*, No. 1:05-cv-04331 (N.D. Ill. July 2005).  Nine residents sought intervention, objecting to the Appellees'/Plaintiffs' claims that all residents experience unnecessary regression, deterioration, isolation and segregation, and prefer to live in a home that is integrated in the community rather than an institution.  The potential interveners also objected to P&A representation of their family members.  Although the district and appellate courts denied intervention, the appellate court questioned a

class that was dependent on knowing class members' "state of mind." *Ligas v. Maram*, 478 F.3d 771 (7th Cir. 2007).  In 2008, the parties proposed a settlement agreement which called for the reduction of ICFs/MR beds over a period of time, among other requirements.  A group of objectors, led by the original "interveners," submitted 2,500 written objections to the Court.  As a result, the Court rejected the proposed settlement agreement and decertified the class, ultimately granting intervention to the objectors.  *Ligas*, No. 1:05-cv-04331 (N.D. Ill. July 7, 2009).

*Ligas* is instructive because it exhibits a case wherein the court (prompted by the appellate court) reversed itself on class certification, recognizing the extraordinary value of family input, and acknowledging that a few parents were not able to represent such a broad array of class members.  A case involving analysis of the level of care needed by thousands of mentally disabled individuals is certain to lead to individual questions of fact that should, from its outset, prevent valid class certification.

Here, Plaintiffs/Appellees argued that a class should be certified with them potentially representing all mentally disabled individuals in Pennsylvania ICFs/MR. Appellees/Plaintiffs claimed they are typical of the class of intellectually disabled people presently living in Pennsylvania's ICFs/MR.  Yet, none of the Appellees/Plaintiffs are, in fact, "typical" of intellectually disabled individuals, and not all intellectually disabled individuals are capable of existing in community

placement.   None of the five named Appellees/Plaintiffs in this action is profoundly disabled like the multitude of people affected by this lawsuit.   None of them requires around the clock care.

By contrast with the five named Appellees/Plaintiffs, there are individuals like Lauren Lotzi, represented by her sister, Linda Lotzi, an Amicus with VOR and objector to the underlying action.   Lauren has lived at White Haven Center, an ICF/MR, for the last 40 years.   *See* Objection Letter of Linda M. Lotzi.   (A606) Her medical diagnoses include severe profound mental retardation, seizure disorder, spastic quadriplegia, vision impairment and dysphasia, among others. (A606-A607).   Lauren is non-verbal and unable to communicate what she wants, non-ambulatory and confined to a wheelchair, has seizures, urinary and bowel incontinence and strict dietary constraints, among various other medical and welfare concerns.   (A607)   Nurses administer medication to Lauren every day, along with routine medical procedures and examinations.   (A607).   Lauren has also demonstrated over the years severe resistance and adverse reaction to changes in her environment, including refusing to eat.   (A607)

Lauren Lotzi is the norm – not the exception.   Nationally, nearly 75% of all ICF/MR residents have severe and profound intellectual disabilities.   They also endure multiple disabilities, chronic medical conditions and/or behavioral challenges.   Many also have seizure disorders, behavior problems, mental illness,

are visually-impaired or hearing-impaired, or have a combination of these conditions. *See Residential Services for Persons with Developmental Disabilities: Status and Trends Through 2008,* Research and Training Center on Community Living Institute on Community Integration/UCEDD, College of Education and Human Development University of Minnesota (2009), http://rtc.umn.edu/docs/risp 2008.pdf.

In Pennsylvania, 86.5% of state-operated ICF/MR residents have severe or profound intellectual disabilities, with 37.4% having two or more additional disabling conditions such as cerebral palsy, blindness, hearing impairments, seizure disorders, psychiatric disorders, etc. *Id.* at Tables 1.17, 1.18. A significant number of residents cannot communicate "basic desires verbally" (54.6%) or cannot "understand simple verbal requests" (26.4%). *Id.* at Table 1.19. Many Pennsylvania state ICF/MR residents also need assistance walking (47.8%), transferring (63.2%), eating (70.2%), dressing ( 67.5%) or toileting (76.1%). *Id.* at Table 1.19.

Most of the individuals presently residing in the five remaining Pennsylvania ICFs/MR are just like Lauren Lotzi. Indeed, for Appellees/Plaintiffs to say they are the same as Lauren and her peers, is not true. The differences are all too apparent. Individuals like Lauren **cannot** be moved safely into community placement because, as demonstrated by the research and reports of Shavelle and

others, above, community placement is not equipped to handle the care of people with profound intellectual disabilities.

Given the broad range of conditions that fall under the umbrella of intellectual disabilities, there is no doubt that class certification was inappropriate here. It would have been far more appropriate for the Appellees/Plaintiffs to have fought on their own behalf to seek transfer to the communities, which VOR supports. But to unilaterally drag in everyone currently residing in Pennsylvania's five ICFs/MR (by default, because Rule 23 does not provide for opting out in these types of class actions) will lead to the inevitable transfer of the remaining residents into communities ill-equipped to care for their myriad of needs. Furthermore, if allowed to move forward, the parties' settlement will eliminate the intellectually disabled's right to choose placement in ICF/MR care, contrary to the same rights cited by Plaintiffs/Appellees in their underlying claim.

### F.    Even the District Court Recognized the Inevitable Harm In Approving the Proposed Settlement.

The District Court's error in certifying the above class served as the foundation for a series of erroneous decisions in this case ultimately leading to the District Court's recent decision regarding the parties' proposed settlement. In approving the settlement, the District Court openly expressed that it had "***serious doubts***":

> To our admittedly untrained eye, it appears as though the assessment protocol that has been developed to effectuate the Proposed Settlement Agreement ***may imply an unintended bias towards community placement.*** Reviewing the questionnaire to be utilized causes us to entertain ***serious doubts*** as to whether it is the proper tool for gauging whether the profoundly disabled, and especially those with no guardian to speak for them, are opposed to community placement. ***Indeed, we wonder about the wisdom of defaulting such individuals into a no preference category without greater analysis. And we have no doubt that the stated fears of many objectors, including those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real***.

September 2, 2011 Memorandum, p. 15 (emphasis added).[8] (A15) Despite acknowledging the very real and disturbing impact the settlement agreement will have on these individuals, the District Court nonetheless went on to approve it.

As summarized at length by the Appellants, the parties' settlement agreement includes a plan to assess particular ICF/MR residents through the use of a questionnaire to determine whether they are suited for community placement. Having reviewed the questionnaire, and the accompanying plan, even the District Court recognized they contain bias in favor of transferring residents into the communities. Thus, the inevitable result, as demonstrated through the reports and studies of Shavelle and others, is the migration of all ICF/MR residents into the communities and the subsequent closure of all state-run ICFs/MR. When 24-hour

---

[8] See FN 2.

care is not available to the profoundly intellectually disabled in community placement, and these individuals are unable to choose 24-hour care in ICFs/MR because those facilities have been closed, their rights become violated.

The United States Supreme Court has already spoken on the issue of the rights of the mentally disabled. *Olmstead*, 527 U.S. at 581. The Supreme Court has recognized that these people do, in fact, have every right to choose the care best suited for them. *Id.* Yet, as a result of class certification and the resultant settlement agreement in this case, the District Court has taken away the rights of those residents presently residing in Pennsylvania's five ICFs/MR to choose institutionalized care, contrary to *Olmstead*.

The Amici have the same "serious doubt" as the District Court that the settlement agreement's proposed plan is biased in favor of placing all intellectually disabled in community based facilities. The parties' settlement employs a process that does not properly assess whether a profoundly intellectually disabled individual will do well in a community setting, and it lacks any system for follow-up reporting on whether those that have been moved are thriving successfully in their new community homes. The settlement appears to serve the need of the Commonwealth to close more state-run facilities in an effort to save future costs, in the face of ***certain*** abuse, neglect, and death that will immediately follow these people into community placement, in violation of their civil rights. There is a

significant number of profoundly intellectually disabled individuals in Pennsylvania's ICFs/MR that require the around-the-clock care that only exists in that setting. They have the right to choose the level of specialized care only found in licensed facility-based.

For the reasons stated above, this Court should reverse the District Court's orders approving class certification and class settlement.

Respectfully submitted,

/s/ Nancy Shane Rappaport
Nancy Shane Rappaport
Lesli C. Esposito
DLA PIPER LLP (US)
1650 Market Street, Suite 4900
Philadelphia, PA  19103
Telephone (215) 656-2432

Attorney for AMICUS CURIAE

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(c) of the Federal Rules of Appellate Procedure, I certify that, according to the word-count feature of the Microsoft Word word processing program, the foregoing Brief contains 6,988 words.


Dated: December 27, 2011              /s/  Nancy Shane Rappaport
                                      Nancy Shane Rappaport

## **CERTIFICATE OF TEXT**

I, Nancy Shane Rappaport, hereby certify that the text of the electronically filed Brief and the text of the hard copies of the Brief are identical.


Dated: December 27, 2011            _____/s/ Nancy Shane Rappaport_____
                                            Nancy Shane Rappaport

## <u>CERTIFICATE OF A VIRUS CHECK</u>

I, Nancy Shane Rappaport, hereby certify that a virus check has been performed on the PDF file containing the Brief.   The virus check was completed using McAfee VirusScan Enterprise–Antispyware Enterprise 8.7i.


Dated: December 27, 2011          _____/s/ Nancy Shane Rappaport_____
                                                            Nancy Shane Rappaport

## **<u>CERTIFICATE OF ADMISSION TO BAR</u>**

    1.   I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

    2.   Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.


Dated: December 27, 2011        <u>    /s/ Nancy Shane Rappaport     </u>
                                    Nancy Shane Rappaport

# APPENDIX
# TABLE OF CONTENTS

## <u>Volume I</u>

1.   Springstead Objectors' Notice of Appeal, dated September 30, 2011 ..........A1

2.   Diane Solano's Notice of Appeal, dated September 30, 2011 ......................A3

3.   Order of the Honorable John E. Jones III, Approving Class
     Settlement dated September 2, 2011 ............................................................A5

4.   Memorandum of the Honorable John E. Jones III, dated
     September 2, 2011 ......................................................................................A7

5.   Order of the Honorable John E. Jones III, Denying Appellant Solano
     and Appellants Springstead Objectors Alternative Motions to
     Intervene, dated August 16, 2011 ..............................................................A33

6.   Order of the Honorable John E. Jones III, Granting Motion for Class
     Certification, dated September 2, 2009 ......................................................A36

## <u>Volume II</u>

7.   Amended Complaint dated July 14, 2009....................................................A44

8.   Order of the Honorable John E. Jones III, Denying Joint Motion
     by Objectors for a Partial Stay of this Court's Order (Doc. 290)
     Approving the Settlement Agreement dated December 19, 2011...............A69

9.   Complaint - *People First of Washington, Inc. v. Rainier Residential
     Habilitation Center, et al.*, No. C96-5906 FDB (WD Wash 1997).............A71

10.  Statement of Undisputed Material Facts in Support of Plaintiffs'
     Motion for Summary Judgment...................................................................A159

11.  *Cost Comparisons of Community and Institutional Residential
     Settings: Historical Review of Selected Research*, pp. 103-122,
     Mental Retardation, Volume 41, Number 2 (April 2003;
     unpublished update, 2009) ........................................ ................................A193

12. Shaville, Strauss, and Day, *Deinstitutionalization in California: Mortality of Persons with Developmental Disabilities after Transfer into Community Care, 1997-99, Life Expectancy Project,* Section 1, p. 372, Journal of Data Science 3 (2005) ...................................... ...................................................A159

13. Complaint - *Brown v. Bush*, Civil Action No. 98-cv-673 (S.D. Fla. March 1998) ..................................................................................A223

14. Complaint - *Travis D., et al. v. Eastmont Human Services Center,* Civil Action No. 96-93, (D. Mont. 1996) .......................................................A270

15. Complaint - *Hunt v. Meszaros*, No. PJM 91-2564 (D. Md. 1991)..............A298

16. Settlement Agreement - *Coffelt v. Department of Developmental Services*, Civil Action No. 91-6401 (Cal. Super. Ct. Jan. 1994) ................A324

17. *State Probes Abuse of Disabled*, Albuquerque Journal, November 18, 2003.................................................... ..............................A426

18. Complaint - *Nelson v. Snider*, Civil Action No. 94-CV-440 (E.D. Pa. 1994) .............................................................................A428

19. Settlement Agreement, *United States v. Pennsylvania,* 832 F.Supp. 122.................................................... .......................A499

20. Complaint - *Torisky, et al v. Schweiker, et al*, NO. 05-1496 (M.D. Pa. 2001) ....................................................... ................A531

21. *Policy Implications of Mortality Research: Authors' Perspectives, What Can We Learn From the California Mortality Studies?,* Mental Retardation, October 1998, p. 407................................................A549

22. *1,200 Deaths and Few Answers*, The New York Times, November 6, 2011....................................................................A552

23. September 19, 1997 Letter from Daniel Torisky to Nancy Thalen.............A561

24. VOR Weekly E-Mail Update Dated December 19, 2009...........................A562

25. Settlement Agreement - *Mumford v. Department of Public Welfare of the Commonwealth of Pennsylvania, et al.*, Civil Action No. 11-3312 (October 5, 2011 E.D. Pa.) ..............................A568

26. Answer to Amended Complaint dated February 23, 2010.........................A604

27. Linda Lotzi Objection Letter dated August 2, 2011...................................A606

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
-----------------------------------------------------------------x
```
FRANKLIN BENJAMIN, *et al.,* on behalf of    :
themselves and all others similarly situated,    :
    :
          *Plaintiffs,*    :
    :    No. 09-cv-01182
      v.    :    (Jones, U.S.D.J.)
    :
DEPARTMENT OF PUBLIC WELFARE OF    :    (Am. Complaint
THE COMMONWEALTH OF    :    Filed 7/14/09)
PENNSYLVANIA, *et al.*,    :
    :
          *Defendants.*    :
```
-----------------------------------------------------------------x
```

## NOTICE OF APPEAL

Notice is hereby given that Craig Springstead, by and through his father and

guardian, Bertin Springstead, Maria Meo, by and through her mother and guardian,

Grace Meo, Daniel Bastek, by and through his father and guardian, John Bastek,

Michael Storm, by and through his guardian, Polly Spare, Beth Ann Lambo, by

and through her father and guardian, Joseph Lambo, Richard Kohler, by and

through his sister and guardian, Sara Fuller, Maria Kashatus, by and through her

father and guardian, Thomas Kashatus, and Wilson Sheppard, by and through his

brother and next friend, Alfred Sheppard (collectively, the "Springstead

Objectors"), as members of the class certified by the District Court and as

Objectors to the class action settlement in this action, hereby appeal to the United

States Court of Appeals for the Third Circuit from the September 2, 2011 Order

approving the class action settlement and from the August 16, 2011 Order denying,

in part, the Springstead Objectors' motion to intervene in this action.

Dated: Philadelphia, Pennsylvania          Respectfully submitted,
September 29, 2011

**VAIRA & RILEY, P.C.**

By: ___/s/ John E. Riley_____
John E. Riley (PA ID# 22504)
William J. Murray, Jr. (PA ID# 73917)
1600 Market Street, Suite 2650
Philadelphia, Pennsylvania 19103
T: (215) 789-9405
F: (215) 751-9420

**SIDLEY AUSTIN LLP**

Benjamin J. Hoffart
787 Seventh Avenue
New York, New York 10019
(212) 839-5300
(212) 839-5599 (fax)

*Attorneys for Craig Springstead, Grace
Meo, Daniel Bastek, Michael Storm,
Beth Ann Lambo, Richard Kohler,
Maria Kashatus, and Wilson Sheppard*

2

A2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
----------------------------------------------------------------x
FRANKLIN BENJAMIN, et al., on behalf of        :
themselves and all others similarly situated,   :
                                                :
               Plaintiffs,                      :
                                                :        No. 09-cv-01182
               v.                               :        (Jones, U.S.D.J.)
                                                :
DEPARTMENT OF PUBLIC WELFARE OF     :        (Am. Complaint
THE COMMONWEALTH OF                  :        Filed 7/14/09)
PENNSYLVANIA, et al.,                           :
                                                :
               Defendants.                      :
----------------------------------------------------------------x
```

## NOTICE OF APPEAL

NOTICE IS HEREBY GIVEN THAT:

Diane Solano, by and through her brother and guardian Carl A. Solano, as a member of the class certified by the District Court and as an Objector to the Class Action Settlement in this action, hereby appeals to the United States Court of Appeals for the Third Circuit from the September 2, 2011 order approving the class action settlement; the August 16, 2011 order partially denying the relief

A3

requested in her motion to intervene; and all other orders and judgments leading to and including the final order in this action.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano (I.D. No. 23986)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
215-751-2202
215-972-7363 (fax)

*Attorney for Diane Solano*

Dated:  September 29, 2011.

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

## ORDER

### September 2, 2011

In accordance with the Memorandum entered on this date, it is hereby **ORDERED** as follows:

1. The Court **FINDS** that the Settlement Agreement is fair, reasonable, and adequate;

2. Plaintiffs' Unopposed Motion for Final Approval of the Proposed Class Action Settlement Agreement (Doc. 260) is **GRANTED**;

3. The Settlement Agreement is **APPROVED**;

4. Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs (Doc. 262) is **GRANTED**;

5. Defendants' will pay Plaintiffs' counsel the sum of $432,500 for

1

A5

attorneys' fees, litigation expenses, and costs incurred;

6.   This action is hereby **DISMISSED** and the Clerk is directed to
     **CLOSE** this case; and

7.   The Court expressly retains jurisdiction as set forth in the Settlement
     Agreement, in order to enter any further orders that may be necessary
     or appropriate in administering or implementing the terms and
     provisions of the settlement agreement.

<u>/s/ John E. Jones III</u>
John E. Jones III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

**September 2, 2011**

## I.    INTRODUCTION

Plaintiffs, a class of individuals with intellectual disabilities (formerly

known as mental retardation) who are institutionalized in state intermediate care

facilities for persons with mental retardation ("ICF/MRs") initiated this litigation

in June 2009.  Plaintiffs alleged that they were appropriate for, and not opposed to,

community-based services, and that Department of Public Welfare and the

Secretary of Public Welfare (collectively, "Defendants" or "DPW") violated Title

1

II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131-12134, and

Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, by failing to

provide those services to institutionalized individuals.  Plaintiffs sought both

declaratory and injunctive relief.  On January 27, 2011, the Court resolved cross

Motions for Summary Judgment in Plaintiffs' favor, finding that Defendants were

violating the integration mandates of the ADA and RA by relegating

institutionalized individuals to a class of persons who receive community

placements only after another class, those who are not institutionalized, was fully

served.  (*See* Doc. 88.)  Because of the exhaustive detail that would be required in

any resulting injunctive relief ruling, and mindful that the parties were in a better

position to come to closure on an acceptable policy, we encouraged the parties to

mediate in aid of seeking a final resolution.  The parties thereafter reached a

settlement with the commendable assistance of U.S. Magistrate Judge Martin C.

Carlson, and, thus, before the Court is Plaintiffs' Unopposed Motion for Final

Approval of the Proposed Class Action Settlement Agreement (Doc. 260) and

Plaintiffs' Unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs

(Doc. 262).  For the reasons that follow, the Court will approve the proposed

settlement and award the requested fees.

## II.    BACKGROUND

A8

### A.    Procedural History

As aforementioned, the Plaintiffs initiated the action on June 22, 2009.

Pursuant to an unopposed motion predicated upon Federal Rule of Civil Procedure

23(b)(2), we thereafter certified the following class:

> All persons who: (1) currently or in the future will reside in one of
> Pennsylvania's state-operated intermediate care facilities for
> persons with mental retardation; (2) could reside in the community with
> appropriate services and supports; and (3) do not or would not oppose
> community placement.

(Doc. 17.)  Defendants subsequently filed a Motion to Dismiss (Doc. 20) that the

Court denied by our Order of January 25, 2010.  (Doc. 38.)

While the Motion to Dismiss was pending, a group of individuals filed a

Motion to Intervene in the litigation.  (Doc. 27.)  These individuals, referred to

throughout this litigation as the "Springstead Intervenors", alleged that, although

they were opposed to community-based services and support, they were

nonetheless *de facto* members of the certified class.  The Springstead Intervenors

alleged that the resolution of the class action in Plaintiffs' favor would limit the

Springstead Intervenors' rights to choose ICF/MR care.  We denied the Motion to

Intervene on March 10, 2010, finding that the Springstead Intervenors were

explicitly excluded from the class by virtue of their opposition to community-based

care.  (Doc. 41.)  The Springstead Intervenors appealed that decision, and the

United States Court of Appeals for the Third Circuit affirmed our denial in April 2011. *See Benjamin v. Dep't of Pub. Welfare*, 2011 WL 1243683 (3d Cir. 2011) (unpublished opinion).

The parties completed extensive discovery and filed cross-Motions for Summary Judgment. (Docs. 48, 51.) In January 2011 we issued a Memorandum and Order that denied Defendants' Motion for Summary Judgment, granted Plaintiffs' Motion for Summary Judgment, and declared that DPW violated the integration mandates of the ADA and RA. (Doc. 88.) As noted, because at that juncture the Court was reluctant to draft such extensive injunctive relief as would be required, and in effect construct a policy that was better left for the parties to develop in the first instance, we encouraged the parties to attempt to resolve the remedy amicably.

Again, and as noted, we referred the parties to mediation with Magistrate Judge Martin Carlson in February 2011. The parties met twice with Judge Carlson and continued arms-length negotiations on their own. The parties eventually finalized the Proposed Settlement Agreement, and we granted preliminary approval of said Agreement on May 27, 2011. (Doc. 106.) Notice was either hand-delivered to nearly all ICF/MR residents or mailed to involved family and guardians of residents by June 24, 2011, and interested persons had the opportunity

A10

to object to the Settlement by August 2, 2011.  The Court received numerous objections, discussed in more detail below, and conducted a fairness hearing in accordance with Federal Rule of Civil Procedure 23(e) on August 22, 2011.

### B.     The Proposed Settlement and Attorneys' Fees

Plaintiffs appropriately summarize the salient terms of the Proposed Settlement in their Brief in Support of the Motion for Final Approval (Doc. 261), and we shall highlight the significant points herein.

As articulated in the Agreement and expanded upon during the testimony at the fairness hearing, DPW is in the process of creating, and will continue to create, a Planning List that includes all state ICF/MR residents who are not opposed to discharge – this includes those who wish to be discharged and those who assert no preference.  To evaluate who is not opposed to discharge, DPW's Office of Developmental Programs ("ODP") and others will assess residents', guardians', and involved family members' opposition to discharge utilizing the ICF/MR Community Planning List Assessment Protocol (the "Assessment Protocol") that was introduced in the hearing as Exhibit 1.  The assessment is intended to be an individualized evaluation, and residents who do not indicate opposition to community placements will be placed on the planning list unless their guardians

5

oppose.[1]  DPW will perform this assessment every year in conjunction with the residents' IEPs.

Related to the assessments that will be performed to develop the Planning List, DPW will create a committee to develop a training program to educate residents and their families about community placements.  This committee will distribute literature regarding the community placements and will offer visitations to some of the placements.

Thereafter, DPW will develop and implement an Integration Plan to provide community placements in the following order: (1) at least 50 persons on the Planning List in Fiscal Year 2011-2012; (2) at least 75 persons on the Planning List in FY 2012-13; (3) at least 100 persons on the Planning List in each FY 2013-2014 and 2014-2015; and (4) at least 75 persons on the Planning List in FY 2015-16 and every FY thereafter until all persons on the Planning List have been discharged.  Throughout the course of the implementation of the Settlement Agreement, DPW will provide to Plaintiffs regular status reports, and the Court will retain continuing jurisdiction over the case for purposes of enforcement of the Settlement Agreement.

---

[1]A substitute decision-maker can likewise oppose community placement for an individual who expresses no preference; thus preventing their inclusion on a waiting list.  A substitute decision-maker cannot, however, override the decision and prevent inclusion on the list if the resident affirmatively indicates a preference for community placement.

The Court received letters of opposition to the Settlement Agreement from at least one (1) state ICF/MR resident and from the families or guardians of approximately 101 other state ICF/MR residents.  We likewise received letters of objection from several Commonwealth lawmakers as well as others who will not be directly impacted by the litigation, and several letters of support from state ICF/MR residents and others.  Most of the articulated objections clearly stem from two apparent fears: that some state ICF/MR residents will be unable to voice their opposition to community placements and will be wrongly placed in the community and that, ultimately, the Settlement Agreement will result in the closure of all state ICF/MRs because of a decrease in the resident population.  Several objectors likewise objected to any award of fees to counsel for Plaintiffs or to the measure of any fees awarded.

Plaintiffs also filed an unopposed Motion for Attorneys' Fees, Litigation Expenses, and Costs.  (Doc. 262.)  Plaintiffs seek a total award of $432,500; an amount that is, according to Plaintiffs, only 86.6 percent of their actual fees, litigation expenses, and costs incurred through June 30, 2011.  Defendants do not oppose the Motion for Attorneys' Fees and Costs.

## III.   DISCUSSION

### A.   The Proposed Settlement Agreement

Rule 23(e) provides, in pertinent part:

The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval.  The following procedures apply to a proposed settlement. . .

(1)    The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(2)    If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

(3)    The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

. . .

(5)    Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

F.R.C.P. 23(e).  As noted above, the class was properly certified in September 2009, so the Court need not make a certification determination as it would with a settlement class.  Because the Court directed reasonable notice and allowed for objections, the only requisite, but clearly important, step remaining is a determination that the proposal is fair, reasonable, and adequate.

As the Third Circuit has often stressed, when considering a class settlement the district court must "act[] as a fiduciary, guarding the claims and rights of the absent class members."  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010).   A "presumption of fairness" applies in a class action settlement if a court finds that the negotiations were conducted at arm's length, that there was sufficient

8

discovery, that the proponents of settlement are experienced, and that only a small

percentage of class members object. *See In re Warfarin Sodium Antitrust Litig.*,

391 F.3d 516, 535 (3d Cir. 2004).   Here, the presumption of fairness attaches to

the Proposed Settlement Agreement.   First, and as referenced above, the parties did

conduct extensive arms-length negotiations between themselves and with the

guidance of Magistrate Judge Carlson.   Second, because the settlement was

reached after the Court entered summary judgment in Plaintiffs' favor, extensive

discovery – including expert discovery – had already occurred, and the Court and

the parties are all well-acquainted with the factual basis for the salient assertions

made by Plaintiffs.   Third, it is beyond peradventure that Plaintiffs' and

Defendants' counsel are seasoned litigators with decades of combined experience

in the subject matter at bar.   Finally, the number of objectors are a small fraction of

the total population of the state ICF/MRs, and an infinitely smaller fraction of

those who meet the strict definition of the class.

### 1.    The *Girsh* Factors

In *Girsh v. Jepson*, the Third Circuit articulated nine factors for courts to

further consider when determining the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the
> reaction of the class to the settlement; (3) the stage of the proceedings
> and the amount of discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the risks of

maintaining the class through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010).  The Third Circuit later identified other factors that are useful to consider, including whether any provisions for attorneys' fees are reasonable.  A court *must* make findings as to each of the nine *Girsh* factors before approving a settlement under Rule 23(e).  *See Pet Foods*, 629 F.3d at 351.  For the reasons articulated below, we find that the Proposed Settlement Agreement is fair, adequate, and reasonable and we shall adopt it.

The first factor – the complexity, expense, and likely duration of the litigation weighs in favor of approving the Settlement Agreement.  Though the litigation is in its latter stages, it would take an extensive hearing, further submissions, and large amounts of the Court's time to develop any sort of injunctive remedy.  Not only will the Court expend considerable resources, the parties will incur even greater fees and costs, and those Plaintiffs who wish to live in the community and who have been denied the opportunity to do so would remain institutionalized without recourse for DPW's clear violations as previously determined by us.

"In an effort to measure the class's own reaction to the settlement's terms

10

directly, courts look to the number and voicferousness of the objectors." *General Motors Pick-Up Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 812 (1995) ("*GM*"). Thus, when considering the second *Girsh* factor, the reaction of the class appears almost entirely favorable. Notably, only one state ICF/MR resident voiced an opposition to the Proposed Settlement Agreement, and it appears that the entirety of his objection was that he wished to continue to live at the Selinsgrove Center. (Doc. 115.) Accordingly, neither this one individual's objection nor the remaining objections from non-class members truly demonstrate the balance of the class's own reaction to the Proposed Settlement Agreement's terms. Indeed, the non-class members oppose any discharge at all.[2] Therefore, this factor weighs in favor of approving the Proposed Settlement Agreement.[3]

The stage of the proceedings and the amount of discovery completed weighs in favor of approval of the Proposed Settlement Agreement. The parties must have

---

[2]We understand that all state ICF/MR residents are affected in some way by the Proposed Settlement Agreement because all residents will be subject to evaluation, but any effect on those who wish not to be discharged is negligible compared to the effect that a wholesale denial of the Settlement Agreement will have on those who do not oppose discharge.

[3]Assuming *arguendo* that the record objections by non-class members were cognizable and demonstrative of the reaction of the actual class members, we nonetheless believe that the objections miss the mark. The objections voice misguided fears that the intended or inevitable consequences of the Proposed Settlement Agreement are that DPW will force ICF/MR residents into community placements against their wishes, and that all state ICF/MRs will close. We do not believe the former to be the case, and find the latter to be pure speculation that is beyond the scope of our fairness evaluation.

an "adequate appreciation of the merits of the case before negotiating." *Id.* at 813.

To ensure the parties have that appreciation of the merits and the respective

consequences of the litigation, it is important to evaluate both the amount and type

of discovery conducted. As mentioned before, the parties completed extensive

discovery, including expert discovery, for an extensive period before the Proposed

Settlement Agreement was submitted for approval by the Court. Indeed, the

extensive discovery conducted was sufficient to support cross motions for summary

judgment and *actual* judgment. Further, our decision on the merits clearly supports

the inference that the parties adequately appreciated the merits of their respective

positions.

The fourth factor, the risks of establishing liability, is not in play relative to

our analysis. There are essentially no risks attendant here because the liability of

DPW was previously established by the Court's January 27, 2011 Order granting

Plaintiffs' Motion for Summary Judgment.

The fifth factor, which involves the risks of establishing damages, or, more

relevant to our case, securing the requested relief, weighs in favor of allowing

settlement. Although the Court found for Plaintiffs on the issue of liability, the

nature of the relief or precise contours of any injunction that would be crafted by

the Court are far from certain. Indeed, it is our reluctance to impose a judge-made

12

policy on Defendants which triggered the mediation that ultimately brought this proposed settlement before us for approval.

The sixth factor – the risks of maintaining the class – calls for the Court to weigh the possibility that a class would be decertified prior to trial. The risk of decertification at this stage, after resolution of the cross-motions for summary judgment, is quite negligible.[4]  Therefore, this factor does not weigh in favor of the Proposed Settlement Agreement in any significant way.

The seventh factor, Defendants' ability to withstand a greater judgment, weighs in favor of settlement because, by any estimation, DPW is subject to significant budgetary constraints as recognized by the Court and the parties throughout this case. The terms of the Proposed Settlement Agreement require DPW to develop and implement phased-in community placements. While these may ultimately result in future cost reduction, they will undoubtedly require upfront

---

[4]On August 25, 2011, Carl A. Solano, Esq., who objected on behalf of his sister, Diane Solano, and presented argument at the hearing, submitted a letter and supplemental authority. (Doc. 279.) Specifically, Mr. Solano submitted the Third Circuit's August 25, 2011 Opinion in *Gates v. Rohm and Haas, Co.*, No. 10-2108, in which the Third Circuit held that it would be improper to certify a class if the requirement of cohesiveness was not satisfied. Presumably, Mr. Solano is suggesting that the Court should *sua sponte* reevaluate its certification decision because of the objections to the Proposed Settlement Agreement. We note, again, that those who oppose the Proposed Settlement Agreement are those who oppose community placement and the certified class includes those who do not, or would not oppose community placement. Thus, although the rights of those who are non-class members must be vigilantly protected, their objections do not destroy the cohesiveness of the class members. We thus find *Gates* inapt as it relates to the task at hand.

13

costs.  Any relief designed by this Court – a body certainly far less well-versed in the intricacies and necessities of planning for community integration than the parties – will almost necessarily result in much greater costs and budgetary burdens on DPW and the Commonwealth.

Finally, the range of reasonableness in light of the best possible recovery by Plaintiffs and the attendant risks of litigation weighs in favor of settlement.  As Plaintiffs aptly note, "[a]ssessing the value of a settlement and the 'best possible recovery' is particularly difficult in a case seeking injunctive, rather than monetary relief."  (Doc. 261 p. 20.)  The Proposed Settlement Agreement confers upon Plaintiffs the benefits they sought – the opportunity to have a reasonable prospect of discharge from institutionalization.  The Proposed Settlement Agreement develops a reasoned plan to ensure Plaintiffs receive the relief they sought through a process that is rationally measured in scope, duration, and cost.  Rejection of the settlement will only result in further delay in implementing relief for the Plaintiffs. As we would then have to return to the proverbial "drawing board", the Court would be tasked to conduct a hearing on remedies in light of the violations, compelled to spend a considerable amount of time deciding the precise relief, and thereafter the parties would presumably spend a substantial amount of time preparing for or conducting the discharge of proper Plaintiffs.  Forcing upon the parties an

injunction and resulting policy to which they did not agree via arms-length

negotiation could also presumably result in further litigation to ensure its

enforcement, draining the resources of the Plaintiffs, the Commonwealth, and this

Court.  Perhaps most importantly, the sooner the Proposed Settlement Agreement

can be implemented, the faster Plaintiffs can benefit from its mandate and achieve

real consideration for appropriate community placements.

### 2.    Conclusion

Thus, the ultimate balance of the *Girsh* factors weigh in favor of approval of

the Proposed Settlement Agreement, and we find that it is fair, adequate, and

reasonable.  Although we give our approval to Proposed Settlement Agreement and

its terms, we advise the parties to implement the settlement with caution.  To our

admittedly untrained eye, it appears as though the assessment protocol that has been

developed to effectuate the Proposed Settlement Agreement may imply an

unintended bias towards community placement.  Reviewing the questionnaire to be

utilized causes us to entertain serious doubts as to whether it is the proper tool for

gauging whether the profoundly disabled, and especially those with no guardian to

speak for them, are opposed to community placement.  Indeed, we wonder about the

wisdom of defaulting such individuals into a no preference category without greater

analysis.  And we have no doubt that the stated fears of many objectors, including

15

those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real.  We urge those responsible for implementing the policy to consider these concerns, and if necessary revise the protocols in question. As to the other oft-articulated objection, that this settlement is simply a stalking-horse for DPW's plan to close all ICF/MRs, we reiterate that this issue is not before us today, nor is it a facet of the settlement.  To the extent that any Objectors believe that there is an overarching policy to close ICF/MRs by DPW, their recourse lies not with this Court, but through their elected representatives and those who make policy within DPW.  At the end of the day, the Settlement we are approving is the necessary result of violations of class members' legal rights by Defendants.  We are thus duty-bound to place our imprimatur on a reasonable resolution that remedies those violations.  No remedy in a world such as this, where family members must make wrenching decisions regarding loved ones who are in many cases profoundly impaired, will be perfect.  However, the settlement presented to us is worthy of our approval for all of the reasons aforestated.

### B.    Attorneys' Fees and Costs

When evaluating an award of attorney's fees, in most instances courts apply the "American Rule".  This bedrock principle requires that each litigant pays his or her own costs or attorneys fees, unless a statute or contract provides otherwise.

16

Often, statutory fee-shifting provisions will deviate from the American Rule and permit a court to award attorney's fees to a "prevailing party." The fee-shifting statutes at issue *sub judice*, 42 U.S.C. § 12205 under the ADA and 29 U.S.C. § 794a(b), authorize the payment of reasonable attorneys' fees and costs to a prevailing party who has filed suit under these acts. It is within the Court's discretion to award fees to a prevailing party, although "it is well established that a prevailing party should recover an award of attorney's fees absent special circumstances." *Truesdell v. Philadelphia Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002) (reviewing and reversing a denial of attorney's fees under 42 U.S.C. § 1988). Because a plaintiff may be a "prevailing party" for attorney's fees purpose "if they succeed on any significant issue in the litigation which achieves some of the benefit the parties sought in bringing suit", *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983), the Court has no doubt that Plaintiffs *sub judice* are the "prevailing party" in this litigation because they already fully succeeded on the merits prior to this proceeding to approve a final settlement. Therefore, we shall evaluate whether the requested fees and costs in the amount of $432,500 are reasonable.

### 1.    Calculating the Lodestar

Plaintiffs assert they incurred total attorneys' fees in the amount of $430,715 and, as mentioned, are requesting an award of a portion of that amount. "In general,

a reasonable fee is one which is adequate to attract competent counsel, but which does not produce windfalls to the attorneys." *Pub. Interest Research Grp. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (internal quotation omitted).  A court typically calculates the appropriate award by determining a lodestar.  The lodestar is calculated by determining the product of an appropriate hourly rate and a reasonable number of hours expended.  The party seeking fees has the burden of producing "sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered. . . ."  *Knight v. Drye*, 2009 U.S. Dist. LEXIS 82369 (M.D. Pa. Sept. 10, 2009) (quoting *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 150 (3d Cir. 1990)).  Once the prevailing party's burden has been met, the opposing party bears the burden of producing sufficient evidence to challenge that amount.  *McCutcheon*, 560 F.3d at 150.  If the opposing party does not challenge the amount, or does not provide sufficient evidence to challenge the amount, the district court need not make an independent lodestar determination, though the calculation of fees nonetheless is within the court's discretion.  *Id.*  Notably, Defendants do not oppose the Motion for Fees and Costs and thus do no challenge the reasonableness of the amount petitioned.  Indeed, this amount was the result of extensive negotiations as stated by counsel at the fairness hearing.  However, in an abundance of caution we will briefly articulate

A24

our independent lodestar determination.

### a.  Reasonable Hourly Rate

A reasonable hourly rate is typically based on the prevailing rates in the relevant community, and "[t]he court should assess the experience and skill of the prevailing party's attorneys and compare their rates to the rates prevailing in the community for similar services. . . ."  *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001).  "Thus determination of the market rate first requires determination of the relevant market."  *Windall*, 51 F.3d at 1186.  In determining the reasonable hourly rate, courts can start by considering "the attorney's usual billing rate, but this is not dispositive."  *Maldonado*, 256 F.3d at 185 (quoting *Windall*, 51 F.3d at 1185).  As previously mentioned, the prevailing party bears the burden of establishing "by way of satisfactory evidence in addition to the attorney's own affidavits that the requested hourly rates meet [the above-mentioned] standard."  *Id.* (quoting *Washington v. Philadelphia Cty. Ct. of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir. 1996)) (internal quotation omitted).

Applying the lodestar, Plaintiffs assert the following respective hourly rates charged and hours expended by each attorney from Disability Rights Network:

| Attorney | Hours | Rate | Lodestar |
|----------|-------|------|----------|
| Robert W. Meek | 467.8 | $475 | $222,205.00 |
| Mark J. Murphy | 69.0 | $450 | $31,050.00 |
| Robin Resnick | 443.65 | $400 | $177,460.00 |

A25

In considering the expertise and skill of each respective attorney, as well as the

relevant market rate, we find that the rates claimed are not excessive.  As attorneys

Meek, Murphy, and Resnick have demonstrated in their submissions, they have

practiced law for approximately 33, 28, and 25 years, respectively.  Most of those

years were with the Disability Rights Network, or its predecessor, the Disabilities

Law Project.  (*See* Doc. 262, Exhibits E-G.)  All counsel have extensive

demonstrated experience in the subject matter of this litigation – disabilities law –

and have participated in the seminal cases upon which we relied in deciding this

action under the ADA's integration mandate.  *See, e.g., Frederick L. v. Dep't of*

*Pub. Welfare*, 422 F.3d 151 (3d Cir. 2005); *Frederick L. v. Dep't of Pub. Welfare*,

402 F.3d 374 (3d Cir. 2004).

With respect to the prevailing market rate, the Third Circuit has previously

noted:

> In establishing a standardized fee schedule the court will encounter the problem of selecting hourly rates for visiting lawyers from other parts of the country litigating in this forum.  The Task Force [appointed by the Third Circuit] reviewed the current practices of the various circuits and concluded that the best rule is the "forum rate" rule.  Hence an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged.  Deviation from this rule should be permitted only when the need for "the special expertise of counsel from a distant district" is shown or when local counsel are unwilling to handle the case.

20

*Windall*, 51 F.3d at 1186 (quoting Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 260-62 (1986)).  Thus, the typical measure of a market rate is based upon the forum of the litigation, unless Plaintiffs can demonstrate that they "required the particular expertise of counsel from another vicinage, or that local counsel were unwilling to take on the litigation."  *Interfaith Cmty. Org. v. Honey-well Intn'l, Inc.*, 426 F.3d 694, 699 (3d Cir. 2005).

Candidly, the rates requested by Mr. Meek, Mr. Murphy, and Ms. Resnick ($475, $450, and $400, respectively), give the Court some pause at first blush when comparing those rates to the prevailing market rates in the Middle District.  Mr. Meek declares in his Affidavit (Doc. 262, Exhibit A), and we have no reason to doubt, that these rates are entirely consistent in the Philadelphia legal community.  Although the rates are not commensurate with the local market rates, three considerations inform our decision that the rates requested are ultimately reasonable.  First, this complex litigation required a very high level of expertise by counsel.  As Mr. Meek avers, the litigation "required knowledge of operation and funding of Pennsylvania's mental retardation service system, the Medical Assistance system, and the legal issues under the ADA and the RA."  (Doc. 262-1 p. 5.)  The learned counsel at DRN quite clearly has this expertise.  Second, it is doubtful that local counsel would have been willing or able to take on a class action

lawsuit that required as much time and up-front costs with no monetary award even prayed for. Finally, equally importantly, and as noted, this Motion is uncontested and the product of Defendants' searching examination of Plaintiffs' counsels' charges. Therefore, the rates therein are not only uncontested, but have been thoroughly vetted as well. For these reasons, we find the hourly rates represented therein to be reasonable.

**b.     Reasonable Hours Expended**

In addition to determining a reasonable hourly rate, a court is charged with calculating the hours that are reasonably expended by the prevailing party. "Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary." *Rode v. Dellarciprete*, 802 F.2d 1177, 1183 (3d Cir. 1990). As such, a party should not be responsible for those hours that are not reasonable or are excessive under the circumstances. Counsel for Plaintiffs collectively spent 980.45 hours on this litigation. In reviewing the time sheets attached to the Motion (Docs. 262, Exhibits B-E) and considering the length and development of this vigorously-contested litigation,[5] we find that there were no excessive expenditures of time.

---

[5]The hours claimed include, *inter alia*, time spent in pre-complaint investigation, drafting the Complaint, researching and drafting the Motion for Class Certification, responding to the Motion to Dismiss, Motion to Intervene, conducting and responding to discovery, pursuing the Motion for Summary Judgment. Review of the time-sheets likewise demonstrates that counsel consistently strived to avoid duplication of efforts.

A28

### c.    Other Considerations

The amount reached by employing this framework and calculating the lodestar is typically "presumptively reasonable." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 703 n.5 (3d Cir. 2005). Nonetheless, after calculating the lodestar, a district court's discretion then comes into play and the court may then increase or decrease the total award based upon other factors such as the relative success of the prevailing party. *See In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009).

We do not find it prudent to disturb the amount requested by Plaintiffs. As we have emphasized, the amount of fees requested is a portion of a bargained-for settlement that the Court encouraged the parties to reach. Furthermore, the total fees requested by Plaintiffs are in fact less than Plaintiffs' lodestar.[6] Finally, and very significantly in our view, Plaintiffs are not requesting compensation for fees incurred after June 30, 2011. Therefore, we find the amount requested to be reasonable and shall approve and award the total amount of fees requested by Plaintiffs.

### 2.    Costs

---

[6]The portion of the total amount requested in the Motion for Fees and Costs attributable to attorney's fees is $363,677.74, and the remainder is attributable to litigation costs incurred by Plaintiffs' counsel. The total amount of fees actually accumulated by Mr. Meek, Mr. Murphy, and Ms. Resnick was $430,715.00.

As noted, in addition to the attorney's fees, the $432,500.00 requested also includes $68,822.26 in costs. The litigation expenditures are itemized by Plaintiffs as follows:

| Expenses | Amount |
|---|---|
| Filing Fee | $350.00 |
| Depositions | $6,074.95 |
| Expert Witnesses | $58,883.75 |
| Defendants' Expert Deposition Fee | $1,943.00 |
| Postage | $9.94 |
| Travel | $435.35 |
| Photocopying | $1,125.27 |

Once again, we find that these costs are entirely reasonable considering the length and complexity of the underlying litigation, and will approve the same.

### 3.    Conclusion

Plaintiffs and Defendants engaged in arms-length negotiations with respect to the final relief in this litigation. Plaintiffs agreed to request an award of fees and costs in an amount that was measurably less than what was actually incurred. Defendants have agreed to pay that amount. After calculating the lodestar and considering the complexity of the litigation, the Court can divine no reason to disturb this bargained-for agreement. Therefore, we find that an award of $432,500 to Plaintiffs for fees and costs as the prevailing party in this litigation is reasonable.

### IV.    CONCLUSION

To reiterate, we are placing our imprimatur on this settlement only after much consideration and deliberation.  The objections we received were not only numerous, but some were also cogently expressed and many were at times quite eloquent and even poignant.  The depth of emotion expressed in these objections could easily lead us to neglect the real task at hand, which is to consider the proposed remedy in light of the violations of Plaintiffs' rights.  Our foremost duty, however, is to consider the present posture of those individuals who brought this litigation to vindicate their legal rights.  As we have previously found, DPW has consistently marginalized Plaintiffs and relegated them to a class of persons who received integrated services only after every other person who was not in that class was served.  Plaintiffs are thus entitled to the remedies as agreed to by the parties.  This Settlement Agreement seeks to discontinue practices that have systematically violated Plaintiffs' rights, and we thus find that it is a fair, adequate, and reasonable way to achieve that end, although admittedly imperfect.

In closing however, we note the following for the benefit of the non-class Objectors and for those rightfully concerned citizens and elected officials who have voiced opposition: we are not approving this Settlement Agreement to force individuals who do not wish to live in the community out of the ICF/MRs, and we are certainly not effectuating a closing any of the Commonwealth's ICF/MRs.

25

Rather, we are approving the Settlement Agreement to ensure that the integration

mandates of the ADA and related laws are implemented and followed.

Accordingly, we shall grant Plaintiffs' Unopposed Motion for Final Approval of the

Proposed Class Action Settlement Agreement (Doc. 260) and Plaintiffs' Unopposed

Motion for Attorneys' Fees and Litigation Expenses and Costs (Doc. 262).  An

appropriate Order shall follow.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, *et. al.*,        :        1:09-cv-1182
                                     :
                                     :
          Plaintiffs                 :
                                     :
        v.                           :
                                     :
DEPARTMENT OF PUBLIC ,               :        Hon. John E. Jones III
WELFARE OF THE                       :
COMMONWEALTH OF                      :
PENNSYLVANIA and GARY                :
ALEXANDER, in his official capacity  :
as Secretary of Public Welfare of the :
Commonwealth of Pennsylvania         :
                                     :
          Defendants.                :

## ORDER

### August 16, 2011

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

A fairness hearing related to the Proposed Settlement Agreement in this

action is scheduled for Monday, August 22, 2011.  In addition to several

objections lodged on the record, there have been two motions to intervene (Docs.

179, 253) filed by Carl A. Solano, objecting on behalf of his sister Diane Solano,

and the previously-named "Springstead Intervenors".  In addition to the Motions

to Intervene, the above-mentioned parties likewise filed a joint Motion for

1

A33

Hearing, (Doc. 269) to determine the objectors' standing to appear and present argument at the fairness hearing.

We have thoroughly considered the most effective procedure for the conduct of the August 22, 2011 hearing and the Objectors' requests to actively participate, do not see cause to honor the Objectors' request to hold a hearing on that matter. Because it is the parties' burden to demonstrate at the hearing that the Proposed Settlement is fair, adequate, and reasonable, we shall take testimony and fact evidence presented only by the parties. We shall fully consider the objections lodged on the record, and will further allow the "Springstead Intervenors" and Mr. Solano, through counsel, to question the respective witnesses. Because the interests of these Objectors are sufficiently aligned, and representative of all Objectors, we direct them to designate one counsel to participate in the hearing.

We are, in part, granting the relief the Objectors seek in their respective Motions to Intervene by allowing them to reasonably participate in the August 22, 2011 hearing. Further, we incorporate by reference our March 10, 2010 Order denying the Springstead Intervenors' original Motion to Intervene, which was affirmed by the Third Circuit, and find that full intervention is unwarranted and improper. We will accordingly deny the outstanding Motions to Intervene (Docs. 179, 253).

2

A34

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.    The Springstead Intervenors and Mr. Solano shall identify, via letter

on the docket, the attorney designated to appear in the August 22,

2011 hearing on or before Thursday, August 18, 2011;

2.    Carl A. Solano's Motion to Intervene (Doc. 179) and the Springstead

Intervenors' Motion to Intervene (Doc. 253) are respectively

**DENIED**;

3.    The Joint Motion for a Hearing (Doc. 269) is **DENIED**.


_____

John E. Jones III

United States District Judge

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FRANKLIN BENJAMIN, by and        :
through his next friend, Andreé  :
Yock; RICHARD GROGG and          :
FRANK EDGETT, by and through     :
their next friend, Shirl Meyers; :
ANYTHONY BEARD, by and           :
through his next friend, Nicole  :
Turman, on behalf of themselves and :
all others similarly situated,   :        No. 09-cv-01182
                                 :
        Plaintiffs,              :
                                 :
        v.                       :        Class Action
                                 :
DEPARTMENT OF PUBLIC             :
WELFARE OF THE                   :
COMMONWEALTH OF                  :        Judge Jones
PENNSYLVANIA and ESTELLE B. :
RICHMAN, in her official capacity :
as Secretary of Public Welfare for the :
Commonwealth of Pennsylvania     :
                                 :
        Defendants.              :

## **ORDER**

### September 2, 2009

Upon consideration of Plaintiffs' Unopposed Motion for Class Certification,

it is hereby ORDERED:

I.    Plaintiffs' Motion (Doc. 15) is GRANTED based upon the following

      findings:

a.   The requirements of Federal Rule of Civil Procedure 23(a) are

satisfied.

    i.   The evidence indicates that there are more than 1,200 class

members.  These individuals have intellectual disabilities and

have low incomes, making it unlikely that they would file

individual lawsuits.  In addition, the class members are

dispersed throughout the Commonwealth, undermining the

expediency of joinder.  The class is thus too numerous to make

joinder practicable.

    ii.   There are questions of law and fact common to the named

individual Plaintiffs and members of the class: (a) whether

Defendants have a viable integration plan for residents of state-

operated ICFs/MR; (b) whether Defendants properly evaluate

residents of state-operated ICFs/MR to asses their community

service and support needs; (c) whether Defendants' policies

and practices, including its administration of its waiting list

process, effectively exclude class members from accessing the

community mental retardation system; (d) whether Defendants'

failure to offer and, if not opposed, provide services and

supports in more integrated community settings to class

members violates the integration mandates of the Americans

with Disabilities Act (ADA) and the Rehabilitation Act (RA);

and (e) whether Defendants use methods of administration that

have the effect of discriminating against individuals with

disabilities in violation of the ADA and the RA.

iii.　The claims of the individual Plaintiffs are typical of those of

the class members. The individual Plaintiffs' and class

members' claims arise out of the same policies, practices, and

procedures of Defendants and are based on the same legal

theories under the ADA and the RA.

iv.　The individual Plaintiffs will fairly and adequately prosecute

this lawsuit. They have no interests antagonistic to the class or

subclass members and they have retained qualified counsel to

represent them and the class.

b.　The requirements of Federal Rule of Civil Procedure 23(b)(2) are

satisfied because final declaratory and injunctive relief would be

appropriate for the class as a whole.

II.　Plaintiffs Franklin Benjamin, by and through his next friend, Andreé York,

Richard Grogg and Frank Edgett, by and through their next friend, Joyce

McCarthy, Sylvia Baldwin, by and through her next friend Shirl Meyers,

and Anthony Beard, by and through his next friend, Nicole Truman, are
hereby certified as class representatives.

III.    This case shall proceed on behalf of the following class:

> All persons who: (1) currently or in the future will reside in on
> of Pennsylvania's state-operated intermediate care facilities
> for persons with mental retardation; (2) could reside in the
> community with appropriate services and supports; and (3) do
> not or would not oppose community placement.

IV.    Attorney Robert W. Meek, Attorney Mark J. Murphy, Attorney Robin
Resnick, all of the Disability Rights Network, and Attorney Stephen P. Gold
are hereby appointed as class counsel based upon the following findings
sufficient to satisfy Federal Rule of Civil Procedure 23(g):

a.    Counsels' experience in handling class actions and other complex
litigation;

b.    Counsels' knowledge and experience with claims asserted and
governing law, specifically the ADA and the RA;

c.    Counsels' experience in conducting the present litigation thus far and
willingness to continue.

/s/ John E. Jones III
The Honorable John E. Jones III
United States District Judge

4

# AFFIDAVIT OF SERVICE

DOCKET NO. 11-3684 & 11-3685

--------------------------------------------------------------------------------X

 Franklin  Benjamin

      vs.

Department  of Public Welfare  of the Commonwealth
of  Pennsylvania

--------------------------------------------------------------------------------X

     I, Elissa Matias , swear under the pain and penalty of perjury,  that according to law and being over the age of 18, upon my oath depose and say that:

     on December  27, 2011

     I served the **BRIEF *AMICI CURIAE* OF VOR, Inc. (Formerly, Voice of the Retarded, Inc.")
AND 92 MEMBER AMICI IN SUPPORT OF APPELLANTS' ARGUMENT FOR REVERSAL and
VOLUME I**  within in the above captioned matter upon:

Robert W. Meek, Esq.
Disability Rights Network of Pennsylvania
1315 Walnut Street, Suite 500
Philadelphia, PA  19107-4705
*Attorney for Plaintiff-Appellees*

Carl A. Solano, Esq.
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
*Attorney for Appellant*

Doris M. Leisch, Esq.
Office of General Counsel
Pennsylvania Department of Public Welfare
Third Floor West, Health & Welfare Building
Harrisburg, PA 17120
*Attorney for Defendants*

Benjamin J. Hoffart, Esq.
Sidley Austin LLP
787 Seventh Avenue
New York NY 10019

via **electronic filing and electronic service**.

Unless otherwise noted, copies have been sent to the court for filing via Hand Delivery on
December 28, 2011.

**Sworn to before me on December 27, 2011**

 **/s/ Robyn Cocho**

_____
Robyn Cocho
Notary Public State of New Jersey
No. 2193491
Commission Expires January 8, 2017

/s/ Elissa Matias
Elissa Matias

Job # 239679