**No. 11-3684, 11-3685**

*In The*

# United States Court of Appeals

*for the*

# Third Circuit

---

**FRANKLIN BENJAMIN**, by and through his next friend**, ANDRÉE YOCK**; **RICHARD GROGG** and **FRANK EDGETT**, by and through their next friend **JOYCE MCCARTHY**; **SYLVIA BALDWIN**, by and through her next friend, **SHIRL MEYERS**; **ANTHONY BEARD**, by and through his next friend **NICOLE TURMAN,** on behalf of themselves and all others similarly situated,

**v.**

**DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA** and **ESTELLE B. RICHMAN**, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania.

**CRAIG SPRINGSTEAD**, by and through his father and guardian**, BERTIN SPRINGSTEAD**; **MARIA MEO**, by and through her mother and guardian **GRACE MEO**; **DANIEL BASTEK**, by and through his father and guardian, **JOHN BASTEK**; **MICHAEL STORM**, by and through his guardian, **POLLY SPARE**; **BETH ANN LAMBO**, by and through her father and guardian**, JOSEPH LAMBO**; **RICHARD CLARKE**, by and through his father and guardian, **LEONARD CLARKE**; **RICHARD KOHLER,** by and through his sister and guardian, **SARA FULLER**; **MARIA KASHATUS** by and through her father and guardian, **THOMAS KASHATUS**; and **WILSON SHEPPARD**, by and through his brother and next friend, **ALFRED SHEPPARD**,

*Appellants, No. 11-3684*

**DIANE SOLANO,** by and through her brother and guardian, **CARL SOLANO,**

*Appellant, No. 11-3685*

---

On Appeal from the Order dated September 2, 2011, by the United States District Court for the Middle District of Pennsylvania, Civil Action No. 09-01182

---

**APPENDIX FOR AMICI CURIAE OF VOR, INC. (Formerly, Voice of Retarded, Inc.) AND 92 MEMBER AMICI IN SUPPORT OF APPELLANT'S ARGUMENT FOR REVERSAL (File By Consent Pursuant to Fed. R. App. P.29 (a))**

---

*\* List of Amici on following page*

### *LIST OF AMICI*:

| | | |
|---|---|---|
| VOR, Inc.* | Kate Govaeea* | Shirley Musacchio* |
| Ellie Adams | Wes Grebski* | Kenneth O. Myers* |
| Frank Beston* | John P. Gregor | Celine M. Nauman |
| Richard Bolger | Adelaide Hardy* | Patricia O'Donnell* |
| Sharon & Elmer Brice* | Deborah & Gerard Hey* | Frances Fowler Parker |
| William F. Brill* | William F. Hudock* | Satish & Neela Patel |
| Walter Buchholz | Ruth Jarrett* | Mary Shaffer Raderstorf |
| Helen Cox | Doris L. Kalan* | Leonora Polizzi |
| Andy & Irene Crichton | Mary Kashatus* | Joseph Potera* |
| William & Beverly | C.W. Koopman | David Rosen |
| Daugherty* | Sandra Krafft* | Barbara Sabo* |
| Guy Di Marzio | Dr. Michael and Rosa | Alfred, Allan & |
| Carin Doddroe* | Kurtz | Carmella Sames |
| Dolores J. Drews* | Arthur Leibowitz | Andrea A. Sarris |
| Gerald S. Dunne* | Linda Leichter | Charlene Shaffer |
| Catherine Dymacek* | Jane Lemmon | Trudy Sheetz* |
| Beverly Evans | Betty Lightner* | Beatrice Sitko* |
| Susan B. Farina | Linda Lotzi* | Eugene Shuxteau |
| Norma Ferguson* | Lawrence Lotzi | Kathryn Spare |
| Kimberley Gauronski* | Francis J. Marlow* | Margaret M. Tierney* |
| The Giarratano Family (6) | Charles McCormick* | Bill Toperzer* |
| Gaetana Giarratano | Michael & Thomas | Daniel Torisky |
| Emil & Elizabeth Gnall* | McKeaney | Christopher W. Tyler |
| Mindy & Richard Goldstein | Wilson McKinley | Gary & Mary Wills* |
| Reverend Adelbert Gordon* | Doris Jane Miller | C.L. & Donna |
| Minerva Gordon* | Jean McCoy Milliron* | Witzleben |
| Mary Gough* | Charlotte Morris | |

*These individuals also filed objections to the settlement in the District Court.

NANCY SHANE RAPPAPORT
LESLI C. ESPOSITO
DLA PIPER LLP (US)
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103
(215) 656-3300
*Counsel for Amici Curiae*

# APPENDIX
# TABLE OF CONTENTS

## <u>Volume I</u>

1.   Springstead Objectors' Notice of Appeal, dated September 30, 2011 ..........A1

2.   Diane Solano's Notice of Appeal, dated September 30, 2011 ....................A3

3.   Order of the Honorable John E. Jones III, Approving Class
     Settlement dated September 2, 2011 ............................................................A5

4.   Memorandum of the Honorable John E. Jones III, dated
     September 2, 2011 ......................................................................................A7

5.   Order of the Honorable John E. Jones III, Denying Appellant Solano
     and Appellants Springstead Objectors Alternative Motions to
     Intervene, dated August 16, 2011 ..............................................................A33

6.   Order of the Honorable John E. Jones III, Granting Motion for Class
     Certification, dated September 2, 2009 ......................................................A36

## <u>Volume II</u>

7.   Amended Complaint dated July 14, 2009....................................................A44

8.   Order of the Honorable John E. Jones III, Denying Joint Motion
     by Objectors for a Partial Stay of this Court's Order (Doc. 290)
     Approving the Settlement Agreement dated December 19, 2011...............A69

9.   Complaint - *People First of Washington, Inc. v. Rainier Residential
     Habilitation Center, et al.*, No. C96-5906 FDB (WD Wash 1997).............A71

10.  Statement of Undisputed Material Facts in Support of Plaintiffs'
     Motion for Summary Judgment..................................................................A159

11.  *Cost Comparisons of Community and Institutional Residential
     Settings: Historical Review of Selected Research*, pp. 103-122,
     Mental Retardation, Volume 41, Number 2 (April 2003;
     unpublished update, 2009) ........................................ ................................A193

12. Shaville, Strauss, and Day, *Deinstitutionalization in California:  Mortality of Persons with Developmental Disabilities after Transfer into Community Care, 1997-99, Life Expectancy Project,* Section 1, p. 372, Journal of Data Science 3 (2005) ..................................... ..................................................A159

13. Complaint - *Brown v. Bush*, Civil Action No. 98-cv-673 (S.D. Fla. March 1998) ..................................................................................A223

14. Complaint - *Travis D., et al. v. Eastmont Human Services Center,* Civil Action No. 96-93, (D. Mont. 1996) ......................................................A270

15. Complaint - *Hunt v. Meszaros*, No. PJM 91-2564 (D. Md. 1991)..............A298

16. Settlement Agreement - *Coffelt v. Department of Developmental Services*, Civil Action No. 91-6401 (Cal. Super. Ct. Jan. 1994) ...............A324

17. *State Probes Abuse of Disabled*, Albuquerque Journal, November 18, 2003..................................................... ..............................A426

18. Complaint - *Nelson v. Snider*, Civil Action No. 94-CV-440 (E.D. Pa. 1994) ........................................................................................A428

19. Settlement Agreement, *United States v. Pennsylvania,* 832 F.Supp. 122........................................................... ......................A499

20. Complaint - *Torisky, et al v. Schweiker, et al*, NO. 05-1496 (M.D. Pa. 2001) ...................................................................... .................A531

21. *Policy Implications of Mortality Research:  Authors' Perspectives, What Can We Learn From the California Mortality Studies?,* Mental Retardation, October 1998, p. 407..................................................A549

22. *1,200 Deaths and Few Answers*, The New York Times, November 6, 2011.....................................................................................A552

23. September 19, 1997 Letter from Daniel Torisky to Nancy Thalen.............A561

24. VOR Weekly E-Mail Update Dated December 19, 2009...........................A562

25.  Settlement Agreement - *Mumford v. Department of Public Welfare of the Commonwealth of Pennsylvania, et al.*, Civil Action No. 11-3312 (October 5, 2011 E.D. Pa.) ..............................A568

26.  Answer to Amended Complaint dated February 23, 2010.........................A604

27.  Linda Lotzi Objection Letter dated August 2, 2011...................................A606

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |
|---|---|
| FRANKLIN BENJAMIN, by and through his next friend, Andreé Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated, | : : : : : : : : : : |
| Plaintiffs, | : Filed via ECF System |
| v. | : Civil Action No. 1:09-cv-1182-JEJ |
| DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and ESTELLE B. RICHMAN, in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, | : Class Action : : : : : |
| Defendants. | : |

_____

## AMENDED COMPLAINT

## I.    Introduction

1.    Plaintiffs, individuals who are institutionalized in Pennsylvania's state-operated intermediate care facilities for persons with mental retardation (ICFs/MR), bring this lawsuit on behalf of themselves and others similarly situated to challenge the Defendants' continuing failure to offer and provide them with the opportunity to

receive services in integrated, community settings that are the most appropriate settings to meet their needs, resulting in their continued unnecessary segregation and institutionalization.

2.    Despite the fact that Plaintiffs and many others in the state-operated ICFs/MR want to live in community settings and that the community is the most integrated setting appropriate to meet their needs, Defendants have not offered them any alternative to remaining institutionalized.

3.    The costs of providing community services to Plaintiffs and putative class members would be far less than the costs of continuing to institutionalize them. The average annual cost of providing services in a state-operated ICF/MR is nearly $228,000 per person, more than double the average per capita cost of providing community services (including residential services) to such an individual.

4.    Defendants' failure to offer and provide community alternatives to Plaintiffs and other persons confined in ICFs/MR who are appropriate for and not opposed to discharge violates Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  Plaintiffs seek appropriate declaratory and injunctive relief.

2

## II.    <u>Jurisdiction and Venue</u>

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).

6.    Plaintiffs' claims are authorized by 42 U.S.C. §§ 1983 and 12133, 29 U.S.C. § 794a(a)(1), and 28 U.S.C. §§ 2201 and 2202.

7.    Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b) since Defendants reside in this District.

## III.    <u>Parties</u>

8.    Plaintiff Franklin Benjamin is a 48-year-old resident of Philadelphia, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1966. He brings this lawsuit by and through his next friend, Andreé Yock, pursuant to Federal Rule of Civil Procedure 17(c).

9.    Plaintiff Richard Grogg is a 45-year-old resident of York County, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1988. He brings this lawsuit by and through his next friend, Joyce McCarthy, pursuant to Federal Rule of Civil Procedure 17(c).

10.    Plaintiff Frank Edgett is a nearly 51-year-old resident of Cumberland County, Pennsylvania who has been institutionalized in a state-operated ICF/MR

since 1987. He brings this lawsuit by and through his next friend, Joyce McCarthy, pursuant to Federal Rule of Civil Procedure 17(c).

11.     Plaintiff Sylvia Baldwin is a 33-year-old resident of Allegheny County, Pennsylvania who has been institutionalized in a state-operated ICF/MR almost continuously since 1990. She brings this lawsuit by and through her next friend, Shirl Meyers, pursuant to Federal Rule of Civil Procedure 17(c).

12.     Plaintiff Anthony Beard is a 49-year-old resident of York County, Pennsylvania who has been institutionalized in a state-operated ICF/MR since 1967. He brings this lawsuit by and through his next friend, Nicole Turman, pursuant to Federal Rule of Civil Procedure 17(c).

13.     Defendant Department of Public Welfare (DPW) is the Commonwealth agency that is responsible to provide services to Pennsylvanians with mental retardation, including Plaintiffs and putative class members, under the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4201(1). DPW operates five ICFs/MR and funds numerous privately-operated ICFs/MR, most of which are large institutions. DPW also arranges for and funds the provision of home and community-based mental retardation services so that people with mental retardation can live in the community with non-disabled persons.

14.    Defendant Estelle B. Richman is the Secretary of Public Welfare for the Commonwealth of Pennsylvania.  Defendant Richman is responsible to administer and oversee DPW.  As such, Defendant Richman is responsible to administer and oversee DPW's mental retardation programs, including state and private ICFs/MR and community-based mental retardation services.  Defendant Richman also is responsible to assure that DPW's programs and services comply with relevant federal laws, including the Americans with Disabilities Act and Rehabilitation Act.

## IV.    <u>Class Action Allegations</u>

15.    Plaintiffs Benjamin, Grogg, Edgett, Baldwin, and Beard, by and through their next friends, bring this lawsuit on behalf of themselves and all other persons who:  (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

16.    The size of the class makes joinder impracticable.  Currently, there are approximately 1,272 individuals who reside in Pennsylvania's five state-operated ICFs/MR.  The geographic dispersion of these individuals, their lack of resources, and their cognitive disabilities further render individual lawsuits impracticable.

5

17.    There are questions of fact and law common to all class members, including, but not limited to: (a) whether Defendants' policies and practices effectively exclude class members from accessing the community mental retardation system; (b) whether Defendants' failure to offer and, if not opposed, provide services and supports in more integrated community settings to class members violates the integration mandates of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and (c) whether Defendants use methods of administration that have the effect of discriminating against individuals with disabilities.

18.    The claims of the named Plaintiffs are typical of those of all putative class members.

19.    The named Plaintiffs will adequately protect the interests of the class. They have no interests which conflict with other class members.  Plaintiffs' counsel are experienced in litigating class actions, including enforcement of the civil rights of people with disabilities.

20.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

6

## V.    Facts

### A.    Plaintiffs' Unnecessary Institutionalization

21.    Plaintiff Franklin Benjamin, a 49-year-old man with mental retardation and bipolar disorder, was admitted to Ebensburg Center in 1966 when he was six years old and where he remains institutionalized more than 40 years later.

22.    Mr. Benjamin has difficulty communicating, using a few words, signs, as well as body language and facial expressions to communicate.  Mr. Benjamin is extremely sensitive to light and noise.  The congregate, institutional nature of Ebensburg Center exacerbates Mr. Benjamin's mental health issues and undermines his capacity to benefit from treatment.

23.    Mr. Benjamin, with appropriate services and supports, can live in the community.  Ebensburg Center is not the most integrated setting appropriate to meet his needs.

24.    On information and belief, DPW's staff and agents have concluded that Mr. Benjamin is appropriate for discharge to the community, but he remains unnecessarily institutionalized.

25.    Mr. Benjamin is not opposed to discharge from Ebensburg Center.  His mother is willing to consider discharge to an appropriate community placement.

26.    Plaintiff Richard Grogg, a 45-year-old man with mental retardation, was involuntarily committed to Selinsgrove Center in 1988, more than 20 years ago.  He remains involuntarily committed at Selinsgrove Center.

27.    Mr. Grogg is extremely independent and sociable.  He holds a number of jobs at Selinsgrove Center and in the community and is involved in his church.

28.    Mr. Grogg is so capable of managing his own money that Defendants do not even require him to have a representative payee appointed to receive his Supplemental Security Income payments.

29.    Mr. Grogg, with appropriate services and supports, can live in the community.  Selinsgrove Center is not the most integrated setting appropriate to meet his needs.

30.    On information and belief, DPW's staff and agents have concluded that Mr. Grogg is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

31.    Mr. Grogg wants to be discharged from Selinsgrove Center and live in the community closer to his mother, who supports his choice.

32.    Plaintiff Frank Edgett, a 51-year-old man with mental retardation, was involuntarily committed to Selinsgrove Center in 1987, more than 20 years ago.  He remains involuntarily committed to Selinsgrove Center.

8

A47

33.    Mr. Edgett was previously admitted to Laurelton Center, a now-closed state-operated ICF/MR, in 1973 when he was 15 years old.  He was discharged to a community residential mental retardation program in 1983.  He was admitted to Harrisburg State Hospital in 1987 and then transferred to Selinsgrove Center where he remains.

34.    Mr. Edgett is very social, engaging, and independent.  He enjoys community trips.

35.    Mr. Edgett, with appropriate services and supports, can live in the community.  Selinsgrove Center is not the most integrated setting appropriate to meet his needs.

36.    On information and belief, DPW's staff and agents have concluded that Mr. Edgett is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

37.    Mr. Edgett wants to be discharged from Selinsgrove Center and live in the community.  His sister supports his choice.

38.    Plaintiff Sylvia Baldwin, a 33-year-old woman with mental retardation, bipolar disorder, and borderline personality disorder, was originally admitted to Polk Center in 1990 when she was 14 years old.  Nearly 20 years later, Ms. Baldwin remains at Polk Center.

9

39.    Ms. Baldwin was discharged twice to residential programs in the community in 1999 and 2001, but was returned to Polk Centers after relatively short time periods due to behavioral and mental health issues.

40.    Ms. Baldwin is generally very independent at Polk Center, but she has challenging behavioral issues. Defendants' failure to develop and implement an appropriate behavioral support plan for Ms. Baldwin led Polk Center staff to use pepper spray on her in 2008 when she exhibited aggressive behavior.

41.    Ms. Baldwin, with appropriate services and supports, can live in the community. Polk Center is not the most integrated setting appropriate to meet her needs.

42.    On information and belief, Defendants' staff and agents have concluded that Ms. Baldwin is appropriate for discharge to the community, but she remains unnecessarily segregated in an institutional setting.

43.    Ms. Baldwin wants to be discharged from Polk Center and live in the community. Her mother supports that choice.

44.    Plaintiff Anthony Beard, a 49-year-old man with mental retardation, was admitted to Ebensburg Center in 1967 when he was seven years old. He remains at Ebensburg Center more than 40 years later.

45.    Mr. Beard is blind and has significant bilateral hearing loss.

46.     Mr. Beard, with appropriate services and supports, can live in the community.  Ebensburg Center is not the most integrated setting appropriate to meet his needs.

47.     On information and belief, DPW's staff and agents have concluded that Mr. Beard is appropriate for discharge to the community, but he remains unnecessarily segregated in an institutional setting.

48.     Mr. Beard is not opposed to discharge from Ebensburg Center. Mr. Beard's mother is no longer able to travel from her home in York County to Ebensburg Center to visit Mr. Beard.  She wants him to be discharged to a community placement closer to York County.

### B.     Pennsylvania's Mental Retardation System

49.     The Mental Health and Mental Retardation Act of 1966 (MH/MR Act), 50 P.S. §§ 4101-4704, requires DPW "[t]o assure within the State the availability and equitable provision of adequate ... mental retardation services for all persons who need them ...."  50 P.S. § 4201(1).

50.     The MH/MR Act requires DPW to operate any state facilities and to provide at least 90 percent of the funding for community-based mental retardation services.  50 P.S. §§ 4202(a), 4509(1).

51.    The MH/MR Act also requires the establishment of county mental health and mental retardation programs that are responsible to administer community-based mental retardation programs.  50 P.S. § 4301.  The county mental health and mental retardation programs act as the agents of DPW to conduct intake to assess service needs, to develop community services, and to arrange for funding for those services for individuals with mental retardation.

52.    DPW implements its responsibility to provide mental retardation services to Pennsylvanians who need them in the following ways:  (a) it directly operates five intermediate care facilities for persons with mental retardation (ICFs/MR); (b) it funds services in numerous privately-operated ICFs/MR; and (c) it funds the provision of community-based mental retardation services administered through its agents, the county mental health and mental retardation programs.

53.    An ICF/MR is a type of licensed facility that is funded through the joint federal-state Medical Assistance program.

a.    All ICFs/MR – whether private or state-operated -- must comply with detailed criteria established by federal regulations.  42 C.F.R. Pt. 483, Subpt. I.

b.    As a Medical Assistance service, the federal government provides a funding match for the costs of ICF/MR services in Pennsylvania.  With adjustments under the American Recovery and Reinvestment Act of 2009, the federal funding

12

A51

match for Fiscal Year 2009 (October 1, 2008 to September 30, 2009) is approximately 63.1 percent.

54.    DPW directly operates five ICFs/MR (which are also called "state centers"). These state-operated ICFs/MR are: (1) Ebensburg Center, located in Cambria County; (2) Hamburg Center, located in Berks County; (3) Polk Center, located in Venango County; (4) Selinsgrove Center, located in Snyder County; and (5) White Haven Center, located in Luzerne County.

55.    As of July 2008, the five state-operated ICFs/MR housed a total of 1,272 individuals, ranging from 129 at Hamburg Center to 347 at Selinsgrove Center.

56.    Between July 1, 2007 and May 30, 2009, 23 residents of state-operated ICFs/MR were discharged to community services, and five residents were admitted to those facilities. During that same time period, 76 residents died.

57.    All of the state-operated ICFs/MR operate at significantly less than full capacity, with Hamburg operating at a little more than 50 percent capacity.

58.    The Commonwealth's allocation to fund services at the five state-operated ICFs/MR for Pennsylvania's Fiscal Year 2008-2009 (July 1, 2008 to June 30, 2009) is nearly $290 million, an average annual cost of nearly $228,000 to provide services to each of the 1,272 residents.

59.    The Governor's proposed budget for FY 2009-2010 will increase the allocation to fund services at the five state-operated ICFs/MR to approximately $303 million, an increase of nearly 4.5 percent.  With the projection that the number of individuals at the state-operated ICFs/MR will decrease to approximately 1,240 persons (primarily due to deaths), the average annual per capita cost to serve an individual in one of those facilities will increase to more than $244,000.

60.    DPW funds an array of home and community-based services for persons with mental retardation.  The Medical Assistance program provides nearly 90 percent of the funding for these services through home and community-based services (HCBS) waivers, including the Consolidated Waiver, approved by the federal government pursuant to 42 U.S.C. § 1396n(c).

a.    HCBS waivers allow states to include in their state plans as "Medical Assistance" home or community-based services for individuals who, with-out such care, would require institutionalization in an intermediate care facility for persons with mental retardation, nursing facility, or similar institution.  42 U.S.C. § 1396n(c).

b.    Pursuant to HCBS waivers, states can provide an array of services, including services that cannot be funded as mandatory or optional services under

Title XIX, such as habilitation services, vocational services, and respite services for persons with mental retardation. 42 U.S.C. § 1396n(c)(4)(B); 42 C.F.R. § 440.180.

c.    The purpose of Title XIX's HCBS waivers is to encourage states to provide services to assist individuals with disabilities to avoid institutionalization. 42 U.S.C. § 441.300. As long as community-based services vis-a-vis institutional services are cost-neutral, *see* 42 U.S.C. § 1396n(c)(2)(D), the preference is to provide services in the community.

d.    The Consolidated Waiver, established in 1986, is the largest HCBS Waiver in the Commonwealth, both in terms of the number of individuals served and expenditures. Approximately 15,000 Pennsylvanians receive services under the Consolidated Waiver. The Consolidated Waiver is the primary funding source for community-based mental retardation services in Pennsylvania. The Consolidated Waiver offers a broad range of community-based mental retardation services, depending on the participant's needs, including: residential habilitation; home and community-based habilitation; day habilitation; vocational services; environmental accessibility adaptations; and transportation. For individuals who participate in the Consolidated Waiver, there is no monetary cap on services. Participants are entitled to receive any services they need that are available under the Waiver.

15

   e. Consolidated Waiver services are Medical Assistance services and, as such, the federal government provides a funding match for those services. Currently, the federal match is 63.1 percent.

  61. The average annual cost of community-based residential services for an individual with mental retardation in Fiscal Year 2008-2009 is approximately $80,200. The average annual cost of non-residential community-based services and supports for an individual with mental retardation in Fiscal Year 2008-2009 is approximately $15,300. Accordingly, the average annual cost of community-based services for a person with mental retardation who receives residential and non-residential supports is less than $100,000 -- less than one-half of the cost of comparable services in a state-operated ICF/MR.

  62. There is a waiting list for community-based mental retardation services in Pennsylvania. Defendants divide individuals on the waiting list into three categories: "emergency" (i.e., those who need services immediately); "critical" (i.e., those who need services within two years); and "planning" (i.e., those who are anticipated to need services more than two but less than five years away).

  63. Defendants require their agents to complete Prioritization of Urgency of Need for Services (PUNS) forms for each individual with mental retardation who

16

applies for community mental retardation services and is not fully served, including individuals who reside in the state-operated ICFs/MR.

64.     Although Defendants require Supports Coordinators (i.e., case managers) to be provided to all individuals in the state-operated ICFs/MR, the Supports Coordinators who serve clients in those institutions have a much higher caseload (*i.e.*, many more clients) than Supports Coordinators who serve individuals who live in the community since DPW does not pay for supports coordination services provided to residents of the state-operated ICFs/MR. The low ratio, combined with the distance between many Supports Coordinators and the clients living in isolated state-operated ICFs/MR, undermine the ability of Supports Coordinators to provide effective services to clients in those facilities.

## C.     Defendants' Failure to Offer Community Alternatives to State-Operated ICF/MR Residents

65.     All persons with mental retardation who are institutionalized in state-operated ICFs/MR, with appropriate supports and services, could live in more integrated community settings.

66.     State-operated ICFs/MR are not the most integrated settings appropriate to the needs of any individual resident of those facilities.

67.     The Commonwealth has embraced the principle of "normalization which defines the right of the individual with mental retardation to live a life which is as

17

close as possible in all aspects to the life which any member of the community might choose." 55 Pa. Code § 64001.1.

68.    Both the Secretary of Public Welfare, Defendant Richman, and the Deputy Secretary for the Office of Developmental Programs, Kevin Casey, do not dispute that people with mental retardation can reside in the community with appropriate community-based services and supports.

69.    Many residents of state-operated ICFs/MR and their families are not opposed to discharge to the community as long as appropriate supports and services are in place.

70.    Some residents of state-operated ICFs/MR or their families who might currently be opposed to discharge to the community may not be familiar with the types of community services and supports that could be provided and, if they were provided with information and education about such services and supports, they might not be opposed to discharge.

71.    Many residents who had lived for many years in now-closed state-operated ICFs/MR and who were discharged to community-based placements despite initial opposition by them or their families now are satisfied with the community services and supports they receive.

18

72.     Despite the fact that the named Plaintiffs and other state-operated ICF/MR residents are appropriate for and not opposed to discharge to the community with appropriate supports and services, Defendants have failed to offer them appropriate community alternatives.

73.     Although Defendants have required PUNS forms to be completed for the named Plaintiffs and putative class members, they either are not on the waiting lists for services or are unlikely to be removed from the waiting lists despite their categorization of need.

a.     Defendants' agents have never prepared a PUNS for Plaintiff Benjamin because they do not consider him to be on the waiting list for community services.

b.     In July 2007, Defendants' agents prepared a PUNS for Plaintiff Grogg that removed him from the waiting list because "all [of his] needs [are] being met" and he has no need for community services and supports, even though he is extremely independent and capable of living in the community with appropriate services and supports.  On information and belief, Defendants' agents do not currently consider Mr. Grogg to be in need of community services and has not made and will not make any efforts to offer or develop community alternatives to meet his needs.

c.    Defendants' agents did not complete PUNS forms for Plaintiff Edgett until 2008, at which time Defendants' agents identified his waiting list status as "planning."  Given his status as an individual who is unnecessarily institution-alized, Plaintiff Edgett should have been placed on the "emergency" waiting list. Moreover, individuals who are in the "planning" group, such as Plaintiff Edgett, are not likely to be removed from the waiting list within five years given the number of individuals on the emergency and critical waiting lists.

d.    Defendants' agents completed a PUNS form for Plaintiff Baldwin in September 2008 that identified her waiting list status as "critical," and which indicates that community residential and other supports were first requested for Ms. Baldwin in December 2003.

e.    Defendants' agents completed a PUNS form for Plaintiff Beard in May 2008 that identified his waiting list status as "emergency," and that indicates that community services and supports were first requested for Mr. Beard in March 2006.

f.    State-operated ICF/MR residents who are on the emergency or critical waiting lists, such as Mr. Beard and Ms. Baldwin, are unlikely to receive services within two years since Defendants' agents give priority to persons living in

20

the community who are on the emergency and critical waiting lists over those who are institutionalized.

74.     In at least the past five fiscal years, DPW has sought and received from the General Assembly funding for initiatives to provide community-based services for individuals with mental retardation who are on the waiting list for community services, including:  more than 3,400 individuals in FY 2007-2008 and more than 1,300 individuals in FY 2008-2009.  DPW has requested funding for FY 2009-2010 to provide community-based services to nearly 800 persons on the waiting list.

75.     On information and belief, more than 1,000 of the approximately 5,500 persons who have received or will receive funding for community services under the waiting list initiatives between FY 2007-2008 and FY 2009-2010 will receive, *inter alia*, residential services and supports.

76.     Only about 23 residents of state-operated ICFs/MR have been provided with community-based services and supports through the waiting list initiatives since the beginning of Fiscal Year 2007-2008.

77.     The costs to Defendants of providing Plaintiffs and putative class members with appropriate, community-based services, including residential services, would be less than 50 percent of the average costs Defendants currently pay to provide them with services in the state-operated ICFs/MR.

78.    The costs to Defendants of providing community alternatives to state-operated ICF/MR residents could be further reduced if they implemented the "Money Follows the Person" (MFP) Rebalancing Demonstration Project.   Under this Project, the federal government authorized Pennsylvania to receive an enhanced federal match of approximately 77 percent to provide community alternatives to 87 residents of state-operated ICFs/MR (30 in calendar year 2009 and 57 in calendar year 2010). Such an increased match would defray the costs involved in transitioning people from institutional to community services (including the costs of funding, for a short period of time, both institutional and community services for the individuals). Defendants, however, have not implemented and have no plans to implement this initiative for state-operated ICF/MR residents at this time.

79.    DPW does not have an integration plan -- with specific time lines and discharge benchmarks -- to develop community alternatives for residents of state-operated ICFs/MR.

80.    DPW does not have a waiting list to provide community alternatives to residents of state-operated ICFs/MR that moves at a reasonable pace.

**D.    <u>Irreparable Harm</u>**

81.    Plaintiffs and putative class members have suffered irreparable harm as a result of the Defendants' actions and inactions in this case.

## VI.    Claims

### A.    Violation of Title II of the Americans with Disabilities Act

82.    Paragraphs 1 through 87 are incorporated by reference.  This Count is brought solely against Defendant Richman in her official capacity for acts and omissions under state law.

83.    Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking.  As such, they are persons with disabilities protected by the Americans with Disabilities Act (ADA).  42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

84.    Plaintiffs and putative class members are eligible for community-based mental retardation services and, as such, are qualified persons with disabilities.  42 U.S.C. § 12131(2).

85.    DPW, operated and administered by Defendant Richman, is a public entity subject to the requirements of Title II of the ADA.  42 U.S.C. § 12131(1)(B).

86.    Defendant Richman violates Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d), by unnecessarily segregating Plaintiffs and putative class members in institutions, by failing to offer them mental retardation services in the community, which is the most integrated setting appropriate to meet their needs, and

by failing to provide such services to Plaintiffs and those putative class members who are not opposed to discharge.

87.    Defendant Richman violates Title II of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3), by using methods of administration that subject Plaintiffs and putative class members to discrimination through continued unnecessary segregation and institutionalization, including, but not limited to:

a.    failing to effectively assess all state-operated ICF/MR residents to determine what community supports and services they need;

b.    allowing DPW's agents to completely remove state-operated ICF/MR residents from the waiting list for community mental retardation services, to improperly place them on the "planning" waiting list, and/or not to treat even those on the "emergency" waiting list as priorities;

c.    not assuring that Plaintiffs and putative class members have access to effective Supports Coordination services to assist them in securing appropriate community services;

d.    failing to provide ICF/MR residents and their families with adequate information about the community placements to enable them to make an informed choice if and when they are offered community services; and

24

e.    failing to have a plan with specific and concrete benchmarks and timelines within which state-operated ICF/MR residents and their families will be offered and, if accepted, provided with community alternatives so that there is a waiting list that moves at a reasonable pace.

### B.    Violation of Section 504 of the Rehabilitation Act

88.    Paragraphs 1 through 93 are incorporated by reference.  This Count is brought solely against Defendant DPW.

89.    Plaintiffs and putative class members have mental retardation, an impairment that substantially limits one or more major life activities, including but not limited to, caring for themselves, learning, concentrating, and thinking.  As such, they are persons with disabilities protected by Section 504 of the Rehabilitation Act. 29 U.S.C. § 705(20)(B).

90.    Plaintiffs and putative class members are eligible for community-based mental retardation services and, as such, are qualified persons with disabilities pursuant to Section 504 of the Rehabilitation Act.

91.    DPW is a recipient of federal financial assistance and, as such, is subject to the requirements of Section 504 of the RA.  29 U.S.C. § 794(b).

92.    Defendant DPW violates Section 504 of the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d), by unnecessarily segregating Plaintiffs and putative class members

in institutions, by failing to offer them mental retardation services in the community, which is the most integrated setting appropriate to meet their needs, and by failing to provide such services to Plaintiffs and those putative class members who are not opposed to discharge.

93.    Defendant DPW violates Section 504 of the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(3), by using methods of administration that subject Plaintiffs and putative class members to discrimination through continued unnecessary institution-alization, including, but not limited to:

a.    failing to effectively assess all state-operated ICF/MR residents to determine what community supports and services they need;

b.    allowing its agents to completely remove state-operated ICF/MR residents from the waiting list for community mental retardation services, to improperly place them on the "planning" waiting list, and/or not to treat even those on the "emergency" waiting list as priorities;

c.    not assuring that Plaintiffs and putative class members have access to effective Supports Coordination services to assist them in securing appropriate community services;

      d.      failing to provide ICF/MR residents and their families with adequate information about the community placements to enable them to make an informed choice if and when they are offered community services; and

      e.      failing to have a plan with specific and concrete benchmarks and timelines within which state-operated ICF/MR residents and their families will be offered and, if accepted, provided with community alternatives so that there is a waiting list that moves at a reasonable pace.

## VII.  Relief

94.      Plaintiffs respectfully request that the Court award the following relief:

      a.      exercise jurisdiction over this action;

      b.      certify this case to proceed as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

      c.      issue appropriate declaratory relief and injunctive relief; and

      d.      grant such other relief as may be appropriate, including awarding reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §§ 1988, 12205 and 29 U.S.C. § 794a(b).

Respectfully submitted,

Dated:  July 14, 2009          By:    /s/ Robert W. Meek
                                      Robert W. Meek
                                      PA 27870
                                      Mark J. Murphy
                                      PA 38564
                                      Disability Rights Network of PA
                                      1315 Walnut Street, Suite 400
                                      Philadelphia, PA  19107-4798
                                      (215) 238-8070
                                      (215) 772-3126 (fax)
                                      RMeek@drnpa.org


                               By:    /s/ Stephen F. Gold
                                      Stephen F. Gold
                                      PA 09880
                                      125 South Ninth Street, Suite 700
                                      Philadelphia, PA  19107
                                      (215) 627-7100
                                      (215) 627-3183 (fax)
                                      stevegoldada@cs.com

                                      Counsel for Plaintiffs

28

A67

## CERTIFICATE OF SERVICE

I, Robert W. Meek, certify that Plaintiffs' Amended Complaint was filed with the Court's ECF system on July 14, 2009 and is available for viewing and downloading from the ECF system by the following counsel who consented to electronic service:

Howard Ulan, Esquire
Deputy Chief Counsel
Allen C. Warshaw, Esquire
Chief Counsel
Office of General Counsel
Department of Public Welfare
3rd Floor West, Health & Welfare Building
Harrisburg, PA  17120

Doris M. Leisch, Esquire
Deputy Chief Counsel
Office of General Counsel
Department of Public Welfare
1700 State Office Building
1400 Spring Garden Street
Philadelphia, PA  19130

/s/ Robert W. Meek
Robert W. Meek

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

## ORDER

### December 19, 2011

The Joint Motion by Objectors for a Partial Stay of this Court's Order (Doc.

290) approving the settlement agreement in the above-captioned action is

**DENIED.**[1]

---

[1] We note that the Objectors fail to raise any novel arguments that have not been previously addressed by this Court in determining the fairness, adequacy, and reasonableness of the settlement agreement. In challenging the Court's decision, the Objectors fail to argue that the Court erred in its application of any one of the nine factors articulated by the Third Circuit in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), for determining the fairness of the settlement. Instead, the Objectors contend that the implementation of the agreement, as opposed to the substance of the agreement itself, is unsatisfactory and that the settlement agreement should be set aside because, in the Objectors view, this Court expressed its own hesitations with respect thereto in its Order approving the settlement. However, the language so heavily relied upon by the Objectors, where this Court expressed "serious doubt" as to the practicality and propriety of

1

/s John E. Jones III
John E. Jones III
United States District Court

---

portions of the agreement's implementation procedures and protocol, was mere dicta, an inconsequential observation premised on the Court's receipt of copious information during the fairness hearing regarding implementation. Thus, ultimately, the quoted language does not impact our holding that the settlement agreement represents a fair, adequate, and reasonable disposition of the case.

Moreover, we find that the Objectors have not otherwise provided argument supporting the presence of the four factors to be considered in deciding a motion to stay: a strong showing of likelihood of success on appeal, irreparable injury to the appellant absent a stay, lack of substantial injury to other parties interested, and that the public interest supports a stay. *See Nken v. Holder*, 556 U.S. 418, __, 129 S. Ct. 1749, 1760 (2009). The Objectors have failed to show a likelihood of success on appeal, one of the "most critical" factors to consider in determining whether to exercise our discretion to issue a stay pending appeal. *Id.* at 1760. Conclusory possibilities of success are insufficient for purposes of a motion to stay. *See id.* at 1761 (holding that "more than a mere 'possibility' of relief is required"). Again, the Objectors have not provided this Court with any novel arguments or facts proving the settlement unfair, inadequate, or unreasonable, and have thus provided no indication of grounds for reversal. Finally, the Objectors fail to plead a likelihood of irreparable injury, indeed failing to demonstrate anything more than mere speculation as to potential future harm, which *Nken* holds is insufficient to support a motion to stay. Accordingly, the Objectors' Motion to Stay is denied.

2

MR-WA-002-002

1
2

**In the United States District Court**
**In and For the Western District for the State of Washington**

3  People First of Washington, Inc., a
   Washington corporation, on

4  behalf of its members and

5  James Campbell, a real person, by and
   through his next friend, Dennis

6  Campbell,

7  Chris Olson, a real person, by and
   through his next friend, Diane Grace,

8
   Houston Williams, a real person, by
9  and through his next friend and
   legal guardian, Steven Cassio,

10
   Peter Bohnke, a real person, by and
11 through his next friend, John Domenic
   Revello,

12
   Dawn Lavery, a real person, by and
13 through her next friend and legal
   guardian, Emerson Fosner,

14
   John Mann, a real person, by and
15 through his next friend, Resa Hayes,
   on behalf of themselves and all

16 others similarly situated;

17    and

18 The Arc of Washington State, Inc., a
   Washington corporation, on behalf
19 of its members;

20 The Autism Society of Washington,
   on behalf of its members; and

21
   The Washington Protection and
22 Advocacy System, Inc., a
   Washington corporation,

23
                    Plaintiffs,

24
       vs.
25

26

Civil Cause No. . . . . . . . . . . . . . .

# C96-5906

### Class Action
### Civil Rights Complaint

✓ FILED          ENTERED
   LODGED          RECEIVED

★    OCT 31 1996    ★

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

27  **Class Action Complaint -**
    **Civil Rights**

28  Page - 1

Washington Protection & Advocacy System
1401 East Jefferson Street, Suite 506
Seattle, Washington 98370
Telephone: (206) 324-1521/Facsimile: (206) 324-1783

A71

1    **The Rainier Residential Habilitation**
      **Center;**                    :

2

3    **Michael Lowry, in his official**        :
      **capacity as Governor of the State**   :
      **of Washington;**               :

4

5    **The Washington Department of Social**   :
      **and Health Services;**          :

6    **Lyle Quasim, in his official**        :
      **capacity as the Secretary of the**     :

7       **Washington Department of Social**    :
      **and Health Services;**          :

8

9    **The Washington Division of**        :
      **Developmental Disabilities;**      :

10    **Norm Davis, in his official**        :
      **capacity as the Director of the**     :

11       **Washington Division of Developmental**   :
      **Disabilities;**                :

12

13    **Leanna Lamb, in her official**       :
      **capacity as the Superintendent**     :
      **of the Rainier Residential**        :

14       **Habilitation Center;**          :

15    **The Washington Office of Financial**    :
      **Management; and**            :

16

17    **Gary Robinson, in his official**      :
      **capacity as the Acting Director of**   :
      **the Washington Office of Financial**   :

18       **Management,**              :

19               **Defendants.**        :
                                 :

20

---

21

22                             **Preliminary Statement**

23       1.1.   This is a civil rights class action brought by six Washington citizens with developmental

24 disabilities who currently reside at the Rainier Residential Habilitation Center in Buckley, Washington,

25 on behalf of themselves and all others similarly situated; and People First of Washington, Inc.; The Arc

26

27   **Class Action Complaint -**                **Washington Protection & Advocacy System**
  **Civil Rights**                           **1401 East Jefferson Street, Suite 506**

28                                   **Seattle, Washington 98370**
  **Page - 2**               **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

A72

1  of Washington State, Inc.; the Autism Society of Washington; and the Washington Protection and
2  Advocacy System, Inc., in its capacity as the designated protection and advocacy agency for those
3  Washington citizens who have mental and physical disabilities.

4      1.2.  The representative plaintiffs and the other members of the plaintiff class that they represent
5  (hereinafter "Class Plaintiffs") are residents of the Rainier Residential Habilitation Center (hereinafter
6  "Rainier"), a large state institution for individuals with mental retardation and developmental
7  disabilities.  Specifically, plaintiffs bring this action to redress the unconstitutional, unlawful, unsafe,
8  and unprofessional conditions imposed on them by the defendants under color of state law.
9  Approximately four hundred fifty persons with mental retardation and developmental disabilities
10  currently reside at Rainier.

11      1.3.  Rainier is a dangerous place to live.  Many members of the plaintiff class have been and
12  continue to be subjected to abuse, neglect, injury, and unnecessary physical and chemical restraint.  In
13  addition, Rainier and the defendant state officials responsible for the conditions at Rainier routinely
14  deprive the plaintiff class of liberty and fundamental human rights in violation of their rights under the
15  Constitution and laws of the United States.

16      1.4.  By this action, the plaintiffs seek to enforce the constitutional and statutory rights of those
17  individuals with mental retardation and developmental disabilities currently residing at Rainier to
18  receive their  habilitation, vocational, and other services and supports in integrated settings and in
19  accordance with current professional standards.

20      1.5.  The plaintiff class' need for habilitation, vocational training, and other supports and
21  services require placement in small, community-based programs where their individual developmental
22  and daily living needs can be met.  However, the defendants deny the plaintiffs these services because
23  of the plaintiffs' perceived severe disabilities, complex medical conditions, and challenging behaviors.

24      1.6.  The defendants' attitudes on the severity and complexity of the individual class members'
25  disabilities, medical conditions, and behaviors are based, in large part, on plaintiffs' prolonged

26

27  **Class Action Complaint -**
    **Civil Rights**

28  Page - 3

A73

1  institutionalization at Rainier, as well as the defendants' failure to meet their federal statutory and
2  regulatory obligations to place, monitor, and discharge the members of the plaintiff class to alternative
3  non-institutional programs.

4    1.7.  The defendants have failed to properly assess the plaintiff class' skills and abilities, in
5  contravention of the requirements of the federal laws and regulations governing the provision of
6  habilitation and active treatment to individuals with mental retardation and developmental disabilities.

7    1.8.  The acts and omissions of the defendants have violated the rights of the plaintiff class under
8  the First and Fourteenth Amendments to the United States Constitution; Title II of the Americans with
9  Disabilities Act of 1990, 42 U.S.C. § 12131, et seq. (hereinafter "ADA"); Section 504 of the
10  Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. (hereinafter "Section 504"); and the Social Security
11  Act, 42 U.S.C. § 1396, et seq. (hereinafter "SSA").

12
13                                    **Jurisdiction and Venue**

14    2.1.  This action arises under the Civil Rights Act, 42 U.S.C. § 1983, to redress the deprivation,
15  under color of state law, of the plaintiffs' rights, privileges and immunities secured by the Constitution
16  and laws of the United States.  The rights which plaintiffs seek to redress are guaranteed by the First and
17  Fourteenth Amendments to the United States Constitution, as well as 29 U.S.C. §§ 720 and 794, 42
18  U.S.C. §§ 1396, 1396a, 1396d, and 12131.

19    2.2.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331(a), 1343(3) & (4), and 1367 as
20  this action arises under the Constitution and laws of the United States, and seeks injunctive and other
21  equitable relief under acts of Congress providing for the protection of civil rights.

22    2.3.  This Court also has authority pursuant to 28 U.S.C. §§ 2201 & 2202 to enter declaratory
23  judgments declaring the rights and other legal relations of parties to the action, as well as 42 U.S.C. §
24  1983.

25    2.4.  Venue is proper pursuant to 28 U.S.C. § 1391(b) as all of the parties reside in the State of
26  Washington and plaintiffs' claims for relief arise within this state.

27  Class Action Complaint -
    Civil Rights

28  Page - 4

Washington Protection & Advocacy System
1401 East Jefferson Street, Suite 506
Seattle, Washington 98370
Telephone: (206) 324-1521/Facsimile: (206) 324-1783

1

**Parties**

2

**A. Plaintiffs**

3       3.1.  The plaintiff People First of Washington, Inc. (hereinafter "People First"), a nonprofit

4   corporation duly organized under the laws of the State of Washington, is a state wide self-advocacy

5   organization governed entirely by people with developmental disabilities. More than one thousand

6   Washington citizens are members of People First through its thirty-three chapters and support groups

7   located throughout Washington.  People First maintains its main administrative office at 932½ Sixth

8   Street in Clarkston, Washington.

9       3.2.  People First's members include individuals with disabilities who currently live in state

10  institutions, residential facilities, and nursing homes, including Rainier.  People First believes that all

11  of its individual members could live in their local communities if appropriate habilitation programs and

12  other support services were available to them.

13      3.3.  People First's purpose, for which it expends its resources, are as follows:

14          a.   To promote the philosophy that everyone, no matter what disability he or she has or
            its severity, has the same basic civil rights and responsibilities;

15

16          b.   To advocate and defend the rights of persons with disabilities in the areas of
            employment, education, housing and transportation; and

17          c.   To provide a way for persons with disabilities to express and remedy their concerns
            and enhance their well-being.

18

19      3.4.  To advance these goals, People First and its members advocate for legislation to enable

20  those Washington citizens with disabilities to live more independently.  Its members travel around the

21  state teaching people with disabilities about self-advocacy and their legal rights and responsibilities at

22  regularly scheduled local, regional, and statewide conferences, meetings, and programs.  People First

23  provides leadership and self-advocacy training, and fosters community awareness through the volunteer

24  service activities of its members.  Its individual members also represent the interests of Washington's

25  citizens with disabilities by serving on regional, state, and national committees, including, but not

26  limited to: the Managed Care Feasibility Work Group, the Developmental Disabilities Council for the

27  **Class Action Complaint -**           **Washington Protection & Advocacy System**
    **Civil Rights**                        **1401 East Jefferson Street, Suite 506**
                                            **Seattle, Washington 98370**
28  **Page - 5**                            **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

1  State of Washington, and the Statewide Advisory Committee for Developmental Disabilities.

2      3.5.  People First International was founded in 1974 by residents of the Fairview Training
3  Center, a state institution for persons with mental retardation in Oregon. In discussing the selection of
4  a name for their new organization, one of the founding members said, "Why not call ourselves People
5  First, because we want to be known as people first before we're known for our handicaps?" After that,
6  they formed People First organizations in many other states, including Washington. These organizations
7  share a common purpose -- to support their members' right to speak for themselves, make their own
8  decisions, and know how to exercise their rights as citizens, including their right to live in their home
9  communities.

10      3.6.  People First has many individual members who reside at the Rainier. These individual
11  members, who actively support the goals and purposes of People First, are individuals who are directly
12  harmed by the actions and inactions of the defendants, as set forth and more fully described in
13  paragraphs 4.1 through 5.12 below.

14      3.7.  Plaintiff James Campbell (hereinafter "Campbell"), who was born on June 2, 1972, was
15  first diagnosed as having mental retardation when he was a child.  Since December 1, 1983, when he
16  was just eleven years old -- and for the last thirteen years -- Mr. Campbell has continuously resided and
17  has been unnecessarily institutionalized at Rainier.

18      3.8.  Dennis Campbell, who is a resident of Vancouver, Washington, brings this action on behalf
19  of James Campbell in his capacity as James Campbell's next friend. Dennis Campbell, who is a member
20  of People First, is familiar with James Campbell.

21      3.9.  James Campbell resides at PAT E / Shasta House, a residential unit at Rainier for men and
22  women with developmental disabilities.

23      3.10.  James Campbell is a capable man with good communication skills who has been labeled
24  as moderately retarded. He has repeatedly stated that he wants to leave Rainier and live in a normal
25  home in the community.  However, because of the defendants' disparate discharge policies and

26

27  **Class Action Complaint -**
   **Civil Rights**

    **Washington Protection & Advocacy System**
    **1401 East Jefferson Street, Suite 506**
    **Seattle, Washington 98370**

28  Page - 6
    **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

1  discriminatory development of community-based services, the defendants have denied James Campbell

2  the individualized habilitation programs and services he needs.

3      3.11.  James Campbell has little opportunity to model appropriate social skills or to learn how

4  to act in the community.  Instead, he is regularly exposed to persons whose social skills and

5  inappropriate behaviors are at least as problematic as his own.

6      3.12.  James Campbell is not receiving adequate habilitation at Rainier.  James Campbell and the

7  individuals in his residential unit have little or no choice about when to wake up and go to bed, what to

8  eat, or what to do from day to day.  On average, plaintiff James Campbell receives less than two hours

9  of programming per day, which is neither adequate nor appropriate for his needs.  James Campbell's

10  limited habilitation program does not constitute active treatment according to accepted professional

11  standards.

12      3.13.  James Campbell lacks meaningful employment training opportunities at Rainier.  He

13  participates in an inadequate and segregated workshop at Rainier, where much of his "vocational

14  training" amounts to repetitive and monotonous tasks, interrupted by extended periods of "dead time"

15  when he has nothing to do.  This "program" is the only "employment" opportunity available to James

16  Campbell and the vast majority of his fellow Rainier residents.

17      3.14.  James Campbell could receive all of his habilitation, vocational, and attendant services in

18  the community.  However, he remains at Rainier because of barriers caused by the defendants'

19  development and operation of a community service system that discriminates against him because of

20  his disabilities and prevents his successful discharge.  These barriers include, but are not limited to, the

21  defendants' failure to develop adequate habilitation  programs for persons living in the community; their

22  failure to develop appropriate supported employment and other day services for persons living in the

23  community; their failure to develop adequate residential and behavioral support services for persons

24  living in the community; and their failure to provide adequate staff development training and technical

25  assistance available to those people who work in this state's community service system.

26

27  **Class Action Complaint -**
    **Civil Rights**

28  Page - 7

A77

1    3.15.  Since James Campbell's admission to Rainier, no one has developed or implemented an
2    appropriate discharge plan. To date, contrary to professional judgement, plaintiff James Campbell has
3    never been placed in a supervised community-based program and placement appropriate to meet his
4    needs.

5    3.16.  Although plaintiff James Campbell could live in the community with appropriate
6    habilitation, vocational training, and support services, he experiences on a daily basis the harmful and
7    unlawful conditions described in paragraphs 4.1 through 5.12 herein and below.  Because of the
8    defendants' discriminatory policies and practices, he has no alternative to Rainier.

9    3.17.  The failure to provide James Campbell with the necessary support services has resulted in
10    direct and immediate injury to him, has caused him physical and emotional harm, and has been the direct
11    cause of his deterioration and regression. This failure is unreasonable, constitutes a substantial departure
12    from accepted professional standards, and needlessly deprives James Campbell of his liberty.

13    3.18.  Plaintiff Chris Olson (hereinafter "Olson"), who was born on June 11, 1954, was first
14    diagnosed as having mental retardation when he was a child.  Since March 2, 1970, when he was just
15    fifteen years old -- and for the last twenty-six years -- Mr. Olson has continuously resided and has been
16    unnecessarily institutionalized at Rainier.

17    3.19.  Diane Grace, who is a resident of Seattle, Washington, brings this action on behalf of Chris
18    Olson in her capacity as Chris Olson's next friend. Ms. Grace, who is a member of People First, is
19    familiar with Chris Olson.

20    3.20.  Mr. Olson resides at PAT B / Meyer House, a residential unit at Rainier for men and
21    women with developmental disabilities and behavior problems.

22    3.21.  Chris Olson has multiple disabilities and is labeled as severely retarded.  He does not say
23    many words clearly and has difficulty with the activities of daily living.  Mr. Olson engages in
24    stereotypical, perseverative behaviors that are the result of his long institutionalization at Rainier.  With
25    the appropriate supports, Mr. Olson could live in a normal home in the community. However, because

26

27    **Class Action Complaint -**
       **Civil Rights**

28    Page - 8

1   of their discriminatory discharge policies and practices with respect to community-based habilitation
2   services and supports, the defendants have denied Mr. Olson the individualized habilitation programs
3   and services he needs.

4       3.22.  Mr. Olson has little opportunity to model appropriate social skills, behaviors, or to learn
5   how to act in the community. He is exposed without respite to persons whose social skills and
6   inappropriate behaviors are at least as problematic as his own.

7       3.23.  Chris Olson is not receiving adequate habilitation at Rainier. Mr. Olson and the individuals
8   in his residential unit have little or no choice about when to wake up and go to bed, what to eat, or what
9   to do from day to day. On average, plaintiff Olson receives less than two hours of programming per day,
10  which is neither adequate nor appropriate for his needs. Mr. Olson's limited habilitation program does
11  not constitute active treatment according to accepted professional standards.

12      3.24.  Mr. Olson has sustained numerous and frequently unexplained injuries while in the care
13  of the defendants that have required medical treatment. During 1995 and 1996, these injuries have
14  included, but have not been limited to: lacerations to the area around his eyes, bruising about his body,
15  abrasions, and severely torn finger and toe nails.

16      3.25.  Despite Mr. Olson's injuries, incident reports were not done to explain how or when his
17  injuries were sustained, as required by Rainier's policies and regulations, except in limited instances.
18  Defendants also failed to conduct any investigation into how these injuries were sustained, in spite of
19  Rainier policies and regulations that require such investigations when residents are injured.

20      3.26.  Chris Olson lacks meaningful employment training opportunities at Rainier.  He
21  participates in a limited, inadequate, and segregated workshop at Rainier, where much of his "training"
22  amounts to repetitive and monotonous tasks, interrupted by extended periods of "dead time" when he
23  has nothing to do. This "program" is the only "employment" opportunity available to Mr. Olson and
24  the vast majority of his fellow Rainier residents.

25      3.27.  Mr. Olson could receive all of his habilitation, vocational, and individual support services

26

27  **Class Action Complaint -**             **Washington Protection & Advocacy System**
    **Civil Rights**                          **1401 East Jefferson Street, Suite 506**
                                              **Seattle, Washington 98370**
28  **Page - 9**                             **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

1  in the community. He remains at Rainier because the defendants refuse to consider him for placement
2  in the community because they believe he requires specialized supports -- supports that they have chosen
3  to provide only at Rainier.

4      3.28.  The community service system operated by the defendants discriminates against Chris
5  Olson and precludes his appropriate discharge from the segregation of Rainier to an appropriate
6  community placement. Plaintiff Olson could receive all of his habilitation, vocational, and attendant
7  services in the community were it not for the barriers caused by the defendants' community service
8  system. These barriers include, but are not limited to, the defendants' failure to develop adequate
9  habilitation  programs for persons living in the community; their failure to develop appropriate
10  supported employment and other day services for persons living in the community; their failure to
11  develop adequate residential and behavioral support services for persons living in the community; and
12  their failure to provide adequate staff development training and technical assistance available to those
13  people who work in this state's community service system.

14      3.29.  Since Mr. Olson's admission to Rainier, no one has developed or implemented an
15  appropriate discharge plan. To date, plaintiff Olson has never been placed in a supervised community-
16  based program and placement appropriate to his needs.

17      3.30.  Although Chris Olson could live in the community with appropriate habilitation, vocational
18  training, and support services, he experiences on a daily basis the harmful and unlawful conditions
19  described in paragraphs 4.1 through 5.12 herein and below. Because of the defendants' discriminatory
20  policies and practices, he has no alternative to Rainier.

21      3.31.  Defendants' failure to provide Chris Olson with the necessary support services he requires
22  has resulted in direct and immediate injury to him, caused him physical and emotional harm, and has
23  been the direct cause of his deterioration and regression. This failure is unreasonable, constitutes a
24  substantial departure from accepted professional standards, and needlessly deprives Mr. Olson of his
25  liberty.

26

27  **Class Action Complaint -**           Washington Protection & Advocacy System
    **Civil Rights**                       1401 East Jefferson Street, Suite 506
                                            Seattle, Washington 98370
28  Page - 10                               Telephone: (206) 324-1521/Facsimile: (206) 324-1783

1    3.32.  Plaintiff Houston Williams (hereinafter "Williams"), who was born on February 14, 1949,
2    was first diagnosed as having mental retardation when he was a child.  Since February 21, 1956, when
3    he was just seven years old -- and for the last forty years -- Mr. Williams has continuously resided and
4    has been unnecessarily institutionalized at Rainier.

5    3.33.  Steven Cassio, who is a resident of Bonney Lake, Washington, is the duly-appointed legal
6    guardian for Houston Williams, pursuant to an order of the Superior Court for Pierce County,
7    Washington.  Steven Cassio brings this action on behalf of Houston Williams, in his capacity as his
8    ward's next friend and legal guardian.

9    3.34.  Until recently, Houston Williams resided at PAT C / 2015 Quinault Court, a residential unit
10    at Rainier for men with severe developmental disabilities and challenging behaviors.  Last month,
11    Rainier staff, over the objections of his legal guardian, moved Mr. Williams to PAT C / 1040 Quinault,
12    another residential unit at Rainier.  In both of his Rainier cottages, Mr. Williams has had little
13    opportunity to model appropriate behavior or to learn how to act in the community.  Instead, he is
14    exposed without respite to persons whose behaviors are at least as problematic as his own.

15    3.35.  Houston Williams has limited communication skills, but understands others when they
16    speak to him.  He can walk, feed himself, and make his choices and preferences known to others.  Mr.
17    Williams has been labeled as severely retarded and behaviorally impaired.  While the defendants have
18    repeatedly stated that Houston Williams is appropriate for community placement if they provide him
19    with extensive supports, and have acknowledged that his challenging behaviors are substantially
20    decreased when he is able to go into the community on visits, defendants have not helped Mr. Williams
21    and his legal guardian in finding an appropriate community placement.

22    3.36.  Mr. Williams and the other men in his residential unit have little or no choice about when
23    to wake up and go to bed, what to eat, or what to do from day to day.  Plaintiff Williams was placed at
24    Rainier because of his severe developmental disabilities and challenging behavior, and because the State
25    of Washington and the defendants' predecessors only offered services to people with his disabilities at

26

27    **Class Action Complaint -**
      **Civil Rights**

      **Washington Protection & Advocacy System**
      **1401 East Jefferson Street, Suite 506**
      **Seattle, Washington 98370**
28    **Page - 11**
      **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

1 | institutions like Rainier.

2 |     3.37. Mr. Williams hardly ever leaves Rainier, and spends most of his time in his residential unit.
3 | Defendants provide him with minimal activities and opportunities for socialization outside the
4 | institution.

5 |     3.38. Defendants have repeatedly used and continue to use a variety of inappropriate and
6 | discriminatory restraints to address Mr. Williams' challenging behaviors, including the use of
7 | antipsychotic medications and other unspecified manual restraints, despite the fact that these
8 | interventions have had little effect on decreasing the frequency or severity of Mr. Williams' challenging
9 | behaviors.

10 |     3.39. Although Houston Williams has the potential to acquire adaptive, functional life skills
11 | focused on the maintenance of a home, meal-preparation, and personal care skills, he cannot learn these
12 | skills at Rainier because it cannot provide him with an appropriate, community-based habilitation
13 | program.

14 |     3.40. Mr. Williams is not receiving even minimally adequate habilitation at Rainier. He lives
15 | in a barren residence with stark, institutional furniture, a television blaring for most of the day, and little
16 | else to do. During his forty years at Rainier, Mr. Williams has not had access to meaningful activities,
17 | vocational training, or the opportunity to learn real-life skills in the natural environments where those
18 | skills can be practiced, which has resulted in a loss of his individual skills and competencies. Mr.
19 | Williams' current habilitation program does not constitute active treatment according to accepted
20 | professional standards.

21 |     3.41. The defendants have denied Houston Williams community placement because of his
22 | challenging behaviors. With proper habilitation, support, and training in a small community home,
23 | however, these challenging behaviors could be decreased or eliminated. Further, in an appropriate
24 | community-based program and placement, Mr. Williams could also receive much richer and more
25 | meaningful habilitation, consistent with his individual needs and the judgment of qualified professionals.

26 |

27 | **Class Action Complaint -**
**Civil Rights**

28 | Page - 12

1    3.42. Since Mr. Williams' admission to Rainier, no one has developed or implemented an

2    appropriate discharge plan. To date, contrary to professional judgement, plaintiff Williams has never

3    been placed in a supervised setting appropriate to his individual needs.

4    3.43. Houston Williams experiences on a daily basis the harmful and unlawful conditions

5    described in paragraphs 4.1 through 5.12 below. Because the defendants have limited their community

6    services to persons who do not have severe developmental disabilities and challenging behaviors, Mr.

7    Williams remains confined and segregated at Rainier.

8    3.44. Due to the length and circumstances of his institutionalization, Houston Williams will

9    require appropriate clinical, programmatic and habilitative services to support his placement in a

10    community-based program for an extended period.

11    3.45. If Mr. Williams is discharged from Rainier without an appropriate habilitation program and

12    the necessary supports and services required to meet his individual needs, there is a significant likelihood

13    that he will be deprived of his liberty by his reinstitutionalization in the future.

14    3.46. The failure to provide Houston Williams with the necessary support services and has

15    resulted in direct and immediate injury to him, has caused him physical and emotional harm, and has

16    been the direct cause of his deterioration and regression. This failure is unreasonable, constitutes a

17    substantial departure from accepted professional standards, and needlessly deprives Mr. Williams of his

18    liberty.

19    3.47. Plaintiff Peter Bohnke (hereinafter "Bohnke"), who was born on July 31, 1940, was first

20    diagnosed as having mental retardation when he was a child. Since July 24, 1947, when he was just six

21    years old -- and for the last forty-nine years -- Mr. Bohnke has continuously resided and has been

22    unnecessarily institutionalized at Rainier. He has no family who is involved in his life and activities at

23    Rainier.

24    3.48. John Domenic Revello, who is a resident of Seattle, Washington, brings this action on

25    behalf of Peter Bohnke in his capacity as Peter Bohnke's next friend. Mr. Revello is familiar with Peter

26

27    **Class Action Complaint -**      **Washington Protection & Advocacy System**
      **Civil Rights**                  1401 East Jefferson Street, Suite 506
                                        Seattle, Washington 98370
28    **Page - 13**                     Telephone: (206) 324-1521/Facsimile: (206) 324-1783

A83

1  Bohnke.

2      3.49.  Mr. Bohnke resides at PAT C / 2015 Quinault Court, a residential unit at Rainier for men
3  with severe developmental disabilities and challenging behaviors.  Mr. Bohnke has little opportunity to
4  model appropriate behavior or to learn how to act in the community.  He is exposed without respite to
5  persons whose behaviors are at least as problematic as his own.

6      3.50.  Due to the severity of his developmental disabilities, Peter Bohnke has limited
7  communication skills, as well as difficulty with activities of daily living.  He engages in stereotypical,
8  perseverative behaviors that are the result of his long institutionalization.  The irony is that because of
9  the disabilities that were created in part by prolonged institutionalization and inadequate habilitation,
10  plaintiff Bohnke is now considered inappropriate for community living.  The defendants refuse to
11  consider him for community living on the ground that he requires specialized supports -- supports that
12  they have chosen to provide only at Rainier.

13      3.51.  Peter Bohnke and the other men in his residential unit have little or no choice about when
14  to wake up and go to bed, what to eat, or what to do from day to day.  Mr. Bohnke was placed at Rainier
15  because of his severe developmental disability and challenging behavior, and because the State of
16  Washington and the defendants' predecessors only served people with his disabilities at institutions like
17  Rainier.

18      3.52.  Mr. Bohnke never leaves Rainier, and rarely leaves his residential unit, mostly because the
19  defendants have frequently restrained him twenty-four hours a day for weeks at a time with a variety of
20  inappropriate and discriminatory physical and chemical restraints, as well as aversive therapies.  These
21  restraints and therapies have included: physical restraints, antipsychotic medications, manual holds,
22  locking helmets, and prolonged five-point prone restraints, along with other forms of restraint and
23  therapies, despite the fact that these interventions have had little effect on decreasing the frequency or
24  severity of Mr. Bohnke's challenging behaviors.

25      3.53.  During his forty-nine years at Rainier, Mr. Bohnke has had little or no opportunity to

26

27  **Class Action Complaint -**
     **Civil Rights**

28  **Page - 14**

**Washington Protection & Advocacy System**
**1401 East Jefferson Street, Suite 506**
**Seattle, Washington 98370**
**Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

A84

1    practice vocational skills, recreational skills, or community living skills. His environment is barren,
2    monotonous, and unpleasant. He is currently condemned to live from day to day without hope or
3    companionship. Mr. Bohnke's current habilitation program is provided less than two hours a day and
4    does not constitute active treatment according to accepted professional standards.

5        3.54. Despite the fact that Peter Bohnke could live in the community with appropriate
6    habilitation, vocational training, and support services, he experiences on a daily basis the harmful and
7    unlawful conditions described in paragraphs 4.1 through 5.12 below. Because the defendants have
8    discriminated in the development and operation of their community services against persons who they
9    perceive as having severe developmental disabilities and challenging behaviors, he has no alternative
10   to Rainier.

11       3.55. Plaintiff Dawn Lavery (hereinafter "Lavery"), who was born on June 24, 1956, was first
12   diagnosed as having mental retardation when she was a child. Since February 26, 1973, when she was
13   just 16 years old -- and for the last twenty-three years -- Ms. Lavery has continuously resided and has
14   been unnecessarily institutionalized at Rainier. She has no family who is involved in her life and
15   activities at Rainier.

16       3.56. Emerson Fosner, who is a resident of Tacoma, Washington, is the duly-appointed legal
17   guardian for Dawn Lavery, pursuant to an order of the Superior Court for King County, Washington.
18   Emerson Fosner brings this action on behalf of Dawn Lavery in his capacity as his ward's next friend
19   and legal guardian.

20       3.57. Ms. Lavery resides at PAT B / Tyee House, a residential unit at Rainier for men and
21   women with severe developmental disabilities and challenging behaviors. Ms. Lavery has little
22   opportunity to model appropriate behavior or to learn how to act in the community. She is exposed
23   without respite to persons whose behaviors are at least as problematic as her own.

24       3.58. Due to the severity of her developmental disabilities, Dawn Lavery has limited
25   communication skills, as well as difficulty with activities of daily living. She engages in stereotypical,

26

A85

1  perseverative behaviors that are the result of her long institutionalization. The irony is that because of
2  the disabilities that were created in part by institutionalization and inadequate habilitation, plaintiff
3  Lavery is now considered inappropriate for community living. The defendants refuse to consider her
4  for community living on the ground that she requires specialized supports -- supports that they have
5  chosen to provide only at Rainier.

6      3.59.  Plaintiff Lavery lives in a barren residence with stark, institutional furniture, a television
7  blaring for most of the day, and little else to do. Ms. Lavery and the other individuals in her residential
8  unit have little or no choice about when to wake up and go to bed, what to eat, or what to do from day
9  to day. Plaintiff Lavery was placed at Rainier because of her developmental disability and challenging
10 behaviors, and because the State of Washington and the defendants' predecessors served people with
11 her disabilities at institutions like Rainier.

12     3.60.  Ms. Lavery rarely leaves her residential unit, mostly because the defendants have
13 frequently restrained her twenty-four hours a day for weeks at a time with a variety of physical and/or
14 chemical restraints.  During her twenty-three years at Rainier, Ms. Lavery has had little or no
15 opportunity to practice vocational skills, recreational skills, or community living skills.  She is currently
16 condemned to live from day to day without hope or companionship.

17     3.61.  During her twenty-three years at Rainier, Ms. Lavery has not had access to meaningful
18 activities, vocational training, or the opportunity to learn real-life skills in the natural environments
19 where those skills are practiced.  Her environment is barren, monotonous, and unpleasant.  On average,
20 she receives less than two hours of programming per day, which is neither adequate nor appropriate for
21 her needs. Ms. Lavery's current habilitation program does not constitute active treatment according to
22 accepted professional standards.

23     3.62.  In an attempt to address Dawn Lavery's challenging behaviors, Rainier staff has
24 continually and regularly used a variety of inappropriate and discriminatory physical and chemical
25 restraints, as well as aversive therapies, including the use of antipsychotic medications and other

26

27 **Class Action Complaint -**
   **Civil Rights**

28 Page - 16

Washington Protection & Advocacy System
1401 East Jefferson Street, Suite 506
Seattle, Washington 98370
Telephone: (206) 324-1521/Facsimile: (206) 324-1783

1  unspecified manual restraints. These restraints and therapies have included: physical restraints, cold

2  water baths, antipsychotic medications, visual occlusion, manual holds, locking helmets, and wheelchair

3  restraints, along with other forms of restraint and therapies.

4      3.63. Ms. Lavery's current Behavioral Treatment Plan (BTP) does not allow for the use of

5  chemical or physical restraints. Her BTP calls for the use of an aversive therapy known as "visual

6  occlusion."

7      3.64. "Visual occlusion" therapy, as implemented by Rainier staff, consists of "blocking" Ms.

8  Lavery's vision with a screen and/or a ski mask placed over her head and eyes to address her self-

9  injurious behavior. This "visual occlusion" therapy is to be used for approximately thirty seconds or

10  until Ms. Lavery stops the alleged self-injurious behavior, but not beyond thirty minutes.

11      3.65. Despite the fact that physical restraints are not to be used on Dawn Lavery, on or about

12  August 18, 1994, she was placed in a wheelchair restraint for "medical" reasons for three days.

13      3.66. On or about August 3, 1995, Dawn Lavery's hand was severely injured in a paper shredder

14  which resulted in her being placed in wrist to wrist restraints.

15      3.67. On or about February 21, 1996, Rainier staff used a manual hold on Dawn Lavery on at

16  least three separate occasions, despite the fact that this type of restraint is not permitted and is

17  specifically prohibited by her BTP because it causes her self-injurious behaviors to worsen.

18      3.68. On or about March 15, 1996, Rainier staff restrained Dawn Lavery with a locked helmet,

19  despite the fact that this type of restraint is not permitted by her BTP and there was no authorization

20  from her legal guardian for this type of restraint.

21      3.69. On or about March 17, 1996, Rainier staff restrained Ms. Lavery with a locked helmet on

22  four separate occasions, despite the fact that this type of restraint is not permitted by her BTP. Further,

23  her legal guardian had not authorized Rainier to use this type of physical restraint.

24      3.70. Despite the fact that Dawn Lavery could live in the community with appropriate

25  habilitation, vocational training, and support services, she experiences on a daily basis the harmful and

26

27  **Class Action Complaint -**
    **Civil Rights**

    **Washington Protection & Advocacy System**
    **1401 East Jefferson Street, Suite 506**
    **Seattle, Washington 98370**

28  Page - 17                                    Telephone: (206) 324-1521/Facsimile: (206) 324-1783

A87

1    unlawful conditions described in paragraphs 4.1 through 5.12 below. Because the defendants have
2    discriminated in the provision of community services against persons who have severe developmental
3    disabilities and challenging behaviors, Ms. Lavery remains confined and segregated at Rainier.

4        3.71.  Plaintiff John Mann (hereinafter "Mann"), who was born on November 18, 1942, was first
5    diagnosed as having mental retardation when he was a child. Since December 15, 1947, when he was
6    just five years old -- and for the last forty-eight years -- Mr. Mann has continuously resided and has been
7    unnecessarily institutionalized at Rainier. He has no family who is involved in his life and activities at
8    Rainier.

9        3.72.  Resa Hayes, who is a resident of Spokane, Washington, brings this action on behalf of John
10   Mann in her capacity as John Mann's next friend. Ms. Hayes, who is a member of People First, is
11   familiar with John Mann.

12       3.73.  John Mann resides at PAT B / Oakley House, a residential living unit at Rainier for men
13   and women with severe developmental disabilities and challenging behaviors. Mr. Mann has little
14   opportunity to model appropriate behavior or to learn how to act in the community. He is exposed
15   without respite to persons whose behaviors are at least as problematic as his own.

16       3.74.  Mr. Mann hardly ever leaves Rainier, and spends most of his time in his residential unit.
17   Defendants provide him with minimal activities and opportunities for socialization outside the
18   institution.

19       3.75.  John Mann lives in a barren residence with stark, institutional furniture, a television blaring
20   for most of the day, and little else to do. Mr. Mann and the other individuals in his residential unit have
21   little or no choice about when to wake up and go to bed, what to eat, or what to do from day to day.
22   John Mann was placed at Rainier because of his developmental disability and challenging behaviors,
23   and because the State of Washington and the defendants' predecessors served people with his disabilities
24   at institutions like Rainier.

25       3.76.  Due to the severity of his developmental disabilities, John Mann has limited
26
27   **Class Action Complaint -**                    Washington Protection & Advocacy System
     **Civil Rights**                               1401 East Jefferson Street, Suite 506
                                                     Seattle, Washington 98370
28   **Page - 18**                                  Telephone: (206) 324-1521/Facsimile: (206) 324-1783

1  communication skills, as well as difficulty with activities of daily living. He engages in stereotypical,
2  preservative behaviors that are the result of his institutionalization. The irony is that because of the
3  disabilities that were created in part by institutionalization and inadequate habilitation, John Mann is
4  now considered inappropriate for community living. The defendants refuse to consider him for
5  community living on the ground that he requires specialized support-- support that they have chose to
6  provide only at Rainier.

7      3.77.  Mr. Mann is not receiving adequate habilitation at Rainier. During his forty-eight years
8  at Rainier, he has not had access to meaningful activities, vocational training, or the opportunity to learn
9  real-life skills in the natural environments where those skills are practiced. On average, Mr. Mann
10  receives less than two hours of programming per day, which is neither adequate nor appropriate for his
11  needs. Mr. Mann's current habilitation program does not constitute active treatment according to
12  accepted professional standards.

13      3.78.  John Mann rarely leaves his residential unit, mostly because the defendants have frequently
14  and extensively restrained him with a variety of physical and/or chemical restraints. During his time at
15  Rainier, he has had little or no opportunity to practice vocational skills, recreational skills, or community
16  living skills. Mr. Mann's environment is barren, monotonous, and unpleasant. He is currently
17  condemned to live from day to day without hope or companionship.

18      3.79.  In an attempt to address Mr. Mann 's behaviors, Rainier staff has continually and regularly
19  used various forms of physical and chemical restraints, as well as aversive therapies, since his admission.
20  These restraints and therapies have included, but not been limited to: body wraps, specialized jump suits,
21  prone restraints, manual holds, Haldol, Lithium, Mellaril, and other physical restraints and therapies.

22      3.80.  John Mann has a severe cardiac condition that exacerbates the risk of harm he must endure
23  when placed in restraints. Despite defendants' acknowledgment of this condition, Mr. Mann's
24  behavioral support plan currently allows for the use of manual restraints when he is sitting on a couch
25  or mat, as well as a restrictive jumpsuit restraint. In the recent past, his behavioral support plan has also

26

27  **Class Action Complaint -**
    **Civil Rights**

    **Washington Protection & Advocacy System**
    **1401 East Jefferson Street, Suite 506**
    **Seattle, Washington 98370**
28  **Page - 19**
    **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

A89

1 allowed for the use of prone restraint, body wraps, and other physical and chemical restraints, despite
2 his heart condition.

3    3.81.   Despite the fact that John Mann could live in the community with appropriate habilitation,
4 vocational training, support services, he experiences on a daily basis the harmful and unlawful
5 conditions described in paragraphs 4.1 through 5.12 below.  Because the defendants have discriminated
6 in the provision of community services against persons who have severe developmental disabilities and
7 challenging behaviors, he remains confined and segregated at Rainier.

8    3.82.   Plaintiff The Arc of Washington State, Inc. (hereinafter "Arc"), a nonprofit corporation
9 duly organized under the laws of the State of Washington in 1936, is this state's oldest and largest
10 membership organization for individuals with developmental disabilities, their families, friends, and
11 persons providing services to them.  Arc's administrative office is located at 1703 East State Avenue
12 in Olympia, Washington.  It has chapters in counties across the state.

13    3.83.   In 1936-37, the Arc drafted and successfully lobbied for the legislation that created the
14 state's second institution for persons with developmental disabilities, now known as Rainier, because
15 their sons and daughters with mental retardation were then excluded by law from attending their local
16 public schools.  Later, it supported the creation of the Fircrest Residential Habilitation Center in Seattle,
17 as well as the Yakima Valley Residential Habilitation Center in Selah, Washington.  For decades, the
18 Arc provided the mainstay of support in Olympia for appropriations to support and expand such
19 institutions.  Gradually, however, the members of plaintiff Arc became convinced that such segregated
20 facilities could not provide individuals with developmental disabilities with minimally adequate living,
21 training, working, and recreational supports and opportunities.

22    3.84.   Among the Arc's purposes is the education of individuals with disabilities, their families,
23 and the public on issues affecting persons with developmental disabilities.  The Arc's membership
24 includes individuals who are at risk of institutionalization at Rainier due to their developmental
25 disabilities.

26

27 **Class Action Complaint -**
   **Civil Rights**

28 **Page - 20**

A90

1    3.85.  The Arc devotes considerable resources to support and promote the development of
2    community-based habilitation programs.  Further, the Arc seeks to render defendants aware of the
3    competencies and potential of persons with severe developmental disabilities, and to ensure that all such
4    persons, including the children of its parent members, are not forced into segregated institutional centers,
5    which always retard, and often defeat, their personal growth and development.

6    3.86.  Defendant's actions and inactions adversely effect the Arc's organizational purposes and
7    the interests of its members, as set forth and more fully described in paragraphs 4.1 through 5.12 below.

8    3.87.  Plaintiff Autism Society of Washington (hereinafter "Autism Society") is a local chapter
9    of the Autism Society of America, which provides advocacy, support, and education on issues affecting
10   persons with autism and their families and friends.  The Autism Society's members include individuals
11   with autism and other similar disabilities, as well as their families and friends.  The Autism Society's
12   main administrative office is located at 15230 Fifteenth Avenue N.E. in Seattle, Washington.

13   3.88.  Many of the Autism Society's members include individuals who currently live in
14   institutions and nursing homes, and who could live in their local communities if there were appropriate
15   habilitation programs and support services available to them.  The Autism Society's membership
16   includes individuals who are at risk of institutionalization at Rainier due to their developmental
17   disabilities.

18   3.89.  The Autism Society's purpose, among others, is to empower and support the self-advocacy
19   efforts of individuals with developmental disabilities, including those individuals who are currently
20   residing in institutions and nursing homes but could live in their local communities in non-institutional
21   alternatives.

22   3.90.  Defendants' actions and inactions adversely affect the Autism Society's organizational
23   purposes and the interests of its members, as set forth and more fully described in paragraphs 4.1
24   through 5.12 below.

25   3.91.  Plaintiff Washington Protection and Advocacy System, Inc. (hereinafter "WPAS"), a

26

27   **Class Action Complaint -**
     **Civil Rights**

28   **Page - 21**

     **Washington Protection & Advocacy System**
     **1401 East Jefferson Street, Suite 506**
     **Seattle, Washington 98370**
     **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

1   nonprofit corporation duly organized under the laws of the State of Washington, is the statewide
2   protection and advocacy system designated by the Governor of the State of Washington to protect and
3   advocate for the legal and civil rights of those citizens of this state who have physical or mental
4   disabilities, pursuant to the "Developmental Disabilities Assistance and Bill of Rights Act", 42 U.S.C.
5   § 6000, et seq.; the "Protection and Advocacy for Individuals with Mental Illnesses Act", as amended,
6   42 U.S.C. § 10801, et seq.; and RCW 71A.10.080. WPAS maintains its offices at 1401 East Jefferson
7   Street, Suite 506, in Seattle, Washington.

8   3.92. As the duly designated statewide protection and advocacy system for individuals with
9   mental and physical disabilities in the State of Washington, WPAS has the authority and responsibility
10  to pursue legal, administrative, and such other appropriate remedies or relief as may be necessary to
11  protect and advocate for the rights of those persons within the State of Washington who are or who may
12  be eligible for treatment, services, or habilitation due to their developmental, mental, or physical
13  disabilities. 42 U.S.C. §§ 6000, et seq., and 10801, et seq., 29 U.S.C. § 794e.

14  3.93. Defendants' actions and inactions adversely affect WPAS' organizational interests and the
15  legal rights of its clients, as set forth and more fully described in paragraphs 4.1 through 5.12 below.

16  ## B. Class Action Allegations

17  3.94. The individual plaintiffs, their legal guardians, next friends, and People First, Arc, Autism
18  Society, and WPAS bring this action pursuant to FRCP 23(a) and (b)(1)(A) & (B), 23(b)(2), and
19  23(b)(3) on behalf of themselves and all of the other persons similarly situated.

20  3.95. The plaintiff class consists of all persons who: (1) presently reside at Rainier; (2) may be
21  admitted or are at risk of being admitted to Rainier; or (3) have been discharged from Rainier to group
22  homes, nursing facilities, intermediate care facilities for individuals with mental retardation and
23  developmental disabilities, and other community living arrangements funded, operated, or licensed by
24  the defendants after October 1, 1991.

25  3.96. There are approximately four hundred and fifty-nine individual class members who

26

27  **Class Action Complaint -**           **Washington Protection & Advocacy System**
    **Civil Rights**                        **1401 East Jefferson Street, Suite 506**
                                            **Seattle, Washington 98370**
28  **Page - 22**                           **Telephone: (206) 324-1521/Facsimile: (206) 324-1783**

A92