IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

NOS. 11-3684 AND 11-3685

---

FRANKLIN BENJAMIN, BY AND THROUGH HIS NEXT FRIEND ANDREE YOCK;
RICHARD GROGG AND FRANK EDGETT, BY AND THROUGH THEIR NEXT FRIEND,
JOYCE MCCARTHY; SYLVIA BALDWIN, BY AND THROUGH HER NEXT FRIEND, SHIRL MEYERS;
ANTHONY BEARD, BY AND THROUGH HIS NEXT FRIEND, NICOLE TURMAN,
ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

PLAINTIFFS-APPELLEES,

v.

DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA
AND SECRETARY OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA,

DEFENDANTS-APPELLEES.

CRAIG SPRINGSTEAD, BY AND THROUGH HIS FATHER AND GUARDIAN, BERTIN SPRINGSTEAD;
MARIA MEO, BY AND THROUGH HER MOTHER AND GUARDIAN, GRACE MEO;
DANIEL BASTEK, BY AND THROUGH HIS FATHER AND GUARDIAN, JOHN BASTEK; MICHAEL
STORM, BY AND THROUGH HIS GUARDIAN, POLLY SPARE; BETH ANN LAMBO,
BY AND THROUGH HER FATHER AND GUARDIAN, JOSEPH LAMBO; RICHARD KOHLER,
BY AND THROUGH HIS SISTER AND GUARDIAN, SARA FULLER; MARIA KASHATUS,
BY AND THROUGH HER FATHER AND GUARDIAN, THOMAS KASHATUS;
WILSON SHEPPARD, BY AND THROUGH HIS BROTHER AND NEXT FRIEND, ALFRED SHEPPARD,

APPELLANTS (NO. 11-3684),

DIANE SOLANO, BY AND THROUGH HER BROTHER AND GUARDIAN, CARL A. SOLANO,

APPELLANT (NO. 11-3685).

---

APPEAL FROM ORDER OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT
OF PENNSYLVANIA ENTERED SEPT. 2, 2011 IN CIVIL ACTION NO. 1:09-CV-1182

---

CONSOLIDATED BRIEF FOR PLAINTIFFS-APPELLEES AND DEFENDANTS-APPELLEES

**ROBERT W. MEEK**
**KELLY DARR**
**ROBIN RESNICK**
**DISABILITY RIGHTS NETWORK OF PA**
**1315 WALNUT STREET, SUITE 500**
**PHILADELPHIA, PA 19107-4705**
**(215) 238-8070**

*COUNSEL FOR PLAINTIFFS-APPELLEES*

**DORIS M. LEISCH**
**DEPUTY CHIEF COUNSEL**
**DEPARTMENT OF PUBLIC WELFARE**
**OFFICE OF GENERAL COUNSEL**
**801 MARKET STREET, SUITE 6092**
**PHILADELPHIA, PA 19107**
**(215) 560-2192**

*COUNSEL FOR DEFENDANTS-APPELLEES*

**DATED: APRIL 3, 2012**

# TABLE OF CONTENTS

Table of Citations..................................................................................................iv

Statement of Issues.............................................................................................1

Statement of the Case.........................................................................................1

    A.    Complaint and Class Certification..........................................1

    B.    First Failed Intervention.........................................................2

    C.    Liability Judgment ...................................................................3

    D.    The Settlement Agreement, Second Intervention
          Attempt, and Fairness Hearing ...............................................4

Statement of Facts...............................................................................................6

    A.    Terms of the Settlement Agreement.......................................6

    B.    Implementation of the Settlement Agreement ........................9

Related Cases and Proceedings........................................................................14

Summary of Argument ......................................................................................15

Argument............................................................................................................17

    I.    Appellants Are Neither Class Members Nor
        Intervenors and, Thus, Are Not Proper Parties
        Who Can Appeal the District Court's Rulings ......................17

        A.    Standard of Review ......................................................17

        B.    Appellants Are Not Class Members .............................17

                1.    This Court's Prior Ruling, That Appellants
                     Are Not Class Members, Is the Law of
                     the Case and Cannot Be Relitigated....................17

2.     The District Court Did Not Abuse Its
Discretion in Determining that Appellants
Are Not Class Members ......................................................20

C.     The District Court Did Not Abuse Its Discretion
in Denying Appellants' Motions to Intervene..............................22

D.     Since They Are Not Parties, Appellants Cannot
Challenge the District Court's Class Certification
Ruling or Approval of the Agreement .........................................26

II.     Assuming *Arguendo* That This Court Determines that
Appellants Are Parties Who Can Appeal the District
Court's Rulings, the District Court's Decision to Certify
the Class Should Be Affirmed ...................................................27

A.     Standard of Review .................................................................27

B.     This Court's Prior Endorsement of the Class
Certification Ruling Is the Law of the Case .................................27

C.     The District Court Did Not Abuse Its Discretion
in Certifying the Class .................................................................28

1.     Integration Mandate Cases Should Generally Be
Pursued As Class Actions..................................................28

2.     The Class Definition Is Not Indefinite...............................29

3.     The Class Definition Does Not Include
an Opt-Out Provision, But It Would Not
Be Improper Even If It Did.................................................35

4.     The Class Is Sufficiently Cohesive ....................................38

5.     The Class Satisfies the Rule 23(a)
Requirements of Commonality, Typicality,
and Adequacy of Representation........................................42

(a)     Commonality..........................................................42

            (b)      Typicality ................................................................44

            (c)       Adequacy of Representation ...................................46

      6.     The District Court Complied With the Procedural
             Requirements for Class Certification ................................47

III.   Assuming *Arguendo* That This Court Determines That
      Appellants Are Parties Who Can Appeal the District
      Court's Rulings, the District Court's Approval of the
      the Agreement Should Be Affirmed ........................................48

     A.   Standard of Review .....................................................48

     B.   The District Court Carefully Evaluated
         All Appropriate Factors in Approving the
         Agreement ......................................................................49

     C.   Appellants' Objections Are Inadequate to
         Establish an Abuse of Discretion ................................54

      1.     The Agreement Is Not Invalid Because It
             Permits Community Placement for State
             ICF/MR Residents Who Cannot Express
             a Preference and Have No Involved
             Family or Guardians ...........................................55

      2.     The Agreement's Procedures Are Not
             Biased ..................................................................61

      3.     Class Members Are Protected After They
             Are Discharged ...................................................64

      4.     Appellants' Speculation That the Agreement
             Will "Depopulate" the State ICFs/MR Is Not
             a Valid Basis for Rejection of the Agreement...................66

Conclusion ............................................................................72

# TABLE OF CITATIONS

## Cases

*AAL High Yield Bond Fund v. Deloitte Touche LLP*,
   361 F.3d 1305 (11th Cir. 2004) ............................................................21, 26

*Baby Neal ex rel. Kanter v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ........................................................41, 43, 44, 45

*Barnes v. American Tobacco Co.*,
   161 F.3d 127 (3d Cir. 1998), *cert. denied*,
   526 U.S. 1114 (1999)......................................................................................40

*Behrend v. Comcast Corp.*,
   655 F.3d 182 (3d Cir. 2011), *petition for cert. filed*,
   80 U.S.L.W. 3442 (U.S. Jan. 11, 2012) (Nos. 11-864, 11A534) ...........42, 48

*Benjamin v. Dep't of Public Welfare*,
   432 Fed. Appx. 94 (3d Cir. 2011)
   (non-precedential)................... 3, 14, 18, 19, 20, 21, 25, 28, 35, 37, 47, 68, 69

*Benjamin v. Dep't of Public Welfare*,
   267 F.R.D. 456 (M.D. Pa. 2010), *aff'd,* 432 Fed.
   Appx. 94 (3d Cir. 2011) (non-precedential)................................2, 19, 21, 25

*Benjamin v. Dep't of Public Welfare*,
   768 F. Supp. 2d 747 (M.D. Pa. 2011)......................................................3, 4, 43

*Benjamin v. Dep't of Public Welfare,*
   807 F. Supp. 2d 201 (M.D. Pa. 2011)..........................................................3, 5

*Bishop v. New Jersey*,
   144 Fed. Appx. 236 (3d Cir. 2005) (non-precedential)...............................19

*Bryan v. Pittsburgh Plate Glass Co.*,
   494 F.2d 799 (3d Cir.), *cert. denied*, 419 U.S. 900 (1974) ..........................51

*Chiang v. Veneman*,
   385 F.3d 256 (3d Cir. 2004) ..................................................................32, 43

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002)..................................................................................26

*D.G. ex rel. Stricklin v. DeVaughn*,
    594 F.3d 1188 (10th Cir. 2010) ..................................................40

*Disability Advocates, Inc. v. Paterson*,
    653 F. Supp. 2d 184 (E.D.N.Y. 2009), *app. pending*....................33

*Disability Advocates, Inc. v. Paterson*,
    Civil Action No. 03-CV-3209, 2010 WL 786657
    (E.D.N.Y. Mar. 1, 2010), *app. pending*........................................33

*In re Fine Paper Antitrust Litig.*,
    695 F.2d 494 (3d Cir. 1982) .................................................17, 26

*Frederick L. v. Dep't of Public Welfare*,
    422 F.3d 151 (3d Cir. 2005) ...........................................................29

*Gaskin ex rel. Gaskin v. Pennsylvania*,
    197 Fed. Appx. 141 (3d Cir. 2006) (non-precedential)................22

*Gates v. Rohm & Haas Co.*,
    655 F.3d 255 (3d Cir. 2011) .................................................38, 39

*Gautreaux v. Chicago Housing Auth.*,
    475 F.3d 845 (7th Cir. 2007) ................................................21, 26

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975) .................................................50, 54

*Gortat v. Capala Bros., Inc.*,
    Civil Action No. 07-CV-3629 (ILG), 2010 WL
    1423018 (E.D.N.Y. Apr. 9, 2010) ................................................31

*Gould v. Alleco, Inc.*,
    883 F.2d 281 (4th Cir. 1989), *cert. denied*, 493 U.S.
    1058 (1990)...................................................................................51

*Harris v. Pernsley*,
820 F.2d 592 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987) ...............25, 26, 27

*Hawker v. Consovoy*,
198 F.R.D. 619 (D.N.J. 2001) ......................................................................51

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) .........................................................................47

*In re Ins. Brokerage Antitrust Litig.*,
579 F.3d 241 (3d Cir. 2009) ...........................................................24, 27, 43

*Kleissler v. United States Forest Service*,
157 F.3d 964 (3d Cir. 1998) ........................................................................24

*Kyriazi v. Western Elec. Co.*,
647 F.2d 388 (3d Cir. 1981) ........................................................................36

*Liberty Mutual Ins. Co. v. Treesdale, Inc.*,
419 F.3d 216 (3d Cir. 2005) ..................................................................22, 24

*Ligas ex rel. Foster v. Maram*,
478 F.3d 771 (7th Cir. 2007) ................................................................34, 35

*Ligas ex rel. Foster v. Maram*,
Civil Action No. 1:05-cv-4331, 2010 WL 1418583
(N.D. Ill. Apr. 7, 2010) ........................................................................67, 68

*Ligas ex rel. Foster v. Maram*,
Civil Action No. 1:05-cv-4331, slip op. (N.D. Ill. July 7, 2009) .................68

*Ligas ex rel. Foster v. Maram*,
Civil Action No. 1:05-cv-4331, 2006 WL 644474
(N.D. Ill. Mar. 7, 2006).................................................................................34

*Marino v. Ortiz*,
484 U.S. 301 (1988) (per curiam)................................................................26

*Messier v. Southbury Training School*,
562 F. Supp. 2d 294 (D. Conn. 2008) ...................................................33, 34

*Miller v. Gorski Wladyslaw Estate*,
    547 F.3d 273 (5th Cir. 2008) ........................................................................70

*In re Monumental Life Ins. Co.*,
    365 F.3d 408 (5th Cir.), *cert. denied*, 543 U.S. 870 (2004) .........................36

*Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*,
    72 F.3d 369 (3d Cir. 1995) ...................................................................22, 23

*O'Bannon v. Town Court Nursing Center*,
    447 U.S. 773 (1980)..........................................................................70, 71

*Olmstead v. L.C.*,
    527 U.S. 581 (1999)......................................... 28, 32, 33, 56, 58, 59, 60, 70

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    582 F.3d 432 (3d Cir. 2009) ...........................................................................19

*In re Prudential Ins. Co. Sales Prac. Litig. Agent Actions*,
    278 F.3d 175 (3d Cir. 2002) ...........................................................................17

*In re Prudential Ins. Co. Sales Prac. Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998), *cert. denied*,
    525 U.S. 1114 (1999).......................................................................24

*Richard C. ex rel. Kathy B. v. Houstoun*,
    229 F.3d 1139, slip op. (3d Cir. 2000) (non-precedential).........................70

*Richard C. ex rel. Kathy B. v. Houstoun*,
    196 F.R.D. 288 (W.D. Pa. 1999) ...................................................................70

*Richard C. ex rel. Kathy B. v. Snider*,
    Civil Action No. 89-2038, 1993 WL 757634 (W.D. Pa.
    June 22, 1993), *aff'd mem.*, 31 F.3d 1173 (3d Cir. 1994) ...........................70

*In re School Asbestos Litig.*,
    977 F.2d 764 (3d Cir. 1992) ...........................................................................19

*Stewart v. Abraham*,
275 F.3d 220 (3d Cir. 2001), *cert. denied*, 536 U.S.
958 (2002) ................................................................................29, 41, 44

*Sullivan v. DB Investments, Inc.*,
667 F.3d 273 (3d Cir. 2011) (en banc), *petition for cert.
filed*, 80 U.S.L.W. _____ (U.S. Mar. 8, 2012) (No. 11-1111) ......41, 42, 47, 48

*Stoetzner v. U.S. Steel Corp.*,
897 F.2d 115 (3d Cir. 1990) ........................................................51

*In re Sunrise Sec. Litig.*,
131 F.R.D. 450 (E.D. Pa. 1990) ..................................................51

*United States v. Alcan Aluminum, Inc.*,
25 F.3d 1174 (3d Cir. 1994) ........................................................17

*United States v. Pelullo*,
399 F.3d 197 (3d Cir. 2005), *cert. denied*, 546 U.S.
1137 (2006) ..................................................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
___ U.S. ___, 131 S. Ct. 2541 (2011) ............................36, 42, 43

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ........................................................46

*In re World Health Alternatives Sec. Litig.*,
Civil Action No. 05-CV-1194, 2007 WL 1670180
(W.D. Pa. June 8, 2007) ...............................................................50

*Zeisel v. Diamond Foods, Inc.*,
Civil Action No. 10-01192 JSW, 2011 WL 2221113
(N.D. Cal. June 7, 2011) ..............................................................32

## Statutes and Regulations

29 U.S.C. § 794 ...................................................................................1

42 U.S.C. § 1396a(a)(23)(A) ............................................................70

42 U.S.C. §§ 12131-12134 ...................................................................1

42 C.F.R. §§ 483.400 *et seq.*...........................................................47, 66

20 Pa. Cons. Stat. Ann. § 5514 ...........................................................55

20 Pa. Cons. Stat. Ann. § 5521(f)(1) ...................................................65

50 P.S. § 4402(a)..............................................................................65

50 P.S. § 4406 .................................................................................65

50 P.S. §§ 4417-4420.........................................................................58

55 Pa. Code §§ 6250.1 *et seq.* ..........................................................65

55 Pa. Code Ch. 6400.........................................................................13

55 Pa. Code § 6400.1 ...................................................................59, 60

Fed. R. App. P. 3(c)(1)........................................................................26

Fed. R. Civ. P. 7(a)............................................................................21

Fed. R. Civ. P. 23(a).....................................................................16, 42

Fed. R. Civ. P. 23(a)(2)......................................................................42

Fed. R. Civ. P. 23(a)(4)................................................................46, 47

Fed. R. Civ. P. 23(b)(2)...............................................2, 35, 36, 38, 39, 41

Fed. R. Civ. P. 23(c)(1)......................................................................47

Fed. R. Civ. P. 23(d) .........................................................................36

Fed. R. Civ. P. 23(e)(5)......................................................................51

## Miscellaneous

James W. Conroy & Valerie J. Bradley, *The Pennhurst
Longitudinal Study: A Report of Five Years of Research
and Analysis* (Mar. 1, 1985), *available at*
http://aspe.hhs.gov/daltcp/reports/5yrpenn.htm.................................................57, 60

DPW, Consolidated Waiver (Nov. 15, 2011), *available at*
http://www.dpw.state.pa.us .......................................................................... 13

Governor's Exec. Budget for FY 2011-12,
*available at* http://www.governor.state.pa.us .......................................................13

DPW, Mental Retardation Bulletin # 99-81-51 (Dec. 1, 1981),
*available at* http://www.temple.edu.
thetrainingpartnershipresources/mrBulletins.asp.....................................................65

HCFA, *Developing Comprehensive Effectively Working
Plans - Initial Technical Assistance Recommendations*
(Jan. 14, 2000), *available at*
*http://www.cms.gov/smdl/downloads/smd011400c.pdf* .........................................33

7A Charles A. Wright, *et al.*, *Federal Practice & Procedure*
§ 1760 (3d ed. 2005) ...............................................................................31, 32

7AA Charles A. Wright, *et al.*, *Federal Practice & Procedure*
§ 1785 (3d ed. 2005) ...................................................................................48

## STATEMENT OF ISSUES

1.      Are the Appellants "parties" who can appeal the district court's rulings to certify the class and approve the Settlement Agreement given that they are not class members and that the district court did not abuse its discretion in denying their intervention motions?

2.      Assuming *arguendo* that Appellants are parties, did the district court abuse its discretion in certifying this case as a class action?

3.      Assuming *arguendo* that Appellants are parties, did the district court abuse its discretion in approving the Settlement Agreement?

## STATEMENT OF THE CASE

### A.  Complaint and Class Certification

Plaintiffs-Appellees (Plaintiffs) are individuals with intellectual disabilities who are institutionalized in intermediate care facilities for persons with mental retardation (ICFs/MR) operated by Defendants-Appellees, Department of Public Welfare and the Secretary of Public Welfare (collectively, DPW).  Am. Compl. ¶¶ 1, 8-14 (JA75, JA77-79).  Seeking declaratory and injunctive relief, Plaintiffs alleged that DPW violated Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794, by failing to offer community services to them and other state ICF/MR residents who are appropriate for and not opposed to discharge.  *See* Am.

Compl. ¶¶ 2, 4, 23-26, 29-32, 35-37, 41-43, 46-48, 72, 82-94 (JA76, JA81-85, JA93, JA97-101).

After reviewing a comprehensive Motion and Brief filed by Plaintiffs (JA103-64), the district court certified this case to proceed on behalf of the following class pursuant to Federal Rule of Civil Procedure 23(b)(2):

> All persons who: (1) currently or in the future will reside in one of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement.

Order dated Sept. 2, 2009 at ¶ III (JA39).

Defendants filed a Motion to Dismiss, which the district court denied. (JA 165, JA171). Defendants subsequently filed an Answer (JA180).

## B. First Failed Intervention

In November 2009, after the district court had certified the class and while the motion to dismiss was pending, family members or guardians of nine residents of the state ICFs/MR (Springstead Group) filed a Motion for Intervention. (JA166). The Springstead Group, which opposed community placement, sought only to decertify the class. *See* Response at 33 (Docket 28). The district court denied that Motion. *Benjamin v. Dep't of Public* Welfare, 267 F.R.D. 456 (M.D. Pa. 2010), *aff'd,* 432 Fed. Appx. 94 (3d Cir. 2011) (non-precedential). The Springstead Group appealed. They were supported on appeal by Diane Solano,

who submitted an *amicus curiae* brief and presented oral argument. This Court rejected in their entirety the arguments of the Springstead Group and Ms. Solano – who are the current Appellants. *Benjamin v. Dep't of Public Welfare*, 432 Fed. Appx. 94 (3d Cir. 2011) (non-precedential) (JA436).

## C. Liability Judgment

In June 2010, after they completed "extensive" fact and expert discovery over an extensive period, *see Benjamin v. Dep't of Public Welfare,* 807 F. Supp. 2d 201, 208 (M.D. Pa. 2011) (JA18); Meek Decl. ¶¶ 2-3 (JA1087-88), the parties filed cross-motions for summary judgment. (JA211, JA328). Following unsuccessful settlement discussions, the district court in January 2011 issued a Memorandum and Order granting Plaintiffs' Motion for Summary Judgment against DPW, holding that DPW violated the ADA's and RA's integration mandates. *Benjamin v. Dep't of Public Welfare*, 768 F. Supp. 2d 747, 756-57 (M.D. Pa. 2011) (JA410). As the court observed, the parties did not dispute that Plaintiffs and class members are appropriate for community placement if they receive necessary supports and services. *Id.* at 754. The court further found that some state ICF/MR residents are not opposed to discharge. *Id.* The court rejected DPW's fundamental alteration defense, specifically its presentation of an integration "plan" developed on June 18, 2010. *Id.* at 755-57. The court concluded that "based upon the plain terms of the

Plan," the possibility that class members will be placed in the community is "quite remote."  *Id.* at 756.

Although Plaintiffs had submitted a proposed order detailing the injunctive relief they sought (JA282-93), the district court declined to grant that or any other remedy.  Instead, it "encourage[d] the parties, imbued with this mandate, to return to mediation to formulate a resolution that implements a realistic plan that fully complies with the ADA and RA."  *Benjamin*, 768 F. Supp. 2d at 757 n.12.

### D.  The Settlement Agreement, Second Intervention Attempt, and Fairness Hearing

Following the district court's suggestion in its liability opinion, the parties resumed settlement negotiations with the assistance of the Honorable Martin C. Carlson.  Meek Decl. ¶¶ 5-6 (JA1089).  After extensive arms-length discussions in which responsible DPW officials participated, *id.* ¶¶ 6-7, the parties finalized a Settlement Agreement (Agreement).  (JA1089, JA1099).

On May 27, 2011, the district court granted preliminary approval of the Agreement and approved the class notice and notice scheme.  (JA485).  Notice was disseminated to state ICF/MR residents and their involved families or guardians, informing them that they could submit comments on the Agreement and could appear at the fairness hearing.  (Docket 257, 263).

Appellant Diane Solano and Appellants Springstead Group filed separate "Objections" to the Agreement (JA948, JA1013) and separate Motions to Intervene

4

to object to the Agreement (JA1000, JA1062).  The district court denied their intervention motions.  (JA33).  Incorporating its prior decision denying the first intervention motion, the district court determined that "full intervention is unwarranted and improper."  Aug. 16, 2011 Order at 2 (JA34).  Nevertheless, the district court allowed counsel for Ms. Solano and the Springstead Group to participate in the fairness hearing.  *Id.* at 3 (JA35).

Plaintiffs filed an unopposed Motion for Final Approval of the Proposed Settlement Agreement on August 8, 2011 (JA1085).  The United States filed a Statement of Support in favor of approval of the Agreement.  (JA1067).

The fairness hearing was held on August 22, 2011.  At that hearing, the parties presented the testimony of three witnesses, who were cross-examined by Appellants' counsel.  Tr. at 16-100 (JA1354-438).  The Court also heard from several family members.  Tr. at 102-116 (JA1440-54).  Finally, the Court heard oral argument from counsel for Plaintiffs, DPW, Appellants, and the Department of Justice.  Tr. at 119-54 (JA1457-92).

On September 2, 2011, the district court issued a Memorandum and Order approving the Agreement as fair, reasonable, and adequate.  *Benjamin*, 807 F. Supp. 2d at 206-210 (JA13-22).  The court also granted Plaintiffs' uncontested Motion for Attorneys' Fees, Litigation Expenses, and Costs (Docket 262), awarding Plaintiffs $432,500 – the negotiated amount DPW had agreed to pay –

after scrutinizing the Plaintiffs' fee and cost submissions.  Mem. at 16-24 (JA22-30); Agreement § VII.7 (JA1113).  The court noted that the sum requested was "in fact less than the Plaintiffs' lodestar" and excluded the substantial time counsel spent after June 30, 2011.  Mem. at 19-23 (JA25-29).

After filing notices of appeal (JA1, JA3), Appellants filed a motion for a partial stay to bar community placements under the Agreement for any individuals who are unable to express a preference and do not have involved family or guardians.  (JA1505).  On December 19, 2011, the district court denied that Motion.  The court determined that the Appellants were unlikely to succeed on appeal, since they failed to argue that the court "erred in its application of the nine factors articulated by the Third Circuit ... for determining the fairness of the settlement" and failed to demonstrate a likelihood of irreparable injury or "indeed ... anything more than mere speculation as to potential future harm ...."  Dec. 19, 2011 Order at 1-2 n.1 (Docket 297).

## STATEMENT OF FACTS

### A.  Terms of the Settlement Agreement

The Settlement Agreement confers significant benefits on class members to assure their access to appropriate community services.  The key provisions include the following:

***Identification of Class Members*** – The Agreement specifies that DPW will create a Planning List that identifies state ICF/MR residents who are not opposed to discharge.    Agreement § III.1 (JA1103-05).    These assessments must be undertaken by Community Transition Specialists (CTSs) employed by DPW and Facility Advocates, who interview residents, their involved families, and guardians to assess whether they oppose discharge.  *Id.* § III.2 (JA1103-04).[1]  The Planning List will be comprised of state ICF/MR residents who:  (1) are not opposed to considering community placement and whose involved family or guardians, if any, are not opposed to discharge; (2) express no preference for community placement unless they have involved family or guardians who oppose discharge; and (3) express a preference for community placement unless they have guardians who oppose discharge.  *Id.* § III.2.b (JA1104).[2]

***Education and Outreach*** – To assure that state ICF/MR residents and their involved families and guardians have access to appropriate information about community options, DPW will establish a Community Partnership Steering

---

[1]    The Agreement defines "involved family" as family members who are designated in the state ICF/MR residents' records as substitute decision-makers. Agreement § II.13 (JA1102).  A "guardian" is a person appointed by a court pursuant to Pennsylvania law to serve as a state ICF/MR resident's guardian of the person.  *Id.* § II.12 (JA1102).

[2]    Approximately 80% of state ICF/MR residents have involved family or guardians.  *See* Exh. 13 to Pls.' Summary Judgment Motion (JA280).

7

Committee (Committee) to develop and implement an education program that provides trainings to residents, their families, and their guardians. Agreement § IV.1 (JA1105-07). The Committee will also distribute written information about community placement options and offer opportunities to visit community placements. *Id.* §§ IV.1.e-IV.1.f (JA1106-07). In addition, DPW will develop and implement a plan to offer one-to-one outreach to current state ICF/MR residents and their families and guardians who express an interest in talking to family members of individuals with intellectual disabilities who currently live in the community. *Id.* § IV.2 (JA1107). After these training and outreach events, state ICF/MR residents, their involved families, and their guardians will be offered the opportunity to change their position in favor of or against community placement, and the Planning List will be amended to reflect any such changes. *Id.* § IV.3 (JA1107); *see also* Tr. at 39-40 (JA1377-78).

**Integration Plan** – DPW will develop and implement an Integration Plan to provide community placements to: (1) at least 50 persons on the Planning List in Fiscal Year (FY) 2011-12; (2) at least 75 persons on the Planning List in FY 2012-13; (3) at least 100 persons on the Planning List in FY 2013-14; (4) at least 100 persons on the Planning List in FY 2014-15; and (5) at least 75 persons on the Planning List in FY 2015-16 and each fiscal year thereafter until all persons on the Planning List have been discharged. Agreement § V.1 (JA1107-08). If the

Planning List has fewer than the specified number of persons in any given year, the Agreement does not require DPW to provide community placements to persons not on the Planning List merely to reach the number in the Agreement.  Tr. at 42-43 (JA1380-81).

*Enforcement, Jurisdiction, and Termination* – The Agreement provides for the district court to retain continuing jurisdiction to interpret and enforce the Agreement.   Agreement § VII.5 (JA1112).  Plaintiffs may seek the remedy of specific performance if Defendants fail to comply with the terms of the Agreement, provided they first afford Defendants 30-days' notice and the opportunity to discuss resolution.  *Id.* §§ VII.2-VII.3 (JA1111-12).  The Agreement will terminate 90 days after the provision of a community placement to the last person on the Planning List.  *Id.* § VII.6 (JA1113).

### B.  Implementation of the Settlement Agreement

DPW currently provides services to approximately 1,150 persons in five state ICFs/MR.  Tr. at 30 (JA1368).  Pamela Kuhno, Director for DPW's Division for ICF/MR Programs, described the process used to identify individuals to be placed on the Planning List, which was well under way at the time of the fairness hearing.  *Id.* at 16-22, 29-30 (JA1354-60, JA1367-68).   Using a standardized questionnaire, CTSs, who are Qualified Mental Retardation Professionals employed at the state ICFs/MR, asked questions of the residents and their involved

families or guardians to determine whether they favored or opposed community placement. *See id.* at 18-26 (JA1356-64); State Center (ICF/MR) Community Planning List Assessment Protocol (Assessment Protocol) (JA1497). The CTSs recorded the answers that were given by the residents, families, or guardians. Neither the CTSs nor the Facility Advocates offered opinions or other unsolicited information. Tr. at 67-69 (JA1405-07).

The interviews of state ICF/MR residents who are non-verbal (*i.e.*, who cannot speak) utilized alternative means of communication if those means were documented in the residents' Individualized Support Plans. Tr. at 28-29, 47 (JA1366-67, JA1385). As witnesses testified, individuals – even those who have "profound" intellectual disabilities – may still be capable of having wishes and desires and communicating them through augmentative communication devices, sign language, gestures, pictures, body language, or the assistance of involved staff who know the resident well and understand his communication. *Id.* at 20, 27-29, 45, 70, 74-75 (JA1358, JA1366-69, JA1383, JA1408-09); Assessment Protocol at § II (JA1500).

Placement on the Planning List, of course, also depends on the views of the residents' involved families or guardians. Using the standardized questionnaire, CTSs interviewed these individuals in person or by telephone. *See* Tr. at 21 (JA1359). The Protocol provides that if DPW is unable to reach involved families

or guardians after three telephone calls and delivery of a certified letter that explicitly advises them that they will be listed as having "no preference" unless they contact DPW, then the family or guardian is recorded as having "no preference." Assessment Protocol at 2 & Attached Sample Letter (JA1498, JA1504).

After completing the initial reviews in 2011, DPW will use the existing annual reviews that it routinely conducts to annually assess opposition to discharge, as the Agreement requires. Agreement § III.2 (JA1103); *see* Tr. at 41 (JA1379). Long before the Agreement, this review process was used by DPW to ask residents, family members, and guardians about their views on community placement. *See* Tr. at 40-41 (JA1378-79); *see also* Community Placement Plan and Annual Family Information for Franklin Benjamin (JA266, JA270); Community Placement Plan and Annual Family Information for Anthony Beard (JA272, JA275). Thus, the Agreement merely standardized the assessment process whereby community placement preferences have been discussed annually.

Once DPW identifies which residents are on the Planning List for a fiscal year, comprehensive, individualized discharge planning will begin. *See* Tr. at 38-39, 80-81, 84-85 (JA1376-77, JA1418-19, JA1422-23). This planning process identifies each individual's service needs with input from the resident, his family or guardian, his county supports coordinator, service providers, and state ICF/MR

11

professionals.  *See id.* at 38-39, 80-81, 84-85 (JA1376-77, JA1418-19, JA1422-23).

Residents will not be forced into services that do not meet their needs; if existing

programs do not meet their needs, new programs will be developed specifically for

them.  *See id.* at 50, 87 (JA1388, 1425).  No state ICF/MR resident will be moved

to the community until services and supports are in place that can meet their needs.

*Id.* at 87 (JA1425); Kuhno Decl. ¶ 14 (Docket 295-1).  In addition, DPW will

assure that appropriate transitions occur, affording residents the opportunity to be

involved with the community programs and staff before they move.  Tr. at 87-88

(JA1425-26); Kuhno Decl. ¶ 14 (Docket 295-1).  Class members can also return to

the state ICFs/MR within 60 days after discharge.  Tr. at 96-97, 100 (JA1434-35,

JA1438).

    While individualized planning and transitioning is essential, the undisputed

testimony established that there are no state ICF/MR residents whose service needs

cannot be met in the community.  Tr. at 82-83 (JA1420-21).  People currently live

in the community with the same types of needs as those living in the state

ICFs/MR, including people who need 24-hour supervision, people who need a

wheelchair-accessible home, people who need tube-feeding, and those who have

other challenging needs.  *Id.  See also* Pls.' SUF & Defs.' Resp. ## 45-47 (JA303-

04, JA365); Defs.' Resp. to Pls.' First Request for Admissions ## 1, 1(a) (JA243-

44); Am. Compl. & Answer ¶¶ 65, 68 (JA91-92, JA185).  Indeed, the vast majority

of the more than 53,000 Pennsylvanians with intellectual disabilities who receive services live in the community.  *See* Governor's Exec. Budget for FY 2011-12 at E35.44, *available at* http://www.governor.state.pa.us.   Since only a handful of people are admitted to the state ICFs/MR each year, Exh. 17 to Pls.' Summary Judgment Motion (JA281), it is apparent that people with intellectual disabilities who have a wide array of needs, including many with challenging needs, live successfully in the community.

Class members living in the community will be afforded the same protections as the thousands of other individuals with intellectual disabilities who live in the community.  Group homes are subject to licensure inspections and must comply with detailed standards.  *See* 55 Pa. Code Ch. 6400.  In addition, DPW has established an extensive system to monitor services to such individuals and to investigate allegations of abuse and neglect.  *See* Tr. at 91-93 (JA1429-31); *see also* Consolidated Waiver at 197-239 (Nov. 15, 2011) (detailing protections for persons receiving community services), *available at* http://www.dpw.state.pa.us.

DPW completed the initial assessments of all residents and involved families and guardians in September 2011.  Kuhno Decl. ¶ 4 (Docket 295-1).   The assessments identified 238 of the 1,150 current state ICF/MR residents to be placed on the Planning List.  *Id.*

Out of these 238 residents, DPW identified 50 who will be discharged in this fiscal year pursuant to the Agreement.  Kuhno Decl. ¶¶ 7-9 (Docket 295-1).   DPW requested and the General Assembly appropriated the funding to develop community placements for these individuals.  Tr. at 42 (JA1380).   In determining the order of discharge, including identifying those to be discharged this year, DPW considered a number of factors, including:  the complexity of the residents' service needs; geography; friendship and compatibility of residents to identify housemate groupings; recommendations of the DPW Facility Directors and state ICF/MR staff who know and are familiar with the residents and their needs; and county capacity to develop new programs.  Tr. at 36-37 (JA1374-75); Kuhno Decl. ¶ 9 (Docket 295-1).

## RELATED CASES AND PROCEEDINGS

This Court previously upheld the district court's denial of a Motion to Intervene filed by eight of the nine current Appellants.  *Benjamin v. Dep't of Public Welfare*, 432 Fed. Appx. 94 (3d Cir. 2011).

14

## SUMMARY OF ARGUMENT

Appellants are not "parties" authorized to appeal the district court's rulings on class certification or approval of the Settlement Agreement. Appellants are not class members. This Court previously ruled that Appellants' opposition to community placement expressly removes them from the class. That ruling is the law of the case and cannot be relitigated. Even if that ruling does not bind Appellants, the district court did not abuse its discretion in determining that they are not class members, since the plain language of the definition excludes individuals, including Appellants, who oppose discharge. Appellants cannot secure party status by relying on their motions to intervene to object to the Agreement. Again, the district court did not abuse its discretion in denying those motions. To the extent they sought intervention to challenge the class certification ruling, Appellants' motions were untimely. To the extent that Appellants sought intervention to challenge the Agreement's procedures governing discharge, they do not have a sufficient interest that will be jeopardized so as to warrant intervention as of right, since they are not subject to discharge.

Even if Appellants could challenge the district court's decision to certify the class, their challenge cannot succeed. First, this Court previously rejected Appellants' arguments that the class was improper, which is the law of the case. Second, class certification was neither substantively nor procedurally improper.

15

The class definition was sufficiently definite and not subjective; the class was cohesive, since it was readily managed and not unfair to absent class members; Plaintiffs amply demonstrated that they satisfied Rule 23(a)'s commonality, typicality, and adequacy criteria; and the district court made adequate findings to support its ruling.

So, too, even if Appellants can contest the district court's approval of the Agreement, their appeal must fail because they cannot establish that the district court's decision constitutes an abuse of discretion.  The district court carefully considered all relevant factors and found that they weigh in favor of approval.  The district court also considered the arguments in opposition to the Agreement raised by Appellants and others.  While the court expressed some concerns, it did not abuse its discretion in determining that those concerns were outweighed by other factors, including its ruling that a remedy was needed to fulfill the ADA's integration mandate.

# ARGUMENT

## I.  APPELLANTS ARE NEITHER CLASS MEMBERS NOR INTERVENORS AND, THUS, ARE NOT PROPER PARTIES WHO CAN APPEAL THE DISTRICT COURT'S RULINGS.

### A.  Standard of Review

This Court gives "particular deference" to the district court's interpretation of its class certification order as to whether individuals are included in the class definition.  *In re Fine Paper Antitrust Litig.*, 695 F.2d 494, 498 (3d Cir. 1982).[3] This Court reviews denials of motions for intervention as of right for abuse of discretion, though the abuse of discretion review applied to the denial of a motion for intervention as of right is "'more stringent'" than that applied to the denial of a motion for permissive intervention.  *United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1179 (3d Cir. 1994) (citations omitted).

### B.  Appellants Are Not Class Members.

#### 1.  This Court's Prior Ruling, That Appellants Are Not Class Members, Is the Law of the Case and Cannot Be Relitigated.

In their prior intervention appeal, Appellants claimed that they were members of the class whose interests were jeopardized by the litigation and that the

---

[3] Appellants cite *In re Prudential Ins. Co. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 180 (3d Cir. 2002), to support their contention that this Court exercises plenary review over whether individuals are members of the class.  App. Br. at 49.  That decision does not support that proposition.  The Court in that case held that the adequacy of an attorney's notice and opportunity to contest imposition of sanctions was subject to plenary review.

district court's denial of intervention was based on the erroneous conclusion that they are not class members.  Springstead Br. at 8, 14, 21-24 (JA1125, JA1131, JA1138-41); Springstead Reply at 8-12 (JA1167-71).  They asserted that, even if they oppose community placement currently, they are still class members because they may opt for community placement in the future.  Springstead Br. at 14, 24-25 (JA1131, JA1141-42).  Appellants further contended that they are class members because, under the relief sought by Plaintiffs, DPW would be required to annually assess whether they oppose community placement.  Springstead Reply at 10 (JA1169); App. Tr. at 7-8 (JA1301).  They proffer precisely the same arguments here. *See* App. Br. at 51, 53.

In its ruling on their previous appeal, this Court plainly addressed and definitively rejected Appellants' assertion that they are class members.  The Court held that Appellants' interest in remaining in the state ICFs/MR was not jeopardized by this lawsuit because "[t]he current parties have deliberately defined the class and the relief sought so that the [proposed] Intervenors' right to choose institutional treatment would not be affected."  *Benjamin*, 432 Fed. Appx. at 98. The Court stressed that the certified class "excludes all current and future residents of ICFs/MR who oppose, or would at any relevant time in the future oppose, community placement.  It therefore excludes [proposed] Intervenors, and they will

not be personally bound by anything that is decided in this litigation." *Id.* (footnote omitted).

Accordingly, this Court has already held that Appellants – and any other state ICF/MR residents who oppose community placement – are not members of the class. This ruling constitutes the law of the case. "'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (citation omitted). Absent "'extraordinary circumstances,'" this Court must adhere to its prior ruling. *Id.* There are no such extraordinary circumstances here, since the class definition now is identical to the class definition considered by this Court previously.

Appellants offer two reasons for this Court to disregard the law of the case. First, they inexplicably emphasize that the prior ruling is non-precedential. App. Br. at 51. A non-precedential ruling does not bind outside parties, but it is the law of the case that binds the litigants in the case. *See Bishop v. New Jersey,* 144 Fed. Appx. 236, 238 (3d Cir. 2005) (non-precedential); *In re School Asbestos Litig.*, 977 F.2d 764, 788 n.32 (3d Cir. 1992). Second, Appellants note that this Court observed that the class definition allows individuals to change their minds, and thus their class status. App. Br. at 51. While the Court did acknowledge that people may change their minds and choose community placements, *Benjamin*, 432

19

Fed. Appx. at 98 n.3, the Court nevertheless held that the Appellants – who opposed community placement – were excluded from the class. *Id.* Since Appellants now, as then, still oppose community placement, this Court's ruling that they are not class members binds them.

## 2.  The District Court Did Not Abuse Its Discretion In Determining that Appellants Are Not Class Members.

The district court repeatedly determined that Appellants are not class members. *See* Mem. at 11 & nn.2-3 (JA17); *Benjamin*, 267 F.R.D. at 462-63. Even if this Court's ruling on Appellants' status as non-class members is not the law of the case, Appellants cannot demonstrate that the district court abused its discretion in determining that they are not class members.

The class definition includes only those state ICF/MR residents who "do not oppose or would not oppose" community placement.  (JA39).  It is beyond dispute that Appellants oppose community placement.  As they admitted to this Court: "We are, at present, not members of the class."  App. Tr. at 12 (JA1302).  The fact that they may in the future not oppose community placement, *see* App. Br. at 53, does not transform them into class members.  This Court concluded that the potential for future acceptance of community placement was not sufficient to confer class membership on Appellants. *Benjamin,* 432 Fed. App. at 98 n.3.  Even if not binding, this Court's analysis is persuasive and demonstrates that the district

court acted well within the bounds of its discretion in holding that Appellants are not class members.

Appellants' suggestion that they are class members because they are subject to annual screening relating to opposition, App. Br. at 51-52, does not undermine this conclusion. The district court acknowledged that the Agreement requires all residents to be evaluated, but concluded that "any effect on those who wish not to be discharged is negligible ...." Mem. at 11 n.2 (JA17). Indeed, Appellants stressed these annual screenings when they argued to this Court that they were class members, Springstead Reply at 10 (JA1169); App. Tr. at 7-8 (JA1301), yet this Court plainly was not persuaded. Moreover, these annual screenings are routine elements of the annual reviews that DPW conducted even before the Agreement. *See* discussion, *supra,* at 11; Tr. at 40-41 (JA1378-79).

At the end of the day, whether Appellants could have been included in the class is not the issue. Rather, the question is whether Appellants are parties who are "actually bound by a judgment, not parties who merely *could* have been bound by the judgment." *AAL High Yield Bond Fund v. Deloitte Touche LLP*, 361 F.3d 1305, 1310 (11th Cir. 2004) (emphasis in original); *accord Gautreaux v. Chicago Housing Auth.*, 475 F.3d 845, 852 (7th Cir. 2007). Here, as this Court and the district court properly determined, Appellants are simply not bound by the Agreement. *Benjamin*, 432 Fed. Appx. at 98; *Benjamin*, 267 F.R.D at 463.

21

## C.  The District Court Did Not Abuse Its Discretion In
### Denying Appellants' Motions to Intervene.

Appellants also challenge the district court's denial of their motions to intervene for the purpose of objecting to the Agreement.   App. Br. at 54.   To intervene as a matter of right under Federal Rule of Civil Procedure 24(a), the moving party must show, *inter alia,* that:  (1) his application is timely; (2) he has a "sufficient interest" in the litigation; and (3) there is a threat that his interest will be impaired or affected by the disposition of the underlying action. *Liberty Mutual Ins. Co. v. Treesdale, Inc.*, 419 F.3d 216, 220 (3d Cir. 2005).  The district court did not abuse its discretion in denying Appellants' intervention motions.[4]

Appellants' intervention motions filed in July and August 2011 were timely to the extent that they sought to object to the terms of the Agreement. Their motions were untimely, however, to the extent that they sought to challenge the class certification ruling entered in September 2009.  In assessing the timeliness of a motion to intervene, the Court can consider:  (1) the stage of the proceedings when the movant seeks to intervene; (2) the prejudice that resultant delay may cause other parties; and (3) the reason for the delay.   *See Mountain Top*

---

[4] Appellants also failed to comply with Rule 24(c)'s requirement to include "pleadings" with their intervention motions.  Their "Objections" are not pleadings. *See* Fed. R. Civ. P. 7(a); *see also Gaskin ex rel. Gaskin v. Pennsylvania*, 197 Fed. Appx. 141, 143-44 (3d Cir. 2006) (non-precedential) ("rambling objections" do not meet the minimal standard for a proper pleading under Rule 24(c)).

*Condominium Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 369 (3d Cir. 1995).

Appellants filed their intervention motions to challenge class certification in the summer of 2011 – nearly two years after the district court certified the class and six months after the district court entered summary judgment. Appellants waited until the virtual eve of the fairness hearing to seek to intervene to contest class certification. Allowing Appellants to intervene to contest class certification at this exceedingly late stage would be highly disruptive and prejudicial to the parties and the district court which, respectively, litigated and decided this case with the understanding that there was a properly certified class. Finally, Appellants have presented no conceivably legitimate reason for their delay.

The court assesses delay from the time that the Appellants knew or should have known of the alleged risk to their rights. *Mountain Top Condominium Ass'n*, 72 F.3d at 370. The Springstead Group's prior intervention in October 2009 – where they explicitly raised objections to the class definition – demonstrates that they were aware of the class certification ruling. Ms. Solano knew about that ruling at least at the time she filed her *amicus* brief in support of the Springstead

Group in August 2010.    Accordingly, Appellants' motions to intervene to challenge the class certification ruling were plainly untimely.[5]

Appellants also cannot establish that they have a sufficient interest that will be jeopardized by the Agreement to justify intervention as of right.    Such an interest must be one that is "significantly protectable."    *Kleissler v. United States Forest Service*, 157 F.3d 964, 969 (3d Cir. 1998). The interest must be direct, not remote, and must be "directly affected in a substantially concrete fashion by the relief sought."    *Id*. at 972.    Even if Appellants have a significantly protectable legal interest in this action, intervention would be warranted only if they can show that such interest "'is in jeopardy.'"    *Liberty Mutual Ins. Co.*, 419 F.3d at 226 (citation omitted).    "'It is not sufficient that the claim be incidentally affected; rather, there must be a *tangible threat* to the applicant's *legal* interest.'" *Id.* at 226-27 (emphases added; citation omitted).

The sole interest that Appellants assert to support their intervention as of right is their "need to be sure that the procedures governing relocation, which

_____

[5]    *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009), and *In re Prudential Ins. Co. Sales Prac. Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999), on which Appellants rely, App. Br. at 29-30, are unavailing to salvage the timeliness of their class certification challenge. In both cases, this Court addressed whether settlement classes were appropriately certified, and the first opportunity to contest certification had arisen at the fairness hearing.    *See Ins. Brokerage*, 579 F.3d at 252; *Prudential*, 148 F.3d at 294. Neither case stands for the proposition that a party may contest class certification at a fairness hearing conducted almost two years after the class was certified.

would apply to Appellants if they decided to move, were appropriate." App. Br. at 52.[6]   Both the class definition and the Agreement specifically assure that Appellants' wards and relatives will not be discharged because Appellants oppose community placement.  As such, their purported "interest" in relocation procedures is not merely remote, it is non-existent.  Even if it is a "significantly protectable" interest, it is not jeopardized by the Agreement because, again, Appellants' relatives and wards will not be discharged as long as Appellants oppose community placement.   Just as the district court and this Court held that Appellants' exclusion from the class meant that any interest in remaining in the state ICFs/MR was not jeopardized by the litigation, *Benjamin*, 432 Fed. Appx. at 98; *Benjamin*, 267 F.R.D. at 462-63, so, too, Appellants' exclusion from the class and the Agreement's discharge provisions mean that they have no interest that can be jeopardized by the Agreement's relocation provisions.

The decision in *Harris v. Pernsley*, 820 F.2d 592 (3d Cir.), *cert. denied*, 484 U.S. 947 (1987), to which Appellants point as authorizing "limited intervention," App. Br. at 53, does not warrant a different result.  In that case, this Court upheld the district court's ruling that denied the district attorney's motion to intervene to

---

[6]    In their motions to intervene, Appellants asserted other "interests." Appellants' failure to raise those interests in their initial Brief constitutes a waiver of those arguments.  *See U.S. v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005), *cert. denied*, 546 U.S. 1137 (2006).

challenge a consent decree in a prison overcrowding case. *Id.* at 596-603. The district court had denied limited intervention but allowed the district attorney to present his objections to the consent decree both in writing and at the fairness hearing. *Id.* at 595. The district court's decision to do precisely the same thing here was not an abuse of discretion.

### D.  Since They Are Not Parties, Appellants Cannot Challenge the District Court's Class Certification Ruling or Approval of the Agreement.

Only "parties" are permitted to appeal an adverse judgment. *See* Fed. R. App. P. 3(c)(1); *Marino v. Ortiz*, 484 U.S. 301, 304 (1988) (per curiam); *Gautreaux*, 475 F.3d at 850; *AAL High Yield Bond Fund*, 361 F.3d at 1309. While absent class members need not intervene to appeal, *Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002), individuals who are not class members must intervene to challenge a certification ruling or object to a class settlement. *See In re Fine Paper Antitrust Litig.*, 695 F.2d at 499; *AAL High Yield Bond Fund*, 361 F.3d at 1309. Appellants are not class members, and the district court properly denied their intervention motions. As such, they stand "as strangers to the class" and are not parties who can appeal the district court's rulings certifying the class and approving the Agreement. *See In re Antitrust Litig.*, 695 F.2d at 499.[7]

---

[7]    Appellants' participation in the fairness hearing does not confer party status on them to allow them to appeal the challenged rulings. In *Harris*, this

26

## II. ASSUMING *ARGUENDO* THAT THIS COURT DETERMINES THAT APPELLANTS ARE PARTIES WHO CAN APPEAL THE DISTRICT COURT'S RULINGS, THE DISTRICT COURT'S DECISION TO CERTIFY THE CLASS SHOULD BE AFFIRMED.

### A. Standard of Review

The Court of Appeals reviews a class certification order only to determine if the district court abused its discretion, which occurs if the "'decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 256 (citation omitted).

### B. This Court's Prior Endorsement of the Class Certification Ruling Is the Law of the Case.

Appellants previously urged this Court to allow intervention based on the impropriety of the class definition – including its purported lack of cohesion, its alleged subjectiveness, and the predominance of individual issues relating to propriety of community services and opposition – and argued that the class should be decertified. *See* Springstead Br. at 25-28 & n.3 (JA1142-45); Springstead Reply Br. at 5-7 (JA1164-66); Solano Br. at 9-17 (JA1195-1203); Solano Post-Argument Br. at 4-6 (JA1220-22); App. Tr. at 33-35, 53-54 (JA1307-08, JA1312-13). In

---

Court did not entertain the district attorney's substantive challenges to the decree after it upheld the denial of the district attorney's intervention motion, although the district court had permitted the district attorney to present his objections in writing and at the hearing. 820 F.2d at 603.

holding that Appellants did not have a right to intervene, this Court rejected their assertions that the alleged flaws in the class definition created an interest that justified intervention as a matter of right. *Benjamin,* 432 Fed. Appx. at 98 n.3.

Appellants again challenge the propriety of class certification. Since this issue has already been litigated and rejected by this Court, the law of the case doctrine bars Appellants from now re-asserting this argument in this appeal absent extraordinary circumstances. No such circumstances exist. The class definition is identical to the definition previously challenged by Appellants in this Court, and no other change has intervened to warrant this Court's reassessment of this issue.

### C. The District Court Did Not Abuse Its Discretion in Certifying the Class.

### 1. Integration Mandate Cases Should Generally Be Pursued As Class Actions.

The Supreme Court and this Court's rulings favor class certification in integration mandate cases. In *Olmstead v. L.C.*, 527 U.S. 581 (1999), which held that the ADA bars unnecessary institutionalization, the Court expressed concern that individual actions might result in queue-jumping. *Id.* at 606.[8] This Court, implementing *Olmstead*, required states to adopt viable integration plans.

---

[8] Appellants stress that *Olmstead* was an individual lawsuit, not a class action. App. Br. at 41 n.7. It was the individual nature of the litigation, however, that generated the Court's concern that individuals might commence litigation to displace persons ahead of them on a waiting list. *Olmstead*, 527 U.S. at 606. Class claims avoid queue-jumping as an issue.

*Frederick L. v. Dep't of Public Welfare*, 422 F.3d 151, 160 (3d Cir. 2005). By acknowledging the need to provide a wide-ranging remedy for all persons who are unnecessarily institutionalized and not opposed to discharge, the courts anticipate that class actions will be an appropriate vehicle in integration mandate cases.

Even by their own calculation, truncated as it is, Appellants concede that there are over 100 state ICF/MR residents whose rights under the ADA have been violated, as determined by the district court. App. Br. at 48-49. Such a large number of individuals should be able to seek class relief. *Cf. Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (numerosity satisfied if there are at least 40 class members), *cert. denied*, 536 U.S. 958 (2002). As discussed in the following sub-sections, Appellants cannot demonstrate, however many reasons they may offer, that the district court abused its discretion in certifying this integration mandate case to proceed as a class action.

### 2.  The Class Definition Is Not Indefinite.

Appellants challenge the class definition on the basis that it is "far from definite." App. Br. at 31. Specifically, Appellants contend that to ascertain who is in the class would require the court to determine:  (1) whether a state ICF/MR resident could be served in the community with appropriate services; and (2) whether a state ICF/MR resident opposes community placement. App. Br. at 31-36. Neither contention has merit.

The class definition did not require the district court to ascertain which state ICF/MR residents are appropriate for discharge. The uncontested evidence demonstrated that *all* state ICF/MR residents can live in the community if they receive appropriate services and supports. *See* Am. Compl. & Answer ¶¶ 65, 68 (JA91-92, JA185); Pls.' SUF & Defs.' Resp. ## 43-47 (JA303-04, JA365); Tr. at 82-83 (JA1420-21). While Appellants contend that "[a]ctual evidence" would have shown this to be untrue, App. Br. at 31, the district court had "actual evidence" and no contrary evidence – despite Appellants' opportunity to cross-examine DPW witnesses on this issue at the fairness hearing.

Neither was the class definition improper because it was based on whether state ICF/MR residents oppose community placement. Appellants' contention that most state ICF/MR residents cannot express a preference and have no substitute decision-makers because they have no guardians, App. Br. at 32, disregards the fact that the Agreement permits involved family members to make decisions on discharge for state ICF/MR residents who do not express a preference for discharge. Agreement § III.2.b (JA1104). Over 80 percent of state ICF/MR residents have either guardians or involved family who can make those decisions. Exh. 13 to Pls.' Summary Judgment Motion (JA280); *see also* Tr. at 60 (JA1398). For those individuals who cannot express a preference and have no involved

family or guardians, DPW is the appropriate decision-maker.  *See* discussion, *infra*, at 58-59.

Appellants also assert that the class definition is flawed because it is "difficult" to decide whether to choose community placement.  App. Br. at 33-35. On the one hand, Appellants criticize the definition for allowing individuals to change their minds, yet, on the other hand, they complain that the decision is complex and may need to change in the future.  The class definition – and the process used by the Agreement to assess opposition – is not amorphous.  Indeed, Appellants and other opponents were readily able to express their opposition, and their decisions have been respected.  Their relatives or wards are not class members and will not be discharged.

Appellants' challenge to the class definition's "not opposed" criterion because it is "subjective," App. Br. at 32, is legally unsound as well.  While courts have held that there must be an "'identifiable class,'" this "standard ... is not demanding.  It is designed only to prevent the certification of a class whose membership is truly indeterminable."  *Gortat v. Capala Bros., Inc.,* Civil Action No. 07-CV-3629 (ILG), 2010 WL 1423018 at *2 (E.D.N.Y. Apr. 9, 2010).  All class members need not be ascertainable at the beginning of the lawsuit as long as the court can "'ascertain the general boundaries of the proposed class.'"  *Id.* (citation omitted); *accord* 7A Charles A. Wright, *et al.*, *Federal Practice &*

*Procedure* § 1760 at 136-37 (3d ed. 2005) (collecting cases). The class definition in this case sufficiently and concretely describes the parameters for membership. While some class members may be added and some dropped during the course of the litigation, this cannot defeat class certification. *Id.* at 139 & n.8.

Moreover, the class definition in this case is supported by *Olmstead* and its progeny. *Olmstead* held that the integration mandate does not require the provision of community services to institutionalized persons who are opposed to discharge. *Olmstead*, 587 U.S. at 602. Such individuals, therefore, must be excluded from the class definition and any relief afforded by an integration mandate lawsuit, which is precisely what the parties and the district court did in this case. In this respect, therefore, this definition differs markedly from that deemed inadequate by this Court in *Chiang v. Veneman*, 385 F.3d 256, 271-72 (3d Cir. 2004), where the class was defined based on whether individuals believed they had been subject to discrimination. Here, the question is not whether class members believe their rights have been violated – a legal conclusion – but whether they oppose community placement, a factual decision that is well within their or their family members' or guardians' capacity to make. *Cf. Zeisel v. Diamond Foods, Inc.*, Civil Action No. 10-01192 JSW, 2011 WL 2221113 at *6 (N.D. Cal. June 7, 2011) (where definition includes objective characteristics that permit consumer to identify himself as member of class, definition is adequate).

The *Olmstead* Court did not explain what constitutes "opposition" to community placement. At minimum, individuals with disabilities and their involved families or guardians must be able to make *informed* choices. *See* HCFA, *Developing Comprehensive Effectively Working Plans – Initial Technical Assistance Recommendations* at 8 (Jan. 14, 2000), *available at* http://www.cms.gov/smdl/downloads/smd011400c.pdf. Although some individuals, families, and guardians, like Appellants, might have all the information they need to make an informed decision about community placement, many others do not. State ICF/MR residents and their involved families or guardians should be provided with "accurate information and a meaningful choice" about community options before they are definitively determined to be opposed to discharge. *See Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 267 (E.D.N.Y. 2009), *app. pending*. This includes comprehensive education about community services as well as the opportunity to visit specific community placements. *See Disability Advocates, Inc. v. Paterson*, Civil Action No. 03-CV-3209, 2010 WL 786657 at *3 (E.D.N.Y. Mar. 1, 2010) (agreeing in integration mandate case that it was appropriate to provide unnecessarily segregated individuals with information about community placement in comprehensive, in-depth, multi-faceted manner to assess their opposition to discharge), *app. pending; Messier v. Southbury Training School*, 562 F. Supp. 2d 294, 333, 337-38 (D. Conn. 2008) (emphasizing need to

make informed decisions about discharge).   The Agreement provides precisely such opportunities for state ICF/MR residents, their families, and their guardians to explore community alternatives so they can make informed decisions.   Agreement § IV (JA1105-07).   Accordingly, it is appropriate that the class definition permits the "process of assessing choice" to be continuous rather than frozen at a single point in time.   *See Messier*, 562 F. Supp. 2d at 340.

The Seventh Circuit implicitly recognized the legitimacy of a virtually identical class definition.   *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773-74 (7th Cir. 2007).   The plaintiffs in *Ligas*, individuals with developmental disabilities, brought a class action lawsuit under the ADA's integration mandate to challenge their unnecessary institutionalization.   The district court in *Ligas* certified a class similar to the one in this case, consisting of Illinois residents with intellectual or other developmental disabilities who: lived in privately-run institutions or were at risk of institutionalization; qualified for long-term care; could live in the community with appropriate supports and services; and "*would not oppose community placement*." *Ligas ex rel. Foster v. Maram*, Civil Action No. 1:05-cv-4331, 2006 WL 644474 at *5 (N.D. Ill. Mar. 7, 2006) (emphasis added).[9]   In rejecting intervention by family members of institutional residents who

---

[9]   It appears that at some point prior to its certification of the class and the appeal of the intervention motion, the district court dismissed a previously-

opposed community placement, the court emphasized that those individuals' interests would not be jeopardized by the litigation because the class definition excluded them from the class. *Ligas*, 478 F.3d at 773-74. By emphasizing the class definition's protection of would-be intervenors, the appellate court implicitly endorsed that definition.[10]

### 3. The Class Definition Does Not Include an Opt-Out Provision, But It Would Not Be Improper Even If It Did.

Appellants contend that the class definition is fatally flawed because it includes an opt-out provision, which they say is barred in cases, such as this, certified pursuant to Rule 23(b)(2). App. Br. at 36-40. Appellants' argument is unsound factually and legally.

First and foremost, the class definition does not include an "opt out" provision. As this Court has previously recognized, the class is defined to exclude individuals, such as Appellants, who oppose discharge. *Benjamin*, 432 Fed. Appx. at 98 & n.3. As defined, the class does not include them and give them the right to opt out. Appellants' distorted interpretation of the class definition does not change

---

proposed class definition and "instruct[ed] ... the plaintiffs to ensure that parties such as [the proposed intervenors who were opposed to community placement] not be included in a future request to certify a class ...." *Ligas*, 478 F.3d at 776.

[10]  While the Seventh Circuit declined to adjudicate the propriety of the class definition, it observed that the exclusion from the class of individuals opposed to discharge "is taken verbatim from the Supreme Court's controlling precedent." *Ligas*, 478 F.3d at 775.

this fact.  For this simple reason, the Court should reject Appellants' argument that the definition improperly confers opt-out rights.

Second, even if the class definition in this case could be construed to confer opt-out rights on those who want to be excluded, such a definition would not be invalid.  Contrary to Appellants' contention that "participation in a class under Rule 23(b)(2) is mandatory," App. Br. at 36, Rule 23(d) permits courts to authorize notice (as was provided to  state ICF/MR residents, their families, and their guardians in this case) and allow individuals to opt out in Rule 23(b)(2) cases.  *See In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir.), *cert. denied*, 543 U.S. 870 (2004).  The decisions cited by Appellants are not to the contrary.  Both *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2558-59 (2011), and *Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393-95 (3d Cir. 1981), simply state that notice and opt-out rights are not required in Rule 23(b)(2) actions – not that they are prohibited.  In fact, in *Kyriazi* this Court affirmed the opt-out rights of class members in a "hybrid" Rule 23(b)(2) action.  *Kyriazi*, 647 F.2d at 395.

Third, Appellants' contention that the class should have been defined to include all state ICF/MR residents to guarantee the "right to ... institutional ... care" for those who desire to stay in the state ICFs/MR, App. Br. at 37, is riddled with

flaws.[11]  Appellants' premise – that they have a right to remain in the institution of their choice – is legally unsupportable.  *See* discussion, *infra,* at 69-71.  Even if the premise were tenable, the Agreement does not require DPW to compel any state ICF/MR resident to be discharged or even transferred to another facility and, thus, any claims to enforce a purported right to institutional care are at best unripe and non-justiciable.  In addition, as this Court recognized, since they are excluded from the class and therefore not bound by this litigation, Appellants can bring their own lawsuit in the unlikely event that DPW would take action that would jeopardize their alleged right to institutional care.  *Benjamin,* 432 Fed. Appx. at 98.  There is no reason for such claims to be part of this case.

Fourth, Appellants' criticism of the alleged inclusion of opt-out rights in the definition appears to stem from their contention that, "[i]n a normal Rule 23(b)(2) class without opt-outs, all class members would have an unquestionable right to object and be heard."  App. Br. at 38.  Of course, this disregards the detailed notice concerning the Agreement that all state ICF/MR residents, their families, and their guardians received, which apprised them of their opportunity to submit objections or comments and attend the fairness hearing.  (Docket 257, 263).  Indeed, the district court afforded Appellants the opportunity to cross-examine witnesses and

---

[11]  It also stands in stark contrast to Appellant Solano's prior representation to this Court that "a class could not be certified here."  App. Tr. at 34 (JA1308).

present argument at the hearing, in addition to considering their written submissions.  Aug. 16, 2011 Order at 3 (JA35).

Finally, Appellants – apparently conceding that the class does not include an opt-out provision – criticize the definition because it does not allow opt-out rights for individuals who cannot express a preference.  App. Br. at 39-40.  As discussed, *infra*, at 55-61, the Agreement's treatment of individuals who cannot express a preference is not contrary to law, and thus neither is the class definition.

### 4.  <u>The Class Is Sufficiently Cohesive.</u>

Appellants also challenge the class as insufficiently cohesive to justify certification.  App. Br. at 40-45.  "Although Rule 23(b)(2) classes need not meet the additional predominance and superiority requirements of Rule 23(b)(3), 'it is well established that the class claims must be cohesive.'"  *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 263-64 (3d Cir. 2011) (citation omitted).  The key question in determining whether a class is cohesive is "'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or none of them.'"  *Id.* (citation omitted).[12]

---

[12]    Appellants erroneously contend that Plaintiffs in this Rule 23(b)(2) class had an obligation to demonstrate a predominance of common issues and cohesiveness.  App. Br. at 40-41.  As to predominance, this is a Rule 23(b)(3) requirement that *Gates* plainly stated need not be met in a Rule 23(b)(2) action.  *Gates*, 655

As the district court correctly determined in certifying the class, this case readily meets the requirement of Rule 23(b)(2), Sept. 2, 2009 Order ¶ I.b (JA38), and, thus, satisfies the cohesiveness element. The district court reiterated its finding of cohesiveness in approving the Agreement. Mem. at 13 n.4 (JA19). The district court did not abuse its discretion in reaching that conclusion. Plaintiffs sought an injunction that would require DPW to offer community services to all state ICF/MR residents who were appropriate for and not opposed to discharge. The class – as defined – would allow the district court to consider the lawfulness of DPW's conduct as to the entire class and, if appropriate, to enter an injunction that applied to all members of the class. The district court's entry of a liability judgment for Plaintiffs and the class precludes any debate on this question here.

An examination of the underlying bases for cohesiveness in a Rule 23(b)(2) action further demonstrates the cohesiveness of this class. This Court has identified two reasons that a Rule 23(b)(2) class must be cohesive: (1) unfairness of binding absent class members to a potentially negative judgment when they

---

F.3d at 263-64. As for cohesiveness, as defined by this Court in *Gates*, 655 F.3d at 264, it is simply a question of whether the Rule 23(b)(2) standard is met, *i.e.*, whether a defendant acted or refused to act on grounds generally applicable to the class so as to make declaratory and injunctive relief appropriate. Plaintiffs addressed this element in their class brief, Brief at 14-15 (JA162-63), and the district court determined that the standard was satisfied. Sept. 2, 2009 Order ¶ I.b (JA38).

have no opportunity to opt out; and (2) unmanageability of litigation in which individual issues arise consistently. *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999).

Unmanageability certainly was not a problem in this case. The parties litigated this case in an efficient manner, yielding a liability judgment and a settlement that required no judicial involvement to identify class members. *Cf. D.G. ex rel. Stricklin v. DeVaughn*, 594 F.3d 1188, 1199-1200 (10th Cir. 2010) (class of foster children was cohesive, since injunction could run to entire class without differentiating between class members). Appellants' efforts to raise potential individualized issues among class members such as the ability to live in the community, App. Br. at 42-43, do not undermine the fact that this case has indeed been manageable.[13] That different class members need differing arrays of community services does not undermine the cohesiveness of class treatment. Cohesiveness focuses on the ability to grant declaratory and injunctive relief for all class members. This has been established by the district court's entry of such relief through both its liability judgment and approval of the Agreement that provides class-wide relief.

---

[13] Appellants' argument on this point also ignores the uncontroverted evidence that services can be developed to support all state ICF/MR residents in the community. *See, e.g.,* Tr. at 82-83 (JA1420-21).

40

Indeed, the district court's conclusion that this action presents a cohesive class accords with this Court's statement that "it is generally recognized that civil rights actions seeking relief on behalf of classes ... normally meet the requirements of Rule 23(b)(2)." *Stewart v. Abraham,* 275 F.3d at 228; *accord Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994). In *Baby Neal,* for instance, this Court held that the denial of Rule 23(b)(2) certification was an abuse of discretion in a case involving thousands of children in the custody of the Department of Human Services who alleged they had been subject to abuse or neglect and were subject to different types of injury. *Id.* at 64. The Court held that the district court "failed to give effect to the proper role of (b)(2) class actions in remedying systemic violations of basic rights of large and amorphous classes." *Id.* As in *Baby Neal*, Plaintiffs here alleged (and proved) a systemic failure that comparably injured all class members, making it appropriate for injunctive relief to effectuate institutional reform. *See id.*

This ADA case is far closer to *Baby Neal* than to the nationwide mass tort actions cited by Appellants to support their cohesiveness challenge. App. Br. at 40. Indeed, this Court has recently allowed certification of antitrust lawsuits that presented far more complex factual scenarios than that presented in this narrow litigation. *See Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 316-19 (3d Cir. 2011) (en banc), *petition for cert. filed*, 80 U.S.L.W. ____ (U.S. Mar. 8, 2012) (No.

41

11-1111); *Behrend v. Comcast Corp.,* 655 F.3d 182, 191-208 (3d Cir. 2011), *petition for cert. filed*, 80 U.S.L.W. 3442 (U.S. Jan. 11, 2012) (Nos. 11-864, 11A534).

### 5.  The Class Satisfies the Rule 23(a) Requirements of Commonality, Typicality, and Adequacy of Representation.

### (a)  Commonality

Appellants' reliance on *Wal-Mart* to establish that Plaintiffs do not meet the "commonality" criterion of Rule 23(a)(2) (which Appellants merge with the cohesiveness criterion of Rule 23 (b)(2)), App. Br. at 44-45, is likewise flawed.  To satisfy the commonality requirement, class claims must depend upon a "common contention."  *Wal-Mart,* 131 S. Ct. at 2551.  The common contention "must be of such a nature that it is capable of classwide resolution – which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*   As this Court recently noted, *Wal-Mart* focuses on "whether the defendant's conduct was common as to all of the class members ...." *Sullivan,* 667 F.3d at 299.

The Supreme Court in *Wal-Mart* acknowledged that for purposes of Rule 23(a)(2), "'[e]ven a single [common] question' will do[.]"  *Wal-Mart,* 131 S. Ct. at 2556.  This fully accords with this Court's recognition that "the commonality standard of Rule 23(a)(2) is not a high bar:  it does not require identical claims or facts among class members, as the ʿcommonality requirement will be satisfied if

42

the named plaintiffs share at least one question of law or fact with the grievances of the prospective class.'" *Chiang*, 385 F.3d at 265 (citation omitted); *accord In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 264; *Baby Neal,* 43 F.3d at 56.  In *Baby Neal*, for instance, this Court held that commonality was established in a case filed on behalf of thousands of children in state custody who challenged widespread constitutional and statutory violations even though plaintiffs and class members all suffered injuries of varying nature and degree.  *Baby Neal*, 43 F.3d at 60-62. "[A]ll of the plaintiffs seek to force [the defendant] to comply with statutory mandates, and all of their injuries alleged here would be cured if [the defendant] remedied the systemic deficiencies. ... Because the complaint does not seek damages, the factual differences are largely irrelevant." *Id.* at 61.

Here, the district court identified multiple common questions.  Sept. 2, 2009 Order ¶ I.a.ii (JA37-38).  These common questions, as *Wal-Mart* requires, focused on DPW's conduct, *i.e.*, whether it failed to offer community services to state ICF/MR residents and, if so, whether that failure violated the ADA and RA.  Thus, the district court did not abuse its discretion in finding commonality, as this case arose out of an across-the-board practice of DPW.  *See Benjamin*, 768 F. Supp. 2d at 755-57.

### (b)  Typicality

"Typicality entails an inquiry [into] whether 'the named Plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Baby Neal*, 43 F.3d at 57-58.  As this Court observed, cases that challenge "the same unlawful conduct which affects both the named plaintiffs and the putative class members usually satisfy the typicality requirement *irrespective of the varying fact patterns underlying the individual claims.* ...  Actions requesting declaratory and injunctive relief to remedy conduct directed at the class clearly fit this mold."  *Id.* at 58 (emphasis added); *accord Stewart*, 275 F.3d at 227.

Appellants assert that the named Plaintiffs are not typical of all class members because they reside in three of the five state ICFs/MR and because none is alleged to have "profound" mental retardation.  App. at 45-47.  These differences do not undermine the typicality of their claims.  The undisputed evidence demonstrated that the living situations of residents in all of the state ICFs/MR are more segregated than they would be in the community.  Pls.' SUF & Defs.' Resp. # 52 (JA305, JA365).  The undisputed evidence also demonstrated that all state ICF/MR residents regardless of their level of disability or individual needs can be provided with appropriate services and supports to live in the

community.[14]  Pls.' SUF & Defs.' Resp. ## 43-47 (JA303-04, JA365); Am. Compl.

& Answer. ¶¶ 65, 68 (JA91-92, JA185); Defs.' Response to Pls.' First Request for

Admissions ## 1, 1(a) (JA243-44); Tr. at 82-83 (JA1420-21).  Thus, the purported

differences are more imagined than real.[15]

More important, any such differences do not preclude a finding of typicality.

This Court has stressed that factual differences – "even relatively pronounced

factual differences" – "will generally not preclude a finding of typicality where

there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58.  Where a

lawsuit "challenges a policy or practice, the named plaintiffs suffering one specific

injury from the practice can represent a class suffering other injuries, so long as all

the injuries are shown to result from the practice." *Id.*  In *Baby Neal*, for instance,

the Court determined typicality to be satisfied in a case filed on behalf of a class of

children in state custody to challenge an array of constitutional and statutory

violations relating to Philadelphia's administration of its children and youth

system.  *Id.* at 63.  The court emphasized that the plaintiffs "attack a systemic

---

[14]    Appellants' premise also is factually inaccurate.  Plaintiff Beard is diagnosed with "profound" intellectual disability.  Community Placement Plan (JA272).

[15]    As they frequently do when they find the evidence inconvenient, Appellants simply claim that there is "no evidence" to support the assertion that all state ICF/MR residents are more segregated than if they lived in the community. App. Br. at 46.  Undisputed evidence is evidence.

failure ... to provide a broad range of legally mandated services.  At any one time, the plaintiffs do not suffer from precisely the same deficiency, but they are all alleged victims of the same systemic failures." *Id.*

The district court in this case thus did not abuse its discretion in finding that the named Plaintiffs' claims are typical of those of class members.  It concluded that Plaintiffs and class members all challenged precisely the same systemic failure, *i.e.*, DPW's failure to offer community services to state ICF/MR residents who are appropriate for and not opposed to discharge.  Neither the alleged differences among the institutional locations nor the class members' particular community service needs precluded the court from reaching that conclusion.

### (c)  Adequacy of Representation

Appellants apparently challenge Plaintiffs' adequacy of representation on the basis that they have a "conflict" with class members because they want to be discharged and other class members do not.  App. Br. at 47.  While Rule 23(a)(4) prohibits conflicts between class representatives and putative class members, *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004), no such conflict exists here because the class, as defined, does not include individuals, like Appellants, who oppose discharge.  Appellants' contention of a conflict based on the possibility that discharge of class members will lead to inadequate funding for those who remain in the state ICFs/MR, App. Br. at 47, is unpersuasive.  Rule

23(a)(4) looks at conflicts between the named representatives and class members – not between named representatives and non-class members.  Even if Appellants are class members, the evidence at the fairness hearing demonstrated that discharges will not adversely impact quality of care at the state ICFs/MR, Tr. at 43-44 (JA1381-82), which must continue to meet federal regulatory requirements.  *See* 42 C.F.R. §§ 483.400 *et seq*.  Moreover, as this Court previously instructed, if DPW somehow undermines Appellants' purported interest in institutional care, the answer is for Appellants to file their own lawsuit – not to decertify the class.  *See Benjamin*, 432 Fed. Appx. at 98.

### 6.  The District Court Complied With the Procedural Requirements for Class Certification.

Appellants contend that procedural deficiencies warrant rejection of class certification.  App. Br. at 48.  The certification order identified the class representatives and class counsel, defined the class, and stated that the entire case – which necessarily includes all claims and defenses – would proceed on behalf of the entire class.  Sept. 2, 2009 Order at ¶¶ II-IV (JA38-39).   The class certification order thus satisfied Rule 23(c)(1)'s requirements.  *See Sullivan*, 667 F.3d at 315.

Contrary to Appellants' contention, the district court was not required to conduct a hearing prior to certifying the class.  Rule 23 simply requires that "the district court must make whatever factual and legal inquiries *are necessary* and must consider all relevant evidence and arguments presented by the parties."  *In re*

47

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) (emphasis added); *see also* 7AA Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 1785 at 364 (3d ed. 2005) ("courts generally agree that there is no absolute requirement that a preliminary [class certification] hearing be held").  Judge Jones did what was required by Rule 23.   The court considered the submissions of Plaintiffs (JA103-64), which were uncontested, and made appropriate findings. Sept. 2, 2009 Order at ¶ I (JA36-38).  Given that Appellants have been unable to highlight a single substantive flaw in the district court's certification ruling, its decision to rule on class certification without a hearing plainly was not an abuse of discretion.

### III.  ASSUMING *ARGUENDO* THAT THIS COURT DETERMINES THAT APPELLANTS ARE PARTIES WHO CAN APPEAL THE DISTRICT COURT'S RULINGS, THE DISTRICT COURT'S APPROVAL OF THE AGREEMENT SHOULD BE AFFIRMED.

### A.  Standard of Review

This Court's role "'is to ascertain whether or not the trial judge clearly abused his or her discretion in approving or rejecting a [class action] settlement agreement.'"  *Sullivan*, 667 at 295; *accord Behrend*, 655 F.3d at 189.

## B. The District Court Carefully Evaluated
## All Appropriate Factors in Approving the Agreement.

Appellants' challenge to the district court's approval of the Agreement misconstrues the terms of the Agreement, ignores evidence of record, presents hypothetical scenarios unsupported by and, in fact, contradicted by the record, impugns the motives of the parties, and mischaracterizes the analysis of the district court. Far from failing to "properly perform its task" of evaluating the fairness of the Agreement, the district court recognized its obligation to act as a "fiduciary" to guard "the claims and rights of absent class members." Mem. at 8 (JA14). Consistent with that obligation, Judge Jones carefully evaluated the Agreement in light of the well-recognized standards and criteria developed by this Court. *Id.* at 8-16 (JA14-22).

Initially, the court held that a presumption of fairness was warranted. *Id.* at 8-9 (JA14-15). Judge Jones noted that the Agreement was the product of arms-length negotiations that occurred only after the conclusion of extensive fact and expert discovery; that "it is beyond peradventure that Plaintiffs' and Defendants' counsel are seasoned litigators with decades of combined experience in the subject matter"; and that "the number of objectors are a small fraction of the total population of the state ICFs/MR, and an infinitely smaller fraction of those who meet the strict definition of the class." *Id.* at 9 (JA15).

49

The court then examined each of the criteria identified by this Court in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), and its progeny. Mem. at 9-15 (JA15-21). Each of these criteria either weighed in favor of approval of the Agreement or was neutral; none favored rejection of the Agreement. *Id.*

Judge Jones determined that the first factor – complexity, expense, and likely duration of the litigation – favored approval. *Id.* at 10 (JA16). While liability had been determined, the court noted that an "extensive hearing" would be necessary if the district court were required to develop an injunctive remedy. *Id.* This would necessitate expenditure of further resources by the parties and the district court and would delay the potential for Plaintiffs and class members to receive community services. *Id.*

The second factor – reaction of the class – also favored approval. *Id.* at 10-11 (JA16-17). Judge Jones noted that the reaction of the class was "almost entirely favorable," since those who urged rejection of the Agreement were not class members because they opposed discharge. *Id.* at 11 (JA17).

Appellants contest this factual finding, arguing that the district court failed to give due weight to the "objections" filed on behalf of approximately 100 state ICF/MR residents. App. Br. at 49-50. As discussed, *supra,* at 20-21, however, the district court correctly concluded – as this Court had previously concluded – that persons opposed to community placement are not class members. Individuals who

are not class members, such as Appellants, have no standing to object to a proposed class action settlement. *See Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989), *cert. denied*, 493 U.S. 1058 (1990); *In re World Health Alternatives, Inc. Sec. Litig.*, No. 05-CV-1194, 2007 WL 1670180 at *1 (W.D. Pa. June 8, 2007); *In re Sunrise Sec. Litig.*, 131 F.R.D. 450, 459 (E.D. Pa. 1990); Fed. R. Civ. P. 23(e)(5). Accordingly, Judge Jones did not abuse his discretion in not counting the opponents' letters as "objections," since the authors oppose discharge on behalf of state ICF/MR residents and, thus, they do not represent class members.

Even if these opponents represent class members, their opposition is not so significant as to warrant rejection of the Agreement. *See Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (approving post-verdict settlement of class action, noting that only 29 of the 281 class members objected); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.) (rejecting contention that district court abused its discretion in approving class action settlement over objections of more than 20 percent of class members), *cert. denied*, 419 U.S. 900 (1974); *cf. Hawker v. Consovoy*, 198 F.R.D. 619, 628-31 (D.N.J. 2001) (rejecting objections by 250 class members, including named plaintiffs, where objections were based on misunderstanding of case and overly optimistic expectations and where Agreement conferred significant benefits).

Contrary to Appellants' contention, App. Br. at 50, Judge Jones did not fail to discuss the opponents' substantive objections. Judge Jones identified the primary objections – that opponents will be forced into community placements against their wishes, that some state ICF/MR residents will be discharged to community placements when they are unable to voice their opposition to discharge, and that the Agreement ultimately will result in the closure of the state ICFs/MR. Mem. at 7, 11 n.3 (JA13, JA17). Judge Jones explicitly addressed those objections on the merits. He determined that opponents' fears that their discharge decisions will be ignored were "misguided." *Id.* at 11 n.3 (JA17).

Indeed, the Agreement makes plain, and testimony at the fairness hearing confirmed, that opposition to discharge by residents, family members, and guardians will be respected. Agreement § III.2.b (JA1104); Tr. at 34, 39-40, 42-43 (JA1372, JA1377-78, JA1380-81). Because the Agreement does not call for the closure of any state ICFs/MR, Judge Jones correctly found that basis for opposition to be "pure speculation." Mem. at 11 n.3, 25-26 (JA17, JA31-32). As for the concern that those state ICF/MR residents who cannot express a preference and have no substitute decision-makers will be discharged, the district court plainly considered that issue but ultimately concluded that the Agreement was nonetheless "worthy of [its] approval." *Id.* at 15-16 (JA21-22).

Judge Jones determined that the third factor – the stage of proceedings and amount of discovery completed – likewise favored approval.  *Id.* at 11-12 (JA17-18).  The court noted that not only had the parties completed extensive discovery, including expert discovery, prior to negotiating the Agreement, but Plaintiffs secured a liability verdict on the strength of that discovery.  *Id.* at 12 (JA18).[16]

Judge Jones found that the risk of establishing liability was not a factor for or against the Agreement in light of the liability verdict, but he determined that the fifth factor relating to the risks of securing the requested relief favored approval of the Agreement.  Mem. at 12 (JA18).  The court explained that the "precise contours of any injunction that would be crafted by the Court are far from certain.  Indeed, it is our reluctance to impose a judge-made policy on Defendants which triggered the mediation" that resulted in the Agreement.  *Id.* at 12-13 (JA18-19).

The district court, notably, found that the risk of class decertification – the sixth factor – was "quite negligible."  *Id.* at 13 (JA19).

DPW's ability to withstand a greater judgment, the seventh factor, also weighed in favor of approval.  *Id.* at 13-14 (JA19-20).  Judge Jones expressed concern that "[a]ny relief designed by this Court – a body certainly far less well-versed in the intricacies and necessities of planning for community integration than

---

[16]    Although Appellants repeatedly cast aspersions on the caliber of the defense mounted by DPW, the district court disagreed, emphasizing the "length and development of this vigorously-contested litigation."  Mem. at 22 (JA28).

the parties – will almost necessarily result in much greater costs and budgetary burdens on DPW and the Commonwealth." *Id.* at 14 (JA20).

The final factors – the range of reasonableness in light of the best possible recovery and the attendant risks of litigation – also favored approval. *Id.* at 14-15 (JA20-21). The Agreement conferred on Plaintiffs and the class "the benefits they sought – the opportunity to have a reasonable prospect of discharge from institutionalization." *Id.* at 14 (JA20). The Agreement developed a "reasoned plan" for community placement "that is rationally measured in scope, duration, and cost." *Id.* Rejection of the Agreement would simply require the Court to conduct a hearing and force on the parties an injunction that might further delay resolution of the litigation, drain the resources of the Commonwealth, and delay access to community placements. *Id.* at 14-15 (JA20-21).

Given the district court's careful analysis of each of the relevant factors, this Court certainly cannot conclude that the district court abused its discretion in approving the Agreement.

## C. Appellants' Objections Are Inadequate to Establish an Abuse of Discretion.

Ignoring the district court's assessment of the *Girsh* factors, Appellants instead posit a number of disputes with the structure of the Agreement and the process to implement it, ultimately revealing their primary concern, *i.e.*, that provision of community placements for class members might result in the closure

of one or more of the state ICFs/MR.  App. Br. at 55-69.  None of Appellants'
purported concerns demonstrates that the district court abused its discretion in
approving the Agreement.

### 1. The Agreement Is Not Inappropriate Because It Permits Community Placement for State ICF/MR Residents Who Cannot Express a Preference and Have No Involved Family or Guardians.

Appellants contend that the district court should have rejected the
Agreement because it authorizes community placements for state ICF/MR
residents who are unable to express a preference and who have no involved family
or guardians to act as their substitute decision-makers.  App. Br. at 55-60.
Appellants concede that they "are not in this group."  App. at 57.  Appellants insist,
however, that they *may* be in that group if:  (1) the family members or guardians
die, or (2) the family members or guardians cannot be contacted during annual
updates.  Again, these concerns are illusory.

Pennsylvania law allows persons who are court-appointed guardians to
identify successor guardians.  *See* 20 Pa. Cons. Stat. Ann. § 5514.  Since involved
family members are authorized to make decisions under the Agreement, the family
can even more simply designate another relative as the involved family member. A
state ICF/MR resident who has involved family or a guardian will not be placed on
the Planning List due to inability to contact the family or guardian until DPW has
made three failed attempts to contact the person by telephone and thereafter

receives no response to a certified letter. Assessment Protocol at 2 & Sample Letter (JA1498, JA1504).

Even if the Court were to overlook the illusory nature of Appellants' concern, their objection is not well-founded. *Olmstead* does not confer on individuals the "right to remain in institutional facilities unless they *choose* to move elsewhere," as Appellants assert. App. Br. at 56 (emphasis added). Instead, the relevant inquiry in *Olmstead* is whether community placement is "*opposed* by the affected individual ...." *Olmstead,* 521 U.S. at 587 (emphasis added). *Olmstead* simply did not address the situation of individuals who are unable, due to their disabilities, to express a preference either for or against discharge and who have no involved family or guardians.

In those situations in which the state ICF/MR resident's preference cannot be determined and the resident has no involved family or guardian, the Agreement properly allows for community placement. Appellants' opposition to placing these residents on the Planning List is premised solely on the transference of their own objections to community placement to other state ICF/MR residents, complaining that they will be "evicted" or "wrenched" from their "homes." App. Br. at 56, 58. Yet, Appellants have offered the Court no basis on which to presume that residents who cannot express a preference want to remain in the state ICFs/MR any more

than a basis on which to presume that those same residents are not happy to live in the community after decades of institutionalization.

Indeed, the evidence demonstrated that opposition by families to community placement does not equate to negative experiences by relatives who are discharged. *See* Pls.' SUF & Defs.' Resp. ## 70, 73 (JA309-10, JA366).   Family members (including *Amicus* Torisky) of residents of Western Center, a now-closed state ICF/MR, who were discharged to community programs filed a lawsuit to secure the right to return to state ICFs/MR.   They testified, however, that they had no complaints about those community services and did not want their family members returned to state institutions.   Defs.' Resp. to Pls.' First Request for Admissions # 8 (JA246).   This is not surprising.   As the Pennhurst Longitudinal Study found, "initial family opposition changes drastically to surprised and enthusiastic support of the [Community Living Arrangement] option," though families remained concerned about the permanence of placement.   James W. Conroy & Valerie J. Bradley, *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis* at 191 (Mar. 1, 1985), *available at* http://aspe.hhs.gov/daltcp/reports/5yrpenn.htm.

No preference either in favor of or opposed to discharge can or should be inferred for individuals who cannot communicate a preference and have no involved family or guardians.   Rather, the only relevant question under *Olmstead*

must be whether the "State's treatment professionals" have determined that the individual can be appropriately served in the community. *See Olmstead*, 527 U.S. at 587, 607. DPW has determined that state ICF/MR residents, with appropriate services and supports, can be fully served in the community. Pls.' Statement of Undisputed Facts & Defs.' Resp. ## 43-47 (JA303-04, JA365). Supported by the uncontroverted evidence presented at the fairness hearing, where the testimony demonstrated that community services can and will be developed to meet each resident's needs and that DPW will assure a careful transition to community placements. *see* Tr. at 82-83 (JA1420-21), this determination is embodied in the Agreement.

Even if opposition must somehow be assessed for persons who are not able to make a decision and have no involved family or guardians, the Agreement still properly allows those individuals to be discharged based on the consent of DPW. DPW routinely acts as the substitute decision-maker for individuals who cannot express a preference and have no involved family or guardians. Pennsylvania law confers the right to make such decisions – as well as decisions to grant leaves of absence or discharge residents – on DPW's Facility Directors. *See* 50 P.S. §§ 4417-4420. As such, DPW is the proper authority to determine whether such

individuals should be discharged, and its decisions are entitled to the same deference and respect as the Appellants' decisions on behalf of their relatives.[17]

Moreover, the provision of community placements for individuals who cannot express a preference and have no private substitute decision-makers accords with the policy of both the federal government and the Commonwealth. As the Supreme Court noted, "[t]he ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the benefits of community living." *Olmstead*, 527 U.S. at 599 (citing Developmental Disabilities Assistance and Bill of Rights Act and Rehabilitation Act). Congress in enacting the ADA "explicitly identified unjustified ʻsegregationʼ of persons with disabilities as a ʻfor[m] of discrimination.ʼ" *Id.* at 600 (quoting 42 U.S.C. § 12101(a)(2)). Accordingly, the *Olmstead* Court had little difficulty concluding that "unjustified institutional isolation of persons with disabilities is a form of discrimination ...." *Id.* The Commonwealth, too, has similarly embraced the policy of "normalization" in the provision of services to people with intellectual disabilities. *See* 55 Pa. Code

---

[17]    In their last appeal, Appellants expressed their fear that, when the family members or guardians die, their relatives would be at risk of community placement if they had no substitute decision-makers because they would be "wards of the State." The Court appeared skeptical of the position that the Commonwealth would be "an inadequate representative of the interests of mentally disabled folks," stating that "that would be a pretty dramatic position to take that you just can't trust the Commonwealth." Appellants conceded the point, stating that was not their position. App. Tr. at 22 (JA1305).

§ 6400.1. The preference for community placement is embodied in the law. The reflection of that preference in the Agreement is thus well within the realm of reason.[18]

Finally, Appellants fail to establish that the district court's slight reservation about the provision of community placements for such individuals reflects "abdication of [the court's] fiduciary responsibilities" and so an abuse of discretion. App. Br. at 59-60. To the contrary, it reflects a careful consideration of the Agreement in its totality and its benefits for the class as a whole. Mem. at 16 (JA22). Judge Jones explained:

> Our foremost duty ... is to consider the present posture of those individuals who brought this litigation to vindicate their legal rights. ... We are approving the Settlement Agreement to ensure that the integration mandates of the ADA and related laws are implemented and followed.

---

[18]     Appellants cannot support their contention that individuals will be subject to psychological harm and trauma. App. Br. at 58-59. As the Supreme Court recognized, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead*, 527 U.S. at 601. Institutionalization diminishes the richness of the lives of persons with even "profound" intellectual disabilities. As the Pennhurst Longitudinal Study demonstrated, institutionalized persons who moved to community living arrangements "became sharply less dependent" and "the people who seem to make the greatest gains in adaptive behavior tend to be those who start out lowest. That is, the people with the most severe impairments turn out to be those who benefit the most from community placement." *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis* at 187.

*Id.* at 25-26 (JA31-32).

Any doubt that the district court's reservation was minor was laid to rest by its more recent order denying Appellants' Motion for a Partial Stay. Rejecting Appellants' contention that the court's own remarks undermined its approval of the Agreement, Judge Jones wrote:

> [T]he language so heavily relied upon by the Objectors, where this Court expressed "serious doubt" as to the practicality and propriety of portions of the agreement's implementation procedures and protocol, was mere dicta, an inconsequential observation premised on the Court's receipt of copious information during the fairness hearing regarding implementation. Thus, ultimately, the quoted language does not impact our holding that the settlement agreement represents a fair, adequate, and reasonable disposition of the case.

Dec. 19, 2011 Order at 1-2 n.1 (Docket 297).

## 2. **The Agreement's Procedures Are Not Biased.**

Despite the district court's determination that the Agreement was fair, adequate, and reasonable – a determination it reiterated in denying Appellants' partial stay motion – Appellants insist that the court abused its discretion because a bias toward community placement "pervades the entire settlement." App. Br. at 60-62. No such bias exists.

First, Plaintiffs' attorneys do not participate in interviews of residents and their families and guardians. *See* App. Br. at 61. Rather, Facility Advocates who

are employed by the same organization as Plaintiffs' counsel and work at the state

ICFs/MR, Tr. at 63-64 (JA1401-02), take part in the interviews. Agreement §§

II.10, III.2.a (JA1102, JA1103). In accordance with the Agreement, the Facility

Advocates do not make the decision as to whether a resident will be placed on the

Planning List. Tr. at 71 (JA1409). They simply participate in the interviews of the

residents, families, and guardians *with* the CTSs, who are DPW employees,

following a standardized interview protocol, and the CTSs record the results. *See*

Tr. at 19, 21-22, 47, 65-71 (JA1357, JA1359-60, JA1385, JA1403-09). As the lead

Facility Advocate testified, the Facility Advocates in these interviews are generally

passive observers who occasionally provide input to answer questions or to correct

gross misunderstandings (such as that the Agreement requires institutional

closures). They do not offer opinions when people express opposition to closure

so as to influence their decisions, and they have no authority to decide whether a

resident will be placed on the Planning List. Tr. at 65-71 (JA1403-09).[19] The

---

[19] Appellants cite the short statement of Mr. Myers that the Facility
Advocate at White Haven Center "inserted her views" into the interview. App. Br.
at 61 (citing Tr. at 111 (JA1449)). The parties had no opportunity to cross-
examine Mr. Myers. Appellants' counsel, in contrast, did cross-examine the lead
Facility Advocate, Coleen Sassaman, whose testimony about the Advocates'
limited role remained unshaken. Distorting her testimony, Appellants assert that
Ms. Sassaman compared community living to a "vacation." App. Br. at 20, 61.
Ms. Sassaman testified that, since some ICF/MR units were called "communities,"
it was sometimes difficult for the residents – who have intellectual disabilities – to
understand what was meant by "community." To distinguish between the

Agreement provides that each Facility Director – also DPW employees – will make determinations if the interviewers cannot agree on whether the interviewee opposes discharge.  Agreement §§ II.11, III.2.c (JA1102, JA1104).

Second, again ignoring the testimony elicited at the fairness hearing, Appellants attack the Protocol's question concerning whether the resident wants to live closer to family as "cruel" and "misleading."  App. Br. at 61.  The testimony established that the purpose of this question is to assist the team in planning for the resident if the resident or his family or guardian wants a community placement and that the question would not be asked of residents who do not have family, Tr. at 48-50 (JA1386-88). Appellants' concerns are therefore unwarranted.

Finally, Appellants challenge the Agreement's provisions to offer opportunities for residents, families, and guardians to learn about community placement options.   App. Br. at 61-62.   It is well-established that obtaining information about community placement opportunities, particularly by visiting programs, is important for individuals to make an informed decision about whether

---

institutional ward (known internally as a "community") and living outside the institution, interviewers might tell residents that the outside "community" meant "where Boscov's is, where the mall is, where they take vacations ...." Tr. at 69 (JA1407).  On cross-examination, she explained that residents do "take vacations, they go to the beach, they go to the Poconos. They are very aware of what ´vacations´ mean."  *Id.* at 75 (JA1413).  At no time did she compare community living to being on a vacation, as Judge Jones plainly understood.  Tr. at 150-51 (JA1488-89).

to choose community placement.  Pls.' SUF & Defs.' Resp. ## 71-72 (JA309, JA366); *see also* discussion, *supra,* at 33.  Appellants made no effort during the fairness hearing to question DPW witnesses about the education opportunities, and thus have no evidentiary basis for their contentions that the information will be "one-sided" and "propaganda."  *Id.*  Under the Agreement, the Steering Committee will include a state ICF/MR resident, the family of a state ICF/MR resident, and a representative of DPW's Office of Developmental Programs.  Agreement § IV.1.a (JA1105).  Indeed, the family member who has been selected for the Committee is Appellant Bastek.  More to the point, the Agreement does not require that DPW compel people to participate in the education opportunities or prevent them from seeking information from alternative sources, including the first-hand knowledge of family members of persons already living in the community.  Agreement § IV.2 (JA1107).

### 3.  Class Members Are Protected After They Are Discharged.

Appellants contest the Agreement's failure to allow class members to return to the institutions at any time in the future after they are discharged.  App. Br. at 62-63.  In fact, class members may return to the state ICFs/MR within a 60-day trial period after their discharge.  Tr. at 96-97, 100 (JA1434-35, JA1438).  Together with the transition period before discharge, *see* Tr. at 87-88 (JA1425-26); Kuhno Decl. ¶ 14 (Docket 295-1), this is ample time to ascertain whether a

placement is appropriate for an individual.   Beyond that trial period, it is appropriate to treat class members like the tens of thousands of other individuals with intellectual disabilities who live in the community.   Under long-standing policy in place well before the Agreement was negotiated, DPW will not admit those individuals to state ICFs/MR without a court order.   Tr. at 97, 99 (JA1435, JA1437).

It certainly was not an abuse of discretion for the district court to approve the Agreement without allowing an open-ended right of return for class members. Under state law, only adults capable of consent can voluntarily be admitted to state ICFs/MR.   *See* 50 P.S. § 4402(a); DPW, Mental Retardation Bulletin # 99-81-51 at 1 (Dec. 1, 1981), *available at* http://www.temple.edu.thetraining partnership resources/mrBulletins.asp.   Parents and guardians do not have authority to authorize admission of adults to ICFs/MR.   *See* 50 P.S. § 4402(a); 20 Pa. Cons. Stat. Ann. § 5521(f)(1).   Absent the ability to consent, a court order is necessary. *See* 50 P.S. § 4406; 55 Pa. Code §§ 6250.1 *et seq.*; Mental Retardation Bulletin # 99-81-51 at 2-3.   As for those class members capable of consent, DPW has authority to control admissions to its ICFs/MR and has determined not to admit individuals without court orders, but nothing prevents individuals from seeking admission to private ICFs/MR if that is their choice.   *See* discussion, *infra*, at 70.

### 4. Appellants' Speculation That the Agreement Will "Depopulate" the State ICFs/MR Is Not a Valid Basis for Rejection of the Agreement.

After 63 pages of their Brief, Appellants reveal the goal of their entire effort to intervene in this case, to decertify the class, and to persuade the Court to reject the Agreement.[20]  Specifically, Appellants argue that the district court's approval of the Agreement was an abuse of discretion because it will "depopulate" the state ICFs/MR and result in the closure of one or more, App. Br. at 64-69, notwithstanding DPW testimony that no such closures are contemplated, under the Agreement or more generally.  Tr. at 59 (JA1397).[21]

---

[20]    Appellants' brief is replete with mischaracterizations of, and baseless charges about the motivations behind, the Agreement, to which Appellees have not responded in an effort to avoid burdening the Court.  In their zeal to persuade, however, Appellants have gone too far in leveling the unconscionable accusation that the Agreement "take[s] advantage of the residents' disabilities to depopulate the State Centers," App. Br. at 57, which Appellees cannot ignore.  The accusation, thoroughly unsubstantiated as it is, is patently false.

[21]    Despite testimony at the fairness hearing to the contrary, Tr. at 43-44 (JA1381-82), Appellants also assert that reduced financing of the state ICFs/MR might lead to reduced quality at those facilities and "compel" residents to move to the community.  App. Br. at 64.  To the extent that Appellants premise their fear of funding reductions at state ICFs/MR on the Agreement's provisions concerning funding for institutional and community programs, their concern reflects a misreading of the Agreement and is misguided.  Those provisions, Agreement §§ V.2.b-c (JA1108-09), are not mandatory and will not adversely impact funding for the state ICFs/MR so as to diminish the quality of care at those facilities.  Tr. at 13-15 (JA1351-53).  Indeed, DPW must still assure that federal health, safety, and treatment requirements are met at its ICFs/MR.  *See* 42 C.F.R. §§ 483.400 *et seq.* The district court did not abuse its discretion in rejecting Appellants' untenable

Although Appellants argue otherwise, App. Br. at 65, this Court has already rejected Appellants' concerns that the potential for state ICF/MR closures justifies Appellants' persistent efforts to involve themselves in this litigation.  In their prior appeal, Appellants vigorously asserted that intervention was required because the litigation – including the relief sought to provide community services to potentially hundreds of state ICF/MR residents – would likely result in the closure of the ICFs/MR.  Springstead Br. at 28-31 (JA1145-48); Springstead Reply Br. at 13-15 (JA1172-74); Solano Br. at 2, 7-8 (JA1188, JA1193-94); Solano Supp. Br. at 3-4 (JA1219-20); App. Tr. at 19-20 (JA1304).    Indeed, Appellant Solano's Supplemental Brief entailed extensive discussion of the ruling in *Ligas ex rel. Foster v. Maram*, Civil Action No. 1:05-cv-4331, 2010 WL 1418583 (N.D. Ill. Apr. 7, 2010) (*Ligas III*), Solano Supp. Br. at 3-4 (JA1219-20), that Appellants simply repeat in their current Brief, App. Br. at 67-68, to contend that intervention is warranted when competing claims on state resources might impact the financial viability of state institutions.[22]

---

suggestion that DPW would enter into an Agreement that would jeopardize its compliance with federal law.

[22]    Appellants misrepresent the history of the *Ligas* litigation.  There is no indication that anything the Court of Appeals for the Seventh Circuit said about the class definition led "the parties [to] remove[] the opt-out provision as part of the class settlement," as Appellants maintain.  App. Br. at 67.  The parties changed the class definition so that their proposed settlement would require *all* institutionalized

This Court squarely addressed this issue, explicitly holding that the potential closure of state ICFs/MR due to a reallocation of resources did not create an interest that justified intervention. *Benjamin*, 432 Fed. Appx. at 98-99. As Judge Stapleton explained:

> In virtually every suit successfully prosecuted against a government entity, the judgment will occasion some reallocation of limited public resources. Every competitor for those limited resources has an interest that may potentially be adversely affected by that reallocation. We have found no case, however, suggesting that the interest of such a competitor justifies intervention in litigation addressing issues in which he or she has no other interest.

*Id.* at 99. Instead, as this Court suggested, the appropriate recourse for Appellants "if DPW should threaten in the future to coerce them into leaving their current institutions" would be for them to file their own lawsuit to assert their purported right to remain in the institutions where they live. *Id.* at 98. In reaching these conclusions, the Court resoundingly rejected the arguments raised by Appellants that the lawsuit's potential impact on institutional closures justified intervention.

---

persons to accept community placement *regardless of their opposition*. It was this action that led to the thousands of objections and to the district court's decertification of the class and rejection of the settlement. *Ligas ex rel. Foster v. Maram*, Civil Action No. 1:05-cv-4331, slip op. (N.D. Ill. July 7, 2009) (JA170.1); *see also* App. Tr. at 27-28 (JA1306). The court's "previous experience" with those actions plainly influenced its subsequent decision to allow the family members to intervene. *Ligas III*, 2010 WL 1418583 at *4, *6.

While the Court's ruling addressed the Appellants' intervention motion, it carries equal weight in assessing the validity of Appellants' objections to the Agreement that are premised on precisely the same arguments. Although the terms of the Agreement could not have been known to the Court, App. Br. at 65, the Court was well aware of the relief that Plaintiffs had requested in their summary judgment motion, including the discharge of 100 residents per year. *Benjamin*, 432 Fed. Appx. at 96-97. The relief afforded by the Agreement is actually less extensive. Agreement § V.1 (JA1107-08). Accordingly, even apart from the absence of record evidence to support their speculative predictions, this Court's determination that the possibility that community placements might result in ICF/MR closures did not confer an interest on Appellants to justify intervention wholly undermines Appellants' assertion that the district court abused its discretion in approving the Agreement simply based on the very same possibility.

Ultimately, the legal underpinnings of Appellants' argument are fundamentally unsound. Appellants seemingly contend that the district court abused its discretion in approving the Agreement because the Agreement does not acknowledge and protect the "right" of state ICF/MR residents to remain in the institutions where they currently live. Neither the ADA nor the federal Medical Assistance statute that governs ICFs/MR confers such a right.

The ADA's integration mandate, as interpreted by *Olmstead*, does not confer on any state ICF/MR resident the right to institutional care. *See Richard C. ex rel. Kathy B. v. Houstoun*, 229 F.3d 1139, slip op. at 9 (3d Cir. 2000) (non-precedential) (JA1285) (*Olmstead* does not require states to provide institutional care); *Richard C. ex rel. Kathy B. v. Houstoun*, 196 F.R.D. 288, 292 (W.D. Pa. 1999) (same); *Richard C. ex rel. Kathy B. v. Snider*, Civil Action No. 89-2038, 1993 WL 757634 at *8 (W.D. Pa. June 22, 1993) ("the court has no authority to direct DPW to deliver services in any particular facility"), *aff'd mem.*, 31 F.3d 1173 (3d Cir. 1994) (Table). Appellants fail to cite a single authority to the contrary.

So, too, the federal Medical Assistance law does not confer on state ICF/MR residents the right to remain in a particular institution. Medical Assistance recipients, like Appellants, have a right to choose among qualified and willing providers of ICF/MR services. *See* 42 U.S.C. § 1396a(a)(23)(A); *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 785 (1980); *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273, 281 (5th Cir. 2008). This includes the many private ICFs/MR that are available in Pennsylvania. Pls.' SUF & Defs.' Resp. # 26 (JA300, JA365). Providers, though, have no obligation to participate in the Medical Assistance program. *Miller*, 547 F.3d at 281. Conversely, Medical Assistance recipients do not have a right to remain in the ICF/MR of their choice if

70

the provider is not qualified or willing to serve them.  *See O'Bannon*, 447 U.S. at 785.   Accordingly, DPW has no obligation under Medical Assistance law to continue to operate its state ICFs/MR.

Absent any right to remain in state institutions and given this Court's ruling that the hypothetical impact of this litigation on institutional closure did not give rise to an interest that warranted intervention by Appellants, Appellants cannot demonstrate that the district court abused its discretion in approving the Agreement.

## <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiffs-Appellees and Defendants-Appellees respectfully request that this Court affirm the district court's Orders denying Appellants' Motions for Intervention and approving the Settlement Agreement.

Respectfully submitted,


Dated:  April 3, 2012                    By:    /s/ *Robert W. Meek*
                                                Robert W. Meek
                                                Kelly Darr
                                                Robin Resnick
                                                Disability Rights Network
                                                  of Pennsylvania
                                                1315 Walnut Street, Suite 500
                                                Philadelphia, PA  19107-4705
                                                (215) 238-8070

                                                Counsel for Plaintiffs-Appellees


                                         By:    /s/ *Doris M. Leisch*
                                                Doris M. Leisch
                                                Deputy Chief Counsel
                                                Department of Public Welfare
                                                Office of General Counsel
                                                801 Market Street, Suite 6092
                                                Philadelphia, PA  19107
                                                (215) 560-2192

                                                Counsel for Defendants-Appellees

## COMBINED CERTIFICATIONS

I, Robert W. Meek, certify as follows:

1.      I am a member in good standing of the Bar of this Court.

2.      This Brief complies with this Court's March 7, 2012 Order permitting Appellees to file a consolidated brief of 17,000 words because it contains 16,851 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because (excluding the cover page) it has been prepared in a proportionally spaced typeface using Word 2010 in Times New Roman 14-point font.

3.      The text of the electronic brief is identical to the paper copies.  A virus detection program (Symantec Anti-Virus Corporate Edition v. 10.2.3.3000) was run on the file using the current virus definitions and no virus was detected.

4.      On April 3, 2012, the Consolidated Brief for Plaintiffs-Appellees and Defendants-Appellees was served on the following by first class mail, postage prepaid and by filing it with the Court's electronic case filing system:

Benjamin J. Hoffart, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019

Carl A. Solano, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103

Nancy Shane Rappaport, Esquire
DLA Piper LLP
1650 Market Street, Suite 4900
Philadelphia, PA  19103


Dated:  April 3, 2012          /s/ *Robert W. Meek*
                               Robert W. Meek