# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## Docket Nos. 11-3684 and 11-3685

---

## FRANKLIN BENJAMIN, *et al.,*
### Plaintiff - Appellees,

### vs.

## DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA, *et al.*,
### Defendants – Appellees.

## CRAIG SPRINGSTEAD, *et al.,*
### Appellants, No. 11-3684,

## DIANE SOLANO, by and through her brother and guardian, CARL SOLANO,
### Appellant, No. 11-3685.

---

**Appeal from the Order dated September 2, 2011, by the United States District Court for the Middle District of Pennsylvania, Civil Action No. 09-01182**

---

## BRIEF OF *AMICUS CURIAE*
## THE ARC OF PENNSYLVANIA IN SUPPORT OF APPELLEES' ARGUMENT FOR AFFIRMANCE
### (Filed by Consent Pursuant to Fed. R. App. P. 29(a))

---

Joseph A. Sullivan (PA 58382)
Jeremy Heep (PA 75607)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
215.981.4750(fax)
Email:  sullivja@pepperlaw.com

Natalie Grill Einsig (PA 89791)
PEPPER HAMILTON LLP
Suite 200, 100 Market Street
Post Office Box 1181
Harrisburg, PA 17108-1181
717.255.1155
717.238.0575(fax)
Email:  einsign@pepperlaw.com

**heepj@pepperlaw.com**
                              **Attorneys for *Amicus Curiae***

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................ ii

I.  <u>INTERESTS OF AMICUS CURIAE</u> .......................................... 1

II.  <u>INTRODUCTION</u> ...................................................................... 2

    A.  Summary Of Argument ................................................... 2

III.  <u>ARGUMENT</u> ............................................................................ 4

    A.  The Preference For Community-Based Services Over
       ICFs/ID Is Established By Law ........................................ 4

        1.  The Supreme Court Has Recognized Both The Inherent
           Benefit Of Community-Based Programs And The
           Problems With Institutional Care ........................... 4

        2.  Pennsylvania Has Safeguards To Ensure That The Care
           And Safety In Community Services Are On Par With, If
           Not Better Than, ICFs/ID ...................................... 8

    B.  The States' Policy Preference For Community Settings Has
       Necessarily Led To The Reduction Of State ICF/ID
       Populations ....................................................................... 13

IV.  <u>CONCLUSION</u> ......................................................................... 17

# TABLE OF AUTHORITIES

Page

CASES

*Olmstead v. L.C. ex rel. Zimring,*
    527 U.S. 581 (1999) ...................................................................................*passim*

OTHER AUTHORITIES

55 Pa. Code § 2600, *et seq.* ...................................................................................13

55 Pa. Code § 6400, *et seq.* ...................................................................................13

Braddock, D., Hemp, R., Rizzolo, M., *The State of the States in
    Developmental Disabilities 2008*, Department of Psychiatry and Coleman
    Institute for Cognitive Disabilities, The University of Colorado (2008) .....14, 16

Bradley, V.J. and Conroy, J.W., *The Pennhurst Longitudinal Study:  A
    Report of Five Years of Research and Analysis,* Philadelphia: Temple
    University Developmental Disabilities Center, Boston: Human Services
    Research Institute (1985) ............................................................................5, 6, 7

U.S. Commission on Civil Rights, *Accommodating the Spectrum of
    Individual Disabilities* (Sept. 1983) ....................................................................15

Pennsylvania Dept. of Public Welfare, Independent Monitoring for Quality,
    http://www.dpw.state.pa.us/PartnersProviders/MentalRetardation/003670
    114.htm ................................................................................................................13

The Home and Community Services Information System
    https://www.hcsis.state.pa.us/hcsis-ssd/ ..............................................................8

Lakin, K.C., Larson, S.A., Salmi, P. & Scott, N., *Residential services for
    persons with developmental disabilities: Status and trends through 2008*,
    Minneapolis: University of Minnesota, Research and Training Center on
    Community Living, Institute on Community Integration (2009) ......................15

O'Brien, K., Zaharia, E.S., *Recent Mortality Patterns in California*, Mental
    Retardation (October 1998) ...............................................................................12

**CORPORATE DISCLOSURE STATEMENT**
**PURSUANT TO Fed. R. App. P. 26.1**

  The Arc of Pennsylvania states that it does not have any parent

corporation, it issues no stock and that there is no publicly held corporation that is

not a party to this proceeding which has any financial interest in the outcome of the

proceeding.


Dated: April 10, 2012   _____

          JEREMY HEEP

## I.    __INTERESTS OF AMICUS CURIAE__[1]

The Arc of Pennsylvania ("The Arc") is the Pennsylvania state chapter of The Arc, the largest advocacy organization in the United States for citizens with intellectual and developmental disabilities, and their families.  In conjunction with its local chapters and the national organization, The Arc works every day to carry out its mission of working to include all children and adults with intellectual and developmental disabilities in every community in Pennsylvania.  This mission is pursued through public policy advocacy, family training, public awareness and the use of existing community resources.  The Arc has a strong interest in an individual's right to community services.  The Arc believes that all people, regardless of disability, deserve the opportunity for a full life in their community where they can live, learn, work, and play alongside each other through all stages of life.

The Arc submits the current brief because some of the information provided to this Court about community-based care for individuals with intellectual disabilities, particularly those significantly disabled individuals who cannot express whether they prefer community settings to institutional settings, is inaccurate and incomplete.  Providing the Court with more accurate and complete

---

[1] All parties have advised that they do not oppose the filing of this *amicus* brief.

information is consistent with The Arc's mission and will assist the Court in

arriving at a result that best protects and serves the needs of those individuals.

## II.   **INTRODUCTION**

### A.   **Summary Of Argument**

The Court did not abuse its discretion in approving a Settlement

Agreement which encompasses all members of the class, including individuals

who cannot express a preference about discharge from a state institution into

community placement and who do not have involved family or guardians.  The

preference for community settings over state-run institutional care settings, also

known as intermediate care facilities for people with intellectual disabilities

("ICFs/ID"),[2] was established definitively in 1999, when the U.S. Supreme Court

ruled that it is discrimination under the Americans with Disabilities Act ("ADA")

to house people with intellectual disabilities ("ID") in institutions when the state

professionals have determined that a person is appropriate for community services

and the person is not opposed to community services.  *Olmstead v. L.C. ex rel.*

*Zimring,* 527 U.S. 581 (1999).

Moreover, and consistent with *Olmstead,* community-based settings

do not diminish the health, safety and welfare of individuals with ID.  In fact, the

---

[2] Although prior briefing referred to intermediate care facilities for people with mental retardation ("ICFs/MR"), the official and more acceptable term is now intermediate care facilities for people with intellectual disabilities ("ICFs/ID").

evidence indicates that people do better in community settings than institutions, including those with significant disabilities. In addition to statutory safeguards enacted in Pennsylvania, there is a higher level of formal and informal oversight in community settings than in state institutions.

It is no surprise then that, given the law and factual evidence, the number of placements in community settings has grown, and the number of individuals in institutions has significantly declined. Pennsylvania was at the forefront of this movement and began to embrace a policy of normalization for those with ID even before enactment of the ADA and *Olmstead*. Many other states have followed suit, leading to the significant reduction in state ICFs/ID institutional populations nationwide. Indeed, thirteen states and the District of Columbia have no state-run large institutions whatsoever, and this number is increasing each year.

Contrary to the position of Appellants and their amici, VOR, Inc. ("VOR"), the evidence, including long-standing statutes, case law and policy, demonstrates that community placement is more beneficial and therefore preferable to institutional care. On the basis, then, of both the well-established law and the evidence, the district court's decision to approve the Settlement Agreement should be affirmed.

## III.  ARGUMENT

### A.  The Preference For Community-Based Services Over ICFs/ID Is Established By Law.

#### 1.  The Supreme Court Has Recognized Both The Inherent Benefit Of Community-Based Programs And The Problems With Institutional Care.

A central theme of Appellants' and VOR's briefs is the argument that community-based services are inferior to ICFs/ID in that they create a health, safety and welfare risk to individuals with ID.  They assert that, under the Settlement Agreement, individuals with significant disabilities are at a particular risk because they will be forced into community settings due to an inability to say whether they would like to relocate to a community or remain in an institution. This argument, however, completely ignores the fact that the preference for community settings over institutional settings was established by law more than twelve years ago.  The Supreme Court held in *Olmstead* that it is discrimination under the ADA to house people in institutions when the state professionals have determined that a person is appropriate for community services, and the person is not opposed to those services.  As the Court stated,

> Under Title II of the ADA, States are *required* to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Olmstead*, 527 U.S. at 607 (emphasis added).

In so holding, the Supreme Court recognized both the inherent benefit of community-based programs and the problems and limitations of institutional care. The Court ruled specifically that: (1) the institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life; and (2) the confinement of such persons in an institution severely diminishes their everyday life activities, including family relations, social contacts, work options, economic independence, educational advancement and cultural enrichment. *Id*. at 600. Thus, there is no debate that the courts have found that community-based programs expand the "every-day life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment" and are preferable to ICFs/ID. *Id*. at 601.

Cases that have interpreted the ADA since *Olmstead* have solidified the preference for community settings over institutional settings. In fact, the evidence indicates that people do better in the community than institutions, including individuals with significant disabilities. Studies, such as the Pennhurst Longitudinal Study, which involved the closure of ICF/ID Pennhurst State School and Hospital in Pennsylvania and the discharge of its residents to community

programs, have demonstrated how well people have done in the community after

discharge and that individuals with the most profound and challenging disabilities

have improved more (relatively speaking) than others.

For instance, individuals who were placed in the community showed a

significant increase in normalization and individualization.  *See* Bradley, V.J. and

Conroy, J.W., *The Pennhurst Longitudinal Study:  A Report of Five Years of*

*Research and Analysis,* Philadelphia: Temple University Developmental

Disabilities Center, Boston: Human Services Research Institute, at 61 (1985)

(hereinafter "*Pennhurst Study*") (noting "clear and large gains [in adaptive

behavior] among people who went to [community settings]" and "after placement

they were doing more things independently or with less help.").  Ultimately, the

study found that the former residents of Pennhurst, no matter how disabling their

condition, who entered into community settings had "increased their capacities to

deal with their environment and their needs." *Id*. at 156.

Moreover, people with all types and levels of disability excel in

community-based settings.  VOR's argument that "there can be no doubt that

community placement is ill-equipped to service the needs of individuals with

profound intellectual disabilities" is simply not correct.  *See* Brief *Amicus Curiae*

of VOR, Inc. (hereinafter, "VOR Brf.") at 20-21.  Many individuals with the same

disabilities as those of Appellants and Amici (i.e. feeding tube and wheelchair,

deaf and blind, Bipolar disorder, epilepsy, etc.) are thriving and excelling in community-based settings, even doing better in the community setting than in institutions. *See Pennhurst Study*, at 61, 102 (showing that even as early as 1984, individuals who were "severely or profoundly disabled" were doing extremely well in community settings after relocating from the state-run institution).

In what is perhaps the most telling evidence in support of community settings, historically most families who have opposed discharge of their family members from institutions ultimately come to support community placement after their family members are discharged. The Pennhurst study revealed the "overwhelming positive change in attitudes among the families of people who left Pennhurst and went to live in community based settings." *Id*. at 108. In fact most families reported witnessing "large improvements" in their relatives after relocating to community settings. *Id*. at 110.

The preference for community-based services is not a new or novel idea and the findings in the Pennhurst Longitudinal Study, performed over 27 years ago, are as valid and relevant now as they were then. The long-standing law and factual studies evidence that individuals with significant disabilities do better in the community than in state-run institutions.

**2.    Pennsylvania Has Safeguards To Ensure That The Care And Safety In Community Services Are On Par With, If Not Better Than, ICFs/ID.**

VOR paints a negative picture, arguing that community-based services are not safe and that individuals with ID "*will* ultimately face neglect, abuse and death in community placement."    *See* VOR Brf. at 16 (emphasis in original).  Contrary to VOR's assertions, however, the care and safety of individuals in community settings are on par with, if not better than, that found in ICFs/ ID.  Indeed, Pennsylvania has a significant number of safeguards to assure the safety of people with ID living in the community.

First, there are greater formal protocols in place in Pennsylvania community settings that are not in place in ICFs/ID.  Each individual county Mental Health/Intellectual Disabilities Office oversees the community service programs within the county.  The community program residents receive periodic visits from supports coordinators to ensure, among other things, that they are safe and receiving appropriate care.  Most state-operated ICF/ID residents do not have supports coordinators, or any type of county visitation services.

Additionally, there is a client incident information system – the Home and Community Services Information System ("HCSIS") – through which reports of abuse and neglect within community services are reported.  *See* The Home and Community Services Information System https://www.hcsis.state.pa.us/hcsis-ssd/

(last visited April 5, 2012). Those reports are then reviewed by the Department of Public Welfare ("DPW") and the County Mental Health/ Intellectual Disabilities agencies, which enable them to detect any patterns of abuse or neglect and then address such patterns in the facilities to ensure that clients with ID in the community system are safe.

Also, appropriate staff members are available at all times in community settings. For example, in group homes there is onsite staff 24 hours, 7 days a week. The round-the-clock staff assists in the development of skills and ensures the safety and welfare of the residents of the group homes.

Additionally, the recently enacted Adult Protective Services Act (Act No. 70 of 2010) ("APS Act") greatly enhanced the safety of persons with intellectual disabilities living in the community when it was enacted on October 7, 2010. 35 Pa. C.S. §§ 10225.101 *et seq.* Under the APS Act the Pennsylvania Department of Public Welfare (DPW) is charged with administering an adult protective services program to protect abused, neglected or abandoned adults between ages 18 and 59 who have a physical or mental impairment that substantially limits major life activities. The APS Act also requires employees and administrators of facilities where adults covered under the act receive services to report suspected abuse. The APS Act became effective in January 2011. In the Governor's budget for the fiscal year beginning July 1, 2012, an appropriation of

$1.5 million has been proposed for APS services. APS creates another layer of protection for people with intellectual disabilities who live in the community that is not available in an institutional setting and affords even greater security for such vulnerable people in the community than that which previously existed.

In addition to these formal safeguards, various informal safeguards also assure that community services are at least as safe as ICFs/ ID, and likely even safer. Because individuals are integrated into the community, there is greater oversight. People are returned to their home counties upon discharge from an ICF/ID, making it easier for family and friends to visit and ensure that the person is well-cared for and safe. The community becomes another set of eyes and ears to ensure the safety of both the people with disabilities and the community at large.

Community members get to know the residents of a community-based home and their habits. The postal worker who delivers the mail each day or the neighbor who lives across the street and befriends an individual with a disability become part of the network of people who assist in the safety of the individuals and the community. Those people may ask questions if they notice something amiss, such as a change in normal activity or routine. None of this "informal" community oversight is present in institutional settings, which essentially shelter residents out of the view of the public community at large.

The Settlement Agreement continues these safeguards by ensuring, through individual interviews and assessments, that before individuals with ID are placed in community settings their individual medical and social needs are met. Residents will not be forced into services that do not meet their needs. *See* Tr. at 87-88 (JA1425); Kuhno Decl. ¶ 14 (Docket 295-1). A community service plan must be developed and approved by the families or guardians, the resident, the county and the Department of Public Welfare. *Id*. Once a plan has been approved, a transition period will ease the resident into his or her new home. *Id*. The resident will have the opportunity to be involved with community programs and staff before they move. *Id*. Additionally, there is a 60-day trial period for the new placement and, in the unlikely situation that the new community placement is not a good fit a new plan is developed. Tr. at 96-98, 100 (JA1434-35, JA1438).

Despite these safeguards, VOR cites to a series of studies all drafted by the same individual in California, David Strauss, to challenge the safety of community services. They assert that the risk of mortality was higher for individuals transferred out of ICFs/ID as compared to those who were not transferred. *See* VOR Brf. at 16-18. Their reliance on these studies, however, is misleading. As an initial matter, VOR omits the actual cause of death of these individuals; most deaths of individuals with ID are due to sickness or illness arising from the disability, and not from the location where services are provided

or from any physical abuse or neglect.[3]  Furthermore, other studies demonstrate

that community services are at least as safe as institutional facilities.  *See* O'Brien,

K., Zaharia, E.S., *Recent Mortality Patterns in California*, Mental Retardation, at

372-379 (October 1998) (demonstrating that mortality rates in community services

are no greater than those in institutional settings).  Indeed, mortality rates "were

lower in the community facilities than in the developmental centers after adjusting

for other risk factors, such as mobility/ambulation, self-help skill and level of

mental retardation."  *Id.* at 377.

    Likewise, the Pennhurst Longitudinal Study found no evidence that

community placements adversely affected mortality rates.  *Pennhurst Study*, at

154.  Indeed, the IM4Q process – a program run by the Office of Developmental

Programs ("ODP") that contracts with non-profit organizations to conduct surveys

of residents and staff at all types of living settings – consistently reveals no

difference in terms of safety between an ICF/ID and a community setting.  *See*

---

[3] VOR references a 2011 New York Times article that asserts that "unreleased" data indicates that more than one in six deaths in New York state and privately run homes are due to "unnatural or unknown causes."  *See* VOR Brf. at 19; The New York Times, *1,200 Deaths and Few Answers*, (November 6, 2011). The article does not analyze the relative safety of community settings with anything remotely approaching scientific rigor.  Moreover, the article is not limited to ID populations.  Finally, the article is irrelevant with regard to Pennsylvania where, as discussed below, disciplined studies have found no increase in mortality in community facilities within the Commonwealth.

Pennsylvania Dept. of Public Welfare, Independent Monitoring for Quality, http://www.dpw.state.pa.us/fordisabilityservices/intellectualdisabilitiesservices/independentmonitoringforquality/S_002048 (last visited April 5, 2012).

VOR also mistakenly relies upon former Auditor General Robert P. Casey's May 2000 and October 2001 audits examining Pennsylvania's Personal Care Homes ("PCH") -- a different program -- to continue arguing against the safety of community-based services.  *See* VOR Brf. at 14, n. 6.  Individuals from ICFs/ID, however, are not discharged to PCHs, and in fact, PCHs are governed by different regulations.  *Compare* 55 Pa. Code § 2600, *et seq.* (regulations governing PCHs) with 55 Pa. Code § 6400, *et seq.* (regulations governing community homes).

In short, Appellants' and VOR's concerns about safety and care are directly contradicted by the evidence of how the system operates in Pennsylvania, particularly given the numerous safeguards in place.

## B.    The States' Policy Preference For Community Settings Has Necessarily Led To The Reduction Of State ICF/ID Populations.

All of the evidence discussed above reflects the nationwide policy preference for community settings that has led to the significant reduction in state ICF/ID institutional populations in most states.  In fact, thirteen states, plus the

District of Columbia, have no large state-operated ICFs/ID at all.[4]  *See*  Braddock,

D., Hemp, R., Rizzolo, M.C., Haffer, L., Tanis, E.S., & Wu, J., *The State of the*

*States in Developmental Disabilities: 2011,* Washington, DC: American

Association on Intellectual and Developmental Disabilities (2011) (listing District

of Columbia, Alaska, Hawaii, Indiana, Maine, New Hampshire, New Mexico,

Rhode Island, Vermont, West Virginia, Oregon, Alabama, Michigan and

Minnesota); Associated Press, *Alabama's last residential home for the mentally*

*disabled closes* (Dec. 28, 2011).  Other states are actively working to transition to

community care.  Press Release, Office of the Governor of Illinois, Governor

Quinn Announces Active Community Care Transition Plan (January 19, 2012),

*available at http://www.illinois.gov/PressReleases/ShowPressRelease.cfm*

*?SubjectID=1&RecNum=9977* (announcing "initiative [to] increase the number of

people with developmental disabilities and mental health conditions living in

community care settings across Illinois.").

   Pennsylvania's movement toward significant downsizing of

institutional populations reflects its long-standing policy of normalization that

predates the ADA and *Olmstead*.  Pennsylvania has been moving towards

---

[4] A large state-operated ICF/ID is defined as an institution with 16 or more
residents.  *See*  Braddock, D., Hemp, R., Rizzolo, M.C., Haffer, L., Tanis, E.S., &
Wu, J., *The State of the States in Developmental Disabilities: 2011,* Washington,
DC: American Association on Intellectual and Developmental Disabilities (2011).

providing appropriate community services to people with ID since that movement

was described nearly 30 years ago by the United States Commission on Civil

Rights in its report, *Accommodating the Spectrum of Individual Disabilities*. *See*

U.S. Commission on Civil Rights, *Accommodating the Spectrum of Individual*

*Disabilities* (Sept. 1983).  The Civil Rights Commission not only found that

institutionalization was harmful, but also that "[t]here has been increasing

acceptance in recent years of the fact that most training, treatment, and habilitation

services can be better provided to handicapped people in small, community-based

facilities rather than in large isolated institutions." *Id.* at 34 (citations omitted).  As

a result of "such official reorientation toward community alternatives and a variety

of other factors ..., the number of handicapped persons in [institutional] facilities

has dwindled in the past two decades." *Id.* at 34-35 (citations omitted).

Indeed, since *Olmstead*, there has been a steady decline in the total

number of persons served in institutional settings of 16 or more (120,919 in 1999

to 92,314 in 2009) and a significant increase in the number of persons living in

small settings of 15 or less (306,232 in 1999 to 501,169 in 2009).  *See*  Braddock,

D., Hemp, R., Rizzolo, M.C., Haffer, L., Tanis, E.S., & Wu, J., *The State of the*

*States in Developmental Disabilities: 2011,* Washington, DC: American

Association on Intellectual and Developmental Disabilities (2011).  *See also* Lakin,

K.C., Larson, S.A., Salmi, P. & Scott, N., *Residential services for persons with*

*developmental disabilities: Status and trends through 2008*, Minneapolis:

University of Minnesota, Research and Training Center on Community Living,

Institute on Community Integration, at iii (2009) (concluding that between 1998

and 2008, the average daily population of large state settings declined almost 32%

nationally, and decreased in every state)**.**

Pennsylvania reflects this nationwide trend.  There are 50,000 people

receiving community services including 15,000 in the Consolidated Waiver, which

is a program to provide funding for community-based care for those who meet the

level of need for care in an ICF/ID.[5]  Meanwhile, there are only 2,500 people in

private ICFs/ID and less than 1,200 in the state-operated ICFs/ID.  Newly

diagnosed individuals with ID either go to private ICFs/ID or community services.

Every year thousands of people in Pennsylvania with ID need services.  However,

only a small handful in rare instances ever goes to a state-operated ICF/ID.

Given the plethora of evidence showing that community-based

services are preferable to institutional settings, coupled with acceptance of this

---

[5] All people in ICFs/ID are *ipso facto* eligible for the Consolidated Waiver
funding system for services.  Under Consolidated Waiver, a person, whether in an
ICF/ID or in community placement, receives all the services they need, meaning
they receive the same services living in the community as they would in an ICF/
ID.  For example, if a person required a feeding tube, as some of the proposed
intervenors do, they would receive such treatment even in a community setting.

evidence by the legislature and Supreme Court, it is no surprise that the significant

downsizing of institutional populations continues.

## IV.    <u>CONCLUSION</u>

The Court did not abuse its discretion in approving a settlement

agreement that encompasses all members of the class including individuals who

cannot express a preference about discharge and who have no involved family or

guardians.  For the foregoing reasons, Amicus The Arc of Pennsylvania supports

the settlement reached by the parties, and requests that the Court affirm the district

court's decision holding that the settlement agreement is fair and reasonable.

Respectfully submitted,

_s/ Jeremy Heep_ _____

Joseph A. Sullivan (PA 58382)
Jeremy Heep (PA 75607)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
215.981.4750 (fax)
Email:  sullivja@pepperlaw.com
        heepj@pepperlaw.com
        liessw@pepperlaw.com


Natalie Grill Einsig (PA 89791)
PEPPER HAMILTON LLP
Suite 200, 100 Market Street
Post Office Box 1181
Harrisburg, PA 17108-1181
717.255.1155
717.238.0575 (fax)
Email:   einsign@pepperlaw.com

Date:  April 10, 2012        Attorneys for _Amici Curiae_
                             The Arc of Pennsylvania

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Jeremy Heep, hereby certify that:

1.      This brief complies with the type-volume limitation of Rules 29(d) and 32(a)(7)(C), because this brief contains 3,387 words of text.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using MS Word, font size 14 Times New Roman.

3.      The hard copy and the electronic copy of this brief are identical.

4.      A Symantec Endpoint Protection anti-virus program has been run on the file and no viruses were detected.

Dated:   April 10, 2012              *s/ Jeremy Heep*_____
                                     JEREMY HEEP

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

The undersigned hereby certifies that I have been admitted before the

bar of the United States Court of Appeals for the Third Circuit, and that I am a

member of good standing of the Court.


Dated:   April 10, 2012                *s/ Joseph A. Sullivan*
                                       JOSEPH A. SULLIVAN

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

The undersigned hereby certifies that I have been admitted before the

bar of the United States Court of Appeals for the Third Circuit, and that I am a

member of good standing of the Court.


Dated:   April 10, 2012          *s/ Jeremy Heep*_____
                                 JEREMY HEEP

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

The undersigned hereby certifies that I have been admitted before the

bar of the United States Court of Appeals for the Third Circuit, and that I am a

member of good standing of the Court.


Dated:   April 10, 2012          *s/ Natalie Grill Einsig*_____
                                 NATALIE GRILL EINSIG

## <u>CERTIFICATE OF SERVICE</u>

I, Jeremy Heep, declare as follows:

On the 10th day of April 2012, I filed with the Court an electronic PDF copy of the foregoing Brief of *Amicus Curiae* The Arc of Pennsylvania in Support of Appellees' Argument for Affirmance and an original and ten (10) copies of the Brief of *Amicus Curiae* The Arc of Pennsylvania in Support of Appellees' Argument for Affirmance were filed via hand delivery.  I also served the Brief of *Amicus Curiae* The Arc of Pennsylvania in Support of Appellees' Argument for Affirmance by filing it with the Court's electronic case filing system and serving one (1) copy by United States Mail, first class postage prepaid, addressed to the following:

Benjamin Hoffart, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
*Attorneys for Appellants, No. 11-3684*

Doris M. Leisch, Esquire
Assistant Chief Counsel
Pennsylvania Dep't of Public Welfare
801 Market Street
Suite 6092
Philadelphia, PA 19107
*Attorneys for Defendant-Appellees*

Nancy Shane Rappaport, Esquire
DLA Piper LLP (US)
1650 Market Street, Suite 4900
Philadelphia, PA 19103
*Attorneys for Amicus Curiae*

Robert W. Meek, Esquire
Disability Rights Network of
Pennsylvania
1315 Walnut Street, Suite 500
Philadelphia, PA 19107-4705
*Attorneys for Plaintiff-Appellees*

Carl A. Solano, Esquire
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
*Attorneys for Appellant, No. 11-3685*

Nathaniel Pollock, Esquire
Mark L. Gross, Equire
Department of Justice, Civil Rights
Division, Appellate Section, Ben
Franklin Station, P.O. Box 14403,
Washington, D.C. 20044-4403

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Dated:  April 10, 2012          *s/ Jeremy Heep*
                                JEREMY HEEP