Nos. 11-3684, 11-3685
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

FRANKLIN BENJAMIN, by and through his next friend, Andrée Yock; RICHARD GROGG and FRANK EDGETT, by and through their next friend, Joyce McCarthy; SYLVIA BALDWIN, by and through her next friend, Shirl Meyers; ANTHONY BEARD, by and through his next friend, Nicole Turman, on behalf of themselves and all others similarly situated,

v.

**DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA and SECRETARY OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA.**

**CRAIG SPRINGSTEAD, by and through his father and guardian, Bertin Springstead; MARIA MEO, by and through her mother and guardian, Grace Meo; DANIEL BASTEK, by and through his father and guardian, John Bastek; MICHAEL STORM, through his guardian, Polly Spare; BETH ANN LAMBO, by and through her father and guardian, Joseph Lambo; RICHARD KOHLER, by and through his sister and guardian, Sara Fuller; MARIA KASHATUS, by and through her father and guardian, Thomas Kashatus; and WILSON SHEPPARD, by and through his brother and next friend, Alfred Sheppard,**
*Appellants in No. 11-3684*;
**DIANE SOLANO, by and through her brother and guardian, Carl A. Solano,**
*Appellant in No. 11-3685.*

_____

On Appeal from the Order dated September 2, 2011, by the United States District Court for the Middle District of Pennsylvania, Civil Action No. 09-01182
_____

## CONSOLIDATED JOINT REPLY BRIEF FOR APPELLANTS

_____

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10016
Telephone: (212) 839-5300
*Attorney for Appellants in No. 11-3684*

Carl A. Solano
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone: (215) 751-2202
*Attorney for Appellant in No. 11-3685*

# TABLE OF CONTENTS

*Page*

ARGUMENT IN REPLY ........................................................................1

I.   APPELLANTS ARE PARTIES WITH STANDING TO BE HEARD IN THIS APPEAL ....1

    A.   Appellants Are Class Members............................................................1

    B.   This Court's 2011 Decision Did Not Hold Otherwise.........................4

II.  THE DISTRICT COURT ERRED IN CERTIFYING AN IMPROPER CLASS.................6

III. THE DISTRICT COURT ERRED IN APPROVING THE CLASS SETTLEMENT..........14

    A.   The Settlement Improperly Seeks to Compel Relocation to Community Facilities...................................................................................14

    B.   The Settlement Improperly Compels Removal of Residents Who Need Comprehensive Care and Have Not Expressed a Desire To Be Removed ........................................................................................18

CONCLUSION ..................................................................................25

APPENDIX

    Trial Court Order Denying Motion for Partial Stay, Dec. 19, 2011

# TABLE OF AUTHORITIES

*Page*

## Cases

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998)*, cert. denied*, 526 U.S. 1114 (1999).........................................................................11

*Benjamin v. Dep't of Publ. Welfare*, 432 Fed. Appx. 94 (3d Cir. 2011) ............... 4-8

*Chiang v. Veneman*, 385 F.3d 256 (3d Cir. 2004)....................................................9

*Conner v. Branstad*, 839 F. Supp. 1346 (S.D. Iowa 1993)....................................19

*Gardner v. Parson,* 874 F.2d 131 (3d Cir. 1989) ....................................................24

*Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d Cir. 2011)......................................11

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)...............................................7, 12

*Gortat v. Capala Bros.*, No. 07-CV-3629, 2010 WL 1423018 (E.D. N.Y., Apr. 9, 2010)...........................................................................................9

*Hagan v. Rogers*, 570 F.3d 146 (3d Cir. 2009) ................................................... 8-9

*In re Community Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3d Cir. 2005) ..................................................6

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)...............7, 9

*In re Monumental Life Ins. Co.*, 365 F.3d 408 (5th Cir.), *cert. denied*, 543 U.S. 870 (2004) ........................................................................................ 9-10

*In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432 (3d Cir. 2009).....6

*Kern v. Siemens Corp.*, 393 F.3d 120 (2d Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005)........................................................................................10

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir. 1981)....................................10

*Ligas ex rel Foster v. Maram*, No. 05-C-4331, 2006 WL 644474 (N.D. Ill., Mar. 7, 2006)...........................................................................................8

*Ligas ex rel. Foster v. Maram*, No. 05-C-4331, 2010 U.S. Dist. LEXIS 34122 (N.D. Ill., Apr. 7, 2010) .....................................................................8, 19

*Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294 (D. Conn. 2008)...........22

*Munoz v. County of Imperial*, 667 F.2d 811 (9th Cir.), *cert. denied*, 459 U.S. 825 (1982)..........................................................................................4

*Neal ex re. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) ............................................13

*Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792 (3d Cir. 1991)...........4

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ..........................................................................................................................7

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999)....................................*passim*

*Powell v. Symons*, Nos. 10-2157 & 10-3069, 2012 U.S. App. LEXIS 6467 (3d Cir., Mar. 30, 2012) ..............................................................................................24

*Richard C. ex. rel. Kathy B. v. Houstoun*, 196 F.R.D. 288 (W.D. Pa. 1999), *aff'd mem.*, 229 F.3d 1139 (3d Cir. 2000) ........................................................19

*Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004) ....................................................19

*Simer v. Rios*, 661 F.2d 655 (7th Cir. 1981), *cert. denied*, 456 U.S. 917 (1982) ......9

*Sullivan v. DB Inv., Inc.*, 667 F.3d 273 (3d Cir.), *cert. denied*, 2012 U.S. LEXIS 2656 (Apr. 2, 2012)........................................................................................12

*U.S. v. Oregon*, 782 F. Supp. 502 (D. Or. 1991), *aff'd mem.*, 28 F.3d 110 (9th Cir. 1994) .............................................................................................................19

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ............................... 9-10, 12

*Zeisel v. Diamond Foods, Inc.*, No. 10-C-1192, 2011 U.S. Dist. LEXIS 60608 (N.D. Cal., June 7, 2011) ..............................................................................9

### *Statutes*

Medicaid Act (Social Security Act, Tit. XIX), 42 U.S.C. §§ 1396 *et seq*...............19

Section 1902(a)(10), 42 U.S.C. § 1396a(a)(10) .................................................19

Section 1905(a)(15), 42 U.S.C. § 1396d(a)(15) .................................................19

Section 1915(c)(2)(C), 42 U.S.C. § 1396n(c)(2)(C)....................................19, 22

### *Court Rules*

Federal Rules of Civil Procedure

Rule 17(c)(2)........................................................................................................23

Rule 23 ...........................................................................................................6-14

Rule 23(a) ..................................................................................14

Rule 23(b) ............................................................................. 9-11

## *Regulations*

Centers for Medicare and Medicaid Services

42 C.F.R. § 441.302(d)(2)......................................................19, 22

42 C.F.R. § 483.440(b)(4)(i)...........................................................19

Department of Justice

28 C.F.R. § 35.130(b)(1)..................................................................20

28 C.F.R. § 35.130(e)(1)..................................................................21

## *Other Authorities*

Arc of Pennsylvania, "Action Plan:  CLOSE STATE CENTERS," *http://www
.thearcpa.org/images/Closing%20State%20Centers%20-%20Action%20
Plan.pdf* (2009) ...............................................................................15

BLACK'S LAW DICTIONARY (9th ed. 2009) ............................................17

J.W. Conroy & V. Bradley, *The Pennhurst Longitudinal Study:  A Report of
Five Years of Research and Analysis*, *http://aspe.hhs.gov/daltcp/reports
/5yrpenn.pdf* (1985) ........................................................................15

T. Kastner, *On the Need for Policy Requiring Data-Sharing Among Research-
ers Publishing in AAMR Journals:  Critique of Conroy and Adler (1998)*, 38
MENTAL RETARDATION 519 (2000) ....................................................15

5 MOORE'S FEDERAL PRAC. (3d ed. 2012)

Paragraph 23.43[6] ........................................................................10

Paragraph 23.104[3][a] ..................................................................10

S.J. Taylor & M.W. Krauss, *The Credibility of Conroy, et al. (2003) and Walsh
and Kastner (2006)*, 44 MENTAL RETARDATION 370 (2006)...............15

7B Wright, Miller & Kane, FEDERAL PRAC. & PROCEDURE:  CIVIL 3D § 1797.1
(2005)..............................................................................................16

_____

All Internet materials are as accessed on April 30, 2012.  Hard copies are available on request.

iv

## ARGUMENT IN REPLY

**I.     APPELLANTS ARE PARTIES WITH STANDING TO BE HEARD IN THIS APPEAL.**

### A.    Appellants Are Class Members.

Rather than excluding themselves from the class, Appellants consistently have insisted that they are class members. *See*, *e.g.*, JA191, 958, 1025-26, 1467-69. And despite their efforts to disclaim Appellants' status, the joint brief by plaintiffs and DPW ("Pl/DPW Br.")[1] acknowledges it. To show that their Rule 23(b)(2) non-opt-out class settlement afforded "all class members" a right to object and be heard, they point to the settlement notice sent to "***all state ICF/MR residents***, their families, and their guardians . . ., which apprised them of their opportunity to submit objections." Pl/DPW Br. at 37 (emphasis added). The notice was sent to all residents because all residents are class members. The fact the trial court, at plaintiffs' urging, then ignored residents' objections did not convert the objecting residents into non-members of the class.

Plaintiffs say the relevant question is whether Appellants are bound by the class action judgment, which means whether they are bound by the settlement. Pl/DPW Br. at 21. Clearly, they are:

•     Pursuant to the settlement, ***all residents***, including Appellants, are reviewed annually for placement on the list of those to be removed to "community" fa-

---

1.     For ease of reference, since plaintiffs and DPW are acting jointly in this case, this brief sometimes refers to "plaintiffs" when discussing both parties' position.

cilities. Plaintiffs say this is nothing new, since annual reviews have occurred for some time. Pl/DPW Br. at 11. But unlike prior annual reviews that merely inquired about residential preferences and recorded the responses, *these* annual reviews come with dire consequences — designation for removal unless the resident or guardian clearly expresses opposition. Residents now will be placed on the relocation list even if their existing Individual Support Plans document longtime opposition to community placement or contain State Center professional staff assessments that relocation to a small community facility is inappropriate. *See* JA1497-98 (Protocol). ***All residents***, including Appellants, are required to undergo these annual reviews and ***no one is permitted to opt out of them***. JA470, 1378 (Stlmt.; Kuhno). Similarly, ***no resident*** can opt out of the settlement's provisions that they will be relocated if there is no recorded statement of opposition each year. JA1498 (Protocol).

• Pursuant to the settlement, ***all residents***, including Appellants, are subject to placement on the relocation list if their guardians die or otherwise become unable to express opposition on their behalf, even though they have consistently expressed opposition in the past. JA1379-80 (Kuhno). Plaintiffs brush this off as is an "illusory . . . concern" because guardians can always appoint successors to continue expressing opposition. Pl/DPW Br. at 55-56. But compelling guardians to now engage in defensive measures to prevent abrogation of their consistently-stated preferences for continued State Center care proves that the settlement binds them. The settlement requires parent-guardians, many of whom are elderly, to search for others willing to exercise vigilance against a court-approved scheme that can produce dreaded results if they do not scrupulously follow its dictates.

2

•       Pursuant to the settlement, ***all residents***, including Appellants, also are subject to placement on the relocation list if they cannot speak for themselves and DPW cannot contact their guardians during the annual reviews.  JA1498, 1504 (Protocol).  Until the settlement, a guardian could miss an annual review without triggering the resident's removal from a State Center.  Now, the guardian misses a review at her loved one's peril.

•       Pursuant to the settlement, ***all residents***, including Appellants, are dependent on the settlement's protocols and procedures for information enabling informed decisions about whether to relocate.  The settlement makes no provision for balanced information about benefits of institutional care, JA1390-96, thus placing residents at the mercy of the settlement's built-in biases.  Savvy residents are free, of course, to do their own research, but many mentally disabled individuals cannot do so.  Even guardians may be dependent on DPW for the balanced information they need.  But the settlement makes no provision for it.

•       Under the settlement, ***all residents***, including Appellants, are bound by provisions governing how they will be relocated and the facilities to which they will be relocated if they agree to removal.  *See*, *e.g.*, JA474-76 (numbers to be relocated); JA476 (types of community housing); JA1434-35, 1437 (Kuhno testimony about no right of return).  The settlement permits no other terms.

The settlement thus binds Appellants and all other residents, imposing mandates that apply whether they choose to stay in the State Centers ***or*** they choose to relocate.  Plaintiffs' argument that the settlement terms (and the class definition) ex-

empt Appellants because Appellants presently choose to stay in the State Centers is meritless. Indeed, the settlement was deliberately crafted to apply both to those who presently wish to relocate and those who might change their minds in the future. JA1489-90 (DPW explanation); *see* Pl/DPW Br. at 34 (class membership is not "frozen at a single point in time"). That is why there are annual interviews seeking new additions to the relocation list.

## B.    This Court's 2011 Decision Did Not Hold Otherwise.

This Court's 2011 decision in this case, JA436-46, *reported at* 432 Fed. Appx. 94, held only that the trial court did not abuse its discretion in declining to permit intervention by those residents ("the Springstead parties") who are now Appellants in No. 11-3684. Contrary to plaintiffs' argument, the Court's statements in that opinion about the relief then sought by the Springstead parties do not deprive Appellants in either of these appeals of standing now.[2]

The Springstead parties had argued that they had an interest sufficient to justify intervention because the litigation threatened closure of the State Centers and thereby jeopardized their ability to continue to live there. The Court disagreed because it believed plaintiffs "defined the class and the relief sought so that Intervenors' right to choose institutional treatment would not be affected." 432 Fed. Appx. at 98.

---

2.    Even if the decision had some bearing on the rights of Appellants in No. 11-3684, it does not bind Diane Solano, the appellant in No. 11-3685. Although she participated as an *amicus* in the 2011 proceedings in this Court, she was not a party. *See generally Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792, 808 (3d Cir. 1991); *Munoz v. County of Imperial*, 667 F.2d 811, 816-17 (9th Cir.), *cert. denied*, 459 U.S. 825 (1982).

In particular, the Court relied on its perception that, since, under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "community based treatment [cannot] be imposed on patients who do not desire it," 432 Fed. Appx. at 96, *quoting Olmstead* at 602, plaintiffs sought relocation of just those State Center residents who had "***affirmatively expressed their desire*** to be discharged to the community" and did not directly seek any State Center's closure.  *Id.* at 96, 98-99 (emphasis added).  The Court said the Springstead parties' "current opposition to community placement ***currently*** excludes them from the class" and that if they dropped that opposition in the future and become class members they no longer would have the interest in institutional care that they asserted as the basis for intervention.  *Id.* at 98 n.3 (emphasis added).

The question here is very different from that decided by the 2011 decision:  whether Appellants have a right to oppose terms of the settlement that affect them.  While Appellants believe the settlement will have an adverse affect on the State Centers, their objections are not limited to that concern.  They also object to settlement provisions that will place them on a relocation list even if they do not "affirmatively express their desire to be discharged"; slants information they will be given as they make critical decisions; and controls when, where, and how any relocation will take place.  They object to a settlement that adversely affects them if they elect to remain in the Centers ***and*** affects their decision whether to leave.  This Court's 2011 decision did not consider these issues because the settlement did not then exist and so no one raised them.  *See* 432 Fed. Appx. at 97.  Thus, the Court's statements about class membership were made without knowing that the settlement would affect ***all*** residents, regardless of their ultimate decision about discharge.  The settlement changed

the circumstances assumed by the Court when it issued its 2011 opinion, and, since this case raises different issues, that opinion does not control the outcome here. *See In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) ("the law of the case doctrine does not preclude a court from revisiting its own decisions . . . where . . . new evidence is available" or "a previous ruling, even if unambiguous, might lead to an unjust result"; citing cases).

For the same reason, the Court's 2011 decision does not dispose of Appellants' appeal from the trial court's denial of limited intervention for the purpose of having their settlement objections heard. Appellants sought that relief in case the court declined to recognize them as class members. This Court's 2011 decision said nothing about Appellants' standing to object to settlement terms like those at issue here or about their right to intervene for that purpose.[3]

## II.    THE DISTRICT COURT ERRED IN CERTIFYING AN IMPROPER CLASS.

Plaintiffs and their *amici* say the Court should not overturn the class certification because they need it to be able to remove from the State Centers as many residents as they can. *See* Pl/DPW Br. at 28-29. The Government's *amicus* brief ("U.S. Br."), at 25-26, even complains that recognizing the class deficiencies identi-

---

3.    Plaintiffs argue that Appellants' motion to intervene was untimely insofar as Appellants sought to object to class certification as part of their objections to the settlement. But the motion was made only to permit objections to the settlement, and the certification objections were just one part of those settlement objections. Timeliness therefore depends on whether objections **to the settlement** were timely, and plaintiffs concede that they were. Pl/DPW Br. at 22; *see In re Community Bank of N. Va. Second Mortg. Loan Litig.*, 418 F.3d 277, 314-15 (3d Cir. 2005). It was not until the settlement terms were made public that it became clear that the litigation judgment would directly affect all residents, including Appellants, despite plaintiffs' assurances to the contrary.

fied by Appellants "threaten[s] the availability of *Olmstead* class actions generally." But this Court has long recognized that the requirements of Federal Rule 23 may not be bypassed merely to make recovery easier, *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191 (3d Cir. 2001), and that the leverage class certification adds to a case supports applying Rule 23 vigilantly. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008). This Court also has emphasized that a district court is not free to relax Rule 23 scrutiny merely because certain types of actions benefit from them. *See id.* at 321-22. As discussed in Appellants' opening brief (p. 37), it may be possible to find a role for non-discriminatory class actions in *Olmstead* litigation, but the unlawful class certified here cannot suffice. In this case, like all types of cases, "'actual, not presumed, conformance' with the Rule 23 requirements is essential." *Peroxide* at 326, *quoting General Tel. Co. v. Falcon*, 457 U.S. 147, 160 (1982); *Newton*, 259 F.3d at 167. Here, those requirements were not met.

  ***The class is too indefinite.*** First of all, there is no merit to plaintiffs' contention that this Court has already upheld this class. *See* Pl/DPW Br. at 27-28. The Court noted in its 2011 opinion that the Springstead parties criticized the class because, by limiting class membership to those who "do not or would not oppose community placement," JA39, "it requires an inquiry into the mental state of class members." 432 Fed. Appx. at 98 n.3. The Court responded that even if that criticism "poses a problem for other purposes," it did not then create an interest sufficient for intervention because the Springstead parties could elect to remain in the State Centers. *Id.* Since the only question before the Court was intervention, the Court could not

have opined on the validity of the class certification, and it did not do so. By recognizing that the class definition might "pose[] a problem for other purposes" (that is, Rule 23), the Court left that issue open. The question is front and center now, and the class definition's dependence on class members' mental states is fatal to certification because it makes the class too indefinite.

Plaintiffs stress that the "do not or would not oppose" element of their definition is derived from the requirements for substantive relief under *Olmstead*, which holds that relocation cannot "be imposed on patients who do not desire it." 527 U.S. at 602. *A fortiori*, they say, the definition must be appropriate. *See* Pl/DPW Br. at 32-35. Plaintiffs have it backwards. Class certification is unsuitable where "proof of the essential elements of the cause of action requires individual treatment." *Newton*, 259 F.3d at 172. The very point of *Olmstead* is that residential care is an ***individual decision*** that must be left to ***each individual's choice***. Proof of that choice clearly must be based on the individualized wishes of each class member, and each choice will vary as minds are changed by new facts, circumstances, and personal analyses. This element of *Olmstead* therefore is ***not*** appropriate for class treatment.

Plaintiffs and their *amici* cite no case that ever has gone forward under a class definition like this one. The certification of a similar class in *Ligas ex rel. Foster v. Maram*, 2006 WL 644474 (N.D. Ill., Mar. 7, 2006), was later abandoned. *See* JA170.1-.2 (*Ligas* minute order describing revised class definition); *Ligas ex rel. Foster v. Maram*, 2010 U.S. Dist. LEXIS 34122 (N.D. Ill., Apr. 7, 2010). The other cases they cite did not involve definitions based on states of mind. *See Hagan v. Rogers*, 570 F.3d 146, 157-58 (3d Cir. 2009) (class of prisoners who had injuries or threatened

injuries); *Zeisel v. Diamond Foods, Inc.*, 2011 U.S. Dist. LEXIS 60608, at \*20-\*21 (N.D. Cal., June 7, 2011) (class of purchasers of shelled walnuts); *Gortat v. Capala Bros.*, 2010 WL 1423018, at \*2 (E.D.N.Y., Apr. 9, 2010) (class of former employees).

Here, on the other hand, the definition has ***everything*** to do with the residents' states of mind, which can vacillate repeatedly as facts and circumstances change. The class' composition depends entirely on what each class member prefers at any given time, and this reliance on class members' states of mind makes the class so indefinite as to be invalid. *Chiang v. Veneman*, 385 F.3d 256, 271-72 (3d Cir. 2004), *overruled on other grounds by Peroxide*, 552 F.3d at 318 n.18; *Simer v. Rios*, 661 F.2d 655, 669-71 (7th Cir. 1981), *cert. denied*, 456 U.S. 917 (1982).[4]

***The definition's opt-out provision is not permitted by Rule 23(b)(2).*** In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2558 (2011), the Supreme Court pointed out that classes certified under Rules 23(b)(1) and (2) are "mandatory classes: The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out." Despite the Supreme Court's teaching, plaintiffs argue that opt-out rights are permissible in Rule 23(b)(2) cases like this one, relying on *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416-17 (5th Cir.), *cert. denied*, 543 U.S. 870 (2004). But in *Monumental*,

---

4.    The class also is invalid because its definition depends on whether a State Center resident can reside in a "community" facility with "appropriate" services and supports, an undefined criterion that also will change as each resident's circumstances change. Contrary to plaintiffs' argument, the fact the parties tried to render this definitional requirement meaningless by claiming everyone meets it merely demonstrates how easy it is for parties to circumvent Rule 23 when a court fails to hold a hearing to enforce it. A hearing would demonstrate that, when considered in light of practical and budgetary constraints, what supports are "appropriate" and can feasibly be provided for each individual to live in a "community" setting is so uncertain as to make the class indeterminate.

the class sought both monetary and injunctive relief, and the court said opt-rights therefore might be considered.  Regardless of whether that remains true after *Wal-Mart*, the general rule remains that, outside of such "hybrid" contexts, Rule 23(b)(2) does not permit opt-outs.  *See Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 393-95 (3d Cir. 1981); 5 MOORE'S FEDERAL PRAC. ¶ 23.43[6] (3d ed. 2012) (citing cases).

Plaintiffs say the exclusion for those who "do not or would not oppose community placement" is not an opt-out provision because the definition "does not include them and give them the right to opt out."  Pl/DPW Br. at 35.  That is sophistry. The class settlement notice went to all State Center residents, Pl/DPW Br. at 37, and it allowed them to exclude themselves from the previously-certified class by stating they did not want the relief offered by the settlement.  That is an opt-out provision.

One of plaintiffs' *amici* takes a different approach, describing the definition as creating an ***opt-in*** class consisting of those residents wanting to be part of it now and those who, while currently opposing relocation, later change their minds and decide to join.  U.S. Br. at 27-28.  If that were true, the class still would be invalid, since Rule 23 does not authorize "opt-in" classes.  *See Kern v. Siemens Corp.*, 393 F.3d 120, 124-29 (2d Cir. 2004), *cert. denied*, 544 U.S. 1034 (2005); 5 MOORE'S ¶ 23.104[3][a] (citing cases).  In fact, however, the parties have emphasized that the class allows residents not only to change their minds by choosing relocation (opting in), but also by declining relocation after receiving information explaining their options (opting out).  *See* JA1240.  Both options are inconsistent with Rule 23(b)(2).

10

**The class is not cohesive.**  Neither plaintiffs nor the district court discussed cohesiveness when the class was certified, even though cohesiveness is a central requirement of a Rule 23(b)(2) class action.  Plaintiffs say such a discussion was unnecessary because they needed to show only that DPW acted or refused to act on grounds generally applicable to the class.  Pl/DPW Br. at 38-39 n.12.  But cohesiveness entails far more than that.  The court "must determine whether a proposed (b)(2) class implicates individual issues," *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998), *cert. denied*, 526 U.S. 1114 (1999), and whether those individual issues are so predominant as to make certification of the class inappropriate.  *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264-69 (3d Cir. 2011).  Had it looked at that question, the trial court would have found cohesiveness lacking.

Plaintiffs say that the class is cohesive because they have garnered a liability judgment and negotiated a settlement without encountering problems of "unmanageability."  Pl/DPW Br. at 40.  But they did that only by sweeping critical individualized issues under the rug.  Since DPW did not contest whether "appropriate" services and supports could be made available for everyone needing them, issues posed by the unique individual needs of each resident were disregarded.  And since the parties used their settlement definition to bar objections by all State Center residents opposing their aims, individual issues about each resident's choice were excised from the case.  No one subjected the class to rigorous examination — not DPW, which did nothing to challenge certification; not the residents opposing class relief, who were denied permission to intervene to ask the hard questions; and, most significantly, not the court,

which signed the proposed certification order with no examination at all.[5]

**_The class fails to meet requirements of commonality, typicality, and adequacy of representation._** Although plaintiffs cite _Wal-Mart_, they fail to recognize its significance. Parroting the pre-_Wal-Mart_ view that commonality is "not a high bar," plaintiffs argue that they met it merely by asking whether DPW "failed to offer community services to state ICF/MR residents and, if so, whether that failure violated the [Americans with Disabilities Act ("ADA")]." Pl/DPW Br. at 43. But _Wal-Mart_ holds that such questions are not sufficient for class certification. Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' _Falcon_, [457 U.S.] at 157, [and t]his does not mean merely that they have all suffered a violation of the same provision of law." 131 S. Ct. at 2551. A "common question" must produce an answer that "will resolve an issue that is central to the validity of each one of the claims in one stroke." _Id._ That cannot happen here because whether DPW violated the ADA by failing to offer community services to each State Center resident depends on whether services "appropriate" for that resident could be provided in the "community" and whether the individual would choose to receive them there. Those answers will vary with each individual. As the Court noted in _Wal-Mart_, "[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers." _Id._ (quoted citation omitted).

---

5.    This case is not controlled by _Sullivan v. DB Inv., Inc._, 667 F.3d 273 (3d Cir.), _cert. denied_, 2012 U.S. LEXIS 2656 (Apr. 2, 2012), which discussed predominance and cohesiveness in **_settlement classes_**, because there was no settlement when the class here was certified. This case has none of the coherence of the claims in _Sullivan_. _See id._ at 338 (summary in opinion by Scirica, J.).

These dissimilarities also should have precluded a finding of typicality. Plaintiffs rely again on "undisputed evidence" about such things as institutional "segregation" of residents and the ability to serve all residents equally in the "community," Pl/DPW Br. at 44-45 & n.15, but none of those assertions were subjected to rigorous proof. The different needs of the State Center residents, as well as the different choices they and their families and guardians will make about the propriety of "community" care, mean there cannot be a sufficient alignment of interests to make a class action fair. This case is not like *Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 63 (3d Cir. 1994), in which the plaintiffs attacked "a systemic failure . . . to provide a broad range of legally mandated services" to everyone. Here, plaintiffs attack a failure to provide to each resident wanting them "community" services that are "appropriate" ***for that individual***. There is no single, typical violation.

At bottom, the dispute about the requirements of Rule 23(a) comes back (as do most issues in this case) to plaintiffs' improper definition of the class. The class is improper because it includes all State Center residents, some of whom can receive appropriate care in community facilities and desire to move, and some of whom either cannot receive such care or have no desire to move. The first group is neither typical of the second nor able adequately to represent it; the groups are in direct conflict. Plaintiffs and their *amici* insist they have solved this problem by excluding from the class those who disagree with them. *See* Pl/DPW Br. at 46-47. But as already discussed, the class begins with ***all*** State Center residents who received the class notice, and then is subject to a fluctuating membership as residents and their families and guardians make up and then change their minds about whether they want to relocate.

13

In the meantime, the class settlement binds everyone, with provisions disfavoring class members who prefer not to move. That is not a fair class, and it is not one that satisfies the requirements of Rule 23(a).

Finally, even putting aside the residents who have no desire to move, the inclusion within the class of residents who have no guardians or involved family members and are incapable of making decisions of their own makes the class improper under Rule 23(a). Plaintiffs are not typical of such residents and their use of this litigation to force such residents' relocation because they cannot speak for themselves proves that they cannot adequately represent those residents' interests. For that reason alone, the class is invalid.

## III.   THE DISTRICT COURT ERRED IN APPROVING THE CLASS SETTLEMENT.

### A.   The Settlement Improperly Seeks to Compel Relocation to Community Facilities.

As the *amicus* briefs make clear, there is an ongoing debate about what types of care are most appropriate for developmentally disabled persons like those currently residing in the State Centers. Plaintiffs and their *amici* dogmatically insist that the only correct answer is relocation to the "community," where, they contend, all those who are developmentally disabled should flourish. But those on the other side of the debate understand that no single answer is correct for everyone. Most of the individuals at issue in this case have "profound" developmental disabilities — mental ages equivalent to those of infants or toddlers. Even if it were true that relocation

might make some of those individuals "sharply less dependent,"[6] that claim must be weighed in the context of such individuals' broader needs.  The importance of reduced dependence in making food choices or selecting bed times, for example, may pale for them when compared to providing secure surroundings and on-site medical care.

Plaintiffs and their *amici* advocate a policy selection that elevates increased independence above all other considerations,[7] and no one quarrels with their right to present that point of view.  The problem here, however, is that they have enlisted the federal courts in imposing that viewpoint on over 1,000 State Center residents who may not all benefit from what plaintiffs advocate.  And the district court, which is supposed to act as a fiduciary to protect the residents as unrepresented class members, allowed that to happen even though it said the settlement was flawed.

---

6.    In support of this claim, plaintiffs rely on a non-peer-reviewed study done after removal of residents from abusive treatment at Pennhurst State School and Hospital, a facility far different from today's State Centers.  *See* Pl/DPW Br. at 60 n.18, *citing* J.W. Conroy & V. Bradley, *The Pennhurst Longitudinal Study: A Report of Five Years of Research and Analysis*, http://aspe.hhs.gov/daltcp /reports/5yrpenn.pdf (1985).  The credibility of work by that study's author is doubtful.  *See* T. Kastner, *On the Need for Policy Requiring Data-Sharing Among Researchers Publishing in AAMR Journals:  Critique of Conroy and Adler (1998)*, 38 MENTAL RETARDATION 519 (2000) (exposing Conroy's analysis of Pennhurst mortality data inconsistent with master's report); S.J. Taylor & M.W. Krauss, *The Credibility of Conroy, et al. (2003) and Walsh and Kastner (2006)*, 44 MENTAL RETARDATION 370 (2006) (editors' statement advising that one of Conroy's articles "should not be cited as informing policy discussions and debates in the professional and research literature").

7.    Incredibly, plaintiffs deny their bias.  But the relentless efforts by plaintiffs' government-financed counsel (the moving force in this litigation) to close institutional facilities is well documented.  *See* VOR Br. at 10-16.  Their *amicus* Arc of Pennsylvania has an online manifesto calling for all State Centers to be closed.  *See* "Action Plan:  CLOSE STATE CENTERS," *http://www.thearcpa .org/images/Closing%20State%20Centers%20-%20Action%20Plan.pdf* (2009).

The tricks and devices employed by the court-approved settlement to ac-
complish removal of residents — one-sided information programs, interview protocols
linking relocation with "vacations" and closer family contacts, etc. — are nefarious,
and while plaintiffs claim good faith, they have opposed any efforts to alter the set-
tlement to address these concerns. Their most potent tool, of course, is their protocol,
JA1497-1502, that automatically places on the relocation list all residents who are un-
able to speak for themselves. Notably, none of the submissions by plaintiffs or DPW
seeking approval of the settlement ever explained that it would relocate hundreds of
residents merely because they lacked guardians, family members, and a personal abili-
ty to comprehend what was happening to them. *See* JA447-484, 1085-1113 (submis-
sions to district court). If Appellants and others had not objected, that aspect of the
settlement might not even have been discussed in the trial court. The trial court's ob-
servation that the settlement has a "bias towards community placement," JA21, thus is
irrefutable.

With so much at stake here, it is fundamental that the settlement provide
fair and balanced procedures that assure protection of all class members as they are
called upon to make what may be the most important decisions of their lives. Class
members must be given neutral information, guidance, and whatever assistance they
need to make reasoned choices. Above all, there can be no room for shortcuts or con-
trivances designed to push individuals into a particular decision. *See generally* 7B
Wright, Miller & Kane, FEDERAL PRAC. & PROCEDURE: CIVIL 3D § 1797.1 (2005)
(fairness considerations; citing cases).

16

The settlement does not do this and the district court recognized that fact, commenting not only on its bias, but also expressing "serious doubts" about the propriety and "wisdom" of the way it treated profoundly disabled residents.  JA21-22.  But the court did nothing to fix those problems.  And when Appellants moved to stay implementation of the settlement with respect to profoundly disabled residents without guardians and families, the court backtracked and refused to provide protection.  In an order entered after Appellants filed their opening brief (copy attached), at footnote 1, the Court stated:

> [T]he language so heavily relied upon by the Objectors, where this Court expressed "serious doubt" as to the practicality and propriety of portions of the agreement's implementation procedures and protocol, was mere dicta, an inconsequential observation premised on the Court's receipt of copious information during the fairness hearing regarding implementation.  Thus, ultimately, the quoted language does not impact our holding that the settlement agreement represents a fair, adequate, and reasonable disposition of the case.

Notably, the court did *not* say that any of its expressions of doubt or concern were wrong or unfounded.  The court merely brushed off the statements as "dicta" and "inconsequential observation[s]."  But it is difficult to see how an observation that a settlement is infected with "bias" and that there is cause for "serious doubts" about the propriety of the settlement's treatment of the most vulnerable class members affected by it can be "inconsequential."  "Dicta" are statements unnecessary to a decision, BLACK'S LAW DICTIONARY 519 (*dictum*), 1177 (*obiter dictum*) (9th ed. 2009), but when a judge acting as a fiduciary expresses doubts and concerns about such things, those statements go to the heart of his role.  To dismiss them as unimportant is an abdication of responsibility.  The court's explanation that the statements were "premised

on the Court's receipt of copious information during the fairness hearing" provides an additional reason to accord them importance, not to disregard them.

This settlement is unfair, and the district court therefore had a responsibility to protect class members and to withhold its approval of the settlement. Its failure to do so was an abuse of discretion that should be reversed.

### B. The Settlement Improperly Compels Removal of Residents Who Need Comprehensive Care and Have Not Expressed a Desire To Be Removed.

The settlement compels removal from the State Centers of residents who cannot object. To defend this, plaintiffs and their *amici* have taken several novel and extreme legal positions that find no support in the law and require a return to first principles.

*1. Residents are entitled to care appropriate to their needs, and that may include institutional care.* Plaintiffs assert that residents have no right to remain under institutional care. That is wrong. Individuals have a right to appropriate care, and *Olmstead* makes clear that this includes institutional care. The Court stated that the ADA "is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk." 527 U.S. at 604. It added that some individuals "may need institutional care from time to time" and "[f]or other individuals, no placement outside the institution may ever be appropriate." *Id.* at 605. Thus, a State must "maintain a range of facilities and . . . administer services with an even hand." *Id.* An individual who needs institutional care thus has a right to it.

In support of their argument, plaintiffs rely on *Richard C. ex. rel. Kathy B. v. Houstoun*, 196 F.R.D. 288 (W.D. Pa. 1999), *aff'd mem.*, 229 F.3d 1139 (3d Cir. 2000), but that decision merely held that individuals may be moved to community care if it is appropriate for them.  Other cases have recognized a right to care in institutional facilities.  *See*, *e.g.*, *Conner v. Branstad*, 839 F. Supp. 1346, 1357 (S.D. Iowa 1993); *U.S. v. Oregon*, 782 F. Supp. 502, 514 (D. Or. 1991), *aff'd mem.*, 28 F.3d 110 (9th Cir. 1994); *see also Ligas*, 2010 U.S. Dist. LEXIS 34122, at *10-*21 (interest in competing for funds).  In addition, Pennsylvania has an obligation to continue to provide ICF/MR care so long as it accepts federal funding for it under the Medicaid Act, 42 U.S.C. §§ 1396 *et seq*.  That Act provides a judicially-enforceable right to receive ICF/MR services, 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(15); *Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004);  be permitted to choose them, 42 U.S.C. § 1396n(c)(2)(C), 42 C.F.R. § 441.302(d)(2);  and be transferred from them only for good cause, 42 C.F.R. § 483.440(b)(4)(i).

**2.  *Residents should not be removed from facilities providing them appropriate care without a showing that they will benefit from removal.***  The settlement provides for removal of residents from the State Centers without any showing that they will benefit if removed.  It does so without any mention that an unknown number of residents have Individual Support Plans prepared by DPW professionals that say the most appropriate placement for those residents is an ICF/MR, not a community home.  The settlement calls for replacement of such plans with new ones "that specify community placements."  JA476.  This disregard for current professional judgments conflicts with the *Olmstead*'s holding that the ADA does not "condone[]

termination of institutional settings for persons unable to handle or benefit from community settings" in the view of State professionals. 527 U.S. at 601-02. There has been no showing that DPW *ever* determined that any of these residents would benefit from relocation, and before the settlement DPW had no plans to remove them.

Plaintiffs and their *amici* argue that the individuals can be relocated without any showing that they will benefit. *See* U.S. Br. at 20-21. The suggestion that they can displace these individuals from their homes with no such showing is shocking and inconsistent with ADA regulations, which prohibit provision of a service "that is not as effective" as alternatives, and authorizes provision of separate services when it is necessary to do so. 28 C.F.R. § 35.130(b)(1). At the least, these regulations require a showing that a community facility will be as "effective" in caring for an individual and that there is no need to provide that individual with continued institutional care. For each of the individuals at issue here, there has been no such proof.

**3. *Residents may not be removed without a showing that they want to be removed.*** Though they say the wishes of those opposed to relocation "have been respected," Pl/DPW Br. at 31, plaintiffs accord no respect to those residents who are unable to make their wishes known, instead using their silence as a means to remove them from their homes. They defend this result by claiming that, under *Olmstead*, anyone who does not (cannot) voice opposition to removal has no say in the issue and can be displaced. *Olmstead* never held anything like that.

The Supreme Court said that individuals may be placed in community facilities if the transfer "is not opposed by the affected individual." 527 U.S. at 587.

This language means, plaintiffs say, that a disabled person's right to choose her residence is limited only to overtly disapproving relocation from an institution, and does not encompass a general right to choose where to live.  That argument distorts the Supreme Court's language.  This Court's statement was based on an ADA regulation that provides:

> Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept.

28 C.F.R. § 35.130(e)(1).  The regulation makes clear that a disabled individual has a choice where to live.  If there were any question about that, explanatory material accompanying the regulation states, "Persons with disabilities must be provided the option of declining to accept a particular accommodation."  *See Olmstead*, 527 U.S. at 602 (quoting material).  The decision in *Olmstead* repeated this language and stated, "Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it," thus making clear that the patient's desire controls.  *Id.* Then, noting that the two plaintiffs before the Court were seeking relocation, the Court added, "neither woman opposed such treatment." *Id.* at 603.  It was in this context that the Court talked about the significance of stated opposition by an individual. Nothing in the regulations or the Court's decision suggests that an individual can be moved to a new home without any evidence she chooses to move there.

The rule advocated by plaintiffs and their *amici* is especially peculiar when considered in light of the ADA.  As plaintiffs point out, that statute was enacted to confer rights on the disabled and to foster respect of their choices and abilities.  But

21

instead of empowering choice, plaintiffs seek to use the ADA as a means to enable forceable removal of residents without any regard for their wishes, and, indeed, to take advantage of their profound disabilities and inability to comprehend and communicate by imposing choices upon them.  The ADA does not support such a result.

Nor does the Medicaid Act.  That statute requires that a patient be informed of the availability of ICF/MR and alternate services "at the choice of such individuals." 42 U.S.C. § 1396n(c)(2)(C).  The regulations underscore that an individual must be "[g]iven the choice of either institutional or home and community-based services."  42 C.F.R. § 441.302(d)(2).

**4.  *There is no "default" rule to be applied to disabled residents.*** Since each resident has a right to choose where to live, a central premise of the settlement — that plaintiffs and DPW can impose a new residence on nonresponsive class members — is untenable.  Plaintiffs' Government *amicus* refers to this premise as imposition of a "default" rule regarding residence and then makes an admittedly unprecedented argument for application of such a rule here.  U.S. Br. at 17-20.[8]  But there is no place in the law for a "default" rule.  Each individual has a right to live where he wishes, and that may be different from where others with similar disabilities wish to live.

The "conundrum" (U.S. Br. at 17), of course, is that some individuals here are incapable of making their own choices and have no guardians or family to as-

---

8.    That argument cites *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 337 (D. Conn. 2008), but recognizes that the decision is inapposite.  *See* U.S. Br. at 19-20 & n.6.  *Messier* disapproved any "default" rule because of the need for individualized determinations.

sist them. But this is an conundrum of plaintiffs' own making. The only reason there is any suggestion of imposing a "default" rule for this group is that plaintiffs sought certification of a class on issues that require individualized decision-making. If this were not a class action requiring new housing decisions for all residents, the focus would be back where it belongs: on whether any individual should be relocated based on her individual needs and desires, rather than on some classwide protocol.

**5.** ***Each resident must be individually assessed.*** Even if the class settlement goes forward, the relocation decision still must be individualized to assess each individual's needs and, as best they can be discerned, desires. That means determining the propriety of relocating each individual to community facilities, rather than sweeping together all of these vulnerable residents and automatically placing them on a relocation list if they cannot answer a questionnaire. The settlement makes no effort to do this, calling only for individual planning for supports in the "community" without any threshold assessment of whether the individual should be relocated there in the first place.

There is substantial reason to believe many residents may be depressed, traumatized, or otherwise adversely affected if they are removed from the only home and companions they have known for decades. Plaintiffs say there is no evidence of this. Pl/DPW Br. at 56-57; U.S. Br. at 21-22. But, given the state of this undeveloped record, Appellants have put forward the only evidence available — the stories of other residents with similar disabilities who, in the words of their guardians and family members, would be "devastated" if forced to leave. JA531, 574, 623, 700, 794, 819,

845.  There is no reason to believe the unrepresented residents who plaintiffs plan to move by "default" are any different from these other residents who objected.

The district court made no provision for individualized assessments or any other protections for these class members.  Its decision should be reversed, with a remand that, at minimum, calls for separate assessments of whether each individual should be relocated in light of the individual's needs and, as best can be discerned, desires.[9]  For those assessments, the Court should require the district court to appoint guardians ad litem.  Such appointments are mandatory under Rule 17(c)(2) where, as here, "a minor or incompetent person . . . is unrepresented in an action."  *Powell v. Symons*, 2012 U.S. App. LEXIS 6467 (3d Cir., Mar. 30, 2012).  To avoid conflicts of interest, independent third parties — not plaintiffs' counsel or (as plaintiffs suggest, Pl/DPW Br. at 58-59) DPW personnel — must fill that role.  *Gardner v. Parson,* 874 F.2d 131, 137-41 (3d Cir. 1989).

---

9.    The assessor might consider, for example, the person's comfort and familiarity with current surroundings, affection for staff, and resistance to change.

## CONCLUSION

The trial court's certification of the class was error, and its approval of the settlement was an abuse of discretion. The Court should vacate the trial court's orders and remand for adjudication of the five named plaintiffs' claims.

Respectfully submitted,

/s/ *Carl A. Solano*

Carl A. Solano, I.D. No. 23986
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2000

/s/ *Benjamin J. Hoffart*

Benjamin J. Hoffart
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

*Attorneys for Appellants*

Dated: May 3, 2012.

# APPENDIX

## Trial Court Order
## Denying Motion for Partial Stay,

## Dec. 19, 2011

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANKLIN BENJAMIN, *et. al.*, | : | 1:09-cv-1182 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| DEPARTMENT OF PUBLIC , | : | Hon. John E. Jones III |
| WELFARE OF THE | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA and GARY | : | |
| ALEXANDER, in his official capacity | : | |
| as Secretary of Public Welfare of the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Defendants. | : | |

## ORDER

### December 19, 2011

The Joint Motion by Objectors for a Partial Stay of this Court's Order (Doc.

290) approving the settlement agreement in the above-captioned action is

**DENIED.**[1]

---

[1] We note that the Objectors fail to raise any novel arguments that have not been previously addressed by this Court in determining the fairness, adequacy, and reasonableness of the settlement agreement. In challenging the Court's decision, the Objectors fail to argue that the Court erred in its application of any one of the nine factors articulated by the Third Circuit in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), for determining the fairness of the settlement. Instead, the Objectors contend that the implementation of the agreement, as opposed to the substance of the agreement itself, is unsatisfactory and that the settlement agreement should be set aside because, in the Objectors view, this Court expressed its own hesitations with respect thereto in its Order approving the settlement. However, the language so heavily relied upon by the Objectors, where this Court expressed "serious doubt" as to the practicality and propriety of

1

/s John E. Jones III
John E. Jones III
United States District Court

---

portions of the agreement's implementation procedures and protocol, was mere dicta, an inconsequential observation premised on the Court's receipt of copious information during the fairness hearing regarding implementation. Thus, ultimately, the quoted language does not impact our holding that the settlement agreement represents a fair, adequate, and reasonable disposition of the case.

Moreover, we find that the Objectors have not otherwise provided argument supporting the presence of the four factors to be considered in deciding a motion to stay: a strong showing of likelihood of success on appeal, irreparable injury to the appellant absent a stay, lack of substantial injury to other parties interested, and that the public interest supports a stay. *See Nken v. Holder*, 556 U.S. 418, __, 129 S. Ct. 1749, 1760 (2009). The Objectors have failed to show a likelihood of success on appeal, one of the "most critical" factors to consider in determining whether to exercise our discretion to issue a stay pending appeal. *Id.* at 1760. Conclusory possibilities of success are insufficient for purposes of a motion to stay. *See id.* at 1761 (holding that "more than a mere 'possibility' of relief is required"). Again, the Objectors have not provided this Court with any novel arguments or facts proving the settlement unfair, inadequate, or unreasonable, and have thus provided no indication of grounds for reversal. Finally, the Objectors fail to plead a likelihood of irreparable injury, indeed failing to demonstrate anything more than mere speculation as to potential future harm, which *Nken* holds is insufficient to support a motion to stay. Accordingly, the Objectors' Motion to Stay is denied.

# CERTIFICATIONS

BENJAMIN HOFFART and CARL A. SOLANO certify:

*Bar membership*.  We are members in good standing of this Court's Bar.

*Type volume*.  This brief contains 6,990 words, as counted by Schnader Harrison Segal & Lewis LLP's Microsoft Office Word 2007 word-processing software.

*Electronic filing*.  The electronic version of this brief was prepared in portable document format (*.pdf*) and is identical to the paper version of this brief.  A virus scan was run on the electronic version of this brief and no virus was detected.

*Service*.  On May 3, 2012, we served this brief electronically on the following counsel, all of whom are Filing Users under Rule 113.2 of this Court, by the Notice of Docket Activity generated when the brief was electronically filed:

> Robert W. Meek, Esquire
> DISABILITY RIGHTS NETWORK OF PENNSYLVANIA
> 1315 Walnut Street, Suite 500
> Philadelphia, Pennsylvania 19107-4705
> *Attorney for Plaintiff-Appellees*

> Doris M. Leisch, Esquire
> OFFICE OF GENERAL COUNSEL
> PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE
> Third Floor West, Health & Welfare Building
> Harrisburg, Pennsylvania 17120
> *Attorney for Defendant-Appellees*

> Nancy Shane Rappaport, Esquire
> DLA PIPER LLP (US)
> 1650 Market Street, Suite 4900
> Philadelphia, Pennsylvania 19103
> *Attorney for Amici Curiae VOR, Inc. and 92 Member Amici*

Nathaniel S. Pollock, Esquire
U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION
Ben Franklin Station
P.O. Box 14403
Washington, DC 20044-4403
    *Attorney for Amicus Curiae United States*

Jeremy Heep, Esquire
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799
    *Attorney for Amicus Curiae The Arc of Pennsylvania*


/s/ *Benjamin J. Hoffart*
Benjamin J. Hoffart

/s/ *Carl A. Solano*
Carl A. Solano

Dated:  May 3, 2012.