**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-3684 and 11-3685
_____

FRANKLIN BENJAMIN, by and through his next friend,
Andre Yock; RICHARD GROGG and FRANK EDGETT, by
and through their next friend, Joyce McCarthy; SYLVIA
BALDWIN, by and through her next friend, Shirl Meyers;
ANTHONY BEARD, by and through his next friend, Nicole
Turman, on behalf of themselves and all
others similarly situated

v.

DEPARTMENT OF PUBLIC WELFARE OF THE
COMMONWEALTH OF PENNSYLVANIA; SECRETARY
OF PUBLIC WELFARE OF THE COMMONWEALTH OF
PENNSYLVANIA

CRAIG SPRINGSTEAD,
by and through his father and guardian, Bertin Springstead;
MARIA MEO,
by and through her mother and guardian, Grace Meo;
DANIEL BASTEK,
by and through his father and guardian, John Bastek;
MICHAEL STORM,
by and through his guardian, Polly Spare;
BETH ANN LAMBO,

by and through her father and guardian, Joseph Lambo;
RICHARD KOHLER,
by and through his sister and guardian, Sara Fuller;
MARIA KASHATUS,
by and through her father and guardian, Thomas Kashatus;
WILSON SHEPPARD,
by and through his brother and next friend Alfred Sheppard,

Appellants in No. 11-3684 *(Pursuant to Fed. R. App. 12(a))

DIANE SOLANO, by and through her brother and guardian
Carl A. Solano,

Appellant in No. 11-3685 *(Pursuant to Fed. R. App. 12(a))

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 1-09-cv-01182)
District Judge: Hon. John E. Jones, III
_____

Argued October 3, 2012

BEFORE: FUENTES, FISHER and COWEN,  Circuit Judges

(Filed: December 12, 2012)

Benjamin J. Hoffart, Esq.
Sidley Austin
787 Seventh Avenue
New York, NY 10019

      Counsel for Appellants in No. 11-3684

Carl A. Solano, Esq. (Argued)
Schnader, Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA 19103

      Counsel for Appellant in No. 11-3685

Nancy S. Rappaport, Esq.
DLA Piper
1650 Market Street
One Liberty Place, Suite 4900
Philadelphia, PA 19103

      Counsel for Amicus Curiae VOR, Inc.
      for Appellant in No. 11-3685

Robert W. Meek, Esq. (Argued)
Kelly L. Darr, Esq.
Disability Rights Network of Pennsylvania
1315 Walnut Street, Rm. 500
Philadelphia, PA 19107

      Counsel for Appellees Franklin Benjamin,
      Rich Grogg, Frank Edgett, Sylvia Baldwin,

3

and Anthony Beard

Doris M. Leisch, Esq. (Argued)
Pennsylvania Department of Public Welfare
Office of General Counsel
801 Market Street, Suite 6092
Philadelphia, PA 19107

      Counsel for Appellees Department of Public
      Welfare of the Commonwealth of Pennsylvania and
      Secretary of Public Welfare of the Commonwealth
      of Pennsylvania

Mark L. Gross, Esq.
United States Department of Justice
Civil Rights Division, Appellate Section
Room 3722
P.O. Box 14403
Ben Franklin Station
Washington, DC 20044

Nathaniel S. Pollock, Esq.
United States Department of Justice
Civil Rights Division
Room 3716
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

      Counsel for Amicus Curiae United States
      of America for Appellees

Jeremy D. Heep, Esq.
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

      Counsel for Amicus Curiae The Arc of
      Pennsylvania for Appellees

_____

OPINION

_____

COWEN, <u>Circuit Judge</u>.

Plaintiffs-Appellees are individuals with "mental retardation" who reside in intermediate care facilities operated by Defendants-Appellees Department of Public Welfare of the Commonwealth of Pennsylvania and the Secretary of Public Welfare of the Commonwealth of Pennsylvania. By and through their respective next friends, they brought this current class action in the United States District Court for the Middle District of Pennsylvania, alleging that Defendants have failed to offer community services to them and other similarly situated individuals in violation of the integration mandates of the Americans with Disabilities Act and the Rehabilitation Act. In turn, Appellants are several intermediate care facility residents who, by and through their own guardians or next friends,

have continued to oppose community placement and, among other things, have sought to intervene in this case. This matter has already been before this Court in a prior appeal, and we ultimately affirmed the District Court's denial of a motion to intervene filed by all but one of the current Appellants in connection with the merits stage of this case.

At this juncture, Appellants specifically appeal from the District Court's order denying the motions to intervene that they filed in connection with the remedy stage of this litigation as well as from the District Court's subsequent order granting final approval to the settlement agreement between Plaintiffs and Defendants. We conclude that the District Court did abuse its discretion by denying intervention as of right pursuant to Federal Rule of Civil Procedure 24(a)(2). Accordingly, we will vacate the District Court's intervention order insofar as it denied Appellants' motions to intervene as of right in the remedy stage of this litigation as well as its order granting final approval to the parties' settlement agreement. We, in turn, will remand this matter to the District Court with specific instructions to grant Appellants' motions to intervene as of right in the remedy stage of this litigation as well as to permit Appellants, as proper intervenors, to challenge the settlement agreement and to seek decertification of the class.

I.

As we observed in our prior ruling, the United States Supreme Court established in <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581 (1999), "that it is a violation of the

[Americans with Disabilities Act ("ADA")], the [Rehabilitation Act ("RA")], and their implementing regulations to force developmentally disabled patients to reside in institutions when they are able and willing to live in a manner more fully integrated into the community." Benjamin ex rel. Yock v. Dep't of Pub. Welfare, 432 F. App'x 94, 95 (3d Cir. 2011). "At the same time, Olmstead and the regulations make clear that 'community based treatment [cannot] be imposed on patients who do not desire it.'" Id. (quoting Olmstead, 527 U.S. at 602).

The named Plaintiffs-Appellees in this class action are five individuals with "mental retardation" who are institutionalized in intermediate care facilities for persons with "mental retardation" ("ICFs/MR")[1] operated by Defendants-Appellees Department of Public Welfare of the Commonwealth of Pennsylvania and the Secretary of Public Welfare of the Commonwealth of Pennsylvania (collectively "DPW"). Franklin Benjamin, Richard Grogg, Frank Edgett, Sylvia Baldwin, and Anthony Beard—by and through their respective next friends and represented by attorneys from the Disability Rights Network of Pennsylvania ("DRN")— specifically alleged in their amended complaint that DPW has violated the ADA and the RA by failing "to offer and provide

---

[1] We note that the mental health community has been working to change the terminology used in this context from terms such as "mental retardation" to terms like "intellectual disabilities." Following the example set, *inter alia*, by the definition of the class as well as our own prior ruling in this case, we generally use the term "mental retardation."

Plaintiffs with the opportunity to receive services in integrated, community settings that are most appropriate settings to meet their needs." Benjamin ex rel. Yock v. DPW, 267 F.R.D. 456, 459 (M.D. Pa. 2010) (citation omitted). In their class action allegations, Plaintiffs claimed that "there are approximately 1,272 individuals who reside in Pennsylvania's five state-operated ICFs/MR." (JA79.)

Plaintiffs filed an unopposed motion to certify a class under Federal Rule of Civil Procedure 23(b)(2). On September 2, 2009, the District Court entered an order granting this unopposed motion and certifying the following class: "All persons who: (1) currently or in the future will reside in on [sic] of Pennsylvania's state-operated intermediate care facilities for persons with mental retardation; (2) could reside in the community with appropriate services and supports; and (3) do not or would not oppose community placement." (JA39.) DPW, for its part, filed an unsuccessful motion to dismiss.

The individual Appellants are also ICF/MR residents. By and through their guardians or next friends, Appellants have continued to oppose community placement and have sought to participate in this litigation. On November 10, 2009, eight of the nine current Appellants—Craig Springstead, Maria Meo, Daniel Bastek, Michael Storm, Beth Ann Lambo, Richard Kohler, Maria Kashatus, and Wilson Sheppard (who was originally a Plaintiff in this action)—

moved to intervene ("Springstead Intervenors").[2]    The existing parties opposed any intervention, and the District Court denied this initial intervention motion in a memorandum and order entered on March 10, 2010.

According to the District Court, the Springstead Intervenors met the applicable timeliness requirement but then failed to satisfy the remaining prerequisites for intervention as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) (i.e., a sufficient interest in the litigation, the interest may be affected or impaired as a practical matter by the disposition of the action, and the interest is not adequately represented by an existing party).    It also concluded that permissive intervention under Federal Rule of Civil Procedure 24(b) was unwarranted.

The Springstead Intervenors appealed.    They were supported in this appeal by current Appellant Diane Solano (by and through her brother and guardian, Carl Solano, Esquire), who appeared as an Amicus.

While this appeal was pending, the existing parties filed cross-motions for summary judgment.    On January 27, 2011, the District Court granted Plaintiffs' motion with respect to the underlying liability of DPW.    See Benjamin ex rel. Yock v. DPW, 768 F. Supp. 2d 747, 748-57 (M.D. Pa. 2011).    Specifically, it entered judgment in favor of Plaintiffs and all others similarly situated and declared that DPW was

_____

[2] The Springstead Intervenors also originally included Richard Clarke, but he subsequently died.

still not in compliance with the integration mandates established by the ADA and the RA with respect to these individuals. Acknowledging the Commonwealth's budgetary constraints and DPW's own limited resources, the District Court stated that the DPW cannot continue its practice of unnecessary segregation. However, the District Court did not believe it was in a position to issue the requested injunction "given the need for extensive detail therein and eventual oversight for any such relief provided." Id. at 757. It therefore stated that this action "will remain open until determination of the proper remedy" and scheduled a conference call to address the need for further submissions as well as for a possible hearing on the question of injunctive relief. Id. The parties were expressly encouraged to return to mediation armed with "this mandate" and attempt "to formulate a resolution that implements a realistic plan that fully complies with the ADA and RA." Id. at 757 n.12.

In a non-precedential opinion filed on April 5, 2011, this Court disposed of the appeal filed by the Springstead Intervenors. See Benjamin ex rel. Yock v. DPW, 432 F. App'x 94, 96-99 (3d Cir. 2011). Generally applying an abuse of discretion standard of review, we affirmed the District Court's denial of both intervention as of right and permissive intervention.

Initially, Plaintiffs "recognize that 'Olmstead requires that patients eligible and desirous of community placement be discharged into community-based programs [only] if placement can be reasonably accommodated, taking into account the resources of the state and the needs of other

10

persons in its care.'"  Id. (quoting Frederick L. v. DPW, 422
F.3d 151, 156-57 (3d Cir. 2005)).  "By way of remedy,"
Plaintiffs sought an injunction directing DPW:

> . . . (1) to maintain a "Planning List that consists
> of all state ICF/MR residents who have been
> identified as not opposed to discharge to
> community services," (2) to promptly place "on
> the Planning List the named Plaintiffs and any
> other state ICF/MR residents identified by the
> ICF/MR Facility Directors as having
> affirmatively expressed their desire to be
> discharged to the community," (3) to question
> "ICF/MR residents and/or their involved family
> or guardians" at least annually regarding their
> current preference in order to keep the Planning
> List current, and (4) beginning in fiscal year
> 2011-12, to "develop and implement a viable
> integration plan that provides community
> services to at least 100 individuals on the
> Planning List annually for each of the first three
> years" and for at least 75 individuals from that
> list thereafter until all on the list have been
> discharged.

Id. at 96-97 (citation omitted).  We further noted that
summary judgment was entered in favor of Plaintiffs "on the
liability issue" and that "[t]he remedy issue remains before
[the District Court]."  Id. at 97.

    With respect to intervention as of right under Rule

11

24(a)(2), the Springstead Intervenors specifically "insist that
their interest in remaining in their current institutional setting
is clearly sufficient to warrant intervention." Id. at 98. We,
however, agreed with the District Court "that Intervenors'
interest in maintaining their current form of care is not
directly in jeopardy in this litigation." Id. In other words:

> The current parties have deliberately defined the
> class and the relief sought so that Intervenors'
> right to choose institutional treatment would not
> be affected.
>
> The District Court made its intent clear.
> The class it certified expressly excludes all
> current and future residents of ICFs/MR who
> oppose, or would at any relevant time in the
> future oppose, community placement. It
> therefore excludes Intervenors, and they will
> not be personally bound by anything that is
> decided in this litigation. It follows that, if the
> DPW should threaten in the future to coerce
> them into leaving their current institutions,
> Intervenors would be free to file their own suit
> and litigate whether they have a legally
> enforceable right to remain in the institution
> where they currently reside.

Id. (footnotes omitted). We observed in a footnote that the
Springstead Intervenors were critical of the class definition
because it purportedly "requires an inquiry into the mental
state of class members." Id. at 98 n.3. Nevertheless, this

12

contention, regardless of "[w]hether [it] poses a problem for other purposes," did not pose one in the current context.  Id.  "It is sufficient for present purposes to hold that their current opposition to community placement currently excludes them from the class.  If they hereafter are persuaded to drop that opposition, they will no longer be in a position to represent the interest they seek to defend here."  Id.  We likewise refused to express an opinion as to whether the Springstead Intervenors "have a legally enforceable right to remain in the institution where they currently reside," id. at 98, and, instead, merely "assume, without deciding, that they do," id. at 98 n.4.

Having determined that the Springstead Intervenors were not class members, we then considered their alternative theory that "'their interest is likely to be affected as a practical matter by the outcome of the lawsuit because the relief sought by Plaintiffs is likely to result in closure of ICFs/MR.'"  Id. at 98 (citation omitted).  While they did not suggest a danger that "any remedy afforded to Plaintiffs in this action will include a requirement that an ICF/MR be closed," the Springstead Intervenors did fear "that budget constraints will cause the DPW to allocate its resources in a different manner if it is required by this suit to satisfy its obligations under the ADA and that this may result in its closing one or more ICFs/MR."  Id.  We, however, rejected this theory:

> While it is, of course, possible that providing additional community placements will occasion some reallocation of the limited

13

resources of the DPW, it is not possible to determine at this point whether that reallocation will result in the closing of one or more ICFs/MR, and we decline to speculate on that matter. It is sufficient to hold that any possible impact on Intervenors' interest in maintaining their current institutional care is not the kind of direct impact that gives rise to a right to intervene. In virtually every suit successfully prosecuted against a governmental entity, the judgment will occasion some reallocation of limited public resources. Every competitor for those limited resources has an interest that potentially may be adversely affected by that reallocation. We have found no case, however, suggesting that the interest of such a competitor justifies intervention in litigation addressing issues in which he or she has no other interest. If such a competitor believes that he or she has an enforceable right for the services of the public entity, he or she may bring his or her own suit.

Where a party has an interest in property over which the court has taken jurisdiction, and the party has an interest in "being heard with respect to the disposition of [a particular] fund[,] . . . such an interest is sufficient to support an applicant's intervention as of right." Mountain Top Condominium Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 368

14

(3d Cir. 1995). Here, the court has not taken control of DPW funds and Intervenors do not have a legal right to particular funds. They may have a right to certain benefits from the state, but not a right to a particular fund.

In [Harris v. Pernsley, 820 F.2d 592 (3d Cir. 1987)], we held that a District Attorney lacked the right to intervene in a suit seeking a cap on the prison population where the DA argued such a ceiling would limit his ability to carry out his duties as a law enforcement officer. 820 F.2d at 601. Because the DA did not administer the prison, and the consent decree placing a ceiling on the prison population would only tangentially affect his ability to prosecute, we held that he had no right to intervene. See [Kleissler v. U.S. Forest Serv., 157 F.3d 964, 969-70 (3d Cir. 1998)]. Similarly here, the relief sought by Plaintiffs— that the DPW offer a choice of community placement to ICF/MR patients who do not oppose such placement—will only tangentially affect the rights of those who are opposed. Intervenors therefore are not entitled to intervene as their interests will not be directly affected by the relief sought.

Id. at 98-99 (footnote omitted).

Because we ultimately concluded that "Intervenors

15

lack sufficient interest to intervene," this Court did not address "their contention that the DPW is an inadequate representative." Id. at 99 n.5.

On May 19, 2011, Plaintiffs and DPW finalized a proposed "Settlement Agreement." This fifteen-page document contains several significant components, including the establishment of: (1) an annual assessment process to create, maintain and update a "Planning List" consisting of "all state ICF/MR residents who have been identified as not opposed to discharge to community placement" (JA470); (2) educational, training, and outreach programs about community placement; (3) a viable "Integration Plan" providing community placements to a minimum number of ICF/MR residents on the Planning List in each fiscal year until each and every resident on the Planning List has been discharged; and (4) a number of budgetary steps designed to facilitate compliance with this Integration Plan.

The District Court preliminarily approved the Settlement Agreement on May 27, 2011. Notice was then disseminated to all ICF/MR residents, guardians, and involved family members. The District Court subsequently received, *inter alia*, at least one objection from an ICF/MR resident and 101 objections from guardians or involved family members of ICF/MR residents. Plaintiffs filed an unopposed motion for final approval, which was supported, *inter alia*, by the federal government.

In contrast, the Springstead Intervenors and Solano, in addition to submitting their own objections, filed separate

motions to intervene. The District Court formally denied
Appellants' respective intervention motions in an August 16,
2011 order. According to the District Court, it "thoroughly
considered the most effective procedure for the conduct of the
August 22, 2011 [fairness] hearing and the Objectors'
requests to actively participate." (JA34.) However, it
determined that there was no cause to honor Appellants'
request to hold a separate hearing on "that matter." (Id.)
"Because it is the parties' burden to demonstrate at the
hearing that the Proposed Settlement is fair, adequate, and
reasonable, we shall take testimony and fact evidence
presented only by the parties." (Id.) The District Court also
stated that "we shall fully consider the objections in the
record and will further allow" Appellants, through one
attorney designated by them, to question the respective
witnesses. (Id.) Indicating that it thereby was partially
granting the relief sought by Appellants "by allowing them to
reasonably participate" in the fairness hearing, the District
Court incorporated by reference "our March 10, 2010 Order
denying the Springstead Intervenors' original Motion to
Intervene, which was affirmed by the Third Circuit." (Id.) It
therefore went on to "find that full intervention is
unwarranted and improper." (Id.)

The fairness hearing went ahead as scheduled. The
existing parties presented testimony from three witnesses:
Pamela Kuhno, Director for DPW's Division for ICF/MR
Programs, Patricia McCool, Acting Director of DPW's
Bureau of Supports, and Colleen Sassaman, a Facility
Advocate at the Selinsgrove State Center who (like other
ICF/MR Facility Advocates) is actually employed by DRN.

17

Mr. Solano cross-examined these witnesses. The District Court also heard from several family members, and Mr. Solano was permitted to present arguments on Appellants' behalf.

On September 2, 2011, the District Court ultimately approved the settlement as fair, reasonable, and adequate (and also awarded attorney fees and costs to Plaintiffs). <u>See Benjamin ex rel. Yock v. DPW</u>, 807 F. Supp. 2d 201, 203-214 (M.D. Pa. 2011). However, in the process, it did express some concerns of its own. In particular, the District Court advised the parties to implement the settlement with caution due to certain doubts arising out of the protocol and questionnaire forms developed by the parties, and it further indicated that the parties might wish to revise the protocols at issue.

The Springstead Intervenors and Solano filed separate notices of appeal. They also moved for a stay pending resolution of their appeals of:

> . . . that portion of the [District Court's] September 2, 2011 decision that permits relocation of any State Center resident who has been placed on the Planning List because (a) he or she was deemed to have expressed "No preference" because (in the words of the assessment protocol) he or she failed to provide input in any manner than can be discerned in response to the questions" on the protocol used to implement the settlement, and (b) no

18

> guardian or involved family member could
> speak on the resident's behalf, either because no
> such guardian or family member exists or
> because DPW was unable to contact that person
> and therefore deemed the person to have "No
> preference" regarding where the resident should
> live.

(JA1520-JA1521.)  The District Court denied this motion in a
December 19, 2011 order, finding that Appellants failed to
show either a likelihood of success on appeal or a likelihood
of irreparable injury.  According to the District Court, its
earlier language regarding the implementation procedures and
protocol was nothing more than mere dicta.  Meanwhile, the
two appeals filed by Appellants were consolidated.  After we
heard oral argument, Appellants filed another motion for a
partial stay with this Court.  Over Appellees' opposition, we
granted this motion on October 25, 2012.

This Court has also received three amicus briefs.
VOR, Inc., together with ninety-two individuals who are
members of this disability rights advocacy organization
(including several guardians and family members who had
submitted objections to the Settlement Agreement), filed a
brief in support of Appellants and reversal.  On the other
hand, the federal government and, another advocacy
organization, the Arc of Pennsylvania, submitted briefs in
support of Appellees and affirmance.

II.

19

The District Court had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a). We have appellate jurisdiction under 28 U.S.C. § 1291

This Court reviews "a district court's denial of permissive intervention and intervention of right for abuse of discretion but applies a more stringent standard to denials of intervention of right." Benjamin, 432 F. App'x at 97 (citing Brody v. Spang, 957 F.2d 1108, 1115 (3d Cir. 1992)). "We will reverse a district court's determination on a motion to intervene of right if the court 'applied an improper standard or reached a decision that we are confident is incorrect.'" Id. (quoting Brody, 957 F.2d at 1115).

III.

Appellants contend that the District Court committed reversible error by certifying the class and granting final approval to the Settlement Agreement. Appellees just as vigorously defend class certification and the fairness of their Settlement Agreement. However, the current appeals present the following threshold question: whether or not the District Court abused its discretion by denying Appellants' motions to intervene as of right filed in connection with the remedy stage of this complex and important case and thereby to challenge, as intervenors, the propriety of both the Settlement Agreement and class certification. Taking into account the basic requirements for intervention as of right under Rule 24(a)(2), the specific circumstances of this case, and the fact that the District Court actually relied on its liability-stage analysis of these requirements to deny Appellants' remedy-

20

stage motions to intervene, we ultimately conclude that the District Court did abuse its discretion. Simply put, we believe that Appellants are entitled to participate as intervenors in the remedy stage of this case and—as intervenors—should thereby have the opportunity to challenge the parties' Settlement Agreement and to seek decertification of the underlying class. We, therefore, will vacate the District Court's order of August 16, 2011 insofar as it denied Appellants' motions to intervene as of right in the remedy stage of this litigation. We will also vacate the District Court's September 2, 2011 order granting final approval of the Settlement Agreement because Appellants should have been allowed to participate as intervening parties. We, in turn, will remand this matter to the District Court with specific instructions to grant Appellants' motions to intervene as of right in the remedy stage of this litigation as well as to permit Appellants, as proper intervenors, to challenge the Settlement Agreement and to seek decertification of the class. On the other hand, we express no opinion as to whether or not the Settlement Agreement (or any other settlement that may be reached in this proceeding) should ultimately be approved or disapproved—or whether or not the class itself should be decertified.

## A.      Intervention As Of Right Under Rule 24(a)(2)

As we recognized in our previous ruling in this proceeding, Rule 24(a)(2) provides that

> **(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

21

. . . .

> **(2)** claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

A movant seeking to intervene under Rule 24(a)(2) must satisfy the following requirements: "(1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter, by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation." In re Cmty. Bank of N. Va., 418 F.3d 277, 314 (3d Cir. 2005) (quoting Harris v. Pernsley, 820 F.2d 592, 596 (3d Cir. 1987)).

Appellants moved to intervene after they had received notice of the Settlement Agreement signed by the parties. While permitting a limited degree of participation at the fairness hearing, the District Court formally denied their remedy-stage motions to intervene in a short order. Significantly, it did so without specifically applying (or even mentioning) the prerequisites for intervention as of right. Instead, the District Court simply incorporated by reference its earlier order denying the original liability-stage motion to intervene filed by the Springstead Intervenors and referenced

22

the fact that this Court affirmed its order.  We likewise begin our own analysis with our prior ruling in this case, but we do not stop there.

### 1.    Our Prior Ruling and Class Membership

Not surprisingly, Appellees place particular emphasis on our earlier intervention decision and turn to the law of the case doctrine.  "'[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  In re Pharmacy Benefit Managers Antitrust Litig., 582 F.3d 432, 439 (3d Cir. 2009) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).  In the absence of extraordinary circumstances, this Court should generally adhere to its own prior rulings arising out of the same case.  See, e.g., id.

With respect to this narrow issue of class membership, we agree with Appellees.  Appellants insist that they are (or have become so since this Court's prior opinion) members of the class certified by the District Court.  However, their arguments were previously—and unsuccessfully—advanced before both the District Court and this Court.  We observed that "the class [that the District Court] certified expressly excludes all current and future residents of ICFs/MR who oppose, or would at any relevant time in the future oppose, community placement" and that "it therefore excludes Intervenors."  Benjamin, 432 F. App'x at 98 (footnote omitted).  Appellants have continued to oppose community placement, and the definition of the class itself has not changed.  Likewise, we do not believe that our prior

23

conclusion with respect to class membership should be altered.

Appellees also argue that, because Appellants had urged this Court to allow intervention based on the class definition's alleged impropriety (and had relied on the same basic grounds that they now raise in the present appeals), we thereby litigated and rejected their class certification challenge and that our prior determination disposes of Appellants' current challenge.  However, we simply decided that the District Court did not abuse its discretion by denying intervention.  We thereby did not actually rule on the specific question of whether the class itself should or should not be decertified.  Likewise, as we explain in more detail below, we rendered our ruling in connection with the liability—as opposed to the remedy—stage of this case.  Although we now conclude that the District Court committed reversible error as to intervention under Rule 24(a)(2) with respect to the remedy stage of this case, we similarly need not—and do not decide—whether the class itself should (or should not) be decertified.

## 2.    Timeliness

The District Court did not address the timeliness of Appellants' remedy-stage motions to intervene.  In its initial liability-stage decision (which it incorporated by reference), it expressly found that the Springstead Intervenors' first motion to intervene was filed in a timely fashion, and, in turn, its timeliness finding was not raised on appeal.  Appellees concede that Appellants' subsequent motions were filed in a

timely fashion insofar as Appellants sought to challenge the Settlement Agreement.  However, they go on to argue that the motions were untimely with respect to class certification.  We believe that Appellants do satisfy this timeliness requirement.

"To determine whether the intervention motion is timely, we have listed three factors for courts to consider:  (1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay."  <u>Mountain Top</u>, 72 F.3d at 369 (citing <u>In re Fine Paper Antitrust Liquidation Litig.</u>, 695 F.2d 494, 500 (3d Cir. 1982)).  There is a general reluctance to dispose of a motion to intervene as of right on untimeliness grounds because the would-be intervenor actually may be seriously harmed if not allowed to intervene.  <u>See, e.g.</u>, <u>id.</u>  The delay should be measured from the time the proposed intervenor knows or should have known of the alleged risks to his or her rights or the purported representative's shortcomings.  <u>See, e.g.</u>, <u>United Airlines, Inc. v. McDonald</u>, 432 U.S. 385, 394 (1977).  "The mere passage of time, however, does not render an application untimely."  <u>Mountain Top</u>, 72 F.3d at 369 (citations omitted).

The Springstead Intervenors initially moved to intervene on November 10, 2009, a relatively short period of time after the District Court granted Plaintiffs' unopposed motion and certified the class on September 2, 2009.  They, however, were unsuccessful before both the District Court and (together with Solano as Amicus) on appeal.  Given the law of the case doctrine, it would have been futile for Appellants to file yet another motion to intervene until circumstances changed.    They then filed the instant

intervention motions after the liability stage of the case was finished and the remedy stage began.  In particular, Ms. Solano moved to intervene on July 28, 2011, and the Springstead Intervenors did so on August 2, 2011.  These motions were filed soon after Appellants received (together with other ICF/MR residents, guardians, and involved family members) notice of the Settlement Agreement negotiated by Appellees—which had been preliminarily approved by the District Court on May 27, 2011 and which was to be the subject of a fairness hearing scheduled for August 22, 2011. Appellants also submitted objections to the Settlement Agreement and filed their motions to intervene before the objection deadline of August 2, 2011.  Although we ultimately have concluded to the contrary, Appellants could have believed that, given these circumstances, they were now members of the class certified by the District Court.  More significantly, Appellants, even as non-class members, now had more than adequate reasons to believe that—because of the terms of the Settlement Agreement itself—they satisfy the remaining requirements for intervention as of right with respect to this remedy stage of this proceeding.  In fact, we actually conclude that they do meet these requirements.

We similarly note that the class definition in this case is quite open-ended.  Individuals—like Appellants themselves—could very well become members if, for instance, ICF/MR residents, their guardians, or their involved family members no longer oppose community placement. The Settlement Agreement itself establishes, among other things, an annual and mandatory assessment process to determine whether the residents (and their guardians and

26

involved family members) no longer oppose community placement. Because the parties' Settlement Agreement thereby provides a mechanism by which new members will continuously be identified and the class composition can— and will likely—change, we believe that the definition of the class does, in fact, affect the fairness of the Settlement Agreement.

Likewise, in certifying a class under Rule 23(b)(2), the cohesiveness of the class must be considered with respect to whether the relief is appropriate for all class members. See, e.g., Gates v. Rohm & Haas Co., 655 F.3d 255, 264 (3d Cir. 2011) ("The 'disparate factual circumstances of class members' may prevent a class from being cohesive and, therefore, make the class unable to be certified under Rule 23(b)(2)." (quoting Carter v. Butz, 479 F.2d 1084, 1089 (3d Cir. 1973))); Neal ex rel. Kanter v. Casey, 43 F.3d 48, 59 (3d Cir. 1994) ("What is important is that the relief sought by the named plaintiffs should benefit the entire class."). The fairness of the Settlement Agreement appears to be intertwined with the cohesiveness requirement because the Settlement Agreement constitutes the relief that Plaintiffs ultimately obtained in this litigation. Appellants' objections to certification therefore are properly considered as a component of their objections to the Settlement Agreement itself.

Insofar as Appellees agree that the intervention motions were filed in a timely fashion with respect to the Settlement Agreement, we do not see how they could suffer any real prejudice if Appellants' attempt to intervene with

respect to the closely related issue of class certification was also considered.  Indeed, "[e]ven after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."  General Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982) (footnote omitted).

### 3.    Interest and Disposition's Effect on Interest

In our previous opinion in this case, we affirmed the District Court's denial of intervention "[b]ecause we conclude that Intervenors lack sufficient interest to intervene." Benjamin, 432 F. App'x at 99 n.5.  We specifically observed that "[t]he claimed interest in the litigation must be one that 'is specific [to those seeking to intervene], is capable of definition, and will be directly affected in a substantially concrete fashion by the relief sought.'"  Id. at 98 (quoting Kleissler, 157 F.3d at 972).  The "'polestar'" for intervention is "'whether the proposed intervenor's interest is direct or remote.'"  Id. (quoting Kleissler, 157 F.3d at 972).  A proposed intervenor's interest need not be a legal interest, provided that he or she "'will be practically disadvantaged by the disposition of the action.'"  Id. at 98 (quoting Kleissler, 157 F.3d at 970).  "However, rather than merely showing some impact, 'the applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene.'"  Id. (quoting Harris, 820 F.2d at 601).

Furthermore, proposed intervenors need not possess an interest in each and every aspect of the litigation.  See, e.g., Mountain Top, 72 F.3d at 368.  Instead, "[t]hey are entitled to

intervene as to specific issues so long as their interest in those issues is significantly protectable." Id. (citations omitted). We therefore have recognized that "it is appropriate in certain cases to conduct a two-step examination, separately evaluating whether the applicant has a right to intervene at the merits stage and whether he or she may intervene to participate in devising the remedy." Brody, 957 F.2d at 1116 (citing Harris, 820 F.2d at 599). In the end, we conclude that this is one of those cases.

In our prior ruling, we did make some references to the relief requested by Plaintiffs. However, these statements were made in a specific context—the merits stage of this complex case. We accordingly observed that the District Court entered summary judgment in favor of Plaintiffs "on the liability issue" following the filing of the Springstead Intervenors' appeal and that "[t]he remedy issue remains before it." Benjamin, 432 F. App'x at 97. In fact, the District Court explicitly refused to dispose of this "remedy issue" in its summary judgment ruling, explaining that it was not in a position to issue the injunction requested by Plaintiffs "given the need for extensive detail therein and eventual oversight for any such relief provided." Benjamin, 768 F. Supp. 2d at 757. It also referred to the Commonwealth's "budgetary constraints" and the DPW's own "limited resources." Id. Scheduling a conference call to address the need for further submissions as well as a possible hearing on the extent of injunctive relief, the District Court even encouraged the parties to return to mediation and formulate "a realistic plan that fully complies with the ADA and RA." Id. at 757 n.12.

29

Considering the terms of the Settlement Agreement entered by Appellees, we ultimately determine that Appellants possess "a sufficient interest" in the remedy stage of the litigation and that their "interest may be affected or impaired as a practical matter" by the disposition of this distinct stage of the litigation.  Simply put, there are several components of the Settlement Agreement reached by the parties (and ultimately approved by the District Court after it denied Appellants' motions to intervene) that may affect or impair the protectable interests of Appellants themselves as well as other ICF/MR residents, guardians, and involved family members.  We also note that Appellants' interests in this stage of this complex yet important case—and the possible effects of the disposition of this stage on their interests—extend to the District Court's underlying class definition.  Just like the actual class members, they may be affected by the Settlement Agreement and, among other things, appear to be in "the best position to apprise the court of any unforeseen or undisclosed impact that the class definition may have on its evaluation of [a settlement agreement]."  Ligas ex rel. Foster v. Maram, No. 05 C 4331, 2010 WL 1418583, at *6 (N.D. Ill. Apr. 7, 2010); see also, e.g., General Tel. Co., 457 U.S. at 160 (stating that certification order may be modified in light of subsequent developments).

Initially, we must not overlook the specific characteristics of the ICF/MR residents—as well as their guardians and involved family members.  In short, this case implicates the health, safety, and welfare of more than a thousand highly vulnerable individuals.  For instance, as

30

DPW has closed ICFs/MR around the Commonwealth, it has moved residents into community placements.  More than three-fourths of all remaining ICF/MR residents are diagnosed as having profound "mental retardation," and many residents have other disabilities as well.  For example, Ms. Solano has a mental age at or below one year, is non-verbal, is incapable of caring for herself or understanding more than the simplest commands, and thereby needs constant around-the-clock care.  Likewise, her condition stems from Down's Syndrome, and, like other older individuals with Down's Syndrome, she has early stages of dementia together with a broad range of physical ailments.  According to Appellants, 59% of all residents are non-verbal, nearly 50% are unable to walk, 56% have seizure disorders, 27% have cerebral palsy, 26% have autism, 23% are visually impaired, and 16% require a feeding tube.  Many residents, in turn, have lived at these facilities for several decades.  Close relationships have often developed between residents and staff members.  For instance, at least one ICF/MR resident calls staff members "Mommy."

The ICF/MR residents are not the only individuals who have aged—so have their closest family members.  Because, among other things, parents have passed away, there are some residents who have no close relatives involved in their care.  Therefore, it appears that 82% of all residents have no appointed guardian.  On the other hand, approximately 80% of the residents do apparently have either a guardian or, at least, an involved family member.

Turning to the Settlement Agreement negotiated by the

31

parties and approved by the District Court, we begin by observing that it subjects Appellants and all other ICF/MR residents, guardians, and involved family members to an annual—and mandatory—assessment process. DPW specifically agreed to create, maintain, and update a "Planning List" consisting of "all state ICF/MR residents who have been identified as not opposed to discharge to community placement." (JA470.) Specifically, DPW "will assess opposition to discharge by state ICF/MR residents and their involved families or guardians no later than September 30, 2011, and at least annually thereafter." (Id.) "[T]he state ICF/MR resident's social worker or Community Transition Specialist, or both, together with the Facility Advocate, will determine whether the state ICF/MR resident should be placed on the State ICF/MR Planning List based on discussions with the resident and involved family or guardians to assess their position as to community placement." (Id.) Evidently, each and every ICF/MR resident, guardian, and involved family member has been required to undergo these reviews, and there is no mechanism for opting out of this ongoing procedure. We also note that the initial assessments were completed by September 2011, resulting in 238 residents ending up on the Planning List.

It is uncontested that the Facility Advocates are employees of DRN, the organization that has represented Plaintiffs throughout the course of this litigation. In cases of disagreement, the Facility Director makes the final decision, but he or she must do so based, *inter alia*, on interviews with the Facility Advocate. Furthermore, Appellees acknowledge that the Facility Advocates, as "generally passive observers,"

32

do "occasionally provide input to answer questions or to correct gross misunderstandings (such as that the Agreement requires institutional closures)." (Appellees' Brief at 62.)  In turn, one of the objectors (Kenneth Myers, who joined in the brief supporting Appellants that was filed by VOR, Inc.) stated under oath at the fairness hearing that "the facility advocate at White Haven Center was very insistent on inserting her views into the interview process and questioned me repeatedly about the wisdom of my choices as guardian for my sister." (JA1449.)  Sassaman, a Selinsgrove Facility Advocate, likewise testified that she drew a comparison between moving to a community placement and a vacation— at least for purposes of making it clear that the residents would not be moving to another site (also apparently called a "community") at the ICF/MR facility.   Appellees' "State Center (ICF/MR) Community Planning List Assessment" form also includes questions such as:  "Do you want to live closer to your family?" (JA1499.)

Appellants take issue with the Settlement Agreement's allegedly one-sided educational, training, and outreach programs.  The Settlement Agreement sets up a Steering Committee for the express purpose of developing and implementing "a program to educate state ICF/MR residents and their involved families about community placement." (JA472.)  This Steering Committee must include, among its various members, representatives from DRN, a community care provider, the entities that contract with DPW to administer the community care system, together with an individual with intellectual disabilities living in the community as well as a family member of a person with

33

intellectual disabilities living in the community.    The Settlement Agreement, in turn, says nothing about any possible disadvantages or risks of community placement or about the possible advantages of ICF/MR care.    On the contrary, the Steering Committee is required to develop a training curriculum that addresses, among other things, the availability of "specialized programs" for elderly, medically fragile, or difficult individuals, funding for community services, and "opportunities to participate in community life." (JA473.)  According to the Settlement Agreement, DPW must conduct a minimum of three training sessions at each of the five ICFs/MR every year.  DPW is also required to provide ICF/MR residents and their guardians and involved family members with opportunities to visit community placements, meet with providers, and, as part of a one-to-one outreach program, discuss community placements with family members of individuals with intellectual disabilities who currently live in community settings.    "State ICF/MR residents and their involved families and guardians will be given an opportunity after they participate in training events or have outreach contacts to state their position on discharge," and DPW then "will supplement or amend" the Planning List. (JA474.)  DPW likewise must provide periodic status reports on its implementation of the Settlement Agreement, but the Settlement Agreement does not expressly require any updates on such issues as whether relocated residents are being provided with appropriate care in their community placements or whether any mistakes have been made in the assessment and relocation processes.

In fact, the annual and mandatory assessment

34

procedure appears to involve a kind of default rule for a number of ICF/MR residents.  The Settlement Agreement expressly provides that, "[i]f the state ICF/MR resident does not express opposition to considering community placement, the resident will be placed on the State ICF/MR Planning List" with the following exceptions:  (1) if the resident does not express a preference for community placement but has involved family or a guardian who is opposed to community placement; or (2) if the resident expresses a preference for community placement but has a guardian who is opposed to community placement.    (JA471.)    The "State Center (ICF/MR) Community Planning List Assessment Protocol" states that, "[i]f the person does not provide input in any manner that can be discerned in response to the questions in this section, [it is to be] indicate[d] that they have no preference regarding living in the community."  (JA1497.) "[R]esidents will be placed on the State ICF/MR Planning List" if, *inter alia*, "Person has no preference and has no involved family/guardian" or "Person has no preference and there is no involved family/guardian opposition."  (JA1498.) In the end, it appears that a resident whose disabilities are so severe that he or she is incapable of expressing, in some fashion, where he or she wishes to live—and who otherwise lacks a guardian or involved family member or his or her guardian or involved family member fails to express opposition to community placement—must be placed on the Planning List.

Appellants themselves (whose guardians and involved family members have so adamantly opposed community placement) do not fall within this default category at this

present time.  However, Appellants evidently face an ongoing and mandatory mechanism in which a non-responsive resident is placed on the Planning List unless the guardian or involved family member continues to make his or her opposition known each and every year until the Settlement Agreement expires.  If an Appellant's aging guardian or involved family member dies or otherwise becomes unable to express his or her opposition on behalf of the ICF/MR resident, it appears that his or her past opposition would no longer preclude application of this apparent default rule and the resident's inclusion on the Planning List.  The guardian or involved family member must continue to communicate his or her continuing opposition to the DPW and otherwise find and designate an adequate substitute or successor.  Indeed, it appears that a "no preference" response for the guardian or involved family member is entered if DPW is unable to reach him or her after three telephone calls and the delivery of a certified letter.

Turning to the community placement system itself, we acknowledge that Plaintiffs and DPW agreed that all ICF/MR residents, with the appropriate supports and services, could live in the community setting and that the District Court itself accepted this admission.  However, we further note that Appellants and Appellees (together with the respective Amici) vigorously contest the capacities and characteristics— as well as the respective benefits and risks—of the community placement and ICF/MR systems.  In any case, inclusion on the Planning List and subsequent relocation from an ICF/MR to a community placement obviously has serious consequences—whether good or bad—for the relocated

resident as well as any guardian or involved family member he or she may have. Among other things, an ICF/MR resident moved to a community placement then generally has a 60-day trial period in which to return to his or her prior placement. After that period expires, it appears that a court order generally must be obtained for the resident to return to the ICF/MR.

Finally, "Appellants believe the settlement will have an adverse effect on the State Centers" (Appellants' Reply Brief at 5), claiming that "the settlement will depopulate them and may cause a reduction in their funding[, a reduction in the quality of care provided at the ICFs/MR,] and, ultimately, one or more of their closures" (Appellants' Brief at 64). While it was "not possible to determine . . . whether . . . reallocation will result in the closing of one or more ICFs/MR" at the time of our prior opinion, the remedy stage of this case renders Appellants' interests here far less speculative. Benjamin, 432 F. App'x at 98-99. The Settlement Agreement itself addresses the critical question of funding at some length. Among other things, it evidently requires DPW to: (1) request, as one of its top budget priorities in its budget proposal to the Governor, "appropriations to fund the development of community placements to meet the Integration Plan's benchmarks;" (2) "consider the feasibility and propriety of consolidating the budget lines for state ICFs/MR and Community Waiver services;" (3) to the extent feasible, "shift funds from the carry-forward budget for state ICFs/MR to the Community Waiver services budget;" and (4) modify its policies and practices to assure that persons on the Planning List have access to existing community placement

vacancies.  (JA475-JA476.)  In the end, this remedy stage of the litigation involves more than just a mere "competitor" for "limited public resources" challenging a judgment that "will occasion some reallocation of [such] resources."  <u>Benjamin</u>, 432 F. App'x at 99.

Based on this review of the settlement reached by Appellees, we determine that Appellants satisfy the second and third requirements for intervention as of right under Rule 22(a)(2) with respect to the remedy stage of this complex and important proceeding.  We again note that the District Court, in its order denying Appellants' remedy-stage motions to intervene, did not expressly acknowledge the complexities posed by this distinct stage or address the apparent effects of the Settlement Agreement on Appellants or others.  However, the District Court's subsequent opinion granting final approval to the Settlement Agreement actually provides further support for our determination.

While the District Court indicated that the reactions of the class itself were almost entirely favorable and that the relatively small number of objections were based on misguided fears of forced removals and ICF/MR closures, it also stated that the objections themselves "were not only numerous, but some were also cogently expressed and many were at times quite eloquent and even poignant."  <u>Benjamin</u>, 807 F. Supp. 2d at 213.  The District Court recognized that "all state ICF/MR residents are affected in some way by the Proposed Settlement Agreement because all residents will be subject to evaluation," only to qualify this statement by adding that "any effect on those who wish not to be

38

discharged is negligible compared to the effect that a wholesale denial of the Settlement Agreement will have on those who do not oppose discharge." Id. at 207 n.2. Likewise, it noted that, "[a]lthough the rights of those who are non-class members must be vigilantly protected, their objections do not destroy the cohesiveness of the class members." Id. at 208 n.4.

Most significantly, the District Court advised "the parties to implement the settlement with caution." Id. at 209. According to the District Court:

> To our admittedly untrained eye, it appears as though the assessment protocol that has been developed to effectuate the Proposed Settlement Agreement may imply an unintended bias towards community placement. Reviewing the questionnaire to be utilized causes us to entertain serious doubts as to whether it is the proper tool for gauging whether the profoundly disabled, and especially those with no guardian to speak for them, are opposed to community placement. Indeed, we wonder about the wisdom of defaulting such individuals into a no preference category without greater analysis. And we have no doubt that the stated fears of many objectors, including those contained in the eloquent presentation by Mr. Solano on behalf of his sister, are heartfelt and entirely real. We urge those responsible for implementing the policy to consider these

concerns, and if necessary revise the protocols
in question. . . .

Id. at 209-10.    But the District Court then indicated that
objectors concerned about any supposed policy to shut down
ICFs/MR must look to their elected representatives and DPW
policymakers.  The District Court noted that while no remedy
in a context in which "family members must make wrenching
decisions regarding loved ones who are in many cases
profoundly impaired" will ever be perfect, the settlement
presented here "is worthy of our approval" as a reasonable
resolution and remedy for illegal conduct.  Id. at 210.  In its
subsequent order denying a partial stay pending appeal, the
District Court dismissed its own language as nothing more
than insubstantial dicta.

In the end, the District Court's various observations
resemble in many ways our own analysis of the Settlement
Agreement and its possible effects on the protectable interests
of Appellants and other ICF/MR residents, guardians, and
involved family members.  In short, the District Court was
troubled by the poignant objections received in this matter,
the apparent effects of the Settlement Agreement even on
non-members of the class, and, in particular, the "default"
treatment of residents who are unable to express a preference
and otherwise lack a guardian or involved family member.

We noted in our prior opinion that Plaintiffs
"recognize that 'Olmstead requires that patients eligible and
desirious of community placement be discharged into
community-based programs [only] if placement can be

40

reasonably accommodated, taking into account the resources of the state and the needs of other persons in its care.'" Benjamin, 432 F. App'x at 96 (quoting Frederick L., 422 F.3d at 156-57). In Olmstead, Justice Ginsburg (expressly joined by Justices O'Connor, Souter, and Breyer) reached the following conclusion:

> For the reasons stated, we conclude that, under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. . . .

Olmstead, 527 U.S. at 607 (Ginsburg, J.) (plurality opinion); see also, e.g., id. at 587 (Ginsburg, J.) (plurality opinion).

At this juncture, we simply conclude that the Supreme Court's decision in Olmstead provides some additional support for our already limited determination with respect to the second and third requirements for intervention as of right under Rule 24(a)(2). In short, we have already explained at some length the various ways the Settlement Agreement may affect or impair the protectable interests of Appellants and other ICF/MR residents, guardians, and involved family members. Under the circumstances, Appellants should have

41

the opportunity to be heard insofar as the Settlement Agreement may have an impact on the available resources as well as the needs of other individuals with mental disabilities, especially other ICF/MR residents. See, e.g., Ligas, 2010 WL 1418583, at *2-*6.[3]

_____

[3] The District Court stated in its initial intervention decision that it was persuaded by the holdings of the Seventh Circuit and the United States District Court for the Northern District of Illinois in the Ligas litigation, noting that "both parties have recognized and relied on this case due to its almost identical circumstances to the instant case." Benjamin, 267 F.R.D. at 462. However, we believe that subsequent events in this Illinois proceeding actually weigh in Appellants' favor.

After the Illinois district court refused to approve a proposed consent decree and decertified the class, plaintiffs, "[w]ith a new class definition in hand," requested class certification as well as preliminary approval of another proposed consent decree. Ligas, 2010 WL 1418583, at *1. Their motion, however, was dismissed as moot because the district court instead granted a motion to intervene filed by "approximately 2,000 previous objectors who lived in intermediate care facilities for people with developmental disabilities ('ICF-DD') or are on a waiting list for an ICF-DD as well as at least one individual who currently resides in a community integrated living arrangement ('CILA')." Id. (footnote omitted). Relying on Olmstead, the Illinois district court determined that these objectors were entitled to intervene under Rule 24(a)(2) as to the new proposed consent decree. Id. at *2-*4. It also allowed them to intervene with

42

Before moving to the final requirement for intervention as of right under Rule 24(a)(2), we again wish to emphasize the limited scope of our decision. We merely determine that, given the possible effects of the Settlement Agreement, Appellants possess "a sufficient interest" in the remedy stage of the litigation and that their "interest may be affected or impaired as a practical matter" by the disposition of this distinct stage of this complex yet important case. We express no opinion whatsoever as to whether or not the Settlement Agreement (or any other settlement that may be reached in this proceeding) should ultimately be approved—or whether the class itself should or should not be decertified. All such matters must be decided in the first instance by the District Court on remand—with the full and appropriate participation of Appellants as Rule 24(a)(2) intervenors.

### 4.    Representation of the Interest by an Existing Party

Although not really emphasized in the appellate briefing, we note that Appellants must establish inadequacy of representation in order to intervene as of right under Rule 24(a)(2). See, e.g., Mountain Top, 72 F.3d at 368. In general, "the burden of making that showing should be treated as minimal." Id. (quoting Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972)). Again, the District Court denied the motions to intervene filed in connection with the remedy stage of this case without any real discussion of this (or any other) requirement, and it merely incorporated by

---

respect to the new class definition. Id. at *5-*6.

reference its previous order denying the Springstead Intervenors' liability-stage motion to intervene. Although we did not reach this issue in our prior opinion, the District Court did conclude that the Springstead Intervenors failed to demonstrate that DPW was an inadequate representative of their alleged interests. However, in doing so, it expressly cited to the early stage of the litigation. See Benjamin, 267 F.R.D. at 464 ("Finally, although Applicants attempt to downplay the parallel positions of Defendants and Springstead Intervenors of opposing the relief sought at this early of the litigation, Applicants fail to demonstrate that Defendants will fail to prosecute their defenses in the future or will alter their position in this litigation."). Since then, circumstances have changed.

While their interests were possibly aligned prior to the District Court's summary judgment decision and its finding of liability, DPW's interests thereafter shifted from generally maintaining and defending the status quo to reaching a cost-effective settlement responsive to the successful disability discrimination theory of liability advanced by Plaintiffs on behalf of themselves and the other class members. Although DPW may still be charged by law with representing the interests of all persons under its care (and may constitute the substitute decision-maker for ICF/MR residents who are incapable of expressing any preference and have no guardians or involved family members), these persons now include both Plaintiffs and Appellants—two groups with quite divergent desires and interests. There is a general presumption that a government entity is an adequate representative. See, e.g., Kleissler, 157 F.3d at 972. "But the presumption

44

notwithstanding, when an agency's views are necessarily colored by its view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it, the burden is comparatively light."    Id. (citations omitted).  We further note that Appellees have not submitted any briefing expressly addressing this final intervention requirement or specifically explaining how the Settlement Agreement satisfies their obligations to protect Appellants as well as other non-class members.  We also believe that intervention here could very well assist DPW in fulfilling its Olmstead "obligation to administer services with an even hand."  Olmstead, 527 U.S. at 587 (Ginsburg, J.) (plurality opinion).

## IV.

For the foregoing reasons, we will vacate:  (1) the District Court's August 16, 2011 order insofar as it denied Appellants' motions to intervene as of right in the remedy stage of this litigation; and (2) the District Court's order of September 2, 2011 granting final approval to the Settlement Agreement.  In turn, we will remand this matter to the District Court with specific instructions to grant Appellants' motions to intervene as of right in the remedy stage of this litigation as well as to permit Appellants, as proper intervenors, to challenge the Settlement Agreement and to seek decertification of the class.  We, however, express no opinion as to whether or not the Settlement Agreement (or any other settlement that may be reached in this proceeding) should ultimately be approved or disapproved—or whether or not the class should be decertified.